**MS-4088**
**WU-1187**
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD**
A Professional Corporation
25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Telecopier
Proposed Attorneys for Jazz Photo Corp.,
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 03-26565 (MS)

Chapter 11

| In the Matter of: |
| --- |
| JAZZ PHOTO CORP., |
| Debtor-in-Possession. |

**AFFIDAVIT OF ANTHONY**
**COSSENTINO IN SUPPORT OF**
**DEBTOR'S VARIOUS "FIRST DAY**
**MOTIONS"**

**HEARING DATE**:
May __, 2003, at __:__ __.m.

STATE OF NEW JERSEY    )
                                        ) ss.
COUNTY OF MIDDLESEX)

ANTHONY COSSENTINO, being duly sworn according to law, upon his oath, deposes

and says:

1.    I am the President and Chief Executive Officer of Jazz Photo Corp., the within

debtor and debtor-in-possession (the "Debtor").  I have served in these capacities since May

2001 and am familiar with the Debtor's day-to-day operations, business affairs and records, and the facts set forth herein.  I am authorized to make this Affidavit on the Debtor's behalf.

## I.   INTRODUCTION

2.      On May 20, 2003 (the "Filing Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").  Since the Filing Date, the Debtor has remained in possession of its assets and has continued management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.      To avoid the potentially disruptive impact the commencement of this Chapter 11 case might have on the Debtor's business, the Debtor has requested that the Court consider, on shortened notice, the following motions filed simultaneously with the Debtor's Chapter 11 petition: (a) motion for an Order: (i) authorizing the Debtor to factor accounts receivable and obtain post-petition financing from Rosenthal & Rosenthal, Inc. ("Rosenthal"), (ii) scheduling a final hearing date, and (iii) granting other related relief; (b) motion for an Order authorizing the Debtor to satisfy, and directing payroll banks to honor, pre-petition gross salaries, commissions and related obligations to the Debtor's employees; (c) motion for an Order authorizing the Debtor to maintain its active bank account and continue using its existing business forms and cash management system; (d) motion for an Order restraining utilities from discontinuing, altering or refusing service pursuant to 11 U.S.C. § 366, and establishing procedures for determining requests for adequate assurance; and (e) motion for an Order authorizing the Debtor to honor certain pre-petition rebate obligations  (collectively, the "First Day Motions").  The purposes of the First Day Motions include, among other things, to: (a) insure the Debtor's ability to operate in the ordinary course and to minimize disruption of its ability to continue to provide quality service and products to its clients; (b) maintain and bolster employee morale so as to

2

reduce employee attrition during the Debtor's Chapter 11 proceeding, which would have a

detrimental impact on the Debtor's business and on customer service; (c) maintain vendor

relationships; and (d) preserve the confidence of customers.

4.      Each of the First Day Motions is critical to the Debtor's reorganization efforts and

preservation of the estate's assets. The purpose of this Affidavit is to explain the circumstances

precipitating the Debtor's Chapter 11 proceeding and provide general information about the

Debtor and its business operations that is germane to the First Day Motions.

5.      The factual statements in this Affidavit are based on my personal knowledge,

information supplied to me by others under my supervision, my review of relevant documents

and/or my opinions based on my experience and knowledge of the Debtor's operations, financial

condition and the industry in general.

## II.    THE DEBTORS' BUSINESS AND BACKGROUND

### A.    The Debtor's Business

6.      The Debtor is a New Jersey corporation formed in 1995.  The Debtor's main

office is located at 1035 Centennial Avenue, Piscataway, New Jersey.  The Debtor has

approximately 28 employees  and 1 principal consultant, Jack Benun ("Benun").  The Debtor's

sales force in the United States is comprised of approximately 20 independent sales

representatives and 6 of the Debtor's full time employees.

7.      The Debtor is engaged in the design, development, importation and wholesale

distribution of cameras and other photographic products, primarily in the United States.  The

camera categories that are imported and distributed include traditional hard-body 35mm cameras,

both point-and-shoot and zoom-lens cameras, and digital cameras (collectively, the "Hard-Body

Cameras") and disposable cameras that are refurbished ("Repaired Cameras") by the Debtor in

compliance with applicable intellectual property law.  The Debtor distributes its products under

3

its own brand name, as well as under the name of Bell & Howell pursuant to an exclusive license

agreement. The Debtor also sells certain items under the private labels of the Debtor's

customers.

8.      Benun founded the Debtor in 1995 and was its Chief Executive Officer and a

director until March 31, 1997. Pursuant to a resolution of an investigation by the Securities and

Exchange Commission in the mid-1990s relating to Concord Camera Corp., an entity founded by

Benun, he agreed not to serve as an officer or director of any publicly traded company although

Benun did not admit any wrongdoing. In contemplation of a public offering of its stock in 1997,

Benun resigned his positions as President and CEO of the Debtor. The proposed public offering

later was abandoned by the Debtor. Since inception, however, the stock in the Debtor has been

owned by certain of Benun's family members.

9.      The Debtor and JCB Consultants, Inc. ("JCB") are parties to an Amended and

Restated Consulting Agreement dated as of February 6, 2001 pursuant to which JCB provides

consulting services to the Debtor.[1] Benun is the President and principal shareholder of JCB.

10.     The Consulting Agreement requires JCB to make Benun's services available to

assist the Debtor in connection with, among other things, the development and procurement of

products for marketing and distribution, obtaining institutional debt and equity financing, finding

and recommending acquisitions, and developing the Debtor's business generally, all at the

request of the Debtor's senior executives. During the term of the Consulting Agreement, which

runs through January 2007, and for a period of three years thereafter, JCB is precluded from

---

[1] The Amended and Restated Consulting Agreement superseded a prior consulting
agreement between the Debtor and JCB dated April 2, 1997.

4

providing similar consulting services to any competitor of the Debtor without the Debtor's prior

consent.

11.     The Consulting Agreement requires compensation to be paid to JCB based on the

Debtor's annual net sales as follows: (a) 2.25% of net sales up to $10,000,000; (b) 4.5% of net

sales exceeding $10,000,000 but not exceeding $20,000,000; and (c) 2.25% of net sales

exceeding $20,000,000.  The Consulting Agreement requires the Debtor to make advance

payments to JCB at the rate of $15,000 per week, subject to reduction if the Debtor's gross profit

falls below $9,750,000 on an annualized basis.  The payments to JCB for any calendar year are

capped at 8% of the Debtor's gross profits.[2]

12.     Because of Benun's knowledge and experience in the Debtor's business, the

Debtor's Consulting Agreement with JCB is one of its most valuable and important assets.

Benun has invaluable relationships with Rosenthal, the Debtor's factor and primary secured

creditor, as well as the Debtor's most important customers and suppliers.  In addition, the Benun

family members who possess stock in the Debtor are guarantors to Rosenthal and have pledged

valuable real property to secure those guarantees.  The Debtor intends to perform all its

obligations to JCB under the Consulting Agreement, pending a determination of whether to

assume or reject same, to insure the Debtor's smooth transition into Chapter 11 and the

maintenance of the value of the Debtor's franchise.

13.     The Debtor has several subsidiaries that source and market the Debtor's products.

The Debtor's operating subsidiaries are:  (a) Jazz Photo Canada Corp., a Canadian corporation

---

[2] In addition to the foregoing, the Consulting Agreement contemplates fees to JCB, in
amounts to be determined by the Debtor's board of directors, for work performed by JCB
relating to: (a) debt or equity financing, (b) personally guaranteeing obligations of the Debtor,
and (c) finding and recommending acquisitions by the Debtor.

40654/0001-1272476v6

("Jazz Canada"); (b) Jazz Photo (Hong Kong) Limited, a Hong Kong corporation ("Jazz Hong

Kong"); and (c) Jazz Photo Ltd., a United Kingdom corporation ("Jazz UK").  In addition, Jazz

Hong Kong has two subsidiaries: (a) Jazz Photo (Shenzhen) Limited, located in China ("JPZ");

and (b) Jazz Photo (Shenzhen) Company Limited, also located in China ("JPZC").

14.     Jazz Canada is responsible for sales of the Debtor's products into Canada.  Jazz

UK is responsible for sales and marketing in the United Kingdom and Europe.  The Debtor

sources its products primarily from Jazz Hong Kong and resells the products in the United States.

The transactions between the Debtor and Jazz Hong Kong are generally arms' length

transactions on normal business terms.

15.     The Hard-Body Cameras the Debtor purchases are sourced by Jazz Hong Kong

from a limited number of third party vendors and contract manufacturers located in the Far East.

The Repaired Cameras the Debtor purchases from Jazz Hong Kong are sourced from third party

vendors, contract manufacturers and from JPZ and JPZC.  An opinion rendered by the United

States Court of Appeals for the Federal Circuit on August 21, 2001 has limited the sale of

Repaired Cameras in the United States to those that are repaired using camera shells from

disposable cameras first sold in the United States ("US shells") by Fuji Photo Film Co. Limited

("Fuji") or its licensees.  That restriction has increased the Debtor's costs and, accordingly,

reduced its profit margins.

16.     The Debtor's customers include food retailers and photo specialty shops, as well

as major retailers such as Wal-Mart, Walgreen's, Staples and Office Depot.  The majority of the

Debtor's sales are derived from a limited number of customers.  The Debtor's largest client,

Wal-Mart, accounted for 56% of the Debtor's sales in 2001.

6

17.     The Debtor's assets as of the Filing Date had a value of approximately

$6,931,292.00 and consist of inventory and accounts receivables that are factored pursuant to a

factoring arrangement, more particularly described below, with Rosenthal.  The Debtor

maintains its inventory at its New Jersey location and in a public warehouse in Carson,

California.

18.     The Debtor had revenues totaling approximately $63.4 million for 2001 in the

United States, and $70.7 million overall.  Revenues for 2002 totaled approximately $47.9 million

in the United States and $55.9 million overall.  The reduction in the Debtor's revenue  was

primarily attributable to competition and a decrease in sales to Wal-Mart.

**B.     Rosenthal Factoring Agreement**

19.     Since July 1995,  the Debtor has been a party to a factoring agreement with

Rosenthal pursuant to which Rosenthal factored the Debtor's qualified accounts receivable and

provided a line of credit and other financial accommodations to the Debtor (the "Factoring

Agreement").  Among the First Day Motions is the Debtor's motion for an Order, among other

things, authorizing the Debtor to continue factoring accounts receivable with Rosenthal and

obtaining post-petition financing from Rosenthal during its Chapter 11 proceeding.  A detailed

description of the Factoring Agreement and the Debtor's proposed post-petition arrangement

with Rosenthal is set forth in the Verified Application submitted in support of that motion.

20.     As of the Filing Date, the Debtor owed Rosenthal approximately $6,439,940.00

under the Factoring Agreement, which represents a cash loan of approximately $5,546,984.00

and a contingent liability of approximately $892,956.00.  Rosenthal's claim is secured by liens

on the Debtors' accounts receivable, inventory and other collateral.  As of the Filing Date, the

Debtor had accounts receivable totaling approximately $6,088,752.00 and inventory totaling

approximately $842,540.00 at the New Jersey and California facilities combined.

40654/0001-1272476v6

C.    Debtors' Claim Against Imation Corp., et al.

21.    In 1998, the Debtor shipped, primarily to its largest customer, approximately 4.5

million Repaired Cameras that were loaded with film supplied by Imation Corp. and Imation,

S.p.A. (collectively, "Imation").  The film was defective and, as a result, the Debtor's customer

rescinded the sale and returned the Repaired Cameras for credit.  That caused the Debtor

substantial pecuniary loss and impaired its reputation as a supplier of low-cost, quality Repaired

Cameras.

22.    The Debtor has claims against Imation for, among other things, Imation's breach

of express and implied warranties and fraud resulting from the sale and shipment of defective

film to the Debtor.  In 1999, the Debtor commenced an action against Imation in the United

States District Court for the District of New Jersey, bearing the caption Jazz Photo Corp. v.

Imation Corp. and Imation S.p.A., Docket No. 99-2505 (the "Imation Case").

23.    The Debtor is moving for authority to retain the firm of Budd Larner Rosenbaum

Greenberg & Sade, P.C. ("Budd Larner") as its litigation counsel for the Imation Case.  Attached

as Exhibit A is a copy of the Affidavit of Peter John Frazza, Esq., Budd Larner's co-managing

shareholder and lead counsel in the Imation Case.[3]  As set forth therein:  (a) the Debtor has

expended more than $2 million pursuing its claims in the Imation Case; and (b) the Debtor has

submitted expert reports in the Imation Case that state the Debtor sustained more than $85

---

[3] Mr. Frazza's Affidavit was submitted in support of the Debtor's motion for a stay of
execution pending appeal relating to a judgment (described below) recently entered against the
Debtor by the United States District Court for the District of New Jersey.  The exhibits to Mr.
Frazza's Affidavit are voluminous and have been intentionally omitted.

8

million in damages as a result of Imation's conduct, before trebling and the assessment of pre-

judgment interest.[4]

### III.   FACTORS PRECIPITATING THE  DEBTOR'S CHAPTER 11 FILING

24.     The Debtor was a respondent in a complaint filed by Fuji before the United States

International Trade Commission ("ITC"), seeking a cease and desist order and a general

exclusion order.  One June 3, 1999, the ITC issued a ruling that barred importation and sale of

one-time-use or single-use cameras and infringement of Fuji patents.  During the Presidential

review period, the Debtor appealed and filed for a stay of the order in the United States Court of

Appeals for the Federal Circuit.  The Debtor was granted a stay, pending a decision on the

appeal.

25.     Pursuant to an order by the Federal Circuit dated July 22, 1999, the Debtor was

required to post a bond with ITC in the amount of $665,000, equal to the amount of sales that

occurred during the precedential review period.  That order was modified on December 21, 1999

to increase the bond by $212,000.  The Debtor posted the bond in January 2000.

26.     On August 21, 2001, the Federal Circuit ruled that a certain process for reloading

single-use cameras was non-infringing, but only if performed on cameras sold originally by Fuji

or its licensee in the United States; (i.e. US shells).  The issue of whether permissive reloading

should be limited to US shells was the subject of a petition by the Debtor for *certiorari* to the

United States Supreme Court.  Fuji filed a cross-petition for *certiorari* to the United States

Supreme Court seeking review of the Federal Circuit's holding on the reloading process.  The

Supreme Court declined both petitions for *certiorari*.

---

[4] Pursuant to the Debtor's Consulting Agreement with JCB, JCB is entitled to 25% of the
Debtor's net recovery in the Imation Case, subject to reduction to 15% if the net recovery is the
result of a jury award, as same may be modified and/or confirmed on appeal.

40654/0001-1272476v6

27.     Fuji subsequently filed a complaint in the United States District Court for the District of New Jersey against the Debtor, bearing the caption Fuji Photo Film Co. Ltd. v. Jazz Photo Corp. Inc., Jazz Photo Hong Kong Ltd., and Jack Benun, Docket No. 99-2937(FSH).[5]

28.     On December 2, 2002, a jury rendered a special verdict in favor of Fuji and against the Debtor, Jazz Hong Kong and Benun, finding the Debtor had infringed on Fuji's patents between 1995 and August 2001.  The court entered a final judgment on March 18, 2003 against the Debtor, Jazz Hong Kong and Benun, jointly and severally, in the amount of $28,438,361.84 and against the Debtor and Jazz Hong Kong, jointly and severally, in the amount of $1,326,918.76 (the "Judgment").[6]  The Debtor's motions for a stay pending appeal have been denied by the United States District Court for the District of New Jersey and United States Court of Appeals for the Federal Circuit.

29.     Before the Filing Date, Fuji began the process of attempting to collect on the Judgment.  Specifically, Fuji has a pending application before the United States District Court for the District of New Jersey in which it seeks authority to register the Judgment in the federal courts of New York and California.  In addition, on May 15, 2003, Fuji served on Rosenthal a Restraining Notice pursuant to CPLR § 5222(b) that purports to restrain Rosenthal from paying

---

[5] Thereafter, Fuji brought a second enforcement action against the Debtor before the ITC, bearing the caption In re Certain Lenses Fitted Film Packages, Docket No. 337-TA-406.  There, Fuji seeks a determination  that the Debtor violated the cease and desist order by importing non-complying cameras in violation of the ITC order.  That matter was scheduled for trial in June 2003.  However, as a result of the SARS outbreak in the Far East, this matter has been stayed indefinitely, as the parties are unable to travel to the Far East to conduct discovery.  The Debtor intends to seek approval of its retention of the firm of Kaplan & Gilman, LLP to represent the Debtor in that enforcement action.

[6] The Court did DENY Fuji's request for entry of a final injunction precluding defendants and others from "infringing" or "inducing such infringement" of its patents.  Given that Fuji limited the scope of its infringement claims to cameras sold prior to August 21, 2001, there was no evidence to support the injunction request.

40654/0001-1272476v6

any debts owed to the Debtor or returning to the Debtor any of the Debtor's property in

Rosenthal's possession until the Judgment is satisfied.

30.    Fuji has expressed no desire to work with the Debtor to reach a business solution

to the parties' dispute that would allow the Debtor to continue as a going concern.  Instead, it is

the Debtor's belief that Fuji seeks to put the Debtor out of business and force a liquidation of its

assets for Fuji's benefit.  The Debtor anticipates that Fuji will continue its aggressive tactics in

this proceeding and seek to deprive the Debtor of an opportunity to reorganize its affairs in the

context of this Chapter 11 proceeding.

31.    The Debtor has filed this Chapter 11 proceeding in a good faith attempt to

maximize the value of its estate for the benefit of all creditors.  The Debtor understands that the

factual and legal bases for the Judgment are highly debatable and has filed an appeal of the

Judgment in the United States Court of Appeals for the Federal Circuit.  If the Debtor is

successful in reversing or significantly modifying the Judgment, the most substantial claim

against the Debtor's estate will disappear or be substantially reduced.  In addition, bringing

conclusion to the Debtor's several years of litigation with Fuji will allow the Debtor to dedicate

its resources more fully to improving and growing its business.

### IV.    THE DEBTOR'S OBJECTIVES IN CHAPTER 11

32.    During its Chapter 11 proceeding the Debtor intends to continue providing

quality, low cost products to its customers under the Debtor's brand name, the Bell & Howell

label and its customers' private labels.  The Debtor is committed to improving its marketing

efforts to increase sales to its current customer base and assessing other available marketing

channels.

33.    In addition, the Debtor intends to vigorously pursue its claims against Imation.

The Debtor expects the Imation Case to conclude in either a favorable settlement or a substantial

judgment against Imation and its affiliates that will compensate the Debtor for the damages it

suffered as a result of Imation's conduct.

34.    Finally, the Debtor intends to challenge the Judgment resulting from the Fuji

litigation.  Even if the Debtor is unsuccessful in reversing the Judgment, the Debtor believes a

successful resolution of the Imation Case will yield a recovery that will far exceed the Judgment,

paving a way for a successful emergence from Chapter 11.

35.    The relief requested in the First Day Motions is necessary to allow the Debtor to

stabilize its affairs as it transitions into Chapter 11.  It is therefore respectfully requested that the

Court grant each of the Debtor's First Day Motions and enter the proposed Orders accompanying

same.

/s/ Anthony Cossentino<br>ANTHONY COSSENTINO

Sworn and subscribed to
before me this 20th day of
May, 2003


    /s/ Nancy Hanley
A Notary Public of New Jersey
My Commission Expires April 25, 2004