# Public Version

Lowenstein Sandler PC
Michael S. Etkin, Esq. (ME 0570)
Bruce Buechler, Esq. (BB 0324)
65 Livingston Avenue
Roseland, New Jersey 07068-1791
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

**Hearing Date and Time:**

**Objection Deadline:**

Stroock & Stroock & Lavan LLP
Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Co-Counsel to Fuji Photo Film Co., Ltd.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**      X
-------------------------------------------------- X
In re:                                                          Chapter 11
                                                                 Case No. 03-26565 (MS)
JAZZ PHOTO CORP.,

       Debtor.

-------------------------------------------------- X
-

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

JURISDICTION ........................................................................................................................3

STATEMENT OF FACTS .........................................................................................................3

    I.     The Bankruptcy.............................................................................................................3

    II.    Benun .........................................................................................................................5

    III.   Benun and the Debtor ..................................................................................................9

    IV.   The Violation of Fuji's Patents by Debtor, Jazz Hong Kong and Benun ....................16

    V.    Improprieties in the Period Running Up To and Post-Petition....................................20

RELIEF REQUESTED AND BASIS THEREFOR .......................................................................27

    VI.   The Appointment Of A Trustee Is Required In This Case. .........................................27

CONCLUSION.........................................................................................................................42

SSL-DOCS1 1352114v1

# TABLE OF AUTHORITIES

## CASES

In re Bellevue Place Associate,
    171 B.R. 615 (Bankr. N.D. Ill. 1994) ................................................................39, 40

In re Colorado-Ute Electric Association, Inc.,
    120 B.R. 164 (Bankr. D. Colo. 1990) ...................................................................39

Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.,
    828 F.2d 239 (4th Cir. 1987) ...............................................................................29

In re Concord Coal Corp.,
    11 B.R. 552 (Bankr. S.D.W. Va. 1981) ...............................................................40

In re Great Northeastern Lumber & Millwork Corp.,
    20 B.R. 610 (Bankr. E.D. Pa. 1982) .............................................35, 36, 38, 41

In re Hotel Associates., Inc.,
    3 B.R. 343 (Bankr. E.D. Pa. 1980) .....................................................................36

In re Intercat,
    247 B.R. 911 (Bankr. S.D. Ga. 2000) .........................................................30, 31, 33

In re Ionosphere Clubs, Inc.,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) ............................................................29, 36

In re Justus Hospitality Properties, Ltd.,
    86 B.R. 261 (Bankr. M.D. Fla. 1988) ..................................................................40

Lemon v. Kurtzman,
    411 U.S. 192 (1973) .............................................................................................36

In re Madison Management Group, Inc.,
    137 B.R. 275 (Bankr. N.D. Ill. 1992) .................................................................39

In re Main Line Motors, Inc.,
    9 B.R. 782 (Bankr. E.D. Pa. 1981) ..........................................................38, 40, 41

In re Marvel Entertainment Group, Inc.,
    140 F.3d 463 (3d Cir. 1998)............................................................................29, 30

In re North America Communications, Inc.,
    138 B.R. 175 (Bankr. W.D. Pa. 1992) ......................................32, 33, 35, 36

In re PRS Insurance Group, Inc.,
        274 B.R. 381 (Bankr. D. Del. 2001) ............................................................32, 38

Pereira v. Cogan,
        2003 WL 21039976 (S.D.N.Y. May 8, 2003) .............................................27

In re Philadelphia Athletic Club, Inc.,
        15 B.R. 60 (Bankr. E.D. Pa. 1981) ...............................................................32

In re Prof'l Accountants Referral Services, Inc.,
        142 B.R. 424 (Bankr. D. Colo. 1992) ...........................................................39

Schuster v. Dragone,
        266 B.R. 268 (D. Conn. 2001) ......................................................................40

In re Sharon Steel Corp.,
        86 B.R. 455 (Bankr. W.D.Pa. 1985) ............................................................29

In re Sharon Steel Corp.,
        871 F.2d 1217 (3d Cir. 1989)...............................................29, 30, 35, 36, 38, 40

In re Sletteland,
        260 B.R. 657 (Bankr. S.D.N.Y. 2001) .........................................................38

In re United Church of the Ministers of God,
        74 B.R. 271 (Bankr. E.D. Pa. 1987) ........................................................32, 36

In re V. Savino Oil & Heating Co., Inc.,
        99 B.R. 518 (Bankr. E.D.N.Y. 1989).......................................................29, 38

## STATUTES

11 U.S.C. § 1104(a) .......................................................................1, 28, 29, 38

19 U.S.C. § 1337(f)(2) ...........................................................................19

28 U.S.C. §§ 1408 and 1409 ...................................................................4

28 U.S.C. §§ 157 and 1334 ....................................................................4

28 U.S.C. § 157(b)(2) ............................................................................4

SSL-DOCS1 1352114v1

Fuji Photo Film Co., Ltd. ("Fuji"), by its undersigned counsel, hereby submits this Memorandum of Law in support of its motion (the "Motion") for an order pursuant to 11 U.S.C. § 1104(a) directing the appointment of a chapter 11 trustee.  In support of the Motion, Fuji respectfully represents as follows.

## PRELIMINARY STATEMENT

By this Motion, Fuji will demonstrate that:

(a)    Debtor is a company organized by Jack C. Benun ("Benun") for the purpose of violating the law (by infringing Fuji's patents), a practice that continues to this day, even after repeated agency and court findings of infringement;

(b)    Notwithstanding his nominal title of "consultant," Debtor is the alter ego of Benun operated for the benefit of Benun (and to a lesser extent, the benefit of his appointed officers), to the detriment of all creditors;

(c)    Pre-petition, Benun systematically looted Debtor, a conclusion reached by the District Court in the action which gave rise to Fuji's judgment;

(d)    Post-petition, Benun continues to loot Debtor, exacting a $15,000 per week "consulting" fee, while his primary service seems to be establishing new business practices to insure that Debtor's profits remain hidden from creditors;

(e)    Benun organized Debtor, including the formation and use of a fully controlled wholly owned subsidiary, Jazz Photo (Hong Kong) Ltd. ("Jazz Hong Kong") (itself, not a debtor in any bankruptcy proceeding, but, with Benun himself, jointly and severally liable for Fuji's judgment), in a way which hides in Asia, whatever profits not directly taken by Benun, leaving nothing for creditors of the Debtor;

1

(f)    In the period immediately before filing the petition, the Debtor and Benun conspired to reorganize the Debtor's business so that assets are now being funneled out of the Debtor's estate to entities in Asia over which Benun wields influence or control (some of which entities appear to have just recently become suppliers), effectively eliminating even the limited transparency provided by dealing with a wholly-owned foreign subsidiary over which this Court can exercise jurisdiction;

(g)    In April of 2002, Polytech Enterprise Limited ("Polytech") was organized.  It is now the second largest creditor and represented on the Creditors' Committee by a business associate of Benun.  Notwithstanding representations to the contrary to the Office of the U.S. Trustee, the director of Polytech is a person believed to be a key employee of Jazz Hong Kong.

(h)    Debtor and Benun's misconduct continues post-petition, including Debtor and Benun making misrepresentations of fact to this Court and to the U.S. Trustee, such as that Polytech and another entity, Everbest, are totally unaffiliated with Jazz Hong Kong, and the continuing looting of the Debtor by Benun;

(i)    The history of the Debtor is replete with preferences and fraudulent transfers to Benun, members of his family and others, and improper conduct by officers and of directors, that will not, and perhaps cannot, be pursued by the Debtor, or even by the Creditors' Committee as it is presently formed; and

(j)    The pre-and post-petition misconduct in this case is predictable from Benun's history of embezzlement from a prior company run through the use of a Hong Kong subsidiary.

(k)    As will be pointed out more particularly below, Debtor and the real party in interest, Benun, are in the remarkable position of satisfying nearly every criteria for the

2

appointment of a Trustee including, fraud and dishonesty (or in the alternative, incompetence and gross mismanagement), as well as the need to protect the best interests of creditors.

Fuji offers the Declaration of Ellen Brier and annexed Exhibits and the Declaration of Bruce Buechler in support of this Motion. A non-confidential version of this Memorandum of Law and of the Brier Declaration will be filed with the clerk and served on persons not permitted access under the agreement of the parties.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF FACTS

### I.    The Bankruptcy

On May 20, 2003 (the "Petition Date"), Jazz filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No Trustee has been appointed. Therefore the Debtor is charged with carrying out the functions and duties of a Trustee under Section 1107 of the Bankruptcy Code. According to the List of 20 Creditors attached to the Debtor's voluntary Chapter 11 Petition, Fuji is the Debtor's largest unsecured creditor by a wide margin. The almost $30 million debt to Fuji arises from a judgment obtained by Fuji as a result of the Debtor's blatant infringement (in part already found to be willful) of patents owned by Fuji, which was entered after a jury trial before Hon. Faith Hochberg of the United States District Court for the District of New Jersey (the "District Court"). Brier Dec. Exh. 1. Debtor's essentially wholly-owned Hong Kong subsidiary, Jazz Hong Kong, is jointly and severally liable with Debtor on the full amount of the judgment and Benun is jointly and

3

severally liable with Jazz and Jazz Hong Kong for more than $28.4 million of the judgment. Id. The District Court's opinion supporting the judgment is found at *Fuji Photo Film Co., v. Jazz Photo Corp.*, 249 F.Supp. 434 (D.N.J. 2003). Brier Dec. Exh. 2.

The second largest creditor, Polytech, a Hong Kong company purportedly owed about $1.5 million, is affiliated with Jazz Hong Kong and, by a proxy, is represented on the Creditors' Committee by Leon Silvera, a business associate and neighbor of Benun. This relationship and the relationship between Polytech and Jazz Hong Kong will be explained further below.

The third and fourth largest creditors are law firms, Dreier & Baritz LLP and Skadden, Arps, Slate, Meagher & Flom LLP. Drier represented Debtor, Benun and Jazz Hong Kong in the District Court action, while Skadden represented only Benun[1]. Dreier is on the Creditors' Committee. Neither firm was fully paid for their services. The fifth largest creditor, Bell & Howell Company, is a licensor of the Bell & Howell trademark to Debtor. An official of Bell & Howell is a director of Jazz. The sixth largest creditor is the firm of Budd Larner Rosenbaum Greenberg & Sade, P.C., retained as counsel for Debtor in the appeal of the District Court action and in connection with an action against the Debtor's former suppliers, Imation Corp. and Imation S.p.A. (collectively, "Imation"). The remaining 14 creditors have claims ranging from about $65,000 to $25,000. Of them, the twelfth largest creditor, Jevic Transportation, is owed less than $40,000, is the third member of the Creditors' Committee and is its chairman. Jevic is a trade creditor and likely desirous of future business with Debtor.

On May 22, this Court signed an Interim Order authorizing Debtor to factor accounts receivable (pre-and post-petition) and obtain post-petition financing by Rosenthal & Rosenthal of New York City. The budget annexed to the Order authorizing DIP financing reflects a

---

[1] It is telling that Skadden is indebted to Jazz, not Benun.

continuation of "business as usual" on the part of Benun and the officers of Debtor to operate the company for their own personal benefit, without any benefit to creditors (*e.g.* the budget provides for the paying of $15,000 per week to JCB Consultants, Inc. ("JCB), still another alter ego of Benun[2], and salaries at pre-petition levels, subject to a cap, but forecasts no monies available for creditors after thirteen weeks of operation). On May 30, 2003, this Court issued a second Interim Order authorizing Debtor to obtain supplemental financing accommodations (letters of credit) from Rosenthal & Rosenthal.

## II.    Benun

Prior to founding Debtor, Benun was the founder and Chief Executive Officer of Concord Camera Corp. ("Concord"), a publicly traded company that manufactured, among other things, new single use cameras that infringed Fuji's patents. Benun became aware of Fuji's single use camera patents from his association with Concord, which Fuji had charged with infringement. After Benun was dismissed from Concord, Fuji and Concord settled their dispute and Fuji licensed Concord under its single use camera patents.

As detailed in a Complaint filed in 1994 in the District Court for the District of Columbia (94 Civ. 1913), the Securities and Exchange Commission ("SEC") charged Benun with misappropriating $150,000 from Concord through a complex series of steps. Specifically, the SEC alleged that Benun ordered an employee of a Hong Kong subsidiary to issue a draft to a new employee, ostensibly as a signing bonus. The employee endorsed the draft and delivered it to Benun, who instructed a longtime friend to deposit it into the friend's Hong Kong bank account and to wire transfer the $150,000 to another of Benun's longtime friends. The second friend delivered five checks totaling $144,500 to Benun and his wife, Mona Benun, who

---

[2] Benun is the sole owner of JCB, which is located in Benun's home.

deposited the checks into their bank accounts. Brier Dec. Exh. 3.    Although Benun neither admitted nor denied the allegations of the Complaint, as a result of a settlement of the investigation and consent judgment, he was ordered to reimburse Concord $150,000, "representing disgorgement of the original amount Benun misappropriated from Concord," plus $65,242.58 in prejudgment interest, to pay the Government $150,000 as a civil money penalty; and to be subject to a lifetime ban from holding office in a public company. Brier Dec. Exh. 4.

Benun (largely represented by Budd Larner) then engaged in a long series of suits and arbitrations with Concord, as described in a Verified Complaint in *Benun v. Concord* filed in the Superior Court of New Jersey, Law Division: Monmouth County, dated April 20, 2001 (Mon.L-1845-01).    In the Verified Complaint (par. 37), Benun admitted that an Arbitrator issued an interim award on August 25, 1999 in which he concluded that Benun had defrauded Concord by "diverting and embezzling $150,000 out of the Company's monies."    Brier Dec. Exh. 5 (emphasis added).

During the patent infringement trial with Fuji, the District Court permitted the impeachment of Benun's character based on the foregoing evidence, after the Debtor's Chairman of the Board testified that "most of the manufacturers in Asia had worked for Benun at one time;" and that he had a great deal of influence in the Asian manufacturing community, lauding his "reputation" in that community.    Brier Dec., Exhs. 6 at 107-08 and 7 at 61-62, 64, 95-97. Benun's prior misconduct involving embezzlement from a Hong Kong subsidiary and his affiliations in Asia are telling in this proceeding, because Asia is where the great bulk of the assets of the Debtor are now being sent, at the direction of Debtor, under the Rosenthal & Rosenthal DIP financing agreements approved on an interim basis by this Court.

SSL-DOCS1 1352114v1

Benun's role in the formation, control and looting of Debtor will be set out below. However, after years of looting Debtor to the tune of more than $10.7 million that can be identified at this time (not including a $932,000 loan from Debtor to Benun outstanding as of February 28, 2003), and exacting unknown sums from Jazz Hong Kong and other Asian operations, Benun claims to be insolvent (even without regard to Fuji's judgment).  Brier Dec. Exh. 8.[3]  In fact, he claims to have lived luxuriously in a $5 million home from 2000 to 2002 while incurring a cumulative deficit of $1,915,633 (based solely on "tax-related expenses," i.e. not including living expenses other than mortgage interest and principal), during which period he claims to have had taxable income directly or indirectly from the Debtor of $5,323,101.  Brier Dec. Exh. 9.  On the other hand, Debtor acknowledges paying to Benun directly or indirectly $7,189,024 during this period.  Brier Dec. Exh. 10 at Exh. B.  The fact that these millions have disappeared shows that Benun cannot be trusted to safeguard Debtor's assets for the benefit of creditors.

Benun has a history of hiding his assets.  Fuji believes that Benun is the true owner of four properties held by nominees, all of which were put up on behalf of Debtor as security for the Rosenthal & Rosenthal factor agreement (pre-and post-petition).[4]  Three of these properties are in the names of Benun's daughters:  Rebecca (house on Benun's estate, adjacent Benun's home,

---

[3] Much of the financial material relied upon here was recently submitted without confidentiality restriction in support of an unsuccessful attempt to obtain a stay of Fuji's judgment without posting a supersedeas bond from the District Court and the Court of Appeals for the Federal Circuit by Debtor, Benun and Jazz Hong Kong.  The submission in the Federal Circuit was not under seal.

[4] While it has been argued that Benun's daughters pledged their assets to protect their ownership interest in Jazz, that interest was gifted to them by Benun's wife in 1997 (Brier Dec. Exh. 11 at 41 of 262), and neither they, nor Benun's wife, ever made any contribution to the management or operation of Debtor or Jazz Hong Kong (Brier Dec. Exh. 6 at 27); nor have the wife and children ever been paid any salary.  Brier Dec. Exh. 12.

7

transferred by Benun in 1995[5] and secured for $1 million); Sabrina (a house transferred by Benun in 1996 and secured for $1 million; and Vanessa (land purchased in 1998 and secured for $1 million). Brier Dec., Exhs. 13, 14 and 15.[6] In October, 2002, these daughters were 25, 24 and 22 years old, respectively, and therefore were minors when they received the properties. Brier Dec. Exh. 16 at 112-13. The property owned by Rebecca was occupied for several years by Roger Lorenzini, former President of the Debtor and still its Chairman of the Board. The Debtor paid $60,000 in rent to Rebecca in 1998 and thereafter waived the rent due from Rebecca. Brier Dec., Exhs. 6 at 39-40 and 12 at ¶ 6. Fuji contends that Benun's children hold these properties as mere nominees of Benun as a means to shelter these assets from creditors.

The fourth property is an apartment in New York purchased in 1999 for about $1.1 million by Kintic US, Inc. ("Kintic"). The "process" address of Kintic is the offices of Greenberg & Kahr. Mr. Kahr is a long-time attorney for Mr. Benun and General Counsel to Jazz.[7] The "business" address of Kintic is c/o Kestenbaum, 599 W. Hartsdale Avenue, Suite 201, White Plains, New York 10607. Gerald L. Kestenbaum, CPA, is the accountant for the Benun Foundation of which the settlor and trustee is Benun. Brier Dec., Exhs. 18 and 19 (without exhibits) and Chief Executive Officer. The director of Kintic is Suk Yee Szeto (also known as Jessie Szeto), a Managing Director of Jazz Hong Kong and a former employee of Concord's Hong Kong subsidiary. Brier Dec., ¶21 and Exhs. 20 and 11 at 35 of 262. Mr. Greenberg signed all of the papers in 1999 on behalf of Szeto and Kintic.

---

[5] Transfers in 1995 and 1996 were most likely made to avoid liability to Concord and others by reason of Benun's embezzlement. See Brier Dec. Exh. 5, ¶¶23-28. They may also have been to shield assets from Fuji patent infringement liability.

[6] The "security" referred to is a mortgage to Rosenthal & Rosenthal.

[7] Fuji has opposed the retention of Greenberg and Kahr as corporate counsel to Debtor.

The original mortgage from a bank was for $613,250. In 2002, to secure financing for the Debtor, Rosenthal & Rosenthal entered into an additional mortgage for $500,000 with Kintic secured by the apartment, "owing pursuant to a Guaranty of even date," now known to be security for Debtor's factor arrangement. Brier Dec. Exh. 20. The apartment is occupied by a person believed to be associated personally with Benun. Ms. Szeto earned $100,000 per year in 1997 and about [      ][8] per year in 2002. Brier Dec. Exhs. 11 at 36 of 262 and 21 at 173 (Confidential)[9]. It is reasonable to infer that funds for the New York apartment came from Benun, perhaps funneled through Hong Kong. Fuji contends that the apartment is held by Kintic as a mere nominee of Benun.

The foregoing demonstrates that any money paid to Benun is likely to be lost forever, or at least extremely difficult to find and recover.

### III.    Benun and the Debtor

After being fired by Concord, in 1995 Benun founded the Debtor, making himself the president and director. Benun modeled the Debtor's corporate structure after that of Concord, including the establishment of a parent marketing company in the United States (the Debtor) and a supplier subsidiary located in Hong Kong (Jazz Hong Kong).

Although it is believed that Benun furnished all funds necessary to found and initially sustain the business, Benun's wife, Mona Benun, was initially named as the sole shareholder of the Debtor. In April 1997, in anticipation of a failed public offering, some stock was gifted to Benun's four daughters, two of whom were minors at the time. Currently, the Debtor's

---

[8] Material in brackets is confidential and found in a confidential version of this memorandum and of the Brier Declaration filed under seal and served on counsel and the Office of the U.S. Trustee.

[9] The Benun Foundation loaned Debtor a total of $120,000 in 1998 and 1999, repaid in 2000. Brier Dec. Exh. 12 at Exh. A.

shareholders consist, with minor exceptions, of Mona Benun and the Benun's four children. Brier Dec. Exh. 11 at 37, 41 of 262. Jazz Hong Kong supplied the Debtor with the bulk of its products from Asian sources. The Company's first product and in fact its largest volume product even to date, were the single use cameras found to be patent infringements in the District Court. Brier Dec. Exh. 16 at 89-92, 106-09, 114.

As part of an ill-fated attempt to take Debtor public in 1997,[10] Benun "resigned" his positions of President and Director of the Debtor (in order to comply with the SEC Consent Judgment that prohibited Benun from serving as a director or officer of a public company), and assumed the position of "consultant." Brier Dec. Exh. 11 at 37 of 362. However, the reality is that Benun never relinquished his control over the Debtor. Instead, Benun engineered the appointment of his successor, Roger Lorenzini (although retired as CEO, still Chairman of the Board of Directors and on salary from the Debtor), and retained control over the Debtor directly and through a "consulting" company he created, JCB Consultants, Inc. ("JCB"). Brier Dec. Exh. 16 at 112-114, 116-117.

JCB is wholly owned by Benun and is still another of his alter egos. Brier Dec. Exhs. 6 at 14-16 and 16 at 116-17. Through an agreement between Debtor and JCB (originally "negotiated" between Benun and Lorenzini), and through effective control of Mr. Lorenzini and the Board of Directors[11] (which awarded Benun substantial "bonuses" each year beyond the "commissions" required by the agreement), Benun has extracted millions of dollars out of the

---

[10] Benun's attempt to take Debtor public failed because each of the stock exchanges to which Debtor applied, refused to list the company, at least in part because of Benun's affiliation with the Debtor. Brier Dec. Exh. 6 at 19-20.

[11] The Board consisted of Mr. Lorenzini, David Mizrahi (a former director of Concord and a co-defendant with Benun in a shareholders suit against Concord (Brier Dec. Exh. 22)), Henry A. D'Ambrosio (an official of Bell & Howell Company, licensor of Debtor) and Elie Houseman (a former investment banker). Brier Dec. Exh. 11 at 35 of 262.

Debtor to the detriment of all of Debtor's creditors. *See e.g.* Brier Dec., Exhs. 23 at 7-8, 24 at 8-9 and 25. That JCB is an alter ego and a "fiction" was recognized from its inception by Debtor's accountants, Richard A. Eisner & Company LLC. Eisner characterized all transactions between Debtor and JCB as being with "Benun," including the large interest ostensibly granted to JCB in the proceeds of the lawsuit against Imation. Brier Dec. Exh. 26 at notes J[5], [7].

Benun's looting of Debtor was chronicled in his testimony in the District Court (Brier Dec. Exh. 6 at 39-46, 50-52, 60-66), and brought forward to the end of 2002 by a Declaration of Mr. Cossentino. Brier Dec. Exh. 10 at Exh. B. The testimony and declaration revealed the following payments to JCB by the Debtor:

| Year | Consulting Fees/Bonuses (including loan forgiveness) |
|---|---|
| 1997 | $790,000.00 |
| 1998 | $1,390,000.00 |
| 1999 | $1,347,575.00 |
| 2000 | $2,859,268.00 |
| 2001 | $1,879,000.00 |
| 2002 | $2,450,756.00 |
| **TOTAL** | $10,716,599.00 |

The JCB Consulting Agreements (original and two amendments) (Brier Dec., Exhs. 27, 28 and 29) require Debtor, in addition to paying Benun a percentage of Net Sales, to pay for health and disability insurance for Benun, as well as the costs and expenses for obtaining, using, operating and garaging a car for Benun's use (reported by Mr. Cossentino to amount to $93,126.00 for lease payments alone from 1998 through 2002) (Brier Dec. Exh. 10 at Exh. B) and to reimburse "out-of-pocket" expenses.[12]    A February 28, 2003 statement of financial

---

[12] The original agreement entered on April 2, 1997 was amended in August 1997 to eliminate a cap on commissions imposed for the purpose of the public offering, and in 2001 to further sweeten Benun's deal,

condition of Benun reveals that Benun, as of February 28, 2003, owed Debtor $932,000, presumably still unpaid. Brier Dec. Exh. 8.

One of the apparent purposes of the Consulting Agreement was to attempt to immunize Benun from liability for the actions of Debtor, including patent infringement. Thus, Paragraph 1(B) of the Agreements always provided that "neither JCB nor Benun will be responsible for decisions or actions taken by Jazz or any of its officers, directors or shareholders whether or not based on consultation with JCB, Benun or any other employee of JCB." Brier Dec. Exhs. 27 and 29 at ¶1B. Apparently this provision justified the assumption of the fees of the separate counsel engaged by Benun in the District Court action (Skadden Arps) ($392,427 of a $732,248 fee remaining unpaid). Brier Dec. Exh. 10 at Exh. B.

From 1995 through 2002, Debtor had $335,370,165.00 in sales on which it showed, at the end of 2002, a cumulative gross profit of $93,164,386, a cumulative net loss of $4 million and cumulative payments to JCB or Benun of $10,809,725. Brier Dec. Exh. 10 at Exh. B.

The District Court considered the issue of Benun's control over Debtor in the context of whether Benun induced Debtor's infringement and therefore was liable to Fuji. **The Court concluded that Benun controlled Debtor and therefore was liable.** The District Court found that:

1.     Benun founded Debtor.

2.     Benun had been Debtor's President, CEO and sole director.

---

including the provision for JCB's alleged share of the proceeds of Imation lawsuit and additional "fees" for performing certain services. See Brier Dec. Exhs. 27, 28, 29. It is unknown if any "fees" were actually paid to Benun. Specifically, the amended agreement provides, *inter alia*, for fees for guaranteeing Debtor's credit obligations on the basis of the costs of such guarantees if, from third parties. Brier Dec. Exh. 29 at 4.

SSL-DOCS1 1352114v1

3.  Benun's wife and children had owned all of Debtor's stock.

4.  Benun asked Fuji for a single use camera patent license, and when he was turned down, nevertheless caused Jazz to continue selling infringing single use cameras, with no exculpating opinion of counsel.

5.  Benun became a consultant merely to facilitate a public offering, but did not relinquish control over Debtor.

6.  Benun was paid over $10 million, more than four times Debtor's retained earnings through 2001.

Specifically, the Court's opinion stated these factual findings as follows:

> Fuji demonstrated Mr. Benun's control over Jazz throughout the period at issue and his personal direction of Jazz's infringement. After having left Concord in 1994, Mr. Benun founded Jazz. He was Jazz's President, Chief Executive Officer, and sole director. His wife and children owned all of Jazz's stock. In 1995, under Mr. Benun's direction, Jazz began selling refurbished cameras without having requested a license from Fuji to do so and without having obtained any non-infringement opinion of counsel. It was only after Jazz began selling cameras that Mr. Benun twice approached Fuji to request a license. No such license was forthcoming, yet the infringing sales continued -- again, with no opinion of counsel.

> Mr. Benun resigned his position as director and officer of Jazz in April 1997, at which time he assumed the position of "consultant." However, **Fuji adduced evidence demonstrating that Mr. Benun's resignation was a not a relinquishment of control over the company at all. Rather, it was designed to facilitate the public offering of Jazz's stock,** as Mr. Benun had previously been barred from serving as a director and officer of any public company. (Footnote omitted) After becoming a "consultant," Mr. Benun continued to exert substantial control over Jazz. Mr. Benun remained intimately involved in virtually all aspects of Jazz's business. He hand-picked his own successor, Mr. Lorenzini (footnote omitted). Mr. Benun's family continued to own the overwhelming majority of Jazz's stock under a voting arrangement, pursuant to which they agreed to grant him an irrevocable proxy to vote their shares in the event the bar preventing him from serving as an officer or director of the company was ever lifted. Perhaps most probative of Mr. Benun's control, during the post-1997 time period when Mr. Benun was a purported "consultant" to Jazz, **the company paid over $10 million in direct payments and loans, representing more than four times the company's retained earnings during the time period.**

13

*Fuji v Jazz*, 249 F.Supp. 434, 458-59 (D.N.J. 2003) (Brier Dec. Exh. 2)("This evidence tends to prove that **Mr. Benun was the moving force behind Jazz's infringement of Fuji's patents.**" *Id.* (emphasis added).

Lest there be any doubt that Benun controls the Debtor, the Debtor itself, when it suited its purpose, [

] Brier Exh. 17 at 2804, 2812 (Confidential). Debtor's trial counsel in the District Court, who withdrew for non-payment of fees, went so far as to recently state: "Upon information and belief, Jazz Photo and Jazz Hong Kong are completely within the control of Jack Benun, who personally makes all major decisions regarding them." Brier Dec. Exh. 30 at ¶18.

In rejecting Debtor's application for a stay of the judgment without posting a supersedeas bond, the District Court found that Debtor and Benun were incapable of conducting the business in a manner that protected creditors without close supervision by a Bankruptcy Court. The District Court found that millions of dollars, a substantial portion of Debtor's operating income, has been flowing to Benun, then "vanishing." Moreover, the Court found that despite operating a successful business for years, Benun caused both Debtor's and Benun's assets to vanish:

> [t]he proofs adduced in connection with Defendants' Order to Show Cause demonstrate a pattern of **millions of dollars flowing from Jazz to Mr. Benun (representing a substantial portion of Jazz's operating income), then vanishing from Mr. Benun's ledger entirely**. Indeed, Jazz has been operating a successful business for over seven years, and Mr. Benun has received more than $11 million dollars in compensation and bonuses in the form of loan forgiveness. Yet **by all appearances nothing remains in Jazz**.

Brier Dec. Exh. 31 at n 3 (emphasis added).

The District Court also found that Benun would not run Debtor in the future in a manner that would benefit the creditors. In fact, the District Court went so far as to conclude that

14

Bankruptcy Court supervision would be necessary to prevent Benun's practice of causing

Debtor's assets to vanish without a trace.

> **[T]here is little hope that Fuji's judgment would receive any protection** during the pendency of the appeal in the matter absent the posting of a supersedeas bond. . . . This is particularly true given **Mr. Benun's practice of causing himself to be paid a substantial portion of Jazz's available funds and disposing of them.** For instance, from the inception of this action until December 31, 2002, Jazz paid Mr. Benun (either directly or through JCB Consultants) nearly $8.6 million in consulting fees and other payments, and forgave $3.3 million in loans that the company had made to Mr. Benun via his personal "exchange account." These payments, totaling $11.9 million, represent nearly 75% of Jazz's operating income (net of the payments to Mr. Benun) during the course of this lawsuit, not including over $900,000 in additional monies that Jazz loaned to Mr. Benun which have not been repaid to date. Despite these very large payments, neither Jazz nor Mr. Benun made any provision whatsoever to reserve for potential royalties and other damages to Fuji that would have resulted (and, indeed, did result) from a verdict and judgment of infringement. A financial statement which Mr. Benun provided to this Court dated February 28, 2003 listed the following personal assets as of that date: cash = $28,000; a one half interest in Mr. Benun's home = $2,500,000; and personal effects = $17,000. This means that approximately $9 million in funds and other benefits received by Mr. Benun directly from Jazz during the course of this lawsuit, which derived from the infringing activities, have simply **disappeared without a trace**, thus enabling Mr. Benun to now claim lack of funds as a basis for seeking the extraordinary relief of a stay without a bond to secure the judgment pending appeal. **Under these facts, there is utterly no basis to conclude that Mr. Benun would take appropriate steps to protect his own or Jazz's assets for the benefit (sic.) Fuji during the pendency of appeal. Based upon what this Court has seen, the orderly supervision of Jazz's financial affairs that would be accorded by the Chapter 11 reorganization process may well be the most appropriate result.**

*Id.* at n. 4 (emphasis added). Given the untrustworthiness of Debtor and Benun and the lack of

transparency in their conduct of the business (the bulk of revenues going to Asia to persons

selected by and affiliated with Benun where the appropriateness of each transfer cannot be

confirmed), a lesser remedy of appointing an examiner is highly unlikely to successfully protect

SSL-DOCS1 1352114v1

the assets of the Debtor's estate for the benefit of creditors, and therefore a trustee must be appointed.

## IV.    The Violation of Fuji's Patents by Debtor, Jazz Hong Kong and Benun

The history of Debtor's infringement of Fuji's patents and the dispute with Fuji which led to a $30 million judgment is instructive of the dishonesty of Benun and Debtor.

The dispute between Fuji and Debtor, Jazz Hong Kong and Benun, involves the manufacturing, importation and sale of "reloaded" single use cameras, as well as a relatively small amount (over 1 million) of newly made cameras. The bulk of the reloaded cameras were manufactured by third parties in China and Korea from used cracked open Fuji, Kodak, Konica and Concord camera bodies, held together with tape and Debtor's packaging. Not only are these reloaded cameras infringements on the patents held by the original manufacturers of the cameras, but they are of inferior quality and their true nature is hidden from consumers.

As recently as November 2002, CBS TV in New York ran a consumer alert piece featuring Debtor's cameras, and pointing out their poor quality. Brier Dec., ¶33. More recently, in April 2003, a United States Congressman called for an investigation of this type of camera by the Federal Trade Commission as a fraud on consumers. Brier Dec. Exh. 32. The basis for the complaint is that consumers do not realize they are buying reloaded used camera shells held together with tape.

In March 1998, Debtor was served with a complaint filed by Fuji before the U.S. International Trade Commission ("Commission") and an Order of the Commission instituting an official investigation of unfair competition in international trade, charging Debtor and 26 others with infringing 15 of Fuji's single use camera patents. After a hearing, in February, 1999 an Administrative Law Judge ruled that Debtor's single use cameras and those of 25 other

16

Respondents infringed Fuji's patents. These findings of the ALJ were affirmed by the Commission, which on June 2, 1999, issued a Cease and Desist Order against Debtor, its subsidiaries, officers and agents, barring *inter alia*, importation of infringing single use cameras. Brier Aff., Exh. 33. Thus, the Debtor has known that its cameras infringed Fuji's patents for four years. On June 23, 1999 Fuji filed a complaint for patent infringement in the District of New Jersey (which in 2003, resulted in a Judgment of almost $30,000,000 against Jazz and Jazz Hong Kong and slightly less against Benun).

In June 1999, Jazz filed a motion for a stay of the Commission's Cease and Desist Order with the Federal Circuit, arguing that without the stay, the company would go bankrupt. The stay was granted on a small bond. Jazz then operated, business as usual, with no exculpating opinion of counsel, until August 21, 2001, when the Federal Circuit issued its decision and lifted the stay. While reversing the Commission in part, the Federal Circuit affirmed the Commission's Orders as to Jazz and all others. Specifically, the Federal Circuit affirmed the Commission's finding of infringement as to cameras made by unknown processes, cameras made by processes more extensive than an enumerated eight steps, and cameras made from empty bodies of cameras first sold outside of the United States. *Jazz Photo Corp. v. International Trade Comm'n*, 264 F.3d 1094, 1111 (Fed. Cir. 2001). The ALJ recently ruled that [



]. Brier Dec. Exh. 34 at 8. (Confidential).

More recently, Fuji, relying on declarations of Mr. Cossentino submitted in an unsuccessful attempt to stop the Federal Circuit's mandate, asked the Commission to start an enforcement proceeding against Debtor, Benun and Debtor's current President, Mr. Cossentino.

17

The Commission requires *prima facie* proof of violation of the Commission's Orders to institute an enforcement proceeding. It instituted an enforcement proceeding in 2002. Discovery and the deadlines are now stayed because the SARS outbreak prevents discovery in Asia. Possible penalties in the enforcement proceeding can be up to $100,000 per day or twice the domestic value of the articles entered or sold for each day of violation. 19 U.S.C. § 1337(f)(2). The Commission contends that the automatic stay does not apply to this proceeding and Fuji agrees. Fuji can prove that violations of the Commission's Orders have persisted to date.[13]

In October-November of 2002, a jury trial was held in the District of New Jersey. As set forth in the February 25, 2003 Opinion of Judge Hochberg, nearly all of Debtor's sales of nearly 41 million single use cameras from 1995 to August 21, 2001 were found to infringe Fuji's patents. *Fuji v. Jazz,* 249 F. Supp. 2d at 459 (Brier Dec. Exh. 2).

The jury found that the Debtor, Jazz Hong Kong and Benun had willfully infringed Fuji's patents by the importation and sale of newly-made cameras. In affirming this jury finding Judge Hochberg agreed that the jury was justified in giving little, if any, weight to Mr. Benun's explanation that Benun was unaware that these cameras were newly made:

> Defendants' argument for judgment as a matter of law on willfulness is based on the testimony of Mr. Benun that Defendants were unaware that the cameras were newly-made until after the fact. Even on the Defendants' theory, the willfulness issue turns on whether Mr. Benun's testimony was truthful. Credibility issues of this kind as are squarely within the province of the jury. The jury in this case could well have determined that Mr. Benun's self-serving protestations as to Defendants' lack of knowledge were entitled to little any weight.

---

[13]    Judge Hochberg denied an injunction because of the August 21, 2001 cutoff date imposed by the District Court (the date of the Federal Circuit decision), reasoning that the Commission's Orders gave Fuji an adequate injunctive remedy. Brier Dec. Exh. 1.

249 F.Supp. 2d at 456-57. Mr. Benun's dishonesty at trial makes his self-serving protestations here that he is a mere " consultant," and Debtor's self-serving protestations that all monies will eventually be accounted for, equally entitled to little, if any, weight.

An example of Debtor's dishonesty during the run up to the District Court trial is particularly instructive here. Prior to the Federal Circuit Opinion, Fuji had filed a successful Motion to Compel the production of Debtor's documents helping to prove Fuji's damages. Debtor produced some of these compelled documents and certified that all had been produced. After the Federal Circuit opinion, the District Court allowed discovery on the issue of the country of first sale of cameras from which the shells used in Debtor's single use cameras were obtained. All other discovery had previously been completed per court order. Because they purportedly would, in light of the Federal Circuit decision, have helped Debtor's case by purportedly showing first sale in the U.S., Debtor produced thousands of pages of documents in the summer of 2002. However, most of these documents were excluded by order of then Magistrate Judge Chesler because they also related to damages and **should have been produced earlier under his prior Order compelling their production**. Brier Dec. ¶ 40 and Exh. 37.

Also produced in the summer of 2002, at Fuji's specific request, were [

] Brier Dec. ¶ 39, Exh. 37. The apparent purpose was to suppress the connection between Single Use Camera Co. and Jazz Hong Kong in case production would be required during discovery. This

19

manipulation of documents highlights not only dishonesty but the lack of transparency and ease of manipulation of transactions in Hong Kong.

## V.    Improprieties in the Period Running Up To and Post-Petition

The pattern of fraud and dishonesty of Debtor and Benun, even if viewed in the best light for Benun and Debtor as incompetence or gross mismanagement, has extended to this proceeding and can only be stopped by the appointment of a Trustee.

Examples are as follows:

(a)    Mr. O'Grady, Benun's counsel at the May 27, 2003 first day hearing, represented to the Court that "I just found out from Mr. Cossentino that the Hong Kong transactions are arms-length at market prices which includes mark up for Hong Kong as a profit margin, but they're certainly are arms-length market comparable to their other suppliers...." Brier Dec. Exh. 35 at 25. Debtor's counsel had previously represented that "Hong Kong [

], to the extent product is purchased from Hong Kong, is arm's length without any markups other than to cover their own external payroll." Brier Dec. Exh. 35 at 23.[14]   See also Cossentino First Day Affidavit at ¶14. The reality is that the evidence adduced in the District Court and the documents produced in discovery therein reveal that Jazz Hong Kong is totally controlled by Debtor and Benun, who allocate costs and expenses between Debtor and Jazz Hong Kong as it suits their purpose. It is instructive that [

---

[14] Both representations, while untrue, were made based on information furnished by Debtor or Benun, and Fuji does not doubt the good faith of counsel.

.]

Brier Dec. Exh. 38.  It is even more likely that "profits" will remain in Hong Kong when, as here, new suppliers are created pre-bankruptcy (see ¶(d) below), and the Asian suppliers are heavily influenced by Benun. See p. 6, *supra*. This situation insures a total lack of transparency.

(b)    At the May 22, 2003 hearing, Fuji's counsel asked for a clarification of the representation from the Debtor that the amounts to be paid as salaries "do not include any amounts to Mr. Benun or any of his immediate family members."  Mr. Sirota responded, after consultation with Mr. Cossentino:  "That is the case, Judge."  Brier Dec. Exh. 35 at 75. Nonetheless, the next day, Debtor's counsel submitted a letter advising that the representation was incorrect and that Benun's brother, Mark Benun, was "employed" in Debtor's warehouse at a salary of $55,000.  Brier Dec. Exh. 39.  That the president (since May 2001) of a company with only 28 employees did not know that the brother of the founder, "principal consultant," and in fact, controlling principal, of the Debtor, was employed in the "warehouse" is both incredible and suggests that the position is a no-show position.

(c)    In the run up to filing the petition, Debtor changed its modus operandi from purchasing solely through Jazz Hong Kong to purchasing in many cases, directly from suppliers, without explanation as to how Jazz Hong Kong is compensated for its services. Thus, at the May 30, 2003 hearing, Mr. Cossentino conceded that Debtor was now bypassing Jazz Hong Kong and dealing directly with suppliers.  Brier Dec. Exh. 40 at 34-37.  In contrast, immediately before filing the Petition, Mr. Cossentino represented to the District Court and Court of Appeals that "JPHK is primarily the purchasing arm for Jazz." Brier Dec. Exh. 10 at ¶3. Even in the cases in the past where Debtor obtained letters of credit from Rosenthal & Rosenthal to pay suppliers

21

directly, they were treated on the books of Debtor as payments by Debtor "for" Jazz Hong Kong. *Id.* at Exh. A. By making payments directly to suppliers, on terms ostensibly negotiated by Jazz Hong Kong, there is just no way to know where the money is going, especially where the practice is for Rosenthal & Rosenthal to make direct payments to Hong Kong at Debtor's direction from advances and receivables. Verified Application in Support of Motion for an Order authorizing the Debtor to Maintain its Actual Bank Account et al., at ¶8.

(d)     In this connection, as noted above, Mr. Lorenzini testified in the District Court, that most manufacturers in Asia had worked for Benun at one time, and Benun had a great deal of influence on them. Brier Dec., Exhs. 6 at 107-108 and 7 at 61-62, 64. It should also not be forgotten that Mr. Benun's problem with the SEC and Concord arose out of being caught embezzling $150,000 through the vehicle of Concord's Hong Kong subsidary. It is also telling that between the filing of the first day motions on May 20, 2003 and the hearing thereon on May 27, 2003, the budget changed by an increase in payments to suppliers in Asia of $1.356 million and an increase in sales of only $288,000. Compare attachments to DIP Financing Application and first DIP Financing Order. This suggests that Debtor, at Benun's direction, is shipping as much money as possible out of the Debtor's estate to Asia.

(e)     At the May 30 hearing, Mr. Cossentino represented that the two entities identified on the vendor list furnished by him (Brier Dec. Exh. 38) as suppliers of single use cameras "are the ones that we currently doing business with." Brier Dec. Exh. 40 at 36. The two listed entities are "Polytech Enterprise," an apparent reference to Polytech Enterprise Limited (the second largest creditor) and "Everbest." When questioned as to whether "Everbest" is another name for one of the wholly-owned subsidiaries of Jazz Hong Kong in China, Mr. Cossentino responded "I do not believe so. I know we have done business with Everbest before, a totally

22

unaffiliated company, and I will confirm that that is the unaffiliated Everbest. I will confirm that." Brier Dec. Exh. 40 at 36-37.

No such confirmation that Everbest is unaffiliated has been forthcoming. This is not surprising since Everbest is an affiliated company. The general manager of Jazz Hong Kong, Jesse Szeto, in a deposition on August 16, 2002, testified that [



] Brier Dec. Exh. 21 at 158-64 (Confidential). As for Polytech, in answers to interrogatories served as recently as January, 2003 in an ITC proceeding, [

] Brier Dec. Exh. 42 (Confidential). While [          ] and both of the wholly-owned Chinese subsidiaries are listed, that is because the list covered the period both before and after the acquisition. Brier Dec. ¶ 45.

(f)      At the first meeting to organize the Creditors' Committee, Polytech appeared, represented by Leon Silvera, who explained that his company, Photo Recycling Enterprises, was owed money by Polytech, and in view of his interest, Polytech had granted Silvera a proxy to act for Polytech on the Creditors' Committee. Also at the meeting, Mr. Cossentino stated that all of the nearly $1.5 million in invoices allegedly owed to Polytech was incurred in the last 60 days. Buechler Dec. ¶¶ 2, 3, 5. Mr. Silvera represented to Margaret Lambe Jurow, Esq., the Assistant United State Trustee, that as far as he is aware, there are no overlapping officers, directors or employees between Polytech, the Debtor and Jazz Hong Kong. Debtor's President, Mr. Cossentino, represented to Ms. Jurow that he had called Benun who confirmed that there is no relationship between Polytech, Jazz Hong Kong and Debtor and that there are no overlapping

employees.  Buechler Dec. ¶ 4.  At the meeting, Fuji had no evidence to contest these representations but Ms. Jurow advised Mr. Silvera and Mr. Cossentino that if individuals were "lying" she would have no problem submitting a criminal referral to the U.S. Attorney's office. Buechler Dec. ¶ 6.  The representations made to Ms. Jurow remain, to date, unchanged. However, as shown in sub-paragraphs (g) and (h) below, these representations are false.

(g)    In deposition, Mr. Benun testified that [

].  Brier Dec. Exh. 53 (confidential).  In the ITC Enforcement Proceeding, Debtor produced numerous documents, including a series of documents which purport to show [

] Brier Dec. Exh. 43 (Confidential).  These documents do not reflect a true sale by [                              ].  An investigation of Wing Shan reveals that Mr. Silvera is a director of the company and signed many of the documents filed with the Hong Kong Corporate Registry.  Brier Dec. Exh. 44 at the 8th, 10th and 12th pages.

(h)    An investigation of Polytech reveals that it was organized in April, 2002 and Wong Titi Tai Tai was appointed a director in May of 2002.  Wong Titi Tai Tai resides at Room A24/F, Chong Wah Court, Wealthy Garden, Tsuen Wan, NT, and has a Hong Kong Identity Card Number C413549(9).  As the director, Wong Titi Tai Tai has extraordinary powers over

24

Polytech. *See* Brier Dec. Exh. 45 at 4th page and pages 5-6 of the Articles of Association. A "Kitty Wong" has been an employee of Jazz Hong Kong for years.

Kitty Wong witnessed a signature of a guarantee given in 1997 by Szeto and Benun to a Hong Kong bank, identifying herself as the Secretary of Fordteam Limited. Brier Dec. Exh. 11 at 253 of 262-359 of 262 (Exh. 10.14 to 1997 S1 of Debtor). Fordteam Limited changed its name to Jazz Photo (Hong Kong) Limited on December 30, 1996. Brier Dec. Exh. 46. Kitty Wong's name appears on many of the documents produced by the Debtor in the ITC proceeding. *See e.g.* Brier Dec. Exh. 37. For example, [                    ] dated June 10, 2002, *after* **the formation of Polytech, is signed by Kitty Wong on behalf of Jazz Hong Kong**. Brier Dec. Exh. 46 (with translation) (confidential).

Consideration of a list of shareholders of Debtor, prepared by Debtor, reveals that Kitty Wong's home address is identical to that of Wong Titi Tai Tai (Brier Dec. Exh. 47 (confidential)), who also signed the proxy to Mr. Silvera on behalf of Polytech. Beuchler Dec. ¶ 3. The Hong Kong Corporate Registry document for Fordteam Limited, filed June 22, 1995, lists Wong Titi Tai Tai as one of two "first directors". Brier Dec. Exh. 50. The address listed is the same as that of Kitty Wong on the Debtor's shareholder list (Brier Dec. Exh. 48) and Wong Titi Tai Tai on the Polytech Hong Kong Corporate Registry document (Brier Dec. Exh. 45). Further, the Hong Kong Identity Card No. C413549(9) for Wong Titi Tai Tai on the Polytech and Fordteam Corporate Registry documents are the same.

Finally, the Hong Kong Corporate Registry reveals that on December 9, 1996, Ms. Wong Titi Tai Tai and another person resigned as directors of Fordteam Limited and Mr. Jack C. Benun and Ms. Szeto Suk Yee were appointed as directors. Brier Dec. Exh. 51. There can be no doubt that the director of Polytech is a key employee of Jazz Hong Kong. It is fair to conclude from

25

the foregoing that the representations by Mr. Silvera and Mr. Cossentino that Polytech and Jazz Hong Kong are not affiliated are false.

(i)       Why there is only one supplier left unpaid, notwithstanding the nearly continuous operation through only a few days before the filing of the petition of the Rosenthal & Rosenthal factoring agreement, remains unexplained.  One likely explanation is that Polytech's position as a creditor was created pre-petition for the sole purpose of ensuring its presence, and therefore that of Mr. Silvera, on the Creditors' Committee.  Mr. Silvera was [

                        ] (Brier Dec. Exh. 49 at 10, 89 (confidential)).  Mr. Silvera lives close to Mr. Benun and, while having many interests, is a relative newcomer to the single use camera industry.  Brier Dec. ¶ 50.  It is likely that both Mr. Silvera's entry into the camera recycling business and his sudden appearance on the creditors committee as the agent for a new creditor, was engineered by Benun.

(j)       This court must conclude that there is little likelihood that the interests of any creditor would receive any protection during the pendency of this proceeding unless present management, subservient as it is to Benun, is ousted and a Trustee is appointed.  If Benun and present management are left in charge, it is likely that the Debtor will assume the JCB consulting agreement through which Benun loots the profits of the Debtor and seeks to capture a large portion of the proceeds of the Imation case.  Finally, Debtor is unlikely, if not incapable, of pursuing the many preferences, disputed payments and claims which permeate the history of the Debtor. These include at least the following:

(1)       the payments made to JCB Consultants, Benun's alter ego;

(2)       the bonuses by way of loan forgiveness or otherwise, paid to Benun directly;

26

(3)    the sudden repayments in 2002 of long-standing debts to Mona Benun and the 's children. (totaling $268,770). Brier Dec. Exh. 12 at Exh. A;

(4)    payments made to Skadden Arps, special counsel for only Benun in the District Court ($339,821). Brier Dec. Exh. 10 at Exh. B;

(5)    payments made to Mark Benun, Benun's brother for alleged services in Debtor's warehouse unknown to even Mr. Cossentino. Brier Dec. Exh. 38;

(6)    payments made to Jazz Hong Kong and to others in Asia, the propriety and purpose of which cannot be determined due to the lack of transparency; and

(7)    a claim against the directors of Debtor who approved the payments and loans to Benun in the face of impending insolvency. Cf. *Pereira v. Cogan*, 2003 WL 21039976 at *53 - *56 (S.D.N.Y. May 8, 2003) (Judge Sweet) (In an action brought by a Trustee of a bankrupt private company, under Delaware law directors have a fiduciary duty to creditors both when insolvent and "in the vicinity of insolvency".)

## RELIEF REQUESTED AND BASIS THEREFOR

**VI.    The Appointment Of A Trustee Is
Required In This Case.**

By this Motion, Fuji seeks the appointment of a trustee under section 1104(a) of the Bankruptcy Code to operate the Debtor's business. For nearly eight years, Benun has operated the Debtor to illegally market products in violation of patents owned by Fuji and others, and has abused the Debtor's corporate form to enhance his own fortunes to the detriment of the Debtor's creditors. It is impossible for anyone but an independent trustee to properly fulfill the fiduciary obligations owed to creditors of the Debtor in this chapter 11 case. In Benun's world, the chapter 11 filing is meaningless and he intends to continue to plunder the Debtor by using the same structure that existed prior to the filing.

27

Section 1104(a) of the Bankruptcy Code provides that, after the commencement of the bankruptcy case but before the confirmation of a plan, on request of a party in interest, the bankruptcy court shall appoint a trustee "(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case... or... (2) if such appointment is in the interest of creditors, any equity holders, and other interests of the estate...." 11 U.S.C. § 1104(a)(1)-(2).

It is undisputed that courts generally favor allowing a debtor to remain in possession of the estate absent a showing that there is a need for the appointment of a trustee. However, a court's willingness to allow a debtor to remain in possession and control of the estate is premised upon an assurance that the debtor will carry out the fiduciary responsibilities of a trustee. *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("A debtor-in-possession must act as a 'fiduciary of his creditors' to 'protect and conserve property in its possession for the benefit of creditors,' and to refrain [ ] from acting in a manner which could damage the estate . . ." (citing *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D.Pa. 1985)). Where, as here, a debtor-in-possession has no hope of fulfilling its fiduciary responsibilities to its creditors, "the stewardship of the reorganization effort must be turned over to an independent trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (debtor's pre-petition actions represented calculated and calibrated effort in contemplation of the chapter 11 filing to place debtor's operations beyond the reach of creditors and constituted sufficient "cause" for the appointment of a chapter 11 trustee).

For the reasons set forth herein and in the affidavits attached hereto, there is compelling "cause" which mandates the appointment of a chapter 11 trustee under section 1104(a)(1) of the

28

Bankruptcy Code, and sufficient showing that such appointment is in the best interest of the creditors, and therefore authorized by section 1104(a)(2) of the Bankruptcy Code.

A.    **Cause Exists To Appoint A Trustee
Under 11 U.S.C. § 1104(a)(1).**

The language of section 1104(a)(1) of the Bankruptcy Code does not contain an exclusive list of causes mandating the appointment of a trustee. Rather, courts have considerable discretion to decide whether cause exists, such that a trustee must be appointed under section 1104(a)(1), based on the specific facts and circumstances of each case. *See In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 473 (3d Cir. 1998); *In re Sharon Steel Corp.,* 871 F.2d 1217, 1228 (3d Cir. 1989); *Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.,* 828 F.2d 239, 242 (4th Cir. 1987). In addition to fraud, dishonesty, incompetence and gross management (all of which exist in the case at bar), factors used by courts to determine that cause exists include: (i) materiality of the misconduct of the debtor's management, (ii) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors, (iii) existence of pre-petition voidable preferences or fraudulent transfers, (iv) unwillingness or inability of management to pursue estate causes of action, (v) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (vi) self-dealing by management or waste or squandering of corporate assets. *See In re Marvel Entm't Groups, Inc.,* 140 F.3d at 472-473; *In re Sharon Steel Corp.,* 871 F.2d at 1228; *In re Intercat,* 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000).

In *In re Intercat,* a case replete with similarities to the instant case, Intercat, a maker of catalysts used in the refining of crude oil, was founded by Regis Lippert ("Lippert"), who appointed himself President and Chief Executive Officer and who was Intercat's sole shareholder. Intercat was sued by W.R. Grace, who argued that Intercat had willfully infringed

29

W.R. Grace's patents.  The Court in that litigation held that Intercat infringed W.R. Grace's patent rights and awarded Grace a judgment of approximately $22 million.  Approximately two months after the rendering of the judgment, Intercat filed a voluntary petition under chapter 11 of the Bankruptcy Code.  Mobil Oil Corporation ("Mobil"), a creditor of Intercat, filed a motion to appoint a trustee on the grounds that there existed evidence of fraud, dishonesty, incompetence, or gross mismanagement, and that appointment of a trustee was not discretionary, but is mandatory under section 1104(a)(1) of the Bankruptcy Code.

The Bankruptcy Court in *In re Intercat* found that Mobil demonstrated cause for appointing a trustee under section 1104 of the Bankruptcy Code.  *In re Intercat, 247 B.R.* at 922.  The Bankruptcy Court held that Intercat's willful infringement of the patent rights of W.R. Grace was evidence that the debtor's management was guilty of dishonesty and that these dishonest actions resulted in a judgment of $22 million to be entered against the debtor.  *Id.*  In addition, the Bankruptcy Court found that the excessive payment of compensation to the Lippert and later forgiveness of certain loans made by Intercat to Lippert, at a time when Intercat was suffering from severe financial losses, was evidence of mismanagement.  *Id.*  The Bankruptcy Court also found evidence of self-dealing and transfers of assets of the debtor to other entities controlled by the Lippert was a violation of the fiduciary duties that Lippert owed to creditors of Intercat.  *Id.*  These acts, individually and collectively established the need for the appointment of a trustee to oversee the financial management of Intercat during the bankruptcy, as well as to prosecute all estate causes of action.  *Id.* at 923.

In this case, it is clear that Benun controls the Debtor, as already found by Judge Hochberg in a ruling this Court could find is binding on it.  *Cf. In re Interat,* 247 B.R. at 915 (Bankruptcy Judge held that District Court's finding of willful patent infringement by debtor's

SSL-DOCS1 1352114v1

principal to be binding on the Bankruptcy Court).   The Debtor's and Benun's willful infringement of Fuji's patents as found by Judge Hochberg is demonstrative of Benun's dishonesty.   Debtor's conduct during the pendency of the District Court proceeding, such as withholding documents in discovery, then producing them when it suited its purpose and instructing a supplier as to how to falsify invoices to mask its involvement, is further evidence of dishonesty.   Debtor and Benun's infringement resulted in a judgment of approximately $30,000,000 being entered against the Debtor.   In addition, the transfer of over $11,000,000 (that we know of) from the Debtor to Benun since the Debtor was formed - and when the Debtor showed no profit - is unequivocal evidence of mismanagement and self-dealing.

Benun's history of embezzlement from his prior company using a Hong Kong subsidiary defines dishonesty.   The conduct of Benun and management pre- and post-petition clearly intended to misuse the bankruptcy system (including misrepresentations to the Court and Office of the U.S. Trustee and the engineering of the appointment of an insider to the creditors committee) are themselves potentially criminal acts, and are examples of the very type of dishonesty a trustee is intended to avoid.

Several courts in the Third Circuit have recognized that acts of self-dealing by the debtor or its management, such as the transfer and use of corporate assets for personal benefit, calls for the appointment of a trustee. *See e.g., In re PRS Insurance Group, Inc.*, 274 B.R. 381 (Bankr. D. Del. 2001); *In re North America Communications, Inc.*, 138 B.R. 175 (Bankr. W.D. Pa. 1992); *In re United Church of the Ministers of God*, 74 B.R. 271 (Bankr. E.D. Pa. 1987); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60 (Bankr. E.D. Pa. 1981).   In *In re PRS Insurance Group, Inc.*, the court found that "cause" existed to appoint a trustee where the debtor failed to satisfactorily explain diversion of funds from the debtor's subsidiary to its corporate president.

31

*In re PRS Insurance Group, Inc.*, 274 B.R. 381. An emergency motion for the appointment of a trustee was filed shortly after an involuntary petition under chapter 11 was filed. A creditor who filed the motion argued that the appointment of a trustee was justified because Mr. Lucia, the debtor's president, sole director and sole shareholder has diverted assets of the Debtor and its subsidiaries for the benefit of one of the debtor's holding companies, and almost $3.5 million was then transferred from that account to pay personal expenses of Mr. Lucia. *Id.* at 385. The court noted that "[t]he Debtor's inability to explain the diversion of assets is evidence, at a minimum, of its incompetence or gross mismanagement and, at most, evidence of actual fraud." *Id.* at 387. It further reasoned that it is "unrealistic to assume that the Debtor, if controlled by Mr. Lucia, will authorize or even cooperate in the investigation and prosecution of ...actions" to recover property wrongfully transferred out of the Debtor's estate. *Id.* at 387. Therefore, the court authorized the appointment of a trustee under section 1104(a)(1).

Similarly, in *In re North America Communications, Inc.*, the court authorized the appointment of a trustee because there was evidence that debtor's present management grossly mismanaged its affairs, as evidenced by the manner in which the two individuals that directed the debtor "lent" themselves substantial sums of money and "repaid" the loans by directing that they be paid substantial bonuses, which were then set off against the amounts they owed to the company. *In re North America Communications, Inc.*, 138 B.R. at 179. These individuals used the debtor's funds to purchase expensive items, such as a yacht, an airplane and cars for their personal use. In addition, while the debtor suffered net losses exceeding one million dollars for fiscal years 1989 through 1991, the debtor's management received nearly $1,400,000 in compensation during 1991, which was more than twice what they received during the prior year. The court concluded that such behavior showed that in the minds of the debtor's management,

32

the distinction between the corporation and themselves was blurry or nonexistent, therefore, cause existed to appoint a trustee. *Id.* at 180. Here, Benun's looting of the of the Debtor during the past six (6) years with the consent and support of the Debtor's management and directors is illustrative of managements' incompetence and gross mismanagement and the directors' and officers' breach of their judiciary duty to creditors, and mandates the appointment of a trustee.

Furthermore, because of the numerous and questionable transfers between the Debtor and Benun, members of Benun's family and the current management of the Debtors, there also exists an inherent and unavoidable conflict of interest. A similar conflict of interest was recognized by the Bankruptcy Court in *In re Intercat*. The Bankruptcy Court in *In re Intercat* stated:

> Lippert has not volunteered to rescind any of the transactions which he orchestrated or offered to disgorge any compensation he has received in order to restore the Debtor to the **status quo ante**. He has not suggested that he is or will be capable of pursuing the aggressive, independent investigation of all the transactions in issue, or that he will prosecute litigation to recover assets, or sue for the damages sustained by the debtor. **Indeed, since he, his family, or his closely-held corporations are all potential targets of any such litigation, it is impossible to believe that he would do so in the manner that a disinterested person would**.

*Id.* at 923 (emphasis added).

As in Intercat, here the Debtor is owned by members of the Benun family and controlled by Benun. A myriad of fraudulent transfers, as well as preferential transfers were made by the Debtor to Benun, members of his family, members of the current management, and JCB. In denying Jazz's motion to stay the final judgment in connection with the Fuji litigation, the District Court Judge alluded to the possible liability of Benun when it stated:

> the proofs adduced in connection with Defendants' Order to Show Cause demonstrate a pattern of millions of dollars flowing from Jazz to Mr. Benun (representing a substantial portion of Jazz's operating income), then vanishing from Mr. Benun's ledger entirely. Indeed, Jazz has been operating a successful business for over seven years, and Mr. Benun has received more than $11 million dollars in compensation and bonuses in

33

the form of loan forgiveness.  Yet by all appearances nothing remains in Jazz.

*Fuji Photo Film Co. v. Jazz Photo Corp.*, Civil Case No. 99-2937 (FSH) (April 8, 2003) (emphasis added).

Since Benun, members of the Benun family and directors and officers of Benun are all potential targets of litigation in connection with such transfers and Benun controls the Debtor, it is impossible for the Debtor to act as a disinterested person and therefore able to pursue any causes of actions.  Moreover, the fact that the Debtor's proposed post-petition budget provides for a weekly fee of $15,000 to be paid to JCB (in reality to Benun) for "consulting" services during the pendency of the bankruptcy case is yet another example of how Benun intends to continue to siphon assets out of the Debtor's estate to the detriment of the Debtor's creditors.

The courts in this circuit have recognized that it is appropriate to appoint a trustee to pursue recovery of funds on behalf of the estate where it is clear that the current management of the debtor has been involved in acts that diverted money out of the estate, and will not undertake any legal action against itself. *See In re Sharon Steel Corp.*, 871 F.2d at 1221 (bankruptcy court doubted the ability of the debtor's management to fulfill its fiduciary duty by pursuing avoidance actions on behalf of the debtor because there was common management with the recipients of the transfers, who owed conflicting fiduciary duties to the recipients); *In re North America Communications, Inc.*, 138 B.R. at 180 (holding that the appointment of a trustee was appropriate where it was clear that if the current management remains in power, it will not take any legal action to recover the assets it has diverted that belong to the estate); *In re Great Northeastern Lumber & Millwork Corp.*, 20 B.R. 610, 611 (Bankr. E.D. Pa. 1982) (finding that there was evidence that the new operator of debtor's business was the alter ego of the debtor, and there was a possibility and the creditors were being defrauded by the debtor's action in ceasing to

34

do business and allowing a related entity to take over its operations, and holding that it would be in the best interests of creditors to appoint a trustee to at least "investigate the circumstances of the debtor and its relationship to other entities"). Similarly in this case, it is also critical that a trustee be appointed in order to halt the depletion of assets from the Debtor's estate by Benun.

**B.     The Appointment Of A Trustee Is
        In The Best Interest Of Creditors.**

While section 1104(a)(1) of the Bankruptcy Code requires that the Court find that specific "cause" exists for appointing a trustee, section 1104(a)(2) of the Bankruptcy Code has no such requirement. Section 1104(a)(2) of the Bankruptcy Code "creates a flexible standard [that] ... allows the appointment of a trustee even when no 'cause' exists," but where to do so would be in the best interest of creditors. *In re Sharon Steel Corp.*, 871 F.3d at 1226; *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168. Even if a court were to determine that the appointment of a trustee is not mandated by the analysis required in section 1104(a)(1) of the Bankruptcy Code, a court may exercise its discretion and still appoint a trustee under section 1104(a)(2) of the Bankruptcy Code if doing so is in the best interest of the parties.

In determining whether the appointment of a trustee is in the best interest of creditors, a bankruptcy court must utilize its broad equity powers. *In re Hotel Associates., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). "In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *Id.* (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200-201 (1973)). Where current management or persons in control of the debtor have engaged in acts that have caused harm to the debtor's estate and its creditors, while advancing personal interests of the wrongdoers, the courts often find that appointing a trustee is in the best interest of the creditors, and in fact, the only way to avoid further mismanagement of the debtor's affairs. *See In re North America Communications, Inc.*,

35

138 B.R. 175; *In re United Church of the Ministers of God,* 74 B.R. 271; *In re Great Northeastern Lumber & Millwork Corp.*, 20 B.R. 610. The courts are mindful that as a practical matter, unless a trustee is appointed, the current management will not undertake an investigation to uncover its own illegal acts, and certainly will not take any legal action to recover the assets diverted from the debtor's estate.

The facts of the case at hand strongly indicate that the appointment of a trustee is in the best interest of all of the creditors. First, the Debtor's past practice of infringing on Fuji's patents is evidence that the Debtor's management cannot be trusted to live up to its fiduciary obligations to the creditors, the largest of whom is Fuji. It is less than realistic to believe that after more than five years of litigation, resulting in findings in the ITC in 1999, the Federal Circuit in 2001 and the District Court in 2002 that the Debtor was guilty of stealing intellectual property that belonged to Fuji, and the finding of the District Court that such intellectual property was used to benefit insiders of the Debtor, that the Debtor and Benun will now act in a manner that is in the best interest of Fuji and other creditors. Second, the interests of the Debtor's management is in conflict with the interests of creditors. Millions of dollars flowed out of the Debtor's business to Benun and others, and are therefore subject to possible avoidance actions to be brought by the Debtor-in-possession. The directors and officers of Debtor have breached their fiduciary duty to creditors in the past, and are subject to claims by the estate. Under these circumstances, it is impossible that the Debtor, under Benun's control and influence, is a disinterested person and able to bring such causes of actions. Without an independent trustee, the interests of the creditors will continue to be subject to a dishonest and incompetent management team that will put its own interests ahead of those of the creditors.

SSL-DOCS1 1352114v1

In denying Jazz's stay motion, the District Court Judge has already ruled that Benun

cannot be trusted to run Debtor for any benefit of its creditors:

> *Under these facts, there is utterly no basis to conclude that Mr. Benun*
> *would take appropriate steps to protect his own or Jazz's assets for the*
> *benefit Fuji during the pendency of appeal. Based upon what this Court*
> *has seen, the orderly supervision of Jazz's financial affairs that would*
> *be accorded by the Chapter 11 reorganization process may well be the*
> *most appropriate result.*

Opinion and Order, April 8, 2003, n. 4. Brier Dec. Exh. 31 (emphasis added).

**C.    The Appointment Of A Trustee Is Appropriate At This Early Stage
Of The Debtor's Reorganization Process In Light Of Benun's
Pre-Petition Gross Mismanagement And Fraud.**

It is a well-recognized principle that generally, a debtor should be given a 'second

chance' through the chapter 11 bankruptcy filing, and should be allowed, as a general rule, to

remain in control of its business. *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001).

Speculation alone that a debtor may not be successful in its reorganization efforts merely because

there was evidence of past mismanagement does not justify the appointment of a trustee. *Id.*

However, where pre- and post-petition actions committed by a debtor are so egregious, such as

those committed by Debtor's management and Benun in this case, and where a debtor and its

management are hopelessly incapable of running the business, or cannot be trusted to act in the

best interests of the estate and its creditors, the appointment of a trustee is not only appropriate,

but is required. *In re Sharon Steel Corp.*, 871 F.2d at 1228; *In re Great Northeastern Lumber &*

*Millwork Corp.*, 20 B.R. 610; *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bankr. E.D. Pa. 1981).

Therefore, although the appointment of a trustee is an extraordinary remedy, "section 1104

represents a potentially important protection that the courts should not lightly disregard or

encumber with overly protective attitudes towards debtors-in-possession." *V. Salvino Oil &*

*Heating,* 99 B.R. at 525.

The fact that this request for an appointment of a trustee comes at the early stage in the Debtor's reorganization process should not be determinative of its outcome. Section 1104 provides that "the court shall order the appointment of a trustee" "[a]t *any time* after the commencement of the case but before confirmation of a plan…" 11 U.S.C. § 1104(a) (emphasis added). A court's decision to appoint a trustee under section 1104(a) of the Bankruptcy Code is made on a case-by-case basis, *In re Sharon Steel Corp.,* 871 F.2d at 1226, and courts tend to focus on the merits of the case in deciding whether a request is timely or premature. Where there is sufficient evidence of gross mismanagement, fraud, self-dealing and diversion of funds, courts do not hesitate to appoint a trustee on the expedited bases. *See e.g., In re PRS Ins. Group*, Inc., 274 B.R. 381 (trustee appointed a month after an order for relief was entered, justified by management's inability to fulfill its fiduciary duties, acts of self-dealing and diversion of funds from debtor's subsidiary); *In re Bellevue Place Assoc.,* 171 B.R. 615, 622-624 (Bankr. N.D. Ill. 1994) (trustee appointed on a motion filed a month after a voluntary chapter 11 petition because a debtor was deprived of the ability to discharge its fiduciary duties to all creditors by virtue of being under complete control of one secured creditor); *In re Madison Mgmt. Group, Inc.,* 137 B.R. 275 (Bankr. N.D. Ill. 1992) (trustee appointed on a motion filed less than three months after the voluntary chapter 11 petition to investigate and handle debtor's potential alter ego causes of action against its shareholders).

One court addressed an issue of first impression in its circuit – whether a court should appoint a trustee on an emergency motion during the "gap" period, or prior to the entry of an order for relief in an involuntary chapter 11 case. *In re Prof'l Accountants Referral Services, Inc.*, 142 B.R. 424 (Bankr. D. Colo. 1992). The court found that the totality of the evidence supported such an appointment, since there was strong evidence of diversion of corporate assets

38

for personal use by debtor's president and other acts of self-dealing. The court concluded that "there could be serious and irreparable injury without the forthwith appointment of an independent, disinterested, competent trustee." *Id.* at 429.

Another court, addressing the issue of whether a motion to appoint a trustee filed within the original exclusive period is premature, stated that "… if the facts and circumstances warrant the appointment of a trustee, it is not appropriate to wait to file the motion until the termination of the exclusive period. Such a deferral will only further delay the process toward the effective rehabilitation and reorganization of the debtor." *In re Colorado-Ute Electric Ass'n, Inc.*, 120 B.R. 164, 175 (Bankr. D. Colo. 1990).

The case law discussed above demonstrates that it is not uncommon for a court to appoint a trustee at the early stages of a bankruptcy proceeding, and that only where there is insufficient evidence to establish "cause" is it inappropriate and premature to appoint a trustee and deny a debtor and its management an opportunity to oversee the reorganization process. *See e.g., Schuster v. Dragone*, 266 B.R. 268 (D. Conn. 2001) (emergency motion to appoint a trustee denied because there was not enough evidence of alleged fraud or dishonesty); *In re Justus Hospitality Properties, Ltd.*, 86 B.R. 261 (Bankr. M.D. Fla. 1988) (motion to appoint a trustee was premature where there was insufficient evidence of any wrongdoing to justify such appointment). In this case, there is no shortage of evidence that support an appointment of an independent trustee, and the timing of the motion is appropriate due to the irreparable harm Benun and Debtor's management shall cause to the estate and Debtor's creditors if such an appointment is delayed.

In addition, "cause" under section 1104(a)(1) includes incompetence and gross mismanagement *both before or after* the commencement of the case. *In re Main Line Motors,*

*Inc.*, 9 B.R. at 784-85.  Simple mismanagement of the debtor's business that is a result of the lack of sophistication is not sufficient to establish cause. *In re Sharon Steel Corp.*, 871 F.2d at 1227 (citing cases).  However, the appointment of a trustee is mandated where management's behavior "raises grave questions about [its] ability to fulfill its fiduciary duty as debtor-in-possession" to the debtor's creditors. *Id.* at 1228; *see also In re Bellevue Place Assoc.*, 171 B.R. at 623-24.  Similarly, the appointment of a trustee is appropriate under sub-section 1104(a)(2), where a court finds that actions taken by the debtor pre-petition illustrate that the debtor will not act in the best interests of the creditors during the pendency of the bankruptcy. *See In re Concord Coal Corp.*, 11 B.R. 552 (Bankr. S.D.W. Va. 1981) (court appointed trustee under section 1104(a)(2) on grounds that debtor's many competing business interests rendered questionable his commitment to rehabilitation and that debtor could not secure and maintain creditors' trust).

Several cases in the Third Circuit have recognized that a debtor's gross misconduct pre-petition, exacerbated by its continuing conflict of interests post-petition, will render a debtor incapable of carrying out its duties in bankruptcy.  In *In re Great Northeastern Lumber & Millwork Corp.*, the court found that debtor's failure to file and pay its sales taxes for six years prior to the bankruptcy filing constituted such gross mismanagement and that "cause" existed to appoint a trustee post-petition. *In re Great Northeastern Lumber & Millwork Corp.*, 20 B.R. at 611.  In addition, the court in that case found that there was a likelihood that the creditors would be defrauded by the debtor's actions post-petition. *Id.*  In another case, *In re Main Line Motors, Inc.*, the court stated that events that preceded the bankruptcy petition that show incompetence or gross mismanagement may be considered to appoint a trustee in bankruptcy, and in fact, authorized the appointment of a trustee in light of evidence revealing that the president and sole

40

shareholder of debtor had withdrawn substantial sums from the debtor operations and placed them in control of two other corporations owned and controlled by him. *In re Main Line Motors, Inc.*, 9 B.R. at 784-5.

These cases show that courts will only give a debtor a 'second chance' if such a debtor is deserving of the trust and confidence of the court and the creditors.   Parties who have a substantial stake in a debtor's successful reorganization are not required to sit passively, while the debtor and its management continue to milk the resources of the estate.   Moreover, where, as here, there is little hope that the management of the Debtors will engage in avoidance actions against themselves or others, like Benun and those close to him, the appointment of a trustee is mandated.   In a case such as this, a court is required under section 1104 to use its authority to appoint a trustee, to ensure that the assets of the Debtor's estate are preserved for all creditors.

*{The Remainder Of This Page Was Intentionally Left Blank}*

SSL-DOCS1 1352114v1

## CONCLUSION

For the foregoing reasons, this Court should grant this Motion and appoint a trustee.

Dated:  Trenton, New Jersey

June 24, 2003

LOWENSTEIN SANDLER, PC

By: _____
Michael S. Etkin, Esq.
Bruce Buechler, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  973.597.2500
Facsimile:  973.597.2400


**STROOCK & STROOCK &
LAVAN LLP**
Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone:  212.806.5400
Facsimile:  212.806.6006

SSL-DOCS1 1352114v1