## Public Version

Lowenstein Sandler PC
Michael S. Etkin, Esq. (ME 0570)
Bruce Buechler, Esq. (0324)
65 Livingston Avenue
Roseland, New Jersey 07068-1791
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

Stroock & Stroock & Lavan LLP
Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Co-Counsel to Fuji Photo Film Co., Ltd.

**Hearing Date and Time:**

**Objection Deadline:**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

---

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 03-26565 (MS) |
| JAZZ PHOTO CORP., |  |
| Debtor. |  |

---

**DECLARATION OF ELLEN G. BRIER IN SUPPORT OF FUJI PHOTO FILM CO.,
LTD.'S APPLICATION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE
PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE**

I, Ellen G. Brier, declare the following under penalty of perjury that:

1

1. I am a legal assistant employed by Stroock & Stroock & Lavan LLP at 180 Maiden Lane, New York, New York 10038, and have been responsible for maintaining the pleadings and discovery in the civil action in the District of New Jersey, Fuji Photo Film Co., Ltd. v. Jazz Photo Corp. et al, Civil Action No. 99-2937 (FSH) ("Fuji v. Jazz"), the U.S. International Trade Commission ("ITC") proceedings including the initial ITC action, Certain Lens-Fitted Film Packages, U.S. ITC Inv. No. 337-TA-406 ("ITC Action"), the appeals of both these proceedings to the Court of Appeals to the Federal Circuit, Jazz Photo Corp. v. Int'l Trade Comm'n, Nos. 99-1431, -1504, -1595, -1596, -1601 and Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., et al., Nos. 03-1324, -1331 ("Fuji v. Jazz appeal"), and the bankruptcy proceeding before this court, In re: Jazz Photo Corp., Chapter 11, Case No. 03-26565 (MS).

2. Annexed as Exhibit 1 is a true and correct copy of the March 13, 2003 Final Order and Judgment by Judge Hochberg in Fuji v. Jazz.

3. Annexed as Exhibit 2 is a true and correct copy of Fuji Photo Film Co., v. Jazz Photo Corp., 249 F.Supp. 434 (D.N.J. 2003).

4. Annexed as Exhibit 3 is a true and correct copy of the Complaint for Permanent Injunction and Other Relief, Securities and Exchange Commission v. Jack C. Benun, USDC/DDC Case No. 1:94CV01913 filed Sept. 1, 1994 ("SEC v. Benun").

5. Annexed as Exhibit 4 is a true and correct copy of the Final Judgment of Permanent Injunction and Other Relief as to Jack C. Benun, on consent, entered on Sept. 13, 1994 in SEC v. Benun.

2

6. Annexed as Exhibit 5 is a true and correct copy of the Verified Complaint, <u>Jack C. Benun v.</u>
<u>Concord Camera Corp.</u>, Superior Court of New Jersey Law Division:  Monmouth County,
Docket No. MON-L-1845-01 dated April 20, 2001.

7. Annexed as Exhibit 6 is a true and correct copy of <u>Fuji v. Jazz</u> Oct. 30, 2002 trial transcript
pages 1, 14-16, 19-20, 27, 39-46, 50-52, 60-66 and 107-108.

8. Annexed as Exhibit 7 is a true and correct copy of <u>Fuji v. Jazz</u> Oct. 31, 2002 trial transcript
pages 1, 61-62, 64 and 95-97.

9. Annexed as Exhibit 8 is a true and correct copy of a Statement of Financial Condition of Jack
C. Benun as of Feb. 28, 2003 by Amper, Politziner & Mattia, P.C. received as Exhibit C to
the Declaration of Richard A. Sackin, CPA signed March 10, 2003 and filed in the <u>Fuji v.</u>
<u>Jazz</u> appeal in support of Appellants' Motion for a Stay Pending Appeal on April 14, 2003.

10. Annexed as Exhibit 9 is a true and correct copy of the April 7, 2003 Affidavit of David
Goldman filed in the <u>Fuji v. Jazz</u> appeal in support of Appellants' Motion for a Stay Pending
Appeal on April 14, 2003.  This affidavit includes an Exhibit A which is entitled "Jack
Benun  Schedule of income & tax-related expenses."

11. Annexed as Exhibit 10 is a true and correct copy of the April 7, 2003 Supplemental
Declaration of Anthony Cossentino filed in the <u>Fuji v. Jazz</u> appeal in support of Appellants'
Motion for a Stay Pending Appeal on April 14, 2003.  This declaration includes an Exhibit A
which is entitled "Analysis of Intercompany Account between Jazz Photo Corp (USA) and
Jazz Photo Hong Kong For the January 1, 1998 through December 31, 2002" and Exhibit B

SSL-DOCS1 1349058v1

which is entitled "Summary of Statement of Operations For the period from Inception

through December 31, 2002."

12. Annexed, as Exhibit 11 is a true and correct copy of pages 1, 31, 35-37, 41-42 and 253-259

of 262 of <u>Fuji v. Jazz</u> Plaintiff's Trial Exhibit 138, Jazz's April 7, 1997 filing with the SEC,

referred to in testimony as the "S-1."

13. Annexed as Exhibit 12 is a true and correct copy of the Affidavit of Anthony Cossentino

submitted In Camera as filed with the Court of Appeals for the Federal Circuit on April 14,

2003.

14. Annexed as Exhibit 13 are a true and correct copies of 1995 Quitclaim Deed for 80

Wickapecko Drive, Ocean Township, New Jersey from Jack C. Benun to Rebecca Benun, a

1994 Mortgage of the property by Jack and Mona Benun (not satisfied) and a portion of a

1998 Mortgage, Assignment of Leases and Security Agreement by Rebecca Benun to

Rosenthal & Rosenthal, Inc. ("Rosenthal").

15. Annexed as Exhibit 14 is a true and correct copy of a 1996 Deed transferring the ownership

from Jack Benun to Sabrina Benun of 1151 Elberon Avenue, Long Branch, New Jersey, and

a 1988 Mortgage, Assignment of Leases and Security Agreement from Sabrina Benun to

Rosenthal.

16. Annexed as Exhibit 15 is a true and correct copy of 1998 Deed from Solomon Dwek for 5

Ivy Place, Allenhurst, New Jersey to Vanessa Benun and a 2000 Mortgage and Security

Agreement from Vanessa Benun to Rosenthal .

4

17. Annexed as Exhibit 16 is a true and correct copy of the <u>Fuji v. Jazz</u> trial transcript of Oct. 29, 2002 at pages 1, 89-92, 106-109, 112-114 and 116-117.

18. Annexed as Exhibit 17 is a true and correct copy of pages Bates numbered RR02798-2800, RR02804 and RR02812 from a document authored by Mettle Oxbridge LLC produced by Rosenthal on a confidential basis. **Confidential.**

19. Annexed as Exhibit 18 is a true and correct copy of New York Department of State Corporate Record of Kintic and the September 2001 Biennial Statement of Kintic to New York State.

20. Annexed as Exhibit 19 is a true and correct copy of March 12, 2003 Affidavit of Gerald L. Kestenbaum, CPA without exhibits filed in the appeal in support of Appellants' Motion for Stay Pending Appeal on April 14, 2003. **Confidential.**

21. Annexed as Exhibit 20 is a true and correct copy of the 1999 Deed purchased by Kintic for $1,111,706 according to tax payment (1%) , the 1999 Mortgage by Kintic to a bank for $613,250 and the 2002 Mortgage from Kintic to Rosenthal for $500,000 for Condominium Unit 1A at 340 West 86th Street, New York, New York.

22. Annexed as Exhibit 21 is a true and correct copy of pages 1, 158-164 and 173 of the Aug. 16, 2002 deposition transcript of Jessie Szeto taken in the <u>Fuji v. Jazz</u> case.  The amount testified to can be converted to U.S. dollars at $HK 7.78 to $US 1.00.

23. Annexed as Exhibit 22 is a true and correct copy of a docket sheet obtained from CourtLink (Lexis) for <u>Bergman, et al. v. Benun, et al.</u>

24. Annexed as Exhibit 23 is a true and correct copy of an unredacted version of Fuji v. Jazz
Plaintiff's Trial Exhibit No. 424, Minutes of a Special Meeting of the Board of Directors of
Jazz Photo Corp. taken June 10, 1998.  Exhibit 424 was admitted with certain information
redacted to avoid jury prejudice.

25. Annexed as Exhibit 24 is a true and correct copy of an unredacted version of Fuji v. Jazz
Plaintiff's Trial Exhibit No. 423, Minutes of a Special Meeting of the Board of Directors of
Jazz Photo Corp. taken Sept. 24, 1998.  Exhibit 423 was admitted with certain information
redacted to avoid jury prejudice.

26. Annexed as Exhibit 25 is a true and correct copy of Fuji v. Jazz Plaintiff's Trial Exhibit No.
419, a Sept. 21, 1999 letter from Roger Lorenzini to Jack Benun.

27. Annexed as Exhibit 26 is a true and correct copy of an unredacted version of Fuji v. Jazz
Plaintiff's Trial Exhibit No. 149, Jazz Photo Corp. and Subsidiaries Consolidated Financial
Statements, December 31, 2001 and 2000.  Exhibit 149 was admitted with certain
information redacted to avoid prejudice of the jury.

28. Annexed as Exhibit 27 is a true and correct copy of April 2, 1997 Consulting Agreement
between Jazz Photo Corp. and JCB Consultants, Inc., admitted as a portion of Fuji v. Jazz
Plaintiff's Trial Exhibit 139.

29. Annexed as Exhibit 28 is a true and correct copy of August 8, 1997 Amendment to
Consulting Agreement between Jazz Photo Corp. and JCB Consultants, Inc., admitted as a
portion of Fuji v. Jazz Plaintiff's Trial Exhibit 139.

6

30. Annexed as Exhibit 29 is a true and correct copy of the Amended and Restated Consulting Agreement dated Feb. 6, 2002 between Jazz Photo Corp. and JCB Consultants, Inc.

31. Annexed as Exhibit 30 is a true and correct copy of the March 28, 2003 Affidavit of John K. Crossman submitted in the Fuji v. Jazz case.

32. Annexed as Exhibit 31 is a true and correct copy of Judge Hochberg's April 8, 2003 Opinion and Order in Fuji v. Jazz denying Jazz's motion for a stay pending appeal without the posting of a supersedeas bond.

33. A videotape excerpt of the CBS 11:00 p.m. News on Nov. 16, 2002 was admitted during the Fuji v. Jazz trial as Court Exhibit 10.  This news segment was a consumer alert regarding the sale of reloaded Fuji and Kodak cameras sold under other names, including Jazz Photo. Testing by CBS found the reloaded cameras produced defective photographs.

34. Annexed as Exhibit 32 is a true and correct copy of an April 28, 2003 Press Release by Congressman Tom Reynolds.

35. Annexed as Exhibit 33 is a true and correct copy of the Order to Cease and Desist issued to Jazz by the ITC on June 2, 1999.

36. Annexed as Exhibit 34 is a true and correct copy of Judge Luckern's Order No. 90 in the ITC Bond Forfeiture Proceeding.  **Confidential.**

37. Annexed as Exhibit 35 is a true and correct copy of pages 1, 23, 25 and 75 from the May 22, 2003 Hearing Transcript before Judge Stern in this bankruptcy proceeding.

7

38. Annexed as Exhibit 36 are true and correct copies of pages 1 and 22-23 of the transcript of a

June 24, 2002 Hearing before Magistrate Judge Chesler in the Fuji v. Jazz case.

39. Annexed as Exhibit 37 are true and correct copies of two emails dated Aug. 14, 2001 and

July 30, 2001 to an alleged supplier of empty camera bodies (shells) produced in the Fuji v.

Jazz case at Fuji's request in the summer of 2002, bates stamped 102936 and 103014.

**Confidential.**

40. Discovery in Fuji v. Jazz closed in 2002 except for a continuing obligation on Debtor's part

to produce damages documents on a quarterly basis.  Though discovery was completed Judge

Hochberg permitted discovery on the "first sale" issue in the summer of 2002.  The order of

Exhibit 36 refers to numerous documents produced in the summer of 2002 by Debtor but not

produced in damages discovery.

41. Annexed as Exhibit 38 is a true and correct copy of a Feb. 5, 2001 document entitled

"Program Memorandum" produced by Rosenthal as RR02713-2715.  **Confidential.**

42. Annexed as Exhibit 39 is a true and correct copy of a May 23, 2003 letter from Mr. Warren

Usatine to Judge Stern correcting a representation regarding employment of Jack Benun's

brother by Jazz.

43. Annexed as Exhibit 40 is a true and correct copy of pages 1 and 34-37 from the May 30,

2003 Hearing Transcript before Judge Stern in this bankruptcy proceeding.

44. Annexed as Exhibit 41 is a true and correct copy of a vendor list given to counsel for Fuji in

open court on May 30, 2003 by Mr. Sirota who represented that the list was from Mr.

Cossentino.

SSL-DOCS1 1349058v1

45. Annexed as Exhibit 42 are true and correct copies of Vendors Address Lists produced by
Debtor in the ITC Action Enforcement Proceeding, bates stamped 000001 and 000018,
purporting to cover purchases starting on January 1, 2001. **Confidential.**

46. Annexed as Exhibit 43 are true and correct copies of four documents bates numbered J
37083, J 37085, J 37081 and J 37082 produced by Debtor in the ITC Enforcement
Proceeding. **Confidential.**

47. Annexed as Exhibit 44 is a true and correct copy of the Hong Kong Corporate Registry
documents for Wing Shan (China) Limited.

48. Annexed as Exhibit 45 is a true and correct copy of the Hong Kong Corporate Registry
documents for Polytech Enterprise Limited.

49. Annexed as Exhibit 46 is a true and correct copy of the Hong Kong Corporate Registry
document entitled Certificate of Incorporation on Change of Name for Jazz Photo (Hong
Kong) Limited.

50. Annexed as Exhibit 47 is a true and correct copy of a document produced by Debtor in the
ITC Enforcement Proceeding bates numbered J 40248, with a certified translation of the
Chinese writing. **Confidential.**

51. Annexed as Exhibit 48 is a true and correct copy of a Certificate as to Officers, Directors,
Stockholders and Authorized Signatures of Jazz Photo Corp. produced by Rosenthal as
RR00065-67. **Confidential.**

9

52. An AT&T search on the internet shows that Leon Silvera lives at 10 Surrey Lane, West Deal, New Jersey that is one block west and parallel to Wickapecko Drive, which is where Mr. Benun lives.  A database investigation has also revealed that Mr. Silvera is involved in many businesses, of which only Photo Recycling Enterprises appears to have any involvement with single use cameras.

53. Annexed as Exhibit 49 is a true and correct copy of pages 1, 10 and 89 of the Aug. 6, 2002 deposition of Jack C. Benun taken in the Fuji v. Jazz case.  **Confidential.**

54. Annexed as Exhibit 50 is a true and correct copy of the Hong Kong Corporate Registry document entitled Return of first directors and secretary of Fordteam Limited filed June 22, 1995.

55. Annexed as Exhibit 51 is a true and correct copy of the Hong Kong Corporate Registry document entitled Notice of change of directors or secretary or in their particulars of Fordteam Limited filed Dec. 10, 1996.

56. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001, Title 18 of the United States Code.

Signed this 23rd day of June, 2003.

_____
Ellen G. Brier

SSL-DOCS1 1349058v1

FILED

MAR 1 7 2003

AT 8:30
WILLIAM T. WALSH
CLERK

RECEIVED
WILLIAM T. WALSH, CLERK

284

2003 MAR 17  A II: 36

UNITED STATES
DISTRICT COURT

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| Fuji Photo Film Co. Ltd., | : | Civil Case No. 99-2937 (FSH) |
| Plaintiff, | : | Date: March 13, 2003 |
| v. | : | **FINAL ORDER AND JUDGMENT** |
| Jazz Photo Corp., Jazz Photo Hong Kong Ltd. and Jack Benun, | : | |
| Defendants. | : | |

ENTERED
ON
THE DOCKET

MAR 18 2003

WILLIAM T. WALSH, CLERK
By_____
(Deputy Clerk)

### HOCHBERG, District Judge:

This patent infringement action having been commenced on June 23, 1999 by the filing of

a Summons and Complaint by Plaintiff Fuji Photo Film Co., Ltd. ("Fuji") against Defendants

Jazz Photo Corp. ("Jazz Photo"), Jazz Photo (Hong Kong) Ltd. ("Jazz Hong Kong") and Jack

Benun; and a trial on the merits having been held beginning on October 24, 2002 and the jury

having rendered a unanimous verdict on December 2, 2002; and for the reasons stated in this

Court's Opinion dated February 25, 2003; and for good cause shown; and

it appearing that the parties have jointly submitted a calculation of pre-judgment interest,

as directed by this Court's Order dated February 25, 2003; and

it appearing that all prerequisites to the entry of a Final Order and Judgment have been

met;

**IT IS** on this 13th day of March 2003, hereby **ORDERED** that Jazz Photo and Jazz Hong

Kong's importation, use, and/or sale of 40,928,185 Lens Fitted Film Packages ("LFFP's") from

EXHIBIT 01

the period 1995 through August 21, 2001 infringed Fuji's patent rights in violation of 35 U.S.C.

§ 271(a); and it is further

ORDERED that Defendant Jack Benun induced Jazz Photo's infringement with respect

to 39,103,664 cameras in violation of 35 U.S.C. § 271(b); and it is further

ORDERED that all Defendants' infringement was willful with respect to 1,209,760

newly-made LFFP's imported, used, and/or sold by Jazz during the period 1995 through August

21, 2001; and it is further

ORDERED that Fuji was damaged as a result of the Defendants' infringement in the

total amount of $22,919,783.60, representing the number of infringing LFFP cameras multiplied

by a reasonable royalty of $0.56 per camera, plus pre-judgment interest in the amount of

$6,845,497; and it is further

ORDERED that judgment is hereby **GRANTED** in favor of Plaintiff against Defendants

Jazz Photo, Jazz Hong Kong and Jack Benun, jointly and severally, in the amount of

$21,898,051.84, plus pre-judgment interest in the amount of $6,540,310, for a total amount of

$28,438,361.84; and it is further

ORDERED that judgment is hereby **GRANTED** in favor of Plaintiff against Defendants

Jazz Photo and Jazz Hong Kong, jointly and severally, for the additional amount of

$1,021,731.76, plus pre-judgment interest in the amount of $305,187, for a total amount of

$1,326,918.76; and it is further

ORDERED that Fuji's request for final injunctive relief is **DENIED**.[1].

---

[1]  Fuji has requested that this Court enter a final injunction precluding Defendants and
others from "infringing" or "inducing such infringement" of its patents. *See* 3/7/02 Ltr. at 2.
Fuji's proposed language fails to comply with the strictures of Rule 65(d) in that it is neither

HON. FAITH S. HOCHBERG, U.S.D.J.

---

"specific in terms" nor does it describe "in reasonable detail the acts sought to be restrained."
*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 479-80 (Fed. Cir.
1993) (vacating injunction barring plaintiff "from infringing Flowdata's patent"); Under the
highly fact-specific repair/reconstruction analysis at issue in this case, the general "obey the law"
language proffered by Fuji fails to satisfy the strictures of Rule 65(d). *Cf., Payne v. Travenol
Labs., Inc.*, 565 F.2d 895, 898 (5th Cir. 1978) ("Obey the law" injunctions prohibited); *compare
Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1359 (Fed. Cir. 1999) (detailed record made
danger of unwarranted contempt proceedings nonexistent).  Even if the proposed language were
more narrowly-tailored, however, final injunctive relief would be inappropriate under the facts of
this case for several reasons.  First, Fuji voluntarily limited the scope of its infringement claims
in this case to cameras sold prior to August 21, 2001.  As a result, Defendants' post-August 21,
2001 activities were never at issue in this case; and there is no evidence in the record as to the
refurbishing activities currently employed by any Defendant.  Second, this Court's Opinion as to
repair/reconstruction turned on issues of proof which may not necessarily adhere in a proceeding
with a damages period beginning after August 21, 2001, the date of the Federal Circuit's ruling in
*Jazz v. ITC*.  Third, Fuji has already sought and obtained injunctive relief in the ITC proceeding,
the subject of which is Defendants' *current and ongoing* conduct.  While the injunctive power of
the ITC is not necessarily coextensive with that of this Court (in that the ITC may only enjoin
importation of infringing products), the existence of the ITC injunction for the most part vitiates
Fuji's claim to ongoing and irreparable harm with respect to the Jazz supply chain for which
evidence has been adduced in this case.

249 F.Supp.2d 434                                                                              Page   3
(Cite as: 249 F.Supp.2d 434, 2003 WL 678140 (D.N.J.))

< KeyCite History >

United States District Court,
D. New Jersey.

FUJI PHOTO FILM CO. LTD., Plaintiff,
v.
JAZZ PHOTO CORP., Jazz Photo Hong Kong
Ltd. and Jack Benun, Defendants.

No. CIV. 99-2937(FSH).

Feb. 25, 2003.

Patent holder brought infringement action against competitor over patents for disposable cameras, known as lens-fitted film packages (LFFPs). The District Court, Hochberg, J., held that: (1) refurbishment procedures constituted permissible repair; (2) court could not exculpate unknown processes from charge of reconstruction; (3) in context of its exhaustion claim, competitor was not required to adduce direct proof of country of origin for each and every permissibly repaired camera it sold; (4) jury's 56 cent royalty award was not so grossly excessive or monstrous, or clearly not supported by evidence, or based only on speculation or guesswork, that it had to be overturned as matter of law; (5) patent holder's reliance on proof of its own market share, without more, was insufficient as matter of law to support reasonable probability of "but for" causation of lost profits; (6) evidence was sufficient for jury to find that competitor's infringement was willful; and (7) evidence was sufficient to support jury verdict that particular individual was personally liable for inducing infringement.

Judgment for patent holder.

West Headnotes

[1] Patents ⟨⟩ 255
291k255
Refurbishment procedures associated with patented disposable cameras, known as lens-fitted film packages (LFFPs), constituted "permissible repair," rather than reconstruction, since totality of those procedures, which all devolved into opening cameras, replacing film and battery, and closing cameras, served function of preserving useful life of cameras, rather than recreating article after it had become spent.

[2] Patents ⟨⟩ 312(8)
291k312(8)
Court could not exculpate unknown processes from charge of reconstruction, in infringement suit over patents for disposable cameras, known as lens-fitted film packages (LFFPs); even though competitor was able to prove affirmative defense of permissible repair with respect to cameras from particular suppliers by presenting evidence of their processes, competitor failed to satisfy its burden with respect to cameras refurbished by other suppliers because it did not present any evidence as to how those suppliers refurbished their cameras.

[3] Patents ⟨⟩ 191
291k191
The principle of "exhaustion" holds that a patentee's rights in a patented article are exhausted after the first sale of the article by the patentee or under the patentee's authority;  in exchange for the royalty received, the patentee ceases to have the ability to use its patent monopoly to restrict the further sale, use, or lawful modification or repair of the product.

[4] Patents ⟨⟩ 218(1)
291k218(1)
A patentee is entitled to but one royalty for a patented machine.

[5] Patents ⟨⟩ 191
291k191
A patentee's United States patent rights are not exhausted unless the patented product is first sold under the United States patent.

[6] Patents ⟨⟩ 312(8)
291k312(8)
Competitor was not required to adduce direct proof of country of origin for each and every permissibly repaired camera it sold, in context of exhaustion claim in infringement suit over patents for disposable cameras, known as lens-fitted film packages (LFFPs), since it would have been fundamentally unjust to do so, and it was reasonable to make inferences from evidence adduced at trial.

[7] Federal Civil Procedure ⟨⟩ 2142.1
170Ak2142.1

[7] Federal Civil Procedure ⟨⟩ 2608.1
170Ak2608.1

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 02

Case 03-26565-MS   Doc 90-3   Filed 06/24/03   Entered 06/24/03 17:09:50   Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5   Page 15 of 93

249 F.Supp.2d 434                                                    Page   4
(Cite as: 249 F.Supp.2d 434,  2003 WL 678140 (D.N.J.))

A motion for judgment as a matter of law will be granted only where, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability;  question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[8] Patents ⟷ 319(1)**
291k319(1)
Jury's 56 cent royalty award was not so grossly excessive or monstrous, or clearly not supported by evidence, or based only on speculation or guesswork, that it had to be overturned as matter of law, in infringement suit over patents for disposable cameras, known as lens-fitted film packages (LFFPs), even though award was not based on royalty suggested by expert by either party;  in light of wide variance between parties' experts, it was within jury's realm, as finder of facts, to reject extreme figures proffered by litigants as incredible and substitute intermediate figure as matter of its judgment from all of evidence.     Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[9] Patents ⟷ 319(1)**
291k319(1)
A "reasonable royalty" is the rate that would be agreed upon by the patentee and infringer as the result of a hypothetical negotiation at the outset of the infringement.

**[10] Patents ⟷ 324.55(1)**
291k324.55(1)
Given the hypothetical nature of the exercise of what constitutes a reasonable royalty, any reasonable royalty calculation necessarily involves an element of approximation and uncertainty;  thus, a jury's reasonable royalty verdict will be overturned only if grossly excessive or monstrous, clearly not supported by evidence, or based only on speculation or guesswork.

**[11] Patents ⟷ 312(10)**
291k312(10)
Patent holder's reliance on proof of its own market share, without more, was insufficient as matter of law to support reasonable probability of "but for"

causation of lost profits, in infringement suit over patents for disposable cameras, known as lens-fitted film packages (LFFPs), since competitor could have sold non-infringing alternative by permissibly repairing cameras out of shells first sold in United States.     35 U.S.C.A. § 284;   Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[12] Patents ⟷ 312(1.7)**
291k312(1.7)

**[12] Patents ⟷ 318(4.1)**
291k318(4.1)
A standard method of establishing patent damages is for the patentee to demonstrate the profits on sales it would have made absent the defendant's infringement;  however, lost profit damages of this kind must be proved, they are never presumed. 35 U.S.C.A. § 284.

**[13] Patents ⟷ 318(1)**
291k318(1)
In order to recover lost profits, a patent owner must demonstrate a causal connection between the infringement and its loss of profits. 35 U.S.C.A. § 284.

**[14] Patents ⟷ 312(1.7)**
291k312(1.7)
The burden rests on the patentee to show a reasonable probability that "but for" the infringing activity, the patentee would have made the infringer's sales;  once the patent owner establishes a reasonable probability of "but for" causation, the burden then shifts to the accused infringer to show that the patent owner's claim is unreasonable for some or all of the lost sales. 35 U.S.C.A. § 284.

**[15] Patents ⟷ 312(1.7)**
291k312(1.7)

**[15] Patents ⟷ 318(4.1)**
291k318(4.1)
In order to obtain lost profits damages under the Panduit test, a patent owner must prove demand for the patented product, absence of acceptable non-infringing substitutes, his manufacturing and marketing capability to exploit the demand, and the amount of the profit he would have made;  upon proof of these four elements, a presumption of "but for" causation is accorded the patent holder with respect to all of the alleged infringer's sales. 35

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(Cite as: 249 F.Supp.2d 434, 2003 WL 678140 (D.N.J.))

U.S.C.A. § 284.

**[16] Patents** ⇐ **312(1.7)**
291k312(1.7)
The presumption under the Panduit lost profits test, that all of the infringer's sales would have accrued to the patentee absent the infringement, is unreasonable in the multi-competitor landscape, where presumably some portion of the infringer's sales would have accrued to competitors other than the patent holder itself; moreover, the presence of multiple competitors makes proof of the second Panduit factor, absence of acceptable non-infringing alternatives, impossible, since in the ordinary multi-competitor situation the patentee's competitors by definition engage in the sale of non-infringing alternatives. 35 U.S.C.A. § 284.

**[17] Patents** ⇐ **312(1.7)**
291k312(1.7)
Patent holder had burden, as part of its ultimate burden of proof, to demonstrate reasonable probability of "but for" causation, in light of competitor's non-infringing alternative, in context of patent holder's claim for lost profits in infringement suit over patents for disposable cameras, known as lens-fitted film packages (LFFPs). 35 U.S.C.A. § 284.

**[18] Patents** ⇐ **312(8)**
291k312(8)
Evidence was sufficient for jury to find that competitor's infringement of patent on disposable cameras, known as lens-fitted film packages (LFFPs), was "willful," even though competitor testified that he thought he was selling cameras that had been permissibly repaired; competitor had duty to exercise due care to refrain from infringing activities, having acknowledged that he needed license to sell newly-made cameras, and jury could have determined that competitor's self-serving protestations were entitled to little, if any, weight. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[19] Patents** ⇐ **312(4)**
291k312(4)

**[19] Patents** ⇐ **314(5)**
291k314(5)
Whether infringement is willful is a question of fact for the jury, which the patentee must prove by clear and convincing evidence.

**[20] Patents** ⇐ **323.3**
291k323.3
A jury's finding that an accused infringer wilfully infringed upon a patent may be overturned on a motion for judgment as a matter of law only if unsupported by substantial evidence in the record; thus, an infringer seeking to overturn a verdict bears a heavy burden to show that no reasonable juror could find the asserted proof of willfulness rose to the quantum of clear and convincing evidence. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[21] Patents** ⇐ **227**
291k227
When an infringer has actual notice of a patentee's rights, the infringer has an affirmative duty of due care to avoid infringement.

**[22] Patents** ⇐ **227**
291k227
While the absence of an opinion of counsel with respect to infringement of a patent is ordinarily of critical significance in any willfulness inquiry, it is of less importance where the alleged infringer knew that a particular action would constitute infringement, but claims not to have known that it was taking the action.

**[23] Patents** ⇐ **319(3)**
291k319(3)
Court declined to exercise its discretion to award enhanced damages and attorney fees, even though jury found that competitor had willfully infringed on patent with respect to newly-made disposable cameras, known as lens-fitted film packages (LFFPs); competitor acquired newly-made cameras from third parties, newly-made cameras reflected very small percentage of total cameras sold by competitor, competitor took remedial measures once infringement was discovered, competitor did not conceal existence of its sales of newly-made cameras, and competitor's conduct in litigation did not warrant any damages enhancement.      35 U.S.C.A. §§ 284, 285.

**[24] Patents** ⇐ **319(3)**
291k319(3)
A finding of willful infringement merely authorizes, but does not mandate an award of increased damages; paramount consideration in determining whether to award enhanced damages is the egregiousness of the defendant's conduct based on

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                                    **Page  6**
(Cite as: 249 F.Supp.2d 434, 2003 WL 678140 (D.N.J.))

all the facts and circumstances. 35 U.S.C.A. §§ 284, 285.

**[25] Patents ⬪ 312(8)**
291k312(8)
Evidence was sufficient to support jury verdict, finding that particular individual was personally liable for inducing infringement of corporation, in infringement action over patents for disposable cameras, known as lens-fitted film packages (LFFPs); patent holder demonstrated individual's control over corporation and his personal direction of corporation's infringement, most notably, through evidence that corporation paid individual over $10 million in direct payments and loans, representing more than four times company's retained earnings, during time period when individual was purported "consultant" to corporation. 35 U.S.C.A. § 271(b).

**[26] Patents ⬪ 259(1)**
291k259(1)
Before inducement liability will attach, the patentee must satisfy the following two-part test: first, the patentee must show that there has been direct infringement, and, second, the patentee must prove that the alleged infringer knowingly induced the direct infringement and possessed a specific intent to encourage that infringement. 35 U.S.C.A. § 271(b).

**[27] Patents ⬪ 312(8)**
291k312(8)
While proof of the alleged inducer's intent is a necessary element of the patent holder's burden to prove inducement, direct evidence of intent is not required; rather, circumstantial evidence may suffice. 35 U.S.C.A. § 271(b).

**[28] Patents ⬪ 314(5)**
291k314(5)
Intent to induce infringement of a patent is a factual determination particularly within the province of the trier of fact. 35 U.S.C.A. § 271(b).

**Patents ⬪ 328(1)**
291k328(1)
345,750, 356,101, 372,722, 4,833,495, 4,855,774, 4,884,087, 4,954,857, 4,972,649, 5,235,364, 5,361,111, 5,381,200, 5,408,288, 5,436,685, 34,168. Infringed.

**Patents ⬪ 328(2)**
291k328(2)
Infringed.

**Patents ⬪ 328(4)**
291k328(4)
Infringed.

**\*438** Lawrence Rosenthal, Matthew W. Siegal, Lisa A. Jakob, Angie M. Hankins, Stroock & Stroock & Lavan LLP, New York, NY, Robert J. Rohrberger, Fox and Fox LLP, Livingston, NJ, for Plaintiff.

John Crossman, Terence D. Watson, Emma E. Harzem, Dreier & Baritz LLP, New York, NY, Jeffrey I. Kaplan, Kaplan & Gilman, LLP, Woodbridge, NJ, Constance S. Huttner, Meir Y. Blonder, Skadden, ARPS, Slate, Meagher & Flom LLP, New York, NY, Donald P. Jacobs, Budd, Larner, Gross, Picillo, Rosenblaum, Greenberg & Sade, Short Hills, NJ, for Defendants.

OPINION

HOCHBERG, District Judge.

BACKGROUND

**\*1** This case is the second chapter of a patent infringement dispute involving patents owned by Plaintiff Fuji Photo Film Co. Ltd. ("Fuji") for disposable cameras, known as "lens-fitted film packages" or "LFFPs." Fuji and its licensees manufacture these disposable cameras for sale both in the United States and abroad. Consumers purchase the cameras, take their pictures, and deliver them to photo processors, who then remove the exposed film for development by opening a compartment that holds the film. Once the film is removed, the remaining camera shells are either discarded by the developers, sold back to the original manufacturer, or sold to collectors who then resell them to companies that "refurbish" the cameras by, among other things, reloading the cameras with new film. Defendant Jazz Photo Corp. ("Jazz Photo") and its subsidiary, Jazz Photo Hong Kong Ltd. ("Jazz Hong Kong" and, together with Jazz Photo, "Jazz") acquire these "refurbished" cameras and resell them in the United States.

Jazz was founded in 1995 by Defendant Jack

249 F.Supp.2d 434                                                           **Page 7**
(Cite as: 249 F.Supp.2d 434, *438, 2003 WL 678140 (D.N.J.), **1))

Benun, who was Jazz's President, Chief Executive Officer, and sole Director until 1997, when he resigned his positions with Jazz and assumed the title of "consultant" as part of an effort to take Jazz public (Mr. Benun had previously been barred from serving as an officer or director of any publicly-traded company). Shortly after he founded Jazz, Mr. Benun twice personally approached Fuji for a license to sell its cameras. Fuji refused to grant Jazz a license. Starting in 1995, *439 Jazz began importing and selling "refurbished" cameras covered by Fuji's patents in the United States. Jazz also imported and sold some newly-made cameras covered by Fuji's patents. [FN1]

> FN1. There is no dispute that Jazz's importation and sale of these newly-made cameras infringed Fuji's patents. The only issues with respect to these cameras are whether the infringement was willful, whether Mr. Benun induced the infringement, and the amount of Fuji's damages.

The primary focus of this patent infringement lawsuit involves the manner in which the cameras sold by Jazz are "refurbished." [FN2] As discussed more extensively below, there is a significant distinction in the law of patents between "repairing" a patented item, such that its useful life is preserved, and "reconstruction" of the item, which is tantamount to making new patented product on the template of the original after its useful life is spent. The former is permissible, as the right of "repair" inheres in the rights of a purchaser under the patent laws. The latter, however, is not, as "reconstruction" of a patented product runs afoul of the patent holder's right to seek and obtain a royalty on patented items newly-made.

> FN2. As used in this Opinion, the terms "refurbished" and "refurbishment" are neutral terms, connoting neither "repair" nor "reconstruction." See Jazz Photo Corp. v. International Trade Commission, 264 F.3d 1094, 1094 n. 1 (Fed.Cir.2001) ("Jazz v. ITC").

Thus, the key issue in the dispute between Fuji and Jazz is whether the cameras sold by Jazz are "refurbished" in such a way that they can be considered to have been permissibly "repaired" or impermissibly "reconstructed."

Chapter I-The ITC Proceeding.

Fuji began the first chapter of this dispute in 1998 by commencing a proceeding (the "ITC Proceeding") before the International Trade Commission (the "ITC" or the "Commission"). In the ITC Proceeding, Fuji sought to prevent Jazz and the twenty-five other respondents therein from importing refurbished LFFP's into the United States pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. Among other things, Fuji claimed that the refurbishment of its patented disposable cameras constituted impermissible "reconstruction," and that the importation of refurbished cameras into the United States therefore infringed fifteen of Fuji's LFFP patents. [FN3]

> FN3. Those patents, with a brief general description of each, are as follows: United States Patent Nos. 4,833,495 (the '495 patent-LFFP having projections for promoting smooth, scratch-free unrolling of film during use); 4,855,774 (the '774 patent-LFFP having a plurality of ribs for promoting smooth, scratch free unrolling of film and other claimed features); Patent 4,884,087 (the '087 patent-LFFP having a spool which promotes film loading and certain assembly features); 4,954,857 (the '857 patent-LFFP having a roll of unexposed film having no inner spool, film advancement features, and a spool in an LFFP film role to promote film loading); 4,972,649 (the '649 patent-methods of assembling an LFFP with unexposed film removed from a film cartridge and wound in a roll to promote ease of use); 5,235,364 (the '364 patent-LFFP with a flash unit arranged in a specified way to promote compactness); 5,361,111 (the '111 patent-LFFP with a wall to protect flash button to prevent inadvertent flash activation); 5,381,200 (the '200 patent-LFFP with a shutter blade having a crank shape to promote a thinner design); 5,408,288 (the '288 patent-LFFP with a winding knob with knurled teeth to mesh with a film cartridge having knurled teeth); 5,436,685 (the '685 patent-LFFP having a removable mechanical unit to facilitate recycling of spent LFFPs and the remanufacture thereof); Re 34,168 (the Re '168 patent-LFFP in which internal parts project into thickness of front cover); and Design Patent Nos. D 345,750 (the D '750 patent-ornamental features; camera without flash); D 356,101 (the D '101 patent-ornamental features; camera with flash); and D 372,722 (the D '722 patent-ornamental features; cameras with round shaped flash button area).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**\*440  \*\*2** During the course of the ITC Proceeding, only eight of the twenty-six respondents actually appeared before the ITC. Of the remaining respondents, eight failed to respond to the complaint, and ten more failed otherwise to appear. See Jazz v. ITC, 264 F.3d at 1098. An ITC Administrative Law Judge held a hearing with the eight participating respondents--including Jazz Photo--after which he issued a detailed Final and Initial Recommended Determination ("IRD") finding that the respondents' activities constituted impermissible reconstruction.

During the administrative hearing, several respondents did not participate in meaningful discovery regarding their refurbishment processes. Id. at 1101. Others presented evidence on this issue which the ALJ found to be incomplete or non-credible. Id. Thus, at the conclusion of the ITC hearing, the precise details of the accused refurbishing processes were not entirely known. Id. Nevertheless, each of the participating respondents in the ITC Proceeding admitted to the use of eight common procedures in their refurbishment processes. Id. [FN4] The ALJ based his finding of impermissible reconstruction on these eight common refurbishment procedures. See In the matter of Certain Lens-Fitted Film Packages, Inv. No. 337-TA-406, IRD at 86 (Feb. 24, 1999).

> FN4. Those eight procedures consisted of: (1) removing the cardboard cover; (2) cutting open the plastic casing; (3) inserting new film and a container to receive the film; (4) replacing the winding wheel for certain cameras; (5) replacing the battery for flash cameras; (6) resetting the counter; (7) resealing the outer case; and (8) adding a new cardboard cover. Jazz v. ITC, 264 F.3d at 1098, 1110-11.

Upon review of the IRD, the Commission adopted the ALJ's finding that the eight common procedures amounted to impermissible reconstruction. See In the matter of Certain Lens-Fitted Film Packages, Inv. No. 337-TA-406, n.4 (Int'l Trade Comm. June 28, 1999). The Commission issued a General Exclusion Order and Order to Cease and Desist from further infringement of Fuji's patents.

Jazz and several other respondents appealed the Commission's ruling to the Federal Circuit. On August 21, 2001, the Federal Circuit reversed the Commission's finding of infringement with respect to cameras: (1) refurbished by the eight common procedures which formed the basis of the ALJ's decision, and (2) for which Fuji's patent rights had been "exhausted by first sale in the United States." Id. at 1110-11. [FN5] The Federal Circuit's dual holding in Jazz v. ITC, which sets forth both the distinction between "repair" and "reconstruction" and the doctrine of patent exhaustion, is at the heart of the proceedings in this case. A detailed analysis of the Federal Circuit's decision is therefore reserved for later portions of this Opinion.

> FN5. The Court remanded the case to the ITC for any further proceedings in implementing its decision. Id. at 1110-11.

Chapter II-The Proceedings Before This Court.

Five days before the Commission issued its opinion in the ITC Proceeding, and prior to Jazz's appeal to the Federal Circuit, Fuji commenced the instant action--the second chapter of its dispute with Jazz--by filing a three-count complaint against Jazz and Mr. Benun seeking damages and injunctive relief for, inter alia, direct infringement of Fuji's patents under 35 U.S.C. § 271(a) (as to Jazz) and inducement of infringement under 35 U.S.C. § 271(b) (as to Mr. Benun). The four-year history of this litigation culminated in a \*441 five-week jury trial, which is the subject of this Opinion.

**\*\*3** The Parties' Stipulations. As part of a mutual effort to decrease litigation costs in this case, and to avoid undue delay, the parties entered into a stipulation (the "Repair/Reconstruction Stipulation") prior to the Federal Circuit's decision in Jazz v. ITC. Pursuant to this stipulation, the parties agreed to litigate the instant case on the basis of the record in the ITC Proceeding. [FN6] During the trial of this case, the witnesses' testimony was taken live in order to permit the jury to hear and evaluate the testimony first-hand. As to repair/reconstruction issues, however, the scope of the witnesses' live testimony was limited to the scope of their factual ITC testimony pursuant to the parties' Repair/Reconstruction Stipulation.

> FN6. The Court permitted the parties to reopen discovery on the issue of domestic versus foreign exhaustion after the Federal Circuit's ruling in Jazz v. ITC. As to repair/reconstruction issues,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS    Doc 90-3    Filed 06/24/03    Entered 06/24/03 17:09:50    Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5    Page 20 of 93

249 F.Supp.2d 434                                                                 **Page   9**
(Cite as: 249 F.Supp.2d 434, *441, 2003 WL 678140 (D.N.J.), **3)

however, the parties' stipulation precluded new discovery beyond the ITC record.

Prior to trial, the parties entered into an additional stipulation in which they agreed to submit to the jury a 13-question joint special verdict form (attached as an addendum hereto). The parties stipulated that the Court would: (1) determine whether the factual refurbishment processes found by the jury constituted legally permissible repair or legally impermissible reconstruction; and (2) determine the number of legally infringing cameras and apply that number mathematically to the jury's damages verdict in order to determine the total amount of damages to be awarded.

The Jury Verdict. At the conclusion of trial, the jury reached the following verdict:
Jazz infringed Fuji's patents with respect to 39,889,850 of the 40,099,369 refurbished cameras sold by Jazz from 1995 through August 21, 2001 (*advisory*);
Jazz infringed Fuji's patents with respect to 1,209,760 newly-made cameras sold during this period;
Mr. Benun induced Jazz Photo's infringement with respect to 39,103,664 cameras;
Defendants' sale of newly-made cameras was willful, but their sale of refurbished cameras was not willful;
A reasonable royalty for Jazz's alleged infringement is 56 cents per infringing camera sold; and
Fuji lost profits of $3,531,711.70 as a result of Jazz's sales of refurbished cameras and $112,749.63 as a result of Jazz's sales of newly-made cameras.

Pursuant to the parties' stipulation, the Court must now determine the total number of infringing cameras sold by Jazz during the relevant period (1995 through August 21, 2001) and apply that number to the jury's damages per camera verdict to determine the total annual damages to be awarded. Defendants have also moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) challenging the jury's verdict on the issues of lost profits, reasonable royalty, Mr. Benun's inducement, and willful infringement. All issues are decided in this Opinion.

### DISCUSSION

In Jazz v. ITC, the Federal Circuit held that the importation or sale of a refurbished camera infringes the patentee's rights unless the alleged infringer can prove as an affirmative defense: (1) that the procedures employed in refurbishing the camera constitute "repair" under the patent laws, rather than impermissible *442 "reconstruction" (Jazz v. ITC, 264 F.3d at 1098-99, 1103-1107, 1110-11); and (2) that the camera sold was refurbished from the shell of a camera first sold by the patentee in the United States (id. at 1098, 1105, 1110). The first of these requirements is derived from the oft-litigated distinction in the patent laws between permissible repair and impermissible reconstruction. The second requirement arises from the doctrine of patent exhaustion.

**4 It is this Court's task to analyze and apply this two-part test to the facts adduced at trial to determine whether, and to what extent, Jazz's sales of refurbished cameras between 1995 and August 21, 2001 infringed Fuji's patent rights. Part I of this Opinion addresses the doctrine of "repair versus reconstruction" and its application to the facts of this case as found by the jury. Part II, in turn, analyzes the principle of patent exhaustion as articulated by the Federal Circuit in Jazz v. ITC and applies this principle to the jury's verdict. Part III sets forth this Court's findings with respect to the number of infringing cameras sold by Jazz pursuant to the parties' stipulation. Part IV decides Defendants' motions for judgment as a matter of law.

### I. REPAIR vs. RECONSTRUCTION

"Repair vs. Reconstruction"--Legal Principles.

The core issues before this Court center around the distinction under the patent laws between permissible "repair" and infringing "reconstruction." This distinction was articulated by the Supreme Court in Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 346, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) ("Aro I") as follows: "reconstruction ... is limited to such a true reconstruction of the entity as to in fact make a new article ... after the entity, viewed as a whole, has become spent." Thus, under the Supreme Court's formulation, reconstruction consists of "a second creation of the patented entity." Id. (emphasis added).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                    Page  10
(Cite as: 249 F.Supp.2d 434, *442,  2003 WL 678140 (D.N.J.), **4)

While this rule is easily stated, it has proven difficult to implement.  Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 709 (Fed.Cir.1992). Indeed, the Federal Circuit has repeatedly commented on the challenge faced by the courts in distinguishing between permissible repair and impermissible reconstruction. See, e.g., Husky Injection Molding Systems Ltd. v. R & D Tool & Engineering Co., 291 F.3d 780, 784 (Fed.Cir.2002) ("The Supreme Court and this court have struggled for years" to draw an appropriate line). The critical question is: "how much 'repair' is fair before the device is deemed reconstructed." Id.

Cases interpreting the repair/reconstruction dichotomy devolve into three distinct lines. See Husky, 291 F.3d at 785. The first line involves situations where a patented item is refurbished in order to make it useable after the item, considered as a whole, has become spent. Id. Courts have held that refurbishment of the spent item constitutes impermissible reconstruction. See, e.g.,

American Cotton-Tie Co. v. Simmons, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79 (1882) (iron cotton-bale tie consisting of band and buckle; band was cut by original purchaser and defendants thereafter purchased the scrap iron and riveted the pieces of cut band together for use with original buckle--held: reconstruction); Sandvik Aktiebolag v. E.J. Co., 121 F.3d 669, 670-71 (Fed.Cir.1997) (breaking off and replacing worn tip of drill bit with tip "recreated" in a process similar to original manufacture *443 after sharpening was no longer possible--held:  reconstruction).

**5  The second line of cases involves the replacement of a spent, unpatented element of a patented combination in order to preserve the useful life of the combination as a whole. Husky, 291 F.3d at 785. The leading case in this category is the Supreme Court's decision in Aro I, where the Court found replacement of the fabric portion of a patented convertible automobile top to be permissible repair. Aro I, 365 U.S. at 346, 81 S.Ct. 599. See also:

Wilson v. Simpson, 50 U.S. (9 How.) 109, 13 L.Ed. 66 (1850) (replacement of cutting knives which typically wore out after sixty to ninety days of use--held:  repair); Heyer v. Duplicator Mfg. Co., 263 U.S. 100, 44 S.Ct. 31, 68 L.Ed. 189 (1923) (replacement of gelatine bands with two-month useful life for

use in patented copying machine--held:  repair); Everpure, Inc. v. Cuno, Inc., 875 F.2d 300 (Fed.Cir.1989) (replacement of cartridge containing spent water filter in water purification unit--held:  repair, even where adaptor was necessary to mate replacement cartridge to head of unit); Bottom Line Mgt., Inc. v. Pan Man, Inc., 228 F.3d 1352 (Fed.Cir.2000) (refurbishing of plates in hamburger machine, including replacement/rewelding of broken hinge--held: repair). [FN7]

FN7. See also Kendall Co. v. Progressive Med. Tech., Inc., 85 F.3d 1570 (Fed.Cir.1996) (replacement of used pressure sleeve in blood pressure device--held:  repair); Sage Products, Inc. v. Devon Indus., Inc., 45 F.3d 1575 (Fed.Cir.1995) (replacement of inner container of medical waste disposal unit--held:  repair); Dana Corp. v. American Precision Co., 827 F.2d 755 (Fed.Cir.1987) (commercial-scale rebuilding of worn truck clutches--held:  repair); General Electric Co. v. U.S., 215 Ct.Cl. 636, 572 F.2d 745 (1978) (assembly-line overhauling of gun mounts including disassembly and replacement of spent parts with new parts or parts from other gun mounts--held:  repair).

A final category of cases involves the modification or replacement of a non-patented part in order to enable the patented machine to perform a different function from its intended use. Husky, 291 F.3d at 786.  Such modification has been held by the following courts to be repair or "kin" to repair. See, e.g.,

Wilbur-Ellis Co. v. Kuther, 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964) (modification of fish canning machine to change size of cans used--held:  "kin to repair"); Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., Inc., 123 F.3d 1445 (Fed.Cir.1997) (replacement of cap on ink jet printer cartridge, even if cap was not broken or spent--held:  akin to repair); Surfco Hawaii v. Fin Control Sys. Pty., Ltd., 264 F.3d 1062 (Fed.Cir.2001) (sale of replacement fins for surfboard with different characteristics from original, unspent fins--held: repair).

The instant case falls between the first and second

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

lines of cases. In Husky, the Federal Circuit established a "safe harbor" to be considered in precisely these situations. 291 F.3d at 787-88. Under the Husky analysis, an alleged infringer's refurbishment procedures fall within the Aro I line of cases--and, thus, will be considered permissible repair--if the part refurbished by the alleged infringer was "readily replaceable." Id. The present case, however, cannot be decided solely on the basis of Husky's "readily replaceable" test. Indeed, the Husky panel cited to Jazz v. ITC as an example of the extreme difficulty faced by courts drawing a line between *444 the first and second lines of cases where the parts at issue are not "readily replaceable." Id. at 787.

**6 Fortunately, this Court's analysis is aided by the Federal Circuit's determination in Jazz v. ITC that the reloading of disposable cameras is more closely analogous to Aro I-type cases involving "the replacement of unpatented parts, having a shorter life than is available from the combination as a whole ...." Jazz v. ITC, 264 F.3d at 1107. Upon "consideration of the remaining useful capacity of the [patented] article, and the nature and role of the replaced parts in achieving that useful capacity," the Federal Circuit concluded, based upon the totality of the circumstances before it, that "the changes made by the remanufacturers [of Fuji-patented cameras] all relate to the replacement of the film." Id. Under these circumstances, the Federal Circuit held that the reloaded disposable cameras should "be viewed as repaired, not reconstructed." Id. at 1105.

The decision in Jazz v. ITC does not, however, conclude the repair/reconstruction analysis for this Court. Because of the unique procedural circumstances involved in that case, where many of the twenty-six respondents had proffered insufficient evidence regarding their refurbishment processes, the ALJ based his decision upon eight common refurbishment processes used by all respondents. [FN8] The Federal Circuit's holding that reversed the ITC's decision on repair/reconstruction was likewise confined to the eight procedures before it; the Circuit never addressed what impact any additional factual procedures not falling within the eight common steps would have on its holding.

FN8. The Federal Circuit summarized these common processes as follows: (1) removing the cardboard cover; (2) cutting open the plastic casing; (3) inserting new film and a container to receive the film; (4) replacing the winding wheel for certain cameras; (5) replacing the battery for flash cameras; (6) resetting the counter; (7) resealing the outer case; and (8) adding a new cardboard cover. Jazz v. ITC, 264 F.3d at 1098, 1110-11.

Fuji argues that the Federal Circuit's decision in Jazz v. ITC forecloses a finding of repair as to any refurbishment procedures beyond the eight common processes endorsed by the Federal Circuit. This Court does not agree. The Federal Circuit could not have reached such a conclusion given the limited record before it, as the ALJ decided the repair/reconstruction issue solely upon the eight common refurbishment procedures admitted to by all respondents. Moreover, Fuji's interpretation of the Federal Circuit's decision contravenes the highly fact-specific nature of the repair/reconstruction inquiry. Both the Federal Circuit and the Supreme Court have repeatedly eschewed reliance on any rigid test in distinguishing between repair and reconstruction, and this Court will not adopt such a test here. See, e.g., Jazz v. ITC, 264 F.3d at 1106 (citing Aro I). The repair doctrine does not turn on a consideration of the number of acts performed, or minor details such as what tool was used in the refurbishment process. Rather, the proper focus is on "the remaining useful capacity of the article, and the nature and role of the replaced parts in achieving that useful capacity." Jazz v. ITC, 264 F.3d at 1106.

[1] Thus, the task in this case is to determine whether, under the totality of the circumstances, the factual refurbishment process found by the jury to have been used by Jazz and/or its suppliers amounts to such a "true reconstruction" of each refurbished camera as to "in fact make a new article" under established precedent. See Aro I, 365 U.S. at 346, 81 S.Ct. 599.

*445 "Repair vs. Reconstruction"--Jury Verdict.

**7 By stipulation of the parties, the jury was asked to state whether or not each of nineteen steps was utilized in the refurbishing of cameras sold by Jazz. [FN9] When asked: "Which of the following happens at least some of the time when the cameras sold by Jazz are refurbished?," the jury rendered the following verdict:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

FN9. The parties jointly stipulated to present the jury with this list of nineteen steps after extensive discussions under the Court's direct supervision. This list was presented by the parties to the Court as the list covering all possible refurbishment procedures which could be identified from the evidence to be presented at trial. This was possible because the parties knew the substantive evidence that would be adduced at trial in advance, given their joint stipulation to limit the evidence on repair/reconstruction to the evidence in the ITC record. After having tried the case based upon this stipulated verdict sheet, Fuji, in its post-trial submissions, now seeks to identify and rely upon additional procedures not covered by the parties' stipulated list.  Given that Fuji knowledgeably stipulated to the list to be posed to the jury, Fuji is estopped to now present these additional "steps." Even if considered, however, these additional procedures would have no impact on this Court's holding.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                                Page   13
(Cite as: 249 F.Supp.2d 434, *445, 2003 WL 678140 (D.N.J.), **7)

| Step | Verdict |
|---|---|
| (a) Removing the cardboard cover | Yes |
| (b) Cutting open the plastic casing | Yes |
| (c) Inserting new film and a container to receive the film | Yes |
| (d) Replacing the winding wheel for certain cameras | Yes |
| (e) Replacing the battery for flash cameras | Yes |
| (f) Resetting the counter | Yes |
| (g) Resealing the outer case | Yes |
| (h) Adding a new cardboard cover | Yes |
| (I) Removing the front cover | Yes |
| (j) Replacing the front cover from one camera on a different camera | Yes |
| (k) Slim tool step | Yes |
| (l ) Unwinding the film from the cartridge in the camera | Yes |
| (m) Multiple hook attachments and later removals | Yes |
| (n) Modifying the film cartridge to mesh with the winding wheel | Yes |
| (o) Inserting, then removing a film spindle | Yes |
| (p) Replacing the film door | Yes |
| (q) Cutting plastic tabs to open the camera | Yes |
| (r) Inserting a washer to hold open attached rear cover | Yes |
| (s) Grinding off the Fuji logo | Yes |

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434
(Cite as: 249 F.Supp.2d 434, *445, 2003 WL 678140 (D.N.J.), **7)

Steps (a) through (h) are identical to the eight common refurbishment procedures found to constitute permissible repair by the Federal Circuit in Jazz v. ITC. The additional procedures must be analyzed in order to determine whether a refurbishment process involving all nineteen procedures crosses the line from permissible repair to impermissible reconstruction. The parties stipulated that the Court would conduct this analysis, which is an application of law to the facts found by the jury.

"Repair vs. Reconstruction"--Application of Law to Fact.

Procedures (a) through (h) were previously held to be repair. Jazz v. ITC, 264 F.3d at 1110-11. These eight procedures essentially permit a camera refurbisher to replace the film and, where necessary, the battery. See id. at 1107 ("On the totality of the circumstances, the changes made by the remanufacturers all relate to the replacement of the film, the LFFP otherwise remaining as originally sold"); id. at 1111 (permissible repair includes "replacement of the battery in flash cameras"). Permissible replacement of the film and battery cannot be accomplished without:
1. opening the camera (Jazz v. ITC procedures (a) and (b));
2. properly inserting the film (Jazz v. ITC procedures (c), (d) and (f));
3. replacing the battery for flash cameras (Jazz v. ITC procedure (e)); and
4. closing the camera (Jazz v. ITC procedures (g) and (h)).

Thus, under the Federal Circuit's formulation in Jazz v. ITC, when a camera is opened, film is properly inserted, the battery is replaced, and the camera is closed, the camera has been permissibly repaired. *446 These four permissible processes serve the function of preserving the remaining useful life of the camera as a whole.

**8 As the following table demonstrates, all but one of the nineteen procedures found by the jury to have been actually performed in connection with the cameras sold by Jazz fall within one of these four categories of permissible processes [FN10]:

FN10. The remaining procedure--grinding off Fuji's logo--is of little, if any, significance in considering the repair/reconstruction issue. This procedure is closely akin to the removal the cardboard packaging, which contains Fuji's trademarks, and its replacement with packaging containing Jazz's marks--both of which the Federal Circuit expressly permitted as part of the repair process in Jazz v. ITC. This Opinion addresses no trademark issues, nor any consumer protection issues, as these issues have not been put before the Court in this patent trial.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

| Permissible Action | Equivalent Jury Verdict Procedures |
|---|---|
| "Opening the camera" | removing the cardboard cover (a) cutting open the plastic casing (b) removing the front cover (i) cutting plastic tabs to open the camera (q) inserting a washer to hold open attached rear cover (r) |
| "Properly inserting the film" | inserting new film and a container to receive the film (c) replacing the winding wheel for certain cameras (d) resetting the counter (f) slim tool step (k) unwinding the film from the cartridge in the camera (l ) modifying the film cartridge to mesh with the winding wheel (n) inserting, then removing a film spindle (o) |
| "Replacing the battery" | replacing the battery for flash cameras (e) |
| "Closing the camera" | resealing the outer case (g) adding a new cardboard cover (h) replacing the front cover from one camera on a different camera (j) [FN11] multiple hook attachments and later removals (m) 11 replacing the film door (p) |

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS   Doc 90-3   Filed 06/24/03   Entered 06/24/03 17:09:50   Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5   Page 27 of 93

249 F.Supp.2d 434                                                          Page 16
(Cite as: 249 F.Supp.2d 434, *446, 2003 WL 678140 (D.N.J.), **8)

FN11. Steps (j) and (n), require further comment. Step (j) involves replacement of the front cover of the camera with a cover from an entirely different camera. Such a mixing and matching of unpatented components is permissible under established repair/ reconstruction precedent. Jazz v. ITC, 264 F.3d at 1103-04 ("Precedent has classified as repair the disassembly and cleaning of patented articles accompanied by replacement of unpatented parts that had become worn or spent, in order to preserve the utility for which the article was originally intended.") (citing General Electric Co., 215 Ct.Cl. 636, 572 F.2d 745 and Dana Corp., 827 F.2d 755). Step (n), modifying the film cartridge to mesh with the winding wheel, is similarly permissible. See, e.g., Everpure, 875 F.2d at 303 ("it is of no moment" in contributory infringement suit that manufacturer of replacement water filter cartridge "chose to supply an adapter with its cartridge" to facilitate mating with patented purification unit).

Whether these refurbishment procedures are counted as four, eight or nineteen "steps" is a matter of semantics, as virtually any step can be divided into multiple "sub-steps." The legal issue is whether the totality of the refurbishment *447 procedures are of such a nature that they preserve the useful life of the patented article, or whether they in fact recreate the article after it has become spent. As set forth in the table above, the procedures found by the jury to have been performed in this case all devolve into opening the cameras, replacing the film and battery, and closing the cameras. The totality of these procedures serve the function of preserving the useful life of the cameras. This Court therefore finds that the refurbishment procedures found by the jury in response to Question 5 of the stipulated Special Verdict form constitute permissible repair. [FN12]

FN12. By contrast to American Cotton-Tie, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79 (1882) and other reconstruction precedents, this is not a case where the patented item has been entirely recreated after having suffering "as complete a destruction" as in "the explosion of a patented torpedo." Morgan Envelope v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 434, 14 S.Ct. 627, 38 L.Ed. 500 (1894) (distinguishing American Cotton-Tie ). Rather, whether described in the "nineteen step" verdict, the Federal Circuit's "eight step" holding, or this court's "four step" analysis, it is clear that

the totality of the procedures employed by Jazz serve the function of preserving the remaining useful capacity of the cameras through replacement of the film and battery. See Jazz v. ITC, 264 F.3d at 1107. Cf., Heyer, 263 U.S. at 101-02, 44 S.Ct. 31 ("The owner when he bought one of these [copying] machines had a right to suppose that he was free to maintain [its] use, without the further consent of the seller, for more than the sixty days in which the present gelatine might be used up. The machine lasts indefinitely, the bands are exhausted after a limited use and manifestly must be replaced."); Everpure, 875 F.2d at 302-304 ("Replacement of the spent cartridges" in water filter system "is clearly repair and not reconstruction.").

"Repair vs. Reconstruction"--Finding As To Number Of Cameras Repaired.

Question 5 of the stipulated Special Verdict form only called upon the jury to determine whether the nineteen identified processes were performed "at least some of the time" during refurbishment. Under the parties' pre-trial stipulation, the Court is asked to determine, as a matter of fact, the actual number of cameras refurbished using some or all of these nineteen procedures. By their stipulation, the parties waived their jury demands as to this issue, which this Court will address as though it had been tried to the bench. Jazz bears the burden of proof. See Jazz v. ITC, 264 F.3d at 1101-02 (infringer has "the burden of establishing [the repair] defense by a preponderance of the evidence, including the burden of coming forward with evidence to show that the activities performed in processing the used cameras constituted permissible repair"). [FN13]

FN13. See also Second Case Management Order dated 10/23/02 at p. 2 n. 1.

**9 At trial, Jazz adduced the following evidence on repair/reconstruction: (1) a videotape recording taken in the spring of 1998 at the refurbishing facilities of a single Jazz supplier, Boshi (the "Boshi Video"); and (2) the testimony of Mr. Lorenzini, Jazz's current Chairman of the Board of Directors, who was present during the making of the Boshi Video and who also visited two other Jazz suppliers, Peji and Ginfax, in 1997 and 1998.

Mr. Lorenzini testified at length regarding the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                                    Page 17
(Cite as: 249 F.Supp.2d 434, *447, 2003 WL 678140 (D.N.J.), **9)

processes exhibited in the Boshi Video. He also testified regarding the substantial similarity between the Boshi processes and the processes used at Peji and Ginfax during his visits to those factories. Based upon Mr. Lorenzini's testimony, this Court's review of the Boshi Video, and the jury's verdict in response to Question 5, the Court is satisfied that Jazz has met its burden to prove permissible repair **448** with respect to all cameras refurbished by Boshi, Peji and Ginfax.

However, Jazz adduced no evidence whatsoever at trial regarding the refurbishment procedures employed by any other Jazz supplier. [FN14] Jazz presented no testimony of Mr. Benun on this issue, despite his apparent involvement in the procurement of empty shells. Nor did Jazz call Ms. Szeto, the Managing Director of Jazz Hong Kong, who testified at length in the ITC about the details of processes she had personally seen in visiting four different Jazz suppliers. [FN15]

> FN14. The parties stipulated that Jazz purchased refurbished LFFPs from at least the following eight factories: Boshi, Ginfax, Vastfame, Leader Peak, Mass Chance, Rino, Peji, and Wingkai (while Jazz also purchased refurbished LFFPs from three additional suppliers: Tomda, Southforce and Advance Tech, these suppliers were merely agents who purchased cameras from one or more of the eight named factories).

> FN15. Ms. Szeto's testimony was part of the ITC record, and could therefore have been introduced under the parties' Repair/Reconstruction Stipulation.

[2] Jazz chose to rest on the Boshi video and Mr. Lorenzini's testimony. However, Mr. Lorenzini never visited any factory other than Boshi, Peji or Ginfax, and the Boshi video itself says nothing of the processes employed by any other Jazz supplier. Thus, the processes employed in refurbishing the cameras obtained by Jazz from Vastfame, Leader Peak, Mass Chance, Rino and Wingkai are not proven. This Court "cannot exculpate unknown processes from the charge of reconstruction." Jazz v. ITC, 264 F.3d at 1109. This is particularly true under the facts of this case, where the jury found that Jazz sold over 1 million cameras that were newly-made by its suppliers. See Jazz v. ITC, 264 F.3d at 1109 n. 3. In the absence of any evidence as to the processes employed by suppliers other than

Boshi, Peji and Ginfax, Jazz has failed to satisfy its burden to prove repair with respect to any cameras refurbished by such other suppliers.

Thus, on the evidence adduced by Jazz at trial, only those cameras refurbished by Boshi, Peji and Ginfax are found to have been permissibly repaired. The Court, however, has searched in vain for evidence in the record as to the actual number of cameras sold by Jazz that were produced by these three factories. [FN16] The only testimony on this issue was that of Mr. Lorenzini, who testified that Boshi supplied Jazz with approximately 10% of its cameras. Accordingly, the evidence of record in this case will support a finding of permissible repair with respect to 10% of the 40,099,369 refurbished cameras sold by Jazz during the relevant period.

> FN16. The Court has twice asked the parties to identify evidence in the record from which the Court could determine the number of cameras refurbished by supplier. No such information has been forthcoming, and Jazz has acknowledged that no separate records were kept of exactly how many cameras were supplied by each factory.

Repair/Reconstruction--Conclusion.

**10 For the foregoing reasons, the Court finds that Jazz has proven that 4,009,937 of the cameras it sold from 1995 to August 21, 2001 were permissibly repaired. The Court further finds that Jazz has failed to satisfy its burden to prove the affirmative defense of permissible repair with respect to the remaining 36,089,432 cameras at issue. [FN17]

> FN17. The jury was asked to render an advisory verdict on repair/reconstruction, which this Court has considered. The jury found that Jazz proved permissible repair with respect to approximately 5.5% of the cameras refurbished by Jazz.

## II. "EXHAUSTION" BY FIRST SALE

This Court's finding of repair with respect to approximately 4 million cameras *449 does not end the inquiry, because a refurbished disposable camera infringes unless it was permissibly repaired from an empty camera shell first sold in the United States. Jazz v. ITC, 264 F.3d at 1098-99, 1103-1107, 1110-11. This requirement of domestic first sale

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS    Doc 90-3    Filed 06/24/03    Entered 06/24/03 17:09:50    Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5    Page 29 of 93

249 F.Supp.2d 434                                                              Page 18

(Cite as: 249 F.Supp.2d 434, *449, 2003 WL 678140 (D.N.J.), **10)

derives from the principle of patent "exhaustion."

"Exhaustion"--Legal Principles.

[3][4] The principle of exhaustion holds that a patentee's rights in a patented article are "exhausted" after the first sale of the article by the patentee or under the patentee's authority. Jazz v. ITC, 264 F.3d at 1105. In exchange for the royalty received, the patentee ceases to have the ability to use its patent monopoly to restrict the further sale, use, or lawful modification or repair of the product. See id.; see also, e.g., Mitchell v. Hawley, 83 U.S. (16 Wall.) 544, 547, 21 L.Ed. 322 (1872); Boesch v. Graff, 133 U.S. 697, 703, 10 S.Ct. 378, 33 L.Ed. 787 (1890) ("when the machine passes to the hands of the purchaser it is no longer within the limits of the monopoly. It passes outside it, and it is no longer under the protection of the act of congress."). This principle flows logically from the common-sense notion that a patentee is "entitled to but one royalty for a patented machine." Mitchell, 83 U.S. (16 Wall.) at 547. [FN18]

> FN18. While several decisions of the Federal Circuit, including Jazz v. ITC, have addressed the repair/reconstruction question as implicating the doctrine of "exhaustion," (see, e.g., Jazz v. ITC, 264 F.3d at 1105; Surfco Hawaii v. Fin Control Sys. Pty., Ltd., 264 F.3d 1062, 1065 (Fed.Cir.2001); Kendall Co. v. Progressive Med. Tech., Inc., 85 F.3d 1570, 1573 (Fed.Cir.1996)), other Federal Circuit decisions have addressed the issue under the rubric of implied license. See, e.g., Bottom Line Mgt. Inc. v. Pan Man, Inc., 228 F.3d 1352, 1354 (Fed.Cir.2000); Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., Inc., 123 F.3d 1445, 1451 (1997). While these two doctrines are not always congruent, in the instant case they can be viewed as opposite sides of the same coin; i.e., where a patentee's rights are "exhausted" through first sale, subsequent purchasers could be said to have an implied license to repair the purchased article. See, e.g., Michael D. Lake, Patent & Know-How (Technology) Licensees and Licensing Strategies, 722 PLI/Pat 353, 371 (Practicing Law Institute, 2002) (exhaustion and implied license rationalized identically). Because the Federal Circuit treated the repair/reconstruction issue as implicating the "exhaustion" doctrine, reserving its discussion of implied license for its analysis of whether subsequent purchasers' rights of repair were limited by the circumstances of sale under principles of contract law (Jazz v. ITC, 264 F.3d at 1107-08), this Court similarly treats the repair/reconstruction question as one of "exhaustion," rather than "implied license."

[5] As the Federal Circuit noted in Jazz v. ITC, however, there is a significant exception to this general principle of exhaustion by first sale: A patentee's United States patent rights are not exhausted unless the patented product is first sold "under the United States patent." Jazz v. ITC, 264 F.3d at 1105. This exception traces its origins to the Supreme Court's decision in Boesch v. Graff, in which the Court held that the sale or use in the United States of a patented product purchased abroad, even from an authorized seller of the product in the foreign country, constitutes patent infringement. See 133 U.S. at 702-03, 10 S.Ct. 378.

The patentee in Boesch owned both United States and German patents for lamp burners. The defendant acquired the burners in Germany from an individual who was not licensed by the patentee to make or sell the product in either country, but was permitted to make or sell the burners under German law. Id. at 379-80, 10 S.Ct. 378. The Supreme Court found the defendant's sale of the product in the United States to be infringement. Id. at 380, 10 S.Ct. 378.

*450 The Supreme Court's decision in Boesch left open the question whether a foreign sale by the holder of both United States and foreign patents (or its licensee with a license to sell in both countries) "exhausts" the patentee's rights "under the United States patent." See 5 CHISUM ON PATENTS § 16.05[3][a][ii]. Several courts thereafter distinguished Boesch on this ground, concluding that, on the one hand, the foreign sale of a patented article by the patentee (or a licensee) constituted exhaustion, while on the other hand the patentee retained its monopoly over items sold abroad by a licensee with no authority to sell the product in the United States. See Dickerson v. Matheson, 57 F. 524 (2d Cir.1893); Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp., 266 F. 71, 78 (2d Cir.1920); Sanofi, SA v. MedTech Veterinarian Products, Inc., 565 F.Supp. 931 (D.N.J.1983). See also Dickerson v. Tinling, 84 F. 192 (8th Cir.1897) (dictum); Kabushiki Kaisha

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS   Doc 90-3   Filed 06/24/03   Entered 06/24/03 17:09:50   Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5   Page 30 of 93

249 F.Supp.2d 434                                                                                    **Page  19**
(Cite as: 249 F.Supp.2d 434, *450, 2003 WL 678140 (D.N.J.), **10)

Hattori Seiko v. Refac Tech. Devel. Corp., 690 F.Supp. 1339, 1342 (S.D.N.Y.1988) (dictum); PCI Parfums Et Consmetiques Int'l v. Perfumania Inc., No. 93 Civ. 9009 (KMW), 35 U.S.P.Q.2d 1159, 1160, 1995 WL 121298, at *1 (S.D.N.Y. Mar.21, 1995).

**11 Prior to its decision in Jazz v. ITC, the Federal Circuit was never called upon to address this distinction. [FN19] The record on appeal in Jazz v. ITC, however, placed the issue before the Circuit, which held that in order for a sale to be "under the United States Patent" such that the patentee's rights are exhausted, the sale must be "in the United States." 264 F.3d at 1105. According to the Court:

> FN19. Compare Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co., 228 F.3d 1338, 1348 (Fed.Cir.2000) (importation into United States of a product made abroad by a patented process is infringement under Product Process Amendments Act, 35 U.S.C. § 271(g), even though product was authorized to be produced outside the United States).

> United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the [exhaustion by first sale] doctrine, the authorized first sale must have occurred under the United States patent [citing Boesch ] ... Our decision applies only to LFFPs for which the United States patent right has been exhausted by first sale in the United States.

Id. (emphasis added). The Federal Circuit explicitly stated this holding four times in the Jazz v. ITC opinion. See id. at 1098 (reaching repair issue only with respect to used cameras whose first sale was "in the United States" with the patentee's authorization); id. at 1105 (exhaustion applies "when a patented device has been lawfully sold in the United States"); id. at 1110 (same, and affirming the ITC's finding of infringement for "LFFPs whose prior sale was not in the United States"). Thus, the Federal Circuit has ruled that Fuji's patent rights are exhausted only with respect to cameras refurbished from shells first sold in the United States. This court is bound by that ruling. [FN20]

> FN20. Jazz sought a stay of the Federal Circuit's ruling, rehearing en banc, and certiorari to the Supreme Court on the exhaustion issue. In its various petitions, Jazz argued that the Federal

Circuit improperly changed the law and that foreign exhaustion should remain viable if the patented article is sold by the holder of a license in both the United States and the foreign country. Jazz's petitions were denied. The Circuit's decision is therefore stare decisis in this case. Nor is the proposition that foreign sales should not eviscerate United States patent rights without substantial justification. Indeed, it follows directly from the territorial nature of the patent laws themselves. Cf. Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972) (patent laws "do not, and were not intended to, operate beyond the limits of the United States"). As one leading commentator has noted, "[s]ince a patent only extends to the borders of the country using it, it makes sense to limit the right to make, use or sell the product to the same borders." Martin J. Adelman, PATENT LAW PERSPECTIVES § 3.6[1]. Thus, "anyone purchasing a product in the territory of one sovereign country ought to be on notice that the use or sale of that product in another sovereign country may be impermissible." Id. This was precisely the balance struck by the Federal Circuit in Jazz v. ITC.

*451 "Exhaustion"--The Jury's Verdict.

In the stipulated Special Verdict form, the jury was asked to determine: (1) the total number of refurbished cameras sold by Jazz Photo and Jazz Hong Kong in or to the United States during the relevant period (Question 1); (2) the number of those cameras refurbished from shells of cameras first sold in the United States (Question 2); and (3) the number of those cameras made from shells of cameras first sold abroad (Question 3). [FN21] In response to these questions, the jury rendered the following verdict:

> FN21. Specifically, Question 3 asked the jury to determine the number of cameras sold by Jazz in or to the United States made from refurbished shells of cameras first sold outside the United States by Fuji or a licensee with the right to sell in both countries. This question was asked solely in an abundance of caution: after the appeal of this matter, should the Federal Circuit sitting en banc or the Supreme Court overrule the panel decision in Jazz v. ITC on the issue of foreign first sale, a retrial of this matter would be unnecessary.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

```
TOTAL NUMBER OF REFURBISHED CAMERAS:          40,099,369
TOTAL NUMBER FIRST SOLD IN THE U.S.:           3,809,442
TOTAL NUMBER FIRST SOLD ABROAD:               36,289,927
```

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS    Doc 90-3    Filed 06/24/03    Entered 06/24/03 17:09:50    Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5    Page 32 of 93

249 F.Supp.2d 434                                                                    Page  21

(Cite as: 249 F.Supp.2d 434, *451, 2003 WL 678140 (D.N.J.), **11)

Thus, the jurors concluded that approximately 9.5% of the cameras sold by Jazz were refurbished from shells of U.S. origin. [FN22]

> FN22. This verdict is amply supported by the record. Fuji's witness, Mr. David Field testified that Fuji's examination of reloaded cameras showed that approximately 86% of the cameras examined came from Japan, that a "very small amount" came from Europe, and that the remainder of cameras came from the United States. Mr. Field's testimony is consistent with the testimony of Mr. Lorenzini, Jazz's former president, who testified that "600,000 out of 7 million, or something like that, 10 percent" of Jazz's shells came from a United States supplier in 1997 (Lorenzini Tr. 10/28/02 at 5.121.6).

"Exhaustion"--Application of Law to Fact.

Applying the jury's verdict to the legal principles discussed above, this Court reaches the following conclusions:  (1) Fuji's patent rights have been exhausted with respect to 3,809,442 cameras refurbished from shells first sold in the United States;  (2) only those 3,809,442 shells could have been permissibly repaired;  and (3) Jazz's sales of the remaining 36,289,927 cameras refurbished from foreign-sold shells infringed Fuji's patents.

III.  INTERSECTION BETWEEN "REPAIR" AND "EXHAUSTION"

As the analysis above demonstrates, Jazz has met its burden to prove repair with respect to 4,009,937 shells sold between 1995 and August 21, 2001, constituting 10% of Jazz's total sales of refurbished cameras.  Jazz has further proven that, during this same time period, Fuji's patent rights were exhausted by first sale in the United States with respect to 3,809,442 cameras, or 9.5% of the total number of refurbished cameras sold by Jazz.

**12 [6] While there has been no direct evidence presented by either party demonstrating that any one camera was both permissibly repaired and refurbished from a domestic shell, the Court believes that it would be fundamentally unjust under the circumstances of this case to require Jazz to adduce direct proof of the country of origin for each and every permissibly repaired *452 camera it sold. [FN23]  As the finder of fact charged with determining the number of infringing cameras, the

Court concludes that it is reasonable to infer from the evidence adduced at trial (and the jury's finding that 9.5% of the entire pool of the cameras sold by Jazz were of domestic origin) that 9.5% of the 4,009,937 permissibly repaired cameras sold by Jazz were refurbished from shells first sold in the United States.

> FN23. The issue of foreign versus domestic exhaustion was first introduced into this case during the legal proceedings after the close of the relevant period.  Thus, all of the cameras sold by Jazz at issue in this case had already been acquired, refurbished, and sold before the issue first arose. In the interest of reaching a just and fair resolution at trial, this Court relaxed the parties' Repair/ Reconstruction Stipulation in order to permit discovery on the issue of the origin of shells and also granted Jazz's request for a jury instruction explaining the absence of perfect records as to the origin of the shells sold by Jazz.

Summary and Conclusion--Repair/Reconstruction and Exhaustion.

For the foregoing reasons, this Court concludes that Jazz has satisfactorily proven both exhaustion and repair with respect to 380,944 cameras sold between 1995 and August 21, 2001.  The remaining 39,718,425 refurbished cameras sold by Jazz are found to have infringed Fuji's patents.  When added to the number of newly-made cameras found by the jury to have been sold by Jazz during the relevant period, for which infringement is not contested, the resulting total number of infringing cameras is 40,928,185.

IV. DEFENDANTS' RULE 50(B) MOTION.

[7] Defendants move for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure on the following four issues: reasonable royalty;  lost profits;  inducement of infringement;  and willful infringement.  The standard for a motion for judgment as a matter of law is well-settled in the Third Circuit. [FN24] A Rule 50(b) motion will be granted only where, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Buskirk v. Apollo Metals, 307 F.3d 160,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS    Doc 90-3    Filed 06/24/03    Entered 06/24/03 17:09:50    Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5    Page 33 of 93

249 F.Supp.2d 434                                                    Page 22
(Cite as: 249 F.Supp.2d 434, *452, 2003 WL 678140 (D.N.J.), **12)

166 (3d Cir.2002) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993)). The question "is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Lightning Lube, 4 F.3d at 1166 (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir.1978)).

> FN24. The governing standard for a Rule 50 motion is procedural in nature. Accordingly, the law of the Third Circuit provides the rule of decision to be applied by this Court. See EMI Grp. North Am. v. Cypress Semiconductor Corp., 268 F.3d 1342, 1348 (Fed.Cir.2001) (regional law applies to JMOL motion).

Reasonable Royalty.

[8] Jazz challenges the jury's verdict of "reasonable royalty" as unsupported by the evidence. This Court cannot agree.

[9][10] A "reasonable royalty" is the rate that would be agreed upon by the patentee and infringer as the result of a hypothetical negotiation at the outset of the infringement. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1554 (Fed.Cir.1995). Given the hypothetical nature of the exercise, any reasonable royalty calculation "necessarily involves an element of approximation and uncertainty." Interactive Pictures Corp. v. Infinite Pictures, *453 Inc., 274 F.3d 1371, 1385 (Fed.Cir.2001) (citations and internal quotations omitted). Thus, a jury's reasonable royalty verdict will be overturned only if "grossly excessive or monstrous, clearly not supported by evidence, or based only on speculation or guesswork." Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1290 (Fed.Cir.2002).

**13 At trial, both Fuji and Jazz pressed their respective positions regarding the outcome of the hypothetical negotiation giving rise to a "reasonable royalty." Fuji's expert, Mr. Carter, opined that there was no established royalty for Fuji's patents, but rather that each license negotiation had to be considered on a case-by-case basis. Mr. Carter estimated that Jazz's expected profits at the time the hypothetical negotiation would have been approximately $1.09, which, he opined, would

represent the upper limit of Jazz's bargaining range. Mr. Carter also placed particular emphasis on Fuji's motivation to charge a relatively high royalty in a hypothetical Jazz negotiation than it was willing to charge other competitors, given the wide variance in the parties' respective cost structures and Fuji's reluctance to facilitate the entry of a low-cost competitor who could potentially drive down profits in the entire industry. Based upon these and other factors, Mr. Carter identified $1.00 as the point at which the parties would reach a "meeting of the minds" in a hypothetical negotiation.

By contrast, Jazz's expert, Dr. Stewart, opined that Fuji would be entitled to no more than 11 cents for each newly-made camera and 7 1/2 cents for each refurbished camera. Dr. Stewart based this opinion principally upon his analysis of extant patent licenses granted by Fuji for disposable cameras to other competitors, including Kodak and Concord, which Dr. Stewart argued tended to prove an established royalty.

The jury, as instructed, considered this conflicting testimony in light of the factors articulated in Georgia-Pacific v. U.S. Plywood Champion Papers, Inc., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), mod., 446 F.2d 295 (2d Cir.1971), and awarded a reasonable royalty of 56 cents--well within the range of royalties presented by the parties. In light of the wide variance between the parties' experts, it was within the jury's realm, as the finder of the facts, to reject "the extreme figures proffered by the litigants as incredible and substitute an intermediate figure as a matter of its judgment from all of the evidence." SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 926 F.2d 1161, 1168 (Fed.Cir.1991). [FN25]

> FN25. In their post-trial submissions, Defendants imply that the jury was constrained to adopt or reject the reasonable royalty of one or the other party (Def's Omnibus Br. at 27). However, the Federal Circuit's decision in SmithKline Diagnostics, the principal case upon which Defendants rely, is directly to the contrary. See 926 F.2d at 1168 ("the factual determination of a reasonable royalty ... need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party.").

Under the facts presented here, it cannot be said

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

that the jury's 56 cent royalty award is so "grossly excessive or monstrous, clearly not supported by evidence, or based only on speculation or guesswork" that it must be overturned as a matter of law. See Catalina Lighting, 295 F.3d at 1290. Jazz's Rule 50(b) motion with respect to reasonable royalty therefore DENIED.

Lost Profits.

[11] The jury awarded Fuji damages for lost profits with respect to 4% of Jazz's sales. Jazz challenges this verdict on the ground that Fuji failed to prove the absence *454 of non-infringing alternatives under Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152 (6th Cir.1978).

[12] A patent holder who has established liability for infringement is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer ..." 35 U.S.C. § 284. A standard method of establishing patent damages is for the patentee to demonstrate "the profits on sales it would have made absent the defendant's infringement." Panduit, 575 F.2d at 1156. "Lost profit" damages of this kind, however, must be proved--they are never presumed. See, e.g., Kaufman Co., Inc. v. Lantech, Inc., 926 F.2d 1136, 1141 (Fed.Cir.1991). If the patent owner cannot demonstrate its entitlement to lost profits, "only a reasonable royalty may be recovered." 8 LIPSCOMB'S WALKER ON PATENTS § 27:24 (1989); Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1353 (Fed.Cir.2001).

**14 [13][14] In order to recover lost profits, a patent owner must demonstrate "a causal connection between the infringement and its loss of profits." BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed.Cir.1993). In other words, "the burden rests on the patentee to show a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." Crystal Semiconductor, 246 F.3d at 1353. Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's claim] is unreasonable for some or all of the lost sales." Grain Processing Corp. v. American Maize-Products Co., 185 F.3d

1341, 1349 (Fed.Cir.1999).

[15] Case law has developed two principal methods for a patentee to meet its burden of establishing "but for" causation. The first method derives from the seminal decision in Panduit. In order to obtain lost profits damages under the Panduit test, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." Id. at 1156. Upon proof of these four elements, a presumption of "but for" causation is accorded the patent holder with respect to all of the alleged infringer's sales. See State Industries, 883 F.2d at 1578; 7 CHISUM ON PATENTS § 20.03[1].

[16] A literal application of the Panduit test is inappropriate, however, in situations involving multiple competitors, such as in the present case. As an initial matter, the presumption that all of the infringer's sales would have accrued to the patentee absent the infringement is unreasonable in the multi-competitor landscape, where presumably some portion of the infringer's sales would have accrued to competitors other than the patent holder itself. Cf. State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573, 1578 (Fed.Cir.1989). Moreover, the presence of multiple competitors makes proof of the second Panduit factor--absence of acceptable non-infringing alternatives--impossible, since in the ordinary multi-competitor situation the patentee's competitors by definition engage in the sale of non-infringing alternatives.

Thus, Courts have refined Panduit to allow a patentee to substitute proof of the patentee's market share for the second Panduit factor. See, e.g., State Industries, 883 F.2d at 1578. This second method of proving causation is generally referred to as the "market share" approach.

*455 The dispute between Fuji and Jazz centers around which of these two approaches is most appropriately applied to the facts of this case. Jazz argues that Fuji must demonstrate the second Panduit factor, but has failed to do so here because Jazz could have substituted a permissibly repaired camera from a shell first sold in the United States for each infringing camera that it actually sold.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                      **Page 24**
(Cite as: 249 F.Supp.2d 434, *455, 2003 WL 678140 (D.N.J.), **14)

Fuji, on the other hand, contends that proof of its own market share, adjusted for price elasticity, is sufficient to satisfy its burden to prove "but for" causation under State Industries and its progeny.

**15 Given the unique circumstances of this case, Jazz's argument is persuasive. As the Federal Circuit noted in Grain Processing, "a fair and accurate reconstruction of the 'but for' market" requires consideration of the "alternative actions the infringer foreseeably would have undertaken had he not infringed." Grain Processing, 185 F.3d at 1350-51. The rationale underlying this rule is simple:

Without the infringing product, a rational would-be infringer is likely to offer an acceptable non-infringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner....

Id. at 1351 (emphasis added). In the instant case, Jazz could have sold a non-infringing alternative by permissibly repairing cameras out of shells first sold in the United States. Cameras refurbished in this fashion would have had all of the appearances of the cameras Jazz actually sold. In light of this alternative, it is "hardly likely," in the words of Grain Processing, that Jazz would have surrendered its entire share of the disposable camera market. See id. [FN26]

FN26. At trial, Jazz's damages expert, Dr. Stewart, opined that Fuji's suffered no lost profits, based in large part upon the availability of this non-infringing alternative. Yet Fuji adduced no evidence at trial to demonstrate that it would have captured some or all of Jazz's sales if Jazz had pursued this alternative. Indeed, Fuji's damages expert, Mr. Carter, acknowledged the existence of this alternative on cross-examination, but failed to consider its impact on Fuji's market share analysis. In their post-trial submissions, Defendants challenged Fuji's expert testimony on Daubert grounds for failure to consider the impact of this non-infringing alternative. While on its face untimely, Defendants' Daubert objection appears to have been preserved by Magistrate Judge Chesler's oral ruling on October 7, 2002. Given the Court's disposition, however, it is unnecessary to address this issue.

[17] Thus, under the circumstances of this case, Fuji's reliance on proof of its own market share, without more, is insufficient as a matter of law to support a reasonable probability of "but for" causation of lost profits. [FN27] See, e.g., Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d *456 1453, 1458 (Fed.Cir.1991) (affirming district court's refusal to award lost profits based on market share theory where patentee failed to establish that alleged infringer would not have made sales in non-infringing manner); see also Grain Processing, 185 F.3d at 1351 ("[w]here an infringer demonstrates that it could have chosen to market a non-infringing alternative and that it would have done so had it known that it was infringing ... the sales that it made of the infringing products were not sales that the patentee would otherwise have made") (citing SCHLICHER, PATENT LAW: LEGAL AND ECONOMIC PRINCIPLES § 9.05[2][1] ). Jazz's Rule 50(b) motion with respect to lost profits is therefore GRANTED. [FN28]

FN27. Grain Processing and its progeny place the burden of demonstrating the availability of the non-infringing alternative on the infringer. See Grain Processing, 185 F.3d at 1353; see also Fiskars, Inc. v. Hunt Mfg. Co., 279 F.3d 1378, 1382 (Fed.Cir.2002). Fuji argues that Jazz has failed to satisfy this burden because, Fuji contends, the non-infringing alternative—a camera repaired from a U.S. shell—was only a theoretical possibility. To the contrary, this Court's holdings with respect to repair/reconstruction and exhaustion, as well as the jury's advisory verdict, make clear that Defendants could have refurbished cameras in a non-infringing manner. Jazz has therefore proven availability. Thus, it is Fuji's burden, as part of its ultimate burden of proof, to demonstrate a reasonable probability of "but for" causation in light of this non-infringing alternative. Proof of Fuji's market share, standing alone, does not satisfy this burden.

FN28. Given the Court's disposition, it is also unnecessary to address Jazz's alternative contention that its cameras operate in a different market segment than those of Fuji and that, accordingly, the majority of its sales would have gone to competitors other than Fuji. See BIC Leisure Prods. v. Windsurfing Int'l, Inc., 1 F.3d 1214 (Fed.Cir.1993).

Willful Infringement.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS    Doc 90-3    Filed 06/24/03    Entered 06/24/03 17:09:50    Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5    Page 36 of 93

249 F.Supp.2d 434                                                                                                    Page 25
(Cite as: 249 F.Supp.2d 434, *456, 2003 WL 678140 (D.N.J.), **15)

[18] The jury determined that Jazz and Jack Benun willfully infringed Fuji's patents with respect to the 1,209,760 newly-made cameras sold by Jazz during the relevant period, but found no willful infringement with respect to the remaining, refurbished cameras. Jazz seeks judgment as a matter of law with respect to this finding of willfulness for newly-made cameras.

[19][20] Whether infringement is willful is a question of fact for the jury, which the patentee must prove by clear and convincing evidence. See, e.g., Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc. 249 F.3d 1341, 1355-56 (Fed.Cir.2001). A jury's finding of willfulness may be overturned on a motion for judgment as a matter of law only if unsupported by substantial evidence in the record. See Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1190 (Fed.Cir.1998). Thus, an infringer seeking to overturn a verdict bears a "heavy burden" to show that "no reasonable juror could find the asserted proof of willfulness rose to the quantum of clear and convincing evidence." Id.

**16 [21] It is well-settled that, "[w]hen an infringer has actual notice of a patentee's rights, the infringer has an affirmative duty of due care to avoid infringement." Crystal Semiconductor Corp., 246 F.3d at 1351 (citing Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1566 (Fed.Cir.1988)). Here, there is no dispute here that Defendants had actual knowledge of Fuji's patents dating back to 1995, when Mr. Benun first approached Fuji for a license to sell disposable cameras. Moreover, Mr. Benun testified that Jazz "absolutely" needed a license to sell newly-made cameras. Under these circumstances, Defendants clearly had a duty to exercise due care to refrain from infringing activities.

[22] There is no dispute that both Jazz Photo and Jazz Hong Kong in fact sold newly-made cameras. Indeed, Jazz offered no defense to infringement with respect to these cameras at trial. [FN29] Defendants' argument for judgment as a matter of law on willfulness is based upon the *457 testimony of Mr. Benun that Defendants were unaware that the cameras were newly-made until after the fact. Even under Defendants' theory, the willfulness issue turns on whether Mr. Benun's testimony was truthful. Credibility issues of this kind are squarely within the province of the jury. The jury in this case could well have determined that Mr. Benun's self-serving protestations as to Defendants' lack of knowledge were entitled to little, if any, weight.

> FN29. Because infringement with respect to newly-made cameras was effectively conceded at trial, Jazz offered no opinion of counsel with respect to these cameras. Indeed, no such opinion could exist. While ordinarily the absence of an opinion is of critical significance in any willfulness inquiry, it is of less importance under the circumstances presented here—i.e., where the alleged infringer knew that a particular action would constitute infringement, but claims not to have known that it was taking the action.

[23][24] Defendants' motion for judgment as a matter of law with respect to willfulness is DENIED. [FN30]

> FN30. While the jury's finding of willfulness with respect to the newly-made cameras remains undisturbed, the Court declines to exercise its discretion to award enhanced damages and attorneys' fees under the circumstances of this case. See 35 U.S.C. § 284 (trial court may "increase the damages up to three times the amount found or assessed") and § 285 (trial court may award attorney fees "in exceptional cases"). It is well-settled that "a finding of willful infringement merely authorizes, but does not mandate an award of increased damages." See Modine Mfg. Co. v. Allen Grp., Inc., 917 F.2d 538, 543 (Fed.Cir.1990); see also Riles v. Shell Exploration and Prod. Co., 298 F.3d 1302, 1313 (Fed.Cir.2002). The paramount consideration in determining whether to award enhanced damages is "the egregiousness of the defendant's conduct based on all the facts and circumstances." Riles, 298 F.3d at 1313. The Court concludes, in its discretion, that enhanced damages and/or fees are not warranted here for the following reasons: (1) Jazz did not manufacture the new cameras—it acquired them from third parties; (2) the newly-made cameras reflected a very small percentage (roughly 3%) of the total cameras sold by Jazz; (3) Fuji adduced no direct evidence at trial that any Defendant had actual knowledge that any supplier was providing Jazz with cameras refurbished from newly-made shells, but rather relied upon an inference arising out of the fact that the cameras

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

were sold and the credibility of Mr. Benun; (4) Mr. Benun testified that Jazz took remedial measures once, according to Mr. Benun, the infringement was discovered; (5) Fuji adduced no evidence at trial that the sale of newly-made cameras resumed or continued thereafter with any Defendant's knowledge; (6) this Court is not aware of any efforts on behalf of Defendants to conceal the existence of Jazz's sales of newly-made cameras; and (7) there is nothing with respect to Defendants' conduct in the instant litigation which would warrant any damages enhancement. Under these circumstances, the Court feels that an award of enhanced damages and/or fees would be inappropriate in this case.

Inducement.

[25]  Finally, Mr. Benun challenges the jury's verdict finding him personally liable for inducing the infringement of Jazz Photo.

[26]  35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." This section of the patent statute "is premised on a concept of tortfeasance whereby persons in authority and control may in appropriate circumstances be deemed liable for wrongdoing when inducing direct infringement by another." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1575 (Fed.Cir.1996). Before inducement liability will attach, the patentee must satisfy the following two-part test: first, the patentee must show that there has been direct infringement; and second, the patentee must prove that the alleged infringer knowingly induced the direct infringement and possessed a specific intent to encourage that infringement. Minnesota Mining and Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1305 (Fed.Cir. 2002) (citations omitted).

The first requirement has clearly been met here: Both this Court and the jury have found that Jazz Hong Kong and Jazz Photo directly infringed Fuji's patents.

Mr. Benun's Rule 50(b) motion is directed principally to the second requirement.  **458** He contends that Fuji failed to adduce sufficient evidence that he acted with the requisite degree of intent to actively induce Jazz's infringement.

[27][28]  While proof of the alleged inducer's intent is a necessary element of the patent holder's burden to prove inducement, it is well-settled that "direct evidence [of intent] is not required; rather, circumstantial evidence may suffice." Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363, 2003 WL 124307, at *12 (Fed.Cir. Jan.16, 2003). Indeed, as this Court has noted, in certain cases, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence" of intent. See Symbol Techs., Inc. v. Metrologic Instrum., Inc., 771 F.Supp. 1390, 1405 (D.N.J.1991) (citing Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed.Cir.1986)); Water Technologies Corp. v. Calco Ltd., 850 F.2d 660, 668 (Fed.Cir.1988). Moreover, "[i]ntent is a factual determination particularly within the province of the trier of fact." Water Technologies, 850 F.2d at 669 (quoting Allen Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1567 (Fed.Cir.1988)).

**17**  At trial, Fuji offered substantial circumstantial evidence of Mr. Benun's intent to induce Jazz's infringement of Fuji's patents. Fuji demonstrated Mr. Benun's control over Jazz throughout the period at issue and his personal direction of Jazz's infringement. After having left Concord in 1994, Mr. Benun founded Jazz. He was Jazz's President, Chief Executive Officer, and sole director. His wife and children owned all of Jazz's stock. In 1995, under Mr. Benun's direction, Jazz began selling refurbished cameras without having requested a license from Fuji to do so and without having obtained any non-infringement opinion of counsel. It was only after Jazz began selling cameras that Mr. Benun twice approached Fuji to request a license. No such license was forthcoming, yet the infringing sales continued--again, with no opinion of counsel.

Mr. Benun resigned his positions as director and officer of Jazz in April 1997, at which time he assumed the position of "consultant." However, Fuji adduced evidence demonstrating that Mr. Benun's resignation was not a relinquishment of control over the company at all. Rather, it was designed to facilitate the public offering of Jazz stock, as Mr. Benun had previously been barred from serving as a director and officer of any public company. [FN31]

FN31. This public offering was ultimately never

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 03-26565-MS    Doc 90-3    Filed 06/24/03    Entered 06/24/03 17:09:50    Desc
Declaration of Ellen G. Brier - Part I  Exhs. 1-5    Page 38 of 93

249 F.Supp.2d 434                                                                                    Page 27
(Cite as: 249 F.Supp.2d 434, *458, 2003 WL 678140 (D.N.J.), **17)

consummated because the national stock exchanges to which Jazz applied all refused to list the company.

After becoming a "consultant," Mr. Benun continued to exert substantial control over Jazz. Mr. Benun remained intimately involved in virtually all aspects of Jazz's business. He hand-picked his own successor, Mr. Lorenzini. [FN32] Mr. Benun's family continued to own the overwhelming majority of Jazz stock under a voting agreement, pursuant to which they agreed to grant him an irrevocable proxy to vote their shares in the event the bar preventing him from serving as an officer or director of the company was ever lifted.

FN32. Mr. Lorenzini's compensation package included a $5,000 per month housing allowance, which he used to move into the house next door to Mr. Benun, which was held in the name of one of Mr. Benun's daughters. Mr. Lorenzini's obligation to pay rent on this house was eventually waived.

Perhaps most probative of Mr. Benun's control, during the post-1997 time period when Mr. Benun was a purported "consultant" to Jazz, the company paid him over $10 million in direct payments and loans, *459 representing more than four times the company's retained earnings during that time period.

This evidence tends to prove that Mr. Benun was the moving force behind Jazz's infringement of Fuji's patents. Numerous courts have affirmed a finding of inducement on a far lesser showing than was made by Fuji here. See, e.g., Sensonics, Inc., 81 F.3d at 1575-76 (affirming finding of inducement where district court disbelieved statement of founder that he lacked control to discontinue production of infringing products after he became aware of patentee's rights); Power Lift, Inc. v. Lang Tools, Inc., 774 F.2d 478, 481 (Fed.Cir.1985) (affirming denial of Rule 50 motion brought by "president, founder, majority owner and director" of infringing company). Indeed, "[t]he cases are legion holding corporate officers and directors personally liable for participating in, inducing, and approving acts of patent infringement by a corporation." Fromson v. Citiplate, Inc., 886 F.2d 1300, 1304 (Fed.Cir.1989).

**18 The jury in this case had more than ample evidence from which to infer that Mr. Benun induced Jazz to infringe Fuji's patents, and possessed the specific intent to do so. Viewing the evidence in a light most favorable to Fuji, as this Court must, Mr. Benun has offered no basis to disturb the jury's verdict. Mr. Benun's Rule 50(b) motion is therefore DENIED.

CONCLUSION

For the reasons stated in this Opinion, this Court finds that Jazz is liable for infringement of Fuji's patents with respect to 40,928,185 cameras sold by Jazz during the period 1995 through August 21, 2001. Multiplying this number by the jury's reasonable royalty award of 56 cents per infringing camera, this Court finds that Fuji was damaged by Jazz's infringing sales in the amount of $22,919,783.60. Mr. Benun is liable for inducement of infringement with respect to 39,103,664 cameras. An appropriate Final Order and Judgment will issue forthwith.

ORDER AND JUDGMENT

**20 This patent infringement action having been commenced on June 23, 1999 by the filing of a Summons and Complaint by Plaintiff Fuji Photo Film Co., Ltd. ("Fuji") against Defendants Jazz Photo Corp. ("Jazz Photo"), Jazz Photo (Hong Kong) Ltd. ("Jazz Hong Kong") and Jack Benun; and a trial on the merits having been held beginning on October 24, 2002 and the jury having rendered a unanimous verdict on December 2, 2002; and for the reasons stated in this Court's Opinion dated as of this date;

IT IS on this 25th day of February, 2002, hereby ORDERED that Jazz Photo and Jazz Hong Kong's importation, use, and/or sale of 40,928,185 Lens Fitted Film Packages ("LFFP's") from the period 1995 through August 21, 2001 infringed Fuji's patent rights in violation of 35 U.S.C. § 271(a); and it is further

ORDERED that Defendant Jack Benun induced Jazz Photo's infringement with respect to 39,103,664 cameras in violation of 35 U.S.C. § 271(b); and it is further

ORDERED that all Defendants' infringement was

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

willful with respect to 1,209,760 newly-made LFFP's imported, used, and/or sold by Jazz during the period 1995 through August 21, 2001; and it is further

ORDERED that Fuji was damaged as a result of the Defendants' infringement in the total amount of $22,919,783.60, representing the number of infringing LFFP cameras multiplied by a reasonable royalty of $0.56 per camera; and it is further

ORDERED that judgment is hereby GRANTED in favor of Plaintiff against **460** Defendants Jazz Photo, Jazz Hong Kong and Jack Benun, jointly and severally, in the amount of $21,898,051.84; and it is further

ORDERED that, judgment is hereby GRANTED in favor of Plaintiff against Defendants Jazz Photo and Jazz Hong Kong, jointly and severally, for the additional amount of $1,021,731.76; and it is further

ORDERED that Defendants will pay pre-judgment interest at the statutory rate provided for in N.J. Ct. R. 4:42-11, compounded annually; and it is further

ORDERED that the parties will jointly submit an accounting of the appropriate calculation of pre-judgment interest, with a proposed form of order, within ten business days of the entry of this Order and Judgment; and it is further

ORDERED that all other pending motions in the above-captioned matter are DISMISSED as moot.

## ADDENDUM

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                           **Page  29**
(Cite as: 249 F.Supp.2d 434, *460, 2003 WL 678140 (D.N.J.), **20)

SPECIAL VERDICT FORM

Special Verdict Form
Fuji v. Jazz Photo et al.,
Civil Case No. 99-2937 (FSH)

This case will be decided on the basis of the answers that you give to certain
    questions that will be submitted to you. Each of the questions calls for
    insertion of a finding (for example a number, dollar amount or period of
    time) or a "Yes" or "No" answer. The answer to all questions must be based on
    a unanimous decision of all of you. When all of you have agreed on any
    answer, the foreperson of the jury will write the answer in the space
    provided for each answer. As you will note from the wording of the questions,
    depending on how you answer certain questions, you may not have to answer
    others.

When you have answered all the questions which require answers, report to the
Court.

Do not assume from the questions or from the wording of the questions or from
my instructions on them what the answers should be.

   WE THE JURY, make the following unanimous answers to the following
questions submitted by this Court.

   1. How many refurbished one-time use cameras did Jazz Photo and Jazz Hong
Kong sell in or to the United States between 1995 and August 21, 2001?

   2. Of the number of refurbished cameras Jazz Photo and Jazz Hong Kong sold
in or to the United States (which you wrote in answer 1), how many were
refurbished from shells of cameras first sold IN the United States?

   3. Of the number of refurbished cameras Jazz Photo and Jazz Hong Kong sold
in or to the United States (which you wrote in answer 1), how many were
refurbished from shells of cameras first sold outside the United States by
Fuji, or a licensee who had the right to sell both in the country where it
was first sold, and in the United States.

   4. How many NEWLY MADE (not refurbished) cameras did Jazz Photo and Jazz
Hong Kong sell in or to the United States?

   5. Which of the following happens at least some of the time when the
cameras sold by Jazz are refurbished: (write "yes," "no," or "unknown" in the
space) :

                                                        Write Yes, No,
                                                        or Unknown

(a)   Removing the cardboard cover.                     _____

(b)   Cutting open the plastic casing.                  _____

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                                    Page  30
**(Cite as: 249 F.Supp.2d 434, \*460, 2003 WL 678140 (D.N.J.), \*\*20)**

(c)      Inserting new film and a container to receive the film.      _____

(d)      Replacing the winding wheel for certain cameras.      _____

(e)      Replacing the battery for flash cameras.      _____

(f)      Resetting the counter.      _____

(g)      Resealing the outer case.      _____

(h)      Adding a new cardboard cover.      _____

(i)      Removing the front cover.      _____

(j)      Replacing the front cover from one camera on a different
         camera.      _____

(k)      Slim tool step.      _____

(l )     Unwinding the film from the cartridge in the camera.      _____

(m)      Multiple hook attachments and later removals.      _____

(n)      Modifying the film cartridge to mesh with winding wheel      _____

(o)      Inserting, then removing a film spindle.      _____

(p)      Replacing the film door.      _____

(q)      Cutting plastic tabs to open the camera      _____

(r)      Inserting a washer to hold open attached rear cover.      _____

(s)      Grinding off the Fuji logo.      _____


    6A. How many refurbished cameras sold in or into the United States by Jazz
Photo and Jazz Hong Kong (which you wrote in answer to question 1 and without
regard to where the cameras had been first sold, as you addressed in answer
to questions 2 and 3) were permissibly repaired? Write a number of cameras:
_____. If the number of cameras you wrote in
answer to Question 6A is less than the number of cameras you wrote in answer
to Question 1, then the number of infringing refurbished cameras is the
number from Question 1 MINUS the number from Question 6.


_____   -   _____   =   _____
(Write Number From         (Write Number From              (Subtract And Fill In
 Question 1)                Question 6)                      Number. This is the
                                                             number of cameras not
                                                             permissibly repaired,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434                                                          Page  31
(Cite as: 249 F.Supp.2d 434, *460,  2003 WL 678140 (D.N.J.), **20)

which you will use in
question 8.)


6B. Of the number of refurbished cameras which you wrote in answer to
question 2, how many refurbished cameras sold in or into the United States by
Jazz Photo and Jazz Hong Kong were permissibly repaired? Write a number of
cameras:

7. Did Jack Benun induce Jazz Photo or Jazz Hong Kong to infringe any of
Fuji's patents?

Circle "Yes" or "No"

(a) Induced Jazz Photo.          Yes          No

(b) If yes to (a), over what time period (if no, skip this question)?
_____, and for how many cameras (write a number):
_____

Circle "Yes" or "No"

(c) Induced Jazz Hong Kong.      Yes          No

(d) If yes to (c), over what time period (if no, skip this question)?
_____, and for how many cameras (write a number):
_____


8. You have been asked to decide how many refurbished cameras sold by Jazz
were permissibly repaired. (This is the result of the equation at the end of
Question 6A) Even if you find that all of the cameras were permissibly
repaired, answer the rest of the questions so the Court can determine how
much to award in damages if the Court disagrees with your finding. What TOTAL
profit would Fuji have made but for Jazz sales of the refurbished cameras
which were NOT permissibly repaired? $_____. Continue to
question 9.

9. What amount of profit did Fuji make on each individual camera it sold?
Write an amount of money here: $_____.

10. If you find that Jazz's sales of NEWLY MADE (not refurbished) cameras
took sales away from Fuji, answer this question; otherwise skip to question
11. What profit would Fuji have made but for Jazz sales of NEWLY MADE (not
refurbished) cameras? $_____

11. What amount of money is a reasonable royalty for Jazz Photo and Jazz
Hong Kong to pay Fuji for each infringing camera sold? $_____

12. For each defendant for which you find infringement, state whether
infringement was willful (circle "Willful" or "Not Willful"):

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434
(Cite as: 249 F.Supp.2d 434, *460, 2003 WL 678140 (D.N.J.), **20)

|  |  | Circle ONE for each defendant |  |
|---|---|---|---|
| (a) | Jazz Photo New Cameras: | Willful | Not Willful |
| (b) | Jazz Hong Kong New Cameras: | Willful | Not Willful |
| (c) | Jazz Photo Refurbished Cameras: | Willful | Not Willful |
| (d) | Jazz Hong Kong Refurbished Cameras: | Willful | Not Willful |

13. For defendant Jack Benun, if you find he induced infringement answer
this question; otherwise, skip this question. State whether such inducement
was willful (circle "Willful" or "Not Willful"):

|  | Circle ONE |  |
|---|---|---|
| Jack Benun New Cameras: | Willful | Not Willful |
| Jack Benun Refurbished Cameras: | Willful | Not Willful |

Sign and date this verdict sheet and notify the courtroom deputy.

Dated: November ____, 2002

By:_____
       Foreperson

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

249 F.Supp.2d 434
**(Cite as: 249 F.Supp.2d 434, \*460, 2003 WL 678140 (D.N.J.), \*\*20)**

249 F.Supp.2d 434, 2003 WL 678140 (D.N.J.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

---

**Citation Entry:     1**

Your Information:
    2003 wl 678140
    Extracted from page: 1

WestCheck Information:
    Fuji Photo Film Co. Ltd. v. Jazz Photo Corp., 249 F.Supp.2d 434,
        2003 WL 678140 (D.N.J., 2003)

---

**KeyCite Request:   2003 wl 678140**

**KeyCite**

Citation:  2003 WL 678140
    Fuji Photo Film Co. Ltd. v. Jazz Photo Corp., 249 F.Supp.2d 434
    (D.N.J., Feb 25, 2003) (NO. CIV. 99-2937 (FSH))

**History**
**Direct History**

=>  1 **Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.,**  249 F.Supp.2d 434 ,
        2003 WL 678140 (D.N.J. Feb 25, 2003) (NO. CIV. 99-2937 (FSH))

**Related References**

H   2 Jazz Photo Corp. v. International Trade Com'n., 217 F.3d 854
        (Fed.Cir. Oct 12, 1999) (TABLE, TEXT IN WESTLAW, NO. 99-1431,
        99-1595, 99-1503, 99-1596, 99-1504, 99-1601)

Y   3 Jazz Photo Corp. v. International Trade Com'n, 264 F.3d 1094 ,
        59 U.S.P.Q.2d 1907 (Fed.Cir.(Hawai'i) Aug 21, 2001)
        (NO. 99-1431, 99-1596, 99-1504, 99-1601, 99-1595), rehearing and
        rehearing en banc denied (Nov 09, 2001) (Additional Negative
        History)
        Certiorari Denied by
H   4 Jazz Photo Corp. v. I.T.C., 536 U.S. 950 , 122 S.Ct. 2644 ,
        153 L.Ed.2d 823 , 70 USLW 3518 , 70 USLW 3786 , 70 USLW 3789
        (U.S. Jun 24, 2002) (NO. 01-1158)
        AND Certiorari Denied by
H   5 Fuji Photo Film Co. v. Jazz Photo Corp., 536 U.S. 950 ,
        122 S.Ct. 2644 , 153 L.Ed.2d 823 , 70 USLW 3597 , 70 USLW 3786 ,
        70 USLW 3789 (U.S. Jun 24, 2002) (NO. 01-1376)

H   6 Fuji Photo Film Co. Ltd. v. Jazz Photo Corp. Inc., 173 F.Supp.2d 268
        (D.N.J. Nov 15, 2001) (NO. CIV. 99-2937 (FSH))
H   7 In re International Trade Com'n, 44 Fed.Appx. 480 , 2002 WL 1906626
        (Fed.Cir. Aug 02, 2002) (Not selected for publication in the
        Federal Reporter, NO. 702)

PLAINTIFF'S
EXHIBIT
133

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

**FILED**

SEP  1 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,
450 Fifth Street, N.W.
Washington, D.C.  20549

                    Plaintiff,

          v.

JACK C. BENUN,
80 Wickapecko Drive
Allenhurst, N.J.  07711

                    Defendant.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
RELIEF

CASE NUMBER  1:94CV01913

JUDGE: Paul L. Friedman

DECK TYPE: Civil General

DATE STAMP: 09/01/94

     Plaintiff Securities and Exchange Commission ("Commission")
alleges for its Complaint the following:

     1.   Defendant Jack C. Benun ("Benun"), directly or
indirectly, has engaged, and unless permanently enjoined and
restrained, will continue to engage, in acts, transactions,
practices, and courses of business that violate the securities
laws and regulations of the United States, as described below.

### SUMMARY OF THE FRAUD

     2.   From May to June 1990, Benun, the chairman, chief
executive officer, and a principal shareholder of Concord Camera
Corp. ("Concord") at that time, misappropriated $150,000 from
Concord through its wholly owned Hong Kong subsidiary, Dialbright
Company, Ltd. ("Dialbright").

     3.   Benun misappropriated the $150,000 by having Dialbright
issue, in May 1990, a $150,000 draft to a Dialbright employee who

PLAINTIFF'S
EXHIBIT
BENUN 22
2/28/08 EE

EXHIBIT 03

had just begun working for the company in April 1990. Benun claimed, at that time and later, that the $150,000 represented an incentive bonus for the newly hired Dialbright employee.

4. This newly hired employee endorsed the $150,000 draft and delivered it to Benun, who then funnelled the proceeds back to himself through two other individuals.

5. Benun thereafter caused Concord, in its Form 10-K for the fiscal year ended June 30, 1990 and in a proxy statement it filed on October 26, 1990, (a) to misrepresent that it had paid a $150,000 incentive bonus to a newly hired Dialbright employee, and (b) to fail to describe, or even disclose, Benun's $150,000 transaction with Concord during the fiscal year ended June 30, 1990.

6. As a result, Benun violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, as amended ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(a)], and Rules 10b-5, 14a-3, and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.14a-3, and 240.14a-9], and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] under Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin and restrain the defendant from engaging in such acts, transactions, practices, and courses of business as set forth herein, and for other relief.

2

8.    This Court has jurisdiction over this action pursuant
to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and
78aa].

9.    The defendant, directly or indirectly, has made use of
the means or instrumentalities of interstate commerce, or of the
mails or facilities of a registered securities association, in
connection with the acts, transactions, practices, and courses of
business alleged herein, certain of which have occurred in the
District of Columbia.

10.    Venue lies in this Court pursuant to Section 27 of the
Exchange Act [15 U.S.C. § 78aa].

11.    The Commission, pursuant to Sections 10(b),
13(b)(2)(A), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b),
78m(b)(2)(A), and 78n(a)], has promulgated Rules 10b-5, 13b2-1,
14a-3, and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1,
240.14a-3, and 240.14a-9], which were in effect at all relevant
times herein.

### DEFENDANT

12.    Benun was the chairman and chief executive officer of
Concord Camera Corp., and he remains a principal shareholder of
the company. He resides in Allenhurst, New Jersey.

### RELEVANT ENTITIES

13.    Concord Camera Corp., incorporated in New Jersey and
headquartered in Avenel, New Jersey, manufactures and distributes
cameras. Concord's common stock is registered with the
Commission pursuant to Section 12(b) of the Exchange Act [15

3

U.S.C. § 1(b)] and listed on the National Association of
Securities Dealers Automated Quotation ("NASDAQ") system.  The
company, as required by Section 13(a) of the Exchange Act [15
U.S.C. § 78m(a)], has filed periodic and other reports with the
Commission since its securities became publicly traded in 1988.

14.  Dialbright Company, Ltd. is a limited company chartered
and headquartered in Hong Kong and became Concord's wholly owned
subsidiary in 1988.  Since the activities described herein,
Dialbright was renamed and is now Concord Camera Hong Kong
Limited.

### FIRST CAUSE OF ACTION

#### BENUN VIOLATED SECTION 10(b) OF THE
#### EXCHANGE ACT AND RULE 10b-5 THEREUNDER

15.  Paragraphs 1 through 14 are realleged and incorporated
herein by reference.

16.  From May 1990 to November 1990, Benun, directly or
indirectly, by use of the means and instrumentalities of
interstate commerce, or of the mails, and in connection with the
offer, purchase, and sale of securities: (a) employed devices,
schemes or artifices to defraud; (b) obtained money or property
by making untrue statements of material facts or by omitting to
state material facts necessary in order to make the statements
made, in light of the circumstances under which they were made,
not misleading; and (c) engaged in acts, transactions, practices,
and courses of business which operated as a fraud or deceit upon
purchasers and sellers of such securities, as described below.

4

## Benun Misappropriated
## $150,000 from Concord

17.    On or about May 1, 1990, Benun ordered Dialbright's
financial officer to have a $150,000 draft issued to a newly
hired Dialbright employee; Benun explained to the officer that
Dialbright was obligated to pay this newly hired employee a
$150,000 signing or incentive bonus.  Within three days, the new
employee received a $150,000 draft from Dialbright.

18.    Shortly after receiving the draft, the new employee
endorsed and delivered it to Benun.  Upon receiving the endorsed
$150,000 draft, Benun instructed a longtime friend to deposit it
into the friend's Hong Kong bank account and to wire-transfer the
proceeds to a specified bank account in the United States.  This
friend complied with Benun's instructions.

19.    The bank account in the United States into which Benun
instructed the friend to wire-transfer the $150,000 was held by
another of Benun's longtime friends (the "second friend").  The
second friend previously had agreed to receive Benun's funds into
his bank account and to issue checks from that account back to
Benun.

20.    The second friend received the proceeds from the
$150,000 and over the next month issued and delivered five checks
totalling $144,500 to Benun and his wife.  Benun and his wife
deposited these five checks into their bank accounts.

### Benun Caused Concord to Make
### Material Misrepresentations in
### Certain Filings with the Commission

21.  In its Form 10-K for the fiscal year ended June 30, 1990, filed with the Commission on or about September 28, 1990 ("Form 10-K"), and in a proxy statement, filed with the Commission on or about October 26, 1990, Concord made materially false and misleading statements and omitted to state material facts as follows:

(a)  Concord stated that it had paid a $150,000 incentive bonus to a newly hired Dialbright employee when, in fact, Benun had used the purported incentive bonus obligation and disbursement as a ruse to misappropriate those funds.

(b)  Concord failed to describe, or even disclose, its $150,000 transaction with Benun.

22.  Benun knowingly caused Concord to make the materially false statements and omissions contained in its Form 10-K and proxy statement, described in paragraph 21 above.

23.  Benun signed Concord's Form 10-K and proxy statement knowing that they contained the material misrepresentations described in paragraph 21 above.

### Benun Lied to Concord about
### the Disposition of the $150,000

24.  In February 1991, Concord, in response to a wrongful discharge lawsuit against it and Benun, commenced an internal investigation to determine whether Benun had misappropriated the purported $150,000 incentive bonus.  In the course of that

6

investigation, Benun lied to Concord's investigatory committee and its agents about his knowledge of the actual use of the $150,000.

<u>Conclusion</u>

25. By reason of the foregoing, Benun violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

SECOND CAUSE OF ACTION

BENUN VIOLATED RULE 13b2-1 UNDER
SECTION 13(b)(2)(A) OF THE EXCHANGE ACT

26. Paragraphs 1 through 25 are realleged and incorporated herein by reference.

27. At all relevant times herein, Concord was required, pursuant to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], to make and keep certain books, records, and accounts in reasonable detail so as to accurately and fairly reflect the transactions and dispositions of its assets.

28. Benun, directly or indirectly, falsified or caused to be falsified certain books, records, and accounts maintained by Concord pursuant to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by making certain misrepresentations to Concord.

29. By reason of foregoing, Benun violated Rule 13b2-1 under the Exchange Act [17 C.F.R. §§ 240.13b2-1].

7

## THIRD CAUSE OF ACTION

### BENUN VIOLATED SECTION 14(a)
### OF THE EXCHANGE ACT AND RULES
### 14a-3 AND 14a-9 THEREUNDER

30. Paragraphs 1 through 29 are realleged and incorporated herein by reference.

31. Benun, by use of the mails or by other means or instrumentalities of interstate commerce or otherwise, in contravention of certain rules and regulations as the Commission has prescribed as necessary or appropriate in the public interest or for the protection of investors, specifically Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9], solicited or permitted the use of his name to solicit a proxy or consent or authorization concerning those securities of Concord that were registered pursuant to Section 12 of the Exchange Act.

32. On or about October 26, 1990, Concord filed a proxy statement with the Commission and mailed the statement to shareholders of record soliciting proxies pursuant to Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Regulation 14A thereunder [17 C.F.R. §§ 240.14a-1, *et seq.*].

33. Pursuant to Rule 14a-3 [17 C.F.R. § 240.14a-3] under Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)], no solicitation subject to Regulation 14A under the Exchange Act [17 C.F.R. §§ 240.14a-1, *et seq.*] shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing information specified in the Commission's Schedule 14A [17 C.F.R. § 240.14a-

8

101]. Schedule 14A required that Concord's proxy statement describe certain relationships and related transactions between Concord and Benun, including any transactions or series of transactions involving amounts in excess of $60,000 during the company's fiscal year ended June 30, 1990.

34. Pursuant to Rule 14a-9 [17 C.F.R. § 240.14a-9] under Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)], no solicitation subject to Regulation 14A under the Exchange Act [17 C.F.R. §§ 240.14a-1, *et seq.*] shall be made by any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to a material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

35. As described in paragraphs 21 to 23 above, Concord's proxy statement contained materially false and misleading statements concerning the company's $150,000 transaction with Benun during the fiscal year ended June 30, 1990, and the company's payment of a $150,000 incentive bonus to a newly hired Dialbright employee.

9

36.  By reason of foregoing, Benun violated Section 14(a) of
the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9
thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this
Court:

### I.

Enter an order, pursuant to Section 21(d)(1) of the Exchange
Act [15 U.S.C. § 78u(d)(1)], that permanently enjoins and
restrains Benun and his officers, agents, servants, employees,
attorneys and those persons in active concert or participation
with him, and each of them, from engaging in any acts,
transactions, practices, and courses of business of similar
purport and object, in connection with transactions that,
directly or indirectly, constitute violations of Sections 10(b)
and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(a)]
and Rules 10b-5, 14a-3, and 14a-9 thereunder [17 C.F.R. §§
240.10b-5, 240.14a-3, and 240.14a-9] and Rule 13b2-1 under
Section 13(b)(2)(A) of the Exchange Act [17 C.F.R. § 240.13b2-1
under 15 U.S.C. § 13(b)(2)(A)].

### II.

Enter an Order, pursuant to Section 21(d)(2) of the Exchange
Act [15 U.S.C. § 78u(d)(2)], that permanently enjoins and
restrains Benun from acting as an officer or director of any
issuer that has a class of securities registered pursuant to
Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is

required to file reports with the Commission pursuant to Section
15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### III.

Enter an Order, pursuant to Section 21(d)(1) of the Exchange
Act [15 U.S.C. § 78u(d)(1)], that directs Benun to disgorge
$150,000 -- the amount which he derived from the transactions
complained of herein -- together with pre-judgment interest
thereon from May 1, 1990 to the entry of final judgment in this
matter.

### IV.

Enter an Order, pursuant to Section 21(d)(3) of the Exchange
Act [15 U.S.C. § 78u(d)(3)], a provision of the Securities
Enforcement Remedies and Penny Stock Reform Act of 1990, that
directs Benun to pay to the Commission civil fines and/or
penalties of $150,000 for his violative conduct occurring on or
after October 15, 1990.

### V.

Grant all further relief warranted under the circumstances.

Respectfully submitted,

Dated:   September 1, 1994

Barry R. Goldsmith, D.C. Bar #93022
Thomas Newkirk
Jerry A. Isenberg
Patrick M. Joyce
Cory C. Kirchert
Arian Colachis
Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W. (Stop 4-3B)
Washington, D.C.  20549
(202) 942-4672

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA **FILED**

SEP 1 3 1994

Clerk, U.S. District Court
District of Columbia

SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff;

                v.

JACK C. BENUN,

                                    Defendant.

FINAL JUDGMENT OF
PERMANENT INJUNCTION
AND OTHER RELIEF AS TO
JACK C. BENUN

Civil Action No.

**94 1913**

The plaintiff Securities and Exchange Commission

("Commission") has filed a Complaint for Permanent Injunction and

Other Relief ("Complaint") against the defendant, Jack C. Benun

("Benun"), in this matter.  The defendant Benun, in his Consent

of Jack C. Benun ("Consent"), has admitted jurisdiction of this

Court over him and over the subject matter of this action, has

waived his right to serve an Answer to the Commission's

Complaint, and has waived the entry of findings of fact and

conclusions of law pursuant to Rule 52 of the Federal Rules of

Civil Procedure.

Without admitting or denying any of the allegations of the

Complaint, except as to jurisdiction, which he admits, and

without a trial or adjudication of any of the issues of fact or

law raised by this action, Benun consents to the entry, without

further notice, of this Final Judgment of Permanent Injunction

and Other Relief as to Jack C. Benun ("Final Judgment").  It

appearing that this Court has jurisdiction over Benun and the






PLAINTIFF'S
EXHIBIT
C-4

PLAINTIFF'S
EXHIBIT
135

PLAINTIFF'S
EXHIBIT
Benun 24
2/28/00 GF

EXHIBIT 04

subject matter of this action, and the Court being fully advised
in the premises:

## I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Benun, his
agents, servants, employees, attorneys-in-fact, successors,
assigns, and all persons in active concert or participation with
them, and each of them be, and they hereby are permanently
enjoined and restrained from violating Section 10(b) of the
Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17
C.F.R. § 240.10b-5], directly or indirectly, by using any means
or instrumentality of interstate commerce or of the mails, or any
facility of any national securities exchange,

    (1)   to employ any device, scheme, or artifice to defraud,

    (2)   to make any untrue statement of a material fact or omit
to state a material fact necessary in order to make the
statements made, in light of the circumstances under
which they were made, not misleading, or

    (3)   to engage in any act, practice, or course of business
which operates or would operate as a fraud or deceit
upon any person,

in connection with the purchase or sale of any security.

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that
Benun, his agents, servants, employees, attorneys-in-fact,
successors, assigns, and all persons in active concert or
participation with them, and each of them be, and they hereby are

permanently enjoined and restrained from violating Rule 13b2-1

under the Exchange Act [17 C.F.R. § 240.13b2-1], directly or

indirectly, by falsifying or causing to be falsified, any book,

record, or account subject to Section § 13(b)(2)(A) of the

Exchange Act.

### III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

Benun, his agents, servants, employees, attorneys-in-fact,

successors, assigns, and all persons in active concert or

participation with them, and each of them be, and they hereby are

permanently enjoined and restrained from violating Section 14(a)

of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-

9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9] by using the

mails or by any means or instrumentality of interstate commerce

or of any facility of a national securities exchange or

otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the

public interest or for the protection of investors, to solicit or

to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted

security) registered pursuant to Section 12 of the Exchange Act

[15 U.S.C. § 78l], specifically, by:

> (1)   making a solicitation subject to Section 14 of the
>        Exchange Act [15 U.S.C. § 78n] unless each person
>        solicited is concurrently furnished or has been
>        previously furnished with a written proxy statement

3

containing the information specified in Schedule 14A
[17 C.F.R. § 240.14a-101] or with a written proxy
statement included in a registration statement filed
under the  Securities Act of 1933 on Form S-4 or F-4
[17 C.F.R. §§ 239.25 or 239.34] or Form N-14 [17 C.F.R.
§ 239.23] and containing the information specified in
such Form, or

(2)  making a solicitation subject to Section 14 of the
Exchange Act [15 U.S.C. § 78n] by means of any proxy
statement, form of proxy, notice of meeting, or other
communication, written or oral, containing any
statement which, at the time and in the light of the
circumstances under which it is made, is false or
misleading with respect to any material fact, or which
omits to state any material fact, or which omits to
state any material fact necessary to correct any
statements therein not false or misleading or necessary
to correct any statement in any earlier communication
with respect to the solicitation of a proxy for the
same meeting or subject matter which has become false
or misleading.

### IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that
Benun be, and he hereby is, permanently enjoined and restrained
from acting as an officer or director of any issuer which has a
class of securities registered pursuant to Section 12 of the

4

Exchange Act [15 U.S.C. § 78l] or which is required to file
reports with the Commission pursuant to Section 15(d) of the
Exchange Act [15 U.S.C. § 78o(d)].

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that
Benun pay, no later than September 16, 1994, the sum of:
(1) $150,000, representing disgorgement of the original amount
Benun misappropriated, and (2) $65,242.58 representing pre-
judgment interest on the $150,000 from May 1, 1990 through
September 16, 1994, for a total of $215,242.58.  Benun shall pay
the $215,242.58 to "Concord Camera Corp.," 35 Mileed Way, Avenel,
N.J., 07001, by certified or cashier's check, along with a cover
letter identifying this Court and the case caption.  Copies of
the check and the accompanying cover letter shall be
simultaneously transmitted to Jerry A. Isenberg, Principal
Assistant Director of the Securities and Exchange Commission,
Division of Enforcement, Mail Stop 4-3B, 450 Fifth Street, N.W.,
Washington, D.C. 20549.  Benun relinquishes all legal and
equitable right, title, and interest in the funds, and no part
shall be returned to Benun, his successors, or his assigns.

## VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that
Benun be assessed and shall pay, no later than January 17, 1995,
a civil money penalty pursuant to Sections 21(d)(3) of the
Exchange Act [15 U.S.C. §§ 78u(d)(3)] in the amount of $150,000.
Benun shall pay this $150,000 penalty by certified or cashier's

check made payable to the "Securities and Exchange Commission."
This payment shall be transmitted to the Comptroller, Securities
and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C.
20549, under cover of a letter that identifies Benun, the caption
and case number of this action, and the name of this Court.
Copies of the check and accompanying cover letter shall be
simultaneously transmitted to Jerry A. Isenberg, Principal
Assistant Director of the Securities and Exchange Commission, at
the same address.   At the time the funds are transmitted to the
Comptroller of the Securities and Exchange Commission, Benun
relinquishes all legal and equitable right, title, and interest
in the funds, and no part shall be returned to Benun, his
successors, or his assigns.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that the
annexed consent be, and it hereby is, incorporated herein with
the same force and effect as if fully set forth herein.

VIII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that
this Court shall retain jurisdiction of this matter for the
purposes of implementing and enforcing the terms of this Final
Judgment.

6

There being no just cause for delay, the Clerk of the Court hereby is directed, pursuant to Rule 54(b) of Federal Rules of Civil Procedure, to enter this Final Judgment forthwith.


UNITED STATES DISTRICT JUDGE


Dated: _September 13_ , 1994
Washington, D.C.


7

Received:  7/ 6/01  5:29PM;   -> Strook Strook & Lavan Management;  Page 2
07/06/01  18:07 FAX 212 528 1621      US DOCUMENT                          002

FAX NO. :                                    Apr. 07 2001 07:19AM P2

FEE ATTACHED
CHECK  CASH  ACCOUNT
OTHER
PA  DA  C
JACOBS
CHECKS  ACCOUNT
AMOUNT  #15
OVER    009

FEE ATTACHED
CHECK  CASH  ACCOUNT
OTHER
PA  DA  O
Jacobs
CHECKS  ACCOUNT
AMOUNT # 175
OVER    009

BUDD LARNER GROSS ROSENBAUM
GREENBERG & SADE, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
(973) 379-4800
Attorneys for Plaintiff
Jack C. Benun

801
CoS

Mc
DONALD P. JACOBS

| | |
|---|---|
| JACK C. BENUN,<br><br>Plaintiff,<br><br>vs.<br><br>CONCORD CAMERA CORP.,<br>a corporation of the<br>State of New Jersey,<br><br>Defendant. | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION: MONMOUTH COUNTY<br>:<br>: DOCKET NO. MON-L-1845-01<br>:<br>: Civil Action<br>:<br>:<br>: VERIFIED COMPLAINT<br>: |



PLAINTIFF'S
EXHIBIT
C-3

     Plaintiff Jack C. Benun (Benun), by his attorneys, Budd
Larner Gross Rosenbaum Greenberg & Sade, P.C., complaining of
defendant Concord Camera Corp. (Concord), states:

### NATURE OF THE ACTION

     1.  This is an action for damages arising from
Concord's failure to provide Benun with (a) agreed-upon fees to
compensate Benun for personally guaranteeing millions of dollars
of Concord's debt and (b) an agreed-upon, vested option to
purchase 50,000 shares of Concord stock. Both these claims were
fully presented and briefed in a wide-ranging arbitration

**Exhibit 3**

EXHIBIT 05

PLAINTIFF'S
EXHIBIT
NO. 95

administered by the American Arbitration Association (AAA).
However, in an opinion and award dated March 19, 2001, the
arbitrator declined to resolve these claims, ruling that he lacked
the authority to do so.

In addition, pursuant to N.J.S.A. 2A:24-7, this action
seeks modification of the arbitrator's award to correct two
errors. The award reflects an erroneous calculation of damages
and erroneously fails to provide for setoff of an amount awarded
to Benun against a larger amount awarded to Concord. Benun
applied to the AAA for modification of the award, but the AAA
refused to convey the request to the arbitrator, stating that he
has no authority to consider the request.

### The Parties

2.  Benun is, and at all relevant times was, a resident
of New Jersey, residing at 80 Wickapecko Drive, Allenhurst, New
Jersey, in the County of Monmouth.

3.  Concord, is, and at all relevant times was, a
corporation organized and existing under the laws of the State of
New Jersey. Until 1999, Concord maintained its principal
executive offices at 35 Mileed Way, Avenel, New Jersey. In or
about mid-1999, Concord moved its principal executive offices to
Hollywood, Florida. Upon information and belief, Concord no
longer maintains offices in New Jersey.

4.  This Court has personal jurisdiction over Concord

Received:   7/ 6/01  5:30PM;   -> Strook Strook & Lavan Management;  Page 4
07/06/01  18:08 FAX 212 528 1621          US DOCUMENT                              ☑004
                            FAX NO. :                    Apr. 07 2001 07:20AM  P4

because Concord initiated in 1994, and thereafter continued to prosecute, an arbitration in Somerset, New Jersey in which it asserted claims against Benun and defended against counterclaims asserted by Benun. Moreover, upon information and belief, Concord continues to transact business and take actions within the State of New Jersey, and actions taken by Concord outside of New Jersey have had a direct effect on residents of New Jersey.

### Background

5. Benun founded Concord in 1981 to design, manufacture and distribute cameras. Concord's market was initially limited to the United States, but it later expanded globally.

6. Between 1982 and 1988, Benun received no compensation from Concord, yet he personally guaranteed all of the company's bank debt. After Concord went public in July 1988, Benun entered into additional personal guarantees to enable the company to grow. If called, the personal guarantees would have caused Benun to lose his home and everything else he owned. Benun received no compensation for the personal guarantees he entered into on behalf of Concord.

7. From Fiscal Year 1986 through Fiscal Year 1993, Benun personally guaranteed millions of dollars of Concord debt. Concord's president and CEO, Ira Lampert, attached an itemization of those guarantees to an August 25, 1993 memo to members of

Received:   7/ 6/01  5:30PM;   -> Strook Strook & Lavan Management;   Page 5
07/06/01  18:08 FAX 212 528 1621        US DOCUMENT                              ☑005

FAX NO. :                               Apr. 07 2001 07:21AM P5

Concord's Stock Option Committee.

8.   Lampert's itemization shows that from Fiscal Year 1988 (when Concord went public) through Fiscal Year 1993, Benun's personal exposure on the guarantees was continuously in the millions of dollars, with high points ranging from $7,000,000 to $24,000,000.  For example, in Fiscal Year 1991, a guarantee of Concord debt caused Benun to have a maximum personal exposure of $13,400,000.  As of August 1993, Benun's maximum personal exposure was $18,976,778.

9.   On at least one occasion -- involving a threat in the middle of the night by Midlantic Bank to force Concord into bankruptcy the next morning -- Benun's agreement to personally guarantee millions of dollars of Concord debt "saved the company" from ruin, according to the arbitration testimony of David Mizrahi, the then-chairman of Concord's Stock Option Committee. The minutes of the August 29, 1993 meeting of Concord's board of directors note that Midlantic gave Benun "only several hours during the middle of the night to reach a decision" as to whether to provide a personal guarantee and that, "[b]ecause of the extremely short period in which to make a decision, Mr. Benun did not then request the Board to approve specific compensation for such guarantee."

10.  Benun had no obligation to enter into the personal

4

Received:   7/ 6/01   5:31PM;   -> Strook Strook & Lavan Management;   Page 6
07/06/01  18:09 FAX 212 528 1621        US DOCUMENT                           ☑006

FAX NO. :                                       Apr. 07 2001 07:21AM  P6

guarantees but did so to enable Concord to remain viable and grow.

11.  No other director or employee personally guaranteed any of Concord's debts or obligations during this period.  Benun implored the other officers and directors to relieve him of some of the burden by entering into personal guarantees of their own, but they all refused.

12.  By the summer of 1993, having been kept alive by Benun, Concord was finally on the brink of achieving major breakthroughs in the global market.  Concord candidly gave Benun credit for those successes.  In an August 25, 1993 memo to the Stock Option Committee that accompanied Lampert's itemization of Benun's personal guarantees, Lampert detailed highlights of Concord's recent performance, all of which were made possible by Benun's entering into the numerous personal guarantees over the years.  Those highlights included:  Concord's impending ability to market its cameras to 1.2 billion people in China; its execution of a memorandum of understanding with respect to a joint venture "which will distribute Concord cameras within the former Soviet Union"; its positioning itself for sales and distribution in Japan and South America;  its  substantial  improvement  in  earnings performance; its significant reduction in indebtedness; and its purchase of substantial fixed assets.

Received:   7/ 6/01  5:31PM;   -> Stroock Stroock & Lavan Management;  Page 7
07/06/01  18:09 FAX 212 528 1621        US DOCUMENT                          Ø007

                                                    Apr. 07 2001 07:22AM P7
                        FAX NO. :

## Concord's Agreement to Pay Guarantee Fees

13. Prior to the August 29, 1993 meeting of Concord's board of directors, Benun advised that he was unwilling to continue guaranteeing Concord's debt unless he received appropriate compensation. At that meeting, the board engaged in a full discussion of the history of Benun's guarantee efforts on behalf of the company. With specific reference to the guarantee he had recently entered into with Midlantic in the middle of the night, the board stated that even if it had had the opportunity to solicit competitive guarantee proposals, "[i]t is doubtful that proposals could in any event be acquired on anything like the terms to be offered to Mr. Benun...." The board also noted that "the guarantee fees being requested [by Benun] were not related to any employee services rendered to the Company by Mr. Benun."

14. The board then passed a resolution authorizing the payment to Benun of guarantee fees in stated percentages, including a fee "based upon the total outstanding commitments of all lenders to the Company, the repayment of which has been guaranteed by Mr. Benun." Specifically, it was

> RESOLVED, that this Board of Directors hereby authorizes the payment to Mr. Benun of guarantee fees from time to time as follows:
>
> (a) 1/2% upfront fee based upon the total outstanding commitments of all lenders to the Company, the repayment of which has

6

Received:   7/ 6/01   5:31PM;   -> Strook Strook & Lavan Management;   Page 8
07/06/01   18:09 FAX 212 528 1621        US DOCUMENT                          ☑008

FAX NO. :                              Apr. 07 2001 07:22AM  P8

been guaranteed by Mr. Benun; _provided_, _however_, that this fee shall be increased to 1% in the event that CIT does not agree within a reasonable period of time to replace the Midlantic credit facility (such decision estimated to be received within 60 days).

(b) 2 1/2% (reduced to 2% in the event the upfront fee is increased to 1%) per year, payable monthly, based upon the weighted average outstanding borrowings from all such guaranteed lenders during each such month.

(c) In the event that any lender increases its commitment or grants to the Company a new commitment and Mr. Benun is required to guarantee such increased commitment, a new upfront fee in the amount set forth in (a) above shall be paid upon delivery of such increased or new commitment.

(Emphasis in original).

15.  The board stated that those fees "constitute the only cash compensation to be paid to Mr. Benun for his past guarantees on behalf of the Company, for which he had not received any cash compensation, the Board having noted that Mr. Benun has received in the past certain stock options in partial consideration for such guarantees."

16.  Concord terminated Benun effective July 14, 1994, allegedly for cause.

17.  After his termination, Benun continued to remain exposed to millions of dollars in liability pursuant to the personal guarantees he had entered into on Concord's behalf. The

Received:   7/ 6/01   5:32PM;   -> Strook Strook & Lavan Management;   Page 9

07/06/01  18:10 FAX 212 528 1621        US DOCUMENT                        ⌐009

                                        FAX NO. :                    Apr. 07 2001 07:23AM P9

following four personal guarantees remained in effect after Benun's termination:

    (a) A guarantee to the Bank of China whereby Benun personally guaranteed between $279,000 and $308,000 in Concord debt. Benun remained exposed on that guarantee until the fourth quarter of 1995.

    (b) A guarantee to EDS whereby Benun personally guaranteed between $134,000 and $1,271,000 in Concord debt. Benun remained exposed on that guarantee until the second quarter of 1996.

    (c) A guarantee to CIT whereby Benun personally guaranteed between $187,000 and $4,357,000 in Concord debt. Benun remained exposed on that guarantee until the second quarter of 1999.

    (d) A guarantee to the Bank of East Asia whereby Benun personally guaranteed between $435,000 and $6,425,000 in Concord debt. Benun remained exposed on that guarantee until the second quarter of 1999.

18. Despite the board of directors' statement that the

8

Received:   7/ 6/01  5:32PM;    -> Strook Strook & Lavan Management;  Page 10
07/06/01  18:10 FAX 212 528 1621        US DOCUMENT                        ☑010

FAX NO. :                                        Apr. 07 2001 07:23AM  P10

guarantee fees were "cash compensation to be paid to Mr. Benun for his past guarantees" and that they were "not related to any employee services rendered to the Company by Mr. Benun." Concord has failed to pay Benun the agreed-upon fees for the guarantees that were in effect after his termination.

### The Option to Purchase 50,000 Shares

19.    As of August 1993, Benun's compensation was governed by the Benun Stock Option Plan (the Benun Plan), which provided him with options to purchase 1,400,000 shares of Concord stock.  Option A of the Benun Plan provided Benun with an option to purchase 150,000 shares of Concord stock at $5 per share.  It provided that he "shall be entitled to exercise the Option with respect to one-third of the Option A Shares commencing on July 1, 1992 and an additional one-third of the Option A Shares commencing on each of July 1, 1993 and 1994."

20.    In August 1993, as part of an adjustment of Benun's entire compensation package, Concord and Benun agreed to cancel the Benun Plan except for Option A.  They agreed that Benun would participate in an amendment and restatement of Concord's 1988 stock option plan (the Amended Plan).

21.    Concord's Stock Option Committee was responsible for considering all proposals concerning the granting of stock options.  At a meeting in August 1993, the Stock Option Committee

Received:  7/ 6/01  5:32PM;   -> Strook Strook & Lavan Management;  Page 11
07/06/01  18:10 FAX 212 528 1621       US DOCUMENT                              ☑011

FAX NO. :

Apr. 07 2001 07:24AM P11

reviewed the proposed Amended Plan and then

> RESOLVED, that the Benun Plan ... is hereby
> cancelled on an ongoing basis, except that
> <u>Option A shall continue to vest on January 1,
> 1994 with respect to 50,000 shares</u> of common
> stock at a price equal to $5.00 per share.

(Emphasis added).

22. Benun's option to purchase the 50,000 shares vested on January 1, 1994, prior to his termination in July 1994. Nevertheless, Concord asserts that all of Benun's outstanding stock options were terminated with the termination of his employment.

### The Arbitration

23. Benun's Employment Agreement required arbitration of "[a]ny disputes arising under or in connection with this Agreement." The arbitration was to be held in New Jersey in accordance with the rules and procedures of the AAA.

24. On November 17, 1994, Concord filed a Demand for Arbitration, seeking damages for alleged wrongdoing committed by Benun.

25. On December 12, 1994, Benun filed an answering statement and counterclaim. In his counterclaim, Benun alleged, among other things, entitlement "to certain rights and benefits under certain option agreements that have been improperly denied to him by the company." On December 21, 1994, Concord filed an

10.

Received:   7/ 6/01  5:32PM;   -> Strook Strook & Lavan Management;  Page 12
07/06/01  18:10 FAX 212 528 1621        US DOCUMENT

                                                              ☑012

                                            Apr. 07 2001 07:24AM  P12

                        FAX NO. :

answer to the counterclaim, denying that Benun was entitled to such rights and benefits.

26. On February 24, 1995, the parties notified the AAA that they had agreed to suspend all proceedings pending developments in a recently filed securities class action involving the parties.

27. On December 18, 1995, while the stay of the arbitration was still in effect, Benun filed suit in Middlesex County -- where Concord was then headquartered -- against Concord and Ira Hechler, a member of Concord's board of directors. In his verified amended complaint, Benun alleged that the claims asserted therein were not subject to arbitration because they did not arise under, and were not connected to, the Employment Agreement.

28. On December 29, 1995, Concord filed an answer and counterclaim in the lawsuit. The counterclaim sought (1) rescission of a voting rights agreement; (2) damages for alleged fraud committed in connection with two pledge agreements; (3) damages or other relief stemming from Benun's alleged breach of a pledge agreement; (4) compensatory and punitive damages arising from Benun's alleged fraud in inducing Concord to indemnify him with respect to certain proceedings; and (5) reimbursement of monies Concord expended on Benun's behalf pursuant to the indemnification agreements.

11

Received:  7/ 6/01  5:33PM;   -> Strook Strook & Lavan Management;  Page 13
07/06/01  18:11 FAX 212 528 1621       US DOCUMENT                               013

                                                        Apr. 07 2001 07:25AM  P13

                        FAX NO. :

29.   On January 18, 1996, Concord directed the AAA to resume the arbitration proceedings.  Concord did not move to refer to the arbitration any of the issues raised in the litigation.

30.   On March 29, 1996, during argument in the Chancery Division of a motion by Benun to stay or dismiss portions of Concord's counterclaim, Concord's counsel suggested that it would be appropriate to refer all of the parties' claims to arbitration. Judge C. Judson Hamlin agreed, holding that all of the claims asserted in Benun's amended verified complaint and in Concord's counterclaim would be dismissed without prejudice so that they could be submitted to the pending arbitration proceeding.  Judge Hamlin concluded that all of the parties' disputes were arbitrable because they would not have arisen "but for" Benun's employment with Concord.

31.   On April 18, 1996, Judge Hamlin entered an Order of Dismissal reflecting his decision.

32.   As a result of Judge Hamlin's decision and order, Benun and Concord reasonably understood that all claims between them were subject to arbitration and that so long as the arbitration continued, any further attempt to litigate issues between them would be quickly rebuffed.

33.   On April 16, 1996, Benun supplemented his claims in the arbitration by filing with the AAA the verified complaint that

Received:   7/ 6/01  5:33PM;    -> Strook Strook & Lavan Management;  Page 14
07/06/01  18:11 FAX 212 528 1621        US DOCUMENT
@014

FAX NO. :

Apr. 07 2001 07:25AM  P14

he had filed in court.

34.   On April 26, 1996, Concord filed a supplement to its arbitration demand, consisting of 11 counts.  The first five counts were identical to the claims Concord had asserted in court in its counterclaim.  In the sixth through eleventh counts (for breach of fiduciary duty, conversion and unjust enrichment), Concord alleged for the first time that Benun received unauthorized bonuses, commissions and advances, and that he received unauthorized reimbursement for travel and personal expenses.

35.   On May 30, 1996, the parties signed a Statement of Issues to Be Determined, which identified issues the parties then believed needed to be resolved in the arbitration and the order in which they should be addressed.  The parties agreed that the first phase of the arbitration would concern the propriety of Benun's termination, while the second phase would concern Concord's damages (if any) and the claims for damages and other relief asserted by Benun.  Discovery with respect to the damage (second) phase of the arbitration was stayed pending completion of the first phase.

36.   The hearing on the first phase of the arbitration did not begin until nearly three years later, on April 20, 1999. The last hearing day in that phase was May 5, 1999.

Received:  7/ 6/01  5:33PM;   -> Strook Strook & Lavan Management;  Page 15
07/06/01  18:11 FAX 212 528 1621       US DOCUMENT                     Ⓩ015

                                                          Apr. 07 2001 07:26AM P15

                          FAX NO. :

37.   On August 25, 1999, the arbitrator issued an interim award in which he concluded that Benun had defrauded Concord by "diverting and embezzling $150,000 of the Company's monies." On that basis, the arbitrator concluded that Concord had just cause to terminate Benun.

38.   In March 2000, prior to the completion of discovery in the damage (second) phase of the arbitration, Benun filed an action in the Superior Court of New Jersey, Chancery Division, Monmouth County, to vacate the interim award, disqualify the arbitrator because of evident partiality and actual bias, and require the AAA to appoint another arbitrator. Judge Clarkson S. Fisher, Jr. denied the application on the merits.

39.   Discovery in the damage phase of the arbitration continued through September 21, 2000.   In addition to interrogatories and depositions, that discovery included production of more than 5,000 pages of documents -- 2,325 by Concord and 3,046 by Benun. On the basis of that discovery, Benun continued to refine his damage claims.

40.   On September 18, 2000, two days before the deposition of Concord's Chief Financial Officer, Gary Simon, and three days before the deposition of Benun, Benun's counsel informed Concord's counsel of the claim for guarantee fees and the claim for an option to purchase 50,000 shares of Concord stock.

Received:    7/ 6/01  5:34PM;    -> Strook Strook & Lavan Management;  Page 16

07/06/01  I8:12 FAX 212 528 1621        US DOCUMENT                        ☒016

FAX NO. :                                    Apr. 07 2001 07:26AM  P16

At his deposition on September 20, 2000, Simon was questioned about those claims. Similarly, Benun was questioned about those claims at his deposition on September 21, 2000.

41. On September 27, 2000, the first hearing day of the damage phase of the arbitration, Concord's counsel objected to Benun's pursuit of the claims for guarantee fees and an option to purchase 50,000 shares of Concord stock. Concord's counsel argued that those claims should be barred because they were not specifically identified in the Statement of Issues to Be Determined filed in 1996. The arbitrator noted that "[w]hat the damages are is a relatively broad concept." He permitted the parties to submit proofs with respect to the claim for guarantee fees and the claim for an option to purchase 50,000 shares, but reserved decision on whether he had the "authority" to resolve those claims.

42. Accordingly, the parties presented proofs as to Benun's claim for guarantee fees and his claim for an option to purchase 50,000 shares of Concord stock. The parties also briefed those issues thoroughly in their post-hearing submissions. Nevertheless, in his award rendered on March 19, 2001, the arbitrator declined to resolve those claims, stating: "In this matter, there are only two (2) documents from which the Arbitrator draws his authority. The employment Agreement and the Statement

Received:  7/ 6/01  5:34PM;   -> Strook Strook & Lavan Management;  Page 17
07/06/01  18:12 FAX 212 528 1621      US DOCUMENT                          @017

FAX NO. :

Apr. 07 2001 07:27AM P17

of Issues to be Determined.  Neither document arguably includes these two disputes and I so find."

### The AAA's Refusal to Forward Benun's Request For Modification to the Arbitrator

43.  In the opinion accompanying the award, the arbitrator stated that "Concord is entitled to damages for the reasonable and necessary attorney fees paid to [specified] law firms," in an amount totaling $1,133,276.68 (emphasis added). Similarly, the award states that "Respondent Jack C. Benun shall reimburse Claimant Concord Camera Corp. for attorney fees in the amount of $1,133,246.67" (emphasis added).

44.  One of the components of this attorney fee award is the amount paid by Concord to the law firm of Hannoch Weisman (Hannoch).  The opinion and award show that in computing the total award, the arbitrator credited Concord with having paid Hannoch $341,588.57.  That computation was erroneous:  Concord's own proofs show that it paid Hannoch $311,588.54, not $341,588.57.

45.  Specifically, Concord initially claimed to have paid Hannoch $342,588.45 in attorneys' fees.  But Concord's CEO, Lampert, then testified that Hannoch wrote off billed amounts of $5,080, $24,886.36 and $1,113.55.  Concord then moved into evidence a document that states on its third page, in connection with the $24,886.36 and $1,113.55, "WRITTEN OFF BY HANNOCH."

46.  At the end of Lampert's direct examination,

16

Received:    7/ 6/01  5:34PM;    -> Strook Strook & Lavan Management;  Page 18
07/06/01  18:12 FAX 212 528 1621      US DOCUMENT                      Ø018

FAX NO. :                                        Apr. 07 2001 07:28AM  P18

Concord's counsel, John J. Rizzo, assured the arbitrator and Benun that the amount of Concord's claim would be reduced to reflect the amounts that were written off:

> MR. RIZZO: [W]e will do the math for you, Mr. Ryan. The amount that is set forth on the exhibit itself, 342[,588.45], in terms of our claim is reduced by the amounts that were previously written off.
>
> THE ARBITRATOR: I think Mr. Frazza [Benun's counsel] has that amount –
>
> MR. RIZZO: This exhibit is reduced by the amounts that he's just testified to. And in our post-trial summation we will provide you with the math.

47. No further proofs were offered or admitted as to the amounts paid by Concord to Hannoch.

48. In its post-hearing summation brief, Concord did not "do the math" accurately for the arbitrator. Instead of reducing its claim of $342,588.45 by the written-off amounts totaling $30,999.10 ($5,000 + $24,886.36 + $1,113.55) -- which would have resulted in a corrected claim of $311,589.35 -- Concord included in its brief a newly created "Schedule of Damages" that identified the amount paid to Hannoch as $341,588.57. Concord's only explanation as to why it claimed that amount, rather than the $311,589.35, appeared in a footnote placed two pages after the Schedule of Damages. In that footnote, Concord asserted:

> The legal fees of Hannoch Weisman were

17

Received:    7/ 6/01  5:35PM;    -> Strook Strook & Lavan Management;  Page 19
07/06/01  18:13 FAX 212 528 1621        US DOCUMENT                        ☑019
                                                        Apr. 07 2001 07:28AM P19
FAX NO. :

reduced after negotiation with Concord, and
in particular, Benun and Ira Lampert. The
fees of Hannoch Weisman were reduced by
$30,999.91.    (See  T156:10  to  158:18 and
T162:11-22)[.] However, the summary sheet did
not reflect this reduction of the $30,000
which Hannoch Weisman received as retainer.
Thus, the total amount sought by Concord is
$341,588.57.

49.  Notwithstanding this assertion in Concord's post-
hearing brief, Concord did not prove that it paid Hannoch any more
than $311,589.35. No proofs were offered or admitted with respect
to a $30,000 retainer, and even if there had been such proofs, a
retainer would merely have been an advance against the amounts
paid, not an amount in addition to the amounts paid. The
uncontradicted proofs -- offered by Concord itself -- showed that
Concord paid Hannoch $311,589.35, not the $342,588.45 that Concord
originally claimed at the hearing and not the $341,588.57 that
Concord claimed in its post-hearing brief.

50.  In computing the amount that Benun would be
directed to reimburse Concord for amounts it paid to Hannoch, the
arbitrator mistakenly relied upon the Schedule of Damages
contained in Concord's brief, rather than the proofs admitted at
the hearing. This was clearly a clerical or computational error;
the arbitrator could not properly have <u>intended</u> to require Benun
to "reimburse" Concord for more than it actually paid to Hannoch.
Therefore, paragraph 2 of the award should be modified to reflect

Received:   7/ 6/01  5:35PM;   -> Strook Strook & Lavan Management;  Page 20

07/06/01  '8:13 FAX 212 528 1621    US DOCUMENT                         @020

                   FAX NO. :                        Apr. 07 2001 07:29AM P20

the correct total of $1,103,277.46, rather than $1,133,246.67.

51.   There is also another aspect of the award that requires modification.  While the award correctly orders Concord to pay Benun $193,000 plus interest in repayment of a loan, it fails to provide that Benun collect that amount by setting it off against the amount to be disbursed to Concord from the Raymond James account referred to in the award.  The inadvertence of this omission is evidenced by the fact that the award provides for just such a setoff procedure with respect to the amounts awarded to Concord.

52.   Specifically, the proceeds of Benun's sale of 30,770 pledged shares of Concord stock reside in an account maintained by Raymond James & Associates, Inc. (Raymond James).  Those proceeds belong to Benun, as Concord acknowledged at the arbitration hearing, and exceed the $1,133,246.67 that paragraph 2 of the award directs Benun to pay Concord in reimbursement for attorney fees (as explained above, the amount in paragraph 2 should be $1,103,277.46).  Rather than treat Concord as an ordinary, unsecured creditor of Benun, the award permits Concord to set off the amount awarded in its favor against the amount in the Raymond James account, thus providing Concord with an immediate, cost-free way to collect the money.  The award does this through paragraph 9, which reads as follows:

19

Received:   7/ 6/01   5:35PM;   -> Strook Strook & Lavan Management;  Page 21
07/06/01 · 18:13 FAX 212 528 1621     US DOCUMENT                        ☑021

                              FAX NO. :                    Apr. 07 2001 07:29AM P21

Claimant Concord is directed to instruct Raymond James Associates Co. [sic] to disburse monies held in Concord's restrictive legend account pursuant to Respondent Benun's pledge agreement as follows:

A.   To Claimant concord [sic] for reimbursement of attorney fees awarded in Paragraph 2 of this award; and

B.    The remainder, if any, to Respondent Benun.

Respondent Benun and Claimant Concord are directed to provide Raymond James Associates with any necessary documents and to sign any necessary documents to allow for such disbursements.

53.  ·Paragraph 10 of the award requires Concord to repay a loan that it has wrongfully refused to repay since 1994.  Unlike paragraph 9, paragraph 10 makes no mention of the Raymond James account.  Paragraph 10 states:

Claimant Concord shall pay to Respondent Benun the amount of $193,000 (plus interest from 2/15/01) in repayment of the loan with interest, except that such payment is subject to a set-off, if any, against the amount of damages due Claimant Concord.

54.  Having permitted Concord, through paragraph 9 of the award, to tap the Raymond James account to satisfy the full amount of the award in Concord's favor, and having used the word "set-off" in paragraph 10, the arbitrator apparently intended to ensure that the net amount of Concord's recovery would be disbursed from the Raymond James account.  But that is not what

Received:   7/ 6/01  5:36PM;   -> Strook Strook & Lavan Management;  Page 22
07/06/01  18:14 FAX 212 528 1621          US DOCUMENT                    ☑022
                    FAX NO. :                    Apr. 07 2001 07:30AM P22

the award says.   As written, the award would result in the following three-step procedure: (1) Raymond James would disburse to Concord the $1,133,246.67 awarded in Concord's favor (an amount that should be $1,103,277.46); (2) Raymond James would disburse to Benun the remaining proceeds of the account; and (3) Benun would have to attempt to collect the $193,000 plus interest directly from Concord.

55.  Given Concord's wrongful refusal to repay the loan since 1994, Benun understandably fears that Concord will continue to refuse to pay him the money.  Conceivably, Benun would have to pursue Concord in Florida, where it is presently headquartered, to recover the $193,000 plus interest.  Since the arbitrator thought it appropriate to ensure that Concord not be treated as an ordinary, unsecured creditor of Benun, he no doubt also thought it appropriate to ensure that Benun not be treated as an ordinary, unsecured creditor of Concord.

56.  In response to the suit filed by Benun in Middlesex County in 1995, Concord asserted as an affirmative defense that "[a]ny sums due to plaintiff are set off by those amounts plaintiff owes to Concord for his wrongful acts."

57.  In a Form 8-K filed by Concord with the Securities and Exchange Commission on April 2, 2001, Concord described the arbitration award.  After noting the award of $193,000 plus

Received:  7/ 6/01  5:36PM;    -> Strook Strook & Lavan Management;  Page 23
07/06/01. 18:14 FAX 212 528 1621        US DOCUMENT                                    023
FPCM :                                    FAX NO. :                Apr. 07 2001 07:30AM P23

interest in Benun's favor, Concord's Form 8-K states: "All such amounts are subject to set off against the $1,133,246.67 that was awarded to the Company."

58. Thus, the award should be modified to permit for reciprocal setoff from the Raymond James account. Paragraph 9A should be modified to read as follows:

A. To Claimant Concord for reimbursement of attorney fees awarded in Paragraph 2 of this award, minus the amount awarded to Respondent Benun in Paragraph 10 of this award.

The remainder of paragraph 9, and the entirety of paragraph 10, would remain unchanged.

59. On April 2, 2001, Benun's counsel sent the AAA a Notification of Request for Modification of Award, together with a supporting affidavit and brief, seeking modification of the award to correct the computational error and the failure to provide for reciprocal setoff. Benun filed the application pursuant to R-48 of the AAA's Commercial Arbitration Rules, as amended and effective on September 1, 2000. That rule provides for the prompt modification of an award if it contains a clerical or computational error.

60. On April 3, 2001, the AAA faxed counsel a letter acknowledging receipt of Benun's application but refusing to forward it to the arbitrator. The AAA stated:

22

Received:   7/ 6/01  5:36PM;   -> Strook Strook & Lavan Management;  Page 24
07/06/01  18:14 FAX 212 528 1621          US DOCUMENT                              @024
                                    FAX NO. :                        Apr. 07 2001 07:31AM P24

Please be advised that the above referenced
matter was administered in accordance with
the Commercial Arbitration Rules as amended
and effective on November 1, 1993. The Rules
shall apply in the form obtaining at the time
the demand for arbitration is received by the
Association.

The November 1, 1993 Rules do not provide for
post award submissions to the arbitrator and,
since an arbitration Award is usually
considered to be final when rendered, unless
the Association is authorized by both Parties
to reinstate the authority of the Arbitrator,
it cannot be of further assistance by
conveying the request for modification to the
Arbitrator.

<u>COUNT I</u>

(Failure to Pay Guarantee Fees)

61. Benun repeats and incorporates paragraphs 1 to 60
above as if they were set forth at length herein.

62. Concord's failure to pay Benun the agreed-upon
guarantee fees for the personal guarantees in effect after Benun's
termination constitutes multiple breaches of contract.

WHEREFORE, Benun demands judgment:

(a) Requiring Concord to pay Benun the agreed-upon
guarantee fees, plus interest, for his personal guarantee to the
Bank of China, on which he remained exposed until the fourth
quarter of 1995;

(b) Requiring Concord to pay Benun the agreed-upon
guarantee fees, plus interest, for his personal guarantee to EDS,

Received:  7/ 6/01  5:36PM;    -> Strook Strook & Lavan Management;  Page 25
: 07/06/01  18:14 FAX 212 528 1621        US DOCUMENT                           ☑025
FROM :                              FAX NO. :              Apr. 07 2001 07:31AM P25

on which he remained exposed until the second quarter of 1996;

(c) Requiring Concord to pay Benun the agreed-upon guarantee fees, plus interest, for his personal guarantee to CIT, on which he remained exposed until the second quarter of 1999;

(d) Requiring Concord to pay Benun the agreed-upon guarantee fees, plus interest, for his personal guarantee to the Bank of East Asia, on which he remained exposed until the second quarter of 1999;

(e) Awarding Benun attorneys' fees, costs and such other relief as the Court deems just and proper.

### COUNT II

#### (Wrongful Termination of Stock Option)

63. Benun repeats and incorporates paragraphs 1 to 62 above as if they were set forth at length herein.

64. By declaring that Benun's vested option to purchase 50,000 shares of Concord stock terminated upon the termination of his employment, Concord breached its agreement to provide Benun with the option to purchase 50,000 shares of Concord stock.

65. On March 14, 2000, Concord announced a two-for-one stock split payable on April 14, 2000 to stockholders of record as of the close of business on March 27, 2000. Therefore, with respect to Benun's option to purchase 50,000 shares of Concord stock, the $5 exercise price became $2.50 and the 50,000 shares

24

Received:   7/ 6/01  5:37PM;   -> Strook Strook & Lavan Management;  Page 26
07/06/01  18:15 FAX 212 528 1621        US DOCUMENT                        ☒026
FROM :                          FAX NO. :                  Apr. 07 2001 07:32AM P26

became 100,000 shares.

WHEREFORE, Benun demands judgment:

(a)  Awarding Benun damages for its wrongful termination of the stock option;

(b)  Awarding Benun attorneys' fees, costs and such other relief as the Court deems just and proper.

<u>COUNT III</u>

(Modification of the Award)

66.  Benun repeats and incorporates paragraphs 1 to 66 above as if they were set forth at length herein.

67.  Paragraph 2 of the award is inaccurate because it reflects an amount paid to Hannoch by Concord that is more than the amount that was actually paid.

68.  Paragraph 9 of the award mistakenly fails to provide for reciprocal setoff.

WHEREFORE, Benun demands judgment:

(a)  Modifying paragraph 2 of the award to reflect a total of $1,103,277.46, rather than $1,133,246.67;

(b)  Modifying paragraph 9 of the award so that it reads as follows:

Claimant Concord is directed to instruct Raymond James & Associates, Inc. (Raymond James) to disburse monies held in Concord's restrictive legend account pursuant to Respondent Benun's pledge agreement as follows:

25

Received:   7/ 6/01  5:37PM;    -> Strook Strook & Lavan Management;  Page 27
07/06/01  18:15 FAX 212 528 1621        US DOCUMENT                           027
FROM :                          FAX NO. :              Apr. 07 2001 07:32AM P27

A.   To Claimant Concord for reimbursement of attorney fees awarded in Paragraph 2 of this award, minus the amount awarded to Respondent Benun in Paragraph 10 of this award; and

B.    The remainder, if any, to Respondent Benun.

Respondent Benun and Claimant Concord are directed to provide Raymond James with any necessary documents and to sign any necessary documents to allow for such disbursements.

(c)    Awarding Benun attorneys' fees, costs and such other relief as the Court deems just and proper.

## COUNT IV

(Alternative Relief With Respect to Counts I and II)

69.   Benun repeats and incorporates paragraphs 1 to 68 above as if they were set forth at length herein.

70.   If one accepts the correctness of Judge Hamlin's conclusion that any claim between the parties is arbitrable so long as it would not have arisen "but for" Benun's employment with Concord, Benun's claims for guarantee fees and an option to purchase 50,000 shares of Concord stock are arbitrable.

71.   Following the conclusion of the arbitration, the AAA has determined, based upon its construction of its controlling rules, that the arbitrator's award is "final" and that not even obvious errors can be submitted to the arbitrator for correction. The AAA has also determined that "the authority of the arbitrator" cannot be "reinstated" without the consent of both parties.

26

Received:   7/ 6/01   5:37PM;    -> Strook Strook & Lavan Management;   Page 28
07/06/01  18:15 FAX 212 528 1621            US DOCUMENT                    ☑028
3PM :                              FAX NO. :              Apr. 07 2001 07:33AM P28

72.  On September 27, 2000, the first hearing day of the damage (second) phase of the arbitration, Concord's counsel refused to consent to the submission of these two claims to the arbitration.   He added:   "As to whether they are subject to another arbitration proceeding, you do not have to reach that issue at this point."  The arbitrator never "reached that issue" and, in the words of the AAA, he no longer has the "authority" to consider any issue.

73.  As suggested by Concord's counsel, Benun's claims for guarantee fees and an option to purchase 50,000 shares of Concord stock should be decided in "another arbitration."

WHEREFORE, Benun demands judgment:

(a) Referring Benun's claims for guarantee fees and an option to purchase 50,000 shares of Concord stock to arbitration in a proceeding separate and apart from the proceedings that have concluded;

(b) Directing Benun to promptly file a Statement of Claim with the AAA with respect to those claims.

BUDD LARNER GROSS ROSENBAUM
GREENBERG & SADE, P.C.
Attorneys for Plaintiff,
Jack C. Benun

BY: _____
DONALD P. JACOBS

DATED: April 20, 2001

27

Received:    7/ 6/01  5:38PM;   -> Strook Strook & Lavan Management;  Page 29
07/06/01  18:16 FAX 212 528 1621          US DOCUMENT                          ☒029

FROM :                              FAX NO. :              Apr. 07 2001 07:33AM P29

## DEMAND FOR JURY TRIAL

Pursuant to R. 4:35-1, plaintiff hereby demands a jury trial as to Counts I and II of the Verified Complaint.

BUDD LARNER GROSS ROSENBAUM
GREENBERG & SADE, P.C.

Attorneys for Plaintiff,
Jack C. Benun

BY: _____
        DONALD P. JACOBS

DATED:  April 20, 2001

28

Received:    7/ 6/01   5:36PM;    -> Strook Strook & Lavan Management;   Page 30
07/06/01  18:16 FAX 212 528 1621         US DOCUMENT                              ☒030
FROM :                                   FAX NO. :              Apr. 07 2001 07:34AM P30

## VERIFICATION

1.  I am Jack C. Benun, the plaintiff in this matter.

2.  I have read the foregoing Verified Complaint, and to the best of my personal knowledge and based upon documents referred to therein, the facts set forth in the Verified Complaint are true, and they are incorporated in this Verification by reference.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made me are willfully false, I am subject to punishment.

DATED:  April 17th, 2001

————————————
JACK C. BENUN

Received:   7/ 6/01  5:38PM;   -> Strook Strook & Lavan Management;  Page 31
C7/06/01  18:16 FAX 212 528 1621          US DOCUMENT                    031

FROM :                          FAX NO. :               Apr. 07 2001 07:34AM P31

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding. No other action or arbitration proceeding is contemplated except to the extent that a new arbitration may be ordered by this Court, as requested in Count IV hereof, in which event the parties would be Jack C. Benun and Concord Camera Corp. No non-party should be joined in this action.

BUDD LARNER GROSS ROSENBAUM
GREENBERG & SADE, P.C.

Attorneys for Plaintiff,
Jack C. Benun

BY: _____
        DONALD P. JACOBS

DATED:   April 20, 2001

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:5-1(c), plaintiff Jack C. Benun hereby designates Peter J. Frazza as his trial counsel.

BUDD LARNER GROSS-ROSENBAUM
GREENBERG & SADE, P.C.

Attorneys for Plaintiff,
Jack C. Benun

BY: _____
        DONALD P. JACOBS

DATED:   April 20, 2001
321148