UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                              . Case No. 03-26565
                                    .
                                    .
   JAZZ PHOTO CORP.,                .
                                    . 50 Walnut Street
                                    . Newark, New Jersey 07102
                    Debtor,         .
                                    . October 21, 2003
. . . . . . . . . . . . . . . . 9:34 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE MORRIS STERN
UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Debtor:                Cole, Schotz, Meisel, Forman
                                 & Leonard, P.A.
                               By:  MICHAEL SIROTA, ESQ.
                                    STUART KOMROWER, ESQ.
                                    FRANCK CHANTAYAN, ESQ.
                               Court Plaza North
                               25 Main Street
                               P.O. Box 800
                               Hackensack, New Jersey 07602-0800

                               Kaplan & Gilman
                               By:  JEFFREY KAPLAN, ESQ.
                               900 Route 9 North
                               Woodbridge, New Jersey  07095

Audio Operator:                Carol Urena

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No.   (609) 587-3599**

2

APPEARANCES (Cont'd.):

For Rosenthal:     Kirkpatrick & Lockhart
By: ELIZABETH SINGER, ESQ.
599 Lexington Avenue
New York, New York 10022-6030

For Jack Benun:     Riker, Danzig, Scherer, Hyland &
 Perretti, LLP
By:  DENNIS J. O'GRADY, ESQ.
  STEPHEN J. AMORIELLO, ESQ.
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ  07962

For the Trustee:    Office of the U.S. Trustee
By:  MARGRET JUROW, ESQ.
One Newark Center
Suite 2100
Newark, NJ 07102

For Fuji Photo:     Lowenstein Sandler, PC
By:  BRUCE D. BUECHLER, ESQ.
  JASON TEELE, ESQ.
65 Livingston Avenue
Roseland, NJ 07068

Stroock & Stroock & Lavan, LLP
By:  LAWRENCE ROSENTHAL, ESQ.
  LISA JAKOS, ESQ.
  MATTHEW W. SIEGAL, ESQ.
180 Maiden Lane
New York, NY  10038

For Creditors Committee:  Ravin Greenberg PC
By:  HOWARD S. GREENBERG, ESQ.
  SHERYLL S. TAHIRI, ESQ.
101 Eisenhower Parkway
Roseland, New Jersey 07068

### I N D E X

**WITNESSES:**                                                        **PAGE**
JAMES P. FIELD
   Direct Examination by Ms. Jakos                          30
   Continued Direct Examination by Ms. Jakos                67
   Cross Examination by Mr. Kaplan                          111
   Cross Examination by Mr. Greenberg                      133
   Redirect Examination by Ms. Jakos                       139
   Recross Examination by Mr. Kaplan                       152
   Further Redirect Examination by Ms. Jakos               155
   Recross Examination by Mr. Greenberg                    157
   Examination by the Court                                158

PETER GOODE
   Direct Examination by Mr. Siegal                        164
   Cross Examination by Mr. Sirota                         197
   Redirect Examination by Mr. Siegal                      215

FONG PO LAW
   Direct Examination by Mr. Siegal                        220
   Cross Examination by Mr. Sirota                         247

| **EXHIBITS** | **I.D.** | **EVD.** |
| --- | --- | --- |
| Debtor's Exhibit Binder | -- | 20* |
| D-30 Depo transcript - Mr. Fong - 10/17 | 18 | 18 |
| D-31 Depo transcript - Mr. Goode - 10/17 | 18 | 18 |
| Fuji's Binder | -- | 20** |

*All exhibits stipulated to and in evidence except exhibits 11
through 16.
**All exhibits stipulated to and in evidence.

4

1          THE COURT:  Court is now in session.  The scheduled

2   matter will be heard and fully considered.  Jazz Photo, the

3   motion to appoint a trustee.  Appearances, please.

4          MR. SIROTA:  Judge, good morning.  Michael Sirota,

5   Stuart Komrower, and Franck Chantayan on behalf of the debtor.

6   Cole, Schotz, Meisel, Forman, and Leonard.

7          MR. GREENBERG:  Good morning, Your Honor.  Howard S.

8   Greenberg and Sheryll S. Tahiri, Ravin Greenberg, and we appear

9   for the Creditors Committee.

10          MS. JUROW:  Margaret Jurow for the United States

11   Trustee.

12          MR. O'GRADY:  Good morning, Your Honor.  Dennis

13   O'Grady and Steve Amoriello of Riker, Danzig, Scherer, Hyland,

14   and Perretti representing Mr. Benun.

15          MS. SINGER:  Good morning, Your Honor.  Elizabeth

16   Singer from Kirkpatrick and Lockhart on behalf of Rosenthal and

17   Rosenthal.

18          MR. KAPLAN:  Your Honor, Jeff Kaplan from Kaplan and

19   Gilman?? for Jazz Photo.

20          MR. ROSENTHAL:  Your Honor, Lawrence Rosenthal of

21   Stroock and Stroock and Lavan of New York.  Present with me are

22   Lisa Rudden -- Lisa Jakos Rudden and Matthew Siegel.

23          MR. BUECHLER:  Bruce Buechler and Jason Teele from

24   Lowenstein Sandler co-counsel to Fuji Photo Film.

25          THE COURT:  All right.  Who's going to present the

**J&J COURT TRANSCRIBERS, INC.**

1  movant's case?

2              MR. BUECHLER:  Mr. Rosenthal to start.

3              THE COURT:  Mr. Rosenthal.

4              MR. ROSENTHAL:  Your Honor, at the end of the day

5  this is a factually-implicated matter.  Putting aside the

6  statements against counsel and client in the reply or the

7  answering papers, the case turns on the facts, and on an issue

8  which we will submit a brief the case can be decided on

9  circumstantial evidence.  I don't need to find a witness who

10  watches Mr. Benun walk away with a bag of money.  All of the

11  elements of this case can be decided under circumstantial

12  evidence and matters what we contend exists here.

13              In fact, we contend that the smoking gun is the

14  accumulated sum of the evidence in this case, so we propose to

15  get right -- cut right to the quick and start presenting to

16  Your Honor the evidence -- the proofs.

17              THE COURT:  May I ask you something?  And I

18  appreciate that approach.  I think we ought to just get

19  witnesses who traveled and get them on and hear what they have

20  to say, but I do want to direct the parties' attention to some

21  questions that I have.  I don't mean to indicate that these are

22  exclusive areas of concentration of the Court, but let me ask

23  you, Mr. Rosenthal, do you intend to challenge Mr. Benun's

24  position?  It's in several places, but if we take the brief of

25  the debtor -- the memorandum summarizing the evidence at page

6

1             THE COURT:  Court is now in session.  The scheduled

2  matter will be heard and fully considered.  Jazz Photo, the

3  motion to appoint a trustee.  Appearances, please.

4             MR. SIROTA:  Judge, good morning.  Michael Sirota,

5  Stuart Komrower, and Franck Chantayan on behalf of the debtor.

6  Cole, Schotz, Meisel, Forman, and Leonard.

7             MR. GREENBERG:  Good morning, Your Honor.  Howard S.

8  Greenberg and Sheryll S. Tahiri, Ravin Greenberg, and we appear

9  for the Creditors Committee.

10            MS. JUROW:  Margaret Jurow for the United States

11  Trustee.

12            MR. O'GRADY:  Good morning, Your Honor.  Dennis

13  O'Grady and Steve Amoriello of Riker, Danzig, Scherer, Hyland,

14  and Perretti representing Mr. Benun.

15            MS. SINGER:  Good morning, Your Honor.  Elizabeth

16  Singer from Kirkpatrick and Lockhart on behalf of Rosenthal and

17  Rosenthal.

18            MR. KAPLAN:  Your Honor, Jeff Kaplan from Kaplan and

19  Gilman for Jazz Photo.

20            MR. ROSENTHAL:  Your Honor, Lawrence Rosenthal of

21  Stroock and Stroock and Lavan of New York.  Present with me are

22  Lisa Rudden -- Lisa Jakos Rudden and Matthew Siegal.

23            MR. BUECHLER:  Bruce Buechler and Jason Teele from

24  Lowenstein Sandler co-counsel to Fuji Photo Film.

25            THE COURT:  All right.  Who's going to present the

7

1   make a difference to you?

2           MR. ROSENTHAL:  No, Your Honor, and let me explain.

3           THE COURT:  So what would your argument be if I found

4   the numbers to be roughly correct?

5           MR. ROSENTHAL:  Your Honor, there is a profit that

6   rested and assets that rested in Jazz Hong Kong independent of

7   all else.  We will show you, for example, in the exhibits put

8   forward by the debtor himself invoices for cameras from third

9   parties at a dollar 25, and the -- one of the legs upon which

10  our motion stands is that there was a moment in time before the

11  bankruptcy, in fact, before and up to the bankruptcy, starting

12  some time in the end of 2002 when the jury came in with its

13  verdict that there was a thriving entity called Jazz Hong Kong,

14  who made money, and, in fact, perhaps visually made most of the

15  money that the entire consolidated company made.

16          THE COURT:  That's virtually conceded.

17          MR. ROSENTHAL:  And --

18          THE COURT:  Am I not right?  I mean we've moved from

19  four cents to 36 cents or so in U.S.

20          MR. ROSENTHAL:  But the entire premise upon which

21  that argument is made is that a dollar 88 is what it cost to

22  make the camera, and there is a profit in here, and these

23  cameras were largely made pre this shift by wholly-owned

24  subsidiaries of Jazz Hong Kong what are called the WOFEs.

25  There was one affiliated with a company called Pengji and

**J&J COURT TRANSCRIBERS, INC.**

1  another one affiliated with a company called Ever Best, and

2  those are wholly-owned entities to which substantial sums were

3  invested for the purpose of --

4           THE COURT:  Wholly-owned by?

5           MR. ROSENTHAL:  Jazz Hong Kong, and were part of the

6  asset body of Jazz Hong Kong.  They took money, and they

7  invested it.

8           THE COURT:  But as I understand it, the argument that

9  Poly-Tech is set up in a free trade zone, apparently was able

10  to operate.  Again, I'm -- this appears to be the allegation --

11  was able to operate at lower costs, and so they were able to

12  supply Jazz U.S. at roughly the same price that Jazz Hong Kong

13  -- that they were supplying Jazz Hong Kong or that Jazz Hong

14  Kong was being supplied at.

15          MR. ROSENTHAL:  But I think, as I said before, Your

16  Honor, first of all, we shouldn't be over focusing on the

17  concept of free trade zone.  There were not duties involved

18  with these products under any circumstances.  So there was no

19  apparent financial advantage other than a claim ease of

20  operation.

21          Second of all, the -- one has to assume in that

22  analysis that says that all be well, that there isn't a profit

23  on the other side of --

24          THE COURT:  In Poly-Tech.

25          MR. ROSENTHAL:  In Poly-Tech.  Poly-Tech --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That should've been -- should've belonged

2     to Jazz U.S. now.

3          MR. ROSENTHAL:  Exactly.  Actually should've belonged

4     to Jazz U.S.'s wholly-owned subsidiary and its wholly-owned

5     subsidiaries, and, therefore, was an asset of Jazz U.S., and I

6     think that there was a conscious effort to eliminate access to

7     those funds -- those monies at the -- on the run up to the

8     bankruptcy, and I think Your Honor will hear the evidence, and

9     I think it will show that, first of all, there were two Poly-

10    Tech's, and you also can't lose sight of that.  There's the

11    Poly-Tech organized in April of 2002 for mystical purposes, and

12    then there's the Poly-Tech wholly-owned subsidiary, mind you,

13    not owned by Mr. Lau necessarily but wholly owned by the Poly-

14    Tech in Hong Kong.  This Kitty Wong entity which doesn't seem

15    to have much of a life or a revenue stream, that entity is the

16    sole proprietor, as best public records could reveal, of the

17    factory in Hong Kong.  So there is a chain of events which I

18    think Your Honor will -- when treated as a whole would -- can

19    only be described as a transferring of the assets of the debtor

20    in anticipation of where we are today, which is --

21         THE COURT:  But if I were to turn a blind eye -- and

22    I'm not saying I will -- to all of the factors running up, that

23    there was an ongoing litigation, that both Jazz Hong Kong and

24    Jazz U.S. and Mr. Benun were at risk in that litigation before

25    Judge Hochberg -- if I were to ignore that for the moment --

1  again, I'm not saying I will ultimately but -- and Jazz U.S.

2  were able to find a cheaper source -- cheaper than its own

3  subsidiary and were able to take -- essentially collapse the

4  profit or take the profit out of China and bring it into the

5  U.S., would there be something fundamentally wrong with that?

6          MR. ROSENTHAL:  Your Honor, there would not be

7  provided the entity that is created is not also taking for

8  itself a profit that belongs to the family of companies.  The

9  savings I guess --

10          THE COURT:  Well, wait a minute.  Wait a minute.  Let

11  me just go to that.  It's one thing to say Mr. Benun secretly

12  owns Poly-Tech.  If you can prove that or establish through

13  strong circumstantial evidence that he has an interest in it,

14  that's one thing, but it's something else to say that if

15  there's any profit in a supplier who supplies the system at a

16  lower price, then that is some sort of a fiduciary breach.  I

17  have trouble understanding that.  All outsourcing would be

18  questioned on that basis for every U.S. enterprise.

19          If, again,  ignoring the immediate circumstances of

20  the action before Judge Hochberg, if Jazz U.S. looked around

21  and found XYZ Company in wherever -- Iceland -- and that

22  company could supply product at a lesser price, so that the 36

23  cents or 40 cents or whatever could be realized by Jazz U.S.

24  and they chose to do it, where would -- even if the Iceland

25  company were making a profit, what would be wrong with that in

11

1  terms of management by Jazz U.S.?

2          MR. ROSENTHAL:  The way you framed the question, Your

3  Honor, unfortunately that's not the situation we have here.  We

4  have, for example, Jazz Hong Kong still there with employees

5  and spending money, servicing and keeping, enabling the Poly-

6  Tech and Jazz U.S. to function at no compensation.  The fees

7  that were left and the profit still left in Hong Kong, some of

8  them went to support the unit, you described it, Your Honor.

9          I would also point out that that's not the only leg

10 of our claim, but normally I would agree with you that seeking

11 a lower price operation would certainly be commendable under

12 normal circumstances.  Here the lower-priced entity is just a

13 preacher not an independent entity -- just a preacher of either

14 Mr. Benun or the -- or Jazz U.S., and here the way it came to

15 be generates serious issues about the transfer of assets that

16 belong to the debtor.

17         THE COURT:  Assets -- you mean the setup costs, or

18 you're talking about the future profit -- today's profit?

19         MR. ROSENTHAL:  Your Honor, there are several assets

20 involved here.  The first is the setup cost.  The very creation

21 of this factory was entirely funded by Jazz.  The second aspect

22 is the transfer of the profit, because I don't believe anybody

23 functions as a charity.  There's a profit in the manufacture,

24 there's a profit in the middle man in Jazz Hong Kong, and

25 there's a profit in Jazz U.S., although to tell the truth, the

1  prices in which Jazz U.S. is selling, I don't think there can

2  ever be a profit no matter what they do, but they commendably

3  perhaps organized the WOFEs in order to try and capture the

4  manufacturing profit.  That's what they did, and they -- that

5  arrangement is -- has now been substituted to a second

6  arrangement where the manufacturing profit is no longer in this

7  enterprise, looking at it in a global view.  That manufacturing

8  profit is somewhere in Hong Kong or China, and with zero -- and

9  I emphasize zero -- transparency as to what's going on, because

10  what we have here is this company appears to be functioning

11  using the raw materials that were purchased before by the unit

12  -- the film, the shells -- and there are questions about the

13  prices at which the shells are being purchased, but the bottom

14  line though is that there is just no accounting, absolutely

15  zero accounting is what's going on.

16         In Jazz Hong Kong there was a concession throughout

17  these proceedings that Jazz Hong Kong is an arm of Jazz U.S.

18  If we wanted discovery, for example, on an infringement issue,

19  all we have to do is ask, and never once, to Jazz's credit, was

20  the argument made that we couldn't have discovery of Jazz Hong

21  Kong, because they're an independent third party located in

22  Hong Kong.  That was never the issue.  The issue always was how

23  can I -- I should produce the documents.  What do they need?

24         Now all of the activities are now hiding in another

25  entity which we contend, as I said, is created not to take

**J&J COURT TRANSCRIBERS, INC.**

1  advantage of any profit, because at the end of the day the

2  costs remain pretty much the same.  What happens here is that

3  it has the appearance of being more profitable, because we have

4  20 people working in Hong Kong for nothing and performing all

5  the overhead functions, and in any event, it's not spilling off

6  enough to cover the overhead in any meaningful way.  So I think

7  that's --

8          THE COURT:  But if it weren't a cost -- and I guess

9  that will have to be established -- that works it way back to

10  the debtor, that is cost in maintaining Jazz Hong Kong, and my

11  recollection is the discussion of Jazz Hong Kong's function to

12  turn to quality control, but leaving that out for the moment,

13  though I'm sure there's a business argument that will be made

14  that a presence in Hong Kong by Jazz U.S. is necessary and

15  whether it's their subsidiaries' people or individuals sitting

16  there as quality control people or controllers of the flow of

17  product, whatever it is, that's a business issue.

18          But for me I think the question is a little

19  different.  It looks like Jazz U.S. has suddenly become

20  enormously profitable.  It's gotten a ninefold increase in its

21  gross profit on the single use cameras.

22          MR. ROSENTHAL:  Commensurate with a meaningful

23  percentage decrease in selling price.  Essentially very

24  interesting except that they're not making a profit, and that

25  brings into question -- that's another issue in front of this

14

1  Court.  They, in fact, did not -- whatever this gap -- this so-

2  called windfall, they are not making a profit.

3        THE COURT:  Shouldn't I say that your complaint was

4  with the situation that was before in terms of management?  Now

5  this is a better management program for the debtor?  That

6  they're -- that Jazz U.S. is getting products at a lesser price

7  than they were charged before even though it was their own

8  subsidiary?

9        MR. ROSENTHAL:  I am not convinced, and I --

10        THE COURT:  So we're back to the factual question,

11 but if that were the case, isn't it better management?  Isn't

12 that an improvement in the Chapter 11 for the debtor?

13        MR. ROSENTHAL:  Your Honor, I think under the

14 circumstances here, no, and I think the reason is that we have

15 no -- the reason is the missing profits.  There are other

16 profits in this chain, and as I said before, the debtor

17 commendably tried to capture as many of those profits as it

18 could by controlling as many of the stages of the process as it

19 could and --

20        THE COURT:  But in a risky business -- I mean is it

21 fraud that they out sourced, or is it fraud, because they have

22 a secret interest in Poly-Tech through Mr. Benun?  Which is it

23 or both?

24        MR. ROSENTHAL:  Your Honor, from --

25        THE COURT:  Fraud.  I'm focusing on that.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENTHAL:  On the word fraud.  Your Honor, I

2     think it's fraud in the way that Poly-Tech is structured and

3     the way that they are financing --

4          THE COURT:  Because of Mr. Benun's interest or

5     because Jazz U.S., whether through Jazz Hong Kong or directly,

6     set up Poly-Tech as a supplier?

7          MR. ROSENTHAL:  Because of the way it's functioning.

8     Your Honor, I think --

9          THE COURT:  I'm not clear on that.

10          MR. ROSENTHAL:  All right.  The fraud is in the

11     functioning.  The evidence will reveal that Poly-Tech -- we

12     have surmised, interestingly enough by Mr. Benun, who knows

13     apparently what's going on, or we can suspect, as to what

14     exactly Poly-Tech is doing, buy it is truly a business as usual

15     in the sense the raw material for the camera -- there are

16     several constituents.  There's the shell.  There's the film.

17     There's the packaging.  They all seem to be, at least as we can

18     perceive it here -- not seem to be, they are still being bought

19     and paid for by the company here in the United States and

20     coming back as a finished product, and somewhere between those

21     two is a profit, and somebody is making that profit, and we

22     contend that that somebody is whoever truly controls Poly-Tech,

23     and we believe that that somebody is Mr. Benun.

24          THE COURT:  Okay, but you've just -- so it's Mr.

25     Benun.  If it's proven that Mr. Benun has no relationship at

1    all to Poly-Tech -- if it were proven -- would that be the end

2    of your argument as to that point?

3              MR. ROSENTHAL:  If Poly-Tech were truly an

4    independent entity --

5              THE COURT:  Yes.

6              MR. ROSENTHAL:  -- I think that would be the end of

7    that argument.

8              THE COURT:  That's what I was trying to get to.  All

9    right.

10             MR. ROSENTHAL:  Your Honor, that's -- I was trying to

11   say that if this were truly an independent --

12             THE COURT:  And now who has the burden of

13   establishing Mr. Benun's connection to Poly-Tech?

14             MR. ROSENTHAL:  We do, Your Honor.

15             THE COURT:  All right.  Okay.  We can begin.

16             MR. SIROTA:  Judge, before we begin --

17             THE COURT:  Yes?  I'm sorry.  I --

18             MR. SIROTA:  -- can I just attend to a housekeeping

19   issue --

20             THE COURT:  Oh, absolutely.

21             MR. SIROTA:  -- so that we're all on the same page?

22   Fortunately, to try to lessen the torment to the Court and the

23   parties, we agreed this morning on a stipulation regarding --

24             THE COURT:  Did I bring your stipulation here?

25             MR. SIROTA:  I --

                    **J&J COURT TRANSCRIBERS, INC.**

1           MR. BUECHLER:  We gave the original, Your Honor, to

2    your Clerk.

3           MR. SIROTA:  I have an extra copy if you'd like.

4           THE COURT:  Yes, I think I left it on the table.  I

5    did review it.

6           MR. SIROTA:  May I approach?

7           THE COURT:  Yes.  Thanks.

8           MR. SIROTA:  And basically, Judge, I think you were

9    delivered two packages.  One from Fuji which had I believe

10   three or so binders which summarized their evidence, and then

11   we delivered a binder yesterday, which was captioned "Debtor's

12   Exhibits in Opposition," and that -- what that stipulation

13   provides is that we stipulate to the admission of evidence as

14   to Fuji's three binders.  Our view of this case is whatever

15   they wanted and proposed to put into evidence, we welcomed, and

16   that we did the same thing with respect to the discovery they

17   requested.  Given the very serious nature of these allegations,

18   there was no time to bicker over fine rules of evidence.

19          And with respect to our exhibits, Fuji has stipulated

20   to all except the 11, 12, 13, 14, 15, and 16.  Basically, they

21   did not stipulate to the admission of Mr. Benun's supplemental

22   affidavit and the exhibits contained therein, and we will

23   address that.

24          THE COURT:  But it's only the Benun supplemental

25   affidavit.

1          MR. SIROTA:  Everything else was stipulated to and is

2   in evidence, and there are two add on's, Judge, just so that

3   we're all on the same numbering.  D-30 we'd like to add on in

4   our exhibit binder.  It would be the deposition transcript of

5   Mr. Fong, and D-31 is the deposition transcript of Mr. Good,

6   which has also been stipulated and moved into evidence, and

7   that these numberings are all set forth in our binder that we

8   delivered, and if Your Honor needs another set, I have it.

9          THE COURT:  Yes, I just made a copy.  Let me just get

10   my ducks in a row, if I may.  Just give me one minute.

11                          (Pause)

12          THE COURT:  All right, Mr. Sirota, if I can just

13   account a little bit.

14          MR. SIROTA:  Sure.

15          THE COURT:  In your debtor's exhibits in opposition

16   D-30 -- do we have a supplement that --

17          MR. SIROTA:  No, we don't.  We agreed on it this

18   morning.  Those depositions --

19          THE COURT:  Okay.  All right, so let me write that

20   in.  What's D-30?

21          MR. SIROTA:  D-30 is the October 17th deposition

22   transcript of Mr. Fong, F-o-n-g, and D-31 is the October 17th

23   deposition transcript of Mr. Peter Goode, G-o-o-d-e, and if

24   Your Honor will just note that D-11 through 16 has not been

25   stipulated to, and the balance of what Your Honor has in our

**J&J COURT TRANSCRIBERS, INC.**

19

1   binder is in evidence per that stipulation.

2          THE COURT: Okay. That's very helpful.

3          MR. SIROTA: And, Judge, I'm not going to take the

4   opportunity at this point to respond to Mr. Rosenthal's very

5   brief opening comments. Our view of the case is that when the

6   evidence goes in, Your Honor will be left with the same

7   impression we're left with, and that is there is absolutely no

8   support whatsoever, circumstantial or otherwise, to prove the

9   extraordinarily serious allegations made against this debtor

10  and Mr. Benun, and we'd like to move forward with the evidence,

11  so we can put this behind us.

12         THE COURT: All right. Thank you.

13         MR. ROSENTHAL: Your Honor, I sensed I thought in Mr.

14  Sirota's comment an application to receive in evidence the

15  exhibits that have been agreed to, and I actually move -- in

16  order to save time as we go, move into evidence the exhibits in

17  the binders which -- the sub-set of the original selection, and

18  I have here an exhibit list entitled, "Confidential Exhibits in

19  Support of Fuji's Motion to Appoint a Trustee," which is the

20  volumes that Your Honor was handed, and I move the admission of

21  these exhibits in light of our stipulation.

22         THE COURT: I appreciate it. Let me just make sure

23  that we are again on the same page. That's an exhibit list of

24  six pages. Your numbering system runs through 100's and starts

25  at exhibit 100 and ends at 888, Jazz Operating monthly report.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. ROSENTHAL:  That's correct, Your Honor.

2            THE COURT:  All right.  Mr. Sirota, I assume that

3   pursuant to the stipulation there's no objection.

4            MR. SIROTA:  There's no objection.  Both sides'

5   binders are respectively in evidence.

6            MR. ROSENTHAL:  I have no problem.  In fact, I

7   thought that's what he was doing, Your Honor.

8            THE COURT:  What we will do is have Carol Mark the

9   exhibit lists, and we'll go from there.  All right.

10           MR. ROSENTHAL:  Thank you, Your Honor.

11           MR. SIROTA:  Thank you, Judge.

12           MR. ROSENTHAL:  Your Honor, as our first witness we

13  call Jim Field, who is an employee of Fuji's Greenwood, South

14  Carolina manufacturing subsidiary, and Mr. Field will be

15  examined by Ms. Lisa Jakos Rudden.

16           THE COURT:  Carol, would you swear the witness,

17  please?

18           MS. URENA:  Raise your right hand.

19               JAMES P. FIELD, FUJI'S WITNESS, SWORN

20           MS. URENA:  Please state your name for the record.

21           MR. FIELD:  James P. Field.

22           MS. JAKOS:  Good morning, Your Honor.  May it please

23  the Court.  My name is Lisa Jakos Rudden.  As a preliminary

24  matter, we would like to offer to the Court all of the cameras

25  that Mr. Field has examined for his analyses that have been

**J&J COURT TRANSCRIBERS, INC.**

1  reviewed in the various reports, are actually in a van outside.

2  We didn't want to burden the Court with boxes and boxes of

3  cameras, however, if the Court would like to receive them, we

4  have them available to be received.  What we've done is we

5  brought one set in of the cameras which we'll use during

6  examination of Mr. Field today.

7            THE COURT:  Were these available to the debtor?

8            MS. JAKOS:  Yes, they were, and they were examined

9  during Mr. Field's deposition last week by Mr. Kaplan, so --

10 and they were made available for a couple of days last week,

11 and that offer was made for Mr. Kaplan to come back if he

12 wanted to further review the cameras, that they were available

13 in our offices, and they will continue to be available in our

14 offices if the Court does not wish to have them in their

15 storage room.

16           THE COURT:  Well, I think you better hang on to them.

17           MS. JAKOS:  Okay.

18           THE COURT:  Just knowing what happens around here,

19 somebody may just take one out just to see what it's like not

20 with any ill motive, but it's a -- what do you intend to do

21 with these?  Just have it available?  Is that your point?

22           MS. JAKOS:  Yes.  I mean these are the cameras that

23 Mr. Field reviewed, so in the event that the Court --

24           THE COURT:  So if there's a question that the Court

25 raises or on cross examination, we can at least look at this

**J&J COURT TRANSCRIBERS, INC.**

1 and get some idea of what he saw and what he examined. All

2 right. Fine.

3      MS. JAKOS: Yes. Also, as another preliminary

4 matter, Your Honor, understand that exhibits 400, 401, 402, and

5 403 are not part of the stipulation which was just entered by

6 the parties, and these are transcript -- excerpts of

7 transcripts from the testimony of Mr. Ogura, Mr. Kroger, Mr.

8 Field, and Mr. Walde from the District Court of New Jersey

9 action, and they provide background, so that we could shorten

10 some of Mr. Field's testimony in some of the areas relating to

11 production and origination of manufacture and those issues. So

12 I would ask to move Fuji exhibits 400, 401, 402, and 403 into

13 evidence at this time as well as Fuji exhibit 404 which is a

14 chart of production which was also used and admitted in the

15 District Court case as plaintiff's exhibit 627.

16      THE COURT: Mr. Sirota.

17      MR. SIROTA: Well, Mr. Kaplan is going to address the

18 particular nuances, but I can generally state that the debtor

19 will not stipulate or consent for the very reason that entire

20 procedure was set out where Fuji was obligated in its October

21 memorandum to put before this Court its entire case, all of its

22 exhibits, all of its evidence, and present it to us for our

23 consideration.

24      MR. KAPLAN: Your Honor, I might add that at Mr.

25 Field's deposition, which I took last week -- and if I have a

**J&J COURT TRANSCRIBERS, INC.**

23

1   moment, I'm sure I can find it.  After we examined him we

2   specifically asked him -- I think it was twice -- is there

3   anything else you'll be using or testifying about at the

4   hearing on October 21st other than what we've discussed, and he

5   said, no, everything's been discussed.  These exhibits -- this

6   is the first I've ever heard -- I've never seen -- other than

7   they were in the District Court, I was there, but I don't know

8   what it is they're offering or how it relates to any of this.

9   The first I'm hearing is it right now that they're planning to

10  offer these.  10:06:45 figure out if I need to go depose

11  somebody to cross examine that testimony.

12          THE COURT:  Can you make a proffer on this?

13          MS. JAKOS:  Your Honor, the testimony contained in

14  exhibits 400 through 404 merely support exhibits that are

15  already admitted into evidence.  I can give you an example

16  which is Fuji exhibit 405, which discusses -- which is an

17  exhibit that has a diagram of a type one Fuji camera and it has

18  other information on it that was testified to at the District

19  Court trial by Mr. Ogura and Mr. Kroger, so this is merely

20  background testimony to shorten Mr. Field's testimony here

21  today.  These exhibits are already admitted, so I don't

22  actually --

23          THE COURT:  It's hard for me to assess what is in

24  there.  If it's background, maybe we can just skip it until it

25  becomes critical if you think it becomes critical, and then we

                    **J&J COURT TRANSCRIBERS, INC.**

1  can revisit it.

2          MS. JAKOS:  All right, and --

3          THE COURT:  So let's leave it out.  Mr. Rosenthal?

4          MR. ROSENTHAL:  I would just observe that -- let me

5  make two observations, Your Honor.  First of all, at the

6  request of Mr. Sirota, a part of the stipulation is that the

7  defendant could use --

8          THE COURT:  Fuji reserves the right to seek admission

9  of other evidence, deposition excerpts and testimony to which

10 there is no stipulation.

11         MR. ROSENTHAL:  All right.  If we turn to the top of

12 page three, Your Honor?

13         THE COURT:  Yes.

14         MR. ROSENTHAL:  Item Roman 12 --

15         THE COURT:  Right.

16         MR. ROSENTHAL:  -- is excerpts from the United States

17 District Court of New Jersey trial, which Mr. Sirota asks for

18 permission to receive, and I agreed, and the four exhibits --

19 the first four exhibits that are at issue here are just that --

20 excerpts of the testimony at the District Court trial by

21 witnesses whom Jazz -- and Mr. Kaplan was one of co-counsel --

22 had an opportunity to cross examine.  This was the evidence

23 that was heard as background by the jury and Judge Hochberg in

24 receipt.  So I would divide this issue into two parts.  The

25 chart is a variation out of a piece of evidence that was

**J&J COURT TRANSCRIBERS, INC.**

1 received in the District Court trial, but I think we have to

2 reach that one when we reach it.

3           THE COURT:  Okay.

4           MR. ROSENTHAL:  But I think the transcripts -- the

5 text of the transcripts, which is what the other exhibits are,

6 are part and parcel of a stipulation.  We can go forward

7 without it, but I would commend to the Court --

8           THE COURT:  I'm confused about your reference to

9 excerpts at 12:00.  That's the -- what the debtor can admit

10 into evidence.

11           MR. ROSENTHAL:  Yes.  No, I understand, but what I'm

12 saying is that the debtor has already reserved to himself the

13 right to dip into the transcripts of the District Court action

14 and, therefore, has no objection to the use of that transcript,

15 and I think that that does separate this particular issue.

16           THE COURT:  Let me just -- maybe it's just that no

17 one knows what is going to be referred to, at least on that

18 side of the fence.  Mr. Sirota, do you know what they're going

19 to refer to here?

20           MR. SIROTA:  Judge, I'm sure that what they're

21 referring to is buried someplace in 180 exhibits that we

22 received initially, and we all agonized right up until this

23 morning as to identifying precisely what would be admitted.

24 Nowhere in the documents Your Honor just took into evidence is

25 there reference to these other tagalong exhibits.  The

                    **J&J COURT TRANSCRIBERS, INC.**