**MS - 4088**
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD**
A Professional Corporation
25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Telecopier
Attorneys for Defendant, Jazz Photo Corp., Debtor-in-Possession

|  |  |  |
|---|---|---|
| | : | UNITED STATES BANKRUPTCY COURT |
| In the Matter of: | : | FOR THE DISTRICT OF NEW JERSEY |
| | : | HON. MORRIS STERN |
| JAZZ PHOTO CORP., | : | CASE NO. 03-26565 (MS) |
| | : | |
| Debtor-in-Possession. | : | Chapter 11 |
| | : | |

---

### MEMORANDUM OF LAW IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER IMPOSING SANCTIONS AGAINST FUJI PHOTO FILM CO., LTD. AND ITS COUNSEL PURSUANT TO (i) FED. R. BANKR. P. 9011(b)(1), (2) AND (3), AND (ii) 28 U.S.C. § 1927

---

Of Counsel:
    Michael D. Sirota

On the Brief:
    Stuart Komrower
    Kristin S. Elliott

**HEARING DATE AND TIME:**
February 23, 2004
at 10:00 a.m.

## PRELIMINARY STATEMENT

Jazz Photo Corp., the within debtor and debtor-in-possession (the "Debtor"), seeks an

Order imposing sanctions against Fuji Photo Film Co., Ltd. ("Fuji") and its counsel pursuant to

(i) Federal Rule of Bankruptcy Procedure 9011, and (ii) 28 U.S.C. § 1927, in connection with

Fuji's motion for the appointment of a Chapter 11 trustee (the "Motion").

Merely five weeks after this case was commenced, Fuji's counsel, obliging the directive

of its well-paying client to destroy the Debtor at any cost, rushed headfirst into Court asserting

allegations of fraud, theft and various criminality - - without any evidentiary support.  This

improper conduct was compounded by the arrogant refusal of Fuji's counsel to withdraw its

Motion despite written notice from the Debtor and clear warning from the Court as early as the

initial hearing on July 30, 2003.  Despite those warnings, Fuji undertook some 14 depositions

and thousands of pages of document production review _after_ the July 30 hearing with full

knowledge of the Court's admonition regarding the nature of the evidence required to prevail.

Fuji's "witch hunt" turned up nothing.  Nevertheless, Fuji's counsel refused to withdraw its

Motion until the Court advised, during a conference call on January 27, 2004, that it would deny

Fuji's request for an adjournment, deny its Motion on February 6, 2004 and entertain the

Debtor's Rule 9011 motion in the ordinary course.

Fuji has sophisticated counsel, well-versed in the fragility of the Chapter 11 process and

"scorched earth" litigation tactics.  Counsel was well aware that by filing and continuing to

prosecute a groundless motion, the Debtor would be required to absorb, in its defense, significant

legal fees and disruption to its business.  Acting solely pursuant to its client's "market

motivation" to harass and destroy its smaller competitor, Fuji's counsel unreasonably and

vexatiously multiplied the proceedings and ran up costs in an attempt to break the Debtor's back.

For the reasons set forth herein, the Debtor seeks an Order imposing sanctions against Fuji and its counsel for the substantial expenses incurred by the estate in opposing the frivolous Motion.  It is respectfully asserted that only a significant monetary penalty will act as an effective deterrent against similar conduct for the remainder of this Chapter 11 proceeding, and send a clear message that the Chapter 11 process is not to be used as a tool to accomplish an illegitimate agenda.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

The Debtor filed its Chapter 11 petition on May 20, 2003 ("Filing Date").  The filing was necessitated by the entry of a District Court judgment for patent infringement against the Debtor in favor of Fuji for approximately $30,000,000.00.  That judgment is on appeal.  After entry of the judgment, the Debtor unsuccessfully sought a stay pending appeal.  In connection with its application for a stay, the Debtor prepared and produced to Fuji and the District Court extensive disclosures relating to its transactions with Jack Benun, the Debtor's principal officer, and Mr. Benun's personal assets and financial history.  The disclosures included 12 separate Declarations and Affidavits, as well as Mr. Benun's Statement of Financial Condition.[1]

Immediately after the Debtor filed its Chapter 11 case, Fuji objected to virtually every application filed by the Debtor and fired off a barrage of discovery demands, both in the context of the Chapter 11 proceeding and asset discovery relating to the District Court judgment.  These demands included Rule 2004 examination and supplementary proceeding subpoenas directed to Mr. Benun and the Debtor's financier, Rosenthal & Rosenthal, Inc.  Additionally, Fuji sent the Debtor's counsel on June 11, 2004 a Rule 2004 subpoena seeking the production of 38 categories of documents, including documents relating to the Debtor's subsidiary, Jazz Hong Kong.  These discovery demands were in addition to the extensive discovery produced to Fuji over several years in the District Court matter and a proceeding before the International Trade Commission ("ITC").

Despite the Debtor's vast disclosures before and after the Chapter 11 filing, including those concerning Mr. Benun's financial condition and his relationship with the Debtor, Fuji

---

[1] A list of the filings with the District Court in support of the stay application are recited in the Debtor's Brief in Opposition to Fuji's motion dated July 25, 2003 ("Opp. Brief") at Pages 5-6.

alleged from the first day of the case and in the Motion that Mr. Benun "systematically looted"

the Debtor and that such "looting" continues post-petition.[2]  In addition to the allegations of pre-

and post-petition looting, Fuji's counsel, in signing the Fuji Memo, also certified under Rule

9011(b)(3), that:

- the Debtor was organized by Benun for the purpose of infringing Fuji's patents
  and that such infringement is continuing to occur post-petition;

- Benun organized the Debtor, including the formation and use of Jazz Hong Kong,
  to hide the Debtor's profits in Asia, leaving nothing for creditors of the Debtor;

- the Debtor and Benun conspired to funnel assets out of the Debtor's estate to
  entities in Asia;

- Polytech Enterprise Limited ("Polytech"), a member of the Official Committee of
  Unsecured Creditors, is controlled by the Debtor;

- Benun lied to the Court and to the U.S. Trustee concerning the Debtor's
  relationship with Polytech and another entity; and

- the Debtor made preferential and fraudulent transfers to Benun, members of his
  family and others, and that such transfers cannot be pursued by the Debtor, or
  even the Creditors' Committee.

In addition to the Fuji Memo, the only other filings in support of Fuji's Motion were the

Declaration of Ellen G. Brier, a paralegal employed by Fuji's counsel ("Brier Dec.")[3], and the

---

[2] See Fuji's Memorandum of Law in support of Application for Appointment of Chapter 11 Trustee dated June 24, 2003 ("Fuji Memo") at Page 1.  The Fuji Memo used the word, "loot" or some derivation 23 times.

[3] The Brier Dec. annexed 51 separate exhibit tabs consisting largely of unintelligible, inadmissible and unverified documents, some of which are not in the English language.

Affidavit of Fuji's counsel summarizing certain statements made at the initial meeting of

creditors.  Fuji did not submit an affidavit of any person with personal knowledge of the exhibits

annexed to the Brier Dec. or the factual basis of the allegations in the Fuji Memo.  In response to

Fuji's Motion, the Debtor filed its Opp. Brief, together with extensive Affidavits of Anthony

Cossentino, its then President and Chief Executive Officer,[4] Mr. Benun, Jesse Szeto, the

managing director of Jazz Hong Kong, Peter John Frazza, Esq. and Jeffrey Kaplan, Esq.

The initial hearing on the Motion occurred on July 30, 2003.[5]  At that hearing, counsel

for the Debtor argued that the matter should not go forward because the Motion was procedurally

defective and the Debtor did not have a fair opportunity to conduct discovery on the volumes of

Fuji's documentary evidence and the witnesses that Fuji intended to call.  Counsel for the

Unsecured Creditors' Committee and the United States Trustee forcefully supported the Debtor's

argument that the Motion should not go forward.  Concerned with the severity of the allegations,

the Court, in response to the Debtor's request for a continuance, stated:

> . . . If there's a witness who's going to get up and say that
> this is how dollars have gone out of this estate post-petition and
> into the hands of X, Y or Z, including Mr. Bennon [sic], this Court
> feels duty-bound to allow that testimony to go forward as early as
> possible.
>
> If it doesn't exist, and I am very, very tied into this list of --
> well, the indictment on Page 1 and 2 running into Page 3 in the
> brief of Fuji, to the extent that someone signed their name to this,

---

[4] Mr. Cossentino left the Debtor's employ on September 17, 2003.

[5] Fuji filed its Motion of June 24, 2003 and sought a hearing date on three business days
notice, on June 30, 2003.  The Court denied the short notice request and held the initial hearing
on July 30, 2003.

<u>they had better come forward with something provable</u> . . .
(emphasis added).[6]

(Sirota Aff., Exh. A, 7/30/03 Tr., p. 14, l. 25 – p. 15, l. 1-9.)

At the request of the Debtor, United States Trustee and other parties, the Court directed

Fuji's counsel to make a proffer of the evidence that it intended to introduce.  After hearing the

initial components of the proffer, wherein Fuji's counsel admitted the absence of a "smoking

gun", the Court stated:

> Buy by your own statement we don't yet have a smoking
> gun, and all the talk about looting, I understand the creative writing
> exercise on everybody's part, but what doesn't – we haven't yet
> gotten to anything that is what I would call hard evidence of any
> kind of dissipation of estate assets.
>
> Now, if I've missed it, correct me, even if your proffer –
> even accepting your proffer as being the entire range of facts that
> might be presented without rebuttal for argument's sake.

(Sirota Aff., Exh. A, 7/30/03 Tr., p. 59, l. 19 – p. 60, l. 3.)

After Mr. Benun's counsel objected to a proffer regarding a New York apartment owned

by Ms. Szeto's company, Kintic, the following colloquy occurred between the Court and Fuji's

counsel:

> THE COURT:  All right, but I would like - - I just want to
> say this in response, and Mr. O'Grady's point is well taken up to a
> point.  If you're not telling me that you have a smoking gun as to
> post petition looting, I don't -- and we're now a long way away
> from the issue of the web or network of suppliers and
> manufacturers.  There seems to have been a drop-off and now
> we're talking about Mona Bennon [sic], etcetera.  You're really
> arguing the sort of pattern of conduct.

---

[6] Excerpts from the transcript of the July 30, 2003 hearing are annexed to the
accompanying Affidavit of Michael D. Sirota ("Sirota Aff.") as Exhibit A.  The transcript is
hereinafter referred to as "7/30/03 Tr."

Well, I'm not sure, and I'm just taking it -- so this side doesn't get too upset, I'm just taking it as offered for argument's sake.  Where -- you know where is it?  <u>Can you site [sic] one dollar's worth of loss to the estate post petition as a hard matter</u>?

MR. ROSENTHAL:  As a hard matter, all I can report to you is - -

THE COURT:  <u>I'm sorry, the answer was you can't</u>.

MR. ROSENTHAL: No, I'm just saying all I can report is that a disproportionate amount of the funds of the estate are going to Asia.  More than used to go, I think, proportionately, cost of goods sold as a proportion of revenues.

THE COURT:  How much more, percentage-wise?

MR. ROSENTHAL:  Mr. Constantino [sic] could help me better, but I think the present percentage is something like ten or eleven percent cost of goods sold, and previously it was closer to fifteen or twenty.

But I would defer to Mr. Constantino [sic] who has the actual number.  And by the way, the old cost of goods sold included half of the payments to Mr. Bennon [sic] and a lot of things that are now on the bottom line, freight and other things.  So, it's a disproportionate number.

THE COURT:  <u>Mr. Rosenthal, you're -- and no disrespect intended, but so far you're sort of nowhere here.  Actually dealing with a matter of proof that this court at this time can get its teeth into and say, "Oh, boy, there's a risk to the estate."</u>  (Emphasis added.)

(Sirota Aff., Exh. A, 7/30/03 Tr., at p. 62, l. 13 – p. 63, l. 23.)

After a break in the hearing, and having heard the Court's pointed comments, Fuji's counsel suggested to the Court that its own Motion be carried and that the parties "deal with a discovery schedule."  (Sirota Aff., Exh. A, 7/30/03 Tr., p. 135, l. 19-25.)  The Court carried the hearing to October 21, 2003.

On September 22, 2003, a Discovery Stipulation and Consent Order was entered in connection with the Motion ("Discovery Stipulation").[7] In a blatant acknowledgment that it had not fully investigated its factual allegations before filing its Motion, Fuji's counsel demanded in the Discovery Stipulation that Jazz produce nine separate witnesses for depositions before the October 21 hearing. In addition, Fuji sought to depose Albert and Leon Silvera of Photo Recycling Enterprises ("PRE"). Moreover, after the July 30 hearing, Fuji served five subpoenas upon Emigrant Mortgage Company, Greenberg & Kahr, HSBC USA, Gerald Kestenbaum and Carla Drummond. The Debtor objected to those subpoenas and Fuji withdrew them in this case, only to seek to go forward with the exact same subpoenas in the Chapter 11 proceeding of Mr. Benun. Fuji also served four additional subpoenas for depositions and document production upon Mr. Benun and his three daughters, Rebecca, Sabrina and Vanessa Benun. The service of these subpoenas resulted in an objection by Mr. Benun which was joined by the Debtor. A Court hearing was held. Ultimately, by Order entered on October 16, 2003, seven of Fuji's nine subpoenas were quashed by the Court.

In all, since the initial July 30, 2003 hearing date, Fuji's counsel conducted, and Debtor's counsel was required to attend, 14 days of depositions in the United States and Asia, which generated over 2,000 pages of transcripts. The Debtor also responded to new and repetitive document demands, wherein 7,947 Bates stamped pages of documents were produced to Fuji. In addition, 38,508 pages of documents which comprise the Debtor's system for tracking camera shells were produced, even though many of the same documents had already been given to Fuji.

---

[7] As a show of good faith, even while the Discovery Stipulation was being negotiated, the Debtor accommodated Fuji's deposition and document demands.

40654/0001-1312895v1

The Debtor also arranged for Fuji to physically inspect various production facilities in the Far East.

On September 26, 2003, Fuji's counsel served its Fed. R. Civ. P. 26 disclosures and copies of exhibits that in intended to utilize at the time of the hearing.  On October 3, 2003, Fuji's counsel filed its Memorandum Discussing Evidence and Law in support of its Motion ("Fuji Evidence Memo").  Assuming that neither Fuji nor its counsel would proceed without evidentiary support for its colorful allegations, the Debtor awaited Fuji's submission before taking the serious step of sending a Rule 9011 notice.  Astoundingly, the Fuji Evidence Memo contained many of the same bold factual allegations as the Fuji Memo without any additional support.  (See Fuji Evidence Memo, pp. 2-3.)  On October 16, 2003, after thoroughly reviewing Fuji's submissions and prior to the commencement of the hearing on October 21, 2003, Debtor's counsel served Fuji's counsel with a letter pursuant to Rule 9011 (the "Initial Rule 9011 Letter"). A copy of that letter is annexed to the Sirota Aff. as Exhibit B.

The Initial Rule 9011 Letter gave Fuji's counsel a detailed list of various violations of subsection (b) of Rule 9011 posited by the Debtor.  (Sirota Aff., Exhibit B, pp. 2-4.)  As to violations of subsection (b)(1) of the Rule, the Initial Rule 9011 Letter stated that:

> [T]he Motion, and the Memorandum and Supplemental Memorandum filed in connection therewith, as well as certain third party subpoenas served by Fuji, were all presented to increase the Debtor's administrative expenses and to distract the Debtor and its officers and employees from focusing on its reorganization effort. Those tactics were designed primarily, if not solely, to further a "market motivation" of Fuji, and to harass and embarrass the Debtor's Chief Operating Officer and members of his family;

(Sirota Aff., Exh. B, p. 2.)

As to subsection(b)(3) of the Rule, the Initial Rule 9011 Letter also recited in specific detail the many factual allegations in the papers signed by Fuji's counsel that were ultimately

40654/0001-1312895v1

shown to lack evidentiary support.  Specifically, the Initial Rule 9011 Letter put Fuji on notice

that:

> [M]any of Fuji's allegations and factual contentions are
> misleading, replete with mischaracterizations of deposition
> transcripts and documents, and lack evidentiary support,
> notwithstanding that: (i)  the Debtor produced thousands of pages
> of documents demanded by Fuji; (ii) Fuji has taken no less than
> fourteen (14) depositions upon oral examination in connection with
> both the Motion and the ITC Enforcement Proceeding since the
> initial July 30, 2003 hearing date on the Motion; (iii) Fuji
> conducted a Rule 2004 examination of Jack Benun on June 23,
> 2003; (iv) Fuji conducted a supplementary proceeding deposition
> of Mr. Benun on June 24, 2003; (v) Fuji conducted a
> supplementary proceeding deposition of Gerald Sandak of
> Rosenthal & Rosenthal, Inc. on June 26, 2003; and (vi) Fuji
> conducted extensive investigation in the Far East, including
> numerous factory tours arranged by the Debtor.  The specific
> allegations and other factual contentions that do not have
> evidentiary support include, but are not limited to, the following:

> (a)      that the Debtor is a company that was organized by
> Mr. Benun for the purpose of violating the law and that this
> practice continues to this day;

> (b)      that the Debtor is the alter ego of Mr. Benun,
> operated for his benefit to the detriment of all creditors;

> (c)      that Mr. Benun systematically looted the Debtor
> pre-petition;

> (d)      that since the filing date, Mr. Benun has
> continued to "loot" the Debtor, and that his primary service to
> the Debtor is to establish new business practices to ensure that
> the Debtor's profits remain hidden from creditors;

> (e)      that Benun organized the Debtor, including its
> subsidiary, Jazz Photo (Hong Kong), Ltd. ("Jazz HK"), in a way
> which hides in Asia whatever profits are not directly taken by
> Benun, leaving nothing for the Debtor's creditors;

> (f)      that prior to the filing date, the Debtor and Benun
> conspired to reorganize the Debtor's business to funnel assets
> out of the Debtor's estate;

10

(g)    that Polytech Enterprise Ltd. ("Polytech") is essentially a "front" for the Debtor on the Creditors' Committee and that the director of Polytech is a key employee of Jazz HK;

(h)    that the Debtor and Benun misrepresented to the Court that Polytech and another entity, Everbest, are totally unaffiliated with Jazz HK;

(i)    that the Debtor's history is replete with preferences and fraudulent transfers to Benun, members of his family and others, and improper conduct by officers and directors, and that not even a Creditors' Committee will or can pursue such transfers;

(j)    that the Debtor's Chief Operating Officer, Mr. Benun, assisted Polytech in filing a "patently fraudulent" claim;

(k)    that Mr. Benun transferred valuable assets and business opportunities of the Debtor and Jazz HK;

(l)    that the Debtor is operating at a huge and unsustainable operating loss;

(m)    that the Kintic apartment is actually owned by the Debtor or Mr. Benun as a "hidden asset";

(n)    that mortgage payments of $5,045.00 per month and the initial downpayment on the Kintic apartment of $600,000.00 came from the Debtor, Jazz HK and/or Mr. Benun; and

(o)    that Debtor is selling cameras reloaded from shells originally sold by Fuji outside of the United States.

(Sirota Aff, Exh. B, pp. 3-4.)

The Initial Rule 9011 Letter demanded that Fuji's counsel withdraw the Motion, and at a minimum, that it withdraw those allegations and factual contentions in the Motion that lack evidentiary support. Id., p. 4. The letter further advised that the Debtor would seek sanctions under Bankruptcy Rule 9011(c)(1)(A) if Fuji's counsel failed to do so, including an Order directing Fuji and its counsel to pay the Debtor's reasonable attorneys' fees and other expenses. Id., p. 4.

11

Fuji's counsel <u>never</u> responded to the Initial Rule 9011 Letter.  Accordingly, Debtor's

counsel completed its depositions of Fuji's witnesses, and its Court submissions, to prepare for

the October 21 hearing.  With the assistance of the Debtor's key personnel and Mr. Cossentino,[8]

all of whom were diverted from their operational responsibilities, Debtor's counsel spent

significant time on this endeavor.

On October 17, 2003, Debtor's counsel filed and served its Summary of Evidence in

Response to the Fuji Evidence Memo ("Debtor's Evidence Memo")[9], and Supplemental

Affidavits of Jack Benun and Jeffrey I. Kaplan.  The parties' counsel also delivered to the Court

transcripts of the various depositions, and binders containing the evidence upon which the parties

intended to rely, and to which they stipulated.

The hearing on October 21 was attended by Mr. Benun and his counsel, attorneys for the

Debtor, including Mr. Kaplan, who is handling the ITC proceedings, Ms. Jurow of the United

States Trustee's Office, counsel for the Creditors' Committee and a battery of attorneys and

paralegals for Fuji.

The hearing commenced on October 21 and continued through October 22, 2003.  Copies

of the relevant portions of the hearing transcripts for October 21 ("10/21/03 Tr.") and October 22

("10/22/03 Tr.") are annexed to the Sirota Aff. as Exhibits C and D, respectively.  Fuji called

---

[8] Mr. Cossentino flew from his new home in Georgia to attend the October 21 hearing
and its continuation on October 22, 2003.

[9] Annexed as Exhibit A to the Debtor's Evidence Memo is a summary of Fuji's many
mischaracterizations of the deposition testimony with detailed transcript page and line
references.  The Debtor's Evidence Memo gave a second notice to Fuji's counsel that the Debtor
intended to seek Rule 9011 sanctions if the Motion was not withdrawn.  It referenced service of
the Initial Rule 9011 Letter and reiterated that Fuji had violated Bankruptcy Rules 9011(b)(3)
and (1) because (i) allegations of Fuji's counsel in the Fuji Evidence Memo, as well as in the Fuji
Memo, lacked evidentiary support, and (ii) Fuji was acting for the improper purpose of driving
the Debtor out of the single-use camera business.  See Debtor's Evidence Memo, p. 3, fn. 3.

five witnesses on its direct case – James P. Field, Peter Goode, Fong Po Law, Mr. Benun and Mr.

Cossentino.

Mr. Field is the administrator for Recycling Operations employed at Fuji's plant in

Greenwood, South Carolina.  (Sirota Aff., Exh. C, 10/21/03 Tr., p. 30, l. 10-13.)  He was called

as a witness to testify concerning his sampling of single-use cameras ("SUC's") and his belief

that the Debtor is selling "repaired" SUC's in the United States that were first sold outside of the

United States.  (Sirota Aff., Exh. C, 10/21/03 tr., p. 33, l. 18-25.)[10]  Mr. Field testified concerning

his sampling of various camera shells and was questioned by Fuji's counsel as to what

percentage of those cameras were manufactured outside of the United States, or were of foreign

"origin."  (Sirota Aff., Exh. C, 10/21/03 Tr., p. 71, l. 7-10, 22-23; p. 72, l. 15-16; p. 73, l. 12-14,

24-25; p. 74, l. 1; p. 79, l. 1-3, 18-22; p. 81, l. 13-15.)  However, it is the location of first sale,

rather than manufacture, that is relevant.  Fuji's counsel conceded that while Fuji has the ability

to track the location of first sale, as opposed to manufacture, counsel did not ask Fuji to do so,

despite having been asked for this precise information by the Debtor in discovery in the ITC

proceeding.  (Sirota Aff., Exh. C, 10/21/03 Tr., p. 93, l. 2-15 to p. 104, l. 17.)

Fuji's counsel knew full well that the patent infringement issue dealt with country of first

sale, but instead had their expert render a report only as to where the SUC's were manufactured.

On cross-examination, Mr. Field acknowledged that it was not until the day before the hearing

that he began to test where the cameras were first sold.  (Sirota Aff., Exh. C, 10/21/03 Tr.,

p. 112, l. 5-7.)  He also admitted that he was unable to determine whether Fuji itself may, in fact,

have imported millions of foreign made cameras into the United States for first sale.   (Sirota

---

[10] Based on a decision of the Federal Circuit, Fuji contends that its patents are infringed
when the first sale of a re-loaded Fuji SUC occurs outside of the United States.

13

Aff., Exh. C, 10/21/03 Tr., p. 120-121, l. 21.)  This totally destroyed the notion on his direct

examination that, except for approximately 3.6 million "support" cameras that Fuji shipped to

the United States in and before the year 2000, all cameras manufactured outside of the United

States were first sold outside of the United States.

The last minute exercise of Mr. Field in not testing country of first sale until one day

before the hearing caused the Court great concern.  Fuji's counsel shamelessly acknowledged

that it failed to provide the Court with evidence of first sale -- crucial evidentiary support for its

allegation that the Debtor continues to engage in patent infringement.  At the October 22, 2003

continued hearing on the Motion, the Court questioned why Fuji's counsel did not go through its

client's own records to demonstrate the location of first sale.  In response, Fuji's counsel stated:

> MR. ROSENTHAL:  Your Honor, I must confess because
> we didn't think of it as I said before.
>
> * * *
>
> … Your Honor, I came away yesterday with the thought
> that, would have, could have, should have.  I wish I had, if I
> thought of it…

(Sirota Aff., Exh. D, 10/22/03 Tr., p. 97, l. 6-7, 17-19.)

Having miserably failed with any credible evidence in the area of patent infringement,

Fuji moved to the second and final leg of the Motion, namely, fraud.  Fuji called Mr. Goode, a

director of risk consulting with Deloitte & Touche Forensic Services.  (Sirota Aff., Exh. C,

10/21/03 Tr., p. 165, l. 3-4.)  Mr. Goode had 30 years of experience in law enforcement,

including 24 years with the Hong Kong Police, and received numerous awards and

commendations.  (Sirota Aff., Exh. C, 10/21/03 Tr., pp. 165-167.)  He was hired by Fuji to

investigate Jazz Hong Kong, Mr. Benun and numerous individuals and entities referenced in

Fuji's Motion.  Interestingly, Mr. Goode testified that in connection with his investigations he

14

would not hesitate to lie.  (Sirota Aff., Exh. C, 10/21/03 Tr. p. 167, l. 4-8, 25 to p. 168, l. 2; p.

197, l. 17-23.)  Notwithstanding the serious allegations of fraud in the Fuji Memo and Fuji

Evidence Memo, on cross-examination Mr. Goode testified that despite an unlimited budget he

had absolutely no evidence to support the certifications and suggestions of Fuji's counsel that,

among other things, (i) Mr. Benun looted and continues to loot the Debtor, (ii) Mr. Benun

committed any fraud at all, (iii) the Debtor committed fraud, (iv) Jazz Hong Kong committed

fraud, (v) Mr. Benun controls Polytech, (vi) Mr. Benun has any assets in Asia, (vii) Mr. Benun or

the Debtor have any interest in Yibo Electronics or Pengji, (viii) Mr. Benun has any interest or

controls Wing Shan or Everbest, and (ix) Mr. Benun receives any compensation from Polytech,

Everbest, Jazz Hong Kong or PRE.  (Sirota Aff., Exh. C, 10/21/03 Tr., pp. 207-214.)

Next, Fuji called Mr. Fong, another investigator, who testified with an interpreter.  He is

currently unemployed and previously worked for the Hong Kong Police Force for 28 years.

(Sirota Aff., Exh. C, 10/21/03 Tr., p. 220, l. 9-14.)  He visited various addresses in the Far East,

assisting Mr. Goode in his investigation.  On cross-examination, he stated that in some instances,

he asked a Mr. Chen to visit certain locations and that he reported Mr. Chen's findings to Mr.

Goode, who was unaware of Mr. Chen's involvement.  (Sirota Aff., Exh. C, 10/21/03 Tr., p. 255,

l. 2 to p. 257, l. 11.)  Mr. Fong believed that Mr. Goode's investigation was not "ideal" because

of the lack of "concrete evidence."  (Sirota Aff., Exh. C, 10/21/03 Tr., p. 253, l. 22 to p. 254,

l. 23.)  As with Mr. Goode, Mr. Fong also had absolutely no proof of any of the allegations in the

submissions signed by Fuji's counsel.  (Sirota Aff., Exh. C, 10/21/03 Tr., p. 258, l. 14 to p. 260,

l. 9.)

On October 22, Fuji called Mr. Benun as a hostile witness.  Fuji's counsel undertook

several hours of unfocused, open-ended questions concerning the formation of Polytech, its

relationship with PRE, Wing Shan and Jazz Hong Kong, the movement of camera shells, and

numerous other areas.  At a break in the testimony, the Court questioned Fuji's counsel as to why

the creation of Polytech to replace Jazz Hong Kong in the chain of supply should be deemed

evidence of fraud or mismanagement of the Debtor's estate.  (Sirota Aff., Exh. D, 10/22/03 Tr.,

pp. 66-75.)  In fact, the Court recognized that while the involvement of Polytech may be

"competition and feeding competition from Fuji … [i]t may not be harming creditors in the

estate generally if it promotes the business enterprise of [the Debtor] during the pendency of this

proceeding."  (Sirota Aff., Exh. D, 10/22/03 Tr., p. 75, l. 19-22.)  Again, seemingly recognizing

an improper purpose in Fuji's Motion, the Court questioned Fuji's counsel:

> THE COURT:  Shouldn't I be more impressed by the
> creditor's committee's view of [a decrease in Jazz Hong Kong's
> assets] than a creditor who has yet another agenda, Fuji…

(Sirota Aff., Exh. D, 10/22/03 Tr., p. 76, l. 9-18.)

Counsel for the Committee strongly criticized Fuji's position, and the irony of its

argument that the Debtor was being harmed by diminution in Jazz Hong Kong's assets, while

Fuji was simultaneously initiating judicial proceedings in Hong Kong to attach those assets.

(Sirota Aff., Exh. D, 10/22/03 Tr., p. 77-78.)  The Court, apparently unimpressed with the

attempt of Fuji's counsel to somehow prove diversion of profit to Polytech and PRE, stated:

> But we've had $100,000 minimally [of investigative costs to Fuji]
> in the last three months to look into such matters and [the
> Committee's counsel] in that regard makes the point.  I haven't
> heard anything by way of inference, circumstantial evidence, guess
> work that any of that has happened.  That is not in this case as far
> as I am concerned.  And to sort of slather over it and say this isn't
> the type of person who should be a fiduciary doesn't present facts
> to this Court that this Court can operate on…

(Sirota Aff., Exh. D, 10/22/03 Tr., p. 79, l. 11-19.)

After Mr. Benun's initial testimony, Mr. Cossentino took the stand as a hostile witness for Fuji. Fuji's counsel sought to paint a picture of patent infringement, some two years before the Filing Date, through sales by Jazz of foreign shells in violation of the Federal Circuit's ruling in August, 2001. In Declarations submitted by Mr. Cossentino in an earlier proceeding, the Debtor indicated that it could not meet its demand to customers such as Wal-Mart unless it was permitted to use foreign shells. Fuji's counsel attempted to establish that the Debtor must have used foreign shells in violation of the Federal Circuit's ruling. When questioned by Debtor's counsel, Mr. Cossentino unequivocally stated that the Debtor did <u>not</u> violate the Federal Circuit's decision. Mr. Cossentino, however, explained that the Debtor lost a large portion of its sales to Wal-Mart, thus causing a reduction in its need for foreign shells. He further stated that some foreign shells were already in transit to the United States at the time of the August, 2001 ruling, and these shells were later re-exported. (Sirota Aff., Exh. D, 10/22/03 Tr., pp. 127-130.) Upon questioning by the Court, Mr. Cossentino also explained the extensive informed compliance procedures implemented by the Debtor to assure compliance with the Federal Circuit's ruling, including implementation of its master lot number, or "MLN", tracking system. (Sirota Aff., Exh. D, 10/22/03 Tr., pp. 130-135.)

After Mr. Cossentino was questioned, Mr. Benun again took the witness stand. The cumbersome examination of Mr. Benun by Fuji's counsel did nothing to demonstrate any evidence in support of the allegations in Fuji's Motion papers. On examination by Debtor's counsel, Mr. Benun testified that the Debtor, rather than using Polytech to "siphon" assets away from the estate, is actually realizing a profit of approximately 36¢ per camera since it began buying from Polytech in April, 2003. This is greater than the combined profit realized by the Debtor and Jazz Hong Kong of 32¢ to 36¢ prior to April, 2003. (Sirota Aff., Exh. D, 10/22/03

Tr., pp. 199-201; p. 206, l. 13 to p. 207, l. 21.)  Mr. Benun also testified that neither he nor any

members of his family receive any consideration from PRE, Polytech, or any other entity (Sirota

Aff., Exh. D, 10/22/03 Tr., pp. 201-203), and that Mr. Benun has no assets hidden in Asia nor

anywhere else.  (Sirota Aff., Exh. D, 10/22/03 Tr., p. 202, l. 19 to p. 203, l. 1.)  After again

questioning Mr. Benun and adducing absolutely no evidentiary support for its factual allegations,

Fuji's counsel closed its direct case.  (Sirota Aff., Exh. D, 10/22/03 Tr., p. 221, l. 22-24.)

Thereafter, the Court made the following comments:

> THE COURT: … But I'm going to telescope things in a
> sense.  And what I will do now and obviously we won't go ahead
> today, is indicate as an inter[sic]-matter that I am thoroughly
> unconvinced as to most, if not all, of what has been presented by
> Mr. Rosenthal on behalf of Fuji that there certainly is no fact base
> that is strong enough to appoint a trustee as a function of the
> allegations relating to Jazz Hong Kong's disappearance from play
> and the introduction of Poly-Tech end of year.  The sort of
> whispers that Poly-Tech is really Mr. Benun.  There's nothing here
> that shows that with any kind of strength.  I say that as an interim
> matter.
>
> * * *
>
> There is an overriding question of finances.  Mr. Greenberg
> mentioned before, Mr. Rosenthal or Mr. Buechler pointed it out
> right at the beginning.  I've looked at the monthly report – monthly
> operating report of the debtor for September.  It's awful and
> getting worse and the issues of the future may have nothing to do
> with anything else that was presented her [sic].  It may just be a
> matter of this debtor collapsing.  I don't know.  <u>In fairness to the
> debtor Fuji is largely responsible.  And whether that's appropriate
> or inappropriate I'm not making an assessment about, but at least
> Fuji's tracking down and pressing and causing this type of hearing
> now for the second time in the third day is a huge expense to the
> debtor.  It is for the Court to ultimately decide how appropriate
> Fuji's agenda is.</u>  **And I'm not sure that it is an appropriate
> agenda after hearing two days worth of testimony.  But again, I
> make no findings in that area**.

(Emphasis added.)  (Sirota Aff., Exh. D, 10/22/03 Tr., p. 225, l. 19 to p. 226, l. 4, p. 226, l. 18 to

p. 227, l. 8.)

18

By this Motion, the Debtor respectfully asserts that now is the time to make such findings under Bankruptcy Rule 9011 and 28 U.S.C. § 1927.

After the conclusion of the hearing on October 22, a continued date was set for February 6, 2004. On January 15, 2004, Debtor's counsel wrote to Fuji's counsel inquiring whether Fuji intended to proceed with its Motion, and again indicated that the Debtor intended to hold Fuji responsible for legal fees and costs under Bankruptcy Rule 9011 (the "Second Rule 9011 Letter"). A copy of the Second Rule 9011 Letter is annexed to the Sirota Aff. as Exhibit E. In the Second Rule 9011 Letter, Debtor's counsel stated in part:

> The Debtor views Fuji's continued prosecution of the motion to be an unnecessary drain on the assets of the estate. The purpose of this letter is to put Fuji on notice that, if Fuji's motion is found to have been filed and prosecuted in violation of Rule 9011, which notice to pursue we have already provided to you, the Debtor intends to hold Fuji responsible to the estate for the legal fees and costs the Debtor will incur preparing for February 6, 2004 hearing, as well as the other hearing dates in connection with Fuji's motion.

In response, Fuji's counsel advised that it was unwilling to withdraw its Motion and would seek an adjournment. Sirota Aff., ¶ 7.

On January 27, 2004, Fuji's counsel wrote to the Court requesting a two month adjournment of its Motion. Debtor's counsel objected to this request. The Court held a conference call on January 27, 2004, at which time it denied Fuji's adjournment request and indicated that it would deny Fuji's Motion if it intended to go forward on February 6.

On the same day, after putting the Court, the Debtor's personnel, the United States Trustee, the Committee, Mr. Benun, and the numerous attorneys representing all of them, through a huge and costly boondoggle, Fuji's counsel unceremoniously withdrew its Motion.

<u>**LEGAL ARGUMENT**</u>

**I.    THE IMPOSITIONS OF SANCTIONS AGAINST FUJI IS
    <u>WARRANTED PURSUANT TO FED. R. BANKR. P. 9011.</u>**

**A.    <u>Fuji Has Violated Bankruptcy Rule 9011(b).</u>**

Under Rule 9011, the signer of a pleading has an obligation to make a reasonable inquiry

into the facts and law which support the pleading.  <u>In re Kouterick</u>, 167 B.R. 353 (Bankr. D.N.J.

1994) (citing <u>Jones v. Pittsburgh National Corp.</u>, 899 F.2d 1350, 1359 (3d Cir. 1990)).[11]

Rule 9011, in relevant part, specifically provides:

> . . . (b) *Representations to the Court.*  By presenting to the court
> (whether by signing, filing, submitting, or later advocating) a
> petition, pleading, written motion, or other paper, an attorney or
> unrepresented party is certifying that to the best of the person's
> knowledge, information, and belief, formed after an inquiry
> reasonable under the circumstances, --
>
> (1)    it is not being presented for any improper purpose
> such as to harass or to cause unnecessary delay or needless
> increase in the cost of litigation;
>
> (2)    the claims, defenses, and other legal contentions
> therein are warranted by existing law or by a nonfrivolous
> argument for the extension, modification, or reversal of existing
> law or the establishment of new law;
>
> (3)    the allegations and other factual contentions have
> evidentiary support or, if specifically so identified, are likely to
> have evidentiary support after a reasonable opportunity for further
> investigation or discovery...

Fed. R. Bankr. P. 9011(b).

---

[11]The 1997 amendment of Rule 9011 conformed the rule to the 1993 version of Rule 11
of the Federal Rules of Civil Procedure.  Courts have expressly held that it is appropriate to look
to the case law developed under Fed. R. Civ. P. 11 to interpret Rule 9011.  <u>In re Mahendra</u>, 131
F.3d 750 (8th Cir. 1997), <u>cert. denied</u>, 523 U.S. 1107 (1998); <u>accord In re Spectree Group, Inc.</u>,
185 B.R. 146 (Bankr. S.D.N.Y. 1995).

The Debtor seeks sanctions under subsections (b)(1) and (3) of Rule 9011 because there is ample basis to conclude that Fuji's Motion was presented for an improper purpose, and lacks any evidentiary support, even after Fuji's extraordinary discovery efforts.

The United States Court of Appeals for the Third Circuit has summarized the essence of Rule 11 as follows:

> the rule imposes an obligation on counsel and client analogous to the railroad crossing sign, "Stop, Look and Listen." It may be rephrased, "Stop, Think, Investigate and Research" before filing papers whether to initiate suit or to conduct the litigation. These obligations conform to those practices which responsible lawyers have always employed in vigorously representing their clients while recognizing the court's duty to serve the public efficiently.

Gaiardo v. Ethyl Corp., 835 F.2d 479. (3d Cir. 1987) (emphasis added)

The bankruptcy court in Kouterick, applied that rationale in the bankruptcy context to Rule 9011. Rule 9011(b)(2) and (3) place an affirmative duty on attorneys and litigants to investigate the facts and law before signing and submitting any petition, pleading, motion, or other paper. 10 Collier on Bankruptcy ¶ 9011.04[2][a] (15th ed. 2003). Attorneys are not permitted to file suit hoping that discovery will later show that the claim was proper. Rather, attorneys must "look before leaping." Lieb v. Topstone Indus., Inc., 788 F.2d 151 (3d Cir. 1986).

In determining whether Rule 9011 has been violated, the court must apply the "reasonableness under the circumstances" standard. See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 534 (1991). The analysis focuses on whether a reasonable attorney in like circumstances would believe his actions to be factually and legally justified. See In re Ford T. Johnson v. W. Clarkson McDow, Jr., 236 B.R. 510 (D.D.C. 1999) (citing Artco Corp. v. Lynnhaven Dry Storage Marina, Inc., 898 F.2d 953, 956 (4th Cir. 1990) (citations omitted)).

21

Sanctions are imposed for pleadings not well grounded in fact and law after reasonable inquiry. Kouterick, 167 B.R. at 363 (citing Bradgate Associates, Inc. v. Fellows, Read & Assoc., Inc., 999 F.2d 745, 752-53 (3d Cir. 1993)). An attorney may make a written allegation or factual contention (Rule 9011(b)(3)) only with the benefit of evidentiary support. In re Melendez, 235 B.R. 173, 194 (Bankr. D. Mass. 1999). Where such support is not available, and the attorney specifically identifies the absence of such support, the attorney may make the contention only if it is "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." In re Melendez, 224 B.R. 252, 259, n.8 (D. Mass. 1988).

To determine whether sanctions should be imposed, the bankruptcy court in Kouterick considered: (1) the amount of time available to the signer for conducting the factual and legal investigation; (2) the necessity for reliance on a client for the underlying factual information; (3) the plausibility of the legal position advocated; (4) whether the case was referred to the signer by another member of the Bar; [and] (5) the complexity of the legal and factual issues implicated. In re Kouterick, supra, 167 B.R. 363 (citing Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988) (citing Fed. R. Civ. P. 11 advisory committee note; Thomas v. Capital Security Servs., Inc., 836 F.2d 866, 875 (5th Cir. 1988)).

All of these factors, when applied to this case, compel the imposition of sanctions. First, counsel has more than adequate time to conduct the necessary investigation. The same counsel has been litigating with the Debtor and Mr. Benun since 1997. There were exhaustive discovery and disclosures well before the Filing Date in connection with the litigation in the District Court and before the ITC. The disclosures related not only to Mr. Benun and the Debtor, but to its non-debtor subsidiary, Jazz Hong Kong, as to which Fuji's counsel was afforded unfettered access to conduct its discovery. Fuji has even had a second bite at the apple and conducted far-reaching

discovery, including factory tours in the Far East, <u>after</u> it filed its Motion.  Certainly, Fuji cannot

reasonably assert that it did not have enough time to find evidentiary support for its allegations.

Second, Fuji's counsel has apparently relied very little upon its client for the underlying

factual information.  Instead, it commissioned investigators to go on a "witch hunt" in the Far

East, resulting in the submission of Court papers which are filled with half-truths, innuendo and

outright mischaracterizations.  Arguably, the only area in which Fuji's counsel relied upon

information from its client was the findings of Mr. Field regarding the country of manufacture.

However, the country of manufacture, or "origin", is irrelevant.  Incredibly, Fuji's counsel never

directed that its client search its own records to ascertain the country of first <u>sale</u>, rather than the

country of manufacture.  Therefore, it cannot be said that Fuji's counsel was misled in any way

concerning the information provided by its client.  To the contrary, while calling the Court an

"enabler", it was Fuji's counsel who blatantly failed to put before the Court the evidentiary

support for this serious charge, which evidence is admittedly under the control of its client.

Perhaps this is because such information would have refuted the irresponsible and baseless

allegations of post-petition infringement.

Third, while the legal theories of Fuji's counsel might be plausible if there was any proof

of its allegations, the abject failure of evidentiary support destroys counsel's legal theories.

Moreover, on the issue of pre-petition patent infringement as a ground to appoint a Chapter 11

Trustee, the Debtor pointed out that the <u>Intercat</u>[12] case, relied upon heavily by Fuji, is clearly

distinguishable from our case.  <u>See</u> Debtor's Memo, pp. 18-20.  That this argument was ignored

in the Fuji Evidence Memo is an apparent concession that <u>Intercat</u> does not apply.  The Debtor's

Memo and the Affidavit of Anthony Cossentino in opposition to the Motion also comprehensibly

---

[12]<u>In re Intercat</u>, 247 B.R. 911 (Bankr. S.D.Ga. 2000).

23

discuss the meritorious grounds for appeal of the District Court Judgment. (Debtor's Memo,
pp. 3-4; Affidavit of Anthony Cossentino dated July 24, 2003, ¶¶ 60-61.) Fuji appears to agree
that the appeal will succeed since it also ignored the Debtor's argument on this point.

Fourth, there is no other referral attorney who is responsible, as Fuji's present counsel has
"lived with" this matter for seven years.

Finally, other than the patent infringement issue[13], the factual allegations made by Fuji's
counsel are not complex. The allegations of looting by Mr. Benun and the "funneling" of assets
out of the Debtor's estate to entities in Asia are straightforward and simple. However, Messrs.
Goode and Fong testified that they have absolutely no evidence of this. Fuji's counsel would
have known this (and presumably did) had they only inquired of their own witnesses. Similarly,
the allegation that Polytech's claim is based on "accounting sleight of hand and outright fraud"
(Fuji Evidence Memo, p. 3) is as unsupported as it is lacking in complexity. The same is true
with the allegation of Fuji's counsel that Mr. Benun lied to the Court and to the U.S. Trustee
regarding the Debtor's relationship with Polytech.

The Court can easily find that Fuji is acting in bad faith. It is a competitor of the Debtor
with a motivation to run up costs and force the Debtor out of the single-use camera business.
However, even if Fuji is not intentionally acting in bad faith, sanctions can still be imposed by
the Court. In contrast to 28 U.S.C. § 1927 which is discussed in Point II below, Bankruptcy Rule
9011 sanctions are based on an objective standard of reasonableness, and do not require
subjective bad faith. Martin v. Brown, 63 F.3d 1252 (3d Cir. 1995); see also Yagman v.
Republic Ins., 987 F.2d 622 (9th Cir. 1993); Corporate Printing Co. v. New York Typographical

---

[13] Despite the Court's invitation, Fuji repeatedly declined to have the Bankruptcy Court
preside over a patent infringement trial.

Union, 886 F. Supp. 340 (S.D.N.Y. 1995). One Court has held that an attorney's good faith

belief that an argument has merit is insufficient to avoid Rule 11 sanctions; the belief must be in

accord with what a reasonable competent attorney would believe under the circumstances. In re

Brown, 152 B.R. 563 (Bankr. E.D. Ark. 1993). According to the Third Circuit, the objective

reasonableness standard "seeks to discourage pleadings 'without factual foundation, even though

the paper was not filed in subjective bad faith." In re Kouterick, supra, 167 B.R. at 363 (citing

Lony v. E.I. Dupont De Nemours & Co., 935 F.2d 604, 615 (3d Cir. 1991) (quoting Lieb v.

Topstone Indus., 788 F.2d 151, 157 (3d Cir. 1986)). No objectively reasonable attorney would

have leveled these allegations against the Debtor and Mr. Benun without first conducting

discovery to find evidentiary support. Equally as significant, an objective attorney, acting

without advancing the improper agenda of a large and powerful client, would never have

continued to prosecute a motion that lacked evidentiary support even after conducting extensive

discovery after the Motion was filed.

> ### B.  The Debtor Has Complied With the Procedural Requirements Set Forth in Bankruptcy Rule 9011(c)(1)(A).

Bankruptcy Rule 9011(c)(1)(A) sets forth the manner in which a party may seek

sanctions for violations of the rule. That subsection provides, inter alia, that, "[a] motion for

sanctions may not be filed with or presented to the court unless, within 21 days after service of

the motion . . ., the challenged paper, claim defense, contention, allegation, or denial is not

withdrawn or appropriately corrected[.]" Fed. R. Bankr. P. 9011(c)(1)(A). The purpose of this

requirement is to afford counsel a "safe harbor" to withdraw the papers complained of and to

avoid sanctions. See 10 Collier on Bankruptcy ¶ 9011.06[1][b] (15th ed. 2003). Several courts,

most notably the Seventh Circuit Court of Appeals, have recognized that the issuance of a

detailed letter outlining why sanctions are warranted and requesting the withdrawal of offending

papers satisfies the "safe harbor" requirement of Rule 9011(c)(1)(A). See Nisenbaum v. Milwaukee County, 333 F.3d 804, 808 (7th Cir. 2003) (holding that Rule 9011(c)(1)(A) was satisfied when "the defendants sent [a] lawyer a 'letter' or 'demand' rather than a 'motion[;]' [b]efore turning to the court, defendants alerted [the lawyer] to the problem and gave him more than 21 days to desist; he decided to press on[;] [d]efendants have complied substantially with Rule 11(c)(1)(A) and are entitled to a decision on the merits of their requests for sanctions under Rule 11") [14]. See also Jeffreys v. Rossi, 275 F. Supp.2d 463, 480 n.27 (S.D.N.Y. 2003); The Carlton Group, Ltd. v. Tobin, 2003 WL 21782650 *2 n.4 (S.D.N.Y.)[15]

In this instance, the Debtor's counsel, on October 16, 2003 and January 15, 2004, sent detailed letters to Fuji's counsel clearly setting forth the Debtor's intent to seek, and the basis for, the imposition of sanctions under Rule 9011.[16]  There can be no dispute that Fuji's counsel was well aware of the Rule 9011 implications in this matter.  At the October 21 hearing, Fuji's counsel stated:

> . . . we reject the continued threat from Mr. Sirota in writing and in his briefs and letters and just now that our actions somehow violate Bankruptcy Rule 9011 which is the parting threat that he's made repeatedly . . .

(Sirota Aff., Exh. D, 10/22/03 Tr., p. 81, l. 18-22.)

While the Initial Rule 9011 Letter and Second Rule 9011 Letter put Fuji and its counsel on notice of the consequences if it did not withdraw the Motion, Fuji's counsel chose to ignore them.  Fuji's counsel continued to prosecute the Motion despite their failure to uncover any

---

[14] But see Barber v. Miller, 146 F.3d 707, 710 (9th Cir. 1998).

[15] As the Carlton Group decision is unpublished, a copy is attached hereto as Exhibit "A."

[16] As noted above, the Debtor's intent to seek sanctions was also referenced in the Debtor's Evidence Memo at p.3, fn. 3.

26

factual support for the allegations to which they certified.  Strict adherence to the 21-day

provision in our case would also serve no purpose because there was less than 21 days from the

filing of Fuji's Evidence Memo on October 3, 2003 to the continuation of the hearing on

October 21, 2003.  Requiring that a Rule 9011 motion be served in the interim, would lead to the

absurd result of Fuji withdrawing the Motion <u>after</u> the October 22 hearing without being liable

for sanctions.

Because the Debtor's letters (i) amply notified Fuji's counsel that its continued

prosecution of the Motion violated Rule 9011, and (ii) afforded Fuji a greater than 21-day "safe

harbor" to withdraw the Motion to avoid sanctions, the within Motion satisfies the requirements

of Rule 9011(c)(1)(A) and the Court, therefore, should hear the Debtor's request to impose

sanctions pursuant to Bankruptcy Rule 9011.  <u>See</u> Nisenbaum, 333 F.3d at 808.

### C.    Pursuant to Bankruptcy Rule 9011(c)(2), Only a Meaningful Monetary Sanction Will Deter Similar Misconduct by Fuji's Counsel.

Pursuant to Rule 9011(c)(2), the Court's determination of the type of sanction to be

imposed is discretionary.  Bankruptcy Rule 9011(c)(2) states that sanctions "shall be limited to

what is sufficient to deter repetition of such conduct or comparable conduct by others similarly

situated".  The sanctions may include an Order directing payment to the movant of some or all of

the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

The Advisory Committee Note to Rule 9011 suggests various factors for consideration by

the Court:

> --  whether the improper conduct was willful or negligent;

> --  whether it was part of a pattern of activity or an isolated event;

> --  whether it infected the entire pleading or only one particular
>     count or defense;

-- whether the person has engaged in similar conduct in other
litigation;

-- whether it was intended to injure;

-- what effect it had on the litigation process in time or expense;

-- whether the responsible person is trained in the law;

-- what amount, given the financial resources of the responsible
person, is needed to deter that person from repetition in the
same case;

-- what amount is needed to deter similar activity by other
litigants.

Collier on Bankruptcy, ¶ 9011.07[1] (15th ed. 2003).

In this case, every one of these factors weighs in favor of imposing a meaningful sanction

against Fuji and its counsel. Fuji's conduct has been willful in the relentless pursuit of the

Debtor and Mr. Benun. Fuji is a large company[17] that competes with the Debtor, and which has

clearly acted with a "market motivation". With its unlimited financial resources, Fuji has

arrogantly used this Court for its improper agenda, knowing full well that sanctions were

possible. For a company the size of Fuji, anything less that a severe monetary sanction would be

a nuisance. Fuji's arrogance is reflected not only in its aggressive litigation posture, but in its

outrageous unwillingness to even "engage in settlement negotiation with [the Debtor] and/or Mr.

Benun", as stated in the January 27, 2004 letter of its counsel. (Sirota Aff., Exh. F.)[18] Fuji's

conduct is not an isolated event, but a pattern of activity on its part, including objecting to nearly

every application by the Debtor in this proceeding, serving improper subpoenas, and seeking to

---

[17] Public filings indicate that Fuji had sales of 641.2 billion Yen, or approximately
$6.07 billion at current exchange rates, for the three months ending December 31, 2003.

[18] Despite many overtures by the Debtor, Fuji has failed to engage in any settlement
discussions.

convert the Chapter 11 proceeding involving Mr. Benun.  The Fuji Memo and the Fuji Evidence

Memo are infected in their entirety with allegations of misconduct for which there is no

evidentiary support.  Fuji clearly intends to injure the Debtor and its reorganization effort

through the incurrence of suffocating administrative expenses.

Fuji's Motion has also caused a severe broadening of the litigation process and has

greatly increased administrative expenses.  On this point, Fuji's conduct is particularly

egregious.  It manufactured a "crisis" by filing its Motion on June 24, 2003 with an application

to shorten time, alleging horrific fraud and requesting a hearing to occur six days later on June

30, 2003.  The hearing was ultimately adjourned to July 30, 2003, and Fuji's counsel served

additional materials throughout the weekend and the days immediately prior to the hearing.

Specifically, by letter dated July 23, 2003, received by Debtor's counsel on July 24, 2003, Fuji's

counsel provided copies of Court documents from a prior litigation in 1994 and corporate

registry documents of various Asian entities.  By separate letters dated July 24, 2003, received by

Debtor's counsel on July 25, 2003, Fuji served an uncertified complaint from an earlier

litigation, disclosed its exhibits and identified its witnesses.  Curiously, some of the exhibits were

dated from prior years, but were never previously produced with the Motion.  On July 25, 2003,

Debtor's counsel received, via hand delivery, testimony outlines for Fields and Goode, as well as

Goode's report.  Despite the fact that these materials included emails and documents dating back

to early June, 2003, before the Motion was even filed, they were not included as part of Fuji's

case until July 25.  Finally, on September 26, 2003 - - four days before the hearing - - Fuji made

its Fed. R.Civ. P. 26 Disclosures, referencing 888 exhibits.

As noted, after dumping these materials on Debtor's counsel at the last minute of its

initial attack, Fuji requested an adjournment of its own Motion at the July 30, 2003 hearing.  The

import of the manner in which Fuji played its game of "hurry up and wait" is clear. Fuji

gambled that it would shock the Court with its allegations and hoped that the Court would be less

than thorough and not consider all of the evidence. Fuji's strategy was to paint Mr. Benun as an

evil person who could not serve as a Chapter 11 fiduciary based on the District Court judgment.

Fuji lost its gamble and faced a judge who heard <u>all</u> the evidence and refused to allow Fuji's

"shock and awe" campaign to short-circuit the judicial process.

Fuji's counsel also broadened the proceedings by bringing into play allegations of post-

petition patent infringement. This was of great concern to the court, who Fuji's counsel accused

of "enabling" such conduct. However, Fuji played "fast and loose" with the Court in changing

its position many times on the issue of where the patent infringement issues should be

adjudicated. It first declined the Court's invitation to preside over a patent infringement trial and

moved for relief from the automatic stay to proceed with those issues before the ITC. Thereafter,

Fuji insisted on presenting evidence of patent infringement through Mr. Field, while asserting

that the Court's findings were not binding on the ITC. When requesting an adjournment on

January 27, 2004, Fuji reverted back to waiting for a ruling from the ITC, recognizing its failure

of proofs before this Court.[19]

Fuji's counsel is well trained in the law. Given the amount of Fuji's financial resources,

and the fact that it gave Mr. Goode a "blank check" to run up a minimum of $100,000.00 in

---

[19] Even more troubling is that after its failure to present the Court with evidence of the
location of first sale, Fuji's counsel promised the Court that it would perform the proper analysis
on 2,700 SUC's at issue "under any circumstance". (Sirota Aff., Exh. D, 10/22/03 Tr. p. 97,
l. 10-11.) After putting the Court and the Debtor through a very expensive exercise, Fuji's
counsel has not lived up to its promise, as no evidence of first sale was ever produced. In fact,
Fuji's counsel has done nothing since the October 22, 2003 hearing with respect to first sale
issue. This is reflected in its letter of January 27, 2004 (Sirota Aff., Exh. F) which seeks a two-
month adjournment to conduct an "independent investigation", although Mr. Field stated that
Fuji had this information available in its own records.

investigative costs in the Far East only to come up empty, only a significant monetary sanction will deter repetition of such misconduct. The Court should also send a clear message to similarly situated creditors that costly "sport" litigation and other illegitimate anti-competition actions will not be tolerated in the Bankruptcy Court. Might does not make right.

As set forth in the Sirota Aff., Cole Schotz has expended $343,603.85 of legal fees and costs through January 27, 2004 in defending against the Motion. The firm of Kaplan & Gilman has incurred fees of $18,016. In addition, the firm of Ravin Greenberg, counsel for the Committee, has also incurred fees that the Debtor must pay. The Debtor respectfully submits that Fuji will not be deterred unless it is required to fully reimburse the Debtor's estate in the total amount of $361,619.85, plus the fees and costs expended by the Committee's counsel.

**II.   FUJI'S COUNSEL VEXATIOUSLY AND UNREASONABLY MULTIPLIED THE PROCEEDINGS RELATING TO THE TRUSTEE MOTION AND THEREFORE, THE COURT SHOULD IMPOSE SANCTIONS PURSUANT TO 28 U.S.C. § 1927**

Section 1927 of Title 28 of the United States Code "is directed against attorneys who willfully abuse judicial processes." Hackman v. Valley Fair, 932 F.2d 239, 242 (3d Cir. 1991) (quoting Colucci v. New York Times Co., 533 F. Supp. 1011, 1014 (S.D.N.Y. 1982). Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred by such conduct.

28 U.S.C. § 1927 (West 2003).[20]

---

[20] The Debtor recognizes that some courts have held that bankruptcy courts lack jurisdiction to impose attorney sanctions pursuant to Section 1927. See e.g. In re Courtesy Inns, Ltd., Inc., 40 F.3d 1084, 1086 (10th Cir. 1994) (holding that bankruptcy courts may not sanction (continued…)

40654/0001-1312895v1

To establish the right to obtain sanctions pursuant to Section 1927, a party must

demonstrate that "an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously;

(3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional

misconduct." Veneziano v. Long Island Fabrication & Supply Corp., 238 F. Supp.2d 683, 693

(D.N.J. 2002). "Indications of bad faith include findings that the claims advanced were

meritless, that counsel knew or should have known that they were without merit, and that the

motive for filing the suit was for an improper purpose such as harassment." Id. at 694. A lawyer

also acts in bad faith when he "pursues a plausible claim because of the costs the suit will impose

on the other side, instead of the potential recovery on the claim." In re TCI Limited, 769 F.2d

441, 445 (7th Cir. 1985) (recognizing that such conduct constitutes "subjective bad faith" and

also is an "abuse of process [that] . . . is independently tortious").

Case law in the Third Circuit establishes that an attorney acts in bad faith by continuing

to prosecute an action that lacks factual support to further an improper purpose. For example, in

Veneziano v. Long Island Pipe Fabrication & Supply Corp., a court in this district found that an

attorney acted in bad faith by (i) making a "serious allegation" against her adversary that "was

utterly unsupported by the voluminous record in th[e] case," (ii) filing a frivolous appeal instead

of limiting discovery requests according to a magistrate judge's instructions, (iii) continuing to

prosecute claims that "utter[ly] lack[ed] factual or legal support," and (iv) prosecuting claims to

---

(…continued)
attorneys pursuant to 28 U.S.C. § 1927, but upholding sanctions pursuant to 11 U.S.C. § 105(a)).
However, as the District Court for the Eastern District of Pennsylvania has recognized, "the issue
of whether § 1927 sanctions should be imposed . . . for . . . conduct during [a] bankruptcy
proceeding[] is one that is properly considered, in the first instance, by the bankruptcy court." In
re Argus Group 1700, Inc., 1997 WL 87623 *3 (E.D. Pa.) (also recognizing that the Third Circuit
has not addressed the issue). A copy of the Argus decision is attached hereto as Exhibit "B."
Accordingly, the Debtor maintains that the Court has jurisdiction to sanction Fuji's counsel
pursuant to Section 1927.

harass her adversary, "with whom she had been in conflict prior to th[e] action." <u>Veneziano</u>, 238

F. Supp.2d at 694.

Likewise, in <u>Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.</u>, the Third

Circuit affirmed a bankruptcy court's decision that a debtor's attorney filed and prosecuted a

complaint against a creditors committee's counsel in bad faith where the attorney made several

unsupported allegations against the committee's counsel, including, <u>inter alia</u>, that counsel

breached its fiduciary duties and defamed the debtor.  <u>Fellheimer, Eichen & Braverman, P.c. V.</u>

<u>Charter Techs., Inc.</u>, 57 F.3d 1215, 1229 (3d Cir. 1995) (recognizing that the bankruptcy court

justifiably determined that counsel acted in bad faith). [21]  Specifically, the bankruptcy court

found that the complaint was asserted for an improper purpose, <u>i.e.</u> to prevent the Committee

from removing the debtor's principal from active management of the debtor's business.  <u>See</u> <u>id.</u>

at 1222.  "That illicit purpose plus the total lack of any evidentiary basis for the serious

accusations made in the Complaint cr[ied] out for judicial recognition and appropriate sanction."

<u>Id.</u>

### A.    <u>Fuji's Counsel Have Pursued the Trustee Motion in Bad Faith.</u>

Fuji's continued prosecution of the Motion, despite its counsel's inability to provide any

factual support for the serious allegations asserted therein, clearly satisfies the Third Circuit's

definition of bad faith.  First, as described at length above, Fuji filed the Motion without offering

any factual support for its allegations, including <u>inter alia</u>, allegations of fraud, breach of

---

[21] Admittedly, the <u>Fellheimer</u> court upheld the imposition of sanctions pursuant to the bankruptcy court's inherent power to sanction attorneys appearing before it, and not pursuant to Section 1927.  <u>See</u> <u>Fellheimer</u>, 57 F.3d at 1224.  However, as with Section 1927 sanctions, before a court may invoke its inherent power to sanction, it must first find that an attorney acted in bad faith.  <u>See</u> <u>id.</u> at 1225.

fiduciary duty and other types of corporate wrongdoing.  See Veneziano, 238 F. Supp.2d at 694

(stating, "[i]n light of the utter lack of factual or legal support for the claims [the attorney] filed

and continued to prosecute . . ., I conclude that [the lawyer's] conduct in pressing these claims

demonstrated willful bad faith").

Second, after the July 30 Hearing, Fuji unabashedly continued prosecuting the Trustee

Motion by initiating extensive discovery on two continents which involved fourteen (14)

depositions and the production of tens of thousands of pages of documents.  As was made clear

during the October 21 Hearing, those efforts failed to produce any evidence that the Debtor

committed the acts alleged in the Trustee Motion.  In fact, the Court chastened Fuji for that

failure stating, inter alia, "I am thoroughly unconvinced as to most, if not all, of what has been

presented by Mr. Rosenthal on behalf of Fuji[.]"  See Sirota Aff., Exh. D, 10/22/03 Tr., p. 225,

l. 21-23.  Notwithstanding such admonitions, Fuji and its counsel continue to prosecute their

groundless motion.

Third, Fuji's "scorched earth" litigation tactics and its continued refusal to abandon a

motion for which it has no factual support belie the true motivation for the Motion, namely Fuji's

intent to damage the Debtor by, inter alia, inflicting huge litigation expenses on the Debtor's

estate.  Also indicative of Fuji's improper purpose is the fact that the Committee has been critical

of the Trustee Motion.  See Sirota Aff., Exh. D, 10/22/03 Tr., p. 77-78.  Clearly, as the Court has

recognized, if Fuji's primary concern is to vindicate its legitimate creditor rights, the Official

Committee of Unsecured Creditors would be sympathetic to its Motion.  See Sirota Aff., Exh. D,

10/22/03 Tr., p. 76, l. 15-17 (wherein the Court states, "[s]houldn't I be more impressed by the

creditor's committee's view . . . than a creditor who has yet another agenda. . .").

### B.    Fuji's Counsel Have Unreasonably and Vexatiously Multiplied the Trustee Motion Proceedings.

As outlined above in Point I, the Motion was woefully deficient at its inception because of its complete lack of factual support.  Notwithstanding that deficiency and clear instructions from the Court regarding what evidence was required to sustain its Motion, Fuji thereafter let loose an avalanche of discovery on the Debtor that entailed numerous depositions and voluminous document productions.  As that discovery progressed, it became increasingly clear that Fuji could not meet its threshold evidentiary burden.

However, Fuji did not withdraw its Motion in light of that inability.  Rather, Fuji continued to beleaguer the Debtor with discovery requests.  Furthermore, Fuji still refused to withdraw its Motion, even after the Court noted that Fuji failed to offer evidence that was sufficient to support the Motion.  That refusal caused the Debtor to prepare for a third hearing on what clearly is a groundless Motion.

By unreasonably prosecuting its Motion, Fuji and its counsel have caused the Debtor and its counsel needlessly to (i) prepare for and attend three separate hearings on the Motion, (ii) prepare and review voluminous document productions, and (iii) prepare for and attend some fourteen (14) depositions both in this country and abroad.  Fuji's actions also have required extensive efforts and participation by the Court, the Committee, and the Office of the United States Trustee.

### C.    Fuji's Counsel Have Caused the Debtor to Incur Otherwise Unnecessary Administrative Expenses.

By wrongfully multiplying the proceedings associated with the Motion, Fuji and its counsel have caused the Debtor's estate to suffer economic harm.  As the Court correctly noted during the October 21 Hearing, litigating the Motion has wasted an enormous amount of the Debtor's resources.  See Sirota Aff., Exh. D, 10/22/03 Tr., p.226, l. 25 to p. 227, l.1 (wherein the

35

Court commented that, "In fairness to the debtor Fuji is largely responsible").  As outlined

above, Cole Schotz has expended $343,603.85 of legal fees and costs through January 27, 2004

in defending against the Motion.  In addition, the firm of Kaplan & Gilman has incurred fees of

$18,016.  Finally, the Committee counsel has incurred legal fees and costs in connection with the

Motion, which are also payable by the Debtor's estate.  It is requested that the Committee's

counsel be directed to submit an Affidavit setting forth the amount of such fees and costs, which

amount should be included in the sanction awarded by the Court.  Because the Trustee Motion

was patently deficient from inception, the Debtor maintains that all of its costs in connection

therewith be chargeable to Fuji's counsel pursuant to Section 1927.

40654/0001-1312895v1

<u>**CONCLUSION**</u>

For the foregoing reasons, it is respectfully requested that the within motion for sanctions

be granted and that the Court afford such other relief as it is just and proper.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Jazz Photo Corp., Debtor-in-Possession


By:___*/s/ Michael D. Sirota*_____
Michael D. Sirota

DATED:  February 3, 2004

37