**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (MS 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ  07068
973-597-2500 phone
973-597-2400 fax

- and -

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
BRIAN M. COGAN
KRISTOPHER HANSEN
180 Maiden Lane
New York, NY  10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JAZZ PHOTO CORP., | : | Case No. 03-26565 (MS) |
| | : | |
| | : | Hearing Date: April 27, 2004 at 2:00 pm |
| | : | |
| | : | |
| Debtor-in-Possession. | : | |
| | : | |

## OPPOSITION TO DEBTOR'S MOTION FOR AN ORDER IMPOSING SANCTIONS AGAINST FUJI PHOTO FILM CO., LTD. AND ITS COUNSEL PURSUANT TO (i) FED. R.  BANKR. P.  9011(b)(1), (2) AND (3), AND (ii) 28 U.S.C. § 1927 AND JOINDER OF JACK C. BENUN

Fuji Photo Film Co., Ltd. ("Fuji"), by and through its counsel, Stroock & Stroock &

Lavan LLP and Lowenstein Sandler PC, submits this opposition (the "Opposition") to the motion

and memorandum of law of Jazz Photo Corp. ("Jazz" or the "Debtor") for an order imposing

sanctions against Fuji Photo Film Co., Ltd. and its counsel pursuant to (i) Fed. R. Bankr. P.

9011(b)(1), (2) and (3) ("Rule 9011"), and (ii) 28 U.S.C. § 1927 ("Section 1927") (the "Sanctions Motion"), and the joinder of Jack C. Benun ("Benun") and request for additional sanctions in connection with the Debtor's Sanctions Motion (the "Benun Joinder"). In support of the Opposition, Fuji respectfully states:

## PRELIMINARY STATEMENT

1.    On the heels of a trial, which resulted in a $30,000,000 judgment against the Debtor and others for intentionally infringing Fuji's patents (the "Fuji Judgment") and the denials of stays of enforcement, which determined that it was not likely that the Debtor would prevail on an appeal and that bankruptcy supervision was needed to prevent further dissipation of assets, the Debtor sought relief under Chapter 11 of the Bankruptcy Code in this Court. At the same time, the Debtor's non-debtor affiliates and subsidiaries, one of which was also subject to the Fuji Judgment, freely operated away from this Court's watchful eye. The Debtor has admitted that the sole reason for its Chapter 11 filing was the Fuji Judgment, making it clear that this Chapter 11 proceeding is little more than a two-party dispute.

2.    The Debtor retained an entity, JCB Consulting, wholly-owned by Benun, now also a debtor in a related Chapter 11 proceeding, and paid it $15,000 per week without Court approval. The names of new corporate entities began to appear with new business relationships with the Debtor but with old and familiar names holding the ownership interests. Clearly, a corporate shell game appeared to be emerging with the potential purpose of shifting value from the Debtor to those outside the jurisdiction of this Court. Given the backdrop of pre-petition willful infringement and questionable real estate transfers from Benun to his family members with all the typical "badges of fraud," it was more than reasonable for Fuji and its professionals to believe that these new revelations provided at least circumstantial evidence that something very wrong was occurring and would continue to occur absent intervention of this Court. Moreover, post-petition patent infringement appeared to be ongoing. This was the reality facing

Fuji, a reality that the Debtor would have preferred Fuji walk away from with its proverbial tail between its legs.

3.      Fuji chose to challenge the Debtor's conduct and its interrelationships with these questionable non-debtor entities and affirmatively pursue the options that the Bankruptcy Code provides to creditors.  Fuji needs no more reason than the Fuji Judgment to justify its posture in these proceedings, despite the Debtor's attempts to focus on an alleged hidden agenda.  Whether Fuji would ultimately mourn the loss of the Debtor is not the issue, although the demise of a company that has been adjudged to have competed illegally via patent infringement would understandably not cause the victim of these tactics to be stricken with grief.  Indeed, this Court should not lose sight of the fact that Fuji is the victim of the Debtor's intentional and illegal conduct and that Fuji firmly believes that such conduct has persisted post-petition, and even to date.  The reason why Jazz finds itself as a Debtor in a Chapter 11 proceeding can be traced directly to its own calculated conduct and that of Benun.

4.      Actions like those taken by Fuji in filing and pursuing its motion to appoint a Chapter 11 Trustee (the "Trustee Motion") under section 1104 of the Bankruptcy Code are not uncommon in chapter 11 proceedings, especially where the conduct of the Debtor's management was the reason why the Debtor was forced to file a petition for relief in the first place, and the Chapter 11 proceeding is essentially the product of a two-party dispute.  Ordering sanctions against a party who exercises rights available to it under the Bankruptcy Code is simply not common.  Section 1104 exists to provide creditors and other parties in interest with a mechanism for replacing management of a debtor when a creditor believes that management is not acting in the best interests of the estate and is not fulfilling its fiduciary duties to creditors – regardless as to whether such acts by management occurred pre-petition, post-petition or both.  Issuing sanctions against a creditor for exercising its rights would send a clear message to creditors that the Bankruptcy Code is not a two-way street that protects debtors and creditors alike, but rather is a single lane highway that encourages debtors to continue to act to the detriment of creditors.

5.    In reliance on the rights provided to it pursuant to section 1104 of the Bankruptcy Code, Fuji filed the Trustee Motion based on a good faith belief founded upon knowledge of pre-petition wrongdoing and available circumstantial evidence that the Debtor's post-petition conduct violated United States intellectual property laws and that the Debtor's assets were being systematically drained both prior to Jazz's bankruptcy filing and continuing thereafter.  Fuji engaged in discovery in connection with the Trustee Motion pursuant to the express authority of the Bankruptcy Rules and under a Discovery Stipulation and Order with Jazz, entered by this Court on September 22, 2003, and presented evidence to the Court in support thereof. Ultimately, based upon the Court's statements and on the likelihood that substantive rulings regarding post-petition infringement from the Administrative Law Judge ("ALJ") of the United States International Trade Commission (the "ITC") would be forthcoming, Fuji withdrew the Trustee Motion without prejudice.

6.    Nothing about Fuji's conduct, or that of its counsel in adhering to its ethical obligations to zealously represent Fuji, is sanctionable.  Indeed, no determination has been made by this Court or the ITC regarding post-petition infringement, which would provide a *per se* basis for the appointment of a Chapter 11 Trustee.  The fact that this Court believed that Fuji fell short of satisfying its heavy evidentiary burden on the other asserted bases for appointing a Chapter 11 Trustee means only that there may have been insufficient clear and convincing evidence, and not that such improper conduct has not taken place.

7.    Most of the discovery complained of in the Debtor's Sanctions Motion was also taken, again, by stipulation, for use in the ITC enforcement proceeding, which will resolve the issue of whether Jazz has been continuing to infringe Fuji's patents and whether Jazz and Benun have violated an ITC Cease and Desist Order both before and after the petition date, May 20, 2003 (the "ITC Enforcement Proceeding").  With the permission of the Court and the consent of Jazz and Benun, the ITC Enforcement Proceeding was allowed to continue to hearing.  In order to avoid duplication of effort and waste of the Debtor's assets, and in view of the overlap of the issues, Fuji, Jazz and Benun agreed that the discovery taken on the Trustee Motion and in the

ITC Enforcement Proceeding would proceed together, and the results of that discovery would be usable in both proceedings. Almost every aspect of the discovery on the Sanctions Motion (and every aspect of the discovery on the patent infringement issue) would have been taken in connection with the ITC Enforcement Proceeding. In fact, most of the evidence gathered was offered into evidence or otherwise relied upon in the hearings held on December 8th through 13th, 2003, before the ITC's ALJ.

8.    Very little of the activity in prosecuting and defending the Trustee Motion occurred after Debtor's counsel sent its "Initial Rule 9011 Letter," dated October 16, 2003. Practically none of the complained of activities occurred more than 21 days after the Initial Rule 9011 Letter or after the Debtor filed its Sanctions Motion. Therefore, very little, if any, of the activity occasioned by the Trustee Motion can even be the subject of the instant Sanctions Motion. The Debtor would have been essentially in the same position it is in today had Fuji withdrawn its motion 21 days after receiving the Initial Rule 9011 Letter.

9.    For many of the reasons discussed above, the Benun Joinder, in which he seeks additional sanctions in the amount of $116,121, must also be rejected. Failing to comply with any procedural requirements of Rule 9011 or bothering to file a separate motion, Benun wishes to go along for the ride and requests a substantial amount in sanctions, which are unjustified by fact or law. Benun seems to forget that Fuji's Trustee Motion never sought any relief against Benun in his individual capacity, and it is puzzling why Benun, fully represented by counsel, had to waste a significant amount of the assets of his estate to defend a motion that did not seek any relief from Benun and did not directly involve Benun. This is just another example of Benun trying to manipulate the Jazz estate for his own personal benefit and using Fuji to ultimately finance that effort. The Benun Joinder is inappropriate by any standard and should be rejected by this Court.

## JURISDICTION

10.    The Court has jurisdiction over this Chapter 11 case and this Objection pursuant to 28 U.S.C. § 1334.  This Opposition presents a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

11.    A patent infringement action by Fuji against Jazz, Benun and Jazz Hong Kong was tried in the United States District Court for the District of New Jersey (the "District Court") at the end of 2002.  In early 2003, the District Court rendered its decision, awarding Fuji $30,000,000 in damages, and then denied Jazz's motion for a stay pending its appeal of the Fuji Judgment in part because Jazz's management, and in particular, Benun, could not be relied upon to protect the interests of creditors, including Fuji.  The District Court highlighted the fact that more than $9 million dollars of Jazz's assets disappeared after being paid to Benun.  The Federal Circuit Court of Appeals likewise denied a stay pending appeal on the ground that it was not likely that the Debtor would prevail on its appeal.  In denying the stay motion, the District Court confirmed Fuji's view that Benun had been looting Jazz, thereby rendering it judgment proof.  The District Court's findings served as the basis for many of the allegations in the Trustee Motion.

12.    On May 20, 2003 (the "Petition Date"), after all its efforts to obtain a stay of enforcement of the Fuji Judgment failed, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to obtain the benefit of the automatic stay (as its efforts to obtain a stay pending appeal had been denied) and to avoid the posting of a supercedeas bond.

13.    On June 24, 2003, Fuji filed the Trustee Motion.  The initial hearing on the Trustee Motion took place on July 30, 2003, on which date several unrelated matters were also heard.  The parties thereafter conducted discovery under the Discovery Stipulation and Order, the discovery rules of the ITC and agreements reached between counsel for the parties in the ITC Enforcement Proceeding.  All but a small portion of this discovery was also related to the ITC

proceeding and would have been taken in connection with that proceeding even in the absence of the Trustee Motion. Thereafter, on October 16, 2003, the Debtor sent what it refers to as its "Initial Rule 9011 Letter"[1] (the "<u>Jazz Letter</u>") to Fuji threatening to file a motion for sanctions if the Trustee Motion was not withdrawn. Hearings on the Trustee Motion were held five days later on October 21 and October 22, 2003. At the conclusion of the hearing held on October 22, 2003, the matter was adjourned to January 8, 2004, which hearing was subsequently rescheduled for February 6, 2004. Little activity other than the October 21 and 22 hearing on the Trustee Motion occurred subsequent to the Jazz Letter.

14.    By letter dated January 27, 2004, Fuji requested that the Court further adjourn the hearing on the Trustee Motion. Fuji believed that based upon prior comments from this Court, the only remaining issue in connection with the Trustee Motion was that of post-petition infringement of the Debtor. Since a decision from the ALJ in the pending ITC Enforcement Proceeding against Jazz, Benun and Jazz' former president, Anthony Cossentino, would be rendered by March or April 2004, awaiting such decision with respect to the Trustee Motion would allow for a determination of whether Jazz was continuing to infringe Fuji's single-use camera patents. Not only had Fuji argued that all of Jazz's past and present cameras infringed Fuji's patents, but the ITC attorneys from the Office of Unfair Import Investigations (referred to herein as the "<u>Staff</u>"), who participate in proceedings before the ALJ as a party representing the public interest, have also taken the position that about 90% of Jazz's cameras imported from <u>August 21, 2001 through December 12, 2003</u>, including cameras of the type currently being imported from Polytech Enterprises (Shenzhen) Ltd. ("<u>Polytech</u>"), infringed Fuji's patents. Furnished in a confidential addendum to this Opposition as Exhibit "A" ("<u>Confidential Exhibit A</u>"), subject to the Protective Order entered in this case, is the Staff's opening brief, which contains a recommendation for the imposition of $10 million in civil penalties, the largest fine

---

[1] In addition to the Jazz Letter, the Debtor sent a letter on January 15, 2004 that threatened to hold Fuji liable to pay the Debtor's legal fees if Fuji did not withdraw the Trustee Motion.

ever imposed if adopted by the ALJ Commission, but far less than the maximum penalty permitted by 19 U.S.C. § 1337(f)(2).

15.     During a conference call held on January 27, 2004 between the Court, counsel for Fuji and counsel for Jazz, the Court expressed its unwillingness to continue the hearing on the Trustee Motion.  The Court informed all parties that it did not believe that Fuji had met its burden for the appointment of a chapter 11 trustee and that it was prepared to rule on the matter on February 6, 2004.

16.     Shortly after the conference call on January 27, 2004, counsel for Fuji, mindful of the Court's directive to "reduce" the litigation costs in the Debtor's case, the significance of a ruling by the ALJ in the ITC proceeding, which was anticipated in approximately sixty (60) to ninety (90) days, and the Court's view as to the allegations other than post-petition infringement in support of the Trustee Motion, withdrew the Trustee Motion without prejudice.

17.     Notwithstanding the considerable amount of evidence presented by Fuji in support of the Trustee Motion, the pendency of the ITC Enforcement Proceeding and Fuji's voluntary withdrawal of the Trustee Motion, on February 3, 2004, the Debtor's counsel filed the Sanctions Motion.[2]

## **ARGUMENT**

### I.     **THE DEBTOR IS NOT ENTITLED TO RELIEF UNDER RULE 9011**

#### A.     **Fuji Had a Reasonable Basis for Filing its Trustee Motion, Which Precludes the Imposition of Rule 9011 Sanctions on Fuji and its Counsel**

18.     Ignoring the procedural defects of Jazz's Sanctions Motion, which are addressed below, the imposition of Rule 9011 sanctions is not warranted in this case.  As the Court is aware, Rule 9011 sanctions are only imposed where a party, prior to presenting to the court a petition, pleading, motion or other paper, fails to make a **reasonable inquiry** into the factual and

---

[2] Although the Sanctions Motion appears to be seeking to impose sanctions against Fuji <u>and its counsel</u>, notice of the Sanctions Motion failed to mention Fuji's counsel.

legal basis of the claims and contentions present in its paper, or presents such paper for an improper purpose.  Fed. R. Bankr. P. 9011(b) (*emphasis added*).  Reasonableness has been defined as "an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact."  *In re Kauterick*, 167 B.R. 353, 362 (Bankr. D. N.J. 1994) (quoting *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 289 (3d Cir. 1991)).  *See also*, *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 544 (1991) (holding that under Fed. R. Civ. P. 11 an objective standard of reasonable inquiry is to be imposed on anyone signing a pleading or other paper).

### B.    Fuji's Allegations Made in the Trustee Motion Were Grounded in Fact

19.    At the time it filed the Trustee Motion, Fuji and its counsel had good reason to believe that the allegations made in the Trustee Motion had evidentiary support and that additional evidence could be uncovered through discovery.  *See* Declaration of Lawrence Rosenthal, submitted herewith.  Those allegations and the factual support for Fuji's belief as to each of these allegations were as follows:

> Allegation (a):  *Debtor is a company organized for the purpose of violating the law (by infringing Fuji's patents), a practice that continues to this day, even after repeated agency and court findings of infringement;*[3]

20.    Fuji's allegation was reasonably supported by the litigation history between Fuji and the Debtor and is believed by Fuji to be true to this day.  It is uncontested that the Debtor was organized to sell the single use cameras ultimately found to infringe by the ITC and the District Court.  On March 25, 1998, the Debtor was served with a complaint filed by Fuji before the ITC and an Order of the ITC, which noticed the institution of an official investigation of unfair trade practices in violation of section 337 of the Tariff Act by the Debtor and various other entities.  Trustee Motion at 16.  The ALJ conducted a hearing and issued his Initial and Final

---

[3] These allegations are contained in Fuji Memorandum of Law filed in support of Trustee Motion dated June 24, 2003.

Determination on February 24, 1999, whereby the Debtor was found to have infringed Fuji's patents through the sale of all of its newly made and reconstructed single use cameras. *Id.* at 16-17. On June 2, 1999, the Commission upheld the ALJ's ruling and issued a Cease and Desist Order against the Debtor. *Id.* at 17. On August 21, 2001, the Federal Circuit affirmed the Commission's orders as to the Debtor. *Id.* On February 25, 2003, the District Court issued its judgment finding that all but 380,944 of the 39,718,425 refurbished single use cameras and all of the newly made single use cameras Jazz sold from its inception through the August 21, 2001 cut-off (for a total of 40,928,185 cameras) are infringing. *Id.* at 18; *Fuji Photo Film Co. v. Jazz Photo Corp.*, 249 F. Supp.2d 434, 452 (D. N.J. 2003) ("*Fuji v. Jazz*"). The ITC, in a pending Enforcement Proceeding, is investigating whether Debtor's cameras sold since August 21, 2001 infringe Fuji's patents. While Fuji contends that all such cameras infringe, the ITC Staff has concluded that almost 90% of such cameras infringe, including most of Polytech's post-petition production.[4] The Debtor's business practices over the years have amounted to continued infringement of Fuji's patents even after successive judgments of infringement. Although the ITC, District Court and Federal Circuit findings of infringement are pre-petition, they nevertheless support Fuji's allegation of continuing post-petition infringement, especially when joined with the current ITC Enforcement Proceeding, which will determine, in fact, whether the Debtor engaged in post-petition infringement. Those issues have yet to be determined and this

---

[4] The Staff's conclusion that nearly 90% of the single use cameras sold by Debtor in the United States since August 21, 2001 infringe Fuji's patents (Fuji contends the number is 100%) is based on proof of the sale by Debtor of cameras made from the shells of cameras first sold outside the United States, as well as proof of some refurbishment processes amounting to infringing reconstruction and the failure of the Respondents (the Debtor, Benun and Cossentino) to prove the processes used to refurbish many of the cameras. Appendix B to Confidential Exhibit A. Here and in the ITC, the Debtor relies on an "Informed Compliance Program" ("ICP") to prove non-infringement. That program purports to assign "MLN" numbers to shipments of empty used shells from the United States and "SLN" numbers which include MLN numbers to shipments of cameras from the factory in China to Jazz in the United States. The Debtor and Benun have falsely represented that the presence of MLN/SLN numbers on various documents guarantees that the imported cameras were made from the shells of cameras first sold in the United States. The reality is that no post-petition Polytech invoice has an SLN number, as would be required by the ICP program. The Staff's conclusions as to the inadequacy of Jazz's ICP program are found at pp. 26-27 and 49-51 of Confidential Exhibit A. At best, even were it properly implemented, ICP merely insures that shells came from U.S. providers, not that they were from cameras first sold in the U.S.

Court has more than once indicated that post-petition infringement would provide an independent basis for the appointment of a Chapter 11 Trustee. Yet, the Debtor seeks to sanction Fuji and its counsel even prior to a determination on the merits. As more fully set forth below, it is respectfully submitted that pre-petition activities are in fact relevant to the Trustee Motion.

> *Allegations (b) and (c):  Notwithstanding his nominal title of "consultant," Debtor is the alter ego of Benun operated for the benefit of Benun (and to a lesser extent, the benefit of his appointed officers), to the detriment of all creditors;*
>
> *Pre-petition, Benun systematically looted Debtor, a conclusion reached by the District Court in the action which gave rise to Fuji's judgment;*

21.    Fuji's good faith belief in allegation (b) that the Debtor is the alter ego of Benun and is operated for the benefit of Benun, and allegation (c) that Benun systematically looted the Debtor pre-petition were based on the findings set forth in the District Court's Opinion in *Fuji v. Jazz*. Support for these allegations was presented in the Brief, starting on page 9, titled "III. Benun and the Debtor". The Brief includes extensive quotations from that District Court Opinion in addition to citing the SEC filing. Brier Dec. Ex. 11 to the Trustee Motion[5]. These transcript citations and quotations and the District Court's decision all supported the allegation that Benun looted the Debtor and provided circumstantial evidence that such conduct was continuing. Indeed, Benun personally guaranteed obligations to purchase materials for use by Polytech. That this evidence is largely pre-petition does not make it irrelevant to the Trustee Motion.

22.    The District Court stated that Benun's purported resignation was not a relinquishment of control over the company, but rather was designed to facilitate the public offering of Jazz's stock. *Fuji v. Jazz*, 249 F. Supp.2d at 458. *See also* Trustee Motion at 13.

---

[5] The Debtor complains of Fuji's reliance on the Declaration of Ms. Brier, a Stroock paralegal, but that complaint is misplaced. Ms. Brier merely authenticated the numerous documents actually re lied upon and her Declaration was perfectly proper.

The District Court also noted that while Benun purported to be a consultant, he was paid over $11,000,000 in direct payments and forgiven loans which represented more than four times the company's retained earnings during the relevant time period. *Id.* at 13-14. The District Court considered this to be the "most probative evidence" of Benun's control. *Id.* at 13. The District Court went on to state how millions of dollars flowed from the Debtor to Benun but vanished from Benun's ledger entirely. *Id.* at 14. The District Court stated that although the Debtor's business was successful, by all appearances nothing remained in the Debtor. *Id.* at 14.

23. The District Court even added that there was little hope that the Fuji Judgment would receive any protection during the pendency of the appeal because of Benun's practice of causing himself to be paid substantial portions of the Debtor's available funds and then disposing of them. *Id.* at 15. The District Court chronicled payments of $11.9 million and stated that $9 million of those funds simply disappeared without a trace after looking at Benun's financial statements. *Id.* Further the District Court said that under these facts there was utterly no basis to conclude that Benun would take appropriate steps to protect his own or the Debtor's assets for the benefit of creditors. *Id.* The District Court's illustrations of Benun's control and unreliability effectively encouraged Fuji to ultimately file the Trustee Motion, especially given the signals provided by the questionable post-petition transactions of the Debtor. Accordingly, there is no doubt that allegations that Benun systematically looted the Debtor and that the Debtor was the alter ego of Benun had a reasonable basis, as they were derived from the District Court opinion and the Debtor's SEC filings.

> Allegation (d): *Post-petition, Benun continues to loot Debtor, exacting a $15,000 per week "consulting" fee, while his primary service seems to be establishing new business practices to insure that Debtor's profits remain hidden from creditors;*

24. Fuji asserted that Benun was receiving a $15,000 per week consulting fee through his alter ego consulting firm, JCB Consultants, without providing commensurate services, which would result in the looting of Jazz. One can reasonably assume that exacting such a huge fee from a company that is insolvent can be considered self-dealing and prejudicial to creditors.

-12-

This is further supported by statements made by Benun at a deposition in a state court collection action on June 24, 2003, where Benun admitted that JCB and Benun directed the Debtor not to make the $15,000 weekly payments to JCB, but rather directed the Debtor to issue money orders to pay various obligations of Benun in an attempt to prevent Fuji from collecting on its judgment against Benun.  In fact, this Court appeared to agree, in part, with Fuji on this issue.  At the July 30th hearing, this Court stated that even a lower $12,500 per week payment was too high.  *See* Trustee Hearing, July 30, 2003, 88:25-89:18.  This Court stated that for the Court to go ahead with this expenditure would be reckless under the circumstances.  This lead to the creation of a $5,000 per week reserve account from the compensation agreed to between Benun, the Debtor, the U.S. Trustee and counsel for the Creditor's Committee.  Trustee Hearing, July 30, 2003, 91:2-6.  Accordingly, Fuji's allegation that $15,000 per week was wrongfully being funneled through JCB Consulting was more than appropriate.

25.    Fuji's allegations were also based on Benun's and the Debtor's involvement in the organization of entities in Hong Kong and China (Polytech Hong Kong and Polytech China) and the Debtor's new practices of dealing directly with suppliers.  Polytech Hong Kong became a $ 1.5 million creditor of the Debtor within 60 days of the filing date.  There was no reasonable explanation for why Polytech Hong Kong was the only supplier that remained unpaid despite the fact that the Rosenthal & Rosenthal factoring agreement was operative until only a few days before the filing of the Bankruptcy petition.  Trustee Motion at 23, 26.  It was more than reasonable to make this allegation and proceed with discovery to expose these business practices that were reasonably suspected to be detrimental to creditors.  That Fuji failed to find sufficiently persuasive clear and convincing proof of Benun's interest in the Polytech companies to satisfy the high evidentiary threshold for the Trustee Motion despite the substantial circumstantial evidence of his "interest" in these companies does not mean that it was unreasonable for Fuji to assert that contention and take discovery on this issue.  In fact, Fuji did request the testimony of Kitty Wong (founder of Polytech Hong Kong) and Mr. Lau (the alleged owner of Polytech China).  Ms. Wong was conveniently out of Hong Kong during the 10 days Stroock lawyers

were in Hong Kong and Mr. Lau, who obtained permission to come to Hong Kong, was too busy to appear while the Stroock lawyers were available. He suddenly became available after the last Stroock lawyer left Hong Kong. *See* Declaration of Lisa A. Jakob, submitted herewith. There was no practical way to compel their attendance at depositions.

> Allegation (e): *Benun organized the Debtor, including the formation and use of a fully controlled wholly owned subsidiary, Jazz Photo (Hong Kong) Ltd. ("Jazz Hong Kong") (itself, not a debtor in any bankruptcy proceeding, but, with Benun himself, jointly and severally liable for Fuji's judgment), in a way which hides, in Asia, whatever profits were not directly taken by Benun, leaving nothing for creditors of the Debtor;*

26.    Fuji's allegation was reasonable in light of the inconsistent statements surrounding the operations of Jazz Hong Kong. On page 20 of the Trustee Motion, Fuji discussed that Mr. O'Grady, Benun's counsel at the May 27, 2003 hearing, stated that he found out from Mr. Cossentino that the Jazz Hong Kong transactions included a mark-up for Jazz Hong Kong as profit margin. *Id.* at 20. However, Debtor's counsel previously represented that the purchases from Hong Kong were without any mark-up other than to cover Jazz Hong Kong's payroll. *Id.* Fuji reasonably believed that the Debtor, controlled by Benun, allocated costs and expenses between the Debtor and Jazz Hong Kong as it suited their collective purposes and without regard to the Debtor's fiduciary duties to its creditors. *Id.* In further support of this allegation, Fuji cited an internal memorandum of Rosenthal & Rosenthal, dated February 5, 2001, which states that most of the Jazz profit is in the Hong Kong operation. *Id.* at 21. Thus, it was reasonable for Fuji to make the allegation and take discovery on the issue of how the Debtor was using Jazz Hong Kong.

27.    Fuji also relied on evidence that Benun exerted control over most camera manufacturers in Asia based on Mr. Lorenzini's testimony in the District Court. *Id.* at 22. Taking this evidence together with Benun's prior use of a Hong Kong subsidiary of his former company to embezzle money, as evidenced by the SEC investigation and settlement, *id.* at 5-6, and given Benun's influence over manufacturers in Asia and the perceived lack of a business

-14-

reason for eliminating Jazz Hong Kong and its two wholly-owned manufacturing subsidiaries from the supply chain, it was quite reasonable to assume that Benun was once again taking advantage of the lack of transparency of transactions in Asia to the detriment of the estate's creditors.  Further evidence which supported this allegation was Benun's willingness to risk the assessment of huge civil penalties by the ITC[6] in the ITC Enforcement Proceeding in exchange for $15,000 per week in compensation, where such civil penalties are likely not dischargeable in bankruptcy.  *See* 11 U.S.C. §523(a)(7); *see also Commonwealth of Kentucky, Nat'l Res. and Envtl. Prot. Cabinet v. Seals*, 161 B.R. 615, 619 (W.D. Va. 1993)(surface mining reclamation penalties imposed against debtor were penal in nature and nondischargeable); *In re Poule*, 91 B.R. 83 (9th Cir. BAP 1988)(civil penalties assessed by California Registrar of Contractors for violation by debtor of licensing law held nondischargeable).  This conduct reasonably suggested sources of revenue for Benun other than direct payments from Jazz.

> Allegation (f):  *In the period immediately before filing the petition, the Debtor and Benun conspired to reorganize the Debtor's business so that assets are now being funneled out of the Debtor's estate to entities in Asia over which Benun wields influence or control (some of which entities appear to have just recently become suppliers), effectively eliminating even the limited transparency provided by dealing with a wholly-owned foreign subsidiary over which this Court can exercise jurisdiction;*

28.    Fuji's Trustee Motion detailed considerable circumstantial evidence that, when taken together, formed a reasonable basis for this allegation.  Immediately before filing the petition, Mr. Cossentino represented to the District Court and the Federal Circuit Court of Appeals that Jazz Hong Kong was primarily the purchasing arm for Jazz.  Trustee Motion at 21. Mr. Cossentino's Declaration in support of the first day Motions confirmed this business practice.  However, at the May 30, 2003 hearing, Mr. Cossentino conceded that the Debtor was bypassing Jazz Hong Kong and dealing directly with suppliers such as Polytech, notwithstanding

---

[6] The ITC Staff recommended $10 million against both Debtor and Benun, far less than the statutory maximum. *See* Confidential Exh. A at 56-57, 71-72.

his earlier representations to the contrary.  One reasonable explanation was that the factory now called Polytech China and its parent, Polytech Hong Kong, were considered a part of Jazz Hong Kong until Benun perceived it advantageous to deem the Polytech companies to be separate entities.  *Id.*

29.     As discussed in the Trustee Motion, the suppliers with whom Mr. Cossentino testified that Jazz was doing business were Everbest and Polytech.  Fuji had evidence that they were not only affiliated but overlapping with Jazz Hong Kong and appeared to replace two wholly-owned subsidiaries of Jazz Hong Kong, which previously supplied cameras to Jazz Hong Kong for delivery to Jazz.  *Id*. at 22-23.  The belief that this so-called business reorganization was done to divert profits away from the Debtor and, therefore, its creditors, was reasonable.

30.     Documents cited in the Trustee Motion establish that Jazz Hong Kong was billed by Polytech Hong Kong for sixty cents a shell, the same amount as the invoice from Photo Recycling Enterprises ("PRE") to Wing Shan, PRE's Hong Kong sister company, which in turn "sold" the shells to Polytech Hong Kong.  *Id*.  Apparently there was no profit along the chain of supply from Photo Recycling Enterprises to Jazz Hong Kong.  Discovery revealed that PRE was, itself, organized by Mr. Leon Silvera at Benun's request using Jazz' capital.  Although Jazz was paying for the film and shells, a debt was created to Polytech Hong Kong on a per camera basis.  This transaction was suspect and warranted further investigation.  Further investigation of Polytech Hong Kong's records revealed that Wong Titi Tai Tai (discovered to be Kitty Wong, an employee of Jazz Hong Kong until November 2002) was appointed director of Polytech Hong Kong in May 2002.  Kitty Wong was a former director of Fordteam Limited, Jazz Hong Kong's predecessor. This transaction and corporate overlap, coupled with the fact that only one supplier, Polytech Hong Kong, was left unpaid notwithstanding the continuous existence through only a few days before the filing of the Chapter 11 petition of the Rosenthal & Rosenthal factoring agreement, made it reasonable to believe that this was engineered to assure the presence of Polytech Hong Kong as a creditor and Mr. Leon Silvera's presence on the creditors committee as its proxy.  *Id.* at 26.  Mr. Silvera is admittedly another associate of Benun.  All of this evidence,

taken together, shows a change in business practices contemporaneous with the time of the filing the Chapter 11 petition. The change resulted in entities influenced by Benun receiving profits as suppliers but not subject to divestiture or the jurisdiction of this Court because they were supposedly unrelated to Jazz. That Fuji was unable to obtain sufficient clear and convincing direct proof of the allegation, resulting at least in part from the convenient absence of Ms. Wong and the failure of Mr. Lau (claimed to be Polytech China's "owner") to show up for depositions, does not mean the allegation was baseless or untrue.

> Allegation (g): *In April of 2002, Polytech was organized. It is now the second largest creditor and represented on the Creditors' Committee by a business associate of Benun. Notwithstanding representations to the contrary to the Office of the U.S. Trustee, the director of Polytech is a person believed to be a key employee of Jazz Hong Kong.*

31.     As discussed above, Polytech Hong Kong is the second largest creditor of the Debtor at $1.5 million dollars and is represented by Mr. Leon Silvera, Benun's business associate, on the creditors committee. Trustee Motion at 23. As further discussed above, Kitty Wong, a former director of the predecessor to Jazz Hong Kong and an employee of Jazz Hong Kong was found to be the director of Polytech Hong Kong and even to have continued to execute documents on behalf of Jazz Hong Kong after she became a director of Polytech Hong Kong. This allegation has ample support and is further circumstantial evidence of the Debtor's self-dealing.

> Allegation (h): *Debtor and Benun's misconduct continues post-petition, including Debtor and Benun making misrepresentations of fact to this Court and to the U.S. Trustee, such as that Polytech and another entity, Everbest, are totally unaffiliated with Jazz Hong Kong, and the continuing looting of the Debtor by Benun;*

32.     As discussed above under allegation (e), Mr. Cossentino represented at a May 30, 2003 hearing that Everbest was unaffiliated with Jazz Hong Kong. Trustee Motion at 22-23. However, Everbest was originally a supplier of Jazz Hong Kong and Jazz Hong Kong used the same factory manager and workers when it operated its wholly owned subsidiary, referred to

internally as JPFE (the "E" representing "Everbest"). *Id.* at 23. Mr. Cossentino also represented to Ms. Jurow, the Assistant United States Trustee, that Mr. Benun had confirmed that Polytech Hong Kong and Jazz Hong Kong were unaffiliated. However, as discussed above, the director of Polytech Hong Kong was a key employee of Jazz Hong Kong and the evidence demonstrated that she was working for Jazz Hong Kong while she was a director of Polytech Hong Kong which entity purported to do business with Jazz Hong Kong. *Id.* at 24-25. Polytech Hong Kong is also represented by Mr. Silvera, a business associate of Benun, who was on the Creditor's Committee. Accordingly, it was reasonable for Fuji to allege the impropriety of this relationship and to further investigate the relationship between these companies.

> Allegation (i): *The history of the Debtor is replete with preferences and fraudulent transfers to Benun, members of his family and others, and improper conduct by officers and of directors, that will not, and perhaps cannot, be pursued by the Debtor, or even by the Creditors' Committee as it is presently formed; and*

33.    Given the huge sums of money paid to Benun through JCB Consultants and bonuses by way of loan forgiveness or otherwise discussed by the District Court, and the transfers of real property to Benun's children, this allegation was reasonably made. *Id.* at 7-12, 14. The Trustee Motion detailed sudden repayments in 2002 of long-standing debts to Benun's family, payments to Skadden Arps as special counsel for Benun in the District Court litigation, payments to Benun's brother for alleged services that were unknown even to the Debtor's president and transactions in Asia that lacked clear transparency, *id.* 26-27, all of which left an apparently successful business, as noted by the District Court, effectively insolvent. *Id.* at 14. That these allegations related to pre-petition conduct did not make them irrelevant to the Trustee Motion.

> Allegation (j): *The pre-and post-petition misconduct in this case is predictable from Benun's history of embezzlement from a prior company run through the use of a Hong Kong subsidiary.*

34.    Benun was charged by the SEC with misappropriating $150,000 from his prior company, Concord, by having an employee of a Hong Kong subsidiary receive money and transfer it back to Benun through friends of his.  *Id.* at 5.  The motion cited Brier Declaration Exhibit 3, which is the SEC's complaint for permanent injunction detailing the fraud.  *Id.*  The motion stated that Benun had been subject to a lifetime ban from holding office in a public company.  *Id.* at 6 (citing the final judgment and permanent injunction by the United States District Court in *SEC vs. Jack Benun*).  Fuji further supported the allegation of Benun's embezzlement history with the admission of Benun that on August 25, 1999 an arbitrator issued an interim award where he concluded that Benun had defrauded Concord by embezzling $150,000 of the company's money.  *Id.* at 6 (citing Brier Dec. Exh. 5 and Brier Dec. Ex. 6 at 107-108 and Exh. 7 at 61-62, 64, 95-97).  This prior misconduct involves embezzlement from a Hong Kong subsidiary and shows a history of using Hong Kong companies for illegal personal gain.  It was certainly reasonable for Fuji to believe that given the appearance of these new business entities such as Polytech and Photo Recycling Enterprises, controlled by or through a business associate of Benun, that this type of activity was happening again.

> Allegation (k):  *As will be pointed out more particularly below, Debtor and the real party in interest, Benun, are in the remarkable position of satisfying nearly every criteria for the appointment of a Trustee including, fraud and dishonesty (or in the alternative, incompetence and gross mismanagement), as well as the need to protect the best interests of creditors.*

35.    Fuji's allegation finds reasonable basis in the District Court opinion that Benun could not be trusted to safeguard the Debtor's assets for the benefit of creditors.  As noted above, the District Court stated that "there was utterly no basis to conclude that Benun would take appropriate steps to protect his own or Jazz's assets for the benefit [of] Fuji during the pendency of appeal."  *Id.* at 15.  The District Court's conclusions were based on the evidence of Mr. Benun's failure to account for $9 million in funds which disappeared "without a trace."  *Id.*

36.    Benun's history of hiding assets as stated in the Trustee Motion further forms a basis for the foregoing allegation.  *Id.* at 7-8.  There are four properties, which Fuji alleged

Benun to be the true owner of, that were all offered as security for the Debtor under the Rosenthal & Rosenthal factoring agreement. *Id.* at 7, n. 4. In support of this statement, Fuji cited deeds in which Benun transferred 3 of the 4 properties to his daughters Rebecca, Sabrina and Vanessa. *Id.* (citing Brier Dec. Exhs. 13, 14 and 15 respectively). In furtherance of this allegation, the Trustee Motion recited that one of the properties, owned by Rebecca, was occupied by Roger Lorenzini, the former president of the Debtor, in which he lived rent-free. However, Fuji was not able to depose the purported owners of these properties.

37.    It was reasonable for Fuji to allege that Benun's properties were transferred to Benun's children to shelter his assets from his creditors and that Benun, still asserting control over the property, had the properties mortgaged as security for the Rosenthal & Rosenthal factoring agreement. A company called Kintec held the fourth property located in New York City. *Id.* at 8. The Trustee Motion recited the close ties of Kintec corporation to Benun (it is owned by a Hong Kong company in turn owned by Jesse Szeto, the General Manager of Jazz Hong Kong and the condominium apartment in question is occupied by a friend of Benun, Carla Drummond, essentially rent-free. *Id.* The Kintec property, like the other three properties, was also used for collateral security for the Debtor's financing with Rosenthal & Rosenthal. This evidence, taken together, including the knowledge that each property was mortgaged in favor of the Debtor, formed a reasonable basis to assume that these property transfers were yet another way that Benun shielded assets of Jazz from creditors. Most discovery on the Kintec apartment was likewise cut off.

38.    Fuji did not insist on discovery of the persons involved in the foregoing transactions, but rather reserved such discovery for an avoidance action, the bringing of which is deferred in light of tolling agreements now in place in the Benun Chapter 11 proceeding.

**C.    Fuji's Legal Arguments in the Trustee Motion were Supported by Law**

39.    Section 1104(a) of the Bankruptcy Code provides that, after the commencement of the bankruptcy case but before the confirmation of a plan, on request of a party in interest, the

bankruptcy court shall appoint a trustee "(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, **either before or after the commencement of the case** … or … (2) if such appointment is in the interest of creditors, any equity holders, and other interests of the estate…."   11 U.S.C. § 1104(a)(1)-(2)(*emphasis added*).

40.    The language of § 1104(a)(1) of the Bankruptcy Code does not contain an exclusive list of causes mandating the appointment of a trustee.  Rather, courts have considerable discretion to decide whether cause exists, such that a trustee must be appointed under § 1104(a)(1), based on the specific facts and circumstances of each case.  *See In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 473 (3d Cir. 1998); *In re Sharon Steel Corp.,* 871 F.2d 1217, 1228 (3d Cir. 1989); *Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc*., 828 F.2d 239, 242 (4th Cir. 1987).  In addition to fraud, dishonesty, incompetence and gross mismanagement (all of which Fuji reasonably believed to exist in the case at bar), factors used by courts to determine that cause exists include: (i) materiality of the misconduct of the debtor's management, (ii) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors, (iii) existence of pre-petition voidable preferences or fraudulent transfers, (iv) unwillingness or inability of management to pursue estate causes of action, (v) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (vi) self-dealing by management or waste or squandering of corporate assets. *See In re Marvel Entm't Groups, Inc.,* 140 F.3d at 472-473; *In re Sharon Steel Corp.,* 871 F.2d at 1228; *In re Intercat*, 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000).

41.    In *In re Intercat* [7], a case similar to the Debtor's case, a Bankruptcy Court found that Mobil, a creditor, demonstrated cause for appointing a trustee under § 1104 of the Bankruptcy Code.  *In re Intercat, 247 B.R.* at 922.  The Bankruptcy Court held that Intercat's **pre-petition** willful infringement of the patent rights of W.R. Grace was evidence that the

---

[7] The Sanctions Motion incorrectly states that Fuji has conceded that *Intercat* is not applicable to the case at hand.

debtor's management was guilty of dishonesty and that these dishonest actions resulted in a judgment of $22 million to be entered against the debtor. *Id.* In addition, the Bankruptcy Court found that the excessive **pre-petition** payment of compensation to Lippert and later **pre-petition** forgiveness of certain loans made by Intercat to Lippert, at a time when Intercat was suffering from severe financial losses, but still pre-petition, was evidence of mismanagement. *Id.* The Bankruptcy Court also found evidence of self-dealing and transfers of assets of the debtor to other entities controlled by Lippert **pre-petition** was a violation of the fiduciary duties that Lippert owed to creditors of Intercat. *Id.* These acts, individually and collectively were found to establish the need for the appointment of a trustee to oversee the financial management of Intercat during the bankruptcy, as well as to prosecute all estate causes of action. *Id.* at 923.

42.     Fuji was entitled to rely on the similarities between this case and *Intercat*, to move for appointment of a trustee based, in part, on pre-petition conduct. Similar to Mobil in *Intercat*, Fuji, by far the Debtor's largest creditor, believed that sufficient cause existed to require the appointment of a chapter 11 trustee. The Debtor's and Benun's willful infringement of Fuji's patents as found by the District Court is demonstrative of Benun's dishonesty. The Debtor's conduct during the pendency of the District Court proceeding, such as withholding documents in discovery, then producing them when it suited its purpose and instructing a shell supplier as to how to falsify invoices to mask the shell supplier's involvement, was believed to be further relevant evidence of dishonesty.

43.     From 1995 through 2002, the Debtor's books and records showed a cumulative gross profit of $93,164,386, a cumulative net loss of $440 million and cumulative payments to Benun of $10,809,725. Brier Dec. Exh. 1 at 4–5 and Exh. B. The District Court found that the Debtor's infringement of Fuji's patents from 1985 through August 21, 2001 made it liable to Fuji for almost $30,000,000. Brier Dec. Exh. 2 at 1-2.

44.     In denying the Debtor's application for a stay of the $30,000,000 judgment pending appeal without posting a supersedeas bond, the District Court confirmed Fuji's belief that Benun cannot be trusted to manage the Debtor for the benefit of anyone but himself:

> [T]here is little hope that Fuji's judgment would receive any protection during the pendency of the appeal in the matter absent the posting of a supersedeas bond. . . . This is particularly true given Mr. Benun's practice of causing himself to be paid a substantial portion of Jazz's available funds and disposing of them. . . . **Under these facts, there is utterly no basis to conclude that Mr. Benun would take appropriate steps to protect his own or Jazz's assets for the benefit (sic.) Fuji during the pendency of appeal.**

Brier Dec. Exh. 2 at n. 4 (*emphasis added*). Fuji was entitled to rely on these findings, as a basis in part, to initiate the Trustee Motion.

45. After years of intense litigation that resulted in (i) a determination by the ALJ that the Debtor's single use cameras infringed Fuji's patents, (ii) an affirmation of the ALJ's finding by the ITC and the subsequent issuance by the ITC of a Cease and Desist Order barring, *inter alia*, the importation of infringing single use cameras by Jazz, (iii) a District Court finding that Benun and Jazz systematically and in part, willfully stole Fuji's technology for their own profit to the detriment of Fuji, specifically that only 380,944 out of about 4 million refurbished cameras sold during the period did not infringe and (iv) a District Court ruling that Jazz must post a supersedeas bond because Benun is not trustworthy enough to preserve Jazz' assets for the benefit of Fuji - Fuji, as Jazz' largest creditor, had more than a good faith basis to move for the appointment of a chapter 11 trustee under § 1104 of the Bankruptcy Code.

to December 13, 2003 confirmed that, in fact, infringement has continued post-petition while the Debtor was under the protection of this Court.  In the separately submitted confidential Post-Hearing Brief of the ITC Staff, the Staff concludes that 90% of the tens of millions of single-use cameras sold since August 21, 2001 infringe.  *See* Confidential Exhibit A.  When Fuji's counsel visited Polytech China to videotape the process in September of 2003, Kodak cameras were being refurbished by a process, which the Staff concludes violates Fuji's patents.  *See* Confidential Exhibit A, at 40-44.  Jazz and Benun have recently represented to this Court that Jazz has an order from Wal-Mart for another 11 million cameras, which order will be filled by single use cameras that in all likelihood will likewise infringe.

46.    That all of Jazz's single use cameras infringe Fuji's patents, in that they are made from cameras covered by Fuji's patents, is not in dispute.  Rather, Jazz has asserted that it can prove that all of its cameras are entitled to the affirmative defense of repair, because all are allegedly made consistent with the Federal Circuit's 8-step safe harbor process and all are made from shells of cameras first sold in the United States.  Jazz only indirectly proves that its cameras are made from shells of cameras first sold in the United States, because all it can prove, at best, is that it purchases shells from U.S. collectors.  On the first sale issue, Jazz argues that Fuji improperly relies on the country of manufacturer, where the Federal Circuit test is country of first sale.  But Jazz is wrong in this assertion, since there is a direct correlation between country of manufacture and country of first sale as to Fuji's cameras.  This is because only a small percentage of cameras sold by Fuji in the US., after the Fuji Greenwood factory was established in 1995, were made outside the U.S.  In fact, Fuji has identified Jazz's cameras that were made from shells of cameras, which were unequivocally sold overseas.  For example, Fuji found two models of its cameras (referred to as Types 2 and 3) which had never even been sold in the U.S. and seven of eight models of Konica cameras, which were likewise never sold in the U.S., but all such models were refurbished by Jazz.  Thus, Fuji reasonably believed that Jazz was unlikely to be able to support its affirmative defense.  Fuji had an objective good faith belief that Jazz continued to infringe its patents post-petition, even if Fuji's proof was considered insufficient in

this Court to rebut Jazz's naked allegation of first sale and the affirmative defense of repair. It is submitted that this Court's conclusion is based on the shifting of the burden of proof to Fuji from Jazz (where the Federal Circuit placed the burden), and the high burden imposed on Fuji of proving infringement by clear and convincing evidence. As noted above, Fuji fully expects the ITC's ALJ to vindicate Fuji's belief that Jazz and Benun infringed Fuji's patents post-petition. The issue is not whether every camera infringes, but whether any infringement continued post-petition. That 90% of the cameras sold after August 21, 2001 infringe, as found by the Staff, is telling. That the Polytech Hong Kong documents adduced in the Trustee Motion show 4.9 million cameras sold to Jazz from May 22 through September 1, 2003 illustrates the magnitude of the problem. This Court has frequently indicated that post-petition infringement was a justification for the appointment of a Chapter 11 trustee under § 1104 of the Bankruptcy Court. If Fuji had any ulterior motive in bringing the Trustee Motion, it was the legitimate and good faith desire to stop Jazz's unfair competition through continued patent infringement.

47.    In addition to Fuji believing sufficient cause existed to require the appointment of a chapter 11 trustee, Fuji believed that it was in the best interest of all creditors that a chapter 11 trustee be appointed. First, the Debtor's past practice of infringing on Fuji's patents is evidence that the Debtor's management cannot be trusted to live up to its fiduciary obligations to creditors, the largest of whom is Fuji. It was less than realistic to believe that after more than five years of litigation, resulting in findings that the Debtor was guilty of stealing intellectual property that belonged to Fuji, and the finding of the District Court that such intellectual property was used to benefit insiders of the Debtor, that the Debtor and Benun will suddenly act in a manner that is in the best interest of Fuji and other creditors. Second, the interests of the Debtor's management are in conflict with the interests of creditors. Millions of dollars flowed out of the Debtor's business to Benun and others, and are therefore subject to possible avoidance actions. The directors and officers of the Debtor have breached their fiduciary duty to creditors in the past, and are subject to claims by the estate. Under these circumstances, Fuji believed that it was impossible that the Debtor, under Benun's control and influence, was a disinterested party, able

to bring such causes of actions. Without an independent trustee, Fuji believed and still believes, that the interests of Jazz' creditors will continue to be subject to a dishonest and incompetent management team that will put its own interests ahead of those of the creditors. That Fuji's evidence and allegations are based largely on pre-petition conduct does not make the evidence irrelevant and the allegations baseless.

48.    Merely because the Court later informed the parties that it was unlikely to grant Fuji's Trustee Motion does not require that the Court sanction Fuji, or allow Jazz to recoup legal fees and expenses incurred in defending against the Trustee Motion. Rule 9011 is not to be used as a tool to escape the norm of the American legal system, where each party pays for its litigation expenses. Moreover, Rule 9011 "must not be used as an automatic penalty against an attorney or a party advocating the losing side of a dispute." *See Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3rd Cir. 1987). In fact, litigants misuse the Rule when they seek to impose sanctions against a party or counsel on the unsuccessful side of a ruling or judgment.[9]  *See Morristown Daily Record, Inc. v. Graphic Comm. Union Local 8N*, 832 F.2d 31, 32 n.1 (3d Cir. 1987) (cautioning the litigants that when the issues are close, the invocation of the Rule borders on the abusive, and that the Rule is intended for only "exceptional circumstances").

49.    In *In re Century Glove, Inc.*, the court considered the application of Rule 9011 in similar circumstances that are present here and denied debtor's request for sanctions. 73 B.R. 528 (Bankr. D. Del. 1987). In that case, a bank moved for a conversion of the debtor's chapter 11 case to Chapter 7 or the appointment of a trustee, alleging that there was fraud, dishonesty and diversion of corporate opportunity by the debtor's managing executive, a fiduciary. An

---

[9] Likewise, many courts recognize that Rules 11 and 9011 should not be used to penalize creative and novel arguments or aggressive advocacy on behalf of a client. *See Gaiardo v. Ethyl Corp.*, 835 F.2d at 483 (quoting Fed. R. Civ. P. 11 Advisory Committee Note, which observed that the rule is "not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."). It is often impossible to prove fraud and mismanagement with direct evidence because officers and directors often go to great lengths to conceal their activities. The situation in the instant case is no different and Fuji attempted to convince the Court of the need for a chapter 11 trustee by providing a number of circumstantial facts that when taken as a whole, at a minimum, raise significant concerns as to Benun's ability to properly manage the Debtor.

examiner was appointed to conduct an investigation, and the court, after reviewing the examiner's report and considering all the facts, denied the bank's request to appoint a trustee. In the same decision, the court also denied the debtor's request to award the costs it incurred in defending against the bank's motion, stating that the debtor failed to demonstrate that the bank violated either Rule 9011 or 28 U.S.C. § 1927. *Id.* at 538. The court noted that the bank's motion contained reasonable arguments based on the perceived facts of the case and was supported by legal authorities, and although the court ultimately concluded that these facts did not warrant the appointment of a trustee, the court's dismissal of the bank's motion did "[n]ot preclude [the bank's] counsel from having a reasonable belief at the time of filing the motion that the motion was well grounded in fact and warranted by existing law." *Id.*

50.    Jazz also stresses the fact that Fuji failed to withdraw its Motion as it continued to conduct discovery and did not obtain specific evidence supporting certain statements it made in the Motion. However, Jazz ignores that the inquiry in the analysis of the appropriateness of Rule 9011 sanctions should focus on the facts and circumstances that existed as perceived by counsel at the time counsel filed the challenged paper, and "[i]mposing a continuing duty on counsel to amend or correct a filing based on after-acquired knowledge is inconsistent with the Rule." *Mary Ann Pensiero, Inc.*, 847 F.2d 90, 95 (3d Cir. 1988) (*emphasis added*).[10] In fact, courts are expected to "avoid using the wisdom of hindsight" and consider whether the conduct was reasonable under the circumstances at the time the pleading at issue was submitted. *In re Kauterick*, 167 B.R. at 363; *see also Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484-85 (stating same and holding that although plaintiff did not prevail, his suit was not frivolous and "finding a violation of Rule 11 in these circumstances would indeed chill effective advocacy and would run directly contrary to the Rule's language and intent.").

---

[10] While the test turns on the facts and circumstances as perceived by counsel at the time of the motion, it is instructive that the evidence adduced in the ITC Enforcement Proceeding strongly supports a finding of continued post-petition infringement.

51.    Although Fuji made a decision to withdraw its Trustee Motion without prejudice, at the time the Trustee Motion was filed Fuji certainly made a reasonable inquiry into a series of events that when taken as a whole, painted a picture of an individual, Jack Benun, who used Jazz to engage in patent infringement to the detriment of Fuji.    Based on these facts and circumstances, as they were known by Fuji at the time the Trustee Motion was filed, Fuji and its counsel formed a reasonable and objective belief that the appointment of a trustee was warranted and then engaged in stipulated discovery to obtain the evidence needed to meet the heightened burden of proving its reasonably based allegations in the context of the Trustee Motion.  That the eventual proof did not rise to a high enough level to satisfy that heavy burden in the eyes of this Court does not mean that the original allegations were without basis or are, in fact, untrue. Indeed, a determination as to whether Jazz has engaged in post-petition infringement of Fuji's patents has yet to be made.

52.    Several courts have recognized that it is not always possible to trace and pinpoint such illegal conduct, and the imposition of sanctions is not warranted for mere inability to produce specific evidentiary proof when a party made diligent attempts in its investigative efforts.  *Mary Ann Pensiero, Inc.*, 847 F.2d at 95.   In *Mary Ann Pensiero, Inc.*, a beer retailer brought an antitrust action against exclusive wholesalers on several counts, including alleging that defendants had conspired unlawfully to unreasonably restrain trade.    After defendants' motion for summary judgment was granted, defendants moved for Rule 11 sanctions, which were granted by the District Court that concluded that plaintiffs had failed to come forward with some evidence of conspiracy.    *Id.* at 96.   The Third Circuit reversed, stating that proof of wrongdoing was often difficult without discovery and that it was acceptable to base allegations of wrongdoing on reasonable suspicions and to attempt to uncover the relevant evidence via discovery, without being liable for sanctions:

> Proving a conspiracy is usually difficult and often impossible without resort to discovery procedures.  This is particularly true in antitrust actions, where "the proof is largely in the hands of the alleged conspirators."  *Poller v. Columbia Broadcasting Sys. Inc.*,

> 368 U.S. 464, 473, 82 S. Ct. 486, 491 7L. Ed. 2d 458 (1962). ...**At
> the time plaintiffs' counsel filed the complaint here, he knew
> facts that supported a reasonable suspicion** of cooperation
> between defendants and other parties who could have been
> expected to benefit from the defendants' intransigence. These
> factual circumstances and the rational inferences that may be
> drawn from them convince us that the allegations of the first count
> composted with Rule 11's pre-filing investigation requirement.

*Id.* at 95 (*emphasis added*). The court concluded that plaintiffs were not obligated to prove their

case in order to escape sanctions, and failure to present "specific facts," invoked by the District

Court as one of the reasons to justify sanctions, was not a proper standard to consider. *Id.*

53.    In addition, Jazz' reliance on the *Kouterick* case is misplaced because the facts in

*Kouterick* are clearly distinguishable from the facts in this case. In *Kouterick*, a creditor's

attorney was sanctioned under Rule 9011 for making deliberate misrepresentations and

omissions of material facts to the court in connection with the creditor's motion for relief from

the Debtor's Chapter 13 confirmation order, including attempting to deceive the court that he did

not have notice of the chapter 13 case. *Kouterick*, 167 B.R. 353, 363-64. No such

misrepresentations or omissions were made in this case.

54.    Applying the five factors[11] used in *Kouterick* to the facts of the case at bar, Rule

9011 sanctions are clearly not warranted. First, primary counsel for Fuji in this bankruptcy case,

Stroock & Stroock & Lavan LLP, was also counsel for Fuji in the action leading to the $30

million judgment. Counsel had, over the years, developed a firm conviction that Benun could

not be trusted to run Jazz for the benefit of the creditors and witnessed first hand the animosity

Benun had to Fuji. Most of the facts forming the basis for Fuji's position were pre-petition facts,

which are legally relevant. That post-petition evidence sufficient for the Court was not

discovered or demonstrated by clear and convincing evidence does not mean that Fuji had no

---

[11] The factors listed in *Kouterick* to determine whether sanctions should be imposed were: (1) the amount of time available to the signer for conducting the factual and legal investigation; (2) the necessity for reliance on a client for the underlying factual information; (3) the plausibility of the legal position advocated; (4) whether the case was referred to the signer by another member of the Bar; [and] (5) the complexity of the legal and factual issues implicated. 167 B.R. at 363.

reasonable basis for bringing the Trustee Motion or that Fuji's allegations are not true. Whether a trustee is appropriate is a complex analysis, and can be based on circumstantial evidence. That the Court did not consider the evidence sufficient at the conclusion of the October hearing does not mean Fuji should never have raised the issue in the first place or that the filing of the Trustee Motion violated Rule 9011.

55.    Fuji and its counsel had objective suspicions and conducted a reasonable inquiry into the facts and legal arguments contained in the Trustee Motion and, based on extensive research, gathered sufficient evidence to formulate a reasonable belief that cause existed to appoint a trustee and that the appointing of a trustee was in the best interests of all creditors of Jazz. Fuji continues to believe that the appointment of a Chapter 11 trustee is warranted to best preserve the assets of the Debtor's estate and ensure that the Debtor does not continue to infringe on Fuji's patents. Thus, Fuji and its counsel should not be subject to Rule 9011 sanctions.

### D.    The Sanctions Motion Was Not Properly Filed under Rule 9011

56.    Fuji voluntarily withdrew the Trustee Motion seven (7) days prior to being served with the Sanctions Motion. Rule 9011(c) specifically precludes the issuance of sanctions where the allegedly sanctionable pleading is withdrawn. Accordingly, the Sanctions Motion is procedurally defective.

57.    In 1997, Rule 9011(c) was amended to conform to the 1993 changes to F. R. Civ. P. 11 ("Rule 11"), to provide, in pertinent part, that "[t]he motion for sanctions may not be filed with or presented to the court **unless, within 21 days after service of the motion** (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial **is not withdrawn** or appropriately corrected . . ." Fed. R. Bankr. P. 9011(c)(1)(A)(*emphasis added*). This provision is often referred to as the "safe harbor" provision, because its purpose is to give the allegedly offending party the opportunity to avoid sanctions by withdrawing the pleading at issue.

58.    Numerous courts, including the District Court in New Jersey, have recognized that the language and intent of the 1993 amendment to Rule 11 precludes parties from seeking sanctions, after the party against which sanctions are sought has voluntarily withdrawn the complained of pleading. *See Hockley v. Shan Enterps. L.P.*, 19 F.Supp.2d 235, 240 (D. N.J. 1998) (stating that "a motion for sanctions under Rule 11 must be submitted prior to the dismissal of a case")[12]; *see also Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998) (stating that the purpose of the safe harbor provision is to give the offending party the opportunity to withdraw the offending pleading and escape sanctions; and that a motion for sanctions served after the complaint had been dismissed was procedurally defective because it did not provide that opportunity); *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (holding that plaintiffs' failure to serve its motion for Rule 11 sanctions prior to filing it with the court, deprived the defense counsel of the safe harbor opportunity to withdraw or correct the offending contention; and stating that the plain language of the rule indicates that the safe harbor notice and opportunity prior to filing is "mandatory"); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2nd Cir. 1995) (reversing the imposition of sanctions where (i) the movant failed to serve the sanctions motion 21 days prior to presenting it to the court and (ii) the record indicates that if the party had received the benefit of the safe-harbor period, he would have "withdrawn or appropriately corrected" his misstatements, thus avoiding sanctions altogether; also finding that to the extent the party against whom sanctions were sought corrected or withdrew misstatements in pleadings, such statements were not sanctionable); *Schweizer v. Mulvehill*, 93 F.Supp.2d 376 (S.D.N.Y. 2000) (holding that Rule 11 sanctions are inappropriate because the complaint was withdrawn within the 21 day period); *Morroni v. Gunderson*, 169 F.R.D. 168, 171 (M.D. Fla. 1996)

---

[12] In *Hockley*, a boiler manufacturer sought sanctions against a hotel owner who had previously dismissed its third-party claims against the manufacturer. The court held that the hotel owner was not subject to Rule 11 sanctions, since it voluntarily withdrew its third-party claims, thus there was nothing left to withdraw after being served with the sanctions motion. *Id.* at 241. In this well-reasoned decision, Judge Brotman reviewed pre-1993 and post-1993 Rule 11 requirements, case law and legislative history, and explained why cases with contrary results applying pre-1993 Rule 11 and pre-1997 Rule 9011 are no longer binding authority.

(holding that a party who voluntarily dismisses a case has withdrawn the offending pleading and cannot be subject to sanctions); *Photocircuits Corp. v. Marathon Agents, Inc.*, 162 F.R.D. 449, 452 (E.D.N.Y. 1995) (holding that post-1993 Rule 11 precludes an award of sanctions following a voluntary dismissal of the action).

59.     The purpose of the amendment to Rule 9011(c) is to act as a check against satellite litigation by providing parties with a period within which they could withdraw the allegedly offending paper – and if there is nothing to withdraw or remedy because the offending paper has been withdrawn or there was a final judgment on the merits,[13] then a motion for sanctions is clearly not appropriate. *See Hockley*, 19 F.Supp.2d at 240 (examining Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment)); *see also* 10 *Collier on Bankruptcy*, ¶ 9011.04 (Mathew Bender 15th ed. rev. 2003) (explaining that under the revised Rule 11, "the timely withdrawal of a contention will protect a party against a motion for sanctions."); *Wright & Miller*, 5A Fed. Prac. & Proc. Civ.2d § 1337, at 6 (discussing the 1993 Advisory Committee Notes and case law and stating that the procedural requirements of post-1993 Rule 11 were intended to encourage the withdrawal of improper papers, since litigants will no longer be exposed to sanctions upon such withdrawal).

60.     The *Wright & Miller* treatise also explains that after the court has entered judgment or dismissed claims, service and subsequent filing with the court of the sanctions motion does not comply with the safe harbor provision, and if service is delayed, the motion for sanctions will be rejected, as the party served will not be able to withdraw the papers or rectify the situation in any way. *Id.* at 6-7.

---

[13] Even prior to the 1993 amendment, a supervisory rule was adopted in the Third Circuit that all motions requesting Rule 11 sanctions must be filed with the court as early as practicable, but certainly before the entry of a final judgment. *See Mary Ann Pensiero, Inc.*, 847 F.2d 90, 99-100 (3d Cir. 1988) (expressing concern for routine and indiscriminative invocations of Rule 11 and requiring prompt action by a litigant whenever he believes there is Rule 11 violation).

61.     Because Fuji voluntarily withdrew the Trustee Motion on January 27, 2004 and Jazz did not file or serve its Sanctions Motion until February 3, 2004, the Sanctions Motion was not made timely and must be denied.

**E.     The Sanctions Motion was not Timely Served to Provide Fuji with Adequate Notice Required Under Rule 9011**

62.     Rule 9011(c) requires that **a motion** for sanctions be served upon the party against whom sanctions are being sought twenty-one (21) days prior to the motion being filed with the court to allow the party the opportunity to withdraw or appropriately correct the challenged paper.  Fed. R. Bankr. P. 9001(c)(1)(A).  If the moving party fails to comply with the procedural requirement of advance notice, his sanctions motion should be denied.  *See Cannon v. Cherry Hill Toyota, Inc.*, 190 F.R.D. 147 (D. N.J. 1999) (holding that because the court cannot determine if plaintiff complied with the safe harbor provision of Rule 11, as plaintiff did not provide the court with a copy of the papers that he served on defense counsel or proof that service was accomplished, plaintiff's sanctions motion was denied); *see also In re Engel*, 246 B.R. 784, 789 (Bankr. M.D. Pa. 2000) (stating that because there was no advance service of the motion for sanctions, the sanctions request cannot be considered).

63.     Jazz failed to serve Fuji and its counsel with its Sanctions Motion prior to filing it with the Court.  Instead, Jazz sent the Jazz Letter to Fuji threatening to file a motion seeking sanctions.  Through a letter to the Court, dated February 11, 2004 (7 days after the Sanctions Motion was filed and served), Jazz asked the Court to find that the Jazz Letter preserves its right to bring a motion seeking sanctions under Rule 9011, even though Rule 9011 and *Slater v. Skyhawk* (see below) clearly state that a letter is insufficient notice.

64.     Clearly, Jazz and its counsel failed to review Rule 9011(c) and comply with its explicit requirements.  As a result, Jazz now requests the Court to rewrite Rule 9011 in its favor.  Such a result is nonsensical and directly violates the requirement of particularized advance notice in the form of the actual motion required under Rule 9011.

65.    The rationale for requiring that a copy of the actual motion be served upon the respondent prior to filing was "[t]o stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule," so that the party against which sanctions are sought may avoid sanctions by withdrawing the offending papers.  *See* Fed. R. Civ. P. 11 Advisory Committee Note to the 1993 Amendment.

66.    Several courts have recognized that the 21-day safe harbor requirement is not satisfied through an informal notice.  The New Jersey District Court specifically stated:  "[a]n informal notice, either by letter or other means, does not trigger the commencement of the 21-day period," and therefore, does not satisfy the safe harbor provision of Rule 11.  *See Slater v. Skyhawk Transp., Inc.*, 187 F.R.D. 185, 200 (D. N.J. 1999) (quoting *Piantone v. Sweeney*, 1995 WL 691915, at *1, n. 1 (E.D. Pa. 1995)); *see also Farris v. County of Camden*, 61 F.Supp.2d 307, 332, n. 15 (D. N.J. 1999)(citing to *Slater* with approval).  Courts have recognized that it would "wrench both the language and purpose of the amendment to the Rule to permit an informal warning to substitute for service of a motion."  *See Vandanacker v. Main Motor Sales Co.*, 109 F.Supp.2d 1045, 1054-55 (D. Minn. 2000).  *See also Barber v. Miller*, 146 F.3d 707, 710 (informal letter of intent to file motion for sanctions does not trigger the safe harbor period); *Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir. 1997), *cert. denied*, 522 U.S. 1046 (1998) (stating that the plain language of Rule 11 provides that a sanctions motion may not be filed with the court unless the moving party complies with the safe harbor requirement); *Harding Univ. v. Consulting Servs. Group, L.P.*, 48 F.Supp.2d 765, 770 (N.D. Ill. 1999) (safe harbor period not triggered by letter to plaintiffs' counsel; service of the motion on counsel is required); *Weeks Stevedoring Co. Inc. v. Raymond Int'l Builders, Inc.*, 174 F.R.D. 301, 305 (S.D.N.Y. 1997) (the court refused to impose sanctions because defendants' sending the plaintiff a letter informing it that they intend to move for sanctions did not meet the procedural requirements of

Rule 11); *Photocircuits Corp. v. Marathon Agents, Inc.*, 162  F.R.D. at 452 (stating that the safe

harbor period begins to run upon service of **the motion** for sanctions). [14]

67.    Although the Debtor fails to identify the most relevant decisions that hold that

informal notice does not trigger the commencement of the 21-day period, the Debtor cites to the

case of *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 808 (7th Cir. 2003).  The holding in

*Nisenbaum* is clearly the minority view and is not binding on this Court.   In addition, in

*Nisenbaum*, unlike this case, the sanctioned party did not voluntarily dismiss his actions against

the various defendants prior to the filing of the motion for sanctions.

68.    Because Jazz filed the Sanctions Motion without giving Fuji 21 days prior notice,

Jazz failed to comply with the clear and express procedural requirements of Rule 9011(c) and its

Sanctions Motion should be denied.

### F.    Jazz Incurred Most of its Costs in Connection with the Trustee Motion Prior to Sending the Jazz Letter Warning Fuji of Sanctions

69.    The majority of the discovery taken in connection with the Trustee Motion, and

the associated costs incurred by Jazz, occurred well prior to October 16, 2003, the date of the

Jazz Letter.  Essentially all of the complained of conduct occurred within 21 days of the Jazz

Letter.  This is evident from the time entries filed as exhibits to the Supplemental Affidavits of

Jeffrey I. Kaplan and Michael D. Sirota in support of the Sanctions Motion.  The overwhelming

majority of the time entries are dated prior to October 16, 2003.  Since prior to the October 16,

2003 letter, Fuji did not have <u>any</u> warning or notice (formal <u>or</u> informal) that Jazz planned to

---

[14] But for footnote 14 in the Sanctions Motion, decisions that speak directly on the safe harbor issue are notably
absent from the Debtor's Memorandum of Law in support of the Sanctions Motion.  Rather than properly amend the
Sanctions Motion to address this well-established case law, the Debtor simply filed a letter with the Court seven
days after the Sanctions Motion was served.  The letter stated the holding of the New Jersey District Court in *Slater
v. Skyhawk Transp., Inc.*, 187 F.R.D. 185 (D. N.J. 1999), which although not binding, does not support the Debtor's
argument that informal notice triggers the safe harbor period.  Furthermore, the Debtor's letter suggests that the
Court issue an order to show cause on its own initiative in an attempt to circumvent the procedural requirements of
Rule 9011 that the Debtor failed to meet.  Treating an improperly served motion, let alone a letter, as a request for an
order to show cause would render the safe harbor provision meaningless and, therefore such relief should not be
granted.  *See Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772 (9th Cir.), *cert.  denied*, 534 U.S. 1020 (2001).

seek sanctions, Jazz cannot retroactively seek reimbursement of its legal expenses through this "afterthought" Sanctions Motion.

70.     From August 21 through September 18, 2003, counsel for Fuji took a number of Depositions of Jazz personnel in the United States and in Hong Kong under a Court approved stipulation with Debtor's counsel and pursuant to an agreement and rules governing discovery in the ITC Enforcement Proceeding.  In all but two cases, those individuals testified at the ITC hearing, either as a live witness, through the submission of the same deposition testimony, or both.  One of those two individuals, Joseph Weber, was deposed on the ICP System for the ITC hearing because he was identified by the Debtor in interrogatory responses in the ITC proceeding, but proved to have no useful knowledge.  The other of the two individuals, Andrew Cameron, of Jazz Hong Kong, was deposed on the issue of sales for the ITC case, but only had knowledge of sales to countries other than the United States.  From October 7 through October 14, Jazz took the deposition of Fuji personnel who testified live at the ITC hearing.  On October 17, Jazz took the depositions of Peter Goode and Paul Fong.  Accordingly, it is clear that little, if any of the work complained of by Jazz occurred after its October 16, 2003 letter, much less 21 days thereafter.

71.     As discussed in *Mary Ann Pensiero, Inc.*, a motion for sanctions should be filed promptly to foster efficiency of the judicial system and prevent future violations – if a party's action is abusive, "the adversary should be able to realize immediately that an offense has occurred" and should not wait for a ruling on the merits to seek sanctions.  847 F.2d 90, 99-100. In this case, Jazz complains of Fuji's "offensive papers" filed in June of 2003 and extensive discovery (to which Jazz consented), essentially all of which was also relevant to the ITC Enforcement Proceeding and took place around the time the Trustee Motion was filed or shortly thereafter.  However, Jazz waited until this Court indicated its sentiments on the merits of the Trustee Motion and after Fuji voluntarily withdrew the Trustee Motion without prejudice to seek sanctions.

72.     Courts in this Circuit have recognized that Rule 9011 sanctions are to be imposed only in "exceptional circumstances 'where the claim or motion is patently unmeritorious or frivolous.'" *In re Kauterick*, 167 B.R. 353, 362 (citing *Dura Systems, Inc. v. Rothbury Inv., Ltd.*, 886 F.2d 551, 556 (3d Cir. 1989)).  As previously set forth, such exceptional circumstances are not present here, as Fuji and its counsel had ample circumstantial evidence to proceed with the Trustee Motion, worked diligently to investigate all facts available to them at the time and researched all relevant law prior to filing the Trustee Motion.[15]  Moreover, as previously stated, the issue of the Debtor's post-petition infringement remains unresolved.    Under the circumstances, sanctions are wholly inappropriate.

### G.    The Benun Joinder and Request for Additional Sanctions must be Denied

73.     In his Joinder, Benun seeks additional sanctions in the amount of $116,121 as reimbursement for Benun's alleged expenses incurred in connection with the Trustee Motion.  It is outrageous that Benun should be compensated for the cost of his own personal counsel in opposing a motion that sought to appoint a trustee in the <u>Jazz Chapter 11 case</u>.  Indeed, why Benun's personal counsel was required to expend over $100,000 in opposing a motion not directed at their client, when Jazz was independently represented, remains a mystery.  In light of the fact that the need for a trustee was to a great extent necessitated by acts of fraud and mismanagement by Benun, Benun's request is even more ridiculous.  In any case, since Benun seeks the imposition of sanctions on the same grounds as the Debtor, his request for sanctions should also be denied for the reasons discussed in this Opposition with respect to the Debtor's Sanctions Motion.

---

[15] Courts have stated that Rule 11, and its corresponding Rule 9011, is being perverted when it is used as a tool or tactic for harassment and intimidation, and practitioners using this "hardball" litigation techniques "invite retribution from courts which are far from enchanted with such abusive conduct."  *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484-85 (3rd Cir. 1987).  In fact, a court "may impose sanctions on its own initiative when the rule is invoked for an improper purpose." *Id.*  It is quite clear that Jazz is using Rule 9011 for an improper purpose to harass Fuji for its active participation in this proceeding and bring Fuji to the negotiating table.  Such use of the rule is improper and should not be encouraged or condoned by the Court.

74.     Benun's "Joinder" is wholly improper and must be rejected by the Court.  Benun and his counsel have failed to comply with any of the requirements of Rule 9011 in seeking sanctions.  They have failed to provide Fuji with any notice, let alone appropriate notice, and failed to file a motion as required by Rule 9011.

75.     In addition, Fuji's motion seeking the appointment of a trustee never sought any relief against Benun in his individual case.  Nonetheless, at his deposition and in the hearings conducted before the Court, Benun had his personal bankruptcy counsel present.  At the same time, Benun was represented by Debtor's counsel, as the relief sought in Fuji's motion dealt with the replacement of Benun as a manager/officer of the Debtor.  The Benun Joinder fails to set forth any basis why Benun needed two or more attorneys from separate law firms to attend the Court hearings and was personally represented by Riker Danzig Scherer Hyland & Perretti LLP at some uncontested depositions and other aspects of discovery in connection with the Trustee Motion.  The real question is whether the duplicate and unnecessary legal services are even compensable under §§ 329 and 330 of the Bankruptcy Code.

76.     The spurious nature of the Benun Joinder is further evidenced by the fact that the Joinder does not cite a single case to support the alleged proposition that an individual against whom no relief was sought can join in a Sanctions Motion under Rule 9011 and receive relief.  Thus, Benun has no standing in the Jazz bankruptcy case to seek sanctions under Rule 9011.

77.     Lastly, as demonstrated herein, the Trustee Motion was proper and there is no basis upon which sanctions under Rule 9011 could be awarded to Jazz or, even assuming Benun could overcome all of the hurdles set forth above, to Benun, as a matter of law or fact.  Fuji respectfully submits that the filing of the Joinder on behalf of Benun itself violated Rule 9011 because it has no objective basis in fact or law.  Accordingly,  the Benun Joinder must be denied.

**H.    Assuming, <u>Arguendo</u>, the Court Determines that Sanctions are Appropriate, Rule 9011 Should Not be Used for Compensation or Punishment and Neither Fuji Nor its Counsel Should be Liable for Attorneys' Fees**

78.    Courts in this circuit are well aware that the purpose of Rule 9011 is to deter baseless filings, rather than compensation or punishment. *Doering v. Union County Board of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988)(directing the bankruptcy court to consider equitable considerations and mitigating factors when considering the amount of sanctions). Therefore, appropriate sanctions are "the minimum that will serve to adequately deter undesired behavior." *Id.* at 194 (quoting *Eastway Const. Corp. v. City of New York*, 637 F.Supp. 558, 565 (E.D.N.Y. 1986)).  The amended Rule 11 and Rule 9011 state that the court "may," but is not required to, impose a sanction, and the court's discretion as to what sanctions, if any, are appropriate, is limited to "what is sufficient to deter repetition" of undesirable conduct.  Fed. R. Bankr. Proc. 9011(c)(2).

79.    The legislative intent to discourage the use of Rule 11 and Rule 9011 as a fee-shifting mechanism was also recognized by the *Wright & Miller* treatise, cited with approval in *Zuk v. Eastern Pennsylvania Psychiatric Institute of the Medical College of Pennsylvania*, 103 F.3d 294, 300-301 (3d Cir. 1996)(holding that it was an error by the district court to "invoke without comment a very severe penalty" in the amount of $8,750 when Rule 11 has a non-punitive purpose, and that the court needs to consider mitigating factors).  The *Wright & Miller* treatise notes that the amended Rule 11 changed the emphasis in the types of sanctions to be ordered, moving away from the private interest remedies to the public interest remedies, and favoring non-monetary sanctions over monetary sanctions. *Zuk*, 103 F.3d at 301 (quoting Wright & Miller, 5A Fed. Prac. & Proc. § 1336 (2d ed. Supp. 1996)).  *Zuk* further states, quoting the Advisory Committee Notes, that any monetary penalty "should ordinarily be paid into the court" except "under unusual circumstances."[16]  *Id.*

---

[16] In Jazz's letter to this Court dated February 11, 2004, it indicated that the Court could overcome the procedural defects of Jazz's Sanctions Motion by issuing sanctions on its own initiative.  In this scenario, the Court would be limited to ordering sanctions payable only to the Court, and not to an opponent.  *See In re Crofford*, 2003 WL 22881016 (8th Cir. BAP 2003).

80.    Fuji asserts that its filing of the Trustee Motion was a valid exercise of its rights as the largest creditor of Jazz to protect its interests, and it could not be viewed as a "baseless filing" or an act that Rule 9011 was designed to deter.  However, even if this Court disagrees with Fuji's position, the circumstances of this case do not warrant the imposition of attorneys' fees, a remedy reserved for extreme cases of clear abuse of the judicial system.  This Court should not allow Jazz or Benun to use Rule 9011 as means to compensate them for expenses they've incurred in defending against a properly filed motion, or to punish Fuji for filing a motion it had every right to file.  Such use of Rule 9011 is clearly not appropriate.

81.    The Debtor needs to justify the huge sanctions it requests by arguing that the Debtor's operating losses are solely attributable to legal fees incurred as a result of Fuji's actions.  This allegation has no merit.  The largest component of Jazz's legal expenses are those incurred in the Imation litigation and the retention of Budd Larner, which have been approved by this Court.  Clearly, the necessity for the Imation litigation cannot be attributed to Fuji, nor can the legal fees expended on prosecuting Jazz's claims therein.  Likewise, Jazz's legal expenses incurred in its appeal from Fuji's Judgment in the District Court and the ITC Enforcement Proceeding are solely attributable to the conduct of Benun and Jazz in infringing Fuji's patents and otherwise ignoring Fuji's substantive rights.[17]  Absent such conduct, Fuji would not have obtained a judgment against Jazz for approximately $30 million.  Finally, a portion of Jazz's legal expenses have resulted from its own applications to the Bankruptcy Court in connection with its operations under Chapter 11 of the Bankruptcy Code.  For these reasons, it is simply untrue and, at best misleading, to attribute Jazz's operating losses since the commencement of its

---

[17] The Debtor is paying all of the legal expenses incurred by both Jazz Hong Kong and Benun in connection with the Imation lawsuit, the appeal before the Federal Circuit Court of Appeals, and the proceedings before the ITC.  In this regard, neither Budd Larner nor Kaplan & Gillman, the lawyers handling these matters,  have filed any applications for compensation in the Benun bankruptcy case, nor have they provided any evidence of any allocation of fees between Jazz and Benun, although Fuji has requested this information.  Jazz's prior allocation of legal fees to Jazz Hong Kong has stopped because Jazz has conceded that Jazz Hong Kong has ceased operations and no longer is in a position to repay any allocated legal fees.

bankruptcy case to action taken by Fuji (which action, Fuji, of course, maintains was and is wholly appropriate). Simply stated, and as admitted by the Debtor, Jazz is in Chapter 11 solely because it was adjudged to have knowingly infringed on Fuji's patent rights.

82.    Furthermore, even if there was any merit to the argument that an award of attorneys' fees are appropriate in this case, the amount of requested compensation is outrageous. Fuji has heeded the Court's admonition to ratchet down the litigation. As this Court is well-aware, fees and expenses awarded under Rule 9011 should be limited to the amount incurred for services directly and unavoidably caused by the violation. Fed. R. Bankr. Proc. 9011(c)(2). As discussed above, the majority of discovery complained of in the Sanctions Motion was also undertaken in connection with the ITC Enforcement Proceeding and thus, the fees incurred by Jazz or Benun in connection with that discovery should not be included in any sanctions calculation. Further, only a small portion of the fees incurred were 21 or more days after the date of the Initial Rule 9011 Letter. In addition, upon reviewing the time entries submitted by Jazz in support of its Sanctions Motion, Fuji discovered that many time entries seem wholly unrelated to the Trustee Motion. Although Fuji reserves its right to investigate what services were really provided in those instances, it would like to draw the Court's attention to merely a few such examples.

83.    Reference is therefore made to time entries by Cole, Schotz, Meisel, Forman & Leonard, P.A., on 10/14-15/03, where services were provided with respect to the predatory pricing issue and Carter deposition. In addition, a number of entries, specifically those on 8/11/03, refer to Benun's bankruptcy counsel as "co-counsel," which implies that Fuji is being asked to compensate Jazz for consultations with Benun's counsel, while Benun was not implicated in the Trustee Motion. Assuming, _arguendo_, that the Court determines that sanctions are appropriate, the case law cited above makes clear they are not to be punitive. Jazz seeks exactly that. The Court should be mindful of the simple fact that but for Jazz and Benun's willful patent infringement and the resulting millions of dollars of damages such infringement has caused Fuji, Jazz would not be in Chapter 11 and Fuji would have never filed the Trustee

-41-

Motion.  Jazz has caused its own problems, yet argues the victim (Fuji) is in reality the bully.

Nothing could be further from the truth.  Jazz is improperly using its Sanctions Motion to punish

Fuji for seeking to protect its rights against Jazz, when Jazz and Benun are the ultimate root

cause.  Moreover, Fuji expects the ALJ to shortly rule that infringement of Fuji's patents has

continued after August 21, 2001, both pre- and post-petition.  Thus, for all these reasons, there is

no basis for the Court to assess any sanctions against Fuji.

## II.    THE IMPOSITION OF SANCTIONS AGAINST FUJI IS NOT APPROPRIATE OR WARRANTED PURSUANT TO 28 U.S.C. § 1927[18]

84.    As a threshold matter, it is questionable that this Court has jurisdiction to impose

section 1927 sanctions.  There is a split of authority among the circuits on the issue of whether a

bankruptcy court has the power to sanction under section 1927 of Title 28.[19]  The ability of a

bankruptcy court to impose section 1927 sanctions turns on whether it qualifies as a "court of the

United States."  The Third Circuit Court of Appeals has stated that it is not.  *See Becker's Motor*

*Transp., Inc. v. Dep't of Treasury, IRS (In re Becker's Motor Transp., Inc.)*, 632 F.2d 242, 247

(3d Cir. 1980), *cert. denied*, 450 U.S. 916 (1981).  *See also In re Buck*, 157 B.R. 247, 249

(Bankr. W.D. Pa. 1993)("It *remains* the law in this circuit that a bankruptcy court is not a court

of the United States for purposes of the provisions of Title 28.").  Although *In re Becker's Motor*

*Transp., Inc.* case has been subject to some criticism, its holding with respect to whether a

bankruptcy court is a "court of the United States" has not been reversed.  Thus, it is doubtful that

this Court has authority to impose § 1927 sanctions of Fuji's counsel.

---

[18] Since Benun's Joinder seeks the imposition of sanctions on the same grounds as Jazz, his request for sanctions pursuant to 28 U.S.C. § 1927 should also be denied for the reasons discussed in this section.

[19] *See Jones v. Bank of Santa Fe*, 40 F.3d 1084, 1086 (10th Cir. 1994); *Perroton v. Gray*, 958 F.2d 889, 896 (9th Cir. 1992); *Gower v. Farmers Home Admin.*, 899 F.2d 1136, 1138-40 (11th Cir. 1990); *but see Grewe v. United States*, 4 F.3d 299, 304 (4th Cir. 1993); *Baker v. Latham Sparrowbush Assoc.*, 931 F.2d 222, 230 (2d Cir. 1991) (acknowledging that a bankruptcy court has authority to impose section 1927 sanctions).

85.     Even if this Court determines that it does have authority to sanction under § 1927, such sanctions are only imposed on an attorney who unreasonably and vexatiously multiplied proceedings, thereby increasing the costs of the proceedings.  28 U.S.C. § 1927.[20]  Fuji is the largest creditor of the Debtor.  It is owed approximately $30 million, while the total amount of other unsecured claims, not including the claims of affiliate Jazz Hong Kong, is about $3 million. The reason that the Debtor filed a petition for relief is because Fuji obtained a pre-petition judgment against it based upon the Debtor's infringement of Fuji's patents.  Fuji believes that the Debtor and Benun continued to violate the United States patent laws after the filing of the order for relief and continue to do so to this day.  To say that Fuji has a significant stake in the outcome of this bankruptcy proceeding is an understatement.  Clearly, Fuji should not be expected to sit idle while estate funds are used to flaunt the United States patent laws for the personal benefit of Benun.  Fuji's right to conduct discovery and to seek to stop such abuse of the bankruptcy process should not be viewed as an act of bad faith meant to unreasonably and vexatiously multiply the proceedings.

86.     Section 1927 penalties are only appropriate when a moving party makes a showing that the party against which sanctions are sought acted in subjective bad faith. *Lightning Lube, Inc. v. Witco Corp.*, 144 F.R.D. 662, 669 (D. N.J. 1992).  Bad faith has been defined in the Third Circuit as "intentional advancement of a baseless contention that is made for an ulterior purpose, e.g., harassment or delay."  *See Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986).  In determining whether bad faith exists, a court must not use hindsight and must not assume that merely because a party did not ultimately prevail, his action must have been

---

[20] As noted above, Fuji reserves its right to argue that the Debtor's counsels' time entries filed with this Court as exhibits to the Supplemental Affidavits of Jeffrey I. Kaplan and Michael D. Sirota, and those offered in support of Benun's Joinder, alleged to contain time related to the Trustee Motion, were in fact incurred not in connection with the Trustee Motion, but rather in connection with other proceedings, including the ITC Enforcement Proceeding. Therefore, they cannot be included in the calculation of sanctions, even in the unlikely event that this Court determines that Fuji's counsel is subject to Section 1927 or Rule 9011 sanctions.

unreasonable or without foundation. *Lightning Lube, Inc. v. Witco Corp.*, 144 F.R.D. 662, 669 (citing *Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1193 (3d Cir. 1989)).

87.    Non-bankruptcy courts in this district and this circuit have recognized that § 1927 penalties "should be used with restraint," *id.* at 669, out of fear of "chilling attorneys' zealous advocacy on behalf of their clients." *Id.* (citing *Baker Indus. v. Cerberus Ltd.*, 767 F.2d 204, 208-09 (3d Cir. 1985)).  Such sanctions should only be imposed "in instances of a serious and studied disregard for the orderly process of justice." *Farris v. County of Camden*, 61 F. Supp.2d 307, 334 (D. N.J. 1999) (quoting *Williams v. Giant Eagle Markets, Inc.*, 883 F.2d at 1191).

88.    For the same reasons why the Debtor's claim under Rule 9011 is baseless, the Debtor's claim under § 1927 also has no merit.  There is simply no evidence in this case that Fuji's attorneys acted in bad faith or had any intention to harass the Debtor or delay the bankruptcy proceeding.   To the contrary, Fuji was harmed pre-petition by the Debtor's intentional acts and believes that it continues to be so harmed now.  Fuji's right to protect itself and prevent the estate from being used for an improper purpose is not "bad faith," and neither are the actions of counsel who zealously represented their client within the bounds of the law as required by both the Model Code of Professional Responsibility (stating that "[t]he duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law…") and New Jersey Rules of Professional Conduct (stating that "[a] lawyer shall act with reasonable diligence and promptness in representing a client").  *See* Model Code of Prof'l Responsibility EC 7-1 (2003); N.J. Rules of Prof'l Conduct R. 1.3 (2003).

89.    The Debtor alleges that because Fuji's counsel took 14 depositions and conducted extensive discovery they should be sanctioned.  <u>However, the Debtor ignores the fact that it consented and stipulated to these discovery procedures, and that each of these depositions would have been taken and were in fact used in connection with the pending ITC Enforcement Proceeding</u>.

90.    The Debtor also claims that § 1927 sanctions are appropriate because Fuji continued to prosecute an action that lacked evidentiary support.  However, as previously

discussed, Fuji formed a reasonable belief that cause existed to appoint a chapter 11 trustee and that the appointment of a trustee was in the best interests of the creditors based on the prior judgment and the evidence it developed through discovery. While Fuji voluntarily withdrew the Trustee Motion prior to the final judgment on the merits, Fuji still believes that a Chapter 11 Trustee will be appointed, or this case converted to Chapter 7, at least by reason of the Debtor's post-petition infringement of Fuji's patents.

91.     Fuji is not obligated to provide conclusive evidence that preferential payments were made to Benun and his family and that Benun conspired to use the Debtor for his own illegal purposes in order to avoid the imposition of sanctions or a finding of bad faith filing. In *Farris v. County of Camden*, a party moving for § 1927 sanctions complained that the allegations against the defendants contained in the complaint lacked evidentiary support, even after the plaintiff conducted significant discovery. The court denied defendant's motion for § 1927 sanctions, stating:

> While plaintiff and his counsel have certainly failed to produce an overwhelming body of evidence to support their claims against [defendants], an examination of the factual record in this case does not warrant the conclusion that counsel for [plaintiff] "intentionally advanced[d] ….baseless contention[s]…for an ulterior purpose, such as harassment or delay[.]"

61 F.Supp.2d at 335 (citing *Ford v. Temple Hospital*, 790 F.2d 343, 347 (3d Cir. 1986)).

92.     While the Debtor does not cite or discuss any of the relevant cases mentioned above, it relies on two cases that are not similar in any way to the case at hand: (i) *Veneziano* and (ii) *Fellheimer*. In *Veneziano*, an employee sued his insurer, Aetna. 238 F.Supp.2d 683 (D. N.J. 2002). The claim against Aetna was pursued under the Americans with Disabilities Act ("ADA"), which only applied to employers and not insurers. *Id*. at 688-89. To establish that Aetna was liable, the employee attempted to rely on an implausible agency theory that was unreasonable and had no factual or legal foundation. Not surprisingly, the court concluded that the employee's claim against Aetna was in bad faith, and was "frivolous, meritless and vexatious." *Id.* at 690. Similarly, in *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs.,*

*Inc.*, the court sanctioned the attorneys of a chapter 11 debtor by denying their fee application for abandoning their fiduciary obligations as counsel to debtor and undertaking to represent debtor's president and principal shareholder, and filing a frivolous complaint to cut off creditors' efforts to remove the debtor's president from managing the debtor's affairs.  57 F.3d 1215 (3d Cir. 1995).  *Veneziano* and *Fellheimer* are so factually dissimilar to the instant case that they provide no assistance whatsoever to the Debtor's unsupportable position.

93.    Fuji's counsel vigorously pursued Fuji's rights with the tools available to them under the Bankruptcy Code and Rules in a professional manner.  Section 1104 of the Bankruptcy Code authorizes a party in interest to seek the appointment of a chapter 11 trustee.  Fed. R. Bankr. P. 7026 and 9014 authorizes how discovery between the parties should be taken and in this case, the Debtor consented to the discovery.  As discussed above, the discovery of Jazz employees was needed to investigate the flow of money and the role of Jazz Hong Kong and the two Polytech companies.  In any event, the depositions complained of were also needed for the ITC enforcement proceedings.

94.    Fuji and its counsel have always acted with utmost concern for preserving the dignity and the efficiency of the judicial process, and it is the evidence that Benun, using the Debtor, engaged in what Fuji believed were improper acts that necessitated extensive discovery undertaken by Fuji.  Since Fuji and its counsel did not engage in any willful or intentional acts to delay these bankruptcy proceedings or to harass Jazz, it respectfully asks the Court to deny Jazz's request for sanctions under Section 1927 in all respects.


*{The remainder of this page has been intentionally left blank}*

## CONCLUSION

Based on the foregoing, Fuji respectfully requests that the Court (a) deny the Debtor's Sanctions Motion; (b) deny the Benun Joinder seeking additional sanctions; and (c) grant Fuji such other and further relief as is just and proper under the circumstances.

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:/s/ Michael S. Etkin, Esq.

Michael S. Etkin, Esq. (ME 0570)
Bruce Buechler, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973.597.2500
Facsimile:  973.597.2400

**STROOCK & STROOCK & LAVAN LLP**

Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone:  212.806.5400
Facsimile:  212.806.6006

Dated: March 24, 2004