**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (ME 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ  07068
973-597-2500 phone
973-597-2400 fax

– and –

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
BRIAN M. COGAN
KRISTOPHER HANSEN
180 Maiden Lane
New York, NY  10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JAZZ PHOTO CORP., | : | Case No. 03-26565 (MS) |
| | : | |
| | : | Hearing Date: August 23, 2004 at 10AM |
| | : | |
| | : | |
| Debtor-in-Possession. | : | |
| | : | |

**MOTION OF FUJI PHOTO FILM CO., LTD. PURSUANT TO 11 U.S.C. § 1112(b)
FOR ORDER CONVERTING THE DEBTOR'S CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

By this motion (the "Motion"), Fuji Photo Film Co., Ltd. ("Fuji"), through its

undersigned counsel, seeks an order converting the above-captioned Chapter 11 case to a case

under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").[1]  In support of

the Motion, Fuji respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.      On July 27, 2004, the International Trade Commission (the "ITC") adopted the

decision of the administrative law judge ("ALJ"), finding that Jazz Photo Corp. ("Jazz" or the

"Debtor") infringed Fuji's patent rights on a massive scale from August 21, 2001 to December

12, 2003.  The recent ruling by the ITC is definitive evidence of the Debtor misusing the

protections afforded by the Bankruptcy Code as a shield, behind which the Debtor is able to

continue to infringe on Fuji's patents.  Such a finding of post-petition misconduct and breaches

of fiduciary duty is, by itself, sufficient to compel this Court to convert the Debtor's case to one

under Chapter 7; however, when coupled with the Debtor's (i) pre-petition infringement, (ii)

continued operating losses, (iii) massive administrative insolvency, (iv) failure to file a plan of

reorganization after more than a year since the Petition Date (defined below), (v) inability to

confirm a plan of reorganization by virtue of its inability to pay the substantial administrative

claims of both Fuji and the ITC, and (vi) refusal to adequately respond to questions regarding

discrepancies found in certain operating reports, this Court is required to immediately convert the

Debtor's Chapter 11 case to Chapter 7.  Accordingly, by this Motion, Fuji seeks the entry of an

order pursuant to Bankruptcy Code § 1112(b) converting Jazz's Chapter 11 case to a case under

Chapter 7.

2.      Despite repeated assurances that it was not infringing post-petition, the ITC's

recent ruling is conclusive evidence that Jazz continued to infringe on Fuji's patents on a

massive scale post-petition.  Moreover, five separate written decisions by the ITC, the ITC's

---

[1]    Fuji does not now seek conversion of the Benun case but reserves the right to do so at a later date.

ALJ, Judge Hochberg of the District Court of New Jersey, and the United States Court of Appeals for the Federal Circuit (all of which are discussed herein) have found that Jazz has infringed Fuji's patents both pre and post-petition. Converting the Debtor's case to one under Chapter 7 will prevent the Debtor's continued willful violation of federal patent law. The conversion will not only benefit Fuji, who will no longer be a compulsory and involuntary licensor to the Debtor, but the conversion will also protect the rights of prepetition unsecured creditors from having their claims diluted by Fuji's ever-increasing administrative claims caused by the Debtor's post-petition infringement. In addition, there is no reasonable likelihood that the Debtor is capable of successfully rehabilitating its affairs, even if this Court were to continue to afford the Debtor the protections under Chapter 11. Accordingly, cause exists for the Court to convert the Jazz Chapter 11 case to Chapter 7.

## II.    BACKGROUND

A.    **The Jazz Bankruptcy Case**

3.    On May 20, 2003 (the "Jazz Petition Date"), Jazz filed a voluntary petition for relief pursuant to chapter 11 the Bankruptcy Code. On July 2, 2003, Jack C. Benun (the "Benun Petition Date") also filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Benun is the principal and senior officer of Jazz.

4.    No trustee has been appointed in the Jazz or Benun bankruptcy cases. Therefore, each Debtor is charged with carrying out the functions and duties of a trustee under § 1107 of the Bankruptcy Code and continues to operate as a debtor-in-possession under § 1108 of the Bankruptcy Code. The U.S. Trustee has appointed an Official Committee of Unsecured Creditors in the Jazz case, and it is represented by counsel. No committee has been appointed in the Benun Chapter 11 case.

5.      Fuji is the largest pre-petition unsecured creditor of Jazz and Benun.  Fuji is owed $28,436,361.84 jointly and severally between Jazz and Benun and an additional $1,326,918.76 by Jazz, for a total of $29,765,280.60 pursuant to a judgment entered on March 13, 2003 (the "Fuji Judgment") in Fuji Photo Film Co. Ltd. v. Jazz Photo Corp., 249 F.Supp.2d 434 (D. N.J. 2003),[2] ("Fuji v. Jazz") arising out of Jazz's and Benun's infringement of Fuji's patents up to August 21, 2001.  The Fuji Judgment was entered on March 13, 2003 after a jury trial before the Hon. Faith Hochberg of the United States District Court for the District of New Jersey (the "District Court").  Judge Hochberg's opinion in the District Court action is reported at Fuji v. Jazz, 249 F. Supp.2d 434 (D.N.J. 2003).  Fuji also has a substantial unliquidated claim for pre-petition infringement against Jazz and Benun for infringing sales between August 21, 2001 and their respective Petition Dates, estimated to amount to $10,938,527 in the case of Jazz and $12,160,173 (based on findings in EID(II) up to the Jazz Petition Date and on Polytech Enterprises, Ltd. ("Polytech") invoices between the Petition Dates).

6.      Simultaneously herewith, Fuji has filed a motion with this Court seeking the allowance of an administrative claim against Benun in the amount of $5,342,000, as well as against Jazz in the amount of $6,546,400, arising out of their post-petition infringement of Fuji's patents, as determined by the ALJ and adopted by the ITC.  Fuji's administrative claims increase each day that Jazz and Benun continue to engage in post-petition infringing activity.

7.      On June 8, 2004, counsel for Fuji sent an email to counsel for Jazz inquiring as to certain accounting discrepancies contained in Jazz's operating reports through and including the

---

2    Declaration Of Lawrence Rosenthal In Support Of The Motion of Fuji Photo Film Co., Ltd. Pursuant To 11 U.S.C. § 1112(b) For Order Converting The Debtor's Chapter 11 Case To A Case Under Chapter 7 of The Bankruptcy Code (the "Rosenthal Decl."), Ex. 1.

month of April, 2004.[3]  On June 15, 2004, counsel for Jazz sent Fuji a letter in response to Fuji's email which Fuji found to be non-responsive.[4]  Thereafter, on June 22, 2004 and June 24, 2004, Fuji sent letters clarifying the accounting discrepancies contained in Jazz's operating reports in hope that Jazz's response would better address Fuji's concerns.[5]  Although Jazz sent a letter to Fuji, dated July 22,[6] the following issues raised by Fuji remain unanswered.

- There appears to be a $5,250,000 discrepancy between amounts shown to be paid to Polytech and PRE Photo Recycling Enterprises ("PRE") in the various operating reports when compared to the "Summary of Disbursements" schedules and check registers.

- Jazz has informed the Court and Fuji that obligations of Jazz Hong Kong to Jazz should not be part of Jazz's losses because the credits were offset by cost items owed to Jazz Hong Kong; however, Fuji has been unable to find such cost items in the operating reports.

- No explanation has been provided by Jazz as to how the management fee payable to Jazz is allocated between Jazz Hong Kong, Jazz Canada and Jazz UK.

- Since Jazz UK is allegedly solvent, Fuji assumes that it will be timely paying all of its obligations (including any past-due obligations) to Jazz; however, Jazz has not confirmed this information.

- Is the law firm of Neville Peterson simply an unsecured creditor for services provided to the Debtor post-petition because they were not properly retained by the Debtor? Does Neville Peterson continue to work for Jazz post-petition on this basis?

8.      As more fully described below, on July 27, 2004, the ITC adopted the decision of the ALJ, by determining not to review the ALJ's EID(II) (defined below) on the violations set forth therein, including his determination that Messrs. Benun and Cossentino are subject to the ITC's Cease and Desist Order applicable to Jazz.  The ITC solicited written submissions from the parties to the investigation, interested parties and interested government agencies on the

---

[3]    Rosenthal Decl., Ex. 2.

[4]    Id.

[5]    Id.

[6]    Id.

specific enforcement measures recommended by the ALJ (i.e., imposition of civil penalties against Jazz ($13.675 million), Benun ($13.675 million) and Cossentino ($154,000)).  EID(II) (defined below) at 148.[7]

9.    In the year since the Jazz Petition Date, no plan of reorganization has been filed or distributed to the Debtor's creditors, and Jazz has not provided its creditors with any information as to how it intends to reorganize in the event it is unsuccessful on its Appeal to the Federal Circuit from the District Court Judgment and/or the Imation Litigation.

**B.    Findings of Jazz's Infringement**

10.    While the Court is presumed to be familiar from prior filings with the history of the several proceedings in which Jazz and Benun have been found to have engaged in infringing conduct during the post-petition period, the history is repeated here for completeness.

(a)    **The Initial ITC Investigation**

11.    On March 25, 1998, at Fuji's request, the U.S. International Trade Commission (the "ITC" or the "Commission") instituted an investigation alleging that several respondents, including Jazz, were violating Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.  Fuji alleged that the respondents were engaging in the sale and importation of lens-fitted film packages (single-use cameras) that infringed a number of Fuji's patents. See 63 Fed. Reg. 14474 (March 25, 1998).  The ALJ conducted a hearing from November 2 through November 13, 1998 in Investigation No. 337-TA-406.

12.    The ALJ issued an Initial Determination ("ID") on February 24, 1999 and found that Jazz had infringed many of Fuji's patents. See ID at 344-345.[8]  The ALJ's finding of infringement was based on three grounds.

---

[7]    Rosenthal Decl., Ex. 3.

13.    First, the ALJ found that all of the factories refurbishing single-use cameras utilized at least eight common steps and that a theoretical process involving only those eight common steps was reconstruction.  See ID at 108, 109.  Second, the ALJ described individual processes used by Jazz's suppliers (and other manufacturers) that were more extensive than the eight steps.  See ID at 119-124, 133-134, 285-304.  Consequently, the ALJ found that the evidence presented at the hearing "further revealed" the nature of the alleged "remanufacture" processes [beyond the Commission's eight steps] and supports the finding that these processes [including those of Jazz's then suppliers] involved reconstruction and not permissible repair.  See ID at 19.  Third, the ALJ found that Jazz had not sustained its burden of proving the affirmative defense of repair because "little or no information on the factories' processes" was provided, or Fuji was denied discovery of most of the processes and/or that the information provided was incomplete. See ID at 119 at n. 43, 122, 133.

14.    On June 9, 1999, the Commission adopted the ALJ's reasoning for rejecting the repair defense and found that all respondents violated Section 337 of the Tariff Act of 1930 and infringed one or more of the Fuji patents.  The Commission, however, found that the ALJ relied on the wrong burden of proof, clear and convincing, rather than preponderance of the evidence.  Nonetheless, the Commission considered the evidence and found that the application of the correct standard of proof did not affect the ALJ's conclusions regarding the repair defense.  See In re Certain Lens-Fitted Film Packages, USITC Inv. No. 337-TA-406, Commission Opinion at 5 (June 9, 1999).[9]  The Commission reversed the ALJ's finding of non-infringement of the design patents but otherwise adopted the ALJ's numerous infringement and validity determinations.

---

8    Cited confidential excerpts from the ID were previously submitted to the Court under seal.

9    Rosenthal Decl., Ex. 5.

15.    The Commission also adopted the ALJ's findings regarding the inadequacy of

Jazz's and other respondents' evidence of repair:

> The ALJ, however, did not rule against respondents merely
> because they had failed to carry their burden of proof on
> permissible repair.  Rather, the ID contains detailed findings on the
> activities of some of the remanufacturing respondents' suppliers,
> and concluded that those respondents "are effectively recreating
> the patented single use camera of complainant and its licenses, and
> hence are involved in impermissible reconstruction." ID at 164.
> Thus, the ALJ affirmatively found that those respondents were
> engaged in impermissible reconstruction of a patented good.  **He
> found that the other remanufacturing respondents were
> infringing Fuji's patents because they obtained their LFFPs
> from factories where Fuji was not allowed to inspect their
> remanufacturing processes.  ID at 133.  Since there was
> insufficient information in the record about the processes
> employed by their suppliers, *id.*, those respondents failed to
> carry their burden of proof, regardless of the standard of proof
> that was imposed.**  Accordingly, we determine that application of
> the correct standard of proof to the ALJ's findings does not affect
> his conclusions on the repair/reconstruction issue.

Id. at 4-5 (emphasis supplied).  The Commission imposed a Cease and Desist Order against Jazz
(later found to apply to Benun personally) (the "Order"), as well as against 19 other domestic
respondents and a General Exclusion Order applicable to all importers and manufacturers.  See
64 Fed. Reg. 30541 (June 8, 1999).  In the case of Jazz, evidence was adduced only as to three of
Jazz's factories and in each case the ALJ pointed out the failure to provide Fuji with access and
the incompleteness of the proofs.  See ID at 119 at n. 43 and 122.

16.    On June 7, 1999, Jazz appealed to the U.S. Court of Appeals for the Federal

Circuit.  Jazz also moved for a stay pending appeal, which was granted on July 6, 1999, before

the expiration of the Presidential review period.  The Federal Circuit only required the posting of

a bond for infringing conduct during a 60-day presidential review period.

17.    On August 21, 2001, the Federal Circuit, in its Opinion and Judgment, affirmed

the Commission's determination of Jazz's infringement.  See Jazz Photo Corp. v. Int'l Trade

Comm'n, 264 F.3d 1094 (Fed. Cir. 2001) ("Jazz v. ITC").  See generally Certain Lens-Fitted

Film Packages, USITC Inv. No. 337-TA-406, Notice of Institution of Further Enforcement

Proceeding (Sept. 24, 2002)[10]; see also, EID(II) (defined below) at 5 ("On August 21, 2001 the

Federal Circuit affirmed the Commission's determination of Jazz's infringement and lifted the

stay.").[11]  Specifically, the Federal Circuit concluded that the affirmative defense of permissible

repair was available only for single-use cameras **first sold in the United States** and refurbished

by a procedure "**limited**" to the eight common steps.  See Jazz v. ITC, 264 F.3d at 1098-1099

(emphasis added).

18.    The Federal Circuit lifted the stay and affirmed the finding of infringing

reconstruction for any single-use cameras that were refurbished by procedures "**more extensive**"

than those held to constitute repair, or whose remanufacturing procedures were "**withheld or

insufficiently disclosed** to the Commission."  See id. at 1111 (emphasis added).  The Federal

Circuit found that the alleged infringer has the burden of proof on the permissible repair defense

by a preponderance of the evidence and affirmed where the defense was not proven by credible,

verifiable, and complete evidence.  See id. at 1102, 1109 and 1111.  Where, as in the case of

Jazz, the burden was not met, *e.g.*, by denying Fuji access to its factories, such refurbished

cameras remained subject to the Commission's orders. See id. at 1111.

**(b)    The District Court Judgment**

19.    Shortly after the Commission opinion issued, Fuji filed a patent infringement

action in the District Court against, inter alia, Jazz and Benun.

20.    After a five-week jury trial in October and November 2002, and Judge

Hochberg's separate consideration of the permissible repair defense, which is a legal issue on

which the jury's findings were advisory, the District Court found Jazz, Jazz Hong Kong and

Benun liable for infringement.  See Fuji v. Jazz, 249 F.Supp. 2d at 459.  The District Court,

---

[10]    Rosenthal Decl., Ex. 6

[11]    Rosenthal Decl., Ex. 3.

applying the two-prong test for analyzing the permissible repair defense (first sale (exhaustion) plus a permissible repair process) enunciated by the Federal Circuit, concluded that more than 99% of the 40,099,369 refurbished cameras at issue infringed Fuji's patents. See id. at 451-52. The District Court also affirmed the jury's finding that Benun was liable for inducement based on his control of Jazz; that he caused Jazz to infringe Fuji's patents. See id. at 457-59. Finally, the District Court awarded Fuji approximately $30 million in damages and pre-judgment interest against Jazz and its Hong Kong subsidiary and approximately $28.4 million against Benun personally (jointly and severally with Jazz and Jazz Hong Kong). See Fuji v. Jazz, Final Judgment at 2 (March 13, 2003).[12]

21.    Jazz and Benun immediately moved for a stay of the District Court Judgment pending appeal of the decision to the Federal Circuit, first to the District Court and then to the Federal Circuit. Both of these stay requests were denied. The Federal Circuit's denial of a stay was inter alia, based on the ground that the Defendants have "shown neither a strong likelihood of success nor a substantial case on its merits to entitle [them] to stay." Fuji Photo Film v. Jazz Photo, U.S. Court of Appeals for the Federal Circuit, Nos. 03-1324,-1331, Order dated May 1, 2003 at 2.[13]

22.    On May 3, 2004 oral argument on that appeal was heard. Although it is difficult to glean anything from comments made during oral argument, one thing appears clear: the judges sitting on the Federal Circuit panel indicated that they were bound by the Federal Circuit's prior decision in Jazz v. ITC and that in order to reverse the rule governing first sale, the case would

---

12   Rosenthal Decl., Ex. 1.

13   Rosenthal Decl., Ex. 7.

have to be heard *en banc* (which had been refused by the Federal Circuit after the <u>Jazz v. ITC</u>

decision).[14]

23.    The foregoing decisions relate to Jazz's and Benun's infringement of Fuji's

patents **prior to** August 21, 2001.  Their infringement **after** August 21, 2001 was the subject of

the Enforcement Proceedings (II) before the ITC.

**(c)    The Enforcement Proceedings (II)**

24.    On September 24, 2002, the Commission instituted a formal enforcement

proceeding to determine whether Jazz, Benun, and Anthony Cossentino (Jazz's former president)

violated the Commission's Orders after August 21, 2001 and what, if any, enforcement measures

were appropriate.  <u>See</u> Completion of Remand; Notice of Institution of Further Enforcement

Proceedings at 3.[15]  After a consent order modifying the automatic stay was entered by this Court

on July 30, 2003 and after extensive discovery by both sides, an extensive evidentiary hearing

was conducted by the ALJ from December 8 through December 13, 2003.

25.    On April 6, 2004, the ALJ issued a 150 page Enforcement Initial Determination

("<u>EID(II)</u>").[16]  In the EID(II), the ALJ found, <u>inter</u> <u>alia</u>, that 25,216,980 of 26,957,730 single-use

cameras imported and sold by Jazz from August 21, 2001 through December 12, 2003 infringed

Fuji's patents.  EID(II) at 90-93, 148.[17]  Thus, the ALJ concluded that 93.5% of the cameras

imported and sold by Jazz infringed Fuji's patents in violation of the Commission's Orders.  The

ALJ determined that 40% of the shells used by Jazz were from cameras <u>not</u> first sold in the

United States as required by the Federal Circuit's decision in <u>Jazz v. ITC</u>, EID(II) at 67.  The

---

[14]    Note that the appeal included issues common to Jazz and Benun and one issue specific only to Benun: did the
District Court err in finding Benun induced infringement by Jazz and Jazz Hong Kong.

15    Rosenthal Decl., Ex. 6.

[16]    Cited portions of EID(II) are provided in Rosenthal Decl., Ex. 3, taken from a recently issued public version.

[17]    Rosenthal Decl., Ex. 3

ALJ also found that the record supported a $13,675,000 civil penalty against Jazz and Benun, jointly and severally, and $154,000 against Cossentino.  EID(II) at 148.[18]  The ALJ found that about 84% of the cameras sold by Jazz in 2003, including those manufactured post-petition by Polytech and others, infringed.  Id.  In other words, the ALJ **expressly found** that Jazz, presumably under Benun's control, extensively infringed Fuji's patents in violation of the Commission's Cease and Desist Order while under the supervision of this Court and the protection of the Bankruptcy Code.  In fact, given the large percentage of Jazz's business represented by the sale of single-use cameras, it is fair to say that Jazz has been staying alive and paying its professionals out of the proceeds of its unlawful activities.

**(d)     The ITC's Ruling on the EID(II)**

26.     On July 27, 2004, the ITC gave notice that it has determined not to review the infringement and liability determinations of EID(II).[19]  Although the ITC has not yet ruled on whether to adopt the ALJ's specific enforcement measures recommended by the ALJ in EID(II), the ITC's determination has the effect of affirming the findings of fact and conclusions of law contained in EID(II).  As discussed above, the ALJ found massive, systematic infringement of Fuji's patents, and Fuji believes that this infringement is continuing.  Indeed, there is no reason to believe otherwise.  In the face of the ITC's adoption of EID(II), the conclusion that Jazz has and continues to violate the Cease and Desist Order by violating Fuji's patents is inescapable.

### III.     JURISDICTION AND VENUE

27.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Venue

---

18     Fuji submits that at least part of the ITC's claim is entitled to administrative priority.  The results of Fuji's independent research on this issue are available for this Court upon request.

19     Rosenthal Decl., Ex. 8.

Case 03-26565-MS    Doc 602-1    Filed 08/02/04    Entered 08/02/04 18:46:16    Desc
Motion    Page 13 of 24

of this proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to 11 U.S.C. §

1112(b), the Court has the authority to grant the relief requested by this Motion.

## IV.    RELIEF REQUESTED

28.    By this Motion, Fuji requests the entry of an Order, substantially in the form

submitted herewith, converting Jazz's Chapter 11 case to a case under Chapter 7 of the

Bankruptcy Code and granting Fuji such other and further relief as may be just under the

circumstances.

## V.    ARGUMENT

**A.    Jazz's Chapter 11 Case Must Be Converted, As Jazz Is Misusing The Protections Afforded To It Under Chapter 11 By Continuing To Infringe On Fuji's Patents Without Being Held Accountable**

29.    The Bankruptcy Code is intended to protect and rehabilitate debtors and must not

be allowed to be used as a shield behind which Jazz and Benun may continue to infringe on

Fuji's patents.  See Steak & Brew Inc. v. Makris, 177 U.S.P.Q. 412, 414  (D. Conn. 1973) ("The

Bankruptcy Act was intended to protect and rehabilitate debtors.  It should not be used as a

shield behind which a debtor may sustain the misappropriation of a trade name to which he is not

rightfully entitled.  Nor will this Court permit it to be used as an instrument by which the

damages to an innocent party may be increased unnecessarily.").  The recent ruling by the ITC

affirming the ALJ's findings that Jazz infringed on Fuji's patents post-petition is clear evidence

that Jazz is misusing the generous protections afforded to it by Chapter 11 of the Bankruptcy

Code as a mechanism to infringe with impunity.  Where the provisions contained in Chapter 11

of the Bankruptcy Code are misused by the debtor-in-possession as they have been in this case,

Section 1112(b) of the Bankruptcy Code affords the Bankruptcy Court the power to convert a

-13-

Chapter 11 case to one under Chapter 7.[20]  <u>See</u> 11 U.S.C. § 1112(b).  This case should be converted.

30.    Jazz has nothing to lose by continuing to infringe on Fuji's patents while remaining a debtor-in-possession in a Chapter 11 case.  Jazz's post-petition infringement simply reduces the amount of distribution that will be available for unsecured creditors, since such infringement will give rise to Fuji and the ITC having massive administrative claims for damages caused by such infringement.  At this point, Fuji believes that the Debtor views the Fuji Judgment as an insurmountable obstacle to a successful reorganization, and therefore is simply attempting to produce as many cameras as possible, whether or not they infringe on Fuji's patents.  **This blatant violation of the law must be stopped.**  "Chapter 11 is not a free-for-all for debtors and their insiders to carry on with impunity and without accountability."  <u>In re Sal Caruso Cheese, Inc.</u>, 107 B.R. 808, 819 (Bankr. N.D.N.Y. 1989).

31.    During his deposition on September 18, 2003, Benun was asked about the foreign shells used to make Jazz cameras.  Benun responded in part, "As far as continuing onward after August 2001, the company [Jazz] was extremely careful in making sure that we did not use foreign shells and that we only used U.S. shells."[21]  Benun's answer is the opposite of what the ITC has determined (See the description of the Enforcement Proceeding (II) above).  Moreover, at the hearing on Fuji's motion to appoint a trustee, when questioned as to whether Jazz was

---

20   Although the Bankruptcy Code does not define "cause," § 1112(b) provides a <u>non-exhaustive</u> list of ten grounds that demonstrate cause, including: "(1) the continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; (3) unreasonable delay by the debtor that is prejudicial to creditors; and (4) failure to propose a plan under section <u>1121</u> of this title within any time fixed by the court . . . ." <u>See</u> 11 U.S.C. § 1112(b); <u>In re SGL Carbon Corp.</u>, 200 F.3d 154, 160 (3d Cir. 1999) (Section 1112(b) does not contain an exhaustive list.); 7 Collier on Bankruptcy ¶ 1112.04[1], at 1112-20. <u>See In re Brown</u>, 951 F.2d 564, 572 (3d Cir. 1991) (Courts are free to consider other factors.); <u>In re Young</u>, 76 B.R. 376, 378 (Bankr. D. Del. 1987) (The determination of whether cause exists must be made on a case-by-case basis.) (citations omitted).

21   Rosenthal Decl., Ex. 9 (Confidential and submitted separately).

violating the Federal Circuit's decision forbidding the use of foreign shells, Anthony Cossentino,

Jazz's then acting CEO stated, "[n]o, we have not sold foreign shells into the United States."[22]

This statement was simply not true because it conflicts with the express findings of the ALJ as

affirmed by the ITC.

32.     Fuji asks this court to act to protect the rights of the creditors of the Jazz estate.

> A principal goal of the reorganization provisions of the Bankruptcy
> Code is to benefit the creditors of the Chapter 11 debtor by
> preserving going-concern values and thereby enhancing the
> amounts recovered by all creditors . . . .  However, when there is
> no reasonable likelihood that the statutory objective of
> reorganization can be realized or when the debtor unreasonably
> delays, then the automatic stay and other statutory provisions
> designed to accomplish the reorganization objective become
> destructive of the legitimate rights and interests of creditors, the
> intended beneficiaries.  In that situation it is incumbent upon the
> bankruptcy judge to effectuate the provisions of the Bankruptcy
> Code for the protection of creditors lest the judge keep the Code's
> word of promise to the ear of creditors and break it to their hope.
> The bankruptcy judge must meet head-on his obligation to decide,
> fairly and impartially, the hard questions.

United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of
Inwood Forest Assocs., Ltd.), 808 F.2d 363, 373 (5th Cir. 1987)(en banc).

33.     The hard questions presented in this case are: Why should the Debtor be afforded

the protections of Chapter 11, if it continues to freely infringe on Fuji's patents?  **It should not**.

What entitlement does this Debtor have to the protections afforded to it under Chapter 11, if its

representatives claim that the Debtor is not infringing when several tribunals have found

otherwise?  **None.**  What benefit do creditors of the Debtor's estate receive by allowing the

Debtor to continue to operate as a debtor-in-possession under Chapter 11?  **None.**

34.     Although Fuji believes that the Debtor's misuse of the benefits provided by the

Bankruptcy Code through its continued infringement of Fuji's patents is sufficient 'cause' to

---

[22]     Rosenthal Decl., Ex. 10.

require the conversion of Jazz's Chapter 11 case to one under Chapter 7, Fuji points to several

other factors that support conversion under section 1112(b) of the Bankruptcy Code.

> **(a)     There Is A Continuing Loss To And Diminution Of Jazz's Estate, And There Is No Likelihood Of A Reorganization Under § 1112(b)(1).**

35.     Section 1112(b)(1) provides that a case may be converted when the debtor is

suffering continuing losses or the estate is being diminished and there is an absence of a

reasonable likelihood of rehabilitation.  See In re AdBrite Corp., 290 B.R. 209, 215 (Bankr.

S.D.N.Y. 2003).

36.     An evaluation of Jazz's financial statements alone demonstrates compelling

evidence of continuing loss and diminution of the estate.  According to Jazz's operating report

for the month of June, 2004, since it filed a voluntary petition under Chapter 11 of the

Bankruptcy Code, Jazz has operated at a loss of $2,910,691, plus $1,581,641 in largely

unrealizable credits for legal and professional fee allocation and management fees from

subsidiaries (only $184,130 is carried on the June 30 balance sheet for Intercompany Balances).

Since the Petition Date, the Debtors' balance sheets show that the difference between total assets

(less certain worthless loan obligations of Benun) and current liabilities (assets that otherwise

would have been available to creditors) has decreased from approximately $2.3 million to

negative $800,000, a decrease of more than $3,000,000.  In sum, since the Petition Date, the

Debtor has successfully lost more than $3,000,000 of assets that would have otherwise been

available for distributions to creditors.

37.     Further supporting Fuji's argument that Jazz's estate is diminishing is the fact that

Jazz is administratively insolvent at this juncture.  As more fully set forth in Fuji's Motion For

The Allowance Of An Administrative Claim, filed simultaneously herewith, Fuji has an

administrative claim against Jazz in the amount of at least $6,546,400 arising out of Jazz's post-

petition infringement as found by the ALJ EID(II) and affirmed by the ITC.    Fuji's administrative claim increases by each day that Jazz engages in post-petition infringing activity. Thus, there is a continuing loss to and a diminution of Jazz's estate by Jazz's continued operation.

38.    A continuing loss or diminution of the estate may only be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization.  See In re AdBrite Corp., 290 BR. at 215.  A debtor, however, should not continue in control of the business beyond a point at which reorganization no longer remains realistic: "there must be a reasonable possibility of a successful reorganization within a reasonable time."  United Sav. Ass'n. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 376 (1988).  At this time in the case, more than 15 months after the Petition Date, there remains no reasonable possibility that Jazz will successfully reorganize in a reasonable time.  Jazz is unable to pay its administrative claims.  The Imation litigation and all related appeals, likely will not be concluded for several years.  The core of Jazz's business model continues to be the illegal sale of single use cameras.  Consequently, Jazz will not be able to formulate a plan of reorganization, much less seek confirmation of a plan, and any plan that Jazz does propose will not be confirmable so long as Jazz's business relies upon selling cameras that violate Fuji's patents.

39.    Fuji submits that Jazz is incapable of selling single use cameras that do not infringe Fuji's patents.  In an effort to confuse the Court about the extent of its reliance on infringing cameras to support the business, Jazz has recently begun asserting that Polytech Enterprises Ltd. ("Polytech") is Jazz's sole provider of single use cameras and that the ALJ determined that Polytech was permissibly repairing single use cameras.  See Cross-Motion for an Order Authorizing the Debtor to Expand the Retention of Budd, Larner, Rosenbaum, Greenberg

& Sade, P.C. to Include Any Action Commenced by Fuji Photo Film Co., Ltd. to Enjoin the Debtor From Any Further Purported Infringing Activity, ¶ 2.  (June 1, 2004, Docket No. 555)  These statements are misleading and/or untrue.  Although Polytech does coordinate Jazz's supply of refurbished single use cameras in China, they are not the sole refurbishing factory used by Jazz.  See EID(II) at 69-70.  Moreover, the ALJ found that of the 6,050,000 cameras refurbished by Polytech (which only started shipping cameras to Jazz in April 2003), only 998,250 (16.5%) were permissibly repaired.  See EID(II) at 92.

40.    Section 1112(b)(1) exists "to prevent the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."  In re GPA Technical Consultants, Inc., 106 B.R. 139, 141 (Bankr. S.D. Ohio 1989).  Gambling on an enterprise with slim prospects of a rehabilitation at Fuji's expense is precisely what Jazz is doing.  "Courts usually require a debtor to have more than manifest unsubstantiated hopes for a successful reorganization."  In re Brown, 951 F.2d 564, 572 (3d Cir. 1991).  Moreover, as determined by the ALJ and just affirmed by the ITC, Jazz's business is principally based upon the illegal sale of product: more than 93% of the single use cameras that Jazz sold between August 2001 and December 12, 2003 (including more than 84% of cameras Jazz sold in 2003) infringed Fuji's patents.  See EID(II), 91-93, 148.[23]  The large majority of Jazz's business is the sale of single use cameras, which have been found to violate Fuji's patents both pre and post-petition.  In sum, Jazz's business model is based upon unlawful behavior and an infringing, unlawful business should not be permitted to reorganize under the Bankruptcy Code.

---

[23]    Rosenthal Decl., Ex. 3

41.    Given Jazz's post-petition losses, its titanic administrative expense liabilities to
Fuji and the ITC, and the ITC's recent affirmation of EID(II) finding that Jazz has violated Fuji's
patents on a massive scale, it is clear that there is no reasonable likelihood of rehabilitation.

**(b)    Jazz is Unable to Effectuate a Plan - § 1112(b)(2).**

42.    Under § 1112(b)(2), the Court may convert or dismiss Jazz's case if Fuji
demonstrates that Jazz is unable to effectuate a plan.  An inability to effectuate a plan has been
interpreted to mean that "the debtor lacks the ability to formulate a plan or to carry one out."
Moody v. Security Pacific Business Credit, Inc., 85 B.R. 319, 345 (W.D. Pa. 1988), vacated on
other grounds sub nom; Moody v. Simmons, 858 F.2d 137 (3d Cir. 1988); In re Economy Cab &
Tool Co., 44 B.R. 721, 725 (Bankr. D. Minn.1984).  "The failure to file a plan after a reasonable
time indicates [the debtor's] inability to do so whether the reason for the debtor's inability to file
is its poor financial condition, the structure of the claims against it, or some other reason." Hall
v. Vance, 887 F.2d 1041, 1044 (10th Cir. 1989); see also, In re Sunflower Racing, Inc., 226 B.R.
665, 669 (D.Kan. 1998) ("A debtor's failure to propose a confirmable plan … constitutes cause
under section 1112(b)(2).").

43.    After more than 15 months, and three extensions of its exclusive periods under
Bankruptcy Code § 1121(d), Jazz has been unable to file a plan of reorganization.  Jazz has said
that the Imation litigation is the lynchpin of its reorganization.  See Hearing Tr., 5/30/03 at
56:16-25; 8/22/03 at 37:1-9; 9/30/03 at 5:1-6.[24]  However, the Imation litigation will not be tried
for many months and, if any party appeals the ultimate judgment, the litigation may not be
finally resolved for several years.  In addition, a Chapter 7 trustee is fully capable of prosecuting
the Imation litigation.  Jazz's counsel in the Imation case has represented to this Court that he

---

[24]    Rosenthal Dec., Ex. 11.

will remain in the case no matter what happens in this proceeding ("I'm not backing away and

have every intention as I've said every time I've been here, to bring that matter to a conclusion

and hopefully for everybody's benefit." (Hearing Tr. 6/4/04 at 71-72)).[25]  In any event, Jazz's

counsel will not be permitted by the District Court to withdraw at this late date after receiving

millions of dollars in fees, and being entitled to a substantial contingent fee. In addition, Jazz has

also said that it is depending upon a reversal of the Fuji Judgment for its reorganization.  See

Hearing Tr., 5/22/03 at 11:9-24.[26]  A reversal of the Fuji Judgment is unlikely, especially in view

of the Federal Circuit's decision denying Jazz a stay pending appeal based on the fact that Jazz

showed neither "a strong likelihood of success nor a substantial case on its merits"  Fuji v. Jazz,

U.S. Court of Appeals for the Federal Circuit, Order dated May 1, 2003 at 2.[27]

44.    Courts are not bound to clog their dockets with "visionary or impracticable

schemes for resuscitation,"  Tennessee Publishing Co. v. American National Bank, 299 U.S. 18,

22 (1936), yet that is exactly what Jazz's putative plan for reorganizing will amount to.

Accordingly, Fuji submits that cause exists under § 1112(b)(2) to convert Jazz's case to Chapter

7 of the Bankruptcy Code.

**(c)    Jazz's Unreasonable Delays Are Prejudicial To Creditors Under §
1112(b)(3).**

45.    Cause exists to convert a Chapter 11 case under § 1112(b)(3) if there is

"unreasonable delay by the debtor that is prejudicial to creditors." 11 U.S.C. § 1112(b)(3).  The

"key words are 'unreasonable' and 'prejudicial.'"    In re Adbrite, 290 B.R. at 216.  Most

decisions under § 1112(b)(3) have focused on the time taken by a debtor, post-petition, to submit

a confirmable plan. See, e.g., In re C.J. Corp., 78 B.R. 273, 275 (Bankr. D. Haw. 1987).  In

---

[25]    Rosenthal Dec., Ex. 11.

[26]    Rosenthal Dec., Ex. 11.

[27]    Rosenthal Decl., Ex. 7.

determining whether a debtor's delay has been unreasonable, a bankruptcy court must take into consideration the context of the delay. See In re Sphere Holding Corp., 162 B.R. 639, 643 (E.D.N.Y. 1994).

46.    As noted above, Jazz has been unable to file or even propose a plan of reorganization for more than 15 months, which is not surprising because Jazz is incapable of filing one, as discussed above.[28]  Throughout this time, Fuji has suffered, and continues to suffer, material harm to its intellectual property rights resulting in a multi-million dollar administrative claim.  Jazz has hijacked Fuji's patent rights since at least 1995 and will continue to do so unless this Court affirmatively stops Jazz by converting this case to Chapter 7.

47.    Jazz's 15 month delay in filing a plan of reorganization, combined with Jazz's unrealistic chances of a successful reorganization, constitutes unreasonable delay, and the fact that Fuji has suffered, and continues to suffer, irreparable harm at the hands of Jazz, constitutes prejudice to a creditor, and is sufficient for a finding of cause under § 1112(b)(3) of the Bankruptcy Code.  Thus, this Court should therefore convert Jazz's case to Chapter 7 without further delay.

**B.    This Court Should Give EID(II) And The ITC' Decision Preclusive Effect.**

48.    Because Jazz consented to allow the ITC to determine whether it, Benun and Cossentino violated the ITC's orders after August 21, 2001, Jazz should be judicially and equitably estopped from continuing to argue that either the EID(II) or the ITC's decision affirming EID(II) should not be given preclusive effect by this Court.  Judicial estoppel generally prevents a party from assuming a certain position in a legal proceeding and thereafter, simply because that party's interests have changed, assuming a contrary position.  See New Hampshire

---

[28]    The prejudicial effect of this delay is compounded by Jazz's failure to explain large discrepancies in its operating report.

v. Maine, 532 U.S. 742, 749 (2001); Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1213 (3d Cir. 1991). Jazz has previously argued that the EID(II) is not binding on this Court, and is expected to take a similar position with respect to the ITC's decision affirming EID(II). By taking these positions, Jazz is doing precisely what the Supreme Court held judicial estoppel prevents: assuming a certain position in a legal proceeding and thereafter changing that position to suit its present needs. Likewise, Jazz should also be equitably estopped from doing this.

49.     Moreover, this Court may give preclusive effect to the EID(II) and the ITC's decision affirming EID(II). In In re Brown, supra, the Third Circuit gave preclusive effect to a state court's summary judgment that was not embodied in a formal written order. 951 F.2d at 568-569, 572-573. Rather, the state court's findings were contained in a transcript of the hearing. The Brown court held that the parties were represented by counsel and summary judgment is sufficiently final so that "it should be given preclusive effect as to the matters considered and decided in that phase of the controversy… ." 951 F.2d at 570. In contrast to Brown, where the Third Circuit held that a court's order embodied in a transcript may be given preclusive effect, the EID(II) is a 150-page written decision that meticulously illustrates Jazz's infringement of Fuji's patents since August 21, 2001. Similarly, the ITC's decision affirming EID(II) is a written opinion upholding the ALJ's findings of fact in EID(II). Therefore EID(II) and the ITC's decision affirming it, are sufficiently final and may be given preclusive effect by this Court.

50.     For the foregoing reasons, Jazz should be judicially and equitably estopped from taking the position that either the EID(II) or the ITC's decision affirming it are not binding on this Court and/or should not be given weight in these proceedings.

## <u>CONCLUSION</u>

51.    It is imperative that this Court convert Jazz's Chapter 11 case to one under Chapter 7.  In addition to misusing the protections of Chapter 11 as a mechanism by which Jazz was able to continue to infringe on Fuji's patents, this Court should also consider the following: (i) the downfall of Jazz was caused by its pre-petition infringement on Fuji's patents; (ii) Jazz continues to sustain large operating losses; (iii) Jazz's business without infringing on Fuji's patents has no prospects of success; (iv) Jazz has little hope of ever confirming a plan of reorganization, the legitimate goal of every Chapter 11 case, thus, Fuji believes that it is merely using this Chapter 11 case to hold Fuji hostage to its compulsory royalty-free licensing scheme; (v) the Jazz estate is clearly administratively insolvent; (vi) failure to convert this case and thereby halt Jazz's continued infringement will result in further accrual of administrative claims of Fuji and the ITC, thereby minimizing the recovery for unsecured prepetition creditors; and (vii) Jazz has failed to  adequately explain large discrepancies in its operating reports.

52.    For above-stated reasons, Fuji respectfully requests that the Court enter an order, substantially in the form submitted herewith, converting Jazz's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code and granting Fuji such other and further relief as may be just under the circumstances.

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:_____/s/ *Bruce Buechler*_____
       Michael Etkin, Esq.
       Bruce Buechler, Esq.
       S. Jason Teele, Esq.
       65 Livingston Avenue
       Roseland, New Jersey 07068
       Telephone: 973.597.2500
       Facsimile:  973.597.2400

**STROOCK & STROOCK & LAVAN LLP**

Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone:  212.806.5400
Facsimile:  212.806.6006
Attorneys for Fuji Photo Film Co., Ltd.

Dated: August 2, 2004