**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (ME 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ  07068
973-597-2500 phone
973-597-2400 fax

 - and -

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
BRIAN M. COGAN
KRISTOPHER HANSEN
180 Maiden Lane
New York, NY  10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| JAZZ PHOTO CORP., | Case No. 03-26565 (MS) |
| | Hearing Date: August 23, 2004 at 10 a.m. |
| Debtor-in-Possession. | |

**MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM**

Fuji Photo Film Co., Ltd. ("Fuji"), by and through its counsel, Stroock & Stroock & Lavan LLP and Lowenstein Sandler PC, submits this motion (the "Motion") for allowance of an administrative claim against Jazz Photo Corp. ("Jazz") in the estimated amount of at least

SSL-DOCS1 1483474v1

$6,546,400 as of July, 2004 pursuant to section 503 of title 11 of the United States Code (the "Bankruptcy Code").[1] In support of the Motion, Fuji respectfully states:

## JURISDICTION

1. The Court has jurisdiction over this Chapter 11 case and this Objection pursuant to 28 U.S.C. § 1334. This Objection presents a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. On May 20, 2003 (the "Jazz Petition Date"), Jazz filed a voluntary petition for relief pursuant to chapter 11 the Bankruptcy Code.

3. On July 2, 2003 (the "Benun Petition Date"), Jack C. Benun ("Benun") also filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Benun is the principal and senior officer of Jazz.

4. No trustee has been appointed in the Jazz or Benun bankruptcy cases. Therefore, each Debtor is charged with carrying out the functions and duties of a trustee under § 1107 of the Bankruptcy Code and continues to operate as a debtor-in-possession under § 1108 of the Bankruptcy Code.

5. Fuji is the largest pre-petition unsecured creditor of Jazz and Benun. Fuji is owed $28,436,361.84 jointly and severally between Jazz and Benun and an additional $1,326,918.76 by Jazz, for a total of $29,763,280.60 pursuant to a judgment entered on March 18, 2003 (the "Fuji Judgment") in *Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F.Supp.2d 434 (D. N.J.

---

[1] Separate motions for the allowance of Fuji's administrative claims have been filed in both the Jazz and Benun cases.

-2-

SSL-DOCS1 1483474v1

2003), ("Fuji v. Jazz")arising out of Jazz's and Benun's infringement of Fuji's patents up to August 21, 2001.

6. On April 6, 2004, Administrative Law Judge Paul J. Luckern (the "ALJ") issued an Enforcement Initial Determination (the "EID(II)") in the enforcement proceedings against Jazz and Benun pending before the United States International Trade Commission ("ITC"). The EID(II) found, *inter alia*, that for the period of August 21, 2001 through December 12, 2003, of the 26,957,730 single-use cameras sold by Jazz, 25,216,980 infringed Fuji's patents (approximately 94%). *See Enforcement Initial Determination of ALJ*, 90-93, 148 (April 6, 2004).[2] Thus, the ALJ found that cameras manufactured by Jazz pre-petition (from August 21, 2001 through May 19, 2003), as well as post-petition (from May 20, 2003 through December 12, 2003), infringed on Fuji's rights. Of these, he found that 83.5% of the cameras sold by Jazz's current supplier, Polytech, were infringing. EID(II) at 91-92.

7. The EID(II) also recommends significant enforcement measures against both Jazz and Benun. Pursuant to the statute establishing penalties for violations of cease and desist orders entered by the ITC, 19 U.S.C. § 1337(f)(2), Jazz is liable for per diem penalties of up to $100,000 or "twice the domestic value of the articles entered or sold on such day in violation of the order." The ALJ, in the EID(II), found that this penalty statute applies to Jazz and Benun for each day that they were in violation of the Cease and Desist Order and determined that the appropriate penalty was $25,000 per day. The ALJ further found that the record supports the imposition of a $13,675,000.00 penalty, calculated pursuant to 19 U.S.C. § 1337(f)(2), against Jazz and Benun, jointly and severally, for violation of the ITC's Cease and Desist Order.

---

[2] Cited pages from the EID(II) are annexed as Exhibit 6 to the Declaration of Matthew W. Siegel (the "Siegel Declaration").

-3-

8.  On July 27, 2004, the ITC adopted the ALJ's findings that Jazz was infringing Fuji's patents and requested additional briefing on the issue of the amount of the civil penalty recommended by the ALJ. Siegel Declaration Ex. 6.

Amount of Fuji's Post-Petition Claim

9.  The ALJ's decision covered the period from August 22, 2001 to December 12, 2003 and found that during this time, the total number of infringing cameras sold by Jazz and Benun was 25,216,980 cameras. However, some of these infringements occurred pre-petition and some occurred post-petition. Accordingly, Fuji has estimated the number of cameras sold by Jazz post-petition as approximately 14 million, as discussed below. Because these cameras came from Polytech or from a source with a higher percentage of infringing cameras than Polytech, Fuji applied the percentage of infringing cameras from Polytech (83.5%) to the 14 million cameras total, for an estimate of 11.69 million infringements. Additional details of these calculations are provided below and are also described in the accompanying Siegal Declaration.

10. The first step in estimating how many infringing cameras Jazz imported post-petition is determining the total number of cameras Jazz imported. One method of estimating this is by examining data concerning the cargo that entered United States ports wherein Jazz is the importer and the products imported are single use cameras. One way this can be accomplished is by analyzing PIERS (Port Import Export Reporting Service) reports, which are based on data of the U.S. Customs service.

SSL-DOCS1 1483474v1

11. Based on PIERS reports[3] in Fuji's possession, from July 26, 2003 through June 19, 2004, Jazz imported 3,191,915 pounds of single use cameras. *See* Siegal Declaration ¶9. Based on an estimated average weight of 0.3 pounds per camera, this amounts to 10,639,716 cameras. *See* Siegal Declaration ¶10-11.

12. Fuji does not have PIERS reports from May 20, 2003 (the date of the petition) through July 17, 2003. However, Jazz had produced invoices dated from May 23, 2003 to July 21, 2003 that detail its importations. *See* Siegal Declaration ¶13. The July 21, 2003 invoice states an ETA of August 2, 2003. Accordingly, PIERS data was not used for the period of July 18, 2003 to August 2, 2003. Jazz's invoices show that during this period, Jazz imported 3,191,915 single use cameras. *Id.* Thus, according to these two sources, Jazz imported approximately 14,036,756 single use cameras post-petition (through June 19, 2004).

13. A second method of estimating Jazz sales is based on dividing the amount of money Jazz paid for its cameras to Polytech, Agfa (film) and Seven Bucks (shells) then dividing this number by the price per camera. On the June operating report, this total appears in the somewhat illegible document to be $24,910,000. Siegal Declaration ¶6. Then, using $1.80 as the average price Benun testified Jazz pays for cameras, *see* Siegal Declaration ¶7, this leads to purchases of 13,879,000 cameras through the end of June. Siegal Declaration ¶8. Accordingly, based on these two methods, an estimate of 14,000,000 cameras appears reasonable.

14. Based on the PIERS reports, the invoices, Jazz's June Operating Report and Jazz's prior testimony, it appears that the overwhelming majority of Jazz's post-petition cameras originate from Polytech. The ITC determined that 83.5% of the cameras originating from

---

[3] PIERS reports are available from a private company that compiles import information from vessel manifests and U.S. Customs Automated Manifest Systems (AMS) from all U.S. ports. *See* Thompson Dialog bluesheet on PIERS imports (U.S. Ports) at http://library.dialog.com/bluesheets/html/b10573.html.

Polytech were infringing. For example, the ALJ found that Polytech refurbished 6,050,000 Jazz cameras. EID(II) at 91. Of those cameras, 998,250 were found to be permissibly repaired. EID(II) at 92. This means that 5,051,750 (83.5%) cameras were infringing. It should be noted that the ALJ determined that the percentage of Polytech cameras that were infringing was smaller than the percentage for Jazz's other suppliers in 2003. *See* EID(II) at 92-93 (showing 85% infringement for cameras originating from Junshi and Everbest, Jazz's other 2 suppliers). Accordingly, to the extent some of these cameras originate from other suppliers, the infringement estimates are conservative.

15. Thus, of the approximately 14 million cameras that Jazz has imported post-petition, about 11.69 million are infringing. Based on a reasonably royalty of $.56 per camera, the amount found by the jury in the district court case, *see Fuji v. Jazz*, 249 F. Supp. at 453, this amounts to a claim by Fuji of $6,546,400 against Jazz through July 2004. Fuji believes that it would be entitled to a larger lost profits amount, plus an award of attorneys' fees and treble damages, under 35 U.S.C. §§ 284, 285 were Jazz not in bankruptcy. However, in the interest of expediting these proceedings, in the event a full hearing on the merits can be avoided, in the interest of judicial efficiency, Fuji is only claiming entitlement to the 56 cent lost royalty per infringing camera, as determined by the District Court in <u>Fuji v. Jazz</u>.

16. Turning to Benun, Fuji's claim for infringement inducement since Benun's Petition Date amounts to $5,342,000. This is based on 2,612,588 cameras sold by Jazz after Jazz's May 20, 2003 Petition Date and Benun's July 2, 2003 Petition Date, 14 million minus 2,612,588 equals 11,424,168 total cameras. Taking 11,424,168 cameras times 83.5% equals 9,539,180 infringements, times 56 cent royalty equals $5,342,000 in owed royalties. *See* Siegal Declaration ¶14.

17. Fuji notes that its administrative claim as of July, 2004 is estimated only and increases with each passing day as Fuji believes that Jazz continues to infringe Fuji's patents. Jazz has not advised this Court that it has in any way changed its actions, which resulted in massive infringement of Fuji's patents. Fuji's administrative claims are in addition to the Fuji Judgment against Jazz and Benun, jointly and severally, and Fuji's pre-petition claims for the period from August 21, 2001 through the respective Petition Dates, estimated to amount to $10,938,527 as to Jazz and $12,160,173 as to Benun. Siegal Declaration ¶15.

## RELIEF REQUESTED

18. Fuji respectfully asks this Court to find that Fuji has an administrative claim for damages resulting from Jazz' post-petition infringement in the amount of at least $6,546,400,[4] accrued from Jazz's Petition Date through and including July, 2004.

## BASIS FOR RELIEF

### I. Fuji Is Entitled To An Administrative Claim For Damages From Jazz's and Benun's Post-Petition Infringement

19. Section 507(a) of the Bankruptcy Code sets forth the order of priorities for claims. It provides that administrative expenses allowed under section 503(b) of the Bankruptcy Code are entitled to the first priority. 11 U.S.C. § 507(a). Section 503(b) defines "administrative expenses" as "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case…" 11 U.S.C. § 503(b).

---

[4] This amount is an estimate calculated as described above. Fuji reserves the right to modify this amount based on new information that may become available to it. To this end, Fuji has prepared a subpoena to be served on Joseph Weber, the Chief Financial Officer of Jazz, which requests that he produce certain documents, including the invoices and shipping documents for cameras Jazz purchased from its suppliers and shipped to its customers.

20. The Supreme Court decision of *Reading Co. v. Brown*, held that the concept of "necessary costs" is not limited to costs necessary to benefit the estate and advance the reorganization process, but should include costs incidental to operation of a business, such as tort claims arising during a bankruptcy proceeding. *See Reading Co. v. Brown*, 391 U.S. 471, 484 (1968)(holding that claims for damages resulting from negligence of a receiver acting within the scope of his authority gave rise to actual and necessary costs of administration of a bankruptcy proceeding). The court in *Reading* recognized that although the primary statutory objectives are to facilitate rehabilitation of the debtor's business and to preserve a maximum of assets for distribution among the general creditors, another important objective is "fairness to all persons having claims against an insolvent." *Id*. at 477.

21. Therefore, when a party is damaged through the operations of a debtor's business, its claim is entitled to administrative priority, even though the claim did not arise from transactions that were necessary to preserve or rehabilitate the estate. *See e.g., In re Hanlin Group, Inc.*, 176 B.R. 329, 334 (Bankr. D. N.J. 1995)(holding that back pay awarded for post-petition violation of Worker Adjustment and Retraining Notification Act were wages for services rendered after commencement of the case entitled to administrative expense priority, notwithstanding lack of benefit to the estate); *In re Cohen and Sons Caterers, Inc*., 143 B.R. 27 (E.D. Pa. 1992)(claim for postpetition tort injuries of debtor's customer was entitled to administrative priority status); *In re Charlesbank Laundry, Inc*., 755 F.2d 200 (1st Cir. 1985)(damages for breach of injunction in violation of zoning ordinance entitled to priority).

22. In this case, Jazz's continued post-petition infringement of Fuji's patents gives rise to Fuji's administrative claim. Jazz's illegal post-petition infringement of Fuji's patents, which Fuji believes is being directed by Benun, caused significant harm to Fuji and provided the

estate with a significant material benefit, namely increased sales and lower manufacturing costs, without being required to pay any licensing fees to Fuji. As succinctly stated by the Second Circuit court: "[d]amages for infringing a patent in the course of sales made for profit would seem an a *fortiori* case for priority." *See Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2nd Cir. 1971).

23. In another case where intellectual property rights were at issue, copyright holders moved for relief from the automatic stay to pursue their request for preliminary injunction against an individual chapter 13 debtor and several corporate chapter 11 debtors and alleged infringement that began pre-petition and continued post-petition. *In re Deep,* 279 B.R. 653 (Bankr. N.D.N.Y. 2002). The bankruptcy court found that the balance of harms weighed in the movants' favor and cause existed to lift the automatic stay and noted that "… if the Debtors are actually committing copyright infringement, harm to the Movants, and even to the estate due to the potential administrative expenses that would also be accruing, would continue." *Id.* at 659. The court also stated that the debtors can "only use property of the estate in a lawful manner" and the question of infringement must be resolved by some court, therefore, potential harm to the debtors from lifting the stay is not compelling. *Id.*

24. Deliberate violation of the law, such as the one Fuji believes Jazz and Benun are engaged in, should not be condoned in bankruptcy. Thus, in *In re Charlesbank Laundry, Inc.*, the court concluded that a civil compensatory fine for violation of a state court injunction by a debtor who continued to commit a private and public nuisance by operating a laundry post-petition in violation of a town's zoning ordinance qualified for first priority treatment as administrative expense. 755 F.2d at 203. The court noted that the debtor "*deliberately* continued a violation of law month after month presumably because it was more lucrative for the business

to operate outside the zoning ordinance than within in." *Id. (emphases in the original).* The court concluded that an intentional act, which violates the law and damaged others should give rise to a claim entitled to administrative priority. *Id.* This holding, together with the *Carter-Wallace, Inc.* case, strongly supports the conclusion that Fuji's claim for Jazz's deliberate post-petition infringement of its patents should be entitled to administrative priority.

25. At the hearing held on April 27, 2004 in the Bankruptcy Court for the District of New Jersey, Mr. Sirota made a reference to the case of *Pennsylvania Dep't of Envtl. Res. v. Tri-State Clinical Labs., Inc.*, 178 F.3d 685 (3d Cir. 1999) ("*Tri-State*"), suggesting that post-petition infringement may not give rise to an administrative claim in certain circumstances. Although it is Fuji's position that the *Tri-State* decision is wholly inapplicable to the situation at hand, because of the ambiguity of Mr. Sirota's remark, Fuji will address the facts of the *Tri-State* decision in this Motion so as to avoid any confusion.

26. The *Tri-State* decision held that a criminal fine imposed on a chapter 7 debtor for post-petition conduct was not an administrative expense entitled to priority. The *Tri-State* court was unwilling "to infer that disposing of infectious human waste [the conduct for which the criminal fine was imposed] in a manner that not only endangers members of the general public, but also constitutes criminal activity, is part of the ordinary and necessary operations of a business." *Tri-State*, 178 F.3d at 698. Furthermore, the court concluded that the imposition of criminal penalties would not compensate any party for the damages resulting from the debtor's conduct, as the fines would be ultimately paid by innocent third persons, the creditors, rather than the debtor-criminal. *Id.* at 692.

27. The *Tri-State* court determined that it is not appropriate to accord administrative priority to criminal fines, which have nothing to do with compensation, but are merely designed

-10-

to deter and punish criminal conduct. *Id.* at 693. However, the *Tri-State* case is clearly inapplicable to the facts of this case for several reasons. First, Fuji's claim is for civil, rather than criminal penalties. Second, it is compensatory, rather than purely punitive. The claim for reasonable royalty is not intended to deter or punish Jazz, but rather serves as a statutory fine under 35 U.S.C. § 284 to compensate Fuji for the monetary damages and lost profits Fuji incurs every day as the infringement continues. And finally, it is a fact that Jazz operates and makes a profit by violating Fuji's patents. Given the ALJ's findings of extensive infringement, it is fair to say that Jazz has been staying alive and operating its business out of the proceeds of its unlawful activities.

28.     The case of *Pennsylvania Dep't of Envtl. Res. v. Conroy*, 24 F.3d 568 (3d Cir. 1994) ("*Conroy*") is more analogous to this case. In *Conroy*, the court held that compensatory environmental fines imposed on a debtor for expense incurred by the environmental agency for cleaning a contaminated site were entitled to administrative priority and regarded as costs "necessary to preserve the estate." *Id*. at 570-71. The court noted that because the debtor could not abandon the contaminated site and avoid the clean-up costs, the agency's claim for such costs should be entitled to priority. Similarly, outside of bankruptcy, Jazz and Benun would not be able to avoid paying penalties for infringement, and they should not be allowed to use the bankruptcy proceeding as a shield for their post-petition illegal conduct. It is also notable that the *Tri-State* decision did not overrule the *Conroy* decision, and merely drew a distinction between claims for compensatory expenses and those for criminal fines. *Tri-State*, 178 F.3d at 693. Therefore, Fuji's claim for compensatory damages incurred post-petition entitles Fuji to administrative claim in the amount of $6,546,400.

**II.      This Court Has Authority To Estimate Fuji's Claim Pursuant To Section 502(c) Of The Bankruptcy Code**

29.     Section 502(c) of the Bankruptcy Code provides: "There shall be estimated for purposes of allowance under this section – (1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the closing of the case…" *See* 11 U.S.C. § 502(c)(1).  It is generally held that this provision imposes an affirmative duty on a Bankruptcy Court to estimate an unliquidated or contingent claim if fixing or liquidating such claim would "unduly delay" the reorganization process. *In re Stone & Webster, Inc.*, 279 B.R. 748, 810 (Bankr. D. Del. 2002)("An estimation proceeding expedites the bankruptcy process so that key steps in a reorganization that depend of the fixing of value may proceed"). The *Webster* court described the estimation proceeding as a "procedural device that is to be used when adjudication and liquidation of a claim would take an unreasonably long time to allow courts to quickly and flexibly estimate the amount of an as yet to be liquidated claim." *Id.*

30.     Courts look at the circumstances in each case to determine whether the delay of liquidation of a claim would be "undue" and consider, among other things, how long the liquidation process would take compared with the uncertainty due to the contingency of the claim in question. *In re Teigen*, 228 B.R. 720, 723 (Bankr. D. S.D. 1998)(the court estimated unliquidated guarantee claims against chapter 7 debtors, finding that a delay engendered by not estimating these claims would be undue).  Thus, when the benefits of the estimation outweigh those of liquidation, it is appropriate to estimate the claim.   It would be a waste of judicial resources and a huge drain of the estate's assets to engage in yet another litigation, to conduct extensive discovery and to hold evidentiary hearings on the liquidation value of Fuji's claim.  To do so would unduly delay the proceedings in this case and result in further injustice to Fuji, as Fuji would be forced to spend significant amounts in attorney's fees itself and watch Jazz' and

-12-

Benun's estate assets melt, thereby reducing the recovery available to Fuji pursuant to its administrative claim. Thus, the most reasonable and efficient solution is for this Court to estimate Fuji's claim.

31.     In this case, Fuji has an unliquidated claim, since the amount of the claim is not readily ascertainable without estimation. *In re Teigen*, 228 B.R. at 723. The court has broad discretion in estimating the value of an unliquidated claim. *Id.* (citing *Ryan v. Loui*, 892 F.2d 829, 834 (9th Cir. 1989)). Although the Bankruptcy Code does not provide guidance on how a claim is to be estimated, the Third Circuit held that bankruptcy judges may use "whatever method is best suited to the particular contingencies at issue." *See Bittner v. Bourne Chemical Co.*, 691 F.2d 134, 135 (3d Cir. 1982). The *Bittner* court further noted that an arbitration or a jury trial may be necessary in rare and unusual cases, but such methods will run counter to the efficient administration of the bankruptcy estate in most cases, and "where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value." *Id.* at 135. Fuji believes that there is sufficient evidence to determine the value of its claims against Jazz and Benun, using the approach discussed above, and requests that the Court adopt this approach to achieve a speedy and fair resolution of the prolonged litigation between the parties.

32.     It is not uncommon for courts to estimate claims to advance the distribution process. Thus, in *In re Continental Airlines, Inc.*, 57 B. R. 842, 844 (Bankr. S.D. Tex. 1985), chapter 11 debtors moved for bankruptcy court to estimate all contingent and unliquidated employee claims for purposes of confirmation of their reorganization plans. The court considered whether liquidation or estimation would be reasonably feasible and concluded that the estimation process "is the most appropriate, efficient and equitable method of concluding this

-13-

Chapter 11 proceeding in an orderly manner, and most effective method to accomplish the statutory purpose in bankruptcy of advancing a ratable distribution of assets among the creditors." *Id.* In making this determination, the court considered the alternative of liquidation and stated that liquidating these types of claims would involve the unnecessary expenditure of enormous amounts of time, effort and money, by way of attorneys' fees inherent in such litigation. *Id.* Although this Court is not dealing with multitudes of employee claims, the principle of avoiding undue delays and unnecessary excessive litigation costs still applies to this case with equal, if not greater, force since the fixing of the number of infringing cameras up to December 12, 2003 required extensive discovery, including in China and Hong Kong, and a six day hearing equivalent to ten to twelve normal court days. These considerations are especially important, since Jazz is administratively insolvent and the costs of the liquidation process would be passed on to Fuji.

33. Therefore, Fuji respectfully asks this Court to estimate and fix its claim against Jazz at $6,546,400.

## CONCLUSION

34. Based on the foregoing, Fuji respectfully requests that the Court fix and allow Fuji's administrative expense claim against Jazz in the estimated amount of $6,546,400, and grant Fuji such other and further relief as is just and proper under the circumstances.

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By: /s/ Bruce Buechler, Esq.

Bruce Buechler, Esq.
Michael Etkin, Esq.
S. Jason Teele, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973.597.2500
Facsimile: 973.597.2400

**STROOCK & STROOCK & LAVAN LLP**

Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: 212.806.5400
Facsimile: 212.806.6006

Dated: August 2, 2004