**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (ME 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ  07068
973-597-2500 phone
973-597-2400 fax

- and -

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
KRISTOPHER HANSEN
180 Maiden Lane
New York, NY  10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JAZZ PHOTO CORP., | : | Case No. 03-26565 (MS) |
| | : | |
| | : | Hearing Date: |
| Debtor. | : | |
| | : | |

### FUJI PHOTO FILM CO., LTD.'S MOTION FOR A DETERMINATION THAT THE AUTOMATIC STAY IS NOT APPLICABLE AND TO LIFT THE INJUNCTION AGAINST PROCEEDING OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY

By this motion (the "Motion"), Fuji Photo Film Co., Ltd. ("Fuji"), through its

undersigned counsel, seeks an order (i) authorizing Fuji to commence an action in the United

States District Court for the District of New Jersey (the "District Court") to enjoin further

infringing activities by Jazz Photo Corp. ("Jazz") and Jack C. Benun ("Benun") (collectively the

"Debtors") by granting Fuji relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1), or

in the alternative, (ii) determining that the automatic stay does not prohibit Fuji from

commencing and pursuing such action, pursuant to 28 U.S.C. § 959 and lifting the injunction

against commencing and pursuing such action currently in place.[1]  In support of the Motion, Fuji

respectfully represents as follows:

## BACKGROUND

1.   On May 20, 2003 (the "Jazz Petition Date") and on July 2, 2003 (the " Benun Petition

Date"), Jazz and Benun respectively filed a voluntary petition for relief pursuant to Chapter 11 of

Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code").

2.   No trustee has been appointed in these cases, and thus the Debtor is charged with

carrying out the functions and duties of a trustee under § 1107 of the Bankruptcy Code.  The

U.S. Trustee has appointed an Official Committee of Unsecured Creditors in this case.

3.   Fuji is the largest unsecured creditor of Jazz and Benun.  Benun owes Fuji

approximately $28.4 million.  Benun's company, Jazz, owes Fuji nearly $30 million.  Jazz and

Benun's obligation to Fuji arises from a judgment obtained by Fuji as a result of Jazz and

Benun's infringement through August 2001 of patents owned by Fuji (in part found to be willful)

(the "Fuji Judgment").[2]

4.   On April 6, 2004, the Administrative Law Judge (the "ALJ") of the U.S. International

Trade Commission (the "ITC" or the "Commission") found, inter alia, that more than eighty-four

percent (84%) of the single use cameras sold by Jazz in 2003, including those sold post-petition,

and more than 93% of the single use cameras sold from August 21, 2001 to December 12, 2003

---

[1]    Separate, but identical motions are filed in the Jazz and Benun cases.

[2]    Declaration of Lawrence Rosenthal in Support of Fuji Photo Film Co. Ltd.'s Motion For A Determination That
The Automatic Stay Is Not Applicable And To Lift The Injunction Against Proceeding Or, Alternatively, For Relief
From The Automatic Stay dated August 2, 2004 (the "Rosenthal Decl."), at Ex. 1.

infringed Fuji's patents. *See Enforcement Initial Determination of ALJ*, 90-93, 111, 148 (April

6, 2004) (the "EID II")[3]. In other words, the ALJ expressly found that Jazz, under Benun's

control, engaged in extensive infringement of Fuji's patents in violation of the Commission's

Cease and Desist order while under the supervision of this Court. In fact, given the large

percentage of Jazz's business represented by the sale of single use cameras, it is fair to say that

Jazz has been staying alive and paying appointed professionals out of the proceeds of its

unlawful activities.

5.    On or about May 13, 2004, Fuji filed a motion (the "First Injunction Motion") with

this Court seeking almost the identical relief as is being sought by this motion, namely a

determination by the Court that the automatic stay did not prohibit Fuji from seeking injunctive

relief from the District Court or, alternatively, a finding by the Court that sufficient cause existed

to lift the stay to allow Fuji to proceed in District Court in an effort to prevent continued

infringement by Benun and Jazz.

6.    On June 4, 2004, at the Hearing on the First Injunction Motion, the Court denied the

First Injunction Motion and, without making a determination as to whether or not the automatic

stay applied, the Court used its general equitable powers under 28 U.S.C. § 959(b) to enjoin Fuji

from proceeding with an action in the District Court. The order denying the First Injunction

Motion, dated June 9, 2004, explicitly provided that it was without prejudice to Fuji's right to

renew the First Injunction Motion upon a change of events or circumstances after June 4, 2004.[4]

7.    On July 27, 2004, the ITC adopted the decision of the ALJ, by determining not to

review the ALJ's EID(II) on the findings related to the violations determined to exist, including

---

[3]    Cited portions of the public version of the EID(II) are annexed as Rosenthal Decl., Ex. 2.

[4]    Rosenthal Decl., Ex. 3.

his determination that Messrs. Benun and Cossentino are subject to the ITC's Cease and Desist

Order applicable to Jazz.  The ITC solicited written submissions from the parties to the

investigation, interested parties and interested government agencies on the specific enforcement

measures recommended by the ALJ (i.e., imposition of civil penalties against Jazz ($13.675

million), Benun ($13.675 million) and Cossentino ($154,000)).[5]

8.  Simultaneously herewith, Fuji has filed a motion with this Court seeking the

allowance of an administrative claim against Benun in the amount of $5,342,000, as well as

against Jazz in the amount of $6,546,400, arising out of their post-petition infringement of Fuji's

patents, as determined by the ALJ and adopted by the ITC.[6]  Fuji's administrative claims

increase each day that Jazz and Benun continue to engage in post-petition infringing activity.

Fuji also has filed a motion seeking the entry of an order converting the Jazz case to a case under

Chapter 7 and for identical relief as is sought in this motion against Jazz.

### JAZZ AND BENUN'S INFRINGING CONDUCT

9.  While  the Court is presumed to be familiar with the history of the several

proceedings in which Jazz and Benun have been found to have engaged in infringing conduct,

including during the post-petition period, from prior filings, that history is repeated here for

completeness.

**The Initial ITC Investigation**

---

[5]    Rosenthal Decl., Ex. 4.

[6]    The method used by Fuji to calculate these sums is set forth in the Motion For Allowance of Administrative
Claims filed herewith.  Essentially, Fuji's claim recalculation is based on the percentage of cameras found to be
infringing post-petition by the ALJ, as adopted by the ITC, and the 56 cent reasonable royalty found by the jury and
adopted by the District Court.  The number of cameras sold as of July 2004 can only be estimated by Fuji  from the
information publicly available, but can be determined with greater particularity from the invoices from Polytech and
Jazz's sales invoices in Jazz's possession.

10. On March 25, 1998, at Fuji's request, the U.S. International Trade Commission ("ITC" or the "Commission") instituted an investigation alleging that several respondents, including Jazz, were violating Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.  Fuji alleged that the respondents were engaging in the sale and importation of lens-fitted film packages (single use cameras) that infringed a number of Fuji's patents.  See 63 Fed. Reg. 14474 (March 25, 1998).  The Administrative Law Judge ("ALJ") conducted a Hearing from November 2 through November 13, 1998 in Investigation No. 337-TA-406.

11. The ALJ issued an Initial Determination ("ID") on February 24, 1999 and found that Jazz had infringed many of Fuji's patents. ID at 344-345.[7]  The ALJ's finding of infringement was based on three grounds.

12. First, the ALJ found that all of the factories refurbishing single use cameras utilized at least eight common steps and that a theoretical process involving only those eight common steps was reconstruction.  ID at 108, 109.  Second, the ALJ described individual processes used by Jazz's suppliers (and other manufacturers) that were more extensive than the eight steps.  ID at 119-124, 133-134, 181-187, 285-304.  Consequently, the ALJ found that the evidence presented at the Hearing "further revealed" the nature of the alleged "remanufacture" processes [beyond the Commission's eight steps] and supports the finding that these processes [including those of Jazz's then suppliers] involved reconstruction and not permissible repair.  ID at 119.  Third, the ALJ found that Jazz had not sustained its burden of proving the affirmative defense of repair because "little or no information on the factories' processes" was provided, or Fuji was denied discovery of most of the processes and/or that the information provided was incomplete.  ID at 119 at n. 43, 122, 133.  The ALJ's findings covered each of Jazz's then factories.

---

[7]    Cited excerpts from the ID are marked Rosenthal Decl., Ex. 5 (confidential).

13. On June 9, 1999, the Commission adopted the ALJ's reasoning for rejecting the repair defense and found that all respondents violated Section 337 of the Tariff Act of 1930 and infringed one or more of the Fuji patents.  The Commission, however, found that the ALJ relied on the wrong burden of proof, clear and convincing rather than preponderance of the evidence. Nonetheless, the Commission considered the evidence and found that the application of the correct standard of proof did not affect the ALJ's conclusions regarding the repair defense.  In re Certain Lens Fitted Film Packages, USITC Inv. No. 337-TA-406, Commission Opinion at 5 (June 9, 1999).[8]  The Commission reversed the ALJ's finding of non-infringement of the design patents but otherwise adopted the ALJ's numerous infringement and validity determinations.

14. The Commission also adopted the ALJ's findings regarding the inadequacy of Jazz's and other respondents' evidence of repair:

> The ALJ, however, did not rule against respondents merely because they had failed to carry their burden of proof on permissible repair.  Rather, the ID contains detailed findings on the activities of some of the remanufacturing respondents' suppliers, and concluded that those respondents "are effectively recreating the patented single use camera of complainant and its licensees, and hence are involved in impermissible reconstruction." ID at 164.  Thus, the ALJ affirmatively found that those respondents were engaged in impermissible reconstruction of a patented good. **He found that the other remanufacturing respondents were infringing Fuji's patents because they obtained their LFFPs from factories where Fuji was not allowed to inspect their remanufacturing processes.  ID at 133.  Since there was insufficient information in the record about the processes employed by their suppliers, *id.*, those respondents failed to carry their burden of proof, regardless of the standard of proof that was imposed.**  Accordingly, we determine that application of the correct standard of proof to the ALJ's findings does not affect his conclusions on the repair/reconstruction issue.

---

[8]    Rosenthal Decl., Ex. 6.

Id. at 4-5 (emphasis supplied).  The Commission imposed a Cease and Desist Order[9] against Jazz

(the "Order"), as well as against  19 other domestic respondents and a General Exclusion Order[10]

applicable to all importers and manufacturers.  64 Fed. Reg. 30541 (June 8, 1999).  In the case of

Jazz, evidence was adduced only as to three of Jazz's factories and in each case the ALJ pointed

out the failure to provide Fuji with access and the incompleteness of the proofs.  ID at 119 at n.

43 and 122.

15. On June 7, 1999, Jazz appealed to the U.S. Court of Appeals for the Federal Circuit.

Jazz also moved for a stay pending appeal, which was granted on July 6, 1999, before the

expiration of the Presidential review period.  The Federal Circuit only required the posting of a

bond for infringing conduct during a 60-day presidential review period.

16. On August 21, 2001, the Federal Circuit, in its Opinion and Judgment, affirmed the

Commission's determination of Jazz's infringement.  Jazz Photo Corp. v. U.S. Int'l Trade

Comm'n, 264 F.3d 1094 (Fed. Cir. 2001) ("Jazz v. ITC").[11]  See generally Certain Lens-Fitted

Film Packages, USITC Inv. No. 337-TA-406, Notice of Institution of Further Enforcement

Proceeding (Sept. 24, 2002)[12]; see also EID(II) at 5 ("On August 21, 2001 the Federal Circuit

affirmed the Commission's determination of Jazz's infringement and lifted the stay.").[13]

Specifically, the Federal Circuit concluded that the affirmative defense of permissible repair was

available only for single use cameras **first sold in the United States** and refurbished by a

---

[9]    Rosenthal Decl., Ex. 7.

[10]   Rosenthal Decl., Ex. 8.

[11]    Rosenthal Decl., Ex. 9

[12]   Rosenthal Decl., Ex. 10.

[13]   Rosenthal Decl., Ex. 2.

procedure "**limited**" to the eight common steps.  <u>Jazz v. ITC</u>, 264 F.3d at 1098-1099 (emphasis added).

17. The Federal Circuit lifted the stay and affirmed the finding of infringing reconstruction for any single use cameras that were refurbished by procedures "**more extensive**" than those held to constitute repair, or whose remanufacturing procedures were "**withheld or insufficiently disclosed** to the Commission." <u>Id.</u> at 1111 (emphasis added).  The Federal Circuit found that the alleged infringer has the burden of proof on the permissible repair defense by a preponderance of the evidence, and affirmed where the defense was not proven by credible, verifiable, and complete evidence. <u>Id.</u> at 1102, 1109 and 1111.   Where, as in the case of Jazz, the burden was not met, e.g., by denying Fuji access to its factories, such refurbished cameras remained subject to the Commission's orders. <u>Id.</u> at 1111.

**The District Court Judgment**

18. Shortly after the Commission opinion issued, Fuji filed a patent infringement action in the District Court against, <u>inter alia</u>, Jazz and Benun.

19. After a five-week jury trial in October and November 2002, and Judge Hochberg's separate consideration of the permissible repair defense, which is a legal issue on which the jury's findings were advisory, the District Court found Jazz, Jazz Hong Kong and Benun liable for infringement. <u>Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.</u>, 249 F.Supp.2d 434, 459 (D.N.J. 2003) ("<u>Fuji v. Jazz</u>").  The District Court, applying the two-prong test for analyzing the permissible repair defense (first sale (exhaustion) plus a permissible repair process) annunciated by the Federal Circuit, concluded that more than 99% of the 40,099,369 refurbished cameras at issue infringed Fuji's patents. <u>Id.</u> at 451-52.  The District Court also affirmed the jury's finding that Benun was liable for inducement based on his control of Jazz; that he caused Jazz to infringe

Fuji's patents.  Id. at 457-59.  Finally, the District Court awarded Fuji approximately $30 million

in damages and pre-judgment interest.  Fuji v. Jazz, Final Judgment at 2 (March 13, 2003).[14]

20. Fuji sought a preliminary injunction twice in the District Court action.  First, right

after the Federal Circuit decision in Jazz v. ITC, Fuji sought a preliminary injunction.  It was

denied by Order filed October 9, 2001 on the ground that "there is no irreparable harm because

alternate forms of relief are available and mere delay in a government agency's ability to hear a

matter does not constitute irreparable harm [a reference to the ITC]" and because the Court

found that Fuji  had not shown "a likelihood of success regarding future cameras that have not

yet been reviewed by any agency or judicial body."[15]

21. Second, after the jury verdict in its favor, Fuji sought a permanent injunction.  It was

denied by a Final Order and Judgment entered March 13, 2003 on the grounds that:  a) the

requested injunction was "neither 'specific in terms' nor does it describe 'in reasonable detail the

acts sought to be restrained'"; b) "Fuji voluntarily limited the scope of its infringement claims in

this case to cameras sold prior to August 21, 2001"; c) the Court's "Opinion as to repair/

reconstruction turned on issues of proof which may not necessarily adhere in a proceeding with a

damages period beginning after August 21, 2001"; and d) "Fuji has already sought and obtained

injunctive relief in the ITC Proceeding, the subject of which is Defendants' *current and ongoing*

conduct."  The Court pointed out that the injunctive power of the ITC is not coextensive with

that of the Court because it is limited to imports, "the existence of the ITC injunction for the

most part vitiates Fuji's claim to ongoing and irreparable harm with respect to the Jazz supply

chain for which evidence has been adduced in this case."[16]

---

[14]    Rosenthal Decl., Ex. 1.

[15]    Rosenthal Decl., Ex. 11.

[16]    Rosenthal Decl., Ex. 2 (emphasis in original).

22. Jazz and Benun immediately moved for a stay of the District Court Judgment pending appeal of the decision to the Federal Circuit, first to the District Court and then to the Federal Circuit.  Both of these stay requests were denied.  The Federal Circuit's denial of a stay was <u>inter alia</u>, on the ground that the Defendants have "shown neither a strong likelihood of success nor a substantial case on its merits to entitle [them] to stay."  <u>Fuji v. Jazz</u>, U.S. Court of Appeals for the Federal Circuit, Order dated May 1, 2003 at 2.[17]

23. On May 3, 2004 the oral argument on that appeal was held.  Although it is difficult to glean anything from comments made during oral argument, one thing appears clear --- the judges sitting on the Federal Circuit panel indicated that they were bound by the Federal Circuit's prior decision in <u>Jazz v. ITC</u> and that in order to reverse the rule governing first sale, the case would have to be heard <u>en banc</u>.  Note that the appeal included issues common to Jazz and Benun and one issue specific only to Benun:  did the District Court err in finding Benun induced infringement by Jazz and Jazz Hong Kong.

---

[17]    Rosenthal Decl., Ex. 12.

**The Enforcement Proceedings (II)**

24. On September 24, 2002, the Commission instituted a formal enforcement proceeding to determine whether Jazz, Benun, and Anthony Cossentino (Jazz's former president) violated the Commission's Orders after August 21, 2001 and what, if any, enforcement measures were appropriate.  See Completion of Remand; Notice of Institution of Further Enforcement Proceedings at 3.[18]  After a consent order modifying the automatic stay was entered by this Court on July 30, 2003 and after extensive discovery by both sides, an evidentiary Hearing was conducted by the ALJ from December 8 through December 13, 2003.

25. On April 6, 2004, the ALJ issued a 150 page Enforcement Initial Determination ("EID(II)")[19] and on July 27, 2004 the ITC adopted the infringement determinations of the EID(II) and sought comment on the penalty recommendations as described above.

<u>**RELIEF REQUESTED**</u>

26. Through this Motion, Fuji seeks an order (i) authorizing Fuji to commence an action in the District Court to enjoin further infringing activities by Jazz and vacate the injunction currently in place and (ii) determining that the automatic stay does not prohibit Fuji from commencing and pursuing such action, pursuant to 28 U.S.C. § 959 or, alternatively, granting Fuji relief from the automatic stay to commence and pursue such action, pursuant to Bankruptcy Code § 362(d)(1).  A copy of Fuji's proposed Complaint setting out the injunctive relief being sought is annexed as Rosenthal Decl., Ex. 13.

---

[18]    Rosenthal Decl., Ex. 10.

[19]    Fuji distributed a confidential copy of the EID(II) to the Court, eligible counsel and the U.S. Trustee by letter dated April 9, 2004.  Cited excerpts from the recently issued public version are marked as Rosenthal Decl., Ex. 2.

## JURISDICTION

27. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested is 28

U.S.C. § 959 and 11 U.S.C. § 362(d)(1).

## ARGUMENT

**A.    ALLOWING FUJI TO SEEK INJUNCTIVE RELIEF FROM THE
DISTRICT COURT IS NECESSARY TO PREVENT JAZZ, BENUN AND
THOSE ACTING IN ACTIVE CONCERT WITH THEM FROM
CONTINUING TO INFRINGE POST-PETITION AND POST-DISCHARGE**

28. At the June 4, 2004 Hearing on the First Injunction Motion, the Court raised a

number of issues going to whether Fuji needs an injunction, focusing on the ITC and Customs

and the form of order.  These are addressed here.

29. Regarding the ITC, at this time, Jazz and Benun are subject to the ITC's General

Exclusion Order and Cease and Desist Order which, collectively, bar them, inter alia, from

importing, selling and offering for sale single use cameras that infringe the identified Fuji

patents, as well as aiding and abetting such activity.[20]  These Orders were issued pursuant to 19

U.S.C. § 1337(d) and (f)(1).  In effect, all that these Orders do is exclude infringing merchandise

from entry into the United States.  The statute provides that:  "The Commission shall notify the

Secretary of the Treasury [now the Secretary of Homeland Security] of its action under this

subsection directing such exclusion from entry, and upon receipt of such notice, the Secretary

shall, through the proper officers [Customs], refuse such entry."  19 U.S.C. § 1337(d)(1)

(emphasis added).  The ITC does not, itself, engage in any affirmative enforcement activities.  It

---

[20]    Rosenthal Decl., Exs. 7 and 8; EID(II) at 93-105.

does conduct ancillary investigations to determine if its orders have been violated or to render advisory opinions concerning whether particular products should be refused entry, but the result of these investigations is usually not a new order unless, for some reason, the scope of the original order was found to be deficient.  19 C.F.R. §§ 210.75 and 210.79.  The only power which the ITC has to enforce its orders is punitive, and then only with regard to persons and entities subject to Cease and Desist Orders.  The ITC is charged with the responsibility of determining the appropriate civil penalty to be paid to the United States by reason of a violation of a Cease and Desist Order.  Congress has required the imposition of such penalties up to a maximum of $100,000 or twice the domestic value of the articles entered or sold, for each day that a Cease and Desist Order is violated.  19 U.S.C. § 1337(f)(2).  The ability of the ITC to impose civil penalties looks, of necessity, only retrospectively.  Unlike a District Court, which has the power to find criminal contempt of its orders, no such power exists in the ITC.  Further, the ITC does not reach cameras refurbished in the United States, a real possibility in this case, since it was in this case that we learned for the first time, that Jazz opened and temporarily ran a refurbishing factory in the United States.

30. As to Customs, the ALJ's findings that more than 93% of the single use cameras imported and sold by Jazz from August 21, 2001 (when the orders became effective as to Jazz) infringe at least one of Fuji's patents, is proof positive that Customs erred in permitting the entry of these cameras.[21]  Fuji submits that the only explanations for this error are that Customs made a mistake or was affirmatively misled by Jazz, acting under the direction of Benun.  The ALJ

---

[21]    It is the province of the ITC, not Customs, to interpret and enforce its own cease and desist orders.  In Certain Agricultural Tractors, the Commission ruled that "the Commission's authority to determine what constitutes a violation of its own cease and desist orders is not circumscribed in any way by Customs' interpretation or enforcement of Commission exclusion orders . . . ."  In re Certain Agricultural Tractors Under 50 Power Take-Off Horsepower, Notice of Commission Determination Concerning Violation of Cease and Desist Orders and Civil Penalty, U.S.I.T.C. Inv. No. 337-TA-380, Enforcement Proceeding, Pub. No. 3227, 1999 WL957711, 14 (July 28,1999).

pointed out that Jazz misrepresented to Customs "that its informed compliance program was

developed to ensure, and even 'guarantee,' that the used LFFPs collected in the United States

were first sold in the United States." EID(II) at 114. This finding supported the ALJ's

determination that "Jazz has acted in bad faith," a factor in assessing civil penalties. EID(II) at

115. As to Benun, the ALJ cited his broad responsibility in the selection of products, suppliers,

factories and the acquisition of empty shells to support the conclusion that the good faith factor

"weighs in favor of imposing a substantial penalty against Benun." EID(II) at 126-27. The ALJ

also pointed out that several of the videotapes purporting to show refurbishing processes alleged

to be prepared by Jazz in 2001 for submittal to Customs" were bench demonstrations staged for

videotaping which do not accurately reflect the refurbishing process at Jazz's factories. EID(2)

at 80-82.

31. In any event, at this point in time the failure of Customs to enforce the ITC's Orders

is irrelevant since the ITC has determined that Customs' actions were erroneous. The ITC issued

no new order in the face of this clear error because, in the ITC's view, its Orders and the

hundreds of pages that have been written about them are sufficient instructions to Customs for

Customs to enforce the Orders as required by Congress.

32. In contrast with the existing ITC Orders, a District Court injunction will cover both

imported and domestically reloaded single use cameras. Further, a District Court injunction

covers not only the parties to the action, but their officers, agents, servants, employees and

attorneys, and those persons in active concert or participation with them who receive actual

notice of the order by personal service or otherwise. F.R.C. P. 65(d). The Cease and Desist

Order, while extending to principals, stockholders, officers, directors, employees, agents,

licensees, distributors, controlled and/or majority owned business entities, successors and

assigns, such persons are covered only to the extent that they are acting for, with or otherwise on behalf of, Jazz.[22]  From Fuji's perspective, there is a serious risk that upon the conversion of this case to Chapter 7, or some other event that results in the demise of Jazz, that Mr. Benun or other officers or employees of Jazz, or persons acting in concert with Jazz, such as its subsidiaries, Polytech Enterprises, Photo Recycling Enterprises, JoyFame Corporation or the Silveras, will pursue what must be a very profitable business to at least some of the entities in the supply chain. If this new entity cannot be viewed as a successor of Jazz, even Mr. Benun will cease to be subject to the ITC's existing Cease and Desist Order, and he will be free to actively aid and abet this new infringer and to benefit from that activity, while not being at risk to further civil penalties.  Only an injunction with potential contempt sanctions has any likelihood of deterring Mr. Benun from continued infringements.

33. Another concern raised by the Court is why Fuji did not seek an injunction prior to the First Injunction Motion.  The reason is simple.  Judge Hochberg in denying Fuji's applications for injunction repeatedly sent Fuji to the ITC to make the factual determinations as to whether Jazz's conduct after August 21, 2001 constituted infringement.  (See paragraphs 21 and 22, supra.)  Fuji followed the admonition of Judge Hochberg and only sought a court injunction after the ITC's ALJ found, in fact, that Jazz was engaged in continuous and large scale infringement of Fuji's patents after August 21, 2001, in violation of the Commission's Orders. While it was arguable as to whether a ruling of the ALJ represented a sufficient satisfaction of Judge Hochberg's prerequisite for an injunction, there can be no doubt that the ITC's adoption of the ALJ's determinations fully obviates the principle reasons why Judge Hochberg denied an injunction.

---

[22]    Rosenthal Decl., Ex. 8 at § II

34. The only ground for denial of the injunction that the ITC's adoption of the ALJ's

determinations does not obviate is the form of the order objection.  In its proposed Complaint,[23]

Fuji seeks an injunction against infringement of its patents that recognizes that compliance with

the Federal Circuit's safe harbor would avoid infringement.  Such an injunction was issued

against other infringers in the Southern District of New York.[24]

35. The Federal Circuit has upheld injunctive orders employing non-specific language on

the ground that the detailed record of the case ameliorated any risk of unwarranted contempt

actions.  <u>Singtech USA, Ltd. v. Vutek, Inc.</u>, 174 F.3d 1352, 1377 (Fed. Cir. 1999); <u>Oakley, Inc.</u>

<u>v. Sunglass Hut Int'l</u>, 316 F.3d 1331, 1346-47 (Fed. Cir. 2003).  In <u>KSM Fastening Systems,</u>

<u>Inc., v. H.A. Jones Co.</u>, 776 F.2d 1522, 1526-27 (Fed. Cir. 1985), the Federal Circuit provided an

explanation for the frequent practice in patent cases of "broadly enjoining 'further infringement'

of the 'patent' despite the language of Rule 65(d) and the Supreme Court interpretation" that

applies here:

> The unreasonableness of the decree incorporating a vague or broad
> prohibition against "infringement" of a "patent" is alleviated
> because of the universal rule . . . that contempt proceedings, civil
> or criminal, are available only with respect to devices previously
> admitted or adjudged to infringe, and to other devices which are no
> more than colorably different therefrom and which clearly are
> infringements of the patent.  This limitation is seen as properly
> balancing the interests of the respective parties.  An enjoined party
> is entitled to design around the claims of a patent without the threat
> of contempt proceedings with respect to every modified device
> although he bears the risk that the enjoining court may find
> changes to be too insubstantial to avoid contempt.

<u>Id.</u> at 1526.

---

23    Rosenthal Decl., Ex. 13

24    Rosenthal Decl., Ex. 14

36. Over the life of Jazz and Benun's infringing activities from 1995 to December 2003, Jazz has changed factories periodically, changed the shells that it refurbishes depending on the availability of camera styles, and has changed refurbishing processes.  For example, starting in 2003, Jazz started fully or partially replacing the back covers of Kodak-type single use cameras with either newly-molded fullbacks or halfbacks.  The ALJ found, and the ITC agreed, that the replacement of the original back by a newly-molded full back constituted an infringing refurbishing process (i.e., reconstruction).  EID(II) at 86-90.  For these reasons, an injunction that merely refers to specific factories, specific processes or specific shells would be ineffectual.  On the other hand, it cannot be disputed that merely changing factories or shell models, by itself, would be too insubstantial a change to avoid contempt.  The extensive opinions written by the ALJ and District Court gave Jazz and Benun sufficient notice as to what is infringing so as to satisfy Rule 65(d).  Cf. Signtech and Oakley, supra.  It is respectfully submitted that Fuji's proposed form of injunction fully satisfies Rule 65(d) and, to the extent that this Court believes it does not, the proper form of injunction is the province of  the District Court and not this Court.

**B.     FUJI SHOULD NOT BE STAYED FROM SEEKING
        INJUNCTIVE RELIEF IN THE DISTRICT COURT**

37. The Bankruptcy Code is intended to protect and rehabilitate honest debtors and may not be used as a shield behind which Benun and Jazz may continue to infringe on Fuji's patents. Nor should this Court permit Jazz and Benun to use the automatic stay as a mechanism by which they  may prevent Fuji from seeking injunctive relief from the District Court necessary to dissuade each of Benun and Jazz from continuing their campaign of infringement.  See Voice

Systems and Services, Inc. v. VMX, Inc., 1992 WL 510121 *10 (N.D. Okla. 1992); See also,

Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F.Supp. 899, 916-17 (E.D.N.Y. 1988).[25]

38. Section 959(a) of title 28 of the United States Code states:

> Trustees, receivers or managers of property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

28 U.S.C. § 959(a).

39. "[A]s a general rule, 'a nondebtor party is *not* required to obtain leave of the

bankruptcy court before filing suit against an operating trustee or a debtor in possession,

provided that the lawsuit is based on an act or conduct … by the debtor in possession in carrying

out business in connection with the debtor's property.'" In re Telegroup, Inc., 237 B.R. 87, 94

(Bankr. D.N.J. 1999) (citations omitted, emphasis in original). Thus, the automatic stay, under

§362 of the Bankruptcy Code, does not apply to Fuji's right to seek an order of the District Court

that will enjoin Benun and Jazz from infringing Fuji's patents post-petition. See In re Television

Studio School of New York, 77 B.R. 411, 412 (Bankr. S.D.N.Y. 1987) (The post-petition

infringement claim, by definition, is not protected by 11 U.S.C. § 362.).

40. At the Hearing on the First Injunction Motion, the Court stated that, "[this case] is

similar in many, many ways to what Judge Brazman [sic] decided back in 1987 in Television, the

---

[25] The court in Bambu Sales, Inc. v. Sultana Crackers, Inc. cites to Steak & Brew Inc. v. Makris, 177 U.S.P.Q. 412 , 414 (D. Conn. 1973), which discussed the applicability of the general stay order of a referee under the Bankruptcy Act in connection with alleged trademark infringement. In finding that the stay was not applicable, the *Steak & Brew* court stated: "The Bankruptcy Act was intended to protect and rehabilitate debtors. It should not be used as a shield behind which a debtor may sustain the misappropriation of a trade name to which he is not rightfully entitled. Nor will this Court permit it to be used as an instrument by which the damages to an innocent party may be increased unnecessarily."

cited case, at 77 B.R. 411," and this Court further stated, "I think that case is the strongest

precedent right now for [the denial of Fuji's motion]." Hearing Tr., June 4, 2004 at 64:3-8.[26]

41. In Television, the court used its equitable powers to stay a creditor from pursuing its

claim of infringement against the debtor. See In re Television, 77 B.R. at 413. The Television

court determined that the policy behind the second sentence of 28 U.S.C. § 959(a) is to "avoid an

unjust result" and to limit a creditor's ability to bring suit against the debtor in possession, where

to do so would significantly interfere with the orderly administration of the debtor's estate. See

Id. at 412. The Court stated that while most suits against debtors for post-petition acts of

misconduct should proceed without interference by the Bankruptcy Court, there are certain

instances where such actions would impede the reorganization of the Debtor, and therefore

should be stayed. "The standard which has been employed under section 959(a) is that the

bankruptcy court must 'exercis[e] sound discretion [and] find [ ] the action would embarrass,

burden, delay, or otherwise impede the reorganization proceedings.'" Id. (citations omitted).

42. Fuji believes that there are significant factual differences between the case of

Television and the case at bar.

- First, in Television, the debtor was a business on the verge of confirming its plan of reorganization, not an individual with little or no hope of confirming a plan of reorganization. Benun and Jazz have been in Chapter 11 for over one year and have not filed or even proposed a plan of reorganization.

- Second, in Television, the debtor was administratively solvent and any harm to the movant was able to be redressed by an award of damages; whereas, in this case, Jazz owed professionals $912,105.12 as of June 30 (out of a total of $4,348,160); Jazz has accumulated an operating loss[27] of

---

[26]    Rosenthal Decl., Ex. 15.

[27]    In addition, since the Petition Date, the Debtors' balance sheets show that the difference between total assets (less certain worthless loan obligations of Benun) and current liabilities (assets that otherwise would have been available to creditors) has decreased from approximately $2.3 million to negative $800,000, a decrease of more than $3,000,000. In sum, since the Petition Date, the Debtor has successfully wasted more than $3,000,000 of assets that would have otherwise been available for distributions to creditors.

$2,910,691 as of June 30, 2004 plus $1,581,641 in largely unrealizable credits for Legal and Professional Fees Allocation and Management Fees from subsidiaries (only $184,130 is carried on the June 30 balance sheet for Intercompany Balances); and Fuji has a pending administrative claim against Jazz's estate in the amount of $6,546,400 and against Benun's estate of $5,342,000. Unlike the debtor's estate in <u>Television</u>, Benun and Jazz's estates are clearly administratively insolvent and Fuji is not likely to be paid the full amount of its post-petition damage claims, no less its pre-petition claims (the Judgment does not include a reasonable royalty for the period August 21, 2001 to the respective petition filing dates).

- Third, in <u>Television</u>, the creditor's claim of patent infringement was ancillary to the debtor's case; whereas, here, the reason Benun filed for bankruptcy protection was, <u>inter alia</u>, his inability to post a bond pending the appeal of Fuji's Judgment resulting from the patent infringement.

- Fourth, in <u>Television</u>, the stay was limited in duration. The court stated that if consideration of the debtor's disclosure statement was delayed by more than three weeks, or should a confirmation hearing not occur prior to a specified date, the creditor may move for dissolution of the restraint upon him. However, here, Benun and Jazz will likely argue that Fuji should be stayed indefinitely from obtaining an injunction from the District Court.

- Fifth, in Television, the court determined that the infringement action was not essential, since the alleged infringement began pre-petition, yet the injured party did not attempt to commence any action until post-petition. Moreover, since the plan would likely be confirmed within a short period of time, the court determined that the movant would not be greatly prejudiced by a short delay. In this case, prior to the Petition Date, Fuji successfully pursued its claim of infringement in the District Court and in the ITC in the Enforcement Proceeding. As to after the Petition Date, the ITC determined that the Benun has continued to infringe Fuji's patents post-petition. Unless Fuji is able to immediately proceed to the District Court, Jazz will be free to continue to infringe on Fuji's patents, while Fuji continues to accrue damage claims against an administratively insolvent estate. It is without question that Fuji is greatly prejudiced by not being able to seek an injunction in the District Court that will stop Benun from infringing Fuji's patents.

- Sixth, in <u>Television</u>, the infringement by the debtor was merely alleged; whereas, here Fuji has successfully proven, in both the District Court and the ITC, that Benun infringed Fuji's patents both before and after the Petition Date.

- Finally, in <u>Television</u>, the court was concerned that allowing the infringement action to proceed would jeopardize the successful confirmation of the debtor's Chapter 11 plan, since the debtor would be required to focus its efforts on the infringement action. In this case, Jazz and Benun's only means

by which they can pay their creditors is through participation in the proceeds
from Jazz's litigation with Imation. In fact, Benun has no direct entitlement to
any proceeds from the Imation litigation, assuming Jazz ultimately prevails
against Imation and realizes a sufficiently large judgment to fully satisfy
administrative claims and creditors. Thus, the commencement of an action in
the District Court seeking to prevent Benun from continuing to infringe on
Fuji's patents, will not distract Jazz's lawyers from proceeding with the
Imation lawsuit, and thus not jeopardize Benun's ability to orderly liquidate
his estate.

43. In re Cinematronics, Inc., 111 B.R. 892 (Bankr. S.D.Cal. 1990), also cited by the

Court at the Hearing on the First Injunction Motion is respectfully, inapposite. In Cinematronics,

the defendants obtained a TRO that prevented the plaintiff/Chapter 11 debtor[28] from using,

showing, disclosing, selling, promoting or displaying a video game about to be shown at a

critical trade show. Id. at 895. The court found that 28 U.S.C. § 959 did not apply in that case

because the TRO had the effect of attempting to obtain possession of property of the estate. Id.

at 897-98. Here, the injunction is a purely prospective injunction not ordering that Jazz go out of

business, but merely ordering that Jazz and Benun cease all infringing activity or risk civil or

criminal contempt. Further, Cinematronics involved an unadjudicated (aside from a TRO

hearing) questionable claim of theft of trade secrets, while in this case Jazz and Benun have been

adjudged infringers by both a District Court after a lengthy trial and the ITC after two extensive

hearings.

44. While Fuji understands that creditors should not have the unfettered ability to distract

a debtor with unnecessary and burdensome litigation while it attempts to reorganize, in this case,

for the above-cited reasons, the Court should authorize Fuji to commence and prosecute an

action in the District Court to enjoin Jazz and Benun from continuing to infringe Fuji's patents

by determining that the automatic stay is not applicable, pursuant to 28 U.S.C. § 959, and lifting

---

[28]    Note also that unlike the Jazz case, in the Cinematronics case a Chapter 11 Trustee had been appointed.

the injunction put in place at the June 4, 2004 Hearing, thereby allowing Fuji to prevent Fuji and

Benun from further infringing Fuji's patents.

**C.    ALTERNATIVELY, FUJI SHOULD BE
GRANTED RELIEF FROM THE AUTOMATIC STAY**

45. Bankruptcy Code § 362(d) provides, in pertinent part, as follows:

> On request of a party in interest and after notice and a hearing, the
> court shall grant relief from the stay provided under subsection (a)
> of this section, such as by terminating, annulling, modifying, or
> conditioning such stay -
>
> (1) for cause …

11 U.S.C. §362(d)(1).

46. The Bankruptcy Code does not specify what constitutes cause sufficient to justify

terminating, annulling, modifying or conditioning an automatic stay.  In drafting § 362(d)(1),

Congress granted the court broad latitude to decide what might constitute "cause" to modify the

automatic stay.  See In re Sonnax Industries, Inc., 907 F.2d 1280, 1288 (2d Cir. 1990).

Accordingly, a court must determine whether appropriate cause exists on a case by case basis.

See In re Robbins, 964 F.2d 342, 345 (4th Cir. 1992).

47. Initially, the burden of proof on a motion to lift the automatic stay is a shifting one.

In re Telegroup, Inc., 237 B.R. at 90.  While § 362(d)(1) of the Bankruptcy Code requires an

initial showing of "cause" by the movant, § 362(g) places the burden of proof on the debtor for

all issues other than "the debtor's equity in property."  Id.; Matter of Holly's, Inc., 140 B.R. 643

(Bankr. W.D. Mich. 1992); In re Drexel Burnham Lambert Group, Inc., 1990 WL 302177 at *6

(Bankr. S.D.N.Y. 1990).

48. Many courts have applied a balancing of interests analysis in order to make a

determination of "cause" for purposes of stay relief under § 362(d)(1) of the Bankruptcy Code.

In re Telegroup, Inc., 237 B.R. at 92 (citing, In re Maurice, 167 B.R. 114 (Bankr. N.D. Ill.

1994)).  A leading test is the so-called <u>Sonnax</u> analysis.  The Second Circuit held that a court

may consider 12 factors when deciding whether to lift the stay in order that litigation may

continue in a different forum.  These factors include:

> (1)    whether relief would result in a partial or complete
> resolution of the issues; (2) lack of any connection with or
> interference with the bankruptcy case; (3) whether the other
> proceeding involves the debtor as a fiduciary; (4) whether a
> specialized tribunal with the necessary expertise has been
> established to hear the cause of action; (5) whether the debtor's
> insurer has assumed full responsibility for defending it; (6)
> whether the action primarily involves third parties; (7) whether
> litigation in another forum would prejudice the interests of other
> creditors; (8) whether the judgment claim arising from the other
> action is subject to equitable subordination; (9) whether the
> movant's success in the other proceeding would result in a judicial
> lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11)
> whether the parties are ready for trial in the other proceeding; and
> (12) [the] impact of the stay on the parties and the balance of
> harms.

<u>In re Sonnax Industries, Inc. v. Tri Component Products Corp.</u>, 907 F.2d 1280, 1286 (2d Cir.

1990)(citing <u>In re Curtis</u>, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)).

49. Clearly not every one of the <u>Sonnax</u> factors will be relevant in every case or need be

met.  <u>See</u> <u>In re Bogdanovich</u>, 292 F.3d 104, 110 (2d Cir. 2002).  <u>See also</u> <u>In re Mazzeo</u>, 167 F.3d

139, 143 (2d Cir. 1999).  In the case sub <u>judice</u>, the relevant <u>Sonnax</u> factors not only justify, but

necessitate the lifting of the stay.

50. The first <u>Sonnax</u> factor is "whether [stay] relief would result in a partial or complete

resolution of the issues."  <u>See</u> <u>Sonnax</u>, 907 F.2d at 1286.  There is no doubt that stay relief would

pave the way for a complete resolution of Jazz and Benun's post-petition conduct that infringes

on Fuji's patents.  Indeed, stay relief is the surest way to ensure that Jazz and Benun's post-

petition infringing conduct is stopped and never reoccurs.  Allowing Fuji to commence an action

in the District Court for an injunction will allow for a complete resolution of whether Jazz and

Benun may continue to engage in business as usual, which the District Court, the ALJ and the

ITC have essentially found to be the patent infringement business.  While conversion to Chapter

7 will cut off the infringement by Jazz, it will not prevent Benun, Jazz's other officers, agents,

servants and employees, and those in active concert or participation with Jazz and/or Benun,

such as Polytech, Photo Recycling Enterprises, Joyfame and the Silveras, from infringing.  See

Fed. R. Civ. P. 65(d).

51. The second Sonnax factor is whether litigation in another forum would interfere with

the bankruptcy case.  If the Jazz case is converted to chapter 7, there will be no Chapter 11 case

with which to interfere.  To the contrary, allowing the District Court to determine whether to

enjoin Jazz and Benun's post-petition infringing conduct will expedite - not interfere with – Jazz

and Benun's bankruptcy cases by resolving one of the most significant unresolved issues in these

cases: the continuing harm suffered by Fuji as a result of Jazz and Benun's continuing

infringement.  Most crucially, two relevant experiences in these cases has demonstrated that the

Jazz and Benun cases can proceed despite litigation in another forum.  First, Jazz obtained stay

relief to continue its prepetition litigation against Imation Corp.  Second, Jazz, Benun and Fuji

consented to stay relief to allow the ITC proceeding and the appeal to the Federal Circuit in Fuji

v. Jazz to go forward.  While the Imation litigation, ITC litigation and Federal Circuit appeal are

each in their own right integral to the ultimate resolution of these cases, none of these litigations

have interfered with the administration of these cases.

52. The fourth Sonnax factor inquires as to whether the matters in controversy concern

unsettled questions of law that another tribunal may be better suited to resolve, or involve

matters "routinely heard in the bankruptcy court."  See In Re Curtis, 40 B.R. at 805.  The issue of

whether Benun should be enjoined from patent infringement, while not a matter of unsettled

questions of law, involve questions that another tribunal (the District Court) is better suited to

resolve.  Just as this Court determined that the ITC was the most appropriate forum in which to

litigate the infringement issue,[29] the District Court is the most appropriate forum to consider

enjoining Jazz and Benun's post-petition infringement.  Thus, the District Court would be better

suited to adjudicate an action by Fuji for an injunction against Jazz and Benun's continuing

infringement.

53. Under the seventh <u>Sonnax</u> factor, i.e., whether allowing Fuji to proceed in the District

Court would in any way prejudice the interests of other creditors, no creditors will be prejudiced

by allowing the District Court to adjudicate an action by Fuji for an injunction against Jazz and

Benun's continuing infringement.  Fuji believes that the quantification of its claim should be left

to this Court and its proposed order and the Complaint (Rosenthal Decl., Ex. 13) makes it clear

that injunction is the only relief being sought.  In fact, stopping Jazz and Benun's post-petition

infringement benefits other creditors by stopping the accrual of Fuji's administrative claims.

This factor weighs in favor of lifting the stay.

54. The eighth prong of <u>Sonnax,</u> whether a judgment claim arising from the District

Court is subject to equitable subordination, also weighs in favor of lifting the stay.  Fuji would

not seek a monetary judgment from the District Court, only injunctive relief, unless separately

authorized to do so by this Court.  Thus, there is no legal basis upon which an argument could be

made that a judgment in the District Court would be subject to equitable subordination.

---

[29]    <u>See</u>, <u>e.g.</u>, Order Determining (I) That The Automatic Stay Provision Of The Bankruptcy Code Does Not Prevent
The International Trade Commission From Continuing Its Enforcement Proceeding And (II) Modifying The
Automatic Stay To Permit The International Trade Commission To Continue Its Enforcement Proceeding [Docket
No. 194 in Jazz case and Docket No. 46 in Benun case]; <u>See also</u>, Hearing Tr., July 30, 2003 16:18-20 (The Court
stated:  "The infringement issue is an issue, as I understand it at this point, for the ITC.") (Rosenthal Decl., Ex. 16).

55. The ninth <u>Sonnax</u> factor inquires whether Fuji's success in the District Court would result in a judicial lien avoidable by Debtors. The answer again is no. Fuji does not seek a judicial lien as a part of any remedy that would be prayed for in the District Court.

56. The tenth <u>Sonnax</u> factor focuses on whether the interests of judicial economy and the expeditious and economical resolution of the litigation would be served by the lifting of the stay. This factor clearly weighs in favor of modifying the automatic stay in this case. Since this Court may lack jurisdiction over all or certain aspects of Fuji's request for an injunction, it is more consistent with principles of judicial economy to lift the stay in order to allow Fuji to proceed in the District Court. <u>See</u> 28 U.S.C. § 157.

57. The twelfth <u>Sonnax</u> factor considers the impact of the stay on the parties and the balance of harms. In the case at bar, the prior rulings by the District Court, Federal Circuit, and the ITC, finding that Jazz and Benun have infringed Fuji's patents, and finding that Jazz and Benun have continued to infringe Fuji's patents from August 21, 2001 to December 12, 2003, which period includes the post-petition period, clearly demonstrate Jazz and Benun are using the automatic stay offensively to the detriment of Fuji. Fuji has suffered significant irreparable harm and, unless it is able to seek appropriate relief in the District Court, will continue to suffer irreparable harm at the hands of Jazz and Benun due to their infringing conduct (some of which was found to be willful in the <u>Fuji v. Jazz</u> matter). Counsel for Jazz has argued that Fuji has not been harmed by the automatic stay. To the contrary, absent the bankruptcy filing, Fuji would have levied on the assets of both Jazz and Benun and effectively prevented them from continuing to infringe on its patents, both pre- and post-petition as Jazz and Benun's requests for a stay pending appeal of the Fuji Judgment were denied prepetition. It is difficult to understand how Jazz and Benun can claim that they will be harmed in the likely event that they are enjoined from

future infringement.  For such harm to result would require them to violate the injunction, a

course of conduct that would be ill advised and which should not be countenanced.  In any event,

the costs associated with the District Court injunction proceeding could be avoided by Jazz and

Benun consenting to an injunction.  Thus, cause exists to grant Fuji stay relief to protect its

valuable interests.

58. Thus, an injunction preventing Jazz and Benun from further infringement is the only

remedy that will give Fuji any redress.  Benun and Jazz have been continually infringing Fuji's

patents since 1995.  They have imported into the United States over 65 million single use

cameras that have been adjudicated either by a District Court Judge or the ITC to be infringing.

They continue to import millions of cameras, as evidenced by a new order from Wal-Mart for

more than 10 million cameras touted by Benun in seeking to receive the wage set aside, and the

summary of the PIERS reports annexed as Exhibit 3 to the Siegal Declaration in support of the

Motion for Allowance of Administrative Claim filed herewith.  If Fuji obtains an injunction from

the District Court, then Fuji can seek contempt sanctions if Jazz and Benun, other officers,

agents, servants and employees of them, and those in active concert or participation with either

of them who receive actual notice of the injunction continue to import infringing cameras.  It is

believed that this risk may, finally, deter the continuation of Jazz and Benun's infringement.

Despite all of the suggested agendas attributable to Fuji in this case, Fuji's fundamental goal is

simply to stop the infringement.

59. The prior rulings by the District Court, Federal Circuit, and the ITC, finding that Jazz

and Benun have infringed Fuji's patents from 1995 through August 21, 2001, and the ALJ's and

ITC's finding that Jazz and Benun have continued to infringe Fuji's patents from August 21,

2001 to December 12, 2003, which period includes nearly seven months of the post-petition

period, and the likelihood that Fuji on these facts will obtain an injunction against continued

infringement, constitute cause to lift the automatic stay.

60. Examining the factors for the grant of a preliminary injunction in a patent case, Fuji

has suffered, and unless it is able to seek appropriate relief in the District Court, will continue to

suffer irreparable harm at the hands of Jazz and Benun due to his infringing conduct (some of

which was found to be willful, and all of which, post-petition, has been found to be in bad faith).

See EID(II), 116, 127.  Fuji has been harmed by the imposition of the automatic stay resulting

from both Jazz and Benun having filed for relief under Chapter 11 because the stay has given

Jazz and Benun the opportunity to continue to infringe and benefit from that infringement

without any immediate consequence.  Patents have a limited term.  Every day of delay in

stopping infringement has the effect of denying Fuji and its licensees of their lawful right to

exclusively practice the inventions covered by the Fuji patents at issue.  Thus, cause exists to

grant Fuji stay relief to protect its interests.

61. As the moving party, Fuji is entitled to a preliminary injunction in a patent case under

35 U.S.C. § 283 if it can succeed in showing: 1) a reasonable likelihood of success on the merits;

2) irreparable harm if an injunction is not granted; 3) a balance of hardships tipping in its favor;

and 4) the injunction's favorable impact on the public interest.  M&R Marking Systems, Inc. v.

Top Stamp, Inc., 926 F. Supp. 466, 469-70 (D.N.J. 1996).  "These factors, taken individually, are

not dispositive; rather, the district court must weigh and measure each factor against the other

factors and against the form and magnitude of the relief requested."  Hybritech, Inc. v. Abbott

Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988).  Irreparable harm is presumed when a clear

showing of patent validity and infringement has been made.  Bell & Howell Document Mgmt.

Prods. Co. v. Altek Systems., 132 F.3d 701, 708 (Fed. Cir. 1997) (citations omitted).  "This

presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm." Id.

62. An analysis of the four factors for granting a preliminary injunction confirm that Fuji is likely to succeed before the District Court:

a.    That Fuji is irreparably injured by a lack of injunction is clear from the fact that Jazz and Benun are effectively insolvent, so that Fuji has little or no likelihood of recovering for its damages for past infringement, no less future infringement.  Fuji's patents, because of their limited term (many expire in 2007), are a diminishing asset, so that passage of time during which infringement continues denies Fuji the benefit of the exclusivity normally provided by patents, further showing irreparable harm.  Atlas Powder Co. v. IRECO Chemicals, 773 F.2d 1230, 1233 (Fed. Cir. 1985)("The patent statute further provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money.  If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts.").  Here, Jazz and Benun have had just such a compulsory license since being adjudicated on infringer first by the ITC, adopted by the Federal Circuit in Jazz v. ITC, second by the District Court in Fuji v Jazz, and third by the ALJ in his Enforcement Initial Decision that was just adopted by the ITC.  The difference is that both Benun and Jazz have rendered themselves insolvent so that Fuji has little expectation of recovering any "royalty" or other payment for such compulsory license from them.  Finally, "where validity and continuing infringement, have clearly been established … immediate irreparable harm is presumed." Smith Int'l , Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir. 1983) (footnote omitted).  Validity is not at issue because of the Judgment in Fuji v. Jazz, where validity was not contested but could have been, and therefore is res judicata.  As for infringement, in Smith the Federal Circuit went on to find that "[e]ven if Smith's admissions are not interpreted as indicating an intention to infringe in the future, the showing of past infringement has been strong enough to justify a finding of probably future infringement …." Id. at n.6 (citation omitted).  In this case, Jazz represented to the Federal Circuit and Supreme Court (in stay applications), to Customs (to get the cameras into the United States) and to the ALJ (in Enforcement Proceeding (II)), that it was following the safe harbor of Jazz v. ITC, but has consistently been found to have infringed.

b.    Fuji is likely to succeed on the merits of a District Court action filed against Jazz and Benun.  As discussed above, Jazz and Benun have no regard for Fuji's patent rights and have continued to import infringing single use cameras since 1995.  The ALJ has found (as adopted by the

-29-

ITC) over 93% of the single use cameras imported by Jazz from August 2001 through December 12, 2003 to be infringing.  Although Benun will likely argue that Jazz is not now infringing, this can no longer be accepted as a ground for denial of a preliminary injunction.  As noted above, both Benun and Jazz have argued this, repeatedly, before and have consistently been found to infringe with regard to a huge percentage of their products. The ALJ's Enforcement Initial Determination as adopted by the ITC is conclusive evidence of a likelihood of success on the merits.  While not binding (unless this Court finds Jazz and Benun are equitably and/or judicially estoppel from asserting it is not binding), at this stage in the history of this series of infringements, it is highly persuasive and compelling evidence.  Glasstech, Inc. v. AB Kyro OY, 635 F.Supp. 465, 468 (N.D. Ohio 1986) ("… although the ITC's decision has no binding effect on this Court, the proceedings before that agency were quite extensive and comparable to those which might take place before a federal district court.  Even though the ITC proceedings are not res judicata, the inference that this Court must draw on plaintiff's probability of success on the merits is inescapable.")  In Glasstech, the court, in granting a preliminary injunction, found that "[t]he evidence in the record at this point leads the Court to find that Kyro is seeking to circumvent the exclusion order by manufacturing and selling the systems domestically." Id.  Here, rather than manufacturing domestically, Benun is circumventing the Exclusion and Cease and Desist Orders by taking advantage of the protection provided in bankruptcy.  See Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996) (where, while agreeing that collateral estoppel did not apply, the Federal Circuit went out of its way to reconcile its current and prior rulings (Id. at 1570)).  Fuji should not have to wait further to seek an injunction.  Therefore, based upon the overwhelming evidence of prior infringement, and in view of Judge Hochberg's prior suggestion that a finding of such infringement in the ITC would indicate a likelihood of success on the merits, this factor weighs in favor of Fuji.

c.    The third factor, harm to the non-moving party, must also weigh in favor of Fuji.  Although Jazz continues to sell single use cameras, Jazz's operating reports submitted to this Court reveal that it is losing money on each camera it sells.  Further, as has been borne out in the past, for each infringing single use camera Jazz sells, it is building further administrative debt for infringement of Fuji's patents at fifty-six cents per infringing camera as found by the Fuji v. Jazz jury and affirmed by Judge Hochberg. At this point, if the ALJ's decision is followed, Jazz and Benun will jointly and severally owe Fuji millions of dollars in reasonable royalties and likely owe the government a civil penalty of $13.675 million recommended to the ITC by the ALJ just for the cameras sold from August 21, 2001 through December 12, 2003.  Indeed, it would benefit creditors who are looking solely to the Imation litigation and not Jazz's continuing business for repayment, to enjoin Jazz and Benun from

continuing to sell infringing single use cameras.

d.     The final factor, the public interest, favors Fuji. There is no public interest in the importation and sale of infringing cameras. <u>Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.</u>, 106 F. Supp.2d 696, 705 (D.N.J. 2000) (holding that the public's interest in protecting the integrity of the patent system outweighs any public interest that would be injured by granting the injunction).  Therefore, Fuji is likely to succeed in a motion for preliminary injunction because all four factors favor Fuji.

63. Jazz and Benun apparently have no fear of further dollar penalties since they will likely be unable to pay those already levied and those likely to be levied by the ITC.  Why else would Benun continue infringement to December 12, 2003 and thereafter, given the draconian maximum penalties for violations of ITC Cease and Desist orders?  <u>See</u> 19 U.S.C. § 1337(f)(2); EID(II) at 120 (maximum civil penalty in the ITC Enforcement Proceeding is $156,118,017). Only a District Court injunction is calculated to have the deterrent effect sufficient to prevent further infringement while not interfering with lawful activities.

64. For the above-cited reasons, sufficient case exists to lift the automatic stay and allow Fuji to seek an injunction in the District Court.

## <u>NOTICE</u>

65. Notice of this Motion shall be served upon counsel to Benun, Jazz, the Official Committee of Unsecured Creditors in the Jazz case, the Office of the U.S. Trustee and all other parties who have served a notice of appearance and demand for service of papers in this case.

WHEREFORE, Fuji respectfully requests that the Court enter an order, substantially in the form submitted herewith, (i) authorizing Fuji to commence an action in the District Court to enjoin further infringing activities by Jazz; (ii) determining that the automatic stay does not prohibit Fuji from commencing and pursuing such action, pursuant to 28 U.S.C. § 959 and lifting the Court's injunction preventing Fuji from commencing and pursuing such action, or, alternatively, granting Fuji relief from the automatic stay to commence and pursue such action, pursuant to Bankruptcy Code § 362(d)(1); and (iii) granting Fuji such other and further relief is just and equitable.

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:____/s/ Bruce Buechler_____
Michael S. Etkin, Esq.
Bruce Buechler, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  973.597.2500
Facsimile:  973.597.2400
*Co-Counsel to Fuji Photo Film Co., Ltd.*

-and-

**STROOCK & STROOCK &
LAVAN LLP**
Lawrence Rosenthal, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone:  212.806.5400
Facsimile:  212.806.6006
*Counsel to Fuji Photo Film Co., Ltd.*

Dated:  August 2, 2004