**FOR PUBLICATION**

**FILED**
**JAMES J. WALDRON**

**AUG – 3 2004**

**U.S. BANKRUPTCY COURT**
NEWARK, N.J./
BY _____/DEPUTY

| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-2(c)** |

| In the Matter of: | Case No.: | 03-26565 (MS) |
|---|---|---|
| JAZZ PHOTO CORP., | Chapter 11 | |
| Debtor-in-Possession. | | |

## OPINION

**APPEARANCES:**

Michael D. Sirota, Esq.
Cole, Schotz, Meisel, Forman & Leonard, PC
25 Main Street
Hackensack, NJ 07602
Counsel for Debtor-in-Possession, Jazz Photo Corp.

Michael S. Etkin, Esq.
Bruce Buechler, Esq.
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, NJ 07068
Co-Counsel for Fuji Film Co., Ltd.

Lawrence Rosenthal, Esq.
Stroock, Stroock & Lavan, LLP
180 Maiden Lane
New York, NY  10038
Co-Counsel for Fuji Film Co., Ltd.

Margaret Jurow, Esq.
Office of the United States Trustee
One Newark Center, Ste. 2100
Newark, NJ 07102

Howard S. Greenberg, Esq.
Ravin Greenberg, PC
101 Eisenhower Parkway
Roseland, NJ 07068
Counsel for Official Committee of Unsecured Creditors

Dennis O'Grady, Esq.
Riker Danzig
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962
Counsel for Jack C. Benun

**HONORABLE MORRIS STERN**

## I.    Background

Sanctions are sought against both a creditor and its counsel who are accused of filing and

pursuing, out of ill-will and without reasonable factual underpinnings, a motion to have a

Chapter 11 trustee appointed.

Jazz Photo Corp. ("Jazz") and its operating principal, Jack Benun,[1] were driven into

Chapter 11 bankruptcy cases by an unrelenting creditor-competitor, Fuji Photo Film Co., Ltd.

("Fuji"). The critical and immediately precipitating event causing the debtors' filings in this

---

[1] Jack Benun founded Jazz in 1995 to develop, market, and distribute cameras. Benun initially served as Jazz's chief operating officer and sole director. The stock of Jazz is wholly owned by Mr. Benun's immediate family members. In March 1997 Benun resigned from Jazz and formed JCB Consulting, Inc. ("JCB"). On April 1, 1997 Jazz signed a consulting contract with JCB, through which Benun maintained control of Jazz (at a weekly fee to JCB of $15,000). In July 2003, as part of Jazz's bankruptcy case, Benun again became Jazz's chief operating officer. Note that Benun, like Jazz, seeks sanctions against Fuji and its counsel.

court was the entry of a judgment against them for infringement of Fuji patents. That district

court judgment, in the amount of almost $30 million, was the culmination of Fuji's long-term

pursuit of its claims that Jazz's reuse of disposable camera shells violated Fuji patents.[2]  Along

the way, the parties venued their dispute with the International Trade Commission (the "ITC")

and, on appeal, with the Federal Circuit.[3]

The District Court Opinion and its March 2003 monetary judgment addressed

infringement claims only through August 21, 2001. Thus, when the bankruptcy petitions were

filed on May 20, 2003, there was no determination that patent violations were ongoing.  Fuji has

alleged that Jazz has not changed its method of operation so as to avoid infringement; Jazz has

---

[2]Fuji sued Jazz, its subsidiary, Jazz Photo (Hong Kong), Ltd. ("JPHK"), and Benun in
1999 for infringement of Fuji's patents for disposable cameras known as lens-fitted film
packages ("LFFP").  In the U.S. District Court for the District of New Jersey (Civil Case No. 99-
2937 (FSH)), Fuji sought damages and injunctive relief as to Jazz for direct patent infringement
and as to Benun for inducement to infringe.  The district court held a twelve-day jury trial in
October and November 2002 and issued its judgment for Fuji on March 18, 2003.  *See Fuji
Photo Film Co., Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434 (D.N.J. 2003) ("District Court
Opinion") (focusing on the distinction between a permitted "repair" and an infringing
"reconstruction," as well as the doctrine of patent exhaustion).

[3]In 1998 Fuji began a proceeding before the ITC in which it sought to prevent Jazz and
twenty-five other respondents from importing refurbished LFFPs into the United States.  Fuji
claimed that the refurbishment of its patented disposable cameras constituted impermissible
"reconstruction" and that the importation of refurbished cameras into the United States infringed
fifteen of Fuji's LFFP patents.  The ITC held that the procedures used by Jazz in its
refurbishment constituted impermissible reconstruction, thus violating Fuji's patents, and issued
a General Exclusion Order and an Order to Cease and Desist from further infringement of Fuji's
patents.  Jazz and several other respondents appealed the ITC's ruling to the Federal Circuit.  On
August 21, 2001 the Federal Circuit reversed the ITC's finding of infringement *with respect to
those cameras* for which the purported infringer could establish: (1) refurbishment by eight
common procedures which formed the basis of the ITC's ruling; *and* (2) that Fuji's patent rights
had been "exhausted by first sale in the United States" (i.e., the disposable camera shells were
previously sold in this country).  *See Jazz Photo Corporation v. Int'l Trade Comm'n*, 264 F.3d
1094 (Fed. Cir. 2001).

argued to the contrary, while preserving its more fundamental position (now once again in the

Federal Circuit in the appeal of the district court judgment) that Jazz has never infringed the Fuji

patents.

Fuji pressured the debtors from the outset of the bankruptcy cases. Early on, it moved for

the appointment of a Chapter 11 trustee for Jazz, contending *both* that infringement was ongoing

*and* that Benun should not be entrusted with the stewardship of a debtor-in-possession. The

latter point is, in Fuji's view, bolstered by an April 8, 2003 Opinion and Order of the district

court, denying a stay of its judgment pending appeal. The district court detailed Benun's

"practice of causing himself to be paid a substantial portion of Jazz's available funds and

disposing of them." From June 1999 through December 2002, Benun received a total of $11.9

million from Jazz.[4] Benun's questionable history in the camera business was also cited.[5]

---

[4]"The proofs adduced in connection with Defendants' Order to Show Cause demonstrate
a pattern of millions of dollars flowing from Jazz to Mr. Benun (representing a substantial
portion of Jazz's operating income), then vanishing from Mr. Benun's ledger entirely. Indeed,
Jazz has been operating a successful business for over seven years, and Mr. Benun has received
more than $11 million dollars in compensation and bonuses in the form of loan forgiveness. Yet
by all appearances nothing remains in Jazz." *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., Jazz
Photo (Hong Kong) Ltd., and Jack Benun,* Opinion and Order, (D.N.J. April 8, 2003).

[5]In the U.S. District Court for the District of Columbia, the Securities and Exchange
Commission ("SEC") charged Benun with misappropriating $150,000 from Concord Camera
Corp. ("Concord"), a publicly traded company which manufactured new single-use cameras.
Benun was Concord's founder and chief executive officer. *SEC v. Benun,* USDC/DDC Case No.
1:94CV01913 filed September 1, 1994. Although Benun neither admitted nor denied the
allegations of the Complaint, as a result of a settlement of the investigation and by consent, he
was ordered (1) to reimburse Concord $150,000, "representing disgorgement of the original
amount Benun misappropriated from Concord," plus $65,242.58 in prejudgment interest, (2) to
pay the Government $150,000 as a civil penalty, and (3) to be subject to a lifetime ban from
holding office in a public company. Final Judgment of Permanent Injunction and Other Relief as
to Jack C. Benun, entered September 13, 1994 in *SEC v. Benun.*

Eventually, Fuji chose to pursue its application to the ITC for relief as to its claim of continuing Jazz infringement (a prosecution permitted by order of this court), effectively severing determination of the patent issues from the trustee appointment motion. Thus, as the Chapter 11 trustee motion moved through hearings and interlaced discovery, the ITC action was regenerating and the appeal from the district court judgment was maturing.[6] Obviously, the stakes here are high and the intensity of the parties is white-hot.

## II.    Jazz's Disposable Camera Business

Jazz is a New Jersey corporation with its principal place of business in Carteret, New Jersey. At the time of filing, Jazz had wholly owned subsidiaries, including JPHK. JPHK was the purchasing arm of Jazz in China.

Jazz operates by importing and selling disposable cameras, relatively simple cameras which consumers purchase, use to take pictures, and then deliver to photo processors, who remove the exposed film for development by opening a compartment that holds the film. Once the film is removed, the remaining camera shells are either discarded by the developers, sold back to the original manufacturer, or sold to collectors who then resell them to companies that "refurbish" the cameras by, among other things, reloading the cameras with new film. Jazz acquires these shells after they have been reloaded and otherwise refurbished in a network of Chinese factory works. Jazz then sells the LFFPs in the United States. Until some time after the

---

[6]An ITC Administrative Law Judge's "Enforcement Initial Determination" of April 6, 2004, issued more than two months *after* Fuji withdrew its trustee motion, includes a finding of further infringement of Fuji's patents by Jazz, and recommends assessment against Jazz and Benun (jointly and severally) of a $13,675,000 civil penalty for LFFP sales after August 2001. The ITC is currently reviewing the ALJ's recommendation. Moreover, the pending appeal from the district court judgment was argued in the Federal Circuit in early May 2004.

district court judgment and before the bankruptcy petition date, JPHK was Jazz's gathering point
for and source of LFFPs.

The former operation of JPHK in obtaining LFFPs from rural China's vast pool of job
shops lacks transparency to this court, as does Jazz's current offshore supply system. Benun and
Jazz made an obvious strategic decision to exclude JPHK from Jazz's Chapter 11 case,
notwithstanding the fact that the subsidiary was subject to the district court's judgment.
Eventually, Fuji pressed JPHK through the Hong Kong court system and the Jazz subsidiary was,
essentially, liquidated. Jazz personnel apparently remain in Hong Kong as quality
control/purchasing agents, working through (perhaps among others) Polytech Enterprise Ltd.
("Polytech"), a company formed with Jazz's support shortly before the judgment. The current
supply system includes Polytech and an offshore supplier formed in 2001 also with Jazz's direct
support (Photo Recycling Enterprise, Ltd. or "PRE"). A Benun confidant, Leon Silvera, is both a
principal of PRE and Polytech's designated representative on the Creditors Committee in Jazz's
Chapter 11 case.[7]

---

[7]PRE, a New York corporation with offices in New Jersey, was formed in 2001 by Leon
Silvera. The three shareholders of PRE are Leon Silvera, his son Albert and Leon's brother Jack.
Shortly after PRE's incorporation, Jazz paid it a $160,000 advance to foster PRE's purchase of
camera shells from vendors with photo labs in the United States, including Walgreens and CVS.
In 2002, Leon Silvera expanded his company, forming Wing Shan Hong Kong as a division of
PRE. Wing Shan was then included in the supply chain. Thus, at least into 2002, JPHK, as a
wholly owned subsidiary of Jazz, obtained shells and other component parts for the LFFPs, sent
these items to a network of factories to be assembled, and then sold the finished product to Jazz.
[AC78:18-22] By early 2003, this practice had changed; Jazz stopped purchasing its LFFPs from
JPHK and began, instead, to purchase the finished product directly from Polytech. Polytech was
formed in Hong Kong in 2002 with the support of Kitty Wong, a JPHK/Benun affiliate who
became its director while still an employee of JPHK. In March 2003 Polytech opened a factory
under the name "Polytech Shen Zhen Camera Co. Ltd., China." This factory, located in China's
Free Trade Zone, was begun at the behest of Benun, and was organized and run by employees of
Jazz (who were paid salaries by Jazz and whose expenses in China were reimbursed by JPHK).

6

The change in lines of supply apparently served to move profit from the offshore JPHK to

Jazz. This result is the antithesis of Fuji's early contention that Jazz's Chapter 11 estate was

being drained of funds.  Nevertheless, though Jazz blunted the primary thrust of Fuji's argument,

the relative ease with which margins could be adjusted and allocated by Benun to offshore or

domestic enterprises as he saw fit is apparent to this court.[8]

**III.**    **Motion Chronology**

Barely one month into Jazz's Chapter 11 case, on June 24, 2003, Fuji filed its motion for

the appointment of a trustee.  The motion was initially heard on July 30, 2003, then carried to an

October 21, 2003 evidentiary hearing.  Before that hearing, fourteen days of depositions were

conducted in the United States and in Asia by Fuji's counsel.

On October 3, 2003 Fuji filed its memorandum discussing evidence and law in support of

its trustee motion.  After reviewing Fuji's evidence memorandum, on October 16, 2003 Jazz

served Fuji with a letter (the "Initial Notice Letter") demanding that Fuji withdraw its motion.

*See* Appendix hereto (particularizing Jazz's claims that Fuji's motion was baseless).  On October

17, 2003 Jazz filed and served its summary of evidence in response to Fuji's evidence

memorandum.

The evidentiary hearing on the trustee motion went forward on October 21 and 22, 2003

with testimony from several witnesses.  No conclusion was reached and the matter was continued

---

Eventually, Polytech supplanted JPHK as the direct supplier of LFFPs to Jazz.

[8]Jazz contends that the price at which it now purchases LFFPs from Polytech is less than
had been paid to JPHK. [AC89:13-20]  Jazz is said *now* to pay Polytech between $1.78 and
$1.88 (depending on the speed of the film) per LFFP.  Before (in effect) replacing JPHK with
Polytech in the supply chain, Jazz had paid its own subsidiary $2.24 per unit. [Benun 55:6-17]
On this basis, between $.36 and $.46 per unit was formerly left in the offshore subsidiary.

7

to February 6, 2004. On January 15, 2004 Jazz wrote to Fuji a second time inquiring whether it intended to go forward with its motion and reiterating its intention to seek sanctions if Fuji did not withdraw its motion.

On January 27, 2004 Fuji requested a two-month adjournment of the February 6 scheduled hearing. Following a court-initiated conference call with all parties during which the court advised Fuji that it would deny Fuji's request for an adjournment, Fuji withdrew its motion. Thereafter, on February 3, 2004, Jazz filed and served its motion seeking sanctions under FED. R. BANKR. P. 9011 ("Rule 9011") and 28 U.S.C. § 1927. Benun joined in Jazz's motion on March 8, 2004 by filing a paper denominated "Joinder."

## IV.    Scope and Procedural Requirements - FED. R. BANKR. P. 9011

A.  Scope of Rule.  The actions that trigger liability under Rule 9011[9] are "signing,

filing, submitting or later advocating" a paper that violates the Rule's certification standards.

Central to the matter at bar is the Rule 9011(b)(3) standard that the document signed by the

attorney must be well grounded in fact.  Inquiry will also focus on the requirement that the

document signed by the attorney must not be filed for an improper purpose.  FED. R. BANKR. P.

9011(b)(1).  Signing or advocating a paper which violates these standards may result in the

imposition of sanctions.  FED. R. BANKR. P. 9011(c).  A motion to appoint a Chapter 11 trustee is

---

[9]  FED. R.BANKR. P. 9011: Signing of Papers; Representations to the Court; Sanctions; Verification and Copies of Papers.
(a) Signature
Every petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name . . . An unsigned paper shall be stricken unless omission of the signature is corrected promptly. . . .
(b) Representations to the court
By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) the allegations and other factual contentions have evidentiary support or . . . are likely to have evidentiary support . . . ; and
(4) the denials of factual contentions are warranted on the evidence. . . .
(c) Sanctions
If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b). . . .

covered by Rule 9011. *Computer Dynamics Inc. v. Merrill (In re Computer Dynamics Inc.)*, 252

B.R. 50, 57 (Bankr. E.D. Va. 1997).

Rule 9011 parallels FED. R. CIV. P. 11 ("Rule 11"). Courts apply the same standard in

interpreting cases under Rule 9011 as in cases involving Rule 11. *Landon v. Hunt*, 977 F.2d 829,

833 n.3 (3d Cir. 1992). Rule 9011 discourages in bankruptcy proceedings the same conduct that

Rule 11 proscribes. *Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584, 585 (3d Cir. 1985).

The common purpose of the Rules is to deter baseless filings. *Cooter & Gell v. Hartmarx Corp.*,

496 U.S. 384, 393 (1990). More particularly, the Third Circuit has summarized the essence of

Rule 11 as follows:

> [T]he rule imposes an obligation on counsel and client analogous to the
> railroad crossing sign, "Stop, Look and Listen." It may be rephrased,
> "Stop, Think, Investigate and Research" before filing papers whether to
> initiate a suit or to conduct the litigation. These obligations conform to
> those practices which responsible lawyers have always employed in
> vigorously representing their clients while recognizing the court's duty to
> serve the public efficiently.

*Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987) (*citing Lieb v. Topstone Indus., Inc.*,

788 F.2d 151 (3d Cir. 1986)). Rule 11 and Rule 9011 sanctions are imposed when a pleading

constitutes "abusive litigation or misuse of the court's process." *Mary Ann Pensiero, Inc. v.*

*Lingle*, 847 F.2d 90, 95 (3d Cir. 1988) (citation omitted).

B. Procedural Requirements. A party filing a motion for sanctions must comply under

Rule 9011(c)(1)(A)[10] with two procedural requirements. First, the motion for sanctions must be

---

[10](A) **By Motion**. A motion for sanctions under this rule shall be made separately from
other motions or requests and shall describe the specific conduct alleged to violate subdivision
(b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with
or presented to the court unless, within 21 days after service of the motion (or such other period a
the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is

made "separately from other motions or requests and [must] describe the specific conduct alleged

to violate subdivision (b)." *See Divane v. Krull Electric Co., Inc.*, 200 F.3d 1020, 1025 (7th Cir.

1999). Second, the motion may not be presented to the court unless, within twenty-one days of

service, the nonmovant has not withdrawn or corrected the challenged behavior. *Id.* The twenty-

one-day "safe harbor" period was added to Rule 11 in 1993 and to Rule 9011 in 1997.[11] Its

purpose is "to give the offending party the opportunity [within the safe harbor period] to

withdraw the offending pleading and thereby escape sanctions." *Barber v. Miller*, 146 F.3d 707,

710 (9th Cir. 1998). *See also Ridder v. City of Springfield*, 109 F. 3d 288, 297 (6th Cir.1997)

("A party seeking sanctions must leave sufficient opportunity for the opposing party to choose

whether to withdraw or cure the offense voluntarily before the court disposes of the challenged

contention").

    *Sub judice*, three issue areas are presented as to the scope and required procedures of Rule

9011. First, will letter notice suffice, notwithstanding the Rule's clear reference to service (but

not filing) of *a motion* to initiate the safe harbor period? Second, does the withdrawal (after the

running of the safe harbor period) by Fuji of its trustee motion, require denial of the after-filed

---

not withdrawn or appropriately corrected . . . . If warranted, the court may award to the party
prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or
opposing the motion. [FED. R. BANKR. P. 9011(c)(1)(A).]

   [11]The effect of this change was to reverse the result in cases such as *Cooter & Gell v.
Hartmarx Corp.*, 496 U.S. 384 (1990). In *Cooter*, the challenged complaint was withdrawn and
the case was dismissed following service of a Rule 11 motion, but the court nevertheless imposed
sanctions years later. "This safe harbor has had the salutary effect of reducing Rule 11 volume
while at the same time accomplishing the goal of the Rule – streamlining litigation by
eliminating abuses proscribed by the Rule. It has the merit of doing so without burdening the
court." GREGORY P. JOSEPH, SANCTIONS, THE FEDERAL LAW OF LITIGATION ABUSE § 2(A)(4) at
p.23 (3d ed. 2000).

Rule 9011 motion? And, third, as to parties, (i) can Benun join in the Jazz Rule 9011 motion,

and (ii) is Fuji (as well as its attorneys) exposed to Rule 9011 sanctions?

C. <u>Sufficiency of Letter Notice</u>. In 1997, the drafters of new Rule 9011 relied upon the

notes accompanying the 1993 amendments to Rule 11. *Miller v. Cardinale (In re DeVille),* 361

F.3d 539, 551-52 (9th Cir. 2004) (citations omitted). Regarding the initiation of Rule 11

sanctions by the service of *a motion,* those 1993 Advisory Committee notes said:

> To stress the seriousness of a motion for sanctions and to define
> precisely the conduct claimed to violate the rule, the revision
> provides that the "safe harbor" period begins to run only upon
> *service of the motion.* In most cases, however, counsel should be
> expected to give informal notice to the other party, whether in
> person or by a telephone call or letter, of a potential violation
> before proceeding to prepare and serve a Rule 11 motion.

Advisory Committee's Notes, 1993 Amendments to FED. R. CIV. P. 11 (emphasis added).

In *DeVille,* the bankruptcy court had accepted the plaintiff's attorney's declaration of the

attorney's fees incurred as a result of the defendant's abusive filings as the equivalent of a

"motion" for Rule 9011 sanction purposes. No sanctions motion was ever filed by the aggrieved

party. The Ninth Circuit concurred in the Bankruptcy Appellate Panel's conclusion that the

attorney's fee declaration did not constitute a "motion" within the meaning of *part (c)(2)*[12] of the

Rule. "As the text of the Rule makes clear, an award to an adverse party 'of reasonable

attorneys' fees and other expenses' can only be made pursuant to a 'motion' by that party." *Id.* at

---

[12](c)(2) Nature of sanction; limitations. A sanction imposed for violation of this rule shall
be limited to what is sufficient to deter repetition of such conduct or comparable conduct by
others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction
may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into
court, **or, if imposed on motion and warranted for effective deterrence, an order directing
payment to the movant of some or all of the reasonable attorneys' fees** and other expenses
incurred as a direct result of the violation. [FED. R.BANKR. P. 9001(c)(2) (emphasis added).]

544.[13]  But *DeVille* does not reach the issue of whether a motion (versus other written notice) was

necessary to satisfy the *part (c)(1)(A)* provisions, i.e., the initiation of the twenty-one-day safe

harbor period.[14]   However, in *Barber v. Miller*, the Ninth Circuit addressed directly the matter of

(c)(1)(A) initiation by motion in a Rule 11 case.  There, the plaintiff's claims for patent

infringement were seriously deficient and were the subject of repeated warning letters from the

defendant.  "[T]hose warnings were not motions, however, and the Rule requires service of a

motion.  That requirement . . . was deliberately imposed, with a recognition of the likelihood of

other warnings. . . .  It would therefore wrench both the language and purpose of the amendment

to the Rule [adding the safe harbor] to permit an informal warning to substitute for service of a

motion."  146 F.3d at 710.

In this district the *Barber* view is reflected in *Slater v. Skyhawk Trans., Inc.*, 187 F.R.D.

185, 200 (D.N.J. 1999) ("[A]n informal notice, either by letter or other means, does not trigger

the commencement of the 21 day period").  *See also Piantone v. Sweeney*, 1995 WL 691915, at

*1 n.1 (E.D. Pa.).[15]   Other courts disagree.   In *Barker v. Bank One, Lexington, N.A.*, 1998 WL

---

[13]*See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 528 (6th
Cir. 2002) (Proponent of Rule 11 sanctions could not recover those sanctions where the
proponent "did not meet the procedural prerequisites of Rule 11's safe harbor provisions, in that
[proponent] did not file a motion for sanctions."  It was contended that proponent's letter notice
and his motion for summary judgment "sufficiently complied with the safe harbor provision of
Rule 11."  *Id.* at 527.  The court noted, however, that "there is not a single letter that clearly
reflects that [proponent] will seek sanctions" and that the letter sent did not "satisfy the spirit of
the 1993 Amendments to Rule 11 by providing notice. . . ."  *Id.* at 528).

[14]The safe harbor period does not apply where the court initiates the Rule 9011 sanction
process.  *See* Rule 9011(c)(1)(B).

[15]*See also Truesdale v. S. Cal. Permanente Med. Group*, 293 F.3d 1146, 1151 (9th Cir.
2002); *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772 (9th Cir. 2001); *TRI, Inc. v Boise
Cascade Office Prods., Inc.*, 2002 U.S. Dist. LEXIS 17935 (D. Minn.); *Harding Univ. v.*

13

466437 (6th Cir.), the Sixth Circuit *affirmed* the award of sanctions under Rule 11, where

defendants merely wrote to the plaintiff clearly indicating that they would seek sanctions because

of the "obvious frivolity" of the case. The court held that "the purpose of the safe harbor

provision was complied with in this case by the warning letters [plaintiff] received" from the

defendants. *Id.* at **2.

Similarly, the Seventh Circuit approved such a warning letter. In that case the Rule 11

warning letter was sent before the filing of the sanctions motion, was deemed to be sufficient

notice of the demand, and provided more than the twenty-one-day safe harbor period.

*Nisenbaum v. Milwaukee County,* 333 F.3d 804, 808 (7th Cir. 2003). The court held that

"[d]efendants have complied substantially with Rule 11(c)(1)(A) and are entitled to a decision on

the merits of their request for sanctions under Rule 11." *Id. See also Jeffreys v. Rossi,* 275 F.

Supp. 2d 463, 480 n.27 (S.D.N.Y. 2003).[16]

*Sub judice*, Jazz's letter notices of October 16, 2003 and January 15, 2004 are, at a

minimum, procedurally questionable. In this district, *Slater* (supported by like precedent)

suggests persuasively that Jazz's notice is, in fact, inconsistent with the stated notice

requirements of Rule 9011(c)(1)(A).

D. Fuji's Withdrawal of Trustee Motion Before Jazz's Filing of Sanctions Motion.

Although the text of the amended rule fails to specify when a Rule 11 motion should be brought,

early action is advised:

---

*Consulting Servs. Group, L.P.*, 48 F. Supp. 2d 765 (N.D. Ill. 1999).

[16]*Contrast Lancaster v. Zufle*, 170 F.R.D. 7 (S.D.N.Y. 1996) (letter purporting to satisfy
twenty-one-day notice provision of Rule 11 did not provide adequate notice because it failed to
specify that Rule 11 sanctions would be sought).

14

> The revision leaves for resolution on a case-by-case basis,
> considering the particular circumstances involved, the question as
> to when a motion for violation of Rule 11 should be served and
> when, if filed, it should be decided. Ordinarily the motion should
> be served promptly after the inappropriate paper is filed, and, if
> delayed too long, may be viewed as untimely. . . . *Given the "safe*
> *harbor" provisions . . . a party cannot delay serving its Rule 11*
> *motion until conclusion of the case (or judicial rejection of the*
> *offending contention).*

*Ridder,* 109 F.3d at 295 *(citing* FED. R. CIV. P. 11 Advisory Committee Notes to the 1993

Amendments) (emphasis added). *See also Barber,* 146 F.3d at 711. "By virtue of the fact that

under the 1993 amendments, 'a Rule 11 Motion cannot be made unless there is some paper,

claim or contention that can be withdrawn'. . . it follows that a party cannot wait to seek

sanctions until after the contention has been judicially disposed. A party must now serve a Rule

11 motion on the allegedly offending party at least twenty-one days prior to the conclusion of the

case or judicial rejection of the offending contention." *Ridder,* 109 F.3d at 295.

The Third Circuit adopted a supervisory rule requiring that Rule 11 motions be filed in

the district court before the entry of final judgment.

> To carry out the objectives of expeditious disposition . . . all
> motions requesting Rule 11 sanctions [shall] be filed in the district
> court before the entry of a final judgment. Where appropriate, such
> motions should be filed at an earlier time – as soon as practicable
> after discovery of the Rule 11 violation.

*Mary Ann Pensiero,* 847 F.2d at 100. The *Pensiero* requirement that Rule 11 motions be filed in

the district court before entry of a final judgment has been extended by the Third Circuit. *See*

*Prosser v. Prosser,* 186 F.3d 403, 406 (3d Cir. 1999) (invalidating an inherent power sanction

issued over thirty months after the final order); *Simmerman v. Corino,* 27 F.3d 58, 62-63 (3d Cir.

1994) (reversing, on abuse of discretion grounds, an award of sanctions imposed three months

15

after the entry of summary judgment dismissing the case).  Whether a timely sanctions motion is

required to preserve the twenty-one-day safe harbor period or "to carry out the objectives of

expeditious disposition," the filing of a sanctions motion after *entry of final judgment* is

procedurally defective.

*Sub judice*, Jazz's sanctions motion followed Fuji's *withdrawal* of its trustee motion (not

entry of a final judgment).  That after-withdrawal filing, at a minimum, casts doubt on the

timeliness of the sanctions motion.  *See Retail Flooring Dealers of America, Inc. v. Beaulieu of*

*America*, 339 F.3d 1146, 1150 (9th Cir. 2003) ("[T]he purpose of the safe harbor . . . is to give

the offending party the opportunity, within 21 days after service of the motion for sanctions, to

withdraw the offending pleadings and thereby escape sanctions.  A motion served after the

complaint has been dismissed [does] not give [the offending party] that opportunity") (citation

omitted); *Mellon Bank Corp. v. First Union Real Estate,* 951 F.2d 1399, 1413 (3d Cir. 1991) (a

motion for Rule 11 sanctions must be filed in district court before entry of final judgment);

*Hilman Co. v. Hyatt Int'l*, 899 F.2d 250, 251 n.1 (3d Cir. 1990) (because final judgment had

already been entered in favor of appellee, a request to remand the matter for consideration of

sanctions based on appellant's conduct was untimely); *Louros v. Kreicas*, 2003 WL 22353979 at

*2 (S.D.N.Y.) ("[A]s plaintiff withdrew . . . claims within the 'safe harbor' period provided for

by Rule 11, sanctions with respect to those claims would be inappropriate").

E.  <u>Standing/Parties</u>.  Benun, although not formally a party to Fuji's trustee motion, has

applied to join in Jazz's motion for sanctions; moreover, both Jazz and Benun seek sanctions

against Fuji as well as its counsel.

16

As to Benun's efforts, no provision in Rule 9011 recognizes joinder in a sanctions motion filed by another party. *See Wolf v. Kupetz (In re Wolf & Vine, Inc.)*, 118 B.R. 761 (Bankr. C.D. Cal. 1990) (holding that joinder is not a substitute for the necessary sanctions motion). Benun did not file a sanctions motion as is required by the Rule. Moreover, his standing to complain about Fuji's trustee motion directed at Jazz is doubtful.

As to Fuji being targeted, a represented party can be sanctioned for a violation of Rule 9011, if such a party "had some direct personal involvement in the management of the litigation and/or the decisions that resulted in the actions which the court finds improper." *Indep. Fire Ins. Co. v. Lea*, 979 F.2d 377, 379 (5th Cir. 1992). *See also Bus. Guides, Inc. v. Chromatic Communications Enter., Inc.,* 498 U.S. 533, 554 (1991) (affirming the imposition of sanctions on a represented party, sophisticated in prosecuting copyright infringement actions, who had through its officers signed a pleading in violation of Rule 11 certification requirements); *Project 74 Allentown, Inc. v. Frost*, 143 F.R.D. 77, 83 n.7 (E.D. Pa. 1992), *aff'd*, 998 F.2d 1004 (3d Cir. 1993) (noting that Rule 11 permits a court "to sanction the individual who signed a paper on behalf of a corporation as well as the corporation itself"); *Calloway v. Marvel Entm't Group*, 854 F.2d 1452, 1475 (2d Cir. 1988), *rev'd sub nom., Pavelic & LeFlore v. Marvel Entm't Group,* 493 U.S. 120 (1989) (holding that "where the party does know that the filing and signing is [sic] wrongful, and the attorney reasonably should know, then sanctions against both are appropriate"). Neither Jazz nor Benun has identified any Fuji personnel who has directed the filing of or engineered the content of the trustee motion. Jazz and Benun simply assume that all of Fuji's counsel's actions, and particularly the overzealous written advocacy set forth in the initial memorandum in support of Fuji's trustee motion, are attributable to Fuji. Such an

assumption applied to counsel's written argument would seem to overextend the intended reach of Rule 9011.

## V.    Application of FED. R. BANKR. P. 9011

A. Standard for Application. The conduct of a person who signs a pleading is judged under the objective standard, reasonableness under the circumstances. *Bus. Guides, Inc.*, 498 U.S. at 546-47. Required of counsel is "an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact." *Midlantic Nat'l Bank v. Kouterick (In re Kouterick)* 167 B.R. 353, 363 (Bankr. D.N.J. 1994) (*quoting Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991)).

Rule 9011 requires that a pleading have evidentiary support, *or be likely to have such support after a reasonable opportunity for further investigation or discovery. Halverson v. Funaro (In re Funaro)*, 263 B.R. 892, 903 (BAP 8th Cir. 2001). "Sanctions may not be obtained unless a particular allegation is utterly lacking in support." *In re Highgate Equities, Ltd.*, 279 F.3d 148, 154 (2d Cir. 2002).

Under Rule 9011 the signer of a pleading has an obligation to make a reasonable inquiry into the facts and law which support a paper filed with the court.[17]   *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1359 (3d Cir. 1990).   *See also Lieb*, 788 F.2d at 157 (attorney must conduct "a reasonable investigation of the facts and a normally competent level of legal research

---

[17]In determining whether counsel made a reasonable inquiry into the facts and law several factors are considered: (1) the amount of time available to the attorney for factual and legal investigation; (2) the degree of reliance the attorney had to place on the client for the facts of the case; (3) the plausibility of the legal position advocated; (4) whether the case was referred by another member of the Bar; and (5) the degree of complexity of factual and legal issues involved. *Mary Ann Pensiero, Inc.*, 847 F.2d at 95 (citation omitted); *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1573 (11th Cir. 1995).

to support the presentation"); *Mary Ann Pensiero, Inc.*, 847 F.2d at 96 ("The correct Rule 11

inquiry is 'whether at the time he filed the complaint, counsel . . . could reasonably have argued

in support' of his legal theory") (citation omitted).

"[M]ere failure to prevail does not trigger a sanction award." *Gaiardo*, 835 F.2d at 483.

*See also Mary Ann Pensiero, Inc.*, 847 F.2d at 95 (finding a reasonable basis for the complaint

when filed, the court held, "we are persuaded that the complaint filed here while unsuccessful,

was not sanctionable"); *Knowles Bldg. Co. v. Zinni (In re Zinni)*, 261 B.R. 196, 203 (BAP 6th

Cir. 2001) ("Simply because a party's arguments are not accepted by the trial court does not

support a sanction under Bankruptcy Rule 9011").

The court examines the signer's conduct by inquiring what was reasonable to believe at the

time the paper was filed. *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d

Cir. 1985). The court also examines the signer's conduct in "later advocating" a position contained

in the papers after learning that the position no longer has merit. 10 COLLIER ON BANKRUPTCY, ¶

9011.RH[4] (*citing* 1993 Advisory Committee Note to FED. R. CIV. P. 11). *See also In re Funaro*,

263 B.R. at 903-04 ("The Rule thus imposes a continuing duty on the plaintiff to dismiss a cause of

action if he learns, or has reason to learn that he will not be able to offer evidence sufficient to

sustain his burden"); *Timmons v. Cassell (In re Cassell)*, 254 B.R. 687, 691 (BAP 6th Cir. 2000)

("Rule 9011 also imposes a continuing responsibility to review and reevaluate pleadings and modify

them when it is appropriate"); *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368,

374 (6th Cir. 1996) ("In *Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 335-36 (6th Cir. 1988), this

court stated that 'the reasonable inquiry under Rule 11 is not a one-time obligation.'. . . '[T]he

plaintiff is impressed with a continuing responsibility to review and reevaluate his pleadings and

19

where appropriate modify them to conform to Rule 11'"). *In re Reuscher*, 1998 WL 93965 (7th

Cir.) affirmed the bankruptcy court's reasoning for imposing sanctions against creditors who

brought a nondischargeability claim against the debtor. "[E]ven if their perception of the law and

facts at the time they filed the complaint was reasonable, they violated Rule 11 in continuing to

advocate the allegations of the complaint at trial even while producing no evidence to support the

allegations." *Id.* at *2.

Reflecting on the need to reevaluate unsupported claims, the Third Circuit stated, "Indeed

abandoning a claim that appears unlikely to succeed is responsible advocacy to be commended. . . .

Courts benefit when counsel reduce the issues in dispute by objectively reappraising the evolving

strengths of their positions throughout the course of the litigation." *Mary Ann Pensiero, Inc.*, 847

F.2d at 95.

In *Anderson Assoc. PA v. S. Textile Knitters (In re Southern Textile Knitters)*, 65 Fed. Appx.

426 (4th Cir. 2003), a Chapter 7 trustee filed an adversary complaint against the closely held

corporate debtor's president and other related parties, alleging that the defendants had fraudulently

misappropriated large sums of cash and inventory from the debtor. The bankruptcy court rejected

the trustee's main claims and imposed sanctions on the trustee's counsel for improperly pursuing

certain claims without sufficient foundation. On appeal, the Fourth Circuit reversed the sanctions

holding that the trustee's claims "were neither improper when filed nor affirmatively reiterated once

their lack of evidentiary support became clear." *Id.* at 440.

B. Analysis of Fuji's Alleged Unsubstantiated Factual Assertions (Rule 9011(b)(3) Claims).

Jazz contends that Fuji has presented only innuendo, speculation and unfounded allegations of fraud

and dishonesty. Fuji's broad response is that it filed its trustee motion based on (i) knowledge of

20

Jazz's prepetition wrongdoing; (ii) available circumstantial evidence that Jazz continues its

violations of intellectual property laws postpetition; and (iii) circumstantial evidence that Jazz's

assets are being drained by Benun.

The "written motion" or "papers," as those terms are used in Rule 9011, which Jazz claims

embody unsubstantiated factual allegations, are:  Fuji's "Memorandum of Law in Support of

Application for Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy

Code," dated June 24, 2003 (hereinafter the "Trustee Motion Memo"); and the "Memorandum

Discussing Evidence and Law in Support of Application for Appointment of a Chapter 11 Trustee

Pursuant to Section 1104 of the Bankruptcy Code," dated October 3, 2003 (hereinafter the "Fuji

Evidence Memo").  The purported misstatements, as listed in the Initial Notice Letter,[18] have been

evaluated by the court as set forth more specifically in the Appendix hereto.  In sum, this court finds

that, with one exception, each statement had either evidentiary support or a likelihood of same, as

provided in Rule 9011(b)(3).  This is the case even though a number of the Fuji charges, *in*

---

[18]As previously indicated, Jazz's Initial Notice Letter has been amplified (in terms of
pinpointing certain purported misstatements) by Jazz's submission of May 6, 2004.  However,
the essential fifteen points ("a" through "o" in the Appendix) of the Initial Notice Letter have not
been increased notwithstanding the purported reservation of Jazz's right to add to grounds for
sanctions as expressed in the letter.

*isolation,*[19] were weakly and/or circumstantially corroborated.  Nevertheless, the motion, discovery and hearings were, in this court's view, clearly justified.

Somewhat more generally than as set forth in the Appendix hereto, the Jazz and Benun complaints that Fuji papers fail the existing evidence or "likely to have evidentiary support" tests of Rule 9011(b)(3) may be categorized in three areas.  Fuji has averred that (i) Jazz was organized to, did, and continues to infringe Fuji's patents[20] (*see* a and o of the Appendix); (ii) Benun did "loot" and continued postpetition to "loot" Jazz (*see* c, d, i, l, m, and n of the Appendix); and (iii) Jazz was organized so as to hide, and continues to hide its profits offshore (*see* b, e, f, g, h, j, and k of the Appendix).

Fuji's most inflammatory statements were not proven to this court's satisfaction at the October 2003 hearings (through testimony or documentary evidence).  No "smoking gun" could be produced regarding ongoing "looting" or hiding of profits offshore.  Indeed, Fuji unwisely exposed itself to risk of sanctions by issuing needlessly aggressive and definite statements of *postpetition*

---

[19]The purported misstatements of Fuji were set forth in memoranda.  To the extent that those statements could be parsed, as per the Initial Notice Letter, each in isolation can be inspected (and, of course, none should be made without foundation); however, this court recognizes the chilling effect of too finely dissecting, for Rule 9011 purposes, written argument in trustee-appointment motions. *See Waltz v. County of Lycoming*, 974 F.2d 387, 390 (3d Cir. 1992) ("[I]t is important to avoid the chilling effect of over-scrupulous application of Rule 11 to relatively trivial procedural inadequacies having no serious consequences"); *Kanematsu-Gosho Ltd., v. M/T Messiniaki Aigli*, 814 F.2d 115, 119 (2d Cir. 1987) ("In recognition of the potential chilling effect that [Rule 11] awards may have on the filing of actions, this court requires 'a high degree of specificity in the factual findings of lower courts when attorneys' fees are awarded on the basis of bad faith'"); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985) ("Mindful of the potential severe chilling effect of Rule 9011 sanctions on counsel and the parties, and the concomitant restraint on legal creativity and effective representation, the Second Circuit has counseled that 'any and all doubts must be resolved in favor of the signer'").

[20]Though Fuji presented certain evidence (including testimony) regarding infringement, it then opted to have the ITC decide whether Jazz's current practices infringe.

conduct of Jazz/Benun.  Its motion would have been indisputably effective and proper if it had been

grounded in the past and established conduct of Jazz/Benun; in the opportunity to manipulate Jazz's

funds; and in the suspicion of a continuation or extension postpetition of Benun's method of

operation.  In particular, this court is influenced by the following factors (the "Supporting Factors"),

which would tend to support Fuji's trustee motion:  (i) Benun's earlier run-in with the SEC,

including his use in that episode of an Asian entity to mask untoward conduct; (ii) Jazz's

organizational structure, which includes substantial and rather "opaque" offshore operations, and

the strategic election to *exclude* offshore subsidiaries from Jazz's Chapter 11 case; (iii) the

crossover of key Jazz and/or JPHK employees to roles with supplier Polytech, Polytech's ongoing

connection to Jazz and the Creditors Committee *sub judice*, and arguably ambiguous activities of

Benun-confidant Silvera, a principal of supplier PRE and agent of Polytech; (iv) the ease with

which profit, formerly left offshore, was brought into the United States after Jazz filed its petition;

(v) Benun's unmitigated denuding of Jazz by taking out available profit ($11.9 million withdrawn

by Benun from Jazz in less than four years from June 1999 to December 2002, as recited by Judge

Hochberg in her April 8, 2003 Opinion and Order); (vi) Benun's presumptuous claim to, initially, a

$15,000 per week consulting fee (through his alter ego, JCB), later converted to a somewhat

reduced salary request (i.e., $12,500 per week [21]); and (vii) Judge Hochberg's finding of

infringement through August 21, 2001 (now amplified by the recent initial determination of an ITC

Administrative Law Judge of ongoing infringement extending into the Chapter 11 administration

period).

---

[21]*See* Order of August 22, 2003 (Docket # 227) (reducing the salary to $7,500 and
allocating $5,000 per week to potential administrative expenses or bonus, depending upon case
developments).

These Supporting Factors were sufficient to justify the initiation of Fuji's trustee motion, *and its continuation through discovery and partial hearing.*[22] Moreover, Fuji's *withdrawal* of the motion (for whatever reason, including this court's indication of weakness in the proofs presented by Fuji) would satisfy the purposes of Rule 9011 and undercut Jazz's demand for sanctions.

Overall, Jazz and Fuji have battled in the frontier marketplace of low-tech international commerce.    The nature and context of their competition is not lost on this court; nor is the basic makeup of the contestants.    In this regard, *Jazz's counsel* forthrightly conceded at oral argument that, given the commercial background and parties involved, *he* would have moved for the appointment of a trustee for Jazz (albeit with more constrained allegations) if he were serving as Fuji's counsel.    And, though Marquis of Queensbury rules now apply via Rule 9011, brass-knuckle battlers should not expect a court to ignore the realities of context when fiduciary status is at issue. Though this court has indicated that history, generalities and circumstantial evidence would not, as of January 2004, necessarily suffice as proof that a trustee should be appointed for Jazz, the *entirety* of the Fuji allegations is by no means frivolous.    And, given recent developments with the ITC, the future of debtor-in-possession status for Jazz and its management is uncertain.

As reflected in the Appendix hereto, Jazz's case for Rule 9011(b)(3) violations is rejected by this court on a charge-by-charge basis.    The single clearly "over-the-top" statement by Fuji's

---

[22]It is clear to this court that the largest part of Jazz's "investment" in defending Fuji's trustee motion was made before Jazz issued its Initial Notice Letter on October 16, 2003. *See* Docket # 500 (Sirota Affidavit) (establishing that 893.3 hours or $272,454 was expended in defense of that motion through October 16; moreover, a substantial part of the balance of 240.2 hours or $69,092 claimed to have been expended after that date, was in preparation for and attendance at the October 21 and 22 hearings (i.e., over 190 hours or nearly $55,000)). Therefore, the period between the October hearings and Fuji's withdrawal of its motion saw relatively little motion activity.

24

counsel deserves a rebuke. *See* (j) of the Appendix. However, because in this court's view the motion, all discovery and the October hearings were plainly justified (and could have benefited this court and the estate),[23] monetary sanctions are inappropriate.

C. Analysis of Fuji's Alleged Improper Purpose (Rule 9011(b)(1) Claim). Rule 9011(b)(1) admonishes that no pleading or motion shall be presented for an improper purpose, "such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Whether papers are presented for an improper purpose is judged by an objective standard. *Lieb,* 788 F.2d 151, 157 (3d Cir. 1986). One view of an "improper purpose" is any purpose other than one to vindicate substantive or procedural rights or to put claims of a right to a proper test. GREGORY P. JOSEPH, SANCTIONS, § 13(B)(2) at p.216. But simplifying and isolating the "purpose" of certain litigation tactics is not always helpful. *See Sussman v. Bank of Israel,* 56 F.3d 450, 459 (2d Cir. 1995) (reversing sanctions imposed pursuant to Rule 11 and the court's inherent power for the filing of a complaint "with a view to exerting pressure on defendant through the generation of adverse and economically disadvantageous publicity" where complaint did not lack foundation in law or fact); *Resolution Trust Corp. v. Blasdell,* 154 F.R.D. 675, 682 (D. Ariz. 1993) (holding that Rule 11 sanctions are not appropriate when a motion is filed in part for a legitimate purpose even when the motion "includes certain evidence which is assertedly presented for an improper purpose").

---

[23]In fact, this court has been edified by Fuji's efforts to dislodge Benun. Those efforts allowed certain scrutiny which would otherwise not have been available to the court. This is particularly true with regard to Benun's current conduct. Moreover, Fuji's unrelenting pressure helps this court police a troublesome case, where ultimate results are not predictable, where appointment of a Chapter 11 trustee while alleged infringement is ongoing could expose that trustee to risk, and where requiring a halt to sale of LFFPs might cause the liquidation of Jazz.

As indicated earlier, an objective basis for attempting to secure the appointment of a Chapter

11 trustee is amply demonstrated in this case, whether advocated by Fuji or any other party-in-

interest.  Of course, Fuji would like to see the demise of Jazz for marketplace reasons; plainly Fuji

chooses to leave no stone unturned in pursuing Jazz and Benun in available venues; and, a clear

result of Fuji's persistence is additional expense to the Jazz and Benun cases.  Nevertheless, Fuji

had solid grounds for seeking to avail itself of Code protections and has not stepped over any line of

propriety (such as by filing excessive and repetitive motions).[24]  In fact, by withdrawing its trustee

motion, Fuji stayed within the bounds of hard-nosed but proper practice.  Again, these debtors

cannot ply their trade as they have in the rough-and-tumble world of international low-tech

commerce and then expect competitors to don kid gloves before this court.

## VI.    Application of 28 U.S.C. § 1927[25]

Jazz has also requested that sanctions be imposed on Fuji's counsel pursuant to 28 U.S.C.

§ 1927.[26]  *Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985).  "[T]he principal

---

[24]*See Sheet v. Yamaha Motors Corp., USA*, 891 F.2d 533, 538 (5th Cir. 1990) (stating that "[a]lthough the filing of a paper for an improper purpose is not immunized from Rule 11 sanctions simply because it is well grounded in fact and law, only under unusual circumstances – such as the filing of excessive motions – should the filing of such a motion constitute sanctionable conduct") (citations omitted).

[25]"Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927 (West 2004).

[26]Courts are split as to the applicability of § 1927 to the bankruptcy court because  § 1927 applies to cases "in any court of the United States. . . ." "While an argument can be made that a bankruptcy court lacks the authority to impose sanctions under § 1927 (*see, e.g., In re Courtesy Inns, Ltd.*, 40 F.3d 1084, 1086 (10th Cir. 1994) (holding that 'bankruptcy courts are not within the contemplation of § 1927')), the Court of Appeals for the Third Circuit has not so ruled. Morever, several bankruptcy courts, including those within the district, have imposed § 1927

purpose of imposing sanctions under 28 U.S.C. § 1927 is the deterrence of intentional and

unnecessary delay in the proceedings." *Zuk v. Eastern Pa. Psychiatric Inst.*, 103 F.3d 294, 297

(3d Cir. 1996) (citation omitted).  Imposition of such sanctions requires a court to find that an

attorney has "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3)

thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional

misconduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175,

188 (3d Cir. 2002) (citation omitted).[27]  Section 1927 is to be strictly construed.  *Overnite*

*Transp. Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983).

Unlike Rule 11 sanctions, a motion for excess costs and attorney's fees under § 1927

against an attorney who multiplies proceedings unreasonably and vexatiously "is not predicated

upon a 'safe harbor' period, nor is the motion untimely if made after final judgment in the case."

*Ridder*, 109 F.3d at 297.  However, prior to sanctioning an attorney, a court must provide the

---

sanctions where a bankruptcy case was filed in 'bad faith'" *In re Argus Group 1700, Inc. v.*
*Steinman,* 1997 WL 87623 at *3 n.2 (E.D. Pa.).

[27]Before a court can order the imposition of attorneys' fees under § 1927, it must find
willful bad faith on the part of the offending attorney. *Baker Indus., Inc.,* 764 F.2d at 208.  *See*
*also Hackman v. Valley Fair*, 932 F.2d 239, 242 (3d Cir. 1991) (holding that a finding of bad
faith on the part of the offending lawyer is a prerequisite for imposing sanctions under § 1927).
A finding of bad faith is required in order to avoid chilling an attorney's zealous representation of
his client and because in the absence of bad faith "an attorney who might be guilty of no more
than a mistake in professional judgment in pursuing a client's goals might be made liable for
excess attorneys' fees under section 1927." *Baker Indus., Inc.,* 764 F.2d at 208-9. Bad faith is a
factual determination which can include finding that the claims advanced were without merit,
that the attorney knew or should have known this, and that the claims were advanced for an
improper purpose such as harassment. *In re Prudential Ins. Co.,* 278 F.3d at 188 (*citing Smith v.*
*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1375 (6th Cir. 1987)).  Once a finding of
bad faith is made, the appropriateness of sanctions is a matter entrusted to the discretion of the
district court. *In re Prudential Ins. Co.*, 278 F.3d at 181 (citation omitted).

party to be sanctioned with notice and some opportunity to be heard. *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990).

The imposition of § 1927 sanctions "is a power which the courts should exercise only in instances of a serious and studied disregard for the orderly process of justice." *Williams v. Giant Eagle Mkts., Inc.*, 883 F.2d 1184, 1191 (3d Cir. 1989) (citation omitted). "Mere finding that an attorney failed to undertake reasonable inquiry into the basis for a claim does not automatically imply that proceedings were intentionally or unreasonably multiplied so as to warrant an award of excess attorney's fees and costs." *Ridder*, 109 F.3d at 298. For the reasons set forth earlier, there is no basis to assess statutory sanctions in this case.

## VII.  Conclusion

Jazz's motion for sanctions under Rule 9011 and 28 U.S.C. § 1927 must be denied (as must Benun's "joinder" effort).

The motion under Rule 9011 is flawed on multiple procedural grounds. It was noticed by letter rather than the service of a formal motion; and, the filing of the motion followed Fuji's withdrawal of the purportedly offending trustee motion. Both procedural defaults have impaired Fuji's "safe harbor" period as permitted by the Rule.

Moreover, the targeting of the client, Fuji, was never advanced in Jazz's motion, while Benun's effort at "joinder" is outside Rule 9011 processes.

Substantively, Fuji's trustee motion was well grounded in fact and law, though certain of its allegations were grossly stated and overzealously (indeed, often foolishly) advocated in written argument. Fuji's marketplace motivation *sub judice* does not require it to "stand down"

under the immediate circumstances, i.e., *where objective factors would justify pursuit of a trustee motion by any party-in-interest.*

Benun and Jazz have operated in a commercial zone of substantial jeopardy. Patent infringement in the low-tech, high profit market of single-use cameras was a risk knowingly undertaken by Benun and Jazz. They have little to complain about when their gamble turned out badly and a powerful competitor asserts its full range of rights against them.

This court will issue an order implementing this decision.

Dated: August 3, 2004

MORRIS STERN
United States Bankruptcy Judge

## Appendix

### Determinations Re: Fuji's Alleged Unsubstantiated
### Factual Assertions (Rule 9011(b)(3) claims).

Jazz's claims, as extracted from its Initial Notice Letter, are set forth and analyzed below in alphabetical order ("a" through "o") as listed by Jazz.

(a)  (i)  Jazz allegation: There is no factual support for Fuji's charge "that the Debtor is a company that was organized by Mr. Benun for the purpose of violating the law and that this practice continues to this day." [Jazz Sanctions Memo, p.10.]

(ii) Actual Fuji written statement: "Debtor is a company organized by Jack C. Benun ("Benun") for the purpose of violating the law (by infringing Fuji's patents), a practice that continues to this day, even after repeated agency and court findings of infringement." [Fuji Trustee Memo, p.1.]

(iii) Fuji's stated support for its statement:

* On March 25, 1998, Jazz was served with a complaint filed by Fuji before the International Trade Commission ("ITC") and an Order of the ITC initiating an official investigation of unfair trade practices in violation of section 337 of the Tariff Act by the Debtor and various others. [Fuji Trustee Memo, p.16.]

* At a hearing on February 24, 1999, the Administrative Law Judge ("ALJ") issued his Initial Determination which found that Jazz infringed Fuji's patents through the sale of all of Jazz's newly made and reconstructed single-use cameras. [Fuji Trustee Memo, pp.16-17.]

* On June 2, 1999, the ITC upheld the ALJ's ruling and issued a Cease and Desist Order against Jazz. [Fuji Trustee Memo, p.17.]

* On August 21, 2001, the Federal Circuit affirmed the ITC's orders as to the Debtor. *Jazz Photo Corp. v. ITC*, 264 F.3d 1094 (Fed. Cir. 2001). [Fuji Trustee Memo, p.17.]

* On February 25, 2003, the district court issued its decision finding that all but 380,944 of the 39,718,425 refurbished single-use cameras and all of the newly made single-use cameras Jazz sold from its inception through August 21, 2001 infringed Fuji's patents. *Fuji Photo Film Co. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434 (D.N.J. 2003) ("District Court Opinion"). [Fuji Trustee Memo, p.18.]

i

- Although the ITC, district court, and Federal Circuit findings are pre-petition, Fuji contends they nevertheless support its allegations of continuing post-petition infringement.

- In further support of its allegation, Fuji states that within the last several months James Field, Fuji administrator for recycling operations, has examined over 2,800 Jazz-brand refurbished camera shells made from Fuji camera shells and consistently found that a significant portion of those cameras have been made from foreign Fuji shells in continued infringement of the ITC's June 1999 Exclusion and Cease and Desist Orders. [Fuji Evidence Memo, pp. 30-31.]

(iv)    Jazz response:  (i) Fuji failed to investigate facts within its own control and to provide evidence that is within its possession regarding the country of first sale of camera shells refurbished by Jazz; (ii) Jazz has been fully compliant with the United States Customs Clearance Procedures and not one of its single-use cameras has been found to violate these procedures; (iii) Fuji's allegations of postpetition infringement before the bankruptcy court are misplaced because on July 30, 2003, the Court granted Fuji's motion for relief from the automatic stay to proceed with its claims of postpetition infringement before the ITC. [Jazz Reply Memo, pp.5-6.]

(v)    Determination:  Both circumstantial and actual evidence support the Fuji charge. In addition to Fuji's stated supporting factors, the April 6, 2004 "Enforcement Initial Determination" of the ITC's Administrative Law Judge Paul J. Luckern *abundantly* supports, for Rule 9011 purposes, the challenged Fuji statement. *See also* the Supporting Factors considered by this court which serve to support Fuji's motion.

(b), (c) (i)    Jazz allegations: There is no factual support for Fuji's charges (b)"that the Debtor is the alter ego of Mr. Benun, operated for his benefit to the detriment of all creditors," and (c) that "Mr. Benun systematically looted the Debtor pre-petition." [Jazz Sanctions Memo, p.10.]

(ii)    Actual Fuji written statement:  "Notwithstanding his nominal title of 'consultant,' Debtor is the alter ego of Benun operated for the benefit of Benun (and to a lesser extent, the benefit of his appointed officers), to the detriment of all creditors," and (c) "Pre petition, Benun systematically looted Debtor, a conclusion reached by the district court in the action which gave rise to Fuji's judgment." [Fuji Trustee Memo, p.1.]

(iii)    Fuji's stated support for its statement:

ii

- (b) While Benun resigned his positions of President and Director of the Jazz in 1997, he "engineered the appointment of his successor, Roger Lorenzini . . . and retained control over the Debtor directly through a 'consulting' company he created, JBC Consultants, Inc. [and] . . . through effective control of Mr. Lorenzini and the Board of Directors (which awarded Benun substantial 'bonuses' each year beyond the 'commissions' required by the agreement), Benun has extracted millions of dollars from the Debtor." [Fuji Trustee Memo, pp.10-11.]

- (c) The district court stated that Benun's purported resignation as the Director of Jazz was not a relinquishment of control over the company. [Fuji Trustee Memo, p.13.] The district court recognized that while Benun purported to be a consultant, he was paid over $11,000,000 in direct payments and forgiven loans which represented more than four times the company's retained earnings during the relevant time period, a fact the court considered the "most probative evidence" of Benun's control. [Fuji Trustee Memo, pp.13-14; Fuji Opposition Memo, p.12.] The district court took notice of how millions of dollars flowed from the Debtor to Benun but vanished from Benun's ledger entirely. [Fuji Trustee Memo, p.14.]

(iv)     Jazz response: (i) the District Court Judgment is on appeal; (ii) the district court never concluded that the Debtor was organized to engage in illegal conduct, and (iii) the district court's refusal to impose heightened damages on Jazz actually refutes this claim. [Jazz Reply Brief, p.8.]

(v)      Determination: Though Fuji uses strong language in its charge ("looting" *ad nauseam*), Fuji's stated supporting factors establish sufficient circumstantial and/or actual evidence for Rule 9011 purposes. Certainly, Benun totally controlled Jazz and left little, if any, earnings behind (i.e. "retained earnings"), and, in particular, failed to provide any reserve for Fuji's long-standing patent infringement claim. *See also* the Supporting Factors considered by this court which serve to support Fuji's motion.

(d)    (i)      Jazz allegation: There is no factual support for Fuji's charge "that since the filing date, Mr. Benun has continued to 'loot' the Debtor, and that his primary service to the Debtor is to establish new business practices to ensure that the Debtor's profits remain hidden from creditors." [Jazz Sanctions Memo, p.10.]

(ii)     Actual Fuji written statement: "Post-petition, Benun continues to loot Debtor, extracting a $15,000 per week 'consulting' fee, while his primary service seems to be establishing new business practices to insure that Debtor's profit remain hidden from creditors." [Fuji Trustee Memo, p.1.]

iii

(iii)    Fuji's stated support for its statement:

- Jazz's postpetition budget, providing for a payment of $15,000 per week to JCB Consultants, Inc. (an alter ego of Benun), shows that Benun and Jazz's officers continued to operate the company for their own personal benefit. [Fuji Trustee Memo, pp.4-5.]

- Regarding the creation of new business practices to keep Jazz's profits hidden from creditors, Fuji points to Jazz's changed *modus operandi* in the run up to bankruptcy "from purchasing solely through Jazz Hong Kong to purchasing . . . directly from suppliers, without explanation as to how Jazz Hong Kong is compensated for its services." [Fuji Trustee Memo, p.21.] Fuji contends that "[b]y making payments directly to suppliers, on terms ostensibly negotiated by Jazz Hong Kong, there is no way to know where the money is going, especially where the practice is for [factor] Rosenthal & Rosenthal to make direct payments to Hong Kong at the Debtor's direction from advances and receivables." [Fuji Trustee Memo, p.22.]

- Fuji points to the fact that nearly all of the $1.5 million allegedly owed to supplier Polytech accrued within sixty days of Jazz's bankruptcy filing. [Fuji Trustee Memo, p.23.]

- In further support of its allegation Fuji states even this court recognized that the Benun "compromise" proposed salary of $12,500 per week payment was too high. (Trustee Hearing, July 30, 2003, 88:25-89:18.) [Fuji Opposition Memo, p.13.] Fuji also points to the establishment of a $5,000 per week reserve account carved out of Benun's proposed compensation [Fuji Opposition Memo, p.13], and contends that for these reasons its allegation that $15,000 per week was wrongfully being funneled through JBC to Benun was appropriate. [Fuji Opposition Memo, p.13.]

(iv)    Jazz response: Benun's "compensation arrangement was fully disclosed, was modified by the Debtor and Mr. Benun, and certainly did not warrant the filing of the Trustee Motion." [Jazz Reply Brief, p.9.]

(v)    Determination: The charge, as stated by Fuji, has two elements. First, the high weekly fee, (halved early-on but after the initial assertion by Fuji) is overstated as "looting," but that mischaracterization is not a Rule 9011 violation (especially given the awareness of the court and all parties-in-interest as to Benun's compensation). Second, there is Fuji's *argumentation* that Benun's "primary service *seems to be*" development of "new business practices" to hide Jazz profit from creditors. Given the "seems to be" aspect of the charge, the Supporting Factors, and emphasizing the overarching lack of transparency of offshore

iv

operations and the intricate supply network through which Benun maneuvers, Fuji's allegations of efforts to hide profits – though never established with sufficient hard evidence – is supported for Rule 9011 purposes.

(e)   (i)    Jazz allegation: There is no factual support for Fuji's charge "that Benun organized the Debtor, including its subsidiary, Jazz Photo (Hong Kong), Ltd. ('Jazz HK'), in a way which hides in Asia whatever profits are not directly taken by Benun, leaving nothing for the Debtor's creditors." [Jazz Sanctions Brief, p.10.]

     (ii)    Actual Fuji written statement: "Benun organized Debtor, including the formation and use of a fully controlled, wholly owned subsidiary, Jazz Photo (Hong Kong), Ltd. ('Jazz Hong Kong') (itself, not a debtor in any bankruptcy proceeding, but, with Benun himself, jointly and severally liable for Fuji's judgment), in a way which hides in Asia, whatever profits not directly taken by Benun, leaving nothing for creditors of the Debtor." [Fuji Trustee Memo, p.1.]

     (iii)   Fuji's stated support for its statement:

• Fuji claims that this allegation was reasonable in light of the inconsistent statements made surrounding the operations of Jazz Hong Kong. Benun's counsel, at the May 27, 2003 hearing, said that he found out from Mr. Cossentino that the Jazz Hong Kong transactions "are arms-length at market prices which includes [sic] a markup for [Jazz] Hong Kong as profit margin[.]" [Fuji Trustee Memo, p.20.] Yet Debtor's counsel had previously said that purchases from Hong Kong were without any markup other than to cover Jazz Hong Kong's payroll. [Fuji Trustee Memo, p.20.] Fuji contends that these contradictory statements, together with evidence produced in the district court case, revealed "that Jazz Hong Kong is totally controlled by Debtor and Benun, who allocate costs and expenses between the Debtor and Jazz Hong Kong as it suits their purpose." [Fuji Trustee Memo, p.20.]

• Taking this information together with evidence that Benun exerted influence over most camera manufacturers in Asia [Fuji Trustee Memo, p.22] and Benun's prior history of using a Hong Kong subsidiary of his former company to embezzle money as evidenced by the SEC investigation and settlement, [Fuji Trustee Memo, p.22], and Jazz's inexplicable change of *modus operandi* eliminating Jazz Hong Kong from the supply chain in the run up to bankruptcy [Fuji Trustee Memo, p.21], Fuji contends this conduct reasonably suggested that Jazz, at Benun's direction, "was shipping as much money as possible out of the Debtor's estate to Asia." [Fuji Trustee Memo, p.22.]

     (iv)   Jazz response: Jazz replies that Fuji provided "absolutely no factual foundation for such subjective belief." [Jazz Reply Brief, pp.9-10.]

(v)   Determination:  Both circumstantial and actual evidence are sufficient here to
support Fuji's charge in this sanctions context.  The lack of transparency of offshore
operations and total control by Benun are concerns of the court as well as Fuji; the
strategy of keeping JPHK out of the Chapter 11 case is an important circumstance,
which could well justify Fuji's charge for Rule 9011 purposes.  Jazz's
organizational structure is thus appropriately questioned.  *See also* the Supporting
Factors considered by this court which serve to support Fuji's motion.

(f)   (i)   Jazz allegation: There is no factual support for Fuji's charge "that prior to the filing
date, the Debtor and Benun conspired to reorganize the Debtor's business to funnel
assets out of the Debtor's estate." [Jazz Sanctions Memo, p.10.]

(ii)   Actual Fuji written statement: "In the period immediately before filing the petition,
the Debtor and Benun conspired to reorganize the Debtor's business so that assets
are now being funneled out of the Debtor's estate to entities in Asia over which
Benun wields influence or control (some of which entities appear to have just
recently become suppliers), effectively eliminating even the limited transparency
provided by dealing with a wholly-owned foreign subsidiary over which this Court
can exercise jurisdiction." [Fuji Trustee Memo, p.2.]

(iii)   Fuji's stated support for its statement.

• "The names of new corporate entities began to appear with new business
relationships to the Debtor, but with old and familiar names holding ownership
interests." [Fuji Opposition Memo, p.2.]  A corporate shell game appeared to be
emerging, possibly to shift value from the Debtor to these entities outside the
jurisdiction of the court. [Fuji Opposition Memo, p.2.]

• Jazz's former president, Mr. Cossentino testified that Jazz was doing business with
two new suppliers, Everbest and Polytech Enterprise Limited ("Polytech"), entities
that not only were affiliated with but also had "overlapping" personnel with Jazz
Hong Kong. [Fuji Trustee Memo, pp.22-23.]

• Mr. Cossentino's statement that nearly all the $1.5 million in invoices allegedly
owed to Polytech by Jazz was incurred shortly before Jazz filed its bankruptcy
petition. [Fuji Trustee Memo, p.23.]

• Kitty Wong, an employee of Jazz Hong Kong, was appointed director of Polytech.
[Fuji Trustee Memo, p.25.]  Fuji claims that this corporate overlap, coupled with
the fact that only one supplier, Polytech, was left unpaid, made it reasonable to
believe that "Polytech's position as a creditor was created pre petition for the sole
purpose of ensuring its presence . . . on the Creditors' Committee," [Fuji Trustee

vi

Memo, p.26] and that this business reorganization was done to divert profits away from the Debtor.

- Jazz Hong Kong was Jazz's sourcing agent for single-use camera products up until shortly before Jazz declared bankruptcy. [Fuji Evidence Memo, p.7.] The creation of Polytech in April 2002 (and its subsidiary in China in January 2003) was for "the purpose of shielding from scrutiny the transfer of funds" from Jazz to Hong Kong. [Fuji Evidence Memo, p.7.]

- Jazz and Benun were involved in the organization of the Polytech China factory. [Fuji Evidence Memo, p.10.] Details of such linkage to Polytech were made available to this court under seal.[28]

- During a six-week period from June 21, 2002 through the beginning of August 2002 over US $800,000 (in bulk payments) was paid to Polytech Hong Kong. [Fuji Evidence Memo, p.9.] Jazz Hong Kong's Managing Director provided sealed testimony which, by negative inference or otherwise, is related to this point for Rule 9011 purposes. [Fuji Evidence Memo, p.9.]

- Upon establishing the Polytech China factory in March 2003, Jazz, as evidenced in sealed deposition testimony, changed its line of supply for LFFPs [Fuji Evidence Memo, p.17.] Profits for JPHK and Jazz, as per sealed testimony, adjusted accordingly. [Fuji Evidence Memo, p.17.] Thus, Fuji contends, it is clear that "the Polytech . . . .is a transparent replacement for Jazz Hong Kong through which Jazz US can funnel any profits made from the sale of single use cameras." [Fuji Evidence Memo, p.16.]

(iv)    Jazz response: "Fuji attempts to legitimize [this] allegation by claiming that fraud and dishonesty is [sic] '[o]ne reasonable explanation' for a change in the Debtor's business practices. . . An objectively reasonable attorney acting without 'market motivation' would never have signed his or her name to such a pleading." [Jazz Reply Brief, p.10.]

(v)    Determination: Both circumstantial and actual evidence are sufficient to support Fuji's charge for Rule 9011 purposes. Jazz, Benun and JPHK were being challenged and chased by Fuji for years; reorganization of supply lines in this context are reasonably questioned. The Polytech tie-in is undenied (though defended by Jazz and Benun); however, this affiliation remains cause for court, as well as creditor, concern. Other supplier tie-ins and the Leon Silvera affiliation are likewise

---

[28]The court has reviewed certain sealed deposition testimony in connection with the determinations set forth in this Appendix; rather than expose the substance of the specific sealed statements relied on herein, more general references are included throughout this Appendix.

probative in this regard.    *See also* the Supporting Factors considered by this court which serve to support Fuji's motion.

(g)    (i)    Jazz allegation: There is no factual support for Fuji's charge "that Polytech Enterprise Ltd. ('Polytech') is essentially a 'front' for the Debtor on the Creditors' Committee and that the director of Polytech is a key employee of Jazz HK." [Jazz Sanctions Brief, p.11.]

(ii)    Actual Fuji written statement:  "In April of 2002, Polytech Enterprise Limited ("Polytech") was organized.  It is now the second largest creditor and represented on the Creditors' Committee by a business associate of Benun.  Notwithstanding representations to the contrary to the Office of the U.S. Trustee, the director of Polytech is a person believed to be a key employee of Jazz Hong Kong." [Fuji Trustee Memo, p.2.]

(iii)    Fuji's stated support for its statement:

• The fact that the $1.5 million owed on the petition date to Polytech by Jazz was incurred in the sixty days before the debtor filed for bankruptcy.  [Fuji Trustee Brief, p.23.]

• The fact that Polytech is represented on the Creditors' Committee by Leon Silvera, a close Benun associate.  [Fuji Trustee Memo, p.23.]

• Documents evidence that Kitty Wong, Director of Polytech, was simultaneously a key employee of Jazz Hong Kong. [Fuji Trustee Memo, pp.23-25.]

• In further support of its allegation, Fuji states that "Polytech Hong Kong gave PRE a proxy to serve as its representative on the Creditors' Committee.   PRE's president, Leon Silvera, is Benun's neighbor and has known him for 30 years." [Fuji Evidence Memo, p.18.]

• "PRE was founded at the behest of Benun and received a $160,000 advance from the Debtor that enabled it to purchase single use cameras shells."  [Fuji Evidence Memo, p.18.]

• Sealed deposition testimony as related to a Jazz-Benun PRE connection. [Fuji Evidence Memo, p.18.]

• Fuji contends that "PRE's business unconditionally relies on the Debtor and Benun." [Fuji Evidence Memo, p.19.]  Sealed deposition testimony provides certain specific indicia of same. [*Id.*]

viii

(iv)    Jazz response: "Fuji points to disparate facts that in no way support its allegation that the Debtor lied to the Court or to the Office of the United States Trustee. . . . Fuji states that 'it was reasonable to allege the impropriety of th[e] relationship [between Mr. Silvera and Mr. Benun] and to further investigate the relationship between these companies.' *Id.* at 18, ¶ 32. The absence of any proof, however, refutes all notions of reasonableness." [Jazz Reply Memo, pp.10-11.]

(v)    Determination: Fuji's allegations are supported for Rule 9011 purposes. *See* (f)(v) above. The Jazz-Benun tie-in to Polytech, Silvera and PRE, along with the Supporting Factors, establishes an adequate Rule 9011 basis for Fuji's allegation.

(h)    (i)    Jazz allegation: There is no factual support for Fuji's charge "that the Debtor and Benun misrepresented to the Court that Polytech and another entity, Everbest, are totally unaffiliated with Jazz HK." [Jazz Sanctions Brief, p.11.]

(ii)    Actual Fuji written statement: "Debtor and Benun's misconduct continues post petition, including Debtor and Benun making misrepresentations of fact to this Court and to the U.S. Trustee, such as that Polytech and another entity, Everbest, are totally unaffiliated with Jazz Hong Kong, and the continuing looting of the Debtor by Benun." [Fuji Trustee Memo, p.2.]

(iii)    Fuji's stated support for its statement:

- As evidence that Polytech is affiliated with Jazz Hong Kong, Fuji again points to documents demonstrating that Kitty Wong worked for Jazz Hong Kong while she was a director of Polytech Hong Kong. [Fuji Trustee Memo, pp.24-25.]

- As evidence of Everbest's affiliation with Jazz Hong Kong, Fuji points to certain sealed deposition testimony linking Everbest and JPHK. [Fuji Trustee Memo, p.23.]

- Fuji claims that, given this evidence, it was reasonable to allege the impropriety of this relationship and to investigate further.

(iv)    Jazz response: Jazz responds to allegations (g) and (h) noting that "Fuji points to disparate facts that in no way support its allegation that the Debtor lied to the Court or to the Office of the United States Trustee." [Jazz Reply Memo, p.10.]   Jazz points out the absence of any proof related to allegations (g) and (h) "refutes all notions of reasonableness." *Id.*, p.11.

(v)    Determination: Though circumstantial as to misrepresentations, evidence is sufficient for Rule 9011 purposes to support the text and tenor of Fuji's charges. Jazz and Benun are obviously closely affiliated with supplier-entities and Leon

Silvera. (The reference to "continuing looting," is presumably more of the overstated accusations per (d) and (e) above.) *See also* the Supporting Factors considered by this court which serve to support Fuji's motion.

(i)  (i)    Jazz allegation: There is no factual support for Fuji's charge "that the Debtor's history is replete with preferences and fraudulent transfers to Benun, members of his family and others, and improper conduct by officers and directors, and that not even a Creditors' Committee will or can pursue such transfers." [Jazz Sanctions Brief, p.11.]

(ii)   Actual Fuji written statement: "The history of the Debtor is replete with preferences and fraudulent transfers to Benun, members of his family and others and improper conduct by officers and directors, that will not, and perhaps cannot, be pursued by the Debtor, or even by the Creditors' Committee as it is presently formed." [Fuji Trustee Memo, p.1.]

(iii)   Fuji's stated support for its statement:

   • Fuji claims that, given the huge sums of money paid to Benun through JCB and bonuses by way of loan forgiveness or otherwise discussed by the district court and the transfers of real property to Benun's children, this allegation was reasonably made. [Fuji Trustee Memo, pp.7-12.]

   • As evidence, Fuji details sudden repayments in 2002 of longstanding debts to Benun's family, payments to Skadden Arps as special counsel for Benun in the district court litigation, and transactions in Asia that lacked transparency. [Fuji Trustee Memo, pp.26-27.] Fuji notes that all of this left an apparently successful business effectively insolvent. [Fuji Trustee Memo, p.14.]

(iv)   Jazz response: The district court "did not rule that any of the Debtor's payments to Mr. Benun were fraudulent or preferential, nor did it rule that Mr. Benun fraudulently conveyed real property to family members or anyone else." [Jazz Reply Memo, p.11.] Jazz points out that the Creditors' Committee is fully empowered to investigate such transfers and take action if necessary. [*Id.*]

(v)   Determination: Transfer issues have not matured to this point, but circumstantial and actual evidence do, for sanctions purposes, support the Fuji charges. *See also* the Supporting Factors considered by this court which serve to support Fuji's motion.

(j)  (i)    Jazz allegation: There is no factual support for Fuji's charge "that the Debtor's Chief Operation Officer, Mr. Benun, assisted Polytech in filing a 'patently fraudulent' claim." [Jazz Sanctions Brief, p.11.]

x

(ii)   Actual Fuji written statement: "Not only did Benun exact huge sums from the Debtor, he also caused Debtor to engage in a host of pre and post petition improprieties, . . . . [including] the filing of a patently fraudulent claim by Polytech Hong Kong with the active assistance of Debtor[.]" [Fuji Evidence Memo, p.1.]

(iii)   Fuji's stated support for its statement:

- Benun was charged by the SEC with misappropriating $150,000 from his prior company, Concord, by having an employee of a Hong Kong subsidiary receive money and transfer it back to Benun through friends. [Fuji Trustee Memo, p.5.]

- Fuji further supported the allegation of Benun's embezzlement history by referring to the admission of Benun that on August 25, 1999, an arbitrator issued an interim award where he concluded that Benun had defrauded Concord by embezzling $150,000. [Fuji Trustee Memo, p.6.]

- Fuji contends that it was reasonable to believe that, given the appearance of new business entities such as Polytech controlled by or through a business associate of Benun, this type of activity was happening again.

- In further support of its allegation Fuji states that Polytech has filed a claim in this proceeding without independent documentary support in the amount of $1,427,240.84.  (Fuji Ex. 884) [Fuji Evidence Memo, p.19.]

- Sealed deposition testimony described usual supply practices for JPHK before April 2003 and changes thereafter. [Fuji Evidence Memo, pp.22-23.]

- Various Polytech invoices were ostensibly analyzed by Fuji to, as is argued, support its claim of fraudulent filing of the Polytech proof of claim. [Fuji Evidence Memo, pp.22-24.]

(iv)   Jazz response: "The circumstances that existed at the time Fuji's counsel filed the Fuji Memo, e.g., the District Court Judgment, Jazz Hong Kong's relationship with Polytech, and an SEC investigation involving Mr. Benun nine years before this case was filed, in no way supported a reasonable conclusion that Polytech's claim was fraudulent. . . .  More significantly, there was no reasonable basis to continue to allege such criminal conduct by Mr. Benun and Polytech in the Evidence Memo, which was signed and filed after Fuji's discovery.   [May 6, 2004 Jazz Letter, p.3.]

(v)   Determination: Here, Fuji cannot bolster its very definite charges with sufficient circumstantial evidence. (At best, the latter filed "accounting" for nineteen Polytech invoices is rank speculation.)   The allegation by Fuji's counsel of Benun's aiding in the filing by Polytech of a "patently fraudulent" claim *thus offends Rule 9011(b)(3).*

However, because the motion (including all hearings and discovery) did not hinge on the proof of this particular charge, given the overall circumstances of this Chapter 11 case, no monetary sanction should apply.

(k)  (i)  Jazz allegation: There is no factual support for Fuji's charge "that Mr. Benun transferred valuable assets and business opportunities of the Debtor and Jazz HK." [Jazz Sanctions Brief, p.11.]

(ii)  Actual Fuji written statement: Benun "caused the Debtor to engage in a host of pre and post petition improprieties, . . . [including] wasting the assets of Debtor and its subsidiary, Jazz Photo (Hong Kong) Ltd. ("Jazz Hong Kong") by both transferring valuable assets and business opportunities and operating at a huge and unsustainable loss." [Fuji Evidence Memo, p.1.]

(iii)  Fuji's stated support for its statement:

- The district court's recognition that "while Benun purported to be a consultant, he was paid over $11,000,000 in direct payments and forgiven loans which represented more than four times the company's retained earnings during the relevant time period." [Fuji Opposition to Sanctions Memo, p.12.]

- The transfers of real property to Benun's children. [Fuji Trustee Memo. pp.7-9.]

- The district court's statement that under these facts there was no basis to conclude that Benun would take appropriate steps to protect his own or the Debtor's assets for the benefit of creditors. [Fuji Opposition to Sanctions Memo, p.12.]

- Benun's and the Debtor's involvement in the organization of entities in Hong Kong and China (Polytech Hong Kong and Polytech China) and the Debtor's new practices of dealing directly with suppliers." [Fuji Opposition to Sanctions Memo, p.13.]

- The fact that Polytech became a $1.5 million creditor of Jazz within sixty days of Jazz's bankruptcy filing. Fuji contends that there was no reasonable explanation for why Polytech Hong Kong was the only supplier that remained unpaid. [Fuji Opposition to Sanctions Memo, p.13.]

(iv)  Jazz response: "Except for the SEC matter, which Mr. Benun has never denied, the other "facts" proved to be groundless speculation and no supporting evidence was submitted at the hearing on the Trustee Motion. If the Court is satisfied that Fuji's allegation was reasonable on June 24, 2003 when the Fuji Memo was filed, certainly it was not reasonable under the circumstances on October 3, 2003 after Fuji had completed its exhaustive investigations." [May 6, 2004 Jazz Letter, p.4.]

xii

(v)    Determination: Circumstantial and actual evidence are sufficient here to support the Fuji charge for Rule 9011 purpose. This charge by Fuji is more of a generality than others contested by Jazz. In that sense, Fuji cited factors and the Supporting Factors set forth in the body of the Opinion suffice.

(l)    (i)    Jazz allegation: There is no factual support for Fuji's charge "that the Debtor is operating at a huge and unsustainable operating loss." [Jazz Sanctions Brief, p.11.]

(ii)    Actual Fuji written statement: Benun "caused the Debtor to engage in a host of pre and post petition improprieties, . . . [including] operating at a huge and unsustainable loss." [Fuji Evidence Memo, p.1.]

(iii)    Fuji's stated support for its statement:

• Debtor's cumulative loss for the postpetition period through August 2003 was $798,771. [Fuji Evidence Memo, pp.32-33.]

• In further support of its allegation Fuji states that "even assuming, *arguendo*, that the Debtor had already incurred $300,000 in legal fees solely for the purpose of defending against the Trustee Motion (a claim which Fuji denies), the Debtor had sustained a loss of at least $500,000 as of August 2003. . . . That loss is at least $750,000 more if one takes into consideration as an asset the postpetition inter-company obligation of Jazz Hong Kong to the Debtor which the Debtor will never collect. Thus, Fuji claims, by the debtor's own admission and separate and apart from defending against the Trustee Motion, the cumulative loss at the time of the October 3, 2003 hearing was at least $1,250,000." [May 20, 2004 Fuji Letter, p.6.]

(iv)    Jazz response: "As the Court has noted, Fuji itself has significant complicity for the staggering amount of fees associated with the Trustee Motion. As of the dates of the Fuji Memo and Evidence Memo, the Debtor was otherwise operating at a breakeven level or better. This allegation was therefore patently unreasonable under the circumstances and just plain incorrect." [May 6, 2004 Jazz Letter, p.5.]

(v)    Determination: Circumstantial and actual evidence are sufficient here to support the Fuji charge for Rule 9011 purpose. This charge by Fuji, like that in (k) above, is more of a generality than others contested by Jazz. In that sense, Fuji cited factors and the Supporting Factors set forth in the body of the Opinion suffice.

(m), (n)(i)    Jazz allegation: There is no factual support for Fuji's charge (m) "that the Kintic apartment is actually owned by the Debtor or by Mr. Benun as a 'hidden asset.'" [Jazz Sanctions Brief, p.11] and (n) "that mortgage payments of $5,045.00 per month and the initial down payment on the Kintic apartment of $600,000.00 came from the Debtor, Jazz HK and/or Mr. Benun." [Jazz Sanctions Brief, p.11.]

(ii)    Actual Fuji written statement: (m) "It is reasonable to infer that funds for the New
York apartment came from Benun, perhaps funneled through Hong Kong. Fuji
contends that the apartment is held by Kintic as a mere nominee of Benun." Fuji
Trustee Memo, p.9]; (n) "The mortgage payments on the apartment are [$5,045] per
month and the initial down payment was $600,000. . . . [I]t is clear that this money
came from Debtor, Jazz Hong Kong and/or Benun. . . ." [Fuji Trustee Memo, pp.5-
6.]

(iii)   Fuji's stated support for its statement:

• The Kintic apartment in New York City was purchased in 1999 for about $1.1
million by Kintec US, Inc. [Fuji Trustee Memo, p.8.]

• Kintic's "process" address is the office of Greenberg & Kahr. Mr. Kahr is an
attorney for Benun and is General Counsel for Jazz. [*Id.* at 8.]

• Kintic's business address is c/o Kestenbaum, CPA. Mr. Kestenbaum is the
accountant for the Benun Foundation of which Benun is trustee and CEO.
[*Id.* at 8.]

• Jessie Szeto, a Managing Director of Jazz Hong Kong, is the Director of Kintic.
[Fuji Evidence Memo, p.8] (Ms. Szeto is the purported owner of the apartment.)

• The down payment for the property was $613,250, as compared to Ms. Szeto's
compensation of $100,000 in 1997 and a sealed testimony amount in 2002. [Fuji
Trustee Memo, pp.8-9.]

• To secure financing *for Jazz* in 2002, the Kintic apartment was pledged as
collateral to Rosenthal & Rosenthal. [Fuji Trustee Memo, p.9.]

• In further support of its allegation Fuji states that Ms. Szeto, claiming that her
money paid for the apartment, said that JPHK wired money toward the down
payment of the apartment as part of Jazz's payments, in installments, to her for her
sale of her five-percent interest in JPHK in 1998. [Fuji Evidence Memo, p.6.] In
contrast Ms. Szeto later testified that the stock sale actually took place in 1997, and
that she was paid in installments only over several months. [Fuji Evidence Memo,
p.6.] Fuji claims Ms. Szeto's story as to the source of the funds for the deposit on
this apartment does not hold up: a payment over several months in 1997 cannot be
reconciled with the statement that JPHK was wiring money toward the down
payment on the apartment over twelve months later in November 1999 as part of
its payment to her for the sale of her stock. [Fuji Evidence Memo, p.6.]

xiv

(iv)    Jazz response: (m) This allegation was made not only in the Fuji Memo, but three months later in the Fuji Evidence Memo, after Fuji deposed Ms. Szeto on this issue, a second time, for hours. However, despite extensive pre- and postpetition discovery, Fuji produced absolutely no proof in support of this. This allegation was an attempt to embarrass Mr. Benun and serve his client's vindictive agenda. [May 6, 2004 Jazz Letter, pp.5-6]; (n) Even after conducting its extensive discovery, Fuji had no proof that one penny was improperly diverted from the Debtor and JPHK, or secretly paid by Mr. Benun, for the Kintic apartment. This allegation was, therefore, not reasonable under the circumstances. [May 6, 2004 Jazz Letter, pp.-5-6.]

(v)    Determination: Circumstantial and actual evidence were sufficient here as an initial matter to support the Fuji charge for Rule 9011 purposes. *See also* the Supporting Factors considered by this court which serve to support Fuji's motion. The full range of discovery as to this charge was also warranted. Whether "withdrawal" of this claim was necessary prior to the October hearings is simply too fine a point to draw, given the general propriety of the motion for the appointment of a trustee *sub judice*.

(o)    (i)    Jazz allegation: There is no factual support for Fuji's charge "that Debtor is selling cameras reloaded from shells originally sold by Fuji outside of the United States." [Jazz Sanctions Brief, p.11.]

(ii)    Actual Fuji written statement: "However, there is ample proof of debtor's postpetition infringement on the first sale issue because Debtor has always been and is still selling cameras first made from shells sold *outside* the U.S." [Fuji Evidence Memo, p.30.]

(iii)    Fuji's stated support for its statement:

• James Field, the Fuji administrator for recycling operations, examined over 2,800 Jazz-brand refurbished camera shells made from Fuji camera shells in the last several months and found a significant portion of these cameras to have been made from foreign Fuji shells. [Fuji Evidence Memo, p.31.] This evidence of continued sales of Jazz cameras made from shells first sold outside the United States proves the Debtor's continued infringement of Fuji's patents. [Fuji Evidence Memo, p.32.]

• Fuji contends that "[n]ot only did Fuji have a reasonable belief that the Debtor was selling infringing cameras made from shells first sold outside the U.S., the belief was vindicated by the ALJ" [referring to the ITC, Enforcement Proceeding II, April 7, 2004]. [May 20, 2004, Fuji Letter, p.8.]

(iv)    Jazz response: The Debtor's position regarding the recent decision of an Administrative Law Judge in the ITC proceeding was addressed at length at the April

27, 2004 hearing. Allegation (o) of the Initial Notice Letter, was, thereafter, essentially withdrawn by Jazz at least insofar as Rule 9011(b)(3) is concerned. [May 6, 2004 Jazz Letter, p.6.]

(v)     Determination: Fuji presented evidence at the October hearing of first sale *outside* of the United States and appears to have convinced the Administrative Law Judge of the reasonableness – indeed correctness – of its position. There is no hint of a Rule 9011 violation here.