MS-4088
WU-1187
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
HONORABLE MORRIS STERN
CASE NO. 03-26565 (MS)

Chapter 11

In re:

JAZZ PHOTO CORP.,

                    Debtor-in-Possession.

**DEBTOR'S OBJECTION TO THE**
**MOTION OF FUJI PHOTO FILM CO.,**
**LTD. FOR ALLOWANCE OF AN**
**ESTIMATED ADMINISTRATIVE**
**EXPENSE CLAIM**

**HEARING DATE AND TIME:**
September 22, 2004, 10:00 a.m.

**ORAL ARGUMENT REQUESTED**

TO:   HONORABLE MORRIS STERN
      United States Bankruptcy Judge

Jazz Photo Corp., the within debtor and debtor-in-possession (the "Debtor"), by and

through its counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., objects to the motion of Fuji

Photo Film Co., Ltd. ("Fuji") for allowance of an "estimated" $6,546,400 administrative expense

claim in Fuji's favor, and respectfully states as follows:

## I.   <u>INTRODUCTION</u>

1.      Fuji once again has escalated its continuing "blood feud" with the Debtor by

simultaneously filing three (3) motions collectively aimed at forcing the Debtor into liquidation

and leaving it defenseless to Fuji's market motivated onslaught.  This latest barrage of motions comes on the heels of a _partial_ determination of the U.S. International Trade Commission ("ITC") upon which Fuji now relies to conjure up a multi-million dollar administrative expense claim.  Fuji then uses that alleged claim as primary support for its motions to convert the Debtor's proceeding to Chapter 7 and for relief from the automatic stay to commence a new action against the Debtor in the federal district court to seek an injunction.

2.    Fuji's request that this Court fix an administrative expense claim in its favor is premature and procedurally defective.  Although Fuji is crafty in the way it characterizes the ITC's recent decision, the ITC has _not_ completely disposed of the April 6, 2003 non-binding recommendation of Administration Law Judge Paul Luckern ("ALJ").  Specifically, on July 27, 2004 the ITC issued its Determination Not To Review the Presiding Administrative Law Judge's Enforcement Initial Determination, Request for Briefing or Recommended Enforcement Measures (the "ITC Determination").  The ITC Determination, at page 2, states:

> In connection with the final disposition of the enforcement proceedings, the Commission _may_ issue civil penalties for violations of its cease and desist order.  The Commission has _NOT_ yet ruled on whether it will adopt the specific enforcement measures recommended in the EID.  (Emphasis added.)

3.    The ITC has requested that the parties file written submissions on the specific enforcement measures recommended by the ALJ.  Those submissions were made in late August and early September and a decision on what penalty, if any, will be levied against the Debtor will not be rendered until sometime thereafter.  Thus, despite Fuji's repeated references to multi-million dollar penalties and administrative claims, _no such penalty has been determined by the ITC_ nor has the ITC, unlike Fuji, ever once suggested that such a claim either constitutes or would be pursued as an administrative expense claim.  Moreover, even if the ITC were to affirm

2

the ALJ's non-binding damages assessment, Fuji still would not be entitled to a damage award until it first:  (a) commences an action in the district court and successfully proves the Debtor infringed its patents post-petition, and (b) submits evidence to the district court jury as to the reasonable royalty rate at the time of that alleged infringement.

4.      Rather than await the ITC's <u>complete</u> disposition and review of the ALJ decision and thereafter debate its impact on this Chapter 11 proceeding, Fuji precipitously filed its pre-prepared motions in the hope that this Court would deny the Debtor due process and save Fuji the trouble of actually proving its claim of infringement and establishing its alleged damages.  Moreover, as set forth below, Fuji's request that the Court "estimate" its claim at more than $6,000,000 is substantively and procedurally defective.

5.      Fuji's motivation for seeking to fix an alleged multi-million dollar administrative claim is clear.  Fuji desperately seeks to have this Court fix such an administrative expense claim in its favor to have the necessary "building block" to ask this Court to convert the Debtor's case to Chapter 7 based on a fictitious administrative insolvency.  For the reasons set forth below, however, Fuji's motion should be denied.

## II.      <u>BACKGROUND</u>

### A.      <u>History Of The Debtor's Chapter 11 Proceeding.</u>

6.      On May 20, 2003 (the "Filing Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").  Since the Filing Date, the Debtor has remained in possession of its assets and has continued management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.    On June 4, 2003, the Office of the United States Trustee formed an official committee of unsecured creditors (the "Committee").  The Committee has retained the firms of Ravin Greenberg PC as its counsel and Weiser, LLC as its accountants.  Since its appointment and retention of professionals, the Committee has been involved in all aspects of the Debtor's Chapter 11 proceeding.[1]

8.    The Debtor is engaged in the design, development, importation and wholesale distribution of cameras and other photographic products, primarily in the United States.  The camera categories that are imported and distributed include traditional hard-body 35mm cameras, both point-and-shoot and zoom-lens cameras, and digital cameras and disposable cameras that are refurbished by the Debtor in compliance with applicable intellectual property law.  The Debtor distributes its products under its own brand name, as well as under the name of Bell & Howell pursuant to an exclusive license agreement.  The Debtor also sells certain items under its customers' private labels.

9.    At the outset, and throughout this case, the Debtor made clear that the success of this reorganization was conditioned upon prevailing in at least one of two (2) pending matters; namely, the appeal of Fuji's pre-petition $30 million patent infringement judgment and the prosecution of the Debtor's multi-million dollar claims against Imation.  Through absolutely no fault of the Debtor, and notwithstanding the Debtor having expended countless hours and enormous resources to bring speedy conclusion to both actions, those matters haven taken longer than expected to conclude.

---

[1] At no time throughout this proceeding has the Committee (or, for that matter, Fuji as to its legitimate requests) been denied or delayed access to any information reasonably requested of the Debtor or its non-debtor affiliates.

4

10.     In addition, the Debtor recognized that its financial performance would be break-even, at best, and under enormous continuing pressure given the need to fund the Imation litigation and Federal Circuit appeal, as well as the intense litigation promoted by Fuji during this bankruptcy proceeding.  Notwithstanding that "stress," the Debtor has: (a) remained in compliance with its secured lender; (b) filed all required monthly operating reports and exhibits; (c) kept current with its post-petition obligations, except to professionals; (d) accumulated approximately $280,000 in a reserve account as required by the Court; and (e) maintained strong business relationships with the likes of Walmart and other customers.

11.     Recognizing that filing a reorganization plan would be futile without the disposition of either the Federal Circuit appeal or Imation litigation, the Debtor filed several motions seeking extensions of its exclusive periods to file a plan of reorganization and solicit acceptances thereof.  On September 22, 2004, this Court will hear the Debtor's request for a further extension of the exclusive periods.

**B.**     **The Debtor's Financial Performance During Its Chapter 11 Proceeding.**

12.     The Debtor has filed all its monthly operating reports in compliance with the guidelines of the Office of United States Trustee ("UST").  The July 2004 operating report was filed on or about August 25, 2004.  For the period May 2003 through July 31, 2004, the Debtor generated revenues of $42,333,119 at a net loss of $3,016,118.  That net loss, however, is attributed to $3,443,490 in legal fees (after allocations) incurred during the Chapter 11 proceeding.  Without those extraordinary fees, the Debtor would have operated at a net profit of $427,372.  While a large portion of the professional fees were devoted to responding to Fuji's various motions and objections, the bulk of fees have been devoted to funding the Debtor's case

against Imation, which should generate millions of dollars to pay all administrative expense claims and unsecured creditors.

13.     As of July 31, 2004, the Debtor had total post petition payables of $2,553,062 of which $1,128,596 was owed to professionals.  Of the $1,424,466 owed to non-professionals, $1,136,653 is <u>current</u> leaving a balance of $287,813, of which $267,368 is less than 30 days old. It is disingenuous for Fuji to criticize the Debtor's financial performance when the Debtor disclosed <u>on the first day of this case,</u> and at every subsequent hearing, that the reorganization of this company would not be on the basis of generating excess cash flow but upon success in the Federal Circuit appeal and/or recovery from Imation.

## C.    The ITC Proceedings.

14.     In March 1998, at Fuji's request, the ITC instituted a proceeding captioned <u>In the Matter of Certain Lens-Fitted Film Packages</u> ("ITC-1") seeking to prevent the Debtor and 27 other respondents from importing refurbished single use cameras into the United States pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.  Fuji asserted that the refurbishment of its patented single use cameras and the importation of such cameras into the United States infringed its patent rights.

15.     On February 24, 1999, the ALJ issued an initial determination and held, among other things, that the eight common steps used by all the participating respondents constituted impermissible reconstruction of the cameras in violation of Fuji's patent rights.[2]  Upon review of the initial determination of the ALJ, the ITC reversed the ALJ's application of the incorrect

---

[2] In ITC-1, the ALJ relied on tests that showed the Debtor's cameras had a lower quality than those of Fuji, despite case law in the patent area holding that quality is irrelevant to the repair doctrine.  The ALJ himself noted at closing arguments in ITC-1 that Fuji had no precedent to support its "quality" theory.

burden of proof but adopted the ALJ's holding the that eight common steps constituted

impermissible reconstruction.  As a result, in June 1999 the ITC issued to the United States

Customs Department ("Customs") a General Exclusion Order prohibiting the importation of

infringing cameras, and an Order directing the Debtor and the other respondents to cease and

desist from further infringement of Fuji's patents.

16.     The Debtor and several other respondents appealed the ITC's ruling to the United

States Court of Appeals for the Federal Circuit.  Upon reviewing the ALJ's analysis, which the

ITC adopted, the Federal Circuit immediately stayed the ITC's Order *ex parte*.  The Federal

Circuit imposed a bond for the first 60 days of the stay obtained by the Debtor, and indicated that

the remainder of the stay (over two-years) would be bond free.

17.     On August 21, 2001 the Federal Circuit reversed the ITC ruling in ITC-1 with

respect to cameras refurbished with the eight-step process.  Notwithstanding the purported

expertise of the ALJ and ITC, the Federal Circuit held the eight-step process constituted

permissible repair -- not reconstruction.  Although never addressed in ITC-1 or briefed on appeal

by anyone, the Federal Circuit stated that the repair ruling only applies to cameras that were

refurbished from shells first sold in the United States.  Thus, although the Debtor was found to

infringe it was not based upon the faulty analysis of the ALJ or ITC.  Rather, the Federal

Circuit's infringement holding was based on a completely unanticipated issue not raised by

anyone in the proceeding.  For obvious reasons, it was impossible for the Debtor to contemplate

such a result when the issue was never raised below.

18.     In June 1999, Fuji filed a complaint for patent infringement against that Debtor

and others in the United States District Court for the District of New Jersey.  That action was

necessary for Fuji to pursue its purported damages given that the finding in ITC-1 had no *res judicata* or collateral estoppel effect and did not entitle Fuji to any economic relief.

19.     In March 2003, Judge Hochberg entered a Final Order and Judgment in Fuji's favor the approximate sum of $30 million (the "Fuji Judgment").  The Fuji Judgment covers the Debtor's sales of cameras during the period from 1995 through August 21, 2001.  Judge Hochberg determined that nineteen steps, not eight, constituted permissible repair.  The Fuji Judgment, including the manner in which damages were calculated (at $0.56 per camera), currently is on appeal to the Federal Circuit, which heard oral argument in May 2004.

20.     Again at Fuji's insistence, in September 2002, the ITC instituted enforcement proceedings against the Debtor and others seeking the imposition of penalties for the Debtor's alleged violations of the ITC's June 2, 1999 General Exclusion and Cease and Desist Orders issued in ITC-1.  The Debtor vigorously opposed Fuji's allegations advanced on behalf of the ITC.

21.     On April 6, 2004, the ALJ issued an Enforcement Initial Determination (the "Recommendation") which constituted his non-binding recommendation to the ITC.  The ALJ found that the Debtor sold approximately 27 million single-use cameras from August 21, 2001 through December 12, 2003.  (Recommendation, p. 14.)

22.     The ALJ found that 25,216,980 of the single-use cameras sold by the Debtor infringed on Fuji's patents, and that the Debtor, Jack Benun ("Benun") and Anthony Cossentino ("Cossentino") were each subject to civil penalties for violation of the Cease and Desist Order issued in ITC-1.

23.     Regarding the issue of the appropriate enforcement measures, Fuji requested a penalty of $148,892,666 against the Debtor and Benun.  (Recommendation, p.106.)  The ITC

8

argued that a $10,000,000 penalty would suffice to meet the goal of deterring future violations. (Recommendation, p. 107.)

24.     Fuji's position notwithstanding, the ALJ did not recommend a penalty aimed at putting the Debtor out of business. Instead, the ALJ recommended that the Debtor and Benun be jointly and severally liable for $13,675,000 in civil penalties and that Cossentino be liable for $154,000 in civil penalties. Furthermore, the ALJ found that the Debtor has the financial ability to pay a substantial penalty. (Recommendation, pp. 116-17.)

25.     Fuji presented much of the same evidence before the ITC to support its claim that the Debtor infringed its patents that this Court found unconvincing as a basis to appoint a Chapter 11 trustee. Throughout the Chapter 11 proceeding, the Debtor's single-use cameras have been the subject of extensive review by Customs, which is empowered to enforce the rulings of the ITC. Despite the Debtor's meticulous compliance with Customs' protocol, the ALJ made his latest findings and at the same time denied Fuji's attempt to remove Customs as the compliance authority. Fuji unsuccessfully argued that Customs was unable to assure that the Debtor was not importing infringing cameras because Customs lacked regulations, published guidelines and resources with regard to infringing cameras.

26.     In denying Fuji's request to remove Customs as the ultimate enforcement authority, the ALJ noted that Customs had the necessary protocols and resources to monitor the Debtor's importation of single-use cameras to insure compliance with the ITC's rulings. The ALJ stated that in early 2003 "Customs began stopping Jazz shipments every week." (Recommendation, p. 130.) Furthermore, the ALJ noted that in the spring of 2003 Customs began a process of subjecting all the Debtor's incoming shipments to intensive examinations. Id. Furthermore, the ALJ pointed out that since early 2003, the Debtor was required to produce

additional information to Customs regarding its reloading process including, but not limited to,

videotapes of factories showing such processes. Id. Therefore, the ALJ, and now the ITC, in

denying Fuji's request, found that Customs was more than capable of assuring that the Debtor

has been complying with the ITC's rulings.

27.     It is significant that the ALJ found Polytech, the Debtor's sole provider of single

use cameras, was permissibly repairing cameras and that Customs' intensive examination of the

Debtor's single-use cameras assured compliance with the ITC's rulings.  The ALJ nonetheless

found that the Debtor was infringing on Fuji's patents.  The inconsistencies between the

Recommendation and Customs' enforcement of the same law is mind-boggling, and the Debtor

filed a petition for review of the Recommendation before the ITC, the first step in the appellate

process.

28.     On July 27, 2004, the ITC Determination issued.  The ITC determined not to

review the ALJ's findings that the General Exclusion Order and Cease and Desist were violated

significantly.  However, the ITC did not rule on whether it would adopt the specific enforcement

measures recommended by the ALJ.

29.     The Debtor's ITC counsel has advised that if the enforcement measures are

ultimately adopted by the ITC, it has the effect of a judgment.  The ITC, however, must obtain an

order from the District Court prior to being able to enforce the judgment.  Ordinarily, as with the

earlier enforcement proceeding (ITC-1), the ITC and Debtor will seek to negotiate a consensual

resolution.

30.     Once the ITC issues its complete ruling the Debtor will again appeal to the

Federal Circuit.  The Debtor respectfully submits that the ALJ ruling and ITC Determination will

be reversed by on appeal to the Federal Circuit and are erroneous in at least three ways:  (a)

10

improperly basing the decision on certain videotapes[3]; (b) utilizing the wrong burden of proof;
and (3) misapplying the "reloaded reload" issue. The ALJ has ruled in Fuji's favor at every turn.
However, the ALJ and ITC have been reversed in prior proceedings and the Debtor respectfully
submits they will be reversed again.

31.    On May 3, 2004, the Federal Circuit heard oral argument on the appeal of Fuji's
February 25, 2003 judgment. According to the Debtor's appellate counsel, the Debtor
anticipates that the Federal Circuit will render its decision shortly. The Federal Circuit decision
could very well impact not only Fuji's Judgment and Fuji's appeal on the issuance of an
injunction, but also the most recent proceedings before the ITC. Fuji would like the Debtor out
of business before the Federal Circuit rules or the Imation case is decided so the Debtor will be
unable to remobilize its operations if it is successful on either front.

## III.    FUJI'S MOTION SHOULD BE DENIED

32.    Rather than waiting to see if the ITC adopts, rejects or modifies the ALJ's
enforcement measure recommendation, Fuji requests that this Court bypass the penalty phase of
the ITC proceeding and excuse Fuji from proving its alleged damage claim in the district court.
Instead, Fuji urges this Court to fix an administrative expense claim in a summary fashion under
the guise of a Section 502(c) estimation proceeding. Fuji's motion is procedurally and
substantively flawed and should be summarily denied.

---

[3] The ALJ spent much time at trial in the enforcement proceeding discussing the
importance of videotapes of the reload factories. As with the evidence relating to the quality of
the cameras, there is no case known by the Debtor's counsel that has ever mentioned or relied on
videotapes in deciding the repair / reconstruction issue. The ALJ and ITC created a new
standard that the Debtor believes is not recognized in the patent law. (See Affidavit of Jeffrey I.
Kaplan in Opposition to Fuji's Conversion Motion, ¶¶ 19-24).

11

A.    **Fuji's Estimate of Its Alleged Administrative Expense Claim**

33.    Fuji seeks an order from this Court fixing an administrative expense claim in its favor in the estimated amount of $6,546,400, which Fuji claims is a "reasonable royalty" based on the Debtor's alleged post-petition infringement of Fuji's patents.  To arrive at that figure, Fuji conducted, in its own words, an "estimation" of its alleged administrative expense claim based on:  (a) Fuji's rough calculation that 14,000,000 cameras sold by the Debtor post-petition infringed Fuji's patents, (b) the jury's determination in the district court action of an implied royalty rate of $0.56 per camera, which determination currently is on appeal to the Federal Circuit, and (c) the ITC's determination not to review the ALJ's finding of post-petition infringement, which decision the Debtor believes resulted from faulty reasoning and will be reversed on appeal.

34.    Fuji <u>concedes</u> its alleged administrative expense claim is not liquidated, but rather can only be "estimated" at this time.  Before Fuji could possess a liquidated post-petition claim, the required procedural course is for Fuji to commence a new district court action, during which it would be required to prove both post-petition infringement and the appropriate measure of damages.[4]  Rather than go through those steps, Fuji merely asks this Court to assume that: (a) based on the ALJ's finding (and ITC's affirmance thereof) of post-petition infringement, Fuji similarly would be able to demonstrate post-petition infringement before the district court; and (b) a district court jury would adopt the determination that $0.56 was a reasonable royalty, even

---

[4] While Fuji would need to liquidate in a new district court proceeding any damage claim relating to alleged post-petition infringement, there is no urgency that would require Fuji to do so at this time.  Indeed, it would be illogical and wasteful for Fuji to bring a new claim based on post-petition infringement until the Federal Circuit rules in connection with the pending appeal of the Fuji Judgement.  When it ultimately rules, the Federal Circuit hopefully will provide clearer guidance to the parties and lower courts on what processes constitute permissible repair.

though the prior jury finding in that regard related to periods that preceded the Debtor's Chapter 11 filing by several years.[5]

35.     Through the Declaration of Matthew W. Siegal ("Siegal Decl."), Fuji presents what it dubs a "good faith estimate" of the number of infringing cameras sold by the Debtor post-petition.  Tellingly, and as will be discussed further below, Mr. Siegal states that the "estimate" presented in his Declaration "… is not intended to represent substantive evidence in this matter.  Rather, Fuji intends to take discovery from Jazz and confirm, based on that discovery, the number of cameras imported and/or sold during the relevant period."  (Siegal Decl., ¶3.)

36.     Fuji employed two methods for calculating the number of post-petition cameras sold by the Debtor, which Fuji estimates at 14,000,000.  First, through what it calls the "dollar value method," Fuji analyzed the amount of money the Debtor paid to its suppliers (as reflected in the Debtor's monthly operating reports) and then divided that amount by $1.80, which Fuji asserts is the Debtor's average cost per camera based on testimony in this proceeding.  (Siegal Decl., ¶¶ 4, 6-8.)  By this method, Fuji calculated that the Debtor sold 13,839,000 cameras through the end of June 2004.  Based on that calculation, Fuji "conservatively" estimates the total post-petition cameras sold at 14,000,000.

37.     Second, Fuji analyzed Port Import Export Reporting Service ("PIERS") reports, which are reports based on Customs data that Fuji claims are relied upon to "give measure of the

---

[5] Notably, in the one case where the ITC and the district court ruled on the same evidence, the district court found that the Debtor's evidence, when available, proved permissible repair.  The ITC, however, erroneously rejected the same evidence. There simply is no basis to rely on the ITC findings in the district court, and Fuji should not be permitted to employ such a procedure here.

40654/0001-2171769v2

global shipments of goods and commodities." (Siegal Decl., ¶ 5.) The PIERS data provided Fuji

with the total pounds of cameras the Debtor allegedly imported between August 10, 2003 and

June 14, 2004, which Fuji then divided by 0.3 pounds (which it contends is the average weight of

the Debtor cameras at issue) to arrive at a total of 10,639,716 cameras. (Siegal Decl., ¶¶ 9-12.)

Because Fuji did not have PIERS data for the periods prior to August 10, 2003, to estimate the

number of post-petition cameras through August 10, 2003, Fuji analyzed the Debtor's invoices

for the period May 23, 2003 through July 24, 2003, which Fuji claims indicate an additional

3,397,040 single-use cameras imported by the Debtor. Fuji then added that number to the

10,639,716 figure derived from the PIERS data, and rounded down to 14,000,000. (Siegal Decl.,

¶ 13.)

38.     To complete the estimate of its alleged administrative expense claim, Fuji

assumes (without fully explaining the basis for the assumption) that 83.5% of the 14,000,000

post-petition cameras sold by the Debtor were infringing, for a total of 11,690,000 infringing

cameras. (Siegal Decl., ¶¶ 2, 15.) Adopting the $0.56 royalty rate found by the district court

jury, Fuji "estimates" its alleged administrative expense claim at $6,546,400. (Id.)

**B.      Fuji's Alleged Administrative Expense Claim Is Not Subject To Estimation Under
         Section 502(c)**

39.     Fuji argues this Court has the authority to estimate its alleged administrative

expense claim pursuant to Section 502(c). As discussed in detail below, Fuji actually does <u>not</u>

ask this Court to conduct an estimation hearing consistent with the mandate of the Bankruptcy

Code. Rather, Fuji merely asks this Court to adopt Fuji's own estimate of its administrative

claim - - an estimate admittedly submitted to the Court without substantive evidence. Those

deficiencies in Fuji's proposed procedure notwithstanding, Section 502(c) is inapplicable in this

context requiring denial of Fuji's motion.

40.    Section 502(c) of the Bankruptcy Code provides, in relevant part:

(c)    There shall be estimated for purpose of allowance under this section --

(1)    any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .

11 U.S.C. § 502(c). The Bankruptcy Code's claims estimation provision is designed to promote the equitable administration of the estate from the standpoint of both the debtor and its creditors. 4 Collier on Bankruptcy, ¶ 502.04 (15th Rev. Ed. 1996). It has been observed that Section 502(c)(1) serves at least two important purposes:

First, it is designed to avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions. By so doing, the trustee can more rapidly determine the payout of each creditor who, in the meantime, receives no interest on its claim. Second, Section 502(c)(1) is designed to promote a fair distribution to creditors through a realistic assessment of uncertain claims.

Matter of Ford, 967 F.2d 1047, 1053 (5th Cir. 1992).

41.    Section 502(c) does not contemplate or authorize bankruptcy courts to estimate requests for allowance of administrative expenses. Rather, Section 502(c) is only applicable to pre-petition claims and is not applicable to administrative expenses. See 2 Norton Bankr. L. & Prac. 2d § 42:14 (June 2004).

42.    As an initial matter, the plain language of the Bankruptcy Code makes clear that the allowance of administration expenses is governed by Section 503 and is not affected by Section 502, including the Section 502(c) claims estimation procedure. Accordingly, a noted commentator has recognized that:

The Code's treatment of first priority administrative expenses stands in sharp contrast to the treatment of the second through ninth priorities. To begin with, §503 is captioned "allowance of

15

> administrative expenses." This appears to suggest that §503 itself
> is a separate allowance section, apart from §502, devoted
> exclusively to administrative expenses. If so, then §502 would not
> apply to the allowance of administrative expenses. The rest of the
> statute is consistent with this reading. Section 507(a)(1) refers to
> "administrative expenses allowed under section 503(b)." Note that
> the reference is to "expenses," rather than "claims," the latter of
> which is handled under §502. Also, of course, §507(a)(1) states
> that allowance is under §503(b), implying that §502 is out of the
> picture.

Id.; see also 4-502 Collier on Bankruptcy, p. 502-03[1][c](15th Ed. Rev. 2004) ("Section 502(b)

requires that a claim be determined 'as of the date of the filing of the petition.' This requirement

coincides with other Code sections that make it clear that section 502 applies to a proof of claim

only if it reflects a pre-petition claim.") (Emphasis added.)

43.      Section 502(a) provides that "[a] claim or interest, proof of which is filed under

section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. §

502(a). Similarly, Section 502(b) authorizes the bankruptcy court to determine the amount of a

claim "as of the date of the filing of the petition." 11 U.S.C. § 502(b). Thus, Sections 502(a)

and (b), which collectively describe a claims allowance process, apply only to pre-petition

claims. It follows logically that Section 502(c) also only permits estimation of pre-petition

claims, because Section 502(c) on its face permits estimation only of claims for "purposes of

allowance under this section" (i.e. pre-petition claims under section 502). See 11 U.S.C.

§ 502(c); see also In re MacDonald, 128 B.R. 161, 167 (Bankr. W.D. Tex. 1991) ("Section

502(c) does not by its own terms apply to post-petition claims.")

44.      In contrast, Section 503 provides the process for allowing administrative

expenses. That section, however, does not have an equivalent provision to Section 502(c) for

estimating contingent or unliquidated administrative expense claims. See In re Industrial

16

Commercial Elec., Inc., 304 B.R. 24, 33 (Bankr. D. Mass. 2004) ("There is no comparable

provision for estimating contingent or unliquidated administrative expenses.")

45.    The five cases upon which Fuji relies in support of its request for estimation of its

alleged claim are completely inapplicable, as none of those cases estimates an alleged

administrative expense claim.  Rather, each of Fuji's cases addressed estimation of a pre-petition

claim.  See In re Stone & Webster, Inc., 279 B.R. 748, 810 (Bankr. D. Del. 2002); In re Teigen,

228 B.R. 720, 723 (Bankr. D.S.D. 1998); Ryan v. Loui, 892 F.2d 829, 834 (9th Cir. 1989);

Bittner v. Bourne Chemical Co., 691 F.2d 134, 135 (3d Cir. 1982); In re Continental Airlines,

Inc., 57 B.R. 842, 844 (Bankr. S.D. Tex. 1985).

46.    Fuji clearly is attempting to fit the square peg of its alleged administrative

expense claim into the round hole of the Section 502 claims allowance and estimation

procedures.  Because Section 502 relates only to pre-petition unsecured claims, and because the

Bankruptcy Code does not contemplate estimation of administrative expense claims, Fuji's

request that the Court "estimate" and allow its administrative claim should be rejected.[6]

---

[6] Although not cited by Fuji, the Debtor recognizes that some cases have borrowed procedures similar to those employed under Section 502(c) to estimate administrative expense claims.  In those cases, however, courts have done so only for purposes of determining plan feasibility.  Those courts have not estimated claims for purposes of actual allowance and payment to support conversion to Chapter 7 as proposed by Fuji in its motion.  Indeed, those cases have recognized that the estimation of an administrative expense is not definitive and does not determine the "'outer limit of a claimant's right of recovery' as with a pre-petition claim, [to do so] would jeopardize due process rights of the holder of an administrative claim."  In re Indian Motorcycle Co., Inc., 261 B.R. 800, 809 (1st Cir. BAP 2001) (citing In re MacDonald, 128 B.R. at 167).  Where estimation does not determine the outer limit of a claimant's right because of due process rights, it similarly should not be invoked to impose a definitive obligation on a debtor for the same reason.  Accordingly, the relief requested by Fuji for estimation of its administrative expense claim for purposes of allowance is improper.

C.   **This Court Should Not Estimate Fuji's Alleged Administrative Expense Claim Because Liquidation Of Such Claim In the Ordinary Course Will Not Unduly Delay The Administration of This Case.**

47.     Even assuming, *arguendo*, the estimation process embodied in Section 502(c) is applicable to Fuji's alleged administrative expense claim, Fuji's request that this Court accept its proposed short-cut estimation procedure should be rejected.  Courts have remarked that "the key consideration in whether a bankruptcy court should estimate a claim pending in another forum is whether liquidation of that claim would unduly delay the debtor's Chapter 11 reorganization." In re Apex Oil Co., 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) (estimation denied because the bankruptcy court found that liquidation of the claims in the district court would not unduly delay the administration of the debtor's case); see also In re Bellucci, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990) (court need not estimate claim unless, in court's discretion, awaiting final resolution of claim would unduly delay administration of the estate).  Where liquidation of a claim in the ordinary course would not unduly delay the administration of the proceeding, Section 502(c) should not be applied.

48.     In In re Statewide Realty Co., 159 B.R. 719, 725 (Bankr. D.N.J. 1993), Judge Winfield determined not to conduct an estimation hearing because resolution of the claim at issue would not have affected confirmation of the plan.  The court found that confirmation of a plan was not dependent upon resolution of the subject claim and the proposed distribution to unsecured creditors would not have been modified as a result of the allowance or disallowance of the claim.  Statewide Realty, 159 B.R. at 725.  In addition, Judge Winfield was guided by the strong federal policy for enforcing contractual arbitration provisions, and decided to have the claim determined through arbitration as required by the management agreement between the parties.  Id. at 722.

49.    In the instant case, the potential need to liquidate an administrative expense claim asserted by Fuji does not threaten to delay the administration of the Debtor's Chapter 11 proceeding.  There has been no plan of reorganization filed, the feasibility of which is dependent upon a quick determination of the validity and extent of Fuji's alleged administrative expense claim.  Indeed, the Debtor repeatedly has expressed its view that filing a plan would be futile until either the disposition of the Federal Circuit appeal or the conclusion of the Imation litigation.  In other words, there is no danger of delaying the administration of the Debtor's case if Fuji's alleged administrative expense claim is determined in the ordinary course (rather than in a truncated estimation proceeding).

50.    Moreover, a party seeking estimation of a claim pursuant to Section 502(c) must demonstrate not only that liquidation of the claim in the ordinary course would unduly delay the administration of the estate, but also that a fair estimation of the claim by the bankruptcy court can be accomplished faster than liquidation of the claim in the ordinary course.  In <u>In re Marvin Johnson's Auto Service, Inc</u>., 192 B.R. 1008, 1018-19 (Bankr. N.D. Ala. 1996), the debtor, after filing its plan of reorganization and disclosure statement, requested that the bankruptcy court conduct an estimation hearing with regard to a creditor's fraud claim.  <u>Id</u>. at 1013.  The bankruptcy court was presented with evidence that the lawsuit would be completed in the state court within six months of the bankruptcy court's granting the creditor relief from the automatic stay.  <u>Id</u>. at 1018-19.  On the other hand, no evidence was presented that the case could be tried in a lesser amount of time in the bankruptcy court, or that liquidating the claim in the state court would unduly delay the administration of the Chapter 11 case or threaten the debtor's ability to confirm its plan.  <u>Id</u>. at 1019.  Accordingly, the bankruptcy court denied the debtor's request to estimate the creditor's claim, but stated that "Section 502(c) remains available if it later becomes

19

apparent that the state court trial would be substantially delayed or postponed for a longer period." Id.

51.     Here, Fuji requests, on the one hand, that this Court accept its own estimate of its alleged administrative claim but concedes, on the other hand, that it has provided no substantive evidence in support of that request and that discovery will be necessary before its claim can be fixed.  As discussed in greater detail in Point III(D) below, an actual proceeding of some kind will be required even if this Court determines estimation of Fuji's alleged claim is appropriate.  As part of that proceeding, as Fuji admits, discovery will be necessary and Fuji will be required to submit "substantive evidence" to support its alleged claim – something it concedes it has not done in connection with this motion.

52.     Fuji has made absolutely no showing that the ultimate liquidation of its claim can be accomplished more expeditiously before this Court than in the district court.  Accordingly, Fuji has not met its burden of demonstrating a need for estimation of its alleged administrative expense claim, and its motion should be denied.

**D.     Even If This Court Determines Estimation Is Appropriate, Discovery And An Evidentiary Hearing Are Necessary.**

53.     In estimating claims pursuant to Section 502(c), bankruptcy courts may use whatever method is best suited to the particular circumstances of the case.  See Bittner v. Bourne Chem. Co. Inc., 691 F.2d 134, 135 (3d Cir. 1982); In re Seaman Furniture Co. of Union Square, Inc., 160 B.R. 40, 42 (S.D.N.Y. 1993).  Bankruptcy courts generally have wide discretion in choosing the process for estimating particular claims.  In re Windsor Plumbing Supply Co., Inc., 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994).  Other than the bankruptcy court's duty to use the legal rules that ultimately govern the value of the claim, there are no other limitations on the

bankruptcy court's authority to estimate claims pursuant to Section 502(c).  Bittner, 691 F.2d at 136.

54.    Notwithstanding the broad discretion afforded to bankruptcy courts in determining the methodology for estimating claims, Fuji has not cited a single case in which estimation was conducted "on the papers" in a summary fashion as Fuji urges here.[7]  Rather, the most common estimation technique employed by courts in the reported decisions generally involves mini-trials or other abbreviated proceedings for assessing a claimant's probability of success and expectation of recovery.

55.    For example, in In re Eagle Bus Mfg., Inc., 158 B.R. 421 (S.D.Tex. 1993), the bankruptcy court estimated the claim of the National Labor Relations Board ("NLRB") for the debtor's alleged unfair labor practices.  The bankruptcy court conducted a mini-trial, allowing each side seven (7) hours to present evidence through live testimony, including expert witnesses.  Id. at 437.  Each side was permitted time for cross-examination and could introduce into evidence documents, charts, summaries and other visual aids.  Id.  During the course of the mini-trial, the bankruptcy court accepted into evidence approximately 165 trial exhibits.  Id.

---

[7] The Debtor's research has revealed one case in which an estimation was conducted on the parties' written submissions.  In In re Windsor Plumbing Supply Co., Inc., 170 B.R. 503 (Bankr. E.D.N.Y. 1994), the bankruptcy court granted a creditor's motion to estimate its claim against the debtor for amounts due under invoices the creditor factored, treble damages under RICO, and additional damages based upon theories of equitable estoppel, common-law fraud, and conspiracy.  Rather than having the court conduct an evidentiary hearing and submit proposed findings of fact and conclusions of law to the district court, the parties agreed to have the court estimate the creditor's claims based upon the parties' written submissions.  Id. at 517.  Here, the Debtor does not consent to the estimation of Fuji's alleged claim based upon written submissions to this Court.  Rather, the Debtor agrees with the candid statement of Fuji's counsel that, given Fuji's failure to submit substantive evidence, discovery is necessary.  (Siegal Decl., ¶ 3.)  That discovery process should then be followed by a plenary hearing.

56.     The bankruptcy court ultimately estimated the NLRB's alleged $142,415,241.00 claim at $31,250,000.00.  Id. at 436-437.  After the court confirmed the debtor's plan of reorganization, the NLRB appealed the bankruptcy court's decision to estimate its claim and argued the procedure invoked was improper.  The NLRB claimed, inter alia, that it was vested with exclusive authority to liquidate claims for unfair labor practices and that the bankruptcy court erred in estimating its claim at an amount other than that set forth in the NLRB's proof of claim.  Id. at 436.

57.     The district court affirmed both the decision to estimate the NLRB's claim and the bankruptcy court's procedure.  Id. at 437.  After reviewing the transcript of the bankruptcy court's estimation hearing, the trial exhibits introduced into evidence during the proceeding and the transcripts of the court's oral ruling estimating the NLRB's claim, the district court held the bankruptcy court's estimation procedures "were both thorough and just and as such did not constitute an abuse of discretion."  Id. (citing Bittner, 691 F.2d at 136).

58.     Other courts have conducted variations on the abbreviated procedure employed by the court in Eagle Bus.  For example, in Matter of Baldwin-United Corp., 55 B.R. 885 (Bankr. S.D. Ohio 1985), the bankruptcy court consolidated the contested claims of two brokers and ordered estimation of their claims through a two-day summary trial.[8]  The claimants were afforded two hours each to present their cases, and the debtor was allowed five hours to present its case.  Id. at 911.  The claimants were allowed 20-minute opening statements, and each defending party was allowed a 10-minute opening statement.  Id.  Each party was permitted to solicit the testimony of one live witness, and all opposing parties were afforded 30 minutes for

---

[8] The court's order describing the estimation procedure is attached as an exhibit to the published opinion.  Baldwin-United, 55 B.R. at 911.

cross-examination. Id. Finally, each party was allowed to make a closing argument. Id. at

911-912. Parties were required to submit pre-trial memoranda three weeks before the summary

trial date. Id. at 912.

59.     The bankruptcy court rejected the claimant's arguments, raised after the

estimation hearing, that they were deprived of their due process rights. Id. at 899-901. The court

held, inter alia, that the estimation procedure would not be set aside as unfair given the creditor's

failure to take discovery, call any witnesses at the hearing or use their full allotment of time to

present their cases. Id. at 899.

60.     Similarly, in In re Nova Real Estate Inv. Trust, 23 B.R. 62 (Bankr. E.D. Va.

1982), the bankruptcy court employed an estimation procedure which was more akin to a full

bench trial. In estimating a real estate developer's alleged $12 million claim against the estate,

the court heard eight (8) days of testimony and read into the record its factual findings and legal

conclusions regarding the claimant's various legal theories. Id. at 64-65. The court's findings

were supplemented by its published opinion in which the court confirmed the debtor's plan of

reorganization. Because the developer's claim, as estimated, did not endanger the feasibility of

the debtor's plan, the bankruptcy court confirmed the debtor's plan. Id. at 77.

61.     As set forth above, the estimation process of Section 502(c) does not apply here.

To the extent this Court determines that an estimation of Fuji's alleged administrative expense

claim is appropriate, however, the foregoing cases demonstrate that discovery is necessary (as

Fuji concedes) and a plenary hearing of some kind is required to prevent prejudice to the Debtor

and its estate.

62.     Fuji's request for allowance of an administrative expense claim is based on two

events: (a) the ALJ's holding that the Debtor infringed Fuji's patents during the post-petition

period, and (b) the district court jury's determination that $0.56 was a reasonable royalty at the time of the infringement that was the subject of the district court action.  Fuji should not be permitted to seize upon the Debtor's current debtor-in-possession status to short-cut the normal procedures for adjudicating an alleged damage claim based on patent infringement.  Fuji cannot merely rely on the determination of post-petition infringement by the ALJ, which the Debtor's counsel believes strongly will be reversed on appeal.  (See Affidavit of Jeffrey Kaplan in Opposition to Fuji's Conversion Motion, ¶ 24)  Rather, Fuji must prove de novo in the district court its claim that the Debtor infringed its patents after August 21, 2001, including during the post-petition period.

63.      Nor can Fuji simply rely upon the prior finding by a district court jury that $0.56 is a reasonable royalty.  First, the issue of whether that finding was erroneous is part of the pending appeal before the Federal Circuit, which heard oral argument on that and all other issues on appeal in May 2004.  Attached hereto as **Exhibit A** are excerpts from the Debtor's Federal Circuit brief in which the Debtor argues the jury erred by essentially taking the average between: (a) the Debtor's position that 3 to 5.5 cents was a reasonable royalty, and (b) Fuji's contention that approximately $1.00 was a reasonable royalty.  As argued by the Debtor on appeal, the conclusion that a $0.56 royalty is reasonable is patently erroneous and should be reversed.

64.      Finally, Fuji cannot rely upon a determination of reasonable royalty for pre-August 2001 periods as conclusive evidence of what a reasonable royalty rate is for the post-petition period.  Rather, a reasonable royalty determination for purposes of calculating patent infringement damages must relate to the time the alleged infringement occurred.  See Unisplay, S.A. v. American Electronic Sign Co., Inc., 69 F.3d 512, 518 (Fed. Cir. 1995) (citing Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1079 (Fed. Cir. 1983), and quoting Panduit Corp. v.

24

<u>Stahlin Bros. Fibre Works</u>, 575 F.2d 1152, 1158 (6th Cir. 1978) ("The key element in setting reasonable royalty . . . is the necessity for return to the date when the infringement began.")).

Accordingly, Fuji cannot rely on a jury finding that $0.56 was a reasonable royalty as of 1995 (when the infringement that was the subject of the prior district court action allegedly began) to calculate damages for alleged post-petition infringement.

65.     By prematurely seeking the allowance of an administrative claim based on post-petition infringement and a $0.56 royalty, Fuji is asking the Court to highjack the normal process on those two crucial issues, to the severe detriment of the Debtor's due process rights.  This Court also should decline that invitation and deny Fuji's motion on that ground in addition to the others expressed herein.

## IV.   CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an Order denying Fuji's motion for allowance of an estimated $6,546,400 administrative expense claim, and granting the Debtor such other relief as the Court deems just and appropriate.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Jazz Photo Corp., Debtor-in-Possession

By:   /s/ Michael D. Sirota
       Michael D. Sirota
       Warren A. Usatine

DATED:  September 10, 2004

25