**MS-4088**
**WU-1187**
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD**
A Professional Corporation
25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Telecopier
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
HONORABLE MORRIS STERN
CASE NO. 03-26565 (MS)

| | |
|---|---|
| In re:<br><br>JAZZ PHOTO CORP.,<br><br>Debtor-in-Possession. | Chapter 11<br><br>**DEBTOR'S: (A) OPPOSITION TO THE MOTION OF FUJI PHOTO FILM CO., LTD. FOR A DETERMINATION THAT THE AUTOMATIC STAY IS NOT APPLICABLE AND TO LIFT THE INJUNCTION AGAINST PROCEEDING OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY TO COMMENCE AN INJUNCTION ACTION IN THE DISTRICT COURT, AND (B) APPLICATION IN SUPPORT OF CROSS-MOTION, TO THE EXTENT NECESSARY, TO EXPAND THE RETENTION OF BUDD, LARNER, ROSENBAUM, GREENBERG & SADE, P.C. AS SPECIAL LITIGATION COUNSEL**<br><br>**HEARING DATE AND TIME:**<br>September 22, 2004, 10:00 a.m.<br><br>**ORAL ARGUMENT REQUESTED** |

TO: HONORABLE MORRIS STERN
United States Bankruptcy Judge

Jazz Photo Corp., the within debtor and debtor-in-possession (the "Debtor"), by and through its counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., by way of (a) opposition to the Motion of Fuji Photo Film Co., Ltd. ("Fuji") For A Determination That The Automatic Stay Is Not Applicable And To Lift The Injunction Against Proceeding Or, Alternatively, For Relief From The Automatic Stay ("Stay Motion"); and (b) Application In Support Of Cross-Motion, To The Extent Necessary, To Expand The Retention Of Budd, Larner, Rosenbaum, Greenberg & Sade, P.C. ("Budd Larner") As Special Litigation Counsel, respectfully states as follows:

## I. INTRODUCTION

1. Fuji, for the second time,[1] has filed a premature Stay Motion to permit Fuji to proceed before the United States District Court for the District of New Jersey ("District Court") for, among other things, an order enjoining the Debtor from selling allegedly infringing single-use cameras.[2] Having been denied injunctive relief (the *exact* same relief it seeks in the Stay Motion) by the District Court on two (2) separate occasions, and with the *exact* issue on appeal before the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), Fuji seeks

[1] On or about May 13, 2004, Fuji filed a Motion For A Determination That The Automatic Stay Is Not Applicable Or, Alternatively, For Relief From The Automatic Stay (Docket No. 535) ("Initial Stay Motion") which was denied by the Court by Order dated June 9, 2004.

[2] Attached as Exhibit 13 to the Declaration Of Lawrence Rosenthal In Support Of Fuji's Stay Motion ("Rosenthal Stay Declaration") is a draft Complaint Fuji proposes to file with the District Court. In addition to seeking to enjoin the Debtor from selling allegedly infringing single-use cameras, Fuji seeks an order that would provide Fuji sixty (60) days' notice of any sale of single-use cameras and, if Fuji objects, require District Court approval before a sale can occur. The procedure (aside from being intentionally impractical) would cause the Debtor great expense and delay and serve Fuji's real agenda of putting the Debtor out of business.

permission to further torture the Debtor and Mr. Benun by filing yet another lawsuit for which they will be forced to dedicate precious time and limited resources.

2. The basis upon which Fuji brought its Initial Stay Motion was the April 6, 2004 *non-binding* Enforcement Initial Determination of Administrative Law Judge Paul L. Luckern (“ALJ”) (“Recommendation”)[3] pending before the U.S. International Trade Commission (“ITC”). In denying the Initial Stay Motion and enjoining Fuji from proceeding, this Court reasoned, among other things, that the ALJ’s Recommendation was an insufficient basis to grant Fuji’s request. The Court ruled that, at a minimum, it should await further developments in the ITC or other pending proceedings before entertaining such relief.

3. On July 27, 2004, the ITC issued a Determination Not To Review the Presiding Administrative Law Judge’s Enforcement Initial Determination; Request for Briefing on Recommended Enforcement Measures (“ITC Determination”) indicating that it would not review the ALJ’s Recommendation with regard to the Debtor’s violation of the ITC’s earlier Cease and Desist Order. More importantly, however, the ITC stated that it was <u>not</u> ruling on the specific enforcement measures in the ALJ Recommendation and established a briefing schedule on that issue.

4. Knowing that this Court had declined to act on the ALJ’s non-binding Recommendation, Fuji prematurely filed the Stay Motion based on the incomplete, non-final, non-appealable ITC Determination.[4] As set forth herein, Fuji should not be given the relief it

[3] A copy of the ITC Determination is attached as Exhibit 4 to the Rosenthal Stay Declaration.

[4] See Affidavit of Jeffrey I. Kaplan (the “Kaplan Affidavit”) in Opposition to Fuji’s Motion for an Order Converting the Debtor’s Chapter 11 case to Chapter 7 (the “Conversion Motion”) at ¶3, stating that the ITC Determination is not appealable until the ITC rules on a remedy.

seeks (the ability to, among other things, seek an injunction from the District Court) because: (a) at Fuji's request, the matter was brought before the ITC, which has yet to make a final determination, (b) the District Court has twice before denied Fuji the exact same relief it now seeks, and (c) the issue of Fuji's entitlement to a permanent injunction is on appeal before the Federal Circuit and precludes this Court or the District Court from interfering with the Federal Circuit's jurisdiction.[5]

5. It is apparent that Fuji's Stay Motion (and the relief sought in its proposed Complaint) is simply a "back-up" plan to put the Debtor out of business if it is unsuccessful with its motion to convert the Debtor's case to Chapter 7.

## II. BACKGROUND

6. On May 20, 2003 (the "Filing Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"). Since the Filing Date, the Debtor has remained in possession of its assets and has continued management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7. On June 4, 2003, the Office of the United States Trustee formed an official committee of unsecured creditors (the "Committee"). The Committee has retained the firms of Ravin Greenberg PC as its counsel and Weiser, LLC as its accountants. Since its appointment and retention of professionals, the Committee has been involved in all aspects of the Debtor's Chapter 11 proceeding.

---

[5] Fuji's present Stay Motion and Initial Stay Motion are remarkably silent in addressing the case law holding that the District Court lacks jurisdiction to entertain the injunction request given that the exact issue is on appeal before the Federal Circuit. (See Section VIII (C) herein.)

8. The Debtor is engaged in the design, development, importation and wholesale distribution of cameras and other photographic products, primarily in the United States. The camera categories that are imported and distributed include traditional hard-body 35mm cameras, both point-and-shoot and zoom-lens cameras, and digital cameras and disposable cameras that are refurbished by the Debtor in compliance with applicable intellectual property law. The Debtor distributes its products under its own brand name, as well as under the name of Bell & Howell pursuant to an exclusive license agreement. The Debtor also sells certain items under the private labels of the Debtor's customers.

9. At the outset, and throughout this case, the Debtor made clear that the success of this reorganization was conditioned upon prevailing it in at least one of two pending matters; specifically, the appeal of the March 18, 2003 Final Order and Judgment ("Fuji Judgment") entered in Fuji v. Jazz, et. al. by the District Court and prosecution of Jazz's claims against Imation in the matter captioned Jazz v. Imation Corp., Docket No. 99-2505(JLL) ("Imation Litigation") pending in the District Court since 1999. Through absolutely no fault of the Debtor, and having expended countless hours and enormous resources, those matters haven taken longer than expected to conclude. In addition, the Debtor recognized and disclosed early in this case that its financial performance would be break-even, at best, and that its resources would be substantially challenged by the need to fund the Imation Litigation, Federal Circuit appeal of the Fuji Judgment and the litigation promoted by Fuji during this bankruptcy proceeding. Notwithstanding the "perfect storm" wrought by those difficult circumstances, the Debtor has

weathered the onslaught and has: (a) been vigilant in reducing operating costs[6]; (b) complied with its secured lender; (c) filed of all required monthly operating reports; (d) satisfied its post-petition obligations (except to professionals); (e) accumulated approximately $280,000.00 in a reserve account as required by the Court; and (f) maintained strong relationships with the likes of Walmart and its other customers.

10. Recognizing that filing a reorganization plan would be futile before disposition of either the Federal Circuit appeal of the Fuji Judgment or Imation Litigation, the Debtor filed several motions seeking an extension of its initial exclusive and solicitation periods. The Debtor's motion seeking a further extension of the exclusivity periods is scheduled to be heard on September 22, 2004.

## III. DEBTOR'S FINANCIAL PERFORMANCE

11. The Debtor has filed all of its monthly operating reports in compliance with the guidelines of the Office of United States Trustee ("UST"). The July 2004 operating report was filed on or about August 25, 2004. For the period May 2003 through July 31, 2004 the Debtor generated revenues of $42,333,119 and a net loss of $3,016,118. The net loss, however, is attributable to $3,443,490 in legal fees (after allocations) incurred during the Chapter 11 proceeding. Without these extraordinary fees, the Debtor would have operated at a net profit of $427,372. While a large portion of the professional fees were devoted to responding to Fuji's various motions and objections, an equally large portion of fees have been devoted to prosecuting the Imation Litigation, which should generate millions of dollars to satisfy the claims

[6] By way of example, when the Debtor's lease expired on June 30, 2004, it negotiated a one year lease for office space with Bridgeview Associates and a month-to-month lease for warehouse space with Photo Recycling Enterprises at an annual savings of $56,525.04.

of administrative and unsecured creditors. (See Affidavit of Peter Frazza in opposition to Fuji's Conversion Motion, p. 3.)

12. As of July 31, 2004, the Debtor has total post-petition payables of $2,553,062 of which $1,128,596 is owed to professionals. Of the $1,424,466 owed to non-professionals, $1,136,653 is current leaving a balance of $287,813, of which $267,368 is less than 30 days old. It is disingenuous for Fuji to criticize the Debtor's financial performance when the Debtor disclosed on the first day of this case, and at virtually every subsequent hearing, that its reorganization would not be based on the generation of excess cash flow but rather on success in the Federal Circuit appeal and/or recovery from the Imation Litigation.

## IV. ITC PROCEEDINGS

### A. Enforcement Proceeding I

13. In March 1998, at Fuji's request, the ITC instituted a proceeding captioned In the Matter of Certain Lens-Fitted Film Packages ("ITC-1") seeking to prevent Jazz and 27 other respondents from importing refurbished single use cameras into the United States pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. Fuji asserted that the refurbishment of its patented single use cameras and the importation of such cameras into the United States infringed its patent rights.

14. On February 24, 1999, the ALJ issued his final initial determination and held, among other things, that the eight common steps to refurbish single-use cameras, used by all of the participating respondents, constituted impermissible reconstruction of the cameras in violation of Fuji's patent rights.

15. Upon review of the initial determination of the ALJ, the ITC reversed the ALJ's most fundamental error, namely, the application of the wrong burden of proof. The ITC did, however, adopt the ALJ's findings that the eight common refurbishment steps constituted

impermissible reconstruction. As a result, in June 1999, the ITC issued to the United States Customs Department ("Customs") a General Exclusion Order and Order to Cease and Desist ("Cease and Desist Order") prohibiting the importation of infringing cameras, and directing the Debtor and the other 26 respondents to cease and desist from further infringement of Fuji's patents. (See Exhibit 7 to Rosenthal Stay Declaration.)

16. The Debtor and several other respondents appealed the ITC's ruling to the Federal Circuit. Upon reviewing the ALJ's analysis, which was adopted by the ITC, the Federal Circuit immediately stayed the ITC's Order ex parte. At the Debtor's request, the Federal Circuit imposed a bond for the first 60 days of the stay, and indicated that the remainder of the stay (over two-years) would be bond free. Thus, it was readily apparent to the Federal Circuit that the analysis of the ALJ and ITC was clearly flawed in ITC-1.[7]

17. On August 21, 2001 the Federal Circuit in Jazz Photo Corporation v. ITC, 264 F.3d 1094 (Fed. Cir. 2001), reversed the ruling in ITC-1 with respect to the eight step refurbishment process. Notwithstanding the ALJ's and ITC's purported expertise, the Federal Circuit held the eight step refurbishment process constituted permissible repair, not reconstruction. Although never addressed in ITC-1 by the ALJ, ITC or Fuji and never briefed on appeal, the Federal Circuit stated that the permissible repair ruling only applies to cameras that were refurbished from shells first sold in the United States. Thus, the Debtor was found to infringe, not based upon the faulty analysis of the ALJ or ITC, but on a completely unanticipated

[7] On August 27, 2004 the ITC entered a Bond Forfeiture Order which, after reversing the ALJ, ordered that $412,050.85 of the $877,000 bond be paid to Fuji. On September 8, 2004, the Debtor and Fuji filed with the ITC a joint response seeking the disbursement of the bond proceeds. Thereafter, the Debtor will be seeking the release of the balance of the proceeds $464,949.15 in accordance with the Bankruptcy Court order of June 16, 2004 [Docket No. 573].

issue not raised by anyone in the proceeding. For obvious reasons, it was impossible for the Debtor to contemplate such a result when the issue was never raised below.

18. In motions filed with the Federal Circuit, Fuji alleged circumventions of the ITC's orders. The Federal Circuit remanded those matters to the ITC. Upon remand, the ITC issued a Remand Opinion (attached as Exhibit 10 to Rosenthal Stay Declaration) in which it rejected Fuji's request for the ITC to issue its interpretation of Jazz v. ITC. Instead, the ITC held, "issues that arise concerning the interpretation of the Jazz decision in the context of enforcement of the general exclusion order are properly resolved, in the first instance by the U.S. Customs Service." (See ITC Remand Opinion attached as Exhibit 10 to Rosenthal Stay Declaration.)

## B. The District Court Judgment

19. In June 1999, Fuji filed a complaint (Fuji v. Jazz, et al) in the District Court against that Debtor and others alleging patent infringement. This proceeding was required for Fuji to pursue its purported damages given that the ALJ and ITC determinations have no res judicata or collateral estoppel effect and do not entitle Fuji to damages.

20. In March 2003, the District Court entered the Fuji Judgment in the approximate sum of $30 million. The Fuji Judgment covers the Debtor's sales of cameras during the period from 1995 through August 21, 2001. In the District Court action, it was determined that nineteen steps, not eight, constituted permissible repair. The Fuji Judgment, including the manner in which damages were calculated (at $0.56 per camera), is on appeal to the Federal Circuit, which appeal was argued in May 2004.

## C. Enforcement Proceeding II

21. Again at Fuji's insistence, on September 24, 2002, the ITC instituted a second round of enforcement proceedings against the Debtor and others seeking the imposition of

penalties for the Debtor's alleged violations of the Cease and Desist Order issued in ITC-1. The Debtor vigorously opposed Fuji's allegations advanced on behalf of the ITC.

22. On April 6, 2004, the ALJ issued the Recommendation which constituted his non-binding recommendation to the ITC. The ALJ found that the Debtor sold approximately 27 million single-use cameras ("SUC") from August 21, 2001 through December 12, 2003. (Recommendation at p. 14). The ALJ found that 25,216,980 of the SUC's sold infringed on Fuji's patents, and that the Debtor, Jack Benun ("Benun") and Anthony Cossentino ("Cossentino") were each subject to civil penalties for violation of the Cease and Desist Order.

23. After concluding that infringement occurred, the ALJ focused on the enforcement measures to be implemented. Fuji requested the penalty of $147,892,666 against Jazz and Benun. (Recommendation at p. 106.) The ITC staff argued that a $10,000,000 penalty would suffice to meet the goal of deterring future violations. (Recommendation at p. 107.) Before ruling on penalties, the ALJ cited the relevant statute for violation of the ITC's Cease and Desist Orders, which provides:

> any person who violates an order issued by the Commission under paragraph (1) after it has become final shall forfeit and <u>pay to the United States</u> a civil penalty for each day on which an importation of articles, or their sale, occurs in violation of the order of not more than the greater of $100,000 or twice the domestic value of the articles entered or sold on such day in violation of the order. Such penalty shall accrue to the United States and <u>may</u> be recovered for the United States in a civil action brought by the Commission in the Federal District Court for the District of Columbia or for the district in which the violation occurs. In such actions, the United States district courts may issue mandatory injunctions incorporating the relief sought by the Commission as they deem appropriate in the enforcement of such final orders of the Commission. [*emphasis added*]

19 U.S.C. §1337(f)(2). (See Recommendation p. 108.)

24. The ALJ then considered the following three factors enumerated by Congress to guide the ITC in imposing an appropriate penalty: (a) the desire to deter violations; (b) the intentional or unintentional nature of any violations; and (c) the public interest. (Recommendation at p. 109.)

25. The ALJ recommended that the Debtor and Benun be jointly and severally liable for $13,675,000 and Cossentino for $154,000 in civil penalties. Furthermore, the ALJ made its determination under the belief that the Debtor could pay a substantial penalty. (Recommendation at pp. 116-17).

26. Fuji presented much of the same evidence before the ITC to support its claim that the Debtor infringed its patents that this Court found unconvincing as a basis to appoint a Chapter 11 trustee.

27. As Fuji had previously attempted with the Federal Circuit and ITC, it requested that the ALJ and ITC usurp the authority of Customs in the enforcement of the Cease and Desist Order. In that regard, Fuji requested that the ITC amend the Cease and Desist Order to insure that Customs complies with the Federal Circuit's decision in Jazz v. ITC.

28. In denying Fuji's request to remove Customs as the ultimate enforcement authority, even the ALJ noted that Customs had the necessary protocols and resources to monitor the Debtor's importation of single use cameras to insure compliance with the ITC's rulings. (Recommendation at p. 130.) The ALJ stated that in early 2003 "Customs began stopping Jazz shipments every week." (Recommendation at p. 130). Furthermore, the ALJ noted that in the Spring of 2003 Customs began a process of subjecting all of the Debtor's incoming shipments to intensive examinations and the Debtor was required to produce additional information to

Customs regarding its reloading process, including, but not limited to, videotapes of factories showing such processes. Id. Therefore, the ALJ, concluded:

> The administrative law judge finds, in view of the actions taken by Customs since the beginning of 2003, coupled with guidance provided by Jazz v. ITC, this EID and in any Commission opinion thereafter, that Customs will be advised as to the proper scope of the existing Commission Orders and will have adequate assistance in Custom's enforcement. Hence, the administrative law judge rejects Fuji's argument for modification of the commission's existing orders or issuance of any new orders. (emphasis added.)

(Recommendation at pp. 130-131.)

29. Thus, contrary to Fuji's demands, at no time throughout any of the ITC proceedings has either the ALJ, ITC, District Court or Federal Court sought in any way to interfere or usurp Custom's enforcement authority.

30. It is significant that the ALJ found Polytech Enterprises, Ltd. ("Polytech"), the Debtor's sole provider of single use cameras, was permissibly repairing cameras (but for the replacement of full backs on Kodak cameras). The inconsistencies between the ALJ Recommendation and Customs' enforcement of the same law is mind-boggling. For obvious reasons, the Debtor filed a petition for review of the Recommendation before the ITC, the first step in the appellate process.

31. On July 27, 2004, the ITC Determination issued. The Commission determined not to review the ALJ's findings that the Cease and Desist Order was violated but did not rule on whether it will adopt the specific enforcement measures.[8] By its determination, the ITC also endorsed the ALJ ruling that Customs' enforcement authority not be usurped.

---

[8] Pursuant to 19 U.S.C. § 1337(f)(2), if the enforcement measures are ultimately adopted by the ITC, it has the effect of a judgment. The ITC, however, must obtain an order from the District Court if it elects to enforce the judgment. Ordinarily, as with the earlier enforcement proceeding (ITC-1), the ITC and Debtor will seek to negotiate a consensual resolution.

32. Once the ITC issues its complete ruling, the Debtor will appeal to the Federal Circuit. The Debtor respectfully submits that the ALJ ruling and ITC Determination will again be reversed by the Federal Circuit and are erroneous in at least three ways: (a) improperly basing their decision on certain videotapes; (b) utilizing the wrong burden of proof[9]; and (c) misapplying the "reloaded reload" issue. (See Kaplan Affidavit In Opposition To Conversion.) The ALJ and ITC have ruled in Fuji's favor at every turn. However, the ALJ and ITC have been reversed in prior proceedings and the Debtor respectfully submits that they will be reversed again. Moreover, the ITC and Customs, not the District Court or Bankruptcy Court, are the proper agencies to enforce the Cease and Desist Order. Fuji, having elected to proceed before the ITC, should not be authorized to change venues.

[9] The burden of proof miscue by the ALJ and ITC is most glaring. Specifically, the Federal Court in Jazz v. ITC held that Fuji has an initial burden, by a preponderance of the evidence, to prove that the claimed features set forth in the patent are present in the accused cameras. After proof of direct infringement is advanced by Fuji, the Debtor needs to come forward with evidence of permissible repair. While the ALJ accepted a small sampling of a few hundred cameras and extrapolated that sampling to conclude that all cameras from all factories ever sold by the Debtor had the same features, he rejected that same approach by the Debtor and instead required videotapes of all factories. How could the use of a sampling satisfy Fuji's burden of proof but then be rejected when the Debtor used the same technique? (See Kaplan Affidavit In Opposition To Conversion, ¶¶ 20-24.)

**D. Debtor's Efforts to Comply With Evolving Rulings From ITC and Federal Circuit**

33. As set forth in the Kaplan and Benun Affidavits in Opposition to Fuji's Conversion Motion, throughout the past five years of these proceedings, the Debtor has attempted to modify its conduct to comport with the rulings of the ITC and Federal Circuit. As the Court can appreciate, while operating a $40 million highly competitive business, the Debtor has been told:

(i) Eight (8) common refurbishment steps are impermissible reconstruction (ALJ and ITC);

(ii) Eight (8) common refurbishment steps are permissible repair (Federal Circuit);

(iii) Nineteen (19) refurbishment steps are permissible repair (District Court); and

(iv) Shells must be first sold in United States (Federal Circuit).

All of that transpired even while Customs, the ITC enforcement authority, has been inspecting the Debtor's shipments to assure compliance and has authorized the Debtor's importation of single use cameras.

34. The past five plus years of litigation has produced one benefit, namely, a well-defined roadmap for the Debtor to refurbish single-use cameras in a non-infringing manner. Specifically, the Debtor need only: (a) purchase all of its cameras from Polytech (which it does) who was found non-infringing; (b) not "reload reloads" (which it is not doing); and (c) replace only half the back of Kodak cameras rather than the full back (which it is doing). (See Kaplan Affidavit, ¶ 8-12; Benun Affidavit, ¶¶ 12-16.)

35. In addition, armed with the ITC's determination, in August 2004 Customs stopped and performed an extensive investigation on four shipments of single use cameras. After conducting its investigation, the product was not "excluded" and is being reviewed to assure compliance with Customs' enforcement of the ITC's order.

## V. FEDERAL CIRCUIT APPEAL

36. On May 3, 2004, the Federal Circuit heard oral argument on the appeal from Fuji Judgment. The Federal Circuit decision could very well impact not only the Fuji Judgment and Fuji's cross-appeal on the issuance of an injunction, but also the most recent ruling of the ITC. Fuji would like the Debtor out of business before the Federal Circuit rules or the Imation Litigation is concluded so that the Debtor will be unable to remobilize its operations if successful.

## VI. IMATION LITIGATION

37. The Affidavit of Peter Frazza of Budd Larner, being submitted with the Debtor's opposition to Fuji's Conversion Motion, explains in detail, as he has many times before, the status of the Imation Litigation and the magnitude of the claims. Fuji's suggestion that the Imation Litigation will not be impacted if this proceeding is converted is deceptive. Fuji and its counsel know very well that conversion to Chapter 7 would result in the appointment of a trustee who would have to become familiar with the Imation Litigation and the efforts of the Budd Larner firm and, if agreeable, move to retain Budd Larner as his/her counsel. Fuji knows full well, given its communication with counsel to Imation, that immediately upon conversion Imation will seek to further delay the trial given the need for retention of counsel and then seek to settle the case "on the cheap."

## VII. FUJI'S PRIOR REQUESTS FOR INJUNCTIVE RELIEF FROM THE DISTRICT COURT

38. Fuji's Stay Motion is no longer limited to "seeking injunctive relief in the District Court enjoining the Debtor from continuing to infringe on Fuji's patents" as was represented in its Initial Stay Motion. This time Fuji seeks an injunction and that the Debtor provide it with 60 days advance notice of any sales of single use cameras. This procedure is designed to prevent the Debtor from selling its merchandise and competing in the marketplace.

39. Fuji has, on two previous occasions, requested that the District Court issue an injunction preventing the Debtor from further infringing activity. (See Initial Stay Motion at 22.) On both occasions, the District Court denied the requests. The District Court first denied Fuji's pre-trial request for a preliminary injunction by order dated October 10, 2001, ruling that: (a) Fuji could seek redress from Customs and the ITC; (b) Fuji would experience no irreparable harm as alternative forms of relief were available and "mere delay in a government agency's ability to hear a matter does not constitute irreparable harm"; and (c) Fuji had not demonstrated a likelihood of success on the merits with regard to the importation of single-use cameras which had not been reviewed by a governmental agency or judicial body. (A copy of the District Court's October 10, 2001 Order is attached as Exhibit 11 to the Rosenthal Stay Declaration.)

40. Notwithstanding finding the Debtor liable for $30 million, the District Court again denied Fuji's post-trial request for an injunction by Order dated March 13, 2003. In denying Fuji's second request, the District Court stated that Fuji had failed to "comply with the strictures" of Fed. R. Civ. P. 65(d). Fuji requested that the Court enjoin the Debtor and others from "infringing" or "inducing such infringement" of its patents. The Court stated that such a request was not specific enough in detail to reasonably describe the acts Fuji sought to restrain. Furthermore, the District Court indicated that Fuji's general "obey the law" language was

insufficient to permit an injunction being imposed on the Debtor. In addition, the District Court stated that even if Fuji had more narrowly tailored its request, an injunction would be inappropriate because, among other reasons, "Fuji [had] already sought and obtained injunctive relief in the ITC proceeding the subject of which is [the Debtor's] current and ongoing conduct." (District Court's March 13, 2003 Order attached as Exhibit 1 to Rosenthal Stay Declaration.)

41. Importantly, the District Court noted that the ITC enjoined the Debtor from importing infringing cameras, which the District Court stated resolved Fuji's claim of further infringing activities with regard to the Debtor's "supply chain for which evidence has been adduced" in the District Court case. Thus, Fuji's rights remain protected in the relief available before the ITC, which apparently was satisfactory to Fuji when it moved and obtained stay relief from this Court to proceed before the ITC.

## VIII. FUJI'S STAY MOTION SHOULD BE DENIED

### A. The Automatic Stay is Applicable

42. Earlier in this Chapter 11 proceeding Fuji requested that the automatic stay be modified, to the extent applicable, to enable it to enforce all of its rights and remedies before the ITC. The Debtor and Mr. Benun *consented* to this request and an appropriate Order was entered. [See Docket No. 194].

43. As the Court observed at the June 4, 2004 hearing on the Initial Stay Motion, Fuji arguably had the ability to request stay relief to seek an injunction from the District Court when instead it sought to go before the ITC. (See Transcript of the June 4, 2004 hearing on the Initial Stay Motion, attached hereto as **Exhibit A**, pp. 21:15-22:4.) Fuji dragged the Debtor and its estate through a costly and protracted procedure before the ITC to "prove" the Debtor violated the Cease and Desist Order and infringed on Fuji's patents. However, Fuji now claims it requires relief from the stay so that it may obtain an order from the District Court that has

"teeth," presumably because the ITC is incapable of inflicting a severe enough bite. (See Exhibit A, p. 20:12-14; Fuji Stay Motion, ¶ 63.)

44. Obviously, Fuji was unhappy with the ALJ's and ITC's unwillingness to usurp the authority of Customs and the ITC's power to enforce its own Cease and Desist Order. As a result, Fuji seeks to run to another forum and institute a new lawsuit further burdening this estate with additional litigation costs.

45. To accomplish its latest objective, Fuji asserts that the automatic stay is not applicable pursuant to 28 U.S.C. § 959 as a result of the Debtor's post-petition patent infringement allegedly established by the Recommendation and ITC Determination. The Recommendation is non-binding and the ITC Determination is non-final, non-appealable and incomplete. Moreover, the ITC Determination "affirms" that Fuji should rely solely on Customs for enforcement. Furthermore, the ALJ found in his Recommendation that the process used by Polytech, Jazz's sole source provider, was permissible repair. In addition, the ALJ found that the Debtor's shipments underwent repeated scrutiny by Customs to ensure compliance with the ITC's Rulings. In fact, that scrutiny by Customs is ongoing and resulted in an extensive review of the Debtor's product in August 2004.

46. Section 959(a) of Title 28 of the United States Code provides:

> (a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. *Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice*, but this shall not deprive a litigant of his right to trial by jury.

11 U.S.C. §959(a) (emphasis added.)

47. Courts have indicated that a post-petition infringement claim (by definition) is not protected under Section 362 of the Bankruptcy Code and, therefore, a debtor is subject to an

action pursuant to 28 U.S.C. § 959(a). However, courts frequently have exercised their equitable discretion pursuant to the second sentence of Section 959(a) to stay an action against a debtor when allowing the action to proceed would deprive the debtor of an interest in property or interfere with the reorganization process. In re Telegroup, Inc., 237 B.R. 87, 95 (Bankr. D.N.J. 1999); In re Television Studio School of New York, 77 B.R. 411, 412 (Bankr. S.D.N.Y. 1987).

48. The standard used to restrain a creditor from commencing an action under Section 959(a) is that the court must "exercise sound discretion [and] find the action would embarrass, burden, delay or otherwise impede the reorganization proceedings." Telegroup, 237 B.R. at 96; Television Studio, 77 B.R. at 412. "Section 959(a) should not be construed to permit suits that aim to establish adverse rights in the estate's property or *otherwise interfere with the trustee's control and management of the estate*." In re Cinematronics, Incorporated, 111 B.R. 892, 897 (Bankr. S.D.Ca. 1990) (emphasis added.)

49. In Television Studio, the bankruptcy court restrained a creditor, pursuant to the second sentence of 28 U.S.C. §959(a) and its powers under Section 105 of the Bankruptcy Code, from commencing an action against the debtor for alleged post-petition copyright infringement. The creditor, like Fuji, sought relief from the automatic stay pursuant to 28 U.S.C. § 959(a) for pre-petition and post-petition infringement. The creditor's motion sought stay relief for the sole purpose of obtaining an injunction against the debtor from further infringement. At oral argument, the creditor's counsel indicated that it would seek damages for the pre-petition infringement. The bankruptcy court indicated that if a claim for pre-petition infringement was not time barred, that aspect could be litigated in the bankruptcy court.

50. The bankruptcy court in Television Studio, in denying relief from the automatic stay pursuant to 28 U.S.C. § 959(a), reasoned that the debtor had made significant progress

toward reorganization. The debtor recently had filed its plan of reorganization and obtained a hearing date to approve its disclosure statement. The bankruptcy court pointed out that a few months earlier the debtor owed some $600,000 in post-petition taxes and only through the graces of a post-petition lender would be able to fund its plan. The bankruptcy court held that the creditor would be enjoined from commencing any action seeking an injunction against the debtor for alleged post-petition copyright infringement until the debtor's plan of reorganization was either confirmed or confirmation was denied.

51. Here, Fuji has plainly stated that if it is successful in its third attempt to obtain an injunction from the District Court, it will seek contempt sanctions against the Debtor for importing "infringing" cameras, which to Fuji, arguably, means importing single-use cameras. (Fuji's Stay Motion at ¶ 58). In the "Wherefore" clause of its draft Complaint attached as Exhibit 13 to the Rosenthal Stay Declaration, Fuji also has proposed a ridiculous procedure to "ensure" the Debtor is not infringing on its patents.

52. The procedure requires that the Debtor give Fuji at least sixty (60) days' notice of the Debtor's intent to sell any single-use cameras, along with a description of the refurbishing process and a sample of the single-use camera. Furthermore, Fuji demanded that its counsel have a reasonable opportunity to inspect the refurbishing process and, in the event that Fuji objects to the sale of the single-use camera, the Debtor would not be allowed to sell the cameras without obtaining prior District Court approval. (See Rosenthal Stay Declaration, Exhibit 13, p. 15.) Obviously such a process would make it impossible for the Debtor to sell single-use cameras as it would permit Fuji to hold up the process to the point that the Debtor's customers would either cancel orders as a result of the delays or, alternatively, choose not to purchase from

the Debtor. The relief Fuji proposes would permit one of the Debtor's major competitors (not to mention its most aggressive adversary) to exert control over the Debtor's business.

53. Fuji clearly has articulated its intention to frustrate the Debtor's reorganization process and force the Debtor into liquidation. The relief Fuji seeks in its draft Complaint is disregard to accomplish those objections. This Court has the discretion pursuant to its equitable powers to deny Fuji's request for authority to seek an injunction against the Debtor in the District Court, particularly since Fuji has all of the necessary remedies available to it in the pending ITC proceedings. The Court's use of discretion in this matter is particularly appropriate because the District Court previously denied such relief and, as discussed more fully below, lacks jurisdiction to grant Fuji the relief it seeks because the very same issue is on appeal before the Federal Circuit.

## B. Fuji's Motion Should be Denied As No "Cause" Exists for Stay Relief

54. Fuji seeks an Order granting it relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code. Fuji claims that the Recommendation and ITC Determination are conclusive evidence that the Debtor has infringed its patents post-petition and, therefore, Fuji is entitled to relief from the automatic stay to permit it to commence an action in the District Court enjoining the Debtor, its officers, directors, employees, agents, and representatives from further infringing activities. As stated above, Fuji's draft Complaint requests additional onerous relief against the Debtor, the sole effect of which would be to burden the Debtor and hinder its ability to fulfill customers' orders.

55. Section 362(d) of the Bankruptcy Code states, in relevant part:

> On request of a party in interest and after notice and hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

> (1) for *cause*, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d)(1) (emphasis added.)

56. Because "cause" is not defined within the Code, courts have "developed a balancing test to determine whether 'cause' exists." In re Telegroup, 237 B.R. 87, 91 (Bankr. D.N.J. 1999) (citing In re Holly's Inc., 140 B.R. 643, 686 (Bankr. W.D.Mich. 1992)). In determining whether "cause" exists, "the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code." Id.

57. Generally, courts have noted that "estimations of 'cause' warranting stay relief intentionally involve a 'broad and flexible inquiry', which permits the bankruptcy court, as a matter of equity, to respond to inherently fact-sensitive situations." Telegroup, 237 B.R. at 91 (citing In re Bell, 215 B.R. 266 (Bankr. N.D.Ga. 1997)). Here, Fuji has failed to show the requisite "cause" required pursuant to Section 362(d)(1) of the Bankruptcy Code to permit this Court to grant Fuji relief from the automatic stay, since the ITC can grant Fuji the relief it seeks.

58. As this Court previously noted, Fuji could have requested relief from the stay to move before the District Court. Instead, however, Fuji opted to seek relief from the automatic stay to move before the ITC. (See Exhibit A, p. 21:5-11.) It was only when Fuji was unable to obtain the specific relief it desired that it requested relief from the automatic stay to move before yet another forum in furtherance of its goal of putting the Debtor out of business. Furthermore, the District Court no longer has jurisdiction to give Fuji the relief it seeks because this very issue is on appeal at the Federal Circuit.

59. As the District Court pointed out in its March 13, 2003 Order denying Fuji's request for an injunction, the ITC already had granted Fuji injunctive relief against the Debtor's

"current and ongoing" infringing activity. Fuji must not be permitted to commence yet another lawsuit aimed at wasting the Debtor's precious time and resources and impeding the Debtor's reorganization process.

## C. The District Court Does Not Have Jurisdiction To Address Fuji's Request For An Injunction.

60. Noticeably absent from Fuji's Stay Motion or Initial Stay Motion is any discussion about the District Court's lack of jurisdiction to grant Fuji the relief it seeks. Fuji has appealed to the Federal Circuit the District Court's denial of an injunction in its March 13, 2003 Order. Notwithstanding that the District Court no longer has jurisdiction to grant Fuji the relief it seeks, Fuji requests stay relief to proceed with a futile effort.

61. It is a well settled principle that the filing of a notice of appeal confers jurisdiction to the appellate court and divests the lower court of its jurisdiction over those aspects of the case that are the subject of the appeal. Holmes Group v. Vornado Air, C.S., 535 U.S. 826, 835, 153 L.Ed.2d 13, 22, 122 S. Ct. 1889 (2002); Marrese v. Amer. Acad. Ortho. Surgeons, 470 U.S. 373, 379, 84 L.Ed.2d 274, 280, 105 S. Ct. 1327 (1985); U.S.V. Scarfo, 263 F.3d 80, 88 (3d Cir. 2001) (citing Sheet Metal Workers' Int'l. Assn. Local 19 v. Herrebros., Inc., 198 F.3d 391, 393 (3d Cir. 1999). Even if Fuji were granted relief from the automatic stay, the District Court does not have jurisdiction to grant Fuji the relief it seeks because the issue of enjoining the Debtor from further and "ongoing" infringing activity is the subject of the Fuji Appeal to the Federal Circuit.

62. The Federal Circuit made it clear at the May 3, 2004 oral argument that the denial of Fuji's requested injunction is being considered as part of the appeal. (See Jacobs Affidavit, ¶¶ 5-7.) The Federal Circuit questioned Fuji's counsel regarding the proposed language of an injunction against the Debtor. Fuji's counsel was unable to articulate anything more than an "obey the law" injunction, which the Federal Circuit made abundantly clear was insufficiently

specific to enjoin the Debtor from selling single-use cameras. (See Exhibit "A" to Jacobs Affidavit.) Remarkably, Fuji uses the same language questioned by the Federal Court in its draft Complaint to attempt to enjoin the Debtor from selling single-use cameras. How can Fuji request this Court or the District Court to interfere with the Federal Circuit?[10]

63. As Fuji's counsel pointed out to the Federal Circuit, its inability to provide more specific injunctive language was because, as he stated, "the process changes from time to time," thereby, obviating the Debtor's ability to make the changes required to comport with various decisions regarding what constitutes proper non-infringing single-use cameras. It is clear that it is not Fuji's intention that the Debtor stop selling single-use cameras that allegedly infringe on Fuji's patents but, instead, that the Debtor simply cease selling single-use cameras altogether, whether infringing or not.

64. In addition, if the Court determines that the automatic stay is not applicable or, alternatively, that it is appropriate to vacate the automatic stay, the Court should limit Fuji to: (a) presenting an application to the District Court for an injunction (not monetary relief or the absurd procedures in the draft Complaint); and (b) confining Fuji to offering only the non-binding Recommendation only as proof of post-petition infringement given Fuji's admission that such Recommendation is sufficient to satisfy its burden of proof for the issuance of an injunction. Those limitations will prevent Fuji from instituting the type of never-ending discovery it commenced with its failed motion seeking the appointment of a Chapter 11 trustee.

[10] Undoubtedly, Fuji will argue that the District Court should decide its jurisdictional limits. In this context, however, this Court should not authorize stay relief and cause the Debtor to expend additional resources when Fuji has not refuted the well settled law regarding the inability of lower courts to interfere with issues on appeal.

## IX. THE DEBTOR'S CROSS-MOTION TO EXPAND THE DEBTOR'S RETENTION OF BUDD LARNER

65. If the Court determines that the automatic stay is not applicable pursuant to 28 U.S.C. § 959(a) or, alternatively, that it is appropriate to vacate the automatic stay pursuant to Section 362 of the Bankruptcy Code, the Debtor requests that the Court authorize the Debtor's retention of Budd Larner to permit that firm to represent the Debtor in any action Fuji commences in the District Court. In addition, the Debtor seeks authority to enter into a post-petition retainer agreement ("Retainer Agreement") with Budd Larner.[11] Pursuant to the Retainer Agreement, the Debtor proposes to expand the retention of Budd Larner and provide for the payment of a $100,000 retainer ("Post-Petition Retainer")from a third-party creditor of Jazz Photo (Hong Kong) Ltd. ("Jazz H.K.").

66. Perfectech International Holding Ltd. ("Perfectech"), a publicly trade company in Hong Kong, has agreed to pay the Post-Petition Retainer to Budd Larner on the Debtor's behalf. Perfectech supplied Jazz H.K. with packaging for single-use cameras. Perfectech has a claim of approximately $1.2 million against Jazz H.K. Perfectech currently supplies Polytech with the packaging used in manufacturing the Debtor's single-use cameras. Perfectech has agreed to pay the Post-Petition Retainer because the survival of the Debtor is so closely aligned with the financial interest of its own company.

67. The Debtor must have counsel to represent its interests in any injunction action Fuji is permitted to commence in the District Court. Prior to the Filing Date, Budd Larner represented the Debtor in certain aspects of the District Court action. In addition, Budd Larner

[11] A copy of the Retainer Agreement is attached as Exhibit "A" to the accompanying Affidavit of Michael D. Sirota.

represented the Debtor before the Federal Circuit with regard to the Debtor's appeal of the Fuji Judgment.

68. Budd Larner is intimately familiar with the issues previously raised by Fuji and well positioned to defend against any action by Fuji to enjoin the Debtor from importing single-use cameras. As such, expanding the retention of Budd Larner to represent the Debtor in an injunction action is in the best interests of the Debtor, the estate and its creditors.

69. Payment of the Post-Petition Retainer by Perfectech is permissible as the funds are not property of the estate pursuant to Section 541 of the Bankruptcy Code. Section 329 of the Bankruptcy Code permits payment of a retainer by a third party. Under Section 329(b) of the Bankruptcy Code, the only issue for the court will be to review the reasonableness of the fees, and order the return of any fees determined to be excessive. 11 U.S.C. § 329(b); In re Furniture Corporation of America, 34 B.R. 46 (Bankr. S.D. Fla. 1983).

70. Payment of the Post-Petition Retainer would not impact the Debtor's business operations or the Debtor's ability to reorganize because the Post-Petition Retainer is to be provided by one of the Debtor's Hong Kong creditors and not from estate property. Arguably, not providing Budd Larner with the retainer would have a greater impact on the Debtor's business operations and its ability to reorganize, as Fuji would be able to effectively put the Debtor out of business if an injunction were granted. Furthermore, the Post-Petition Retainer is reasonable in light of Fuji's track record for "scorched earth" litigation and the importance of defeating the injunction.

## X. CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an Order denying Fuji's motion in its entirety or, alternatively, granting the Debtor's cross-motion to expand the retention of Budd Larner, and for such other relief as the Court deems just and appropriate.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Jazz Photo Corp., Debtor-in-Possession

By: */s/ Michael D. Sirota*
Michael D. Sirota
Warren A. Usatine
Jeffrey M. Traurig

DATED: September 10, 2004