MS-4088
WU-1187
**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
HONORABLE MORRIS STERN
CASE NO. 03-26565 (MS)

Chapter 11

|  |
|---|
| In re:<br><br>JAZZ PHOTO CORP.,<br><br>      Debtor-in-Possession. |

**DEBTOR'S OPPOSITION TO THE
MOTION OF FUJI PHOTO FILM CO., LTD.
PURSUANT TO 11 U.S.C. § 1112(b) FOR
ORDER CONVERTING THE DEBTOR'S
CHAPTER 11 CASE TO A CASE UNDER
CHAPTER 7 OF THE BANKRUPTCY CODE**

**HEARING DATE AND TIME:**
September 22, 2004, 10:00 a.m.

**ORAL ARGUMENT REQUESTED**

TO:  HONORABLE MORRIS STERN
    United States Bankruptcy Judge

   Jazz Photo Corp., the within debtor and debtor-in-possession ("Jazz" or the "Debtor"), by

and through its counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., by way of opposition to

the motion (the "Conversion Motion") of Fuji Photo Film Co., Ltd. ("Fuji") for an order

converting the Debtor's Chapter 11 case to a case under Chapter 7 of Title 11 of the United

States Code (the "Bankruptcy Code"), respectfully states as follows:[1]

## I.    INTRODUCTION

1.      Throughout this Chapter 11 proceeding Fuji has filed countless motions and

objections designed to terminate, at any cost, the Debtor's competitive operations.  Fuji's latest

barrage of motions attempts to use a recent _partial_ determination of the U.S. International Trade

Commission (the "ITC") to argue "cause" exists to allow Fuji to seek a district court injunction

and to assert a non-existent multi-million dollar administrative claim, which is then used as

primary support for the Conversion Motion.  As will be demonstrated herein, the Conversion

Motion is premature, fundamentally flawed and not sufficient to warrant the extraordinary relief

of conversion.  When stripped to its bare essence, Fuji seeks to use this Court to supplant the

authority of the ITC and the U.S. Customs Department ("Customs") and assist Fuji in meeting its

objective of eliminating a competitor.

2.      Most disturbing about the Conversion Motion is Fuji's failure to clearly and

unambiguously disclose to the Bankruptcy Court that the ITC has _not_ completely disposed of the

April 6, 2003 non-binding recommendation of Administrative Law Judge Paul Luckern (the

"ALJ").  Specifically, on July 27, 2004, the ITC issued its Determination Not To Review the

---

[1] At the same time it filed the Conversion Motion, Fuji also filed motions (a) for a
determination that the automatic stay is not applicable and to lift the injunction against Fuji
proceeding in the United States District Court on an action to enjoin the Debtor from infringing
its patents (the "Lift Stay Motion") and (b) for allowance of an administrative expense claim (the
"Administrative Claim Motion").  The Debtor is filing oppositions to these motions
contemporaneously with the filing of this opposition to the Conversion Motion.  (The Lift Stay
Motion, Administrative Claim Motion and Conversion Motion shall be collectively referred to as
"Fuji Motions.")

40654/0001-2171896v12

Presiding Administrative Law Judge's Enforcement Initial Determination, Request for Briefing

or Recommended Enforcement Measures (the "ITC Determination").   The ITC Determination,

at page 2, states:

> In connection with the final disposition of the enforcement
> proceedings, the [ITC] <u>may</u> issue civil penalties for violations of
> its cease and desist order.  The Commission has **<u>NOT</u>** yet ruled on
> whether it will adopt the specific enforcement measures
> recommended in the EID.  (Emphasis added.)

3.      In fact, the ITC requested the parties to file written submissions on the specific

enforcement measures recommended by the ALJ.  Thus, despite Fuji's repeated references to

multi-million dollar penalties and administrative claims, <u>no such penalty has been determined by

the ITC</u> nor has the ITC, unlike Fuji, ever once suggested that such a claim constitutes or would

be pursued as an administrative claim.  There simply has been no ITC disposition quantifying

civil penalties, if any, against Jazz, Anthony Cossentino ("Cossentino") or Jack Benun

("Benun").

4.      Rather than await the ITC's <u>complete</u> disposition and review of the ALJ decision,

and thereafter debate its impact on this Chapter 11 proceeding, Fuji was anxious to file its

pre-prepared motions and concocted various arguments around the unanticipated and inescapable

fact that the ITC's business is unfinished.  Recognizing the apparent flaws in attempting to use

an incomplete ITC Determination, however, Fuji digs deep into its "bag of tricks" to conjure up

other purported reasons (e.g. failure of the Debtor to respond to information requests and the

Debtor's financial performance) to substantiate its extraordinary requested relief.[2]

---

[2] Even a cursory review of the exchange of letters and e-mails between counsel to Fuji
and the Debtor, attached as Exhibit 2 to the Declaration of Lawrence Rosenthal In Support of the
Conversion Motion ("Rosenthal Conversion Declaration") dated August 2, 2004, discloses that
Fuji never contemplated moving for conversion based upon Fuji's claim that the Debtor did not
respond to its never ending questions.  In fact, in his June 22, 2004 letter (attached as Exhibit 2 to
(continued…)

3

5.      As will be demonstrated herein, and in the Affidavits[3] and oppositions to the Lift

Stay Motion and Administrative Claim Motion, nothing has changed regarding the Debtor's

operations that should alter the course of this Chapter 11 proceeding or warrant the crippling

relief Fuji suggests.  In fact, it is obvious that Fuji filed the Conversion Motion and

Administrative Claim Motion with knowledge that the motions are defective but with the hope

that perhaps the Court would grant its Lift Stay Motion so that Fuji could proceed with a revised

form of torture in the United States District Court for the District of New Jersey ("District

Court").  For the reasons set forth in the Debtor's opposition to each of the Fuji motions, those

motions should be denied.

## II.      BACKGROUND

6.      On May 20, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for

relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").  Since

the Petition Date, the Debtor has remained in possession of its assets and has continued

management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the

Bankruptcy Code.

---

(…continued)
Rosenthal Conversion Declaration), Mr. Buechler acknowledges that if the Debtor fails to
comply with his request the proper remedy would be the service of a subpoena pursuant to Rule
2004.  In fact, on August 17, 2004, Fuji issued a subpoena regarding the very matters now
purporting to support conversion.  Notwithstanding the Debtor's previous explanations provided
to Fuji, the Debtor produced more than 700 pages of documents responding to the subpoena.  In
addition, provided herewith is the Affidavit of Mr. Joseph M. Weber (the "Weber Affidavit") in
opposition to Fuji's Conversion Motion, which hopefully brings closure to Fuji's inquiries.

[3] The Debtor is filing herewith (a) the Weber Affidavit, (b) the Affidavit of Peter Frazza
(the "Frazza Affidavit"), (c) the Affidavit of Jeffrey J. Kaplan (the "Kaplan Affidavit") and (d)
the Affidavit of Jack Benun (the "Benun Affidavit") in opposition to the Conversion Motion.

40654/0001-2171896v12

7.      On June 4, 2003, the Office of the United States Trustee formed an official committee of unsecured creditors (the "Committee"). The Committee has retained the firms of Ravin Greenberg PC as its counsel and Weiser, LLC as its accountants. Since its appointment and retention of professionals, the Committee has been involved in all aspects of the Debtor's Chapter 11 proceeding.[4]

8.      The Debtor is engaged in the design, development, importation and wholesale distribution of cameras and other photographic products, primarily in the United States. The camera categories that are imported and distributed include traditional hard-body 35mm cameras, both point-and-shoot and zoom-lens cameras, and digital cameras and disposable cameras that are repaired by the Debtor in compliance with applicable intellectual property law. The Debtor distributes its products under its own brand name, as well as under the name of Bell & Howell pursuant to an exclusive license agreement. The Debtor also sells certain items under the private labels of the Debtor's customers.

9.      At the outset, and throughout this case, the Debtor made clear that the success of this reorganization was conditioned upon prevailing in at least one of two pending matters; specifically, the appeal (the "Federal Circuit Appeal") of the March 18, 2003 Final Order and Judgment (the "Fuji Judgment") entered in <u>Fuji v. Jazz, et al.</u> by the District Court and prosecution of Jazz's claims against Imation Corp. and Imation S.p.A. (collectively, "Imation") in the matter captioned <u>Jazz v. Imation Corp. and Imation S.p.A.</u>, Docket No. 99-2505 (JLL) (the "Imation Litigation") pending in the District Court since 1999. Through absolutely no fault of

---

[4] At no time throughout this proceeding has the Committee or, for that matter, Fuji, been denied or delayed access to any information reasonably requested of the Debtor or its affiliates.

Jazz, and having expended countless hours and enormous resources, those matters have taken longer than expected to conclude.

10.     In addition, Jazz recognized that its financial performance would be break-even, at best, and substantially challenged given the need to fund the Imation Litigation, the Federal Circuit Appeal of the Fuji Judgment, and the litigation promoted by Fuji during this bankruptcy proceeding.  Notwithstanding that "perfect storm," Jazz has remained:  (a) in compliance with its secured lender; (b) current with the filing of all monthly operating reports; (c) current with its post-petition obligations, except to professionals; (d) accumulated approximately $280,000 in a reserve account as required by the Court; and (e) maintained strong customer relationships with the likes of Walmart and other customers.

11.     Recognizing that filing a reorganization plan would be futile without the disposition of either the Federal Circuit Appeal or the Imation Litigation, the Debtor filed several motions seeking an extension of its initial exclusive and solicitation periods, which have been extended through September 22, 2004.[5]

### III.     DEBTOR'S FINANCIAL PERFORMANCE

12.     The Debtor has filed all its monthly operating reports in compliance with the guidelines of the Office of United States Trustee ("UST").  The July 2004 operating report was filed on or about August 25, 2004.  For the period May 2003 through July 31, 2004, the Debtor generated revenues of $42,333,119 and a net loss of $3,016,118.  The net loss, however, is attributed to $3,443,490 in legal fees (after allocations) incurred during the Chapter 11 proceeding.  Without those extraordinary fees, the Debtor would have operated a net profit of

---

[5] The Debtor's request for a further extension filed on August 10, 2004, is now returnable on September 22, 2004.

40654/0001-2171896v12

$427,372.  While a large portion of the legal/professional fees were devoted to responding to Fuji's various motions and objections, an equally large portion of fees have been devoted to funding the Imation Litigation, which, if even modestly successful, should generate millions of dollars to pay all administrative claims and unsecured creditors.

13.     As of July 31, 2004, the Debtor has total post-petition payables of $2,553,062 of which $1,128,596 is owed to professionals.   Of the $1,424,466 owed to non-professionals, $1,136,653 is <u>current</u> leaving a balance of $287,813, of which $267,368 is less than 30 days old. It is disingenuous for Fuji to criticize the Debtor's financial performance when the Debtor disclosed <u>the first day of this</u> case, and at every hearing, that its reorganization would not be based on its generation of excess cash flow but upon success in the Federal Circuit Appeal or recovery from the Imation Litigation.

## IV.    <u>ITC PROCEEDINGS</u>

### A.    <u>Enforcement Proceeding I</u>

14.     In March 1998, at Fuji's request, the ITC instituted a proceeding captioned <u>In the Matter of Certain Lens-Fitted Film Packages</u> ("ITC-1") seeking to prevent Jazz and 27 other respondents from importing refurbished single-use cameras into the United States pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.  Fuji asserted that the refurbishment of its patented single-use cameras and the importation of such cameras into the United States infringed its patent rights.

40654/0001-2171896v12

15. On February 24, 1999, the ALJ issued his final initial determination and held, among other things, that the eight common steps used by all of the participating respondents constituted impermissible reconstruction of the cameras in violation of Fuji's patent rights.[6]

16. Upon review of the initial determination of the ALJ, the ITC reversed the ALJ's application of the wrong burden of proof but adopted the ALJ's findings that the eight common steps constituted impermissible reconstruction. As a result, in June 1999, the ITC issued to Customs a General Exclusion Order and Order to Cease and Desist (the "Cease and Desist Order") prohibiting the importation of infringing cameras, and directing the Debtor and the other 26 respondents to cease and desist from further infringement of Fuji's patents. (See Exhibit 7 to Declaration of Lawrence Rosenthal in support of Fuji's Lift Stay Motion, dated August 2, 2004 (the "Rosenthal Stay Declaration").

17. The Debtor and several other respondents appealed the ITC's ruling to the United States Court of Appeals for the Federal Circuit (the "Federal Circuit"). Upon reviewing the ALJ's analysis, which was adopted by the ITC, the Federal Circuit immediately stayed the ITC's Order *ex parte*. The Federal Circuit imposed a bond for the first 60 days of the stay obtained by the Debtor and indicated that the remainder of the stay (over two-years) would be bond free.

18. On August 21, 2001, the Federal Circuit in Jazz Photo Corporation v. ITC, 264 F.3d 1094 (Fed. Cir. 2001), reversed the ITC ruling in ITC-1 with respect to cameras refurbished with the eight-step process. Notwithstanding the ALJ's and the ITC's purported expertise, the Federal Circuit held the eight-step process constituted permissible repair not reconstruction.

---

[6] In ITC-1, the ALJ relied on tests that showed that the Debtor's cameras had a lower quality than those of Fuji, despite case law in the patent area holding that quality is irrelevant to the repair doctrine. The ALJ himself noted at closing argument in ITC-1 that Fuji had no precedent to support its "quality" theory.

Although <u>never</u> addressed in ITC-1 by any of the parties, and while never briefed on appeal, the Federal Circuit stated that its permissible repair ruling only applies to cameras that were repaired from shells first sold in the United States.  Thus, although the Debtor was found to infringe, it was <u>not</u> based upon the faulty analysis of the ALJ or the ITC but a completely unanticipated issue <u>not</u> raised by anyone in the proceeding.  For obvious reasons, it was impossible for the Debtor to contemplate such a result when the issue was never raised below.

19.    The Federal Circuit, by motions filed by Fuji, asserted circumventions of the ITC's orders, which the Federal Circuit remanded to the ITC.  Upon remand, the ITC issued a Remand Opinion (attached as Exhibit 10 to Rosenthal Stay Motion) where the ITC <u>rejected</u> Fuji's request for the ITC to issue its interpretation of <u>Jazz v. ITC</u>.  Instead, the ITC held, "issues that arise concerning the interpretation of the Jazz decision in the context of enforcement of the general exclusion order are properly resolved, in the first instance by the U.S. Customs Service."

20.    The ALJ also presided over a bond forfeiture hearing that occurred in February, 2003.  In that proceeding, the ALJ took testimony and issued an opinion regarding the portion of the bond for the first 60 days of the stay that might be subject to forfeiture to Fuji.  The ITC <u>reversed</u> a major aspect of the ALJ's decision, thereby significantly increasing the amount to which the Debtor is entitled, and sent the case back to the ALJ for further proceedings.[7]  That was the second instance in which the ALJ's ruling adverse to the Debtor was deemed incorrect.

**B.**    **The District Court Judgment**

21.    In June 1999, Fuji filed a complaint for patent infringement damages against that Debtor and others in the District Court.  This proceeding was necessary for Fuji to pursue its

---

[7] On August 27, 2004, the ITC issued its Bond Forfeiture Order entitling Fuji to $412,050.85 of the $877,000.00 bond posted by Jazz.

purported damages because the finding in ITC-1 had no *res judicata* or collateral estoppel effect and did not entitle Fuji to any economic relief.

22.    In March 2003, the District Court entered the Fuji Judgment in the approximate sum of $30 million. The Fuji Judgment covers the Debtor's sales of cameras during the period from 1995 and ending on August 21, 2001. In the District Court action, the Court delineated nineteen steps, not only eight steps, that constituted permissible repair. The Fuji Judgment, including the manner in which damages were calculated (at $0.56 per camera), is on appeal to the Federal Circuit, which appeal was argued in May 2004.

## C.    The Enforcement Proceeding II

23.    Again at Fuji's insistence, on September 24, 2002, the ITC instituted enforcement proceedings ("ITC-2") against Jazz and others seeking the imposition of penalties for the Debtor's alleged violations of the Cease and Desist Order issued in ITC-1. The Debtor vigorously opposed ITC's allegations advanced on behalf of Fuji.[8]

24.    On April 6, 2004, the ALJ issued the Enforcement Initial Determination ("Recommendation")[9] which constituted his non-binding recommendation to the ITC. The ALJ found that the Debtor sold approximately 27 million single-use cameras ("SUCs") from August 21, 2001 through December 12, 2003. (Recommendation, p. 14.)

---

[8] On July 21, 2003 (two months after the Petition Date), Fuji filed a Motion for Determination That The Automatic Stay Does Not Prevent The ITC From Continuing With The Enforcement Proceeding or To Lift the Stay (Docket No. 140) ("ITC Stay Motion"). On July 30, 2003, an Order was entered, with the consent of the Debtor and Benun, authorizing the ITC matter to proceed.

[9] The un-redacted Recommendation was previously provided to the Court by Fuji.

40654/0001-2171896v12

25.     The ALJ found that 25,216,980 of the SUCs sold infringed on Fuji's patents, and

that the Debtor, Benun and Cossentino were each subject to civil penalties for violation of the

ITC's Cease and Desist Order.

26.     After concluding that infringement occurred, the ALJ focused on the enforcement

measures to be implemented.  Fuji requested the penalty of $147,892,666 against Jazz and

Benun.  (Recommendation, p. 106.)  The ITC staff argued that a $10,000,000 penalty would

suffice to meet the goal of deterring future violations.  (Recommendation, p. 107.)  Before ruling

on penalties, the ALJ cited the following relevant statute, 19 U.S.C. §1337(f)(2), for violation of

ITC cease and desist orders:

> any person who violates an order issued by the Commission under
> paragraph (1) after it has become final shall forfeit and pay to the
> United States a civil penalty for each day on which an importation
> of articles, or their sale, occurs in violation of the order of not more
> than the greater of $100,000 or twice the domestic value of the
> articles entered or sold on such day in violation of the order.  Such
> penalty shall accrue to the United States and may be recovered for
> the United States in a civil action brought by the Commission in
> the Federal District Court for the District of Columbia or for the
> district in which the violation occurs.  In such actions, the United
> States district courts may issue mandatory injunctions
> incorporating the relief sought by the Commission as they deem
> appropriate in the enforcement of such final orders of the
> Commission.

(Recommendation, p. 108.)

27.     The ALJ then recognized that the three considerations enumerated by Congress to

guide the ITC in imposing an appropriate penalty include:  (i) the desire to deter violations; (ii)

the intentional or unintentional nature of any violations; and (iii) the public interest.

(Recommendation, p. 109.)

28.     The ALJ did not, unlike Fuji, design a penalty to put Jazz out of business.  Rather,

the ALJ recommended that the Debtor and Benun be jointly and severally liable for $13,675,000

in civil penalties and that Cossentino be liable for $154,000 in civil penalties.  Furthermore, the

ALJ found that the Debtor has the financial ability to pay a substantial penalty.

(Recommendation, pp. 116-17.)

29.    Fuji presented much of the same evidence before the ITC to support its claim that

the Debtor infringed its patents that this Court found unconvincing as a basis to appoint a

Chapter 11 trustee.

30.    Fuji also sought to usurp Customs' authority, as Fuji previously had attempted

with the Federal Circuit and the ITC.  Specifically, Fuji requested that the ALJ usurp Customs'

authority  in the enforcement of the Cease and Desist Order and that the ALJ amend the Cease

and Desist Order to insure that Customs complies with the Federal Circuit's decision in Jazz v.

ITC.

31.    In denying Fuji's request to remove Customs as the ultimate enforcement

authority, the ALJ noted that Customs had the necessary protocols and resources to monitor the

Debtor's importation of single-use cameras to insure compliance with the ITC's rulings.  The

ALJ stated that in early 2003 "Customs began stopping Jazz shipments every week."

(Recommendation, p. 130.)  Furthermore, the ALJ noted that in the Spring of 2003 Customs

began a process of subjecting all of the Debtor's incoming shipments to intensive examinations.

Id.  Furthermore, the ALJ pointed out that since early 2003 the Debtor was required to produce

additional information to Customs regarding its reloading process, including, but not limited to,

videotapes of factories showing such processes.  Id.  Therefore, the ALJ, concluded:

> The administrative law judge finds, in view of the actions taken by
> Customs since the beginning of 2003, coupled with guidance
> provided by Jazz v. ITC, this EID and in any Commission opinion
> thereafter, that Customs will be advised as to the proper scope of
> the existing Commission Orders and will have adequate assistance
> in Custom's enforcement.  Hence, the administrative law judge

12

<u>rejects Fuji's argument for modification of the commission's
existing orders or issuance of any new orders.</u>  (Emphasis Added.)

(Recommendation, pp. 130-131.)

32.    Thus, at no time throughout these ITC proceedings has either the ALJ, the ITC,
the District Court, or the Federal Court sought in any way to interfere with or usurp Customs'
enforcement authority.

33.    It is significant that the ALJ found that Polytech Enterprises, Ltd. ("Polytech"),
the Debtor's primary provider of single-use cameras in 2003, was <u>permissibly</u> repairing cameras
(but for the replacement of full backs on Kodak cameras and the use of certain previously
reloaded SUCs) and that Customs' intensive examination of the Debtor's SUCs assured
compliance with the ITC's rulings.  The ALJ nonetheless found that the Debtor was infringing
on Fuji's patents.  The inconsistencies between the ALJ Recommendation and Customs'
enforcement of the same law is mind-boggling and the Debtor filed a petition for review of the
Recommendation before the ITC, the first step in the appellate process.

34.    On July 27, 2004, the ITC Determination issued.  The ITC determined not to
review the ALJ's findings that the Cease and Desist Order was violated but did <u>not</u> rule on
whether it will adopt the specific enforcement measures.  By its determination, the ITC also
endorsed the ALJ ruling that Customs' enforcement authority not be usurped.

35.    The Debtor's patent counsel has advised that if the enforcement measures are
ultimately adopted by the ITC, it has the effect of a judgment.  The ITC, however, must obtain an
order from the District Court <u>if</u> it elects to enforce the judgment.  Ordinarily, as with the earlier
enforcement proceeding (ITC-1), the ITC and the Debtor will seek to negotiate a consensual
resolution.

40654/0001-2171896v12

36.    Once the ITC issues its complete ruling, the Debtor will appeal to the Federal Circuit.  The Debtor respectfully submits that the ALJ Recommendation and the ITC Determination will again be reversed by the Federal Circuit and are erroneous in at least three ways:  (a) improperly basing their decision on certain videotapes; (b) utilizing the wrong burden of proof; and (c) misapplying the "reloaded reload" issue.[10]  The ALJ and the ITC have ruled in Fuji's favor at every turn.  However, the ALJ and the ITC have been reversed in prior proceedings and the Debtor respectfully submits that they will be reversed again.  Moreover, the ITC and Customs, not the District Court or the Bankruptcy Court, are the proper agencies to deal with the Cease and Desist Order.

**D.    The Debtor's Efforts to Comply With Ever Evolving Law**

37.    _Historical Efforts_.  As a result of the ruling in ITC-1, the Debtor shifted to suppliers that would only repair reloaded SUCs that were first collected in the United States.[11]  However, the ALJ Recommendation found that the Debtor did not sufficiently remove foreign reloaded SUCs ("Reloaded SUCs") from the SUC supply source.  In addition, the Debtor sought to comply with the eight-step repair process that the Federal Circuit held was proper.  Indeed, as of early 2003, the Debtor had shifted its supply source primarily to Polytech, an entity the Debtor

---

[10] The ALJ spent much time at trial in ITC-2 discussing the importance of videotapes of the reload factories.  As with the evidence relating to the quality of the cameras, there is no case known by Debtor's patent counsel that has required videotapes to prove the repair / reconstruction issue.  As set forth in the Kaplan Affidavit at pp. 8-9, the ALJ applied different standards of inference to the evidence presented by the Debtor and Fuji and created a new standard that the Debtor believes is not recognized in patent law.

[11] To the extent the Debtor pays Fuji with proceeds from the Imation Litigation, the findings of infringement of the Reloaded SUCs will be mooted under the patent exhaustion doctrine.  _See_ Kaplan Affidavit at pp. 5-6.

believed complied with the eight-step repair process.  However, the ALJ Recommendation found

for the first time that the replacement of full backs was not permissible repair.

38.    <u>Recent Efforts</u>.  After the ALJ Recommendation was issued, the Debtor further

modified its processes to ensure the Debtor follows the most recent roadmap for compliance with

the Cease and Desist Order.  Specifically, the Debtor is only purchasing SUCs from Polytech.

To ensure that Reloaded SUCs were first sold in the United States, Polytech now marks the

Reloaded SUCs and only reloads the Reloaded SUCs that are marked as having first been sold in

the United States.

39.    In addition, because the ALJ Recommendation found that Polytech's reloaded

cameras infringed on Fuji's patents if the entire back of the SUC was replaced, Polytech no

longer replaces the entire back of the SUC shells.  <u>See</u> Kaplan Affidavit at p. 4; and Benun

affidavit at pp. 4-5.

## V.    <u>FEDERAL CIRCUIT APPEAL</u>

40.    On May 3, 2004, the Federal Circuit heard oral argument on the appeal of Fuji's

February 25, 2003 judgment.  According to the Debtor's appellate counsel (Donald Jacobs, Esq.

of Budd Larner), the Debtor anticipates that the Federal Circuit will render its decision shortly.

The Federal Circuit decision could very well impact not only the Fuji Judgment and Fuji's

appeal on the issuance of an injunction but also influence the most recent proceedings before the

ITC.  Fuji would like the Debtor out of business before the Federal Circuit rules or the Imation

Litigation is concluded so the Debtor will be unable to remobilize its operations if successful.

## VI.    <u>IMATION LITIGATION</u>

41.    Submitted herewith is the Affidavit of Peter Frazza, Esq., of Budd, Larner,

Rosenbaum, Greenberg & Sade, P.C., explaining in detail, as he has many times before, the

status of the Imation Litigation and the magnitude of the claims.  Fuji's suggestion that Imation

15

Litigation will not be impacted if its Conversion Motion is granted is deceptive.  Fuji and its

counsel know very well that conversion would result in the appointment of a trustee that would

have to become familiar with the litigation and the efforts of the Budd Larner firm and, if

agreeable, move to retain Budd Larner as his/her counsel.  Fuji also knows full well, given its

communication with counsel to Imation, that immediately upon conversion, Imation will seek to

adjourn the Imation proceedings given the need for retention of counsel and then seek to settle

the case "on the cheap."  This would be the second time Imation, with Fuji's "assistance," would

seek to delay the inevitable.

## VII.   FUJI'S INITIAL REQUEST FOR INJUNCTIVE RELIEF FROM THE DISTRICT COURT

42.     The Lift Stay Motion is no longer limited to Fuji "seeking injunctive relief in the

District Court enjoining the Debtor from continuing to infringe on Fuji's patents," as was

represented in Fuji's notice of motion and prior motion for stay relief (Docket No. 535) (the

"Initial Stay Motion") at pp. 1, 21, 30, and 37.  The present Lift Stay Motion seeks an injunction

and that the Debtor provide Fuji with 60 days advance notice of any sales of SUCs.  Putting

aside the defects of its present motion, Fuji's history of requesting, and being denied, injunctive

relief must not go unnoticed.

43.     Fuji has, on two previous occasions, requested that the District Court issue an

injunction preventing the Debtor from further infringing activity.  (See Fuji's Initial Stay Motion

at p. 22.)  On both occasions the District Court *denied* the requests.  The District Court first

denied Fuji's request for an injunction by order dated October 10, 2001, ruling that: (a) Fuji

could seek redress from Customs and the ITC; (b) Fuji had experienced no irreparable harm

because alternative forms of relief were available and "mere delay in a government agency's

ability to hear a matter does not constitute irreparable harm"; and (c) Fuji had not demonstrated a

16

likelihood of success on the merits with regard to the importation of SUCs which had not been

reviewed by a governmental agency or judicial body.  (A copy of the District Court's October

10, 2001 Order is attached as Exhibit 11 to the Rosenthal Stay Declaration.)

44.     The District Court again denied Fuji's request for an injunction by Order dated

March 13, 2003.  In doing so, the District Court stated that Fuji had failed to "comply with the

strictures" of Fed. R. Civ. P. 65(d).  Fuji requested that the Court enjoin the Debtor and others

from "infringing" or "inducing such infringement" of its patents.  The Court stated that such a

request was not specific enough in detail to reasonably describe the acts Fuji sought to restrain.

Furthermore, the District Court indicated that Fuji's general "obey the law" language was

insufficient to permit an injunction being imposed on the Debtor.  In addition, the District Court

stated that even if Fuji had more narrowly tailored its request, an injunction would be

inappropriate because, among other reasons, "Fuji [had] already sought and obtained injunctive

relief in the ITC proceeding the subject of which is [the Debtor's] current and *ongoing* conduct."

(See District Court's March 13, 2003 Order attached as Exhibit 1 to Rosenthal Stay Declaration

(emphasis in original).)

45.     Importantly, the District Court noted that the ITC enjoined the Debtor from

importing infringing cameras, which the District Court held resolved Fuji's claim of further

infringing activities with regard to the Debtor's "supply chain for which evidence has been

adduced" in the District Court case.  Thus, Fuji's rights remain protected in the relief available

before the ITC which apparently was satisfactory to Fuji when it moved and obtained stay relief

from this Court to proceed before the ITC.

46.     Moreover and most importantly, the very issue of whether Fuji is entitled to

injunctive relief is on appeal, at Fuji's request, to the Federal Circuit, and was specifically

17

addressed at oral argument and cannot be revisited before the Federal Circuit rules.  (See

Excerpts of Oral Argument Before Federal Circuit annexed as Ex. C to Affidavit of Donald P.

Jacobs In Opposition To Stay Motion.)

47.    After requesting that the ITC, and not this Court, address all issues relating to

U.S. patent laws, Fuji, for the first time, on May 13, 2004, filed the Initial Stay Motion seeking

authority to move for an injunction before the District Court.  On June 4, 2004, this Court denied

Fuji's request without prejudice to renew the motion upon changed circumstances.  Fuji

essentially asks that its Initial Stay Motion now be reconsidered by virtue of the incomplete ITC

Determination.  Fuji apparently has changed its strategy and the relief it now seeks is not just

limited to injunctive relief, which it previously recognized was the only relief it could be entitled

to receive.[12]

48.    Fuji's latest maneuver (the barrage of three motions) is really a thinly-veiled

disguise to threaten conversion and concoct an administrative claim in the hope that stay or some

other relief will be granted.  Fuji knows not one of the cases cited support conversion and that its

request for an administrative claim is procedurally and substantively flawed.  The Lift Stay

Motion, on the other hand, should be considered by the Court, but only after:  (a) the ITC

concludes its review of the ALJ Recommendation; and (b) the Federal Circuit issues it decision

on the Fuji Judgment and the District Court's denial of the injunction - the very same injunction

Fuji seeks to pursue again.

---

[12] Exhibit 13 to the Rosenthal Stay Declaration contains a draft complaint that seeks not
only to enjoin infringing conduct, but also for Jazz to give Fuji written notice of such intended
sale together with a sample camera and description of the process of refurbishing at least sixty
days before such sale.  (See Draft Complaint at p. 15.)

## VIII.    OPPOSITION TO FUJI'S CONVERSION MOTION

### A.    Cause Does Not Exist to Convert the Debtor's Chapter 11 Case

49.    It is undeniable that the purpose of Chapter 11 of the Bankruptcy Code is to afford a debtor the ability to reorganize itself for the benefit of its creditors by preserving the going concern value of the business.  See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timber of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 373 (5th Cir. 1987) (en banc) ("A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving the going-concern values and thereby enhancing the amounts recovered by all creditors"); see also In re Kings Terrace Nursing Home and Health Facility, 184 B.R. 200, 203 (S.D.N.Y. 1995) ("The object of Chapter 11 of the Code is to permit a potentially viable debtor to restructure and emerge from bankruptcy protection").

50.    Recognizing that in some in instances conversion or dismissal of a Chapter 11 bankruptcy case may be appropriate, Section 1112(b) of the Bankruptcy Code grants the bankruptcy court discretion to dismiss a Chapter 11 case for cause.  Nevertheless, conversion or dismissal of a Chapter 11 case is an extreme remedy and courts must be extremely wary of "precipitously sound[ing] the death knell for a debtor by prematurely determining that the debtor's prospects for economic revival are poor."  In re Economy Cab & Tool Co., Inc., 44 B.R. 721, 724 (Bankr. D. Minn. 1984) (denying motion to dismiss or convert case); see also In re Smith, 77 B.R. 496, 499, 502-503 (Bankr. E.D. Pa. 1987) (denying motion to dismiss case that was over 29 months old when principal remaining asset was litigation and litigant sought to convert case to blunt efforts of counsel to litigate claims).

51.    The burden of proof in connection with the Conversion Motion rests squarely on Fuji to show cause by a preponderance of the evidence; see In re Adbrite Corp., 290 B.R. 209, 214 (Bankr. S.D.N.Y. 2003).  See also In re Chris-Marine U.S.A., Inc., 262 B.R. 118, 124

(Bankr. M.D. Fla. 2001) (denying motion to dismiss case where United States failed to satisfy

burden).

52.      In evaluating motions under Section 1112(b), "all doubts are to be resolved in

favor of a debtor." Id. at 124 (citations omitted); see also In re Smith, 77 B.R. at 499 ("[a] court

should resolve doubts in favor of the debtor in deciding a § 1112(b) motion") (citations omitted).

**B.      The Debtor's Chapter 11 Case is Proper and Fuji Has Not Been Prejudiced**

53.      As set forth above, from the first day of this case the Debtor repeatedly has stated

that the success of its Chapter 11 case is conditioned upon prevailing in either or both of the

Federal Circuit Appeal or the Imation Litigation.  Further, throughout this Chapter 11 case the

Debtor has acted in good faith and has been forthright to this Court and all creditors about its

efforts and the likelihood of success in ITC-2 before the ALJ and the ITC.  As set forth above,

the ALJ twice has issued rulings that were incorrect, including one ruling adopted by the ITC

that was reversed by the Federal Circuit as to the proper repair process.

54.      Nevertheless, the Debtor continues to operate its business and has modified its

supply sources in an environment where complying with the Cease and Desist Order has been

complicated by inconsistent Federal Circuit, District Court, ALJ, and ITC rulings, as well as

sufficient ambiguity in such rulings that even Customs was unable to decipher the requirements

now adopted by the ALJ.  As set forth above, in the appeal to the Federal Circuit in ITC-1, the

Federal Circuit raised for the first time the requirement that SUCs must first be sold in the United

States (the issue was never raised in earlier briefings or decisions in the ALJ or the ITC).  In

addition, the Federal Circuit enunciated an eight-step process, which the Debtor followed to

Customs' satisfaction.  The District Court found an additional eleven steps also were

permissible, for a total of nineteen steps that would be permissible.  However, in ITC-2 the ALJ

went back to a twelve-step process and restricted certain replacement parts, including the use of

20

entire backs, that resulted in the ALJ's finding that the Debtor did not comply with the Cease and

Desist Order.  See Kaplan Affidavit at pp. 3-4.  In addition, the ALJ found infringement based on

the reloading of previously Reloaded SUCs, which the Debtor believes will not infringe on Fuji's

patents if the Fuji Judgment is paid under the patent exhaustion doctrine.  See Kaplan Affidavit

at pp. 5-6.  The ALJ further based its Recommendation on a new standard of proof not

recognized in patent law and required videotape evidence.  See Kaplan Affidavit at pp. 8-9.

      55.     Notwithstanding the changing landscape required to comply with the Cease and

Desist Order,  Fuji has not shown and cannot show that the Debtor continues to infringe on its

patents.  Instead, Fuji relies blindly on the partial ITC Determination, that will be appealed when

final, and does not consider the fact that the ALJ Recommendation has provided the Debtor with

a roadmap to navigate the previously evolving landscape of rulings.  Moreover, this Chapter 11

case is proper because the Debtor believes that, after the resolution of the Federal Circuit Appeal

and the Imation Litigation, the Debtor will have sufficient funds to pay its creditors, including

Fuji's claims, in full and will be able to propose a confirmable reorganization plan and have a

viable business going forward.

      56.     Contrary to Fuji's allegations, the Debtor has not and is not using the bankruptcy

process to avoid accountability and in no way has the Debtor used this Chapter 11 case to shield

it from the consequences of any post-petition wrongdoing.[13]  Rather, the heart of Fuji's

Conversion Motion, together with the Lift Stay Motion and Administrative Claim Motion, is

---

[13] As a result of this Chapter 11 case, the Debtor's obligation to pay the Fuji Judgment was stayed, pending appeal.  Fuji has never argued that the filing of this bankruptcy case to stay the Fuji Judgment was improper pending the Federal Circuit Appeal.  If Fuji thought that the Debtor's use of Chapter 11 to stay the Fuji Judgment was improper, Fuji's experienced counsel would have moved for dismissal of the case.  Instead, Fuji desired the Debtor remain in Chapter 11 and thereby provide Fuji with unfettered access to the Debtor's operations and financial disclosures.

40654/0001-2171896v12

Fuji's attempt to accelerate remedies in the Bankruptcy Court that Fuji could not obtain outside

of bankruptcy.  Specifically, as set forth above, Fuji sought injunctive relief from the District

Court on two occasions outside of bankruptcy.  On both occasions, the District Court denied

Fuji's motions to obtain injunctive relief to enforce the Cease and Desist Order, deferring to the

ITC's enforcement mechanisms.[14]  By filing the Conversion Motion, Fuji essentially is seeking

to end run the ITC process it requested and permanently put the Debtor out of business by

effecting its liquidation in Chapter 7.

      57.     Fuji's attempt to expand its rights before this Court is further evidenced by the

fact that, if no bankruptcy case was pending, Fuji would not be able to obtain an injunction or

enforce a claim against the Debtor until it obtained a judgment from the District Court.  As was

the case in the District Court case resulting in the Fuji Judgment, the District Court would need

to review, de novo, whether any infringement occurred.  Only if the District Court found

infringement could it then impose a judgment against the Debtor.  Fuji simply would not have a

right to payment or injunctive relief at this time outside of bankruptcy.  As such, there is no

reason Fuji should be afforded similar relief by way of conversion of the Debtor's case.  The

Bankruptcy Code is not a sword for creditors and does not afford creditors greater rights than

they would have outside of bankruptcy.  See In re Landmark Distributors, Inc., 189 B.R. 290,

306 (Bankr. D.N.J. 1995) (dismissing involuntary petition filed by creditor and recognizing that

"the Bankruptcy Code was created by Congress to act as a shield for debtors, rather than as a

sword for creditors") (citations omitted).  Fuji should not be allowed to use the Debtor's Chapter

---

[14] As this case has borne out, Fuji has not been limited in its action before the ITC.
Rather, any harm Fuji alleges was caused by this Chapter 11 case has been caused by Fuji's own
overzealousness in bringing premature litigation to this Court before the ITC made any final
determinations, thereby running up the cost of its own legal fees, as well as the Debtor's legal
fees.

11 case as a sword against the Debtor in complete contravention of the Bankruptcy Code and its

prior actions (e.g., stay relief to proceed before the ITC).

58.     As set forth more fully below and in the opposition to the Administrative Claim

Motion, Fuji also cannot allege prejudice on the basis that it has not been paid an administrative

expense claim.  First, as set forth fully in the Debtor's objection to the Administrative Claim

Motion, Fuji cannot legitimately argue that it has a valid administrative claim at this time.

Second, even if Fuji were entitled to an administrative expense claim, such a claim certainly

would not be allowed in the alleged amount of $6,546,000.[15]

59.     Despite its efforts to portray this Chapter 11 case as causing it prejudice and

harm, Fuji has not been prejudiced and cannot show that this bankruptcy case has thwarted its

ability to seek remedies for any post-petition conduct by the Debtor that Fuji otherwise would

have been entitled to seek outside of bankruptcy.  In fact, the Debtor has consented to Fuji

exhausting its rights before the ITC and the Federal Circuit.  Simply put, the Debtor has properly

used the Chapter 11 process and has not prevented Fuji from pursuing any rights Fuji would have

outside of bankruptcy.

## C.     <u>Conversion is Premature</u>

60.     It would be manifestly unjust to convert the Debtor's case to Chapter 7 to only

have the Federal Circuit reverse the Fuji Judgment or have a successful result from the Imation

Litigation.[16]  From day one, the Debtor's Chapter 11 case always has been about reorganizing for

---

[15] Further, to the extent that the Fuji Judgment is satisfied under a reorganization plan, the patent exhaustion would reduce any administrative expense claim to which Fuji might be entitled based on any violations arising from reloading the Reloaded SUCs.  See Kaplan Affidavit at pp. 5-6.

[16] Conversion also would cause the immediate creation of unpaid administrative claims from vendors who have extended credit to the Debtor in good faith.

the benefit of the Debtor's creditors pending the Federal Circuit Appeal and Imation Litigation.

As a result, the Debtor has worked diligently to ensure its commitment to customer relations and

has obtained substantial commitments from its customers to support the Debtor's operations.  In

addition, the Debtor has taken significant steps to reduce its operating costs, including reducing

its payroll and lease obligations.  The Debtor's monthly operating reports submitted to this Court

have shown that the Debtor has, excluding professional fees, operated at a net profit.

61.    As has been disclosed from the outset, the Debtor's ability to formulate a

reorganization plan has been delayed because the formulation of any reorganization plan and

allocation of distributions to all creditors -- not only Fuji -- depends on the outcome of the

Federal Circuit Appeal, which was argued in May 2004, and the Imation Litigation.  To convert

the Debtor's case at this time would abruptly terminate the Debtor's efforts to reorganize without

the conclusion of either of those events, which the Debtor always has maintained are the

linchpins of its reorganization efforts.

62.    The outcome of those matters are fundamental to the formulation of a

reorganization plan.  With respect to the Fuji Judgment, if the Federal Circuit determines that

Fuji is not entitled to a $30 million pre-petition claim, the unsecured creditor body will be

significantly reduced.  Moreover, a reversal of the District Court's determination will impact the

manner in which the Debtor is required to conduct its business going forward and the processes it

is required to use in repairing cameras.  In addition, if the Debtor is successful in the Imation

Litigation, the Debtor may have more than $80 million available to pay its administrative claims,

unsecured creditors, and equity holders.

63.    Even if the Debtor is not successful in the Federal Circuit Appeal, the Debtor has

modified its processes to ensure that only SUCs first sold in the United States are repaired and

imported to the United States in the manner prescribed by the Federal Circuit, the ALJ, and the

ITC.  As described above, the Debtor now uses only Polytech to supply the SUCs and Polytech's

processes have been further modified, as a result of the ALJ Recommendation in ITC-2, to

ensure that (a) foreign shells do not make their way into the United States by marking the

Reloaded SUCs and (b) not using full backs to repair SUC shells.

64.    Similarly, even if the Debtor is not ultimately successful on appeal in ITC-2,[17]

conversion cannot be the proper remedy at this time because the ITC has not established any

enforcement measures that would necessitate conversion.  Fuji cannot assert that the Debtor is

administratively insolvent, in light of the anticipated recoveries from Imation Litigation and

Fuji's premature and substantively improper alleged administrative claim.  There also is no

reason to believe that any enforcement measures the ITC may issue will be so severe that the

Debtor will be unable to meet its obligations.  Indeed, the penalty the ALJ recommended (which

has not been adopted by the ITC) was set at a level that the ALJ believed the Debtor would be

able to pay.  (Recommendation, p. 117.)  Further, Fuji has cited to no authority that would

authorize it to shut down the Debtor outside of bankruptcy based solely on past infringement.

Accordingly, before the ITC rules on enforcement measures, Fuji's motion for conversion is at

best premature and Fuji should not be permitted to do inside bankruptcy that which it cannot do

outside of bankruptcy.

65.    Ultimately, Fuji's basis for conversion is that the Debtor is "incapable of selling

single use cameras that do not infringe Fuji's patents."  (Conversion Motion, p. 17.)  This

allegation simply is not correct and is wholly inconsistent with the ALJ's Recommendation that

---

[17] As set forth above and in the Kaplan Affidavit, the Debtor believes ITC-2 will be
reversed on appeal because the ALJ Recommendation and ITC Determination are erroneous in
multiple respects.

the Debtor was indeed repairing cameras in a manner that did not infringe when it used Polytech

as its supplier.  Moreover, based on the ALJ Recommendation and its roadmap to proper repair,

Polytech, the Debtor's sole supplier, has modified its repair processes.  <u>Furthermore, Customs</u>

<u>currently is actively determining whether the Debtor is complying with the most recent ITC</u>

<u>Determination and has not "excluded" the import of SUCs into the United States since the ITC</u>

<u>Determination</u>.  Accordingly, it is premature to destroy the Debtor's business by converting this

case to a Chapter 7 liquidation proceeding.

**D.      The Debtor Has Acted in Good Faith**

66.      Fuji has not and cannot show that the Debtor is misusing the Chapter 11 process

case.  As set forth above, the Debtor vehemently disputes the ALJ Recommendation and ITC

Determination and will appeal the decision.  Nevertheless, even if the ALJ Recommendation and

the ITC Determination are not reversed as to liability, the findings of the ALJ and ITC simply do

not evidence that the Debtor is misusing this Chapter 11 cases especially in light of the

ambiguity that has even resulted in Customs' permitting the Debtor's practices.

67.      Fuji cites to single statements by Benun and Cossentino apparently to show

blatant violations.  (<u>See</u> Conversion Motion, p. 14.)  However, neither Benun nor Cossentino

ever asserted that absolutely no foreign shells entered the United States.  Indeed, Cossentino,

who was not fully quoted by Fuji, indicated that he recognized that a few cameras may have been

imported and that the procedures instituted would "hopefully prevent any violation."  (<u>See</u>

<u>Rosenthal Decl</u>. Ex. 10, lines 2-3 and 20-21.)  With respect to Benun's quote, Benun never

testified that foreign shells were not used; rather he candidly stated that procedures were put into

place to prevent foreign shells from being used.  Moreover, as the Debtor ultimately will

demonstrate on appeal, the numbers of foreign shells that the ALJ found to have been used

appears to be a statistical anomaly not supported by the record before the ALJ.  Indeed, the ALJ

26

ignored evidence to the contrary.  Further, Fuji completely dismisses the fact that if Fuji is paid

under the Fuji Judgment any misuse of Reloaded SUCs will be remedied through the patent

exhaustion doctrine.

68.    Although Fuji seeks to use the ALJ Recommendation to evidence blatant

violations of law, it is extremely noteworthy that Customs, which is charged with the ultimate

enforcement authority and has the necessary protocols and resources to monitor the Debtor's

importation of cameras, allowed the Debtor to import cameras after subjecting the Debtor to

intensive examinations.  (Recommendation, p. 130.)  For Fuji to allege blatant violations on the

part of the Debtor simply is inconsistent with reality and Customs' determinations that the

Debtor complied with the Cease and Desist Order.

69.    Moreover, as described above and in the Kaplan Affidavit and the Benun

Affidavit, the Debtor continues to work with Polytech to ensure compliance with the ALJ

Recommendation so that the Debtor will not be found liable in the future.

**E.    The ITC Determination Should Not Be Given Preclusive Effect**

70.    Contrary to Fuji's contention, the ITC Determination cannot and should not be

given preclusive effect at this time.  Fuji's overzealous attempt to argue judicial and equitable

estoppel simply is not appropriate where no final judicial decision has been entered that can be

given preclusive effect.

71.    Moreover, even if this Court views the ITC Determination as final for purposes of

the Conversion Motion, a finding of infringement is not in and of itself sufficient to convert a

case.  If findings of violations of law were sufficient to convert a case, any heavily regulated

industry where violations are common would require conversion, even if those violations

ultimately are remedied.  Without enforcement measures issued by the ITC, the Debtor is in

essentially the same situation now as it was when the ALJ Recommendation was first issued.

27

There simply has not been a significant change in this proceeding that would warrant conversion of the Debtor's Chapter 11 case at this time.

72.    Even if this Court were to determine that there has been a change in the Debtor's case, Fuji incorrectly asserts that the Debtor's consent to the ITC determining infringement should bind this Court for purposes of <u>conversion</u>.  Contrary to Fuji's assertion, the Debtor has never taken the position that ITC's determination could not be appealed or would otherwise conclusively bind this Court and require conversion of this case.

## F.    <u>Fuji Has Not Shown Cause For Conversion</u>

73.    In support of its motion to convert, Fuji argues that where the provisions of the Bankruptcy Code are misused by a debtor in possession, Section 1112(b) of the Bankruptcy Code affords the Bankruptcy Court authorization to convert.  Fuji relies on cases that state the ten grounds for conversion listed in Section 1112(b) of the Bankruptcy Code are not exhaustive. (<u>See</u> Conversion Motion, p. 14) (citing <u>In re SGL Carbon Corp.</u>, 200 F.3d 154, 160 (3d Cir. 1999); <u>In re Brown</u>, 951 F.2d 564, 572 (3d Cir. 1991); <u>In re Young</u>, 76 B.R. 376, 378 (Bankr. D. Del. 1987).  The Debtor does not dispute that a Bankruptcy Court may consider multiple factors; however, the Debtor's case does not warrant conversion and the cases cited by Fuji are inapposite.

74.    For instance, in <u>SGL</u>, the United States Court of Appeals for the Third Circuit held a Chapter 11 petition was not filed in good faith where the company was financially healthy and the petition was filed as a litigation tactic.  In contrast, there is no dispute that after the Fuji Judgment was entered, the Debtor was not financially healthy as a result of the judgment.  There

28

also is no dispute that Fuji <u>never</u> moved to dismiss the Debtor's Chapter 11 case, instead making the strategic decision to have the Debtor remain in Chapter 11.[18]

75.    The <u>Brown</u> case upon which Fuji relies actually supports the Debtor's position. In <u>Brown</u>, the Third Circuit <u>reversed</u> the District Court's decision dismissing the debtor's Chapter 11 case because the record did not reflect that the creditor would reject <u>all</u> plans. <u>Brown</u>, 951 F.2d at 572. Indeed, in <u>dicta</u>, the Third Circuit suggested that the bankruptcy judge should lift the stay for the limited purpose of permitting the state court to determine the amount due to the creditor. <u>Id.</u> at 573. The Court held that stay relief should be granted only <u>after</u> the issue of damages is resolved, at which time the bankruptcy court would <u>then</u> review whether a reorganization is possible. The approach in <u>Brown</u> is similar to the approach here, where the Debtor awaits the determination of the Federal Circuit Appeal and now the ITC's enforcement measures. Until such time, and especially in light of the Imation Litigation, the Debtor's case should remain in Chapter 11.

76.    Similarly, Fuji relies on <u>Young,</u> where the court dismissed the Chapter 11 case of a debtor that filed bankruptcy rather than seeking review in the state court. The facts in <u>Young</u> are in stark contrast to the Debtor's case, where the Debtor has pursued its appeal of the District Court decision to the Federal Circuit and has vowed to appeal the recent ITC Determination once same becomes final.

---

[18] Fuji has demonstrated the tendency to select a strategy and then when unsuccessful ignore its prior conduct and move in a completely different direction. For example, Fuji never moved to dismiss the Chapter 11 proceeding and elected to "supervise" the Debtor in Chapter 11. Then Fuji moved unsuccessfully for the appointment of a trustee – instead of conversion which it now seeks. Likewise, Fuji sought and obtained stay relief to proceed before the ITC and unhappy with the results there seeks (for the second time) stay relief to move before the District Court in the face of its own cross-appeal denying Fuji an injunction. Despite Fuji spinning around like a top, the Jazz Chapter 11 proceeding remains stable and in pursuit of its initially stated goals (e.g., prosecution of the Federal Circuit Appeal and Imation Litigation.)

40654/0001-2171896v12

77.     Fuji further argues that "Fuji believes that the Debtor views the Fuji Judgment as an insurmountable obstacle to a successful reorganization and, therefore is simply attempting to produce as may cameras as possible, whether or not they infringe on Fuji's patents.  This blatant violation of the law must be stopped." Motion at 14 (emphasis omitted).  Fuji then cites to In re Sal Caruso Cheese, Inc., 107 B.R. 808, 819 (Bankr. N.D.N.Y. 1989) for the proposition that "Chapter 11 is not a free-for-all for debtors and their insiders to carry on with impunity and without accountability."

78.     Fuji's allegations are ludicrous and directly contrary to this Court's prior rulings. Although the Fuji Judgment is an obstacle, it is not insurmountable.  Indeed, the Debtor believes the Fuji Judgment will be reversed on appeal.  Similarly, the Debtor believes the ALJ Recommendation and the ITC Determination were incorrect and will be reversed.  Moreover, even if these decisions are not reversed on appeal, the Debtor believes the proceeds from the Imation Litigation will be sufficient to satisfy any claims Fuji may eventually be entitled to receive.

79.     Fuji's assertion that the Debtor is producing as many cameras as possible without regard to Fuji's patents is equally ridiculous.  As set forth above, the Debtor has been hampered by the ever-changing and inconsistent rulings of the Federal Circuit, the ALJ, and the ITC. Indeed, the determinations by the Federal Circuit, the ALJ, and the ITC have been so complex that even Customs did not believe the importation of the Debtor's SUCs violated Fuji's patents or the Cease and Desist Order.  Notwithstanding the Debtor's disagreement with the ALJ Recommendation, the Debtor has modified its operations to comply with the ALJ Recommendation and constantly is reviewing its procedures to ensure continued compliance.

80.      In contrast, in the case of  Sal Caruso, the record reflected "a parade of episodes

between the Debtor, its insiders and counsel . . . that appear to have been carried out in direct

violation of Code §§ 363, 541, 547, 548, 549 and 1107(a), notwithstanding the subsequent

'curing' of  . . . transfers." Id. at 817.  In Sal Caruso, the Debtor did not act in good faith in

complying with Bankruptcy Code requirements.  In contrast, here, notwithstanding the findings

infringement, the Debtor has complied with Bankruptcy Code requirements.

81.      As set forth above, the Debtor has acted in good faith before this Court and

conversion is not appropriate.  Indeed, even in Sal Caruso, the court recognized that if the debtor

had "exercised good faith and an honesty of intention in its pre- and post-filing conduct, the

Court presumably would have been willing to allow it to pursue its Chapter 11 reorganization

although that reorganization is claimed to be wholly dependent upon a monetary recovery which

may never occur." Id. at 819.

## G.      Conversion is not warranted under Section 1112(b)(1)

82.      Contrary to Fuji's statement of the law, Section 1112(b)(1) of the Bankruptcy

Code does not provide that "a case may be converted when the debtor is suffering continuing

losses or the estate is being diminished and there is an absence of a reasonable likelihood of

rehabilitation." Conversion Motion, p. 16 (emphasis added).  In fact, In re Adbrite Corp., 290

B.R. 209, relied on by Fuji for this proposition, specifically states that "Section 1112(b)(1)

codifies a two-prong test:  continuing loss to or diminution of the estate and absence of a

reasonable likelihood of success." Id. at 215 (emphasis added).  Thus, cause to convert under

Section 1112(b)(1) requires a showing that both prongs of the test have been satisfied.

83.      In addition to misstating the law, Fuji paints a much darker picture of the Debtor's

operations than is the reality.  Specifically, Fuji alleges that the Debtor has lost more than

$3 million of assets during the course of the Chapter 11 cases.  Fuji does not acknowledge that

31

more than $3.4 million (after allocations) has been paid by the Debtor for professional services, primarily resulting from the litigation with Fuji and Imation and the administration of these Chapter 11 cases.  Such expenses will be largely reduced, if not eliminated, upon the Debtor's emergence from Chapter 11.  Thus, excluding these professional fees and expenses, the Debtor has operated at a net profit during this Chapter 11 case, notwithstanding the fact that the Debtor has modified its production processes and changed its supply source to comply with the Cease and Desist Order.  Indeed, even if there were a loss, conversion would <u>not</u> be mandated.  <u>See In re Adbrite</u>, 290 B.R. at 215 ("A continuing loss or diminution of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization").

84.    Fuji also alleges the Debtor is administratively insolvent in view of Fuji's assertion of an administrative expense claim against Jazz in the amount of at least $6,546,400. As set forth in the Debtor's objection to Fuji's Administrative Claim Motion, the Debtor vehemently disputes that Fuji has an administrative expense claim.  Fuji provides no basis for alleging the Debtor's estate is administratively insolvent or that proceeds from the Imation Litigation will not be able to satisfy all administrative expense claims.  As set forth above, the ITC has <u>not</u> adopted the ALJ Recommendation as to enforcement measures and has not filed a request for payment of an administrative expense.

85.    In its attempt to satisfy the second prong of Section 1121(b)(1), Fuji alleges that the Debtor will not be able to formulate and confirm a plan of reorganization.  Its basis for this assertion is that "Jazz is unable to pay its administrative claims.  The Imation litigation and all related appeals likely will not be concluded for several years - -the core of the Debtor's business model continues to be the illegal sale of single use cameras."  (Conversion Motion, p. 17.)  These

allegations simply do not withstand scrutiny.  First, Fuji does not cite to any allowed

administrative claims that are not paid.  As set forth above, Fuji does not have an allowed

administrative expense that should be paid at this time and, with the exception of professional

fees, the Debtor is paying administrative expenses.  Second, the Imation Litigation is proceeding

and there is no basis for Fuji's allegation that the proceeding will "likely not be concluded for

several years."

**H.      Conversion is Not Warranted under Section 1112(b)(2)**

86.      Fuji is correct that a court may convert a case if Fuji demonstrates that the Debtor

is unable to effectuate a plan.  Fuji, however, cannot meet its burden on this point.

87.      Fuji relies on Moody v. Security Pacific Business Credit, Inc., 85 B.R. 319, 345

(W.D. Pa. 1988), In re Economy Cab & Tool Co., 44 B.R. at 725 (Bankr. D. Minn. 1984), Hall v.

Vance, 887 F.2d 1041, 1044 (10th Cir. 1989), and In re Sunflower Racing, Inc., 226 B.R. 665,

669) (D. Kan. 1998) for the proposition that failure to file a plan after a reasonable time indicates

an inability to do so and is cause for conversion under Section 1112(b)(2).  Those cases are

inapposite to the Debtor's case.

88.      In Moody, the debtor's plan was a liquidation plan and all parties agreed the

Debtor could not reorganize.  Moody, 85 B.R. at 343-344.   Moreover, in Moody the debtor had

no business and was merely a "corporate shell."  Id. at 346.  Similarly, in Economy Cab, the

court denied a motion to convert and stated that courts have usually limited Section 1121(b)(2)

of the Bankruptcy Code to "cases where a debtor was little other than a corporate shell lacking a

place of business, employees, payroll, or discernible economic activity . . . Where a debtor is

carrying on some business activity, this ground is not properly argued or applied before a plan is

filed, when the debtor's ability to accomplish the plan first can be gauged."  Economy Cab, 44

33

B.R. at 725.  Here the Debtor is far from a corporate shell and does not anticipate that it will file

a liquidating plan.

89.     Similarly, Hall and Sunflower are inapposite.  In Hall, the court dismissed the

debtor's case where the debtor was an individual and failed to meet the court's deadlines for

filing various pleadings including the Plan.  Hall 887 F.2d at 1042-1043.  In Sunflower, the

debtor filed three plans that were not confirmable and was warned by the court that it must

present a confirmable plan.  Sunflower, 226 B.R. at 669.  In sharp contrast, the Court has

permitted the Debtor to extend exclusivity based on the complexities of this case and necessity

for the Federal Circuit Appeal and Imation Litigation to proceed.

90.      Finally, Fuji cites to Tennessee Publishing Co. v. American National Bank, 299

U.S. 18, 22 (1936) to argue that a court is not bound to clog its docket with "visionary or

impracticable schemes for resuscitation."  The Debtor is baffled by this citation because the

Debtor's case would remain on the Court's docket regardless of whether the case is converted.

Moreover, Tennessee Publishing was decided more than 40 years before the Bankruptcy Code

was enacted and the Court did not mandate conversion or dismissal.  Under the facts of our case,

conversion is not warranted.

**I.      Conversion is not warranted under Section 1112(b)(3)**

91.     Fuji's argument that the Debtor's case should be converted under Section

1112(b)(3) of the Bankruptcy Code also is unavailing.  As even Fuji concedes, Section

1112(b)(3) gives a court discretion to convert a case if there is both an unreasonable delay and

the delay is prejudicial.  See 11 U.S.C. §1112(b)(3).

92.     The Court in Adbrite, cited by Fuji in support of conversion, recognized that

"[n]ot all delays are unreasonable and not all unreasonable delays are prejudicial."  In the

Debtor's case, the delay in filing a reorganization plan is neither unreasonable nor prejudicial.

34

93.     As set forth above, the Debtor has been waiting for: (a) the Federal Circuit to rule on the appeal of the Fuji Judgment, and (b) the conclusion of the Imation Litigation to propose a reorganization plan.  This delay is not unreasonable.  This Court previously has recognized the necessity of waiting for the Federal Circuit Appeal and Imation Litigation and has extended the Debtor's exclusive period to file a reorganization plan accordingly.

94.     Indeed, the 15 months that this case has been pending is not an unreasonable amount of time.  For instance, in In re C.J. Corp., 78 B.R. 273 (Bankr. D. Haw. 1987), a case relied upon by Fuji to support conversion after an unreasonable delay, the case had been pending for more than three years and the debtor failed to abide by a court order to file a reorganization plan.  Similarly, in In re Smith, 77 B.R. at 502-503, the case had been pending for more than 27 months before the court determined that the delay was excessive.  Notwithstanding finding an excessive delay, the court recognized that under appropriate circumstances a delay caused by litigation may be a sufficient basis for continuing a chapter 11 case.[19]  In Smith, the court did not convert or dismiss the case, but permitted the litigation to continue provided that the debtor continued to pursue the litigation vigorously.[20]  The decision to keep the case open was further buttressed by the fact that the party seeking conversion or dismissal was the litigant against the

---

[19] Fuji also cited to In re Sphere Holding Corp., 162 B.R. 639 (E.D.N.Y. 1994), which recognized that courts must consider the context of delay.  In Sphere Holding, the district court issued an injunction restraining creditors from pursuing collection activities following the dismissal of the debtor's case.  The district court determined that a three month delay was not unreasonable and cited cases where dismissal was not warranted after a two-year delay and where cases were dismissed after four-year delays.  Id. at 643. (citations omitted).  As set forth above, the Debtor has been in Chapter 11 for 15 months.  Any delay is reasonable in light of the pending litigation.

[20] The Smith court also indicated that it would not keep the case open indefinitely for a number of years.  However, in Smith, the case was already 29 months old at the time of the ruling.

debtor. Here, the Debtor believes that its ongoing litigation, which it has been pursuing

vigorously and includes an appeal of Fuji's judgment, is a sufficient basis to allow this case to

continue in Chapter 11. Accordingly, the delay in the Debtor's case has not been unreasonable

and conversion is being pursued by Fuji to simply put the Debtor out of business.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtor respectfully requests that the Court enter an Order denying

Fuji's motion in its entirety and for such other relief as the Court deems just and appropriate.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Jazz Photo Corp., Debtor-in-
Possession

By: _/s/ Michael D. Sirota_
        Michael D. Sirota
        Warren A. Usatine
        Jeffrey M. Traurig

DATED:  September 10, 2004

36