UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          . Case No.  03-26565
                                . Motion No.
                                .
  JAZZ PHOTO CORP.,             .
                                . 50 Walnut Street
                                . Newark, New Jersey 07102
                 Debtor,        .
                                . September 22, 2004
. . . . . . . . . . . . . . . . 10:05 a.m.

TRANSCRIPT OF MOTION TO CONVERT CASE
BEFORE HONORABLE MORRIS STERN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Jazz Photo Corp.:           Cole, Schotz, Meisel, Forman &
                                Leonard, P.A.
                                By:  MICHAEL D. SIROTA, ESQ.
                                     WARREN USATINE, ESQ.
                                     JEFFREY TRAURIG, ESQ.
                                25 Main Street
                                Hackensack, New Jersey 07601

                                Kaplan & Gilman, LLP
                                By:  JEFFREY KAPLAN, ESQ.
                                900 Route 9 North
                                Woodbridge, New Jersey 07095

For the Official Comm.          Ravin Greenberg, P.C.
of Unsecured Creditors:         By:  HOWARD S. GREENBERG, ESQ.
                                101 Eisenhower Parkway
                                Roseland, New Jersey 07068

Audio Operator:                 Carol Urena

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES (Cont'd.):


For Proposed Customs counsel: Budd Larner, P.C.
                              By:  PETER J. FRAZZA, ESQ.
                              150 John F. Kennedy Parkway,
                              CN 1000
                              Short Hills, New Jersey 07078

                              Neville Peterson LLP
                              By:  JOHN M. PETERSON, ESQ.
                              17 State Street, 19th Floor
                              New York, New York 10004

For Fuji Photo Film Co.:      Lowenstein Sandler, P.C.
                              By:  MICHAEL ETKIN, ESQ.
                                   BRUCE D. BUECHLER, ESQ.
                              65 Livingston Avenue
                              Roseland, New Jersey 07068


For Jack Benun:               Riker, Danzig, Scherer, Hyland,
                              Perretti
                              By:  JOSEPH L. SCHWARTZ, ESQ.
                              One Speedwell Avenue
                              Morristown, New Jersey 07960


For Imation Corp.:            Dorsey & Whitney, LLP
                              By:  BILL STORY, ESQ.
                              50 South Sixth Street, Suite 1500
                              Minneapolis, Minnesota  55402


For the U.S. Trustee:         Office of the U.S. Trustee
                              By:  MARGARET L. JUROW, ESQ.
                              One Newark Center, Suite 2100
                              Newark, New Jersey  07102



                              Stroock & Stroock & Lavan LLP
                              By:  LAWRENCE ROSENTHAL, ESQ.
                                   MATTHEW SIEGAL, ESQ.
                                   DOUGLAS MANNAL, ESQ.
                              180 Maiden Lane
                              New York, New York 10038-4982

1          THE COURT:  This United States Bankruptcy Court is

2    now is session.  The scheduled matters will be heard and fully

3    considered.  Jazz Photo and Benun.  Appearances, please?

4          MR. SIROTA:  Good morning, Judge.  Michael Sirota,

5    Warren Usatine and Jeffrey Traurig, Cole, Schotz, Meisel,

6    Forman and Leonard on behalf of Jazz Photo Corporation.

7          MR. GREENBERG:  Good morning, Your Honor.  Howard S.

8    Greenberg, Ravin Greenberg, appearing for the Creditor's

9    Committee and Jazz.

10          MR. SIROTA:  Judge, I'd like the Court to note that

11   Mr. Frazza from the Budd Larner firm is in the courtroom, as

12   well as Mr. John Peterson from the Neivel Peterson firm,

13   proposed Customs counsel, and Mr. Jeffrey Kaplan, Kaplan and

14   Gilman.

15          MR. ETKIN:  Good morning, Your Honor.  Michael Etkin

16   and Bruce Buechler from Lowenstein Sandler on behalf of Fuji.

17          MR. ROSENTHAL:  Your Honor, Lawrence Rosenthal,

18   Matthew Siegal and Douglas Mannal from Strooker.

19          THE COURT:  All right.  Mr. Sirota, perhaps you can

20   give us a status, as you suggested, on Jazz.

21          MR. SIROTA:  Yes, Judge.  Initially, we attempted

22   last evening, but apparently ECF was down for a few hours, to

23   file this August monthly operating report.  I'm advised at this

24   trial this morning, and I saw Mr. Rosenthal this morning the

25   first thing in court I handed to him a copy of the August

**J&J COURT TRANSCRIBERS, INC.**

1  monthly report.  That report, Judge, is not dramatically

2  different from the July report and let me, at least, give the

3  Court some update.  Since the filing -- end of August, Jazz has

4  operated at a net income of $296,000 deposited.  That's after

5  the legal fees of $3,794,000, which is the net legal fee number

6  after allocations.

7         With respect to accounts payable, the total accounts

8  payable as of August is approximately $3,200,000 of which

9  $1,100,000 is owed to professionals.  Of this $2,100,000

10  amounts owed to non-professionals, 1.8 million is current,

11  leaving a balance of $290,000 of which $192,000 is less than --

12  I would like Mr. Frazza to provide this Court with a brief

13  update as to the -- status, and then I will ask Mr. Peterson,

14  who is proposed Customs counsel.  Mr. Peterson will describe to

15  the Court what's taken place since the issuance of the ITCS

16  determination.  His papers were submitted last evening, and is

17  now on the Court's calendar.  Mr. Peterson, while doing work

18  for the debtor -- the submission of the def -- this Court that

19  his work has involved -- in that regard, given the fact that --

20  so, unless Your Honor has any specific questions, I'll ask Mr.

21  Frazza --

22         THE COURT:  Just let me get a line on the million one

23  in professional fees not paid.  How is that distributed, do you

24  know?

25         MR. SIROTA:  How is it broken down?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MR. SIROTA:  I do have that.

3                      (Pause)

4          MR. SIROTA:  Budd Larner is owed 953,000, this is as

5   of -- my firm is owned 52,000; Eisner 14,000; William, Burke

6   and Carr 35,000; Ravin Greenberg 30,000; Neivel Peterson is

7   listed here as 10,000.  Again, until their retention -- and

8   there a sundry items.  Would you like the entire -- I can hand

9   to the Court the schedule, if you like?

10          THE COURT:  That's okay.  I'll take a look at it.

11  But, it's obvious that it's Budd Larner.  All right.  Mr.

12  Schwartz, I note your presence for the record on behalf of Mr.

13  --

14          MR. SCHWARTZ:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. SCHWARTZ:  Joseph Schwartz on behalf of Jack

17  Benun.

18          THE COURT:  Thank you.  Mr. Frazza?

19          MR. FRAZZA:  May I hand up to you a letter that was

20  -- I received from Judge Linares after I submitted my

21  affidavit?  Do you mind if I approach?

22          UNIDENTIFIED SPEAKER:  It was submitted the other

23  day.  We filed it with the Court.

24          MR. FRAZZA:  Very briefly, as usual, Your Honor,

25  while Mr. Story, who is my adversary, and I were busily

1 preparing to start the trial on September 20th, we received a

2 letter from Judge Linares indicating that because of the Speedy

3 Trial Act, he was required to start a case, which I understand

4 he started yesterday, or will be in the process of picking a

5 jury. As Your Honor saw from the letter that I was about to

6 hand up, the case is now set for January 10th, and Judge

7 Linares has fixed November 19th, for Mr. Story and I to argue

8 approximately 15 in limine motions.

9        The letter of September 15th, also, Your Honor,

10 indicates that if you had any questions, you should feel free

11 to contact Judge Linares directly, and I certainly leave that

12 up to you if you want to avail yourself of that option.

13        I'm not going to repeat, unless you think it's

14 necessary, Your Honor, what was in my affidavit. The one thing

15 I would like to do, however, is to respond, and I'm sure Mr.

16 Story, at some point in time, may be heard to three particular

17 items that I saw in his affidavit. First and foremost, there

18 is a contention that the only claims left are a fraud and a

19 RICO count. With all due respect, Count Three of our complaint

20 is a breach of contract claim covering a good faith and fair

21 dealing claim, and that claim is not dismissed as summary

22 judgment and, in fact, in their recently submitted trial brief

23 they submitted an argument as to why Hong Kong law should apply

24 and, therefore, there should not be a breach of contract claim.

25 The point, Your Honor, is, is that there is a breach of

**J&J COURT TRANSCRIBERS, INC.**

1  contract claim.

2        Second, there is a contention that there a higher

3  standard for fraud and RICO.  I agree there is a higher

4  standard to prove a fraud case.  I have to be careful here,

5  because the opinion is under seal, but it was submitted to you

6  in a redacted form.  If you look at Page 55 of the summary

7  judgment opinion of Judge Linares, you will see that for the

8  RICO -- State Court RICO claim, Judge Linares specifically says

9  that the standard is preponderance of the evidence.  And as I

10  have submitted in my affidavit, three of the four elements of

11  the RICO claim have already been put in our column, meaning

12  that we only have to prove the four elements by a preponderance

13  of the evidence.

14        As you know, because I've been here many, many times,

15  I am very high, and the firm is very high on the RICO claim,

16  particularly, Your Honor, since it trebles the damages, and the

17  attorneys fees would also be part and parcel of any RICO.

18        Thirdly, and perhaps most importantly, there is an

19  intimation, using that word diplomatically, that Mr. Benun, in

20  some how or some way worked it -- the mediation process, and

21  then there must have been an allegation that he breached his

22  fiduciary duty in some way, shape or form.

23        Your Honor, Mark Larner and myself were at the

24  mediation with Mr. Benun.  The process by which the mediation

25  was conducted was with the approval of Mr. Greenberg and Fuji's

1  counsel, as well as Mr. Sirota.  The agreement was that Mr.

2  Larner and I, with Mr. Benun on behalf of the company, would

3  attend the mediation, and see what was happening, and report

4  back to Mr. Sirota and Mr. Greenberg as the proceeding ensured

5  to find out whether their presence was necessary, if their

6  input was necessary, and I represent to you, and if you look at

7  their time sheets from April 1st, you will see that they were

8  informed and kept abreast of what was going on.  Now, the

9  troubling intimation from Mr. Story's affidavit is that Mr.

10 Benun forwarded something.  Your Honor, there was no, and I

11 underscore the word no, offer made by Imation at the mediation.

12 Zero dollars.  So, this suggestion in this affidavit that Mr.

13 Benun demanded some high in the sky number that would be

14 necessary more than he would need to take out all the

15 creditors, I don't know where that came from, because Mr.

16 Larner and I, on behalf of Jazz Photo, we were the ones doing

17 the talking and Judge Politan made no demand.  The reason we

18 made no demand was that no offer was made, and the mediation

19 ended in a very relatively short period of time.  And there is

20 a statement on the record at one proceeding, by Judge Linares,

21 that the mediation was a colossal waste of time.  So, again, I

22 do not want there to be any taint that Mr. Benun did anything

23 wrong with respect to trying to amicably resolve this case.  We

24 were there, ready, able and willing, pursuant to the guidance

25 of Mr. Greenberg and Mr. Sirota, and remarkably the concurrence

1 of Fuji that we go there and see if we can do something.  The

2 only money ever put up in this case, Your Honor, was a number

3 of years ago at a status conference, or settlement conference

4 with Judge Hedges, and if memory serves me it was through the

5 insurance company for roughly $1 million.  And everything you

6 know about this case, $1 million offer was not something four

7 years ago, nor is it today, that is going to do anything with

8 respect to an amicable resolution of this case.  So, again,

9 there have never, ever, ever been dollar one put up, except for

10 that one time.  Never has Mr. Story or their local counsel

11 called me, my firm, Mr. Larner, or anybody else and said, we

12 are willing to put up some money to resolve this case.  There

13 have been numerous letters by Mr. Story, all of which I have

14 here imploring him to allow you to somehow get involved in the

15 settlement process.  Judge Winaris has never, ever once

16 responded to any of those inquiries.  So, I was troubled by

17 that last evening.  You may hear it in my voice, because I was

18 there.  I was there through the guidance of this Court, and

19 with everybody in this court, and we did not walk away from

20 some offer.  There was offer, and Judge Politan concluded the

21 proceeding.

22         So, we are anxious to try this case.  It was not Mr.

23 Benun or Jazz' fault that the Speedy Trial Act pre-empted it.

24 Other than these in limine motions, trial briefs are in.

25 Everything is in.  We were ready, as Mr. Story was, and wasn't

**J&J COURT TRANSCRIBERS, INC.**

1    able to go.  So, the hope is we get the January 10th, have the

2    in limine motions resolved, and start with, I think everyone

3    has always concurred, would be a five to six week trial.  I'm

4    sorry, I show a little emotion for once.

5              THE COURT:  That's all right.  That's okay.

6              MR. FRAZZA:  It was very troubling to read that

7    affidavit last evening, because that was not only implicating

8    Mr. Benun, but also myself.

9              THE COURT:  All right.  Thank you.  Mr. Story?

10             MR. STORY:  May I respond, Your Honor.

11             THE COURT:  Yes.  Just for the record, would you make

12   your appearance, please?

13             MR. STORY:  Yes.  Bill Story, Dorsey Whitney on

14   behalf of Imation.

15             THE COURT:  I think you're going to have to come

16   forward.  We won't be able to get you on the tape.

17             MR. STORY:  Bill Story, Dorsey Whitney, on behalf of

18   Imation.  May I respond very briefly?  I won't go through all

19   of the aspects of the claims.  If Your Honor is interested,

20   I'll be happy to.  But let me talk mostly about the last --

21             THE COURT:  Well, is Mr. Frazza correct that Count

22   Three, the breach of contract is, in fact, not dismissed?

23             MR. STORY:  There is a dispute on that.  We believe

24   there is no basis for any contract claim in this case.  We had

25   ready and will -- to the Court that it was never pled as such.

1   Of course, summary judgment never addressed it, as plaintiff,

2   Jazz Photo, in their response never even talked about it.  It

3   was only after their warranty claims were thrown out that

4   suddenly they try arguing, well, there's still a contract.

5   Look at the complaint.  The only mention of contract is the

6   warranties that are in the contract.  There's nothing other

7   than good faith, which, it did not exist in the complaint.

8   Moreover, as perhaps our records in our trial brief, under the

9   Hong Kong law, which the judge tells does apply, there is no --

10  that's why we put that in there.

11          Now, as to the last point, let me simply say this, I

12  was also at the mediation.  I know what was said.  Whether the

13  mediation -- whether the mediator conveyed our position to Jazz

14  Photo, I don't know.  I do know that we discussed with the

15  mediator what Imation would be willing to pay.  There were

16  numbers discussed.  We also told the mediator that it our

17  suspicion, based on what happened that day, that Jazz Photo

18  would not accept anything less then what they had to get to get

19  out of bankruptcy, and that we would go nowhere near that

20  number because --

21          After a long discussion, googling with Jazz Photo and

22  it's representatives, the fact that we're right, this isn't --

23  proceeding, it's not going to happen.  That's all I know.  We

24  were told that.  That's what we were told.

25          THE COURT:  Well --

1        MR. STORY:  To say that there was not one zero --

2        THE COURT:  Well, okay.  Let me just say this, with

3   all due respect to Judge Politan, here you are.  You know,

4   today is as good a day as any day.  You can communicate.  I

5   don't know where that's going to go.  Or you need not.  That's

6   up to you.  You got all the forces here, and so, if something

7   wasn't, in fact, communicated, it can today be communicated

8   without some intermediary.

9        MR. STORY:  That would be fine.  I would also point

10  out that a reference to the prior mediation, a number of years

11  ago, at that time, before Jazz Photo had had thrown out already

12  all its warranty claims, the 1999 fraud claims, the 1999

13  warranty claims, the fraud act claims, before all those were

14  thrown out, Imation's -- was granted summary judgment.  At that

15  -- their demand was far, far less than the amount owed each

16  creditor, and if they're still in that range, I'd be happy to

17  talk to them.

18       THE COURT:  Well, as I'm sure both of you experienced

19  people know, I think it's difficult to deal on the record with

20  old offers, old situations, changing situations as you approach

21  trial, and I'm not going to interfere or influence that

22  process, and I leave it to you, but I do appreciate your input,

23  and I appreciate Mr. Frazza's input.  I do -- yes, Mr. Sirota?

24       MR. SIROTA:  No, I'm sorry, Judge.

25       THE COURT:  That's all right.

**J&J COURT TRANSCRIBERS, INC.**

 1              MR. SIROTA:  Before we leave --

 2              THE COURT:  Oh, I'm not going to leave.

 3              MR. SIROTA:  -- the issue of Imation.

 4              THE COURT:  Yes.  I wasn't going to leave that issue

 5    either.  I had some questions.  But go ahead.

 6              MR. SIROTA:  It's one thing to say to the Court that

 7    there is suspicion that Mr. Benun and this estate may not

 8    settle for the full amount of the creditors.  It's another

 9    thing to say in an affidavit, in Section Seven, and I quote,

10    but to date Jazz Photo, through its representative, Jack Benun,

11    has been unwilling to resolve this matter for anything less

12    than the amount exceeding what it and he owes creditors.

13              THE COURT:  Okay.  But it doesn't -- you know, your

14    statement didn't say that's what we were told.  It seemed as

15    though it was sort of a first party statement, but I don't

16    think -- we have a lot of disdain in this matter, and I don't

17    think it pays to go too deeply into that.  But let me ask Mr.

18    Frazza first and, certainly, I can hear from you on it.  Mr.

19    Frazza, what do you think the linkages, if any, between the

20    Federal Circuit review of Judge Hochberg's judgment and the

21    Imation case in terms of damages?

22              MR. FRAZZA:  Zero.  I don't think it's --

23              THE COURT:  You think it's zero.

24              MR. FRAZZA:  -- issue, which as I saw a footnote in

25    Mr. Story's affidavit, has anything to do with the measure of

1  damages.  It is absolutely, positively irrelevant to the

2  damages, and we have expert reports that relates to damages,

3  and with all due respect, that is an issue that I don't even

4  believe, in the wake of all the in limine motions, that we have

5  in front of us, that it's something that Imation has moved on.

6  So, I don't think that there's any nexus or connection and it's

7  not really been ever addressed by Judge Linares.  That's not to

8  say, Judge, that he might not raise it at some point in time.

9  But, heretofore, it has not been raised.  There's no in limine

10  motion on it, and it was not something that I was considering,

11  although I did see Mr. Story's footnote.

12         THE COURT:  Yes, as did I.  So, is it your position

13  that if, for example, and who knows what will happen, but let's

14  just say that if the Federal Circuit affirms that the 56 cent

15  measure through that August, 2001 date will not have any impact

16  at all on the loss profit or other measure of damages for Jazz

17  if there should be a judgment for Jazz?

18         MR. FRAZZA:  I think I can simply explain that

19  because I gave it some though anticipating it might be raised

20  today.  If Jazz has a claim against Imation, which is viable,

21  they would be entitled to that amount.  What Imation is seeking

22  to do is offset the damages that it owes to Jazz, claiming that

23  the monies that Fuji is entitled to, they should get a credit

24  for.  So, the way this would work, and why I don't think there

25  is any nexus, is that if we are successful in our claim, let's

1  say X dollars times three equals whatever, we would then need

2  to satisfy the judgment against Fuji.  If the judgment, at that

3  juncture, would be 35-40 million, whatever the case might be,

4  and we satisfy that judgment, why should Imation get the

5  benefit of a 56 cent royalty that they allege is owed?

6          THE COURT:  Well, I thought that the simple straight

7  line, and this could be wrong, but that Imation affected the

8  ability to sell the disposables, therefore, there weren't sales

9  of X units, and therefore, there was a loss profit of Y

10  dollars.  To the extent that profit of Y dollars would be

11  impacted before August, 2001, by a 56 cent measure that would

12  go over to Fuji, but was not, because there weren't the sales

13  which would be the infringing sales of those units, that that

14  should affect the measure of damages.  Mr. Story, is that your

15  position?  That's how I read your footnote?

16          MR. STORY:  Correct.  These are not actual

17  statements.

18          THE COURT:  Right.  Exactly.  So, there's --

19          MR. STORY:  Hypothetical loss profits.  The profiting

20  would not include that 56 cent -- and by their own expert, just

21  putting that in reduces the claim by almost 23 million.

22          MR. FRAZZA:  I'd like Your Honor to look at the

23  damage report.

24          THE COURT:  Go ahead.

25          MR. FRAZZA:  The fallacy of that is that the damage

1  claims have multiple components.  One is the Walmart recall,

2  and the damages that ensued there.  After that, we did not use

3  the Imation film, and many of the cameras were deemed not to be

4  infringing.  So, the 56 cents you could not owe if the cameras

5  in question were not deemed to be infringing.  How could we owe

6  --

7        THE COURT:  But if they were?

8        MR. FRAZZA:  Well, that's unresolved at the moment,

9  as you know.  The Federal Circuit is considering that issue.  I

10  know we have Judge Hochberg's decision.

11        THE COURT:  Yes, but my point is, and the

12  hypothetical was that the Federal Circuit just flatly affirms,

13  all right, and is there a linkage between what's before the

14  Federal Circuit and the damage measure in the Imation case?

15        MR. FRAZZA:  I understand your position.  I certainly

16  understood Mr. Story's position, but in the limited amount of

17  time I had to look at that since last evening, I do not think a

18  third party such as Imation can reap the benefits of allegedly

19  monies that Jazz owes to Fuji.

20        THE COURT:  Well, if it's no longer alleged that

21  there would have been if there had been a sale, a 56 cent tax

22  for the infringement --

23        MR. FRAZZA:  Yes.  isn't it Jazz' obligation, you

24  know, to pay that?

25        THE COURT:  Well, if there weren't a sale there'd be

**J&J COURT TRANSCRIBERS, INC.**

1  no obligation.  If your measure of damage on behalf of Jazz a

2  function of a sale that was lost, there was no sale, therefore,

3  there was no infringing sale that it seems that there's some

4  logic to the point that if there were a sale it would have been

5  infringing and would be subject to the pre-August  21, '01 tax,

6  if you will, which was assessed by the District Court, but I

7  won't go too far into that.  My question is really linkage to

8  the Federal Circuit review, and that certainly was introduced

9  by Mr. Story, and I'm not -- you know, it's not for me to give

10 an opinion on that, as to whether it's right or wrong in terms

11 of the measure of damage, but at least as I hear it from

12 Imation's perspective that the infringement issue takes on,

13 yet, another dimension in the Imation case besides having a

14 relationship to the ongoing Chapter 11 and all the issues that

15 are before the Court today.

16         MR. KAPLAN:  Your Honor, may I, having participated

17 in the District Court, add just one point?

18         THE COURT:  Sure.

19         MR. KAPLAN:  And I think you overlooked --

20         THE COURT:  Mr. Kaplan, go ahead.

21         MR. KAPLAN:  If the Federal Circuit affirms

22 everything in Judge Hochberg's opinion, one of the things that

23 will be affirmed is that a portion of the cameras was not

24 infringing because there was a non-infringing way to do it.

25         THE COURT:  Right.

1           MR. KAPLAN:  If the damages theory is that -- which I

2    don't know about the Imation case, but if, taking what you just

3    articulated, if the damages theory is that over all these prior

4    years there could have been more and more cameras sold by Jazz

5    had it not been for Imation's conduct, if that's the theory.

6    That's what I think I just heard you say, there's no evidence,

7    even if the Federal Circuit affirms anything, that everything

8    that those hypothetical additional cameras would have infringed

9    over the non-infringed.  You can't assume that any royalty

10   would be owed on that, because you have to have a whole other

11   proceeding to prove if they would have been made and sold would

12   they have been made in the way the non-infringing ones were

13   found by Judge Hochberg, or the infringing ones were found --

14          THE COURT:  And you don't think that a reasonable

15   District Court could simply take the same ratio that was used

16   by Judge Hochberg and apply it in the same period of time.

17   We're only talking about up through that period of time --

18          MR. KAPLAN:  I don't think so --

19          THE COURT:  -- the Imation damage issue?

20          MR. KAPLAN:  I don't think so, Your Honor, because

21   the way the ratios would work, it would depend on which

22   factories would make which -- and you have to show that these

23   additional ones would have been made in the same factories, and

24   the same proportions.  There's no way to figure that out --

25          THE COURT:  Whose burden is it?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KAPLAN:  Whose burden is it?  I'm not sure whose

2     burden it would be.  I mean, it strikes me initially as saying

3     it should be Imation's burden to prove that that's entitled to

4     offset the damages, but the only point I'm making  -- I don't

5     know that you're --

6          THE COURT:  As opposed to a plaintiff's measure of

7     damage, which is to show net profit, and how net is derived?

8          MR. KAPLAN:  Your Honor, the only point I'm making,

9     because I have no knowledge of the Imation case -- the only

10    point I'm making is the affirmance by the Federal Circuit does

11    not imply that any hypothetical additional cameras would have

12    been made in an infringing matter, and we can debate what

13    percentages or how to calculate that, or whether a proceeding

14    is -- but you, simply can't multiply 56 cents by the number of

15    cameras, because that clearly doesn't work.

16         THE COURT:  But the ratio of non-infringing and

17    infringing could be brought forward to the same calculation,

18    and that 56 cents could be applied.  Whether it should or

19    shouldn't I don't know, but what I'm trying to get to, and the

20    reason that I asked the question wasn't to establish or

21    undermine a measure of damage.  It's simply to test the linkage

22    between and among these different arenas, here the Federal

23    Circuit is now tied, at least in Imation's view, to that case

24    in terms of measure of damage, and it's clearly what's been

25    said in the footnote, and whether it's correct or incorrect is

1   for another court to decide.  Ms. Jurow, I note your presence.

2         MS. JUROW:  Thank you, Your Honor.  Margaret Jurow

3   for the United States Trustee.  I'm sorry I was late.

4         THE COURT:  That's all right.  No, I note yesterday

5   you indicated that you might be here.

6         MR. FRAZZA:  Your Honor, the point is --

7         THE COURT:  Go ahead.

8         MR. FRAZZA:  I'm sorry.

9         THE COURT:  That's all right.

10         MR. FRAZZA:  Mr. Sirota reminded me, there has been

11   no -- and this case has been lurking for close to six years

12   now, no tie together by Judge Linares or Judge Politan or

13   anybody else who handled this case.  I understand the raising

14   of this at this late hour, but I do agree, respectfully, with

15   Mr. Kaplan, that on the hypothetical nature, because no one is

16   going to be able to know, forgetting about shifting burdens or

17   whose burden it is, the lion's share of the damages ensue after

18   the recall.  The recall is a hard dollar number.  We incurred

19   X.  After that it is a loss profit analysis, and I don't know,

20   using an overused cliche, if you can have a case within a case

21   to establish that.  The other side of that, as I said, was, I

22   think, from the research that I was able to do, that to the

23   extent that -- let me say it differently.  If you were to

24   follow the deduction of the 56 cents, what is it that Jazz was

25   then owed to Fuji?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Nothing on that because there was no

2    sale.

3          MR. FRAZZA:  But, the measure of damages would be

4    that there was a sale is what I'm following you, that's what --

5          THE COURT:  If there were a sale, which generated a

6    profit --

7          MR. FRAZZA:  Right.

8          THE COURT:  Which is the event that is the starting

9    point for the measure of damages, we -- Jazz lost sales, but we

10   couldn't get the sale because of Imation's failure, it was

11   their default.  Therefore, that sale was lost.  If that sale

12   were not lost we would have had a profit of Y dollars against

13   an X sale price.  But, if that had occurred, would be the

14   footnote import, which is, in that event, there would be the 56

15   cent tax.  That's the logic of it.  Now, it's either right,

16   wrong or indifferent, but I'm not -- as I say, it's not for me

17   to rule on, and I'll just leave it.  But, we still have, yet,

18   another linkage.

19         MR. STORY:  One last point, Your Honor?

20         THE COURT:  Go ahead.

21         MR. STORY:  This is not raised for the first time in

22   the footnote.  This is our expert's report, out of detailed

23   depositions, reports.  One of the things that we put in our

24   letter is that the damage claim here already has been cut by

25   over half by the first cut that has been by a motion in limine.

1 Constantly, somehow the damages realistically -- in the Jazz

2 Photo resignation case are at such an extent to prompt all of

3 the creditors to move here.  From our perspective, we simply

4 think it's wrong, but we won't go to the argument -- what we

5 put in our letter -- from you or anyone else, to look at the

6 letter to his report.  Look at these issues, because I -- and

7 any assessment of those is going to -- Fuji, that even if --

8 　　　　　THE COURT:  Thank you, gentlemen.  I will ask another

9 question, which would be a bridge question, I would assume,

10 between you, Mr. Frazza and Mr. Sirota, about the impact of

11 conversion if it were to occur on the Imation litigation, and

12 we can get to that but, Mr. Sirota, you had something to say?

13 　　　　　MR. SIROTA:  Judge, I was about to introduce Mr.

14 Peterson, and leave the Imation area.

15 　　　　　THE COURT:  Well, okay.  Maybe you want to think

16 about that and we can hear from Mr. Peterson, all right.

17 　　　　　MR. PETERSON:  Good morning, Your Honor.  My name is

18 John Peterson.  I'm an attorney with Neivel Peterson in New

19 York City.  Our firm specializes in international trade.

20 Recently, we were pressed into action, on an emergency basis,

21 on behalf of Jazz Photo and Photo Recycling Enterprises, a

22 company that supplies Jazz with recycled or used camera shells.

23 　　　　　The circumstances are as follows:  On August 31st,

24 Customs officials in the port of Los Angeles communicated to

25 Jazz a series of new requirements, which Customs had

1  established for people importing cameras -- disposable onetime

2  use cameras, which were claimed to have been processed abroad

3  through permissible repair.  These requirements have been made

4  public before.  They had not been articulated by the United

5  States International Trade Commission, and in several cases

6  they simply were -- for example, the requirements have said

7  that every camera shell exported from the United States was to

8  be marked with an individual and unique serial number, and the

9  serial number was to remain with the camera upon its return to

10 the United States.  Apart from being, perhaps, physically

11 impossible, and incredibly expensive, that was something that,

12 obviously, nobody had done, since nobody had articulated that

13 requirement.  We contacted Customs, and also the Court in Los

14 Angeles and Customs headquarters and both of them that this new

15 requirement that they had imposed was a substantive legal rule

16 that could not be done -- comment rule making under the

17 Administrative Procedure Act.  There was a couple of days worth

18 of discussions with Customs, at the conclusion of which we were

19 informed these requirements were not being withdrawn, and we

20 were also informed by the Customs of Los Angeles that the

21 agency has suspended the normal process of policing cameras

22 claimed to be permissibly repaired.

23          At that point, on September 9th, we filed a lawsuit

24 in the United States Court of International Trade in New York,

25 and we asked the Court to set aside these new requirements,

1  primarily on the ground that there were legislative rules that

2  had not been promulgated in accordance with the requirements of

3  the Administrative Procedure Act.  We asked the Court to enter

4  an injunction against the enforcement of these rules.  We

5  brought that motion on by a show cause motion so that we could

6  get an expedited hearing.  But the case was assigned to Judge

7  Timothy Stanceu, and during this past week we have had a number

8  of discussions with Judge Stanceu over various aspects of the

9  issues.  During the case proceedings, Judge Stanceu made a

10 couple of points clear.  First, he considered these

11 requirements to be substantive rules.  Secondly, he considered

12 that the government needed to comply with the Administrative

13 Procedure Act, and had not.  He recognized that the government

14 was obligated to keep out -- cameras under the exclusion order,

15 but that the government has an equal obligation to allow the

16 importation of permissible repaired cameras, without -- the

17 government is not free to impose any external standards from

18 the prudent permissible repair that were required.  But,

19 instead, Jazz', as an importer, is required to prove on an

20 entry by entry basis that its cameras are admissible.

21        Now, yesterday morning the Department of Justice made

22 a submission to the Court of International Trade advising that

23 it was going to withdraw these new requirements.  These

24 requirements, we learned yesterday, were part of a proceeding

25 started on August 4th, 2004, by Customs called "Operation

1   Snapshot." That was designed to intensify the enforcement of

2   the Section 347 exclusion order. In the case of these

3   particular requirements, Judge Stanceu indicated, and I believe

4   that the government has now agreed that Customs went too far.

5   Also, yesterday, Customs provided the Court with a copy of its

6   construction and sealed offices with -- these new requirements.

7           Now, this, of course, doesn't mean that Jazz or

8   anybody else has cart blanche to import permissible repaired

9   cameras. What it does mean is that Jazz has the obligation to

10  prove to the satisfaction of Customs, on an entry by entry

11  basis, that, in fact, the cameras are permissibly repaired, and

12  that the cameras are, in fact, the subject of a pass -- first

13  sale in the United States, and that's really the only relief

14  that we asked for. Obviously, we could not be held to some

15  standard behavior such as serial memory that hadn't been

16  communicated previously.

17          So, as of today, our understanding is that Customs

18  has communicated its restoration of these rules to the courts,

19  that the courts are now free to resume the regular processing

20  of entry of permissibly repaired cameras, that they ought to

21  contact us with proof of admissibility on an entry by entry

22  basis.

23          The notice only went out yesterday. I understand

24  that Mr. Burkhard, who handles the logistics for Jazz has been

25  in touch with Customs in the port of Los Angeles.

**J&J COURT TRANSCRIBERS, INC.**

26

1          THE COURT:  So, if Mr. Burkhard goes to Customs to

2 make his proofs on container load 15 that comes in, what is he

3 going to show?

4          MR. PETERSON:  Well, he can show anything Customs

5 will accept.

6          THE COURT:  And is it a blank as to what he's going

7 to show?  We don't know yet?  And what Customs is going to

8 accept?

9          MR. PETERSON:  Well, the parties are going to have to

10 have dialogue on that.  I can't, personally, join the dialogue

11 until the stipulation of dismissal is entered in this case,

12 which hopefully will be today, because I can't have any ex

13 parte communication with the opposing -- you know, with the

14 adversary on behalf -- but the government has urged me to get

15 involved in process, and I assume --

16          THE COURT:  Let's assume for argument sake that

17 Customs says, I don't accept your proofs.  What happens?  They

18 keep the container out?

19          MR. PETERSON:  Well, if they keep the container out

20 --

21          THE COURT:  Go back to the Court of International

22 Commerce?

23          MR. PETERSON:  Yes.  The -- if Customs excludes the

24 container, Jazz is permitted to protest that decision and

25 submit proof of admissibility.  If the decision is -- if the

1  protest is denied then the case would go back to the Court of

2  International Trade, where we determined whether that

3  particular entry was admissible, and then in that case the

4  Court might do a trial on the question of infringement which,

5  of course, wasn't involved in this proceeding that we brought

6  last week.  It was really jut a question of administrative

7  procedure.

8          However, as was pointed out to Customs, Jazz does

9  track the shells that it collects to ensure that they're all

10  from the United States.  Since the ITC's determination in the

11  enforcement case, Jazz only prepares, I am advised, cameras

12  that are in their original packaging, bearing the trademark of

13  Fuji or one of the licensees.  So, we've eliminated the so-

14  called -- problem.

15          The only other problem that the ITC had with the

16  proceedings that were going on, I understand, is that for some

17  cameras there was an operation where Jazz replaced the whole

18  back of the camera instead of half of the back of the camera.

19  Jazz, I am told, presumably stopped that whole back

20  replacement.  The ITC did identify in the face of Polytech

21  Enterprises, which I understand is now Jazz' only contractor, a

22  19 step process of permissible repair.  So, basically, the ITC

23  has given a blueprint for Jazz to follow on how to do

24  permissible repair.  There were two things that Jazz or that

25  the ITC found the Jazz Group is doing that it disagreed with.

1  Jazz has appealed that decision with the Federal Circuit, but

2  in the interim, they've obviously stopped the two things which

3  the ITC found objectionable, which were reloading cameras

4  already repaired, and doing this fullback replacement

5  operation.  So, if asked by --

6          THE COURT:  But didn't the ITC, through the

7  administrative law judge, simply scrap the control system that

8  Jazz had in place, saying that it's imperfect if not in chaos?

9          MR. PETERSON:  Well, I think he said it was not

10 consistently applied, but what Judge Stanceu indicated was that

11 for purposes of current imports it's going to be Jazz'

12 obligation on a case by case basis to show that on the case of

13 repaired cameras they can trace the cameras collected in the

14 United States.

15         THE COURT:  And this last fact that you've added that

16 no shell out of its original case or packaging is being

17 utilized for reloading purposes.  Where does that come from?

18 You were told that?

19         MR. PETERSON:  That was communicate to me by Mr.

20 Benun, and it was discussed after the ITC order on the reload.

21 What I understand to be happening is that Jazz is now repairing

22 cameras in the original package.  When it does repair a camera

23 that was in its original package, the place is sort of marked,

24 with not a serial number, but some sort of markup camera, so

25 that should that camera come back again, Jazz would know that,

1 you know, that was a camera that they did, in fact, repair out

2 of its original packaging.  I don't know all the details about

3 how that works.  I'm sure there are other people at Jazz that

4 can explain the details more clearly than I.  But as far as --

5          THE COURT:  But you're being told that every reloaded

6 shell is presented to Jazz or to its single source in an

7 identifiable package, is that what you're being told?

8          MR. PETERSON:  Well, when I say a package, I mean in

9 its original wrapping, you know, bearing Fuji or a Kodak

10 trademark or whatever, as opposed to something that might bear

11 the Jazz trademark --

12          THE COURT:  Well, how does that work?  You know, I go

13 into Walmart and I buy a disposable, right, and it's in a

14 package.  Now I use it, and I, what, send it to a processor,

15 well how is the original package?

16          MR. PETERSON:  Well, I mean, the retail package in

17 which it comes is, obviously, discarded by the user.

18          THE COURT:  So, which package are we talking about?

19          MR. PETERSON:  I'm talking, for example, about the

20 stickers or the markings that appear on the camera itself.

21 These cameras, typically, have logos on the body of the camera,

22 you know, that could say Fuji or Kodak, you know, that's my

23 understanding of the process.  There may be other folks from

24 Jazz who can explain how it works in more detail.  But, a

25 protocol has been added to a sorting process for shells

1  overseas.

2      But, in any event, what we have to prove to Customs,

3  and which we've always had to prove to Customs, and thus, to

4  Customs' satisfaction, is that on an entry by entry basis,

5  every camera we offer is admissible, and we have --

6      THE COURT:  But we have no experience, yet, with

7  that?

8      MR. PETERSON:  Customs has made inquiries and has

9  done some intensive examinations of prior imports since the ITC

10 decision.  I don't know in what detail they went.  During the

11 Court case in the Court of International Trade, we offered to

12 the government, and we said, and it's a standing offer.  We

13 made the offer on the record.  It's not incorporated in the

14 government's -- but we made the offer on the record that, at

15 any time, for any number of occasions it wants to do it,

16 Customs and the board of protection can come, announced or

17 unannounced, to the premises of Jazz, to the premises of Photo

18 Recycling Enterprises, to the premises of Polytech.  They may

19 observe the operations.  They may observe every record.  So, we

20 made that offer.  And, in the past we have provided video

21 records of repair operations.  We didn't go over to Hong Kong

22 about a year or two ago with Customs because of the Sars scare

23 at that time.  But, the offer has been made, and it's been made

24 on the record, and to prove it, you know, Customs may go to

25 Polytech at any time they want.  They may go to Jazz or Photo

1  Recycling Enterprises, and I can ensure that if they find that

2  there's a defect in the current procedure they'll exclude the

3  cameras.

4         THE COURT:  Okay.  And I would guess your, in part,

5  giving me a status, and I appreciate it.  In part, providing me

6  with information that could lead to a conclusion that Jazz is

7  either currently infringing on a continuing basis or otherwise,

8  and may be what Customs decides would be relevant to that in

9  one way, shape or form --

10        MR. PETERSON:  Well, Customs --

11        THE COURT:  Customs says no, these are no good, they

12 can't come in, what do I do with that information?

13        MR. PETERSON:  Well, I think Customs says it doesn't

14 come in, as I mentioned before, their decision would be

15 reviewable by the Court of International Trade in a protest

16 proceeding.

17        THE COURT:  But until it's done, what do I do with

18 that fact, if it were a fact?  Do, I consider it?  Do I say,

19 hmm, they might still be infringing, just as the opposite, if

20 questioned -- I'm sure if Customs said, that's squeaky clean,

21 it can come in, you would be up here saying, look, the process

22 is good and there's no current infringement, am I right?

23        MR. PETERSON:  Well, whether that constitutes proof

24 in another forum I can't say.  All I can say --

25        THE COURT:  No, it would relate to what I'm doing.

1   Obviously, one of the questions before me, and we get back to

2   the enabling term, are we still involved with an ongoing

3   infringement where this Chapter 11 proceeding is being utilized

4   to give a free license to Jazz on Fuji's patents?

5        MR. PETERSON:  I don't believe so, Your Honor.  I

6   mean, the ITC did not find all that the prior cameras be

7   infringing, and as Jazz has gone through the permissible repair

8   proceeding, you know, various courts and administrative bodies

9   is moving along sort of changes the rules a little bit, or

10  expressed different views on what is or isn't permissible

11  repair, or is or isn't proof of first -- and Jazz has had to

12  adapt itself, you know, and hopefully improve its process.

13  Now, in the case of Section 337, Customs was the agency that

14  does the initial enforcement, subject to the review from the

15  Court of International Trade.  There's currently a bit of an

16  issue with 337 where, in some cases, Customs has had cameras

17  that are admissible, the ITC has imposed penalties for the

18  admission of the same cameras.

19       THE COURT:  But let me just press this one point.  If

20  you negotiate -- Jazz negotiates with Customs next week, and

21  that container load is allowed in, I assume that someone on

22  this side is going to say, look, Customs found it to be

23  compliant and non-infringing.  That should influence you,

24  Judge, because there's not a continuing infringement.

25       MR. PETERSON:  I would say so, Your Honor.  But it's

1  also -- it's not a negotiation of Customs, it's a question of

2  giving them proof.  We don't negotiate the admissibility --

3          THE COURT:  Okay.  Fair enough.

4          MR. PETERSON:  -- we prove it.

5          THE COURT:  All right.  I'll use a different term.

6  All right.  I hear you and I appreciate what you're saying.

7  Thank you.

8          MR. SIROTA:  Judge, isn't the point with Customs, and

9  I think I understand Your Honor's question, we're living with

10 their determination.  Relief from the stay was granted.  We're

11 in the process -- the ITC process, and Customs now tells us

12 whether it comes in or it doesn't come in.  Our point exactly,

13 in not having yet another court tell us whether there's

14 infringement.  If Customs says the product is excluded, and Mr.

15 Peterson, through every legitimate Customs or International

16 Court of Trade can't let the product in, then we have a very

17 serious problem.

18         THE COURT:  Yes.  And that was the two sides of it

19 that I had asked.  I appreciate that.

20         MR. SIROTA:  We're not asking permission here, or

21 another court to review what Customs --

22         THE COURT:  I understand that, and that's why I

23 asked.

24         MR. PETERSON:  But there is -- to elaborate on what

25 Mr. Sirota said, I mean, Section 337 is enforced by Customs,

1 but there is a judicial review mechanism in the Court of

2 International Trade, and ultimately back at the Federal Circuit

3 for those decisions.  So, Section 337 --

4 　　　　　THE COURT:  But, Mr. Peterson, let me speak through

5 you to Mr. Sirota, because although I'm perfectly willing to

6 hear, and try to absorb the Customs' issues, as I am the

7 infringement issues through you, I can see et cetera, for this

8 Court to question is always, should this Chapter 11 continue

9 if, for example, there's a negative result insofar as Jazz is

10 concerned with Customs, and Customs says, no way, they stay

11 out, and then you say, well, of course, it's reviewable by the

12 International Court of Trade, well how long, how much, and when

13 does that all work it's way out?  Just as the Federal Circuit

14 issue from the ITC ruling or when it becomes final, the most

15 recent EID-II, as it goes through the ITC and comes out the

16 other end, how long will that take, and what does this Court do

17 with all of this long-term litigation, we could ask the same

18 question about Imation, and the end result there, and the

19 appeal process that comes out of that, and that's what I will

20 ultimately ask Mr. Sirota.

21 　　　　　MR. PETERSON:  If I could help with that.  The only

22 -- as far as Customs is concerned, if Customs keeps stuff out,

23 keeps product out, and their decision is protested, and a

24 judicial review is sought, the first thing to bear in mind is

25 that this will be what we call an exclusion case, and

**J&J COURT TRANSCRIBERS, INC.**

1 merchandise will sit on the dock and it won't be admitted into

2 the United States.  So, as to any merchandise we try that issue

3 on, there's no possibility of harm to Fuji or anybody else

4 because the goods aren't moving, they're not getting in.

5         Secondly, because it is an exclusion case, the Court

6 of International Trade will provide that the case must be heard

7 on an expedited basis.  So, if that issue comes to the point

8 where it needs to be tried, it would not be a very long process

9 in my opinion.

10         THE COURT:  Okay.  All right.  I do appreciate that.

11 Thank you.

12         MR. ROSENTHAL:  Your Honor, can I address a couple of

13 the points that I've been listening very --

14         THE COURT:  All right.  I think it is fair to, you

15 know, to keep you bottled up and have this side discuss --

16         MR. ROSENTHAL:  All right.  Then I --

17         THE COURT:  No, no.  I'll hear you.  I'm saying, it

18 is fair to hear you.  No, I'll hear you, briefly.  You heard

19 Mr. Sirota make his point, and he's made it in papers, and I'm

20 sure will make it again, that the process that has been

21 undertaken consensually through the ITC and Customs is a

22 process that he's willing to stay with and that the application

23 today, which is one of the many application pending, to bring

24 an action before the District Court is out of the straight line

25 of that agreed to program.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENTHAL:  Your Honor, let me start with

2    observation.  When this case started in May of 2003, Fuji's

3    patents had approximately four years of life.  They now have

4    two and a half or less.  What we have here is a wasting asset,

5    and if I listen to -- if I understand what I am being told, we

6    should wait until the patents expire before this Court takes

7    action because we should wait for the CIT, we should wait for

8    the Federal Circuit, and this proceeding and that proceeding.

9    But, I can't escape from one basic fact.  Mr. Benun has put a

10   declaration in, in the CIT.  And I was not permitted to

11   participate in that proceeding.  My application to intervene

12   has been -- not been acted upon.  It now probably becomes moot

13   with this stipulation.  I've been accused by Mr. Sirota of

14   wrongly putting in confidential business information into the

15   CIT in his last pleading.  I will observe that I believe firmly

16   that they were properly given to the Court.  It's responsible

17   for reviewing ITC decisions in the same way that the Federal

18   Circuit gets in.  Neither are mentioned in the statute.  But,

19   unfortunately the ITC never heard of this question before, and

20   no one has an answer, and it may take the commission a year to

21   decide whether the papers should or shouldn't go to the CIT,

22   but it's moot.  But, let -- one of the many first impressions

23   we get in this saga.

24          But, I can't get past Mr. Benun's affirmation.  When

25   I read Mr. Benun's affirmation, what he is saying clearly is,

1  that although I heard the ALJ on April 7th tell me that my ICP

2  program was insufficient, it was chaotic, but more than that it

3  was worthless, and why was it worthless?  It was worthless for

4  many reasons.  The chaos contributed.  The reloaded reload

5  issue contributed.  But, most important, it measured the wrong

6  thing.  It measured whether or not the cameras were purchased

7  in the United States, not -- the shells were purchased in the

8  United States, not whether or not the cameras from which the

9  shells were taken were first sold in the United States, and

10  that's what the Federal Circuit told us in 2001 was the test.

11         But then I go to Mr. Benun's affirmation and I

12  discover that the only things he changed, that he's still

13  relying on the MON/SLN system, the only things he's changed is

14  I have a system now to detect reloaded reloads, and I'll use

15  them if they were reloaded reloads of Fuji or Kodak original

16  cameras, for whatever that's worth.  But it doesn't address the

17  finding of the ALJ adopted now, with finality, by the ITC, that

18  the ICP system just doesn't work.  And here we are four months

19  later, or three and a half months later, and what do we have?

20  We have three and a half million cameras -- shells, most of

21  them exported from the United States after the ALJ tells us

22  what to do, and they're treated like nothing ever happened in

23  the ITC.  They're being offered with the same body of evidence

24  that they were offered before, and --

25         THE COURT:  Well, we just heard a change, that's why

1  I asked --

2          MR. ROSENTHAL:  Well, it's changed though if you read

3  the affidavit -- declaration -- affirmation --

4          THE COURT:  Which I have --

5          MR. ROSENTHAL:  -- carefully.  What the change is, is

6  only to address the reloaded reloads issue, as if that were the

7  only problem with the ICP system.  What the Judge --

8          THE COURT:  Well, that's what Mr. Kaplan says in his

9  certification.

10          MR. ROSENTHAL:  Well, Mr. Kaplan --

11          THE COURT:  Besides the Kodak full half back issue.

12          MR. ROSENTHAL:  Right.  Well --

13          THE COURT:  Mr. Kaplan says that that's -- it's only

14  the reloaded reloads that's at issue.

15          MR. ROSENTHAL:  Well, with all due respect, Your

16  Honor, I have read the decision of the ALJ.  I have lived this

17  trial.  I was there at the trial.  So, was Mr. Kaplan.  I was

18  sort of surprised --

19          THE COURT:  So, let me ask Mr. Kaplan this, if I may,

20  and, Mr. Kaplan, you have identified, in your certification,

21  the reloaded reload issue.  You disagree with the half

22  back/full back Kodak issue, but you say it doesn't matter

23  because it's easy enough to go to the half back issue, and not

24  the full back, so that's out of the mix, and since Polytech's

25  processing is okay, and we'll deal with the reloaded reload

1  issue -- if we deal with that appropriately going forward, we

2  can't possibly step on a crack and be infringing through

3  Polytech.  Is that a fair capsule of what you're saying?

4        MR. KAPLAN:  Your Honor, basically, but let me give a

5  little background.  I think you need a little background based

6  on your question as to Mr. Peterson.  I'll try to be brief, but

7  it's a long case.  Mr. Rosenthal said one thing that I,

8  basically, agree with, and that is the tests.  What happened

9  was, Jazz started collecting all its shells from the U.S.  The

10 problem with that system is that when you're collecting them

11 from the U.S., if you're collecting a Jazz camera that's

12 already been reloaded, say, a year ago, it may have been

13 something --

14        THE COURT:  Exactly.  It's a reloaded reload issue.

15 I understand.

16        MR. KAPLAN:  Now, I want to emphasize, Your Honor, we

17 believe that's okay.  Why do we believe that's okay, because

18 the issue of patent exhaustion --

19        THE COURT:  With due respect --

20        MR. KAPLAN:  Your Honor --

21        THE COURT:  I understand there's a dispute there, but

22 so far the ITC disagrees.

23        MR. KAPLAN:  The point is this, Your Honor, if you

24 start collecting your cameras from the United States, and you

25 only collect cameras from the United States with the original

1 wrapper, and to elaborate on what you said, the ALJ made a

2 finding -- it's in his I.D. that, I think, 90-95 percent -- I

3 forget the exact number, but almost all of the cameras  have

4 that original packaging on.  Not the outer packaging, but when

5 you bring it in to get developed, they crack it open and take

6 the film out of the actual wrapper that's stuck to the camera

7 is on there.  You know if it's Kodak or Fuji.  That's in the

8 ALJ's I.D.  So, if you look at that packaging, and it's an

9 original Kodak camera that you collected from, you know, Eckert

10 Drugs down the street from here, then it was collected in

11 Newark, New Jersey, and it was developed in Newark, New Jersey,

12 and it's an original new camera by Kodak, the only possible way

13 that that wasn't first sold in the United States is somehow if

14 a tourist brought it in, and maybe that's one --

15        THE COURT:  You made that point much, much earlier.

16 But let's just --

17        MR. KAPLAN:  And those cameras are exempt --

18        THE COURT:  But let me just ask this about the

19 original packaging.  That was not part of your argument before

20 the ALJ?

21        MR. KAPLAN:  Because they weren't doing that.  Those

22 facts --

23        THE COURT:  I understand.  So, this is a change in

24 the program?

25        MR. KAPLAN:  Absolutely.  This is what --

1           THE COURT:  Post ALJ April or July, depending on

2    which date you use.

3           MR. KAPLAN:  They changed the test.  Mr. Rosenthal

4    said something that's correct.  Now the test is no longer just

5    collected in the U.S., which --

6           THE COURT:  Let me just get to my $64 question, if I

7    may.  I understand, believe it or not.  And maybe you don't,

8    and I would understand you're not believing it, but I have

9    gotten down to this three line excerpt, Page 35, of --

10          MR. KAPLAN:  Could I just get a copy of what I've

11   sent in if you're going to question -- I'm sorry, I thought you

12   were going to question --

13          THE COURT:  No, no.  No.  I wasn't going to ask you

14   about something you wrote.  I'm going to ask about something

15   that the administrative law judge wrote in the EID-II, as we

16   call it.  And it's simply this, "Hence, the administrative law

17   judge finds, assuming Jazz was able to ensure that the shells

18   of it's LFFP's in issue were strictly from domestic sources,

19   through it's ICP, that this would not ensure that said shells

20   were first sold in the United States."  That's the source, I

21   assume, Mr. Rosenthal, of your statement that it's apples and

22   oranges.  The fact that the sources U.S. does not translate it

23   to first sale anyway.

24          MR. KAPLAN:  Your Honor, that's absolutely correct,

25   and there's several problems.  There's the reloaded reload.

**J&J COURT TRANSCRIBERS, INC.**

1  There's the problem that it could be they sourced it from a

2  retailer --

3          THE COURT:  Look, there's a problem with the blue

4  Fuji that was never sold.  You know, maybe that's a singular

5  incident that was picked out of a videotape, but you've got

6  page after page preceding this conclusion by the administrative

7  law judge --

8          MR. KAPLAN:  Right.

9          THE COURT:  -- saying that the ICP isn't worth a

10  darn.

11          MR. KAPLAN:  Correct, Your Honor, and what I'm

12  telling you is that, I think, if you reason it for the logic,

13  what you'll see is that when you read the page after page, what

14  you'll see is that by making sure it's an original --

15          THE COURT:  So, now you've got it, that's your point?

16          MR. KAPLAN:  Well, I would ask Mr. Rosenthal, what

17  else would we have to do to prove that.  He would tell you it's

18  impossible so that the --

19          THE COURT:  Okay.  But now you're on the right track?

20          MR. KAPLAN:  Your Honor, I believe -- I mean, I've --

21          THE COURT:  You believe that all along it was

22  correct, and those are issues for appeal, but putting aside

23  issues for appeal, now you have the roadmap, now you can

24  comply.  You can comply and convince, through proofs, Customs

25  should allow the container load in, and this Court is not

**J&J COURT TRANSCRIBERS, INC.**

1 enabling because you're finally, finally, after having good

2 definition come out of the regulators, able to develop a

3 roadmap that's perfect and there's not going to be any further

4 infringing.  You don't agree that there was prior infringing,

5 but that's a matter for appeal, and so, everything is sweetness

6 and light now.

7 　　　　MR. KAPLAN:  Well, Your Honor, I would answer that

8 question, with all respect, forgive me, with another question.

9 And I'll ask this sort of rhetorically.  I know I'm not allowed

10 to question the Court.

11 　　　　THE COURT:  Go ahead.

12 　　　　MR. KAPLAN:  If Jazz is going around or, more

13 accurately, the company that collects the shells, and they're

14 collecting on the original packaging once that I'm -- and  I

15 know --

16 　　　　THE COURT:  You're onto the packaging.

17 　　　　MR. KAPLAN:  Excuse me?

18 　　　　THE COURT:  You're onto the new process?

19 　　　　MR. KAPLAN:  Right.  What I'm saying -- I thought

20 that's what you're asking?

21 　　　　THE COURT:  No, what I asked was -- I just want to

22 make sure that the thesis today is that the process today,

23 which has changed, since the EID-II, is now squeaky clean in

24 every quarter, Customs, ITC, et cetera.

25 　　　　MR. KAPLAN:  Well, the process -- let me --

1          THE COURT:  I'm talking -- when I say process, I'm

2 not just talking about eight steps or 19 steps.  I'm talking

3 about first sale as well.

4          MR. KAPLAN:  Okay.  Well, let me break into two

5 pieces, the process of the steps and the first sale.  The step

6 process -- Polytech's process was approved in that same EID.

7 The judge found that their stuff, as long as they used the

8 halfback instead of the fullback is not infringing, and Fuji --

9          THE COURT:  Mr. Rosenthal, do you agree with that?

10          MR. ROSENTHAL:  No, Your Honor.  The ALJ found that

11 the approximately 15 percent of what Polytech produced was

12 okay, if you will, and that consisted of Kodak shells

13 refurbished using a halfback, but it made no finding about the

14 -- that we saw when we were there.  In fact, I mean, it found

15 them to be infringing.  It made no finding about a host of

16 products, obviously --

17          THE COURT:  It is a problem with the finding, because

18 the way the finding worked by taking the factors 60 percent of

19 11 million, times 55 percent, times 55 percent, times 50

20 percent, if I remember the calculus correctly, it gets you down

21 to 900 and whatever -- 98,000 units in 2003, and I think that's

22 where it sort of nets down, which were not infringing.

23          MR. KAPLAN:  The point I'm trying to make --

24          THE COURT:  But that is not the same as saying that

25 Polytech, otherwise, is completely compliant, which is what

1  you're saying.

2          MR. KAPLAN:  Your Honor --

3          THE COURT:  Am I right or am I wrong?

4          MR. KAPLAN:  I think you're right, but I'm still not

5  getting the argument I'm trying to make.

6          THE COURT:  Go ahead.  I'm sorry.  Go ahead.

7          MR. KAPLAN:  I'm trying to say, Your Honor, is that

8  regardless of what the numbers are or were, we have a finding

9  that Polytech has a non-infringing process, meaning the way you

10 put the camera together.  The reason I started my --

11         THE COURT:  But, Mr. Kaplan, everyone has the

12 potential for that process.  Everyone can do it right.

13         MR. KAPLAN:  Correct.

14         THE COURT:  Okay?  Have they done it right in the

15 past?  Authorities say no, you say yes.  Are they doing it

16 right from this moment on so that this Court has a level of

17 comfort?  You say yes.  Mr. Rosenthal doubts it.

18         MR. KAPLAN:  Well, we say let Customs go find out

19 right now.  Well, that's what we say, not yes.

20         THE COURT:  Okay.  And let me hear an answer to that

21 from Mr. Rosenthal.

22         MR. ROSENTHAL:  Your Honor, actually, Mr. Benun's

23 affirmation has more information that bears on this issue.  Not

24 only does he say he's relying on the ICT program, but in

25 Paragraph 11, in describing his economic losses from the

1  conduct of Customs, he recites that Jazz will suffer $1.75

2  million for monies paid to acquire the shells.  That's the

3  story we've been hearing until now, and 6.3 million in amounts

4  paid to foreign processors to repair these cameras, including

5  labor and materials, such as film, batteries, flash units.  I

6  have testimony from Mr. Benun in the ITC, elicited by Mr.

7  Kaplan that we never changed the flash units.  We never do

8  anything like that.  A horrific, terrible thought.  But why

9  does --

10      THE COURT:  So, you think that it's still a changing

11  landscape, and it will keep changing, and you'll keep

12  challenging, and they'll keep defending, and it either will or

13  won't comply?

14      MR. ROSENTHAL:  Well, Your Honor, I don't think you

15  can be a little bit infringing, just as you can't be a little

16  bit pregnant.  The issue is that they're never going to be

17  infringement free, because they choose not to, because it's

18  more profitable not to be infringement free, and --

19      THE COURT:  All right.  But, at least, for this

20  Court, again, and it's unfair, I think, of me, but I have to do

21  it, I have to bring this dispute, which has many faces to a

22  Bankruptcy Court issue, and it's an administrative issue, how

23  do I deal with the disdain here in a technical area, and what

24  weight do I give to authorities who say there was infringement

25  and how do I deal with a debtor who says, all right, I disagree

1  with that and we'll deal with that in appeals, but today, we

2  will meet everything that EID-II requires of us, and going

3  forward we won't infringe, and then I have, of course, Fuji

4  saying, there's already an indication that they will infringe,

5  and I have to do something with these facts, either disregard

6  them, put weight on them, decide them one way or the other --

7       MR. SIROTA:  Your Honor, we do agree, Mr. Rosenthal

8  and I, I think, on one thing, and that is the following, and I

9  quote:  Your Honor, the findings of the ITC are not binding on

10 this Court.  The cases say that since the ITC is an

11 administrative body, it's findings are not entitled to res

12 judicata or collateral estoppel effect, October 21st, 2003,

13 grant script Page 58, Line 20 through Page 59, Line 5.  Your

14 Honor, we do agree, and the cases bear us out -- Mr. Rosenthal,

15 of course, that the findings of this administrative body do not

16 translate, respectfully, to put the debtor's lights out.  What

17 they translate to is the issue that Your Honor asked me at the

18 last stay hearing, and Your Honor asked probably the most

19 important question then and the one today, and that is, when?

20 When does the cycle of litigation stop in the context of this

21 ongoing dispute.

22      THE COURT:  I'm going to ask it again in very

23 specific terms today.

24      MR. SIROTA:  And I've given it a lot of thought, and

25 when Your Honor is prepared to ask it, I'm prepared to answer

**J&J COURT TRANSCRIBERS, INC.**

1  it right now.

2          THE COURT:  So, gentlemen, just please sit down, and

3  I'll give -- Mr. Sirota, I just want to ask you this question,

4  which comes off of your quote of Mr. Rosenthal, and it's this,

5  if today we were to try to strip away uncertainty, which is a

6  function of total disagreement, and make a bit of a

7  hypothetical so that I understand the administration issue,

8  suppose today, Mr. Sirota, that I have before me and ITC

9  conclusion, and I know this is an EID from the administrative

10 law judge, but we had a substantive finding from the ITC, and I

11 know we're going to hear that the refusal to review is the

12 equivalent of that, and it said, in such clear terms, that up

13 until a date in 2004, Jazz had infringed for these reasons, and

14 had not repaired, and Mr. Kaplan couldn't muster, you know, the

15 many arguments and passion for his arguments that he has

16 mustered today -- if we concluded today that there had been

17 infringement, okay, in the administration period, but that now

18 you have a roadmap and you can go on and not infringe, should I

19 convert this case based upon infringement during the

20 administration period, and what would clearly be, however

21 measured, a five million, ten million, $13 million

22 administration claim?  Should I convert because of that?

23         MR. SIROTA:  No.

24         THE COURT:  Why?

25         MR. SIROTA:  Because you would be giving to Fuji more

**J&J COURT TRANSCRIBERS, INC.**

 1  than they would get if we weren't before this Court.  If we

 2  weren't before this Court Fuji would be going down the ITC

 3  process.  They would be influencing Customs the way they're

 4  doing, and they would be starting, perhaps, a second round of

 5  litigation in the District Court had they not put on appeal the

 6  exact issue they'd be going down the road with today.  They

 7  would not, and the ITC is not in the business of putting --

 8          THE COURT:  With all -- I hear you, but with great

 9  respect -- and I appreciate what you're saying, but we're all

10  -- see, we're all stepping out of our realm and into -- you

11  know, we want to be experts all over the place, and it's

12  dangerous for me and for you.  What I'm positing is up to a $13

13  million administration claim, you know, without question.  It's

14  hypothetical.  Is that the end of the game for the bankruptcy?

15  Look, we've gone down the road.  We've encountered a lot of

16  costs for litigation here, there and everywhere, and we have

17  had infringement in this administration period.  Shouldn't that

18  kill off the debtor?

19          MR. SIROTA:  I'm not convinced, Judge, that we have

20  infringement.

21          THE COURT:  No, I'm saying --

22          MR. SIROTA:  In your hypothetical --

23          THE COURT:  Okay.  Go ahead.

24          MR. SIROTA:  If your hypothetical is Your Honor found

25  post-petition infringement, or the District Court, now --

1          THE COURT:  So, I should arrogate to myself the --

2    not just looking at ITC's conclusion, but saying, you know,

3    maybe they're right.  I don't agree with this line on Page 50

4    of their 100 page opinion, should I make that decision, or do I

5    defer, even if I'm not bound, do I say, look, people who know

6    better, who heard the whole proceeding, have decided that there

7    was infringement, what do I do with that?

8          MR. SIROTA:  Those are --

9          THE COURT:  During the administration period?

10         MR. SIROTA:  Those are the same people that decided

11   prior that there was infringement.  Those were the same people

12   that the Federal Circuit questioned --

13         THE COURT:  So, I disregard --

14         MR. SIROTA:  Judge, I'm not suggesting to you for a

15   moment that it's not relevant to decisions made by this Court,

16   but I am suggesting to you that it's not relevant to

17   conversion.  It's very relevant to whether or not there's any

18   other thing that Fuji can do to pursue it's rights.

19         THE COURT:  Let me tie your hands, if I can.  They're

20   right, hypothetically.  Hypothetically, they're right.  Even if

21   it's determined after the fact, the U.S. Supreme Court says,

22   they're right.  Okay?  Looking backward, should I have

23   converted?

24         MR. SIROTA:  Judge, you can ask yourself that

25   question on every decision this Court makes every day.  But,

 1  Your Honor --

 2          THE COURT:  This is a case in which, the question is,

 3  do we wait until -- it's the when question.  Do we wait until

 4  the last, last, last word is in?  What standard does an

 5  administrative -- does a bankruptcy judge use in looking at the

 6  administration of this Chapter 11 and the purposes of Chapter

 7  11, do I hear a tax on the ITC?  Do I say, well, they were

 8  reversed before, therefore, they can be reversed again, or do I

 9  get into other issues, such as how long and what would it cost

10  to challenge ITC final conclusion once it comes out, and I

11  understand that it's not out?  How much will it cost, and how

12  long will it take to Imation to actually be concluded, whatever

13  that is?  What's happening with the debtor now?  Is there a

14  change, which will give me comfort that no responsible ITC or

15  Customs agent will find that there is current infringement?

16  And when I sort of put that together now I'm more in the realm

17  of our usual discourse, and if I conclude, I guess, that, gee,

18  last time it took two years to get from the ITC to a Federal

19  Circuit decision.  A little more than two years.  It was, I

20  think, 26 months.  And at what cost?

21          Now, I don't know if this one will take 26 months, or

22  12 months, or, you know, who knows.  I mean, maybe we need to

23  have some input on it.  What do I do with that?  And I'll hear

24  you.

25          MR. SIROTA:  And let me answer your question of when,

1  and I'll break it down into two parts.  The first part is,

2  operationally, the impact upon this Chapter 11 debtor, clearly,

3  on the issue of conversion for the continuation of this Chapter

4  11 enterprise, the when goes to does Customs release the

5  product and allow this debtor to sell or not?  That's the

6  agency that's responsible for the enforcement of the ITC

7  orders.  That will govern very quickly and very definitely

8  whether this debtor can stay in business or not.  If the

9  product is not released this debtor cannot sell.  This debtor

10  is out of business.  That's the when on the operational

11  conversion front.  It's not waiting 26 months for a Federal

12  Circuit appeal of ITC too.  The when on whether Fuji should go

13  forward, and expand and spread this litigation to the District

14  Court is when the Federal Circuit issues its opinion of Judge

15  Hochberg's decision, and that when and why is because that Fuji

16  has appealed a request for a future injunction, and I know they

17  say you're wrong, it's not the exact same relief, but I've read

18  that footnote in the March 13, 2003 judgment several times, and

19  the third point dealt with a request for future relief, which

20  Judge Hochberg said you can get before the ITC.  It was argued

21  before the Federal Circuit on appeal and, frankly, Judge, the

22  injunction, even if Your Honor were to say go to the District

23  Court, that they seek is exactly or similar to what Customs is

24  doing practically, has Mr. Peterson described, by enforcing the

25  ITC's ruling, which goes to Your Honor's point, no future

1  infringement.  The application to go to the District Court

2  isn't to put this company's lights out.  That's clear.  It's to

3  get an injunction to enjoin this company from future

4  infringement.  They pared down the complaint, but that's what

5  they ask.

6         The conversion issue, putting this company's lights

7  out, based upon a non-binding decision of the ITC, which is

8  being enforced as we speak, so this Court is not enabling, to

9  determine whether our product should come in should run its

10 course.

11        THE COURT:  Let me just -- and I appreciate what

12 you're saying, but you chose to go off onto the stay and

13 injunction issue.  I'm not there.  It's as unimportant today as

14 the administration claim issue.  The important issue today, as

15 I see it, is whether the ITC decision, and I understand that

16 it's technically not final because the penalty stage is still

17 being decided -- we're still in that stage.  If there was,

18 historically, an infringement during the administration period,

19 which generates a multi million dollar claim, should that

20 influence a bankruptcy judge, even if that conduct were

21 stopped?  Because it's certainly going to be stopped if I

22 convert.  This -- the conversion would include an immediate

23 requirement that a trustee appointed would not market these

24 disposables, and a company be liquidated, and so, you don't

25 have to get to stay issues and spreading litigation issues.

54

1   Should I give weight to a multi million dollar -- $13 million

2   recommendation from the ALJ as to an administration claim, or

3   at least a fair part of it is an administration claim?

4          MR. SIROTA:  Judge, in thinking about conversion you

5   certainly can't give weight to the administrative law judge's

6   claim of 13 million, when the ITC --

7          THE COURT:  Move it forward to the ITC.  Suppose the

8   ITC says 13 million.

9          MR. SIROTA:  It's funny, Judge.  The ITC has been

10  involved in this process for as long as Mr. Rosenthal, and as

11  long as Jazz, and according to the letter that I read from Ms.

12  Jurow, not one person from the ITC has expressed an interest

13  before this Court of putting this debtor out of business, or

14  setting a penalty.

15         THE COURT:  With all due respect, they're not

16  involved in that process -- in the process of whether there

17  should be an conversion --

18         MR. SIROTA:  But there --

19         THE COURT:  -- any more than I'm involved currently

20  in deciding whether there was, historically, an infringement --

21         MR. SIROTA:  But there --

22         THE COURT:  -- or is now an infringement.

23         MR. SIROTA:  But they're involved in the process of

24  fixing the penalty, and they way they fixed the penalty is not

25  to impose a penalty that puts even an infringer out of

J&J COURT TRANSCRIBERS, INC.

1  business.

2          THE COURT:  But with great respect, that's not -- I

3  understand -- it's a good argument.  It's just not a home run,

4  and it's not a home run because, as you say, I should give

5  weight -- this isn't binding -- look, if I have spent 15 months

6  with a case, as all of you have, and if in that period up until

7  whatever, this summer, there was, in fact, infringement, which

8  generates a $13 million claim post-petition, isn't that it?

9          MR. SIROTA:  No.  Not under the facts of this case

10  for the same reason --

11          THE COURT:  What's the saving grace? Imation?

12          MR. SIROTA:  The saving grace, Judge, is the same way

13  you may look back under your hypothetical and say, shouldn't I

14  have converted it.  What a same it would be to look back and

15  say, the Federal Circuit made some changes, remand, vacated.

16  Imation hit, and this company is --

17          THE COURT:  Two years from now the Federal Circuit

18  may change.

19          MR. SIROTA:  Judge, I mean, we're -- no, no, not two

20  years from now --

21          THE COURT:  You're talking about on the Hochberg

22  appeal?

23          MR. SIROTA:  On the Hochberg appeal -- Judge Hochberg

24  appeal, that's was --

25          THE COURT:  That's another when point.

1          MR. SIROTA:  The saving grace, Judge, is the same way

2    you may look back under your hypothetical and say shouldn't I

3    have converted it.  What a shame it would be to look back and

4    say the Federal Circuit made some changes, remand, vacated,

5    Imation hit, and this company --

6          THE COURT:  Two years from now the Federal Circuit

7    may change.

8          MR. SIROTA:  Judge, I mean we're -- no.  No, not two

9    years from now on --

10         THE COURT:  You're talking about on the Hochberg

11   appeal.

12         MR. SIROTA:  On the Hochberg appeal -- Judge, the

13   Hochberg appeal, that was argued in May.

14         THE COURT:  So that's another when point.

15         MR. SIROTA:  I think that's a critical when point on

16   spreading the litigation.  I know you're not there yet, but on

17   the conversion issue, Judge --

18         THE COURT:  I think it's related to the conversion

19   very directly I think it's related to Imation.  I think it's

20   related overall to -- but if there is a flat out affirmance

21   from the Federal Circuit, isn't that the death now for this

22   Chapter 11?

23         MR. SIROTA:  It's the death now for Fuji's request to

24   go forward in another forum.  I don't believe it's the death

25   now for the Chapter 11 in light of what we represented to this

1  Court day one, and that is the two-prong Imation and Federal

2  Circuit appeal.  But, Judge --

3          THE COURT:  So Imation can still save it is your

4  point.

5          MR. SIROTA:  Imation -- I'm told by people who have

6  invested a lot of time and money that Imation can save it.

7          THE COURT:  So there's always another day, and I'm

8  not saying that facetiously.  Don't misunderstand me, but I am

9  saying that because of good lawyering on both sides -- and I

10 don't say that to slather anybody with praise.  What I'm faced

11 with is the continuum.  I don't think it's a healthy thing.

12 When you say how would I feel looking back if two years from

13 now this, that, or the other thing happened, well, I think I

14 have to decide now, and I have to decide, but the now is kind

15 of flexible.  I have to decide before it takes two years to --

16 I'm going to assume for argument sake that $13 million comes

17 from the ITC on EID-2, and that's a long road to uncork.

18         MR. SIROTA:  Agreed.

19         THE COURT:  Can't wait for that.  I mean as a

20 practical matter I can't wait for that.  Then the issue is

21 Federal Circuit decision on the May -- early May argument.  I

22 think that is -- I think that's the when to be quite honest.  I

23 could be wrong, but I think that's the when if -- if the

24 decision that comes out of that is affirmed, one word, boom.

25 Then your question of me is going to be, well, what about a

1  zillion dollar potential from Imation, and so I get to the

2  question ultimately that I sort of laid out there initially,

3  which is what's the affect of conversion on the Imation

4  litigation?

5         MR. SIROTA:  And I'd like to respond to that together

6  with the effect of conversion on this entire case and the chaos

7  it will bring, and that is the following.  At the very least

8  it's going to delay the trial of the Imation process.  Your

9  point, Judge, on when, if the Federal Circuit rules, and in

10 your hypothetical gives a blanket affirmance, and Mr. Frazza

11 and his team are on their feet in the Imation case, you may

12 decide at that point in time that it's worth three weeks to see

13 if that trial bears fruit.  You may not.  It's an issue for

14 another day, but it will delay the trial, because a trustee is

15 going to have to become familiar with the case, the economics

16 of the case, the economics of whether Mr. Frazza is the

17 attorney then want to continue.  Undoubtedly, it creates just

18 the ideal opportunity for Imation to come to the table and

19 present to a trustee an opportunity buy out potentially on the

20 cheap.

21        Imation's not here, because they're concerned about

22 their unsecured claimants.  They're concerned about the

23 District Court litigation.  It will result undoubtedly in a

24 loss of personnel -- people dedicated to the Imation and Jazz

25 process.  I can't imagine that you're going to have Jazz

59

1  personnel interested in hanging around a corpse of a company to

2  assist Mr. Frazza and his team in the litigation.  You're going

3  to have the post-petition administrative claims in this case

4  balloon.  The three million dollar post-petition claims that I

5  referenced during the status portion of today's hearing is

6  going to be fixed at three million, but let's add a few more

7  things on top of it.

8         WalMart, who's waiting for their product, is going to

9  come to this court and file a massive administrative claim.

10  Fuji will have the opportunity in this court or some other

11  court to assert an administrative claim that a trustee will be

12  probably disinterested in fighting the way Jazz may be

13  interested in contesting it.  So when the conversion dust

14  settles, on top of that, on the Imation litigation, you have

15  experts to find.  We have a motion pending before the Court

16  with respect to bond proceeds, and hopefully, the ability to

17  pay those experts to fund the Imation litigation.

18         How's a Chapter 7 trustee going to fund those

19  expenses?  So you're going to have a deterioration in the

20  Imation litigation, but more importantly, you're going to have

21  complete chaos and the immediate creation of administrative

22  claims that now will have to be satisfied before the unsecured

23  creditors in this state see one nickel, and to me that is the

24  most damaging part of Fuji's request and using a non-binding

25  decision to get there.  And I do understand, Judge -- and I'm

**J&J COURT TRANSCRIBERS, INC.**

1  not standing here before the Court as a fiduciary for this

2  estate and saying 26 months after ITC-2.  That's not my point

3  at all.  The when, as I suggest to the Court, is the Federal

4  Circuit on whether they spread the litigation, and at that time

5  Your Honor can make the determination whether there's another

6  implication to when, but it's certainly not today, with all due

7  respect.

8            THE COURT:  Mr. Rosenthal or Mr. Etkin, would you

9  address that question?

10           MR. ETKIN:  I'd like to respond to that, Your Honor,

11 and a couple of other questions that the Court posed, if I can

12 just go back a little bit?

13           THE COURT:  Go ahead.  We have to give you enough

14 time.  Go ahead.

15           MR. ETKIN:  Your Honor, you asked Mr. Sirota about

16 whether Fuji is entitled to conversion at this point given the

17 events that have taken place.  Mr. Sirota I think responded by

18 saying that Fuji is asking for more than they would've been in

19 a position to get had this Chapter 11 not been filed, assuming

20 that we had our remedies outside of Chapter 11, and Mr. Sirota

21 makes that point in his papers, too.  That we're looking to get

22 more than we otherwise would've had, because by virtue of the

23 conversion the debtor is liquidated.

24           Well, we said this in our papers, and I think it's

25 obvious, Your Honor.  Jazz filed for Chapter 11 protection in

**J&J COURT TRANSCRIBERS, INC.**

1  the wake of a $30 million judgment that they couldn't get

2  stayed, because there was no likelihood of success on the

3  merits with respect to their appeal.  They're in Chapter 11

4  because of their choice.  We didn't file an involuntary to put

5  them into Chapter 11.

6          Secondly, Your Honor, if there was no Chapter 11,

7  what remedies would we have?  Well, one remedy that Mr. Sirota

8  fails to talk about, and that is we can go ahead and execute on

9  our judgment, and by virtue of executing on a $30 million

10 judgment that they couldn't bond and would not be stayed, what

11 would the ultimate impact be on Jazz in that event?  I would

12 suggest, Your Honor, that by virtue of executing on the

13 judgment it would be more than likely that Jazz couldn't

14 survive with respect to having to pay that $30 million judgment

15 at the time.

16          So we're not looking to exercise remedies that we

17 can't exercise outside of Chapter 11.  We're looking finally to

18 bring some closure to the issues that the Judge has been

19 looking -- that Your Honor has been looking very carefully at

20 over a 15 or 16-month period and weighing carefully that issue

21 that the Court has posed today, which is where do you draw the

22 line and by virtue of all that has gone on in the past and by

23 virtue of the final determination.

24          Now Mr. Sirota keeps talking about non-binding.  Your

25 Honor, it's akin to a bifurcated trial where you have a

1  determination of liability, and then you're just waiting for

2  the damages.  The damages are really not relevant in terms of

3  what the ITC levies as a penalty.  It's not going to be good no

4  matter what the number is, whether it's 13 million, 10 million,

5  8 million.  It's not going to be good.  What has been finally

6  determined by the ITC and something that this Court has been

7  waiting for by virtue of statements that this Court has made on

8  the record, statements that Mr. Sirota has made on the record.

9  Mr. Sirota quotes Mr. Rosenthal.  Let me paraphrase Mr. Sirota,

10 which I paraphrased in the past, where Mr. Sirota said -- and I

11 think it was the July 11th hearing -- that the debtor will put

12 its proof before the ITC to make everybody comfortable that

13 this Court is not being used as some haven to continue to

14 infringe on Fuji's patents.

15      Now I don't fault Mr. Sirota for not keeping his

16 promise in that respect.  I don't really look at it as a

17 promise, although it may have been phrased that way.  But the

18 fact is that back on July 11th we were supposed to wait for the

19 ITC to come down with a final determination as to post-petition

20 infringement.  The parties in this case executed a stipulation

21 to go before the ITC with respect to a determination of post-

22 petition infringement.  The EID-2 came out, but that was non-

23 binding.  We urged the Court at that time to act.  The Court

24 stepped back, looked at the circumstances, and said now was not

25 the time.  Let's wait and see what the ITC has to say.

**J&J COURT TRANSCRIBERS, INC.**

1    Well, the ITC has come out, Your Honor, and said it.

2   It's binding.  There are rights of appeal, but it's binding.

3   These are facts.  When Your Honor quoted from Judge Luckhern's

4   150-page decision, you were quoting findings of fact that the

5   ITC has now blessed from a liability perspective.  What the

6   number is, I don't know.

7    Your Honor, if we're going to pose questions that

8   need to be answered, I would suggest one other question, and

9   what I believe is a very important question.  Has this debtor

10   earned the right to have this Court maintain the status quo in

11   this case to allow the debtor to continue to act and let's say

12   potentially we believe likely -- more than likely continue to

13   infringe?  Has the debtor earned that right?  We've waited,

14   Your Honor.  We've financed this case.

15    The administrative claim -- and I understand that's a

16   subsidiary issue as far as the Court's concerned in terms of

17   determining that motion today, but let's face it, there's an

18   administrative claim looming there somewhere at some point, and

19   it more than likely continues to grow.  And when you talk about

20   the point to draw the line and the suggestion being waiting for

21   the Federal Circuit on Judge Hochberg's decision, I submit,

22   Your Honor, that that's not the place to draw the line.  We're

23   at the place where the line should be drawn, because even if

24   that judgment is overturned -- highly unlikely, but we're

25   raising a lot of hypotheticals today.  Even if that judgment

1  were overturned, that does not impact the fact that the ITC has

2  now determined that the period of August 21, 2001 to December,

3  2003 there has been massive infringement of Fuji's patents,

4  including a seven-month period post-petition.  That we know.

5      Fuji's judgment may be impacted by some decision by

6  the Federal Circuit, but that has nothing to do with the

7  determination that has been made in connection with the post-

8  petition period.

9      THE COURT:  Well, it might.  It depends on the basis

10 of that decision, but I understand your point, and your points

11 are well taken.  I mean --

12     MR. ETKIN:  Your Honor, I'm not going to get into the

13 methodology that the debtor now alleges it has undertaken.  I

14 believe there's been enough discussion about that, but let me

15 address specifically some of the other things that Your Honor

16 has asked Mr. Sirota.

17     THE COURT:  But let me say this, if I may, and -- if

18 this Court were to conclude that the cop on the beat, Customs

19 is on the job now -- and that may be a conclusion that is

20 subject to dispute.  I understand, but if I were to conclude

21 that, what's the harm in waiting for ITC to finalize the

22 penalty phase and/or the Federal Circuit to decide on the

23 appeal from Judge Hochberg's judgment.

24     MR. ETKIN:  Your Honor, I'll tell you what the harm

25 is, because what the ITC determines from a penalty standpoint I

**J&J COURT TRANSCRIBERS, INC.**

1    submit is not what this Court should necessarily be looking at.

2    It's really the underlying liability for patent infringement --

3            THE COURT:  They infringed.  I'll assume --

4            MR. ETKIN:  -- for the administrative period.  Now

5    what the I --

6            THE COURT:  I'll assume they infringed.

7            MR. ETKIN:  What the ITC's administrative claim may

8    be is separate and apart from what Fuji's administrative claim

9    may be, and that has nothing to do with what the ITC assesses

10   as a penalty in this case for infringement post-petition.

11           THE COURT:  No, but my point is this.  My point is

12   this.  As long as that administration claim -- I mean it is

13   what it is.  As long as it's not increasing because the cop on

14   the beat, Customs is doing it's job -- again, an assumption,

15   and we can debate that -- why shouldn't we wait to see what

16   happens in the two areas that I mentioned?  What's the cost?

17   Is there a cost?  Am I missing something, Mr. Rosenthal?

18           MR. ETKIN:  I'm going to defer to Mr. Rosenthal.

19           MR. ROSENTHAL:  Your Honor, you made an observation

20   some ago that we're all wandering in fields that we're not

21   particularly experienced.

22           THE COURT:  I take that as a gentle reminder, and I

23   appreciate it.  Go ahead.

24           MR. ROSENTHAL:  I most of all learned more about

25   bankruptcy than I care to learn in my career, but I come to

1  this Court not as a bankruptcy lawyer but as an intellectual

2  property lawyer, and I view this -- you asked what is the harm,

3  and I go back to the first day when I perhaps injudiciously

4  used the word enabling.

5       THE COURT:  No, I think it was injudicious.

6       MR. ROSENTHAL:  But it has been a word -- a constant

7  theme throughout the last 15 months.

8       THE COURT:  And it resinates.  I don't -- I -- you

9  know, I think it was a contribution.  Go ahead.

10      MR. ROSENTHAL:  So you asked what the harm is, and I

11 say that the harm is to the system if to nothing else.  That

12 the mental impression that my client has of what's going on

13 here -- and Your Honor said we should balance the interest of

14 Fuji against the interest of the debtor here -- is we have a

15 company who has poked its thumb into the eye of the law

16 repeatedly and has been caught four times.  Bodies --

17 administrative and judicial bodies have found them to be

18 infringers, and all the law does is say hit me again.

19      What we have here is this Court said let's start

20 again.  It's a new world.  On May 20th we won't care about what

21 happened before.  That was then, and this is now, and by the

22 way, I do believe that what happens in the Federal Circuit

23 cannot or will not affect what happens in the ITC.  We have a

24 different body of infringements, a finding of an administrative

25 body as to what the Federal Circuit said in a non-appealable,

1  final decision from 2001.  Applying that decision, that's what

2  we got.  The District Court applied it, we applied it, but it's

3  still -- it's a separate transaction.

4      So what do we have here?  We have a period of 15 months

5  during which the record would more than suggest there's a

6  determination by a duly constituted regulatory agency who's

7  charged with the responsibility of making that determination.

8  There has been infringement and not just, you know, a couple of

9  cameras here and there.  We're talking about post-petition --

10 seven months' worth of infringement.  In 2003 that amounted to

11 84 percent of the cameras.  They're getting better.  They went

12 from one percent to 15 and a half percent, but that certainly

13 is -- as I said before, you can't be a little bit pregnant.

14      Now I'm told that we should wait some more, because

15 maybe the cop on the beat will turn them off, but that's not

16 the issue.  The issue is that the evidence in front of Your

17 Honor from the viewpoint of the prospective of a --

18      THE COURT:  Is that they infringed in the

19 administration period when they said they weren't going to.

20      MR. ROSENTHAL:  Exactly, as they told every judicial

21 body or administrative body, they were not infringing.  And

22 having gone across that line, having gone --

23      THE COURT:  But if I were convinced of two things,

24 Mr. Rosenthal -- and I hear what you're saying, and I don't

25 discount it or disregard it.  I'm just trying to assess whether

**J&J COURT TRANSCRIBERS, INC.**

1 I should go back to day one, or I ought to evaluate it right

2 now.  If we have a conclusion that there was administration --

3 infringement in the administration period, which is the

4 question I asked of Mr. Sirota, is that it?  Should once -- if

5 I were to decide that, if there were no comebacks from Mr.

6 Kaplan, etcetera, should I just say, "Ah, I was here on the

7 first day, the petition date, and Mr. Rosenthal said I'm

8 enabling, and low and behold here was infringement, and in that

9 sense there was enabling, and there's damage to Fuji, and

10 there's an administration claim for seven months' worth of

11 infringement, etcetera, maybe more?"  That's just seven months

12 in 2003.

13          MR. ROSENTHAL:  Let's not forget --

14          THE COURT:  I understand.

15          MR. ROSENTHAL:  Let's not forget that there's an

16 inventory in the United States.

17          THE COURT:  I understand.  That's why -- and we only

18 measured it up to December 31, '03, and we come forward into

19 '04.  But having said all that, if on the other side of it this

20 Court is convinced, well, now they have it together and now

21 Customs is not going to stop the importation, because they're

22 convinced by counsel, etcetera, why -- what's the harm in going

23 forward now?

24          MR. ROSENTHAL:  As I said before, Your Honor, first

25 of all, assuming for the purposes of discussion that they have

**J&J COURT TRANSCRIBERS, INC.**

1  got it together, which there is no credible evidence, the --

2  there is an inventory of cameras in the United States that has

3  passed through Customs which are not going to be recalled,

4  can't be recalled, and can be sold tomorrow.  Maybe as we speak

5  they're busy being distributed.  That's a harm to Fuji -- the

6  continued infringement.

7         Fuji is harmed by the existence of a company -- in

8  fact, the system is harmed by the existence of a company who

9  used the procedures of Chapter 11 and misused them, because

10 what was their business during the last sixteen months?

11 Eighty-five percent of that business was selling cameras which

12 85 percent of which were found at least up to a period at the

13 end of 2003 to be infringing, and there's been no change.  I

14 mean as best as I can determine, the changes are less than

15 cosmetic, and, in fact, maybe it got worse if I'm to take Mr.

16 Benun's declaration -- affirmation at face value.

17         THE COURT:  Let me just ask this, if I may.  You

18 know, Fuji and Jazz went down the ITC customs trail by

19 agreement, and don't you have to live and die by that program?

20 Now doesn't that program include this upcoming phase where

21 Customs is getting apparently active.  As of August 4th, they

22 did this, that, and the other thing.  They retrenched as of

23 last week or this week, but that effort by Customs to keep out

24 infringing cameras is what you bargained for.  Isn't it?  And

25 if it works --

1          MR. ROSENTHAL:  Your Honor, what I bargained -- what

2   I bargained for was for the ITC to tell us whether or not they

3   are, in fact, infringing.  I didn't bargain with the last word

4   of the last agency to determine what to do.  I find it

5   interesting that we're now being asked --

6          THE COURT:  But let --

7          MR. ROSENTHAL:  Fuji is know being asked in essence

8   to fund an effort to thwart whatever Customs thinks is

9   appropriate.

10          THE COURT:  The Customs keeps the units out.

11          MR. ROSENTHAL:  That doesn't alter.  That's a -- Your

12   Honor, with all due respect -- and I defer to --

13          THE COURT:  It's not going to affect the current

14   inventory for one.

15          MR. ROSENTHAL:  For one, and it's not going to affect

16   the fact, and I think that's the --

17          THE COURT:  Fact of infringement?

18          MR. ROSENTHAL:  Infringement during the course of

19   this proceeding.

20          THE COURT:  You're right.

21          MR. ROSENTHAL:  And I think that that is critical.

22          THE COURT:  You're right, and that's why I asked the

23   question if there were no doubt -- if we took all the doubt out

24   of the ITC -- and you have no doubt -- the ITC finding, would

25   that be enough right there?  Could this Court in a sense take

**J&J COURT TRANSCRIBERS, INC.**

1  offense at the infringement during the administration period

2  and say, look, that's not what we were designed for as a

3  Bankruptcy Court and conversion right then and there?

4              MR. ROSENTHAL:  Your Honor, I would defer --

5              THE COURT:  And you heard the response.

6              MR. ROSENTHAL:  I would defer to Mr. Etkin except to

7  say that the dignity of the law of which I have a great deal of

8  respect -- I've been doing this for 40 years.  The dignity of

9  the law actually demands that this Court take offense, because

10 the premise under which this Court has acted over the last 16

11 months is we're going to win in the ITC.  Let's just give them

12 a shot.  That has been the premise, and every time we come to

13 court we've been told this, and every time we've come to court

14 Your Honor has said, "Well, let's give them another few

15 minutes.  Let's give them another few days."  You've told us

16 not to do anything for a long period of time at the end of last

17 year, beginning of this year, and we didn't.  We thought we had

18 a decision.

19             THE COURT:  You're right.

20             MR. ROSENTHAL:  We thought we had a decision in

21 April.

22             THE COURT:  I did tell you that.  You're right.

23             MR. ROSENTHAL:  Your Honor, let me --

24             THE COURT:  I just don't know that that is the full

25 answer, but it is influential.  Yes.

1           MR. ROSENTHAL:  Let me address from -- or at least

2    try to address from a bankruptcy perspective, and this will

3    also address some of the statements that Mr. Sirota made.  Your

4    Honor, it is our position that by virtue of the post -- the

5    seven months of post-petition infringement that we know about,

6    that this debtor doesn't deserve.  In answers to the question I

7    pose, doesn't deserve for the status quo to be maintained any

8    longer.

9           But it's not just that, and we have tried, and I

10   think our papers indicate that we have tried to also look at

11   this from the perspective of the case as a whole not just Fuji.

12   Let's look at the case as a whole.  This debtor to date,

13   through August -- despite whatever allocation Mr. Sirota was

14   talking about before, this debtor has lost three and a half

15   million dollars to date.  Now Mr. Sirota will say, "Well,

16   that's all legal fees."  That's like saying, well, you know, if

17   you just take the rent out, or you take the legal fees out, or

18   you take some other expense out, you know, then we'll be making

19   a profit.  It's three and a half million dollars in the hole.

20          By virtue of its last operating report in August,

21   which we were just handed this morning, its asset value has

22   declined in the aggregate to the tune of approximately four

23   million dollars plus, and it's operating.  Okay?  Their

24   numbers.  Your Honor, administrative claims continue to mount.

25   How do unsecured creditors fair in this case as administrative

1  claims continue to mount?  By virtue -- whether it be

2  additional legal fees, whether it be additional infringement,

3  whether it be the ITC's claims, they continue to mount, and the

4  debtor has conceded that it's not going to fund any payment to

5  unsecured creditors and administrative creditors through its

6  operations.  How is it going to fund payment?

7          It's going to fund payment through a contingent,

8  unliquidated litigation claim that is scheduled to go to trial

9  in January of 2005.  And I submit, Your Honor -- and you've

10 asked the question.  I think it's a very important question.  I

11 submit that we argue and continue to argue, and I think it's

12 been conceded, that Mr. Frazza in this for the long haul, and I

13 respect him for that.  He's in it for the long haul.

14          Now is a trustee actually going to come in and take a

15 look at what's been done by Mr. Frazza and the Budd Larner firm

16 and say, "Well, I don't know.  I think I'd rather go to

17 Wilentz, and let them start from scratch?"  That's ridiculous.

18 Now if we convert the case today with a trial date in January,

19 again the parade of horrors that Mr. Sirota was talking about

20 if we convert the case, you have a Trustee -- a very capable

21 Trustee in this jurisdiction, which Ms. Jurow will suggest and

22 which the Court will appoint, that will have an opportunity

23 over the next three months prior to trial to get involved.

24 This trial has every ability to go forward in January as it is

25 presently scheduled.

**J&J COURT TRANSCRIBERS, INC.**

1              That's the assets in this case, and you're talking

2   about an asset that will continue to exist post-conversion.

3   And what's going to happen?  A trustee's going to come in, and

4   Mr. Sirota says, "Oh, the Trustee will settle on the cheap.

5   They're going to settle on the cheap."  Granted, the Trustee

6   will not have the same agenda as Mr. Benin has in connection

7   with settlement.  The Trustee is an independent fiduciary that

8   I'm assuming, and I think we all should assume, will exercise

9   that fiduciary duty, and if there is a settlement, that

10  settlement will see the light of day in front of Your Honor,

11  and Your Honor will have to approve it as fair reasonable.  So

12  I don't understand that problem.

13             Now again it's not the operations of the debtor that

14  are going to pay off these creditors.  It's not the operations

15  of the debtor that's going to pay off Fuji's administrative

16  claims or its pre-petition claims.  It's Imation, the Holy

17  Grail.  If you think for one minute -- and look, I could be

18  wrong, Your Honor.  I'm creating a hypothetical myself, but if

19  Mr. Benun's obligations with respect to that judgment can be

20  fully paid off if that case is successful or paid off

21  dramatically if that case is successful, is he going to

22  disappear and risk that the only possible way that his economic

23  salvation will be compromised by virtue of his lack of

24  participation?  I don't know.  I'm suggesting that I don't

25  think that's going to happen.  It shouldn't happen.

**J&J COURT TRANSCRIBERS, INC.**

 1          THE COURT:  So you see a benefit to the --

 2          MR. ROSENTHAL:  I see --

 3          THE COURT:  -- Imation case as a function of getting

 4  a trustee in there.  Let me hear --

 5          MR. ROSENTHAL:  I see an absolute benefit, Your

 6  Honor.

 7          THE COURT:  All right.  Let me hear from Mr. --

 8          MR. ROSENTHAL:  Not only to Fuji but to the entire

 9  creditor body.

10          THE COURT:  All right.  Let me hear from Mr.

11  Greenberg.  He's been patiently standing by.

12          MR. GREENBERG:  Your Honor, as I sat throughout the

13  main combatants, there were some thoughts that crossed my mind,

14  and the Court itself has raised the two that I think are most

15  important.  But I want to digress for a minute and talk about

16  the composition of my Committee, because it has three members,

17  two of whom who have had absolutely no business dealings I

18  believe with the debtor during the Chapter 11 period.  One is

19  Jevick Transportation, which serves as the Committee chair, and

20  I don't think they've done any trucking for the company, and

21  the other is the law firm that had represented the debtor in

22  the Jazz litigation which gave rise to the $30 million

23  judgment, and I know they've had no continued involvement.

24          The third member is Leon Silvera who sits as proxy

25  for Polytech, and in the most recent meetings -- and we

1  furnished the voluminous pleadings to the Committee members. I

2  don't know that they read everything, but we gave them an

3  opportunity to and then discussed it at length as recently as

4  last week.  And because there was an issue about the Polytech

5  and Silvera potential interests in ongoing operations, when it

6  came time to vote on the Committee's position, Mr. Silvera did

7  not vote.  The other two Committee members did vote to support

8  the debtor and oppose the motion for conversion, certainly, the

9  allowance of an admin claim, and they didn't have as much of a

10 concern, because I deem it to be more of a legal issue about

11 the stay relief application by Fuji.  They believe that this is

12 a company, even though they have no personal interest in it,

13 that can be viable and can ultimately, when it gets beyond a

14 lot of litigation and litigation costs, make some money, and

15 they would like to see it survive.

16         Two of the points that were made, Your Honor, are

17 ones that I was going to make.  You set guidelines, whether

18 you're playing football, the field's 100 yards as opposed to

19 some other number in Canada, and in this case we also set

20 parameters.  There was going to be a process not here but

21 before the ITC, and it was going to have a number of steps

22 along the way and ultimately it would be finalized.  My view

23 and the Committee's view is that that has not been finalized,

24 and until it is, number one, it may not be binding on the

25 Court, but even the weight that the judge should give to it is

1 somewhat compromised by the fact that it doesn't have finality.

2 That's number.

3       Number two is your concept of the cop on the beat.  I

4 think this case lives or dies if the Court were to do nothing

5 today with Customs, and I think Customs has been evenhanded

6 throughout the process.  They've allowed product in, and when

7 they thought there were new regulations promulgated, they kept

8 product out, and now those regulations, we've heard from Mr.

9 Peterson, are going to be set aside potentially, and maybe

10 they'll let the product in, or maybe they won't, or maybe

11 they'll let some in, and they'll keep some out.  The only thing

12 that I understand Customs found the debtor in possession to

13 violate was under those new guidelines not coding or putting

14 serial numbers on each individual unit, which was an

15 unreasonable burden, and that's no longer enforced.

16       But if, in fact, there are other categories of

17 compliance that this debtor in possession has failed to meet,

18 customs is going to keep the product out.  There's no income

19 stream.  We will, as a debtor, default on shipments to WalMart

20 and others, and this case will be over, not because this Court

21 entered an order of conversion, but because the company could

22 not longer operate.  I think that that's something that will

23 probably be resolved in the short term, and I think just as

24 parties said we're going to live with the ITC's final decision,

25 everybody agrees that customs is the cop on the beat.  When

1  they say the game is over and the puck doesn't come in, that's

2  the end of it.  Again subject to the short-term appeals or, you

3  know, other process that is inherent in what customs acts on.

4          And I think that given the fact that the Federal

5  Circuit could be ruling very shortly, and that makes a big

6  difference in sales.  If they set that judgment aside, the

7  landscape of this estate is dramatically changed.  My

8  recollection is that we had about $41 million of claims at the

9  time of filing.  Fuji for 30, which is on appeal, related

10 parties, maybe Jazz Hong Kong for nine, which everybody agrees

11 is subordinate, and the pure unsecureds that I represent,

12 approximately two million, and I'm assuming that that could

13 swell a little with some rejection claims.  But if the Fuji

14 judgment got knocked out, I don't know how anybody on that side

15 of the room can say that doesn't have a material impact on this

16 case and what an ultimate payment to creditors might look like.

17         I think that that is something that could be

18 concluded very quickly.  I have to think that some of Mr.

19 Etkin's points are well taken.  I'm sure that if the case got

20 converted, in candor somebody would find a way to prosecute the

21 litigation, and I would assume that Mr. Frazza, who's done I

22 believe a very competent job for the estate, would be the

23 likely choice to go forward.  I think that -- again, I

24 understand when somebody makes a compelling argument.  Mr.

25 Etkin made one.  It's to Jack Benun's self-interest to

**J&J COURT TRANSCRIBERS, INC.**

1  certainly participate in prosecuting that litigation, but that

2  should not be the sole determinant as to whether or not this

3  case ends today, because I think that litigation is out there,

4  and it's a source of recovery.  There's an entity that may be

5  viable.  There's an entity that has apparently attempted to

6  comply with changing guidelines about importation and what

7  constitutes infringement, and other than the last ruling, which

8  was recently set aside, customs has found from day one of this

9  Chapter 11 they have complied.  They allowed every single

10  shipment, I believe, into this country.

11       I think that should be a significant factor in this

12  Court's determination as to whether or not today is the day we

13  convert the case, and on behalf of creditors I would suggest

14  that today is not the day, and we ought to see what Customs

15  does over the very short term, whether that means two weeks or

16  30 days, and I would certainly suggest that no action should be

17  taken to end this Chapter 11 process today until we see what

18  Customs does.  Thank you.

19       MR. ETKIN:  Your Honor, may I just comment on Mr.

20  Greenberg's statement?

21       THE COURT:  All right, and then I'll hear from Mr.

22  Kaplan.  Just briefly, please.

23       MR. ETKIN:  Just to comment on a couple of points

24  that Mr. Greenberg made.  Mr. Greenberg has referred to Customs

25  as the cop on the beat.  Well, this particular cop on the beat

**J&J COURT TRANSCRIBERS, INC.**

1 has been either asleep or having donuts for the last God knows

2 how many months, because --

3          THE COURT:  There's an inconsistency between what

4 they have done and what the ITC --

5          MR. ETKIN:  No question about it.

6          THE COURT:  -- has decided here.

7          MR. ETKIN:  Where's the proof that Customs has opened

8 up one box and looked and inspected and asked the questions and

9 whatever?  They simply have not done their job.

10          THE COURT:  Yes, they seem to have developed a change

11 in attitude since August.

12          MR. ETKIN:  Perhaps there has been, but I don't think

13 -- they are not the final arbiter.  The ITC is the final

14 arbiter as to whether infringement has occurred, and it has

15 occurred with this cop supposedly on the beat.

16          THE COURT:  But your client wouldn't be put out if

17 Customs held out -- excluded all of the shells from this point

18 forward.  In fact, that would be exactly what your client is

19 looking for.

20          MR. ETKIN:  Well that would be one of the things that

21 my client is looking for, Your Honor, and let's -- again, let's

22 not forget this debtor is obligated as a fiduciary and under 28

23 USC 959 not to violate the law.  They cannot violate the law.

24 They said they weren't.  They -- Mr. Sirota indicated that they

25 would be vindicated by the ITC.  It hasn't happened.  It just

1  hasn't happened.

2        THE COURT:  There's no question, Mr. Etkin, that the

3  ITC stamp of approval, if one wants to call it that, on EID-2

4  is a substantial negative, if not a death now for that Chapter

5  11, and I just have to decide which it is.  Mr. Kaplan wanted

6  to --

7        MR. KAPLAN:  Your Honor, I just want to make a couple

8  of brief points.  One is Mr. Sirota said something before.  He

9  said you should consider that EID and keep holding on, but you

10 shouldn't say today that's dispositive if it gets converted.

11 Let me just point out quickly three things.  I agree with that.

12 You have to consider it.  You can't just turn a blind eye, but

13 number one, Your Honor, the first ITC case would've closed Jazz

14 down, because the ITC ruled all reloading cameras were illegal.

15 That decision was ultimately reversed.  You know, they talk

16 about failure of proof.  The Federal Circuit clearly said in

17 that case you can reload cameras.

18        Number two --

19        THE COURT:  Can I just stop you there?  Because

20 though the ITC and the Federal Circuit sort of worked on

21 different pages, the net result of the Federal Circuit's

22 August, '01 decision to date is a $30 million award against

23 Jazz.

24        MR. KAPLAN:  That's correct, Your Honor, but the net

25 result of it also is that the injunction entered against

reloaded cameras by the ITC was lifted.  That's also the net

result.

THE COURT:  But let me just say this, because it

comes out, and maybe it's sort of a -- if there is such a thing

-- an intellectual property philosophical point, if that's not

a complete oxymoron.  But what you are saying is -- and it's in

the papers -- you know, we never had a clear picture, because

we got varying standards from this, that, and the other

enterprise -- ITC, Federal Circuit, etcetera -- as if an

infringer, because that's the starting point, who then puts up

a defense to infringement and has to prove it is entitled to a

continuing road map as to what infringement is or isn't.  That

seems to be -- it sort of pops out of what in particular you

say.

Now the truth of the matter is that Mr. Benun went to

Fuji for a license, didn't get it, and decided to take his

chances, and this is a point I've made in a written opinion

before.  Now the fact that the didn't have a clear road map is

just a jeopardy of that kind of business.  You're not going to

get a federal agency or court to say, "Here it is.  If you do

exactly this and things don't change in this area, you've got a

clean bill of health."  That's too much to expect in this area,

and it does come out of your papers.

MR. KAPLAN:  Your Honor, I don't disagree with that.

The only point I'm trying to make is that the original decision

83

1  from the ITC, which effectively said -- I don't think you've

2  ever seen that.  I'm not sure you have, but the original 1999

3  decision that was adopted by the ITC --

4          THE COURT:  If I did see it, I flushed it out,

5  because it's too much --

6          MR. KAPLAN:  That decision said reloaded cameras is

7  illegal.  It's enjoined.  At that point, Your Honor, Customs

8  shut the borders, and our cameras were locked up.  The company

9  was out of business.  That decision was reversed.  The Federal

10 Circuit admittedly put limitations, and there's this road map

11 and eight steps or 19 steps, but clearly, there a way to reload

12 these cameras legally.

13         So the point I'm trying to make, Your Honor, is that

14 while obviously you have to go by this decision, you can't turn

15 a blind eye, the decision they had on this before was wrong.

16 This very week, Your Honor -- this week -- I  think it was two

17 days ago -- there's a Federal Circuit decision that was an

18 appeal from an ITC case.  I remember the ITC case.  When it

19 came out, there was all this press.  There was a whole big

20 debacle that the company had put the thing down in the trash,

21 and the Federal Circuit said that the ITC couldn't even figure

22 out what the patent meant, and they reversed them on I think

23 four out of five or three out of four.  They didn't even get

24 past what the patent meant, and they sent it back to them.

25         THE COURT:  But what am I to do with that?  What am I

**J&J COURT TRANSCRIBERS, INC.**

84

1 to do with that?  Am I to be a super ITC?  What is --

2          MR. KAPLAN:  What I'm telling you to do, Your

3 Honor --

4          THE COURT:  Yes.

5          MR. KAPLAN:  -- is -- what I'm telling you to do is

6 in view of the history of this --

7          THE COURT:  Yes.

8          MR. KAPLAN:  -- I'm telling you to let us get to the

9 appeal, because the appeal --

10          THE COURT:  The appeal from this?

11          MR. KAPLAN:  Yes, let us get to the appeal.

12          THE COURT:  The new appeal.  Is that a two-year

13 process?

14          MR. KAPLAN:  Probably not.  Probably --

15          THE COURT:  The last one took 26 months.  You know, I

16 counted it.

17          MR. KAPLAN:  Yes, but the last one was a very, very

18 extremely long one.  I have an appeal that I argued last --

19          THE COURT:  Half that time, 13 months?

20          MR. KAPLAN:  Your Honor, I had an appeal that I

21 argued --

22          THE COURT:  How much time?

23          MR. KAPLAN:  Anywhere from, I don't know, four months

24 to ten months/11 months.  I can tell you two recent --

25          THE COURT:  How much money?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KAPLAN:  Not much, Your Honor.  It's just the

2    briefs are mostly the same -- you know, pretty much the same

3    substance that was in there.  I've had two appeals that I've

4    been involved in, Your Honor, in the past year.  One was

5    decided about I think eight weeks after it was argued.  One

6    took I think about four months.

7          THE COURT:  Look.  Mr. Sirota, I know you want to

8    respond, but let me get back to Imation for a moment, because I

9    don't want to lose site of it.  One could start over again.

10   It's late in the day, and everybody has heard it all we think,

11   but suppose -- pick a number -- $50 million.  Okay?  What

12   happens to it?

13         MR. SIROTA:  What happens to the money?  The money

14   comes into this estate, and it's distributed to -- after --

15         THE COURT:  Fuji gets how much of it?

16         MR. SIROTA:  It depends if Fuji can establish before

17   this Court or another court --

18         THE COURT:  Let's assume -- okay.  You're right.

19         MR. SIROTA:  -- an admin claim.

20         THE COURT:  Let's assume their $30 million basic pre-

21   petition claim stands up, and let's assume that the $13 million

22   claim divided between admin and pre-petition stands up.  You've

23   got a couple million dollars worth of claims from others.

24   You've got a three million hole plus in administration

25   professionals, etcetera.  You've got Mr. Frazza's firm -- and I

1    don't say this with an edge.  Don't misunderstand me -- taking

2    ten percent up to a million seven.

3             MR. FRAZZA:  Seventeen million which equals one point

4    seven.

5             THE COURT:  Yes.

6             MR. FRAZZA:  That's correct, Your Honor.

7             THE COURT:  Okay?  And that's the way it goes.

8    That's $50 million.

9             MR. SIROTA:  Yes, but we have --

10            THE COURT:  Okay.  We don't have a lot of $50 million

11   judgments in this courthouse, but I could be wrong.  It could

12   be $250 million.  I don't know.  Or it could be two cents.  You

13   know, it's a blind item for me.  Do I consider that?  So when I

14   ask the question what's the impact of conversion on that, I'm

15   not sure that that's necessarily on the table in the

16   decisionmaking process.  I'm not sure.  It might be, but I'm

17   not sure.  So I'm back to the Federal Circuit on the Hochberg

18   judgment, which I think we agree is something we'd all like to

19   know right now, one way or the other.

20            MR. SIROTA:  Sure.

21            THE COURT:  Mr. Rosenthal, let me just ask you, if I

22   can -- that's going to be decided when as you know it?

23            MR. ROSENTHAL:  Your Honor, my crystal ball got --

24            THE COURT:  And I want your testimony on this point.

25            MR. ROSENTHAL:  Your Honor, I haven't the slightest

1   idea.  There was no --

2           THE COURT:  What's your guess?

3           MR. ROSENTHAL:  I would guess -- I would've guessed

4   in the next month or so -- three months.  There's no way of

5   knowing.  The Federal Circuit is imponderable in this regard.

6   There's no way to predict --

7           THE COURT:  Mr. Kaplan, can you -- Mr. Frazza, your

8   firm argued the case?

9           MR. FRAZZA:  Well, my partner argued it.  Mr. Jacobs

10  was on the site every single day looking for --

11          THE COURT:  As we did the other day, yes.

12          MR. FRAZZA:  I'm sure you did, but I think Mr.

13  Rosenthal and I would agree it's just impossible to predict

14  given the decisions that you see, and when they were argued,

15  there's no real regularity of this one would be argued and

16  decided and then this --

17          THE COURT:  And you don't think that I should suggest

18  to Judge Linares that he call the Federal Circuit and -- no,

19  no, no.  I'm --

20          MR. FRAZZA:  You almost had me saying yes there.

21          THE COURT:  All right.

22          MR. SIROTA:  Judge, we would love to have that

23  decision, and just as importantly, we would love to have Mr.

24  Frazza on his feet before Judge Linares today, but we don't

25  control either of those two factors, and we never did from day

1  one.  But it is disturbing somewhat to hear Mr. Etkin say the

2  cop on the beat is asleep.  They chose that precinct.  This

3  Court didn't design the strategy for Fuji enforcing its claims.

4  It came here, I think the Court even pointed out at one point,

5  somewhat belatedly for stay relief.  It didn't come the first

6  day of the case.  It went before the ITC.  This very

7  experienced counsel to Fuji understood who the cop on the beat

8  was having extensive experience, and put themselves in the

9  hands of the cop on the beat.  It's disturbing to continually

10  hear that somehow either this debtor and its fiduciaries, which

11  they are not -- their motivation is very different -- and this

12  Court has enabled anything other than the process moving

13  forward with as quick dispatch as could humanly move forward.

14         Your Honor never stood in the way of Fuji's strategy.

15  In fact, Judge, until you mentioned at a hearing the prospect

16  of perhaps Fuji going to the District Court, it was never even

17  on the table.  After Your Honor mentioned it, in came the

18  motion for stay relief to go before the District Court.

19         THE COURT:  Yes.

20         MR. SIROTA:  At no time --

21         THE COURT:  Your point is well taken on the process

22  selection, and there will be a disagreement on whether Customs

23  was sort of part of that continuum or not, but I think it's at

24  least reasonable to say that it was just as it might be argued

25  that it wasn't.  But, Mr. Sirota, the face of the Bankruptcy

1  Court question that's been raised by Mr. Etkin and then very

2  pointedly by Mr. Rosenthal is a significant question.  I mean

3  if one were to conclude that there truly was infringement --

4  and I understand that it's a complex area, but you know, the

5  burden is on the debtor here, and if there was infringement,

6  and if it did result and will result in a multimillion dollar

7  award including an administration claim and if all the ifs are

8  removed from that, which you're going to go to I'm sure, it is

9  a problem for this Court, and it's -- whether it's the ultimate

10  question or not, I'm not sure, but it might be.  It really

11  might be, and it might just put this Court in a position where

12  the chips will fall where they fall on Imation, and whatever

13  happens on appeals happens on appeals.  It is a grave concern,

14  and I think -- I understand sort of the business model, but the

15  business model is a model that accepts the risk, and so far at

16  every turn notwithstanding what Mr. Kaplan might characterize

17  as a win in the Federal Circuit that turned to dust in a $30

18  million negative -- Judge Hochberg.

19          Now I do understand spilt milk and where we are now

20  and that one has to stand here and make the analysis and not go

21  back to May of '03.  I will -- I'll give you another two

22  minutes, and then I'm going to tell you what I'm going to do.

23          MR. SIROTA:  Judge, the ifs that you pose I think

24  should be balanced with what's pending, and hopefully, because

25  we don't control it in site in the Federal Circuit decision and

90

1  the Imation trial.  But as you balance the ifs, Mr. Etkin

2  talked about the Imation litigation and Mr. Frazza's going to

3  go forward, and nobody disputes that.  He's standup person at a

4  standup firm, and they'll carry the torch on the Imation

5  litigation, but Your Honor waves the wand on conversion and

6  cuts this program short.  No one's addressed the immediate

7  accumulation of administration claims that will dramatically

8  erode the $50 million hypothetical.

9       THE COURT:  All right.  Let's --

10      MR. SIROTA:  The vendors and people that have done

11  business --

12      THE COURT:  You're right.

13      MR. SIROTA:  -- with this particular debtor are going

14  to become --

15      THE COURT:  Let's say that it erodes it.  See, that's

16  -- you take $50 million.  Again just hypothetically.  The

17  biggest hit is going to be suffered by Fuji in terms of raw

18  dollars.  The biggest hit --

19      MR. SIROTA:  It all depends, Judge.  If they come

20  here with an administrative claim against a trustee who's got a

21  burial fund of $300,000 and knows nothing about patent

22  infringement and presents this Court with an admin claim of

23  15/20 million dollars, who's contesting that?  They may get the

24  cream of the crop.

25      THE COURT:  I'm assuming a better situation.  I'm

**J&J COURT TRANSCRIBERS, INC.**

1 assuming that the Trustee goes forward with Imation, and

2 there's $50 million.

3      MR. SIROTA:  And the $50 million comes in, and Fuji

4 will have filed an administrative claim for its infringement

5 that will not be aggressively contested, because the Trustee

6 won't have the ability to do it, and they will take in the

7 administrative status --

8      THE COURT:  But your point -- your point is that the

9 administration in the 11 -- and we're talking about the tiering

10 of administration claims, but the 11 tier will be swelled by

11 WalMart, for example.  That's the horrible that you paraded.

12 Well, it may happen, but it'll happen to the detriment of their

13 claim just as their claim in your terms will be enhanced by

14 nobody seeking to seriously challenge it, because who wants to

15 pay for an appeal out of the ITC?  So those are cross currents.

16 That's what would happen.  If there's no money coming in, it

17 doesn't make any difference anyhow.

18      MR. SIROTA:  That's true.

19      THE COURT:  If Imation is a zero, it doesn't matter.

20      MR. SIROTA:  That's true.

21      THE COURT:  It's not -- none of it's worth a hill of

22 beans.

23      MR. SIROTA:  And if the cop on the beat decides that

24 the product is excluded, then it doesn't matter either, because

25 operationally this case is over.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well --

2          MR. SIROTA:  But Fuji's asking that Your Honor just

3   intercede a little bit early.  Judge, the ITC is almost done

4   with its business, but you have enough.  Customs does a good

5   job when they rule in our favor but doesn't do a good job when

6   they rule in Jazz's favor.  So just intervene, if you wouldn't

7   mind.  Put the debtor out of business, and we'll be better off.

8   That's not a fair program.  That's not a fair program for this

9   debtor.  It's premature.  The independent -- or the fiduciaries

10  in this case who represent clients that don't have competitive

11  motivation think it's premature.  The agency that supervises

12  these Chapter 11 cases that rarely opposes conversion thinks

13  it's premature, and I think given that they chose their course

14  of conduct, they should let that roll out full-term.

15          And, Judge, with respect to this enabling, it'll be

16  my last point.  Judge Hochberg in rendering her decision had

17  presided over a multi-week trial.  A trial that resulted in a

18  $30 million judgment.  Comments that were made about Mr. Benun

19  that were not complimentary, and when faced with a request for

20  an injunction going forward said no.  The ITC can handle.  I

21  don't think this Court should take a more aggressive view and

22  give this particular entity, Fuji, more than they would get,

23  and I say more, because they were very happy with this debtor

24  in Chapter 11 and not moving to dismiss the case, so that they

25  could use the avenue of Chapter 11 to poke, explore, review,

**J&J COURT TRANSCRIBERS, INC.**

1 which they've taken every opportunity to do.  I agree with Your

2 Honor wholeheartedly.  The very important when is coming, and

3 that's the Federal Circuit, and we'll have to deal with it, but

4 it's not today, respectfully, Judge.  Thank you.

5       THE COURT:  Thank you, Mr. Sirota.  Mr. Rosenthal.

6       MR. ROSENTHAL:  Your Honor, just the last point that

7 was made.  Fuji was dragged into this Court involuntarily.  We

8 were hardly the people who caused this proceeding to start, and

9 Fuji didn't have, it seems to me, very many options coming in

10 in terms of saying that this wasn't a proper bankruptcy.  There

11 were debts as I understood the bankruptcy law.

12       But Fuji was also -- did make an election.  It said

13 let's go see what the ITC feels about this issue, because at

14 least there's a body with some experience, has a track record

15 of moving relatively quickly, and it's in the best interest of

16 everybody to go down that road.  But at no time in front of the

17 ITC and in front of this Court have we ever said Customs was

18 right.  We always said -- in fact, if you read the end of the

19 opinion of the ALJ, he says Fuji wants us to write another

20 order to instruct Customs, but that's not necessary, so the

21 order is the same one that was issued in 1999, because Customs

22 will learn from what we say here today and what the Commission

23 may say or may not say in the future.  Customs will how to do

24 it right, and there's a stirring.  There's rumblings that maybe

25 Customs has learned it.

1          But the cop on the beat wasn't Customs.  We didn't

2    gutter Customs.  They fell down.  We contended from the get go

3    that Customs wasn't doing their job, and we suspected it was

4    because they were being sold a bill of goods, and it turns out

5    that's exactly what the ALJ finds.  The bill of goods was this

6    ICP system which was found to be worthless.  Customs doesn't

7    have the vehicle for maybe making the kind of determination

8    that an administrative law judge can make with witnesses and

9    evidence and testimony, etcetera, but the bottom line is that

10   we went to the ITC, and for the purposes of this proceeding,

11   that's fine.  There's nothing that the ITC can or will do

12   tomorrow or next year, whenever they decide the remedy issue.

13   They said that issue was gone.  As Mr. Etkin pointed out, it's

14   a bifurcation.

15          We're going to consider what the right penalty is for

16   this wrongdoing, but we're not going to -- and it may be zero,

17   because maybe they'll look at Jazz and say as to Jazz, since

18   they're now gone, we won't levy any penalty, because it's a

19   waste of our time.  But they may levy it against Mr. Benun

20   personally who's not gone, who's present, who they levy joint

21   and severally.  But that's not the issue.  The issue is that a

22   duly constituted body has decided that there has been post-

23   petition infringement, and Mr. Sirota, if I hear him correctly

24   -- I certainly heard him correctly until today, and he's

25   uttered the words today -- maybe we should wait for the Court

**J&J COURT TRANSCRIBERS, INC.**

1  of Appeals, because it's not final until --

2         This is the body that both sides decided should

3  decide the issue.  We took an option.  We'll put aside my

4  injunction issue, because that's -- Your Honor said that's not

5  on the table, and I can defend my request for an injunction,

6  because an injunction would go beyond --

7         THE COURT:  I didn't say it wasn't on the table.  I

8  said it's really --

9         MR. ROSENTHAL:  It's not here.

10        THE COURT:  It's not the central focus.

11        MR. ROSENTHAL:  Central point.  All right.  But what

12  I'm trying to say here is that we did play the game in

13  accordance with the script.  We -- which didn't include

14  Customs.  We went down that road.  There was a vigorous defense

15  before the ITC.  The ALJ determination was in a sense appealed

16  to the full Commission.  The Commission said hell no.  The

17  Commission said whatever the ALJ found as to violation and as

18  to the liability of Mr. Benun and Mr. Cosentino under the order

19  of the Commission stands, and I'm now going to turn to the

20  issue of remedy, which is a complex thing.

21        One of the findings of the ALJ, which is a remedy

22  finding really, is that there was bad faith which warrants a

23  large remedy.  Thirteen point six seven five million dollars is

24  the largest remedy, if issued, ever issued by the ITC in an

25  enforcement proceeding.  It dwarfs everything else, but it's

**J&J COURT TRANSCRIBERS, INC.**

1  less than $154 million which was the maximum exposure.  Only

2  reflects the fact that there's a realism somewhere in the --

3  among the ALJ that $154 million could never be collected, but

4  be that -- and 13.675 in relation to an alleged claim of $250

5  million in Imation maybe can be collected.  But the bottom line

6  is that we've walked down the road that was set out 16 months

7  ago or more -- a little less than 16 months ago, because we

8  decided this soon after the beginning of the case.  We walked

9  down that road.  It's taken longer, as it always does.  Every

10  judicial proceeding, administrative proceeding, always takes

11  longer than it was supposed to.  It took longer than it was

12  supposed to for many reasons -- and a bunch of other reasons.

13        But the bottom line is we got there.  We got there

14  over the protections of the debtor.  We got there after the

15  vigorous defense of the debtor by Mr. Kaplan.  We got there,

16  and now we're being asked to go somewhere else?  I fail to

17  understand how the dignity of the law is satisfied by that

18  approach.

19        MR. SCHWARTZ:  Your Honor, one point of

20  clarification.

21        THE COURT:  Certainly.  Go ahead.

22        MR. SCHWARTZ:  Your Honor, I've said earlier that Mr.

23  Benun at some point in time approached Fuji and asked for a

24  license to generally sell reloaded cameras.  That's simply not

25  true.  He did approach Fuji, and he did ask for a license, but

1  it was only with respect to new cameras to sell to 3M

2  Corporation.  It wasn't generally with respect to all reloaded

3  cameras.

4          THE COURT:  I stand corrected.  Thank you.

5          MR. SCHWARTZ:  Thank you, Your Honor.

6          THE COURT:  Excuse me a moment.

7                  (Pause)

8          THE COURT:  All right.  Certain things we didn't

9  discuss.  The subpoena, for example.  Let me just ask something

10  about the subpoena, and if we could just get sort of a quick

11  response.  Is there still a continuing need as seen by Fuji for

12  response to the subpoena and deposition of Mr. Weber?

13          MR. ROSENTHAL:  Your Honor, the overriding concern

14  that caused us to issue the subpoena still exists 20 -- I guess

15  it's up to $26 million has gone to PRE and/or Polytech, and I

16  think we're entitled to find out exactly how and where and when

17  that went and why.

18          THE COURT:  So as I understand -- I just want to

19  understands your position.  Do you still -- you know, not

20  argument.  Do you still want the documents and access to Mr.

21  Weber?

22          MR. ROSENTHAL:  Yes, Your Honor, I do.

23          THE COURT:  And may I ask this.  Does this step by

24  Fuji with respect to the subpoena relate to the conversion

25  issue, the stay relief issue, the admin claim?

**J&J COURT TRANSCRIBERS, INC.**

1           MR. ROSENTHAL:  Your Honor, it does not relate to the

2    stay or the admin claim.  It does relate to the conversion in a

3    way, because one of the contentions that we make is that the

4    operation of this debtor, aside from its lack of transparency

5    has -- every time we've lifted a rock, there's been a worm

6    under it.  The best example of that --

7           THE COURT:  All right.  Just -- you know, I accept

8    your point that it relates to the conversion issue.

9           MR. ROSENTHAL:  It relates to the conversion issue.

10          THE COURT:  All right.

11          MR. ROSENTHAL:  And I think that's the only fair

12   answer.

13          THE COURT:  As you see it.  Okay.  Mr. Sirota?

14          MR. SIROTA:  Judge, my only recommendation -- I

15   raised this with Mr. Greenberg yesterday.  There seems to be an

16   insatiable appetite for information that we can never satisfy,

17   and we've seen allegations before of wrongdoing, none of which

18   were borne out.  The only thing I can think of to keep the

19   costs under control in responding to this information request

20   is to do what we did with Jazz U.K., and that is -- and Mr.

21   Buechler's recommendation -- we agree that Mr. Horgan should

22   sort of, as the Committee accountant, be the honest broker

23   looking at these issues in the first instance and reporting to

24   the parties, and this way we could get to the bottom of their

25   inquiries through Mr. Horgan.  He could issue a report if there

**J&J COURT TRANSCRIBERS, INC.**

1 was some disagreement, and we could revisit whether Mr. Weber's

2 deposition was necessary.  I just, for purposes of full

3 disclosure, understand that after Horgan issued his report on

4 Jazz U.K., Fuji then said we want all of the confidential

5 backup that went with it, and we were unwilling to produce

6 customer information and things that we felt were confidential

7 that we gave to Mr. Horgan.  But as sort of a compromise, my

8 suggestion is why don't we put these issues before Mr. Horgan,

9 let him do a bipartisan review, and report to the parties.  If

10 there's need for Mr. Weber's deposition after that, he'll be

11 produced.

12          THE COURT:  Mr. Buechler.

13          MR. BUECHLER:  Not acceptable, Your Honor.  Simply

14 put, we asked for additional documents vis-a-vis Jazz U.K., and

15 we asked that they be for attorneys' eyes only pursuant to the

16 protective order.  We were denied.  We do not believe the

17 investigation done was to the extent that it could've or

18 should've been done.  It's done.  Mr. Horgan did his report.

19 We don't believe it accurately looked at what it should have,

20 and, therefore, we felt the need to embark on our own.  There

21 are numerous instances where if you look at the course of this

22 case from day one to the transformation of the way it does

23 business when originally it was Jazz Hong Kong, now it is

24 Polytech and PRE getting millions of dollars each month --

25 millions of dollars -- and that potentially is taking the

**J&J COURT TRANSCRIBERS, INC.**

1  profit of this company, the debtor, offshore.  Because when you

2  do examine carefully the affidavits -- in particular the one

3  that Mr. Benun submitted to the Court of International Trade,

4  it appears to us on our math that the debtor is selling single-

5  use cameras below cost -- below its actual cost.  That means

6  that profit, if there is is being left.  Whether it's in

7  Polytech or PRE, Mr. Silvera, which has a connection back to

8  the Committee, it's now the current debtor's landlord who it

9  shares space with, and, who knows, may be the Phoenix in the

10  future, but it's discovery that we believe we need, because

11  with all due respect, the Committee has not done the

12  investigation that maybe it should've.

13      THE COURT:  Okay.  I think that resources are, of

14  course, an issue with an investigation, but let me address the

15  series of motions that is before the Court today.  There's a

16  motion by Fuji to convert.  There's a motion by Fuji to have a

17  certain administrative claim allowed.  There's motion for

18  either relief from the stay or determination that there is no

19  stay affecting Fuji in its right to go forward to the District

20  Court to seek out an injunction with respect to the sale of the

21  disposable cameras.

22      There's a cross motion pending which is a function of

23  the last-stated motion.  That if the stay is deemed not to be

24  in existence or is the subject of relief order of this Court,

25  that there should be retention of Mr. Frazza's firm for

**J&J COURT TRANSCRIBERS, INC.**

1 representation.   There's a dispute with respect to and a

2 motion to quash the subpoena that was just referred to, but

3 this Court centers on, as I stated early on, the conversion

4 motion, because that would answer many of the other questions

5 and deal with many of the other motions.  And should this

6 Chapter 11 case go forward -- and I don't have a quick and easy

7 answer right now.  I've expressed my concerns for the ITC

8 determination, the EID-2 as apparently not contested or agreed

9 to by ITC, and it is a substantial negative for the life of

10 this case.

11      I'm acutely aware of the Imation litigation, which

12 has now been delayed and deferred into January, and I'm acutely

13 aware of the pending appeal where oral argument was made in

14 early May before the Federal Circuit with respect to Judge

15 Hochberg's judgment.  For interim purposes this Court will

16 continue all -- except the subpoena issue, all issues until

17 November 19th at 1:00, and we can discuss supplementary filings

18 which I would hope would be limited to input relating to

19 developments between now and November 19th, so we don't retrace

20 steps, or a sharpening of points raised at this hearing.

21 Having said that, I leave it to counsel to work out

22 supplementary submissions.

23      The Court reaches this conclusion to continue matters

24 which obviously continues the Chapter 11 at least until that

25 date.  As a function of a series of considerations, it does

**J&J COURT TRANSCRIBERS, INC.**

1  appear as though Customs is now activated in the enforcement

2  area.  The ITC Customs role was agreed to by the parties, both

3  Fuji and the debtor, and though I'm not deciding that Fuji put

4  all of its eggs in the customs basket, if you will, it may be

5  that customs takes certain steps which will impact very

6  dramatically on the Chapter 11 case and particularly on the

7  conversion issue.  And those activities in Customs are just not

8  ripened now, but they could ripen, as I hear it from Mr.

9  Peterson in particular, over the next few weeks.

10         The second factor is that there is at least an

11  allegation by the debtor that once again the process has

12  changed by the -- both the accounting process for first sales

13  and the refurbishment process sufficient to take the reloading

14  of these cameras out of what was determined to be objectionable

15  by the ALJ and EID-2.  I'm not making a finding on that, but at

16  least there isn't stubbornness on the part of the debtor to

17  stay with the old program and simply appeal.  Now whether

18  there's credibility in the change of process is a matter I

19  haven't focused on and may have to focus on.

20         Another factor that the Court will consider is that,

21  as Mr. Rosenthal says, the subpoena has relevance to the

22  conversion, and I will define the scope of the subpoena and

23  will not quash it and will order that Mr. Weber be produced,

24  and the documents we can talk about in particular.  But I think

25  that the open book program is necessary, and if it's a fishing

1    expedition, so be it.

2         The possibility does exist that the ITC process will

3    become finalized in terms of the penalty phase between now and

4    November 19th, and the fact that seems to be likely -- I assume

5    that all submissions have been made to the ITC at this point

6    with respect to that, and so we can get some more insight, and

7    that's what I'm looking for, into what might be an

8    administration claim or might be a pre-petition claim and the

9    overall award generally.

10        There's also the possibility, though it's hard to

11   predict, that between now and November 19th the Federal Circuit

12   will decide the appeal from Judge Hochberg's judgment.  That

13   will have broad implications in a number of directions,

14   including Imation, and the Court would hope to get some

15   instruction and insight there, though it may not happen.  I

16   understand that it may not happen because of the timing.

17        The Court is particularly concerned, as it was

18   several months, in the spread of litigation in the attendant

19   costs moving the process in any degree to yet another court

20   here, the District Court, as applied for by Fuji.  The Court

21   will continue its utilization of the equitable powers under 28

22   USC 959 to hold in for administration efficiency purposes the

23   litigation to this court except as we've already made reference

24   to the ITC.

25        The Court also feels that at least the continuation

1 which continues the life of the Chapter 11 case to November

2 19th for the stated reasons is reasonably consistent with the

3 earlier ruling with respect to the stay relief motion.  We

4 still haven't come to the final phase in the ITC.

5          Now the Court is cognizant of the fact that there

6 may be an effect on both Fuji and the estates generally.  There

7 is a potential that an admin claim will be increased.  Mr.

8 Rosenthal makes the point that even if Customs holds out

9 containers of imported cameras, that there's an inventory that

10 might be sold which might be infringing.  This is a marginal

11 cost, and it's not disregarded by the Court, but on balance the

12 short delay in between now and November 19th in the life this

13 case is relatively short.  The Court is inclined to step slowly

14 toward a very drastic conclusion, if it should be reached, that

15 being conversion, in an attempt to get some of these other

16 benchmarks brought in the proceeding.  And so will reconvene on

17 the 19th of November at 1:00.

18          With respect to the subpoena and its breadth in terms

19 of documents -- yes?

20          MR. BUECHLER:  Just one other question in regard to

21 what you said before we jump into the subpoena.  Two points.

22 One, you neglected to also on today's calendar is a motion to

23 both Jazz and Benun to extend exclusivity which we, Fuji, have

24 objected to and continue to object to.

25          THE COURT:  Thank you.  I do appreciate that.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BUECHLER:  Two.  With regard to your decision to

2    adjourn Fuji's motions til November 19th, if the Federal

3    Circuit were to come down sooner -- sooner than then, would the

4    Court entertain a request by Fuji to have that hearing moved

5    up, because hypothetically that decision could come down next

6    Tuesday.

7          THE COURT:  All right.  If there's an event that

8    occurs and either side or any party in interest should feel is

9    telling, the Court's always available by telephone, and I would

10   have a conference with respect to that and certainly would

11   reconsider the November 19th date.

12         MR. BUECHLER:  Thank you.

13         THE COURT:  To the extent that the exclusivity issue

14   is on the calendar and to the extent that issues here also

15   relate to the Benun case, exclusivity will be continued until

16   November 19th, and the Benun issues will also be continued

17   until November 19th.

18         With respect to the subpoena, Exhibit A, documents to

19   be produced, paragraph one, in lieu of all documents or other

20   information that phrase will be removed and replaced with

21   documents sufficient to disclose information relating to.

22         Paragraph two, the same amendment -- documents

23   sufficient to disclose.

24         Paragraph three, in place of all with respect to

25   accountings, reconciliations, etcetera, the term available

**J&J COURT TRANSCRIBERS, INC.**

1 accountings, reconciliations, summaries, etcetera.

2         Paragraph four, the same -- available instead of all.

3         Paragraph five, that sample documents used by Jazz

4 shall be produced.

5         Paragraph six, instead of all documents or

6 information, it will be a summary of documents or information.

7         Paragraph seven is as is.

8         Paragraph eight, instead of all, it will be principal

9 documents which account for.

10         Same thing in nine and ten.

11         Paragraph 11 is as is, and Mr. Weber will be produced

12 for deposition.

13         MR. SIROTA:  Judge, is there a limitation as to how

14 long Mr. Weber can be deposed for?  We've been down that road a

15 few times.

16         THE COURT:  Mr. Buechler, are you dealing with this

17 matter?  How much time do you need?  An hour and a half?

18         MR. BUECHLER:  No, Your Honor, we'd like to have an

19 entire day.

20         THE COURT:  Okay.

21         MR. BUECHLER:  And --

22         THE COURT:  Entire day.

23         MR. BUECHLER:  And some period of time, in which Mr.

24 Sirota can tell us now, that we'll get the documents, so we

25 can --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's fair.

2          MR. BUECHLER:  -- and then we can then work with Mr.

3  Sirota separately to fix a date.

4          THE COURT:  That's fair, and you can -- I'm sure Mr.

5  Sirota will agree to a period of time following the production

6  of documents, so that you can properly prepare for the

7  deposition.

8          MR. SIROTA:  Judge, we would ask for two weeks to

9  produce the documents.  I just spoke with Mr. Weber.

10          THE COURT:  Does that work for you, Mr. Buechler?

11          MR. BUECHLER:  Two weeks from today is acceptable,

12  Judge.

13          THE COURT:  All right.

14          MR. SIROTA:  And then we'll fix a time thereafter.

15          MR. BUECHLER:  That's perfect.

16          THE COURT:  All right.  Counsel, I do appreciate your

17  cooperation.

18          MR. SIROTA:  Judge, with respect to forms of order,

19  would you like us to undetake the first cut, and we'll share

20  them --

21          THE COURT:  Yes.  Yes, and please provide the other

22  side, and let's see if we can get a form of order locked in on

23  particularly as to the active matter, but of course, the

24  continuations as well.  Is there anything else that's open?

25  Yes, Mr. Buechler?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BUECHLER:  One other housekeeping item, Your

2    Honor.  Next Tuesday --

3          THE COURT:  Nine 28, the pretrial.

4          MR. BUECHLER:  That's in the adversary --

5          THE COURT:  I'd like to adjourn that if there's no

6    objection.

7          MR. BUECHLER:  Mr. Schwartz and I spoke about that

8    before, because that's waiting again for the Fifth Circuit.  I

9    don't know how far Your Honor wants to carry that --

10         THE COURT:  I'll give you a November date for that

11   pretrial.

12         MR. BUECHLER:  What's the date, Your Honor?

13         THE COURT:  I beg your pardon?

14         MR. BUECHLER:  I didn't hear Your Honor.

15         THE COURT:  I'll give you a November date for that

16   pretrial.  Let's put it down for holding purposes as November

17   23rd at 9:00.

18         MR. BUECHLER:  One other, Your Honor.

19         THE COURT:  Go ahead.  We will need an order on the

20   exclusivity periods.

21         UNIDENTIFIED ATTORNEY:  We'll submit one, Judge.

22         MR. BUECHLER:  Well didn't they file that -- you're

23   talking about the motion that Mr. Sirota --

24         UNIDENTIFIED ATTORNEY:  No, the --

25         THE COURT:  Mr. Sirota's going to take the laboring

**J&J COURT TRANSCRIBERS, INC.**

1  oar and --

2         MR. SIROTA:  I'll just circulate that, and if we have

3  a dispute, you'll be the first --

4         THE COURT:  Anything else, counsel?

5         MR. SIROTA:  No.

6         THE COURT:  Mr. Buechler?

7         MR. BUECHLER:  Your Honor, all Mr. Rosenthal said to

8  me is last fall we had filed motions in the Benun case seeking

9  permission or authorization -- and I don't recall the exact

10 nature -- dealing with potential causes of action for

11 fraudulent conveyances.  At that time we entered into

12 agreements with Mr. Seacrest here with his clients, which are

13 Mrs. Benun and the daughters, as well as several other

14 entities.  Those tolling agreements expire by their own terms

15 in November or December of this year.  I just want to alert

16 Your Honor the parties and Fuji will either make a decision as

17 to whether to reactivate those motions or discuss with those

18 same parties through their appropriate counsel whether they

19 will agree to extensions of the tolling agreements, but people

20 shouldn't be surprised with that --

21         THE COURT:  Fair enough.

22         MR. BUECHLER:  -- if there is the motion that the

23 debtor Jazz Photo filed dealing with the funds that come out of

24 the escrow from the ITC for the bond that they have filed,

25 which we will be submitting the papers in connection with when

1  they're due in the next week or so.  I don't know the exact --

2       THE COURT:  And on the horizon is Mr. Peterson's

3  firm's --

4       MR. BUECHLER:  Correct.  We've received those, and we

5  have some issues with those that will progress.

6       THE COURT:  All right.  I do thank counsel for high

7  quality of work.  It always makes it easier, even in a

8  difficult case, and let's see where we go from here.  Thank you

9  very much.

10      ALL:  Thank you, Your Honor.

11                    * * * * *

12                **CERTIFICATION**

13      I, PATRICIA C. REPKO, court approved transcriber,

14  certify that the foregoing is a correct transcript from the

15  official electronic sound recording of the proceedings in the

16  above-entitled matter.

17

18  /s/ Debra Storey              Date:  September 29, 2004
19  DEBRA STOREY
20
21
22  /s/ Patricia C. Repko
23  PATRICIA C. REPKO
24
25  J&J COURT TRANSCRIBERS, INC.