**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (ME 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ 07068
973-597-2500 phone
973-597-2400 fax

- and -

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
BRIAN M. COGAN
KRISTOPHER HANSEN
180 Maiden Lane
New York, NY 10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JAZZ PHOTO CORP., | : | Case No. 03-26565 (MS) |
| | : | |
| | : | Hearing Date: Nov. 19, 2004 at 10 a.m. |
| | : | |
| | : | |
| Debtor-in-Possession. | : | |

**OMNIBUS SUPPLEMENTAL RESPONSE IN SUPPORT OF FUJI PHOTO FILM CO., LTD.'S (A) MOTION FOR ORDER CONVERTING THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE; (B) MOTION FOR A DETERMINATION THAT THE AUTOMATIC STAY IS NOT APPLICABLE AND TO LIFT THE INJUNCTION AGAINST PROCEEDING OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY; AND (C) MOTION FOR <u>ALLOWANCE OF ADMINISTRATIVE CLAIM</u>**

Fuji Photo Film Co., Ltd. ("Fuji"), by and through its counsel, Stroock & Stroock & Lavan LLP and Lowenstein Sandler PC, submits this omnibus supplemental response (the

"Supplemental Response") in support of: (a) Motion For Order Converting The Chapter 11 Case Of Jazz Photo Corp. ("Jazz" or the "Debtor") to a Case Under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code")(the "Conversion Motion"); (b) Motions for a Determination that the Automatic Stay is Not Applicable and to Lift the Injunction Against Proceeding or, Alternatively, for Relief From the Automatic Stay in the Jazz and Jack C. Benun ("Benun") cases (the "Stay Motions"); and (c) Motions for Allowance of Administrative Claim Against Jazz and Benun (the "Administrative Claim Motions," and together with the Conversion Motion and the Stay Motions, the "Motions"). In support of this Supplemental Response, Fuji respectfully states:

## BACKGROUND

1. On August 2, 2004, Fuji filed the Motions in an attempt to: (i) prevent Jazz's continued wasting of estate assets and incurrence of significant administrative claims which cannot be paid, (ii) prevent Jazz from further infringing on Fuji's patents, and (iii) have this Court determine and allow Fuji's administrative expense claim against Jazz and Benun arising out of their post-petition infringement. Indeed, the only ones who are benefiting from this case remaining in Chapter 11 are Benun and his cronies who continue to do business with the Debtor. It is clear from the record that unsecured creditors will not be better off by virtue of the continued operation of the Debtor.

2. Following a hearing on the Motions held on September 22, 2004, this Court adjourned the Motions to November 19, 2004. In the interim, the Debtor commenced several cases and litigated one case before the United States Court of International Trade (the "CIT"), entitled Jazz Photo Corporation v. United States, Case No. 04-00494. (See also Jazz Photo Corporation and Photo Recycling Enterprises, Inc. v. United States, et al., Case No. 04-00442).

**PRELIMINARY STATEMENT**

3.  The continuing rapid deterioration of the Debtor's financial condition highlights the urgency and the appropriateness of the relief sought by Fuji in all of the Motions, but specifically the Conversion Motion. While the Debtor's assets continue to wither away, the Debtor's actions during the bankruptcy proceeding have ensured that its foreign subsidiaries are now almost worthless or non-functioning businesses. Fuji submits that the Debtor is using assets of the estate to purchase infringing products from entities that Fuji believes are really, wholly or partially, alter egos of the Debtor and/or Benun. In addition, since the Petition Date (as defined in the Motions), the United States International Trade Commission (the "ITC") has found that the Debtor and Benun have infringed Fuji's patents, Customs has stopped the Debtor's shipments on the grounds of patent infringement and the CIT has apparently confirmed the Debtor's continued infringing business practices as to some of its cameras. All this occurred post-petition and in the wake of the $30 million patent infringement judgment obtained by Fuji against the Debtor and Benun pre-petition. The Debtor's continued post-petition patent infringement and the Debtor's lack of access to product by virtue of the enforcement action taken by Customs only serves to increase the amount of unpaid administrative expense claims, thereby increasing the amount by which the Debtor is administratively insolvent. This continued post-petition wrongdoing, even after the ALJ and ITC decisions, while not required to support Fuji's Motions, only reinforces Fuji's position that the Debtor's post-petition conduct mandates that Jazz is no longer entitled to debtor-in-possession status. The evidence adduced here demonstrates that the Debtor's financial position has deteriorated to a level such that its Corporate Comptroller cannot predict survival even in the unlikely event everything goes the Debtor's way.

4.  Notwithstanding the findings of post-petition infringement by the Administrative Law Judge (the "ALJ") and subsequent affirmation of continued post-petition infringement by the ITC, the Debtor will undoubtedly suggest to this Court that _now_, the Debtor is no longer

infringing in light of the recent tentative ruling of the CIT.[1] This ruling would allow <u>some</u> of the cameras at issue to enter the U.S. market, pending the posting of a bond that the Debtor clearly cannot afford. As more particularly set out below, Fuji could neither intervene, nor participate in any meaningful way in the CIT proceeding, and the Government did not put on any affirmative case. Fuji believes that if it had been allowed to fully participate in the CIT proceeding and all of the facts were made available to the CIT, the CIT would likely have ruled that Jazz failed to comply with the General Exclusion Order consistent with the earlier findings of the ALJ and the ITC. Moreover, since Fuji was prohibited from participating as a party in the CIT proceeding, Fuji will have no remedy for the Debtor's continued infringement unless Fuji is allowed to proceed before the District Court.[2]

5.  Fuji files this Supplemental Response to apprise this Court as to the current status of Jazz's operations, to further clarify Fuji's need to seek injunctive relief before the District Court and to ask this Court to act and grant the relief requested in Fuji's Motions. Further inaction at this time will not only cause irreparable injury to Fuji, but will also further harm all of the creditors of the Debtor's estate.

## ARGUMENT

### I.  CONTINUED FINANCIAL DETERIORATION OF THE DEBTOR REQUIRES CONVERSION

6.  A close look at Jazz's financial statements is compelling evidence that the Debtor's continued operation only causes a perpetual downward spiral in the value of the estate. According to Jazz's operating report for the month of September 2004, relevant portions of which are attached as Exhibit "A" to the Declaration of Lawrence Rosenthal (the "Rosenthal

---

[1] Note that Jazz failed to prove that several of its cameras do not infringe, and thus, while the CIT has tentatively found certain cameras do not infringe, it also tentatively found several others still do. Thus, even the CIT appears to have found Jazz continues to infringe on Fuji's patents.

[2] A CIT proceeding, in any event, cannot result in an injunction against the Debtor, Benun or any others acting in concert with them, or the award of damages to Fuji.

Decl.") annexed hereto as Exhibit 1, Jazz incurred a net loss in the amount of $3,849,940 since the Petition Date ($540,811 for the month of September 2004 alone). In addition, the Debtor's balance sheet shows that the difference between total assets (less certain worthless loan obligations of Benun) and current liabilities is now a negative $2,431,173, as opposed to positive $2.3 million, as of the Petition Date. It is clear that since the Petition Date, the Debtor has wasted almost $5 million of estate assets that would have otherwise been available for distribution to creditors. Equally significant is the increased debt to Polytech for cameras held up by Customs or en route to the United States, which under these circumstances will likely give rise to additional post-petition claims, although such claims are subject to challenge by a trustee and creditors.

7.   During the month of September alone, Jazz made disbursements of $89,500.00 to Photo Recycling Enterprises ("PRE") and $230,000.00 to Polytech for cameras, at least some of which were apparently found to infringe Fuji's patents, and all of which have been denied entry by Customs.[3] In addition, since the Petition Date, Jazz's latest operating report shows that Jazz has spent a total of $27,875,765 (plus $718,593.92 paid by letter of credit and included in the letter of credit line item) on purchases of products from Polytech, some of which was paid directly to PRE, Seven Bucks/Connor and Agfa. While Jazz has produced various reconciliations bates stamped 009545-9547, 009263-9265 (by the Debtor) and 008743-8763 (by Polytech) (annexed to the Rosenthal Decl. as Exhibits "B" and "C" respectively), Jazz does not explain the numbers in the operating report. Mr. Joseph Weber, the Debtor's Corporate Comptroller, in a deposition on November 10, 2004, could not explain the three "reconciliations" produced in response to Fuji's subpoena along with the corresponding operating report. See Weber Dep. at 1-5, 19-21, 41-42, 49-52, 70-71, 78-80 (Rosenthal Decl., Exhibit "D"). While the discrepancies are not large, they are inexplicable given that Mr. Weber had weeks of notice that

---

[3] Weber, in his deposition on November 10, 2004, advised that ten containers of single use cameras have been released; however, Fuji has been unable to independently confirm this with Customs.

-5-

this would be a subject of the deposition. Such huge disbursements to the Debtor's vendors, whose identity of interests with the Debtor and Benun are clear, have led only to losses, post-petition infringement and the current dispute before Customs and the CIT, to the detriment of legitimate creditors of Jazz. In addition, Jazz's intention to favor these vendors (as well as insiders, such as Benun) over other creditors is further evidenced by the fact that Jazz is not funding the Court-ordered $5K per week set aside for the "burial" fund. See Weber Dep. at 119-120 (Rosenthal Decl., Exhibit "D").

8. The tentative decision in the CIT proceeding (more fully described below), in which some cameras originally excluded by Customs are likely to be found not to infringe by the CIT, will require the Debtors to post a bond of at least $300,000 prior to their entry into the U.S. market. Thus, not only is money still flowing out of the estate to purchase product that has been found by the ITC to infringe, but also the Debtor must now reserve additional assets of the estate to secure a bond necessary to allow for the importation of the same product. In essence, the Debtor is now "doubling-down" on its gamble as to whether the product it is importing will be found to violate the Cease and Desist Order and therefore infringe on Fuji's patents. Perhaps the Debtor may view the tentative ruling in the CIT proceeding as a victory, but the creditors of the Debtor's estate, whose money Jazz continues to gamble with, certainly should not. In fact, Rosenthal and Rosenthal, appears to have less security for monies advanced than required under the final DIP financing order. See Weber Dep. at 127 (Rosenthal Decl., Exhibit "D"). Mr. Weber, the Debtor's Corporate Comptroller, could not predict that the Debtor will survive even if the cameras held by Customs are released. See Weber Dep. at 133-35, 174-75 (Rosenthal Decl., Exhibit "D").

9. Prior to the Petition Date, Jazz had three active wholly owned subsidiaries: Jazz Photo (Hong Kong) Limited ("Jazz Hong Kong"), Jazz Photo (Canada) Corporation ("Jazz Canada") and Jazz Photo Limited ("Jazz UK"), (collectively the "Jazz Subsidiaries"). As of the Petition Date, Jazz Canada, Jazz UK and Jazz Hong Kong each conducted sales and marketing and had significant assets. The Jazz Subsidiaries were purposely kept out of the Jazz bankruptcy

proceeding and the transparency of these operations has been a continued concern of this Court. Today, Jazz UK is in an administration in the United Kingdom (which is a proceeding broadly equivalent to one under Chapter 7 of the Bankruptcy Code), as a result of an application made by GE Commercial Finance Limited ("GE"), which holds a composite guarantee and debenture security in the assets of Jazz UK dated July 1, 2004, apparently because there were problems ("discrepancies") with the accounts.[4] See Weber Dec. at 148-52 (Rosenthal Decl., Exhibit "D"). Similarly, Jazz Canada was voluntarily dissolved in 2004, and the retained earnings of Jazz Hong Kong has dropped by 65% from December 31, 2003 to October 15, 2004 (and in reality by 94.5% when the uncollectible sums owed to Jazz Hong Kong and Jazz UK are considered). See Exhibit SSY-3 to Third Affirmation of Szeto Suk Yee in winding up proceeding (Rosenthal Decl., Exhibit "E"). Thus, it is apparent that while under the Debtor's control, the Jazz Subsidiaries have essentially become worthless to creditors of the Jazz estate.

10. Clearly, the Debtor is suffering continuing losses, and the value of the estate as a going concern continues to diminish to the detriment of creditors. There is simply no benefit to the creditors by allowing the Debtor to continue to operate. Given these dire financial realities, and the understanding that no reasonable likelihood exists that the Debtor may be rehabilitated, conversion of the Debtor's chapter 11 case to one under chapter 7 is proper and necessary to protect the interests of Fuji and other creditors of the Debtor.

## II.    DEVELOPMENTS IN THE CIT PROCEEDING

11. The current status of the two CIT proceedings is as follows:

   a. The first case (Case No. 04-00442) has been put aside by the CIT, apparently because there were significant jurisdictional issues. When Jazz commenced this case, it filed the September 26, 2004 Affirmation of Jack Benun in support of an application for an expedited hearing. Benun alleged that Jazz would run out of operating funds in "perhaps 7 to 10

---

[4] At the request of GE, Tenon Recovery was appointed as the administrator in the UK insolvency proceeding.

-7-

days," or by October 6, the latest. Fuji's Motion to Intervene was never acted upon. Mr. Peterson, Jazz's customs counsel, advised this Court that the relevant shipments will be handled in other, subsequently filed cases.

        b.      The second case (Case No. 04-00494) involves only two of the four shipments at issue in Case No. 04-00442, but there is no jurisdictional issue. The CIT orally barred Fuji from intervening in the second case on the ground that a statute applicable to the jurisdictional basis of the case prevents intervention. The CIT permitted Fuji only a limited *amicus curiae* role. The CIT has not ruled on Fuji's motions to file various briefs, except for an initial brief on the first sale issue. Fuji was denied access to testimony or documents on the Jazz ICP system because they were designated confidential by Jazz. Fuji could not examine witnesses, introduce evidence or participate in the many telephone conferences conducted by the Court, including the one reported on by Mr. Peterson where the Court apparently stated a tentative decision. To this day, Fuji has not seen any transcripts from these "hearings."

        c.      The Government took no discovery and did not introduce any evidence or witnesses. In fact, the sampled cameras available to the Government attorneys included one that clearly infringed (because of Canadian French/English language remnants from original labeling) and others made from Konica shells of the type found by the ALJ to have infringed. When the clearly infringing camera labeled for sale in Canada was uncovered, the Court denied the Government's motion to reopen the record.

        d.      The Court apparently tentatively decided that cameras made from PRE's shells can enter the U.S., but those made from Seven Bucks' shells cannot and must be excluded. This is apparently because Jazz provided the CIT with insufficient evidence showing that the Seven Bucks' shells were from cameras first sold in the U.S. A dispute as to whether Jazz can segregate PRE and Seven Bucks-based cameras is now before the CIT. The CIT has indicated that it will order immediate compliance with its ruling, subject to Jazz posting a bond in an amount equal to the full value of the cameras (their cost). The CIT indicated that it will give the

Government five days to obtain a stay from the Federal Circuit before lifting the automatic stay provided by CIT Rule 62(a) and ordering Customs to comply with the CIT's judgment.

    e. Fuji believes that the proposed CIT order might violate pertinent statutes by improperly waiving the automatic stay. Fuji also believes that there is a high likelihood of success on appeal. For example, Jazz did not provide any evidence as to how Polytech refurbishes Fuji, Konica, or Concord shells believed to be in the shipments. The ALJ had found that all Fuji, Konica and Concord shells refurbished by Polytech were infringing. The CIT Judge did not pass on the ITC's findings on the ground that the ITC had dealt with other cameras. Jazz claims that Polytech has improved its sorting process to eliminate the sins of the past. However, no Polytech employee testified and no documents directed to the removal of foreign shells from those received from PRE were introduced. Thus, there is no evidence that the sorting process removes anything close to the 40% foreign shells found by the ITC. In any event, it is clear that at least some of the cameras (those made from Seven Bucks' shells) are considered infringing by the CIT. Fuji has been advised that the Government will likely appeal to the Federal Circuit the CIT's judgment when issued.

  12. The recent developments before the CIT illustrate that unless Fuji is allowed to proceed in the District Court, Fuji will have no remedy for Jazz's continued infringement. On November 2, 2004, by motion for entry of judgment order, Jazz requested that the CIT order the immediate release of its merchandise being held by Customs upon Jazz posting a bond for the value of its merchandise (estimated at about $1.80 per camera times about 160,000 cameras). Jazz also requested that the CIT override the 30-day automatic stay provided by CIT Rule 62(a). Jazz argues that the posting of a bond would ensure that Customs will receive payment of liquidated damages in the full value of the merchandise, in the event that the cameras were subsequently determined by an appellate court to be inadmissible. However, as Jazz recognizes at page 7, footnote 8 of its motion, attached to the Rosenthal Decl. as Exhibit "F", no bond will be posted to provide security for Fuji, as Fuji is not a party to the CIT proceeding. In the event the Federal Circuit finds that the CIT improperly ordered the release of merchandise, Fuji, at

best, would be left with an additional administrative claim against an administratively insolvent debtor.

13. Clearly, the remedy requested in Fuji's Stay Motion is the only viable remedy available to Fuji at this time. It is the remedy recognized by Jazz itself. <u>See</u> Rosenthal Decl., Exhibit "F", fn. 8. As Fuji is not a party to the CIT proceeding, unless it is allowed to commence an action in the District Court to enjoin further infringing activities by Jazz and Benun, it will be forced to watch passively as Customs, acting pursuant to the orders of the CIT, permits the cameras Fuji believes to be infringing to enter the U.S. market and cause further damage to Fuji. The Debtor recognizes that Fuji has the right, subject to this Court's approval, to pursue its civil remedies in the District Court. Fuji believes that exercising this right to at least seek an injunction against further infringement is the only way for it to prevent further post-petition infringement.

14. In any event, the CIT's potential finding that some new cameras do not now infringe does not cure the Debtor's massive post-petition infringement as found by the ITC. The severity of this indisputable post-petition infringement itself requires granting Fuji's conversion motion, especially when viewed in the context of Jazz's current financial condition, which gets worse (if that is possible) every day.

## **CONCLUSION**

15. Based on the foregoing and the original Motions, this Court should convert Jazz's chapter 11 case to one under chapter 7, allow Fuji to file a civil action in the District Court against Jazz and Benun, and determine the amount of the administrative claims of Fuji against Jazz and Benun. Fuji respectfully requests that the Court grant relief requested in the Motions and such other and further relief as is just and proper under the circumstances.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:___/s/ S. Jason Teele_____
Michael Etkin, Esq.
Bruce Buechler, Esq.
S. Jason Teele, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973.597.2500
Facsimile:  973.597.2400

**STROOCK & STROOCK & LAVAN LLP**

Lawrence Rosenthal, Esq.
Brian M. Cogan, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone:  212.806.5400
Facsimile:  212.806.6006

Dated: November 12, 2004