**MS-4088**
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, New Jersey  07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Attorneys for Jazz Photo Corp., Debtor-in-Possession

|  |  |
|---|---|
| | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE MORRIS STERN<br>CASE NO. 03-26565 (MS) |
| In the Matter of:<br><br>JAZZ PHOTO CORP.,<br><br>　　　　　　　Debtor. | Chapter 11<br><br>DEBTOR'S SUPPLEMENTAL SUBMISSION PURSUANT TO ORDER CONTINUING MOTIONS OF FUJI PHOTO FILM CO., LTD. SEEKING: (A) CONVERSION OF THE DEBTOR'S CHAPTER 11 PROCEEDING; (B) ESTIMATION OF ADMINISTRATIVE CLAIM;  AND (C) RELIEF FROM THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO PROCEED BEFORE THE UNITED STATES DISTRICT COURT<br><br>**HEARING DATE AND TIME:**<br>November 19, 2004, 1:00 p.m.<br><br>**ORAL ARGUMENT REQUESTED** |

Jazz Photo Corp. (the "Debtor"), by and through its undersigned counsel, pursuant to this Court's September 28, 2004 Order ("Continuance Order") continuing motions (the "Fuji Motions") of Fuji Photo Film Co., Ltd. ("Fuji") seeking (A) conversion of the Debtor's Chapter 11 proceeding, (B) estimation of administrative claim, and (C) relief from the automatic stay, to the extent applicable, to proceed before the United States District Court, hereby supplements its previous submissions and respectfully represents:[1]

### I.    BACKGROUND

1.    On May 20, 2003 (the "Filing Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"). Since the Filing Date, the Debtor has remained in possession of its assets and has continued management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    On September 22, 2004, this Court held a hearing (the "Initial Hearing") on the Fuji Motions, and continued such hearing until November 19, 2004, pursuant to the Continuance Order.

3.    The Continuance Order permitted the parties to submit supplemental submissions; provided, however, that such supplemental submissions be limited to relevant developments after September 22, 2004 and, to the extent not already briefed, points raised by the Court during the Initial Hearing.

4.    In addition to the Continuance Order, the Court also entered an Order on September 28, 2004 denying the Debtor's motion to quash a subpoena (the "Fuji Subpoena") that

---

[1] The Debtor hereby incorporates its previous responses to the Fuji Motions and capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Debtor's previous responses to the Fuji Motions.

was served in connection with the Fuji Motions, and modified the scope of the subpoena served by Fuji on Joseph Weber, the Debtor's controller, and the Debtor on or about August 17, 2004. The Debtor responded to Fuji's document demands and on November 10, 2004, Fuji conducted an all-day deposition of Mr. Weber.

5. Since the Initial Hearing, no new fact has emerged which entitles Fuji to any of the drastic relief that it seeks. Instead, there is an even stronger basis to deny all of the Fuji Motions because, among other reasons, (a) extensive in limine motions in the Imation litigation will be argued on November 19, 2004 and the trial date is less than two months away, (b) the Debtor's Federal Circuit appeal of Fuji's judgment for patent infringement is still pending, (c) in Fuji's chosen forum, an Article III Judge of the Court of International Trade ("CIT") has completely eviscerated the cornerstone of Fuji's argument for conversion that the Debtor continues to infringe Fuji's patents, (d) the United States Department of Customs ("Customs") has permitted ten containers of the Debtor's cameras to be entered for consumption and released to the Debtor, enabling it to fulfill a majority of the current orders of its largest customer, Wal-Mart, and (e) the Debtor continues to generally stay current on its post-petition obligations, with the majority of its accrued payables being owed to Polytech (a member of the Official Committee of Unsecured Creditors, whose counsel has repeatedly advised the Court that the Committee is opposed to conversion) and the estate's professionals.

6. This Supplemental Submission summarizes significant events since the Initial Hearing. Submitted herewith is the Affirmation of John Peterson, Esq. ("Peterson Aff."), the Debtor's special customs counsel, and the Affirmation of Jack Benun ("Benun Aff."). Those Affirmations summarize the status of the proceedings before the CIT and the Debtor's sales to Wal-Mart. Despite the fact that Fuji is actively trying to delay the issuance of the written

3

opinion of Judge Stanceau of the CIT (which opinion will facilitate the Debtor's receipt of its product), while simultaneously arguing that this case should be converted based on operating losses, no basis exists at this time for conversion nor for any of the other relief sought by Fuji.

## II.   SUPPLEMENTAL SUBMISSIONS

### A.   Customs and the Court of International Trade

7.   As set forth at the Initial Hearing and during a status conference on October 20, 2004, Customs has been monitoring the Debtor's importation of single use cameras ("SUCs"). As previously disclosed to the Court, Customs detained/excluded numerous containers of SUCs, which resulted in the Debtor bringing an emergency proceeding in the United States Court of International Trade (the "CIT Proceeding") (captioned <u>Jazz Photo Corporation v. United States</u>, Court of International Trade No. 04-00494). The CIT Proceeding was conducted before Judge Stanceau (Peterson Aff., ¶ 3).

8.   On the morning of November 1, 2004, Judge Stanceau announced his decision from the bench in the CIT Proceeding (Peterson Aff., ¶ 6). On the afternoon of that day, counsel for the Debtor sent a letter to this Court attaching a copy of a memorandum prepared by the Debtor's special counsel, John Peterson, Esq. (the "Peterson Memorandum"), which summarized the substance of Judge Stanceau's decision. A copy of the Peterson Memorandum is annexed hereto as Exhibit A.

9.   As set forth in the Peterson Memorandum, Judge Stanceau found that the trial evidence demonstrated that all cameras at the Polytech plant in Shenzen had undergone "permissible repair" as set out by the Court of Appeals for the Federal Circuit in <u>Jazz Photo Corp. v. United Stated International Trade Commission</u>, 264 F.2d 1094 (Fed. Cir. 2001) (Peterson Aff., ¶ 6).

4

10. The CIT further found by a preponderance of the evidence that 14 of the 15 (or more than 93%) master lot numbers ("MLNs") satisfied the "first sale" doctrine. Indeed, all of the MLNs collected in the United States by Photo Recycling Enterprises, Inc. satisfied the first sale doctrine (Peterson Aff., ¶ 7).

11. The sole MLN of cameras that the CIT did not find to satisfy the first sale doctrine were those purchased from Seven Bucks, Inc. ("Seven Bucks"). The CIT did not specifically find infringement as to these cameras, but rather determined that the Debtor had not carried its burden of proof that the shells used for these cameras were gathered from photo processors in the United States.[2]

12. The CIT's finding that the Debtor satisfied its burden of proof on more than 93% of the MLN's completely undercuts Fuji's argument in support of conversion that the Debtor is "simply attempting to produce as many cameras as possible, whether or not they infringe on Fuji's patents." Fuji Conversion Motion at pp. 30.

13. Similarly, Fuji argued in its Conversion Motion that Jazz's business model is based upon unlawful behavior and an infringing, unlawful business. These arguments were also destroyed by Judge Stanceau's ruling. The Debtor's business and importation of SUCs are not based on unlawful behavior.

14. Moreover, as set forth in previous pleadings, after the ALJ Recommendation on April 6, 2004, the Debtor modified its procedures. Accordingly, the Debtor submits that even if the ALJ Recommendation, as accepted by the ITC, is not reversed, the Debtor is not presently

---

[2] In fact, the shells were collected from domestic photo processors. This information was not at hand during the trial.

5

infringing Fuji's patents. Fuji has not offered any evidence that the Debtor is continuing to infringe.

15. Therefore, as stated in the Peterson Aff., (a) the CIT made its determination of non-infringement after a week-long trial, (b) Customs and the Debtor agreed that cameras produced from Seven Bucks' shells could be segregated from the other SUCs, (c) the Debtor has submitted additional information to Customs relating to Seven Bucks' shells, and (d) Customs has indicated that upon issuance of a written opinion by the CIT, Customs will apply the CIT decision to other pending entries of SUCs.

16. The Debtor is anxiously awaiting a written decision by the CIT to enable the Debtor to move forward. Apparently, Fuji is doing everything in its power to prevent the issuance of that decision. On November 11, 2004, Fuji's counsel sent a letter to Judge Stanceau essentially asserting that time was not of the essence and that there was no need to immediately rule. A copy of that letter is annexed hereto as Exhibit B. Fuji's position is quite disingenuous because it is aware that the Debtor's losses grow when it does not have product to ship. Fuji has argued for conversion for this very reason. Accordingly, while simultaneously telling Judge Stanceau that the issuance of his written opinion need not be rushed, Fuji is imploring this Court to convert this case based on Customs' seizure of the Debtor's product. Such transparent and underhanded tactics are consistent with Fuji's agenda to destroy the Debtor, rather than to act in the best interests of creditors.

**B.    Release of 10 Containers by Customs**

17. As set forth in the Benun Aff., Customs has recently allowed the release of 10 containers of SUCs to the Debtor. This has enabled the Debtor to fulfill substantially all of the purchase orders of its largest customer, Wal-Mart, through November 9, 2004. (Benun Aff., ¶¶ 5-7, Exhibit A.) On November 10, 2004, Wal-Mart submitted its weekly replenishment order to

the Debtor, and the Debtor will be able to fill a majority of this order through November 16, 2004 (Benun Aff., ¶ 8, Exhibit B).  However, there remains a significant risk that the Wal-Mart orders which the Debtor expects to receive on November 16th or 17th may not be able to be filled absent the release of Judge Stanceau's written decision and the continued release by Customs of the Debtor's cameras.  (Benun Aff., ¶ 9.)

**C.     Compliance with Subpoenas**

18.     Prior to the Initial Hearing, the Debtor had produced to Fuji more than 800 pages of documents responding to the Fuji Subpoena.[3]

19.     On September 24, 2004, two days after the Initial Hearing, and after the Court indicated that it would enter an order modifying the Fuji Subpoena to limit the scope of the documents that the Debtor is required to produce, Fuji served a second subpoena (the "Second Subpoena"), requesting additional documents relating to the Debtor's subsidiary, Jazz Photo Limited ("Jazz UK").

20.     Since the Initial Hearing, the Debtor has produced more than 1400 pages of additional documents in compliance with the Fuji Subpoena, as modified by the Court's Order. In addition, Joseph Weber appeared at a deposition pursuant to the Fuji Subpoena on November 10, 2004 at the offices of Fuji's counsel.

21.     In addition, after discussions with Fuji's counsel, the Debtor produced more than 1100 additional pages of documents in response to the Second Subpoena.  Based on the foregoing, the Debtor believes it has substantially disclosed all information requested in Fuji's latest discovery barrage.

---

[3] The Debtor previously produced more than 7900 pages of documents in connection with earlier Fuji document requests throughout this case.

7

**D.    Jazz UK**

22.    On or about October 22, 2004, administrators were appointed over Jazz UK in a liquidation proceeding in the United Kingdom.

23.    On or about October 29, 2004, the administrators of Jazz UK issued an Information Memorandum offering for sale the business and assets of Jazz UK and inviting interested parties to make offers.

24.    As a result of the appointment of the administrators and Jazz UK being placed into receivership, it is unlikely that Jazz UK will have assets available to make payments of the remaining amount it owes to the Debtor in connection with the management allocations historically charged by the Debtor to Jazz UK.

25.    However, it should be noted that as of August 31, 2004, the amount owed to the Debtor was approximately $171,287.09.  Annexed hereto as Exhibit B is a summary of the Debtor's transactions with Jazz UK since August 31, 2004.  Since that time, Jazz UK has drastically reduced its liability to the Debtor to $27,827.09.[4]

**E.    Status of Operations**

26.    As of August 31, 2004, the Debtor had cumulative net income of approximately $296,000 net of legal fees.  Based on the Debtor's latest operating report, the Debtor has operated during the Chapter 11 proceeding at a net loss of approximately $42,000, net of legal fees after allocations.  For the month of September, 2004, excluding legal fees, there was a net

---

[4] The Debtor does recognize, however, that these amounts of $171,287.90 and $27,827.09 do not reflect any adjustment relating to $80,000 in payments previously made by Jazz UK to the firm of Akerman Senterfit in 2003 and 2004 that were arguably incorrectly charged to the Debtor.

8

operating loss of approximately $340,000 that is primarily attributable to the Debtor's inability to sell its inventory being held by Customs and to recognize a profit from such sales.

27. Accounts payable as of September 30, 2004 were approximately $3.1 million, of which approximately $1.3 million was owed to professionals. Of the approximate $1.8 million owed to non-professionals, approximately $574,000 was current and a little over a million dollars was less than 31 days past due.

28. In addition, as of September 30, 2004, the Debtor had accrued expenses of approximately $1.25 million of which approximately $458,000 was accrued for professionals that had not yet submitted to the Debtor invoices for professional fees. The other accrued payables are for insurance, advertising, promotions/rebates and other items.

29. The operating report for September 30, 2004 also reflects a significant reduction in total currents assets. This reduction is mainly attributable to (a) a reduction in receivables from more than $3.9 million to less than $2.7 as a result of the Debtor's inability to sell its products being held by Customs in September, and (b) a reduction in inventory based on the fact that Polytech did not pass title of goods to the Debtor while the goods were in transit to the United States while Polytech awaited a determination from Customs. It should be noted that the reduction in accounts payable and the Debtor's secured loan balance with Rosenthal is offset in part by the reduction in inventory. Also, based on the liquidity crunch caused by Customs in detaining the SUCs, the Debtor briefly fell behind on its weekly $5,000 payments into the Reserve Account previously established by the Court for potential liquidation expenses. As of the date hereof, the shortfall has been made up and there is currently $329,895 in the Reserve Account.

### III.    CONCLUSION

30.    For the reasons stated above, Jazz respectfully requests the Court deny the relief requested in the Fuji Motions and grant the Debtor such other relief as the Court deems proper.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession


By:  /s/ Michael D. Sirota
       Michael D. Sirota

DATED: November 12, 2004

40654/0001-2179992v1