**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (ME 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ 07068
973-597-2500 phone
973-597-2400 fax

- and -

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
MATTHEW W. SIEGAL
KRISTOPHER HANSEN
180 Maiden Lane
New York, NY 10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: : | Chapter 11 |
| : | |
| JAZZ PHOTO CORP., : | Case No. 03-26565 (MS) |
| : | |
| : | Hearing Date: January 28, 2005 at 10 a.m. |
| Debtor-in-Possession. : | |

**SECOND OMNIBUS SUPPLEMENTAL RESPONSE IN SUPPORT OF FUJI PHOTO
FILM CO., LTD.'S (A) MOTION FOR ORDER CONVERTING THE DEBTOR'S
CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY
CODE; (B) MOTION FOR A DETERMINATION THAT THE AUTOMATIC STAY IS
NOT APPLICABLE AND TO LIFT THE INJUNCTION AGAINST PROCEEDING OR,
ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY; AND (C)
<u>MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM</u>**

Fuji Photo Film Co., Ltd. ("<u>Fuji</u>"), by and through its counsel, Stroock & Stroock &

Lavan LLP and Lowenstein Sandler PC, submits this second omnibus supplemental response

(the "<u>Second Supplemental Response</u>") in support of its: (a) Motion For Order Converting The

SSL-DOCS1 1533879v7

Chapter 11 Case Of Jazz Photo Corp. ("Jazz" or the "Debtor") to a Case Under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") (the "Conversion Motion"); (b) Motion for a Determination that the Automatic Stay is Not Applicable and to Lift the Injunction Against Proceeding or, Alternatively, for Relief From the Automatic Stay (the "Stay Motion"); and (c) Motion for Allowance of Administrative Claim Against Jazz (the "Administrative Claim Motion," and together with the Conversion Motion and the Stay Motion, the "Motions"). In support of this Second Supplemental Response, Fuji submits the declarations of Lawrence Rosenthal (the "Rosenthal Dec."), Michael Rappeport (the "Rappeport Dec.") and Rita Lin (the "Lin Dec.") and respectfully states:

## PRELIMINARY STATEMENT

1. For more than eighteen months, the Debtor has misused the protections afforded to it by this Court and the Bankruptcy Code to continue to infringe on Fuji's patents, incur a $13,675,000 penalty assessed by the International Trade Commission (the "ITC"), and render the estate administratively insolvent through its post-petition infringement and ever mounting professional fees. The untenable situation now facing the Debtor (and, more importantly, its creditors) is the direct result of the Debtor's desire to prosecute this case to protect the interest of its insiders without any concern for its creditors. The recent affirmance by the Court of Appeals for the Federal Circuit (the "Federal Circuit") of Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., 249 F.Supp.2d (D. N.J. 2003) ("Fuji v. Jazz") and the ITC's recent determination as to the amount of the post-petition penalty flowing from the Debtor's post-petition infringement demonstrate clearly that the Debtor, at best, is abusing the bankruptcy process in order to escape the consequences of violating Federal patent law. These decisions also demonstrate that the Debtor is incapable of reorganization. At the hearing on the Motions held on September 22,

2

2004, this Court asked 'when' this case should be converted? There can be no doubt that the answer is now.

2. By Jazz's own admission, its current financial situation is dire. Jazz has no single use cameras to sell, it is unable to cover its overhead with the sale of other products, it is unable to pay its debts to its suppliers, and it has not paid its myriad of professionals in months. In addition, Jazz owes Fuji almost $30 million dollars in damages, plus interest, as a result of its prepetition infringement, as well as at least six million dollars in damages for post-petition infringement. Jazz now owes the government civil penalties of $13,675,000 with approximately $3,300,000 (132 violation days x $25,000) attributable to post-petition conduct. This entire situation was entirely foreseeable. As this Court observed in its August 3, 2004 Opinion on Jazz's sanctions motion:

> Benun and Jazz have operated in a commercial zone of substantial jeopardy. Patent infringement in the low-tech, high profit market of single-use cameras was a risk knowingly undertaken by Benun and Jazz. They have little to complain about when their gamble turned out badly and a powerful competitor asserts its full range of rights against them.

In re Jazz Photo Corp., 312 B.R. 524, 542 (Bankr. D. N.J. Aug. 3, 2004). Nevertheless, the Debtor continues to follow a business model calculated to insure that pre-petition creditors do not receive any recovery from the continued operation of the Debtor (a windfall judgment from the Imation case remains the creditors' only hope), and post-petition creditors, including retained professionals, receive at best a partial recovery (the extent of which is also dependent on the size of the Imation judgment, if any).

3. In each forum where Fuji has sought relief, Jazz has been found to sell infringing single use cameras. First, in June 1999, the ITC found that Jazz infringed Fuji's patents from 1995 to 1999. In re Certain Lens-Fitted Film Packages, U.S. ITC Inv. No. 337-TA-406 (the

"Initial Investigation"). Despite the findings of the ITC, Jazz did not change its behavior. On August 21, 2001, this decision was affirmed as to Jazz by the Federal Circuit in Jazz Photo Corp. v. Int'l Trade Comm'n, 264 F.3d 1094 (Fed. Cir. 2001)[1] ("Jazz v. ITC"). In March 2003, the District Court for the District of New Jersey (the "District Court") found that Jazz infringed Fuji's patents from 1995 to August 21, 2001 and awarded Fuji approximately $30 million in reasonable royalties and prejudgment interest. Fuji v. Jazz, Judgment (March 21, 2003). Jazz has repeatedly argued to this Court that the District Court judgment should not be relied on in view of its "meritorious" appeal to the Federal Circuit. That argument has been laid to rest by the Federal Circuit's affirmance of the almost $30 million judgment on January 14, 2005. Fuji Photo Film Co. v. Jazz Photo Corp., et al. 03-1324, -1331 (Fed. Cir. Jan. 14, 2005) ("Fuji v. Jazz Appeal"), Rosenthal Dec. Exh. 2.

4.    Since the commencement of this case, Fuji informed this Court that Jazz was still infringing Fuji's patents. With the Debtor's consent, Fuji moved this Court for leave to file an enforcement proceeding with the ITC, which was granted (Enforcement Proceedings II). After intensive discovery and a hearing where both sides were fully heard, the ALJ found that Jazz infringed Fuji's patents from August 21, 2001 through December 2003 and recommended the assessment of $13,675,000 in civil penalties. The ITC adopted the ALJ's recommendations as to infringement on July 27, 2004 and the personal liability of Benun and Jazz's former President, Cossentino. While Jazz has repeatedly argued to this Court that the July 27 ITC order was not final, that argument has now been laid to rest by the "final" order of the ITC adopting the ALJ's recommendations as to remedy issued on January 14, 2005. In re Certain Lens-Fitted Film

---

[1] In its August 27, 2004 Bond Forfeiture Order, the ITC found that the Federal Circuit "ultimately affirmed the Commission's orders as they related to Jazz . . . ." Rosenthal Dec. Exh. 1.

Packages, Inv. No. 337-TA-406 Enforcement Proceedings (II) ("Enforcement II") Order and Notice of Commission Determinations Concerning Enforcement Measures and Respondents' Request for a Stay of Any Order Levying Civil Penalties (Jan. 14, 2004) (the "ITC Order" and "ITC Notice"), Rosenthal Dec. Exh. 3.

5. Altogether, between 1995 and December 2003, Jazz was found by the District Court and the ITC to have sold almost 65 million infringing single use cameras out of a total of about 67 million sold during the period.

6. Once Customs and Border Protection (the "CBP") began enforcing the General Exclusion Order against Jazz in response to the ITC's July 27, 2004 Order, Jazz sought the protection of the United States Court of International Trade (the "CIT"). Yet again, despite the fact that no defense was presented by the Government, a significant percentage of the single use cameras at issue in the only CIT action tried to date was found to violate the General Exclusion Order and to have properly been excluded because they infringed Fuji's patents. Altogether, 15 shipments of single use cameras remain excluded by the CBP and will not be released without further trials and orders of the CIT. Thus, the ITC, Customs and the CIT all confirm that Jazz has been infringing Fuji's patents since obtaining the protections of this Court.

7. A sample of Jazz cameras on sale in Wal-Mart, at least some of which have markings that are consistent with those released by the CBP in November, establish that 25% (six of twenty-four) were made from shells of cameras not first sold in the United States and therefore are infringing. Jazz and Photo Recycling Enterprise ("PRE") (by Leon Silvera) offered essentially uncontested testimony in the first CIT trial that Polytech and PRE adopted a system to ensure, aside from a handful of "tourist cameras" that slipped past the supposedly rigorous

screeners at Polytech, that the first sale rule is complied with.[2] The results of the sampling of the Wal-Mart/Jazz cameras make it statistically impossible for this testimony to be true. If there were truly only an insignificant number of foreign origin cameras in Jazz's shipments, one would expect to need a sample size of thousands to find six foreign origin cameras. Thus, Jazz's protestations that it now has mastered the procedure for producing non-infringing cameras is unworthy of belief.

8. Fuji files this Second Supplemental Response to apprise the Court as to the current status of certain litigation and the Debtor's operations and to request that this Court act promptly to grant the relief requested in Fuji's Motions, as maintaining the status quo at this juncture will not only cause irreparable injury to Fuji, but will also further harm all of the Debtor's creditors (pre and post-petition). The affirmance by the Federal Circuit and the penalty assessment by the ITC were the only further events that this Court was waiting for the reach the inevitable conclusion that conversion is required.

## BACKGROUND

9. On August 2, 2004, Fuji filed the Motions, in an attempt to: (i) prevent Jazz's continued wasting of estate assets, (ii) enjoin the Debtor from further infringing on Fuji's patents, and (iii) have this Court determine and allow Fuji's administrative expense claim against Jazz arising out of Jazz's post-petition infringement.

10. Following a hearing on the Motions held on September 22, 2004, this Court adjourned the Motions to November 19, 2004. Before the November 19 return date, the Motions were adjourned again by the Court, sua sponte, to January 28, 2005. In the interim, the Debtor

---

[2] Note that when this same "MLN" system was put to the test of a vigorous opposition in the December 2003 ITC hearing in Enforcement (II), the ITC concluded that the MLN system was worthless. The CIT gave no deference to those findings.

SSL-DOCS1 1533879v7

commenced three new cases and litigated an earlier-filed case before the CIT entitled <u>Jazz Photo Corp. v. United States</u>, Court No. 04-00494 (now on appeal by the Government, the Debtor and Fuji).

11. On January 14, 2005, the Federal Circuit affirmed Fuji's almost $30 million district court judgment against the Debtor in <u>Fuji v. Jazz</u> and the ITC adopted the Administrative Law Judge's (the "ALJ") recommendation to impose a $13.675 million civil penalty against the Debtor, making the ITC's decision in Enforcement II final.

## **ARGUMENT**

### I. **The Federal Circuit Affirmed the District Court's Judgment in Favor of Fuji**

12. On January 14, 2005, the Federal Circuit affirmed the final judgment entered by the United States District Court for the District of New Jersey against Jazz, Jazz Photo (Hong Kong) Ltd. ("<u>Jazz Hong Kong.</u>"), and Jack C. Benun ("<u>Benun</u>," together with Jazz and Jazz Hong Kong, the "<u>Jazz Parties</u>"). Rosenthal Dec. Exh. 2.

13. The Federal Circuit's opinion makes it clear that any further attempts to appeal the Federal Circuit's first sale doctrine in other proceedings will most likely be rejected. Neither rehearing, nor <u>certiorari</u> are likely. Both were refused on this very same issue in the appeal in <u>Jazz v. ITC</u>. Jazz remains liable to Fuji for nearly $30 million. To make matters worse for Jazz (and, ultimately its unsecured creditors), the ITC has adopted the ALJ's recommended penalties of $13,675,000 against Jazz and Benun for infringement of Fuji's patents between August 21, 2001 and December 12, 2003. Rosenthal Dec. Exh. 3. In transmitting its Order to the Federal Circuit, the Secretary of the ITC characterized the ITC's action as its "final order." <u>Id.</u>

14. On appeal from the District Court in <u>Fuji v. Jazz</u>, the Jazz Parties challenged: (1) the district court's finding that the Jazz Parties failed to provide evidence of the refurbishment

process use by all of its suppliers of single use cameras; (2) the district court's application of the "first sale" doctrine; (3) the district court's finding that Benun was liable for inducing Jazz to infringe; (4) the district court's finding of $0.56 as a reasonable royalty; and (5) the district court finding that the Jazz Parties willfully infringed Fuji's patents by selling 1,209,760 newly-made LFFPs. Rosenthal Dec. Exh. 2, Fuji v. Jazz Appeal at 7. The Jazz Parties lost on every one of these issues.

15. With regard to the adequacy of the evidence provided by the Jazz Parties, the Federal Circuit found that "Jazz bears the burden of preponderant proof on its affirmative defense of repair." Id. at 8. The Jazz Parties only provided a single video tape depicting the process in one factory, and the testimony of Mr. Lorenzini, who had only visited three of the eight factories. Id. at 9. The Federal Circuit found that it could not "find that the district court clearly erred in refusing to draw an inference about the five factories of which no Jazz representative had personal knowledge." Id. The Federal Circuit noted that:

> The trial judge took seriously this court's admonition to examine the evidence for completeness and credibility. Here, where no Jazz representative had personal knowledge of the refurbishing acts performed at five Chinese factories, this court cannot form a 'definite and firm conviction that mistake has been committed' in the district court's holding that Jazz did not meet its burden of proving the repair defense.

Id. at 10.

16. With regard to the first sale doctrine, the Federal Circuit reiterated that it meant what it said when it found in Jazz v. ITC, that only shells from single use cameras first sold in the United States with Fuji's authorization are eligible for the permissible repair defense. There is no patent exhaustion when Fuji or its licensees sell their cameras outside of the United States.

> To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent . . . . Our decision applies only to LFFPs for which the United States patent right has been

8

>exhausted by first sale in the United States. Imported LFFPs of solely foreign provenance are not immunized from infringement of United States patents by the nature of their refurbishment.

Id. at 13 (citing Jazz v. ITC, 264 F.3d at 1105). This is noteworthy because Jazz has consistently asserted that the first sale doctrine does not apply to cameras sold abroad by Fuji or its licensees and, in fact, intends to ground its appeal from the first CIT judgment on its view of international exhaustion. Rosenthal Dec. Exh. 4, Motion to Stay Execution of the Judgment with Respect to the Excluded Merchandise, n. 1. The Federal Circuit soundly rejected Jazz's contention: "Jazz … does not escape application of the exhaustion principle because Fuji or its licensees authorized the international first sales of these LFFPs." Rosenthal Dec. Exh. 2, Fuji v. Jazz Appeal at 14.

17. With regard to inducement, the Jazz Parties argued that there was not substantial evidence to support that Benun possessed the requisite intent to induce Jazz's infringement. Id. at 16. The Federal Circuit refused to reverse the jury's finding of inducement on the grounds that Fuji presented sufficient circumstantial evidence that Benun exerted control over Jazz and that his acts in directing Jazz caused Jazz to infringe Fuji's patents. Id. at 17. Benun's role and personal liability for Jazz's infringement continues to date.

18. With regard to the reasonable royalty rate, the Jazz Parties argued that the jury should have accorded more weight to certain of Fuji's prior license agreements. Id. at 18. The Federal Circuit affirmed the reasonably royalty of $0.56 per camera because the royalty rate was not excessive or speculative given the enormous commercial success of single use cameras, Jazz's incremental profit of $1.09 per camera, and Fuji's lost profits of $2.33 per camera. Id. at 19. This affirmed reasonable royalty rate applies equally to Jazz's post-petition infringement as set out in the Administrative Claim Motion.

19. With regard to the jury's finding of willful infringement, the Jazz Parties argued that there was no evidence of the requisite culpable intent, and the evidence at most demonstrated negligence. Id. at 19. The Federal Circuit refused to disturb the jury's finding of willful infringement because the Jazz Parties had actual notice of Fuji's patents and the jury was free to weigh and reject "Mr. Benun's self-serving testimony." Id. at 20.

20. The Federal Circuit also rejected Fuji's three grounds of cross-appeal. On the issue of a permanent injunction, the Federal Circuit observed that Fuji had not provided narrower language for a proposed injunction and that a broad injunction on these facts would not be appropriate. Id. at 22-23. This ruling does not preclude a district court exercising its discretion to issue a narrowly tailored injunction limited to repetitions of the acts already found to infringe by the District Court and ITC, as now sought by Fuji in its Motion to Lift the Stay. The reality is that, as discussed below, the evidence recently adduced by Fuji at Wal-Mart reveals that Jazz and Benun are still selling cameras of the type found to infringe by the ALJ and the ITC in Enforcement II, and should be enjoined from doing so.

## II. The ITC Adopted The Recommended $13.675 Million Civil Penalty Against Jazz And Benun

21. In addition to the Federal Circuit's affirmance of the award of approximately $30 million in damages and interest, now Jazz is liable to the Government for an additional $13,675,000 in civil penalties. On January 14, 2005, the ITC ordered that:

> (1) Respondents Jazz Photo Corporation and Jack Benun shall forfeit and pay to the United States a civil penalty in the amount of $25,000 for each of the 547 days between August 21, 2001 through December 12, 2003, inclusive, on which a sale of articles occurred in violation of the cease and desist order issued by the Commission on June 2, 1999, **for a total amount of $13,675,000.** Respondents Jazz and Mr. Benun shall have joint and several liability for the payment of this civil penalty; and
>
> (2) Respondent Anthony Cossentino shall forfeit and pay to the United States a civil penalty in the amount of $250 for each of the 479 days between

10

>August 21, 2001 through August 28, 2003, inclusive, on which a sale of articles occurred in violation of the cease and desist order issued by the Commission on June 2, 1999, for a total amount of $119,750.

Rosenthal Dec. Exh. 3, ITC Order at 2-3 (emphasis added).

22. The ITC's July 27, 2004 Order affirmed the finding that the Debtor engaged in post-petition infringement of Fuji's patents. Rosenthal Dec. Exh. 3 at ITC Notice at 2. ("Based on the petitions and responses, and the record developed below, . . . the Commission determined not to review the violation findings and thereby adopted them."). The January 14, 2005 ITC Order closed the book on the ITC's Enforcement II proceeding by adopting the ALJ's recommendations as to remedy. The Secretary of the ITC, in transmitting the ITC Order to the Federal Circuit, characterized the ITC Order as the ITC's "final order." Rosenthal Dec. Exh. 3. While the ITC Notice states that it will not enforce its Order until the Federal Circuit appeals thereof are resolved (Rosenthal Dec. Exh. 3, Notice at 1), this is consistent with the practice of the ITC in enforcement proceedings and not an isolated expression of concern about the ITC's Order in this case. While Jazz can be expected to argue that the Federal Circuit is yet to rule on Jazz's premature appeal, even were Jazz to perfect its appeal from the ITC's Final Order, such an appeal is unlikely to succeed in view of the Federal Circuit's restatement of the first sale rule and its approval of the District Court's following of the Federal Circuit's "admonition to examine the evidence for completeness and credibility" in Jazz v. ITC. Rosenthal Dec. Exh. 2 at 10, 13. A consideration of the ALJ's detailed EID(II) reveals that he applied both the first sale rule and the burden of proof on Jazz, Benun and Cossentino on permissible repair by complete and credible evidence.

23. In any event, the parties agreed to go to the ITC to determine whether Jazz infringed Fuji's patents after the Federal Circuit's decision of August 21, 2001, including the post-petition period after May 20, 2004. As far as this bankruptcy proceeding is concerned, the

11

parties agreed to be bound by the result before the ITC. Jazz is estopped to contest the ITC's finding of substantial post-petition infringement. It is respectfully submitted that the ITC's Final Order fully supports Fuji's Conversion and Administrative Claim Motions. Moreover, the January 14, 2005 ITC Order's assessment of penalties against the Debtor provides the Government with both pre and post-petition claims against the Debtor.

### III. The CIT Found Continued Post-Petition Infringement and the CBP Continues to Detain a Large Quantity of Jazz's Cameras

24. As reported in our Omnibus Supplemental Response in Support of the Motions ("First Supplemental Response"), there were two cases pending in the CIT (Court Nos. 04-00442 and 04-00494). Court No. 04-00442 was held in abeyance for jurisdictional issues and has not been revived. However, Court No. 04-00494 proceeded to trial. The CIT denied Fuji's motion to intervene and granted Fuji only a very limited amicus curiae role. Fuji's counsel was not granted access to much of the testimony or any documents because Jazz designated them as confidential (even though they were of the type furnished to Fuji's counsel subject to a protective order in the District Court and the ITC).

25. On November 17, 2004, the CIT issued a Judgment that Customs was correct to have excluded the two shipments of single use cameras at issue. The CIT ruled that those single use cameras that were refurbished from shells obtained from Seven Bucks should be denied entry, and that those cameras refurbished from shells obtained from PRE should be granted entry[3]. Jazz Photo Corp. v. United States, Court No. 04-00494, Judgment at 1-2. (CIT November 17, 2004), Rosenthal Dec. Exh. 5. At the CIT hearing, Jazz offered documents from Polytech, Jazz and PRE and the testimony of Mr. Leon Silvera of PRE and Michael Zawodny of

---

[3] Jazz was permitted to supplement the record, with information that it had not presented to Customs or during the hearing, as to how cartons of "PRE" cameras could be segregated from cartons of "Seven Bucks" cameras.

Jazz. The Government "presented no case in chief and instead relied principally on its cross-examination of the two witnesses called by Jazz at trial, and on its interpretation of the 'first sale' requirement …." Rosenthal Dec. Exh. 6, Jazz Photo Corp. v. United States, Court No. 04-00494, Slip Opinion 04-146 at 4 (CIT November 17, 2004) ("Jazz v. U.S. Opinion"), Rosenthal Dec. Exh. 5. (Jazz evidence "unrebutted" (Id. at 25, 44, 46)). The segregation of the cameras to be released required reopening the record to receive new evidence from Jazz. Rosenthal Dec. Exh. 5 at 47-52. Thus, Jazz was partially successful because its case largely went unrebutted by the Government and Fuji was precluded from participating, but Customs was correct to detain the shipment in the first place, as Jazz had never proposed any segregation.

26.  Before the CIT, Jazz contended that it had developed, after the ALJ's April 2004 EID (II), a system to ensure (aside from a *de minimis* quantity of "tourist cameras" that slipped past Polytech's screeners) that the first sale requirement was met. Mr. Zawodny, a Jazz employee, testified that only shells with original wrapping or labeling (i.e., not reloaded reloads) produced by Kodak, Fuji, Konica and Concord and without foreign language labeling are used by Polytech. Rosenthal Dec. Exh. 6, Jazz v. U.S. Opinion at 32, FF 25-26. Although this testimony went unchallenged during the trial, a random sampling of cameras available on the marketplace in December 2004 establishes that cameras that were first sold abroad are still being used by Jazz. Thus, Mr. Zawodny's testimony was not true. See paragraph 27 below.

27.  In December 2004, 24 randomly selected Jazz single use cameras were purchased from four Wal-Mart stores located in New York and Virginia. Of the 24 cameras purchased, six were made from the shells of cameras not first sold in the United States. One of the cameras purchased in Long Island is a Fuji camera that was made on September 4, 2000 and shipped from Fuji's Japanese factory on September 5 or 6, 2000 for sale in the Japanese market. Another of

13

the cameras purchased in Long Island is a Kodak camera that had remnants of the original Kodak label. According to Mr. Strong of Kodak, the label, which included foreign language on it, was used only on cameras first sold in Europe by Kodak. Finally, four of the cameras purchased in Virginia were Konica cameras of a type not sold in the United States (aside from 160 available in the United States between May and October of 2003). It is highly unlikely that these four Jazz cameras are made from the 160 Konica cameras available in the United States. All of the six cameras in question carry markings that indicate that they were assembled in a Chinese factory after the new system was allegedly adopted by Jazz. See Rosenthal Dec. Exh. 7, Declaration of Matthew W. Siegal; Rosenthal Dec. Exh. 8, Declaration of Angie M. Hankins. Both of these declarations were submitted to the CIT in opposition to Jazz motions to expedite the litigation schedule in two new cases. The Government is now seeking discovery so that it can offer, for the first time, an affirmative case in chief. Rosenthal Dec. Exh. 9, Defendants' Opposition to Plaintiff's Motion for an Order Directing Defendant to Show Cause Why An Expedited Schedule Should Not Be Entered, CIT Court Nos. 04-00514, 04-00629. Moreover, given the fact that six of twenty-four randomly selected cameras purchased in two states were most likely first sold abroad, it is statistically impossible that Jazz in fact has stopped selling infringing cameras that were made from shells of cameras first sold abroad. Rappeport Dec. ¶11-17. Therefore, it is likely that if Jazz's evidence had been challenged in Court No. 04-00494, all of the cameras at issue would have been excluded (because segregation would have been impossible), and that Customs' exclusion of other shipments will be affirmed.

28. Mr. Rappeport confirms that for rebutting Jazz's assertion that it sells only an insignificant number of foreign origin cameras, 24 cameras is an acceptable sample size. Rappeport Dec. ¶17. By way of illustration, if there were a box with 9990 white marbles and 10

14

red marbles, the odds of pulling six red marbles in only 24 tries is very low. In a box with 10,000 unknown marbles, if six of the first 24 were red, the odds would be astronomical against the box starting with only 10 red marbles. A sample size of only 24 would be statistically significant to establish beyond any reasonable doubt that the box started with many more than 10 red marbles.

29. As discussed in Rappeport Dec. ¶13, Table 1, the odds of finding six foreign cameras in a sample of 24 are about one in ten million if Jazz sells no more than one percent (1%) foreign origin cameras. The odds are less than one in a thousand that Jazz's current infringement is less than five percent (5%). Id. Accordingly, finding six infringing camera out of 24 confirms continued significant infringement by Jazz beyond a reasonable doubt. Rappeport Dec. ¶13-17.

30. Both Jazz and the Government have appealed the judgment of the CIT to the Federal Circuit. Fuji also has appealed from the orders of the CIT that denied intervention, a proper scope of amicus curiae rights and access of at least Fuji's counsel, subject to a protective order, to the evidence, pleadings and transcripts designated by Jazz as confidential. Jazz moved to dismiss Fuji's appeal, but the Federal Circuit denied that motion, while lifting a stay to permit release of part of the two shipments at issue in Jazz v. US, Court No. 04-00494. Rosenthal Dec. Exh. 10, Jazz Photo Corp. v. United States, Federal Circuit Appeal No. 05-1096, -1109 at 4 (Nonprecedential Order of Dec. 9, 2004).

31. On October 14, 2004, Jazz filed a third action in the CIT, Court No. 04-00514, contesting the exclusion of another shipment by Customs. On December 14, 2004, Jazz filed a fourth action, Court No. 04-00629, contesting Customs' exclusion of three additional shipments of single-use cameras. Fuji has moved to intervene, join or to be given a meaningful amicus

15

curiae status in both cases and the motions are pending in the CIT. On January 14, 2005, Jazz filed a fifth action contesting Customs' exclusion of five additional shipments.

32.    After the Government opposed Jazz's motions for expedited litigation schedules, relying in part on the Siegal and Hankins CIT Declarations, Jazz immediately moved for a temporary restraining order and a preliminary injunction to prevent the Government from sampling the cameras at issue without prior Court order and seeking to deny the Government the benefit of the knowledge of Fuji, Kodak and Konica witnesses on the basis that they are competitors. Fuji believes that Jazz has made this motion because any meaningful inspection of the cameras will confirm the results of Fuji's random purchases. Fuji believes that many of the cameras at issue are made from cameras not first sold in the United States or from reloaded reloads of cameras not first sold in the United States, in contradiction to Jazz's testimony in CIT Court No. 04-00494, and that such infringing cameras cannot be segregated from the others in the shipments without opening up every single camera package. If Fuji is correct, Customs' exclusion of these shipments will be sustained.

33.    Jazz supplemented its motions for expedited trial schedules with affirmations of Benun and of Leon Silvera of PRE. Benun reveals that:

>    a.    As of January 3, 2005, CBP has detained or excluded fifteen additional shipments of Jazz's single use cameras, having an entered value (i.e., the value invoiced by Polytech) of $2.6 million, representing the majority of the merchandise Jazz intended to sell during the 2004 holiday season; and
>
>    b.    CBP now claims that the ten shipments released in November 2004 and delivered to Wal-Mart were released to Jazz by mistake and demands their redelivery.

Rosenthal Dec. Exh. 11, Benun Declaration at ¶¶ 3, 4, 6.

34.    It is clear from the foregoing that Jazz's battle with the CBP has just started and can be expected to persist for many months, if not years. The questions are, at whose expense,

for whose benefit and for what purpose are these proceedings being pursued. The answers to these questions are obvious.

## IV. Jazz is Irreparably Administratively Insolvent

35. The financial condition of the Debtor is beyond repair. In Fuji's First Supplemental Response, Fuji reported that as of September 2004, Jazz had incurred a net loss in the amount of $3,849,940 since the Petition Date, and a net loss of $540,811 for the month of September 2004 alone. The situation has gotten materially worse since then.

36. In October 2004, Jazz incurred net losses of $519,018, increasing the net loss from the Petition Date through October 2004 to $4,368,958. Thus, it would seem the trend of loss would continue. However, in November 2004 the Debtor miraculously posted a net profit of $612,290, although its cash position and net worth did not materially change. This is surprising given the steady decrease in Jazz's profits since Jazz filed for bankruptcy protection and its inability to convince the CBP to release 15 shipments of cameras.

37. An examination of Jazz's operating reports and documents produced in response to the Weber subpoena reveals many anomalies. Fuji has attempted to reconcile the operating reports with documents produced by Jazz, including those produced in response to the Weber subpoena, but has been totally unsuccessful. The numbers in the operating reports concerning payments to suppliers and invoices from suppliers cannot be found in documents produced by Jazz. Fuji asked, by its subpoena of Mr. Weber, for documents evidencing the receipt of shipments from Polytech, and Polytech invoices to Jazz. Fuji has compared the produced Jazz receiving records for 2004 with the produced Polytech invoices for 2004 and found that they cannot be reconciled. Lin Dec. ¶¶ 2-5, Exhs. 1 and 2. Specifically, the number of single use cameras invoiced (8,130,712) by Polytech exceeds the number of single use cameras received

17

(4,403,235) by Jazz.  Compare Lin Dec. Exh. 2 (Spreadsheet of Polytech invoices) with Exh. 1 (Spreadsheet of Jazz receiving records).  This 3.72 million camera discrepancy is not explained by the exclusion of shipments by Customs, since that number exceeds the total number of cameras ever excluded.

38.  Second, operating reports through November of 2004 fail to reflect any legal fees owed to Neville Peterson for services in 2004.  This is strange because the Debtor has, since at least August 2004, received zealous representation from Neville Peterson before the CIT.

39.  An affirmation made by Benun on January 3, 2005 in the CIT (Rosenthal Dec. Exh. 11) confirms that Jazz's financial condition deteriorated in December 2004 such that Jazz is now admittedly (and again) on the verge of collapse.  Benun states that Jazz "suffered losses of business of approximately $2 million."  Rosenthal Dec. Exh. 11, Benun Declaration at ¶ 5. Benun further states that by virtually depleting its inventories, Jazz

> was able to supply one of its customers, Wal-Mart Stores, with cameras sufficient to cover the majority of Wal-Mart's product orders through November 29, 2004.  However, Jazz was unable to fulfill the majority of Wal-Mart's December, 2004 orders, and was ***unable to satisfy any of Wal-mart's promotional orders*** for the months of October and November, 2004.

Id. at ¶ 5 (emphasis added).[4]

---

[4] Benun's statement to the CIT that Jazz was unable to fulfill any of Wal-Mart's promotional orders in October and November 2004 is in direct conflict with his affirmation filed with this Court on November 12, 2004. In that affirmation, Mr. Benun stated:

> Debtor shipped two separate promotional programs with Wal-Mart in the last week. The first promotional order consisted of 3,287 items containing approximately 100,000 cameras in single pack tubes (ten cameras per tube). This promotion has been completely satisfied by the Debtor. The second promotional order was for 3,852 items containing approximately 288,000 SUCs contained in a three-pack configuration in a PDQ display. Jazz has been able to fill approximately 97% of the cameras in this second promotional order.

Affirmation of Jack Benun to the Bankruptcy Court, dated November 12, 2004. Rosenthal Dec. Exh. 7 (Siegal Dec. Exh. 2 at ¶ 5).

40. Benun states that Jazz does not have any single use cameras to sell (its existing inventory of $230,000, down from $2,921,277 on November 30, includes no single use cameras). Id. at ¶ 6. Benun also states that Jazz is unable to solicit orders for single use cameras and, as a result, Jazz continues to incur operating losses. Id. Benun further states that Jazz will not be able to survive without selling single use cameras because sales of its other products will not cover its monthly operating costs (estimated by Benun at $170,000 (which seems low compared to other months and clearly does not include attorney/professional fees)). Id. Benun states that Jazz cannot pay its suppliers and trade creditors, including Polytech. Id. at ¶¶ 9, 11. Benun also states that the detained cameras are suffering a loss of value due to the aging of their film. Id. at ¶ 10. Finally, Benun admits that Jazz's financial situation is "dire." Id. at ¶ 15.

41. Jazz's financial condition is at a point where its survival is impossible, given its lack of cash flow, the affirmed $30 million judgment to Fuji, the final assessment by the ITC of civil penalties of $13.675 million, its huge operating losses and negative net worth, and its huge post-petition debts to suppliers, trade creditors, Fuji and attorneys/professionals. While Jazz relies on a large, albeit unlikely, windfall judgment in Imation to survive, any distribution on account of an Imation judgment is a year or two away. By remaining a debtor-in-possession, all Jazz can achieve is increasing its attorney fees and operating losses to the detriment of all creditors. As is now clear from the start of the Imation case and prior representations of Mr. Frazza, conversion to Chapter 7 will have no effect on the prosecution of that action, except for the possibility that a Chapter 7 trustee might settle the case before judgment for the benefit of Jazz's creditors.

## CONCLUSION

Based on the evidence of Jazz's continued infringement, the affirmance of the Fuji Judgment by the Federal Circuit, the final order of the ITC, and its untenable financial condition, this Court should immediately convert Jazz's Chapter 11 case to one under Chapter 7, allow Fuji to file a civil action in the District Court against Jazz and Benun to seek a permanent injunction, and determine the amount of the administrative claims of Fuji against Jazz and Benun along with such other and further relief as is just and proper under the circumstances.

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By: /s/ Bruce Buechler, Esq.
Bruce Buechler, Esq.
Michael Etkin, Esq.
S. Jason Teele, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973.597.2500
Facsimile: 973.597.2400

**STROOCK & STROOCK & LAVAN LLP**

Lawrence Rosenthal, Esq.
Matthew W. Siegal, Esq.
Kristopher M. Hansen, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: 212.806.5400
Facsimile: 212.806.6006

Dated: January 24, 2005

SSL-DOCS1 1533879v7