UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY


| | | |
|---|---|---|
| IN RE: | . | Case No. 03-26565 |
| | . | |
| | . | |
| JAZZ PHOTO CORP., | . | M.L.K. Federal Building |
| | . | 50 Walnut Street, 3rd Floor |
| | . | Newark, New Jersey 07102 |
| Debtor. | . | |
| | . | February 16, 2005 |
| . . . . . . . . . . . . | . | 10:14 a.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE MORRIS STERN
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Jazz Photo Corp.:      Cole, Schotz, Meisel, Forman &
                              Leonard, PA
                           By:  MICHAEL D. SIROTA, ESQ.
                           Court Plaza North
                           25 Main Street
                           Hackensack, NJ   07602

                           Budd Larner
                           By:  DAVID J. NOVACK, ESQ.
                                MARK HOERRNER, ESQ.
                           150 John F. Kennedy Parkway
                           CN 1000
                           Short Hills, NJ   07078

For the Jazz               Ravin Greenberg, PC
Creditors' Committee:      By:  HOWARD S. GREENBERG, ESQ.
                                SHERYLL S. TAHIRI, ESQ.
                           101 Eisenhower Parkway
                           Roseland, NJ   07068


Audio Operator:            Carol Urena

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311     Fax No. (609) 587-3599

2

APPEARANCES (Con't.)

For Jack Benun:                    Riker, Danzig, Scherer, Hyland &
                                     Perretti, LLP
                                   By:  JOSEPH L. SCHWARTZ, ESQ.
                                        DENNIS J. O'GRADY, ESQ.
                                   Headquarters Plaza
                                   One Speedwell Avenue
                                   Morristown, NJ  07692

For Mona Benun:                    Duane Morris, LLP
                                   By:  WALTER J. GREENHALGH, ESQ.
                                        DAVID H. STEIN, ESQ.
                                   744 Broad Street
                                   Suite 1200
                                   Newark, NJ  07102

For the U.S. Trustee:              U.S. Department of Justice
                                   By:  MARGARET L. JUROW, ESQ.
                                   Office of the U.S. Trustee
                                   One Newark Center, Suite 2100
                                   Newark, NJ  07102

For the International              U.S. Attorney's Office
Trade Commission:                  By:  ANTHONY LaBRUNA, JR., ESQ.
                                   970 Broad Street, Suite 700
                                   Newark, NJ  07102

For Fuji:                          Stroock & Stroock & Lavan, LLP
                                   By:  KRISTOPHER M. HANSEN, ESQ.
                                        LAWRENCE ROSENTHAL, ESQ.
                                        DOUGLAS MANNAL, ESQ.
                                   180 Maiden Lane
                                   New York, NY  10038

                                   Lowenstein Sandler, PC
                                   By:  S. JASON STEELE, ESQ.
                                   65 Livingston Avenue
                                   Roseland, NJ  07068

For Imation:                       Dorsey & Whitney, LLP
                                   By:  WILLIAM STOERI, ESQ.
                                   Suite 1500
                                   50 South Sixth Street
                                   Minneapolis, MN  55402

3

**I N D E X**

WITNESSES                                                          PAGE
EDWIN N. ORDWAY, JR.
  Direct Examination by Mr. Greenberg                               24
  Cross Examination by Mr. Schwartz                                 41
  Cross Examination by Mr. Greenhalgh                               84

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  This United States Bankruptcy Court is

2  now in session.  The scheduled matter will be heard and fully

3  considered; Jazz Photo.  Appearances, please?

4          MR. SIROTA:  Judge, good morning.  Michael Sirota;

5  Cole, Schotz, Meisel, Forman and Leonard, on behalf of Jazz

6  Photo Corp.

7          MR. GREENBERG:  Good morning, Your Honor.  Howard S.

8  Greenberg and Sheryll S. Tahiri; Ravin Greenberg, appearing for

9  the Jazz Creditors' Committee.

10          MR. SCHWARTZ:  Good morning, Your Honor.  Joseph

11  Schwartz and Dennis O'Grady; Riker, Danzig, Scherer, Hyland and

12  Perretti, on behalf of Jack Benun.

13          MR. GREENHALGH:  Your Honor, Walter Greenhalgh and

14  David Stein, on behalf of Mona Benun and her four daughters.

15          MS. JUROW:  Margaret Jurow, for the United States

16  Trustee.  And Your Honor, Mr. Edwin Ordway, the examiner is

17  here.  And his partner, Brian Moore, are also here.

18          MR. LaBRUNA:  Good morning, Your Honor.  Anthony

19  LaBruna, from the U.S. Attorney's Office, on behalf of the

20  International Trade Commission.

21          MR. HANSEN:  Good morning, Your Honor.  Kris Hansen;

22  Stroock and Stroock and Lavan.  And I have with me Mr. Lawrence

23  Rosenthal and Mr. Doug Mannal, also of the Stroock firm, and

24  Jason Teele, with the Lowenstein firm, representing Fuji.

25          UNIDENTIFIED ATTORNEY:  Good morning, Your Honor.


                    J&J COURT TRANSCRIBERS, INC.

**5**

1          THE COURT:  Anyone else choose to make an appearance?

2          MR. STOERI:  Bill Stoeri, here; Dorsey and Whitney,

3     on behalf of Imation.

4          MR. NOVACK:  Judge, David Novack and Mark Hoerrner,

5     from Budd Larner, on behalf of Jazz Photo.

6          THE COURT:  All right.  This is the noticed hearing

7     on the proposed settlement of the Jazz/Imation litigation,

8     which is ongoing.  I would catalogue the submissions that I've

9     received.  If I leave anything out, let me know.  I've received

10    Mr. Sirota's submission, on behalf of the debtor; Mr. Novack's

11    submission, as trial counsel in the Imation case -- and that

12    was in two parts.  A second -- I wonder if others got a second

13    projection of costs, going forward.  Mr. Stoeri's material, on

14    behalf of Imation; Mr. Edkin's (phonetic) submission, for Fuji;

15    Mr. Greenhalgh's submission, for Mona Benun and the children;

16    Mr. Schwartz's, for Jack Benun; Mr. Greenberg's, for the

17    Creditors' Committee, and the examiner's report.  Anything

18    else, of recent submission, that was missed?  All right.

19         I emphasized at outset that this is motion practice;

20    that testimony will be limited and circumscribed.  This is not

21    a trial, and it's certainly not a retrial of the Imation case.

22    I address these comments, of course, to everyone, but with

23    emphasis to Fuji, at this time.

24         The Court takes a tentative position, after reviewing

25    all the materials.  The Fuji carve-out -- of 17 percent of the

1    first Fuji dollars, by way of distribution, up to a million

2    dollars -- for certain creditors should be subject to further

3    consideration by this Court, as to whether that carve-out is

4    property of the estate and/or whether the proposed distribution

5    is consistent with the Bankruptcy Code and law.  And that Court

6    consideration, in the future, could result in possible

7    reallocation, as determined -- again, in the future -- by the

8    Court, as part of a consideration of the anticipated

9    liquidation process.  And at this point, I ask Fuji whether it

10   will commit to the carve-out under those circumstances -- with

11   a potential, not certain -- potential reallocation; that

12   reallocation abiding the event of the Court's future

13   determination.  Mr. Rosenthal?

14          MR. ROSENTHAL:  Your Honor, Fuji is committed to that

15   carve-out.  We entered into an agreement as to how it should be

16   distributed.  But the -- I have expressed the view that in

17   Chapter 11 and Chapter 7, somebody would figure out a way that

18   it could be used -- however it could be used.  In other words

19   yes, Fuji is committed.

20          THE COURT:  And if the allocation is adjusted in the

21   future, based upon application by any party or the conclusion

22   by this Court that it's property of the estate or that fair

23   distribution requires a reallocation, as distinguished from the

24   noticed distribution, is that satisfactory to you?  And is the

25   carve-out still committed?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENTHAL:  The carve-out is committed.  I do

2    reserve the rights to object to the claims of any creditor who

3    Your Honor wishes to include in the --

4          THE COURT:  Yes.  I'm not deciding the issue.  And

5    you certainly have the right to object.  But if that objection

6    is overruled, is the carve-out committed?

7          MR. ROSENTHAL:  Yes, Your Honor.  It is.

8          THE COURT:  Thank you.  And so, parties in interest

9    should understand -- because the Court now finalizes and firms

10   that position -- that the carve-out is subject to this Court's

11   review and consideration in the liquidation process and is not

12   binding on this Court, but is binding on Fuji, as per its

13   current commitment.  So the parties should understand, at

14   outset of this hearing, that the million dollars -- and that's

15   a maximum number -- could be so reallocated.  This is possible,

16   though by no means certain.  This Court views this reservation

17   by the Court -- which is really a matter of law -- as not being

18   material, so as to require a re-noticing of this hearing under

19   the current circumstances; which are exigent, as this Court

20   sees it.  Nor, of course, does it affect the gross amount

21   offered in settlement by the Imation interests.

22          The current status of this case is tied to the status

23   of the Imation litigation, pending before Judge Linares in the

24   District Court.  There, the jury is in suspense, as is the

25   trial, of course.  Judge Linares developed a settlement -- it

1  seems to be conceded in all of the papers -- and thought enough

2  of that settlement to, on his own, suspend the trial.  There

3  is, of course, a mistrial potential, which has been discussed

4  in papers.  If the trial goes forward, without a mistrial, it

5  appears as though there would be thirty or more trial days.

6  And if there is a mistrial, there could well be a retrial.

7  Retrial, as I understand it, could be six months or more away.

8  Administrative costs are mounting.  This is currently an

9  administratively insolvent estate, unless there are proceeds

10 which are generated by the Imation litigation.

11        There is a conversion motion pending by Fuji.  And

12 there were two significant events in January; the January 14th

13 affirmance of the $30 million judgment, which came out of Judge

14 Hochberg's court -- that affirmance by the Federal Circuit --

15 and the January 24th, 2005 liquidation of the ITC penalty

16 against Jazz and others, including Mr. Benun.  This Court has

17 -- on relatively short notice -- scheduled this hearing,

18 because we have a jury trial in suspense, upstairs.  And again,

19 the Court views this matter as requiring immediate action.

20        I would, at outset, ask trial counsel to consider the

21 following question.  Is counsel in a position -- and I would

22 assume it's you now, Mr. Novack -- to offer an opinion today as

23 to the following question?  Under current circumstances and

24 viewing the Imation litigation status and potential, as of this

25 date -- February 16, 2005 -- is the proposed settlement

1   reasonable?  I'll give you some to consider first, whether

2   you're in a position to answer that question.  And then, we'll

3   go from there.

4          And finally, I think we should get as much input, as

5   to the particular claims and the particular categories; such as

6   admin, secured claims, general unsecured claims of unaffiliated

7   creditors, and general unsecured claims of affiliated

8   creditors.  There are bits and pieces throughout the materials

9   that were submitted.  The Court has made its own review, in

10  this regard, but would ask parties in interest for specific

11  input and would ask Mr. Greenberg, as Committee counsel, to

12  organize -- to the extent possible -- and I know that it's

13  putting a burden on you, but I want you to consider pulling

14  together this information for disclosure, on the record, today.

15         Having introduced matters in that fashion, we can go

16  ahead with the Martin hearing; that is, a hearing on the Martin

17  factors, with respect to whether this settlement should be

18  approved.  Mr. Greenberg, I look to you, as the noticing party.

19  I know that there are ongoing questions and a debate as to

20  standing.  The Court has addressed that now twice, in the past,

21  and will not reopen or reconsider that position.  Mr.

22  Greenberg?

23         MR. GREENBERG:  Your Honor, pursuant to a prior order

24  -- which was entered approximately a week ago -- we did serve

25  notice of what was then the parameters, as we understood them,

1  of the proposed settlement.  Some of the terms have been

2  modified slightly, as the Court has been so apprised, by

3  submissions from Fuji and others.  But we did serve all known

4  creditors and other parties in interest, for whom we had

5  addresses in both the Jazz and the Benun cases.  And as I

6  explained to the Court, because of the way mail is picked up in

7  Roseland, it really wound up getting sent out on Thursday,

8  rather than Wednesday night.  If you put it in the mailbox in

9  Roseland on Wednesday, after four o'clock, it doesn't get

10 picked up until Thursday, after four o'clock.  And then, it may

11 have been misdated.  So, we resolved that.  And an affidavit of

12 service, I believe, was filed earlier today.

13         The two changes that are material -- from the notice

14 that was previously sent out -- are as a result of dialogue

15 with both representatives of Fuji and the Committee.  The

16 initial requirement -- subject to Your Honor's comments today

17 -- that Photo Recycling Enterprises, Limited and PolyTech

18 Industries would be eliminated from that million dollar Fuji

19 carve-out is off the table.  They would be included.  And

20 obviously, the fact that we thought the carve-out would only be

21 for the non-debtor, unrelated, unsecured creditors is subject

22 to further review.

23         There are two circumstances that have arisen, that

24 impact on that ultimate decision.  And they occurred in the

25 last few days.  Number one, Mr. Benun -- or, I guess it's JCB

1  Associates -- has filed an unsecured claim for approximately

2  $21 million which, if allowed, could have a significant

3  dilution effect on unsecured creditors.  And I believe last

4  night, at about 6:25, Mr. LaBruna -- who is in court -- filed a

5  thirteen and a half million dollar claim for the ITC.  So if

6  those two claims were allowed, we now have another almost $35

7  million to share, in either the one million or whatever

8  spillover there is for unsecured creditors.  That was not

9  contemplated by the Committee, when it considered the

10  settlement.

11          The Committee had a number of conference calls.  We

12  gave everybody an opportunity to ask whatever questions.  We

13  attempted -- at the request of one member -- to have a

14  conference call with Mr. Frazza (phonetic) last Friday

15  afternoon.  But he, in fact, was tied up with Mr. Ordway and is

16  now out in California.  I understand that that dissenting

17  Committee member, Leon Silvera -- who holds a proxy -- is

18  taking no position on the settlement.  Last evening, at about

19  seven o'clock, I spoke with his counsel, Jay Silverberg --

20  who's a New York practitioner -- who advised me that they were

21  taking no position.  And so long as those two parties I

22  identified before were not going to be excluded or treated

23  differently than other allowed claims -- and he recognizes

24  there may be a challenge as to the allowance of those claims --

25  they were not going to be here to object.

J&J COURT TRANSCRIBERS, INC.

1            The Committee really tried to look at the litigation

2    on the merits.  We did not, at all, look at Mr. Benun as a

3    villain.  And as this Court knows, the Committee has stood side

4    by side with Mr. Sirota on virtually every issue that has been

5    litigated in this matter, until this settlement.  We have

6    wanted to see the debtor survive and continue in business, and

7    have never been supportive of the Fuji position.  So we didn't

8    consider that he's a bad guy, he's an infringer, or anything.

9    We looked at the litigation.

10           And we looked at the -- well, I had heard the opening

11    by Mr. Fraza.  I subsequently reviewed the opening by Mr.

12    Stoeri.  And as one might have suspected, it's like reading two

13    different cases.  There are very different views.  And we tried

14    to figure out where the range of reasonableness was -- not zero

15    and not fifty or sixty million dollars -- in the context of

16    settlement.  There is a lot of uncertainty about that

17    litigation.  There are questions about liability, which we

18    considered -- although in candor, we thought the balance tipped

19    in Jazz's favor on the liability issue.  On damages, wide

20    range, depending on different factors.

21           Subsequently -- although, not part of the Committee's

22    deliberation, but prior to my submission -- I did read Mr.

23    Ordway's analysis and saw what he thought might be different

24    ways of not attacking, but reducing some of Mr. Campo's

25    figures; specifically, the fifty-six cent royalty factor and

1  also, whether the 1998 benchmark for computing law sales and

2  other damages was accurate.  And if those two issues tip in

3  favor of Imation instead of Jazz, out of potentially $40

4  million of top line recovery, you could reduce it by $30-35

5  million.

6          The Committee didn't make that analysis, but did

7  recognize that those were issues.  One other thing that we

8  never thought about; in the Fuji submission -- which clearly

9  was filed before the examiner's report -- they talked about the

10 possibility of an Imation insolvency proceeding and the issue

11 about collectability of a judgment, if ultimately recovered and

12 affirmed.  We never thought about that.  Our view had been that

13 Imation was financially responsible.  And as I recall Mr.

14 Ordway's report, I think he said they have cash on hand of $340

15 million, virtually no debt, and an untapped borrowing line of

16 $100 million.  So, that wasn't a factor.

17         So as I said, we didn't look at Mr. Benun and Jazz's

18 bad folks or infringers.  We didn't look at Imation as somebody

19 who couldn't pay.  We looked at the benefits of having a

20 settlement for a sum certain -- $25 million -- in relatively

21 short order.  Very honestly, the Committee felt there was a

22 significant enhancement to the non-Benun, non-affiliated

23 creditors, by reason of the Jazz carve-out, as it was initially

24 structured.  They are unaware of the fact that the Court has

25 said that may be subject to further review.  But, that was a

1   significant issue.

2           My view -- and you did ask that I go through some

3   numbers -- it may well be that Mr. Sirota is a better

4   articulator of those numbers.  But I can give you what I have

5   believed the numbers to be, in large part, based on what Mr.

6   Sirota set forth before Judge Linares -- as I recall it --

7   instead of other people saying they have different

8   recollections.  It was discussed with the Committee.  It was

9   discussed with Mr. Ordway and Mr. Moore, when I spoke with them

10  on Monday afternoon.  I believe that Mr. Sirota's analysis --

11  and he probably was in the best position to do that analysis --

12  was that the admin and secured claims were approximately $17-18

13  million, plus the possibility of the enhanced or contingency

14  fee of almost $2 million for the Budd Larner firm, based on a

15  settlement of a certain level.

16          In round figures -- before Judge Linares and in all

17  subsequent conversations -- I have used as a starting point $20

18  million off the top, for secured and admin.  However, that

19  number has a lot of wiggle room.  Let me try to articulate the

20  ways.  And there are others, who can probably add other factors

21  to it.

22          The secured creditor -- well, Rosenthal and

23  Rosenthal, I believe, is owed approximately $2.8 million.  They

24  have some collateral.  Right now, I think it's sitting in

25  containers, that are being held up by customs.  But were that

1  to be freed up and disposed of in an orderly, non-infringing

2  fashion -- whether that means non-domestically, but

3  internationally or in some other way -- were receivables to be

4  collected, a significant portion of their secured debt -- and

5  there may be other small amounts of secured debt -- wouldn't

6  have to be funded by the settlement.  It would come from other

7  parts.  So some of that $20 million would spill over, into the

8  unsecured fund.

9          Next, there are potential admin claims of Fuji and

10  potentially, the ITC.  Fuji has indicated an admin claim of

11  approximately $6.5 million.  One of the problems that I had,

12  when Mr. Silverberg said Howard, send me a writing. showing me

13  the analysis.  I said, there are too many variables.  It's like

14  trying to solve an equation, with multiple unknowns.  If Mr.

15  Sirota -- and possibly, the Committee -- are right, that Fuji

16  does not have an admin claim of 6.5 or any number, well, we

17  have another 6.5 spilling over into the unsecured creditor pot.

18  The adverse thought would be that that 6.5 -- if it is a

19  legitimate number -- is only through a certain period in time.

20          THE COURT:  July, '04.

21          MR. GREENBERG:  Right.  And if that logic were to

22  hold for the 6.5 and be carried forward, the 6.5 -- instead of

23  being reduced -- could be dramatically expanded, if there were

24  the same kind of violations that gave rise to that, that

25  continued until the present date.  So, I mean, we just don't

1 know what that number is.  If it goes down, more for the

2 unsecureds.  If it goes up, more of the 25 million is eaten up

3 for admin, subject to the setoff that I mentioned, with respect

4 to the secureds.

5       The same thing holds true with the ITC.  We don't

6 believe they have an admin claim, as the creditor's body.  I

7 don't think that Mr. Sirota does.  But if it turns out they

8 did, that could change the numbers.  And I think Mr. Sirota may

9 have ascribed a small number in his admin fund, to that.  If

10 it's zero, more for the unsecureds.  If it's a larger number,

11 less for the unsecureds.  So --

12       THE COURT:  But those post-petition penalties appear

13 to be running at $25,000 a day.

14       MR. GREENBERG:  Big number.  That is correct.  And we

15 just looked at the claim that was filed last night.  And it's a

16 general unsecured claim, based on that ruling.  So -- I mean,

17 we'll have to see how that plays out.  But it's certainly a

18 variable, that would impact on all of the numbers.

19       THE COURT:  The ITC proof of claim runs from 8/21/01

20 until 12/12/03.

21       MR. GREENBERG:  So, it's a pre-petition.

22       THE COURT:  The petition is 5 --

23       UNIDENTIFIED ATTORNEY:  5/20, Your Honor.

24       THE COURT:  5/20.  Thank you.  5/20/03.

25       MR. GREENBERG:  So, you know, there may, in fact, be

J&J COURT TRANSCRIBERS, INC.

1  an admin claim that has to be considered, challenged, et

2  cetera.  Again -- with deference to Mr. Sirota, who I believe

3  is the one who put the numbers together -- my recollection of

4  the unsecured claims was approximately $60 plus million.  I

5  think between 60 and 65 million, of which Fuji is somewhere

6  between 40 and $42 million.  The ITC is ten or so.  When you

7  back those parties out, my recollection is that you got down to

8  a core group of unsecured creditors of approximately $18

9  million, which could be further reduced in the following

10  fashion.

11       Jazz Hong Kong, which has agreed to subordinate at a

12  prior hearing, is approximately nine million dollars.  You back

13  that out, and the eighteen becomes nine.  Imation has a

14  judgment.  We've heard different numbers; one million, one

15  hundred and thirty-four thousand, a million five.  Using a

16  million five, that takes that core group of creditors down to

17  7.5 million, before you look at duplicates and claims that just

18  get challenged -- whatever.

19       In talking to the Committee and focusing on the Fuji

20  carve-out, my view is -- on a worst case basis -- there would

21  be seven million dollars, including the two who are now back in

22  the fold, so to speak, but not including the ITC or JCB or any

23  of the Benun interests, et cetera.  There would be about seven

24  million dollars of allowed claims, that would be sharing a

25  million dollars; roughly, just under 15 percent.  If, in fact,

J&J COURT TRANSCRIBERS, INC.

1  by reason of claims challenges, that number got reduced to six

2  million -- which is a possibility -- you'd then have a

3  dividend, just from that fund; again, subject to the old terms.

4  And we understand that the Court's going to take a further look

5  at it.  You'd have those core, non-related, unsecured

6  creditors, exclusive of Fuji, Jazz, the ITC and the Benun

7  interests, getting about sixteen and a half percent.  And they

8  would also participate in the spillover.  That's not a full

9  satisfaction of their claims.  To the extent there's another

10 five million dollars that becomes available for unsecureds,

11 from whatever sources, they would approximately get ten percent

12 of that -- then being six million out of sixty million.

13        So, that was the analysis that we went through, in

14 taking a look at the overall settlement.  On --

15        THE COURT:  Let me just stop you there, if I may --

16        MR. GREENBERG:  Certainly.

17        THE COURT:  -- because I've reviewed the claims

18 registers, the petition.  And if we start with Schedule F --

19 never amended -- and back out Jazz Hong Kong, there's a

20 fraction under four million dollars.  We'll call it four

21 million dollars.  It's three nine nine two.  You then have

22 proofs of claim filed by creditors who are not listed.  And if

23 you take Rosenthal out, because they're secured, that's about

24 2.4 million.  So, they are 6.4 million.  There is a slight

25 differential between proofs of claim filed for scheduled

1 creditors, and what they were scheduled for.  But it's about

2 $157,000.  So, that would be added on.

3        MR. GREENBERG:  So you'd wind up, I think -- in your

4 analysis -- getting pretty close to my range, between six and

5 seven million dollars.

6        THE COURT:  Exactly right.

7        MR. GREENBERG:  And I paid careful consideration to

8 what Mr. Sirota was saying.  And also, we tried to take a look

9 at the information available to us.  And that was the

10 information that was utilized in conversations with the

11 Committee.  And --

12        THE COURT:  Now, if the ITC's claim dilutes the

13 general unsecured creditors, as it might, one way or another --

14 either as partial admin and partial general unsecured creditor

15 or overall unsecured creditor -- that's just a fact of

16 bankruptcy life.

17        MR. GREENBERG:  Your Honor, and I agree.  And one of

18 the arguments that was made is, this is a sort of bottom up

19 kind of settlement.  And nothing could be further from the

20 truth.  This is a settlement --

21        THE COURT:  Because no one knew what the bottom was.

22        MR. GREENBERG:  Right.  We don't know.  And it

23 changes with each passing hour, as reflected by Mr. Benun's

24 admin claim of -- I think it's $362,999 for the whole back

25 portion of his salary, which may or may not get awarded.  And

1 that's an issue for this Court.  But that would change the

2 numbers.  A $21 million unsecured claim, the thirteen and a

3 half million dollar ITC claim.  So it was not a bottom up

4 settlement, at all.  It was a number.  And then we'll figure

5 out how it gets divided, once there is a claims motion -- both

6 as to admin and as to unsecureds or any other claims -- and the

7 claim challenging process.  The feeling was that that was a

8 reasonable number.

9         I read Mr. Novack's report, which I thought was quite

10 thorough -- that was submitted to the Court yesterday -- three

11 times.  Because I wanted to try to discern from that whether he

12 was saying the settlement was reasonable or unreasonable.  I

13 don't think he said one or the other.  I think I'm balanced,

14 though.  When you read him talking about how the Jazz case may

15 have been prejudiced or could be further prejudiced by reason

16 of the delay -- the retrial -- the time loss, the likelihood of

17 potential Appellate issues, and the cost of going forward.  The

18 -- if I had to decide for him -- and he will address your

19 question directly, whether he thought the settlement was

20 reasonable or not -- I have the impression he comes out on the

21 side of reasonable.  But, he will speak.

22         I do think that Mr. Ordway and Mr. Moore and their

23 associates did an incredible job -- in a very short period of

24 time -- talking to everybody, getting all different views.  I

25 know they spent about 45 minutes on the phone with my office,

1  and really gave us a chance to go through all the issues.  They

2  read a lot of papers.  When I get to their bottom line and look

3  at their last two exhibits, I think that they feel when you

4  make some assumptions -- vis-a-vis the Campos' report -- that

5  in point of fact, assuming the liability issue is decided in

6  favor of Jazz, they would not be surprised if the recovery

7  range fell in the low, low side of five or so million, but more

8  likely eight to eleven million.

9       Treble that -- assuming it's subject to the Ricoh

10 analysis, or anything else that gives rise to trebling -- you

11 get to twenty-five to thirty-three.  And maybe there's an

12 entitlement interest on that for all these years, counsel fees.

13 $25 million cash money right now, even without the enhancement

14 which -- to my creditor constituency -- was an important

15 factor.  And I wouldn't want the Court to lose sight of that.

16      My analysis -- different than Mr. Sirota's on the

17 original terms -- was that that settlement, if the creditors

18 are only owed six or six and a half million, was equivalent to

19 a recovery of thirty-nine cents on the -- 39 million.  Mr.

20 Sirota crunched the numbers differently, and he can speak for

21 himself.  I think he felt it was closer to 32 million.  But

22 that enhancement really changes the dynamics of the settlement

23 for unsecured, non-related, non-ITC creditors, dramatically.

24 And should the Court want to consider the inclusion of all

25 those disparate claims at a later date, certainly, the

1 Committee would want to be heard on that.  That was one of the

2 bargain for factors, that I think had some sway in the

3 Committee's decision.  But I understand the Court's view, as to

4 how that plays out.  I think --

5      THE COURT:  Is it fair to say that if the matter were

6 to go forward, that -- and taking a number, $50 million -- that

7 the differential -- that is, the margin between 25 and 50 --

8 would be somewhere between 70 and 80 percent Fuji's, by way of

9 distribution on a liquidation basis?

10      MR. GREENBERG:  Good point, Your Honor.  And one of

11 the reasons that I was comfortable with that seventeen cent

12 contribution, because, you know, what if it's 17 percent of

13 zero?  I did the following analysis.  We start with the fact

14 that they believe they have an admin claim of six and a half

15 million.  If that's allowed, 17 percent of that -- my math

16 tells me -- gets me above the million dollars.  On the other

17 hand, if it is disallowed and all else stays the same, now we

18 started -- we thought -- with twenty million off the top, for

19 secured, priority and admin.  That left five, for unsecureds.

20 Knock out their claim of six and a half.  Now, that pot is

21 approximately eleven and a half million.  Fuji gets two-thirds

22 of it.  That's just under eight million.  At my seventeen cent

23 clicking away, I'm still above a million dollars.  So yes,

24 although I didn't address it before, I always felt that they

25 are approximately 65 to 70 percent of the unsecured creditor

1  pot.

2       However, that changed when Mr. Benun -- on behalf of

3  JCB -- filed a $21 million claim.  It got filed when Mr.

4  LaBruna filed his $13 million claim.  It changes those dynamics

5  slightly.  But the numbers I was using in discussions with the

6  Committee last week had Fuji being about 42 out of maybe $65

7  million -- roughly two-thirds of whatever's in the pot -- which

8  I figure to be probably eleven and a half million and maybe

9  more, if Rosenthal and Rosenthal gets paid from other sources.

10  Maybe it's $15 million.

11       Hopefully, I have been responsive to --

12       THE COURT:  Very.

13       MR. GREENBERG:  Thank you.

14       THE COURT:  I think we should hear from the examiner

15  at this point.  Mr. Ordway, I have your report.  I assume all

16  parties in interest have it.  I will make it the Court's

17  Exhibit 1.  And please -- and I'm going to ask Mr. Greenberg to

18  start.  Others will have an opportunity to question Mr. Ordway

19  about his report.  Carol?

20       THE CLERK:  Place your left hand.

21            EDWIN N. ORDWAY, JR., WITNESS, SWORN

22       THE CLERK:  Please state your name and address for

23  the record.

24       THE WITNESS:  Edwin N. Ordway, Jr.  And my address is

25  102 Evergreen Court, Franklin Lakes, New Jersey.


J&J COURT TRANSCRIBERS, INC.

Ordway - Direct                    24

1              THE CLERK:  Thank you.

2                     DIRECT EXAMINATION

3    BY MR. GREENBERG:

4    Q     Good morning, Mr. Ordway.

5    A     Good morning.

6    Q     You were recently designated examiner in this matter?

7    A     Yes, I was.

8    Q     And that was pursuant to an order entered by Judge Stern,

9    and an appointment made by the Office of the United States

10   Trustee?

11   A     That is correct.

12   Q     And in that regard, have you previously filed a written

13   report, with respect to your activities and your conclusions?

14   A     No.  This is the first report.  It was submitted yesterday

15   afternoon.

16   Q     Well, when I said previously, on February 15th --

17   yesterday?

18   A     Yes.

19   Q     And to your knowledge, did all the parties in interest --

20   as well as the Judge -- receive a copy of that by e-mail, but

21   not through electronic filing?

22   A     Yes.

23   Q     Okay.

24              MR. GREENBERG:  Your Honor, although everybody has a

25   copy of that, it may make sense to just -- for the record -- go


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Direct                              25

1  through Mr. Ordway's qualifications and the process that he

2  utilized.

3  Q    So Mr. Ordway, if you would be good enough, can you tell

4  us both about your educational and professional background,

5  from college through the present time, in as short or lengthy a

6  fashion as you'd like?

7  A    Sure.  I attended Rutgers University, here in Newark, New

8  Jersey.  I graduated in 1978, with high honors -- highest

9  honors, rather.  I was in the top of my class.  I went to work

10 shortly after graduating, at Arthur Anderson.  I worked at

11 Arthur Anderson for eight years.  After meeting the

12 requirements for experience, I became a CPA.  I passed the

13 test, in two parts, very quickly.  I left Arthur Anderson in

14 1986.  I went to work for a private individual, who had

15 investments in a variety of businesses, mostly real estate

16 development in New Jersey.

17          In 1991, I went to work for a firm named Policano and

18 Manzo.  And Policano and Manzo, they're financial advisors in

19 troubled company situations.  They also do litigation support

20 work.  I've worked there through February of 2000, at which

21 point in time they sold their firm to another company, named

22 FTI Consulting.  I continued to work at FTI Consulting.  I was

23 a senior person in the organization.  And the last year that I

24 worked at FTI, I was co-head of the workout practice -- co-head

25 with a member of the former Price Waterhouse organization.  FTI

Ordway - Direct                          26

1  had acquired Price Waterhouse's workout practice in September

2  of 2003.

3           I left FTI and started my own firm, with several

4  other colleagues, in January of 2004.  Many of the people that

5  were part of the Policano legacy organization left and joined

6  me, as well.  So I currently have a firm now of 50

7  professionals, based in New York, New Jersey, DC and Los

8  Angeles.  And I'm one of the managing partners of that firm.

9  Q    Thank you.  And with respect to this engagement --

10 although again, reflected in your written submission, dated

11 February 15th -- can you tell the Court the mechanism that you

12 utilized to glean the information about both the Jazz

13 proceeding and also, the Imation litigation and proposed

14 settlement?

15 A    Sure.  We collected information.  Initially, we received

16 some information from the U.S. Trustee, regarding the expert

17 reports that were prepared by Mr. Campos and Mr. Zatta

18 (phonetic).  We looked at a variety of documents, that had been

19 prepared in connection with the litigation -- most importantly,

20 the original complaint, the response.  We've looked at the

21 initial -- the depositions -- or transcripts, rather -- from

22 the initial court hearings, that Mr. Stoeri and Mr. Fraza had

23 gone before Judge Linares.  We looked at their trial briefings.

24 We looked at Linares' opinion.  We looked at a variety of

25 supporting documentation that the experts had accumulated, in

Ordway - Direct                              27

1   connection with the preparation of their reports.

2            In addition to all that analysis -- which, by the

3   way, given the short period of time, I had two of my senior

4   colleagues work with me -- so the fact of the matter is, I did

5   not read every single document.  I had them helping me with

6   this.

7   Q    For the record, if I could interrupt, would you just

8   identify those colleagues who worked with you?

9   A    One of them is in the court today; Brian Moore, who has 25

10  years of experience in doing this type of work.  And another

11  senior colleague at my firm, named, Jack Sertoval (phonetic),

12  who has about 20 years experience in private and public

13  accounting.

14  Q    Thank you.

15  A    In addition to the analysis -- reading and analysis of the

16  documents that I just described, which are more detailed in my

17  report, in Section 2 and Exhibit 4 -- we also interviewed many

18  of the parties that are sitting in the court today.  We thought

19  it was appropriate to hear from them their points of view.  In

20  particular, the longest interviews were related to the experts

21  -- both Mr. Zatta and Mr. Campos -- who were kind enough to

22  make their schedules flexible, such to meet with us last

23  Friday.  And we spent a number of hours with both of those

24  individuals.

25  Q    And as a result of those discussions and review of

J&J COURT TRANSCRIBERS, INC.

Ordway - Direct                                28

1    documents, did you form a conclusion -- with respect to the

2    proposed settlement -- whereby Imation would immediately be

3    paying $25 million to the debtor estate and would also be

4    waiving its $1.5 million unsecured pre-petition judgment and

5    any other claims that it has against Jazz?

6    A    Yes, I did.   I concluded that it was a reasonable

7    settlement.

8    Q    Can you tell the Court the foundation of that bottom line

9    conclusion?  What factors led you to that belief, as opposed to

10   feeling that the litigation should continue, in the best

11   interest of this estate and its creditors?

12   A    I think to simply state it, we looked at the damages,

13   especially the way that they had been accumulated by Mr.

14   Campos.  We concluded that the damages that could be assessed

15   -- in the very highest situation -- would be around $50

16   million.  And that's making some assumptions, with respect to

17   how long the process would last, until a payment was made.  We

18   made some assumptions, that either there's a -- there could be

19   a mistrial.  There could be an appeal process, and that it

20   could be several years from now until a payment was made.

21          On the other hand -- based on our reading -- we

22   concluded that this is a very complicated case; that liability

23   is uncertain.  And as a consequence, there's a risk as to what

24   the outcome of the case could be.  We looked at different

25   scenarios, different outcomes.  And many of those outcomes were

Ordway - Direct                    29

1   well below $25 million.  And not that the answer - or the

2   process to get to answer, rather -- was the following.  But if

3   you were to take the average of all the permutations and

4   combinations that we looked at, they average below $25 million.

5          Given that there is an opportunity to receive the

6   cash, receive the cash timely, and avoid the risk of litigation

7   -- that's inherent with litigation and proving liability -- we

8   thought it was appropriate and fair for the creditors to accept

9   the $25 million payment.

10  Q    Thank you.  With respect to the prospects of collection,

11  were the trial to proceed and a significant verdict -- even in

12  excess of $25 million be rendered against Imation -- what kind

13  of investigative work did you or the people assisting you do?

14  And what conclusions did you reach, on that sole issue of

15  potential collectability?

16  A    The -- we reviewed the information that's publicly

17  available.  Imation is a publicly traded company.  It's an FCC

18  reporting company.  The most current quarterly financial

19  information available, regarding Imation, is September 30th.

20  We reviewed that balance sheet and their operating performance.

21  The couple of key pieces of information that would be relevant

22  in understanding whether they have the wherewithal to fund this

23  settlement -- or on the other hand, to proceed with the

24  litigation, which we were concerned about, as well -- could

25  they post a bond, in connection with an appeal?  The answer is

J&J COURT TRANSCRIBERS, INC.

Ordway - Direct                                          30

1   yes.  This company doesn't have any indebtedness, any

2   institutional type indebtedness.  It has $100 million facility,

3   undrawn as of September 30th, and $340 million of cash on its

4   balance sheet.  This company has the capability, in all

5   respects.

6   Q    Would it be fair to say that there was no decrease in your

7   evaluation, by reason of questionable collectability, based on

8   the testimony you just gave us?

9   A    That's correct.

10  Q    And I know that with respect to the February 15th written

11  submission -- which I think all parties have a copy of -- you

12  prepared a number of schedules and exhibits, is that correct?

13  A    That's correct.

14  Q    For a moment, if I could direct your attention to the last

15  two exhibits, which -- actually, it's the last exhibit.  It's

16  Exhibit 9, but it's two pages.

17         MR. GREENBERG:  And while we're doing that, Ms. Jurow

18  has asked -- even though everybody has a copy of it -- if I

19  have this marked for identification purposes.

20         THE COURT:  No.  It's in evidence.  It's the Court's

21  Exhibit 1, in evidence.

22         UNIDENTIFIED ATTORNEY:  Your Honor, could I reserve

23  exception and a possible objection to that?  Really, because we

24  haven't had a chance yet to question the examiner.  I just --

25         THE COURT:  As to whether his report is a matter in

J&J COURT TRANSCRIBERS, INC.

Ordway - Direct                         31

1  evidence, in this proceeding?

2           UNIDENTIFIED ATTORNEY:  Yes.  Just as a matter of in

3  evidence, Your Honor.

4           THE COURT:  Well, you can raise objections to the

5  substance.  But, we have an appointed examiner.  The examiner

6  has filed a report.  You can disagree with it.  But, it's --

7  this is the report.  So for purposes of simply establishing

8  whether this is his report, it is in evidence.  You can object

9  to any part of it.

10          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11          UNIDENTIFIED ATTORNEY:  Your Honor, just because it

12 was filed by e-mail and not electronically, I just wanted to

13 make sure that it bore the Court's mark and that the witness

14 had an opportunity to identify that actual document that bears

15 the mark, as his own.

16          THE COURT:  Okay.  Fair enough.  In terms of making

17 sure we're dealing with the same pieces of paper, your point is

18 well taken.  But it is Exhibit 1, in evidence, as I indicated

19 at outset.  Is this the report that you prepared --

20          THE WITNESS:  Yes, Judge.

21          THE COURT:  -- Mr. Ordway?

22 Q    And turning to that report, the last exhibit is Exhibit 9,

23 which consists of three pages?

24 A    That's correct.

25 Q    And the last two pages of Exhibit 9 are what I will refer

Ordway - Direct                                    32

1  to it as alternative scenarios, or computations of total

2  damages --

3  A    That's correct.

4  Q    -- assumed liability?

5  A    That's correct.

6  Q    Could you just take a look at those two pages -- the first

7  of the two, first -- and just take us through those numbers, to

8  your bottom line conclusion?

9  A    Let me make sure we're looking at the same page.  This is

10 entitled --

11 Q    This one.

12 A    Got it.  This is the page entitled -- it's headed; "Jazz

13 Photo Corp. Examiner Damage Assessment, Including Wedding and

14 Party Packs, Prepared February 15th."  What I'm doing on this

15 chart is, I'm starting with the very first number, which is Mr.

16 Campos' calculation as to what the recall costs were, before

17 mitigation.  And what I'm doing on this chart is, I'm

18 reconciling down to what I would propose, instead, would be a

19 more appropriate claim.  And I'll just walk through this

20 quickly and I'll tie it to another chart, if you wish.

21       But, we looked at the components of what Mr. Campos

22 had prepared.  And we generally thought that his approach and

23 process was very reasonable.  We made two adjustments, with

24 respect to his recall cost.  One was which to give credit, for

25 the fact that some of the value that he was including for the

Ordway - Direct                          33

1   cost of recall from others, he didn't consider that the related

2   recall -- they did get the merchandise back.  And at very best,

3   they should have been able to salvage some of the components

4   from that recall.  So that's the first adjustment, where

5   instead of providing for $221,000 for other parties, we're

6   saying that's only 195.

7           We also looked at the sales -- or resale -- of the

8   product that was returned from Wal-Mart.  We had some detail

9   supporting that, that was part of an exhibit to Mr. Campos'

10  report.  Some of the transactions -- and Mr. Zatta had raised

11  this -- were to a related party.  And there was -- it was an

12  issue raised, as to whether that was an arm's length

13  transaction.  What we did here was, we simply applied the

14  average price that Jazz obtained, in connection with reselling

15  the returned goods and made an adjustment as to what the

16  mitigation was.  So to be clear, the actual mitigation was

17  $188,000 higher.  We're adjusting that downward, to consider

18  that maybe the transaction with Morris Benun was not quite

19  arm's length.  That's obviously debatable.

20          The next section, we are calculating what we believe

21  is a more appropriate loss/profits calculation -- which we can

22  get into in detail now or later, if you wish.  Okay.  Campos'

23  calculations, which -- if you don't mind, if I can refer to

24  another chart in my report, for a minute -- and this would be

25  Exhibit 5.  I beg your pardon.  Exhibit 6 would be a better

J&J COURT TRANSCRIBERS, INC.

1  chart to look at.  What Exhibit 6 does is reconcile on one

2  page, so the reader can see what the differences were between

3  his damage claim estimate and our damage claim estimate.  The

4  first line summarizes the four components of his claim.  And

5  the differences are reconciled to the bottom line, which is

6  what we believe is a more appropriate claim level.  I just

7  wanted to point out that the loss/profit component of Mr.

8  Campos' claims is three quarters of the claim.  It's $30

9  million out of $40 million.

10       In brief -- and I'll turn back to Exhibit 9 -- in

11 brief, he is sending this claim, based on sales they otherwise

12 believe that they would have made to Target; sales that they

13 otherwise would have made to Family Dollar; as well as a

14 variety of analyses, with respect to what the future sales

15 could have been to Wal-Mart.  We questioned, actually, all

16 three calculations that he did.  And as a matter of fact, we

17 felt that the Family Dollar analysis was inappropriate; that,

18 in fact, significant sales had occurred at Family Dollar in

19 1999 -- the year after -- the year during which the recall had

20 occurred and that they continued to grow, thereafter.

21       Similarly -- not similarly -- but we also decided

22 that although there were a variety of reasons that one could

23 point to, as to why Target no longer carried the product, we

24 believe that there's compelling evidence that Target made a

25 decision -- or could have made a decision -- not to carry the

Ordway - Direct                        35

1  product, for merchandising reasons.  It appears, from Mr.

2  Zatta's report, that he had information with respect to Target;

3  that they had concerns about the future viability of Jazz, that

4  they had concerns about the product.  It certainly might have

5  been related to the recall.  But the end of the story with

6  Target was that they decided not to carry any lower price point

7  -- opening price point -- merchandise, at all.  I would have

8  been sympathetic to a claim had, for example, they continued to

9  carry their private product -- their private label category --

10 or had they substituted Jazz product with Concord product.

11 They opted to only carry Fuji and Kodak into the subsequent

12 period of time.  So I was not sympathetic to including that, at

13 all.

14         The calculations that Mr. Campos did with respect to

15 lost sales with Wal-Mart, were based on looking at Wal-Mart's

16 overall growth in the subsequent period of time, principally,

17 and assuming that Jazz's revenues would have grown -- or sales

18 to Wal-Mart, rather -- would have grown in tandem, we don't

19 think that's very realistic.  A lot of Wal-Mart's growth was

20 international.  A lot of Wal-Mart's growth was in other product

21 categories.  We thought what was more appropriate was to look

22 at the actual sales of opening price point cameras -- single

23 use cameras -- that occurred.  And in fact, the information

24 existed and we looked at the information that Mr. Zatta had

25 accumulated.  An we thought that the highest claim that could

Ordway - Direct                                36

1  be asserted would be that Wal-Mart would not have chosen to use

2  a second source for its open point -- initial price point --

3  single use cameras and instead, had continued to use Jazz

4  solely for that purpose.

5          The six million dollars is the gross profit

6  calculation of all the Concord sales that occurred in this

7  period of time, with one exception.  And perhaps I could turn

8  people to another exhibit.  And that would be Exhibit 8.  On

9  Exhibit 8, where illustrating what Mr. Campos' loss/profits

10 were -- Mr. Zatta's -- and then, these are the three boxes

11 across the top of the page.  The box all the way to the far

12 right is -- summarizes our conclusions.  And the box at the

13 very bottom of the page summarizes how we decided to come up

14 with what the unit sales would have been during that period of

15 time.

16         We simply took the actual sales, which -- if I could

17 point out -- grew every year.  We picked up the sales that were

18 made by Concord, came up with a total.  And just a couple of

19 other observations about that.  You'll note that in 1999, that

20 the sales that were showing here are higher than the actual

21 sales that occurred in that period of time.  We took into

22 consideration that the recall highly likely caused a disruption

23 in service of Jazz providing the product to the company.  And

24 we concluded, instead, to do a trending analysis for the 1999

25 sales.  We took the 1998 sales and 2000 sales, and assumed that

Ordway - Direct                                    37

1    had the recall not occurred, that the sales would have trended

2    in a like manner.  So in other words, the sales at Wal-Mart

3    were affected by the fact that perhaps there was some period of

4    time that some stores didn't have stock.  So, we're giving them

5    that credit for that.  Using the gross margin calculations that

6    Mr. Campos had developed, we came up with our own loss sales

7    impact.  And that's $6,096,000 which again, if we can turn back

8    to Exhibit 9, those are the figures that appear at the bottom

9    of the page.  The subtotal, then -- including the recall cost,

10   as well as a loss margin.

11          And the one other item that Mr. Campos had, that we

12   don't was a dollar amount claim for the incremental cost of

13   borrowing, associated with using a factor.  We did not include

14   that here.  We assumed -- and again, this is based on some

15   information that Mr. Zatta had accumulated -- that the company

16   would not have been able to access normal, conventional banking

17   arrangements that might have been less costly; actually, based

18   on testimony from -- or deposition, rather -- from the CEO,

19   that said that they couldn't obtain financing for a variety of

20   reasons, but one of which was related to the ongoing litigation

21   with ITC and Fuji.  So, we excluded that from our calculations.

22          The arithmetic is fifteen million one.  And as the

23   very complicated dense chart -- the first chart on Exhibit 9

24   shows -- we looked at all of these outcomes with and without an

25   assertion that a wealthy charge of fifty-six cents a unit would

Ordway - Direct                                        38

1  be due.  So, that's why there's a subtotal at the bottom.  So

2  our total claim is fifteen one -- damage claim is fifteen one

3  -- or eleven million, eight thirty-three, depending on whether

4  the royalty applies.

5          Now, the calculation that we just walked through, we

6  think, is the highest claim that could be -- highest damage

7  claim -- that could be prepared here.  And on the first page of

8  Exhibit 9, we go through a litany of 21 different scenarios.

9  There's actually more, but we thought that these would be

10 representative of what the potential outcome could be here.

11 And we walked through a calculation, where we have the damage.

12 We have what was otherwise owed to Imation, for a receivable

13 that wasn't paid.  We're showing what we understand are the

14 estimated legal fees through this point in time, which was

15 provided to us by the Budd Larner firm.

16         We calculated interest, based on the damage claim.

17 We assumed that before a payment was made, there would be

18 another three years worth of interest.  The column that says;

19 "Impact of traveling," that's just two times the damage.  So

20 you get three times, in total,  to foot across.  And then we

21 present valued our calculations, using five percent, assuming

22 three years out.

23         The point is this; is that the largest number on the

24 page here is $49 million.  The other permutations and

25 combinations, the reader can read this.  But we're showing what

J&J COURT TRANSCRIBERS, INC.

Ordway - Direct                                    39

1   could occur if they're not troubled, what if professional fees

2   are not awarded, what if -- is excluded from the damage claim

3   are party packs?  There has been raised a number of issues as

4   to whether, had not the recall occurred, would these products

5   have been returned anyway, because of the sell through?  Again,

6   it's not -- I'll point to everyone in the courtroom here, that

7   the average of all these scenarios is about $22-21 million,

8   which is one of the reasons we concluded that $25 million

9   probably would not be unreasonable.

10  Q    Thank you.  Can we go through the same exercise with the

11  second of the two pages of Exhibit 9, which is in similar

12  format, but comes to a somewhat lower bottom line analysis?

13  And maybe you can just point out the differences, rather than

14  doing the line by line analysis.

15  A    Yes.  And to explain that -- this is complicated.  It

16  needed a lot of charts.  Exhibit 7 is an analysis of Mr.

17  Campos' damage claim.  And what we did here was, we broke out

18  the components of the claim, between party packs and all other

19  cameras that were returned.  The very -- if you look at the

20  chart in Exhibit 7, there's columns that are dollars in units.

21  The first two columns represent the party packs.  The cost that

22  we believe is related to the recall, applicable to party packs,

23  is $3,035,000 which -- if we turn back to Exhibit 9 -- is the

24  principal difference on this page, where we started with Mr

25  Campos' gross reclaim -- recall claim -- before mitigation, and

Ordway - Direct                                        40

1  were deducting out the party packs -- impact of the party

2  packs.  So the damages, instead of being fifteen one, are

3  reduced to eleven million seven thirty-five.  And that is one

4  of the scenarios that we're illustrating on the first chart in

5  Exhibit 9, which we think is definitely a possibility, that

6  that could be an outcome.

7  Q    So if I understand your testimony as to that last page,

8  it's the second line, which has the bracket of three million

9  thirty-five as the adjustment.  And then, I assume you applied

10  the fifty-six cent royalty to the lower number, and that's a

11  further difference?

12  A    That's correct.

13  Q    And you wrote it out to be --

14  A    That's correct.  Again, this is a rather complicated

15  presentation.  We tried to make it as simple as we could.  But

16  every one of these calculations, we did with and without a

17  royalty.

18  Q    And as your report indicated, in written form -- for all

19  of those reasons -- it is your considered opinion that a $25

20  million cash settlement and a waiver of the $1,500,000 judgment

21  award, in favor of Imation, is reasonable?

22  A    Yes.

23        MR. GREENBERG:  I have no further questions.  Thank

24  you, Your Honor.

25        THE COURT:  All right.  We can establish an order for

J&J COURT TRANSCRIBERS, INC.

                              Ordway - Direct                          41

1  further examination.  Whether we call it cross examination is

2  just a matter of terminology.  I would start with Mr.

3  Greenhalgh, if you're ready.

4          MR. GREENHALGH:  Well Your Honor, my suggestion would

5  be that I think the other side of the room does not oppose the

6  settlement.  And since Mr. Greenberg has moved it, I think the

7  --

8          THE COURT:  You want to hear all -- what you would

9  think is positive?

10         MR. GREENHALGH:  Yes.

11         THE COURT:  Fair enough.  I'll go with that.

12         MR. GREENHALGH:  Thank you.

13         UNIDENTIFIED ATTORNEY:  Your Honor, Fuji has no

14  questions for Mr. Ordway.

15         THE COURT:  I didn't think so.  Anyone else

16  supporting the settlement have any questions of this witness?

17  And so, we come back to Mr. Greenhalgh.

18         MR. GREENHALGH:  And I'm going to defer, again, Mr.

19  Schwartz in that argument.

20         THE COURT:  Fair enough.

21         MR. GREENHALGH:  Thank you.

22                          CROSS EXAMINATION

23  BY MR. SCHWARTZ:

24  Q    Good morning, Mr. Ordway.

25  A    Good morning.


                      J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                                    42

1  Q    My name is Joseph Schwartz.  I represent Jack Benun in

2  this proceeding.  We spoke on the phone the other day?

3  A    Yes.

4  Q    Would you take me through the chronology of when you were

5  actually appointed and what you did each day?  I think Mr.

6  Greenberg hit upon it, but I'd like to understand that a little

7  better -- over the last few days.

8  A    Sure.  We were -- I was contacted Thursday afternoon.  And

9  -- by the U.S. Trustee.  And we quickly assembled the related

10 applications, that evening.  We received a -- I'm sorry.  Let

11 me back up.  I got a call from the U.S. Trustee Wednesday

12 evening.  I went to visit with the U.S. Trustee's office in

13 Philadelphia.

14 Q    And what day was that?

15 A    Thursday morning.  We met for an hour or so; hour and a

16 half.  They were interviewing me, to make sure that it was

17 appropriate to engage me.  They gave me a package of

18 information, that had the expert reports in them -- a couple of

19 other documents -- which I was able to read on the train,

20 coming back from Philadelphia.  I went back to my office that

21 afternoon, immediately got on the phone and started to organize

22 interviews, starting with Mr. Fraza, because we understood that

23 he had some other commitments and might not be available.

24       We worked into the evening, reading the documentation

25 that we had.  We checked up on SEC information regarding

Ordway - Cross/Schwartz                                    43

1  Imation, that day.  The very next day, Mr. Novack and Mr. Fraza

2  were kind enough to let us use their offices for the whole day.

3  They gave us a conference room.

4  Q     This is Friday?

5  A     Yes, this is Friday.  And during which we spent some time

6  with Mr. Novack, Mr. Fraza, and Mr. Campos.  Later in the

7  afternoon, we spent time with Mr. Zatta, from Wissen Co.

8  (phonetic).  We worked into the evening.  Saturday morning, we

9  had a conference call with Mr. Stoeri -- for quite some time --

10 just to hear his point of view.  On Saturday and Sunday, we

11 continued to read, because there was quite a bit to read from

12 -- in all the information that we had accumulated -- and

13 continued to analyze -- started to assemble our report.  We

14 looked at different scenarios and how to construct the damages;

15 did a lot of financial analysis.

16        On Monday, we had additional conversations.  We spoke

17 with counsel with Stroock.  We spoke with counsel from the

18 Duane Morris firm.  And we spoke with Howard, from the

19 Greenberg firm.  And in between all these interviews and the

20 phone -- which most of them were on the phone that day -- we

21 also continued to read and to look at the numbers.  Went

22 through different iterations, you know, as we were being

23 thoughtful about this.  Tuesday was principally just wrapping

24 up our report and delivering it.

25 Q     Isn't it true that when you were speaking with Mr. Fraza,

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                    44

1  that he told you that he felt uncomfortable in speaking to you

2  about the merits of the litigation, per se, given the fact that

3  the trial was underway?

4  A    Yes.  He did make that reservation.

5  Q    And did he give you any opinion, as to whether or not the

6  settlement was reasonable?

7  A    Yes.  He thought that the more appropriate settlement

8  would be a much higher number.

9  Q    And what -- and did he tell you why he thought that?

10 A    Because of the merits of the case.

11 Q    Let's go back to your education for a minute.

12 A    Sure.

13 Q    You had indicated you graduated from Rutgers?

14 A    Yes, that's right.

15 Q    Undergrad?

16 A    Yes.

17 Q    Did you -- do you have any post-graduate?

18 A    No.

19 Q    You're not a lawyer?

20 A    No.

21 Q    And you have no training, at all, as a lawyer; never take

22 any legal classes, et cetera?

23 A    To become a CPA, you have to take some business law

24 courses.  So, I just took two courses in business law.

25 Q    Have you ever worked on any cases, where the company at

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                         45

1   issue was a camera manufacturer or a camera distributor?

2   A    I worked on the Polaroid bankruptcy.

3   Q    Was that case -- was that with single use cameras?

4   A    No.  This is the first time I've ever had any involvement

5   with a single use camera.

6   Q    I'd like to point you to the -- Page 7 of your report --

7   which is Exhibit 1.  And specifically, Roman Number 2 --

8   A    Yes.

9   Q    -- on the top.  You say there that you have no opinion on

10  liability.  So you have no opinion on liability, whatsoever --

11  whether or not there be liability proved here, correct?

12  A    That's correct.

13  Q    So your report, essentially, comes to the conclusion that

14  the settlement is reasonable, based upon damages only?

15  A    I'm coming to the conclusion that there is a possibility,

16  because I'm not weighing the liability.  I'm not making some

17  judgment as to is it 30/70 or 20/80; as to what the outcome

18  could be, with liability.  What I'm instead concluding -- after

19  reading transcripts and presentations that both sides have made

20  -- that this is a very complex litigation, that there's a lot

21  of expert testimony that would be provided that's very

22  technical, complicated, and that there's no certainty as to

23  which way the case could come out.

24  Q    Do you have any opinion with respect to whether or not

25  Jazz would be successful on its punitive damage claim?

Ordway - Cross/Schwartz                                    46

1  A    I think that there is a chance that they might not be

2  successful.

3  Q    And why do you say that?

4  A    Just given the complexity of prosecuting the case, in the

5  first place.

6  Q    So it's your testimony that in any case, there is a chance

7  that somebody can be successful or somebody can be

8  unsuccessful?

9  A    That's right.

10 Q    Are you aware of the allegations against Imation, in terms

11 of the allegations regarding Imation's predatory practices and

12 things of that nature?

13 A    No, I'm not.

14 Q    Have you reviewed any documents, where Imation said things

15 like; this is a competitor.  Let's not help them out -- things

16 like that?  Did you review documents --

17 A    Yes, I read that.  That was mentioned in Mr. Fraza's -- in

18 one of his documents or one -- in his transcript.

19 Q    Did you see the actual e-mails?

20 A    I beg your pardon?

21 Q    Did you see the actual e-mails?

22 A    I saw e-mails that were connected with that, yes.

23 Q    Are you familiar with the RICOH claim that's asserted by

24 Jazz?

25 A    I understand there's a RICOH claim that's asserted.


*J&J COURT TRANSCRIBERS, INC.*

Ordway - Cross/Schwartz                              47

1 Q    And do you give any opinion, with respect to that claim?

2 A    No.

3 Q    Are you aware that Jazz has already proven three out of

4 the four elements of RICOH, in connection with the District

5 Court litigation?

6 A    I was informed that the Budd Larner felt comfortable that

7 they were able to support three to four positions, necessary to

8 assert that.

9 Q    Are you familiar at all with the law, regarding whether or

10 not Jazz would be successful on its claim, to get reimbursed

11 its legal fees?

12 A    I'm generally familiar with that.

13 Q    And what is your understanding?

14 A    I'm led to understand that they could get their legal

15 fees, if there is -- they are able to demonstrate fraud.

16 Q    I'd like you to now look at Page 4 of your report.  And in

17 connection with that, I'd like you to look at the exhibit that

18 you were looking at earlier, which is Exhibit 9.  And

19 specifically, the second to last page.  There's two exhibits --

20 three Exhibit 9s.  The second one.  First, you say -- on Page 4

21 of your report -- that you found Mr. Campos' calculations,

22 vis-a-vis, the Wal-Mart recall damages, to be reasonable.  And

23 you believe that, as you sit here today, correct?

24 A    Yes.

25 Q    Yet, you deducted certain amounts from the Wal-Mart recall

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                        48

1  claim?

2  A    Yes.

3  Q    And specifically, you deducted $188,655.  Do you see, on

4  Exhibit 9, where I'm talking about?

5  A    Yes.

6  Q    And why did you do that, again?  Why did you reduce it by

7  $188,655?

8  A    There was -- some of the sales of the returned product

9  were to Jack's brother, at one dollar.  Now, we understand that

10 there are different qualities of the product that was returned,

11 as a consequence of testing.  But nevertheless, we didn't

12 believe that -- we believed that that could be challenged, in

13 terms of its arm's length nature.  And in determining a -- the

14 mitigation -- did the company make a sufficient effort to

15 mitigate, by way of selling it to his brother?  The adjustment

16 we made was using the average selling price to all other third

17 parties.

18 Q    Do you have any reason to believe that those cameras were

19 sold for an insufficient amount?

20 A    Based on the sales to all other parties, that's the

21 conclusion that we're coming with -- to here -- in coming up

22 with a number.

23 Q    Do you know whether those specific cameras could have been

24 sold to those other third parties?

25 A    I think that they could have.


J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                              49

1  Q    And why do you think that?

2  A    For -- one reason, really, is in Zatta's report.  He is

3  quoting some depositions that were taken by some of the Jazz

4  sales employees, who argued -- or stated, rather -- that they

5  felt that they could have received much higher prices for all

6  of the product that was sold or mitigated.  And as a matter of

7  fact, we considered -- for a while -- whether we would even

8  calculate, using a higher mitigation factor, but concluded not

9  to.

10  Q    So you're basing the reduction by 188,000 solely on a

11  report that was prepared by Imation's expert, concerning

12  whether or not this --

13  A    His citation of a deposition in his report.

14  Q    Whose deposition was that?

15  A    It was one of -- it was a sales person.  I don't recall

16  the name.

17  Q    A sales person from --

18  A    Who was employed by Jazz, or formerly employed by Jazz.

19  Q    You don't recall the name of the person?

20  A    No.

21  Q    Okay.  You also reduced the Wal-Mart rejection damages by

22  $26,000.  And Mr. Greenberg touched upon it, but can you

23  explain why that was reduced by 26,000?

24  A    Yes.  In connection with Mr. Campos' calculations, he

25  provided for a theoretical salvage value to cameras that

Ordway - Cross/Schwartz                          50

1  weren't otherwise refurbished by Wal-Mart by a third party or

2  weren't otherwise directly resold -- in other words, if they

3  were reworked.  He didn't provide any of that, with respect to

4  these other returned cameras.  And we assume that there would

5  have been some salvage value to these cameras, instead of just

6  the straight loss on the cost of the return.

7  Q    But you don't know whether, in fact, there was some type

8  of return or whether Jazz was even able to get some type of

9  return?  You're just assuming it, because there's some cameras

10 that apparently were not accounted for?

11 A    We feel pretty comfortable that the numbers that appeared

12 in Mr. Campos' report do, in fact, represent returns to some

13 other parties, in connection with his calculation.  He is

14 assuming all of these are lost.  And there must have been some

15 salvage value to them.  It couldn't have been zero.  Well, it

16 could have been zero, but we don't -- we wouldn't provide that.

17 That was an insufficient effort to mitigate the cost of the

18 recall -- or the returns, rather.

19 Q    Any chance that could be somewhere between zero and

20 26,000?

21 A    It could be zero.  But in our judgment, we thought that

22 there should be some credit given, for mitigation -- for

23 salvage, rather.

24 Q    You gave a hundred percent.  26,000 is a hundred percent.

25 Is there any chance it could be somewhere lower than a hundred

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                            51

1   percent?

2   A    Sure.

3   Q    And the same thing, with respect to the 188,000 that was

4   sold, apparently, to Mr. Benun's brother?  Any chance that that

5   could have been sold for less than 188,000?

6   A    If you're asking me if that's possible, sure.

7   Q    Now, let's talk about the party packs camera -- the

8   wedding pack cameras.

9   A    Yes.

10  Q    You deducted $3,035,315 from Mr. Campos' damage report?

11  A    That's correct.

12  Q    And you say, in your report, that there is evidence that

13  these cameras may have been returned to Jazz, anyway, due to

14  their limited success in sell through by Wal-Mart.  What are

15  you talking about there, in terms of evidence?

16  A    Yes.  The evidence that we saw was in Mr. Zatta's report.

17  He had some reference to a e-mail (sic).  As a matter of fact,

18  we have a copy of the e-mail from Wal-Mart, saying that the

19  product was selling through very poorly, that there were a

20  number of weeks of product on hand, and that they were anxious

21  to have that product returned.  In our opinion -- in our

22  experience with Wal-Mart -- we concluded that even if there was

23  not a recall, Wal-Mart is not very anxious to carry a product

24  that doesn't sell very well and probably would have sought to

25  return that, in any instance.


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                         52

1  Q    Are the cameras that are contained in the multi-packs the

2  same as the cameras that are sold singularly?

3  A    As I understand it, they're the same cameras.  They're

4  just packaged differently.

5  Q    And if they're packaged differently and they're the same

6  cameras, isn't there a chance that they had the same magenta

7  problem that the single cameras did?

8  A    That's certainly possible.

9  Q    And so if that's true, isn't it possible that the cameras

10 were returned to Jazz, as a result of that magenta problem and

11 not because of some e-mail that apparently Mr. Zatta relied on?

12 A    That's correct, which is why we're showing the scenario

13 with the party packs and without it.

14 Q    Do you know who that e-mail came from, by the way?

15 A    I don't recall.  It was a copy of an e-mail from a

16 Wal-Mart employee.

17 Q    And do you know what the e-mail said, exactly?

18 A    I don't recall, precisely.  But it was commenting on how

19 well -- or how poorly, rather -- the party pack product was

20 selling.

21 Q    Isn't it possible that that employee piggybacked on the

22 magenta problem and simply came up with the idea, let's give

23 this stuff back, too?

24 A    That's certainly possible.

25 Q    Did you read Mr. Campos' report -- that was dated June 4,

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                          53

1  2003 -- which criticized Mr. Zatta's findings?

2  A    Yes.

3  Q    And in that report, Mr. Zatta refers to an Exhibit P-280,

4  which was a series of e-mails between Wal-Mart and Jazz, where

5  a person at Wal-Mart writes about a customer who returned

6  wedding packs, because the prints came out with magenta

7  problems?

8  A    Yes.

9  Q    And yet, you still think that it's very possible that the

10  wedding packs were returned for reasons other than the magenta

11  problem?

12  A    I'm saying it could have been.  Had there not been a

13  recall, these products may have been returned anyway.

14  Q    But it's very possible that those were returned, as a

15  result of the magenta problem?

16  A    Yes.

17  Q    Let's talk about factoring costs for a minute.  You say --

18  and I'm looking at Page 5 of your report -- and it's under

19  Subsection B.

20  A    Yes.

21  Q    You say there is evidence to suggest that Jazz would not

22  have been creditworthy, in any instance, due, in large part, to

23  its other legal issues.  What evidence and what exactly were

24  you talking about here?

25  A    Yes.  In Mr. Zatta's report, he is citing a deposition

Ordway - Cross/Schwartz                    54

1  from the CEO of Jazz, saying that the company couldn't obtain

2  conventional bank financing.

3  Q    And do you know what Jazz's financial position was, at

4  this time?

5  A    At the time of the testimony -- or the deposition -- I'm

6  not --

7  Q    I'm asking you --

8  A    I'm sorry.

9  Q    -- not at the time of the deposition.  I'm asking you at

10 the time it had to obtain this alternate financing.  Were you

11 aware of Jazz's financial position?

12 A    Yes.

13 Q    And what financial position was that?

14 A    Well at the time, the company had a significant claim

15 recorded on its books and had a negative deficit.

16 Q    What about in 1998 -- at the end of 1998 -- at the time of

17 the recall?

18 A    Well, the recall was accounted for in 1998.  So in months

19 prior to that, they were doing very well.

20 Q    So at the time of the recall, they were doing very well?

21 Is that your testimony?

22 A    It appeared that they were doing well.

23 Q    Did they have any lines of credit with Hong Kong banks?

24 A    Yes.

25 Q    And do you know how much those lines of credit were for?

Ordway - Cross/Schwartz                    55

1  A    I don't recall, but I know that they had arrangements with

2  Hong Kong Shanghai Bank and CitiBank in Hong Kong.

3  Q    Did they have to borrow from a factor, at that time?

4  A    I believe that they were borrowing from a factor in 1998.

5  Q    And do you know how much they were borrowing from a factor

6  in 1998?

7  A    No.

8  Q    Was it more or less than they had to borrow in 1999

9  through --

10 A    They had -- I'm sure that they had to borrow much more in

11 '99 and subsequent years, because arrangements with customers

12 changed, such that I think that they -- instead of buying with

13 letter of credit arrangements, that they were buying on account

14 -- open account.  So, they -- I'm sure that they had to borrow

15 more.

16 Q    Okay.  You talk about legal issues.  And explain what you

17 mean by legal issues?  That was the reason that Jazz supposedly

18 --

19 A    Yes.  Because of the litigation with Fuji and ITC.

20 Q    And the litigation with Fuji and ITC, was that going on at

21 the end of the 1998?

22 A    No.  The damage claim that is trying -- that Campos is

23 asserting -- is for 1999 and subsequent periods, as it relates

24 to interest.

25 Q    Do you know how much the total amount of Jazz's legal fees

Ordway - Cross/Schwartz                              56

1  were, during the 1999, 2000 and 2001 periods?

2  A    No.

3  Q    If I were to tell you that it was about one and a quarter

4  percent of its total sales, would that surprise you?

5  A    Their legal fees, as a percentage of their sales?

6  Q    Yes.

7  A    I don't know what that calculation is, but I wouldn't be

8  surprised if their legal fees were very significant.

9  Q    If I were to tell you that in 1999, the legal fees were

10 190,000, would you have any reason to object to that?

11 A    It sounds like a low number.

12 Q    And in 2000, if I were to suggest that the legal fees were

13 $480,000 -- or in that range -- do you have any reason to

14 object to that?

15 A    That also sounds like a low number.

16 Q    And in 2001, if I were to tell you that the legal fees

17 were approximately $600,000, would you have any reason to

18 object to that?

19 A    That also sounds like a low number.

20 Q    If I were to tell you that those legal fees stem from the

21 Fuji and ITC litigation, without regard to the Imation

22 litigation, would that change your answers?

23 A    No.

24 Q    So if it weren't for the Imation litigation, isn't it

25 possible that the legal fees that were incurred by Jazz -- as a

Ordway - Cross/Schwartz                    57

1  result of the Fuji/ITC litigations -- were relatively small?

2  A    They appear to be small.

3  Q    And when did Fuji ultimately get its judgment against

4  Jazz?

5  A    I don't know the exact date.

6  Q    Was it before or after the recall?

7  A    It was after the recall.

8  Q    So don't you think that it's possible that this problem in

9  obtaining conventional financing was more due to the recall

10  than it was to any other legal fees associated with Fuji and

11  the ITC?

12  A    I'm not giving the recall any weight, one way or the

13  other.  What I'm relying on is the fact that this other

14  litigation existed.  And the deposition from the CEO stated

15  that he couldn't receive financing, anyway.  It was because of

16  the Fuji litigation.  That's what his deposition says.

17  Q    That's what his deposition says?  It doesn't say because

18  of the Imation litigation?  It doesn't say because of

19  litigation?

20  A    It might say both, but he included Fuji in that.

21  Q    Do you know if -- as a result of the recall -- the terms

22  of the debtor's cash flow changed, with respect to both its

23  vendors and also, with respect to its sales to Wal-Mart and its

24  payment terms of Wal-Mart?

25  A    I understand that they did.


J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                        58

1  Q    So do you understand that they got worse or better, as a

2  result?

3  A    They got worse.

4  Q    So if the legal fees went up because of the Imation

5  litigation, and if the terms with Wal-Mart and its other

6  vendors got worse, as a result of that recall, isn't it

7  possible that its financial situation got worse, leading to it

8  being unable to obtain conventional financing?

9  A    Yes.

10  Q    And yet, you deduct the whole $3,035,315 from your

11  analysis.

12  A    No.

13  Q    Can you explain that?

14  A    That's not the number I deducted.  It's one million four

15  thirty-eight, I believe.

16  Q    I'm sorry.  One million four thirty-two.  And you deduct

17  the whole --

18  A    Yes.  And that is -- that's Campos' number, which refers

19  to the incremental cost of dealing with a factor.  And my point

20  is this; is I don't know that they -- I don't believe that they

21  could have done anything else, other than deal with a factor.

22  Q    Yet, we just went through the fact that the legal fees

23  increased -- primarily as a result of the Imation litigation --

24  and its sales and its terms with Wal-Mart and its vendors

25  changed, to its detriment, as a result of the recall.  Yet,

Ordway - Cross/Schwartz                          59

1  your testimony is that you believe that they would have had to

2  obtain unconventional financing, in any event?

3  A    Yes.

4  Q    Why do you believe that?

5  A    Well, the dollar amount of legal fees aren't relevant to

6  whether there was outstanding litigation.  I don't see the

7  connection to that.  They had outstanding litigation with the

8  ITC and Fuji.  And I think that would make it very difficult

9  for any company to obtain conventional financing from a major

10 bank.

11 Q    Why is that?  Any company that's in litigation and has

12 unsubstantial legal fees can't get conventional financing?  Is

13 that what your testimony is?

14 A    No.  What I'm saying is, that a company that has

15 litigation of the sort with Fuji -- that could actually put

16 them out of business -- that that would be very difficult to

17 get conventional financing.

18 Q    So, that's why you believe it; because you believe that

19 this litigation with Fuji was substantial?  And so as a result,

20 they had to go to factor out, as opposed to the conventional

21 route?

22 A    Yes.

23 q    And there's no possibility that the amount of the extra

24 incremental financing costs could have been attributed to

25 something other than that?  It couldn't have been attributed to

J&J COURT TRANSCRIBERS, INC.

**Ordway - Cross/Schwartz**                                    60

1  the recall?

2  A    The fact of the matter is, it -- probably, all of this

3  came into play.  What I'm saying is, even without considering

4  the recall, that they would have had difficulty of securing

5  traditional, conventional financing.

6  Q    Isn't it possible that perhaps some of the unconventional

7  financing would not have had to have been obtained, had the

8  recall not occurred and had the problem with Imation not taken

9  place?

10  A    I'm not -- what Campos is raising, as a claim, is not

11  whether the company needed additional financing.  It was the

12  arrangements that they needed to -- that were available to

13  them.  I'm not debating whether events occurred that required

14  that they had more financing or not.  What's being challenged

15  here is the pricing.

16  Q    Well, if they would have obtained less financing, they

17  would have had to pay less for it, isn't that true?

18  A    Yes.

19  Q    Let's talk now about loss/profits.  In your report, on

20  Pages 5 to 6, you talk about opening price point sales.  Can

21  you explain to the Court what that means?

22  A    Yes.  Within a category of merchandise that a retailer

23  would carry in its stores, the lowest price point is commonly

24  referred to as an opening price point.  And a lot of merchants

25  will -- or retailers, rather -- will use a strategy of carrying

Ordway - Cross/Schwartz                        61

1  two, three, four different price ranges.

2  Q    Are you aware that during the 1999 through 2001 time

3  period, that Jazz was, by law, the only company that could

4  legally sell reloaded, single use cameras in the United States?

5  A    Yes.

6  Q    And yet, you give credence to the fact that Wal-Mart would

7  have, nevertheless, bought from some other discount seller

8  during that time period?

9  A    I'm giving the company credit, for the fact that the sales

10 -- or the purchases, rather -- from another opening price point

11 company could have been theirs.

12 Q    Yet, you say on Page 6 of your report, that you believe --

13 and I'm quoting, from the second paragraph -- it's actually the

14 first full paragraph, in the middle.  It says; "I believe that

15 the defendants" -- meaning Imation -- "may be successful in

16 arguing that there should be little or no loss/profits claim,

17 as they confer the position that Wal-Mart decided, as an

18 obvious and prudent measure, to have a second source for this

19 product category, given Jazz's other legal problems and their

20 potential financial impact."  Why do you believe that?

21 A    Why do I believe that Wal-Mart would have opted to get a

22 second source?

23 Q    Yes.

24 A    Given the financial condition of the company -- as a

25 consequence of the recall or as a consequence of the Fuji

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                        62

1   litigation -- it's not unreasonable -- and especially, for

2   somebody like Wal-Mart -- that they would be concerned about

3   making sure they had an adequate supply of opening price point

4   merchandise.  And it's not at all unusual that they would

5   consider a backup or a second source for that product -- just

6   as a conservative measure.

7   Q    And what due diligence did you do, to come to this

8   conclusion?

9   A    I guess a couple of things.  First of all, I've worked

10  with a number of retailers and a number of companies that

11  provide merchandise to Wal-Mart.  And I'm familiar with how

12  Wal-Mart conducts its business.  And although they usually pick

13  one company to be their opening price point, I'm also very

14  familiar with the fact that merchants who are responsible for

15  making sure that shelves are filled with product, don't put the

16  wrench on companies that might have a difficult situation --

17  whatever the factors are.

18  Q    Okay.  So you just said, Wal-Mart generally deals with one

19  discount seller, correct?

20  A    Yes.

21  Q    And in 1998, was that only discount seller Jazz?

22  A    Virtually so.

23  Q    Well, when you say virtually so, what do you mean?

24  A    I think they had a majority, like over 90 percent.

25  Q    Was it closer to almost a hundred percent?

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                                63

1  A    Probably.

2  Q    And yet, you --

3  A    I think Concord had 10,000 units, or something like that,

4  which probably gets it to Jazz having 98, 99 percent.

5  Q    And was Concord the second source -- the other one or two

6  percent?

7  A    Yes.

8  Q    And was there any other discount seller?

9  A    Not that I'm aware of, from the information I had

10  available to me.

11  Q    And in 1999, did Wal-Mart make a decision to bring Concord

12  on board and start increasing the amount they bought from

13  Concord?

14  A    Yes.

15  Q    And you say that although they only had primarily one

16  discount retailer, this might have been due to something other

17  than the fact that of the -- than the recall?

18  A    To the Fuji litigation.  Concord was a Fuji licensing.

19  Q    Are you aware that Mr. Benun had some issues with Concord,

20  at one point?

21  A    I'm aware of that.

22  Q    And are you aware that Concord will do anything in its

23  power -- or will do anything in its power, at that time -- to

24  hurt Mr. Benun, as a result of that?

25  A    I'm not aware of that.

Ordway - Cross/Schwartz                    64

1  Q    And are you aware that Concord is not a single use camera,

2  reload seller?  Instead, it sells single use cameras that are

3  new?

4  A    Yes.  I am aware of that.

5  Q    And are you aware that Concord's production costs are much

6  higher than Jazz's production costs --

7  A    Yes.

8  Q    -- as a result of that?

9  A    Yes.

10  Q    And would -- if I were to suggest to you that those

11  production costs were 15 to 20 percent higher, would that

12  surprise you?

13  A    No.

14  Q    And yet, Concord was selling to Wal-Mart, to stay

15  competitive with Jazz.  Do you have any idea why it did that?

16  A    I don't know why they did it, but I know they did it.

17  Q    Do you know if Concord was making money or losing money,

18  as a result of this?

19  A    It's possible that they didn't make very much money.

20  Q    And might it have been because they saw an opportunity,

21  because of the Imation problem and they figured, you know,

22  let's screw Jack Benun?

23  A    They probably saw an opportunity to make money.

24  Q    Yet if they weren't making money, because their production

25  costs were higher, wouldn't that be a lie -- that answer?

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                    65

1  A    It doesn't -- just because their production costs are

2  higher, doesn't mean they weren't making money.  I don't know

3  the answer.  I don't know what the reason was -- why they did

4  business with Wal-Mart -- other than they're capitalists and

5  want to do business, just like everybody else.

6  Q    Why did, in your report, did you only take into account --

7  in calculating the loss/profits -- sales that were made by

8  Wal-Mart to -- purchases by Wal-Mart from Concord, and not from

9  another camera manufacturer, such as Fuji or Kodak?

10 A    Sure.  I was looking at the opening price point category,

11 which I'm treating the Concord sale as being opening price

12 point.

13 Q    And what's the difference in prices, between a Fuji camera

14 and a Jazz camera?

15 A    I don't remember, exactly.  But there was a spread between

16 the pricing, at retail.

17 Q    Aren't the Kodak and Fuji single use cameras relatively

18 low priced merchandise?

19 A    Relatively.

20 Q    You wouldn't consider them luxury items, would you?

21 A    No.

22 Q    So isn't it possible that by virtue of the recall, some of

23 Jazz's market share got gobbled up by Fuji or Kodak?

24 A    It's possible.

25 Q    But yet, you didn't take that into account in your report?

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                          66

1  A    No.  I think that consumers -- one of the reasons I didn't

2  take that into account is -- even without considering Concord's

3  sales -- that the sales that Jazz had to Wal-Mart increased and

4  increased substantially year over year, even after the recall.

5  Q    But didn't the trend in single use cameras also increase

6  expedentially, during this time?

7  A    I know that overall, single use cameras -- market wide --

8  increased.  But I don't know what happened, with respect to

9  Fuji and Kodak camera sales at Wal-Mart.

10 Q    What about the sales of single use cameras that are

11 reloaded?  Do you know the growth trend for those?

12 A    No.

13 Q    If I were to tell you that it was more than a hundred

14 percent, would that surprise you?

15 A    No.

16 Q    Let's talk about Target for a minute.

17 A    Sure.

18 Q    In your report, you say that there is evidence that the

19 discontinuance of purchasing Jazz products may have been due to

20 a merchandising decision and the recall had no bearing.  And

21 I'm reading the top of Page 6.  What evidence are we talking

22 about here?

23 A    Yes.  In Mr. Zatta's report, he's referring to some

24 depositions from some representatives from Target.  And

25 although the Target representative comments on a variety of

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                          67

1  considerations that came into play -- with respect to no longer

2  carrying Jazz product -- what I thought was the most compelling

3  was that their initial merchandising strategy was to carry a

4  private label, a Jazz product, Fuji and Kodak, and that they

5  opted to just -- in the future -- carry Kodak and Fuji.  In

6  other words, they dropped their private label and they dropped

7  Jazz, but they never replaced it with another lower price point

8  product.

9  Q    And when did this decision take place?

10  A    I don't know the exact time frame, but it was after the

11  recall.

12  Q    Shortly after the recall?

13  A    Sometime after the recall.

14  Q    Isn't it possible that they decided not to use Jazz

15  anymore, as a result of the recall?

16  A    It's possible that they decided not to use them, as a

17  result of the recall.

18  Q    Yet, you give no credibility to that in your report.  And

19  in fact, all of Mr. Campos' damage calculations -- with respect

20  to the loss of sales by -- from sales to Target, you don't

21  include any of those.

22  A    That's right.

23  Q    Can you explain that?

24  A    That's right.  I'm relying on the conclusion to change

25  their merchandising strategy, as a reason for eliminating that.

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                           68

1  Q    Did you read the deposition testimony that you're talking

2  about today?

3  A    It was quoted in Mr. Zatta's report.

4  Q    So if it was quoted in Mr. Zatta's report, it has to be

5  true?  Is that your testimony?

6  A    I'm relying on the information, not only Mr. Campos'

7  report, where there -- if they cited quotations or they have a

8  piece of evidence -- I'm assuming it's accurate.

9  Q    Wouldn't you think that, given the fact that the damages

10 -- as a result of lost sales to Target -- because they are

11 calculated to be so large, don't you think you should have

12 looked at the deposition testimony, to determine whether or

13 not, you know, that's what the guy said?

14 A    If I had more time, I would have done that work.  I would

15 have looked at the depositions -- the individual depositions.

16 Q    So is it your testimony that you weren't able to conduct

17 full due diligence, because you didn't have enough time?

18 A    No.  I felt satisfied with the level of due diligence that

19 I did.  I'm just explaining to you, if someone gave me one more

20 week, that would be a step that I would have conducted.

21 Q    Why --

22 A    I felt comfortable relying on Mr. Zatta's quotations.

23 Q    I don't mean to take you out of order here --

24 A    Yes.

25 Q    -- but I can direct your attention to Page 8 of your

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                          69

1  report and specifically, the last paragraph.  You say --

2  A    I'm sorry.  I'm sorry?

3  Q    Page 8, your report?

4  A    Oh, okay.  I thought you said Exhibit 8.  Got it.

5  Q    And it's in the last paragraph, in the middle.  It says;

6  "Additional information may alter my thinking, especially

7  regarding the matter of liability and accordingly, may result

8  in me changing my position" -- "my opinion, regarding the

9  reasonableness of the proposed settlement."  Did you include

10 that provision in there, because you didn't have enough time to

11 do -- complete due diligence?

12 A    I included that, just because I know I didn't look at

13 every single piece of paper related to this matter.  And I'm

14 just making it clear that that's right.  We didn't look at

15 every single piece of paper.  And is there something else out

16 there, that would change our opinion.  Of course, there could

17 be.

18 Q    And if I were to suggest to you that Imation will not

19 agree to pay the $25 million, because as part of this

20 settlement, it requires a release from Jazz Hong Kong.  Yet,

21 Jazz Hong Kong can't give that releases, because it's in

22 liquidation, itself.  And the liquidator wont' give that

23 release.  So as a result, Imation will not pay the money.  Will

24 that change your thinking?

25            UNIDENTIFIED ATTORNEY:  Your Honor, before Mr. Ordway

                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                          70

1  answers, many of these questions are assumed facts, not in

2  evidence.  We understand that.  There was no opportunity for a

3  deposition.  So of course, we give Mr. Schwartz wide latitude

4  with the witness.  But obviously, with respect to this issue,

5  that's an unsettled issue.  It assumes the fact, now it's in

6  evidence.  Again -- I guess again, it asks him to express his

7  opinion, with respect to the fact.  But we would just note our

8  objection.

9          MR. SCHWARTZ:  That's all I'm asking for, Your Honor,

10 his opinion.  If that, in fact, were true, would his thinking

11 be different?

12         THE COURT:  You mean, if the settlement could not be

13 concluded for one or another reason, would that affect his

14 judgment as to whether the settlement is reasonable?

15         MR. SCHWARTZ:  Yes.  If Imation were not --

16         THE COURT:  Well, who wouldn't answer that question

17 affirmatively?

18         MR. SCHWARTZ:  Well, but --

19         THE COURT:  But if you have evidence that this

20 settlement can't be concluded, you better put it before this

21 Court.

22         MR. SCHWARTZ:  Well Your Honor, that might be

23 something that we put before the Court --

24         THE COURT:  Move along.

25         MR. SCHWARTZ:  -- before --

                    J&J COURT TRANSCRIBERS, INC.

**Ordway - Cross/Schwartz**                               71

1          THE COURT:  Move along.  The objection is sustained.

2          MR. SCHWARTZ:  Thank you, Your Honor.

3    Q    Family Dollar, is that the other --

4    A    That's right.  Family Dollar, Target and Wal-Mart were the

5    ones --

6    Q    Family Dollar; you didn't include them either, right, as

7    part of the damages?

8    A    Yes.  I looked at the information that existed, regarding

9    Family Dollar sales -- actual sales.  And the actual sales to

10   Family Dollar increased -- frankly, significantly -- year over

11   year, even after the recall.  And --

12   Q    As did the trends in the industry, correct?

13   A    Yes.

14   Q    And so, you give no credence to the fact that the sales to

15   Family Dollar might have increased, even more expedentially,

16   without the recall?

17   A    Here's what I believe.  I believe that Family Dollar would

18   have bought as many cameras as they could possibly sell through

19   their stores.  They did buy more cameras each year, year after

20   year, in the period after the recall.  And I have no reason to

21   believe that they were reluctant to buy this product, because

22   of the recall.  They wouldn't have bought any, if they were

23   concerned about the quality of the product.

24   Q    Do you know whether they got some second discount retailer

25   -- discount seller -- such as Wal-Mart?

                    *J&J COURT TRANSCRIBERS, INC.*

Ordway - Cross/Schwartz                          72

1  A     I'm sorry.  I don't understand the --

2  Q     Do you know whether they got a second discount seller for

3  cameras --

4  A     No, I don't know.

5  Q     -- as did Wal-Mart?

6  A     I don't know.

7  Q     So --

8  A     I don't know if that developed before or after, but I was

9  able to see that their sales grew.

10 Q     So you give no credence, at all, to the damage calculation

11 with respect to either FAMILY Dollar or Target?

12 A     That's right.

13 Q     You -- have you ever heard of Wal-Mart's plan a gram

14 program?

15 A     Yes.

16 Q     Do you know what that is?

17 A     Yes.

18 Q     What is it?

19 A     A planogram is how you lay out the use of your store; how

20 you dedicate shelf place.  It usually gets down to the detail

21 of how many square feet you're dedicating to different

22 products; you know, what you're putting on different racks.

23 Q     And do you know what Wal-Mart's standard position was,

24 vis-a-vis the planogram program?

25 A     What their standard position was?

J&J COURT TRANSCRIBERS, INC.

**Ordway - Cross/Schwartz**                    73

1  Q    Yes.

2  A    No.

3  Q    If I were to suggest to you that they gave their suppliers

4  six to eight months in advance notice of what they were going

5  to buy, as part of this planogram program, would you have any

6  reason to object to that?

7  A    No.

8  Q    And if --

9  A    No.  I'm aware of that.

10  Q    And if I were to suggest to you that during 1998, they

11  told Jazz that Jazz would be their only supplier for 1999,

12  would you have any reason to object to that?

13  A    No.

14  Q    And yet they changed their decision shortly after the

15  recall, correct?

16  A    That's right.

17  Q    Let's talk about the 56 cent royalty.  Do you understand

18  how that works?

19  A    Yes.

20  Q    Okay.  And what's your understanding?

21  A    My understanding is that a 56 cent royalty would be

22  applied -- or would be applied if in fact a Jury decides that a

23  royalty was appropriate, is my reading of the transcript from

24  February 7th.  I believe that's the right date.

25        So, defines that that's the way it would be

**J&J COURT TRANSCRIBERS, INC.**

Ordway - Cross/Schwartz                              74

1  determined.  In other words, a Jury finds there's a royalty to

2  be used, the royalty rate would be 56 cents.

3  Q    And during the time period that Jazz made the sales, or

4  didn't make the sales, as a result of the recall by Wal-Mart,

5  was the 56 cent royalty in effect, at that time?

6  A    I'm led to understand that the directive by the Judge is

7  to apply that rate, for those sales, if in fact the Jury finds

8  that a royalty was appropriate to be applied.

9  Q    Do you have any idea what the effect of Jazz's bankruptcy

10  -- would be, years later, to a royalty that would have never

11  been charged back at the time?

12  A    Are you asking what the nature of the claim would be?

13  Q    No.  I'm asking you, do you have any idea as to what the

14  effect of the damage claim by Fuji would be, years later, when

15  the 56 cent royalty was not due at the time the sales were

16  made?

17  A    I'm not sure.

18  Q    Okay.  Do you have any idea what the instruction to the

19  Jury might be, by Judge Linares, if the District Court

20  litigation were to proceed?

21  A    I -- that's what I -- that was my understanding, is that

22  if they conclude a royalty was appropriate to be asserted, that

23  they were to use 56 cents.

24                          (Pause)

25  Q    I'd like to direct your attention to Exhibit 8 of your

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                    75

1   report.

2                        (Pause)

3   Q    See where I'm talking about?

4   A    Yes.  Exhibit 8.

5   Q    And on top of Exhibit 8 you have the three calculations,

6   one by Mr. Campos, one by Mr. Zatta, and one by yourself.  See

7   that?

8   A    Yes.

9   Q    And for the year 1998, Mr. Campos calculated that Jazz

10  lost sales of $2.2 million -- 2.2 million units, as a result of

11  the recall --

12  A    Yes.

13  Q    -- yet you don't accept that conclusion?

14  A    No.

15  Q    Why not?

16  A    I don't believe that Wal-Mart would have purchased more

17  units beyond what Mr. Zatta calculated in 1998.  I had read

18  that the -- that Wal-Mart was holding as much as 22 weeks worth

19  of supply.

20          The sales that Mr. Zatta used were an estimate of

21  what the sales were from the 1999 -- the same period in

22  December of 1999.  Assuming that the onset of the recall in

23  December of '98 -- he's given them some credit for the fact

24  that maybe there would have been additional shipments into the

25  stores at that point in time, but equal to what the sales were

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                          76

1   in that period of time in the subsequent year.

2   Q    You know when Wal-Mart started complaining to Jazz about

3   the magenta problem?

4   A    I think the complaints started earlier in the year.

5   Q    And -- but yet you conclude, from reading Mr. Zatta's

6   report, that there was a -- you know, there was a lot of

7   inventory and so, as a result, they wouldn't have bought more?

8   A    They only would have bought more if they were selling

9   more.

10  Q    And did -- what documents did you review, that were

11  referenced in Mr. Zatta's report, to support that conclusion by

12  Mr. Zatta?

13  A    Mr. Zatta had information in his report, regarding what

14  the sales were by month, in 1999, and concluded that -- let's

15  -- that they would include in his report that the sales that

16  were perhaps missing, in 1998, would have been equal to the

17  sales that occurred in a similar period in 1999.

18        And that's the information I looked at.  I looked at

19  his report.

20  Q    Do you know whether Mr. Zatta actually spoke with

21  Wal-Mart?

22  A    I don't know.

23  Q    Did you speak with Wal-Mart?

24  A    No.

25  Q    So, you're basing it just upon Mr. Zatta's conclusion, who

Ordway - Cross/Schwartz                    77

1  is the witness from Asia?

2  A    I'm using information that was in his report.

3  Q    And you're discounting, completely, the information that's

4  in Mr. Campos's report?

5  A    For the 1998 unit sales, yes.

6  Q    And so you accepted the 78,000 units that Mr. Zatta came

7  up with?

8  A    Yes.

9  Q    And do you know how he came up with that number?

10  A    The way I just described.  He looked at the sales in the

11  subsequent year, in the December period in the subsequent year,

12  and assumed that that would have occurred in 1998 had not the

13  recall occurred.

14  Q    Do you know the total amount that -- of units that Jazz

15  sold in 1998?

16  A    Yes.  In the box at the bottom of my page is several

17  columns.  The first column is -- are units.  And in 1998 this

18  is the actual sales of the product by Wal-Mart, 4,987,000.

19          Now, let me finish your -- answer your question.  I

20  don't know how many units Jazz actually shipped to Wal-Mart.

21  What that number is, is the units that Wal-Mart sold through

22  its stores.

23  Q    Do you know what the units sold were in 1997?

24  A    No.  I don't remember.

25  Q    Let's take your assumption to be correct and Wal-Mart

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                      78

1  would have bought 78,000 more units in 1998.  That gets us up

2  to 5,065,000?

3  A    Yes.

4  Q    And do you know what the sale's trend was in the -- I

5  think I asked you this before, but let me ask it again, do you

6  know what the sale's trend was with respect to the single use

7  camera industry, particularly with respect to reloaded cameras?

8  A    I don't recall, other than it was significant.

9  Q    Okay.  So, if it was significant -- and I suggested to you

10 that if it were in excess of a hundred percent, would you be

11 surprised, and I think your testimony was, no.  Okay?

12 A    No.

13 Q    If sales would have increased between 1998 and 1999, by

14 100 percent, then what would the sales in 1999 have been?

15 A    If you're asking me to do the calculation, I -- it would

16 have been doubled, if you're telling me it's a hundred percent

17 more.  But, in 2000, it didn't continue that trend.

18 Q    Well, we're not talking about 2000, we're talking about

19 1999.

20 A    I know, but you wouldn't have twice as many in '99 and

21 then less in 2000.

22 Q    Well, couldn't this have been a result of the recall and

23 as a result, Jazz lost buying power -- selling power to

24 Wal-Mart?

25 A    Yes.  Which is why we didn't use the actual Concord sales

Ordway - Cross/Schwartz                                    79

1  as substitute sales for 1999.

2         We took into account that there probably was some

3  disruption and assumed that the trend that the company was on,

4  between '98 and 2000, was consistent in 1999.

5  Q    Yet there's no chance that Jazz could have grabbed some

6  sales from Fuji or Kodak, albeit for the recall?

7  A    There's -- they could have changed the mix of sales.

8  Q    And if they did, then wouldn't Mr. Campos's numbers be

9  somewhat accurate?

10 A    No.  Not necessarily.  His numbers are based on looking at

11 volumes related to total revenues for Wal-Mart, not the cameras

12 -- not the camera sales.

13        And as I stated before, the sales of Wal-Mart are --

14 that's not at all indicative of what the sales were of cameras,

15 for a variety of reasons, one of which was a lot of their

16 growth in this time frame was internationally.

17 Q    So, Mr. -- you think Mr. Campos is wrong that he used the

18 Wal-Mart trend -- sale's trends, and you think that's

19 incorrect?

20 A    He used the total Wal-Mart sale's trend and I think that's

21 not correct.

22 Q    But, the trend with respect to single use cameras was even

23 higher than Wal-Mart, during that same time period, wasn't it?

24 A    I think it might have been.

25 Q    So, don't you think that Mr. Campos was being somewhat

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                           80

1  conservative in his --

2  A    No.

3  Q    -- calculations?

4  A    No.  Because, we're talking about sales through Wal-Mart,

5  through the customer at Wal-Mart.  We're not talking about the

6  total industry.  We're talking about their business with

7  Wal-Mart.

8  Q    So, if the sales of single use cameras during that time

9  period were going through the roof, and they were increasing by

10 100 percent or more, per year, and as a result of this recall

11 the numbers only went up slightly, and at the same time

12 Wal-Mart's were increasing at, say 15 percent of its total

13 sales, there's no way that Mr. Campos is right, in the sense

14 that he uses Wal-Mart as the sale's trend, calculated with

15 respect to all sales?

16 A    I think that could be wrong.  Because, it doesn't -- yes,

17 because Jazz wasn't doing business with every single person --

18 in every single retail in the country that sells cameras --

19 single use cameras.

20 Q    But, he could be right though, can't he?

21 A    I think he could be right, but I think that it's extreme

22 and the calculations are not grounded in facts.

23 Q    And what did you come up with your numbers?  The 2,192,000

24 additional units for 1999?

25 A    That's an average of the sales between '98 and 2000, which

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                    81

1  are higher than the actual sales of open price point cameras at

2  Wal-Mart.

3  Q    So, again, that's only with respect to the sales

4  opportunities that were lost and were grabbed by Concord?

5  A    No.  This is more than that.  If you go all the way to the

6  right-hand column, it's 142 percent of what the actual sales

7  were.

8  Q    But you're only using opening price point sales?

9  A    That's right.

10 Q    And you're not using Fuji or Kodak --

11 A    No.

12 Q    -- in the mix?

13 A    I mean, what actually happened, were people bought Fuji

14 and Kodak cameras.

15 Q    Excuse me?  Say that again.

16 A    People -- customers of Wal-Mart bought Kodak and Fuji

17 cameras.  I'm not going to give Jazz credit for people buying

18 other products.

19 Q    Yet, if there were more shelf space, and Jazz -- if Jazz

20 had more shelf space and Fuji or Kodak had less shelf space,

21 perhaps they would have bought Jazz and not Kodak or Fuji.

22 A    That's possible, but it looks like they had plenty of

23 shelf space.  There sales increased substantially, year, over

24 year, over year, anyway.

25 Q    That's -- and that was given the limited shelf space that

Ordway - Cross/Schwartz                              82

1  they had, right?

2  A    I don't know what exactly the dedication of shelf space

3  was at every single store.

4  Q    But, you do know that the shelf space decreased after the

5  recall?

6  A    I don't know that.

7  Q    Excuse me?

8  A    I don't know that.

9  Q    Well, don't you know that -- we talked about it earlier,

10 about Concord taking up some of the shelf space?

11 A    Oh.  I beg your pardon.  The space dedicated for opening

12 price point, I don't know if that decreased or not.  I beg your

13 pardon.

14                         (Pause)

15          MR. SCHWARTZ:  Just give me one minute, Your Honor.

16                         (Pause)

17 Q    One last question, Mr. Ordway, and I'll direct you again

18 to Page 8 of your report, and specifically, the last paragraph.

19 A    The last paragraph?

20 Q    The last paragraph.  It's in the middle of it, where you

21 talk about the additional information.

22 A    Yes.

23 Q    What additional information would you deem to be necessary

24 to possibly alter your thinking?

25 A    You're asking me what type of information might change my

                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Schwartz                                83

1  mind?

2  Q    Yes.

3  A    If something else developed that showed something

4  different than the information that was otherwise available to

5  me.

6  Q    And --

7  A    I don't know what that could be.  I'm just leaving that

8  there could be other information out there.

9        I couldn't have possibly looked at everything, in

10  four or five days and, you know, maybe there's something else

11  out there.

12        I don't think so, because I had an opportunity to

13  speak with people -- everyone involved in the case, and I think

14  if there was something of import, that they would have

15  presented it to me.

16        MR. SCHWARTZ:  Okay.  Thank you.

17        THE COURT:  All right.  Just to get an idea of

18  scheduling, Mr. Greenhalgh, I assume you want cross

19  examination.  Anyone else?

20        Okay.  Do you want to take a break?  I mean, you've

21  been on a long time?

22        THE WITNESS:  No.  Let's --

23        UNIDENTIFIED MALE ATTORNEY:  Your Honor, I was going

24  to suggest just a five minute recess.  Are you in --

25        THE COURT:  Let's take ten minutes.

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    84

1                          (Recess)

2                THE COURT:  We're back on the record.

3                Mr. Ordway is our witness and Mr. Greenhalgh has the

4    floor for cross.

5                MR. GREENHALGH:  Thank you, Your Honor.  Good

6    afternoon, Mr. Ordway.

7                THE WITNESS:  Good morning -- or, good afternoon.

8                          CROSS EXAMINATION

9    BY MR. GREENHALGH:

10   Q    My name is Walter Greenhalgh and we spoke, I think, for

11   about five minutes on Monday

12   A    Yes.

13   Q    And you understand that I represent Mona Benun and the

14   other shareholders, who are her four daughters?

15   A    Yes.

16   Q    Okay.  Good.  Do you have your report in front of you?

17   A    Yes, I do.

18   Q    Okay.  Very good.  Now, if you go to the last page, in

19   your concluding paragraph, I know that this had been touched

20   upon, but I don't think you were asked directly, this question.

21   The last sentence, which I won't read in its entirety, but it

22   begins with additional information may alter my thinking, et

23   cetera.

24                Since you issued this report, and as you sit here

25   today, have you received any additional information that would

Ordway - Cross/Greenhalgh                      85

1  change your report, or your thinking, at this time?

2  A    No.

3  Q    Okay.  So, it's fair to say then, that at least with

4  regards to liability, you have no opinion?

5  A    That's correct.

6  Q    Have you ever -- this project, as an examiner to assess

7  this settlement, have you ever performed such a project before?

8  A    I've never been a plan examiner before.

9  Q    Have you ever had the responsibility -- similar to what

10 you're here today to assess, whether this proposed settlement

11 meets the criteria that -- and standards that the Court will --

12 would enunciate -- have you ever had that type of a project

13 before?

14 A    Yes.

15 Q    In what instances?

16 A    In a number of instances.  What I principally do for a

17 living is, I'm a financial adviser for either companies or

18 lenders in troubled company situations -- bankruptcies,

19 workouts.

20        And in most instances there are issues that require

21 financial analysis to determine the reasonableness of a

22 compromise or a settlement, whether it's regarding landlord

23 claims, or instances where there's -- there are contract

24 disputes, for example --

25 Q    Well --


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    86

1  A    Yes.  I'm just saying that that's -- kind of comes with

2  the territory of what I do for a living.

3  Q    Do you have experience in litigation?

4  A    I have experience with litigation, yes.

5  Q    Have you ever testified before?

6  A    Yes.

7  Q    Now, just characterizing, you spent the last four or five

8  days on this project, right?

9  A    Yes.

10  Q    Okay.  And you're comfortable that the amount of time that

11  you had was sufficient for you to do the proper due diligence

12  in coming up with an opinion for the Court today?

13  A    Yes.

14  Q    And you interviewed, for example, Mr. Fraza, who lived

15  with this case for, I guess, over six years?

16  A    Yes.

17  Q    Is it fair to say -- I think you testified that you gave

18  -- did you give a great amount of weight to Mr. Fraza's

19  opinions?

20  A    I considered his opinions.

21  Q    And in your opinion, you concluded that with respect to

22  collection, if the debtor, Jazz, was successful in obtaining a

23  judgment against Imation, that Imation would be able to satisfy

24  that judgment?

25  A    Yes.

Ordway - Cross/Greenhalgh                    87

1  Q    Would that be the case --

2  A    Can I correct that?

3  Q    Yes.

4  A    Based --

5  Q    Because, if I don't ask you -- make you do it, the Judge

6  will.

7                        (Laughter)

8  A    Here's the one qualifier to that.  The ultimate point in

9  time that a payment may be made as -- if the litigation were to

10 play out and there was appeal, or a retrial, and this was

11 several years from now, I don't know what their financial

12 condition would be then.

13           So, I could just look at what their financial

14 condition is today.  But, based on their financial condition

15 today, it looks like they have plenty of liquidity and the

16 wherewithal to pay.

17 Q    You're not an attorney -- you testified to, right?

18 A    No, I'm not.

19 Q    If a judgment was entered, do you know what processes

20 there would be if the case was appealed and whether the parties

21 would be able to satisfy that judgment?

22 A    I understand that a bond might have to be posted.  I don't

23 appreciate, however, exactly what the time frame would be to

24 work through an appeal process, other than the fact that my

25 cumulative experience is sometimes a quick process takes a very


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                          88

1  long time.

2  Q    But, you're familiar with the fact that a bond might have

3  to be posted to prevent the satisfaction of a judgment --

4  A    Yes.

5  Q    -- once it's obtained?

6  A    Yes.

7  Q    Now, if you go to Page 7 of your report, and paragraph

8  number 2.  And I refer you to the last sentence, which begins

9  with the words, because of the complex nature of the evidence

10 that the Jury will have to consider -- you conclude that it's

11 highly uncertain what the current Jury will conclude, not only

12 on liability and causation, and then it goes on?

13 A    Yes.

14 Q    What do you base that on?

15 A    I based it on interviews with the related counsels, as

16 well as reading several documents, their transcripts of their

17 initial presentations, their pleadings.

18      And the point is this, is that both of them have

19 pretty significant cases with respect to what sort of evidence

20 that they would be presenting, experts they would be referring

21 to, and even topically, what the issues are that they would be

22 addressing, all of which, in my judgment, lead me to believe

23 that this is an extremely complicated case and that the outcome

24 is not discernible, at this point in time.

25 Q    So, your conclusion is based upon the opinions that you

Ordway - Cross/Greenhalgh                                    89

1  elicited from others, correct?

2  A    Their opinions, their thoughts, and taking into account

3  what I also read about what they said, yes.

4  Q    Right.  But, you did not do any independent due diligence,

5  to ascertain that it would be highly uncertain what a current

6  Jury would conclude?  It's purely based upon the opinions of

7  others that you interviewed in this process?

8  A    In my opinion, naturally.

9  Q    In your opinion?

10  A    Yes.

11  Q    Which, in your opinion, is based upon your -- as you just

12  testified, your discussions with these individuals, correct?

13  A    That's correct.

14  Q    And that would be both attorneys, for either side, and the

15  other individuals that you listed here in your report, correct?

16  A    That's right.

17  Q    Now, in that same sentence, you mention other factors that

18  could result in punitive or trouble damages, should liability

19  and causation be decided in Jazz's favor, correct?

20  A    Yes.

21  Q    Now, you've said that you have no opinion as to liability,

22  correct?

23  A    That's right.

24  Q    So, what we're dealing with, right now, is a calculation

25  of damages, isn't that really what your report comes down to?

Ordway - Cross/Greenhalgh                         90

1   A    Calculation of damages, depending on the outcome of the

2   litigation, yes.

3   Q    Okay.  And when you say punitive or trouble damages, were

4   you referring to the RICO count of the complaint?

5   A    Yes.

6   Q    And you read the complaint, I assume?

7   A    Yes.  I did read the complaint.

8   Q    And even though you're not an attorney, do you have any

9   familiarity with the standards of RICO?

10  A    I understand that they're -- it's fraud and then some.

11  Q    Okay.  That's your basic understanding of it?

12  A    Yes.

13  Q    Are you aware that Judge Linares rendered a decision in

14  summary judgment on -- in favor of Jazz, on three of the four

15  components needed to satisfy a claim for RICO damages?

16  A    Yes.  I understand that there are four standards that have

17  to be met, and --

18            MR. HANSEN:  Objection, Your Honor.

19            THE COURT:  What's the objection?

20            MR. HANSEN:  The objection is just we would ask for

21  appropriate characterization of Judge Linares's ruling, with

22  respect to that summary judgment.

23            I argued quite extensively in the papers that he has

24  entered summary judgment with respect that there only needs to

25  be one Federal --


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                              91

1          THE COURT:  Well, the question is, what's this

2     witness's understanding of that judgment, and I think that's

3     fair game.

4          MR. GREENHALGH:  Thank you, Your Honor.

5     A    There were -- as I understand it there are four criteria

6     that have to be met, and in his opinion and finding that he had

7     established that three of the four had been met.

8     Q    Did you read his opinion at all?

9     A    One of my colleagues did and we -- and he shared with me

10    the highlights of it.

11    Q    Do you give any weight, in your schedules, with regards to

12    a possible troubling of the damages, if it was found in favor

13    of Jazz?

14    A    It -- several of the scenarios that we have described, or

15    calculated the related damages in our Exhibit 9, include

16    troubling.

17    Q    In Exhibit 9, would that be in the --

18    A    First page of Exhibit 9 summarized possible outcomes.  And

19    under each of the scenarios that we describe here, we're

20    showing a -- under different damages claims, that is, what the

21    troubling impact would be under each damage claim --

22    Q    Yes?  Are you finished?

23    A    Yes.

24    Q    Okay.  And where do you come up with the $7 million legal

25    calculation, in the first scenario?

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                                        92

1  A     It was based on a conversation with Mr. Fraza and Mr.

2  Novack, that they thought it was 6 to $7 million perhaps.

3  Q     And are you putting that figure in there, assuming that if

4  they were successful, if Jazz was successful in the litigation,

5  that that is -- that's an estimate of an award of counsel fees?

6  A     Yes.

7                           (Pause)

8  Q     If you had a choice, would you have requested additional

9  time to perform the task that was presented to you by the

10 Court?

11 A     Yes.

12 Q     What would you estimate would be a reasonable period of

13 time for you to do the thorough and appropriate due diligence

14 needed?

15 A     Let me be clear on that.  I would have preferred not to

16 have worked all weekend and work until eleven or twelve o'clock

17 at night, to get additional time.  I feel comfortable with the

18 level of work that we did.

19 Q     Under the circumstances?

20 A     Under the circumstances, yes.

21 Q     And under the time restraints that, unfortunately,

22 circumstances dictated that you had to perform, correct?

23 A     Yes.

24 Q     But, my question is, let's assume that you didn't have a

25 time frame limitation by the Court.  What would you project

Ordway - Cross/Greenhalgh                              93

1  would be reasonable for you to perform this task?

2  A    A few more days.

3  Q    A few more days.  And what would you have done --

4  A    I wouldn't --

5  Q    -- different than what you've done up to yesterday, I

6  guess, as of the close of business?

7  A    We received a package of 500 pages, from Mr. Novack,

8  yesterday afternoon.  We were able -- we were only able to very

9  quickly scan what was the content of that package.  I would

10 have read that, in addition.

11 Q    And nothing --

12 A    I felt comfortable though, with having the related expert

13 reports, and having the exhibits related to the expert reports,

14 and having had time to interview the related experts.  I

15 thought that was the most key thing, and we were able to do

16 that.

17 Q    Did you give more weight to the Zatta reports, versus the

18 Campos reports?

19 A    No.

20 Q    Did you do any of your own due diligence, as to the

21 expertise of Mr. Zatta and Mr. Campos?

22 A    I didn't do any additional investigation, no.  I'm -- I

23 know -- I'm aware of -- I know Mr. Campos, personally, although

24 he doesn't remember me.  And I know of Mr. Zatta from other

25 cases referenced to him.


J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                94

1  Q    Did you review their qualifications as experts?

2  A    Their qualifications were in their expert reports.  I took

3  a quick look at it, yes.

4  Q    I'm sorry, you took a quick look at it?

5  A    I took a quick look at their qualifications, yes.

6  Q    And you did not -- in balancing, give either expert any

7  heavier weight than the other?

8  A    No.

9  Q    So, you -- and in fact, I think you say that you found

10 that Mr. Campos's calculations and analysis, according to costs

11 of a Wal-Mart recall, a portion of the alleged damage claim is

12 reasonable?

13 A    Yes.

14 Q    But, you just disagree with his findings with regards to

15 the lost profits?

16 A    I had some minor adjustments to his recall calculations,

17 but generally found it -- his calculations acceptable.

18 Q    So, as we try to -- as I try to kind of synthesize this,

19 and bring it down -- what your report and your disagreement is,

20 with Mr. Campos, is really coming down to the calculation of

21 lost profits?

22 A    That's a good way to summarize it.

23                    (Pause)

24 A    If I could add to that?  On our Exhibit 6, which

25 summarizes the major components of our differences, to your

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    95

1  point, the largest difference is the lost profits, reconciling

2  from $40 million to our highest damage claim of 15.

3  Q    Now, assuming that Campos was correct at a calculation of

4  damages at 40,440,000, if the RICO complaint was successful,

5  simple math would be that amount would be tripled, correct?

6  A    That's right.

7  Q    And your conclusion is that the total damages were

8  $15,100.00?

9  A    Yes.  Can I correct that?  That would be the highest, in

10 our opinion, the highest damage claim.

11        We believe that there is actually some merit to it

12 being lower than that, which is why we presented lower

13 scenarios, and excluding lost profits, or some of the lost

14 profits, and excluding the party packs.

15 Q    And including the lost profits, how much weight, if any,

16 did you give to sales to Target?

17 A    We didn't include any lost sales to Target.

18 Q    Did you include any lost sales to, I guess, Family Dollar?

19 A    Family Dollar was the other category in Mr. Campos's

20 report.

21 Q    And you just --

22 A    No.

23 Q    You completely discounted that as a factor?

24 A    That's right.

25 Q    Did you look at how much that could possibly be, in -- in

Ordway - Cross/Greenhalgh                              96

1  Mr. Campos's reasoning?

2  A    Yes, we did.  He had some pretty detailed calculations in

3  his report where he calculated the lost sales, by individual

4  customer, so -- it's contained in his report -- Family Dollar,

5  Target, and Wal-Mart.  I don't remember the number though.

6  Q    You don't remember the number?

7  A    I don't remember the number.

8  Q    And it's not included in your report?

9  A    No.  What -- that's right.  The lost profits calculation

10 that we illustrate from Mr. Campos, includes all three of those

11 customers, which is on Exhibit 8.

12 Q    And that's in Mr. Campos's -- his revenue calculation?

13 A    That's right.

14 Q    So, that -- let me just ask -- with regards to year 1998,

15 the -- under Campos, the $7,840,442.00, would include both

16 Wal-Mart --

17 A    I believe all three are part of -- of all years.

18 Q    Okay.  And your calculation of revenues for 1998,

19 eliminates those two?

20 A    I'm only including some calculations as it relates to

21 Wal-Mart.

22 Q    Okay.  And then, just so I understand it, then the box

23 below, for the year 1998, '99 -- just to give you a figure, so

24 you -- can identify it, it has actual, $4,987,117.00?

25 A    Yes.


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    97

Q    That box there, just explain to me, again, what that box

is?

A    Yes.  What we're presenting in this box, at the bottom of

the page, is my calculation of the lost units.

The first column, all the way to the left, is what

the actual sales were, in each of the years in the measurement

period.  The next column is the additional sales that we're

allowing in connection with a lost profit calculation.  In the

third column is what numbers we're using for the total -- for

the losses -- or what the sales would have otherwise been, in

total, to Wal-Mart.  The next column is what the actual opening

price point sales were.

The definition of opening price point being combining

both -- well, Concord, others, because there were some --

fractionally, some other ones, and Jazz.

And then the very last column is saying that, as

adjusted, these are now the percentage of sales that our

adjusted sales represent of the total opening price point sales

during those periods of time.

And other than in 1999, we're giving them almost 100

percent.

Q    So, in the year 1998, Jazz's percentage of the market was

92.7 percent?

A    Their share of opening price point product sales at

Wal-Mart were -- right, 92, 93 percent.

Ordway - Cross/Greenhalgh                    98

1  Q    92.7 percent?

2  A    Yes.

3  Q    Right.  And when was the recall?

4  A    The recall started in December and I'm sure that it -- a

5  matter of process, that it took, you know, a couple of months

6  for it to all work through.  But, it started in December of

7  '98.

8  Q    So, the 1998 actual figures and -- would not be -- would

9  you -- do you have an opinion as to whether the recall would

10  have any significant impact on the 1998 figures?

11  A    I think that it would have an impact, which is why we

12  provided for an adjustment to the December sales.  That's why

13  it's only -- well, it's not only why it's 78,000, we -- using

14  the calculations that Zatta had in his report, which we thought

15  were well founded, looking at the December sales in 1999, we

16  picked up 100 percent of the sales, 1999 sales, and dropped

17  them into 1998.

18  Q    And the 2001 actual sales were 9,092,000 --

19  A    Yes.

20  Q    -- in round figures, of units?

21  A    Units.

22  Q    And that's in -- and that's actual?

23  A    That's correct.

24  Q    And that's a significant increase over '98, '99, and 2000?

25  A    Yes.

Ordway - Cross/Greenhalgh                        99

1  Q    Did you make any inquiry as to why there was an increase?

2  A    No.  Other than we observed it.  I didn't ask either

3  expert if they knew why the sales were so significant, other

4  than, frankly, Zatta pointed that out to me, in particular.

5  Q    Did you ask Mr. Compose any questions in that regard?

6  A    As to why the sales increased significantly year over

7  year?

8  Q    Yes.

9  A    No.

10  Q    And this all occurred after the recall, correct?

11  A    Yes.

12  Q    And Jazz was maintaining a 98.5 percent percentage share

13  of Wal-Mart?

14  A    No.  No, the first -- the way we should read this is, the

15  first column is the actual sales.  The second column is

16  dysfunction of the Concord sales.

17         So, in 2001, it's approximately 80 percent of the

18  share of the sales that were over the price point at Wal-Mart.

19  Q    Do you know what Concord was selling their product for --

20  with -- to Wal-Mart?

21  A    I don't remember exactly, but it was a little bit higher

22  price than what Jazz was selling for.

23  Q    Do you know what Wal-Mart was selling the Concord product

24  for?

25  A    I don't remember, exactly.  A little bit more money than

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    100

1  what they were charging for the Jazz product.

2  Q    Would you object if I suggested that it could be 20 to 30

3  percent higher?

4  A    No.

5  Q    And that would have been how the product was actually sold

6  in Wal-Mart?

7  A    Yes.

8  Q    Do you know what the percentage of increase of sales were

9  by Jazz, to Wal-Mart, over that time frame, from 1998 through

10 to 2001?

11 A    I have the data in front of me.  We'd have to do the

12 calculations, but they're pretty significant.

13 Q    Would it be close to 300 percent?

14 A    Well, if we're going from five million to nine million,

15 '98's five million, 2001 is nine million, that's almost double.

16 It's like 180 percent.

17 Q    Okay.  Do you -- are you aware that Jazz sold different

18 types of cameras to Wal-Mart?

19 A    I'm aware that they had other products that they were

20 selling to Wal-Mart, yes.

21 Q    Do you know what those other products were?

22 A    I think they had a binocular product, and they had some

23 other type of cameras.

24 Q    Do you know what percentages that made up, in terms of

25 sales to Wal-Mart?

Ordway - Cross/Greenhalgh                    101

1  A    No.

2  Q    Why don't we go to Page 5, and let's talk about -- I have

3  a few questions on the inclusion of party and wedding pack

4  cameras.

5                         (Pause)

6  Q    Do you have that in front of you?

7  A    Yes.

8  Q    Okay.  Great.  After the title, you say there is evidence

9  that these cameras may have been returned to Jazz anyway, due

10 to their limited success in sell through, by Wal-Mart?

11 A    Yes.

12 Q    What evidence do you have of that?

13 A    I have a copy of an e-mail that was an exhibit to Mr.

14 Zatta's report, from a person at Wal-Mart, discussing that the

15 product was selling through poorly and that they were

16 interested in returning it?

17 Q    And do you know -- do you recall the date of that e-mail?

18 A    It was during the same period of time where the recall was

19 being discussed.  Sometime in December.

20 Q    Okay.  And was this -- do you recall the person's name?

21 A    No.

22 Q    Okay.  Wes Grann (phonetic), or Wes Grann (pronouncing),

23 something like that?

24 A    I don't remember.

25 Q    Okay.  So, the representative of Wal-Mart sends this

Ordway - Cross/Greenhalgh                    102

1  e-mail, and is that the only evidence that you used to rely

2  upon -- to make -- come to that conclusion in the first

3  sentence?

4  A    Also, the topic was a discussion point in Mr. Zatta's

5  report.  We read his report, and we discussed that with him,

6  and what he had done with respect to party packs, and what his

7  view was with respect to party packs.

8  Q    This is Mr. Zatta?

9  A    Yes.

10 Q    Did you ask Mr. Campos?

11 A    Yes.

12 Q    Mr. Zatta -- I'll withdraw that.  Are you aware that the

13 Wal-Mart representative, two weeks earlier, sent an e-mail to

14 Jazz, extolling how great the party pack and wedding pack

15 cameras were selling?

16 A    No.

17          MR. HANSEN:  Your Honor.  I'm going to object.  If

18 Mr. Greenhalgh's got the e-mail -- we'd be entitled to take a

19 look at that.

20          Or assume -- this is assuming a fact that's not in

21 evidence, that's directly contradictory to something that he's

22 reviewed, as opposed to more of the speculative type questions

23 he's been asked.

24          THE COURT:  I understand.  Mr. Greenhalgh, I will

25 allow some latitude, and in fact I've allowed plenty --

Ordway - Cross/Greenhalgh                    103

1             MR. GREENHALGH:  Okay.

2             THE COURT:  So, to the extent that you're including

3    facts, that's alleged, it would be easier if you just put them

4    into evidence.

5             MR. GREENHALGH:  Okay.  Well -- fine, Your Honor.

6    I'll just -- I'll withdraw that question.

7    Q    But, I'll ask the witness, do you know what film was

8    placed in the party and wedding pack cameras?

9    A    I think it was the same film.

10   Q    And it's alleged that the film was the source of the

11   problems regarding the recall, correct?

12   A    I'm led to understand that, yes, sir.

13   Q    So, that if the party and wedding pack cameras were

14   returned, wouldn't there be a cost of refurbishing these

15   cameras, anyway, by Jazz?

16   A    Yes.  But, my point is this, is that they may have been

17   returned, regardless of the recall and regardless of the film

18   quality.

19   Q    Your -- the only evidence that you have -- evidence now,

20   since we're talking about evidence, is this one e-mail that you

21   read?

22   A    The other evidence that we looked at is what the total

23   sales were of the party packs and how many actually sold during

24   1998 and -- which supported the fact that it was possible that

25   there could have been a -- that Wal-Mart might have pursued,

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    104

1  absent the recall, a desire to return this product, because it

2  wasn't selling through very well.

3  Q    And what were those figures?

4  A    I don't have that in my reports.  I'm going from memory.

5  But, I believe it was around a million eight or a million nine

6  were shipped and they only sold 500 and change, 550,

7  thereabouts.

8  Q    Five hundred and fifty in number, or 550,000?

9  A    You know what, I stand corrected.  Those were all

10  thousands.  So, in other words, 1,800,000 units were shipped

11  and they sold 550, 560,000, thereabouts.

12        And actually some of the inventory had been shipped

13  to Wal-Mart in 1997.  So, I'm taking that into account, as well

14  as this e-mail.

15        It's -- in my experience with Wal-Mart, it's not hard

16  to believe that this might have been recalled independently.

17  Not for reasons of quality, but by reasons that it wasn't

18  selling through very well.

19  Q    So, they were sitting on product in '97, and that was the

20  product -- the part of the inventory that was returned?  Were

21  you just looking at what --

22  A    You know what, I can't track what -- when it was sold and

23  what inventory they still had on hand, I'm just saying that

24  because -- between the sales in 1998 and the quantity that was

25  returned, they had to have returned, or there had to be some

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    105

1  component of the inventory that was shipped to them that was

2  shipped in 1997.

3  Q    So, the evidence that you relied upon to come to that

4  conclusion then, is, we've got the e-mail, and then we have

5  your review of what the sales were of the party pack, and when?

6  A    Yes.

7  Q    No other evidence?

8  A    No.

9  Q    And how much do you reduce the Campos calculation, based

10 upon that conclusion?

11 A    It's approximately $3 million, and there's some detail on

12 an exhibit.

13 Q    Right.

14 A    Exhibit 7.

15 Q    Is that -- that's a significant portion of the damage

16 calculation?

17 A    Yes, it is.  The total cameras returned were four and a

18 half million, roughly, and this is a million three of it.

19 Q    And you said that you also asked the same questions to Mr.

20 Campos and he explained to you why he included that?

21 A    He explained that these were all the same cameras, that

22 they all had the same film, and he felt that that was

23 appropriate.  And it was part of the recall, which is why he

24 was including it.

25 Q    But, you discounted it because you were of the opinion,

Ordway - Cross/Greenhalgh                    106

1  today, that it would have been returned for other reasons?

2  A    I believe that there -- that that's certainly a

3  possibility.

4  Q    Okay.  Well, and --

5  A    And -- that could be a final.

6  Q    -- possible.  Do you think it's more, probably, that it

7  was returned, because they were in the middle of a recall for

8  faulty film, as opposed to the fact that the product, that had

9  the same exact film, had problems with it?

10          THE COURT:  You have an objection?

11          MR. HANSEN:  I do, Your Honor.  This question has

12  been asked and answered a number of times.  Mr. Greenhalgh

13  himself, and by Mr. Schwartz --

14          THE COURT:  I'll allow it.

15          MR. GREENHALGH:  Thank you, Your Honor.

16          THE COURT:  I'll allow it.

17          MR. GREENHALGH:  Because, it isn't exactly the same.

18          THE COURT:  I know it's not.

19          MR. GREENHALGH:  Thank you, Judge.

20  A    No, I know that, factually, what occurred was that this

21  product was returned as part of the recall.

22          The reason that I'm raising it as a potential

23  adjustment to the ultimate damage is based on the evidence I

24  shared with you.  In other words, that this product might have

25  been returned, in any instance.


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    107

1  Q    But, it's more a probable that it was returned, because of

2  the defective nature of the product, as opposed to the -- your

3  conclusion that it was returned for other reasons?

4  A    I'm not saying that.

5            MR. HANSEN:  Your Honor, objection.

6            UNIDENTIFIED MALE ATTORNEY:  And that wasn't --

7            MR. HANSEN:  -- speaks for itself.

8            UNIDENTIFIED MALE ATTORNEY:  And that wasn't the

9  witness's answer.

10           MR. GREENHALGH:  That's right.  He didn't answer my

11 question.

12           UNIDENTIFIED MALE ATTORNEY:  He did.

13           MR. GREENHALGH:  Is it more probable?

14           UNIDENTIFIED MALE ATTORNEY:  Sorry.

15           THE COURT:  Let's have -- the witness is capable of

16 answering the question and I think the witness, if he can,

17 should answer the question.

18 A    I'm not weighting it.  I think it could have been returned

19 because of the quality issue and it also could have been

20 returned had not the quality issue existed, for the different

21 reason that I'm describing.  In other words, this would have

22 been a lost sale anyway.

23 Q    And you wouldn't ascribe any percentage of degree as to

24 what reason Wal-Mart would have returned it or not?

25           UNIDENTIFIED MALE ATTORNEY:  Your Honor --

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    108

1           THE COURT:  He's answered the question.

2           MR. GREENHALGH:   Okay.

3   Q    And you gave it a $3 million discount, correct?

4   A    That's correct.

5   Q    Okay.

6   A    In one of the scenarios that we're illustrating on Exhibit

7   9.

8   Q    And could you just point us to it, so we have a point of

9   reference on that?

10  A    Yes, of course.  On Exhibit 9 --

11  Q    The last page?

12  A    The -- there's three pages in Exhibit 9.

13  Q    Right.

14  A    The first page in the section we illustrate, in the first

15  two lines, what the claims would be, with or without a royalty,

16  but including the party packs.

17          Then, in the next two lines, so lines three and four,

18  are with or without royalties, excluding the party packs.

19          So, if you go all the way to the left, in the damage

20  claim column, you'll note that the damage claim, without

21  royalty, is 51, including the party packs.

22          It's 11,735 without the party packs, the difference

23  being three million and change.  Okay.

24  Q    And then I guess on the last page of Exhibit 9 --

25  A    Yes.


                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    109

1  Q    -- that -- I guess that's more of a summarization.  That's

2  the second item?

3  A    Yes.

4  Q    The 3,035,000?

5  A    Right.  It's a little bit of a road map to get there, but

6  there's another exhibit in the presentation, on the --

7  Q    Right.

8  A    -- calculation of the three million.

9  Q    Okay.  In, I think, Schedule 7?

10  A    That's correct.

11  Q    Right.  Okay.  Let's go to -- stay -- go to Page 5 of your

12  report?

13  A    Yes.

14  Q    The inclusion for a claim for factoring costs paragraph?

15  A    Yes.

16  Q    And you opine that the evidence suggests that Jazz would

17  not have been credit worthy in any instance?

18  A    Yes.

19  Q    You're referring to -- as a result of the recall?

20  A    In -- yes.

21  Q    Did you examine Jazz's financial statements immediately

22  prior to the recall?

23  A    I looked at the financial statements for '97, '98, '99,

24  2000.

25  Q    Right.  And what -- immediately before the recall, do you

Ordway - Cross/Greenhalgh                    110

1 have an opinion as to the financial condition of Jazz?

2 A    They were doing well, financially.  They were also using a

3 factor in that time frame.  Although I don't think

4 significantly, but they were using a factor.

5 Q    Do you know that -- whether or not they had lines of

6 credit, immediately prior to the recall?

7           THE COURT:  That was asked and answered.  He did say

8 yes, several times.

9           MR. GREENHALGH:  Okay.

10 Q    Do you know the size of those lines of credit?

11 A    I don't recall.

12 Q    Do you know if they were substantial?

13 A    They were substantial given the size of the company.  I

14 think at a high point, maybe it was 15, 18 million.

15 Q    And just so I understand, in your report then, based upon

16 your conclusion, you've eliminated the claim for factoring

17 costs?

18 A    Yes.

19 Q    And that's 1,432,000, in rough figures?

20 A    That's correct.

21                         (Pause)

22 Q    Let's go to the amount of lost profits paragraph there, D.

23 A    Yes.

24                         (Pause)

25 Q    Your statement there, and I don't -- I will not try to

Ordway - Cross/Greenhalgh                     111

1  mischaracterize it, but for purposes of my question to you, is

2  that it's your understanding that Mr. Campos, in making his

3  calculations, looked at the sales to Wal-Mart and then looked

4  at the increase of the Wal-Mart growth, as a company, to

5  determine what the damages would be in the sales by -- of Jazz,

6  to Wal-Mart?

7  A     Yes.

8  Q     And you felt that that analysis is incorrect?

9  A     Yes.

10                           (Pause)

11 Q     You know whether Jazz sold its cameras to Wal-Mart's

12 international market?

13 A     I was told that they weren't -- that they do not.

14 Q     Would that have any impact, at all, on your opinion?

15 A     Let me correct that?

16 Q     Okay.

17 A     The matter of the estate here, in the United States,

18 didn't sell internationally.  I think that they had an

19 operation in the United Kingdom that probably sold

20 internationally.

21 Q     Okay.  But, would that -- do you have any idea of the size

22 of that, at all?

23 A     The UK operations?  No.

24 Q     And you didn't give any comparison, or look at the

25 comparison between the actual Jazz camera sales to Wal-Mart

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                112

1  versus Wal-Mart's growth?

2  A    No.

3  Q    And you don't feel that that would be appropriate, in any

4  event?

5  A    No.  Because, other information that was more precise

6  existed to use for a calculation.

7  Q    And what information was that?

8  A    The total opening price point sales of single use cameras.

9                    (Pause)

10 Q    Now, you're very family -- or, let me withdraw that.  Are

11 you familiar with Wal-Mart's operations?

12 A    Yes.

13 Q    And you have experience dealing with Wal-Mart in the past?

14 A    I have experienced dealing with vendors to Wal-Mart.

15 Q    And did you use that experience in coming to the

16 conclusions contained in your report?

17 A    Some of my judgments are based on that experience.

18 Q    Where in your report, and I might have missed it, do you

19 cite your experience with Wal-Mart, as a basis for your

20 inclusions in this report?

21 A    It's not written in -- anywhere in my report.

22 Q    So, this is an element that you -- that is not reflected

23 in your report, that did go into your thought process and

24 ultimately arriving at your conclusion?

25 A    Yes.  I'm taking into consideration my 25, 26 years of

                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    113

1  experience as a professional person having dealt with over 25

2  retail companies and a dozen consumer product companies.

3  Q    Fine.  But, as it relates to Wal-Mart, you're using what

4  you understand Wal-Mart's business is in assisting you in

5  coming to this conclusion?

6  A    Yes.

7  Q    But, that's not contained in your report?

8  A    Yes.  That's right.  It's not in my report.

9  Q    There's no written document that I could look at, either

10 in your report or in any of the documents that you've looked

11 at, that would give me a further idea of how you came to use

12 this experience?

13 A    There's nothing written about my judgment, no.

14                        (Pause)

15 Q    There was a -- Mr. Schwartz asked you a question about how

16 the inventory was set forth in the store.  There is a method

17 that Wal-Mart uses -- a plan as to how it orders it products,

18 six months in advance?

19 A    Here's the way it works.  Wal-Mart will meet, at least

20 annually, with all of its major vendors.  And they'll put

21 together a plan for the year.

22          They'll look at the history of sell through, they'll

23 look at the plans for opening new stores, they'll look at how

24 they're reconfiguring their planograms in the store, and how

25 much space they're allotting -- shelf space, and they'll give

Ordway - Cross/Greenhalgh                    114

1  their vendors an idea of how many units they propose to -- to

2  buy.

3          They'll talk about what we believe you ought to be

4  holding, in terms of safety stock, when we think we're going to

5  want these to be shipped, to the extent they're seasonality.

6          Actual purchases, however, are not committed to.

7  They'll occur as replenishment of the product is needed, or as

8  a promotional product is put on the shelf.  And --

9  Q     How --

10 A     And there's very close coordination between vendors and

11 Wal-Mart.

12 Q     And is there a name that you called that earlier?

13          THE COURT:  Planogram, is that what you're referring

14 to?

15 A     That was the -- the planogram is exactly as we talked

16 before.  It's how a retailer opts to configure stocking his

17 store.

18 Q     And do other retailers use a planogram?

19 A     They should.  Some don't.

20 Q     Okay.  Are you familiar with whether Family Dollar uses a

21 planogram?

22 A     I don't know if they do or not.

23 Q     You -- do you know if Target uses a planogram?

24 A     Yes.  I know they do.

25 Q     Did you make any inquiries with regards to everything that

Ordway - Cross/Greenhalgh                    115

1  you looked at, what the planogram was that Wal-Mart had

2  established for Jazz?

3  A    No.  I didn't ask anyone about planograms.

4  Q    Okay.  And you -- based upon your 25 years of experience

5  in retail and your experience with 25 consumer sellers, I guess

6  --

7  A    It's actually more than that, but a lot of consumer

8  product companies.

9  Q    -- you don't think that making any inquiry into whether

10 Wal-Mart had a planogram, at the time, or immediately prior to

11 the recall, would be important or not?

12 A    I know they had a planogram.

13 Q    Right.

14 A    They had one in place, they have one in place today.  I

15 mean, it's a -- it's a key tool to merchandising.

16 Q    You think -- would that have any relevancy and bearing on

17 your conclusions in evaluating this settlement proposal?

18 A    No.  Because, I think one of the things that the

19 planogram, if it were available, might show, is that they

20 decided to re-figure -- reconfigure the shelf space dedication

21 in the stores, evidently.

22         That's -- it's evidenced by the sales mix changing

23 slightly to Concord.  As I was led to understand, it was not

24 that they were competing with Concord products, it's that some

25 stores carried Concord products and some stores carried Jazz.

Ordway - Cross/Greenhalgh                    116

1  That they only had a single open price point at a particular

2  retailer -- retail location.

3              (Pause)

4        MR. GREENHALGH:  Your Honor, just a moment.  Because,

5  I'm trying not to --

6        THE COURT:  I appreciate it.  Take your time.

7        MR. GREENHALGH:  -- go through Mr. Schwartz's

8  questions.

9        THE COURT:  Go ahead.

10             (Pause)

11  Q    With regards to Concord, and I know I asked you a few

12  questions earlier, what -- was the sales of Concord to Wal-Mart

13  discussed with Mr. Zatta or Mr. Compose, at all?

14  A    Yes.

15  Q    And you -- were you furnished any information with regards

16  to the percentage of sales that Concord had, to Wal-Mart,

17  versus the percentage of sales of Jazz?

18  A    Yes.  Which, basically, I've illustrated on Exhibit 8.

19  Q    Right.

20  A    The sales in '98 and '97, I don't recall which expert had

21  information regarding that, but I've --

22  Q    And then that's contained in that box on Exhibit 8?

23  A    Well, actually, the sales in 2000 and 2001 are the Concord

24  sales.  The sales that we -- in the lost sales column.

25             The sales in 1999 are the result of doing a trend

J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    117

1  analysis.  And the sales in 1998, of 78,000, are through

2  another analysis.

3          But, I believe that the sales that Concord had to

4  Jazz were -- I'll use the word de minimus, in '98.  Ten

5  thousand units, something less than that.  Something like that.

6                          (Pause)

7  Q    In assessing this proposal, this settlement, did you give

8  any consideration if there -- if the settlement is approved by

9  this Court, as to any delays, if appeals were taken from that

10 decision?

11 A    No.

12 Q    You did give consideration with regards to an appeal

13 period process, if the case against Imation went forward and a

14 judgment was obtained against Imation, correct?

15 A    Yes.

16 Q    And you projected, I guess, a few years -- a three year

17 appeal process?

18 A    From today forward, yes.  The -- just the whole chronology

19 of events before ultimately a payment was made.

20 Q    But, you gave no such consideration with regards to the

21 $25 million proposal that's being made by Imation today?

22 A    No, I did not.

23 Q    Do you believe it wouldn't be warranted?  Is that your

24 opinion?  Or you just didn't give it any consideration?

25 A    I didn't give it consideration.  I thought that what I was

                    J&J COURT TRANSCRIBERS, INC.

Ordway - Cross/Greenhalgh                    118

1  requested to do, was -- is $25 million payable immediately,

2  which is the proposal, was what I was opining to.

3  Q    Did you see the notice that Mr. Greenberg sent out to

4  creditors?

5  A    No.  Well, is the document you're referring to what I have

6  contained as Exhibit 3?  Then the answer's yes.

7  Q    I think it is.  Yes.  No.  I'm --

8                       (Laughter)

9  A    Yes.  I saw this.

10  Q    Okay.  I wasn't trying to trick you, I -- now, in -- but

11  -- and you reviewed the proposed settlement components,

12  correct?

13  A    Yes.

14  Q    And since you were asked to give an opinion, you

15  understand all those components, correct?

16  A    Yes.

17                       (Pause)

18  Q    You had to have an opportunity to look at the notice

19  again?

20         THE COURT:  At Exhibit 3, I believe, to your report?

21  A    Yes.

22  Q    Based upon what you had in front of you, if releases were

23  required to be given by other parties, would that be something

24  that you believe you would need information on, in order to

25  weigh the -- weigh whether or not this settlement should be

Ordway - Cross/Greenhalgh                    119

1 approved or not?

2 A    I'd like to understand what that's --

3         MR. HANSEN:  Objection.

4 A    -- an issue about.

5         THE COURT:  We've been down this road.  If there's an

6 issue with respect to whether this is a doable settlement, put

7 it on independently.

8         MR. GREENHALGH:  Right.  Yes, Your Honor.  But, I

9 just wanted this witness to --

10        THE COURT:  I understand what you want.  I

11 understand.  But, move on.

12        MR. GREENHALGH:  Okay.  Fine.  And he -- and thank

13 you.  And he answered the question.  Thank you, Your Honor.

14        Your Honor, could I have just one --

15        THE COURT:  Certainly.

16        MR. GREENHALGH:  -- brief moment.

17        THE COURT:  Go ahead.

18                      (Pause)

19        THE COURT:  Mr. Stoeri, I'm going to ask you,

20 directly, whether releases are required of parties that cannot

21 provide them, for one or another circumstance, with respect to

22 the settlement, as far as you're concerned?

23        MR. GREENHALGH:  Thank you, Your Honor.  I'm

24 finished, at this time.

25        THE COURT:  Anyone else have questions for this

                    J&J COURT TRANSCRIBERS, INC.

1  witness?  Anyone at all?  The floor is open.  Going once.

2          All right.  You're excused with the thanks of the

3  Court.  I know you've had a rough week and we do appreciate

4  your prompt response and compliance with the order.

5          THE WITNESS:  Thank you.

6          THE COURT:  Thank you.  Mr. Greenberg, do you have

7  anything else to present?

8          MR. GREENBERG:  The examiner is our only report --

9  our only witness.

10          You have the position of the committee.  We

11  understand there's some modifications as a result of what the

12  Court has ruled with respect to the million dollar, sort of

13  carve out, from the Fuji's receipts.

14          And other than that, that is what we offer in support

15  of approval of the settlement.

16          THE COURT:  Any proponent of the plan have anything

17  to add to the record, at this point?

18          MR. HANSEN:  Your Honor, Fuji will stand on the

19  papers that I've submitted with respect to the settlement.  We

20  believe the settlement satisfies the market factors.

21          THE COURT:  Before we get to opposition, I would go

22  back to Mr. Novack and ask the question that I started off

23  with, are you in a position, Mr. Novack --

24          UNIDENTIFIED FEMALE ATTORNEY:  Excuse me, Your Honor.

25  Before Mr. Novack starts, may Mr. Ordway be excused, or would

1  you like him to stay for the remainder of the hearing?

2          THE COURT:  Well, that's a good question.  Anybody

3  need Mr. Ordway?

4          MR. HANSEN:  Your Honor, it's -- it may be a bit

5  premature, but in the event that the settlement is approved,

6  there is, obviously, a component of it which is a close of the

7  ongoing sales operations of Jazz and the client liquidation to

8  come in.

9          And it would be Fuji's desire that Mr. Ordway's role

10  be expanded in that capacity, so that he can oversee the

11  shutdown of the business.

12          UNIDENTIFIED FEMALE ATTORNEY:  Your Honor, that's not

13  permissible.

14          THE COURT:  That's a motion that is --

15          UNIDENTIFIED MALE ATTORNEY:  And that's not the point

16  of Court today.

17          THE COURT:  -- really not before the Court.  And so,

18  I appreciate your point, but I think that unless on the

19  substance of the Martin factor hearing, if there's any need for

20  Mr. Ordway, and a party feels there's a need on that basis,

21  otherwise I will release him again, with the thanks of the

22  Court.

23          Seeing --

24          MR. GREENHALGH:  Your Honor, could I ask a question

25  to the Court?

1            THE COURT:  Sure.

2            MR. GREENHALGH:  As -- since counsel raised that, I'd

3   like to ask Mr. Ordway, through the Court, whether that

4   proposal was ever discussed with Mr. Ordway, since his

5   engagement?

6            THE COURT:  Which proposal?

7            MR. GREENHALGH:  Of him overseeing the debtor's

8   liquidation and cessation of business.

9            THE COURT:  Is that what you're asking about?  His

10  overseeing it?

11           MR. HANSEN:  I was going to ask Your Honor to expand

12  his role.

13           THE COURT:  Have you ever talked to Mr. Ordway about

14  that?

15           MR. HANSEN:  No, Your Honor.

16           THE COURT:  All right.

17           MR. GREENHALGH:  Thank you.

18           THE COURT:  Your welcome.  Mr. Ordway, you're

19  excused.

20           MR. ORDWAY:  Judge, I just wanted to raise whether I

21  should leave or not, just to curtail my expenses.  I'm more

22  than happy to stay.

23           THE COURT:  Well, if you're -- you're more than

24  welcome as a -- an unpaid spectator.

25                         (Laughter)


                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  There's no doubt about that.  So, it's up

2    to you.

3          MR. GREENBERG:  Your Honor, if we're going to proceed

4    for another hour or so, given his involvement and the fact that

5    there may be some issues that arise, I, personally, would think

6    that having him in the courtroom would potentially be

7    beneficial, and there's no real downside.

8          THE COURT:  All right.  Mr. Ordway, then I'll ask you

9    to stay because of Mr. Greenberg's request.

10          Yes, sir, may I help you?  Are you --

11          UNIDENTIFIED FEMALE ATTORNEY:  Just employees with

12    Mr. Ordway.

13          MR. ORDWAY:  I -- sorry, Your Honor.

14          THE COURT:  That's all right.

15          UNIDENTIFIED FEMALE ATTORNEY:  They thought they were

16    gone already.

17                         (Laughter)

18          THE COURT:  All right.  Mr. Novack, when this hearing

19    began, I asked whether you're in a position to offer an opinion

20    today, and then I asked you the specific question, are you in a

21    position to offer an opinion today, Mr. Novack?

22          MR. NOVACK:  Judge, I think as trial counsel we're

23    always confronted with that kind of question and expected to

24    respond to a client's inquiry as to the reasonableness of a

25    settlement offer that occurs at any time during the course of

1  litigation.

2          So, I would think that we would be expected to be

3  able to answer that question.

4          THE COURT:  All right.  And so, I will ask you

5  directly, for the record, under current circumstances and

6  viewing the Imation litigation status and potential as of this

7  date, February 16, 2005, is, in your opinion, the proposed

8  settlement reasonable?

9          MR. NOVACK:  Judge, if I might just expand upon your

10 observation of the current circumstances, which, while I

11 indicated before we are often, as trial counsel, confronted

12 with this type of question, the current circumstances are

13 somewhat unique and I would like to at least state what my

14 perception of those circumstances are, for the record.

15         THE COURT:  Fair enough.

16         MR. NOVACK:  That we've begun a trial, a substantial

17 trial.  We put on probably, on behalf of the plaintiff, about

18 75 percent of our case that, due to the circumstances of the

19 settlement negotiations, Judge Linares has suspended the trial,

20 which has meant that the Jury has been sitting around for three

21 plus weeks, without having participated in the case,

22 potentially having been exposed to extraneous information

23 regarding the settlement proceedings that have been public.

24         We certainly face the potential of a mistrial

25 application by Imation, if this Court were to reject this

J&J COURT TRANSCRIBERS, INC.

1  proposed settlement and return us to Judge Linares.

2          In fact, I suspect that we also face an application

3  sua sponte by the Judge, to declare a mistrial, in which case

4  we would be forced to get a new trial date sometime in the

5  future, probably in the fall at the earliest, which gives, in

6  our opinion, gives to Imation an enormous advantage, since they

7  have seen our case, they have seen our trial strategy, they

8  have seen the presentation of the most critical aspects of

9  evidence.

10         And they will certainly, in my opinion, be prepared

11 in a different way to respond to that evidence, then they are

12 had we simply proceeded in the ordinary course.

13         So, I think that those circumstances that -- with

14 which we are presented here today, have a bearing on our

15 evaluation of the case.

16         That having been said, we would have been prepared to

17 recommend to the client that a settlement of $30 million would

18 have been reasonable.  And under the circumstances presented

19 today, in our opinion, the settlement proposal is within the

20 range of reasonableness.

21         THE COURT:  Thank you, Mr. Novack.  Mr. Stoeri, I

22 call on you now.

23         There has been intimation, though no evidence, that

24 for one or another reason this settlement, in terms of

25 documents, cannot be implemented.


                J&J COURT TRANSCRIBERS, INC.

1           Do you know of any reason why this settlement can't

2    be implemented?  Are you, for example, requiring a release from

3    Jazz Hong Kong, which may or may not be feasible under the

4    circumstances of their liquidation?

5           MR. STOERI:  In my current understanding of the

6    situation of Jazz Hong Kong, yes we would require that.  Let me

7    explain, Your Honor.

8           When we put this on the record, for Judge Linares, he

9    asked that I dictate to his clerk the specific terms, which we

10   did, which were attached and delivered to you.

11          One of those terms was complete release from all

12   parties, and it specifically included Jazz Hong Kong, for a

13   very good reason.  Jazz Hong Kong is a party in our lawsuit.

14   This is not simply an affiliated company.  They have sued and

15   are a party to that lawsuit and, of course, we're not going to

16   pay 25 million and yet not get a release from the plaintiffs in

17   the lawsuit.

18          So, that was there all along.  I raised that with Mr.

19   Fraza, back at the beginning of those discussions -- a week ago

20   this past Monday, as I recall.  And I asked him, who would we

21   need to have sign for Jazz U.S. and who would we need to have

22   sign for Jazz Hong Kong, because I don't know their status

23   right now.

24          He investigated that and my understanding is he

25   contacted Mr. Rosenthal, as part of that, and Mr. Rosenthal

1 then sent the parties, which is why people know about it -- a

2 comment concerning his understanding, because Fuji's been

3 involved in the process of -- my understanding, it's a

4 liquidation of Jazz Hong Kong.

5          And the status, from my understanding from Fuji's

6 counsel, is that they currently have a liquidator, or they

7 would need to have someone appointed, who would confirm

8 appropriateness of a settlement.

9          But, they saw little or no likelihood that a

10 liquidator would resist signing the release, after satisfying

11 obligations to investigate.

12          And particularly with reference from this Court that

13 they find this reasonable, he did attach prior orders of that

14 Hong Kong liquidating Court, which specifically quoted and gave

15 deference to and from my understanding --

16          THE COURT:  Stern Jay (phonetic)?

17          MR. STOERI:  Correct.

18                         (Laughter)

19          MR. STOERI:  With a capital and with a lower case s,

20 I think.

21          THE COURT:  I've read them.

22          MR. STOERI:  That they gave deference to this Court.

23 So, yes, we absolutely are not going to pay 25 million without

24 getting a release from the parties to the lawsuit.

25          But, my understanding is what we would -- can do, is

1  put it into escrow, pending that confirmation.  That satisfies

2  our needs in terms of time limits, to move it along.  We wait

3  for that confirmation and it moves at that point.

4          But, no, it's not something where Imation would pay

5  the money and yet not get a release.  So, that is a

6  requirement.

7          We've had some discussion this morning, because we

8  just got -- I just got this, literally, as I was leaving for

9  the airport, about the status of the Hong Kong situation -- is

10 there some other way to do this?  If their claim is subrogated

11 to Jazz U.S., is there someway either to have Jazz U.S.

12 instruct them?

13         I don't think, from my little knowledge of this area,

14 that that could be done, but I'm open to ideas.  There was a

15 suggestion, maybe, that there could be a restraining order on

16 Jazz Hong Kong here.

17         I don't think that would work, because there's an

18 Imation Hong Kong entity and if they proceed in Hong Kong to

19 sue out something, and continue the lawsuit -- in effect, what

20 happened was there was a lawsuit in Hong Kong that the parties

21 jointly agreed to stay, have consolidated with this lawsuit,

22 with all of them becoming parties here.

23         But, I'm -- I don't think any order, even from this

24 District Court, would stop a Hong Kong entity suing another

25 Hong Kong entity in a Hong Kong Court.  And we aren't going to,

 1  obviously, leave that sitting out there.  So, yes, I think

 2  there is that obligation.

 3          I did draft a settlement agreement and general

 4  release, at Mr. Fraza's request, and sent that to Jazz.  It

 5  includes this kind of language, but it still had open-ended,

 6  who signs for Jazz Hong Kong.

 7          THE COURT:  Fair enough.  Okay.  So, that puts the

 8  issue on the table.

 9          Anyone have any comment on the specific issue of Jazz

10  Hong Kong and the release, in terms of implementing a

11  settlement, if it should be approved by this Court.

12          Mr. Rosenthal?

13          MR. ROSENTHAL:  Yes, Your Honor.  The issue was

14  raised with me, as you know --

15          THE COURT:  Well, I now know.  I didn't know before,

16  but I now know.

17          MR. ROSENTHAL:  Well, Your Honor, I was asked a

18  question, and I consulted with Hong Kong counsel, and I

19  circulated, on Tuesday, to counsel for all parties, including

20  counsel for Mr. Silvera and PRE, the results of my

21  investigation.

22          And I have here, that writing, if Your Honor would

23  want, or I could describe it to you.

24          THE COURT:  Well, let's take the description first,

25  and then we'll go from there.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENTHAL:  All right.  Your Honor, under Hong

2   Kong law, the company's officers, or the directors in the case

3   of Hong Kong corporation, are no longer empowered to do

4   anything.

5          Having -- Judge Chu having issued her decision and

6   having, thereafter, as I learned the other day, having issued a

7   judgment which, in effect, removes them -- orders them to

8   report to the liquidator, whoever that may be, and answer all

9   their questions, but nonetheless you no longer have power --

10  this is director, I think, Mazito (phonetic), is the sole

11  director at this point.

12         The initial responsibility for this issue is in the

13  hands of a government official named the official receiver.

14  And the official receiver's job, in essence, is to find a

15  liquidator.

16         And while he -- the official receiver might be

17  empowered, I am advised that it is unlikely that he will do

18  anything in the short period of time before he engages a

19  liquidator.

20         So, as a practical matter, we can discount any act on

21  the part of the government agency.

22         The provisional liquidator is appointed by the

23  official receiver, usually at the first shareholder and

24  creditor meeting, which is scheduled for March 2, 2005.

25         Fuji has put forward a candidate to be the official

J&J COURT TRANSCRIBERS, INC.

1  liquidator.  Representatives of the local office -- and that

2  official liquidator then has an -- a fiduciary obligation to

3  the estates.

4          I am advised by Hong Kong counsel that that

5  liquidator will not just sign the piece of paper.  He will

6  perform due diligence to determine whether signing that piece

7  of paper is appropriate.

8          He may seek an order of Judge Chu, or whoever, to

9  make it happen, but in my estimation and the estimation of my

10 Hong Kong counsel, that process will take a lot less than the

11 process will take here, to disburse $25 million.

12         So, that we -- I do anticipate that we will have this

13 approval.  And Fuji has volunteered to use its resources, and

14 whatever, to make this happen.

15         THE COURT:  Well, will Fuji commit, on the record

16 today, to both use its best efforts and its claim in the

17 liquidation, for that purpose?

18         MR. ROSENTHAL:  Well, yes.  It is our claim in

19 liquidation that gives us the power to recommend a --

20         THE COURT:  And that's exactly --

21         MR. ROSENTHAL:  -- liquidator.

22         THE COURT:  That's exactly why I make the reference

23 to your claim in liquidation.

24         MR. ROSENTHAL:  Yes, Your Honor.  And we will

25 exercise that right.


                    J&J COURT TRANSCRIBERS, INC.

1          No one wants this settlement to go forth faster than

2  we do, because we see this as the largest, at least initial pot

3  of money, from which Fuji is going to get a thin dime.

4          So, yes, Fuji will do this at -- and obviously at our

5  expense.

6          THE COURT:  Well, commit on the record today,

7  assuming, and again, we haven't reached the ultimate issue, but

8  if the settlement were approved, Fuji on the record today

9  commits to use its position, including its position as a

10 claimant in the liquidation, to effectuate the settlement by

11 getting a -- the necessary documentation, here a waiver, from

12 the liquidator in Hong Kong.

13          Is that what I understand?

14          MR. ROSENTHAL:  That's correct, Your Honor.

15          THE COURT:  All right.  Thank you, Mr. Rosenthal.

16          MR. ROSENTHAL:  And then if I would go one step

17 further --

18          THE COURT:  Go ahead.

19          MR. ROSENTHAL:  -- as I did in my document, I would

20 suggest that Your Honor, if the settlement were approved, you

21 should order all the parties before you, and it's leaning, at

22 this point, to take no step, direct or indirect, to interfere

23 with that process of obtaining the consent of Jazz Hong Kong.

24          I can't control -- I can't guarantee what happens in

25 Hong Kong, but I have a lot of confidence in the ability of

1    people to throw wooden shoes in machinery.

2            THE COURT:  Well, we're not there yet and I think

3    we'll take it one step at a time.

4            But, for the moment, that's some education as to what

5    is necessary, based upon the issue that was raised by both Mr.

6    Schwartz and Mr. Greenhalgh, in their questioning.

7            Any other comment on this point?

8            MR. SIROTA:  Judge, I'm working again from the

9    assumption that Your Honor has set forth, which is, if the

10    settlement's approved.

11            The notice of proposed settlement that was

12    circulated, if I recall correctly, and Mr. Hansen typed it, the

13    first section of it was drafted from this, I think, purported

14    settlement agreement, that I haven't seen.  The settlement

15    agreement that Mr. Stoeri refers to with Mr. Fraza.

16            THE COURT:  Settlement agreement, or outline, which

17    --

18            MR. SIROTA:  I understand --

19            THE COURT:  The full agreement?

20            UNIDENTIFIED MALE ATTORNEY:  Is the --

21            THE COURT:  The full agreement?

22            UNIDENTIFIED MALE ATTORNEY:  -- that was attached --

23    what you gave Your Honor, and then --

24            THE COURT:  As I -- because, you're in the dark and

25    it's unfair -- and it was not realized by the Court at the time

1 we had the opening discussion on this a week ago, that outline

2 is cryptic, at best, and in some ways has already been altered.

3 Particularly as to the confidentiality issue.

4      MR. SIROTA:  My point, Judge, is, if there are issues

5 out there on this outline or agreement, that in any way would

6 undermine what I think everybody's counting on, which is $25

7 million paid, immediately upon the Court's entry of the order

8 approving it, and subject to disbursement, immediately, without

9 any appeal, or any -- if there's an appeal filed, we're

10 assuming that money can still be disbursed.

11      There's nothing I've seen, in any outline, agreement,

12 or notice, that ties up $25 million, in any process.  Hong Kong

13 release, appeal, or any problem of the kind.

14      And if there is such an understanding, it should be

15 brought forth, immediately, because --

16      THE COURT:  I agree.  And that's why --

17      MR. SIROTA:  -- it's not in here.

18      THE COURT:  I absolutely agree and that's why I'm

19 raising the issue -- and it's really not me.  I think that

20 appropriately now, and now I see the basis for the question,

21 and though it may have been beyond --

22      UNIDENTIFIED MALE ATTORNEY:  Do you want to overrule

23 the objection, at this point?

24                (Laughter)

25      THE COURT:  But, I'll sustain you right now, and I

1  hope it says sustained.  Mr. Stoeri?

2          MR. STOERI:  Two quick points, Your Honor.  We did,

3  even in the very brief outline, given there's a mutual release

4  of all claims, if you've got Hong Kong as a party, we have to

5  get a mutual release.

6          UNIDENTIFIED FEMALE ATTORNEY:  We don't have that --

7  is the problem --

8          MR. STOERI:  In that notice it says mutual release, I

9  believe --

10          UNIDENTIFIED MALE ATTORNEY:  Yes, it defines Jazz, as

11  Jazz U.S., and not Hong Kong.

12          MR. STOERI:  Well, it's in the litigation, Jazz Hong

13  Kong, a party to wit.

14          That -- you had instructed to have a brief outline,

15  instead of all the elements there, that's what we've done.  But

16  more to the point, from our perspective, we don't want any

17  money paid out unless we're sure that we've got a release.

18          And if that means it waits for a --

19          THE COURT:  Okay.

20          MR. STOERI:  -- it waits.

21          THE COURT:  Okay.  I hear you, and I'm not entering

22  the fray on the point raised right now, by Mr. Sirota.

23          Of course, I will have to, but it is unfair, simply

24  put, to have a litigant offer up $25 million and not get a

25  release from a party plaintiff and have themselves exposed,

1    when the clear understanding is that the payment was to end

2    that litigation, in total, and to wipe out those claims.

3            So, I don't think we ought to frighten ourselves on

4    the issue of the mechanics.  On the other hand, life takes

5    funny twists with respect to mechanics, and in different

6    jurisdictions, and we don't have that certainty, and it's

7    clearly a matter that relates to this settlement hearing.

8            Yes?

9            MR. GREENBERG:  Mr. Sirota raised similar concerns

10   that I have, and maybe we can sort of bifurcate the image.

11           So, I guess the first question of Mr. Stoeri is, were

12   the Court to approve the settlement today, is his client

13   prepared, today or tomorrow, to wire $25 million into either

14   the Kolshocks (phonetic) or Myers (phonetic), somebody's trust

15   account, to be held.  That's the first thing.

16           THE COURT:  I -- that's the way I heard it.  Did I

17   hear it correctly, Mr. Stoeri?  Is the answer to that yes?

18           MR. STOERI:  I'm not sure whether today, or tomorrow,

19   but promptly, yes.

20           MR. GREENBERG:  Okay.

21           MR. STOERI:  That's my understanding.

22           THE COURT:  All right.

23           MR. GREENBERG:  And then from --

24           MR. STOERI:  That is contingent, obviously.

25           MR. GREENBERG:  -- perspective, as the moving party

1  for the settlement, I would like to see money disbursed sooner,

2  rather than later, recognizing his concern, and recognizing the

3  Jazz Hong Kong issue.

4          Because, there may be not the appeals -- there may be

5  not -- be a stay pending appeal, but I know there's a lot of

6  Third Circuit law that says you can mute certain appeals by

7  dispersing funds, et cetera.  So, I may have an objective to

8  accomplish that sooner, rather than later, even without a plan.

9          To the extent we are able to satisfy Imation on their

10 concerns, to the extent there are allowed unchallenged admin

11 claims, or secured claims which don't require a plan, per se,

12 we would certainly -- and I speak for the debtor, I assume, as

13 well, want to accomplish that, to preserve that $25 million

14 fund, and not run risk of it being overturned somewhere down

15 the road, in the absence of a stay.

16          So, that's a concern we have.

17          THE COURT:  Well, I -- again, I understand the

18 tactics, I don't know that this Court should base a decision on

19 those tactics.  I sense not, and I don't think I will.

20          And so, the real issue for this Court is whether this

21 is a settlement that can be effectuated, not a settlement that

22 can be effectuated so quickly as to blunt an appeal.  I'm not

23 going to that and I don't think that's appropriate.

24          MR. GREENBERG:  Well, Your Honor, my point is that an

25 appeal without a stay shouldn't have the benefit, indirectly,

1  of a stay, and that was the point I was trying to make.

2          THE COURT:  But, it's not a function of what the

3  appellate might do, it's a function of the reality of this

4  settlement and needs that the funding party has.

5          And, you know, from what I hear, parties will do what

6  they can do to get the necessary documentation.  It's not

7  guaranteed and it's certainly not guaranteed tomorrow.

8          MR. SIROTA:  My question, Your Honor, is much more

9  precise on the appellate issue.

10          Forgetting for a minute the tactic that Mr. Greenberg

11  refers to, is it Imation's position that the $25 million,

12  assuming the Court approves the settlement, is paid, can be

13  dispersed, assuming the Court approves disbursement,

14  independent of a file of appeal, or is their settlement

15  conditioned upon the entry of a final --

16          THE COURT:  Oh.  I'm sorry.  Then I -- then you're

17  asking a different question than I was addressing.

18          MR. GREENBERG:  That's correct.  I was --

19          MR. SIROTA:  I'm trying to determine what, if any,

20  contingencies exist in this settlement.

21          THE COURT:  Right.  Mr. Stoeri, do you understand

22  what Mr. Sirota's asking?

23          MR. STOERI:  I believe so, and the answer is there

24  should be no distribution of money, on our part, until we are

25  clear that we have firm and final resolution of this matter.  I

1  don't want money going out, finding something's reversed, and

2  the money's gone, and yet we're still in a lawsuit.

3        Now, I also am not a bankruptcy lawyer and my

4  bankruptcy counsel is gone this week.  I will contact someone

5  if need be.  But, my understanding from her, before, was that

6  unless there's an agreement somehow to the contrary, money

7  should not go out -- we can put it into a trust fund and it can

8  wait until it is firm and final, but it shouldn't go out in

9  payment until it's a firm and final position that we will not

10  be exposed to any further litigation in the matter.

11        THE COURT:  Which is somewhat different than saying

12  the appeal must mature and be concluded.  And so, that's an

13  issue for the Court.

14        UNIDENTIFIED MALE ATTORNEY:  It's an issue.

15        THE COURT:  In other words, if Mr. Stoeri is

16  satisfied, and maybe it's a matter to be argued in the future,

17  that any pending appeal, A, doesn't have a stay -- if there's a

18  stay, there's a stay, and that's that.

19        If there's no stay, then it's a matter to yet be

20  resolved, as to whether the future will allow the Stoeri

21  interest here -- the Imation interest, rather, to have a

22  feeling of satisfaction such that the appeal doesn't affect it.

23        MR. SIROTA:  Judge, I've been very careful, given the

24  debtor's position --

25        THE COURT:  Oh, I've noticed.


                    J&J COURT TRANSCRIBERS, INC.

1          MR. SIROTA:  And it's been painful for me, to sit

2   quiet, as the Court knows.

3                        (Laughter)

4          THE COURT:  Okay.

5          MR. SIROTA:  But, if I understand both Mr. Ordway's

6   testimony and Mr. Novack's response, it is based upon --

7          THE COURT:  Current dollars.

8          MR. SIROTA:  -- money being paid immediately --

9          THE COURT:  I understand.  And that point was made by

10  Mr. Greenhalgh.

11         MR. SIROTA:  But, it wasn't made by Mr. Novack in the

12  sense that if you wait out for Mr. Novack, and I don't know the

13  answer, that an appeal might take x-period of time, of the

14  settlement, and the $25 million is sitting in abeyance, is that

15  his idea of a reasonable settlement, compared to the potential

16  risks of going forward with the litigation?

17         THE COURT:  But, I think we can extrapolate from Mr.

18  Novack's statement that $25 million, today, would be

19  reasonable.  I understand, and there are just certain things

20  that we can deal with, on motion, in a <u>Martin</u> hearing.

21         Now, if you want Mr. Novack to come forward again,

22  and ask whether the settlement is less favorable if x-months,

23  or a year, is eaten up in appeal, or more, I'm sure the answer

24  is, of course, dollars today is worth more than dollars a year

25  from now.


                  J&J COURT TRANSCRIBERS, INC.

1          MR. SIROTA:  My request of the Court would be not to

2    rule on the settlement until Mr. Stoeri unequivocally tells

3    this Court whether or not it's based upon a final

4    non-appealable order.  Because, I think that does change the

5    dynamic of Mr. Ordway's testimony.

6          THE COURT:  Well, I'm not so sure that it changes the

7    dynamic of his testimony.  I think that -- you can confer, and

8    I'll certainly take a break and people can confer with Mr.

9    Stoeri, and see where he is.  But, I don't really want to get

10   into negotiating the appeal issue.  I know it's a difficult

11   issue.

12         MR. SIROTA:  It's all the difference in the world.

13         THE COURT:  Well, I don't know that it's all the

14   difference, but I'll hear from counsel.

15         MR. HANSEN:  Your Honor, we just -- since we're

16   engaging in a bit of free ranging discussion, let's just point

17   out, obviously, that $25 million, to the extent it's funded by

18   Imation in due course, is going to accrue interest wherever

19   it's sitting.

20         So, obviously, that is helpful and it's not like --

21   as if the two and a half million dollars is frozen and not

22   accruing interest.  So, I don't know if it changes peoples'

23   views that much, number one.

24         Number two, with respect to distribution on those

25   amounts, there's been no claims allowance process yet even

1   engaged in before the Court.  And, obviously, that takes time

2   too.

3           And there will be significant objections to lots of

4   claims, and with respect to interim distributions, et cetera.

5   Those things take time and I think that we -- by the time you

6   get to a point where you have an allowed pool of claims,

7   sizeable enough to make a distribution on those claims, our

8   estimation is you'll have your release from Hong Kong.

9           I understand we can't speculate with respect to these

10  things. But that's our view point.

11          UNIDENTIFIED MALE ATTORNEY:  Hong Kong's not --

12          MR. GREENHALGH:  Your Honor, I --

13          THE COURT:  Yes?

14          MR. GREENHALGH:  I think this really raises some

15  serious issues for this Court on whether you can approve the

16  settlement, number one, that hasn't been properly noticed.  If

17  Mr. Stoeri advises the Court that, as a condition of this

18  settlement that this order approving -- must approve and it

19  must be a final non-appealable order, that is not a -- that is

20  not discussed in this notice of settlement.

21          And if that is a condition, we should have had notice

22  of it.  And that's number one.

23          Number two --

24          UNIDENTIFIED ATTORNEY:  Well --

25          MR. GREENHALGH:  Excuse me.  Let me finish, please.

1    Number two, counsel's already suggested, counsel for Fuji, that

2    they're in the starting block right now, to have someone

3    overseeing the cessation and liquidation of this company, March

4    1st.  Now, that's right in there.

5            And if we have an appeal, and if Imation is posting

6    the money, but it's going to be withdrawn if it's reversed on

7    appeal, and it's not going to be disbursed, we have just killed

8    this company.  We've shut it down on March 1st.

9            THE COURT:  Which company are you talking about?

10           MR. GREENHALGH:  I'm talking about Jazz.  It's going

11   to cease.

12           THE COURT:  Yes.

13           MR. GREENHALGH:  All sales in the ordinary course of

14   business --

15           THE COURT:  Well, I'll go to that issue directly.

16   This company was going to be killed anyhow, if you use your

17   term.

18           MR. GREENHALGH:  Okay.

19           THE COURT:  This Court, and I would put this on the

20   record, and it's going to be part of my finding, was going to

21   convert this case, with the only consideration being the impact

22   of that conversion on the Imation litigation.

23           The events of January 14 and 24 were so significant,

24   in this Court's view, that is the Federal Circuit Appeal on the

25   ITC liquidation, if we use that term, opinion -- and a finding

1   of bad faith, a critical finding of bad faith, and a $25,000 a

2   day penalty, that's such a significant event that there's no

3   way that Jazz would have survived that motion.

4         And, so this company well deserves to be put out of

5   business and this Court welcomes that event as part of this

6   settlement, or otherwise.  And, I don't want there to be any

7   doubt about that.  Enough is enough.  And, again, my only

8   concern was -- and it would have been done on the 28th,

9   scheduling didn't allow -- but it would have been done.

10        MR. GREENHALGH:  Your Honor, if Your Honor is

11  indicating that the case would have been converted, then

12  without even speaking with my client I would request that the

13  case be converted.

14        THE COURT:  I understand your request.

15        MS. JUROW:  You know, this claim is (indiscernible),

16  and I have a motion pending to convert that claim and I need a

17  date on that.

18        THE COURT:  We'll give you a date.  But, let's deal

19  with one thing at a time.

20        MS. JUROW:  And, with Jazz, I think what we have is a

21  confession by the debtor that there'll be a liquidating plan

22  filed and that my estimation obviated the need for conversion

23  to Chapter 7, especially where the funding source doesn't leave

24  administrative insolvency so there's no need to elevate the

25  seven administration over the eleven.


                    **J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  There are all kinds of benefits, if you

2   will, in terms of efficiency to having the very quick

3   liquidating plan rather than the conversion.  Although, I

4   understand and I'm not unsympathetic, Mr. Schwartz, to all of

5   the aspects of your preference, and it's unfortunate, very

6   unfortunate that things are playing out the way they are but

7   this would have been converted if we didn't have the

8   interdiction of this proposed settlement, which was not this

9   Court's doing but rather a function of what Judge Linares

10  viewed as appropriate and his distinction of the trial which

11  this Court takes as very, very significant.  Yes, Mr.

12  Rosenthal.

13          MR. ROSENTHAL:  I just want to remind everybody that

14  the subordination by Jason B. of their claim out of the Imation

15  --

16          THE COURT:  I understand the order.  The order is

17  that if there is a conversion that subordination is eliminated.

18          MR. ROSENTHAL:  Exactly.

19          THE COURT:  And, that's exactly what I was referring

20  to with Mr. Shwartz because there's enormous -- well, not as

21  big as in the Jazz case -- but there's a large admin. claim

22  building for professionals, and I'm not saying that with an

23  edge, I'm very sympathetic, but in the Benun case.  But, it's

24  just a fact of life.  And, on an overall basis it's clear to

25  this Court that liquidation quickly in an eleven here as the

1 settlement proposal calls for is really more efficient than

2 bringing in a new fiduciary, a Chapter 7 Trustee, and all that

3 that would entail.

4          But, having said that we haven't really dealt with

5 the substantive issue of whether this settlement is

6 satisfactory or not under the Martin factors.  I will go to

7 that issue much more directly but I do want to know, and I

8 think Mr. Sirota is correct in asking the basic question of

9 Imation as to the effect of an appeal.  For the moment I will

10 leave that to some discussion between and among the parties and

11 then come back to that issue.

12          We'll take a 15-minute break.  When I come back I

13 will hear in short form no more than eight or ten minutes per

14 party in interest, and hopefully less, their positions on the

15 Martin factors.  First we'll hear what the status is of the

16 discussion with Mr. Stoeri about the appeal issue.  That's an

17 obvious factor in determining whether this is a reasonable

18 settlement or not under all of the circumstances.  And, if

19 there is a holdup and if there's a holdup as a function of the

20 Hong Kong release, those are things that I think legitimately

21 the Court should consider and will consider in its

22 determination.  Having said that, I'll leave it to the parties

23 to have some discussion and be back in 15 minutes.  Does that

24 work?

25          UNIDENTIFIED ATTORNEY:  At 2:15, Your Honor, does

1  that sound good?

2              THE COURT:  2:15 is good.

3                      (Recess)

4              THE COURT:  Mr. Stoeri, have you anything to report?

5              MR. STOERI:  Yes, Your Honor.  Had a chance to talk

6  to counsel and my client.  Counsel with more bankruptcy

7  background.  And, these are the conditions that Imation would

8  put upon this settlement.  One is a full and complete release

9  from Jazz Photo, which I am confident we've already sent off

10 and Mr. Fraza and I've discussed, and that's relatively easily

11 accomplished, I believe.  But, that would include a mutual

12 release of both parties of all claims known or unknown,

13 etcetera, relating in any way to the purchase of film.  It

14 would include any successors assigns, etcetera, of both

15 parties.

16         That one I don't have a problem, I don't think

17 there's going to be any issue with.  Jazz Hong Kong release

18 would also be a condition and we've discussed that, that would

19 be a condition to release of funds.  Funds would go into escrow

20 and to whom we can discuss later.  I don't know if you have a

21 reference on that, Your Honor.

22         And, lastly, other than the complete release from

23 Jazz and then the Jazz Hong Kong one, there would be a

24 condition that there'd be no stay pending appeal.  And with

25 that, I believe that would cover the conditions.  As I said,

                  J&J COURT TRANSCRIBERS, INC.

1 the other specifics we had was the complete and mutual release,

2 which we can do the exact language on I think apart from Your

3 Honor, work that out.  We had each side bearing its own costs.

4 We had no admissions.  And, dismissal of the case is --

5         THE COURT:  Mr. Stoeri, let me just ask you this.

6 Just so, and again, I appreciate your forthrightness and so I'm

7 going to ask your question that goes to forthrightness.  Is

8 there anything extraordinary in that ultimate settlement

9 document as far as you're concerned as an experienced

10 litigator?

11         MR. STOERI:  No.  The concern that I have as an

12 experienced litigator is that I have a director and

13 shareholders of a company not wanting the company to settle.

14 And, so I'm putting language in saying, "All claims by this

15 company and anyone who's trying to bring a claim derivative of

16 the company are released by this company."  That's the main

17 thing I want to get across.

18         THE COURT:  And, I think after today and maybe after

19 tomorrow you will be able to say that you are in bankruptcy.

20         MR. STOERI:  That sure is not something unto which I

21 aspire.  No intending --

22         THE COURT:  Mr. Rosenthal.

23         MR. ROSENTHAL:  Your Honor, it would make my life a

24 lot simpler if the release with Jazz Hong Kong were also

25 mutual, because Imation hasn't --

1    THE COURT:  Any problem with that, Mr. Stoeri?

2    MR. STOERI:  No, that was anticipated.  I agree.

3    THE COURT:  Thank you.  That's friendly comment.  Mr.

4  Sirota, does that satisfy the appeal issue as far as you're

5  concerned?

6    MR. SIROTA:  I think it does, Judge.  Although,

7  what's set forth in the settlement agreement release that Mr.

8  Stoeri gave to me doesn't reflect this latest amendment, so

9  this has a final non-appealable order in it.  We also

10  understand that the signatory's the settlement of the Jazz

11  Photo, this debtor, Mr. Rosenthal and others will work to

12  extract the ones from Jazz Hong Kong, and then there's a

13  signature line for the Official Committee of Unsecured

14  Creditors, which isn't problematic.  But, I'm assuming those

15  are the only signatures that will be required because the

16  existing document refers to signatories like Long & Benun and

17  others, and obviously we're assuming that's not --

18    THE COURT:  Mr. Stoeri, is that excluded?

19    MR. STOERI:  Yes.

20    THE COURT:  Shareholders are not required to sign?

21    MR. STOERI:  No, as long as there is a binding

22  signature on the company and all its successors in derivative

23  actions I -- I gave Mr. Sirota just a draft that I -- Mr. Fraza

24  had asked for as a working copy.

25    MR. SIROTA:  We'll work on the final version.

1          THE COURT:  All right.  I appreciate it.  So, but for

2     the Jazz Hong Kong wrinkle and however that might be defined,

3     given Fuji's commitment of its claim and its best efforts to

4     bring about that mutual release, is there any other mechanical

5     issue.  There's no issue on the appeal as I hear it, unless

6     someone stands up and tells me there is.  Mr. Greenberg.

7          MR. GREENBERG:  Your Honor, Mr. Stoeri and I had a

8     chance to speak, and when I addressed the Court before it was

9     implicit in my statement that he had to get the release from

10    Jazz Hong Kong.  I wasn't trying to circumvent that.  And, I

11    think we wound up with an understanding which is pretty much

12    what I was talking about.  If there is no stay then the parties

13    can do what the Court allows them to do.  And, I think that's

14    where we are.  He is not (indiscernible) a final non-appealable

15    order.

16         We haven't spoken about the time frame and the

17    mechanics for the transfer.  Obviously, we assume that that can

18    get done forthwith and as to where the money reposes, the Court

19    will have a director.  Mr. Sirota and I can work that out.  But

20    we do want to know that that's something that will be

21    accomplished in very short order.  Doesn't have to be today,

22    but it shouldn't be three weeks from today either.

23         THE COURT:  All right, Mr. Stoeri has made that

24    commitment several times today.  Am I correct, sir?

25         MR. STOERI:  Correct.


                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Anything else before we get to closing

2   arguments?  All right.  It's now 2:30.  I will hear briefly, I

3   could reverse the order, but I'll give -- Mr. Greenhalgh, do

4   you want last licks or you want to go first?  And, Mr.

5   Schwartz.

6          MR. GREENHALGH:  Doesn't matter to us, Your Honor.  I

7   guess we'll go last.

8          THE COURT:  I'll give you the benefit.

9          MR. GREENHALGH:  Thank you.

10          THE COURT:  Mr. Greenberg, did we hear everything

11   from you at the opening?

12          MR. GREENBERG:  Your Honor, I believe you gave --

13   just a couple of comments so the record is clear.  To the

14   extent ultimately there were a carve-out that was not available

15   for all creditors there would be no exclusion from that for

16   Photo Recycling Enterprises, Ltd. and PolyTech Industries.  I

17   make that statement only because I assured Mr. Silverberg last

18   night that that would be reflected --

19          THE COURT:  Absolutely.  I don't want the record to

20   be interpreted as this Court's determination --

21          MR. GREENBERG:  Understood.

22          THE COURT:  -- that the carve-out as initially stated

23   then modified per your statement on the record today will not

24   be effected.  It's simply that the Court reserves the right

25   under the bankruptcy code to make the various determinations

1  that I said.  And we'll see where that takes us.

2         MR. GREENBERG:  And, we understand that.  All parties

3  are certainly reserving their right to argue for or against.

4  From the committee perspective that was a very significant

5  consideration and were that condition to be modified we could

6  have the JCB 20 plus million dollar claim, we could have the

7  recently filed ITC claim, which arguably would be two-thirds of

8  that pot, I think it's 13,675,000, versus six and a half.  But,

9  everybody has their right to argue.

10         The only other --

11         THE COURT:  And that parties in interest to the

12  extent that they have rights can object to claims, and Fuji has

13  reserved its right to object to claims.

14         MR. GREENBERG:  That is correct.  And, Fuji has said

15  that it's still committed to the million dollar carve-out.

16         THE COURT:  Regardless.

17         MR. GREENBERG:  On the steps.  The 17 percent, as

18  they receive dollars.  The only other thing is, an event that

19  did occur today, which I don't think was known to any of us

20  including the examiner when we filed their submissions

21  yesterday.  And, that was the very forthright assessment by Mr.

22  Novack as to settlement as proposed and where his firm as

23  primary litigation counsel thought the reasonable level of

24  settlement would be.  They certainly were not very far apart.

25  And, I would just suggest that if the Court were ultimately to

1  allow the carve-out as had been proposed initially, the

2  unsecured pure non-related creditors would do significantly

3  better with this 25 million dollar settlement and the one

4  million dollar carve-out than even the 30 million dollar number

5  without that kind of provision that Mr. Novack had said their

6  firm would have been prepared to recommend.

7          THE COURT:  In the past.

8          MR. GREENBERG:  That's right.  And, I have no further

9  comments unless the Court has questions of me.  As you do know,

10 the committee's vote in support was two to one, and that has

11 not changed.  We've had conversations subsequent to the vote

12 and the vote still did not change.

13         THE COURT:  My only regret is that we didn't give you

14 an opportunity to be a witness.  All right.  Counsel, go ahead.

15         UNIDENTIFIED ATTORNEY:  Your Honor, Fuji rests on its

16 papers as well as the testimony and report of Mr. Ordway that

17 we entered into evidence today, and Mr. Novack's answers to

18 your questions.

19         THE COURT:  Thank you.  All right, Mr. Sirota, do you

20 intend --

21         MR. SIROTA:  I have nothing, Judge.

22         THE COURT:  All right.  Fine.  Anyone else before Mr.

23 Schwartz or Mr. Greenhal?  Government is here as an observer in

24 two persons.  Yes?

25         UNIDENTIFIED ATTORNEY:  Pretty much, Your Honor.


                    J&J COURT TRANSCRIBERS, INC.

1 Just observing for now.

2            THE COURT:  The U.S. Trustee.

3            MS. JUROW:  Your Honor, I have no position on the

4 settlement.

5            THE COURT:  Fine.  All right.  Either of you.

6            MR. SCHWARTZ:  Thank you, Your Honor.  As the Court's

7 well aware, Bankruptcy Rule 9019 requires, among other things,

8 notice and the notice has to be reasonably calculated.  And the

9 cases that I've set forth in our opposition brief, set forth

10 that the notice has to inform the affected parties, has to be

11 meaningful, etcetera.

12            The notice that went out to creditors here, Your

13 Honor, was defective for a number of reasons.  Number one, the

14 notice that went out contained exclusions that we've resolved

15 apparently here today that certain creditors wouldn't be able

16 to share in one million dollar Fuji carve-out.  Creditors other

17 than those who were excluded may have decided, hey, this is a

18 great deal because I'm going to get more money because those

19 creditors, namely the ITC who has a 13 million dollar claim,

20 and others, we're going to get more money.  Now, as a result of

21 the changes that were made here today, the notice was obviously

22 defective given the fact that creditors who didn't show up and

23 didn't get a chance to be heard will never be heard.  So, for

24 that reason, Your Honor, the notice was defective.

25            In addition, Your Honor, the notice was defective

1  because it didn't provide any explanation to creditors about

2  the Imation litigation.  Didn't tell creditors what they would

3  be getting from the Imation litigation, the chances of

4  probability of success on the merits, the status of the trial,

5  etcetera, etcetera.  And, we think that those provisions should

6  have been included in the notice in order to --

7          THE COURT:  So, you think it's a disclosure

8  statement?

9          MR. SCHWARTZ:  Well, I think, that's my next

10  argument.  But, I think under Rule 9019, I think that because

11  this settlement essentially resolves everything that has to do

12  with this estate and the estate is going to be wrapped up and

13  liquidated, I think that creditors should have received the

14  notice that would be required under a disclosure statement

15  under 1125 pursuant to Bankruptcy Rule 9019 in this

16  circumstance.

17          In addition, Your Honor, we believe that this plan is

18  a sub rosa plan and we've argued that in our papers.  This

19  settlement essentially wraps up everything in the estate, and

20  as a result, Your Honor, for the reasons that are set forth in

21  our papers we believe that it's a sub rosa plan and it doesn't

22  --

23          THE COURT:  Does it deal with claims?

24          MR. SCHWARTZ:  Yes, it does, Your Honor.

25          THE COURT:  Well, how does it deal with claims when

J&J COURT TRANSCRIBERS, INC.

1    the Court has reserved the position as to how the funds are to

2    be distributed, particularly the carve-out, and all parties in

3    interest reserve their rights to challenge claims.  So, why is

4    this an ultimate wrap up of all matters that are plan of

5    liquidation and related issues?

6         MR. SCHWARTZ:  Among other things, Your Honor, the

7    settlement results in a very limited pool of assets.  And, I

8    understand that that might have happened anyway.  But, given

9    the status of the Jury trial, given the status of where we were

10    there, and given the status of what Bud Larner believed this

11    litigation would be worth a week or two ago, as compared to

12    apparently what they believe it to be worth now today given all

13    the circumstances, creditors would have possibly received a lot

14    more.  And, --

15         THE COURT:  With all due respect, and I appreciate

16    your point, and I must say that the level of detail that you

17    are able to both master and put into your cross examination is

18    laudable.  And, I don't say that just as whip cream.  I take my

19    hat off to you.  But, the essence of the settlement and the

20    hearing today is, "What is to be done today?"  Now, your

21    complaint seems to be that maybe something shouldn't have

22    happened in the District Court.  Maybe the case shouldn't have

23    gone on.  But, those are issues that are gone.  And, the only

24    thing this Court can deal with is the hearing now, and to deal

25    with an historically old litigation starting April 27, 1999, if

1 I have the date right, and in the state court, and an aging

2 Chapter 11, May 20, 2003.  And so, I really don't understand

3 the point about why this Court can't hear and analyze and deal

4 with a settlement that's been recommended across the board and

5 decide today reasonableness or not and incorporate the idea of

6 closing down the business.

7          MR. SCHWARTZ:  Your Honor, under certain

8 circumstances I don't disagree with that analysis.  If this

9 were a run of the mill settlement under Rule 9019 then I agree

10 that it wouldn't be a sub rosa plan and we wouldn't have those

11 concerns.

12          However, here, Your Honor, this settlement

13 essentially wraps up everything in the estate and it liquidates

14 or disposes of the primary asset of the estate.  And, the cases

15 that are cited include Cajun Electric Power Cooperative case,

16 5th Circuit (1997), which we cite on Page 21 of our brief,

17 Continental Airlines 780 F2d. 1223, another 5th Circuit case,

18 (Indiscernible) Corp. 722 F2d. 1063, a 2nd Circuit case,

19 Braniff Airway (phonetic) 700 F2d. 935, another 5th Circuit

20 case, Marvel Entertainment Group, 222 BR 243, District of

21 Delaware case, Quality Beverage 181 BR 887, Bankruptcy Court

22 case from the Southern District of Texas.  All say the same

23 thing.  Where you have a settlement that resolves a primary

24 asset of the estate which essentially wraps up everything in

25 the estate, it's essentially a sub rosa plan.  It's the same

1  thing, Your Honor, as if someone came before -- the debtor came

2  before the Court and sought to sell all its assets.  And, --

3        THE COURT:  Well, with all due respect, distribution

4  is not wound up by the settlement.

5        MR. SCHWARTZ:  That may be correct, Your Honor.

6        THE COURT:  It is correct.

7        MR. SCHWARTZ:  That may be correct in the sense that

8  Your Honor cured the infirmities that were contained in the

9  notice here today, so I understand that.  Now, we're creating a

10 pot.  But, nevertheless it's our position that this settlement

11 essentially wrapped up everything in the case given the fact

12 that the settlement required, among other things, the debtor

13 file a liquidating plan by a certain date, the debtor

14 immediately cease operations.  There was more to this

15 settlement than just a settlement of a litigation.  It was a

16 wrap up of the whole case, and as a result we believe that it

17 created the situation where this is a sub rosa plan.

18        THE COURT:  All right.  I appreciate your point.

19 Okay.

20        MR. SCHWARTZ:  And, going further than that, it's the

21 same defective notice that I talked about under Bankruptcy Rule

22 9019, stands true.  If this is a sub rosa plan there's

23 disclosure requirements under 1125, etcetera, and we believe

24 that the notice was defective, didn't meet the requirements of

25 1125, etcetera, etcetera.  So, we believe that the settlement

1  shouldn't be approved for that reason as well.

2       And, Your Honor, importantly as well, and I don't

3  know that this is most importantly, we filed a cross motion

4  with our objection and it's our position and I understand that

5  Your Honor granted the committee's standing last week, sua

6  sponte, but for the reasons that we set forth in our papers we

7  believe that the committee can not gain standing.  The

8  bankruptcy code is clear, only a trustee or a debtor can seek

9  to approve a settlement under 9019, not a committee.  There's

10 case law to that effect.  This is not Cybergenics.  There's

11 vast differences between Cybergenics and a case like this.  And

12 so, we believe that the committee should never have been

13 granted standing and the circumstance of events that, you know,

14 that happened, and the train leaving the station and resulted

15 in Bud Larner coming here today and saying, "Given all the

16 circumstances we believe this is reasonable", should have never

17 occurred.  We should be upstairs and Judge Linares should be

18 sitting listening to witnesses and that would have happened,

19 hopefully, had this train not left the station and this

20 circumstance of events occurred.

21       THE COURT:  Or that case would have been mis-tried.

22       MR. SCHWARTZ:  Or that case would have been mis-

23 tried.  It is what it is.  But, given the status of what

24 happened, we believe, Your Honor, that among other things the

25 committee has no standing and should never have been given

1  standing, and so we cross move for relief on that basis.

2         THE COURT:  Notwithstanding the fact that the debtor

3  stood down, didn't oppose the noticing and agreed to be bound

4  by the examiner's position in this matter?

5         MR. SCHWARTZ:  Yes, Your Honor.

6         THE COURT:  Notwithstanding the fact that there were

7  obvious conflicts on the board as a function of Mr. Benun's

8  control of that board?

9         MR. SCHWARTZ:  We don't believe there were any

10  conflicts, Your Honor.  We believe that Mr. Benun and the other

11  board members were observing their fiduciary obligations, they

12  listened to their trial counsel, their trial counsel told them

13  that the settlement at the numbers that were expressed were not

14  reasonable.  And so, there was no conflict, there was no breach

15  of fiduciary obligations.  We believe the debtor acted

16  reasonably and rationally.  And, the only reason that it was

17  put in the predicament that it was put in was because of the

18  situation and it felt that in order to avoid conversion of the

19  case it would have to say, "I don't object if the examiner

20  says, 'I recommend'."

21         THE COURT:  Well, I think it was put in the position

22  initially by Judge Linares who suspended the trial.  That

23  wasn't a bankruptcy issue.

24         MR. SCHWARTZ:  But, the --

25         THE COURT:  That was a District Court Judge's

J&J COURT TRANSCRIBERS, INC.

1   determination that given the nature of the settlement offer,

2   the trial ought to be suspended.  Now, what is a bankruptcy

3   court do with that when the debtor having fiduciary obligations

4   and having an administrative insolvency unless there's a big

5   payoff out of that case, -- bringing on the settlement to the

6   bankruptcy court for 9019 review?  What is to be done in those

7   circumstances?  And, if standing is the issue, too much is made

8   of standing.

9           MR. SCHWARTZ:  I disagree, Your Honor.

10          THE COURT:  I understand.  And, you're entitled to.

11  I don't make light of your argument.  And, it may be an issue

12  for appeal and it probably will be.  I hear that it will be.

13  And, that's fine.  But, --

14          MR. SCHWARTZ:  I'll be standing up here asking for a

15  stay in a few minutes, so.

16          THE COURT:  Okay.  But, the point is that standing is

17  not substantive law and doesn't expose under these unique

18  circumstances a 25 million dollar offer to a bankruptcy court

19  under circumstances where you have a suspended but not

20  dismissed Jury, a case that could go on for another 30 days,

21  and asset which is really the district court's time, and aging,

22  aging litigation and bankruptcy matters, increased

23  administrative expenses all over the place, and there's a huge

24  amount of administrative debt here as you know, and additional

25  overlays as a function of a finding by ITC that Mr. Benun in

J&J COURT TRANSCRIBERS, INC.

1  his capacity as a fiduciary in this case acted in bad faith and

2  subjected that debtor to $25,000 a day worth of penalties.

3        Now, you may say that he acted neutrally and

4  correctly in his capacity as a fiduciary, a board member.  But,

5  as a minimum the appearance of conflict is there and as a great

6  probability to actuality of conflict is there because whatever

7  incremental amount above the 25 million dollars was sought in

8  the trial, up to a certain point it was never going to go to

9  shareholders anyhow.  So, it looked, I would think to a

10  reasonable District Court Judge as Judge Linares is, as it does

11  to at least this Bankruptcy Court Judge, without

12  characterization, that there's nothing to lose by going ahead

13  with the litigation because the benefit to the individual, Mr.

14  Benun or his wife and children through him, could only be

15  garnered through a home run.  And so, whatever came out of it

16  wasn't going to be satisfactory.

17        Now, having said that I understand and credit on the

18  record counsel's position, Mr. Sirota's position for sort of

19  staying the course with respect to a debtor-in-possession's

20  fiduciary duties.  And, I think he upheld that position as

21  counsel meticulously and diligently.  So, you're not the only

22  one who's going to get credit today for being a quick study and

23  doing the right thing, but Mr. Sirota obviously did.  But, that

24  does not, that does not control the board and eliminate what

25  really is a conflict, that Mr. Benun had nothing to lose by

1  forcing that litigation to conclusion.

2          MR. SCHWARTZ:  Your Honor, obviously if Your Honor

3  felt that a few weeks ago then there was a remedy and that

4  remedy, I believe, was conversion then, I believe conversion --

5          THE COURT:  It would have happened.

6          MR. SCHWARTZ:  Well, then it should have happened,

7  Your Honor, because --

8          THE COURT:  Unfortunately it couldn't.

9          MR. SCHWARTZ:  -- to set in motion a circumstance of

10 events that leads to a 9019 motion being brought by a committee

11 which doesn't have standing, in violation of the bankruptcy

12 code is not for a Court to necessary decide.

13         THE COURT:  Okay.

14         MR. SCHWARTZ:  And that's our position, Your Honor.

15         THE COURT:  I think we have a real difference on the

16 substantive importance of standing issues.  And, the ultimate

17 purpose of this Court and the responsibility of this Court and

18 all fiduciaries to at least disclose the availability of a

19 large dollar value settlement and to have that fully heard, and

20 I think that's the difference between us on standing.  Or,

21 standing as an issue to stand in the way, if you will, is

22 overstating the importance of standing.

23         MR. SCHWARTZ:  I understand Your Honor's position and

24 I'll just close with saying that, again, that Mr. Benun was

25 relying on the advice of his experienced trial counsel who

1  lives with this case for six years and gave him advice based

2  upon what they believed at that time to be the best advice,

3  given the circumstances of the district court litigation.  He

4  relied on that advice.  I don't know that he was --

5          THE COURT:  But, that advice -- even in the papers,

6  just to be clear, to say, "Well, you know, a settlement

7  proposal should be in the range of 50 to 75 million dollars",

8  and then the 62 and a half was floated out there, and then the

9  low range was set forth to Judge Linares and put on the table.

10 That's settlement talk.  That's not ultimate evaluation.  And,

11 you heard Mr. Novack, and you heard him say 30 million dollars

12 but 25 is certainly reasonable given today's circumstances.

13 So, I think that Mr. Benun is far too sophisticated to be

14 misled by a statement of a settlement range to be given to a

15 judge and to think that that's it.

16         MR. SCHWARTZ:  Your Honor, --

17         THE COURT:  Knowing how horse trading goes and

18 knowing how -- I mean, he's too sophisticated to think that

19 that was, in fact, it, and a committed to number by trial

20 counsel.

21         MR. SCHWARTZ:  Unfortunately, had Jazz been able to

22 take part in those discussions the discussions might have been

23 more meaningful and perhaps we might have extracted 30 million

24 dollars or 35 million dollars, and perhaps that might be more

25 reasonable.  I was unaware that Bud Larner would come in today

1  and talk about 30 million.  I'm not sure that 30 million was

2  the number two weeks ago.  Perhaps the 30 million is the number

3  today, and maybe --

4          THE COURT:  No, 25 million is the number today that I

5  heard.  Or, at least that it is a reasonable amount.

6          MR. SCHWARTZ:  I mean, I might have --

7          THE COURT:  We all heard that.

8          MR. SCHWARTZ:  -- misheard Bud Larner, but I thought

9  that they said that 30 million is essentially what they would

10 recommend and 25 is within the range.

11         THE COURT:  Okay.

12         MR. SCHWARTZ:  But, be that as it may, --

13         THE COURT:  I think we're splitting hairs.  But, go

14 ahead.

15         MR. SCHWARTZ:  But, be that as it may, I think two

16 weeks ago the numbers were different.  I agree with you that

17 Mr. Benun is sophisticated.  But again, based upon the advice

18 of his trial counsel, what was in place two weeks ago might not

19 be in place today and I still disagree that the number 25

20 million is reasonable as of today.  Obviously, you know,

21 there's a lot of other circumstances and the chain of events

22 that were set in motion is going to result in whatever it's

23 going to result in.

24         But, be that as it may, we believe that the

25 settlement should be approved because there's numerous legal

1  defects.  And, we also object to the settlement --

2           THE COURT:  Should not be approved.

3           MR. SCHWARTZ:  Excuse me?

4           THE COURT:  Should not be approved.

5           MR. SCHWARTZ:  Should not be approved, Your Honor.

6  Yes.  And, we also believe that for the reasons set forth in

7  our papers, the settlement does not meet the requirements set

8  forth in <u>Martin</u>, and so we object to the settlement on that

9  basis as well.

10          THE COURT:  Thank you.  Thanks a lot, Mr. Schwartz.

11          MR. SCHWARTZ:  Thank you, Your Honor.

12          THE COURT:  Mr. Greenhalgh.

13          MS. JUROW:  Your Honor, may I just be heard briefly

14 on the standing issue so that Mr. Greenhalgh -- just for a

15 second.

16          THE COURT:  All right.  I don't want to exclude you,

17 but, go ahead.

18          MS. JUROW:  For clarification, Your Honor.  Your

19 Honor ruled on the standing of the committee to bring the issue

20 and then directed the noticing.  In the intervening time the

21 debtor had agreed to be bound by the examiner's report and to

22 endorse the settlement or the examiner to endorse the

23 settlement.  So, I think this is a different case than where a

24 committee alone has standing.  I think as we're here today what

25 we have is the debtor moving that settlement under 9019.  It's

1  tantamount to the committee having noticed the settlement but

2  that the settlement is now joined by both the debtor and the

3  committee, and I think that that's a distinction that I wanted

4  to have on the record.

5          THE COURT:  Well, I understand that that was your

6  view and I had heard that before.  But, I think it's for Mr.

7  Sirota to say what that position is.  And he did articulate his

8  position in writing very clearly, I thought.

9          MS. JUROW:  It's Page 8, Paragraph 18 of his papers.

10          THE COURT:  Yes.  Thank you.  Mr. Greenhal.

11          MR. GREENHALGH:  Brieflfy, Your Honor.  Well, Your

12  Honor, I join in Mr. Schwartz's argument on the standing issue.

13  I don't want to belabor it.  But, we do not want to waive that

14  as an issue before this Court and we join --

15          THE COURT:  You've raised it properly and I

16  understand that.

17          MR. GREENHALGH:  Your Honor, I think that the notice,

18  as I said earlier today, I think is defective and insufficient

19  as a result of the conditions that were brought to our

20  attention today with regards to the releases for Jazz Hong

21  Kong.  One could argue that perhaps it isn't a material element

22  but it certainly is for Imation, since Imation has said that it

23  will not authorize the release of those funds until those

24  releases are in hand.

25          I think that the requirements of the rule

1  necessitated that to be placed into the notice and it should be

2  fully laid out before this Court.  I don't believe that the

3  examiner, as the Court permitted us some latitude in

4  questioning the examiner, had that before him.  But clearly,

5  that is an issue.

6        Creditors are entitled to know the full circumstances

7  of the settlement as can be best described, and the case law

8  is, I think, clear that under certain circumstances you try to

9  put forth the best in the notice.  It's not going to be a

10  detailed statement of exactly each dot and comma in a

11  settlement agreement, but clearly an exchange or a requirement

12  that Jazz Hong Kong is to sign off on a mutual release, clearly

13  I think is a significant factor.

14        The debtor's reasoned business decision in rejecting

15  this settlement should not be subverted by the creditor's

16  committee opinion.  And, I understand why Ms. Jurow stated in

17  terms of the standing issue but Mr. Sirota clearly put forth

18  his position paper and an excellent one, I might add, but that

19  was the business decision of the debtor.  And, whether Mr.

20  Benun, as the Court raised, had anything to lose from the board

21  of directors, had anything to lose, I think is not entirely

22  accurate.  There's 25 million dollars that would go to the

23  benefit indirectly to my clients since the factor will be paid

24  out in full if the settlement is approved.  So, whether it's

25  two and a half million or three million dollars of secured

1 debt, it's a significant amount of money that benefits my

2 clients.

3       So, we don't take it lightly that a 25 million dollar

4 settlement, visa ve how it trickles down to ultimately the

5 shareholders which obviously it doesn't, and how high you must

6 go before there is actual dollars being paid to equity --

7       THE COURT:  Wouldn't that exceed 50 million dollars?

8       MR. GREENHALGH:  Yes, it would.

9       THE COURT:  Okay.

10       MR. GREENHALGH:  Yes, it would.

11       THE COURT:  So it would exceed the last demand amount

12 in the negotiation.

13       MR. GREENHALGH:  Your Honor, my understanding of the

14 negotiations, number one, is that a range was proposed and that

15 litigation counsel, after making it known that they would

16 recommend I believe 62 and a half million dollars, not 50, were

17 then basically completely out of the settlement negotiations

18 before Judge Linares.  And, that's --

19       THE COURT:  Well, that's not the way the papers read.

20 The papers read that a demand was then made for 50, against the

21 62 --

22       MR. GREENHALGH:  And, which was rejected.

23       THE COURT:  -- through trial counsel, and so --

24       MR. GREENHALGH:  Your Honor, I stand corrected.

25       THE COURT:  Okay.

1          MR. GREENHALGH:  But, that was a settlement offer in

2    the spirit of negotiations, it was not an opinion that, "Well,

3    50 million dollars is a fair settlement."  I think, if I were

4    --

5          THE COURT:  Well, I mean, are you saying that if the

6    plaintiff's attorney in that case, that is Jazz's attorney,

7    offered 50 million dollars and --

8          MR. GREENHALGH:  And if it was accepted then the

9    debtor would have moved that settlement.

10         THE COURT:  Yes.  And that settlement would not have

11   generated a single dollar for your clients.

12         MR. GREENHALGH:  That's correct.  But, that that does

13   not mean that my client would not receive an indirect benefit.

14         THE COURT:  From the difference between 25 and 50?

15         MR. GREENHALGH:  Yes.

16         THE COURT:  What would be that indirect benefit?

17         MR. GREENHALGH:  The indirect benefit would be, one,

18   is that the secured creditor would be satisfied.

19         THE COURT:  Wouldn't the secured creditor be

20   satisfied out of 25 million?

21         MR. GREENHALGH:  Yes.

22         THE COURT:  So, there's no difference then.

23         MR. GREENHALGH:  No.

24         THE COURT:  So, what is the --

25         MR. GREENHALGH:  Additional funds would be made

1 available to a creditor body.  And, there are certain claims

2 that would be reduced by an increased dividend, from let's say

3 14 percent to --

4         THE COURT:  Claims against Mr. Benun.

5         MR. GREENHALGH:  Claims against Mr. Benun.

6         THE COURT:  So, it's really Mr. Benun's position, not

7 your client's position.  I understand that it's the wife and

8 children, I'm not minimizing it.

9         MR. GREENHALGH:  But, there are other claims, Judge,

10 that -- we're not in a vacuum.  There are other claims that I

11 understand may be asserted or may have been asserted against my

12 clients in the Benun bankruptcy that would have an indirect

13 benefit if those claims were removed or diminished.

14         THE COURT:  Well, we'll have to see.  But, in the

15 Jazz bankruptcy it's clear that the difference between 25 and

16 50 would not result in dollars in the pocket of the equity

17 shareholders.

18         MR. GREENHALGH:  That's why my client and my client's

19 business decision in looking at this believed that this case --

20 and when we look at the Martin factors, and we look at where

21 the status of this unique case is, and it is very unique

22 because when you read most of the decisions it's settlements of

23 litigation that may be in its infancy, may be pending,

24 interestingly, cases where we're -- I have not done any case

25 similar to this one where the case was in the middle of a

1  trial.  Sure they're out there but I certainly didn't find any

2  reported decisions.

3          THE COURT:  Well, it was designed to test Bud Larner,

4  I think, and Mr. Stoeri as well.

5          MR. GREENHALGH:  Okay.  But, Your Honor, here you

6  have a case that, sure, it's over six years old, a huge amount

7  of investment by this debtor was put into this case.  The case

8  was started.  Sure, there might be another 30 days of trial

9  time left in this case.  But, as I believe Mr. Novack stated,

10 75 percent of their case has already been completed.

11         We are well into this case before this Jury.

12         THE COURT:  There's a $350,000 estimate to continue

13 and conclude if there's no mistrial.  If there's a mistrial

14 there's a $700,000 estimate to start over and try, plus the

15 delay into the fall.

16         MR. GREENHALGH:  Well, I look at, do I -- and I'm not

17 much of a gambler, but do I roll the dice for $350,000 versus a

18 potential 120 million dollar payoff?

19         THE COURT:  Well, how about zero?  You don't think

20 that's a possibility?

21         MR. GREENHALGH:  Zero, $350,000?

22         THE COURT:  No, no.

23         MR. GREENHALGH:  Zero, 25 million dollars?

24         THE COURT:  Yes.  You don't think the 25 million is

25 at jeopardy?

J&J COURT TRANSCRIBERS, INC.

1          MR. GREENHALGH:  I think that the 25 million dollars

2    would be in jeopardy if this release isn't signed.  I think

3    it's clearly in jeopardy.

4          THE COURT:  And, if the matter went forward you don't

5    think the 25 million dollars -- if this Court --

6          MR. GREENHALGH:  Based upon what I've read and based

7    upon the assessment of what trial counsel and what I have read

8    as the circumstances moving forward, up until this day, I would

9    say, obviously 25 million is insufficient.  And, 25 --

10         THE COURT:  That's not what I asked.  I asked whether

11   fiduciaries have the right to jeopardize a 25 million dollar

12   offer under the circumstances of this case, by turning it down?

13         MR. GREENHALGH:  I think if the fiduciary has looked

14   at it from a business standpoint and has analyzed and made its

15   own business judgment then they've exercised that right.  And

16   if this Court feels that that's been violated then this Court

17   on the motions pending should have appointed a trustee.  And,

18   we understand --

19         THE COURT:  Well, that's why we appointed an

20   examiner.

21         MR. GREENHALGH:  -- why that wasn't done.

22         THE COURT:  Yes.

23         MR. GREENHALGH:  And, I do not believe that -- well,

24   --

25         THE COURT:  Okay.


                    J&J COURT TRANSCRIBERS, INC.

1          MR. GREENHALGH:  And, Your Honor, I would just

2    repeat, and I know you went through with Mr. Schwartz the

3    issues on the plan and it's a sub rosa plan, and again, we laid

4    that out and we join in that also.

5          THE COURT:  Fair enough.  Thank you, Mr. Greenhalgh.

6          MR. GREENHALGH:  Thank you, Your Honor.

7          THE COURT:  I appreciate it.  Anyone else have

8    anything to say?  Last chance.

9          All right.  I do appreciate the patience and the

10   intense efforts and sometimes a seven-day period, that is from

11   February 9th to February 16th, can be more exhausting than that

12   30 or 60-day trial.  And, to the extent that all participants

13   have jumped in and provided the Court with very substantial

14   written materials and in addition prepared for this hearing and

15   performed in this hearing in a highly professional way, the

16   Court is very pleased and thankful.

17         This is a case that in terms of bankruptcy began with

18   a petition in Chapter 11 on 5/20/03.  But, the antecedence go

19   back years before that.  So, for example, on February 13th,

20   1998 Fuji filed against Jazz and 27 other respondents before

21   the ITC.  And, that ultimately generated a 6/9/99 ITC finding

22   and a cease and desist order with respect to the sale of the

23   particular single-use cameras at issue.

24         Almost at the same time on 6/23/99 Fuji filed a

25   patent infringement suit for damages, as distinguished from an

J&J COURT TRANSCRIBERS, INC.

1   enforcement action before the ITC, in the District of New

2   Jersey, Judge Hochberg sitting on that case.  And then, a

3   series of events unfolded which were historical antecedents and

4   building blocks for what went on here.

5          On 8/21/01 the Federal Circuit affirmed the ITC

6   determination provided that there was an affirmative defense to

7   patent infringement as a function of repair, and provided

8   essentially a two-part program for proving out that affirmative

9   defense.  The first, sale issue, as we might call it, and what

10  was there the eight-step process issue.

11         In February of 2003 Judge Hochberg issued her order

12  and opinion that the debtor infringed Fuji's patents and

13  ultimately that resulted in a judgment of nearly 30 million

14  dollars.

15         It's obvious that the bond on appeal was an issue and

16  so the immediate filing on 5/20/03 of the Chapter 11 petition

17  was done by Jazz.  And, what happened ultimately in the

18  bankruptcy was a debt which was early on recognized -- first,

19  that appeal to the Federal Circuit from Judge Hochberg's

20  judgment would result in a reversal of these highly complex

21  infringement issues.  Secondly, that Jazz was not continuing to

22  infringe a matter that was brought before the ITC again by

23  Fuji.  And, the third leg of this stool was, "And, by the way,

24  Judge, we have this asset which is the Imation litigation and

25  it's worth upwards of 200 million dollars."  And so, we ambled

J&J COURT TRANSCRIBERS, INC.

1   along in the Chapter 11.

2            Two of those legs simply did not pan out.  Totally.

3   And, that is the January 14th, '05 affirmance by the Federal

4   Circuit of the 30 million dollar Judge Hochberg judgment.

5            The issue of continuing infringement brought to the

6   ITC, a very significant matter to this Court because if

7   infringement were going on during the administration period, as

8   Fuji had pointed out on a number of occasions, this Court could

9   well have been an enabler to an infringement, and may well have

10  been because the ITC ultimately found that there was continuing

11  infringement and on the 24th of January of this year put a

12  number on the penalty associated with that and decided flatly

13  that there was bad faith on the part of Mr. Benun and Jazz

14  through Mr. Benun, and assessed a $25,000 a day penalty for

15  some 547 days.  Some of it being pre-petition, some of it being

16  post-petition, and that period covered 8/21/01, which was the

17  terminus date for the Hochberg measure of damages, and

18  12/12/03.  And so, you have yet a period during the

19  administration after 12/12/03 which is a question mark as to

20  the conduct of Jazz in bankruptcy.

21           Fuji had a longstanding motion to convert this case,

22  it was put off from a date in November waiting for critical

23  events, and was scheduled for January 28th, '05, and it just

24  happened that the two events in January did come about, and I

25  would put on the record now, essentially spelled that the

J&J COURT TRANSCRIBERS, INC.

1 continuing operation of Jazz had to end and conversion was a

2 reasonable approach, subject only to the possibility that a

3 conversion might interfere with that last leg of the stool, the

4 Imation suit.  That case to be tried in April of, I believe,

5 '04, put off because of speedy trial issues in the district

6 court in criminal matters, to September '04, put off to a date

7 in January of '05.  And, I believe the trial started on the

8 10th of January, if I have that date correctly in my head.

9        The January 28th hearing on the conversion was

10 adjourned for reasons of this Court's scheduling, and in

11 between Judge Linares by everyone's -- everyone who weighed in

12 and was involved -- by everyone's view pressed for a

13 settlement.  Mr. Sirota's term is brokered a settlement.

14 However one characterizes it, the district court in its wisdom

15 during the penancy of a Jury trial that was to last seven

16 weeks, and two weeks into that trial got heavily involved in

17 negotiations to establish a settlement and the process is

18 described in the record as well as in the submissions, and I'll

19 say what I would include in the record.  Actually, I would

20 include in the record of this hearing, all of the submissions

21 that are cataloged in my opening statement.  And they're all

22 quite consistent on the events that happened in the district

23 court that eventuated in the proposal that 25 million dollars

24 be paid by Imation to settle the case, with other terms as

25 well, the waiver of what's said to be the million and a half

1  dollar number.  Though it's reported in papers here at a

2  million, one, thirty-four, which was a judgment in favor of

3  Imation.

4         But, this Court is influenced by what happened in the

5  district court, and Judge Linares' sua sponte suspension of the

6  trial, following his active promotion of a settlement.  So, if

7  we look at the <u>Martin</u> factors and we look at the first factor,

8  probability of success in the litigation, we have the trial

9  judge promoting this particularly settlement and suspending his

10 trial, holding a Jury in suspense, not mis-trying, so that this

11 settlement could be reviewed by the parties in interest in this

12 court.

13        One could say that in and of itself, that defines the

14 reasonableness of the settlement.  But, I won't say that.  I

15 just say that it's a factor.  But, it's a very significant

16 factor to this Court.  One might ask, "Who knows better than

17 Judge Linares?"  And, the answer might be, "Bud Larner".  And,

18 so we heard today from Mr. Novack.  And, in fairness to Mr.

19 Novack and Mr. Fraza, as trial counsel there is a certain

20 amount of motivation, self motivation and belief in a case that

21 almost requires the optimistic view of that case.  And, I

22 understand that and so does every lawyer here understand that.

23 It's belief in the case.  And so, large numbers were initially

24 put forth and the number kept coming down, and finally when

25 Judge Linares pressed and a settlement offer range was

J&J COURT TRANSCRIBERS, INC.

1  recommended by either Mr. Fraza or Mr. Novack or both of them

2  in combination, or Mr. Larner, as Mr. Fraza once explained that

3  the process in their firm is to have those less involved in the

4  litigation at least review offers -- a 50 to 75 million dollar

5  proposal range was recommended.  And, the midpoint, 62.5 was

6  put forth to Judge Linares.  And, however it came about Judge

7  Linares asked for another offer, and then the 50 million dollar

8  number was proposed.  And, eventually Judge Linares apparently

9  put together a 25 million dollar offer from Imation, which

10 included dollars from several sources as I understand it, not

11 just from Imation.  And that it was not a matter that was

12 easily come by in the district court.  And then, we have the

13 events that transpired here.

14         The debtor, through its board, would not authorize

15 the 25 million dollar settlement.  And so, the creditor's

16 committee brought the matter to this Court.  This Court

17 indicated that it believes there is standing in the creditor's

18 committee under these circumstances, and particularly as was

19 indicated throughout today's record and even before where the

20 shareholders, and here the board member Mr. Benun, but really

21 the person who controlled Jazz, had a totally different agenda.

22 That, in order for Mr. Benun to find his way out of enormous

23 difficulties, particularly with Fuji, a large dollar value

24 judgment or settlement would have to be garnered from Imation.

25 Particularly, after the Federal Circuit affirmance of the 30

1  million dollar award, and an additional penalty of 13 and a

2  half million dollars that was assessed by the ITC, and the

3  virtually concomitant damage claim coming from Fuji, which

4  would be a function of that same 13 and a half million dollar

5  circumstances, which could be another 13 or 14 million dollars

6  divided somehow perhaps between admin. and general unsecured

7  pre-petition claims.  Enormous debt.  And, the stakes kept

8  growing.

9          And, it's clear to me that any reasonable district

10 court judge sitting on a complex and long trial with a Jury

11 would be weary of a controlled board where the main party in

12 interest, Mr. Benun, would have little to lose by going forward

13 and shooting for the moon, if you will.  And so, this Court is

14 comfortable that the issue of noticing the settlement through

15 the committee, the appointment of an examiner to get an

16 objective view of the settlement proposal, and input from all

17 parties in interest was the only reasonable course in this

18 case.  And, so we are here today.

19         The probability of success and whether this is a

20 reasonable settlement, given the status of the trial is in this

21 Court's view endorsed by Judge Linares.  Was endorsed in open

22 court today, under the circumstances, by Mr. Novack and Mr.

23 Novack indicated the rational which, of course, included the

24 potential for mistrial, the exposure of this case to the

25 Imation interests, and all of the tactical concerns that trial

1 counsel legitimately has.  But, nonetheless, here we are and 25

2 million dollars was said to be a reasonable amount for

3 settlement.

4          The examiner, as pointed out through a series of

5 hypotheticals as well as his report that the low range of

6 reasonableness in his view runs down below that 25 million

7 dollar amount.  And so, as an example if one were to look at

8 the hypotheticals or variable models in Exhibit 9 in the

9 largest part of the spreadsheet there, it's clear that just on

10 a gross basis without any evaluation the possibilities in this

11 grid show an out of pocket position for the debtor at the end

12 of the day, that is at the end of the legation, of minus five

13 million, seven hundred and twenty thousand plus dollars to a

14 max of 49 million dollars.

15          We heard testimony from Mr. Ordway, the examiner,

16 that on more average basis his hypotheticals averaged out at

17 about 21 or 22 million dollars.  That his highest number for

18 damages was in the 15 million dollar range.  And, if one were

19 to treble that to get to 45 million dollars, that again, is at

20 the highest range.  And so, a 25 million dollar settlement

21 isn't simply at the lowest range of reasonableness as far as

22 the examiner's report is concerned, it's much higher than that

23 and it's clearly in the range of reasonableness and probably in

24 the midpoint there for all purposes.

25          This Court is substantially influenced by the

J&J COURT TRANSCRIBERS, INC.

examiner's report.  Is it perfect?  Well, it's no more perfect
than the Zetta report or the Campos' report, but it's
objective.  It is approached in a business-like way and done
with what this Court believes is a diligent inquiry, fairly
open mindedly without any agenda, an agenda which Benun might
have, Fuji might have, or any other party in interest might
have.  And so, we now have three supports for the
reasonableness of this settlement in sort of measuring the
probability of success in the litigation that is getting more
money than 25 million dollars.  Judge Linares, Bud Larner, and
the examiner.

        Even if one were to go to the advocating experts, if
I can use that term, Zetta and Campos, Zetta was down at about
three and a half million dollars.  If that were tripled it
would be below the 15 million dollars that was the high number
cited by Mr. Ordway, the examiner.  Of course, Campos was up at
40 million dollars and change, that to be tripled, which of
course, would have been the home run and I would guess the max
that Mr. Benun could hope for through continued litigation.

        This Court has reviewed all of the submissions that
were catalogued in the beginning of the case, recognizing that
there's still a good bit of advocacy in there.  But, if one
were to read the Imation report, for example, again, with a lot
of advocacy, one can also appreciate the quality of the defense
in that case.  And so, given that the case was stopped at a

1  point when only the plaintiff Jazz had some input other than in

2  the opening, the other side of the moon wasn't heard from but

3  we did see it in the Imation report issued by Mr. Stoeri, and

4  without reaching a conclusion as to its merits it is certainly

5  high quality advocacy that Jazz was going to be faced with in

6  defense.

7         This is a settlement which is clearly in the range of

8  reasonableness.  It is substantial money, 25 million dollars,

9  plus the million, one, thirty-four/ one, fifty, or fifty-one,

10  fifty -- million, five.  Which, was the summary judgment

11  amount.

12         There's been mention of the ability to actually

13  implement the settlement.  First there was an issue with

14  respect to the appeal that has been taken off the table.

15  Secondly, there's the issue of a release from Jazz Hong Kong.

16  It's a fact of life in this case and this Court, of course,

17  would prefer not to have the complication of the need for that

18  release, but it is a fact of life, and I don't think it's a

19  material matter for notice, and I think that we have on the

20  record Fuji's commitment and we can't button up 100 percent

21  every aspect of this settlement in this one-day of hearing on

22  9019.  That's not the purpose of a 9019 hearing.  This Court

23  finds that the requirement for the Jazz Hong Kong release is

24  not a factor that would take the settlement off the table.  It

25  is just a mechanical matter that will have to be dealt with one

1  way or another and creative lawyers will just have to deal with

2  that.

3          The second <u>Martin</u> factor besides probability of

4  success in litigation relates to collection.  And, that can be

5  read several different ways.  Mr. Ordway stated flatly that he

6  believes that Imation is currently in good financial standing

7  with cash and availability of lines of credit.  This does

8  appear to be a matter that would be collectable if it were to

9  go to judgment.  I don't know what would happen if it went to

10  the three times 40 million dollar amount, given that I believe

11  the net income for the last year was only 29 million dollars.

12  But, we're not dealing with the 140 million dollars.

13          The other side of the liquidity and current financial

14  standing of Imation is that it certainly can bond off an

15  appeal, which would take us to the third factor in part,

16  complexity, expense, inconvenience, and delay.  Mr. Greenhalgh,

17  in particular, argued minorly with great respect to you, Mr.

18  Greenhalgh, that this is not a complex matter because, of

19  course, there are 20 motions in limine.  And, the case has been

20  paired down to a nub.  From this Court's observations that is

21  anything but the case.  Mr. Ordway indicated that this is a

22  highly complex case.  Mr. Greenhalgh pointed out that Mr.

23  Ordway is not an attorney.  This Court is -- and this is an

24  extremely complex case in every regard and has been from

25  outset, and the number of motions which would limit one or

another aspect of the trial, though helpful, did not remove the

essential point of complexity in both the damage and liability

portions of this case.  It is a complex case, otherwise we

would not have a seven-week potential Jury trial, for one

thing.

But, we can go to other matters, such as expense.

We've heard that it would cost $350,000 if there were no

mistrial.  We also heard, and I think it's clear from what Mr.

Novack is saying, that he believes there would be a mistrial in

any event, or that at least a high probability of that which

would take us to a delay into the fall, and this case has been

delayed so many times, and an additional $700,000 to bring this

case to trial again, and through conclusion of that trial.

Now, many things are speculative in this matter but I

don't believe the $700,000 is speculative.  And this is, I

remind everyone, an administratively insolvent case.  There are

millions of dollars of administration fees outstanding in this

Chapter 11 which can not be paid unless there is recovery in

the Imation case.

Again, going to the third factor of complexity,

expense, inconvenience, and delay, we have an aging Chapter 11

case which is going nowhere.  And, worse.  And, I'll get to

that.  I've gotten to it before in talking about the events of

January '05.  The case is nearly two years old.  The litigation

is ancient.  Jazz filed its complaint on April 27th, 1999 in

1  the superior court.  It was obviously then removed.  And, there

2  have been delays.  Again, I'm not faulting anyone.  It's just a

3  fact of litigating life.  And, here we are pushing the sixth

4  anniversary of this case, facing a mistrial in greater

5  probability, and yet another delay.  This Court has some

6  obligation to bring that matter to a conclusion as augmenting

7  the substantial efforts of Judge Linares in the district court.

8  That is a function of this Court and the Court won't back away

9  from that function.

10         Other cost and delay factors in this category three

11  of _Martin_ is the delay that would be effected by appeal of this

12  Jury trial if it were to go full term.  One can imagine what

13  the full term record would be, what the appeal process would be

14  on such a massive jury trial, and frankly, I believe it would

15  be quite a bit more intricate and time consuming than even a

16  two-step appeal process from an approval of a settlement in

17  this Court.  But, there's certainly delay and costs on appeal.

18  And, risk that there would be a reversal, given the large

19  number of rulings, each of which interlaces -- or, most of

20  which interlace with one another so that one or another error

21  as seen by the Court of Appeals would send this matter back for

22  yet another round of costly and time consuming litigation.

23  Being inconvenienced in _Martin_ terms, delay in _Martin_ terms,

24  and expense in _Martin_ terms.

25         Again, I emphasize that there is a jury that is in

1  suspense upstairs in this Court has to deal with this matter.

2        There's been some discussion about sub rosa plans and

3  whether the requirement that the debtor shut down its business

4  through a liquidating plan, and in a two-step process, and

5  quickly.  That is, sales in the ordinary course stopping March

6  1st, short time from now, and a filing by March 20th or 21st

7  with respect to a plan of liquidation.  And so, this settlement

8  obviously promotes a shut down of the business.  But, as I

9  pointed out before and I state flatly for the record, this

10 debtor had come to the end of the road in terms of operation as

11 far as this Court was concerned.  It had operated, as far as

12 the ITC found, infringing Fuji's patents and putting the estate

13 in jeopardy to the extent of a $25,000 a day penalty.  And, it

14 could not go on in business, period.

15       The hand was also played out with respect to the

16 appeal from the 30 million dollar judgment, as I pointed out

17 earlier.

18       Now, it seems to me that the settlement term which

19 would call for a Chapter 11 liquidation is under these

20 circumstances more efficient both in terms of cost and timing

21 than a conversion, the introduction of a new fiduciary, a

22 Chapter 7 trustee would have to get up to speed, and the costs

23 associated with that.  And so, that is a benefit as this Court

24 sees it in this plan, but it was going to happen anyhow.  And,

25 has nothing to do with sub rosaanything.  This business was

1  over no matter what.

2         That's a point that also relates to the interest of

3  the creditors, the fourth <u>Martin</u> factor.  And so, I emphasize

4  that in terms of measuring the interests of the creditors, they

5  are to be measured in liquidation one way or another because

6  this Court was going to liquidate in a 7, no matter what.  The

7  idea that 30 or 40 or 50 million dollars in settlement or award

8  in Imation was going to save this company for all the good and

9  higher purposes of Chapter 11 was not in the cards.  So, that's

10 off the table and not an appropriate consideration in this

11 case.  And it just happens to be that the timing all came

12 together in January of 2005.

13        Included in measuring the interest of the parties

14 this Court measures the interest of Fuji, the largest creditor,

15 the constant and zealous proponent of conversion, appointment

16 of a trustee, and other efforts that would end the business

17 life of Jazz.  The response by the debtor with respect to all

18 of Fuji's efforts was that Fuji's agenda is to eliminate a

19 competitor in the marketplace.  This Court addressed that issue

20 in its decision relating to the award of fees and penalties

21 arising out of the longstanding effort by Fuji to have a

22 Chapter 11 trustee appointed.   That opinion is 8/3/04.  And,

23 this Court incorporates into this decision all the findings of

24 fact and the decision of 8/3/04.  In which, it found that Mr.

25 Benun operated in a very high stakes game.  He knew exactly

1   what he was doing and what risks he was running.  And, the

2   argument that Fuji was somehow unfairly trying to put him out

3   of business didn't float there and doesn't float today.  This

4   is street brawling.  I don't make Fuji out to be more than a

5   street brawler, but neither is Mr. Benun.  And, in this case

6   the necessary determinations by the ITC, by Judge Hochberg, by

7   the Federal Circuit all favored Fuji.  Their position was

8   essentially proven out to be accurate.  And so, regardless of

9   their agenda they're entitled to their rights, given those

10  determinations.

11          And, Fuji is the largest beneficiary of every

12  incremental dollar that could be added to this settlement

13  through continued litigation if it were to generate a 50

14  million dollar award.  And so, I do consider their position as

15  a proponent and not merely to put this company out of business,

16  because this company was going to be out of business no matter

17  what.  And, they approve this settlement and want it, giving up

18  somewhere between 45 and 70 percent of every additional dollar

19  that might be added in the future.

20          The creditor's committee, albeit by a two to one

21  vote, approves this settlement.  All the reasons expressed by

22  Mr. Greenberg.  And, the value added which would, of course, go

23  to Fuji at least roughly at a level of 50 percent, with 50

24  percent going elsewhere, the value added to the 25 million

25  dollar settlement is just not worth the risk.  Fuji doesn't

1 think so, the creditor's committee doesn't think so.  The risk

2 of losing the 25 million dollars is not addressed anywhere by

3 those who are opposed to this settlement.  And yet, the

4 examiner has pointed out that there certainly is a risk of

5 either a non-suit if you will, a zero verdict or worse, and the

6 cost to get there, or a verdict that would result in less than

7 25 million dollars.

8      This settlement will pay all administration, that is

9 fund the estate to that extent, secured creditors, priority

10 creditors, and allow for some distribution to unsecured

11 creditors.  Now, it is uncertain as to how much they would get

12 but this Court finds value in the settlement as a result of

13 Fuji's carve-out of a million dollars as a max, and it looks

14 like it's probable that that million dollars will be there, and

15 it could well be that unaffiliated, unsubordinated -- those

16 were not subordinated as general unsecured creditors -- could

17 get somewhere between 10 and 25 cents on the dollar as a result

18 of this settlement, which includes the million dollar carve-

19 out.  It's not certain, because we do not have a plan and this

20 was not a bottom up settlement because no one knew what the

21 bottom was and what the claims were.  And we still don't know.

22 That's for the liquidation process.  And, for the same reason

23 this is not a sub rosa plan.  This is simply an efficient,

24 sensible way to end the business that was going to end anyhow,

25 put 25 million dollars into an otherwise administratively

1  insolvent estate, and finally wind it up and wind up litigation

2  that was costly to the system, costly to the parties, and

3  deserving of ultimate resolution.  That is, the Imation

4  litigation.

5       The record should reflect that, again, all of the

6  catalogued items at outset shall be included as a basis for

7  this Court's determination.  The reference to the August '04,

8  8/03/04 opinion of this Court is incorporated.  The only

9  document put into evidence directly is what we'll call Exhibit

10  1, the examiner's report.  For all the reasons set forth on the

11  record here today and arising out of this Court's consideration

12  of the total record in this case, which is voluminous, the

13  matter submitted as referenced in catalogue, the testimony of

14  the examiner, and what was put forth here by trial counsel for

15  Jazz, and all of the arguments and presentations of counsel,

16  this Court will approve the settlement as modified here and

17  there, which this Court, again, does not find to be material.

18  The Court finds that the notice was appropriate, adequate for

19  9019 purposes, and within the experience of this Court, in

20  fact, more detailed than most 9019 notices.  And, that though

21  we operated on a compressed schedule that was necessitated by

22  the suspension of the trial upstairs, and the holding of the

23  Jury, and that there was enough time and enough notice and

24  enough preparation period for this Court to be presented with a

25  full record, and on that record this Court finds the settlement

1 to be reasonable and approves it.

2       Having done that, I think we have to deal with the

3 question of sealing or otherwise defining what will be exposed

4 publicly.  And so, let's deal with that now.  I would include

5 in the record the ITC's opinion and order, and I would amend

6 what I said before with my adding this, of 1/24/05.  That is

7 part of the record.  That in and of itself indicates that it is

8 confidential.

9       MR. ROSENTHAL:  At least for the time being.  The ITC

10 issue that a request that the parties identify confidential

11 information of the opinion, time for satisfying that request is

12 past.  As best as I know, the only party who responded was Fuji

13 who said there was nothing confidential.  So, I anticipate the

14 ITC will issue a public version which will be identical to the

15 confidential version.

16       THE COURT:  All right.  Thank you, Mr. Rosenthal.

17 But, to the extent that we are dealing with current time, this

18 Court feels that the -- could be anything.  That's all right.

19 Don't worry, go -- okay.  It might be that my battery ran down,

20 that might be a --

21       Each of the submissions by counsel and the examiner

22 were also put forth in a manner other than through public

23 docketing.  At this point, as to those submissions, is there

24 still a sense that -- and we'll hear from anyone who feels that

25 -- the matters should not be docketed?  Anyone?  Mr. Stoeri,

J&J COURT TRANSCRIBERS, INC.

1 yours was a submission, as was Mr. Novacks.  Those would be, I

2 guess, the most sensitive.

3          MR. STOERI:  There are two in particular, two aspects

4 of those submissions that I think are subject to the most

5 concern.  One would be the attorneys (indiscernible) documents

6 which were the five other cases passed around just recently.  I

7 don't think those are part of the submissions.  I don't see

8 that as a problem.  The other is Wal-Mart had certain data that

9 it requested be kept confidential, and was primarily done by

10 Bud Larner, that is discussed in a number of different reports.

11 I believe in --

12          THE COURT:  Is that in the examiner's report?  Is it

13 in your report, Mr. Novack?  I'm not talking about taking the

14 compendium that we'll call the Gero publication.  And, putting

15 that in the record.  I'm simply talking about the submissions

16 of yesterday, including the examiner's report.

17          MR. GREENHALGH:  Well, certainly Mr. Campos' report

18 is part of the submissions.  That he would certainly

19 (indiscernible) his report (indiscernible).  And, I think Mr.

20 Zetta report as well --

21          THE COURT:  Wait.  Wait.  I don't -- are they

22 attached to the examiner's report?

23          MR. GREENHALGH:  No, but I'm citing, like, my sale

24 information that I obtained --

25          THE COURT:  No, I understand.


                    J&J COURT TRANSCRIBERS, INC.

1          MR. GREENHALGH:  But, those --

2          MS. JUROW:  Your Honor, they're attached to Mr.

3    Greenhalgh's --

4          MR. GREENHALGH:  Exactly.

5          UNIDENTIFIED ATTORNEY:  And, Mr. Schwartz's are also

6    attached to ours, Judge.

7          UNIDENTIFIED ATTORNEY:  Yes, and, Your Honor, just so

8    counsel understands, there are two or three e-mails that are

9    attached which are part of that 500-page documents, which I

10   could show you --

11         THE COURT:  No, but the 500 -- okay.  But, you've

12   pulled them out and you attached them?

13         UNIDENTIFIED ATTORNEY:  Yes.

14         THE COURT:  Okay.  Fair enough.  All right.  I don't

15   think we can clear the issue standing on one foot.  I think

16   that would be reckless.  And so, what we'll do is leave all

17   matters sealed, but I ask the parties because if there is an

18   appeal this is going to get unwieldy and become unfair to all

19   the parties, and particularly an appellant, we will await a

20   sense of the group as to what can be unsealed.  And as to each

21   party who has submitted something, if you feel that your

22   submission can be put into the record, let me know.

23         MS. JUROW:  Judge, just for the time being so I

24   understand, all the documents that were e-mailed to Your

25   Honor's Chambers last night have been catalogued by the clerk

1 and so, are recorded.  They're part of the record.  The

2 question is, were they part of the public record right now?

3 But, they're all being catalogued by the clerk and I think what

4 Your Honor's suggesting is that we take a few days to see if --

5        THE COURT:  Right.

6        MS. JUROW:  -- they can't be redacted or otherwise --

7        THE COURT:  Exactly.

8        MS. JUROW:  -- released.  But, they could be docketed

9 as received but sealed.

10        THE COURT:  Yes.  I mean, we're going to wind up with

11 what we usually have, which is a corner of a storage room with

12 a label on it.  I mean, I don't want to tell you too much, how

13 it's done because you'll have less confidence in the Court than

14 you now have.

15        MS. JUROW:  No, no, no.  I have one in our own

16 office, so.

17        THE COURT:  Mr. Rosenthal.

18        MR. ROSENTHAL:  Your Honor, if I could suggest that

19 the Court's opinion as read from the bench, certainly contains

20 nothing confidential and should be made immediately part of the

21 public record.

22        THE COURT:  Any problem with that?

23        UNIDENTIFIED ATTORNEY:  If your decision is going to

24 be deemed (indiscernible, coughing) entry of an order, I would

25 request that --

1          THE COURT:  No, it's not, I'm going to ask for an

2    order.  Is that your point?  No, I think we need an order.  And

3    then, the question is, authorship.  Mr. Greenberg, are you it?

4          MR. GREENBERG:  I figured I would.  Okay.

5          THE COURT:  Okay.  One who stands with standing and

6    puts out a notice gets the --

7          MR. GREENBERG:  Okay, we will prepare and circulate

8    -- my pleasure, Your Honor.

9          THE COURT:  Okay.

10         MR. GREENBERG:  Or, even one who doesn't.

11         MR. ROSENTHAL:  Is it the Court's pleasure that it be

12   a relatively abridged, and only make reference to the Court

13   having --

14         THE COURT:  Yes.  You don't have to make findings.

15         MR. ROSENTHAL:  -- read, and considered, and heard

16   the testimony.

17         THE COURT:  Exactly right.

18         MR. ROSENTHAL:  And rules, etcetera.

19         THE COURT:  Yes.

20         MR. ROSENTHAL:  And then, make reference to,

21   consistent with the opinion delivered from the bench?

22         THE COURT:  Yes.  That's fine.

23         MR. ROSENTHAL:  Okay.

24         THE COURT:  And, of course, you'll spread it out

25   among counsel for their consideration.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENTHAL:  Absolutely.  Maybe this time I'll

2  actually send it to everybody instead of just Mr. Sirota, as we

3  did yesterday with our submission.

4          THE COURT:  Okay.  Yes.

5          UNIDENTIFIED ATTORNEY:  Your Honor, so then is it

6  agreed that the opinion part of what was sent today is a public

7  document?

8          THE COURT:  Anyone have a dispute with that?  All

9  right, it is public.  Carol, is Carol here?  Who's here?

10  Debbie?  Carol.  The opinion that I just rendered is not

11  sealed.  How about the balance of the hearing?  The testimony

12  of Mr. Ordway, etcetera?  Now, that did go to certain Wal-Mart

13  information.

14          UNIDENTIFIED ATTORNEY:  I don't think there was any

15  specific detail to Wal-Mart that would be a problem from our

16  perspective.

17          UNIDENTIFIED ATTORNEY:  No, I don't think so, Judge.

18          THE COURT:  Any other?  All right, the record of

19  today's hearing is not sealed.  Okay.  Does anyone have

20  additional matters?  I do --

21          MR. GREENHALGH:  Yes, Your Honor.

22          THE COURT:  Yes, Mr. Greenhalgh.

23          MR. GREENHALGH:  Yes, Your Honor, until the question

24  -- and I would ask Your Honor and counsel for (indiscernible) -

25  - I would need to know what is sealed and unsealed, as part of

1  this record, of all these submissions.  I'd like to know.

2         THE COURT:  Well, at the moment everything that was

3  submitted yesterday is sealed.

4         MR. GREENHALGH:  Right.  But, and the record that

5  Your Honor referenced is really the record of the testimony

6  that was taken, Your Honor's opinion, and the examiner's

7  report.  All of the submissions have been catalogued and still

8  sealed --

9         THE COURT:  And that includes the examiner's report.

10 Go ahead.

11        MR. GREENHALGH:  Here's my quandary.  My quandary is

12 that I don't know when your order is going to be entered but

13 that starts a clock running.  So, I would like to request that

14 until the issue of the sealing of the rest of the record, which

15 I get the sense could be decided fairly quickly within a day or

16 two, is decided, that the Court does not enter the order until

17 I know what the record is.

18        THE COURT:  No, no.  We're not talking about what the

19 record is.  Whether we have a seal --

20        MR. GREENHALGH:  (Indiscernible).

21        THE COURT:  I don't think that has -- I mean, you

22 have everything that's in the record.

23        MR. GREENHALGH:  Right.  But, that record -- but for

24 purposes of a possible appeal the record has to be designated

25 and I don't know once it's transmitted to the District Court

1 whether it remains under seal.

2          THE COURT:  It does.  And, I think we're just going

3 to have to make sure that it does.  So, we're not going to

4 wait.  We'll wait for the order and for comment on the order.

5 That's only fair.  But, the sealing issue is not in the

6 critical path of executing the order.  Ms. Jurow, were you --

7          MS. JUROW:  (Indiscernible).

8          THE COURT:  All right. Anything else?  Mr. Schwartz.

9

10          MR. SCHWARTZ:  Your Honor, obviously, you know, I

11 have to ask this because the rules require that at this point I

12 ask for a stay pending appeal?

13          THE COURT:  All right.  I --

14          MR. SCHWARTZ:  And, if Your Honor would want to hear

15 why, I don't know that Your Honor's going to want to hear me,

16 but --

17          THE COURT:  Is it consistent with your argument on

18 standing and all of the other aspects?

19          MR. SCHWARTZ:  Yes.  Yes.

20          THE COURT:  And again, it was a well stated argument

21 and I appreciate it.  This Court has assessed the settlement

22 issue and the standing issue and with due respect, I don't find

23 them to be difficult, factual, or legal issues.  If I thought

24 that any of it was really a close call for appeal I think I

25 would think better of the stay.  But, I don't think it's a

1   close call.  It was not very difficult in any regard, and

2   therefore, this Court denies the stay pending appeal.

3            UNIDENTIFIED ATTORNEY:  Your Honor, for my purposes I

4   would join in his application and assume that Your Honor would

5   be ruling against our request also.

6            THE COURT:  Fair enough.

7            UNIDENTIFIED ATTORNEY:  Thank you.

8            THE COURT:  Fair enough.

9            MR. GREENHALGH:  Your Honor, one further thought.  We

10  will try to circulate an order either tonight or tomorrow, and

11  it's going to be simple.  Maybe all the parties can look at the

12  documents and see what they believe should be redacted.  I

13  think it would be easier for all concerned if the documents

14  were unsealed.  There's probably very little that's

15  confidential.  There may be some references to Wal-Mart,

16  etcetera.

17           And, to the extent the parties can't agree I know

18  that when we initially scheduled this hearing, we also blocked

19  out tomorrow at 1 o'clock.  I don't if Your Honor would

20  consider either a telephonic, if not meet in person to try to

21  resolve those issues.  To the extent, at least two parties have

22  indicated any intention to take an appeal I think it might be

23  good to have the record complete and where possible unsealed.

24  Rather than, we're sort of in Never Neverland.  We have some

25  things that are in, other things that are critical --

1        THE COURT:  Well, but they're all in, it's just a

2   matter of whether they're going to get standing in full form or

3   not.  You know, I'll hear the sense of the group on it.  Ms.

4   Jurow.

5        MS. JUROW:  Your Honor, the examiner obviously relied

6   on the litigation parties in supplying all the documents that

7   they reviewed, and all those documents were under protective

8   order which they observed.  But, they're not really in a

9   position to redact their own report because they don't know the

10  sensitivity.  So, the examiner would be relying on the Bud

11  Larner firm and Dorsey Whitney firm to ensure that any

12  information that may have been confidential in their report is

13  adequately redacted.

14       MR. GREENHALGH:  And, we could do that.

15       THE COURT:  All right.

16       MR. GREENHALGH:  There's only two issues for us to

17  look at, we'll do that very expeditiously, to have an answer by

18  tomorrow.

19       THE COURT:  Fine.  Thank you very much.  Okay.  There

20  is one open item that the Court has and that's Ms. Jurow's

21  application for an order shortening time on the conversion in

22  the Benun Chapter 11.

23       I have not dealt with that but I will have to.  But,

24  as long as we have parties in interest assembled, maybe by

25  agreement and to the convenience of all parties we can schedule

1  that.

2          MS. JUROW:  Defer to Mr. O'Grady.

3          MR. O'GRADY:  Your Honor, I know of no particular

4  emergency or urgency about hearing that.  I would just ask the

5  Court to schedule it in the ordinary course according to the

6  Court's calendar.

7          THE COURT:  Ms. Jurow, you applied for the order

8  shortening time.

9          MS. JUROW:  I applied for the order shortening time

10 so that Your Honor would have the discretion to file it, to

11 hear it when you thought was best.  And so, I still feel like

12 whenever you think it's best.

13         THE COURT:  All right.  Then, I'll put it on probably

14 on a motion day.  Let the air clear a little bit.  People have

15 other things to do, I would guess.  And, it'll probably be

16 sometime in early March, all right.

17         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

18         THE COURT:  But, we're already in mid-February.  I

19 think maybe middle March.

20         UNIDENTIFIED ATTORNEY:  As long as it's not St.

21 Patrick's Day.

22         THE COURT:  I don't even have that on my calendar.

23         UNIDENTIFIED ATTORNEY:  It's not on mine.  At least

24 on my business calendar.

25         THE COURT:  Thanks.


                    J&J COURT TRANSCRIBERS, INC.

1          MR. GREENHALGH:  Well, the last and probably one of

2     the most important issues is what we're doing with this 25

3     million dollars?  Where it goes.?  Obviously, there are

4     significant restrictions as to how it can be invested.

5     Possibly the only form would be t-bills.  And, I don't know if

6     U.S. Trustee has given thought to that, but we are talking

7     about 25 million dollars.

8          MS. JUROW:  I know.

9          THE COURT:  Ms. Jurow.  T-bills?

10          MS. JUROW:  Your Honor, I think it has to probably be

11     done, you know, with a motion under the 345.  You know, my

12     first, my gut reaction is it's to be held by the debtor-in-

13     possession in an account that satisfied 345 and it wouldn't

14     surprise me if the debtor was going to ask to hold it in

15     something other than a collaterized bank account like t-bills.

16     And, so but I would like there to be, it's a lot of money, I

17     would like there to be an order.  I don't remember whether

18     there's even a collateralization agreement with the bank in

19     this case.  I kind of think that there is because you have more

20     than a hundred thousand in the bank in any one time.

21          But, these are matters that I'm confident that I can

22     work out with Mr. Sirota.

23          THE COURT:  Mr. Sirota.

24          MR. SIROTA:  Judge, I'll be glad to discuss it with

25     Ms. Jurow and if appropriate bring a motion.  I think we have

1  to go and coral some other funds, namely we have the

2  (indiscernible) fund, which would probably be put in one

3  account together with any funds that remain at Bud Larner from

4  the expert fees that were carved out of the ITC settlement and

5  we're holding in excess of $100,000 from those same funds.  So,

6  we will work with Ms. Jurow and Mr. Greenberg, corralling --

7          THE COURT:  And, the money would be put in your

8  account?

9          MR. SIROTA:  I was going to suggest, Your Honor,

10  rather within the debtor-in-possession account that it be held

11  by the --

12          MS. JUROW:  That should be on motion and if we have

13  an objection I'll make it.  You know, an attorney trust account

14  isn't an interest bearing account so I don't know why you would

15  want to do that anyway.  And, --

16          MR. SIROTA:  What would be a (indiscernible) to the

17  t-bill immediately as opposed to sitting in anybody's account

18  for a week or two weeks or however long it takes, and not

19  earning interest on 25 million dollars.

20          MS. JUROW:  I don't think you could skirt 345 by

21  putting money into an escrow account and then putting it in t-

22  bills, instead of putting it in a debtor-in-possession account,

23  it's the debtor's money.

24          MR. SIROTA:  Why don't we have this discussion,

25  Judge, and come up with a solution that makes sense.  I think

1  we know what the objectives are.

2       THE COURT:  I think so.  Mr. Stoeri, any problem with

3  --

4       MR. STOERI:  No, (indiscernible).

5       THE COURT:  But I think that you owe Mr. Stoeri a

6  conclusion so that he can pay the dollars over.  Okay.

7       MR. SIROTA:  We'll make sure to advise him of the --

8       MS. JUROW:  Give him the wiring information.

9       THE COURT:  He may be telling you to take your time.

10  Anything else?  Again, I thank all the assembled.  I appreciate

11  your performance.  Thank you.

12                        * * * * *

13                  C E R T I F I C A T I O N

14       We, SHIRLEY NENNO, MELISSA HYNES, AND MARLENE A.

15  FATTORE, court approved transcribers, certify that the

16  foregoing is a correct transcript from the official electronic

17  sound recording of the proceedings in the above-entitled

18  matter, to the best of our ability.

19  /s/ Shirley Nenno                Date:  February 23, 2005

20  SHIRLEY NENNO

21  /s/ Melissa Hynes

22  MELISSA HYNES

23  /s/ Marlene A. Fattore

24  MARLENE A. FATTORE

25  J&J COURT TRANSCRIBERS, INC.


                    J&J COURT TRANSCRIBERS, INC.