UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                        .        Case No.  03-26565
                              .
                              .
JAZZ PHOTO,                   .
                              .        50 Walnut Street
                              .        Newark, New Jersey 07102
              Debtor.    .
                              .        February 9, 2005
. . . . . . . . . . . . . ..      9:30 a.m.

S E A L E D   T R A N S C R I P T

TRANSCRIPT OF MOTION
BEFORE HONORABLE MORRIS STERN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Jazz Photo:          Cole, Schotz, Meisel, Forman &
                         Leonard, P.A.
                         By:  MICHAEL SIROTA, ESQ.
                              JEFFREY TRAURIG, ESQ.
                         Court Plaza North
                         25 Main Street, P.O. Box 800
                         Hackensack, New Jersey  07602-0800

                         Kaplan & Gilman, LLP
                         By:  JEFFREY KAPLAN, ESQ.
                         900 Route 9 North
                         Woodbridge, New Jersey  07095

Audio Operator:          Carol Urena

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311   Fax No.  (609) 587-3599

2

APPEARANCES (CONT'D):


For the Creditors'          Ravin Greenberg P.C.
Committee:                  By:  HOWARD S. GREENBERG, ESQ.
                            101 Eisenhower Parkway
                            Roseland, New Jersey  07068


For Jazz Photo:             Neville Peterson
                            By:  JOHN PETERSON, ESQ.
                            17 State Street, 19th Floor
                            New York, New York  10004


For Jack Benun:             Riker, Danzig, Scherer, Hyland &
                            Perretti LLP
                            By:  JOSEPH L. SCHWARTZ, ESQ.
                                 STEPHEN AMORIELLO, III, ESQ.
                            Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, New Jersey  07962-1911


For Fuji:                   Lowenstein Sandler, PC
                            By:  MICHAEL ETKIN, ESQ.
                            BRUCE BUECHLER, ESQ.
                            65 Livingston, Avenue
                            Roseland, New Jersey  07068-1791


For Fuji:                   Strook Strook & Lavan
                            By:  LAWRENCE ROSENTHAL, ESQ.
                                 CHRIS HANSEN, ESQ.
                                 DOUG MANNAL, ESQ.
                                 MATTHEW SIEGAL, ESQ.
                            180 Maiden Lane
                            New York, New York  100380-4982


For the U.S. Trustee:       Office of the U.S. Trustee
                            By:  MARGARET JUROW, ESQ.
                            One Newark Center, Suite 2100
                            Newark, New Jersey  07102


For Imation:                Dorsey & Witney, LLP
                            By:  WILLIAM R. STOERI, ESQ.
                            Suite 1500, 50 South Sixth Street
                            Minneapolis, Minnesota  55402-1498

**APPEARANCES (CONT'D):**


**For Jazz Photo:**          Budd Larner, P.C.
                             By:  PETER JOHN FRAZZA, ESQ.
                             150 John F. Kennedy Parkway
                             CN 1000
                             Short Hills, New Jersey  07078-0999


**For Mona Benun:**          Wilentz, Goldman, and Spitzer
                             By:  JOSEPH ZAPATA, ESQ.
                             90 Woodbridge Center Drive
                             Suite 900, Box 10
                             Woodbridge, New Jersey6  07095

**For Mona Benun:**          Duane Morris
                             By:  WALTER GREENHALGH, ESQ.
                             744 Broad Street, Suite 1200
                             Newark, New Jersey 07102-3889

**4**

1          THE COURT:  This United States Bankruptcy Court is

2    now in session.  The scheduled matters will be heard and fully

3    considered.  This is Jazz Photo and Benun series of motions and

4    status conference.  Appearances, please?

5          MR. SIROTA:  Judge, good morning.  Michael Sirota and

6    Jeffrey Traurig, Cole, Schotz, Meisel, Forman and Leonard, on

7    behalf of Jazz Photo.

8          MR. GREENBERG:  Good morning, Your Honor.  Howard S.

9    Greenberg, Ravin Greenberg, appearing for the creditors'

10   committee in the Jazz Photo matter.

11         MR. SCHWARTZ:  Good morning, Your Honor.  Joseph

12   Schwartz and Steve Amoriello, Riker, Danzig, Scherer, Hyland &

13   Perretti, on behalf of Jack Benun.

14         MR. KAPLAN:  Your Honor, Jeff Kaplan for Jazz Photo.

15         MR. PETERSON:  John Peterson, Neville Peterson, for

16   Jazz Photo.

17         MR. ETKIN:  Good morning, Your Honor.  Michael Etkin

18   and Bruce Buechler from Lowenstein Sandler, for Fuji.

19         MR. ROSENTHAL:  Your Honor, Lawrence Rosenthal, Chris

20   Hansen, Doug Mannal, and Matthew Siegal of Strook, for Fuji.

21         MS. JUROW:  Margaret Jurow for the United States

22   Trustee.

23         MR. STOERI:  Your Honor, Bill Stoeri, Dorsey &

24   Witney, on behalf of Imation.

25         THE COURT:  We have a full house.  The motions that

1 are pending for today are the conversion motions, or motion,

2 and the U.S. Trustee's motion on shortened notice for the

3 appointment of an examiner.  But I think we should start with

4 status and go from there.  Mr. Sirota?

5     MR. SIROTA:  Judge, if I could make two requests?

6 The first request is that this record today be sealed for the

7 following reason.  Undoubtedly we are going to get involved in

8 a discussion regarding the potential settlement of the Imation

9 litigation.  I understand from reviewing a transcript before

10 Judge Linares, I believe on February 7th, that one potential

11 ground for a mistrial of that case is the public disclosure of

12 the anticipated settlement amount and the potential tainting of

13 the jury pool.

14     I further understand from speaking to Imation's

15 counsel that independent of my request for the record to be

16 sealed, they may be issuing an 8-K today or tomorrow, together

17 with a public announcement, that might very well result in that

18 jury pool being tainted, and a mistrial.  Our goal is to try to

19 avoid the potential of a mistrial.  Irrespective of how the

20 settlement offer comes before this Court and what the Court

21 ultimately rules, we would prefer this record not play into a

22 potential mistrial, and that's the basis of the request.

23     THE COURT:  All right.  And I appreciate that, and I

24 appreciate the sensitivity of the issue.  Let me give you my

25 outline, which is subject to change as a function of what I

1    hear today.  The parties, I assume, are ahead of the Court on

2    understanding the matters at issue in the settlement.  What I

3    had intended to do, and again, I will adjust as the parties

4    influence the Court, was to stay away from specific terms of

5    the settlement for the moment, assuming that the parties in

6    interest know what the terms are, and to engage in some

7    discussion of the effect of either the appointment of an

8    examiner or the appointment of a Chapter 7 trustee upon

9    conversion on the settlement.  So, that would be a primary

10   question that the Court would have for all assembled.  And to

11   the extent that that would get into areas of sensitivity I'll

12   take into consideration Mr. Sirota's motion to close the

13   record.

14        I would also want to hear specifically about the

15   timing, you know, when this matter has to be brought on for

16   approval, and if it is approved by what date, so as to preserve

17   the settlement.

18        Thirdly, I'd like to know, to the extent that

19   positions are formulated to this date, what the position is of

20   the debtor Jazz, the debtor Benun, the creditors' committee in

21   Jazz, Fuji.  I'll hear from Imation and the U.S. Trustee in

22   those regards as well.  And I may do that if the sense of the

23   group that there's no objection by some initial poll out here,

24   and then I think I would like to meet with each of these

25   constituencies through counsel individually in camera to

J&J COURT TRANSCRIBERS, INC.

1 discuss the position of the parties, again, bearing in mind

2 that we have a jury hanging fire with Judge Linares.

3        I have some factual issues that I think I'd like

4 explained on the record, and it goes, for example, to the

5 interest of the Benun estate in any settlement or judgment, and

6 so to with Jazz Hong Kong, I reviewed the 6/11/03 order in that

7 regard.  I just want to make sure we're all on the same page

8 with respect to that.  It's my understanding that the committee

9 might be considering moving the settlement under 9019, and I

10 think we should have some discussion of standing with respect

11 to that.  And if, and it's an if at this point, we were to get

12 to a 9019 notice, what the form of that notice should be so as

13 to protect the interest that you are pointing out.  So, that's

14 the outline that I am proposing.

15        I would seal the record at this point.  But a sealed

16 record is -- may not be totally satisfactory because some of

17 the parties may want to discuss things that might be still

18 subject to negotiation one way or another, and that's why I

19 would meet separately, again, unless I hear an objection to

20 that.  So, that's the outline.  If someone has a position on

21 shuffling that outline, adding to it, subtracting from it, or

22 commenting on it, I'd be willing to hear Mr. Sirota first and

23 then Mr. Etkin.  Yes?

24        MR. SIROTA:  Judge, the second matter, if I might,

25 that I wanted to bring to the Court's attention, does Your

1    Honor have any specific questions as to the ITC ruling that's

2    been provided to the Court, because I did impose on Mr. Kaplan

3    to be here this morning, and told him that to the extent the

4    Court had any specific inquiry that I would ask for Your Honor

5    to accommodate him to ask those questions first.  If you don't,

6    I can excuse Mr. Kaplan.  We've submitted to the Court the

7    Federal Circuit ruling, the ITC ruling.  Your Honor should know

8    that the ITC ruling will be appealed by Mr. Kaplan.  The ruling

9    speaks for itself with respect to the issue of the sanctions,

10   and the lack of enforcement pending exhaustion.  But if Your

11   Honor had any specific issues in that regard, Mr. Kaplan is

12   available.

13            THE COURT:  At this time I don't -- I don't want to

14   exclude Mr. Kaplan.  On the other hand, the clock is running on

15   all counsel.  Does any other party in interest feel a need to

16   keep Mr. Kaplan captive here?  And you're welcome to stay, but

17   you're certainly excused, and thanks for coming.

18            MR. KAPLAN:  Thank you, Judge.  I have to just leave

19   for overseas tomorrow, and I have just a pile of stuff that I'm

20   trying to finish, so --

21            THE COURT:  Okay.  Fair enough.  Okay.  Have a good

22   trip.

23            MR. KAPLAN:  Thank you.

24            THE COURT:  All right.

25            MR. SIROTA:  Then, with the Court's permission,

J&J COURT TRANSCRIBERS, INC.

**9**

1  Judge, I'd like to jump right into Your Honor's agenda.

2  THE COURT:  Go ahead.

3  MR. SIROTA:  And specifically the question regarding

4  the effect of an examiner versus conversion.

5  THE COURT:  All right.  We can do that.  I just want

6  to make sure that no one has additions, or comments, or

7  deletions from my outline.  Mr. Etkin?

8  MR. ETKIN:  Your Honor, I don't have any additions or

9  deletions.  I think the outline is appropriate.  I would just

10  make two points.  Number one, there may very well be argument

11  and matters placed on the record that should not be

12  appropriately sealed, and I just want to make sure that we all

13  reserve our respective rights with respect to that issue,

14  because --

15  THE COURT:  I think that's fair comment.

16  MR. ETKIN:  -- I understand Mr. Sirota's position,

17  and the settlement issue, and we're sensitive to that going in.

18  But, you know, there are other issues which are appropriately

19  -- should be a matter of public record.

20  THE COURT:  All right.  So, why don't we have the

21  parties in interest really monitor the opening and closing of

22  the record, which we can do very easily.  But your point is

23  well taken.

24  MR. ETKIN:  That's fine.  And secondly, Your Honor,

25  you made one point, and I just wanted to comment on it.

1  Although we were involved in the full day into the early

2  evening session before Judge Linares, we had limited contact

3  with the Court thereafter, and we do not have a sense of what

4  the terms --

5            THE COURT:  Oh.

6            MR. ETKIN:  -- of the settlement are, except in the

7  broadest and most general sense.  So, I understand that there

8  was some -- that there was something delivered to Your Honor

9  that may have taken the form of the term sheet, or something

10  like that.  We've never seen it.  So, I don't want the Court to

11  feel that we've been more involved than we actually have been

12  and know more than we actually do.

13            THE COURT:  Is there any problem in any quarter here

14  with Imation, or with the debtor, or anyone else, in providing

15  that to Fuji?

16            MR. SIROTA:  We have not seen -- I can speak for

17  myself, Judge.  I --

18            MS. JUROW:  I haven't seen it, Your Honor.

19            MR. GREENBERG:  Nor has the committee.  I don't think

20  anybody has, Your Honor.

21            MR. SCHWARTZ:  Nor has Mr. Benun.

22            UNIDENTIFIED SPEAKER:  Mr. Stoeri --

23            MS. JUROW:  And the full terms haven't been

24  communicated to anyone as far as I know.

25            THE COURT:  Okay.  So, can we at least -- all right.

J&J COURT TRANSCRIBERS, INC.

1 That's a good point.  Mr. Stoeri, I'll hear from you on this,

2 because many of the issues regarding what we might call loosely

3 confidentiality I would sense are a function of your input.

4       MR. STOERI:  Yes, Your Honor.  Just so that everyone

5 here understands, there was an offer made on the record with

6 Jazz trial counsel, Mr. Frazza was present, so he has full

7 knowledge of these.  The terms are set forth in a memo at Judge

8 Linares's request, which I believe has been passed on to you.

9 Or position is, if that needs to be, or parties wish to look at

10 that, it would make sense, that's fine, as to confidentiality,

11 we have an 8-K obligation to disclose that, because the offer

12 has been made firmly.  It is accrued.  That disclosure will

13 take place shortly.  The confidentiality aspect today then

14 would be simply that the parties need to examine that, fine,

15 but we don't.  One of the terms of this is that there be no

16 disclosure beyond what's required by law.  And if the parties

17 agree to that, whoever has access to it I have no problem.  We

18 have a legal obligation to make that disclosure under 8-K, we

19 will do what's required under that only.  I'm fine with giving

20 --

21       THE COURT:  And what's the timing of the 8-K?

22       MR. STOERI:  It will go out today.  They had an

23 obligation to do it shortly after the statement on the record

24 and accrue Monday.  We said let's wait to find out today if

25 there's something more than can be added to it, or some more

1   specific information that can be put in.  So, when this is

2   complete today I will be contacting my client and they will be

3   issuing the 8-K.

4           THE COURT:  And that will be a public notice?

5           MR. STOERI:  Correct.

6           THE COURT:  All right.  And so --

7           MR. STOERI:  By law it has to be.

8           THE COURT:  Yes.  And so, just to make sure we don't

9   have a problem, if we were to get to a notice under Rule 9019

10  of the Federal Bankruptcy Rules of Procedure, amount and other

11  terms as disclosed in the 8-K could well be noticed in this

12  9019.  Is that a fair statement?

13          MR. STOERI:  That's a fair statement.  Now, the 8-K

14  will not include the insurance company's contributions.  It

15  would be simply what's required would be what Imation will put

16  on its books and the impact that has on Imation's balance

17  sheet.

18          THE COURT:  Would there be a problem with the total

19  settlement amount being disclosed?

20          MR. STOERI:  I don't believe so.  It would not be

21  part of our 8-K.  If it's not legally obligated we would not do

22  that, and we ask others not do so.  However, at this point, for

23  disclosure within here I have no problem.

24          THE COURT:  Well, but if it were noticed to all

25  creditors in a notice of settlement under 9019, because that's

J&J COURT TRANSCRIBERS, INC.

1  an essential element for real notice to parties in interest.  I

2  mean, you have --

3          MR. STOERI:  Right.

4          THE COURT:  -- people beyond this courtroom who

5  should know what the amount of the settlement is.

6          MR. STOERI:  Then if that needs to be -- our position

7  is whatever needs to be done needs to be done.

8          THE COURT:  All right.  I appreciate that.

9          MR. STOERI:  But we would simply not want publication

10 beyond what has to be done legally.

11         THE COURT:  Fair enough.  Okay.  So -- Mr. Frazza?

12         MR. FRAZZA:  Your Honor, may I be heard?

13         THE COURT:  Certainly.

14         MR. FRAZZA:  Mike, do you mind?

15         MR. SIROTA:  No.

16         THE COURT:  Certainly.

17         MR. FRAZZA:  The public declaration might be grounds

18 for an immediate mistrial.  And as trial counsel, in the middle

19 of a case where $25 million has been put up before our case is

20 even in, that's devastating not only to Jazz, but every other

21 party in this room.  Nobody should be rooting for a mistrial.

22 So, I understand Mr. Stoeri's client's obligations, but either

23 through yourself or Judge Linares, who Mr. Stoeri and I need to

24 report to after today's proceedings, we may be put in a

25 position where we may have to move for some type of an

J&J COURT TRANSCRIBERS, INC.

1  injunction to try to stop this public disclosure, because I'm

2  not a security lawyer, Budd Larner is not a security lawyer,

3  but the limited security lawyers that we have spoken with take

4  issue with the fact that until there is actually a settlement

5  there is any public disclosure requirements.  Again, I'm

6  speaking outside of my bailiwick, but I mean, this public

7  disclosure will be the end of this trial as we know it.  I

8  mean, I think everybody in this room knows that, and that's

9  going to, you know -- whatever the discussions are today they

10 are, but let's not lose sight of that fact that I may have to,

11 on my feet, ask you if you have the powers to issue some

12 preliminary injunction to allow us time to brief it, or I have

13 to go upstairs to Judge Linares, but this is a very important

14 point, and I think that I will have allies in the room not

15 wanting a mistrial based on public disclosures that may or may

16 not, I underscore or not, have to be made.  And I'm not taking

17 issue with Mr. Stoeri, because I'm sure his firm has security

18 lawyers, but from the people that we've spoken with, under

19 something called the Fair Disclosure Act, I don't think that

20 this preliminary possible settlement is an event which triggers

21 a disclosure.

22         MR. STOERI:  From speaking with our securities

23 lawyers, and with the client, it is an obligation on our part

24 to disclose this once the firm offer is made.  And what's more,

25 Judge Linares was told that we believe we have that obligation,

1 and he knows that that will occur.  So, that's our position on

2 it.  We are not, as a publicly-held company, allowed to do --

3 take these steps, put this accrual on, and yet keep it from the

4 public and potential -- actual and potential shareholders.  So,

5 but this is not something that's unknown to Judge Linares.

6         THE COURT:  All right.  I think we will deal with the

7 exposure and risk of a mistrial as we go along, be sensitive to

8 it.  But one way or another, whether it's an 8-K disclosure, or

9 a 9019 notice disclosure, or both, the risk that Mr. Frazza is

10 concerned about will simply be increased whether an injunction

11 is appropriate, and whether it should issue from this Court or

12 elsewhere, Judge Linares, is something we'll deal with, again,

13 as we go along.  Let's see how we do today.

14         MS. JUROW:  Just on the agenda issue --

15         THE COURT:  Yes.

16         MS. JUROW:  -- Your Honor talked about the effect of

17 an examiner or Chapter 7 Trustee, and I just wanted to raise

18 the possibility as alternative relief is a Chapter 11 Trustee.

19 Depending on how the rest of the arguments go, I may need to

20 address that.

21         THE COURT:  Okay.  The motion is not pending, but if

22 someone raises it today I think it's an open field, and I would

23 not exclude at outset that potential.  All right?  Mr. Sirota?

24         MR. SIROTA:  Judge, with respect to your first

25 inquiry, examiner versus conversion, Fuji submitted documents

in response to the examiner motion filed by the U.S. Trustee
suggesting that the board of directors of Jazz's unwillingness
to accept the settlement offer that was proposed is further
grounds to convert the case.  In order for me to refute that, I
would like to take the Court through the process that unfolded
before Judge Linares so that Your Honor is not left with the
impression that somehow this was some act of breaching
fiduciary duty that resulted in the board's rejection.  Is Your
Honor okay with me taking him through that?

THE COURT:  Well, it's really not the question that
I'm asking.

MR. SIROTA:  Okay.

THE COURT:  The question that I'm asking is what the
effect would be on the settlement, not whether there should be
a conversion or should be the appointment of an examiner.  We
can get into the substance of that, but I'm focusing on the
settlement, and maybe I ought to start with the third point,
which is a polling of the various interests.  From what you're
saying, Mr. Sirota, it appears as though the debtor, through
its board, is rejecting the settlement.  Is that a fair
statement?

MR. SIROTA:  Based upon the assessment of the
litigation of the debtor's litigation counsel.

THE COURT:  Fair enough.  And Mr. Schwartz, the
debtor's position in Benun with respect to the settlement?

1          MR. SCHWARTZ:  The debtor's --

2          THE COURT:  Thumbs up or down?

3          MR. SCHWARTZ:  Thumbs down, Your Honor.  And that is

4    also based on the advice of Jazz's trial counsel in the Imation

5    proceeding.

6          THE COURT:  Okay.  Creditors' committee in Jazz?  I

7    don't want to cut off -- and I understand that there could be

8    nuances, and the need for full explanation, but I think we have

9    to get this polling done.  And so, Mr. Greenberg, where is the

10   committee?

11         MR. GREENBERG:  Your Honor, the committee has had a

12   multitude of conversations about not only the settlement, but

13   a lot of collateral issues including the examiner motion, the

14   continuing trustee motion, and the committee, by a two to one

15   vote, is in favor of the settlement, not just because of the

16   top line number from Imation and its carriers, but a concession

17   made by Fuji which allocates certain dollars which we believe

18   will only be derived from a much higher ultimate recovery if we

19   didn't have that kind of million dollar carve out.  But the

20   committee has looked beyond just the settlement issue.  If I

21   can have a couple of minutes on the record?

22         We don't see how any examiner can in any fashion

23   assist in this process.  And we have assessed what the

24   examiner's role might be, and how long, and how extensive it

25   might be for him to come to a conclusion.  And let's assume

J&J COURT TRANSCRIBERS, INC.

1 that the examiner is the most qualified person to look at this

2 litigation.  He first has to decide what it is he's looking at.

3 You have five-and-a-half years of litigation, hundreds of

4 thousands of documents, tens of thousands of pages of

5 deposition transcripts, maybe 50 in limine motions decided by

6 either Judge Linares or various Magistrates, any of which might

7 be overturned or overruled.  How much of that does an examiner

8 have to look at to be able to make any kind of competent

9 decision about the benefits of this settlement of 25 million

10 with the carve out and where that may ultimately go as opposed

11 to let's go back and have a trial, whether it's the same one

12 that was started, or because of mistrial months from now, when

13 Judge Linares can fit it into his calendar, and knowing that

14 it's always fraught with the possibility of some Appellate

15 process.  And as Judge Linares said, I may have called 50

16 issues in this case.  I'd like to think I'm right on all of

17 them, but the odds are maybe I'm not.

18        So, I think the examiner or Chapter 11 trustee has to

19 make that kind of determination, and we really think it's

20 appropriate for the committee, which has taken its

21 responsibility very seriously in this case, to make that call.

22 We think that the committee is the true party in interest in

23 this case.  We think that under any scenario, if the settlement

24 gets approved, all admin and secured claims are being paid in

25 full so they don't need a voice at this table.  We think that

1　the likelihood, based on numbers we have seen from Mr. Sirota

2　as to all of the claims in this estate, the strong likelihood

3　is that equity and/or Mr. Benun or JCB may be out of the money

4　on virtually every scenario.

5　　　　It's the creditors who stand to risk the possibility

6　of an assured recovery in relatively short order with some

7　significant upside.  Don't forget there are a lot of admin

8　claims that may be challenged.  As those claims get knocked out

9　there is a spillover into the pot for the unsecured creditors,

10　and my constituency may have approximately, on a worst-case

11　basis, ten percent of that spillover.  So, it's not just the

12　money they're getting from Fuji, it's additional money.  And

13　so, those are the issues that have --

14　　　　THE COURT:  All right.  You took us further into the

15　substance, and that's fine.  But I want to know about the

16　timing, and it ties to examiner issues and conversion issues.

17　If it's not feasible, if it makes no sense to have an examiner

18　or a Chapter 7 trustee, or Chapter 11 trustee, as Ms. Jurow

19　points out, for purposes of dealing with this immediate issue

20　of settlement, because the timing just can't accommodate it, I

21　put that as a threshold issue, rather than getting into the

22　depth of whether this case has reorganization potential or not,

23　etcetera.  We're just dealing with that top line element.  And

24　I want to stay right there.  Although, you know, I understand

25　the inclination to get below it.  So, I hear the committee's

**J&J COURT TRANSCRIBERS, INC.**

1   position.  I appreciate it.  Fuji I assume, Mr. Etkin, is in

2   favor of this.  Am I correct?

3            MR. ETKIN:  We are, Your Honor --

4            THE COURT:  Settlement?

5            MR. ETKIN:  -- but I would like to be heard briefly

6   so that I can --

7            THE COURT:  Yes.  Go ahead.

8            MR. GREENBERG:  I have one more point --

9            THE COURT:  Yes.  Go ahead.  All right.

10           MR. GREENBERG:  -- in anticipation of the Court

11  focusing on how we possibly, in alternative fashions, move the

12  process forward.  And not knowing whether this case is going to

13  be converted, whether there may be an examiner or a Chapter 11

14  trustee who has a role in this case.  We believe that it is

15  appropriate, given the debtor's board decision not to move the

16  settlement for consideration, to submit an application on short

17  notice to this Court which I have prepared but not filed, which

18  would schedule a hearing next week, or whenever is convenient

19  for the Court, on the limited issue of standing.

20           And we believe a reading of Cybergenics II gives the

21  committee in the sort of abdication of the debtor, the ability

22  to do that with all parties, if that motion is granted,

23  preserving their right to object to the settlement itself, the

24  debtor, Mr. Benun, Mrs. Benun, and the children who have the

25  equity, the U.S. Trustee, etcetera.  And the thinking would be

J&J COURT TRANSCRIBERS, INC.

1   that in theory the motion seeking approval for the committee

2   derivatively to move could be heard in the next week or ten

3   days, and thereafter the ultimate hearing on approval or denial

4   of the settlement could be heard two or three weeks after that.

5         I have, should the Court want to proceed in that

6   fashion, and we didn't want to be presumptuous, because there

7   are so many other issues that could work against that, we are

8   prepared to circulate our actual pleadings today, to file them

9   today but we would not be losing any significant time if the

10   Court decided to move in that direction.  I understand, and Mr.

11   Sirota could speak to this, that the debtor would not oppose

12   the motion for the committee to approve derivatively the

13   settlement as long as it did not preclude their rights to on a

14   substantive basis oppose the ultimate approval.  I don't know

15   whether Mr. Benun, and Ms. Benun, and the daughters have that

16   same view.  But that's something the Court may want to be aware

17   of.

18         THE COURT:  Well, that takes me to a question.  And I

19   appreciate the caution that counsel for the committee is

20   exhibiting in approaching the standing issue.  I will decide

21   standing today, if necessary.  I will not delay the notice of

22   settlement if we should go forward with that for a hearing on

23   standing.  I will decide that today, and am prepared to decide

24   it today.

25         MR. GREENBERG:  Your Honor, if the Court would like,

1  because there, I'm sure, will be breaks, I am happy to give to

2  the various parties in interest our pleadings.  If the Court

3  thinks it's premature I'll just hold on to them until a later

4  point in the discussions today.

5          THE COURT:  This is going to be a long day, and so I

6  think we can hold off for the moment.  But I am satisfied,

7  frankly, and I'm sure one can anticipate where I'm going on the

8  standing issue, that the rule, statement in 9019 that the

9  trustee has the authority to propose the notice of settlement,

10  I think that under certain circumstances and if the record

11  unfolds today as I think it might, I will be able to decide

12  that it's not only the trustee who can put on a notice of

13  settlement in situations where we have a debtor-in-possession

14  and different interests which might be conflictual, and in fact

15  are, that's an if, but if I were to decide some predicate facts

16  today, I would sua sponte decide the standing issue.

17          MR. GREENBERG:  And lastly, just to complete the loop

18  about the committee's position, number one, they do not want to

19  see this case converted.  That would be the worst alternative

20  as far as they're concerned.  They know that that will just

21  slow down the process until they get their distribution at the

22  end of a lengthy Chapter 7.  They do not want to see a Chapter

23  11 trustee.  They do not want an examiner.  But if that were

24  the only way to avoid the other two, the committee would not

25  oppose that, although for the reasons I mentioned --

                    *J&J COURT TRANSCRIBERS, INC.*

1          THE COURT:  I mention as a footnote matter, and I saw

2     the Fuji objection to the examiner in particular, that there's

3     a lot of law about the absolute right to an examiner.

4     Absolute.

5          UNIDENTIFIED ATTORNEY:  Correct, Your Honor.  Under

6     certain circumstances.

7          THE COURT:  Under the -- well, under these

8     circumstances.

9          UNIDENTIFIED ATTORNEY:  Over $5 million.

10         THE COURT:  $5 million.  I don't see any discretion

11    in the statute -- you know, unless somebody reads that statute

12    differently.

13         UNIDENTIFIED ATTORNEY:  Well, I didn't see that -- I

14    --

15         THE COURT:  You didn't -- because you didn't print it

16    in your papers.  But the second leg -- the second leg of 1104,

17    whatever, (b), I guess, reads pretty absolutely.  There's a lot

18    of law on this, whether laches applies, what the scope of the

19    examiner's role would be is left to the Court.  I could say,

20    for example, that an examiner could be appointed to look at one

21    page and get a fee of $1.  I'm being facetious, but the

22    examiner issue I'm going to put to the side, because it may be

23    withdrawn.  But --

24         MS. JUROW:  It won't be withdrawn, Your Honor.

25         THE COURT:  Okay.

                    **J&J COURT TRANSCRIBERS, INC.**

1           MS. JUROW:  By me.

2           THE COURT:  Okay.  Well, we'll see how the day

3    progresses.  You know, I don't know.  If that's the conclusion

4    now, so be it.  I'm not forcing that on the moving party.  I'm

5    just saying that we have series of issues to deal with, and the

6    first issue that I will go to, and I'll hear Mr. Etkin in a

7    second, is really what's introduced by Mr. Greenberg.  And the

8    question goes to Mr. Stoeri, and then to Mr. Frazza.  What is

9    the timing?  If this Court were to take three or four weeks,

10   what would that do to the settlement, Mr. Stoeri?

11          MR. STOERI:  Your Honor, from our position there is a

12   very strong need on Imation's part to get this done by the end

13   of this month when they have to do their final 8-K filing.

14   Now, if that means that it is completed by then, great.  If it

15   means that it is far enough along the path of completion that

16   they can make this filing without -- it has to be a judgment

17   call on their part that it's far enough along that they will

18   make the filing.

19          The concern they would have is if there is absolutely

20   no inkling yet as to whether or not this is resolved, or will

21   be resolved.  If they have no idea whatsoever by February 28th

22   how are they going to deal with the 8-K?  Do they continue on

23   with the statement that this is a settlement offer as accrued

24   pending approval, and then have to withdraw it again with their

25   shareholders with the SEC if it's rejected?  So, there is a

1 strong need to have this resolved, or at least far enough along

2 the path that they can make the judgment by the end of this

3 month that they will file appropriately with the 8-K.

4          THE COURT:  But it's also my understanding

5 independent of the tainting issue, which I understand is a

6 significant issue, and I don't make light of that issue, Mr.

7 Frazza and Mr. Stoeri, but it's my understanding that the jury

8 can't be held for more than a 30-day period no matter what.  Is

9 that correct?

10          MR. STOERI:  I don't know if that's the technical

11 requirement.  I think realistically trying to hold a jury

12 beyond that would be extremely difficult.

13          THE COURT:  I think it's Judge Linares's position.

14 Mr. Frazza, have you heard that?

15          MR. FRAZZA:  This is the first I've heard that.  He

16 met with them yesterday separate from Mr. Stoeri and I.  There

17 may have been constraints placed by jurors with vacation and

18 the like that Mr. Stoeri and I are not aware of.  We need to

19 report, as I said before, down there.

20          THE COURT:  So, I think there is limited time.  How

21 much time is not a certainty.  I don't hear from Mr. Stoeri or

22 from Mr. Frazza that if it's not wrapped up by midnight tonight

23 the offer is off the table.  I don't hear anything like that.

24 I hear Mr. Stoeri saying that his concern is noticing, and

25 moving from the 8-K to the 8-K requirement at the end of this

**J&J COURT TRANSCRIBERS, INC.**

1    month.  Is that correct, Mr. Stoeri?

2          MR. STOERI:  That is correct.

3          THE COURT:  Okay.

4          MR. FRAZZA:  The trial constraint, though, as you can

5    appreciate, is I can't even measure it.  I've never been

6    placed, as any of the trial lawyers in this room, have never

7    been placed in this quandary.  We are stopped mid-stream, in

8    the middle of the presentation, with memories being lost,

9    continuity being lost, and the like.  So, I don't know what the

10   right course is because I'm not a bankruptcy attorney, whether

11   it be an examiner, or someone.  But to me, the foot really

12   needs to go to the pedal.

13         Listening to Mr. Greenberg's scenario of, well, we'll

14   hear it next week, and then ten days after that we'll have

15   another hearing, that's far, far too long for my personal trial

16   counsel liking.  By that point in time --  the jury hasn't

17   heard anything in the last nine or ten days as it is, so now

18   we're into a month right there.  So, again, I know no one has a

19   magic crystal here to say where we'll be at the end of the day,

20   but my repeated theme, Your Honor, will be let's do it as

21   quickly and expeditiously as possible, and as creative as

22   everyone in this room can be, to try to preserve the assets.

23   Because as a plaintiff, we put half of our case in.  Mr. Stoeri

24   is a very competent trial lawyer.  He now has my cards on the

25   table.  I don't have his cards on the table.  So, not only in

J&J COURT TRANSCRIBERS, INC.

1  the mistrial sense, but from a plaintiff's sense, he would be

2  in a much better position, if this falls apart, to retry the

3  case, because he knows what I said in opening.  He knows what

4  Mr. Benun said.  He knows every exhibit we want to use.  I

5  mean, he knows my case right now and I haven't seen a stitch of

6  his.  So, let's not lose sight of the mistrial, that the

7  retrial of this gives a advantage to Imation, particularly

8  given the competence of Dorsey & Witney.  And I don't say that

9  because they're here.  I say that because everyone knows

10  they're one of the largest, best firms in the country.  So,

11  that's dealing them a hand that is going to be advantageous to

12  him and not advantageous to everybody sitting in this room.

13  So, I'm not trying to make it doomsday, but we really need to

14  be creative to get to something.  Not by midnight, I appreciate

15  that's impossible, but by the end of the week, at least to know

16  where the process is, and what it is that, you know, we're

17  going to do, examiner or otherwise.  I don't have a suggestion

18  or position --

19          THE COURT:  No, I'm not asking for one on the

20  ultimate issue.

21          MR. FRAZZA:  I'm probably the one who has no standing

22  here of anybody, but hopefully everyone can appreciate the

23  position that Mr. Stoeri and I are in in terms of the quandary

24  that we both find ourselves.

25          THE COURT:  Mr. Stoeri, you wanted to say something?

1          MR. STOERI:  Other than disagreeing that all the

2     advantage goes to the defendant in these circumstances, I've

3     done my opening and all the cross of their key witnesses, I

4     would agree expeditiously is also our position.

5          THE COURT:  Thank you.  Mr. Etkin?

6          MR. ETKIN:  Thank you, Your Honor.  Let me first

7     respond to the Court's threshold question, so you understand

8     where Fuji stands with respect to this proposed settlement.  We

9     are in favor of the settlement amount, but I want to make it

10    clear to the Court, and I think the parties who are before

11    Judge Linares understand this, that the concession that Fuji

12    made in connection with the settlement discussions before Judge

13    Linares was conditioned, clearly and unequivocally, on the

14    debtor ceasing operations.  Bear in mind, Your Honor, that this

15    was placed on the table in the context of the debtor

16    potentially agreeing to a global resolution of all this, which

17    never came to pass.  But as far as the million dollars that

18    you've heard, the so-called carve out from the Fuji admin

19    claim, placing that on the table was conditioned on the fact

20    that we're not going to have to deal with the continuing

21    infringement and the continuing concerns with regard to the

22    debtor's operations.  Obviously if the case is converted, as we

23    would urge, that takes care of it quite clearly.  Ms. Jurow's

24    suggestion of a Chapter 7 may or may not take care of that.

25         The problem with the examiner motion, as far as that

 1  issue is concerned, and I'll get -- and I'm not going to deal

 2  with that on the merits.

 3            THE COURT:  Fine.

 4            MR. ETKIN:  I want to get to the timing issue that

 5  the Court --

 6            THE COURT:  Yes.

 7            MR. ETKIN:  -- is concerned about.  The problem with

 8  the examiner motion is that putting that fiduciary in place

 9  does not advance the ball with respect to an independent

10  fiduciary being able to tee up a 9019 motion.  The examiner

11  would not have that power.  Ms. Jurow does not suggest that the

12  examiner would have that power in the motion.

13            THE COURT:  Power aside, the timing to bring an

14  examiner up to speed, if the commission of the examiner is to,

15  in fact, evaluate the settlement against the ultimate potential

16  of the litigation, but doesn't that argument go, again, just on

17  the timing, to the conversion, as well?

18            MR. ETKIN:  I don't -- I really don't --

19            THE COURT:  Wouldn't the Chapter -- if I were to

20  convert today as you want, and I assume you still want that --

21            MR. ETKIN:  I really -- yes, we do.  And I really

22  don't believe that it --

23            THE COURT:  Wouldn't a Chapter 7 trustee be in the

24  same position as the examiner?

25            MR. ETKIN:  I don't believe so, Your Honor, because I

                    J&J COURT TRANSCRIBERS, INC.

1  think that the Chapter 7 trustee can talk to the various

2  constituencies in the case.   The Chapter 7 trustee is free to

3  talk to Judge Linares, who --

4           THE COURT:   An examiner isn't free to do all of that?

5           MR. ETKIN:   Well, not the way the examiner has been

6  couched with respect to the U.S. Trustee's application.   This

7  is just an examiner.   This application before the Court is for

8  an examiner to evaluate what an -- what an appropriate

9  settlement number would be.

10          THE COURT:   But that's all I'm focusing on.   In that

11 context, wouldn't the Chapter 7 trustee and the examiner do

12 exactly the same thing between now and a return date on a

13 notice of settlement?

14          MR. ETKIN:   I don't believe so, Your Honor.   I think

15 a Chapter 7 trustee could speak to the various parties in

16 interest and can speak to Judge Linares, and --

17          THE COURT:   Yes, but why couldn't an examiner do

18 that?

19          MR. ETKIN:   Well, I don't think an examiner who is

20 charged with independently evaluating the settlement value of

21 litigation, I think a Chapter 7 trustee could tee it up very

22 quickly based upon discussions that they have with the various

23 parties and with Judge Linares.   Who is the best arbiter, Your

24 Honor?

25          THE COURT:   Well, suppose I put in -- you know, if I

1  were to enter an examiner appointment order I would put in do

2  this, this, and this.  Talk to Judge Linares, talk to this one,

3  that one.  If that's appropriate.  I'm not necessarily agreeing

4  that it's appropriate to have either of those fiduciaries talk

5  to Judge Linares.  I'm not going to that issue.  But that

6  aside, I don't see -- again, just on the threshold aspect of

7  examiner versus Chapter 7 trustee, a great deal of difference

8  on the timing issue.  It's going to take time, unless what is

9  being asked for is a rubber stamp, and I think that would be

10  offensive to everyone.  Maybe I'm wrong.  But the -- it's -- if

11  timing is significant, and I'm beginning to hear that it is for

12  reasons related to the trial, reasons which tie into holding a

13  jury, reasons that tie into tainting a jury, reasons that tie

14  into very substantive matters in the trial itself in terms of a

15  two-week trial becoming stale, I sense that we ought to act

16  quickly.  And I'm not sure that acting quickly includes either

17  appointment of an examiner or conversion today.  I'm not taking

18  those matters off the table, or certainly the conversion issue

19  off the table on an enduring basis, but I'm talking about

20  today.

21        MR. ETKIN:  Well, the quagmire that it potentially

22  creates, Your Honor, an examiner, and I understand what you're

23  saying about timing, and I understand --

24        THE COURT:  I thought you would go back to another

25  point, which is well then, how can you honor the Fuji request

1    --

2                    MR. ETKIN:  That's --

3                    THE COURT:  -- which is really a demand --

4                    MR. ETKIN:  That's the point, Your Honor.

5                    THE COURT:  -- to have the business stop.  I

6    understand.

7                    MR. ETKIN:  That's the quagmire I was going to --

8                    THE COURT:  That's the fundamental point.  So, that's

9    the million dollar question.

10                   MR. ETKIN:  In fact and in theory.

11                   THE COURT:  I understand that.  And we're going to

12   have to have some discussion on that point.  That may have to

13   be discussion that takes place party by party in camera,

14   because I understand that there's negotiation potential there,

15   etcetera, unless there's an objection to that.

16                   MR. ETKIN:  There's no objection.  We're result

17   oriented, Your Honor.  We think that a fair result was

18   negotiated.  We're extremely troubled by the fact that the

19   debtor rejected that proposal.  We think it speaks volumes.  I

20   won't get into it now, but I will address it later, to the

21   extent necessary.  But we are not -- we're looking to get from

22   point A to point B.

23                   THE COURT:  You're entitled to be result oriented,

24   and I -- and as far as everyone else here, except the Court.

25   And I don't have a result in mind, but I do have concerns, and

                     J&J COURT TRANSCRIBERS, INC.

1  I know that people have worked very hard on both sides of the
2  trial, long hours.  This is a potential seven-week or longer
3  trial, two weeks into a jury trial, holding up valuable assets.
4  The Court time is a valuable asset, and we've got Judge Linares
5  with a jury hanging in limbo.  And I think this Court and this
6  group has a duty to do what it can, again, not to have parties
7  waive their fundamental interests, that's not what I'm really
8  going to, but whatever we can do to make it work, and either
9  get on with the trial or otherwise, I think we have to do
10  promptly, and by that I mean within probably the next week or
11  so.

12          MR. ETKIN:  I don't disagree, Your Honor.  The only
13  other observation I would make with respect to the timing issue
14  is that although the Court observed earlier that there are
15  other creditors who are not in the room, the overwhelming
16  majority of interested constituencies and parties are in this
17  room.

18          THE COURT:  I think you're right, but I wouldn't feel
19  comfortable with a 9019 notice that was circulated only in this
20  room.  And so, the terms of the notice -- that's why I raised
21  that issue with Mr. Stoeri whether we would be stepping on a
22  toe, if not a confidentiality requirement, settlement agreement
23  by stating, for example, the total settlement amount, not just
24  the amount that would be in what is the proposed 8-K that would
25  go out tomorrow or so, if that's the case.  So, I think we have

1  to be mindful of that issue.  Although it's a mechanical issue

2  down the road, it's also a due process notice issue.

3          MR. ETKIN:  There's no question.  But the Court does

4  have some flexibility on the 2002.  And this is a unique case

5  to the extent that you don't have a 500 person, or 100 person,

6  for that matter, creditor body out there.

7          THE COURT:  I appreciate your point, but again, if

8  we're talking about timing I think we do have time to do it

9  right, whatever that is.  Thanks.

10          MR. ETKIN:  Thank you, Your Honor.

11          UNIDENTIFIED SPEAKER:  Judge, I only got to answer

12  the question on the Court's poll.

13          THE COURT:  I'm not -- I understand your -- I just --

14  for -- in 30 seconds or less, Ms. Jurow, you are a moving

15  enterprise here.  Just on the issue of timing --

16          MS. JUROW:  Do I get the same 30 seconds as Mr.

17  Etkin?  Your Honor, I'll try to be as brief as I can.

18  Obviously any fiduciary we've put in would work expeditiously.

19  Every fiduciary put into a bankruptcy case is a fiduciary going

20  in from a failed to business to a failed bankruptcy.  You know,

21  Mr. Greenberg talked about how could -- and it would take an

22  examiner forever to evaluate the settlement.  They need to do

23  this and read 10,000 pages.  Well, the truth of the matter is

24  Mr. Greenberg was able to evaluate the settlement on a couple

25  of days upstairs with Judge Linares.  Mr. Etkin and Mr.

1  Rosenthal were able to evaluate the settlement on a day with

2  Judge Linares.  The parties have supplied to me all the damage,

3  expert materials already.  They did that by hand delivery at my

4  request.  A sophisticated examiner would be able to -- someone

5  sophisticated with prior litigation experience, either as an

6  attorney or an accountant, forensic accountant, has the ability

7  to evaluate the settlement of a case as expeditiously as any of

8  the other parties, and I don't find that that would be a

9  significant delay in this case.

10          THE COURT:  Let me just ask you this then, just on

11  that --

12          MS. JUROW:  Yes, Your Honor.

13          THE COURT:  -- narrow point.  Suppose that a motion

14  were put on on short notice today for evaluation of the

15  settlement a week from today, and there were no examiner, or

16  Chapter 7 trustee, and just the materials that you're talking

17  about were circulated, provided to the Court, evaluated by all

18  parties, and all parties in interest came in with their

19  positions a week from today, wouldn't that be sufficient?  Does

20  the examiner add anything?

21          MS. JUROW:  I have to step back a couple of steps,

22  then.  One, I have to interpose an objection to hearing on the

23  standing issue today because the parties aren't all present.

24  Equity is not here.  I understand that the Benun women are

25  represented by counsel.  That counsel is not here.

                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Yes.

2          MS. JUROW:  And I think it -- my position here --

3          THE COURT:  So, you --

4          MS. JUROW:  Judge, just so you understand --

5          THE COURT:  Go ahead.

6          MS. JUROW:  Just so you understand --

7          THE COURT:  Sure.

8          MS. JUROW:  -- the reason that I put in -- I moved

9    for an examiner, I told this to Mr. Buechler yesterday, is when

10   I was upstairs, I even called upstairs to talk to Judge Linares

11   on multiple occasions now.  Last Thursday, I think it was, late

12   in the day, I was called to meet Judge Linares again.  And for

13   the first time I heard the suggestion that the creditors'

14   committee would be moving the 9019.  It was stunning to me.

15   First of all, the statute doesn't provide for that.  I don't

16   know how on earth they could present a case for that.  It

17   seemed to me extremely difficult.  And even if it were approved

18   by Your Honor, I think it hands equity and Mr. Benun a lovely

19   Appellate issue.  And I don't want to see this matter approved

20   for a settlement here in the Bankruptcy Court only to have it

21   unraveled three years from now on a non-bank decision in the

22   Third Circuit.  It just -- it's not a good way to go, in my

23   estimation.

24          Cybergenics, for whatever it's worth, came because

25   there was a breakdown in the bankruptcy process.  Had Judge

1   Stripp converted the <u>Cybergenics</u> case to Chapter 7 when the

2   debtor-in-possession refused to pursue the avoidance cause of

3   action against its insiders, or the leverage buyout partner,

4   whoever it was, we wouldn't have had several years of appeal in

5   <u>Cybergenics</u>.  I don't want to take this Court back there.  I

6   don't want to hand the objectors to the settlement --

7           THE COURT:  Your point --

8           MS. JUROW:  -- an Appellate issue.  I think that's

9   crazy.  And so, I spoke to -- I filed, as promptly as I could,

10  the -- I'll admit the barest pleading I could, to get the

11  examiner position on the table.  And frankly, I would submit

12  that had Mr. Greenberg wanted the standing issue to be heard on

13  the 9019 he could have done the same thing.

14          THE COURT:  Can I just ask you something about the

15  examiner?

16          MS. JUROW:  Yes, Your Honor.

17          THE COURT:  If your concern is a standing issue, and

18  the examiner is in place, and the examiner works quickly, as

19  you're asking, who brings the motion?

20          MS. JUROW:  Your Honor, our office, as a matter of

21  course, does not endorse examiners with expanded powers.  And

22  so, I'm not authorized to request from Your Honor that the

23  examiner be conferred with the expanded power to bring that

24  9019 settlement.  However, I have conferred with debtor's

25  counsel, and it's sort of a fluid mix.  And so, I don't know --

1 my understanding from speaking to Mr. Sirota is that if the

2 examiner were to issue a report that supported the 25 million,

3 the settlement, then the debtor's board of directors would

4 agree to be bound by that and would move the settlement

5 pursuant to 9019 themselves.

6       THE COURT:  Unless I hear that on the record as a

7 firm commitment today, I can't --

8       MS. JUROW:  I'll defer to Mr. Sirota.  That's --

9 because otherwise I would be asking Your Honor to put in an 11

10 or a 7 trustee.

11       THE COURT:  Mr. Sirota?

12       MR. SIROTA:  We have agreed with both Mr. Greenberg

13 and Ms. Jurow in this respect.  Despite Fuji's claim of

14 breaching fiduciary duty, like in many Chapter 11 cases there

15 is a difference of opinion between the debtor and the

16 creditors' committee on this settlement.  No more, no less.

17 You can't throw stones at the debtor for relying on litigation

18 counsel's view of the case in rejecting a settlement offer that

19 through machinations have gotten a few more bucks to the

20 unsecured creditors.  That being said, the debtor wants to do

21 nothing that prevents the issue being brought front and center

22 for this Court's consideration.  And whether it's Your Honor's

23 proposed program of the information being dumped on everybody,

24 and the process unfolding, and everybody weighing in, and the

25 Court making a decision, that's fine.  Mr. Greenberg's approach

1    of expeditiously bringing on the 9019 motion, the debtor

2    consented to, and I shared that with Mr. Greenberg.  When Ms.

3    Jurow voiced an objection because of the Appellate concerns she

4    had to the 9019 approach, the board of directors of Jazz voted

5    yesterday that if an examiner is appointed, and the examiner

6    endorses the settlement, that I am authorized to bring that

7    before the Court for the Court's consideration so that we

8    wouldn't have a false start, an examiner's report, and then

9    some further debate or appeal on what the examiner could do

10   with it.  So, Ms. Jurow is quite correct.  The debtor is

11   committed, to the extent there is an independent view of this

12   settlement, to bringing it before the Court for the parties to

13   consider, and the Court to openly approve or disapprove.

14          THE COURT:  And why isn't the creditors' committee's

15   endorsement the equivalent so that you could join with a motion

16   by the creditors' committee to bring this on?

17          MR. SIROTA:  It's not the equivalent, because frankly

18   the manner in which this case has been proposed to be settled

19   in the view of the board of directors, based upon the amount of

20   the settlement, is woefully -- woefully insufficient, as

21   explained to us by litigation counsel.  In other words, Judge,

22   there's an amount of money that litigation counsel has

23   suggested should be paid pursuant to a settlement.  And we

24   shared that amount of money with Judge Linares as a proposed

25   settlement amount, and that amount was rejected by Imation.

J&J COURT TRANSCRIBERS, INC.

1 And what has happened is a far less amount of money has been
2 put on the table.

3          THE COURT:  I understand.  But let me just take it,
4 because Ms. Jurow is introducing really a sanctity issue with
5 respect to what might happen, and it's a legitimate point.  And
6 I appreciated her point.  But if we, hypothetically, appoint an
7 examiner this minute, and that examiner starts working, the
8 examiner is only charged to come to one of two conclusions --
9 good settlement or not good settlement.  If the examiner says
10 it's not a good settlement, that really unlocks you from
11 joining in any notice of settlement that would be put forward.
12 If the examiner says it's a good settlement, even if your board
13 disagrees, you will still move it to get it before the Court
14 again, not waiving, as I hear what you're saying, your right to
15 oppose the settlement.  Is that correct?

16          MR. SIROTA:  The board of directors, based upon the
17 examiner's conclusion, would not be opposing it.

18          THE COURT:  Would not be opposing it?

19          MR. SIROTA:  It would be presenting it as the
20 examiner desired for approval of the settlement, and not
21 opposing it.  The board of directors of Jazz.

22          THE COURT:  Okay.  So --

23          MR. SIROTA:  Correct.

24          THE COURT:  So, as distinguished from the creditors'
25 committee, if there were an examiner, your board would approve

1  the settlement if approved by the examiner.

2          MR. SIROTA:  And we would also consent, and certainly

3  not object on the Appellate issues that Ms. Jurow is concerned

4  about, if Mr. Greenberg, on behalf of the committee, were to

5  move the 9019 application.  I think the twist Your Honor was

6  putting on it is why wouldn't the debtor join in on the 9019,

7  but in that case preserve its rights to object.  Frankly,

8  Judge, I did not give that menu of options to the board of

9  directors yesterday.

10         THE COURT:  In other words --

11         MS. JUROW:  I don't see how you could move a

12  settlement, though, and object to it at the same time.

13         THE COURT:  Well, I don't know of any restriction to

14  do that.  That would seem to be in --

15         MS. JUROW:  It's like bringing your own motion and

16  opposing it.

17         THE COURT:  I don't have any problem with that in a

18  settlement mode.  That, it would seem to me, to be the most

19  open and honest satisfaction of fiduciary duties by a debtor-

20  in-possession, and I see nothing wrong with that at all.  And

21  if we're just talking about a technical standing issue, I'm

22  willing to deal with that.  And I don't see this as parallel to

23  Cybergenics at its infant stage in any way, shape, or form, Ms.

24  Jurow.  This is a unique case where we have a difference of

25  opinion, dramatically different interests, and there are any

1  number of cases, and there's a Ninth Circuit BAP case, <u>Guy</u> --

2          MR. SIROTA:  <u>Guy F. Atkinson Co. of California</u>.

3          THE COURT:  -- <u>Atkinson</u>, which --

4          MS. JUROW:  I only wish I had had an opportunity to

5  review those cases before I came here today, Your Honor.

6          THE COURT:  I understand, and I'm not unsympathetic

7  to the absence of preparation on that issue.  But I -- that

8  doesn't make me less sympathetic to the timing issue.  And

9  sometimes, and I'll give people time to go to Westlaw, do what

10 they want, and I'll cite the cases that I think support

11 standing under these circumstances for a creditors' committee.

12 A creditor's committee is an appropriate body as the facts are

13 unfolding.  Now, there may be a fact that sets it off track,

14 but as far as I've seen so far, I believe the creditors'

15 committee is quite appropriate to notice a 9019 settlement

16 under these circumstances.

17         Now, you're right, Ms. Jurow, that it would have been

18 best if the standing issue could have been vetted and could be

19 vetted, and still satisfy all the other needs so that we don't

20 have the pyramid of blocks here tumble down.  But I don't know

21 if that can be done.  But I'm willing to hear you further on

22 that point.

23         MS. JUROW:  If I might, Howard?  Thank you.  If Your

24 Honor were inclined to go in that direction I would support,

25 then, Fuji's motion for a trustee, either an 11 or a 7 trustee.

1 We've been at this case a long time, and although I do think

2 that the most --

3          THE COURT:  May I ask why?  Is it only the standing

4 issue?

5          MS. JUROW:  Your Honor --

6          THE COURT:  Is that what is the issue for you?  Or is

7 it something related to exposition of the substance of the

8 settlement?

9          MS. JUROW:  Your Honor, it's the standing issue, and

10 it's the way that the settlement was approached.  Mr. Sirota

11 started to allude to that.  This has been a bottom up building.

12 The discussions, at least the ones that I were involved in

13 before Judge Linares, and I think the other parties as well,

14 it's the equivalent of deciding how much you'll offer your

15 house for sale for based upon what the outstanding liens are

16 against it, and not what it's value is.  And so, I have a hard

17 time determining how anyone is going to put on a case here in

18 support of a settlement, and I would expect that an examiner

19 charged with a fiduciary duty to the entire estate to evaluate

20 that settlement would be able to put on that case.  It might be

21 the number that's on the table, but it might not be that

22 number.  And right now --

23          THE COURT:  All right.  So, I owe you one.  I owe you

24 one, and I owe you this.  There is a case in the District of

25 Massachusetts, 110 Beaver Street Partnership, which starts to

1   sound like your point --

2          MS. JUROW:  I wish I --

3          THE COURT:  -- which is the fact that a settlement

4   proposed by a trustee, Chapter 7 trustee, satisfies all

5   secured, and all unsecured creditors, doesn't necessarily --

6   does not necessarily mean that it is an appropriate settlement.

7          MS. JUROW:  Of course not, Judge.  I mean, I'm not

8   familiar with that case, but I'm familiar with the Chapter 7

9   world that we live in.

10          THE COURT:  244 B.R. 185.  A 2000 case.

11          MS. JUROW:  Judge, the example I gave to Judge

12   Linares and the parties is the common -- the common case.  This

13   is the real bankruptcy case where this comes up.  Debtor --

14   individual consumer debtor, either in a terrible car accident,

15   or a terrible malpractice case, takes what is it, seven years

16   to get to a jury trial against a nice big publicly-traded

17   company, goes, and a substantial offer is put on the table, but

18   it's only enough to pay off his unsecured creditors and his --

19   all his creditors whom he fell into bankruptcy because he's

20   waiting for the trial to come up, the trustee says, you know

21   what, I'll make my three percent, it's a nice number, you take

22   it.  That's not right, Judge.  That's not right.

23          THE COURT:  But with great respect, Ms. Jurow --

24          MS. JUROW:  And Judge --

25          THE COURT:  -- that may happen with a Chapter 7

J&J COURT TRANSCRIBERS, INC.

1  trustee in a New York minute.

2          MS. JUROW:  Well, frankly, it's a breach of the

3  trustee's fiduciary duty, and it's not my experience that the

4  trustees in this district do that.  So, you know, it's -- and

5  they do it when they insist on that number.

6          THE COURT:  Powers of rationalization are great.

7          MS. JUROW:  Well, they may be great, but the debtor

8  is still --

9          THE COURT:  When a commission of a $25 million or

10 other huge settlement is taken into consideration.

11         MS. JUROW:  But the debtor's equity interest is still

12 there to be argued.  And so, anyway -- anyway --

13         THE COURT:  I'm not disagreeing with you.

14         MS. JUROW:  -- we're -- intellectually we're in the

15 same place.  You know, the other part I wanted to take -- to

16 mention is, you know, on this 8-K issue that Imation is

17 raising, I'm a little bit troubled by it.  I'd like to hear

18 some legal authority on it before it's dismissed as having to

19 be done today and having to have a press release, because it

20 seems to me that any time a publicly-traded company wants to

21 call for a mistrial all they need to do is make an offer in the

22 middle of the plaintiff's case and then we're out of here.  And

23 that's troubling to me, and I'm uncomfortable, you know, with

24 the posturing here on this valuable asset without some

25 authority for that, and so I didn't want to leave that off to

the side.  But the examiner, my examiner proposal was to

preserve both the standing issue and to give the testimony in

support of a settlement some integrity, that I -- you know, not

to say that I don't know what Mr. Greenberg's --

THE COURT:  I think your point --

MS. JUROW:  -- testimony would be.

THE COURT:  Let me say this to the group at large,

and talk through you, Ms. Jurow, to everybody seated here.  You

points are very well taken and maybe ultimate points.  And one

way to skirt every issue that you have raised is to get

complete or near complete agreement to the settlement.  That's

obvious.

MS. JUROW:  Well, I don't think that's going to

happen, Judge.

THE COURT:  Well, you may not think so, but I'm not

so sure.

MS. JUROW:  Okay.

THE COURT:  And I'm going to meet with the parties.

MS. JUROW:  Well, Your Honor, then I would recommend

that -- or suggest that you may want to call --

THE COURT:  Because we may have an impossible matrix

without that.

MS. JUROW:  Well, you may --

THE COURT:  Enough said.  Thank you.  I appreciate

your points.  They're well taken.

**J&J COURT TRANSCRIBERS, INC.**

 1             MS. JUROW:  Thank you, Your Honor.

 2             THE COURT:  But we've got to move this.

 3             MR. GREENBERG:  If I can respond briefly to Ms.

 4    Jurow?

 5             THE COURT:  No, no.  I don't think so.  I think we

 6    have to --

 7             MR. GREENBERG:  Can I give the Court one more case --

 8             THE COURT:  Go ahead.

 9             MR. GREENBERG:  -- that further supports <u>Atkinson</u>?

10    And it's from the Eastern District of Pennsylvania.  And

11    incidently, a quote from the <u>Atkinson</u> case that you referred to

12    on page 502, indicates the Court did conclude that in,

13    "appropriate circumstances," and then there's an ellipses, "an

14    entity other than the trustee or debtor-in-possession may be

15    authorized to pursue settlement of claims of the estate."  And

16    then similarly, the Bankruptcy Court, in <u>In Re Walnut Equipment</u>

17    <u>Leasing</u>, which is a 1999 Eastern District of Pennsylvania case,

18    allowed the creditors' committee to propose a settlement for

19    Court approval, with everybody reserving their rights to

20    object.  And what the U.S. Trustee is doing here is really

21    trying to find a way to obfuscate the power of this committee.

22             THE COURT:  Oh, I don't think so.  No, no.  With

23    great respect, I think that Ms. Jurow has made telling points.

24    I think they are -- I think they are substantial points.  There

25    is, on the one hand, a rush to deal with the very sensitive

                    **J&J COURT TRANSCRIBERS, INC.**

1  trial issues here.  On the other hand, she's taking the longer

2  view that maybe, just maybe we are rushing to judgment, and

3  that some consideration has to be given to both the standing

4  and the substantive issue.  And I think that it's proper for

5  the U.S. Trustee to do exactly what she did in this case.  I

6  take my hat off to her.  I think that she has sharpened the

7  focus.  And I don't think it's done for obfuscation.

8           MR. GREENBERG:  Well, but there is a committee which,

9  at the formation, it is told they have a fiduciary

10 responsibility.  They took it seriously --

11           THE COURT:  And I think you're sharpening the issues,

12 as well.  But the fact that we now have much more sharpened

13 issues doesn't resolve them, so we're going to have to meet and

14 discuss this.

15           MR. GREENBERG:  To the extent there's a concern about

16 equity, they either could have been here today, and if they and

17 their counsel chose not to be, shame on them.  To the extent

18 that Mr. Benun has a claim, his counsel certainly is here.  So,

19 I don't know that we need to find somebody to represent their

20 interests when the creditors' committee has spoken, and they're

21 the ones who are in the money.

22           THE COURT:  Sir?

23           MR. ZAPATA:  Hi, Your Honor.  Joseph Zapata from

24 Wilentz, Goldman, and Spitzer.  I am here on behalf of Mona

25 Benun.  I've just been listening.

                    J&J COURT TRANSCRIBERS, INC.

1            THE COURT:  Thank you.  And you're -- you know,

2     you're certainly invited to speak.  Someone else was getting

3     up?

4            MR. ETKIN:  I was getting up just to -- I thought

5     that there may have been a representative here, Your Honor.

6     So, we straightened that out.

7            THE COURT:  All right.  I think what I would like to

8     do, unless someone has a need to adjust or add to, or otherwise

9     comment on what's been said so far, I'd like to meet with the

10    parties in the jury room.  I'll try to take no more than ten

11    minutes per unit.  And when I say parties I mean only counsel.

12    And I would start with the debtor Benun people.  All right?

13    Any objection to this?  I see none.

14           MS. JUROW:  The only thing -- maybe I should tell you

15    about this, is the discussions that I've had with Mr. Benun.

16           THE COURT:  Sure.

17           MS. JUROW:  I was under the mistaken impression that

18    the Benun conversion motion was on for today, just because of

19    some of the way I had read some of the titling of the cert, and

20    it's not.  And so, in the absence of Benun's voluntary

21    conversion to Chapter 7, in the near future I'll be moving for

22    conversion to Chapter 7.  And it's part of the tapestry of how

23    I see the settlement moving forward is that I would like to see

24    the Benun's estates interest, if any, in the settlement

25    represented by an independent fiduciary and any post estate

1  interest that he has he can represent on his own, but that will

2  be the essence of my motion, if it's necessary.  If it's not

3  they'll voluntarily confer.  Thank you.

4           THE COURT:  Thank you.  I appreciate it.  And just to

5  get the facts on the table to make sure we're all in agreement,

6  before I break, on the issue of costs going forward, Mr.

7  Frazza, do I have it correct that your firm's fee arrangement

8  is per the 6/11/03 order, that you charge as services would

9  require on an hourly basis, application made to the Court for

10 payment, that you were being paid, or were to be paid on the

11 estimated $25,000 a week basis going forward, and that all your

12 fees, as approved by the Court, were to be paid, plus a

13 contingency fee of ten percent up to $1.7 million?

14          MR. FRAZZA:  The contingency is up to 17 million,

15 which would equal $1.7 million.

16          THE COURT:  Yes.  Ten percent of the judgment, or

17 settlement amount, up to $1.7 million of fee.

18          MR. FRAZZA:  Yes.  The only caveat I should provide

19 to the Court is my firm has not been paid in at least six

20 months.

21          THE COURT:  That was my next question.

22          MR. FRAZZA:  You can probably -- and the bill for

23 January is going to be, as everyone can appreciate, because

24 it's been a four-week trial, not a two-week trial, is going to

25 be much more significant than any other bill we heretofore have

1   submitted.

2           THE COURT:  But there's no setoff against the

3   contingency amount?  It's one plus the other?

4           MR. FRAZZA:  We went through this, and you cross

5   examined me, so to speak, in detail way back when.

6           THE COURT:  I just want --

7           MR. FRAZZA:  And, yes, both components.  And we also

8   have -- I don't remember the number.  Mr. Sirota may.  But we

9   had a pre-petition --

10          THE COURT:  Two eighty-five.

11          MR. FRAZZA:  Okay.  You're one step ahead of me.  The

12  only thing I might suggest to your order of talking to people,

13  to understand in talking to people you might want to speak to

14  Mr. Stoeri and myself separately to try to put --

15          THE COURT:  You mean together separately?  Or --

16          MR. FRAZZA:  Well, separately.  I would be happy to

17  have Bill in the same room.  But I'm saying, to put --

18          THE COURT:  Oh, I'm going to talk to you separate.

19          MR. FRAZZA:  -- in context, when you talk to other

20  people, you might want to talk to the two of us first before

21  you start talking to parties, to have some understanding from

22  the litigation standpoint, because I know you're not as versed

23  in it as some of the other people who participated in the

24  process.  But I just throw that out there for your

25  consideration.

                    *J&J COURT TRANSCRIBERS, INC.*

1        THE COURT:  You want to confuse me with the facts of

2   the --

3                        (Laughter)

4        MR. FRAZZA:  I've been accused of doing that

5   frequently, but no, that was not my objective, Your Honor.  But

6   I leave that to you.

7        THE COURT:  I appreciate it, but I guess I have my

8   own sense of how I should do this.  It might be wrong, but it's

9   homemade, and I'm just going to have to go with it.  But, you

10  know, certainly I will talk to you and to Mr. Stoeri, and I

11  appreciate the patience of everyone.  This may take some time,

12  but I think what I'm going to propose with each party is that

13  perhaps then sub groups can break off and have some further

14  discussion, because I think that will be necessary.  But I'll

15  start with Mr. Schwartz, Mr. Amoriello, and we'll take a break.

16  I'll try to keep it to ten minutes, and then I'll talk to Mr.

17  Sirota, and then to Mr. Greenberg, and then to Mssrs. -- well,

18  all of the Fuji interests, and I'm not excluding any of the

19  counsel, then to Ms. Jurow, and then I'll allow Mr. Frazza and

20  Mr. Stoeri to flip a coin on who comes in first.  Thanks,

21  folks.

22                      (Off the record)

23       THE COURT:  Back on the record.  The Court

24  acknowledges Debbie instead of Carol.  Some housekeeping.  We

25  have additional counsel.

                    J&J COURT TRANSCRIBERS, INC.

1          MR. GREENHALGH:  Yes, Your Honor.  Your Honor, Walter

2     Greenhalgh, Duane Morris.  Your Honor, I have had -- been just

3     recently retained by Mona Benun.  I represent her interest in

4     this bankruptcy.  I do not have a formal written engagement

5     letter yet, but I will be meeting with her and will make those

6     arrangements.  But I have communicated with her and I've been

7     given certain directions to proceed today on her behalf.

8          THE COURT:  And as well as the children?

9          MR. GREENHALGH:  I will be representing -- and she

10    has advised me that it's their desire that I represent all four

11    of her daughters, but I have not spoken directly with them yet,

12    and I'm going to meet with them in the next 48 hours.

13         THE COURT:  All right.  So, if all the assembled

14    would please add Mr. Greenhalgh to the mailing list, service

15    list, etcetera, on the current basis in anticipation of --

16         MR. GREENHALGH:  Thank you, Your Honor.

17         THE COURT:  -- the retention.  I appreciate the

18    patience of the assembled group.  I've spoken to the various

19    constituencies through counsel in camera.  And let me give you

20    my tentative position.  And I would hear opposition, if it

21    should exist, and that would include the scheduling issues,

22    etcetera.

23         I think that we have a set of circumstances which,

24    though perhaps not unique, are out of the ordinary by any

25    definition for a Bankruptcy Court by way of predicate.  There

                    **J&J COURT TRANSCRIBERS, INC.**

1   has been an ongoing jury trial in which the debtor, Jazz, is

2   plaintiff, and Imation is the defendant.  That jury has trial

3   has been conducted by Judge Linares over the past several

4   weeks, at least two weeks running.  The trial has been long in

5   coming.  It has been long delayed as a function of the busy

6   calendar of the District Court and the need for satisfying

7   speedy trial matters in criminal proceedings.  And so, when the

8   Jazz and Benun cases started there was a great deal of

9   anticipation as to this trial, and it's taken an

10   extraordinarily long period of time to get tee'd up.

11        Two weeks into the trial apparently settlement

12   discussions developed and a settlement proposal has been made.

13   And the Court has conferenced, not heard the substance of the

14   propriety or otherwise of that settlement today, but has

15   conferenced with respect to the mechanics of dealing with that

16   settlement, whether it should be noticed, how it should be

17   noticed.

18        To that extent the Court has, again, polled everyone

19   on the record, their -- the Jazz position is a rejection of the

20   settlement.  The Benun debtor position is the same.  The

21   creditors' committee, by a two-to-one vote, has accepted, or

22   would accept the settlement.  Fuji, as the largest creditor in

23   both cases, promotes the settlement.  The United States Trustee

24   has weighed in with the motion on shortened notice to have an

25   examiner appointed with respect to the issue of the propriety

1    of the settlement, the reasonableness of the settlement.  We've

2    heard from Imation, the defendant, we've heard from Jazz's

3    trial counsel, and I do appreciate all of that input.

4         The immediate status with respect to the jury is

5    significant to this Court.  That jury is in a limbo stage.  The

6    case has not been mistried.  The Court begins to appreciate the

7    difficulties that the District Court has in holding a jury in

8    that limbo position.  We've heard plaintiff's counsel discuss

9    the impact of delay and staleness, if I can use that term with

10   regard to trial issues.  And so, timing is important.  It's

11   hard to evaluate the exact timing that might raise scheduling

12   issues to a critical nature.  I don't want to use that term

13   loosely, but timing is certainly important, if not critical,

14   with respect to dealing with the various issues.  There's also

15   a long, long pending motion by Fuji for conversion.  This Court

16   started off with a matrix of issues, the most common in

17   threshold issue being the effect on the settlement, or

18   settlement approval processes that appointment of either an

19   examiner or conversion and the concomitant appointment of a

20   Chapter 7 trustee would have.  There is also the possibility of

21   a Chapter 11 trustee mentioned today by Ms. Jurow from the

22   United States Trustee's Office.

23        I'm still not certain because, for example, if an

24   examiner were to be appointed we can only surmise what kind of

25   a break-in period would be necessary for the examiner to get up

1   to speed.  Surely I can order an examiner to report out by a

2   given date, but in fairness, that may not result in the most

3   adequate report, and we've got a Court holiday on Friday.

4   There are other scheduling issues.

5          And with all of that having been said, the Court is

6   inclined to, and tentatively, at this point, would do the

7   following by way of ruling and otherwise.  I would appoint an

8   examiner, and that examiner would have to report out by close

9   of business Tuesday, the 15th.  That's not a long time.  I

10  understand that.  And I would want the examiner to, as a

11  minimum, talk to trial counsel, and experts on either side, and

12  I would hope, Mr. Stoeri, that there's no objection to an

13  examiner speaking to the expert on your side?

14          MR. STOERI:  That's correct.

15          THE COURT:  Thank you.  I would ask for written input

16  in somewhat shortened form, that is summarized form, by the

17  same period from Jazz's counsel on the litigation, and would

18  invite Mr. Stoeri, if he chooses, to provide the Court with his

19  view of the case from Imation's point of view, and all other

20  parties can do the same, again, by close of business on the

21  15th.

22          I would ask the creditors' committee, and that would

23  not be a request, this would be an ordered authorization of the

24  creditors' committee, and I'll go to the standing issue

25  specifically, with respect to notice of a 9019 settlement

1  proposal.  I would embody in an order today, and it would be

2  the same, and I would handwrite it in, Mr. Greenberg, the

3  authorization akin to the <u>Cybergenics</u> authorization of the

4  creditors' committee to notice, under 9019, the hearing for

5  settlement.  That notice would have to have full terms, and as

6  I hear it, those terms include not only the dollar disposition

7  of the case, but the carve out and how that carve out would

8  work with respect to the unsecured creditors through the

9  creditors' committee, and the commitment that would be required

10 to have the debtor terminate its operations and file a plan of

11 liquidation.  And those terms would have to be noticed, and I

12 would hope that we could get agreement on the form of the

13 notice before parties disburse.  The notice would be broadly

14 circulated, all parties in interest, and it would be for a

15 hearing on Wednesday, the 16th, at ten a.m.  I know, Mr.

16 Greenberg, that you and I discussed a different hour, but --

17 and, Ms. Jurow, you and I discussed a different date, but it

18 just doesn't work -- yes?

19         MR. BUECHLER:  We have a problem with that -- with

20 that date, Your Honor.

21         THE COURT:  What is the problem?

22         MR. BUECHLER:  We -- Mr. Etkin has to be I think in

23 --

24         MR. ETKIN:  I'm in mandatory mediation in California.

25         MR. BUECHLER:  And I have a Court hearing at 10:30 in

1  Chicago Wednesday morning.

2        MR. ETKIN:  Strook will handle it --

3        THE COURT:  You're sure?

4        UNIDENTIFIED ATTORNEY:  Your Honor -- if Your Honor

5  will permit, we will -- we will --

6        THE COURT:  Oh, I'll certainly permit it, if -- if

7  counsel are not so discomforted by it.  Here, let me just go

8  through the whole arrangement.  Mr. Sirota will be away from

9  Friday through the following week.  And again, in fairness to

10 this side, I would not move the matter out into that week, so I

11 owe you the same balanced courtesy.  Counsel, are you ready to

12 go forward Wednesday?  Again, if there's any problem, I'll hear

13 it, but --

14       UNIDENTIFIED ATTORNEY:  We'll work it out, Your

15 Honor.

16       THE COURT:  And if either Mr. Etkin or Mr. Buechler

17 wants to participate by telephone, I would certainly invite

18 that.  So -- okay.  So, ten o'clock on the 16th would be the

19 noticed hearing on the Federal Rules of Bankruptcy 9019

20 settlement proposal.

21       Now, to the extent that one or another elements to

22 the hearing should be too rushed by that date, either we can't

23 finish or an examiner establishes that it's simply not feasible

24 to come up with a reasonable conclusion, or a conclusion in

25 that time on a reasonable basis, I would continue the hearing

**59**

1  at one o'clock on Thursday, the 17th.  Though counsel and this

2  number of counsel may get drafted to represent some pro se

3  Chapter 13 debtors who would be in the courtroom at that time,

4  we might get a double bang out of such a hearing, and we invite

5  bankruptcy counsel from Stroock to wet his feet with New Jersey

6  Chapter 13 pro se's.

7          MR. ROSENTHAL:  Thank you, Your Honor.

8          UNIDENTIFIED ATTORNEY:  He was just telling me the

9  other day how anxious he was to do that, Your Honor.

10          THE COURT:  The experience is here for the taking.

11  The issue of standing, and I will divide the noticing aspect of

12  the 9019 proposed settlement somewhat from what might happen at

13  the hearing.  It's clear to me, and I regret that the

14  exposition of this issue just can't abide the event of further

15  delay, and so I'm just going to decide the standing issue as

16  opposed to putting a hearing on with respect to the standing

17  issue.  But I believe that it's a question of law, essentially.

18  This Court believes that a creditors' committee, under the

19  circumstances of this case, has standing to notice a proposed

20  settlement.

21          And I'll footnote what might come later, that is, the

22  position of Jazz, the debtor, as Mr. Sirota might express, with

23  respect to this issue, or appeals from the standing issue.  I

24  leave that to Mr. Sirota to put on the record, and I'm not

25  requiring anything in that area.  I'm going to the basic issue

first.  But, if we draw a rough comparison to Cybergenics, and

it's only rough in this area, Cybergenics dealt with an

interpretation of the Bankruptcy Code as it was initially said

to limit avoidance actions to the trustee and through operation

of the code, debtor-in-possession succeeding, or standing in

the shoes, or having like rights to a debtor-in-possession.  A

trustee, the debtor-in-possession having those rights.  And

then, could a Court authorize the -- going forward with

avoidance actions by the committee, notwithstanding the precise

language of the code.  And we know what the result in

Cybergenics was after en banc review, and particular reference

to such sections as 1103(c), and 1109(b), with ultimate resort

to the general section of 105(a).

          Here we are dealing with Rule 9019, which says the

trustee shall notice.  Can the creditors' committee notice?  I

believe so.  We are not talking about authorizing the

initiation of litigation, but only noticing the potential

settlement once it appears that the debtor not being satisfied,

but the committee and a major creditor being satisfied with the

settlement proposal set up an inherent conflict.  And to keep

the proposed settlement with that background, away from

consideration by the broader group of parties in interest

through review by this Court, would turn disclosure and

fiduciary relationships on their ear as far as this Court is

concerned.  I don't for a moment say that debtor's counsel

1 didn't meticulously deal with fiduciary issues.  It's just that

2 the uncertainty as to the reasonableness or unreasonableness of

3 the settlement is the subject of debate and an ultimate

4 hearing.  And so, one party, that is the debtor-in-possession,

5 under these circumstances, should not be in a position to

6 define the turf and withhold the exposure of that settlement

7 from the broader party in interest and a hearing before this

8 Court.

9       Again, the <u>Martin</u> obligation of a debtor-in-

10 possession has been satisfied, but it does not leave

11 exclusively, under circumstances like this, the control of

12 exposure of a settlement to the debtor.  Here, time is of the

13 essence in considering the settlement.  Certain timing has been

14 imposed, or might well be imposed by the defendant, who is

15 funding a would be settlement for very substantial dollars.

16 Again, it may not be enough.  I'm not ruling on that.  But

17 still, there is a risk with respect to delay.  And as pointed

18 out at outset, the District Court is holding a jury in limbo

19 two weeks into a trial which might have another seven weeks yet

20 to go.

21       Although I think that there is a risk with respect to

22 time in appointing an examiner, I will do that because I will

23 in turn define the turf of the examiner and require, again, to

24 the extent feasible and fair, that the examiner report out and

25 be here a week from today, reporting out on the 15th, as I

1    stated before.

2         I cite <u>Cybergenics</u>, 330 F.3d at 548, pinpointing

3    language at 567 and 68 as being instructive as to the impact of

4    1103(c) and 1109(b).  In mentioning 1109(b), if a creditors'

5    committee is given an absolute right to intervene under <u>Marin</u>

6    <u>Motor Oil</u>, it seems to me that the creditors' committee has

7    position in these narrow circumstances to at least notice for

8    purposes of exposition a proposed settlement.

9         With respect to 1103(c), I suggest that <u>Guy F.</u>

10   <u>Atkinson</u> at 242 B.R. 497, pinpointing pages 502 and 503, the

11   Ninth Circuit BAP decision of 1999, well goes to the issue of a

12   creditors' committee presenting a settlement proposal or -- not

13   a creditors' committee, they would have to be a bonding

14   company, an authorized enterprise other than the DIP -- the

15   debtor-in-possession or the trustee to bring on settlement

16   considerations by the Bankruptcy Court.

17        Overall, the question is what's in the best interest

18   of particularly creditors and then all parties in interest, and

19   this Court has no doubt, and finds specifically that it's in

20   the best interest of all parties in interest to consider this

21   settlement before it dissipates, or before the trial becomes

22   any staler.  And so, I sua sponte provide this Court's

23   authorization and require the creditors' committee to notice

24   the settlement as previously indicated.

25        Again, I emphasize the importance of both the form of

J&J COURT TRANSCRIBERS, INC.

1  the 9019 notice to be particularly comprehensive.  To the

2  extent that there was some concept of confidentiality placed in

3  one or another settlement memo in the District Court, I would

4  ask, again, Mr. Stoeri if, by requiring this kind of notice to

5  parties in interest, would that offend, in your view, or

6  insofar as your client is concerned, any aspect of the

7  settlement?

8         MR. STOERI:  No, Your Honor, with the understanding

9  that it is not going to be passed on further -- just --

10  dissemination or anything like that.

11         THE COURT:  Well, if you're saying that it shouldn't

12  be the subject of press releases --

13         MR. STOERI:  Correct.

14         THE COURT:  -- promoted by parties in interest here,

15  that's one thing.  But it is a public notice.

16         MR. STOERI:  I'm talking about the press releases.  I

17  understand that other than that it would have to be made

18  public.

19         THE COURT:  Okay.  So, I hope everyone understands

20  that, that this is a public notice to all parties in interest,

21  but Mr. Benun, and here, Mr. Schwartz, I -- I mention

22  specifically to you that Mr. Stoeri is indicating that his

23  understanding of the settlement is that there will be no press

24  release, and that would apply particularly to Mr. Benun and Mr.

25  Sirota to Jazz as an enterprise.  But that -- and again, the

1  number is certainly going to be a noticed item, and the

2  proposal that the Chapter 11 debtor-in-possession terminate

3  business and a liquidating plan be filed will also be a notice

4  provision, as required by Fuji as a term of its carve out.

5      Having said that, but for the standing determination,

6  which is not tentative, the balance of what I said would be

7  tentative subject to comment by any other parties in interest.

8  Mr. Sirota, any comment?

9      MR. SIROTA:  Judge, with respect to your footnote,

10  the debtor doesn't object to the committee's filing of the

11  notice, if that was my queue.  With --

12      THE COURT:  It was.

13      MR. SIROTA:  -- respect to the information and

14  position papers to be submitted, as well as the examiner's

15  report, is it Your Honor's indication that those documents

16  would all immediately become part of a public record which may

17  support the Imation litigation on one hand, or at least the

18  debtor's cause of action against Imation, on the other hand be

19  critical of it, so that we would have for public consumption

20  the pros and cons of the litigation?  Or is it Your Honor's

21  intention that those position papers be shared with the Court,

22  shared with the parties, and not become part of the public

23  record unless the Court should approve the settlement?

24      THE COURT:  Okay.  That's a -- that's a friendly

25  amendment, and a wake up call to the Court, and I appreciate

1  it.  But let me ask Mr. Frazza, and after that Mr. Stoeri,

2  what's your position on something getting into the docket, the

3  electronic docket in this Court, which would express a view

4  from you, from Mr. Stoeri, from the experts, of a settlement in

5  this case?

6         MR. FRAZZA:  Well, as I had said earlier, that is a

7  concern with the pendency of the trial.  I understand your

8  directive of Mr. Greenberg, and there's nothing I can do about

9  that.  I don't know, from Mr. Stoeri's standpoint, I've heard

10 about an 8-K filing, I don't know if they're going to be

11 obligated to put some press release out, where everybody else

12 has been instructed not to.  So, do you -- and I'd ask through

13 you, Your Honor, Bill, that question, are you understanding

14 some press release in addition to the 8-K by Imation?

15         MR. STOERI:  They have to make it public, yes.

16         MR. FRAZZA:  Does that mean a press release, or --

17         MR. STOERI:  That's the standard mode of doing it.

18 And that's simply filed.  And we have to make it available to

19 the investing public, both shareholders and potential

20 shareholders.

21         THE COURT:  As to the amount?

22         MR. STOERI:  As to the amount that the company itself

23 is putting forward.

24         MR. FRAZZA:  I'll get to that in a second. I think

25 you know what I'm going to request, and I think I know what the

1 answer will be.  But Michael's concern, Mr. Sirota's concern,

2 which is valid, Budd Larner putting in a position paper, or

3 Dorsey & Witney putting in a position paper, or the expert

4 putting in position papers which are electronically filed, if

5 at all possible, I'd like to see that avoided.  One other --

6      THE COURT:  Okay.  Is there any objection to having

7 -- I'm sorry to cut you off.  Go ahead.

8      MR. FRAZZA:  There was one other issue because there

9 was some mention of -- everyone was having discussions with

10 Your Honor of the possibility of me being deposed as part of

11 this process, which -- I know you didn't say that, but there

12 was -- and I want to be clear.  I know Michael might have not

13 said that, but in the middle of a case with attorney-client

14 privilege and work product issues, that's the last place Budd

15 Larner or any trial lawyer would want to be in --

16      THE COURT:  I will not allow any depositions of

17 counsel in this case.  Period.  It's not going to happen.

18      MR. FRAZZA:  Then we go back, hopefully everyone

19 agreeing that the materials that would be submitted by experts

20 or counsel for the Court in the first instance would be under

21 seal.  That, I think, would help.  I don't think Mr. Stoeri --

22      THE COURT:  Is there any objection from any party in

23 interest to sealing what might come in in advance of the

24 hearing of Wednesday next, and we'll deal with what is

25 presented at that hearing by request for seal then?

1          MS. JUROW:  Judge, I would only ask that those terms,

2     to the extent that things are going to be sealed, be included

3     in the 9019 notice so that anybody who receives the notice and

4     wishes to be heard has an opportunity to obtain the sealed

5     documents as well.  It's not fair for any person who intends to

6     come and either support or detract from the settlement to not

7     have an advance look at what other people have had an advance

8     look at.

9          THE COURT:  Mr. Greenberg?

10          MR. GREENBERG:  I don't know when sealed documents

11    are getting filed, so from a practical standpoint if we were to

12    get notice out tomorrow, I haven't even seen a term sheet and

13    don't know that all parties in interest to the settlement have

14    an agreement that that is correctly restating what we discussed

15    with Judge Linares.  So, if notice goes out tomorrow or Friday,

16    people may not get it until Saturday, Monday.  I don't know

17    when --

18          THE COURT:  The notice -- I'd like the notice to go

19    out tonight.  Can you do it?

20          MR. GREENBERG:  Again, I haven't even seen the term

21    sheet.  I just don't know if everybody is --

22          THE COURT:  Where is that term sheet?

23          MR. GREENBERG:  Mr. Stoeri said he had some -- and if

24    the Court said it was all right he would share it with us.

25          THE COURT:  It's more than all right.  It's

J&J COURT TRANSCRIBERS, INC.

1   essential.

2          MR. FRAZZA:  There's one thing, though, Your Honor,

3   that I have not raised with anybody, because my client, Jazz,

4   heretofore has objected to the settlement.  There would be

5   customary conditions which should be in a settlement, i.e.,

6   releases going toward Jazz and the like which are not in this

7   term sheet, and other criteria which puts --

8          THE COURT:  I think that to the extent that a notice

9   of settlement is cryptic and just need include the critical

10  terms, that that will suffice.

11         MR. FRAZZA:  I think you see my point that it's not a

12  rounded -- it's just Imation's half of it.  We didn't comment

13  because our client had instructed us to object to it based on

14  the number alone.  But cryptic, for this purpose I understand

15  how you're using that term, would be okay, with everyone

16  understanding that if this ever is consummated there has to be

17  mutual releases and the like, which is not in this term sheet,

18  and other protections for Jazz as a party to this lawsuit.

19         UNIDENTIFIED ATTORNEY:  Your Honor, I'm assuming that

20  with respect to those -- the examiner's report and the

21  underlying documents that may be part of the examiner's report,

22  that those documents will be available to those who are subject

23  to the existing protective order in the case.

24         MR. SIROTA:  My suggestion is it gets shared with

25  everyone, it just doesn't become part of public --

                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Yes.  I assumed that.

2          MR. SIROTA:  Yeah.  Okay.  I just wanted to make that

3   clear.

4          THE COURT:  Fair enough.

5          MR. SIROTA:  Although what I was trying to address

6   before is that that's not available until Tuesday.

7          THE COURT:  Right.

8          MR. SIROTA:  The other parties who are getting

9   noticed, the hearing is Wednesday at ten o'clock.  I don't

10  know, mechanically, how they're going to have access to that.

11         THE COURT:  They can come to this room --

12         MR. SIROTA:  Okay.

13         THE COURT:  And we will have a package of --

14         MR. SIROTA:  But not before the hearing?

15         THE COURT:  We'll have a package of material

16  available, and that's the best we can do.

17         MR. SIROTA:  Okay.  Your Honor, and I don't know if

18  Mr. Frazza has more statements --

19         MR. FRAZZA:  No --

20         MS. JUROW:  Your Honor --

21         THE COURT:  Bear in mind that if we don't have

22  reports until Tuesday anyhow, there's not much differentiation,

23  which is your concern, a legitimate concern, Ms. Jurow, between

24  a party not in this room today and the folks represented in

25  this room today.

J&J COURT TRANSCRIBERS, INC.

1          MS. JUROW:  Well, Your Honor, I just want people to

2   be able to come on record and say listen, I want you to serve

3   me with the documents.  I don't -- you know, they could still

4   be sealed.  It's not a problem.  I also don't want the examiner

5   to be in the position of having to copy all the documents that

6   he gets from the other parties and then distribute them to as

7   many people as ask for it.  So, if he's getting documents from

8   the experts, for example, from the parties, that the parties

9   could then send those to the other interested parties.  He's

10  got enough to do.

11         THE COURT:  The examiner is going to have a tough

12  enough job just racing to come to a feasible conclusion.  I'm

13  not going to burden the examiner with any obligations to any

14  parties in interest.  The examiner will be a witness to the

15  extent that the examiner is a witness.  That which he reviewed

16  in -- he or she reviewed in documentary form should be brought.

17  Ms. Jurow, I instruct you to advise the examiner, whoever your

18  office appoints, and bring it to the hearing.  It's not the

19  best way, but it's the only way.  And I'll give counsel plenty

20  of time to look into matters, and we'll go from there.

21         MS. JUROW:  Well, I could tell you right now, as I

22  stand here today, I have received a package from Mr. Frazza,

23  and I've received a package from Mr. Stoeri.  I have not

24  reviewed those packages, but they're still sealed on my desk,

25  and that -- those will be the packages that I will provide to

**J&J COURT TRANSCRIBERS, INC.**

1  the examiner.  So, if anybody wants those, they should contact

2  Mr. Stoeri and Mr. Frazza's paralegals to get those materials

3  now.

4          THE COURT:  I would ask you to do just this, because

5  in this room all parties and counsel have history with this

6  case with but one exception, and that's Mr. Greenhalgh, so I

7  would ask that you provide Mr. Greenhalgh, as soon as possible

8  --

9          MS. JUROW:  Judge, if I may?

10          THE COURT:  Yes.

11          MS. JUROW:  In fairness, none of us have seen any of

12  this.  This was all under seal.  None of us had these

13  documents.

14          THE COURT:  Don't misunderstand me.  I'm not saying

15  you've seen it.  You have it.

16          MS. JUROW:  Judge, it's 12 inches of paper that

17  you're asking me to copy for Mr. Greenhalgh, and quite frankly,

18  I'm sure that his firm has a better copy room than my firm --

19  than my office does, so --

20          THE COURT:  No, no.  I'm just saying make -- wait.

21          MS. JUROW:  And I want to be able to --

22          THE COURT:  I don't want to get into who is paying

23  for the copy --

24          MS. JUROW:  Well, I want to turn it over to the

25  trustee -- to the examiner tonight is what I'm saying.  And so,

1  you know, they have it back at the farm, these other guys, and

2  they could give it to Mr. Greenhalgh.  I want to -- I'm not

3  going to make a copy to save for myself.  I'm turning what I

4  have over to the examiner.

5            THE COURT:  Mr. Frazza?

6            MR. FRAZZA:  I'll take care of copies.

7            THE COURT:  Mr. Frazza, the gentleman next to you,

8  and Mr. Stoeri, Mr. Greenhalgh, if you could just accommodate

9  him, and we'll go from there.  All right?  Thank you.

10            MS. JUROW:  Thank you.

11            UNIDENTIFIED ATTORNEY:  Your Honor?

12            UNIDENTIFIED ATTORNEY:  Everybody should get it.

13            UNIDENTIFIED ATTORNEY:  Shouldn't that be sent

14  electronically to everybody?  Because we've never seen those

15  reports.

16            MS. JUROW:  It's not electronic.

17            UNIDENTIFIED ATTORNEY:  No, if they scanned them in

18  and just e-mailed them to us.

19            MS. JUROW:  It's this much each.

20            UNIDENTIFIED ATTORNEY:  It would --

21            UNIDENTIFIED ATTORNEY:  If you could print it out and

22  send it to us, we haven't seen the reports either, Your Honor.

23  That's all.

24            UNIDENTIFIED ATTORNEY:  Do you have extra copies?

25            MR. FRAZZA:  My copy room may not be as good as

                    J&J COURT TRANSCRIBERS, INC.

1  everybody else's, but I'll get them as quickly as we can.  I

2  don't think it's all scanned in, Bruce, but --

3           MR. BUECHLER:  That's fine.  So, a hard copy.

4           UNIDENTIFIED ATTORNEY:  We'll do it the old fashioned

5  way.

6           UNIDENTIFIED SPEAKER:  They'll do the best they can,

7  but I think they know -- they know the short list.

8           THE COURT:  Friendly amendment.  Mr. Greenberg?

9           MR. GREENBERG:  I happen to have a form of order that

10 possibly will be satisfactory.  We had, although we didn't file

11 it, we had an application and order shortening time, which I

12 have taken out of the package.  I have an application for leave

13 for the committee to derivatively move with the brief that I

14 referred to.  But most importantly, I have a very short form of

15 order just the top two pages, if I may -- the order, it is

16 stapled, it may -- you have a copy of it.  It's stapled --

17          MS. JUROW:  The order shortening time?

18          MR. GREENBERG:  No, not that one.  Just the other

19 order.

20          MS. JUROW:  I don't --

21                    (Pause)

22          THE COURT:  All right.  Mr. Greenberg has given me is

23 a -- as he aptly describes, is an order authorizing the

24 official committee of unsecured creditors to derivatively seek

25 approval of settlement of pending litigation.  The decretal

1  paragraph reads "Hereby ordered that the committee's motion,"

2  and he has filed a motion, "is granted and is further ordered

3  that the committee be and hereby is authorized to derivatively

4  seek approval of settlement of their Imation case in accordance

5  with Federal Rule of Bankruptcy Procedure 9019."  Any

6  objections to that form of order?

7          UNIDENTIFIED ATTORNEY:  I think that there were other

8  aspects of the order that Your Honor mentioned that you wanted

9  to include in terms of sending out a notice.

10          THE COURT:  Well --

11          UNIDENTIFIED ATTORNEY:  I mean, I don't know --

12          THE COURT:  -- but that would go in -- when you say

13  sending out the notice --

14          UNIDENTIFIED ATTORNEY:  Directing Mr. Greenberg to

15  send out the notice.

16          THE COURT:  -- I'm going to sign an order -- I'm

17  going to sign an order today which notices the 9019 hearing.

18  I'm going to add to this a finding of standing, and reference

19  the order of even date with respect to the 9019 notice.  All

20  right?  But where is the 9019 notice?  That's the tough one.

21          MR. GREENBERG:  Right.  And the other thing is --

22          THE COURT:  And so, before this group disburses, I

23  want there to be either agreement on the form, or if there's an

24  objection, I want to hear it, and then I'd like you go get it

25  out tonight.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. GREENBERG:  Okay.  And with respect to getting

2   out tonight, we want to notice all creditors, not just parties

3   who filed a notice of appearance?  I haven't looked at the

4   creditor list, but you know that a lot of them may be P.O.

5   boxes, so I guess we're doing regular mail.  The problem that

6   we have in our area is the last mail pickup is somewhere in the

7   range of 4:30.  I mean, theoretically, we could try to get it

8   down to the Newark post office, but I am not sure, since none

9   of us have seen the terms, I am sure, knowing who's involved in

10  this group, we're not all going to think that that's accurate.

11       THE COURT:  To the extent that you don't have a clean

12  list, and it has to go by regular mail, and the pickup is

13  whenever it is, you know, whoever stands at the post office

14  closest at the time that's most readily available after

15  tonight's preparation of the form of notice, and all the

16  mechanics that will go into that is the best you can do.

17       MR. GREENBERG:  Because the parties who are in Court

18  are going to get it either electronically.  Worst case we could

19  do it certainly via overnight mail, or hand delivery tomorrow,

20  so they'll get it as soon.  But for the regular creditors --

21  and the primary creditors are either on the committee or they

22  are represented in this proceeding, we will try to get it out

23  tonight.  It may get --

24       THE COURT:  I assume it provides for objections to be

25  raised at the hearing?

                    *J&J COURT TRANSCRIBERS, INC.*

1        MR. GREENBERG:  At the hearing.

2        THE COURT:  Okay.  All right.  Then I would leave the

3  drafting of the 9019 notice, I'm going to mark up this form of

4  order.  You know, I don't want to hold a lot of people who

5  would not be involved in that process, but Mr. Stoeri, I think

6  you're going to have to weigh in on it.  Mr. Frazza, I'd like

7  you to weigh in on it, and everyone else is invited to comment

8  on it.  So, again, I leave it to your judgment.  But this is

9  the time to object to the 9019 notice after it is drafted.  And

10  I'll hear that today.  Anything else?

11        MR. GREENBERG:  One last thing.  Do you want me to

12  file the application in that brief, or not necessary?  There

13  may be reference to the fact we've filed a motion in that

14  order.  We can do it either way.  It's done --

15        MS. JUROW:  It would be an oral motion?

16        MR. GREENBERG:  Just so I know what you want me to

17  do.  It does have some of the same cases that Your Honor

18  referred to in your decision.

19        THE COURT:  File it.  All right?

20        MS. JUROW:  Your Honor, I would like to confer with

21  anybody who I haven't yet conferred with in terms of the

22  selection of the examiner, and then I'd like to be excused.  I

23  don't really have a say about what's in the 9019.

24        THE COURT:  Okay.  Would you please act immediately

25  on --

J&J COURT TRANSCRIBERS, INC.

1          MS. JUROW:  That's why I'd like to -- you know, I

2    know people need to work on the 9019 statement, but to the

3    extent that they want to consult with me I'd like to hear from

4    them first, and then I'm going to leave and go pick -- go get

5    an examiner going.  So --

6          THE COURT:  Okay.  And let me also give you this

7    checklist if I may.  The examiner should speak to experts on

8    either side of the Imation litigation, should speak to counsel

9    on either side.  I have no problem with the examiner requesting

10   of Judge Linares an audience.  But it's totally up to Judge

11   Linares as to whether he even wants to engage in this, and he

12   may not want to.  If others have a suggestion as to a resource

13   in aid of the examiner, please make it to Ms. Jurow.  All

14   right?  Okay.  Yes, Ms. Jurow, you certainly may be excused

15   with the thanks of the Court.

16         MS. JUROW:  Thank you.

17         MR. FRAZZA:  Your Honor, may I raise the last issue

18   that I had raised earlier?  Not necessary -- this won't impede

19   the process today, but since I still do represent Jazz and Mr.

20   Stoeri has indicated that he believes or his client believes

21   they have a public announcement obligation as opposed to an

22   8-K, i.e., press release, I would ask Your Honor, as I did

23   earlier, to entertain an oral application to enjoin that, and

24   if you say no I already indicated to Judge Linares in Mr.

25   Stoeri's presence that I needed to do that because that's

1  something that the client is insisting be done at this

2  juncture.

3          THE COURT:  I appreciate it, and I don't take it

4  lightly.  But I also don't issue injunctions lightly, and

5  particularly injunctions that go to speech, even commercial

6  speech.  And so, it is what it is, and the risk of taint to the

7  jury is there if that's the case.  But I won't issue an

8  injunction, with all due respect.

9          MR. FRAZZA:  I may just go to Judge Linares tomorrow,

10 just so everybody knows that, or if I could get there this

11 afternoon and just protect the client's interest.  That's all.

12 But I had talked about that with you.

13          THE COURT:  Fair enough.  Mr. Sirota?

14          MR. SIROTA:  I don't want this -- Judge, I don't want

15 this request to come off in the least bit disrespectful to

16 Judge Linares, so I make this request with that statement.

17 Your Honor's appointed an independent examiner to review the

18 case and render a decision. Judge Linares has been very

19 involved in moving the settlement process along, and has

20 expressed himself on the view of the settlement.  And I would

21 ask the Court to --

22          THE COURT:  Has he on the record, or --

23          MR. SIROTA:  No, not on the record.

24          THE COURT:  Okay.

25          MR. SIROTA:  For sure not on the record.

                   J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Yes.

2          MR. SIROTA:  Although he's been involved in forging

3    the settlement, and I think takes a certain pride of authorship

4    in getting the parties together to this point, whether all the

5    parties agreed or not.  And I wonder if the objective is to

6    extract from an examiner an unbiased view, whether inviting the

7    examiner to potentially sit with Judge Linares and have that

8    discussion to the extent that Judge Linares is willing, is the

9    best way to get the view from the examiner, and again, it's

10   with no disrespect to Judge Linares.

11         THE COURT:  Okay.  Your point is well taken.  Anyone

12   have any comment on that?

13         MR. ETKIN:  Yes, Your Honor.

14         MR. GREENHALGH:  Your Honor, just because my opinion

15   I share with counsel, and then counsel can speak.

16         THE COURT:  Go ahead.

17         MR. GREENHALGH:  Thank you.  Your Honor, as I

18   understand it, the examiner may very well be a witness before

19   this Court.

20         THE COURT:  Correct.

21         MR. GREENHALGH:  And as a witness, I have some

22   concern of a witness speaking with a Judge, who may very well

23   be passing upon this like yourself.  But I do have a concern

24   with Judge Linares also speaking with him or her, the examiner,

25   because that person is going to be a witness, and I don't know

1  that it adds to the I guess what you would consider the

2  unbiased opinion of this examiner.  So, I have a concern.

3         THE COURT:  Okay.  Mr. Etkin?

4         MR. ETKIN:  Well, you take that to its illogical

5  conclusion, Your Honor, and you can make the same argument

6  about Mr. Frazza, who I'm sure walks into that discussion with

7  some sense of bias, as well as Mr. Stoeri, who walks in with

8  some sense of bias.  It's going to be up to the examiner to

9  take whatever information he gets and take a fresh look at it.

10 And like -- just like anyone who is in a position of reviewing

11 documents, or positions by parties, and makes an independent

12 judgment stemming from the information he receives.

13        I don't think that the examiner, especially in the

14 short time frame that's been allotted, should be chilled in any

15 respect from speaking to Judge Linares if Judge Linares wants

16 to be spoken to, as Your Honor has pointed out, about the

17 settlement and since he was the architect of the settlement.

18 And he may not want to be involved in that, but I don't think

19 that there should be, you know, any chill to speak to anyone

20 who's prepared to speak to the examiner, and weigh in.  And the

21 examiner then makes the independent judgment as to whether they

22 think the settlement is reasonable under the circumstances.

23        MR. GREENBERG:  Your Honor, I don't know if Judge

24 Linares would want to speak to the examiner.  However, I think

25 the examiner can certainly understand that Judge Linares

1  believes that the settlement is fair and reasonable.  He was an

2  architect, if not author of it.  There's a potential other

3  benefit, though, from talking to Judge Linares as to whether --

4  not whether he thinks the settlement is reasonable or not, but

5  there were approximately 50 in limine motions that were

6  decided, some of which may be Appellate issues.  The examiner

7  could find out rather quickly from Judge Linares, instead of

8  reading through a record, about those issues, because I think

9  in assessing the settlement and whether it's fair and

10  reasonable, you'll also have to consider if there were a trial

11  and a verdict higher than that, what's the likelihood of an

12  appeal, and possibly a reversal or a remand, and that may be a

13  function that would best be accomplished by a short dialogue

14  with Judge Linares.  I think everybody in this room knows that

15  if the examiner asked Judge Linares if he thinks the settlement

16  is reasonable, he's going to say yes.  So, that's not going to

17  be a surprise to the examiner if he speaks to the Judge about

18  that.

19          MS. JUROW:  Judge, the examiner is being given a very

20  short period of time to do this work, and I think that the

21  examiner should be given the discretion to speak to whom he

22  pleases, or not to speak to someone.  You know, Your Honor

23  indicated the experts and counsel.  I certainly think -- I

24  expect that the examiner is going to want to speak to those

25  people.  But people can be wordy, and days can be long when

J&J COURT TRANSCRIBERS, INC.

1  we're talking.  I've spent, and I think most people here have

2  spent a couple of days before Judge Linares.  The examiner has

3  to be given the latitude to decide how to use his or her time

4  in the most effective way so that he can provide a report to

5  Your Honor by Tuesday.  And so, I would just --

6          THE COURT:  Let me --

7          MS. JUROW:  -- ask you to let them have that.  We

8  understand the issue here.  It's not rocket science.

9          THE COURT:  Let me say this.  To the extent that I

10  introduce the subject by allowing for the examiner to go

11  forward to Judge Linares, I'll strike that comment from the

12  record.  I'm not going to say the examiner can't call upon

13  Judge Linares.  In the first instance it's up to the examiner.

14  I think we're really dancing around a moot issue, or an issue

15  that will be moot.  I don't believe that Judge Linares will, at

16  this point, entertain a conference with the examiner, but I

17  could be wrong.  But I'm not going to dwell on it any further.

18  And I leave the examiner to do what he or she can do in the

19  next few days, and await the report.  So, Ms. -- I'm going to

20  take a break, and two things will happen.  Folks can talk to

21  Ms. Jurow if they have suggestions for an examiner, and the

22  committee counsel can begin to mark up a form of order, as I

23  will mark up this form of order for the 9019 notice.  Yes?

24          MR. ETKIN:  One other housekeeping matter, Your

25  Honor.  Since the motion for conversion was technically on for

J&J COURT TRANSCRIBERS, INC.

1  today --

2          THE COURT:  Yes.  I'm going to adjourn that without

3  date because if -- and it's a series of cascading matters, if

4  we get to approval to the settlement, as I understand your

5  requirement, which is cessation of operation and a Chapter 11

6  liquidating plan, then I assume that the conversion motion

7  would be off the table.

8          MR. ETKIN:  Well, I would hope that it would go that

9  smoothly, Your Honor, but certainly to the extent that things

10  change, and the landscape changes, we would want --

11          THE COURT:  I'm not saying you withdraw your motion

12  now.  I'm just saying I'll adjourn it without date and have it

13  abide the event of what happens on the settlement.  Is that

14  fair?

15          MR. ETKIN:  That's fine, Your Honor.

16          THE COURT:  Okay.

17          MR. ETKIN:  And like we've done it before, really, to

18  the extent that events occur that from our standpoint would

19  require the Court to entertain the motion, we'll advise the

20  Court at that time.

21          MR. GREENBERG:  Since I'm going to try to have people

22  in my office start drafting the 9019 notice, although we don't

23  have a term sheet, I may use a format where that term sheet

24  that we've all agreed upon is merely annexed as to the exhibit,

25  so the other things can start to get done and copied, and then

J&J COURT TRANSCRIBERS, INC.

1  we'll just hope that that gets annexed, and that will have the

2  salient terms.

3           THE COURT:  Don't do it.  It's very short.

4           MR. GREENBERG:  Well, I haven't seen the term sheet.

5           THE COURT:  And it has in it some statements that you

6  and Mr. Stoeri might want to talk about with respect to

7  confidentiality, which I think will rub up against the notice.

8  I think you have to modify that a little bit.  It's only a

9  couple of lines.

10          MR. GREENBERG:  And again, the problem is that we

11  haven't seen it --

12          THE COURT:  You haven't seen it.  Yes.

13          MR. GREENBERG:  -- so I thought it was pages.

14          THE COURT:  I thought it's only the Court that's out

15  of the know, so I -- it's encouraging to see that a lot of us

16  don't know what's going on.

17          MR. GREENBERG:  Your Honor, if you have a copy of

18  that in chambers, I don't know if Mr. Stoeri has it with him

19  today, but it may be helpful for the parties to see it.

20          THE COURT:  He does have it.

21          MR. GREENBERG:  Oh, he does?

22                     (Off the record)

23          THE COURT:  All right.  Thanks a lot.  And I'll come

24  back when folk are ready.

25          UNIDENTIFIED ATTORNEY:  Thank you.

                    J&J COURT TRANSCRIBERS, INC.

1              MS. JUROW:  Anybody have any examiner --

2              THE COURT:  If you need any --

3                    (Off the record)

4              THE COURT:  Where do we stand?  Mr. Etkin?

5              MR. ETKIN:  Judge, I think there are two issues that

6    we are going to need your input relating to the cessation of

7    operations and relating to the filing of a plan of liquidation

8    and related disclosure statement.  It is our position, we have

9    requested that there be a date certain in the notice for both

10   of those items, flowing from the approval of the settlement, if

11   there is an order approving the settlement.  So, it's obviously

12   so those dates are contingent upon the approval of the

13   settlement.  The debtor, and I believe the committee as well,

14   have taken the position that the document should say on dates

15   to be fixed by further order of the Court.  We didn't bargain

16   for that, Your Honor.  We bargained for certainty, and what I

17   indicated is that we're not looking for the debtor to

18   completely liquidate all of its remaining assets by that date

19   certain, but certainly the cessation of operations should occur

20   by that date certain in terms of placing the new orders and

21   doing anything other than going forward to liquidate, you know,

22   it's remaining assets subject to whatever further order of the

23   Court is required.  So, we proposed a date that is five days

24   subsequent to the entry of the order approving the settlement.

25   You know, obviously that's not a date that's necessarily etched

1  in stone, but it shouldn't go out, we believe, much further

2  than that.  Everybody should have their eye on the ball at that

3  point, assuming that -- or if the settlement is approved on the

4  16th.  So, that's the issue.

5         MR. SIROTA:  Judge, we understand that Fuji can taste

6  the opportunity of putting the debtor out of business.  That

7  being said, we'd actually like to give the process a

8  termination, and the wind down in the plan some more thought

9  than perhaps they would want to give to it.  So, what we had

10  suggested is let's get the notice out.  If we can't come up

11  with an agreement between us as to the dates fixed, we'll be

12  before the Court, and Your Honor can say this sounds like the

13  right date.  But I'd like to consult with the client on what

14  would be the right termination date, and how it would dovetail

15  into the liquidation of inventory, and if it doesn't make sense

16  to Fuji Your Honor can impose a date and we'll all live with

17  that.

18         THE COURT:  May I ask this.  Is there -- because you

19  seem to both be marrying paragraphs two and three.  Is the --

20  can we define cease ongoing operations and the time period, and

21  distinguish that fairly readily from the plan, disclosure

22  statement, and be more flexible on that point?

23         MR. ETKIN:  I think that we can, Your Honor.  I don't

24  -- I --

25         THE COURT:  Does that work for you a little better?

                    *J&J COURT TRANSCRIBERS, INC.*

1  Or --

2         MR. ETKIN:  I think the cessation of business should

3  be the sooner date, and if we need to give more flexibility for

4  the filing of a plan of liquidation and disclosure statement,

5  that's fine.  We had talked about March 1st in the context of

6  the discussions with Judge Linares.  Mr. Sirota doesn't recall

7  that date, and maybe that was outside of his earshot.  But that

8  was the date the cessation of business date that we were

9  talking about in terms of the -- the settlement, as well as a

10 plan filing date.  But I think that we can be a bit more

11 flexible on the plan and disclosure statement filing date.

12        MR. SIROTA:  Those dates were never discussed with me

13 by Judge Linares or anyone else.  Judge, cessation of

14 operations meaning what?  We have --

15        THE COURT:  Well, that's what I'm saying.  Let's

16 define it.

17        MR. SIROTA:  We have inventory to be liquidated.  We

18 have receivables to be collected.  Is it going to involve Mr.

19 Weber?  Is it going to involve other people?  I just think, for

20 the purpose of getting out a notice, that we're all desperately

21 trying to get out.  We need not fix a date today for either one

22 of those events.  We'll be back here Wednesday.  It will give

23 us the opportunity to consult Mr. Greenberg and discuss whether

24 the plan is going to be joint, or not joint.  And if we can't

25 come to an agreement and they don't like the date, Your Honor

1  will say this is the date, and we will live with it.

2              THE COURT:  See, I'm not sure that that's the case.

3  It's not my settlement.  The point is, and I think that Mr.

4  Etkin is being courteous, at least with the Court, in not

5  saying, look, this is the deal we made, and we want that deal.

6  I'm not the settling party.

7              MR. SIROTA:  Who did they make the deal with?

8              THE COURT:  I'm not -- don't misunderstand me.  I'm

9  not saying that it was agreed to.  We may have an open item on

10  the settlement in terms of this date.  Now, do we have a

11  settlement today that can be noticed or not?  That's a

12  different issue.

13             MR. SIROTA:  We don't with the dates that they have

14  imposed upon us.

15             THE COURT:  I understand.  And so, let me make a

16  suggestion, and it's only that.  I'll hear from Mr. Greenberg

17  first, but then I'll make a suggestion.

18             MR. GREENBERG:  Your Honor, the concern that I had

19  was that we want to give notice, and I don't think the parties

20  had agreed to a date, although there was an agreement to both

21  the concept of a cessation of operations, and as the Court

22  said, what does that mean?  And as Mr. Sirota said, we have

23  receivables, we're going to continue to have a staff collect

24  those.  I think if we give notice that the Court will fix a

25  date on the 16th or 17th, it may turn out to be the five days.

1  And I think all the parties have said that is going to be

2  something that the Court is going to fix.  And with respect to

3  filing a plan, the same thing holds true.  I don't know much

4  information has to be gleaned to do an effective disclosure

5  statement.

6        THE COURT:  But let's be clear on -- on just point

7  two.  It seems to me that if Fuji is bargaining for a date

8  after which there will be no further sales, I emphasize that

9  singular point, we're not talking about collecting accounts

10  receivable.  I don't think Fuji --

11        UNIDENTIFIED ATTORNEY:  We're not talking about

12  liquidating its remaining assets, Your Honor.

13        THE COURT:  We're not talking about collecting

14  accounts receivable, liquidating inventories.  They're just

15  talking about the end of the sales operation, if that's a

16  correct assessment of the way I heard it.

17        MR. GREENBERG:  Although I understand that certain

18  international sales wold not raise the same issue about

19  infringement, and it's contemplated that failing to find any

20  other ways of disposing the product, that's something that we

21  would attempt -- the debtor would attempt to do to maximize

22  dollars.  My point is, how are we going to direct the cessation

23  even before this order which we've heard may be appealed, gets

24  a point of finality?  There's a ten-day appeal period.  I mean,

25  at the very least I would have thought that the 11th day, as

1  opposed to the fifth day after the entry of the order would

2  have more general logic to it as opposed to in mid stream.

3          THE COURT:  Well, I was --

4          MR. GREENBERG:  I just thought it was a too truncated

5  period.

6          THE COURT:  What I was going to say was if March 1st

7  is a critical date, or thought of as a bargained for date, that

8  the March 1st date which is only two weeks after the first date

9  set for hearing on the notice of settlement, should be the

10  paragraph to date, and that shall cease sales operations by

11  that date, and then the plan of liquidation shall be developed

12  expeditiously and leave it at that.  Does that work for you?

13          MR. ETKIN:  Your Honor, I think that if this

14  settlement goes through, I think we need to keep everybody's

15  feet to the fire, and I think the March 1st --

16          THE COURT:  Well, the --

17          MR. ETKIN:  -- date will work for us at the Court's

18  suggestion.  But I think we need a date to deal with with

19  respect to the complaint of liquidation of this merger

20  statement.

21          THE COURT:  Well, in fairness -- see, if they stop

22  their sales operation by the date certain that you want, I

23  would think that the plan of liquidation will follow, it has to

24  follow.  I can't see that as not being done expeditiously, and

25  if it isn't filed by a date certain, and again, we can sharpen

J&J COURT TRANSCRIBERS, INC.

1 that, if, as, and when the settlement is approved, but you can

2 move on short notice to force them to file their plan of

3 liquidation.  You're saying they're not doing it expeditiously.

4 　　　　MR. ETKIN:  I would make the opposite suggestion,

5 Your Honor.  Pick a reasonable date, and if there are issues

6 that preclude the filing of a plan of -- plan of liquidation

7 and disclosure statement by that date, let the parties come

8 before the Court.

9 　　　　THE COURT:  All right.  Let me deal with issue one

10 and then issue two.  Mr. Sirota, does it work if paragraph two

11 were to read, "Shall cease sales operation, ongoing sales

12 operation no later than March 1st," and then we'll deal with

13 paragraph three.

14 　　　　MR. SIROTA:  I'm going to ask to consult with my

15 client.

16 　　　　THE COURT:  Certainly.  Go ahead.

17 　　　　MR. SIROTA:  Could we make that, Your Honor, domestic

18 sales, because I think the foreign sales --

19 　　　　UNIDENTIFIED ATTORNEY:  It's got to be -- I assume

20 the Court is talking about sales outside of the liquidation

21 context.

22 　　　　MR. BUECHLER:  Correct.  And it's -- the decision is

23 made that certain existing single use camera -- cameras are in

24 the U.S., we all agree can be sold in Poland and not violate

25 anyone's patent rights as part of the liquidation, that's not

J&J COURT TRANSCRIBERS, INC.

1  what this is going to.

2         UNIDENTIFIED ATTORNEY:  But it's still a sale.

3         THE COURT:  But I think your point is right.

4         UNIDENTIFIED ATTORNEY:  It's sales outside of the

5  orderly liquidation, as if we were to embark upon new sales.

6  Correct?

7         THE COURT:  Sales in the ordinary course of business

8  shall cease.  Is that a fair statement?  By no later than March

9  1st.

10         UNIDENTIFIED ATTORNEY:  You said sales -- sales other

11  than the liquidation of existing inventory.  I mean, that's

12  what we're talking about.

13         THE COURT:  All right.  I would think that ordinary

14  course of business would be better for you, but you can be the

15  Judge. I'm not -- you know, it's not for me to define your

16  settlement more than I'm doing.

17         UNIDENTIFIED ATTORNEY:  We'll live with the ordinary

18  course, Your Honor.

19         THE COURT:  Does that work for you?

20         UNIDENTIFIED ATTORNEY:  It does.

21         THE COURT:  Okay.  So, paragraph two should read,

22  "Jazz shall cease sales in the ordinary course of business no

23  later than March 1st."  Now, as to paragraph three, Mr. Sirota,

24  we can argue about as soon as possible, as soon as feasible,

25  etcetera.  Can you give them an outside date?

                    J&J COURT TRANSCRIBERS, INC.

1          MR. SIROTA:  March 20th?

2          UNIDENTIFIED ATTORNEY:  March 20th.

3          UNIDENTIFIED ATTORNEY:  Can someone just look to see

4  if that's not a weekend?

5          THE COURT:  Yes.  I'll look.

6          UNIDENTIFIED ATTORNEY:  If so, make it March --

7          THE COURT:  21st?

8          UNIDENTIFIED ATTORNEY:  March 21.

9          THE COURT:  Monday, the 21st?  All right?  Does that

10  settle the settlement issues?

11          MR. SIROTA:  Judge, the only thing is with respect to

12  the language going out with notice that operations are ceasing,

13  there should be language, and I don't know how Mr. Greenberg is

14  going to draft it, that this is all conditioned upon the

15  settlement being approved.  I wouldn't want the reader to get

16  the wrong impression.

17          THE COURT:  Well, that's fair enough.  Mr. Greenberg,

18  and this is a suggestion that anyone can disagree with, when

19  you have the in addition language, if you --

20          UNIDENTIFIED ATTORNEY:  Your Honor, if we put -- if

21  we put in addition, if the settlement is approved after in

22  addition, it solves the problem.

23          THE COURT:  That's -- that was -- you preempted me,

24  but you're right.  Okay?  That was my --

25          MR. GREENBERG:  A few logistical things.  We have

                    J&J COURT TRANSCRIBERS, INC.

1  prepared the notice of settlement and the dates for hearing.

2  Was it the Court's intention that it go to the Jazz creditors

3  or the Jazz and the Benun creditors?  I thought it was just

4  Jazz, but wanted to get --

5          THE COURT:  I think it ought to go to both.  Is that

6  a problem for you?

7          MR. GREENBERG:  No, I just have to make sure we have

8  those addresses.  Some of them are duplicative.  I'm told that

9  on the creditor matrix there are a tremendous number of

10 creditors without addresses.  So obviously if we can't mail it

11 to them we are in position to send your two orders, the notice,

12 whether this gets incorporated in the body or now in revised

13 form just gets slapped on as an exhibit, not the original one,

14 we'll do that.  I don't think we have the ability, even though

15 we've put it in the mailbox, for it to get picked up today.

16 And I'm told that if we were to take it to Newark, they won't

17 take it if it has a Roseland stamp.

18         THE COURT:  I -- okay.  I think you've done the best

19 you can do, it's certainly a strong A-minus.

20         MR. GREENBERG:  Once we have this in the revised

21 form, could your chambers possibly e-mail it to my office so

22 that they can be working on it while I'm driving, instead of me

23 bringing it back, etcetera?

24         THE COURT:  Yes.

25         UNIDENTIFIED ATTORNEY:  I've already made the changes

1  on the system as we're talking.  If people want to look at it,

2  or let them print it out --

3       THE COURT:  Do you want to e-mail it?  Can you e-mail

4  it?

5       UNIDENTIFIED ATTORNEY:  We can't --

6       MR. GREENBERG:  They can't e-mail it.  I asked them.

7       UNIDENTIFIED ATTORNEY:  So we have to have Joe take

8  the disk and print it.

9       THE COURT:  All right, Joe, if you would do that?

10      UNIDENTIFIED ATTORNEY:  And Joe, I'll give you the

11 person --

12      UNIDENTIFIED ATTORNEY:  Yes.  I saved it --

13      THE COURT:  And Howard, perhaps you want to take both

14 the disk and a hard copy, just belt, suspenders, and shoelaces.

15 Just in case the --

16      UNIDENTIFIED ATTORNEY:  If we could all get hard

17 copies, and then Howard --

18      THE COURT:  That's right.  And everybody ought to

19 have a hard copy.  All right?  Is there anything else?  Are we

20 okay?

21      UNIDENTIFIED ATTORNEY:  I want to make sure they know

22 about getting the Benun creditor list, also.

23                    (Pause)

24      THE COURT:  Now, on the last matter we had, in Geo,

25 Reba Rutkowski would make a change in the hundred page

J&J COURT TRANSCRIBERS, INC.

1  document, and it would be in chambers before I got back there.

2  How she did that I don't know.  And she read my mind on top of

3  it, which was very risky.  But, having said that, anything

4  else?

5          UNIDENTIFIED ATTORNEY:  I think we're done, Your

6  Honor.

7          THE COURT:  All right.  Thanks a lot.  This hearing

8  is concluded.  And we'll be reconvening on next Wednesday at

9  ten a.m.

10                        * * * * *

<u>C E R T I F I C A T I O N</u>

          I, **TAMMY DeRISI**, court approved transcriber, certify

that the foregoing is a correct transcript from the official

electronic sound recording of the proceedings in the above-

entitled matter to the best of my ability.


<u>/s/ Tammy DeRisi</u>                   Date:  February 17, 2005

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.



                    J&J COURT TRANSCRIBERS, INC.