**MS-4088**
**WU-1187**
**JT-5874**
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession

|  |  |
|---|---|
|  | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY HONORABLE MORRIS STERN |

| In the Matter of: | : | CASE NO. 03-26565 (MS) |
|---|---|---|
|  | : |  |
| JAZZ PHOTO CORP., | : | Chapter 11 |
|  | : |  |
| Debtor-in-Possession. | : | HEARING DATE AND TIME (Part I of Motion – Sale Procedures) : April __ 2005, ____ _.m. |
|  | : |  |

HEARING DATE AND TIME
(Part II of Motion – Sale Hearing) :
May __, 2005, ____ _.m.

ORAL ARGUMENT REQUESTED

**APPLICATION OF THE DEBTOR IN SUPPORT OF MOTION**
**FOR ORDER:  (1) AUTHORIZING AND APPROVING SALE**
**OF SUBSTANTIALLY ALL OF ITS ASSETS TO RIBI TECH**
**PRODUCT, LLC, OR A PARTY MAKING A HIGHER OR**
**BETTER OFFER, FREE AND CLEAR OF LIENS,**
**ENCUMBRANCES AND SECURITY INTERESTS THEREON**
**PURSUANT TO 11 U.S.C. § 363 AND FED. R. BANKR. P. 6004,**
**(2) AUTHORIZING AND APPROVING SOLICITATION AND**
**COMPETITIVE BIDDING PROCEDURES RELATED**
**THERETO; (3) SCHEDULING AUCTION SALE AND**
**HEARING DATE TO CONFIRM SALE; (3) APPROVING THE**
**FORM, MANNER AND SUFFICIENCY OF NOTICE OF**
**AUCTION AND SALE HEARING; AND (4) GRANTING**
**OTHER RELATED RELIEF**

TO:    HONORABLE MORRIS STERN
       United States Bankruptcy Judge

The Application of Jazz Photo Corp., the within debtor and debtor-in-possession (the

"Debtor"), by and through its counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole

Schotz"), respectfully represents as follows:

## INTRODUCTION AND JURISDICTION

1.    This Application is submitted in support of the Debtor's motion for an Order:

(a) authorizing the Debtor to solicit bids for the sale of substantially all of its assets (as more

fully described below, the "Assets"); (b) approving competitive bidding procedures related

thereto; (c) scheduling (i) an auction (the "Auction") with respect to the sale of the Assets and

(ii) a hearing date to approve the sale (the "Sale Hearing"); (d) approving the form, manner and

sufficiency of notice of the Auction and the Sale Hearing; (e) approving the Debtor's sale of the

Assets to Ribi Tech Products LLC ("Ribi"), or a qualified bidder submitting a higher or better

offer, free and clear of liens, encumbrances and security interests, pursuant to 11 U.S.C. § 363

and Fed. R. Bankr. P. 6004; and (f) granting other related relief (the relief requested in sections

(a) through (d) and (f) of this paragraph shall be referred to as "Part I of the Motion" and the

relief requested in paragraph (e) of this paragraph shall be referred to as "Part II of the Motion").

## THE DEBTOR'S BUSINESS AND BACKGROUND

2.    On May 20, 2003 (the "Filing Date"), the Debtor filed a voluntary petition for

relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").  Since the

Filing Date, the Debtor has remained in possession of its assets and, through March 1, 2005,

continued management of its business as a debtor-in-possession pursuant to Sections 1107 and

1108 of the Bankruptcy Code.

3.      Until it ceased ordinary course operations effective March 1, 2005, the Debtor

was a designer, developer, importer and wholesaler of cameras and other photographic products,

primarily in the United States.  The camera categories the Debtor imported and distributed

included traditional hard-body 35mm cameras, both point-and-shoot and zoom-lens cameras, and

digital and disposable cameras ("SUCs") that were refurbished by the Debtor.  The Debtor

distributed its products under its own brand name, as well as under the name of Bell & Howell

pursuant to an exclusive license agreement.  The Debtor also sold certain items under the private

labels of the Debtor's customers.

4.      On February 18, 2005, this Court entered an Order approving a $25 million

settlement (the "Global Settlement") of the Debtor's claims against Imation Corp. and certain of

its affiliates.[1]  Pursuant to the Global Settlement, the Debtor was directed to cease business in the

ordinary course as of March 1, 2005.  On March 21, 2005, the Debtor filed a plan of liquidation

and intends to liquidate its assets to maximize the benefit to the Debtor's estate and its creditors.

5.      To that end, the Debtor has received an offer from Ribi (the "Ribi Offer") to

purchase substantially all of the Debtor's assets, including, but not limited to, inventory, office

equipment, furniture and trademarks for $887,750 pursuant to the terms of the Asset Purchase

Agreement (the "APA") annexed hereto as **Exhibit A.**  In light of significant litigation before the

United States Court of International Trade (the "CIT") (described below) affecting the vast

majority of the SUCs included in the proposed sale, the Ribi Offer is the best (and only) offer the

Debtor has received for the Assets.  Nevertheless, the Debtor proposes to solicit and encourage

interested bidders to submit bids and participate in an auction for the sale of the Assets.

---

[1] The Order authorizing entry into the Global Settlement currently is the subject of an
appeal.

40654/0001-2190576v4

Specifically, the Debtor seeks to notice the proposed sale to all creditors, other parties-in-interest, and entities that have expressed an interest in purchasing the Debtor's assets.  The Debtor also proposes to publish notice of the sale in *The Star-Ledger* and in at least one industry periodical to encourage interested bidders to submit offers and to participate in an auction that hopefully will generate significant net value to the Debtor's estate.[2]

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7.      The Debtor's initial request, as Part I of the Motion, is that the Court enter an order (the "Procedures Order") (a) authorizing the Debtor to solicit bids for the sale of the Assets pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004, (b) approving bidding procedures related to the solicitation of bids, (c) scheduling (i) the Auction with respect to the sale of the Assets and (ii) the Sale Hearing date to approve the sale, (d) approving the form, manner and sufficiency of notice of the Auction and Sale Hearing, and (e) granting other related relief.

8.      Secondly, assuming the Court enters the Procedures Order, the Debtor requests, as Part II of the Motion, that at the Sale Hearing, the Court enter an order (the "Sale Order") that, among other things, authorizes the Debtor to sell the Assets to Ribi, or a qualified bidder(s) submitting a higher or better offer, free and clear of liens, encumbrances and security interests

---

[2] The Debtor also has requested that counsel to Fuji Photo Film Co., Ltd. ("Fuji") make inquiry of Fuji as to potential buyers.  As of this date, Fuji has identified only two potential buyers.

thereon, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004.  In

addition, the Debtor will request that the Court enter the proposed order annexed to the APA as

Exhibit A.

### FACTORS PRECIPITATING THE DEBTOR'S CHAPTER 11 FILING,  THE SALE AND BASIS FOR RELIEF REQUESTED

**The Fuji Case**

9.      In June 1999, Fuji filed a complaint for patent infringement against the Debtor

and other parties in the District Court for the District of New Jersey, in the case bearing the

caption Fuji Photo Film Co. Ltd. v. Jazz Photo Corp. Inc., Jazz Photo Hong Kong Ltd., and Jack

Benun, Docket No. 99-2937 (FSH) (the "Fuji Case").

10.      On March 18, 2003, the District Court entered a Final Order and Judgment (the

"Fuji Judgment") in favor of Fuji in the approximate amount of $30 million in connection with

the Debtor's sale of SUCs before August 21, 2001.  The Debtor appealed the Fuji Judgment to

the Federal Circuit (the "Federal Circuit Appeal"), however, the Debtor was not able to obtain a

stay pending appeal and was forced to commence this bankruptcy case to protect its assets and

maximize the value of its estate for creditors pending an appeal.

**The Chapter 11 Case**

11.      The Debtor's Chapter 11 case and ability to reorganize was always premised upon

being successful in at least one of two key actions.  The first was the Federal Circuit Appeal,

discussed above.  The second was being successful on the Debtor's claims asserted in the case

captioned Jazz Photo Corp. v. Imation Corp. and Imation S.P.A., Docket No. 99-2505 (the

"Imation Corp.") for, among other things, breach of contract and New Jersey Consumer Fraud

Act and RICO claims (the "Imation Litigation").

40654/0001-2190576v4

12.    The Debtor's ability to reorganize was further complicated when, on September 24, 2002, at Fuji's insistence, the U.S. International Trade Commission (the "ITC") instituted enforcement proceedings ("ITC-2") in <u>In the Matter of Certain Lens-Fitted Film Packages,</u> Investigation No. 337-TA-406 Enforcement Proceedings against the Debtor and others seeking the imposition of penalties for the Debtor's alleged violations of a 1999 cease and desist order (the "Cease and Desist Order") issued by the ITC, in which the ITC previously found the Debtor violated Fuji's patents in connection with the repair of SUCs.  The Debtor vigorously opposed the ITC's allegations in ITC-2.

13.    However, on April 6, 2004, the Administrative Law Judge in ITC-2 issued an Enforcement Initial Determination ("ALJ Recommendation") concluding that the Debtor sold approximately 27 million single-use cameras SUCs from August 21, 2001 through December 12, 2003, and that the Debtor had not met its burden to prove compliance with Fuji's patents on 25,216,980 of those SUCs.  Accordingly, the ALJ recommended that the Debtor and Jack Benun (the Debtor's Chief Operating Officer) ("Benun"), among others, be subject to civil penalties for violation of the ITC's Cease and Desist Order in the amount of $13,675,000.

14.    On July 27, 2004, the ITC issued a determination not to review the ALJ's finding that the Cease and Desist Order was violated but reserved on the imposition of civil penalties. On January 14, 2005, the ITC issued a determination and order in ITC-2 adopting the recommendation of the ALJ and imposed penalties against the Debtor in the amount of $13,675,000.  That very same day, January 14, 2005, the Federal Circuit issued its decision in the Federal Circuit Appeal and affirmed the Fuji Judgment.

15.    Also, in January 2005, the trial in the Imation Litigation commenced and, ultimately, the Global Settlement was approved with Imation, Fuji, the Official Committee of

6

Unsecured Creditors' appointed in this Chapter 11 case (the "Committee") and the Debtor, whereby, among other things, Imation would pay $25 million to the Debtor and waive its judgment in excess of $1 million against the Debtor, and, at the behest of Fuji, the Debtor would agree to cease operations and propose a liquidating plan.

16.     In accordance with the Global Settlement, the Debtor ceased ordinary course business operations on March 1, 2005 and filed a liquidating plan on March 21, 2005, for which it will seek creditor approval.  Accordingly, the Debtor is seeking to maximize the value of its estate by selling its remaining assets and reducing administrative expenses associated with preserving those assets.

## THE RIBI OFFER

### A.  Background

17.     On March 4, 2005, Benun resigned his positions as officer of the Debtor. Immediately thereafter, Mr. Joseph Weber, the Debtor's controller, was appointed Chief Financial Officer.  On March 9, 2005, the Debtor's corporate counsel, Greenberg & Kahr, resigned effective as of March 8, 2005.

18.     On March 9, 2005, the Debtor received an offer from Ribi for the purchase of substantially all of the Debtor's inventory, computer and office equipment, and trademarks.  The Debtor analyzed the Ribi offer and immediately began to explore the details and question the financial wherewithal of Ribi.  The Debtor has determined that, at the present time, it is the best (and only) offer the Debtor has received for the Assets and, as such, should be presented for Court approval subject to a competitive bidding process.  The Debtor understands that Ribi is owned (a) 60% by Ms. Mona Benun (Benun's wife), and (b) 10% each by Benun's four children. The Debtor also understands that Benun is Ribi's Chief Executive Officer and Manager,

although he does not hold an ownership interest in Ribi. Ribi also is represented by Greenberg & Kahr, the Debtor's former corporate counsel.

19.    Following Ribi's initial offer, the Debtor drafted and negotiated the APA with Ribi and is seeking court approval for the sale of the Assets pursuant to the terms set forth in the APA. An important factor guiding the Debtor's determination to sell the Assets pursuant to the APA is that substantially all of the Debtor's inventory that will be sold pursuant to the Ribi Offer is the subject of ongoing litigation with the United States Customs and Border Protection ("Customs") before the CIT. That litigation currently is suspended, pending further order of this Court, pursuant to a Consent Order dated March 15, 2005. Moreover, the Debtor's decision to sell is based on the continuing accrual of significant storage fees estimated at a rate of approximately $21,600 per week.[3]

20.    The Debtor's current litigation with Customs in the CIT has been ongoing since August 2004, when the ITC initially accepted the ALJ Recommendation. At that time, Customs sought to detain/exclude the Debtor's SUCs from the United States market. Despite, repeated attempts and challenges by the Debtor to obtain the release of those SUCs and a finding in November, 2004, by CIT Judge Stanceau (Case No. 04-00494) that the Debtor's cameras produced at a Polytech plant had undergone permissible repair and did not infringe on Fuji's

---

[3] Specifically, the Debtor is incurring storage fees to JAV International ("JAV") with respect to SUCs detained by Customs estimated at the rate of approximately $20,700 per week (for (a) 10 containers held on the West Coast, (b) 4 containers held on the East Coast, and (c) storage in the West Coast Free Trade Zone) and storage fees of approximately $900 per week for storing non-SUCs in the Carson, California, warehouse owned by Pyramid Transportation Systems ("Pyramid").

patents and that 93% of the SUCs satisfied the first sale doctrine, the Debtor was only able to

obtain the release of certain shipments.[4]

21.    Notwithstanding Judge Stanceau's ruling, Customs detained/excluded

approximately 1,356,000 additional SUCs (the "Detained Cameras"), out of approximately

1,410,000 SUCs owned by the Debtor.  In light of Customs' actions, the Debtor challenged the

detainment and exclusion of the Detained Cameras and commenced actions in the CIT (Case

Nos. 04-00514; 04-00629; and 05-00029).  In addition, the Debtor has appealed the exclusion of

36,500 SUCs purchased from Seven Buck's Inc., which Judge Stanceau had not authorized the

release of, that are still detained/excluded.[5]

22.    The Debtor believes that the value of the goods held by Customs will be

maximized if they are released to the Debtor for sale to the Debtor's domestic customers.  The

alternative, which might result in the estate realizing substantially less for those cameras, is

consummating sales in non-United States markets or selling the affected inventory "as is, where

is" and subject to detention by Customs.  The Debtor's fiduciaries, after input from its CIT

counsel, determined that the extra value that would be realized through domestic sales is not

worth the Debtor continuing to fund the CIT Litigation and costs associated with storing the

cameras.

23.    Taking into account the Debtor's financial constraints, the cost of pursuing

litigation before the CIT necessary to obtain the release of the SUCs, and storage fees that accrue

---

[4] Case No. 04-00494 currently is the subject of three pending appeals.

[5] In addition to the foregoing CIT actions, the Debtor also has a lawsuit pending against
the CIT in connection with the issuance of an unpublished regulation known as the "LFFP
Requirements Memorandum," that the Debtor believes imposed unauthorized conditions upon
companies importing into the United States SUCs that have been "permissibly repaired" abroad.

at an estimated rate of approximately $21,600 per week, the Debtor believes that selling the

Assets to Ribi on the terms set forth in the APA, subject to the procedures set forth herein, will

maximize the value of the Debtor's assets for the benefit of creditors and reduce the necessity of

certain ongoing administrative expenses.

**B.  Terms of Ribi Offer**

24.    As set forth above, the Ribi Offer, as reflected in the APA, is the best (and only)

offer received by the Debtor and, as a result, the Debtor requests authority to enter into the APA

and sell the Assets pursuant to the terms set forth therein, subject to higher and better offers.

25.    The APA contains, <u>inter alia</u>, the following pertinent terms:[6]

(a)    <u>Purchase Price.</u>  Ribi will pay $887,750 to the Debtor.

(b)    <u>Purchased Assets.</u>  Ribi will purchase the Assets set forth in
Sections 2.2 and 2.3 of the APA, including:  (a) the Debtor's
trademarks,[7] (b) approximately 1,410,000 SUCs (including
approximately 1,390,000 SUCs detained/excluded by Customs)
and additional non-SUC cameras,[8] and (c) certain computer and
office equipment.[9]

(c)    <u>Free and Clear of Liens and Claims.</u>  Title to the Assets
will be sold to Ribi, "as is," "where is," provided the sale is free
and clear of all liens, encumbrances and security interests thereon
to the extent permissible by Section 363(f) of the Bankruptcy Code
and with valid liens to attach to the proceeds of sale.

---

[6] This discussion of the Ribi Offer is intended only as a summary.  Parties should review
the APA for the complete terms of the transaction.

[7] Certain of the Debtor's foreign trademarks applications included in the Sale may have
been deemed abandoned.

[8] The approximate cost to the Debtor of these SUCs and non-SUC cameras being sold
was approximately $2,566,391.22.

[9] The computer and office equipment has net book value of approximately $56,000.

(d)    <u>Conditions to Sale</u>.  The transfer of assets will be made pursuant to a bill of sale substantially in the form annexed as Exhibit A to the APA.**[10]**

(e)    <u>CIT Litigation</u>.  The Debtor's right, title and interest to claims or interest in proceedings before the CIT relating to inventory set forth on Schedule A to the APA will be assigned to Ribi for Ribi to continue such actions; provided, however, such claims are being transferred "as is, where is" with no representation or warranty as to assignability of such claims and interest in proceedings.

(f)    <u>Time is of the Essence</u>.  Ribi may terminate the APA if Court approval is not obtained on or before May 16, 2005.

### BIDDING PROCEDURES, AUCTION AND SALE HEARING DATE

26.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  As set forth above, the Debtor believes that the best manner in which to maximize the Debtor's value for the benefit of creditors is to solicit bids and conduct an auction to sell the Assets.  The Debtor does not believe that significant marketing of the Assets will increase the likelihood of identifying additional purchasers in light of the significant litigation surrounding the Detained Cameras that comprise the vast majority of the Debtor's inventory.  Indeed, the Debtor has been informed by Fuji, a leader in the industry, that Fuji is only aware of two potential purchasers for the Detained Cameras, both of whom would only be interested in purchasing the Detained Cameras for scrap.

27.    As set forth herein, the Debtor is seeking to conduct an auction to sell the Assets and for authority to enter into the APA if higher or better offers are not received at the Auction.

---

[10] At this time, AGFA Film Co. is holding the bill of lading for certain of the Detained Cameras.  In addition, certain of the camera's being sold may be the subject of a license with BBH, Inc. f/k/a Bell & Howell that may be terminated before the sale closes.  The APA provides for purchase price adjustments of $15,000 and $286,804, as the case may be, if such cameras cannot be sold by the Debtor.  In addition, certain cameras subject to a Bell & Howell trademark have certain restrictions with regard to the sale.

The Debtor seeks this authority because an additional bidder could emerge who would be

interested in selling the SUCs overseas, and therefore would not be subject to Customs'

detainment, or who might take on the litigation risks before the CIT.[11]  Similarly, a purchaser

may exist who is interested in the Debtor's trademarks.  Ribi's obligations under the APA are

conditional upon, among other things, obtaining court approval for the Debtor to enter into the

APA and an order authorizing the transfer of title and possession of the Assets to Ribi, "as is,

where is," except such sale would be free and clear of liens, encumbrances and security interests

to the extent permissible by Section 363 of the Bankruptcy Code and with valid liens to attach to

the proceeds of sale.  The APA may be terminated on May 16, 2005 if not approved by the

Bankruptcy Court.  The APA does not restrict the Debtor's ability to solicit higher or better

offers or place any conditions on the bidding procedures and there is no break-up or other fee

being proposed to be paid to Ribi to act as the "stalking horse."  Accordingly, the Debtor

requests that the Bankruptcy Court enter an order approving the following notice, bidding and

auction procedures that the Debtor believes will maximize assets and ensure that it is receiving

fair value for the Assets:

> (a)    <u>Notice of Auction and Sale Hearing</u>.  No later than two (2) business days
> following entry of an order approving the Part I of the Motion, the Debtor proposes to
> serve notice of bidding procedures, the Auction and Sale Hearing, substantially in the
> form annexed to the proposed Procedures Order as **Exhibit A** (the "Service Notice")
> together with a copy of the Procedures Order and this Application, by regular, first-class
> mail, to the following parties, to the extent such parties do not receive notice via
> Electronic Case Filing ("ECF"):  (a) the Office of the United States Trustee for the
> District of New Jersey, (b) counsel for Fuji, (c) the Debtor's known secured creditors or
> their counsel, (d) counsel for the Committee, (e) the Internal Revenue Service, (f) New
> Jersey Division of Taxation, (g) counsel for Customs, (h) all parties who have filed and
> served a Notice of Appearance, and (i) all parties who have expressed an interest in

---

[11] Fuji has disputed whether a purchaser can take assignment of the CIT litigation and for
purposes of the proposed sale the Debtor is assigning such rights "as is, where is."  Thus, the
purchaser is assuming that risk.

purchasing the Assets within the past three months and the entities that the Debtor believes may be interested in purchasing the Assets.  In addition, the Debtor shall serve a copy of the Service Notice on all other known creditors by regular first class mail, except to the extent such creditors receive notice by ECF.  The Debtor also intends to publish notice, substantially in the form annexed to the proposed Procedures Order **Exhibit B** (the "Publication Notice"), of the sale in *The Star Ledger* on two consecutive days (including one weekend day) on or before seven (7) business days after entry of the Procedures Order.  In addition, the Debtor intends to publish the Publication Notice in at least one (1) industry publication, at least one time before the Bid Deadline.

(b)    Written Bid. In order to bid at the Auction, a potential bidder must submit to the Debtor's counsel, with a copy to the Committee's counsel, a written irrevocable offer for any, some or all of the Assets in any combination by **May ___, 2005** at 5:00 p.m. (the "Bid Deadline").[12]  To the extent a potential bidder bids for all the Assets, then the minimum bid shall be $900,000;

(c)    Ability to Pay.  The written bid must clearly identify the bidder and contain such documents and information so as to establish the bidder's ability to pay the purchase price at closing and to satisfy any and all other forms of consideration offered in the bid;

(d)    Additional Bid Requirements.  Except as the Debtor may otherwise permit in the exercise of its business judgment in consultation with the Committee, the Debtor will consider only those bids that satisfy all of the terms and conditions set forth below (each, a "Qualified Bid").  A Qualified Bid shall be:

(i)    made by a Qualified Bidder (defined below);

(ii)    non-contingent (including, among other things, financing and the outcome of unperformed due diligence) except to the extent of satisfaction of specified conditions, on substantially similar to or less burdensome terms to the Debtor than those described in the APA;

(iii)    submitted to Debtor's counsel using substantially the form of the APA (the "Form Agreement") and be accompanied by financial statements and any other documents that will evidence the bidder's ability to conclude the transaction without delay;

(iv)    received by no later than 5:00 p.m. three (3) business days before the Auction by: Cole, Schotz, Meisel, Forman & Leonard, P.A., 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, Attention: Michael D. Sirota, Esq., Fax: (201) 489-1536 or e-mail (msirota@coleschotz.com); with a copy to the Committee's counsel at Ravin Greenberg, P.C., 101 Eisenhower Parkway, Roseland, NJ 07068, attn:

---

[12] The Debtor will request that the Court establish the Bid Deadline for the beginning of May 2005.

Howard S. Greenberg, Esq. fax No. (973) 226-6888 or e-mail
(Hgreenbeg@ravingreenberg.com); and

(v)       accompanied by a good faith deposit in certified check or wire
transfer of U.S. funds in an amount equal to the greater of ten percent (10%) of the
amount of its bid or $90,000.00 (or 10% of the bid amount, if the bid is for less than all
the Assets) (the "Bid Deposit"), which shall be forfeited as liquidated damages if the
Successful Bidder (defined below) fails to close by reason of its breach of the Form
Agreement;

(e)       Qualified Bid.  A bid shall be deemed a "Qualified Bid" only if (i) it meets
the requirements of the preceding subparagraphs (b) through (d), and (ii) the Debtor, in
consultation with the Committee concludes, in view of the purchase price offered, the
overall terms and conditions of the proposed offer that the bid should be considered a
"Qualified Bid."  A bidder that submits a Qualified Bid shall be deemed a "Qualified
Bidder."  For all purposes herein, the Ribi Offer set forth in the APA shall constitute a
Qualified Bid.

(f)       Qualified Bidder's Duty to Provide Additional Information.  Upon receipt
of a Qualified Bid, the Debtor and Committee, in their discretion, may communicate with
the Qualified Bidder who submitted such Qualified Bid before the Auction and at any
time thereafter, and such Qualified Bidder shall provide information to the Debtor or the
Committee, as the case may be, within one (1) business day after a request for any
information reasonably required by the Debtor or the Committee in order to evaluate such
Qualified Bid;

(g)       The Auction Date. If a Qualified Bid (other than Ribi's Offer set forth in
the APA) is received by the Bid Deadline, the Debtor shall conduct the Auction, for the
sale of the Assets, on **May __, 2005, at 11:00 a.m.,** at the offices of Cole, Schotz, Meisel,
Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey.
If no Qualified Bids are received by the Bid Deadline, then (i) the Auction will not be
held, (ii) Ribi will be deemed to be the successful bidder, (iii) the Ribi Offer set forth in
the APA will constitute the Successful Bid (defined below), and (iv) at the Sale Hearing,
the Debtor will seek approval of and authority to consummate the transaction
contemplated by the Ribi Offer set forth in the APA.

(h)       Parties Attending the Auction.  Only Qualified Bidders will be eligible to
participate at the Auction.  Only the authorized representatives of each of the Debtor,
Qualified Bidders, the Committee and UST shall be permitted to attend the Auction.

(i)       Bidding at the Auction. Bidding at the Auction shall be for any, some or
all the Assets in any combination and shall start at the purchase price stated in the highest
or otherwise best Qualified Bid, as determined by the Debtor, in consultation with the
Committee, and/or as otherwise announced by the Debtor to all Qualified Bidders before
the commencement of the Auction.  At the Auction, Qualified Bidders may improve their
bids in increments of $25,000.00.  Should overbidding occur, Ribi will have the right, but
not the obligation, to participate in the bidding and to be approved as the Successful

40654/0001-2190576v4

Bidder (as defined below) at the Sale Hearing based on any such subsequent successful overbid.  The bidding will be continuous and competitive and shall not end until all bidders have submitted their last and best offers.

(j)    Successful Bidder(s).  At the conclusion of the Auction, if any, or as soon as reasonably practical thereafter, the Debtor will announce the Successful Bid and the second highest or best bid (the "Back-Up Bid").  The holder of the Successful Bid (the "Successful Bidder) shall supplement its deposit by wire transfer or other immediately available funds within one business day so that, to the extent necessary, such deposit equals ten percent (10%) of the Successful Bid (the "Additional Deposit(s)").  If, for any reason, the Successful Bidder fails to consummate the purchase of the Assets, the holder of the Back-Up Bid (the "Back-Up Bidder") will automatically be deemed to have submitted the highest and best bid and the Debtor shall be authorized to effect the sale of the Assets to the Back-Up Bidder as soon as is commercially reasonable without further order of the Court.  If the Successful Bidder's failure to consummate the purchase is the result of a breach by the Successful Bidder of the Form Agreement (as they may be amended from time to time), as the case may be, the Successful Bidder's deposit shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all other available damages from the defaulting Successful Bidder.

(k)    Escrow of Bid Deposits.  Initial Deposits and Additional Deposits (collectively, the "Deposit(s)") shall be held by Debtor's counsel in an interest-bearing bank account, with interest for the account(s) (provided the bidder provides a Tax ID number) of the Qualified Bidder(s).  Upon entry of the Sale Order, Initial Deposits shall be returned to all bidders except the Successful Bidder(s) and Back-Up Bidder(s).  If the sale of the Assets to the Successful Bidder closes, the Successful Bidder's Deposit shall be applied to the purchase price at closing, and the Back-Up Bidder's Deposit returned (with accrued interest) to the Back-Up Bidder.  If the sale of the Assets to the Successful Bidder does not close as a result of the Successful Bidder's breach or default, then, as set forth above, the Debtor shall retain the Successful Bidder's Deposit as liquidated damages (among other remedies), and the Back-Up Bidder's Deposit shall be applied to the purchase price at closing of the Back-Up Bidder's purchase of the Assets

(l)    Sale Hearing.  A hearing to confirm the results of the Auction Sale will be held before the Honorable Morris Stern, U.S.B.J., at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Newark, New Jersey 07102, **on May __, 2005, at _____ _.m.**[13]

(m)    Reservation of Rights to Change Terms of Sale.  The Debtor reserves the right to (i) impose additional or different terms and conditions at or before the Auction, (ii) extend the deadlines set forth in the Sale Procedures and/or adjourn the Auction and/or the Sale Hearing in open court without further notice, (iii) withdraw any of the

---

[13] The Debtor will ask the Court to schedule the Sale Hearing during the middle part of May 2005.

40654/0001-2190576v4

Assets (the "Withdrawn Assets") from sale at any time before or during the Auction and/or Sale Hearing, to make subsequent attempts to market them and to request separate hearing(s) by this Court to approve the sale(s) of some or all of the Withdrawn Assets, and (iv) reject any or all bids if, in the Debtor's reasonable judgment, no bid is for a fair and adequate price.

28.      The Debtor further requests that the Court enter an order stating that the Debtor, after consultation with the Committee, may in its sole discretion disqualify any bidder from the Auction that fails to comply with the bidding requirements set forth above.

29.      The Debtor proposes that within two (2) business days after the conclusion of the Auction, the Debtor will cause its counsel to file with the Court a Supplement outlining the identity of the successful purchaser(s) of the Assets and the purchase price received therefor.

30.      Due to the fact that Court approval for the Debtor to enter into the APA must be obtained on or before May 16, 2005, the Debtor requests that the Court conduct a hearing (the "Sale Hearing") on or before **May 16, 2005, at __ __ _.m.,** to confirm the results of the Auction and to authorize and approve the Debtor's sale of the Assets pursuant to Sections 363 of the Bankruptcy Code.  In addition, because of the Debtor's need to close any sale within five days of entry of an order approving the sale and satisfaction of certain conditions, the Debtor requests that any sale Order be effective and enforceable immediately upon its entry, and that any such sale may close immediately upon entry of the order, pursuant to Fed. R. Bankr. P. 6004(g) and 7062.

## PROCEDURES FOR OBJECTIONS TO SALE

31.      In order to facilitate an orderly sale process, the Debtor's request that the Court establish procedures for objecting to the relief requested in Part II of the Motion and that any such objections shall (i) be in writing, (ii) specify with particularity the basis of the objection and (iii) be filed with the Court and simultaneously served on the following notice parties so as to be received no later than **May 9, 2005, at 4:00 p.m.:**

16

(a)      Counsel for the Debtor

Cole, Schotz, Meisel,
Forman & Leonard, P.A.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey  07602-0800
Attn:  Michael D. Sirota, Esq.

(b)      Counsel for Committee

Ravin Greenberg, P.C.
101 Eisenhower Parkway
Roseland, NJ 07068
Attn: Howard S. Greenberg, Esq.

(c)      The Office of the United States Trustee

Office of the United States Trustee
for the District of New Jersey
One Newark Center
Suite 2100
Newark, New Jersey  07102
Attn: Margaret Lambe Jurow, Esq.

(d)      Counsel for Fuji

Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07608
Attn: Bruce Buechler, Esq.
Michael Etkin, Esq.

-and-

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn:   Lawrence Rosenthal, Esq.
            Kristopher Hansen, Esq.

17

(e)     Counsel for Ribi

Greenberg & Kahr
230 Park Avenue
New York, NY 10169
Attn:  Stephen C. Kahr, Esq.

**APPLICABLE AUTHORITY FOR AUCTION, ENTRY INTO AND
ACCEPTANCE OF THE APA, OR SUCH HIGHER OR BETTER OFFER**

I.     **The Debtor Should Be Authorized to Conduct An
Auction and Sell Substantially All Of Its Assets
Pursuant to Section 363(b) Of The Bankruptcy Code.**

32.     The Debtor should be authorized to sell substantially all of its assets pursuant to

the terms of the APA, subject to higher or better offers.  Section 363(b) of the Bankruptcy Code

governs sales of assets outside the ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing,
> may use, sell, or lease, other than in the ordinary course of
> business, property of the estate.

11 U.S.C. § 363(b)(1).

33.     Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of

business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004 (f) (1).

34.     Although the Bankruptcy Code contains no guidance regarding the circumstances

under which a sale of assets can be approved (except that notice and a hearing must be provided),

the United States Court of Appeals for the Third Circuit in the seminal case of In re Abbotts

Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b) to

require a finding by the Bankruptcy Court that the purchaser of a debtor's assets is a good faith

buyer.  The Third Circuit construed the "good faith buyer" standard to mean one who purchases

"in good faith" and for "value".  Abbotts Dairies, 788 F.2d at 147.

35.     The Abbotts Dairies Court then analogized the bona fides of a Section 363(b)

purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

Abbotts Dairies, 788 F.2d at 147 (quoting Rock Industries, 572 F.2d at 1198).  Finally, the Court noted that "[t]raditionally, courts have held that "[f]air and valuable consideration is given in a bankruptcy sale when the purchases pays 75% percent of the appraised value of the assets." Abbotts Dairies, 788 F.2d at 149; In re Karpe, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988).

36.    Respectfully, the Debtor submits that the sale of the Assets to the Successful Bidder at the Auction and/or pursuant to the APA satisfies the "good faith" prong of the Abbotts Dairies test.  First, the Debtor has fully disclosed and requested the Court's approval of the APA and all of the terms and conditions of the proposed Auction, and intends to provide notice of the sale as discussed herein.  See In re Colony Hill Assoc., 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on traditional equitable principles, including whether there has been full disclosure to the Court).  In addition, as set forth above, the Debtor will market the Assets.  The Debtor is also cognizant, moreover, that as a result of its intended notice of the sale (including notice to all known creditors, parties that have filed a Notice of Appearance and Request for Service of Documents, and publication notice), other bidders that have an interest in the Debtor's assets may be encouraged to submit bids that are higher or better than Ribi's offer, attend the Auction and stimulate spirited bidding.  Accordingly, the Debtor submits that the sale has been proposed in good faith.

37.    At the Sale Hearing, the Debtor will demonstrate that the purchaser or purchasers (whether Ribi or another Successful Bidder) are purchasing the Debtor's assets for "value."  At a minimum, because the sale of the Assets has been the subject of marketing and negotiation by

19

the Debtor and the APA will be subject to the consideration of higher or better bids, the Debtor is confident that the value of its assets will be maximized.

38.    In addition to the <u>Abbotts Dairies</u> requirements, which the Debtor has clearly satisfied, courts consistently require debtors-in-possession to establish a "sound business purpose" to sell any or all of their assets before confirmation of a reorganization plan.  <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>Myers v. Martin</u> (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (stating that under ordinary circumstances, the court defers to the trustee's judgment if there is a legitimate business justification for the disposition of assets); <u>In re Delaware & Hudson Railway Co.</u>, 124 B.R. 169, 175-76 (D. Del. 1991); <u>In re Titusville Country Club</u>, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); <u>In re Sovereign Estates, Ltd.</u>, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); <u>In re Conroe Forge & Manufacturing Corp.</u>, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988).  Courts have developed the following non-exclusive list of factors to consider in determining whether a sound business purpose exists:

(a)    Sound business reason for the sale;

(b)    Accurate and reasonable notice;

(c)    Proportionate value of the asset to the estate as a whole (fair and reasonable);

(d)    The amount of elapsed time since the filing;

(e)    The likelihood that a plan of reorganization will be proposed and confirmed in the near future;

(f)    The effect of the proposed disposition on the future plan;

(g)    The amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and

40654/0001-2190576v4

       (h)      Whether the asset is decreasing or increasing in value.

Lionel Corp., 722 F.2d at 1071; Delaware & Hudson Railway, 124 B.R. at 176; In re Weatherly

Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992).

      39.      Courts have made it clear that a debtor's showing of a sound business justification

need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed

disposition with sound business reason."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr.

S.D. Ohio 1984).

      40.      Consideration of the Lionel factors here unequivocally establishes that the

proposed sale should be approved.  First, as set forth above, the Debtor has demonstrated sound

business justification for the sale.  Pursuant to the Global Settlement, the Debtor has ceased its

operations, yet it continues to accrue administrative expenses in connection with preserving its

remaining assets, including the payment of storage fees at the estimated rate of approximately

$20,700 per week for the SUCs detained by Customs and $3,600.00 in monthly storage fees for

the inventory stored in Pyramid's warehouse.  Consequently, the Debtor has determined that an

expeditious sale of the Assets, through the process set forth herein, will maximize value to the

Debtor's estate and its creditors.

      41.      Second, as set forth herein, the Debtor will provide accurate and exhaustive notice

of the Auction and sale of the Assets.

      42.      Third, based on the proposal the Debtor has received from Ribi and indications

from Fuji that the Detained Containers' only value is as scrap, it is clear that the value under the

APA and/or other bids at the Auction will be fair and reasonable.

      43.      Finally, because the continued administrative expenses are a drain on the Debtor's

remaining assets, the Debtor is concerned that the value of its estate diminishes the longer the

Debtor is unable to sell the Assets.  Moreover, the APA may be terminated by Ribi if Court

approval is not obtained on or before May 16, 2005, and there is no assurance another purchaser

would emerge at or even near the purchase price offered by Ribi.

44.     Consideration of these sound business reasons leads to the inescapable conclusion

that the Debtor should be authorized to sell its assets outside of a plan of liquidation.

**II.     The Debtor Should be Authorized to Sell Its Assets Free
and Clear of Liens, Encumbrances and Security
Interests Pursuant to Section 363(f) of the Bankruptcy
Code.**

45.     The Bankruptcy Code authorizes a debtor-in-possession to sell property of the

estate under Section 363(b) free and clear of any interest or lien in such property if one of the

following five criteria is met:

> 1.     applicable non-bankruptcy law permits sale of such
>        property free and clear of such interest;
>
> 2.     such entity consents;
>
> 3.     such interest is a lien and the price at which such property
>        is to be sold is greater than the aggregate value of all liens
>        on such property;
>
> 4.     such interest is in bona fide dispute; or
>
> 5.     such entity could be compelled, in a legal or equitable
>        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

46.     The language of Section 363(f) is in the disjunctive, so that a sale free and clear of

interests can be approved if any one of the aforementioned conditions is satisfied.  In re Heine,

141 B.R. 185, 189 (Bankr. D.S.D. 1992); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988).

47.     The only parties that the Debtor believes hold or may hold valid security interests

are (a)  Rosenthal & Rosenthal, Inc. (the factor of the Debtor's receivables), (b) Pyramid (the

Debtor's West Coast Warehouseman), and (c) JAV (the entity that provides containers during shipment and storage). Although Rosenthal has properly perfected first priority liens on substantially all of the Debtor's assets, the Debtor anticipates Rosenthal will consent to the sale.[14] The Debtor also has been informed that AGFA Film Co. holds bills of lading relating to approximately 506,000 of the Detained SUCs and may seek payment of approximately $276,000 before releasing the bill of lading. The Debtor currently is investigating AGFA's interest. To the extent Pyramid, JAV or AGFA do not consent to the sale, the Debtor will hold in escrow proceeds from the sale sufficient to satisfy liens or interests that Pyramid, JAV and/or AGFA may assert against the Assets, pending further order of the Court. Except as set forth herein, the Debtor is not aware of any other liens, encumbrances or other security interests in the Assets.

48.     As such, a sale of the Debtor's assets free and clear of liens, encumbrances and security interests, is justified under Section 363(f)(2) or (f)(3) of the Bankruptcy Code.

## NOTICE

49.     Except as otherwise provided herein, the Debtor, through its counsel, has provided notice of the hearing on Part I of the Motion to: (a) the Office of the United States Trustee; (b) all known secured creditors or their known counsel; (c) counsel to Fuji; (d) counsel to the Committee; (e) counsel for Customs; and (f) any parties that have filed a Notice of Appearance requesting notice and service of pleadings pursuant to Fed. R. Bankr. P. 2002.

50.     The Debtor proposes to serve notice of Part II of the Motion in accordance with the provisions described in Paragraph 27(a), and that such service and notice shall constitute good and sufficient notice under the circumstances. In connection with the Publication Notice,

---

[14] The Debtor understands that Pyramid may assert a lien in the amount of approximately $110,000 and JAV may assert a lien in the estimated approximate amount of $460,000, as of March 31, 2005.

23

the Debtor requests that the Court authorize the Debtor to use funds held in the reserve account established by this Court's August 22, 2003 Order, currently held in escrow by Cole Schotz.

WHEREFORE, the Debtor respectfully requests (1) in the first instance, entry of the accompanying Procedures Order and (2) in the second instance, entry of an order approving the sale or sales of the Debtor's assets.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession

By:      /s Michael D. Sirota
       Michael D. Sirota
       Warren A. Usatine
       Jeffrey M. Traurig

DATED:  April 5, 2005