**MS-4088**
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Jazz Photo Corp.,
Debtor-in-Possession

     -and-

**HSG-8559**
**RAVIN GREENBERG, PC**
A Professional Corporation
101 Eisenhower Parkway
Roseland, New Jersey 07068-1092
(973) 226-1500
(973) 226-6888 Facsimile
Attorneys for the Official Committee
of Unsecured Creditors

|  |  |
|---|---|
| In the Matter of: | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY HONORABLE MORRIS STERN CASE NO. 03-26565 (MS) |
| JAZZ PHOTO CORP., | Chapter 11 |
| Debtor-in-Possession. | **FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE JOINT PLAN OF ORDERLY LIQUIDATION FILED ON BEHALF OF THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |

# TABLE OF CONTENTS

Page

I.    **INTRODUCTION**................................................................3

II.   **DESCRIPTION OF THE DEBTOR'S BUSINESS AND  REASONS FOR THE
      DEBTOR'S CHAPTER 11 FILING** ......................................................5

      A.    The Debtor's Business ..................................................5
      B.    Events Leading to and Reasons for the Chapter 11 Filing....................6

III.  **THE CHAPTER 11 CASE** ......................................................9

      A.    The First Day Motions and Related Matters..............................9
      B.    The Post-Petition Financing Arrangements ..............................10
      C.    The Debtor's Professionals.............................................10
      D.    The Committee and its Professionals....................................12
      E.    Claims Process and Bar Date ...........................................12
      F.    Post-Petition Operations ..............................................13
      G.    The Fuji Appeal .......................................................14
      H.    ITC-2 .................................................................14
      I.    Litigation Before the Court of International Trade......................15
      J.    Litigation with Fuji Before the Bankruptcy Court.......................16
      K.    The Imation Case and Settlement .......................................18
      L.    Wind-Down of the Debtor's Operations...................................19

IV.   **SUMMARY OF THE PLAN** ......................................................22

      A.    Introduction...........................................................22
      B.    Voting Procedures and Requirements.....................................22
      C.    Confirmation Procedure.................................................25
      D.    Classification of Claims and Interests and Their Treatment Under the Plan.........29
      E.    Means for Execution of the Plan........................................34
      F.    Preservation of the Debtor's Claims, Demands and Causes of Action.................35
      G.    Trust Assets...........................................................36
      H.    Procedure for Determination of Claims..................................36

V.    **THE LIQUIDATING TRUSTEE**......................................................39

      A.    Appointment of the Liquidating Trustee.................................39
      B.    Duties of the Liquidating Trustee .....................................39
      C.    Reporting Requirements/Effect of Failure to Object ....................40
      D.    Powers of the Liquidating Trustee. ....................................41
      E.    Representative Status of Liquidating Trustee. .........................43
      F.    Tenure, Removal and Replacement of the Liquidating Trustee ............44
      G.    Compensation and Reimbursement of Liquidating Trustee and His Professionals44
      H.    Accounts ..............................................................45
      I.    No Right in Assets ....................................................46

J. Limitation on Liability of the Liquidating Trustee ...............................................46

**VI. TREATMENT OF EXECUTORY CONTRACTS.......................................................47**

 A. Assumption of Executory Contracts ...................................................................47
 B. Rejection Claims Bar Date..................................................................................47

**VII. MODIFICATION OF THE PLAN ..............................................................................48**

**VIII. CONDITIONS TO THE EFFECTIVE DATE ............................................................49**

 A. Conditions to the Occurrence of the Effective Date ...........................................49
 B. Waiver of Conditions..........................................................................................49

**IX. RETENTION OF JURISDICTION ...........................................................................50**

 A. In General.............................................................................................................50
 B. Plan Disputes and Enforcement ..........................................................................50
 C. Further Orders......................................................................................................50
 D. Sales of Assets ....................................................................................................51
 E. Governmental Units or Regulatory Agencies .....................................................51
 F. Final Decree ........................................................................................................51
 G. Appeals ...............................................................................................................51
 H. Executory Contracts............................................................................................51
 I. Other Claims .......................................................................................................51

**X. GENERAL PROVISIONS ........................................................................................53**

 A. Extension of Payment Dates ...............................................................................53
 B. Notices ................................................................................................................53
 C. Closing of the Case .............................................................................................53
 D. Interest.................................................................................................................53
 E. Confirmation By Non-Acceptance Method .........................................................54
 F. Vesting ................................................................................................................54
 G. Severability .........................................................................................................54
 H. Governing Law ....................................................................................................54
 I. No Admissions or Waivers .................................................................................54
 J. Successors and Assigns.......................................................................................55
 K. Fractional Dollars................................................................................................55
 L. Minimum Distribution ........................................................................................55
 M. Payment of Statutory Fees and Filing of Quarterly Reports................................55
 N. Exculpation .........................................................................................................56

**XI. CERTAIN TAX CONSEQUENCES OF THE PLAN................................................57**

**XII. RECOMMENDATION AND CONCLUSION ..........................................................60**

THIS DISCLOSURE STATEMENT, THE FIRST AMENDED JOINT PLAN OF ORDERLY LIQUIDATION DATED APRIL 11, 2005 ANNEXED HERETO AS <u>EXHIBIT A</u>, THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTOR TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF VOTES TO ACCEPT THE PLAN BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., EASTERN TIME, MAY 9, 2005, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY (THE "BANKRUPTCY COURT").  YOUR VOTE ON THE PLAN IS IMPORTANT.**

**THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THE ESTATE TO EFFICIENTLY LIQUIDATE ITS ASSETS FOR THE BENEFIT OF ITS CREDITORS AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.  ADDITIONALLY, THE DEBTOR AND THE COMMITTEE BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTOR'S CREDITORS AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATE.  THE DEBTOR AND THE COMMITTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

BY ORDER DATED APRIL 11, 2005, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT IN ITS ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

40654/0001-2190130v11

# I.    <u>INTRODUCTION</u>

On May 20, 2003 (the "Petition Date"), Jazz Photo Corp. (the "Debtor") filed a petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtor has remained in possession of its assets and, through March 1, 2005, managed its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code (the "Chapter 11 Case").

The Debtor and the Official Committee of Unsecured Creditors appointed in the Debtor's Chapter 11 proceeding (the "Committee") submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject their First Amended Joint Plan of Orderly Liquidation dated April 11, 2005, a copy of which is annexed hereto as <u>Exhibit A</u> (the "Plan").[1]

The Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with Section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of the Voting Classes (as defined herein) contained in the Plan to make an informed judgment about whether to accept or reject the Plan.  **A hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held on May 13, 2005, at 10:30 a.m., Eastern Time**, before the Honorable Morris Stern, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Third Floor, Newark, New Jersey 07102. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for confirmation under the Bankruptcy Code.

---

[1] Unless otherwise defined, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan.

40654/0001-2190130v11

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan

must be filed and served so they are received on or before May 9, 2005 at 4:00 p.m., Eastern

Time, in the manner described in Article IV, Section C of this Disclosure Statement.  The

Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without

further notice except for the announcement of the adjournment date made at the Confirmation

Hearing or at any subsequent adjourned Confirmation Hearing.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

Exhibit A:      The Plan and any exhibits thereto; and

Exhibit B:      Order of the Bankruptcy Court dated April 11, 2005 (the "Disclosure

Statement Order"), among other things, approving this Disclosure Statement and establishing certain

procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

Voting instructions are contained in Article IV, Section B of this Disclosure Statement.

To be counted, your original Ballot must be duly completed, executed and filed with:

> Capstone Advisory Group, LLC
> Attn.:  Brian T. Moore, CPA
> Park 80 West
> Plaza One-Plaza Level
> Saddle Brook, New Jersey 07663

Your Ballot must be received at the address listed above by 4:00 p.m., Eastern Time, on May 9,

2005.  If your Ballot is not timely received, it may not be counted in determining whether the

Plan has been accepted.  You are urged to carefully review the contents of the Plan and

Disclosure Statement, including all exhibits annexed thereto, before making your decision to

vote to accept or reject the Plan.  If your Claim is impaired (as defined in this Disclosure

Statement) by the Plan, you are entitled to vote to accept or reject the Plan.  Particular attention

should be directed to the provisions of the Plan affecting or impairing your rights as they may

presently exist.

4

## II.    DESCRIPTION OF THE DEBTOR'S BUSINESS AND REASONS FOR THE DEBTOR'S CHAPTER 11 FILING

### A.    The Debtor's Business

The Debtor is a New Jersey corporation that was founded in 1995 by Jack C. Benun. Until it ceased ordinary course operations effective March 1, 2005, the Debtor was engaged in the design, development, importation and wholesale distribution of cameras and other photographic products, primarily in the United States. The camera categories the Debtor imported and distributed included traditional hard-body 35mm cameras, both point-and-shoot and zoom-lens cameras, and digital and disposable cameras that were either newly made or refurbished by the Debtor or third parties. The Debtor distributed its products under its own brand name as well as under the name of Bell & Howell pursuant to an exclusive license agreement. The Debtor also sold certain items under the private labels of the Debtor's customers. The majority of the Debtor's sales were derived from a limited number of customers. The Debtor's largest customer was Wal-Mart, which at one point accounted for 56% of the Debtor's sales.

As of the Petition Date, the Debtor owned the following subsidiaries: (a) Jazz Photo Canada Corp., a Canadian corporation ("Jazz Canada"); (b) Jazz Photo (Hong Kong) Limited, a Hong Kong corporation ("Jazz HK"); and (c) Jazz Photo Ltd., a United Kingdom corporation ("Jazz UK"). Jazz HK, in turn, owned two subsidiaries located in China: (a) Jazz Photo (Shenzhen) Limited and (b) Jazz Photo (Shenzhen) Company Limited.

Prior to the Petition Date, Jazz HK was the Debtor's primary source for cameras. Jazz Canada was responsible for sales of the Debtor's products into Canada, and Jazz UK was responsible for sales and marketing efforts in the United Kingdom and Europe. During the Chapter 11 Case, however, the operations of Jazz Canada, Jazz UK and Jazz HK were wound

5

down, for various reasons, pursuant to the laws of Canada, the United Kingdom and Hong Kong,

respectively.  As described in more detail below, the Debtor ceased operations on or about

March 1, 2005, and it is no longer an operating entity.

Since 1995, the Debtor was a party to a factoring agreement with Rosenthal & Rosenthal,

Inc. ("Rosenthal") pursuant to which Rosenthal factored the Debtor's qualified accounts

receivable and provided a line of credit and other financial accommodations.  As set forth more

fully below, Rosenthal continued to finance the Debtor during the Chapter 11 Case until the

Debtor ceased ordinary course business effective March 1, 2005.

**B.**  **Events Leading to and Reasons for the Chapter 11 Filing**

The Chapter 11 Case largely was precipitated by claims of patent infringement that Fuji

Photo Film Co., Ltd. ("Fuji") began to assert against the Debtor in or about March 1998.  Fuji

pursued those claims on two fronts: before the International Trade Commission (the "ITC") and

thereafter, in the United States District Court for the District of New Jersey (the "District

Court").

**1.**  **ITC-1**

In March 1998, Fuji requested that the ITC institute a proceeding ("ITC-1") to prevent

the Debtor and other parties from importing refurbished and newly made single-use cameras for

sale in the United States.  Fuji claimed that such cameras infringed its patents.  The Debtor

disputed the charge of infringement.  Rather, the Debtor maintained, inter alia, that its

refurbishment of cameras was protected by the affirmative defense of non-infringing,

"permissible repair" under United States patent law.

On February 24, 1999, the Administrative Law Judge (the "ALJ") presiding over ITC-1

issued a recommendation finding the process by which the Debtor refurbished single-use

cameras infringed Fuji's patents.  The ITC adopted that recommendation in June 1999, and

issued the following two (2) orders:  (a) a General Exclusion Order to the United States Customs

Service ("Customs") prohibiting the importation of infringing cameras, and (b) a Cease and

Desist Order prohibiting the Debtor from further infringement of Fuji's patents.  The Debtor

appealed the ITC's ruling to the United States Court of Appeals for the Federal Circuit (the

"Federal Circuit").

On August 21, 2001, the Federal Circuit reversed in part and affirmed in part the ITC's

determinations.  The Debtor claims that the Federal Circuit reversed the ITC determination that

the Debtor's method for refurbishing cameras infringed Fuji's patents, holding instead that the

process constituted "permissible repair."  Fuji claims that all the Federal Circuit did was create a

safe harbor for permissible repair, but that the ITC's orders were affirmed as to the Debtor on the

issue of permissible repair process and that the ITC later expressly ruled that its orders were

affirmed as to the Debtor.  The Federal Circuit, however, held the refurbishment constituted

"permissible repair" only with respect to camera shells that were first sold in the United States.

The issue of camera origin was never raised before the ALJ or the ITC and, therefore, the Debtor

had not adduced evidence in those proceedings regarding the cameras' country of origin.

Accordingly, although the Federal Circuit held the Debtor's refurbishing process was not

inherently infringing, it sustained the ITC's finding of infringement, albeit on alternate,

unexpected grounds.

Both the Debtor and Fuji attempted to appeal the Federal Circuit's decision.  The United

States Supreme Court, however, denied each of their petitions for certiorari.  In a later

proceeding, the ITC ruled that its Orders were affirmed as to Debtor.

### 2.    **The District Court Action**

In June 1999, Fuji filed a complaint for patent infringement against the Debtor and other

parties in the District Court bearing the caption <u>Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.</u>

Inc., Jazz Photo Hong Kong Ltd., and Jack Benun, Docket No. 99-2937 (FSH) (the "District

Court Action").  On December 2, 2002, a jury entered a special verdict in the District Court

Action in Fuji's favor, finding, inter alia, facts which aided the District Court Judge to find that

the Debtor had infringed Fuji's patents between 1995 and August 2001.  On March 18, 2003, the

District Court entered a Final Order and Judgment in Fuji's favor and against the Debtor and

Jack C. Benun in the approximate amount of $30 million (the "Fuji Judgment").  The Fuji

Judgment awarded Fuji damages for patent infringement regarding cameras the Debtor sold

between 1995 and August 21, 2001.

     The Debtor appealed the Fuji Judgment to the Federal Circuit (the "Fuji Appeal") and

moved for a stay pending appeal of the Fuji Judgment without the posting of a bond before the

District Court and the Federal Circuit.  Both of those applications were denied.  Accordingly,

Fuji immediately began collection actions in connection with the Fuji Judgment.  Specifically,

Fuji sought to register the Fuji Judgment in the federal courts of New York and California and to

restrain Rosenthal from paying any debts of the Debtor and returning any property of the Debtor

until the Fuji Judgment was satisfied.  Both of those actions, if successful, would have forced the

Debtor out of business, to the detriment of the Debtor and its other creditors, before the Debtor

had the opportunity to avail itself of its appellate rights.  As set forth below, the Debtor's need to

thwart Fuji's collection efforts pending its appeal of the Fuji Judgment was the largest factor

precipitating the Chapter 11 filing.

    **3.**    **The Debtor's Claims Against Imation**

     In 1998, the Debtor sold and shipped approximately 4.5 million refurbished single-use

cameras that were loaded with film supplied by Imation Corp. and Imation S.p.A. (collectively,

"Imation").  The overwhelming majority of those cameras were sold to Wal-Mart, who was by

far the Debtor's largest customer.  The Imation film was alleged to be defective, and Wal-Mart

rescinded the sale and returned all of the cameras for credit.

The Debtor alleged that Imation's sale of defective film inflicted large economic damages

on the Debtor, and it also severely damaged the Debtor's reputation in the marketplace as a

reliable supplier of quality, low-cost single-use cameras.  Accordingly, in 1999 the Debtor filed a

lawsuit against Imation in the District Court to address those harms (the "Imation Case").  The

Debtor's experts estimated the Debtor's damages in the Imation Case at more than $85 million

(exclusive of trebling under relevant law and prejudgment interest), an amount that, if recovered,

would have more than satisfied the Claims of all Creditors, including Fuji.  Imation's expert

estimated the Debtor's alleged damages at an amount substantially less than the Debtor's expert.

As set forth in greater detail below, the Imation Case was settled during the Chapter 11 Case.

### 4.    Reasons for Filing the Chapter 11 Case

The Chapter 11 Case primarily was precipitated by Fuji's immediate steps to execute on

its judgment to the detriment of the Debtor and its other creditors, while the Debtor appealed the

Fuji Judgment to the Federal Circuit.  The Debtor sought protection under Chapter 11 of the

Bankruptcy Code to preserve its Assets, including the Imation Case, for the benefit of all its

Creditors as it challenged the Fuji Judgment in the Federal Circuit.

### III.    THE CHAPTER 11 CASE

This section of the Disclosure Statement describes important developments that have

occurred in the Chapter 11 Case.

### A.    The First Day Motions and Related Matters

As is typical in commercial Chapter 11 cases, the Debtor filed various motions at the

inception of the Chapter 11 Case, all of which ultimately were granted (some as modified) by the

Bankruptcy Court.  Specifically, the Debtor requested and received authority to:  (a) enter a post-

9

petition financing arrangement with Rosenthal, (b) pay all pre-petition wages, salaries, commissions and related obligations to the Debtor's employees, (c) maintain its active bank account and continue using its existing business forms and cash management system, (d) restrain utilities from discontinuing, altering or refusing service pursuant to section 366 of the Bankruptcy Code, and (e) honor certain pre-petition customer rebate obligations (collectively, the "First Day Motions").  The First Day Motions enabled the Debtor to operate in the ordinary course of business during the Chapter 11 Case.

**B.**     **The Post-Petition Financing Arrangements**

Before the Petition Date, the Debtor negotiated an arrangement with Rosenthal pursuant to which Rosenthal would continue to factor the Debtor's receivables during the Chapter 11 Case.  Additionally, shortly after the Petition Date, the Debtor negotiated supplemental post-petition financial accommodations from Rosenthal.  Those supplemental accommodations facilitated the posting of letters of credit required by certain of the Debtor's key suppliers.  The Debtor also obtained authority to finance insurance premiums with A.I. Credit Corp.

The Bankruptcy Court approved the Debtor's requested post-petition financing arrangements, albeit over several objections filed by Fuji.  The post-petition financing from Rosenthal enabled the Debtor to maintain its operations and to pay its ordinary post-petition operating expenses as they became due.  The financing of insurance premiums allowed the Debtor to maintain necessary insurance coverage during the Chapter 11 Case.

**C.**     **The Debtor's Professionals**

The Debtor has retained, pursuant to Orders entered by the Bankruptcy Court, the following professionals to assist it with the administration of the Chapter 11 Case:

10

**Bankruptcy Counsel**
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD P.A.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602
Attention:  Michael D. Sirota, Esq.

**Accountants**
EISNER, LLP
100 Campus Drive
Florham Park, New Jersey 07932
Attention:  Mr. David Ringer

**Special Corporate Counsel**
GREENBERG & KAHR
230 Park Avenue, 26th Floor
New York, New York 100169
Attention:  Stephen C. Kahr, Esq.

**Special Litigation Counsel**
BUDD, LARNER, ROSENBAUM, GREENBERG & SADE, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
Attention:  Peter J. Frazza, Esq.

KAPLAN & GILMAN, LLP
900 U.S. Highway 9 North
Woodbridge, New Jersey 07095
Attention:  Jeffrey I. Kaplan, Esq.

NEVILLE PETERSON, LLP
17 State Street, 19th Floor
New York, New York 10004
Attention:  John Peterson, Esq.

**Financial Advisors (appointed after the Bankruptcy Court ordered Debtor's liquidation)**
CAPSTONE ADVISORY GROUP LLC
Park 80 West, Plaza One-Plaza Level
Saddle Brook, New Jersey 07663
Attention:  Mr. Brian T. Moore

11

**D.**     **The Committee and its Professionals**

On June 4, 2003, the United States Trustee for the District of New Jersey (the "UST")

appointed the Committee to represent the interests of all of the Debtor's unsecured creditors.

The Committee is comprised of individuals representing the following Creditors:

1.     Jevic Transportation, Inc.;

2.     Polytech Enterprises; and

3.     Drier LLP.

The Committee has retained, pursuant to Orders entered by the Bankruptcy Court, the

following professionals:

> **Counsel**
> RAVIN GREENBERG, P.C.
> 101 Eisenhower Parkway
> Roseland, New Jersey 07068
> Attention:  Howard S. Greenberg, Esq.
>
> **Financial Advisors**
> WEISER, LLP
> 135 West 50th Street
> New York, New York 10020
> Attention:  Mr. James Horgan

Since its formation, the Committee has played an active and involved role in all aspects

of the Chapter 11 Case.

**E.**     **Claims Process and Bar Date**

**1.**     **Operating Guidelines**

Upon the Petition Date, the Debtor became bound by the Operating Guidelines and

Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines").  The Debtor has

fulfilled its obligations under the Operating Guidelines, including filing its monthly operating

reports.

12

2.    **Section 341(a) Meeting of Creditors**

On June 25, 2003, the Debtor appeared at the section 341(a) meeting of creditors in the

Chapter 11 Case conducted by the UST.

3.    **Schedules and Statements**

The Debtor timely filed with the Bankruptcy Court its Schedules and Statement of

Financial Affairs (the "Schedules").  The Schedules can be reviewed at the Bankruptcy Court

during regular business hours.

4.    **Bar Date**

The date by which Unsecured Creditors had to file proofs of Claim in the Chapter 11

Case was September 23, 2003.  The deadline for filing a proof of Claim by a Governmental Unit

was November 17, 2003 (the "Governmental Unit Bar Date").  Any Holder of a Claim against

the Debtor who was required to, but failed to file a proof of Claim on or before the Bar Date or

the Governmental Unit Bar Date, as applicable, will be challenged as untimely pursuant to the

contemplated claims objection process and may be forever barred from asserting such a Claim

against the Debtor's estate.

F.    **Post-Petition Operations**

Based on the Debtor's January 2005 operating report, during the Chapter 11 Case the

Debtor operated at a net income of $581,928 net of legal fees, after allocations to subsidiaries of

certain expenses which cannot now be recovered.  The Debtor also created a reserve account,

pursuant to Bankruptcy Court Order dated August 22, 2003 (Docket No. 227), of approximately

$386,000.00 to provide for the payment of anticipated costs that would arise if the Debtor

ultimately were required to wind down its operations.  The Bankruptcy Court also ordered that

$464,949.15 be set aside to pay disbursements in the Imation case and for other purposes to be

determined by the Court.  The balance now retained by order of the Court exceeds $200,000.

13

### G.    The Fuji Appeal

One of the Debtor's primary goals in the Chapter 11 Case was to prosecute the Fuji

Appeal because the Debtor believed the factual and legal bases for the Fuji Judgment were

highly debatable.  Success in the Fuji Appeal would have conferred an enormous benefit on the

Estate.  For example, a reversal of the Fuji Judgment would have eliminated, or at least

substantially reduced, Fuji's Claims, which are by far the largest Claims asserted against the

Debtor's estate.  The elimination or reduction of Fuji's Claims, therefore, would have increased

each Creditor's Pro Rata share of Assets, ensuring a greater (if not a full) recovery for all of the

Debtor's other Creditors.

Although filed before the Petition Date, because of factors outside the Debtor's control,

the Fuji Appeal was not argued until May 2004.  The Federal Circuit decided the Fuji Appeal on

January 14, 2005.  The Federal Circuit affirmed the Fuji Judgment in January 2005.  The Federal

Circuit did not, however, address whether the Debtor infringed on Fuji's patents post-August 21,

2001.

### H.    ITC-2

On September 24, 2002, before the Petition Date, Fuji requested that the ITC institute an

enforcement proceeding ("ITC-2") against the Debtor and other parties.  In ITC-2, Fuji sought,

inter alia, a determination that the Debtor violated the Cease and Desist Order issued in ITC-1,

and requested that the ITC impose penalties against the Debtor for those alleged violations.  The

Debtor vehemently denied that it violated the Cease and Desist Order.  It alleged that it had

adopted measures in response to the Federal Circuit's ruling in ITC-1 that were calculated to

ensure the Debtor would sell only refurbished cameras that were made from shells first sold in

the United States.

14

On April 6, 2004, the ALJ issued a recommendation to the ITC finding the Debtor sold

approximately 25 million infringing cameras between August 21, 2001 and December 12, 2003,

and recommending the imposition of a $13,675,000 penalty against the Debtor and Mr. Benun.

The decision was based on findings of refurbished foreign shells, insufficiently proven

refurbishing processes and refurbishing processes found to be infringing reconstruction.

Although the ALJ's determination covered sales that occurred both pre- and post-petition, the

ALJ did not expressly determine the number of infringing cameras that were sold before and

after the Petition Date, but Fuji contends that those sums can be derived from the ALJ's opinion

and the Jazz documents relied upon by the ALJ in determining the total number of infringing

cameras.  On July 25, 2004, the ITC adopted the ALJ's overall finding of infringement during

the August 21, 2001 to December 12, 2003 period but reserved its decision on the imposition of

penalties.  On January 14, 2005, the ITC adopted the ALJ's penalty findings and imposed a joint

and several civil penalty on the Debtor and Mr. Benun in the amount of $13,675,000.

As a result of the ITC's decision, Fuji has asserted a multi-million dollar administrative

expense claim against the Debtor's estate and it advises that it will amend its unsecured pre-

petition claim to cover sales of cameras from August 21, 2004 through the Petition Date, and the

ITC has filed a proof of claim against the Debtor's estate in the amount of $13,675,000.  The

Debtor and its special counsel believe the ITC's decision is legally and factually flawed, and the

Debtor has filed an appeal of ITC-2 to the Federal Circuit (the "ITC-2 Appeal") and plans to

prosecute the ITC-2 Appeal to the fullest extent of the law.

I.      **Litigation Before the Court of International Trade**

Since the entry of the General Exclusion Order in ITC, the Debtor stated that Customs

had closely monitored the Debtor's shipments of single use cameras, and subjected all the

Debtor's shipments to what the Debtor has characterized as intensive examination.  Starting in

the fall of 2004, Customs has detained 16 containers of single use cameras and has asked for

redelivery of other containers released by Customs after September 2004. The Debtor has

challenged Custom's detention of several containers on the basis that the cameras contained

therein were non-infringing. Those challenges have been brought before the Court of

International Trade (the "CIT"). In the first case to be tried involving two containers, the CIT

ordered the release of portions of several containers because the Debtor proved to the satisfaction

of the Court that they did not contain infringing cameras. Customs is appealing that decision to

the Federal Circuit. Fuji is appealing the CIT's orders which denied it the right to participate in

the case as a party and denied it access to certain evidence on confidentiality grounds.

Customs currently is holding fourteen (14) containers consisting of approximately

1,356,000 of the Debtor's single-use cameras. Based on the average cost per camera of $1.70,

the cost value of the 1,356,000 single use cameras is $2,305,200. Warehouse fees for the

detained cameras are being charged. The Debtor currently has actions pending before the CIT to

obtain the release of at least some of these fourteen containers so the cameras may be sold in the

United States, thereby increasing their value to the Debtor's estate. On February 18, 2005, Fuji

filed a motion for an order directing the Debtor to immediately suspend those actions. On March

15, 2005, the Bankruptcy Court entered an order, to which the Debtor and the Committee

consented, suspending the CIT actions pending further order of the Court.

**J.**      **Litigation with Fuji Before the Bankruptcy Court**

During the Chapter 11 Case, Fuji strongly opposed the Debtor's ability to operate as a

debtor-in-possession pursuant to Chapter 11 of the Bankruptcy Code, based on allegations of

wrongdoing and continued post petition patent infringement. Fuji filed numerous motions and

objections to the Debtor's various requests for relief that the Debtor argued were aimed at

forcing the Debtor out-of-business and out-of-possession of its Assets and which Fuji argued was

16

designed to stop the Debtor's continued infringement of its patents. During the Chapter 11 Case, therefore, the Debtor expended a tremendous amount of time, attention, effort and resources responding to Fuji's various pleadings.

### 1.    The Trustee Motion

On June 24, 2003, five (5) weeks after the Petition Date, Fuji filed a motion seeking the appointment of a Chapter 11 trustee in the Chapter 11 Case (the "Trustee Motion"). Fuji based the Trustee Motion on allegations of, inter alia, continued patent infringement, fraud, dishonesty, incompetence and gross mismanagement of the Debtor. The Debtor vehemently denied Fuji's allegations. On July 23, 2003, the Bankruptcy Court held an initial hearing on the Trustee Motion. After questions from the Bankruptcy Court at that hearing, Fuji requested an adjournment of the hearing to allow it to conduct discovery. The Bankruptcy Court continued the hearing to October 21, 2003.

Fuji then conducted, simultaneously with overlapping discovery in ITC-2, extensive discovery of the Debtor, including numerous depositions and the review of tens of thousands of pages of documents, all of which placed a significant burden on the Debtor's estate. On October 21 and 22, 2003, the Bankruptcy Court conducted an evidentiary hearing and, thereafter, reserved its decision and continued the hearing to February 6, 2004 to allow Fuji to conduct supplemental discovery. Fuji did not, however, conduct any additional discovery during that time and, instead, withdrew the Trustee Motion shortly before the February hearing date.

The Debtor strongly believed that by filing the Trustee Motion without adequate evidentiary support, Fuji's conduct was sanctionable under federal law. Therefore, the Debtor filed a motion seeking sanctions against Fuji and its counsel to offset the costs the Debtor incurred over a seven (7) month period to defend what was, in the Debtor's view, an unfounded

and improper motion.  The Bankruptcy Court, however, denied the Debtor's motion for sanctions

in a written opinion, <u>In re Jazz Photo Corp.</u>, 312 B.R. 524 (Bankr. D.N.J. 2004).

**K.**     **The Imation Case and Settlement**

The Debtor vigorously pursued the Imation Case during the Chapter 11 Case.  After

several adjournments, a jury trial finally commenced in the Imation Case on or about January 10,

2005.  While that trial was underway, the United States District Court Judge presiding over the

Imation Case requested the parties seriously pursue a settlement of the Debtor's claims against

Imation.  Specifically, on or about January 26, 2005, the District Court Judge directed the Debtor

to provide a good faith settlement offer with which he could approach Imation.  Settlement

discussions ensued, and on February 1, 2005, the District Court Judge hosted a day-long

negotiating session which all parties-in-interest were required to attend.

The result of that conference was an agreement between the Committee and Imation to

settle the Imation Case for a payment of $25 million to the Debtor's Estate and a waiver of an

approximately $1.5 million judgment Imation had obtained against the Debtor during the course

of the litigation (the "Imation Settlement").  As part of the Imation Settlement, Fuji also agreed

to "carve-out" up to $1 million of its anticipated recovery to certain of the Debtor's General

Unsecured Creditors.  In exchange for that carve-out, however, Fuji insisted that the Debtor be

required to cease ordinary course operations by March 1, 2005.

Given the Debtor's unwillingness to accept the settlement, the Bankruptcy Court

authorized the Committee to bring a motion to approve the Imation Settlement pursuant to

Bankruptcy Rule 9019. The Bankruptcy Court also granted a motion by the Office of the United

States Trustee to direct the appointment of an Examiner to make an independent

recommendation to the Bankruptcy Court regarding the reasonableness of the Imation

Settlement.  Although the Debtor initially did not support the Imation Settlement, it agreed to be bound by the Examiner's recommendation.

On February 15, 2005, Edwin N. Ordway, Jr. of Capstone Corporate Recovery, LLC ("Captstone"), the Examiner appointed by the Office of the United States Trustee, rendered a report in which he concluded the Imation Settlement was reasonable and recommended its approval.  On February 16, 2005, the Bankruptcy Court heard and granted the Committee's motion to approve the Imation Settlement.  The Bankruptcy Court entered an Order approving the Imation Settlement on February 18, 2005.  Pursuant to that Order and the Imation Settlement, the Debtor was required to, *inter alia*:  (a) cease ordinary course operations by March 1, 2005, (b) begin the process of winding down its business, and (c) prepare and file a plan of orderly liquidation on or about March 21, 2005.  The terms of the Fuji carve-out have not as yet been approved by the Bankruptcy Court, but Fuji reaffirmed its commitment in open court.

On February 28, 2005, Mr. Benun and JCB Consultants, Inc., a company through which Mr. Benun previously provided consulting services to the Debtor, appealed the Bankruptcy Court's approval of the Imation Settlement to the District Court.  That appeal has now been taken over by the Chapter 7 Trustee of Benun's estate (Benun having filed for protection under Chapter 11 of the Bankruptcy Law in July 2003 and his case having been converted to Chapter 7 in March 2005).  The Debtor and the Committee believe that the District Court will affirm the Bankruptcy Court's approval of the Imation Settlement.

## L.    <u>Wind-Down of the Debtor's Operations</u>

Pursuant to the terms of the Imation Settlement, the Debtor ceased normal course operations on or about March 1, 2005 and began the process of winding down its business.  Specifically, among other things, on March 8, 2005, the Debtor filed a motion seeking: (a) authority to use certain monies on hand to fund certain wind down expenses, (b) approving the

19

form of settlement agreement to be executed in connection with the Imation Settlement, (c) establishing a bar date for filing Administrative Claims against the Estate, and (d) approving the Debtor's investment strategy with regard to the settlement proceeds to be received from Imation. The Bankruptcy Court granted that motion on March 14, 2005.

On March 8, 2005, the Debtor also filed an application to retain Capstone as its financial advisors in connection with the wind down of the Debtor's business. The Debtor selected Capstone as its wind down advisors because of that firm's considerable expertise in business liquidations and reorganizations and familiarity with the Debtor's proceeding. In addition, Brian T. Moore, a member of Capstone, likely will be the Liquidating Trustee under the Plan and the Liquidating Trust Agreement.

In addition to its application to retain Capstone, on March 14, 2005, the Debtor filed an application to expand the scope of Budd Larner, PC ("Budd Larner") as its special litigation counsel. In that application, the Debtor seeks authorization for Budd Larner, who represented the Debtor in the District Court Action, the Fuji Appeal and the Imation Case, to represent it in connection with (a) the ITC-2 Appeal, (b) potential malpractice actions against the Debtor's former professionals retained in the District Court Action and the ITC matters (the "Malpractice Claims") and (c) any causes of action the Debtor may have against the Debtor's directors and officers.

The Debtor believes the prosecution of the ITC-2 Appeal and the Malpractice Claims are necessary and essential to its performance of its duties as debtor-in-possession. Success in the ITC-2 Appeal will reduce the amount of Claims against the Debtor's estate by approximately $20 million, including the likely disallowance of Fuji's alleged multi-million dollar

20

administrative expense claim.  The Debtor also believes the Malpractice Claims will yield substantial recoveries that will be distributed to Creditors pursuant to the Plan.

Finally, the Debtor is working to sell substantially all of its remaining assets pursuant to section 363 of the Bankruptcy Code.  The proceeds of any such sale, once consummated, will constitute Liquidation Proceeds that will be distributed to Creditors pursuant to the Plan.

## IV.    SUMMARY OF THE PLAN

The following is a brief summary of certain provisions of the Plan.  This summary does not purport to be complete, and Creditors are urged to read the Plan in full.  A copy of the Plan is annexed hereto as Exhibit A.

### A.    Introduction

Pursuant to the Plan, the Debtor and the Committee propose an orderly liquidation of the Debtor's remaining Assets.  The Plan provides that the proceeds from the liquidation of the Debtor's Assets will be distributed to Creditors in accordance with the distributive provisions and priority scheme of the Bankruptcy Code.  The Plan will be implemented by establishing a Liquidating Trust that will be administered by the Liquidating Trustee.  On the Effective Date, the Debtor's Assets will be transferred to the Liquidating Trust for the benefit of Creditors.  Thereafter, the Liquidating Trustee will be responsible for liquidating the Debtor's remaining Assets and making distributions to Creditors in accordance with the terms of the Plan.

### B.    Voting Procedures and Requirements

#### 1.    Ballots and Voting Deadlines

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan.  Your Claims may be classified in multiple classes.  When you vote and return your Ballot, please indicate the Class or Classes in which your Claims are classified by marking the appropriate space provided on your Ballot for such purpose.

**The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be filed with Capstone Corporate Recovery, LLC, Park 80 West, Plaza Two, Suite 200, Saddle Brook, New Jersey 07663, Attention:  Brian T. Moore, CPA, by no later than 4:00 p.m. Eastern Time on May 9, 2005 (the "Voting Deadline").**  Ballots not received by the Voting Deadline may not be counted, and

22

Ballots that do not indicate either an acceptance or rejection of the Plan will be deemed to

constitute a rejection of the Plan.

If you have any questions regarding the procedure for voting, please contact:

| | | |
|---|---|---|
| Michael D. Sirota, Esq. | -OR- | Howard S. Greenberg, Esq. |
| Warren A. Usatine, Esq. | | Sheryll S. Tahiri, Esq. |
| COLE, SCHOTZ, MEISEL, | | RAVIN GREENBERG, PC |
| FORMAN & LEONARD, P.A. | | 101 Eisenhower Parkway |
| Court Plaza North | | Roseland, New Jersey 07068-1092 |
| 25 Main Street | | tel # (973) 226-1500 |
| P.O. Box 800 | | fax # (973) 226-6888 |
| Hackensack, New Jersey 07602-0800 | | Counsel to the Committee |
| tel #: (201) 489-3000 | | |
| fax #:(201) 489-1536 | | |
| Counsel to the Debtor | | |

It is important for all Creditors that are entitled to vote on the Plan to exercise their right

to vote to accept or reject the Plan.  Even if you do not vote to accept the Plan, you may be

bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the

Bankruptcy Court.

## 2.    Parties in Interest Entitled to Vote

Any Holder of a Claim against the Debtor whose Claim has not been Disallowed

previously by the Bankruptcy Court, is entitled to vote to accept or reject the Plan if such Claim

is impaired under the Plan and either (a) such Holder's Claim has been scheduled by the Debtor

and is not scheduled as disputed, contingent or unliquidated, or (b) such Holder has filed a proof

of Claim before the Bar Date.  Any Claim to which an objection has been filed is not entitled to

vote unless the Bankruptcy Court, upon application of the Holder to whose Claim an objection

has been made, temporarily allows such Claim in an amount that it deems proper for the purpose

of accepting or rejecting the Plan.  Any such application must be heard and determined by the

Bankruptcy Court on or before the Confirmation Hearing.  A vote may be disregarded if the

23

Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 3.    Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

- leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

- notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

    - cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

    - reinstates the maturity of such claim or interest as it existed before such default;

    - compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

    - does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### 4.    Classes Impaired under the Plan

The Claims in Class 3 are impaired and are entitled to vote to accept or reject the Plan.

The Claims in Classes 4 and 5 are impaired.  However, the Debtor and the Committee do not expect any distributions to be made on account of Claims in those Classes.  Therefore,

Classes 4 and 5 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

The Equity Interests in Class 6 are impaired.  No distributions will be made on account of Equity Interests.  Therefore, Class 6 is conclusively presumed to have rejected the Plan, and Holders of Class 6 Equity Interests are not entitled to vote to accept or reject the Plan.

**C.    Confirmation Procedure**

**1.    Confirmation Hearing**

A hearing before the Honorable Morris Stern, United States Bankruptcy Judge, has been scheduled for May 13, 2005, at 10:30 a.m., at the United States Bankruptcy Court, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Third Floor, Newark, New Jersey 07102 to consider confirmation of the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Debtor and the Committee without further notice, or through adjournments announced in open court.

**2.    Procedure for Objections**

Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on the Office of the United States Trustee and counsel for the Debtor and the Committee so as to be received no later than May 9, 2005 at 4:00 p.m.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

**3.    Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of Section 1129 of the Bankruptcy Code.  Among the requirements for confirmation are that the Plan be:  (a) accepted by all impaired classes of Claims and Equity Interests that are entitled to

25

vote or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such class; (b) feasible; and (c) in the "best interests" of creditors and stockholders impaired under the Plan.  The Bankruptcy Court also must find that:

- The Plan has classified Claims and Equity Interests in a permissible manner;

- The Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

- The Plan has been proposed in good faith.

### 4. **Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class.  The Plan creates separate classes to deal respectively with secured claims, unsecured claims and equity interests.  The Debtor and the Committee believe the Plan's classifications place substantially similar Claims or Equity Interests in the same class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

### 5. **Voting and Acceptance of the Plan**

As a condition to confirmation of the Plan, the Bankruptcy Code requires each class of "impaired" Claims or Equity Interests entitled to vote on the Plan to vote to accept the Plan.  The Bankruptcy Code defines acceptance of a plan by a class of Creditors as acceptance by holders of two-thirds (2/3) in dollar amount and more than one-half (½) in number of those claims actually voting.  Acceptance of the plan by a class of equity interests is defined as acceptance by holders of two-thirds (2/3) of the number of shares actually voting.  Holders of Claims who fail to vote will not be counted as either accepting or rejecting the Plan.  A vote, moreover, may be

26

disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote.

### 6. **Best Interests Test**

The "best interests" of creditors test requires that each Holder of a Claim or Equity Interest receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. To determine what members of each impaired Class of Claims and Equity Interests would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtor's assets would generate in the context of a Chapter 7 liquidation sale. The amount available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the sale, reduced by the Claims of secured creditors, to the extent of the value of their collateral, and the costs and expenses of the liquidation.

Because the Plan is a plan of orderly liquidation, each Class of Creditors and Equity Interests will receive substantially the same treatment it would receive if the Debtor's Assets were liquidated pursuant to Chapter 7 of the Bankruptcy Code, except that the Estate will neither be taxed with the additional expenses and commissions of a trustee nor delayed by a trustee's appointment and need to become familiar with this complex matter. Accordingly, the Debtor believes the Plan satisfies the "best interests" of creditors test.

### 7. **The Feasibility Test**

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtor.

40654/0001-2190130v11

Because the Debtor already has ceased operations and the Plan contemplates an orderly liquidation of the Debtor's assets, confirmation of the Plan will not be followed by a liquidation or further reorganization.

### 8.        The Fair and Equitable Test

If any impaired class of claims or equity interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance.  To obtain such confirmation, the Debtor and the Committee must show, among other things, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each impaired class of claims or equity interests that has rejected the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.  A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.

### 9.        Other Requirements of Section 1129

The Debtor and the Committee believe that the Plan meets all the other technical requirements of section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

**THE DEBTOR AND THE COMMITTEE SHALL SEEK CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE AMOUNTS OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.**

**D.      Classification of Claims and Interests and Their Treatment Under the Plan**

The Plan classifies Claims and Equity Interests into six (6) Classes, and also provides for payment of Allowed Administrative Claims.  For each Class, the Plan states whether the Claims or Equity Interests are impaired and whether holders of the Claims or Equity Interests will receive various types of distributions under the Plan.  The Classes and payments to be made and treatment proposed to be accorded to Allowed Claims of each Class under the Plan are summarized and described below.  After Confirmation and upon the occurrence of the Effective Date:  (a) the Debtor will be discharged from all Claims that arose before Confirmation of the Plan, except for payments and distributions provided for in the Plan or in the Confirmation Order; and (b) all Equity Interests will be deemed to be terminated, canceled and annulled.

**1.      Unclassified Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Claims of a kind specified in Sections 507(a)(1) or (8) of the Bankruptcy Code are not to be designated in a class.  Thus, Administrative Claims and Priority Tax Claims against the Debtor shall be treated separately as unclassified Claims.

**a.      Administrative Claims**

The Plan provides that any entity entitled to payment of an Allowed Administrative Claim, excluding Court Orders awarding professional fees, shall receive Cash in an amount equal to such Allowed Administrative Claim on the later of the Effective Date and seven (7) Business Days after entry of a Final Order Allowing such Administrative Claim, or as soon thereafter as is practicable.  To date, the only material requests for payment of an Administrative

29

Claim, excluding professionals, have been made by:  (i) Fuji, which asserted an Administrative

Claim of more than $6,000,000 based on the Debtor's alleged infringement of Fuji's patents after

the Petition Date; (ii) BBH, Inc., which asserted an Administrative Claim for $521,818; and (iii)

Jack C. Benun, who asserted an Administrative Claim for $363,000.  It should be noted,

however, that on March 14, 2005, the Bankruptcy Court entered an Order fixing April 25, 2005

as the deadline for claimants to file proof of Administrative Claims.  The Debtor, the Committee

and, upon confirmation, the Liquidating Trustee reserve the right to object to all Administrative

Claims, including the Administrative Claim asserted by Fuji.

### b.      Professional Compensation and Reimbursement Claims

The Plan provides that any Person seeking payment on account of a Professional

Compensation and Reimbursement Claim shall file its respective final Fee Application no later

than thirty (30) days after the Confirmation Date.  All Professional Compensation and

Reimbursement Claims, to the extent not previously paid, shall be paid in full:  (a) seven (7) days

after such Professional Compensation and Reimbursement Claim becomes an Allowed

Professional Compensation and Reimbursement Claim, or (b) on such other terms as may be

mutually agreed upon between the Holder of an Allowed Professional Compensation and

Reimbursement Claim and the Liquidating Trustee.  Failure to file a Final Fee Application shall

result in the Professional Compensation and Reimbursement Claim being forever barred and

discharged.

### c.      Priority Tax Claims

The Plan provides that each Holder of an Allowed Priority Tax Claim, if any, shall

receive Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective

Date and seven (7) Business Days after the entry of a Final Order Allowing such Priority Tax

Claim.

30

2. **Classified Claims**

The following describes the Plan's classification of those Claims against the Debtor required to be classified under the Bankruptcy Code:

a. **Class 1**

Class 1 shall consist of Allowed Secured Claims. The Allowed Secured Claims are unimpaired. Holders of Allowed Secured Claims, therefore, are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Although Claims in the approximate amount of $445,000 have been asserted against the Estate as secured by warehouseman liens, those claims may be satisfied from proceeds of the sale of the Debtor's remaining inventory that may be sold pursuant to section 363 of the Bankruptcy Code, which likely will occur on or about the Effective Date. The Debtor and the Committee further anticipate that Rosenthal, which is owed approximately $2,088,000[2] may be the only holder of an Allowed Secured Claim on the Effective Date. To the extent not paid pre-confirmation, Rosenthal shall receive Cash in an amount equal to such Allowed Secured Claim on the later of the Effective Date and seven (7) Business Days after the entry of a Final Order Allowing such Secured Claim.

b. **Class 2**

Class 2 shall consist of Allowed Priority Non-Tax Claims. The Allowed Priority Non-Tax Claims are unimpaired. Holders of Allowed Priority Non-Tax Claims, therefore, are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Each Holder of an Allowed Priority Non-Tax Claim, if any, shall receive Cash in an

---

[2] A portion, and perhaps all, of Rosenthal's secured claim also may be satisfied prior to the Effective Date through the liquidation of assets upon which Rosenthal has a first priority lien, including, but not limited to, the Imation Settlement proceeds.

amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and

seven (7) Business Days after the entry of a Final Order Allowing such Allowed Priority Non-

Tax Claim.  The Debtor and the Committee believe there are no Allowed Priority Non-Tax

Claims.

       c.     **Class 3**

Class 3 shall consist of Allowed Unsecured Claims.  The Allowed Unsecured Claims are

impaired and each Holder of an Allowed Unsecured Claim is entitled to vote to accept or reject

the Plan.  The aggregate amount of Unsecured Claims filed against or scheduled by the Debtor

on or before the Bar Date is approximately $49,143,375.00.[3]  The Debtor and the Committee,

however, anticipate that the amount of Allowed Unsecured Claims will be materially reduced

following challenges by the Debtor, Committee or, after the Effective Date, the Liquidating

Trustee.  Specifically, the Debtor and the Committee anticipate obtaining orders from the

Bankruptcy Court disallowing or reducing duplicate claims, superceded claims, previously paid

claims, claims not supported by the Debtor's books and records, and claims that are subject to

other objections.

Each Holder of an Allowed General Claim shall receive its initial Pro Rata Share of the

Liquidation Proceeds as soon as practicable after the Effective Date or at such time as the

Liquidating Trustee shall determine after such Allowed Unsecured Claim becomes Allowed;

provided, however, that the amount of Liquidation Proceeds to be distributed to Holders of

---

[3] The Fuji Unsecured Claim is a Class 3 Claim and is Allowed in the amount of the Fuji
Judgment as of the Petition Date, without prejudice to (i) the rights of Fuji to asset such greater
amounts to which it believes it is entitled, and (ii) the rights of any other party-in-interest to
challenge that portion of the Fuji Claim in excess of the Fuji Judgment.

Allowed Unsecured Claims shall be subject to and reallocated according to the terms of the

Creditor Carve-Out established in the Imation Settlement.

      **d.**    **Class 4**

Class 4 shall consist of Allowed Affiliate Claims.  The aggregate amount of Affiliate

Claims filed against or scheduled by the Debtor on or before the Bar Date is approximately

$8,887,475.00.  Pursuant to a Final Order entered by the Bankruptcy Court in the Chapter 11

Case on June 11, 2003, the Holders of Affiliate Claims have agreed to subordinate their Claims

to the Allowed Unsecured Claims.  Accordingly, Allowed Affiliate Claims are not entitled to

receive a distribution or payment from the Estate until after all Allowed Unsecured Claims are

paid in full.

Because Allowed Unsecured Claims will not be paid in full under the Plan, there will be

no distribution made on account of Allowed Affiliate Claims.  The Allowed Affiliate Claims are,

therefore, impaired, and they are conclusively presumed to have rejected the Plan and are not

entitled to vote to accept or reject the Plan.

      **e.**    **Class 5**

Class 5 shall consist of Penalty Claims.  Because the Penalty Claims represent non-

compensatory fines, they are subordinate to Unsecured Claims pursuant to Section 726(a)(4) of

the Bankruptcy Code.  Accordingly, Allowed Penalty Claims are not entitled to receive a

distribution or payment from the Estate until after all Allowed Unsecured Claims are paid in full.

The Debtor and the Committee believe that the claim(s) asserted by the ITC, to the extent they

become Allowed Claims, will be Class 5 Claims.

Because Allowed General Unsecured Claims will not be paid in full under the Plan, there

will be no distribution made on account of Allowed Penalty Claims.  The Allowed Penalty

Claims are, therefore, impaired, and they are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### f. Class 6

Class 6 shall consist of Equity Interest Holders. The Equity Interests are impaired. Holders of Equity Interests shall receive no distribution on account of their Equity Interests and, therefore, the Holders of Equity Interests are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. Immediately upon the completion of the liquidation of the Debtor's remaining Assets, the Equity Interests will be canceled, and the Debtor will be deemed dissolved.

## E. Means for Execution of the Plan

### 1. Establishment of Expense Reserve Account

The amount of the Expense Reserve Account shall be determined by the Liquidating Trustee. The Expense Reserve Account will be calculated based on the projected expenses necessary to accomplish the tasks by or on behalf of the Liquidating Trustee under the Plan. Subject to the Liquidating Trust Agreement, that portion of the Expense Reserve Account that relates to the costs and expenses of prosecuting the Avoidance Actions and objections to Disputed Claims and payment of professional fees and expenses will be determined on the basis of budgets prepared by the Professionals who will prosecute such matters.

### 2. Appointment of Liquidating Trustee

On the Confirmation Date, the Liquidating Trustee will be appointed.

### 3. Establishment of Liquidating Trust

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, and the Liquidating Trustee will begin his duties.

4.    **Transfer of Assets**

On the Effective Date, in accordance with the Confirmation Order, the Assets will be irrevocably transferred and assigned to the Liquidating Trust, and will be held in trust for the benefit of all holders of Allowed Claims pursuant to the terms of the Plan and the Liquidating Trust Agreement.  Except as otherwise provided in the Plan, the Estate's title to the Assets will pass to the Liquidating Trust on the Effective Date, free and clear of all Claims and Equity Interests in accordance with section 1141 of the Bankruptcy Code.  The Liquidating Trustee will pay, or otherwise make distributions on account of, all Allowed Claims against the Debtor in accordance with the Plan and the Liquidating Trust Agreement.

5.    **Effect of Transfer**

For federal and applicable state income tax purposes, the transfer of the Assets to the Liquidating Trust will be a disposition of the Assets directly to and for the benefit of the beneficiaries of the Liquidating Trust in partial satisfaction of their Claims, immediately followed by a deemed contribution of the Assets by the beneficiaries to the Liquidating Trust. The beneficiaries will be treated as the grantors and deemed owners of the Liquidating Trust.

F.    **Preservation of the Debtor's Claims, Demands and Causes of Action**

All claims, demands and Causes of Action of any kind or nature whatsoever held by, through or on behalf of the Debtor and/or the Estate against any other Person, including, but not limited to, all Causes of Action, including Avoidance Actions, are preserved in full for the benefit of the Liquidating Trust, whether or not such claims or Causes of Action are specifically identified in this Disclosure Statement.  The Liquidating Trustee is designated as the estate representative pursuant to and in accordance with Bankruptcy Code section 1123(b)(3)(B). Among other things, the Liquidating Trustee will have the authority to prosecute any Causes of

40654/0001-2190130v11

Action.  The Liquidating Trustee also will have the authority to handle the Claims reconciliation

process.

**G.**     **Trust Assets**

The Trust Assets, to the extent of cash and cash equivalents, shall be deposited into the

Liquidating Trust and shall be segregated into the following accounts: 1) Expense Reserve

Account; 2) General Trust Account and 3) Disputed Claims Reserve Account.

**H.**     **Procedure for Determination of Claims**

**1.**     **Objections to Claims**

Except as to any Claim that has been Allowed before the Effective Date, the Liquidating

Trustee may object to the allowance of any Claim against the Debtor or seek estimation thereof

on any grounds permitted by the Bankruptcy Code by filing the appropriate pleading in the

Bankruptcy Court at any time prior to the first Business Day which is ninety (90) days after the

Effective Date and continuing the claims objection process initiated by the Debtor or the

Committee pre-confirmation.

**2.**     **Disputed Claims**

As set forth in Article VI of the Liquidating Trust Agreement, no payments or other

distributions will be made to Holders of Claims unless and until such Claims are Allowed Claims

pursuant to a Final Order.  If a Claim is not an Allowed Claim on the Effective Date or when

payment is otherwise due under the Plan, payment of the Allowed Claim will be made when the

Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided

in the Plan, provided, however, a Holder will receive payment on account of any portion of such

Claim that is undisputed on the Effective (or any other Distribution) Date.  At the time of any

payments of Distributions to holders of Allowed Claims in any Class, an amount sufficient to

have paid each Holder of a Disputed Claim in such Class its Pro Rata share of such Distribution,

calculated as though such Disputed Claim were an Allowed Claim, shall be reserved for the

potential benefit of the holder of the Disputed Claim, and thereafter distributed as set forth

above.

### 3. **Treatment of Contingent Claims**

Until such time as a contingent Claim or a contingent portion of an Allowed Claim

becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for

all purposes related to distributions under the Plan.  The Holder of a contingent Claim will only

be entitled to a distribution under the Plan when and if such contingent Claim becomes an

Allowed Claim.

### 4. **Post-Effective Date Professional Compensation and Reimbursement Claims**

Any allowable, authorized, or otherwise permissible Professional Compensation and

Reimbursement Claims incurred by any Chapter 11 Professionals after the Effective Date will be

treated as part of the fees and expenses of administering the Liquidating Trust and will be paid

by the Liquidating Trustee in accordance with the terms of the Plan.

### 5. **Authority to Settle and Assign**

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Liquidating Trustee

will own and retain, and may prosecute enforce, compromise, settle, release or otherwise dispose

of any and all claims, defenses, counterclaims, setoffs and recoupments belonging to the Debtor

or the Estate as set forth in the Plan and the Liquidating Trust Agreement.

### 6. **Dissolution of Debtor/Termination of Service of Corporate Officers and Directors**

On the Effective Date, the Debtor will be deemed dissolved as a corporation pursuant to

New Jersey law and by authority of the Confirmation Order confirming the Plan.  As of the

Effective Date, the existing officers and directors of the Debtor shall cease to serve in their

current capacities.  The term of the board of directors of the Debtor shall be deemed to expire

and the position of each officer shall terminate on the Effective Date.  The Liquidating Trustee

will succeed to the rights to act in such capacities as may be necessary to implement the Plan.

40654/0001-2190130v11

## V.        THE LIQUIDATING TRUSTEE

### A.        Appointment of the Liquidating Trustee

In the Confirmation Order, the Liquidating Trustee will be appointed and will be bound

to perform as required by the Plan.

### B.        Duties of the Liquidating Trustee

On the Effective Date, the Liquidating Trustee will be the representative of the Estate as

that term is used in Bankruptcy Code section 1123(b)(3)(B) and will have the rights and powers

provided for in the Bankruptcy Code in addition to any rights and powers granted in the Plan and

in the Liquidating Trust Agreement.  In his capacity as the representative of the Estate, the

Liquidating Trustee will be the successor-in-interest to the Debtor with respect to all claims,

Causes of Action, and other interests constituting the Trust Assets.  The Liquidating Trustee will

hold all rights, title, and interest in and to the Trust Assets on behalf of the beneficiaries, and will

pay from the Liquidating Trust all ordinary and necessary costs of protecting and preserving the

Trust Assets.  The Liquidating Trustee will administer the Liquidating Trust, will dispute or

otherwise agree to settle claims, will liquidate the Trust Assets of the Liquidating Trust and will

make distributions from the Liquidating Trust, all in accordance with the terms of the Plan and

the Liquidating Trust Agreement.  Unless otherwise excused or exempted from doing so by the

Bankruptcy Code, the Liquidating Trustee will abide by all laws, including tax laws and

regulations, and will prepare or cause to be prepared all local, state, or federal tax returns, filings,

and/or reports that are necessary or appropriate.  In accordance with the Liquidating Trust

Agreement, the Liquidating Trustee will retain professionals to assist him in his duties as the

Liquidating Trustee.

**C.**     **Reporting Requirements/Effect of Failure to Object**

Beginning with a date which is fifteen days after the end of the first month within which

falls the ninetieth (90th) day after the Effective Date, and continuing on the fifteenth day after

the end of each succeeding quarter until the Final Distribution Date, the Liquidating Trustee will

file written reports with the Bankruptcy Court.  As more fully described in Article VI of the

Liquidating Trust Agreement, the reports, subject to any confidentiality or attorney work product

privilege, will provide information on collections and disbursements, administrative costs,

settlements, cash on hand or deposit, and the Liquidating Trustee's ongoing efforts to administer

the Liquidating Trust.  Before making his final distribution, the Liquidating Trustee will file a

written report with the Bankruptcy Court and provide notice of same to the beneficiaries (which

report shall constitute the final accounting of the Liquidating Trust) showing the assets

administered, the distributions made by the Liquidating Trustee, and the final distributions to be

made by the Liquidating Trustee.  Any beneficiary who fails to File and serve on the Liquidating

Trustee a written objection to any quarterly report or to the final report and accounting within

thirty (30) days after such report or account is filed shall be deemed to have assented thereto and

approved the contents thereof.  Any objection to any report or accounting shall be resolved by

the Bankruptcy Court.  If no objection to the final report and accounting is Filed within the time

frame set forth above, then, upon making the final distribution in the manner set forth in the final

report, the Liquidating Trustee and all of the Liquidating Trustee Professionals will be: (a) fully

discharged of their duties hereunder and under the Liquidating Trust Agreement; and, (b) fully

discharged and released from all duties, liabilities and obligations of every kind and nature to the

beneficiaries, except as is expressly set forth in the Liquidating Trust Agreement to the contrary,

except for fraud, gross negligence or willful misconduct.

40654/0001-2190130v11

**D.**    **Powers of the Liquidating Trustee**

Subject to the Liquidating Trust Agreement, the Liquidating Trustee will have the power

to take any and all actions which, in the business judgment of the Liquidating Trustee, are

necessary or appropriate to fulfill his obligations under the Plan, including, but not limited to,

each of the powers set forth below and any powers incidental thereto:

(a)    liquidate any and all Assets in accordance with the Plan;

(b)    undertake any actions required to liquidate the Assets for the

benefit of creditors and the Beneficiaries as provided in the Plan and take all actions to

preserve the Trust Assets;

(c)    collect, hold, manage, liquidate, sell, dispose of or deal in any

manner, and distribute the Trust Assets (and the proceeds thereof) in accordance with the

terms of the Plan;

(d)    review, reconcile, or settle all Claims against the Debtor and file,

and litigate, if necessary, objections to the allowance of Claims;

(e)    pay and discharge any costs, expenses, fees, or obligations deemed

necessary or appropriate to preserve or enhance the value of the Trust Assets and

discharge duties under the Plan;

(f)    open and maintain bank accounts and deposit funds and draw

checks and make disbursements in accordance with the terms of the Plan;

(g)    invest Trust Cash, pending distributions consistent with the

requirements of the Bankruptcy Code or any orders of the Bankruptcy Court modifying

such requirements;

(h)    employ such persons (including professionals) as the Liquidating

Trustee deems necessary and appropriate to assist him in fulfilling his obligations under

41

the Plan and pay the reasonable fees of such Persons, and reimburse such Persons for their reasonable out-of-pocket costs and expenses, as agreed between the Liquidating Trustee and such Persons.  To the extent that the Liquidating Trustee is licensed and capable of doing so, the Liquidating Trustee may serve as his or her own attorney or accountant in conjunction with any of the rights, powers, and duties of the Liquidating Trustee under the Plan;

(i)      in general, without in any way limiting any of the foregoing, deal with the Trust Assets or any part or parts thereof in all other ways as would be lawful for any Person owning the same to deal therewith, but in all events subject to and consistent with the terms of the Plan;

(j)      pursue, defend or participate in any litigation or any other proceeding, including without limitation, the Causes of Action commenced by the Debtor prior to May 20, 2005  relating to the Liquidating Trust, the Debtor or the Unsecured Creditors, commence or continue actions which were or otherwise could have been brought by the Debtor or the Estate and, when appropriate, settle such actions and Claims;

(k)      establish and maintain such funds, reserves and accounts as may be necessary to carry out the provisions of the Plan, including without limitation the Expense Reserve Account, the General Trust Account, and the Disputed Claims Reserve Accounts;

(l)      as soon as practicable, request the entry of the final decree by the Bankruptcy Court;

42

(m)    file all returns of the Liquidating Trust as a grantor trust for the

Beneficiaries pursuant to Treasury Regulation section 1.671-4(a) and any other tax

returns that may be required with respect to the Liquidating Trust, and pay any taxes

owed by the Liquidating Trust, or that may be paid by the Liquidating Trust on behalf of

the Holders of Disputed Claims, with respect to the Debtor or the Liquidating Trust; and

(n)    without limitation, exercise such other powers and duties as

necessary or appropriate in the reasonable discretion of the Trustee to accomplish the

purposes of the Plan.

**E.    <u>Representative Status of Liquidating Trustee.</u>**

The Liquidating Trustee will directly and indirectly be a representative of the Debtor's

Estate and the Unsecured Creditors, and will have the rights and powers provided for in the

Bankruptcy Code in addition to all rights and powers granted in the Liquidating Trust

Agreement.  The Liquidating Trustee will be the successor-in-interest to the Debtor with respect

to any action, which was or could have been commenced by the Debtor prior to the Effective

Date, and shall be deemed substituted for the Debtor as the party in such action.  All actions,

claims, rights or interests constituting Trust Assets (including Causes of Action) are preserved

and retained and may be enforced by the Trustee as a representative of the Debtor's estate.  In

addition, the Liquidating Trustee will be the representative of the Unsecured Creditors, as a

class, with respect to any and all claims or causes of action that the Holders of Unsecured

Creditors have as a Class, as of the Effective Date, against the Debtor, its officers or directors,

without prejudice to the rights of the individual Creditors to pursue such claims or causes of

action on their own behalf.  The Liquidating Trustee will be a party in interest as to all matters

over which the Bankruptcy Court has jurisdiction or retains jurisdiction under the Plan.

**F.**     **Tenure, Removal and Replacement of the Liquidating Trustee**

The authority of the Liquidating Trustee will be effective as of the Effective Date, and will remain and continue in full force and effect until all of the Trust Assets are liquidated in accordance with the Plan and the Liquidating Trust Agreement, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities, and the Order closing the Bankruptcy Case is a Final Order. The service of the Liquidating Trustee under the Plan will be subject to the following:

(a)     the Liquidating Trustee will serve until resignation pursuant to subsection (b) below, removal pursuant to subsection (c) below, or the completion of his duties;

(b)     the Liquidating Trustee may resign at any time by providing a written notice of resignation to the Bankruptcy Court with notice to beneficiaries. Such resignation will be effective only upon acceptance of a successor Liquidating Trustee;

(c)     the Liquidating Trustee may be removed for cause by order of the Bankruptcy Court, which may be sought by any beneficiary of the Liquidating Trust; and

(d)     in the event of a vacancy in the position of the Liquidating Trustee (whether by removal, resignation, illness, incapacity, or death), the vacancy will be filled by the appointment of a successor Liquidating Trustee upon approval by the Bankruptcy Court.

**G.**     **Compensation and Reimbursement of Liquidating Trustee and His Professionals**

The Liquidating Trustee and the Liquidating Trustee Professionals will be compensated for their services on a monthly basis in accordance with the hourly fees customarily charged by the Liquidating Trustee and the Liquidating Trustee Professionals for professional services and will be paid out of the Expense Reserve Account.

44

H.    **Accounts**

As provided in the Plan and in Section 6.1 of the Liquidating Trust Agreement, the

Liquidating Trustee will establish the following accounts for the Liquidation Trust:

(a)    Expense Reserve Account.  The Liquidating Trustee may draw on

the Expense Reserve Account to pay all costs and expenses related to the care and

maintenance of the Trust Assets, including, but not limited to, the expenses of the

Liquidating Trust (including the fees and expenses of the Liquidating Trustee and any

Liquidating Trustee Professionals) and the expenses related to all matters handled by the

Liquidating Trustee and his Professionals, including Causes of Action and Disputed

Claims which are prosecuted and/or resolved by the Liquidating Trustee.

(b)    General Trust Account.  The Liquidating Trustee will establish the

General Trust Account from which the Liquidating Trustee will make Distributions to

Holders of Allowed Claims, including Allowed Administrative Claims.

(c)    Disputed Claims Reserve Account.  The Liquidating Trustee will

establish appropriate reserves for Disputed Claims from which the Liquidating Trustee

will make Distributions to each Holder of a Disputed Claim whose Claim is or becomes

an Allowed Claim.

(d)    if any amount is remaining in any account other than the General

Trust Account at a time when the Liquidating Trustee believes in good faith that the need

for such account has ended, the Liquidating Trustee will eliminate the account and the

amount thereof will be deposited into the General Trust Account and made available for

Distribution to Holders of Allowed claims.

**I.**      **No Right in Assets**

The Trust Assets will be held by the Liquidating Trustee in trust for the benefit of the

Creditors that are beneficiaries of the Trust and that are paid from the Liquidating Trust under

the Plan.  Consequently, other than Liens of Secured Creditors as provided under the Plan, the

Plan does not create or give to any Creditor any direct interest or property right to any of the

Trust Assets.

**J.**      **Limitation on Liability of the Liquidating Trustee**

Subject to applicable law, the Liquidating Trustee will not be liable for any act he may do

or omit to do as Liquidating Trustee while acting in good faith and in the exercise of his

reasonable business judgment; nor will the Liquidating Trustee be liable in any event except for

his own gross negligence or willful fraud or willful misconduct.  The foregoing limitation on

liability also will apply to any Person (including any professional) employed by the Liquidating

Trustee and acting on behalf of the Liquidating Trustee in the fulfillment of the Liquidating

Trustee's duties under the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee

and all Liquidating Trustee Professionals also will be entitled to indemnification out of the

Assets of the Liquidating Trust against any losses, liabilities, expenses (including attorneys' fees

and disbursements), damages, taxes, suits or claims that the Liquidating Trustee may incur or

sustain by reason of being or having been a Liquidating Trustee of the Liquidating Trust, or for

performing any functions incidental to such service; provided, however, that the Liquidating

Trustee and the Liquidating Trustee Professionals will not be relieved of liability for bad faith,

willful misfeasance, reckless disregard of duty, gross negligence, willful fraud, willful

misconduct, self-dealing or breach of fiduciary duty.

46

## VI.    TREATMENT OF EXECUTORY CONTRACTS

### A.    Assumption of Executory Contracts

All Executory Contracts not otherwise assumed by the Debtor will be rejected as of the Confirmation Date.

### B.    Rejection Claims Bar Date

Every Claim asserted by a Creditor arising from the rejection of an Executory Contract must be Filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Effective Date.  Every such Claim that is timely Filed will be treated under the Plan as a Class 3 Unsecured Claim.  Every such Claim that is not timely Filed by the deadline stated above will be forever barred, unenforceable and discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

47

### VII. <u>MODIFICATION OF THE PLAN</u>

The Plan may be modified by the Debtor and the Committee, or the Liquidating Trustee, as applicable from time to time in accordance with, and pursuant to, Bankruptcy Code section 1127.  The Plan may be modified by the Debtor and the Committee at any time before the Effective Date provided that the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123, and the Debtor and the Committee have complied with Bankruptcy Code section 1125.

40654/0001-2190130v11

## VIII.   CONDITIONS TO THE EFFECTIVE DATE

**A.      Conditions to the Occurrence of the Effective Date**

Each and all of the following are conditions to the Plan becoming effective, and must be satisfied fully or waived by the Debtor and the Committee:

(a)      the Confirmation Order has been entered by the Bankruptcy Court and has become a Final Order;

(b)      the Liquidating Trustee has accepted, in writing, the terms of his service and compensation, and such terms and compensation shall have been approved by the Bankruptcy Court in the Confirmation Order; and

(c)      the Liquidating Trust has been established.

**B.      Waiver of Conditions**

The Debtor and the Committee, jointly and in their sole discretion, may waive the Final Order condition in subpart (a) contained in Section VIII, A, above, at any time from and after the Confirmation Date.

40654/0001-2190130v11

## IX.     RETENTION OF JURISDICTION

Notwithstanding Confirmation of the Plan and the occurrence of the Effective Date, the

Bankruptcy Court will retain jurisdiction for the following purposes:

### A.     In General

The Bankruptcy Court will retain jurisdiction to determine the type, allowance and

payment of any Claims upon any objections thereto (or other appropriate proceedings) by

Liquidating Trustee or any other party-in-interest entitled to proceed in that manner.  As part of

such retained jurisdiction, the Bankruptcy Court will continue to determine the Allowance of

Administrative Claims and any request for payment thereof, including Professional

Compensation and Reimbursement Claims.

### B.     Plan Disputes and Enforcement

The Bankruptcy Court will retain jurisdiction to determine any dispute which may arise

regarding the interpretation of any provisions of the Plan.  The Bankruptcy Court also will retain

jurisdiction to enforce any provisions of the Plan and any and all documents relating to the Plan,

including the Liquidating Trust Agreement.  The Bankruptcy Court also will retain jurisdiction

over any matter relating to the implementation and/or consummation of the Plan.

### C.     Further Orders

The Bankruptcy Court will retain jurisdiction to facilitate the performance of the Plan by

entering, consistent with the provisions of the Plan, any further necessary or appropriate order

regarding enforcement of the Plan and any provision thereof.  In addition, the Bankruptcy Court

will retain jurisdiction to facilitate or implement the allowance, disallowance, treatment, or

satisfaction of any Claim, or any portion thereof, pursuant to the Plan.

**D.** **Sales of Assets**

The Bankruptcy Court will retain jurisdiction to authorize and approve any sales of the Debtor's Assets free and clear of all Liens, claims, interests, or encumbrances.

**E.** **Governmental Units or Regulatory Agencies**

The Bankruptcy Court will retain jurisdiction to adjudicate any dispute or to hear and determine any action taken, proposed, or threatened by any state, federal, or local governmental regulatory agency or unit having or asserting jurisdiction or power over the conduct of the business of the Debtor and/or the Liquidating Trust.

**F.** **Final Decree**

The Bankruptcy Court will retain jurisdiction to enter an appropriate final decree in the Chapter 11 Case.

**G.** **Appeals**

In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary to consummate the Plan.

**H.** **Executory Contracts**

The Bankruptcy Court will retain jurisdiction to determine any and all motions regarding assumption or rejection of Executory Contracts and any and all Claims arising therefrom.

**I.** **Other Claims**

The Bankruptcy Court will retain jurisdiction: (a) to hear and determine any Claim or cause of action arising in or related to the Chapter 11 Case; and (b) to adjudicate any Causes of

51

Action or other proceedings currently pending or otherwise referenced here or elsewhere in the

Plan, including, but not limited to, the adjudication of the Avoidance Actions and any and all

"core proceedings" under 28 U.S.C. section 157(b), which are or may be pertinent to the Chapter

11 Case and which the Liquidating Trustee may deem appropriate to commence and prosecute.

40654/0001-2190130v11

## X.    GENERAL PROVISIONS

### A.    Extension of Payment Dates

If any payment date falls due on any day which is not a Business Day, then such due date will be extended to the next Business Day.

### B.    Notices

Any notice required or permitted to be provided under the Plan will be in writing and served by regular postage prepaid first class mail, hand-delivery, facsimile or e-mail.

### C.    Closing of the Case

At such time as the Liquidating Trust has been fully administered (i.e., when all things requiring action by the Liquidating Trustee have been done, and the Plan has been substantially consummated) and in all events within sixty (60) days after the Final Distribution Date, the Liquidating Trustee will File an application for Final Order showing that the Liquidating Trust has been fully administered.  The Liquidating Trustee will File an application for Final Order upon notice to the UST, after which an order approving the Liquidating Trustee's final report may be entered.  None of the filings contemplated in this paragraph, however, will in any way delay the Liquidating Trustee's ability to request entry of the final decree by the Bankruptcy Court.

### D.    Interest

Whenever interest is to be computed under the Plan, interest will be simple interest and not compounded.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

40654/0001-2190130v11

### E.    Confirmation By Non-Acceptance Method

The Debtor and the Committee will request, if necessary, confirmation of the Plan

pursuant to Bankruptcy Code section 1129(b) with respect to any impaired Class of Claims

which does not vote to accept the Plan.

### F.    Vesting

As of the Effective Date, the Liquidating Trust will be vested with all property of the

Debtor and the Estate, free and clear of all Claims, Liens, security interests, assignments,

encumbrances, charges and other interests of Creditors, except as otherwise provided in the Plan.

### G.    Severability

If the Bankruptcy Court determines, before the Confirmation Date, that any provision in

the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable

with respect to the Holder or Holders of such Claims as to which the provision is determined to

be invalid, void or unenforceable.  The invalidity, voidness or unenforceability of any such

provision shall in no way limit or affect the enforceability and operative effect of the Plan.

### H.    Governing Law

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is

applicable, the rights and obligations arising under the Plan shall be governed by, and construed

and enforced in accordance with, the laws of the State of New Jersey, without giving effect to the

principles of conflicts of law of thereof.

### I.    No Admissions or Waivers

Notwithstanding anything herein to the contrary, nothing contained in the Plan or in this

Disclosure Statement shall be deemed an admission by any entity with respect to any matter set

forth herein.  If the Plan is not confirmed (or, if confirmed, does not become effective), no

statement contained herein or in the Plan may be used or relied on in any manner in any suit,

action, proceeding or controversy within or outside of the Chapter 11 Case against the Debtor or

the Committee.  The Debtor and the Committee further reserve any and all of their rights as

against all Persons in the event the Plan is not confirmed.

**J.**      **Successors and Assigns**

The rights and obligations of any Creditor or holder of an Equity Interest referred to in

the Plan will be binding upon, and will inure to the benefit of, the successors, assigns, heirs,

devisees, executors and personal representatives of such Creditor or such holder of an Equity

Interest.

**K.**      **Fractional Dollars**

Notwithstanding any other provision of the Plan, no payments or distributions under the

Plan of or on account of fractions of dollars will be made.  When any payment or distribution of,

or on account of, a fraction of a dollar to any holder of an Allowed Claim would otherwise be

required, the actual payment or distribution made will reflect a rounding up of such fraction to

the nearest whole number.

**L.**      **Minimum Distribution**

The Liquidating Trustee will not be required to distribute Cash to any Creditor if the

amount of Cash to be distributed to such Creditor is less than $50.00.

**M.**      **Payment of Statutory Fees and Filing of Quarterly Reports**

All fees payable pursuant to 28 U.S.C. Section 1930, as determined by the Bankruptcy

Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective

Date and, thereafter, pending entry of a final decree.  All quarterly reports of disbursements

required to be filed by applicable bankruptcy law will be filed in accordance with applicable

bankruptcy law.  The UST will continue to be paid by the Liquidating Trustee until entry of the

final order or decree, or upon conversion or dismissal of the Bankruptcy Case.

40654/0001-2190130v11

N.      **<u>Exculpation</u>**

To the extent allowed by Section 1125(e) of the Bankruptcy Code, neither the Debtor, the

Committee nor any of the Chapter 11 Professionals will have or incur any liability to any Holder

of a Claim or Interest, or any other party-in-interest, or any of their respective agents, employees,

representatives, financial advisors, attorneys, affiliates or any of their successors or assigns, for

any act or omission occurring in connection with, relating to, or arising out of the solicitation of

acceptances of the Plan.

40654/0001-2190130v11

## XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN

SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES

DISCUSSED BELOW.  THEREFORE, EACH HOLDER OF A CLAIM IS URGED TO

CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND

OTHER TAX CONSEQUENCES OF THE PLAN.  NO RULINGS HAVE BEEN

REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF

THE TAX ASPECTS OF THE PLAN.  ALL CREDITORS ARE URGED TO CAREFULLY

REVIEW THE TAX DISCLOSURE PROVIDED HEREIN.

The Liquidating Trust Agreement will conform to the guidelines set forth by the IRS

regarding grantor trusts.  The Liquidating Trust should be treated as a grantor trust if it is

operated in accordance with the Liquidating Trust Agreement.  A grantor trust is generally

disregarded for federal and state income tax purposes.  Claimants having an interest in a grantor

trust are treated as directly owing the assets of the trust and are required to report their

proportionate share of its gain, loss, income and deduction (without regard to the timing of

distributions from the trust).

It is uncertain how the grantor trust rules would apply to the extent it is unknown which

claimants ultimately will receive distributions from the Liquidating Trust.

Because the Liquidating Trust should be recognized as a grantor/liquidating trust and the

beneficiaries are its grantors, the beneficiaries will be taxed on the Liquidating Trust's income

under the grantor trust rules.  Assets held by the Liquidating Trust will be treated as if they had

been disbursed to the beneficiaries in satisfaction of their Claims under the Plan and immediately

thereafter transferred by the beneficiaries to the Liquidating Trust.  The beneficiaries will be

treated as owning the assets held by the Liquidating Trustee in order to accomplish the orderly

liquidation of the Assets.  The beneficiaries will be taxed currently on any income realized by the

Liquidating Trust without regard to whether the beneficiaries actually receive a distribution from the Liquidating Trust.  The Liquidating Trustee will file a tax return reporting the income and will give each of the beneficiaries, as beneficiaries, an appropriate tax statement indicating the beneficiary's share of the income of the Liquidating Trust.  The IRS will then collect taxes on the post-Effective Date income, if any, of the assets held by the Liquidating Trust from the beneficiaries.

The Liquidating Trust also may be treated by the IRS as one or more complex trusts taxable under IRC Section 641, in which event the tax features of the Liquidating Trust would be different from those stated above.

In all events, the Liquidating Trustee will be responsible for preparing and filing the tax returns and for paying the tax liability of the Liquidating Trust out of the Liquidating Trust's assets.

A beneficiary of the Liquidating Trust likely will be required to include in income the amount of any distributions it receives from the Liquidating Trust in a given taxable year of the Liquidating Trust, up to its proportionate share of the Liquidating Trust's distributable net income ("DNI") for that year.  To the extent the beneficiary received distributions in a taxable year that exceeded the Liquidating Trust's DNI for that year, the excess would be included in the beneficiary's income to the extent attributable to accumulated but previously undistributed DNI from prior years.  Such amounts, generally, would be taxed by reference to the taxable income of the beneficiary and the rates in effect in the years in which the undistributed DNI was accumulated (after taking into account a credit for the beneficiary's proportionate share of the federal income taxes paid by the Liquidating Trust in those years).  In general, capital gains and

losses would be excluded from the Liquidating Trust's DNI and, accordingly, the Liquidating

Trust (rather than its beneficiaries) would be taxed on its net capital gain.

The application of the foregoing rules can be very complicated and is, in many respects,

uncertain. Accordingly, while the taxable income of the Liquidating Trust in general would be

subject only to one level of federal income tax if the Liquidating Trust were treated as a grantor

trust, there can be no assurance of such treatment in particular circumstances.

AS INDICATED ABOVE, THE FOREGOING IS A SUMMARY ONLY; IT IS NOT A

SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE

TAX CONSEQUENCES OF THE PLAN COULD BE COMPLEX AND, IN MANY AREAS,

UNCERTAIN. EACH HOLDER OF A CLAIM IS STRONGLY URGED NOT TO RELY

UPON THE FOREGOING AND TO CONSULT HIS OR HER OWN TAX ADVISOR

REGARDING SUCH CONSEQUENCES.

40654/0001-2190130v11

## XII.   RECOMMENDATION AND CONCLUSION

The Debtor and the Committee believe the Plan provides the best available alternative for

maximizing the recoveries that Creditors may receive from the Estate.  Therefore, the Debtor and

the Committee recommend that all Creditors that are entitled to vote on the Plan vote to accept

the Plan.

JAZZ PHOTO CORP.,
Debtor-in-Possession


By:_____/s/ Joseph Weber_____
        Joseph  Weber
        Chief Financial Officer

DATED:  April 11, 2005


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
JAZZ PHOTO CORP.


By:_____/s/ Jerry Boyer_____
        Jerry Boyer
        Chairman

DATED:  April 11, 2005

40654/0001-2190130v11