UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                           . Case No. 03-26565
                                 .
                                 .
  JAZZ PHOTO CORP.,              .
                                 . 50 Walnut Street
                                 . Newark, New Jersey 07102
                 Debtor,         .
                                 . April 11, 2005
. . . . . . . . . . . . . . . . . 1:41 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE MORRIS STERN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Cole, Schotz, Meisel, Forman
                             & Leonard, P.A.
                           By:  MICHAEL SIROTA, ESQ.
                           Court Plaza North
                           25 Main Street
                           P.O. Box 800
                           Hackensack, New Jersey 07602-0800


                           Kaplan & Gilman
                           By:  JEFFREY KAPLAN, ESQ.
                           900 Route 9 North
                           Woodbridge, New Jersey  07095


Audio Operator:            Carol Urena


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

APPEARANCES (Cont'd.):

For Jack Benun:                    Riker, Danzig, Scherer, Hyland &
                                    Perretti, LLP
                                   By:  JOSEPH SCHWARTZ, ESQ.
                                   Headquarters Plaza
                                   One Speedwell Avenue
                                   Morristown, NJ  07962


For the Trustee:                   Office of the U.S. Trustee
                                   By:  MARGRET JUROW, ESQ.
                                   One Newark Center
                                   Suite 2100
                                   Newark, NJ 07102


For Fuji Photo:                    Lowenstein Sandler, PC
                                   By:  BRUCE D. BUECHLER, ESQ.
                                        MICHAEL ETKIN, ESQ.
                                   65 Livingston Avenue
                                   Roseland, NJ 07068


                                   Stroock & Stroock & Lavan, LLP
                                   By:  LAWRENCE ROSENTHAL, ESQ.
                                   180 Maiden Lane
                                   New York, NY  10038


For Creditors Committee:           Ravin Greenberg PC
                                   By:  HOWARD S. GREENBERG, ESQ.
                                   101 Eisenhower Parkway
                                   Roseland, New Jersey 07068


For Charles Forman,                Forman Holt & Eliades LLC
Chapter 7 Trustee for              By:  MICHAEL E. HOLT, ESQ.
Jack Benun:                        218 Route 17 North
                                   Rochelle Park, New Jersey 07662

1          THE COURT:  The scheduled matter will be heard and

2   fully considered.  This is Jazz Photo.  Appearances, please.

3          MR. SIROTA:  Good afternoon, Judge.  Michael Sirota

4   and Jeff Kaplan, Cole, Schotz, Meisel, Forman, and Leonard, on

5   behalf of Jazz Photo.

6          MR. GREENBERG:  Good afternoon, Your Honor.  Howard

7   S. Greenberg, Ravin Greenberg, appearing for the Jazz

8   Committee.

9          MS. JUROW:  Margaret Jurow for the United States

10  Trustee.

11         MR. SCHWARTZ:  Good afternoon, Your Honor.  Joseph

12  Schwartz, Riker, Danzig, Scherer, Hyland, and Perretti on

13  behalf of Jack Benun.

14         MR. ROSENTHAL:  Good afternoon, Your Honor.  Lawrence

15  Rosenthal of Stroock, Stroock, and Lavan for Fuji.

16         MR. BUECHLER:  Bruce Buechler and Michael Etkin from

17  Lowenstein Sandler, co-counsel for Fuji Photo Film Co.

18         MR. HOLT:  Good afternoon, Your Honor.  Michael Holt,

19  Forman, Holt, and Eliades, on behalf of Charles Forman, Chapter

20  7 Trustee for Jack Benun.

21         THE COURT:  All right.  We have three matters.

22  Bullet 818 authorizing a motion which would authorize debtor's

23  payment to Mr. Benun, the funds held in debtor's reserve

24  account.  I'll hear that first.  Mr. Schwartz, it's your

25  motion.

1          MR. SCHWARTZ:  Thank you, Your Honor.  As Your Honor

2    may recall, at the time that Jazz filed its bankruptcy case

3    JCB, which is an S corporation whose stock is owned by Mr.

4    Benun, had a contract with Jazz, and pursuant to that contract

5    JCB was entitled to the sum of $15,000 per week as

6    compensation, was entitled to 25 percent of the settlement of

7    the Imation proceeds if and when a settlement was effectuated,

8    and certain other commissions.  During the Jazz case Fuji filed

9    a motion seeking a determination from the Court that JCB was a

10   professional person under 327 of the Bankruptcy Code and

11   seeking a discouragement of funds that JCB had received up

12   until that point.  Around this time the U.S. Trustee also asked

13   Mr. Benun to step down as a consultant and instead become a

14   fiduciary, which Mr. Benun agreed to do, and Mr. Benun in July

15   of 2003 became an officer and a director of Jazz, the debtor.

16          At around that time, in response to the Fuji motion,

17   Jazz filed a cross motion seeking an order rejecting the JCB

18   agreement.  During this time period negotiations went underway,

19   and one of Mr. Benun's primary concerns was that he wanted to

20   shepherd the process of the Imation litigation.  He wanted to

21   be in control of it.  He wanted to make sure that it wasn't

22   settled out from under him at some amount that he believed was

23   unsatisfactory, and so as a result, he negotiated a deal which

24   at the return date on the Fuji motion and the Jazz cross motion

25   was effectuated, and that settlement called for the JCB claim

1  -- the 25 percent of the Imation proceeds -- to be subordinated

2  only if a trustee for Jazz weren't appointed.  And the reason

3  for that again was so that Mr. Benun can stay in control of the

4  Imation litigation and not a trustee, and Mr. Benun also agreed

5  to reduce his weekly salary from the $15,000 per week that he

6  was getting at JCB to $12,500 pursuant to him becoming an

7  officer and director of Jazz.  At the return --

8            THE COURT:  Subordination -- just remind me.  My

9  recollection is the subordination was effective unless there

10 was a conversion.

11           MR. SCHWARTZ:  It was effective unless there were a

12 trustee appointed I believe.  I believe that it was the

13 appointment of a trustee.

14           UNIDENTIFIED ATTORNEY:  Your Honor, it's my best

15 recollection that it was a combination.  It was a Chapter 11

16 Trustee or a conversion.

17           MR. SCHWARTZ:  I believe that --

18           THE COURT:  Is it both?  Do I have --

19           UNIDENTIFIED ATTORNEY:  I believe so, Judge.

20           THE COURT:  All right.  Thank you.  Thanks.

21           MR. SCHWARTZ:  Thank you, Your Honor.  So at the

22 hearing on July 30th with this settlement essentially in place,

23 the parties came before Your Honor, and Your Honor expressed

24 concern at that point, because at that point Jazz had been

25 touting that its exit from Chapter 11 was tied to either a

1   successful outcome with respect to the Imation litigation or a

2   successful appeal with respect to the Fuji judgment.  And, Your

3   Honor, expressing concerns that this case might go down the

4   tubes and go the route of conversion said very clearly on the

5   record that we had -- we needed to protect against the

6   downside.  That in the event a trustee is appointed, and this

7   case is administratively insolvent, there needs to be a burial

8   fund.  So Your Honor directed that out of the $12,500 that Mr.

9   Benun had agreed to receive, 5,000 would be placed into an

10  escrow account -- a trust account to protect against that

11  downside, and Your Honor then said that Mr. Benun can apply for

12  those funds at some point when there's visibility in the case.

13        As everyone is aware, at some point down the road the

14  Fuji judgment was not overturned on appeal, and, in fact, the

15  Federal Circuit affirmed the District Court's entry of that

16  judgment -- issuance of that judgment.  And then we got to the

17  Imation trial.  The trial started, and ultimately it was

18  settled out from under Mr. Benun objected to the settlement.

19  The Creditors Committee moved it.  Your Honor knows all about

20  that.  And oh, by the way, I don't know if Your Honor saw it

21  this morning, the District Court denied the Trustee's

22  application for a stay pending appeal with respect to that

23  appeal, and I think that at this point, unless the Trustee

24  decides to seek a stay pending appeal from the Third Circuit,

25  the settlement will go effective, and the plan will go into

1    effect assuming that confirmation occurs, etcetera.

2            But be that as it may, the Imation settlement calls

3    for $25 million to be paid into the Jazz estate, and by all

4    best calculations, the total amount of secured and

5    administrative claims in the Jazz estate is significantly less

6    than that.  It's somewhere between 10 and 18 million dollars

7    depending on whether the ITC claim is pending, on whether the

8    Fuji claims are entitled to administrative priority status.

9    And so at this point it looks like $25 million, which is

10   sitting in Mr. Sirota's trust account, is going to be disbursed

11   out to creditors.  Creditors -- unsecured creditors will

12   receive a substantial distribution.  Granted, there is a large

13   Fuji judgment out there, and there are significant amounts of

14   unsecured claims.  But nevertheless, there's a lot of money

15   left over after the payment of unsecured -- after the payment

16   of priority claims, secured claims, etcetera, to get down and

17   pay unsecured creditors.

18           There's also the bond proceeds that are sitting -- I

19   don't recall how much is there, but it's a couple hundred

20   thousand dollars.  There's also the other assets of Jazz that I

21   believe are subject to another motion for sale which is coming

22   up in the next couple of weeks which seeks to bring somewhere

23   in the neighborhood of $900,000 into the estate.  And so when

24   all is said, it appears that at this point unsecured creditors

25   are going to receive a significant distribution.  Again, given

1    the amount of unsecured claims in the estate, it might not be a

2    very meaningful distribution, but nevertheless, I think

3    unsecured creditors, pursuant to the Fuji kicking in of the

4    million dollars, are going to get a significant distribution.

5    I think it's somewhere around 20 percent on the dollar.

6        I guess, first of all, at this point it's Mr. Benun's

7    position that by virtue of the fact that an examiner was

8    appointed and Capstone which was the examiner and is now

9    shepherding the liquidating process, as well as the fact that

10   the Creditors Committee moved the settlement out from under Mr.

11   Benun, a de facto trustee has, in fact, been appointed for

12   Jazz.  Granted, there has not been the appointment of a

13   trustee, but nevertheless, it's Mr. Benun's belief and his

14   position that de facto there has been a trustee appointed, and

15   so the JCB claim shouldn't be subordinated.  But that's not for

16   determination today, obviously, but nevertheless, JCB believes

17   that it should share in those proceeds from the Imation

18   settlement.

19       Now let me get back to this motion, and this motion

20   is to -- Mr. Benun's wants a turnover of the funds that are in

21   the Jazz account -- burial fund -- and he's been placing --

22   Jazz has been placing $5,000 per week, and there's something

23   like $400,000 that's sitting in that account that Mr. Benun

24   believes that he is entitled to, and we seek this motion -- we

25   file this motion solely to allow Mr. Benun to pay his court-

1  appointed professionals not to allow Mr. Benun to see those

2  funds himself.  Mr. Benun's professionals in his case have

3  accrued administrative expense claims that total somewhere in

4  the neighborhood of $600,000 plus for which at this point it

5  doesn't appear that those claims are going to get paid.

6  There's other assets in the estate, and the Trustee is pursuing

7  those assets, but we don't know whether there's going to be any

8  distribution that's going to be available for administrative

9  creditors in Mr. Benun's case.

10       Now there's been three responses that have been filed

11  to this motion.  The first was filed by the debtor, Jazz, and

12  essentially Jazz argues that those funds that were withheld

13  from Mr. Benun's pay were reserved for the debtor's use if the

14  debtor's case does not result in a successful reorganization.

15  That the case is not concluding with a, quote, happy ending.

16  Things did not turn out, quote, bright and rosey, and there was

17  no, quote, pot of gold produced by the Imation litigation.

18       However, Your Honor, I don't believe that that was

19  what Your Honor had in mind when you directed that the burial

20  fund be established.  Again, if you read the transcript -- and

21  I -- obviously, I can only read the transcript.  I was not

22  here.  Mr. O'Grady from my office was here, and I don't know

23  that anybody can get into Your Honor's head, but I think that

24  Your Honor -- what Your Honor meant was that if Jazz -- if the

25  case went down the tubes, if Imation didn't hit, if the appeal

1  of the Fuji judgment were not overturned, and there's no money

2  available to pay anybody, then you wanted some money to pay the

3  Trustee if the case were converted, etcetera, and so you wanted

4  some money held aside for administrative costs.  And there was

5  no talk about a happy ending, a bright and rosey

6  reorganization, etcetera.  It was that administrative expense

7  claims would get paid, and they are getting paid.  And so I

8  believe that the debtor's objection is belied by the terms of

9  -- by the -- what's reflected on the record at the July 30th,

10 2003 hearing.

11          Now, Fuji also files an objection, and Fuji says --

12 essentially they use it as another opportunity to -- for

13 various -- ad hominem attacks on Mr. Benun, and they argue that

14 Mr. Benun breached his fiduciary duties all during the case

15 because it was the determination that Jazz was infringing on

16 Fuji's patents, that Benun's actions in shepherding the debtor

17 post-petition harmed creditors, and that Benun didn't produce

18 any tangible benefit to the debtor's estate at all.  And they

19 also argue that Mr. Benun has personal assets sufficient to pay

20 his own administrative claims.

21          Your Honor, again, first of all, Mr. Benun

22 voluntarily agreed to reduce his compensation from the 15,000

23 per week down to 12 five per week.  Mr. Benun agreed as part

24 and parcel of this to subordinate the JCB claim in the event

25 that there was not a Trustee appointed for Jazz.  Mr. Benun at

1  that point could've resigned back in July of '03, but instead

2  he -- he could've made more money elsewhere.  Instead he stayed

3  on simply to shepherd the Imation process and make sure that

4  Jazz continued to function and operate and hopefully

5  reorganize.

6          And so when you look at the whole picture here, I

7  don't think that you can that Mr. Benun's actions harmed

8  creditors, and whether you want to say they harmed creditors

9  because there's been a finding that Jazz infringed post-

10  petition or not, again the purpose of the reserve account --

11  and that's all that we could really look at, because that's

12  what Your Honor directed at the July 30th, 2003 hearing.  The

13  purpose of that account was to make sure that Jazz's case was

14  not administratively insolvent.  Quite frankly, it's not, and

15  so we ask that those funds be turned over to Mr. Benun, so that

16  his estate which appears to be administratively insolvent can

17  be paid.

18          The Chapter 7 Trustee -- I'm asking --

19          THE COURT:  You don't want the same relief that Mr.

20  Holt is asking for.

21          MR. SCHWARTZ:  I was going to get to Mr. Holt.  Mr.

22  Holt files a response not an objection.  He says we agree, turn

23  the money over, because the money should come over to the

24  Trustee, and the Trustee should use it and pay expenses

25  according to their priority.  What I would suggest is that the

J&J COURT TRANSCRIBERS, INC.

1   money be turned over, and that we -- everybody reserve all

2   rights as to those monies.  Obviously, I'd rather see the money

3   come over than not come over, and so if the money comes over

4   and goes into Mr. Holt's account, and he gets to use the money

5   for whatever purpose he deems necessary -- the Trustee that is

6   -- in the Chapter 7, then I'll have to live with that.  But the

7   bottom line is that the money should be turned over.  We

8   believe that the money constitutes the post-petition earnings,

9   and Mr. Benun is not property of his estate if directs it to

10  come over, and he could use those monies to pay his

11  professionals.  But be that as it may, the money should be

12  turned over.  The purpose of the burial fund has been

13  fulfilled.

14          THE COURT:  I think you've made as much of your

15  argument as you can including arguing the record, and I

16  appreciate that.  There are certain assumptions in your

17  argument that again you wouldn't necessarily know, because your

18  point about not getting into the Judge's head is correct.  But

19  one is that the step down from initially $15,000 to $12,500 and

20  eventually to 75 hundred dollars was in part a function of the

21  offering of Mr. Benun, but in reality it didn't matter what he

22  offered, because he wasn't going to get $15,000, nor was JCB

23  under any circumstances at all.  It was excess compensation,

24  over compensation under the circumstances, and that was never

25  going to happen, and it didn't matter whether there was

1  agreement or disagreement.  Now, again, in fairness to you, you

2  wouldn't know that, but certainly I knew that.

3       And so when the offer came in at $12,500, I wasn't

4  going to allow that, and I thought 75 hundred was more than

5  gracious under the circumstances.  And in analyzing the pluses

6  and minuses in the estate, you're right that my first concern

7  was that there be zero dollars left for burial expenses, but

8  what happened over the period of time since the account was

9  established for reservation purposes was that there were

10 minuses as well as pluses.  The obvious plus is the $25

11 million, but the minuses are a function of what happened with

12 the ITC on the continuing issue.  Now that's not fully attended

13 to as we'll hear later when we deal with the issue of retention

14 for accounts on appeal.

15      But you've got Fuji's administrative claim that

16 piggybacks to some extent on that determination, and an

17 enormous amount of expense in the interim.  And I don't see --

18 though you cast it this way, and I don't blame you, but I don't

19 see Mr. Benun as providing heroic efforts of a selfless nature.

20 I mean he was the one with the most to win or lose here, and

21 his staying with the Imation litigation on the balance of

22 matters in this administration was to protect his own

23 interests.  I don't say that as a negative form, but it's

24 certainly not positive.  I mean it is what it is, and he was

25 there to protect his own interests.  So I don't think he ever

1  was going to get the 15.  He was never going to get 12 five,

2  unless there was a tremendous result.  What is the result?  I

3  think you're over reading -- and I read this transcript again

4  to make sure that I wasn't recasting history.  I read it in

5  several places, including the point in time when I denied the

6  application for Mr. Benun's access to the account on an interim

7  basis, and it's as between Mr. Benun, if you will -- and I

8  understand that Mr. Holt has a legitimate fiduciary concern as

9  between Mr. Benun and the rest of all creditors.  It seems to

10  me that Mr. Benun's entitlement is on the short side of that

11  balance.

12       But having said that, I'm willing to hear more.  Let

13  me hear from first the debtor to see the debtor's view of your

14  position and then Fuji and Mr. Holt.

15            MR. SCHWARTZ:  I'm sorry.

16            THE COURT:  Go ahead.

17            MR. SCHWARTZ:  If I could just say one thing in

18  response to one comment Your Honor made?

19            THE COURT:  Go ahead.

20            MR. SCHWARTZ:  I don't disagree with Your Honor in

21  that Mr. Benun acted in pursuit of his own interests in staying

22  on with Jazz, but at the same time had he left Jazz to make

23  more money elsewhere, Mr. Frazza's firm would've stayed on, and

24  I think that's been made clear by the record throughout.  His

25  firm would've stay on and prosecuted the Imation litigation,

1  and whether it was someone else who shepherded the process at

2  Jazz or whether there was a Chapter 11 Trustee appointed or

3  whatever, the bottom line is that I think we would've gotten to

4  the point we would've gotten to anyway, and so to say that Mr.

5  Benun stayed on simply to further his own interests I think is

6  a little bit illogical to an, because I --

7         THE COURT:  Well if he didn't stay on, we wouldn't be

8  here arguing over the reserve account I assume.

9         MR. SCHWARTZ:  That's true, but I think if he

10 wouldn't have stayed on, then he -- there would be no reserve

11 account, and presumably, he might have made more money

12 elsewhere and been able to pay my firm and paid the Amper

13 Politziner firm, etcetera, and we would've probably gotten to

14 the 25 million in any event.  Mr. Benun was the person who

15 shepherded that process.  And again I know Your Honor said that

16 that's one of the positives, and, in fact, it is, because if it

17 wasn't for Mr. Benun, we would've never gotten to that point.

18        THE COURT:  What year -- you know, again there's

19 quite an assumption there that Mr. Benun would've made more

20 money elsewhere.  Would he have made more money in a way that

21 wouldn't be subject to either an injunction, which I assume is

22 now being sought, or otherwise infringement?  I don't know.  I

23 mean and who knows?  That's a pretty speculative matter as to

24 whether he would've made more money elsewhere, but short of

25 starting up another business and maybe he would have, which

1  would've been an interesting turn of events, 75 hundred dollars

2  a week was not chicken feed for Mr. Benun, and he got it every

3  week.  Mr. Benun was well compensated for what he did.  Whether

4  he was too well compensated might be an issue, but it isn't at

5  this time.  No one's made that argument, but having said that,

6  let me hear from rest of the people.

7          MR. SCHWARTZ:  Thank you, Your Honor.

8          MR. SIROTA:  If the Court please, Judge, my

9  recollection and a reading of the record -- I may not have the

10 answer as to exactly what Your Honor intended with respect to

11 the burial fund, but I do know this.  Nowhere in the record was

12 there an insurance policy issued for anyone in the Benun

13 estate.  It was clearly directed towards a protection afforded

14 to the Jazz estate, and Mr. Benun has filed claims against this

15 estate, an administrative claim, an unsecured claim, and I

16 suspect during this process those claims will get fully aired

17 out and argued to the extent they can't be resolved.  So that

18 the Benun-Jazz debate is still ongoing, and we see no reason or

19 authority for taking money that belongs to the creditors of

20 Jazz and moving it to the Benun estate.  We don't see any

21 authority in the record.  We don't see any authority in the

22 law, and Mr. Schwartz has foreshadowed this potential argument

23 that somehow there's yet an additional claim, and that may stem

24 from this de facto trustee argument.

25          My only point, Judge, is I guess we're in here more

1  about Mr. Benun's claims in this estate.  There's no reason to

2  take what was designed to fund a wind down, call it what you

3  will, whether it's a trustee or otherwise, and move those

4  dollars to the other side of the ledger when those dollars

5  belong to the Jazz creditors.

6         MR. BUECHLER:  Good afternoon, Your Honor.  On behalf

7  of Fuji we clearly oppose the motion.  As Mr. Schwartz pointed

8  out and Your Honor noted, from our perspective there is no

9  question that Mr. Benun was more than handsomely compensated at

10  75 hundred dollars per week.  Mr. Schwartz made the argument it

11  would seem to him that way that somehow the delta between the

12  75 hundred and maybe the 15,000 was whole property of the Benun

13  estate, and from my attendance at the hearing on July 30, 2003

14  and the record there is no hint that he has any property right

15  entitlement to anything above the 75 hundred dollars that was

16  paid and authorized and set forth in the form of compensation

17  in the Court's order dated June 22, 2003 that fixed the gross

18  compensation of Mr. Benun going forward at 75 hundred dollars a

19  week plus the car allowance.

20         Mr. Benun, from our perspective, has wreaked havoc

21  to this case and wreaked havoc upon Fuji by virtue of the

22  infringement both pre- and post-petition.  From our

23  perspective, if Mr. Benun would've walked away from Jazz Photo

24  in June or July of 2003, that would've been fine.  He didn't,

25  but he was paid for it.  He has no property right entitlement

1  or any argument today that the burial funds which were for the

2  Jazz case should somehow be utilized to pay his claims in the

3  Benun estate.   There's no entitlement that that administrative

4  claim should get paid ahead of the administrative claims

5  including Fuji's entitlement to assert an administrative claim

6  for the post-petition infringement which at this point in time

7  has not yet been adjudicated by Your Honor.

8          More importantly, to date the accrued fees on the

9  Jazz side post-petition -- all of the professionals retained

10  just on the Jazz exceeds $10 million.   That includes somebody

11  from Budd Larner, Mr. Greenberg's firm, Mr. Sirota's firm,

12  Neville Peterson, Mr. Kaplan, the accountants, and the host of

13  professionals.   Ten million dollars.   This was not a mega case.

14  To now say that the Jazz estate when creditors -- and honestly,

15  Mr. Schwartz says the unsecured creditors and Jazz will get 20

16  percent.   We wonder whether he's going to guarantee that,

17  because on our calculation of the map we don't see the

18  unsecured creditors on the Jazz side getting 20 cents on the

19  dollar let alone allowing the Benun professionals to be paid

20  for their fees ahead of the unsecured creditors or

21  administrative creditors on the Jazz side.

22          There are assets in the Benun case.   The Trustee,

23  through the efforts of the his counsel, filed two lawsuits last

24  week and will attempt to recover those assets.   They should

25  stand on line like all creditors on the Benun side, like Fuji

1  will stand as a creditor on the Benun side, and likewise,

2  there's no entitlement, in our view, for the Trustee in the

3  Benun case to bootstrap onto the arguments made by Mr. Benun's

4  counsel that the money being sought from the burial fund in the

5  Jazz case should be paid over to the Benun estate at this point

6  in time.  There's just no factual showing, no legal showing.

7       While it turns out, because of the settlement of the

8  Imation case, that there's a likelihood administrative claims

9  on the Jazz side will be paid in full because of the $25

10 million, it doesn't automatically mean the burial fund goes to

11 the Benun case.  That's best case.  The motion is still

12 premature.  Best case.  Candidly, from our perspective, the

13 Court should deny it and not even allow Mr. Benun's counsel to

14 seek to re-file as Your Honor did in May of last year when they

15 brought on a similar motion for an interim determination at

16 that point in time.  There's no basis for this relief.  There's

17 no basis for the entitlement.  We don't need to repeat what's

18 said in our papers.  We think we point to fact.  It's already

19 been proven in our perspective that Mr. Benun breached is

20 fiduciary duties.  He cost this estate a tremendous amount of

21 money.

22       And with regard to the heroic efforts, as Your Honor

23 pointed out, there's not even a showing that Mr. benun was the

24 crucial party or witness or player that brought around --

25 brought about the result of the settlement of the Imation case

1  at $25 million, and from what we know that unfolded in this

2  bankruptcy courtroom Mr. Benun didn't bring that settlement

3  about, because he opposed it.  He hired new counsel to come in

4  at the last minute to try and throw every monkeywrench into

5  that settlement that he could -- serve deposition notices, seek

6  to get documents which Your Honor quashed.  All in an effort to

7  upset that settlement so that $25 million wouldn't be available

8  for the creditors of Jazz, and for that they seek additional

9  monies.  Too little, too late.  We request that the Court deny

10 it outrihgt.  Unless has any questions, we'll rest on this and

11 our papers.

12          THE COURT:  Mr. Holt.

13          MR. HOLT:  Judge, I won't belabor the record.  As you

14 noticed --

15          THE COURT:  You were the one I wanted to hear from.

16          UNIDENTIFIED ATTORNEY:  I'm not sure what we say.

17          MR. HOLT:  I think the issue becomes -- Judge, it's a

18 uniquely factual circumstance that we have here, and the

19 Trustee was not present.  I'm the Johnny Come Lately in the

20 group.  My position is -- and we put this in our papers I

21 think.  As Mr. Buechler just indicated, Jack Benun's

22 compensation was fixed at the 75 hundred dollars, and Your

23 Honor felt that it would be appropriate to have this reserve

24 created, and as I indicated, I wasn't here, and I could only

25 give you the transcript.

                    J&J COURT TRANSCRIBERS, INC.

1           However, to the extent that Mr. Benun retains some

2    residual interest in that reserve account, it's our position

3    that it's not his post-petition earnings.  His compensation was

4    fixed at the 75 hundred dollars, and that reserve account

5    specifically -- actually, I believe it specifically remains

6    property of the Jazz estate absent further order of the Court.

7           We're in a position right now in the Jack Benun

8    Chapter 7 case where we have, in fact, instituted litigation

9    against various family members and related entities to afford

10   certain transfers the nature of which have been brought before

11   the Court on various occasions.  We'll see whether they're

12   successful or not.

13          By way of background, and just so we're all on the

14   same page, we intend to initiate proceedings to sell Mr.

15   Benun's residence, whether it be -- we're going to initiate an

16   adversary proceeding to sell that residence free and clear of

17   his wife's interest pursuant to Section 363(h) of the

18   Bankruptcy Code.  Just by way of background, the tax assessed

19   value for the year 2005 for that property, exclusive of any

20   contiguous properties that may -- that are owned by family

21   members that, you know, may or may not be subject to avoidance

22   actions by the Trustee, is about $3.15 million.  Mr. Benun pre-

23   petition had submitted a financial statement to the District

24   Court in February of 2003 which had valued his one half

25   interest in that property at that time at $2.5 million.  It's

1  not clear from the reading of the opinion in that matter

2  whether that was his net equity in the property or not, but

3  anyway, it looks like -- for the sake of candor for the Court

4  it looks like that there is a source of recovery from if not

5  just the avoidance actions then from the debtor's interest or

6  debtor and his spouse's interest in the debtor's residence.

7         That being said, the Benun estate -- at this time I

8  believe that the Chapter 11 administrative professional fees

9  are somewhere in the nature of $600,000 or more that remain

10  unpaid.  Whether the avoidance actions ultimately prove to be

11  beneficial to the estate, I don't know.  I do know that we find

12  ourselves in a position which I find somewhat ironic given Your

13  Honor's -- at least what I saw in the transcript -- concern

14  about the fact that the Jazz case might ultimately become

15  administratively insolvent where it was handed to a Chapter 7

16  Trustee and said here make something out of this.  I feel that

17  I'm in that position now.

18         But as I said, I'm not going to belabor the record.

19  You all were present when Your Honor created this reserve

20  account, and as I said, I think that any interest that Mr.

21  Benun may have had in that account is the property of this

22  Chapter 7 estate to the extent that it's not going to remain

23  property of the Jazz Photo estate.  It should be paid to Mr.

24  Forman as the Chapter 7 Trustee for Jack Benun.

25         THE COURT:  But to the extent -- and your point is

1  well taken about -- you didn't quite state it, but the tie in.

2  But to the extent that business side case has no relief stand

3  of the burden on the personal side case, whether the dollars

4  are in one way or the other assuming that there are some -- the

5  dollars that you're talking about in -- for administration

6  purposes on the 7 side, it doesn't make too much difference.  I

7  mean there's Fuji with the largest part of the unsecured claim,

8  and whether paid on the corporate side or the personal side

9  would seem to be of little moment as a general matter.

10         It's true that I'm not unsympathetic to the Benun

11  counsel in this case -- in the Jazz case, that he sort of came

12  out on the short end of the lottery.  Everyone took a chance,

13  and it was recognized.  Mr. Sirota said time and again, Mr.

14  Greenberg said time and again, if there isn't a substantial

15  amount of money that comes out of Imation and/or a reversal and

16  it wasn't in the Federal Circuit, that the risk takers were on

17  this side of the room.

18         Now it seems to have worked out for them, and Mr.

19  Schwartz, you know -- and I don't say this with an edge.  I say

20  it quite sympathetically.  His firm is on the short end of it,

21  because there wasn't the conversion.  There wasn't the

22  appointment of a Chapter 11 Trustee, and so there it is.  Now

23  if you develop out of the sale of the house and other assets

24  the dollars for administration, it would seem to make no

25  difference at an administrative level.  And so it's -- in a

1  sense it's an argument against at least the administrative

2  necessity of that money to go into the personal case instead of

3  the business case.

4          Having said that, that's probably not the standard

5  that should be applied.  It's what was the intention, and

6  whether payment of the dollars either as Mr. Schwartz would

7  have it go directly or as you would have it go into the 7

8  estate, was intended under circumstances like this.  Well, of

9  course, the circumstances have changed from that July 30th date

10 both plus and minus.  If you look carefully at the transcript,

11 there are several and/ors, and the and/ors go to successful

12 Imation and/or successful Federal Circuit appeal or the

13 negative side of those and/ors, and now we can debate what is

14 success.  Well, it's clear that the Federal Circuit was a

15 failure from the appeal point of view, and the $25 million in

16 essence was cheapened over the period of the case for several

17 reasons.  It cost more and more and more to get there, and on

18 the other side more and more liabilities or potential

19 liabilities developed not the least of which is what came out

20 of the National Trade Commission, and, as I said before,

21 piggybacked by Fuji with respect to their potential

22 administration claim.  So the picture got better and worse, and

23 I'll give Mr. Schwartz one last crack at a response, and then

24 I'll decide.  Thank you, Mr. Holt.  Mr. Greenberg, I don't mean

25 to leave you out.  I don't know if you're --

1          MR. GREENBERG:  I was going to echo some of the

2  comments of Mr. Sirota if the Court wants to hear me on the

3  record briefly but --

4          MR. SCHWARTZ:  I think that's the first time that

5  Howard only said five or six words in a court hearing.  Your

6  Honor, I guess, first of all, Your Honor just talked about the

7  fact that the Imation settlement, because it took so long, it

8  cheapened that settlement, because it cost more to get to it,

9  and the costs increased in the process.  And that, Your Honor,

10 was not due to Mr. Benun's efforts or lack thereof.  We would

11 like to have gotten to a trial in the Imation case a long time

12 ago.

13         THE COURT:  But here.  We had an entire

14 administration of a complex case where Mr. Benun rode a lot of

15 the benefit besides getting 75 hundred dollars a week.  There

16 was a Federal Circuit appeal, which if successful, would've

17 gotten him off the hook on a $30 million personal judgment.

18 That's worth something.  Of course, now without the win, it all

19 turns to ashes, but he rode the benefit of that, and at least

20 arguably he got whatever benefit will flow through to Fuji in

21 satisfying -- it's really a partial satisfaction, and if it's

22 20 percent or whatever, it's -- it partially satisfies a

23 personal judgment against him.  So he benefitted from the

24 Chapter 11, and we can debate -- Fuji obviously feels that Mr.

25 Benun's presence was a huge negative.  If the infringement

1  post-petition and to some extent pre-petition beyond Judge

2  Hochberg's judgment in that period after August whatever 2001

3  holds, that's a very substantial negative all the way around to

4  everybody on this side of the case not to mention for Mr. Benun

5  personally.

6        So what do you do with all of this?  My assessment is

7  that the changes in the period since July 30th when -- whatever

8  year that was when the reserve was established --

9        MR. SCHWARTZ:  Two thousand three.

10        THE COURT:  What was it?

11        MR. SCHWARTZ:  Two thousand three.

12        THE COURT:  Two thousand three.  Thanks -- is that we

13  have something that is not as absolutely bleak as it could've

14  been.  There could've been zero dollars, a huge negative,

15  because you had this $25 million, but it's still not I use the

16  term rosey, and I don't have much difficulty with the notion

17  that the intention with respect to the use of those funds was

18  for the benefit of creditors in the corporate case and not, you

19  know, something for Mr. Benun unless it really turned out well,

20  and it hasn't turned out well.  I don't see this as a great

21  result.  It's better than, you know, abject failure all the way

22  around and minus $25 million, but it's not a great result.  But

23  I'll hear you.

24        MR. SCHWARTZ:  Obviously, I can, Your Honor, debate

25  you, but I'm debating you on what Your Honor's intent was back

1  on July 30th of 2003, and if your intent was that if we get a

2  rosey picture, then Mr. Benun can apply, then I think Your

3  Honor would've said that then, but Your Honor used the terms

4  burial fund, Trustee expenses, administrative insolvency,

5  things like that, and certainly, that's not what happened.  And

6  so it's my reading of that transcript -- again, I can't get

7  into your head.

8        It's my reading of the transcript that it was only

9  where there was admnistrative insolvency, it was only where the

10  case went down the tubes and burial fund -- the case was going

11  to be buried.  There was going to be a Trustee appointed,

12  administrative insolvency.  Only under those circumstances

13  would that burial fund be used to pay Jazz creditors, which

14  would be administrative creditors, otherwise, I think Your

15  Honor intended was that Mr. Benun can apply and the

16  professionals in the Benun case would then get compensated, and

17  I think that's a fair reading of Your Honor's intent on July

18  30th, 2003.  I don't think that rosey or things like that ever

19  came into the picture.  And that's my last comment.  I thin

20  that's a fair reading of the transcript.

21        THE COURT:  All right.  I read the transcript several

22  times.  What I -- anybody else have any comment?

23              (No verbal response)

24        THE COURT:  All right.  I appreciate the argument on

25  -- in every corner, and in putting myself back into those more

1  uncertain times of 2003 when the reserve was established, there

2  never was an assurance that Mr. Benun was going to get that

3  money.   Frankly, I don't think Mr. Benun personally deserves

4  that money under any circumstances, and it seems to me that

5  that's not a conclusion, by the way, that I reached with

6  respect to Benun's counsel.   That's a very different issue.

7  Ms. Jurow, I didn't mean to cut you out.

8         MS. JUROW:   I have no position.

9         THE COURT:   All right.   The -- I don't think it was

10  just administrative insolvency, though clearly Mr. Schwartz is

11  correct that was the primary point, because that's the starkest

12  danger at a point in time when nobody knows whether the Federal

13  Circuit is going to reverse or not or whether Imation is going

14  to be worth a plug nickel or simply be a cost.   But it's not

15  the only concern, and here we do have a runup in both claims of

16  every stripe and including professional expenses since July

17  30th of 2003.   It's more than just footnote value.

18         Mr. Holt  fairly -- and I appreciate it -- points out

19  that it looks like administration on the Benun side will be

20  accounted for with real dollars.   There's no guarantee, but it

21  looks like that will happen, and so this decision today may be

22  really of not much moment one way or the other, but my

23  conclusion is that this is only a modest distribution in

24  anticipation for the general unsecured creditors that the

25  intended and best use of the reserve funds is to keep them in

1  the Jazz case, and I'm going to deny this motion for those

2  reasons.

3         MR. BUECHLER:  Is that with prejudice to preclude

4  them bringing the motion in another six months or a year or --

5         THE COURT:  No, that's the conclusion, that it's not

6  for their purpose.  Yes, it wasn't -- that's the end of the

7  road as far as this Court is concerned.  That that's an asset

8  in the case -- in the Jazz case and is not available to Mr.

9  Benun or Mr. Benun's trustee or Mr. Benun's professionals.  So

10  818 is denied.  Mr. Sirota, if you would just submit a short

11  form of order on that.  Just clean up the record.

12         We now have the application of Budd Larner to be

13  special litigation counsel, as I understand it, with respect to

14  two matters.

15         MR. SIROTA:  Yes, Judge, and perhaps my use of

16  expanding the retention wasn't the best word to use, especially

17  with a final fee app pending next week.  But in any event, we

18  seek to retain Budd Larner to handle the appeal of ITC-2 to the

19  Federal Circuit.  The rationale there is simple.  We have a $13

20  million plus penalty assessed in that case, and Fuji has

21  indicated in papers filed with this court that it seeks to rely

22  on that ruling as part of its admin claim.  The administrative

23  claim bar date is April 25th, Judge, and we haven't seen the

24  final product from Fuji, but certainly in their motion the ITC-

25  2 ruling was cited extensively.

1        We don't believe that Fuji can simply take the ITC

2   ruling, wave it in this court, have it adopted just like they

3   couldn't wave it before Judge Hochberg in ITC-1 and had to move

4   forward and prove under the appropriate burden of proof their

5   entitlement, if any.  It's a very substantial issue both from

6   the ITC perspective, and it's a substantial monetary issue from

7   Fuji's perspective, and,  therefore, Budd Larner has agreed to

8   handle the appeal at a flat fee of $70,000, and we ask that

9   their retention be approved.  We think it's money well spent

10  given the dollars at issue.

11       The second component for their retention involves the

12  handling of malpractice actions stemming from the case before

13  Judge Hochberg.  This may come as somewhat new information to

14  the Court, but it's certainly not new information to Mr.

15  Greenberg and counsel to the Committee.  We described early on

16  in this case the potential for filing the action.  We didn't

17  want to have Budd Larner distracted by commencing this action

18  while it had Imation under way and, therefore, reserved moving

19  for their retention at that time.  Budd Larner, as set forth in

20  the affidavit of Mr. Frazza, has agreed to accept the case on a

21  33 and a third contingency but for a $30,000 payment for

22  expenses, and we think likewise that's money well spent.

23       Fuji's argument that it's premature we would submit

24  to the Court should not be sustained in this regard.  Mr.

25  Kaplan has filed a notice of appeal in the ITC-2 matter.  As

1    Your Honor can appreciate, he has no desire to remain as

2    counsel of record before the Federal Circuit if he's going to

3    be replaced by Budd Larner.  And secondarily, I'm not

4    intimately familiar with the briefing schedule, but I know Budd

5    Larner is anxious to get underway in reviewing all the

6    documents that need to be reviewed for ITC-2, the appeal, as

7    well as getting underway with the malpractice actions.  I

8    believe it has a six-year statute, and I don't know the date

9    that it expires.  I don't believe we're in immediate harm's

10   way, but more importantly, Judge, we've run this retention by

11   Mr. Moore who, as far as I know, everybody's consented to

12   subject to Court approval as the liquidating Trustee as part of

13   the ultimate liquidating plan.  So if he's on line with the

14   terms of engagement, we felt it appropriate rather than wait

15   until he's formally knighted that we move forward today.

16           THE COURT:  Any opposition?

17           MR. SCHWARTZ:  Your Honor, sorry to interrupt.  May I

18   be excused?

19           THE COURT:  Oh, yes, sure.

20           MR. SCHWARTZ:  Thank you very much.

21           MR. ROSENTHAL:  Your Honor, some 22 months ago we

22   came into this courtroom, and we heard the representation of

23   numerous professionals including Budd Larner, Mr. Kaplan, Mr.

24   Sirota, about how the ITC will rule in favor of Jazz, how the

25   -- Judge Hochberg got it all wrong, and the Federal Circuit

1  would reverse, and here we have the same professionals who were

2  wrong 100 percent of the time on the patent side telling Your

3  Honor that it would be a great thing for this estate to extend

4  any dollars on appealing from the ITC decision.

5       Now, I'm not sure if they're familiar, but these are

6  essentially factual determinations.  The test for reversal on

7  appeal is substantial evidence, worse than the jury trial, or

8  proven at the jury trial, worse than the reversal of the judge.

9  So I personally -- and I don't want to -- that's not what I'm

10 here for is to plead, but I think that this is just a

11 boondoggle that the delays forever the settling of this estate,

12 because the Federal Circuit has a track record of taking two

13 years.  This estate is going to go on to the benefit of

14 professionals for two years until the Federal Circuit settles

15 out, because Fuji's administrative claim will prevent the

16 settlement of this case.

17      We've come to Your Honor and we've asked Your Honor

18 to set the amount of our administrative claim, and contrary to

19 what we just heard, we do not have the burden in this case.

20 The burden is on the estate to prove that they did not -- that

21 they permissibly repaired.  In the normal infringement

22 situation we would have the burden, but this is that oddball

23 situation where all the cameras are covered by Fuji's patents.

24 The issue is is there an affirmative defense.  This is not your

25 normal case.

1           Unlike Judge Hochberg where we did have a burden on

2   one hand, but again the burden shifted to the respondent, and

3   the Judge felt -- in that case the defendants -- the Judge felt

4   that they hadn't met the burden.  So from Fuji's perspective on

5   the -- on what we're facing here, the retention of Budd Larner

6   for $70,000 sounds like a bloody bargain but at whose expense?

7   How many hundreds of thousands of dollars of other

8   administrative expenses will be expended in the next two years

9   while we wait for what the Federal Circuit has to say?  So that

10  -- so my pitch, if you will, Your Honor, is that what this

11  issue needs is fresh eyes.  I think that when we do have a

12  liquidating Trustee and when the liquidating Trustee is hired,

13  fresh counsel, and somebody looks at it, and Your Honor looks

14  at it, I'm not sure that it's such a bargain to the estate.

15          On the issue of the malpractice insurance --

16  malpractice claim, I have no brief for the counsel on the other

17  side in the District Court, but on the other hand, I never hear

18  the name of the attorney who's going to be sued, and I must

19  confess that I find it difficult to distinguish between the

20  firm who represented Jazz principally who was on the Creditors

21  Committee as opposed to Mr. Kaplan who was co-counsel or as

22  opposed to Skadden Arps who was counsel for Mr. Benun but

23  participated actively in the entire defense, or, to continue

24  on, Mr. Kaplan in the ITC, because the results are the same.

25  You know, one is 99 percent and one is 93.5 percent.  I find it

1  hard to distinguish.

2       So again I hear -- it sounds terrific.  Thirty

3  thousand dollars.  We can keep this estate going for another

4  ten years fighting a malpractice suit, but I think that again

5  this is a case where there should be fresh eyes.  Somebody

6  should look at this who's not in this room today, who is fresh

7  to the case, who is going to decide one way or the other.  If

8  the result is we're going to fight the appeal, I'm more than

9  ready willing and able to fight the appeal.  If a decision is

10 made to fight the malpractice suit, I may be a witness.  I

11 don't know.  But I don't -- my only brief on both of those

12 issues is what is the consequence to the administrative expense

13 of this estate?  Are we going to have an estate out there three

14 years from now with lawyers and accountants and liquidators and

15 whatever?

16      So my pitch, Your Honor, is purely that somebody

17 should look at this issue who has not been a party to what is

18 unequivocally a failed case.  I don't see how anybody can

19 justify calling this other than a failed case.  Your Honor, the

20 $25 million has largely triggered away by -- I think but for

21 Fuji's million, I'm not sure how much will be left for the

22 unsecured creditors.  The administrative expenses in this case

23 have been extraordinary -- $10 million dollars in legal fees

24 alone -- legal and professional fees alone.  So with that in

25 mind, perhaps it's less a legal appeal than an equitable

1  appeal, but --

2          THE COURT:  Well to the extent that this had the

3  color of a two-party dispute throughout, because the general

4  unsecured creditors were only a relatively small -- six and a

5  half million dollars or some such --

6          MR. GREENBERG:  We think that's what it's going to

7  shrink down to, between six and a half and seven and a half,

8  Your Honor.

9          THE COURT:  It played out as a battle between two

10 parties, and, you know, however it came out and whatever it

11 cost, there's no much after the fact that can be done about it.

12 But right now at this moment you raise a legitimate point, and

13 let's take the longest lead time item as I would project if it

14 were approved first, and that's the malpractice case.  Mr.

15 Sirota, let me just ask you, if I may.  We'll get to others.

16         My recollection -- I did hear about the malpractice

17 case for the first time last time, and you -- I think the

18 indication was -- and I think it's related to the disclosure

19 statement now -- that that would be an asset that would be

20 turned over in what you would hope is post-confirmation

21 liquidation and would not hold the case open.  Am I correct?

22         MR. SIROTA:  Judge, you're absolutely correct.

23 Neither the appeal nor the malpractice case have any impact on

24 the distribution of the $25 million or hold confirmation up one

25 day.

1          THE COURT:  Okay, so let's -- but let's just stay

2  with the malpractice case, because that would be a potential

3  asset funded to the extent of the $30,000, contingent fee

4  running forward, regardless who counsel is, and whatever comes

5  out of it comes out of it and goes to the unsecured creditors

6  through the post-confirmation process.  Is that right?

7          MR. SIROTA:  Exactly right.

8          THE COURT:  Now, if we step back, so, Mr. Rosenthal,

9  I don't think that that would hold up the case.  Now Mr.

10 Buechler seems to feel otherwise.  Is that --

11         MR. BUECHLER:  Yes, Your Honor.  Let me explain why.

12 Because while you arguably can close the administration of the

13 Chapter 11, which is where Your Honor is going with an order

14 under Section 350 of the Code, the administration of the

15 liquidating trust will close -- just one example.  Until the

16 Federal Circuit appeal is resolved --

17         THE COURT:  Oh, no, I don't want to deal with that

18 yet.  I'll deal with that separate.

19         MR. BUECHLER:  But until you resolve Fuji's

20 administrative claim and what Fuji gets, you can't figure out

21 what unsecureds are going to get, what piece they get from our

22 percentage, and that keeps the administration -- the case,

23 whether it's open for a year --

24         THE COURT:  I was going to go to the federal appeal.

25 I think that's a different issue than the malpractice case.

1    But the malpractice, I mean it's sort of ordinary fare to pass

2    along litigation to the liquidating Trustee post-confirmation

3    and have the chips fall where they fall.

4         MR. BUECHLER:  Well for selective eyes, as Mr.

5    Rosenthal tried to articulate, was if they're pick and attack

6    the Dryer firm -- and there should be fresh eyes, because if

7    the Dryer firm arguably engaged in malpractice in the defense

8    of the litigation before Judge Hochberg in the District Court,

9    then maybe so too did Mr. Kaplan, who was co-counsel for the

10    debtor, and that should be pursued for the estate, and maybe so

11    too should others.  And our point is it seems to be a little

12    selective and again may have delay factors.  And when you look

13    at what you could potentially recover from that --

14         THE COURT:  Delay factors in terms of what?

15         MR. BUECHLER:  Well, again, when you look at what may

16    be potentially recovered from that lawsuit to the cost to keep

17    the administration, whether it's totally before this Court or

18    just having the trust operating after this case, formally

19    before Your Honor and this building is closed, but the trust

20    administration may go on.  How does that balance for the net

21    recovery to creditors?  We're concerned that the net recovery

22    won't be positive.  That's our issue on that.

23         THE COURT:  All right.

24         MR. SIROTA:  Let me just answer some factual

25    questions.  Number one, the Dryer firm is clearly in harm's

1   way.  Mr. Kaplan's firm is being reviewed by Budd Larner as a

2   potential defendant, and the we have had discussions with Mr.

3   Holt as well as with the Riker firm on the issue of Skadden who

4   represented Mr. Benun.  There's been complete discussion as to

5   those who may be in harm's way potentially on a malpractice

6   cause of action, but it's for Budd Larner to evaluate, to

7   review, and to prosecute.  Clearly, the Dryer firm is there.

8          I don't understand in light of the negotiations over

9   the liquidating trust agreement and the disclosure statement

10  and the selection of Mr. Moore why he is suddenly being

11  questioned, because he endorses this retention, and is it

12  Fuji's position that as Mr. Moore makes decisions as

13  liquidating Trustee that he's going to be subject to constant

14  review on those decisions?  It was vetted with him.  There's no

15  hold up in closing or distributing dollars, and when Your Honor

16  gets to the issue of the federal appeal, I'll address that as

17  well.

18          THE COURT:  How about the federal appeal?

19          MR. SIROTA:  We initially thought it made the most

20  sense to try to resolve Fuji's administrative claim as part of

21  this case and avoid the middleman, namely, the appeal of ITC-2,

22  but unfortunately, those discussions were not fruitful.

23          THE COURT:  I assumed that was the case.

24          MR. SIROTA:  As a result, we're stuck in this

25  position where Fuji is waiving the ITC-2 ruling as the basis

1  for Your Honor to approve their admin claim, and we don't

2  believe the ITC ruling should be used for that purpose.  That

3  Fuji has to prove its admin claim as it did in the District

4  Court before this Court or before the District Court, but it

5  can't use ITC-2 as that proof.  But even if we could resolve

6  the Fuji component of the issue, we still have lingering a $13

7  million penalty, and while I've had discussions with Mr.

8  LaBruno in reserving rights in the disclosure statement and

9  don't know whether they're going to articulate an

10 administrative claim, they've certainly articulated an

11 unsecured claim for $13 million, and contrary to Mr.

12 Rosenthal's --

13        THE COURT:  Their position is they're subordinated.

14        MR. SIROTA:  That is my position, and Mr. LaBruno has

15 not acknowledged that position.  We put the appropriate

16 disclosures in the disclosure statement to reserve the ITC's

17 rights, and we'll find out in the very near future whether we

18 can come to an agreement.  But we can't have the ITC-2 ruling

19 out there without challenge given its implications on this

20 estate on two levels.  And, Judge, contrary to Mr. Rosenthal,

21 the ITC's record when being reviewed is not perfect, and he's

22 right, the professionals felt that there should be a reversal

23 at the Federal Circuit.  There was not a reversal.  That

24 doesn't mean this estate should play dead and allow what could

25 be $20 million of claims to come in over an expenditure of

1  $70,000 to make sure those issues are fully challenged,

2  briefed, and argued.

3          THE COURT:  Let me hear from whomever on the Fuji

4  side wants to talk about the Federal Circuit only.

5          MR. SIROTA:  Judge, I'm sorry.  One more point on the

6  Federal Circuit appeal.  To bring in fresh eyes as opposed to

7  the Budd Larner firm that's familiar with the record doesn't

8  seem to be economical, and I don't believe we would be able to

9  strike the economic deal.  But I also don't hear Mr. Rosenthal

10 saying that there should be fresh eyes on both sides.

11         MR. ROSENTHAL:  Well to answer the last point, there

12 haven't been fresh eyes.  Fuji sat here and listened for 22

13 months to counsel on that side of the room tell us repeatedly

14 that everything we said were wrong, and we sat there and said

15 we don't agree.  But unlike some counsel on the other side, we

16 never stood here and said we guarantee the result.  We just

17 write is the only way I can define it.

18         But let me just -- you know, we put our money

19 forward, and we fought these fights, and we were correct.  But

20 the bodies that held in our favor held after a heavily

21 adjudicated result.  Now let me just talk about what a Federal

22 Circuit review of the ITC may or may not entail.  The Court has

23 not as yet set a briefing schedule.  The Court had ordered

24 three months ago that when it dismissed the first appeal on

25 Jazz's side and Benun's side that when the ITC decision -- when

1  the decision on remedies is made, then counsel for Costantino,

2  for Benun, and for Jazz should make a motion to our court to

3  consolidate all the appeals, and then we'll set a schedule.

4  That, of course, hasn't happened, so right now we're sort of in

5  a limbo in terms of administration.

6          But I've been listening for all these many months --

7  maybe years almost -- that it doesn't matter -- well, actually

8  when we started the ITC was a great idea.  They would

9  adjudicate the result, and we'd all know what the answer was.

10  That was how we got into the ITC in the first place.  When the

11  ITC didn't rule in Jazz's behalf, then we're told, well, the

12  ITC is just an administrative body.  Who are they?  What do

13  they know?

14          Well, I'm not sure that a appellate review or an

15  administrative body decision is anymore valuable than the

16  appellate body decision if that's the position that one's going

17  to take.  We I think properly put in front of Your Honor that

18  it's -- it is maybe your job to make the determination as to

19  what the amount of the administrative claim, if any, is to hear

20  the evidence, and obviously, the result in the ITC is very

21  persuasive.  But I guess Your Honor has the right to ignore it,

22  although we disagree with that -- with such a result.

23          THE COURT:  Well, I don't want to ignore it, and, you

24  know, I don't want to arrogate to myself a field and a specific

25  case that has been poured over and decided by an expert

1 administrative body.  On the other hand, the $70,000 -- and

2 we'll have to talk about the time -- the extender.  My

3 recollection is it was May 8th to January 15, 20, 23, something

4 like that, from argument date to decision on this last appeal.

5 So whatever that is, eight months, eight and a half months.

6 And we'll have to talk about that.  I'm obviously pressing two

7 closed matters out to the extent they can be closed out, but

8 for $70,000 given the weight of the claims on the other side,

9 both Fuji's claims pre- and post-petition and the claim -- the

10 penalty claim, if I could use that term, for the ITC, and the

11 fact that there does appear to be a gray zone in all of this.

12        Now, you're right that you were right to the extent

13 the decision makers have weighed in, but -- and it's always of

14 question of when and who has the last word.  When is it, and

15 who has it?  Well here maybe it would be appropriate for the

16 Federal Circuit to look one more time, and maybe they'd look

17 more quickly, at what the ITC has viewed in the reducts of the

18 Jazz processes.  Now having said that, obviously, this Court

19 operates on the quick lines of settlement, and here we have a

20 lot of tactical stuff both on Fuji's side and the debtor's

21 side, and should I favor one side or the other in the

22 negotiation and with the tactics, because it's obviously bound

23 up in that same set of considerations, but I must say it's a

24 bargain rate.

25        Yes, Budd Larner made certain light -- I don't think

                    **J&J COURT TRANSCRIBERS, INC.**

1  they made quite the guarantees that you stated, but they did

2  make some light offerings of a positive nature on the appeal.

3  I recall it distinctly.  I don't quite recall it as guarantees.

4  And it didn't turn out that way.  But I must say I've made

5  predictions like that myself, and I've been wrong more than

6  I've been right, so it's just the nature of it.

7           Now I can't say whether the Federal Circuit was a

8  slam dunk for your side or whether it was debated in the

9  processes of the Federal Circuit or what.  And I don't know

10 what the next appeal would bring, but it does seem to me to be

11 just not appropriate for me to hear again -- which is what you

12 want me to do -- why the Federal -- I'm sorry -- why the ITC in

13 this too is wrong or right when the experts are there, and the

14 process in place, and the amount of money is defined, and it's

15 not significant.  And so now it's just how long will it take.

16 That does make me uncomfortable, but to the extent that that

17 process can be rushed, if at all, by the motion that you say

18 which hasn't been made to consolidate the cases on appeal and

19 otherwise beg the Federal Circuit to hear it quickly, that

20 would be the best resolution.

21           MR. ROSENTHAL:  Well, Your Honor, just to remind you,

22 it wasn't eight months.  It was 20 months.

23           THE COURT:  Am I in the wrong year.

24           MR. ROSENTHAL:  You're in the wrong year, Your Honor.

25 I'm sorry.

                     J&J COURT TRANSCRIBERS, INC.

1              THE COURT:  From the argument?

2              MR. ROSENTHAL:  No, not from the argument.

3              THE COURT:  No, I -- no, I said just from the

4    argument.

5              MR. ROSENTHAL:  No, from the filing of the appeal --

6              THE COURT:  No.  No.  I know it was 20 months, but I

7    remember distinctly that it was a May 4 -- a argument in '04,

8    and it was a January -- whether it was 12 or 15 or 20 --

9    decision in '05.  And so that's a defined period.  I can't

10   recall.  I know that it was a long time from the briefing

11   schedule.  It was forever.  But if one could get -- this isn't

12   the first time it's up.  They're going to say, "Oh, no, this

13   case again?"  You could imagine what they're going to say.

14   "Let's get rid of it quickly."

15             MR. ROSENTHAL:  It's in the first paragraph of the

16   last decision --

17             THE COURT:  Yes.

18             MR. ROSENTHAL:  -- where they said, "You guys back

19   again?"

20             THE COURT:  Yes, and now they're going to go, "Get

21   rid of it."  But it does seem that I would be arrogating to

22   myself -- one way to view it -- or taking on all of these

23   arguments, because they're going to have to get up and say --

24   the debtor's going to have to get up and say the ITC was wrong

25   here, here, and here.  You're going to have to get up and say,

1   well, the ITC has to be deferred to by this court, and where

2   are we?

3            MR. ROSENTHAL:  Well, Your Honor, I would like to --

4            THE COURT:  Let the Federal Circuit decide it.

5            MR. ROSENTHAL:  Well, I would like to just make the

6   point about the consequence of that approach.

7            THE COURT:  All right.

8            MR. ROSENTHAL:  The reality is the liquidator can't

9   liquidate the estates, because --

10           THE COURT:  That's Mr. Buechler's point.

11           MR. ROSENTHAL:  Yes, and it is a reality because of

12  the size of the administrative claim and assuming that the ITC

13  makes an admin claim, which is not irrational to expect now

14  that they've discovered that Mr. Sirota thinks their claim

15  should be erased completely.  There's a lot of money which

16  can't be disbursed expect to professionals.  Professionals seem

17  to get paid as quickly as we can, and my concern, having been

18  here for 22 months, is that time is the enemy of any pile of

19  money in this court.

20           THE COURT:  Well, you're right to the extent that I

21  am concerned about the time and -- but there -- it's not a --

22  though not the history of this cases, but in many cases it

23  isn't this way or that way.  This thing could settle.  It could

24  settle among the ITC on its claim, Fuji on those elements of

25  its claim pre- and post-petition.  The debtor could give, Fuji

1 could give, ITC could give.  Now it may not be in the character

2 of the parties overall, and so if that's the case, that's the

3 case.  But --

4          MR. ROSENTHAL:  But there is a wild card, Your Honor,

5 and that is there is a third respondent, Mr. Costantino, who

6 is --

7          THE COURT:  He's got 130 or 150 thousand --

8          MR. ROSENTHAL:  A hundred -- something like that, and

9 so it's going to be very hard to get -- he's taken his own

10 appeal with new counsel, so it's very hard to resolve this case

11 in his presence.

12          THE COURT:  Oh, I don't think it's so hard.  Mr.

13 Costantino will -- if people would come together and view him

14 in a certain way, it seems to me that he could be taken out of

15 this case one way or another.  But having said, I'm not

16 bargaining on his behalf, although maybe I should, because

17 nobody here seems to representing him.  And what was it, 130 or

18 150 thousand dollars?

19          MR. SIROTA:  I thought it was 147.

20          MR. ROSENTHAL:  About 130 I think.

21          THE COURT:  It wasn't 13 and a half million dollars.

22          MR. ROSENTHAL:  No.  No, not even --

23          THE COURT:  So I think that that ought to wag this

24 entire dog.  I think that -- I think it's Fuji and the debtor

25 and Mr. Benun can weigh in, and it either settles or it

                    J&J COURT TRANSCRIBERS, INC.

1  doesn't, and if it doesn't --

2         MR. ROSENTHAL:  Well, that is another issue, Your

3  Honor, and that is the Benun -- an appeal was filed on his

4  behalf by Mr. Kaplan, and nothing we do in this room can

5  eliminate the claim against Mr. Benun personally.

6         THE COURT:  Mr. Holt has never been before the

7  Federal Circuit.  He's dying to get himself in there to argue

8  in Washington, and that's about the best --

9         MR. SIROTA:  Judge --

10         THE COURT:  Yes?

11         MR. SIROTA:  -- can I clarify --

12         THE COURT:  Go ahead.

13         MR. SIROTA:  -- one issue?  And that is that Mr.

14  Rosenthal I think appropriately told Your Honor that you could

15  look to the ITC-2 and determine your administrative claim or

16  ignore it, and I know Your Honor's feeling in response to it.

17  My point is this.  We did not look at the Federal Circuit

18  appeal as throwing a monkey wrench or delaying the ultimate

19  liquidation of this estate by the liquidating Trustee for the

20  reason that we don't believe the ruling before the ITC is

21  binding or critical in the determination of the administrative

22  claim, and I got the sense from Your Honor's questions and

23  points that Your Honor sees it differently.  That Your Honor

24  sees the ITC ruling and reversal affirmance by the Federal

25  Circuit as dispositive of Fuji's admin claim.

1          THE COURT:  No.  No, not Fuji's.

2          MR. SIROTA:  Okay.

3          THE COURT:  No.

4          MR. SIROTA:  The ITC.

5          THE COURT:  Yes.  No.  No.  No, Fuji may have a

6  different -- the character of Fuji's claim may be different,

7  but clearly if the ITC says Benun and Jazz did not infringe

8  under this revised process, that would impact on the Fuji

9  claim, and the opposite, if they say they did infringe, now as

10 to monetizing it, that's a whole different issue.

11         MR. ROSENTHAL:  Your Honor, I think what I've just

12 heard is that at the end of however many months or years it

13 takes to get the Federal Circuit to rule on a case that they

14 don't want to see anyway we're going to be back here in front

15 of Your Honor to quantify, because whatever the ITC did in the

16 Federal Circuit after it doesn't count.  I think that's what

17 Mr. Sirota just said.

18         MR. SIROTA:  I think, Judge, that to the extent that

19 Fuji wants to prove its administrative claim, this appeal does

20 not mean to prevent them from doing that.  There's two prongs

21 to it.  One to protect against the argument that sometimes is

22 advanced by Fuji that it's res judicata and collateral

23 estoppel.  That's one problem.  The second problem is the $13

24 million penalty from the ITC.  I would be more than glad to

25 agree with Mr. Rosenthal and Fuji, God willing, to a complete

1 resolution, or if not that, some procedure that allows this

2 estate and the liquidating Trustee to make distributions much

3 sooner than later.

4          THE COURT:  Okay, but let's stay on the -- what is to

5 be decided in resolving Fuji's administrative claim.  My

6 assumption -- if I'm wrong, let me know now -- is that the

7 debtor will say there was no infringement.  Dollars aside, how

8 much the damages were, there was no infringement.  Now that's a

9 fundamental issue decided by the ITC and on appeal now to the

10 Federal Circuit.  Do you want me to decide that independent of

11 what happens in that appeal or to deny the capacity to have

12 that appeal, because I won't allow Budd Larner or anyone else

13 to go forward with the appeal on the debtor's behalf?

14          MR. ROSENTHAL:  Your Honor, that's not my position.

15 My position is that, if I listened to Mr. Sirota correctly,

16 we're wasting our time, because the purpose of taking the

17 appeal is to resolve Fuji's claim, which is far above that of

18 the ITC if you try to break and administrative versus a non-

19 administrative --

20          THE COURT:  I'm trying to take it by element.  I'm

21 trying to separate liability from damages.

22          MR. ROSENTHAL:  Fuji contends that -- and has always

23 contended in this Court that the debtor by agreeing to go to

24 the ITC to resolve these disputes is collaterally estopped by

25 the result in the ITC, but what I'm hearing now is --

1              THE COURT:  Even if that's the case --

2              MR. ROSENTHAL:  No, but what I'm hearing now, Your

3    Honor, is that's not the case in the view of the debtor or

4    whoever is going to represent the debtor three years from now

5    or two years from now when this is going to get resolved,

6    represents the Trustee, or whatever.  No money can be disbursed

7    or very little money can be disbursed to the unsecured

8    creditors until Fuji's administrative claim is resolved,

9    because that represents such a big hunk of the money.

10             THE COURT:  That may be the case.

11             MR. ROSENTHAL:  Yes, so what --

12             THE COURT:  That may be the case.  I don't know for

13   sure, but it may be the case.

14             MR. ROSENTHAL:  What I'm hearing now is that after we

15   go through the Federal Circuit process, then their position is

16   whatever the ITC did, that doesn't count.  We're going to start

17   again on the liability issue.  Putting aside the damages issue,

18   they're going to start again, and I think that that's my fear.

19   That we're going to go through the Federal Circuit.  I for one

20   feel very comfortable with the Federal Circuit.  I don't think

21   that there's any likelihood of success on the other side, but

22   that's another issue.

23             THE COURT:  But I think we're way at the end of the

24   line.  I'm not saying that you're misreading Mr. Sirota, and he

25   can speak for himself on that point.  He did say that just as

                  J&J COURT TRANSCRIBERS, INC.

1  with Judge Hochberg, the ITC isn't the last word, and the

2  District Court had to talk about the liability of Benun and

3  Jazz to Fuji.  Likewise, it sounds like he wants me to take the

4  same position that I'm going to have to decide that regardless

5  of what happens in the process.  But if the ITC says that there

6  was infringement, and if the Federal Circuit agrees, it would

7  be a pretty stiff bankruptcy judge who says I'm going to hear

8  that anew and decide -- and if I hear it anew, to hear it for

9  more than 15 minutes -- and decide that there was no

10 infringement.  So I don't think that's a real issue, so I

11 wouldn't worry too much about that.

12        The question is how long will the appeal take, what

13 damage will it do to efficient and timely winding up of the

14 administration of this case, and I don't have a ready answer to

15 that, because that in part depends on the flexibility of the

16 parties involved.  But it seems to me that the $70,000 on the

17 appeal, no predications would be asked for -- guaranteed I'm

18 not going to ask, you know, is it 80 percent or 90 percent sure

19 that you're going to get a reversal, counsel.  I'm not going to

20 ask that, but go ahead.

21        MR. ROSENTHAL:  Can I at least get an agreement to

22 join in an application for expedited consideration on the part

23 of the Federal Circuit?  Because I think it does have -- I have

24 to defer to Bankruptcy Court -- Bankruptcy counsel.

25        THE COURT:  I don't think that that's an unfriendly

1   request.  Mr. Sirota, before we get to counsel, do you have any

2   problem with that?

3             MR. SIROTA:  Absolutely not.

4             THE COURT:  Anyone have any problem with that?

5   Counsel would handle the matter if, as, and when I should

6   approve.

7             UNIDENTIFIED ATTORNEY:  I would certainly think so,

8   Judge.

9             THE COURT:  I mean you're only being paid a fixed

10  amount.  If you drag this out for five years --

11            UNIDENTIFIED ATTORNEY:  Should resolve it tomorrow,

12  there would've no objection.  But I think that if such an

13  application is appropriate, that there would be no reason not

14  to make it.

15            THE COURT:  I think it should be done.  I think the

16  appeal should be processed as quickly as is app and efficient,

17  and let's do it.  All right?  That's the best we can do.  Mr.

18  Greenberg?

19            MR. GREENBERG:  Very briefly, because I think Your

20  Honor touched on all the issues, but just for the record.  I

21  think you were right in approaching the issues on a bifurcated

22  basis.  With respect to the malpractice action, I don't think

23  it delays anything, and the reality is it may well get settled.

24  It may well be that a claim will be waived.  There may be a

25  carrier who doesn't feel like litigating.  So I think you're

1  right, that once we pay the $30,000 at some later day we'll

2  just maybe have more money to be distributed to the unsecureds,

3  and we would hope that happens.

4           With respect to the Fuji claim, if they have an admin

5  claim, whatever that amount is, they're getting 100 cents on

6  the dollar unless it somehow exceeds the 20 some odd million,

7  and reality is if they have an allowed unsecured claim, they're

8  probably going to wind up getting close to 70 cents on the

9  dollar.  So if there is a number -- I think that when we went

10 through the numbers last time, they're 30 or 40 million dollars

11 out of -- there's another six or seven to be added to that in

12 large part.

13          We assume that there are going to be some things that

14 may be subordinated.  They already have I think Jazz Hong Kong

15 for $9 million is subordinate.  There may be issued with

16 respect to JCB and Mr. Benun if he does have claims.  So the

17 reality is when people take a step back and see the difference

18 between payment on an admin claim and an unsecured claim from

19 the Fuji standpoint, it's not 100 percent difference.  It's a

20 30 percent difference, and you factor in the delay and the cost

21 not just of people who are on a contingency but the ongoing

22 Chapter 11 or liquidating trust process.  That may be a reason

23 for people to revisit a global settlement.

24          THE COURT:  If you could those numbers, you know,

25 even in the roughest terms in a genial negotiation session,

1 maybe you can bring it about, but I'm not -- you know, at this

2 point it's not for me to be a part of.

3       MR. GREENBERG:  And we've heard lots of numbers.  I

4 think that Mr. Schwartz wasn't that far off the mark when he

5 said 20 percent.  That's a little bit optimistic, but my view

6 is that it's probably 15.  I think the allowed non-insider

7 claims are going to shake out pretty close to $7 million, and

8 if you get the one million from Fuji and nothing else, you're

9 at 14/15 percent.  And we think there will be some spillover

10 from these various different causes of action or sale of

11 assets, so hopefully it's going to be in excess of 15 percent.

12 Maybe not quite 20, but it's not a 2, 5, or 6 percent kind of

13 distribution.

14       I heard several times today about the $10 million on

15 this side of the room in professional fees.  I know ours are

16 under 500.  I know Mr. Sirota's are.  I don't know where the

17 other eight and a half million is, but, you know, I don't know

18 if they're going back to pre-filing expenses dealing with

19 Imation litigation, but to both Mr. Sirota and I, that $10

20 million seems to be a far cry from what was awarded and paid in

21 the Chapter 11 itself.  So when I heard that number so many

22 times --

23       THE COURT:  Mr. Buechler wants to verify that number.

24       MR. BUECHLER:  Your Honor, simply put, it's what the

25 debtor has accrued, and if you look in your February, 2005

1  monthly operation report to their statement of operations, they

2  show legal professional fees accrued -- that includes Budd

3  Larner -- if $8,738,230, and then the additional one million

4  125,000 dollars and change for the legal fee allocation.  A

5  combination of those two together exceed $10 million based upon

6  this debtor Jazz's February operating report.  That's where we

7  get the number from.

8            THE COURT:  It sounds like eight seven.  And my

9  recollection, isn't the allocation simply inter-company?

10            MR. GREENBERG:  It may be.

11            THE COURT:  So that's the same number.

12            MR. GREENBERG:  Right.  Right.

13            MR. ROSENTHAL:  No, Your Honor, it's not the same

14  number.

15            MR. BUECHLER:  No, it's not the same number.

16            MR. ROSENTHAL:  It's a subtraction from the

17  professional fee number.

18            THE COURT:  Yes.

19            MR. ROSENTHAL:  So you have to add the two to know

20  what the real professional fees were.  But they were

21  compensated some way is not really the issue.  Total

22  professional fees as of end of February were vast approaching

23  $10 million, and by today --

24            THE COURT:  Well, okay, but it's $8.7 million of

25  distribution here, but if it's 10 million or 8.7, it's a lot of

1 money, but that's the nature of this case.  I don't know what

2 Fuji paid, but I would it's, you know, more than nickel, and --

3          MR. ROSENTHAL:  It just didn't come out of the

4 estate, Your Honor.

5          THE COURT:  You're right, and to add insult to

6 injury, those fees did come in largest part out of Fuji's

7 pocket.

8          MR. GREENBERG:  Correct.

9          THE COURT:  So everybody -- that's why I say it's a

10 two-party dispute in most significant part.  There are others

11 who are involved, but it's the nature of a two-party dispute

12 where it's insoluble, and to a large extent now we have the

13 Federal Circuit and the ITC, and that may be now the Federal

14 Circuit again.  They're going to resolve it.

15          MR. GREENBERG:  That's why I was suggesting that

16 maybe now that Jazz has stopped operating and for the moment at

17 least in the vehicle of Jazz Mr. Benun is out of Fuji's hair.

18 There may be the ability to sit down and just talk about

19 numbers and get to a resolution.  I don't think that could've

20 happened in February.  Maybe it can happen in April or May.

21          THE COURT:  Well, I --

22          MR. ROSENTHAL:  Because now we're just talking who

23 gets the dollars.

24          THE COURT:  I encourage it.  As I encouraged the

25 speedy appeal, I would encourage this, and whatever I can do to

1    facilitate it, fine.

2         MR. GREENBERG:  And another thing, as part of the

3    plan, you know that there's a penalty class which, you know,

4    Mr. LaBruno may want to take exception to.  If it's a matter of

5    law it turns out whether that number is 13,675,000 or some

6    lesser number, that is subordinate to unsecured creditors,

7    which it may or may not.  That certainly changes the dynamics

8    of our plan with respect to a large number that may not

9    effectively really have to be dealt with, and hopefully that's

10   something that's going to either be agreed upon or can be

11   brought on before Your Honor in relatively short time.  So

12   that's -- I think there are a lot issues that can fall into

13   place in pretty short order, and we would hope --

14        THE COURT:  Well, someone's going to have to get

15   active to make those issues fall into order, as you put it, and

16   maybe it's the Creditors Committee.

17        MR. GREENBERG:  And obviously I've given some thought

18   to the different numbers, but I think as far as $30,000 to

19   start the process with everything else on a contingency as to

20   malpractice actions or multiple actions with or without the

21   joinder by Mr. Forman on behalf of the Benun estate, that

22   certainly makes sense, and I think given the numbers that are

23   involved with respect to the ITC, there's no option or

24   alternative but to take the next step, especially when you're

25   not doing it on an hourly basis but basically you're committing

1   $70,000, and that's your sole exposure.  Thank you.

2          THE COURT:  Anyone else want to be heard on the issue

3   of retention of counsel, that is Budd Larner, on two matters,

4   the legal malpractice case and the appeal from the ITC to the

5   Federal Circuit?  Anything else?

6                    (No verbal response)

7          THE COURT:  All right.  I've heard discourse.  I

8   appreciate again what counsel have said, and I think that it is

9   a relatively modest investment.  The greater concern is time

10  with the appeal.  I don't think that the malpractice case will

11  slow this matter down in terms of administration.  This Court

12  will approve the retention of Budd Larner in the bases set

13  forth in the application, and the order can be executed

14  electronically.

15         MR. ETKIN:  Your Honor, just one question on that.

16  Given the discourse and the agreement of all sides with respect

17  to the request for expedited appeal, can the order include that

18  the parties have agreed to --

19         THE COURT:  Well let's put it this way.  In fairness

20  to counsel who may not be familiar -- may not, for example --

21  and I don't know -- as Mr. Rosenthal with the mechanism to join

22  the three appeals, merge the three, or otherwise expedite this,

23  we're all on the record.  If there's a problem, if Fuji feels

24  that the matter is not being expedited, I'll entertain a

25  telephone conference on that issue.  I don't think it should be

1  in the order.  You're going to have to educate yourself as to

2  what it is that -- and speak to Mr. Rosenthal.  You know, the

3  two of you really can agree.

4          MR. ETKIN:  That's fair enough, Your Honor.

5          MR. SIROTA:  Judge, I noticed in paragraph five of

6  the order -- and I'm sure Fuji would want this changed -- the

7  last sentence says, "The funds paid by Larner are coming out of

8  the proceeds they were holding."

9          THE COURT:  Yes.

10          MR. SIROTA:  And the last sentence says, "The balance

11  of said funds after deducting 100,000 shall be remitted to the

12  debtor."  I think that Fuji, consistent with other comments

13  I've received, would prefer it be remitted to debtor's counsel

14  held pending further order of the Bankruptcy Court.

15          MR. BUECHLER:  No issue.  If you want to revise it

16  and send it down to the Judge --

17          MR. SIROTA:  I'll make the revision in this --

18          THE COURT:  All right.  Thanks.

19          MR. SIROTA:  -- and make it electronically, Judge?

20          THE COURT:  All right.  Thanks.  Order to be

21  submitted, Carol, instead of electronically entering that

22  order.  All right?

23          MR. SIROTA:  I think the last issue on today's fight

24  card is the approval of the disclosure statement and related

25  procedures.  Per the approved Imation settlement, the debtor

1  was required to file a plan and disclosure statement by March

2  21st.  We did.  I believe a day or two prior the filing of the

3  disclosure statement and plan we provided it to interested

4  parties.  We certainly provided it to Mr. Greenberg earlier, so

5  that he could review it with his constituents and sign up to

6  it.

7          Per the Court's order shortening time on March 22nd,

8  it was served.  In accordance with Your Honor's order,

9  objections were due by April 8th, noon, and the disclosure

10 statement and plan before the Court reflects comments from

11 Fuji, Mr. LaBruno on behalf of the ITC, the Committee, and Mr.

12 Moore, who is the proposed liquidating Trustee.  We circulated

13 numerous drafts and had several discussions.  We attempted, and

14 I think successfully, adopted most of the comments to resolve

15 concerns of all parties.  And on April 8th, Judge -- we

16 apologize for the delay, but we wanted to provide you with

17 black lined versions of the plan and disclosure statement as

18 well as the liquidating trust and proposed order, so Your Honor

19 hopefully had an opportunity to see the progress that was made.

20 And as I indicated, I'm pleased to report there are not

21 objections to the documents as submitted.

22          There are some dates that we need to complete.  Mr.

23 Buechler had asked that we expedite the hearing from the 25th.

24 I noticed I believe that Your Honor holds hearings on the 10th

25 of May which seem to work with our schedule if it works with

                    J&J COURT TRANSCRIBERS, INC.

1  the Court's, and then I can -- we can go through -- assuming

2  Your Honor is comfortable with the adequacy of the disclosure

3  statement and the procedures, we can work through some dates

4  that are hopefully convenient to everyone.

5          THE COURT:  Does that give you enough time?

6          MR. SIROTA:  My paralegal reprimanded me this morning

7  when she saw that I had this getting served on one day's

8  notice.

9          THE COURT:  Yes.

10          MR. SIROTA:  She asked for three days, and I told her

11  that I would beg the Court to accommodate her, and I think it

12  just gives us enough time.

13          THE COURT:  Mr. Buechler?

14          MR. BUECHLER:  Your Honor, from our perspective,

15  under 105 of the Code the Court can shorten the time period.

16  Let's keep in mind this is a case that does not have a large

17  creditor body, and people have been very active, but when you

18  look at the total number of creditors, it's maybe 40 or 50

19  people.  We asked the Court to shorten it, because what we'd

20  like to do is to have the trust in place, because the effective

21  date is now the confirmation date.  So that before we get to

22  the May 20 two-year statute of limitations period, the Trust is

23  in place and can formally commence the lawsuits that need to be

24  commenced prior that date.  So we would encourage the Court to

25  hear confirmation on May 10th, and if need be, give Mr.

1    Sirota's office an extra day or two to just physically copy and

2    mail to, pursuant to the authority under 105 of the Code,

3    shorten the 25-day voting period by a couple of days, because

4    it is not a large creditor body.

5            MR. SIROTA:  I don't on the May 10th date, Judge,

6    that you need to do that necessarily.  I think we fixed the

7    voting deadline to the 6th of May, and we have three days to

8    mail out.  I think we would just come in -- no?  Did I

9    miscount?

10           MR. BUECHLER:  I didn't count the days, but the Court

11   concluded -- and again --

12           THE COURT:  Very tight.

13           MR. SIROTA:  Very tight.

14           MR. BUECHLER:  But we'd ask the Court, you know,

15   because that's our compelling reason is --

16           THE COURT:  No, it's a -- I understand, and it's a

17   fair point.  I'm not -- but again, does Friday, May 13th at

18   10:30 work?  It gives you just a -- those couple more days?

19           MR. BUECHLER:  We'd --

20           THE COURT:  Go ahead.

21           MR. BUECHLER:  Again, from our perspective, we'd ask

22   the Court to shorten the voting period.  If you give people 20

23   days or 21/22 days to vote, it's not a -- you're not dealing

24   with a large creditor body.  Those who have been active -- been

25   very active would rather give the liquidating agent, which will

1  be Mr. Moore, as agreed to by the parties, the extra couple of

2  days to get himself in position, formalize it, and have time

3  and not shorten the time period any further that he has to

4  commence causes of action all before the two-year period, and

5  that's our driving concern.  That's why we asked, and Mr.

6  Sirota agreed on behalf of Jazz Photo, that we move the date up

7  to well before May 20.

8          THE COURT:  Well --

9          MR. BUECHLER:  We did the disclosure statement on

10  short notice --

11          THE COURT:  I'm not resisting.  Don't misunderstand

12  me.  I'm not resisting moving it ahead of May 20, but count

13  days.  If three days are needed to process what's going on

14  here, to do it one day I think is reckless.  You're going to

15  make mistakes, and we're going to have a headache.  Somebody's

16  going to get missed.  Something's going to happen.  So it's

17  basically the balance of this week --

18          MR. BUECHLER:  But if we get it out by Thursday --

19          THE COURT:  Okay.  Fine.  Tuesday, Wednesday,

20  Thursday, and -- so it's out by Thursday.  It's in peoples'

21  hands any time from --

22          MR. BUECHLER:  Saturday to Monday.

23          THE COURT:  -- the 22nd through the 25th or 26th.

24  You've got then only 17 days in the hands --

25          MR. BUECHLER:  I'm not --

                    J&J COURT TRANSCRIBERS, INC.

1        THE COURT:  -- of parties --

2        MR. BUECHLER:  I'm not sure if it's that, because if

3  it's mailed on the 14th, everybody should have it realistically

4  by Monday the 18th.

5        THE COURT:  Well, okay.  Let's say the 18th if you

6  want to -- so you have -- so you have 12 days left in April,

7  and 13 days -- funny how it comes out to 25 days -- in May by

8  the 13th.  And remember that when you read the rules, you're

9  not quite sure of what the objection period is.  We're sort of

10  telescoping the objection period and the 25-day period.

11  There's a quirk in those rules.  I don't see any problem with

12  the 13th and have the vote by your date, the 10th.

13        MR. BUECHLER:  Yes, we'd like to see if we can have

14  the actual hearing on the 10th.  Hopefully, Your Honor's

15  decision will agree with 105(e) of the Code, which would permit

16  the two hearings to have been combined to do a lot of other

17  things, could shorten the time period in which creditors have

18  to vote, but it's Your Honor's ultimate call.

19        THE COURT:  All right.  Let me hear from the neutral

20  voice.

21        MS. JUROW:  Your Honor, I think we've -- we haven't

22  combined the disclosure statement, so that's past, and it was

23  -- there's not authority to do that.  One 05 isn't a panacea to

24  do whatever we feel like because we're in a hurry.  Now that

25  being said, I don't have any objection to us shortening time,

1    but -- Mr. Sirota's also been very efficient in the case but

2    still needs 60 some odd things to be copied, mailed out, sent,

3    and ballots to be tallied and come here and have a confirmation

4    hearing.  And so what are we talking about now, the difference

5    between May 10th and May 13th?  I don't understand this.  I

6    really don't -- I don't understand what we're arguing about.

7              THE COURT:  Yes, sir?

8              MR. ETKIN:  Your Honor, it's just the difference

9    between giving the Trustee and whoever he retains as counsel a

10   adequate time to deal with that May 20th deadline, which is a

11   very serious deadline.  So if that provides some explanation to

12   Ms. Jurow, you know, maybe that's helpful.  Those three days

13   under those circumstances are probably three days that the

14   Trustee would be able to use.  But again, it's Your Honor's

15   decision.

16             MS. JUROW:  Judge, our office has worked with Mr.

17   Moore as an examiner and a trustee for many years.  Mr. Moore I

18   thought did an incredible job expeditiously here in only five

19   days.  I don't hear him here saying, oh -- you don't hear

20   anyone saying I need the --

21             THE COURT:  It's not as though these issues can't be

22   reviewed in advance.

23             MS. JUROW:  You can't even think about it.  I mean I

24   have no reason to believe that Mr. Moore isn't thinking about

25   this as we all sit here.  So I don't -- now I understand --\

                    *J&J COURT TRANSCRIBERS, INC.*

1          THE COURT:  That should be flagged, and any party in

2   interest can flag it to Mr. Moore.  I'm going to set the 13th

3   at 10:30 for confirmation of Jazz.  The votes would have to be

4   in by 4:00 p.m. on the 9th -- Monday, the 9th.

5          MR. BUECHLER:  Any objection deadline?

6          THE COURT:  Same date.

7          MS. JUROW:  That's the objection date and vote?

8          THE COURT:  And voting.

9          MR. SIROTA:  And vote also the 9th at four.

10          MR. SIROTA:  And, Judge, Your Honor has no objection

11   to us mailing this out within three days --

12          THE COURT:  Three days.

13          MR. SIROTA:  -- in paragraphs five, six, and seven?

14          THE COURT:  Three days.  So can we do this in hard

15   copy right now?  Is there any other --

16          MR. SIROTA:  I believe Your Honor has the clean order

17   that I faxed on Friday.

18          THE COURT:  I do have it.

19          MR. SIROTA:  Yes.

20          THE COURT:  Let me just see where the blanks are, and

21   I'll fill them right in now.

22          MR. SIROTA:  I guess the first thing, Judge, is the

23   first page.  It's actually pages number two through 14.

24          THE COURT:  Okay.

25          MR. SIROTA:  And then going to page five, paragraphs

                    J&J COURT TRANSCRIBERS, INC.

1  five, six, and seven would be changed to within three days.

2          THE COURT:  Well where's the language?

3          MR. SIROTA:  Paragraph five, "within three business

4  days after the date hereof," on page five of the order.

5                          (Pause)

6          THE COURT:  Three.  Within three.

7          MR. SIROTA:  And the same would be true of paragraphs

8  six and seven.

9          THE COURT:  Right.

10          MR. SIROTA:  I believe then paragraph 14 is the

11  voting deadline.

12          THE COURT:  Right.  May 9th --

13          MR. SIROTA:  Four p.m.

14          THE COURT:  -- 4:00 p.m.

15          MR. SIROTA:  And I believe the next blank should be

16  at paragraph 28, which is the confirmation hearing.  The

17  objection deadline in the order is set for seven days before.

18          THE COURT:  Yes, we'll have to change that.

19          MR. SIROTA:  Yes.  Paragraph 31.

20          MR. BUECHLER:  It's the last clause of paragraph 31.

21          THE COURT:  No later than May 9, 2005, 4:00 p.m.  Any

22  other changes?

23          MR. SIROTA:  I believe that's it.

24          THE COURT:  All right.  With these changes and seeing

25  no objection to the disclosure statement, is that true?

1  Calling last time for objections.  This Court will approve the

2  disclosure statement for -- and issue the order which would

3  schedule confirmation on May 13th at 10:30.  Thanks a lot.

4          MR. BUECHLER:  Your Honor, one housekeeping item.

5          THE COURT:  Yes.

6          MR. BUECHLER:  On Thursday or Friday of last week Mr.

7  Sirota's firm sent by e-mail a proposed stipulation, an order

8  terminating a license agreement with BBH, Inc., the Bell and

9  Howell license agreement, under the five-day rule.  Based on

10 discussions we've had with Mr. Sirota's office, Mr. Sirota, and

11 Mr. Traurig before this afternoon's hearing, we'd ask the Court

12 to hold issue of that order.  We raised certain issues with Mr.

13 Sirota and Mr. Traurig this afternoon, and they're going to go

14 back and talk among themselves and talk to BBH as to our --

15 meaning Fuji's -- comments to see if we can resolve them.  So

16 instead of us filing an objection, what we'd like to do is ask

17 Your Honor if you haven't signed the order, if you can hold it,

18 and then hopefully we can get back with a revised order in a

19 couple of days, or if we can't work it out, then we'll file an

20 objection at that point and ask the Court to schedule a

21 hearing.

22         THE COURT:  Procedure work okay?

23         MR. SIROTA:  That's perfect.

24         THE COURT:  All right.  So what's -- yes, what's on

25 the horizon?  We have -- next Monday we have a series of

J&J COURT TRANSCRIBERS, INC.

1  issues.  We have the Budd Larner lien and fee issue.

2         UNIDENTIFIED ATTORNEY:  The Budd Larner final, Judge,

3  together with interim  fees and the motion to approve the sale

4  procedures.

5         THE COURT:  The sale procedures.

6         MR. BUECHLER:  We also have the motion by Rosenthal

7  and Rosenthal for direct payment of their alleged secured

8  claim.  We asked Rosenthal with regard to backup, because their

9  motion is devoid of any calculation of numbers to support their

10  number.  They responded in an e-mail that they would supply

11  that.  I have on my list of people to call Ms. Singer today or

12  tomorrow, depending on what time I get back, to find out what

13  the status is, because I don't believe anybody has seen that,

14  and we all would like to see that, so all of us can pose any

15  comment as to whether any of us have an issue.

16         UNIDENTIFIED ATTORNEY:  We've all made the same

17  request.

18         THE COURT:  All right.  Anything else from anyone?

19  Mr. Holt, welcome to the party.

20         MR. HOLT:  Thank you, Judge.

21         THE COURT:  Thank you, counsel.

22         ALL:  Thank you, Your Honor.

23                  * * * * *

24

25

## CERTIFICATION

I, PATRICIA C. REPKO, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter to the best of my ability.


/s/ Patricia C. Repko                Date:  April 14, 2005
PATRICIA C. REPKO
J&J COURT TRANSCRIBERS, INC.