**LOWENSTEIN SANDLER PC**
MICHAEL S. ETKIN (ME 0570)
BRUCE BUECHLER (BB 0324)
S. JASON TEELE (SJT 7390)
65 Livingston Avenue
Roseland, NJ  07068
973-597-2500 phone
973-597-2400 fax

- and -

**STROOCK & STROOCK & LAVAN LLP**
LAWRENCE ROSENTHAL
KRISTOPHER M. HANSEN
180 Maiden Lane
New York, NY  10038
212-806-5400 phone
212-806-6006 fax
Attorneys for Fuji Photo Film Co., Ltd.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JAZZ PHOTO CORP., | : | Case No. 03-26565 (MS) |
| | : | |
| | : | Hearing Date: May 16, 2005 at 2:00 p.m. |
| Debtor. | : | |
| | : | Oral Argument is Requested |

## OBJECTION OF FUJI PHOTO FILM CO., LTD. TO THE DEBTOR'S MOTION FOR AN ORDER AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS AND GRANTING OTHER RELATED RELIEF

To:  Honorable Morris Stern,
     United States Bankruptcy Judge:

Fuji Photo Film Co., Ltd. ("Fuji"), by and through its counsel, hereby submits this objection to the motion of Jazz Photo Corp. ("Jazz" or the "Debtor") for an order authorizing and approving the Debtor's sale of substantially all of its assets pursuant to 11 U.S.C. §363 and Fed.R.Bankr.P. 6004 and granting other related relief (the "Motion"), and respectfully represents as follows:

1.    Ribi Tech Products LLC ("Ribi Tech") was the sole bidder for the assets of the Debtor and the Debtor has submitted a proposed order authorizing the sale to Ribi Tech of substantially all of Jazz's assets.  Fuji submits that this sale cannot be approved  because:

a)    Ribi Tech, as the alter ego of Jack C. Benun ("Benun"), cannot be deemed a good faith purchaser as required by Bankruptcy Code §363(m) and applicable Third Circuit precedent.

b)    Not only has Benun been found to be a recidivist, bad faith infringer of Fuji's patents by both the District Court (affirmed by the Federal Circuit) and the U.S. International Trade Commission ("ITC"), the single use cameras being sold by Jazz include cameras that infringe Fuji's patents and which Benun and Ribi Tech intend to illegally import into and sell in the United States.  This Court should take no further steps to enable and facilitate continued infringement of Fuji's patents.

c)    The very assembly of the inventory and the intended sale of the inventory pursuant to 11 U.S.C. §363 sale appear to be part of a bad faith scheme engineered by Benun to endow Ribi Tech with a starting inventory at the expense of Jazz's creditors.

d)    A key element of that scheme is to wrongfully sell the inventory to Ribi Tech and Benun free and clear of all liens, encumbrances and security interests and, most importantly, free of the successor liability to not only Fuji and other creditors, but orders of the ITC.

e)    Another aspect of the scheme is to artificially burden the inventory with liens by Agfa and various shipping and warehouse entities making a sale of the inventory to a

purchaser other than Ribi Tech and Benun problematic. Ribi Tech would therefore be allowed to acquire the inventory for almost $287,000 less than the $877,000 nominal bid. <u>See</u> Application of the Debtor in Support of the Motion (the "<u>Application</u>") at 11, fn.10.

f)    The sale of at least part of the inventory to Ribi Tech does not maximize the recovery to creditors since the five most recent of the fourteen containers of single use cameras being sold were not delivered to Jazz with clean title as was the past practice. These five containers can and should be returned to Polytech for a credit. That credit, when coupled with the storage and shipping charges which can also be charged to Polytech, exceeds the full amount of the Ribi Tech bid. Other money can be realized by the sale of non-single use cameras by Jazz to their intended customers.

g)    The Debtor has not required that Ribi Tech's principals, Mona Benun (Benun's wife) and their children, who are believed to be targets of avoidance actions in both this proceeding and the Benun bankruptcy, submit a sworn statement demonstrating the source of the purchase price monies.

h)    No provision has been made to permit a systematic inspection of the single-use cameras forming the bulk of the inventory so as to preserve evidence of the continued infringement of Fuji's patents for use both by the Government before the Court of International Trade (the "<u>CIT</u>") and Fuji in the pending infringement action against Benun, Ribi Tech, Polytech Hong Kong and Polytech China in the District Court.

2.    The Court cannot approve the sale of assets to Ribi Tech. Jazz professes to exercise its fiduciary duties in seeking to sell its remaining assets to Ribi Tech, but it appears that Jazz is just continuing to be manipulated by Jack Benun. Ribi Tech was formed on February 18, 2005. (See Ribi Tech Certificate of formation, Rosenthal Dec., Exhibit A[1].) Benun did not resign as an officer and director of Jazz until March 4, 2005. <u>See</u> Application, at 7, ¶ 17. On this

---

[1]    References are to Exhibits to the accompanying Declaration of Lawrence Rosenthal in support of this Opposition.

and other facts adduced below, it is fair to conclude that Ribi Tech was formed to acquire substantially all of Jazz' remaining assets and jump back into the business of importing and selling Jazz's products, including infringing single use cameras even before Benun resigned. Indeed, Ribi Tech is owned by Benun's wife and four children, and Benun serves as Ribi Tech's chief executive officer and manager. This is the same structure of the ownership and management as that of Jazz. Equally outrageous, Ribi Tech, a successor to Jazz in every traditional sense (ownership, business, assets and management are all the same), with Benun, given immunity from successor liability and therefore released from the obligations and risks imposed under the ITC's Cease and Desist Order which otherwise applies to successors. See Cease and Desist Order at Section II, Rosenthal Dec. Exhibit B.

3.      As the Court is all too familiar, Jazz was formed by Benun in 1995 primarily to import, distribute and sell single-use cameras in the United States. Rulings by various courts and administrative bodies have determined that Jazz, at the control, direction and behest of Benun, has consistently and intentionally infringed on Fuji's patents from Jazz's formation in 1995 through at least October 2004. Fuji respectfully submits that Jazz, at the direction of Benun, has continued to infringe on Fuji's patents through March 1, 2005 when this Court directed that Jazz cease operating. See, e.g., Jazz Photo Corp. v. Int'l Trade Comm'n, 264 F. 3d 1094 (Fed. Cir. 2001) ("Jazz v. ITC"); the District Court's decision in Fuji Photo Film, Co. v. Jazz Photo Corp., 249 F. Supp.2d 434, (D.N.J. 2003), aff'd, 394 F.3d 1368 (Fed. Cir. 2005); the ITC Administrative Law Judge's decision in In re Certain Lens Fitted Film Packages, Inv. No. 337-TA-406, Enforcement Proceedings (II), entered on April 6, 2004, adopted by the ITC by orders and opinions dated July 27, 2004 and January 14, 2005 and the decision of the CIT, issued on November 17, 2004, which excluded about 23% of the cameras at issue there even without the benefit of Fuji's participation. In the Enforcement Proceeding, the ITC imposed a civil penalty jointly and severally against Jazz and Benun (both of whom were found to have infringed in bad faith) in the amount of $13,675,000 for violation of the ITC's orders from August 21, 2001 through December 12, 2003. Jazz and Benun were allowed have used the shield of bankruptcy

-4-

to conduct a business grounded in patent infringement, not for the benefit of creditors, but for the benefit of Benun, Polytech, Agfa and Photo Recycling Enterprises ("PRE").  Now this Court is asked to facilitate the seamless continuation of this business, again at the expense of the creditors and Fuji.  This Court should reject out of hand this bad faith sale.

4.      It was apparent from August 2004, when, in response to the ITC's adoption of the ALJ's violation findings, Customs started enforcing the ITC's Orders, that Jazz had a limited life span at best.  Losses mounted from month to month and, in fact, the true extent of Jazz's losses were masked from the Court and creditors by Jazz's apparent failure to record all expenses.  See the various administrative claims filed by employees, former employees, business partners such as Joyfame, Polytech and Agfa, and a customs brokers (J.A.V.), as well as a California warehouse, which is holding part of the inventory on the West Coast and is yet to be heard from, by the taking in an Operating Report of a purported $300,000 credit from Polytech not reflected in the reconciliation accompanying Polytech's administrative claim, and by choosing to ignore the claims by Customs arising out of the demands for redelivery of the shipments erroneously released in November 2004.  The ITC and Federal Circuit decisions on January 14, 2005 merely put nails in the coffin.

5.      Faced with the inevitable collapse of Jazz, Benun apparently acted to create both the inventory at issue and the bases for the huge claims of Polytech, Joyfame and Agfa as follows:

a)      Referring first to the five most recent Polytech shipments on which Agfa allegedly claims a lien and holds the bills of lading, a copy of the Polytech invoices and the Jazz purchase order supporting one, S 50012, dated February 1, 2005 are annexed as Rosenthal Dec. Exhibit C.  All are dated after January 14, 2005, the date of the Federal Circuit and ITC decisions.[2]  The Jazz Purchase Order in Exhibit C is dated January 17, 2005, is for 1.5 million

---

[2]      At a hearing on February 16, 2005, this Court observed that the events of January 14 and 24 (the date of the ITC Opinion in the Enforcement Proceeding) were "such a significant event that there's no way that Jazz would have survived that motion [Conversion].  The Court went on to find that:

single-use cameras and together with the invoices, forms the basis for much of Polytech's administrative claim. The invoices cover 509,016 cameras at a cost of $869,939.68 (not paid by Jazz).

        b)     The five containers were not delivered to Jazz by Polytech in the normal course. All previous orders were delivered with Jazz named as consignee on the bills of lading so that Jazz held title. See Weber[3] email of April 28, 2005, and Polytech invoices of June 8, 2004, December 1, 2004, January 16, 2005 and January 24, 2005 sent thereby, annexed as Rosenthal Dec. Exhibit D. Starting with the January 24, 2005 bill of lading, the "consignee" box stated only "TO ORDER," a change which goes to who holds the title to a shipment. A transportation carrier issues a bill of lading to the shipper acknowledging receipt of the goods to be shipped. The bill of lading contains specific information about the goods, the vessel, the destination and the goods. There are two forms of bill of lading. A non-negotiable, or straight, bill of lading requires the transportation carrier to deliver to the specified consignee named. The bill of lading acts as receipt for the goods and an agreement to transport to a specific designation and consignee. A negotiable bill of lading, typically in the form of "to the order of" and not addressed to a specific consignee, is documentary evidence of title, Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 92n.1 (1st Cir. 1993), as long as the bill of lading is properly issued and negotiated. Since the bill is negotiable, the party listed on the bill might not necessarily be the holder of the bill by the time the goods arrive at its destination. Title is vested in the holder of a negotiable bill of lading. Therefore, the customary practice is for the shipper to send the bills of lading to the intended recipient of the goods. Upon the arrival of the

---

       this company well deserves to be put out of business and this Court welcomes that
       event as part of this settlement, or otherwise. And, I don't want there to be any
       doubt about that. Enough is enough . . . .

Tr. at 143-44 (February 16, 2005).

[3]    Jazz's former Corporate Comptroller who signed all Operating Statements, now Jazz's, Chief Financial Officer and sole officer.

goods, the holder of the bill then presents the bill to claim the goods. In return, the carrier "takes up" or cancels the bill. <u>Id.</u>  When the carrier surrenders goods without taking up the bill of lading, it "remains liable to anyone who has purchased the bill for value in good faith, before or after the improper delivery." <u>Id.</u> "Absent a valid agreement to the contrary, the carrier, the issuer of the bill of lading, is responsible for releasing the cargo only to the party who presents the original bill of lading." <u>Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro</u>, 775 F.2d 476, 481. (2d Cir. 1985).

c)    Since Agfa holds the bills of lading for the five shipments stored in California (even though one of the Polytech invoices provides for delivery to New Jersey (S150003 – Exhibit C), Polytech had failed to deliver good title and has therefore breached the purchase and sale contract with Jazz.  U.C.C. § 2-312(1).

d)    Agfa's alleged security interest in the five shipments was not authorized by Jazz.   In an email dated January 31, 2005, Benun states that he is very disappointed that "Mr. Chung [sic. "Chong" of Agfa HK] has decided to hold the film."  In other words, Agfa was refusing to deliver film for future cameras.  In an email dated February 1, 2005, Benun proposed a security arrangement  <u>for</u>  <u>the</u>  <u>future</u> for film Agfa would advance to Polytech to produce cameras for Jazz.   Agfa responded on February 2, 2005 that Benun's proposal is acceptable "<u>going forward</u>".  (Emphasis added).  By an email of February 2, 2005, 4:44 PM EST (the early morning of the 3rd in Hong Kong) Benun instructs Jesse Szeto (formerly of Jazz HK) and Kitty Wong (Polytech HK) to have their attorneys draw up an agreement between Agfa and Polytech immediately, and advises Agfa that he has done so.  The emails are annexed as Rosenthal Dec. Exhibit E.  All of the 5 Polytech invoices have a "shipped date", presumably when the ship left Hong Kong.  These dates are, respectively, January 17, 2005 (S150003), January 24, 2005 (S150007), January 24, 20005 (S150008), February 1, 2005 (S150012) and February 8, 2005 (S150017).  In each case the invoice is dated the same day as the shipped date.  <u>See</u> Rosenthal Dec. Exhibit C.  Thus, all but S150017 were shipped before the  "security agreement" between Jazz and Agfa was allegedly entered into.  The "security interest" could not have attached to

these cameras, which apparently used film previously delivered by Agfa to Polytech without any security agreement.   As for the fifth container, it is hard to imagine how film released after February 3 (Hong Kong time) can be loaded in cameras and incorporated in a container on board a ship on the 8th. The Imation settlement conference was on February 1, 2005 and by February 9, the settlement providing for Jazz's liquidation had been reached, yet Polytech still shipped the cameras.  Thus, not only did Polytech deliver the cameras without clean title which had been the practice in the past, but the  security agreement approved by Benun for future film deliveries did not apply to the five shipments, so that the Agfa lien claim is without merit (yet Ribi Tech can deduct the amount of the claim from its bid – Purchase Agreement at Sec. 4.5).

e)    Fuji submits that the benefit to the estate of the return of the cameras to Polytech exceeds the benefit of accepting Ribi Tech's bid of 60 cents a camera. An $869,938.98 credit (see Purchase Agreement at Schedule 2.2) plus a credit for the as yet unstated cost of storage in California, taken against Polytech's pre- and post-petition claims would yield to the creditors more than the entire Ribi Tech bid.  Fuji expects the cameras to turn up in Ribi Tech's hands in any event (and therefore will have at least the value that Ribi Tech assigns to each camera – 60 cents).  On information and belief, the Debtor has erroneously rejected returning the good to Poly Tech.

f)    Also included in the inventory are two unexplained shipments of non-single use cameras of a value of more than $82,000 held by Customs for no apparent reason and already paid for by Jazz (by Rosenthal & Rosenthal Letter of Credit).  See Purchase Agreement at Schedule 2.2.  Neither the Purchase Agreement nor any other sale document reveals the nature of the cameras in those shipments.  An inventory of the shipments furnished to Fuji's counsel (see Rosenthal Dec. Exhibit F) at the bidding procedure hearing shows that much of this inventory is labeled with customers' trademarks and/or is destined for specific customers (see "Orders on Hand" column), but were never released to and delivered by Jazz, again without explanation.  Certainly, delivery of the goods to the intended customers would realize additional funds for the estate and would be ordinary course transactions.

g)    On January 25, 2005, Jazz "sold" to Polytech about 75,000 single use cameras in inventory in the United States, 11,088 110-type cameras with Family Dollar packaging and 1,220 power zoom 35 mm cameras for a credit on its debt. Apparently, Polytech "sold" the cameras to PRE, again for a credit on Polytech's debt to PRE. See Rosenthal Dec. Exhibit G annexed hereto. On information and belief, Ribi Tech has already sold some of those single-use cameras in the United States. What makes this transaction incredible is that on January 13, 2005, twelve days earlier, Jazz purchased 50,000 Agfa cameras at $2.50 each (on which a balance is still allegedly owed to Agfa (see Rosenthal Dec. Exhibit H annexed hereto), spent additional sums repackaging the cameras using packaging purchased from Polytech (and not paid for) (see Polytech Administrative claim), and sold the cameras to Wal-Mart for $2.24 each (per Mr. Weber). It is submitted that discovery as to why the inventory of single-use cameras already paid for by Jazz was not repackaged and sold to Wal-Mart, and the circumstances of the various Jazz/Agfa/Polytech transactions, including those relating to the alleged Agfa lien, is likely to reveal evidence of inventory and payment manipulation to the detriment of Jazz's creditors and for the benefit of Benun, Ribi Tech, Polytech and Agfa, supporting a finding of bad faith as to the proposed sale.

6.    In light of the foregoing, it is fair to conclude that many of the cameras at issue were intentionally imported by Jazz to ultimately sell them to Ribi Tech at a discount. What better way for Benun to pick up where he left off than to pay 60 cents per camera for inventory that was charged to the Jazz estate at $1.70-1.80 per camera and to pay next to nothing for an inventory of non-single use cameras for which buyers are already lined up? The highest and best use of the recently acquired five containers of Polytech single-use cameras would be to return them to Polytech for a full value credit and reduce Polytech's alleged administrative claim by a like amount plus the cost of storing the goods. Further, Fuji contends that the sale of the remainder of the inventory to Ribi Tech are inappropriate and violative of the good faith requirement, given Benun's history of bad faith patent infringement and manipulation including post-petition. The Debtor should be instructed to sell the balance of the single-use camera

inventory for scrap and to separately sell the non-single-use camera inventory to its intended customers.    It is submitted that this approach will yield a greater return to creditors while preventing an abuse of the bankruptcy system by Benun.

7.    Fuji submits that based on Benun's track record to date in the business of the importation, distribution and sale of infringing single-use cameras, this Court must reject any sale to an entity controlled by Benun when the likely result is the continued sale of infringing and unlawful single-use cameras.    Fuji submits that this Court would never permit the sale of assets by a debtor that was engaged in an unlawful business even if the sale resulted in positive cash flow for the estate.    The same result should apply to this sale because Jazz is selling unlawful single-use cameras to Ribi Tech.    While most of the detained cameras are subject to pending actions before the CIT and have not yet been found to infringe, the Government, pursuant to 28 U.S.C. § 2639(a)(1), is provided with a rebuttable presumption that decisions by Customs are correct, i.e., that the cameras should be excluded.    In addition, Jazz cameras have repeatedly been found to infringe Fuji's patents and are now subject to the ITC's Cease and Desist Order, but will not be, if sold, as anticipated by the Debtor's motion.    On the facts in this case, the sale of these cameras to any party who seeks to resell them in the U.S., no less to a company organized and run by Benun, is unacceptable and should not be approved by the Court.

8.    The Debtor, Ribi Tech and Benun can be expected to argue that the single-use cameras in the inventory no longer infringe.    But a small sampling of Wal-Mart stores conducted by Fuji and relied upon by the Government before the CIT to oppose Jazz's motions for expedited litigation, reveals that Jazz cameras made on and after July 2004 still infringe Fuji's patents.    In December 2004, twenty-four (24) randomly selected Jazz single-use cameras were purchased from four Wal-Mart stores located in New York and Virginia.    Of the twenty-four (24) cameras purchased, investigation revealed that six (6) were made from the shells of cameras not first sold in the United States (including shells of cameras manufactured by Fuji and Kodak). See Declarations of Matthew W. Siegal, Esq. and Angie M. Hankins, Esq. annexed as Rosenthal Dec. Exhibits I and J respectively (without exhibits).    Thus, under the Federal Circuit's ruling in

Jazz v. ITC they infringe Fuji's patents.  The determination of first sale was made by visual examination of the cases of the LFFPs and consultation with representatives of Fuji, Kodak and Konica.  Jazz packages its cameras in opaque boxes so that the only way to determine the nature of the LFFP shell inside the box is to remove the camera from the box.  While not determinative of the precise number of infringing cameras for sale, it is statistically impossible for a small random sample to turn up 25% infringing shells, as was found by the CIT, if essentially all of the shells were from cameras first sold in the United States.   See Declaration of Michael Rappaport annexed as Rosenthal Dec. Exhibit K.

9.     In the CIT, a Jazz witness testified that:   "[o]nly Kodak, Fuji, Konica and Concord brand shells are chosen for production for the United States."   Jazz Photo Corp. v. United States, 353 F. Supp.2d 1327, 1344 ("Jazz v. U.S.").  The CIT relied on that testimony to support of its first sale findings.  Yet the inspection reports produced by Jazz and admitted into evidence when the record was reopened after the end of the trial to receive evidence on the segregation of LFFPs made from shells supplied by Seven Bucks reveal that Polytech also knowingly refurbished shells from Achiever Industries Ltd. ("Achiever") (not mentioned by the Jazz witness).   Id. at 1352-55; Report dated November 7, 2004 by Customs and Border Protection regarding the Court ordered segregation of Jazz cameras made from Seven Bucks shells with annexed inspection reports, annexed as Rosenthal Dec. Exhibit L.   The tables relied on by Jazz show that the shipments at issue included cameras refurbished from Achiever shells (designated by Jazz model number 306),[4] which Jazz well knows are not even licensed by Fuji, and cannot satisfy the first sale test.  Compare Rosenthal Dec. Exhibit L (2 of 2 of 8/1/04)) with EID (II) at 17 (Jazz shell model no. 306 is an Achiever shell), (Rosenthal Dec. Exhibit M); Jazz v. U.S., 353 F. Supp.2d at 1329.

---

[4]     Fuji can only recognize those Jazz model numbers identified in the ITC Enforcement Proceeding.

10.    Not only does this evidence of continued infringement support the need for a sampling of the inventory before it is released (in a quantity agreed to by the Government, Fuji and Jazz), but it supports a finding of bad faith which precludes a sale to Ribi Tech under any circumstances.[5]

11.    In addition, the proposed sale order with its "free and clear" effect is a thinly veiled attempt to absolve Benun from the risk of alter ego, successor liability, or similar type claims that may be brought by the ITC, Fuji and other creditors, and to prevent the creditors of Jazz from pursuing assets purchased by Ribi Tech pursuant to a Court order.  Given the facts here, Fuji respectfully submits that the Court cannot approve any sale of assets to Ribi Tech under the standards articulated by the United States Court of Appeals for the Third Circuit in In Re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3rd Cir. 1986), and 11 U.S.C. §363(m). The Third Circuit in Abbotts Dairies requires that the Bankruptcy Court to determine that the purchaser of the debtor's assets is a good faith purchaser.  The Third Circuit construed the "good faith buyer" standard to mean one who purchases the assets "in good faith" and for "value".  Id. at 147.

12.    The facts of the Third Circuit's decision in Abbotts Dairies, while generally overlooked, are particularly instructive.  The Bankruptcy Court, after limited notice, approved of the sale of substantially all of the debtor's assets.  The Third Circuit first determined that while no stay was sought, because the sale was not in good faith as defined in Bankruptcy Code §363(m), the order approving the sale was not moot.  Accordingly, the Third Circuit reversed and remanded with instructions.

13.    While Jazz discloses the relationships between Benun, his wife and his children with Jazz and Ribi Tech, that does not mean that the proposed buyer (Ribi Tech) is a buyer in

---

[5]    Fuji has instituted an action for patent infringement in the District Court against Benun, Ribi Tech, Polytech Hong Kong and Polytech China and has moved for a preliminary injunction. After a hearing on May 2, 2005, Magistrate Judge Schwartz adjourned the return date to May 25, 2005 because no lawyer had, as yet, been retained by Benun and Ribi Tech.  See May 2, 2005 Order annexed as Rosenthal Dec. Exhibit N.

"good faith" or is paying fair value.  Good faith speaks to the sale process and whether there is fraud, collusion or "an attempt to take grossly unfair advantage of other bidders."  Id. at 147. Factual findings of good faith are required and would be impossible to make in this instance. Id. at 148.    Here, Benun seeks to take advantage of the Court and the creditors of the Jazz estate.

14.    In addition, there is no proof or showing that fair value is being paid.  The fact that bids were solicited and there was only the Ribi Tech bid is not indicative of a conventional auction.  In this case, much of the inventory is burdened by liens of undetermined amounts for freight, customs brokerage service and storage.  Much of the inventory is stored in special Customs-approved warehouses with limited access.  No one could provide Fuji with answers to the most elemental questions (such as whether anyone can confirm that the inventory is in place and what documents and payments were required to obtain their release).  (See Lawrence Rosenthal email of May 4, 2005 to Joe Weber, which went unanswered, annexed as Rosenthal Dec. Exhibit O).  In effect, bidders were expected to pay for a pig in a poke.  Where only Benun knows the facts, the formal bidding procedure does not equate with the establishment of fair value, let alone good faith.

15.    Where, as here, a debtor proposes to sell assets to an insider, the sale is subject to a higher level of scrutiny by the Court.  See In re W.A. Mallory Co., Inc.,  214 B.R. 834, 837 (Bankr. E.D. Va. 1997).    In that case, the debtor proposed to sell assets to the debtor's president's sisters.  Recognizing the potential for abuse, the Mallory court was concerned with "whether the sales are truly at arm's length or an attempt by the debtor to abuse the bankruptcy process to discharge unwanted debt."  Id.  Ultimately, the court was not convinced that the sale was on the level and refused to approve it.  Fuji submits that the circumstances of this case are analogous to the facts of the Mallory case inasmuch as the Debtor is seeking to sell assets to its principal (Benun) and his family.

16.    In addition, Ribi Tech is nominally owned by Mona Benun (Benun's wife) and Benun's children.  A sworn statement must be submitted to the Court demonstrating the source

-13-

of the purchase price, as serious issues concerning potential fraudulent transfers and preferences from the Jazz estate to Benun and Benun's individual chapter 7 proceeding have been raised. This must be required under § 363 of the Bankruptcy Code.

   **WHEREFORE**, Fuji respectfully requests that the Court deny the Motion of Jazz for the entry of an order authorizing the sale substantially all of its remaining assets to Ribi Tech, and grant such other and further relief as is just and equitable.

         Respectfully submitted,

         **LOWENSTEIN SANDLER PC**

         By: _s/ Bruce Buechler_
         Michael Etkin, Esq.
         Bruce Buechler, Esq.
         S. Jason Teele, Esq.
         65 Livingston Avenue
         Roseland, New Jersey 07068
         Telephone: 973.597.2500
         Facsimile: 973.597.2400

         -and-

         **Stroock & Stroock & Lavan LLP**
         Lawrence Rosenthal, Esq.
         Kristopher M. Hansen, Esq.
         Douglas H. Mannal, Esq.
         180 Maiden Lane
         New York, NY 10038
         Telephone: 212.806.5400
         Facsimile: 212.806.6006

         Co-Counsel for Fuji Photo Film Co., Ltd.

Dated: May 13, 2005